**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH, DANIEL FRIED and PAT CAPRA, | Case No. |
| Plaintiffs, | |
| v. | |
| MONEYLION TECHNOLOGIES INC. and CONTINENTAL STOCK TRANSFER & TRUST COMPANY, | **COMPLAINT** |
| Defendants. | |

Plaintiffs Jeffrey Frommer, Lyusen (Louis) Krubich, Daniel Fried and Pat Capra (collectively, "Plaintiffs" or "Seller Members"), all non-residents of New York, by and through their undersigned counsel, bring this action against Defendant MoneyLion Technologies Inc. ("MoneyLion"), a New York-based corporation, and nominal Defendant Continental Stock Transfer & Trust Company ("Continental"; together with MoneyLion, "Defendants"), a New York-based corporation, and hereby respectfully allege as follows:

**NATURE OF THE CASE**

1.      This is an action for breach of contract and injunctive relief arising from the Membership Interest Purchase Agreement, dated as of November 15, 2021, and entered into by MoneyLion and the Seller Members ("MIPA").[1]

---

[1] Capitalized terms referenced herein but not otherwise defined shall have the meanings assigned to such terms in the MIPA.

### A.      The Vested Shares

2.      Pursuant to the MIPA, the Seller Members sold 100% of their membership interest in Malka Media Group LLC ("Malka"), a company they founded, to MoneyLion.  In exchange, MoneyLion agreed to provide the Seller Members with a certain amount of cash as well as MoneyLion shares valued at $30 million at the closing ("Closing Stock Payment").  In addition, if Malka achieved certain financial targets in 2021 and 2022, MoneyLion would also provide the Seller Members with additional MoneyLion shares, valued at $10 million ("2021 Earnout Payment") and $25 million ("2022 Earnout Payment"), respectively.

3.      With respect to the Closing Stock Payment and 2021 Earnout Payment, MoneyLion issued both tranches of shares owed to the Seller Members, totaling $40 million.  The issued shares were initially subject to restrictions on voting rights and transfers until the shares vested, which was to occur over a four-quarter period.  In fact, the shares were issued with a restrictive legend that detailed the vesting schedule.

4.      As of September 30, 2022, the shares issued as part of the Closing Stock Payment were fully vested, and freely transferable.  Similarly, as of December 31, 2022, the shares issued as part of the 2021 Earnout Payment were fully vested, and freely transferable.  However, MoneyLion has refused to direct, or otherwise cause, its transfer agent, Continental, to remove the restrictive legends or other purported restrictions associated with the Seller Members' shares in the custody and control of Continental.  Without those restrictions removed, the Seller Members cannot access the shares issued to them as part of the Closing Stock Payment and 2021 Earnout Payment.

### B.      The 2022 Earnout Payment

5.      MoneyLion has engaged in further bad faith actions to deprive the Seller Members of the 2022 Earnout Payment.  Like the 2021 Earnout Payment, the Seller Members were required

to achieve certain financial targets related to Malka's revenue and EBITDA.  Although Malka achieved those targets, MoneyLion has refused recognize that achievement and issue the shares owed to the Seller Members.  Instead, MoneyLion has claimed that certain adjustments to Malka's revenue and EBITDA are warranted, but these adjustments disregard the proper calculations and methodologies explicitly set forth in the MIPA.  Moreover, the MIPA requires 2022 revenue and EBITDA to be calculated using the same methodologies for the 2021 earnout period, and MoneyLion never made these adjustments in 2021, when it delivered the 2021 Earnout Payment to the Seller Members.

6.      Not only has MoneyLion refused to deliver the 2022 Earnout Payment, as it should, it has stonewalled the Seller Members' ability to resolve the parties' dispute in accordance with the MIPA's resolution procedure, which requires a "good faith" negotiation and then the selection of an Independent Accountant to resolve the dispute.  MoneyLion has continuously employed delay tactics to drag out the resolution process, including refusing to provide any written response to the Seller Members' objections to MoneyLion's financial adjustments and refusing to retain an Independent Accountant.  As a result of MoneyLion's multiple breaches, the Seller Members have been improperly deprived of the 2022 Earnout Payment, which MoneyLion was contractually required to deliver under the MIPA.

7.      Accordingly, Plaintiffs bring the instant action to enforce their contractual rights.

8.      First, Plaintiffs seek an order directing MoneyLion and Continental to deliver shares representing the Closing Stock Payment and 2021 Earnout Payment free of any legends or other restrictions now that such shares have vested.  The Seller Members have no adequate remedy at law, and respectfully request that the Court issue an injunction directing MoneyLion to lift all

legends and restrictions, and take any other steps that are needed to permit and provide Plaintiffs with full and free access to their fully vested shares.

9.      Second, Plaintiffs seek damages related to MoneyLion's failure to deliver the $25 million 2022 Earnout Payment and failure to engage in the MIPA's resolution process, which also denied Plaintiffs the $25 million in MoneyLion shares representing the 2022 Earnout Payment, plus prejudgment and post-judgment interest, attorneys' fees, costs and expenses, and such other and further relief that the Court deems just and proper.

10.     In the alternative, Plaintiffs seek specific performance and an order directing MoneyLion to comply with its obligations under Sections 2.06(b)(v) and 2.06(e) to deliver the 2022 Earnout Payment and the number of shares that would have been conveyed in Q1 2023 under the formula set forth in the MIPA, including determining that Malka's 2022 EBITDA exceeded the $100,000 threshold and Plaintiffs are owed the 2022 Earnout Payment.

11.     Finally, Plaintiffs seek indemnification from MoneyLion under the MIPA for its multiple breaches, which are "post-closing covenant[s], agreement[s] or obligation[s]," and Plaintiffs are entitled to recover all Losses (as defined in the MIPA) incurred by Plaintiffs, including attorneys' fees, costs and expenses reasonably incurred, related to this action.

## PARTIES

12.     Plaintiff Jeffrey Frommer is a natural person resident in the State of New Jersey.

13.     Plaintiff Lyusen (Louis) Krubich is a natural person resident in the State of California.

14.     Plaintiff Daniel Fried is a natural person resident in the State of California, and has been a domiciliary of California for several years.

15.     Plaintiff Pat Capra is a natural person resident in the State of New Jersey.

4

16.     Defendant MoneyLion is a Delaware corporation with a principal place of business located at 30 W 21st Street, Ninth Floor, New York, NY 10010.

17.     Defendant Continental is New York corporation with a principal place of business located at 1 State Street, 30th floor, New York, NY 10004.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00.

19.     This Court has personal jurisdiction over Defendants pursuant to New York Civil Practice Law & Rules ("CPLR") §§ 301 and 302(a) because both have their headquarters in New York, New York, where they take advantage of the laws and protections of New York, and Defendants have acted and transacted business within this District with respect to the facts and circumstances underlying this dispute, including their actions related to Plaintiffs' issued shares that are under the control of Continental in New York, New York.

20.     Furthermore, MoneyLion has consented to personal jurisdiction and venue in this Court.  Section 5.4 of the Registration Rights Agreement, dated November 15, 2021 ("RRA") – which was executed as part of the MIPA and sets forth certain obligations breached by MoneyLion – provides that "[a]ny legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of New York in each case located in the city of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding."

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions giving rise to the claims occurred in New York, and in that both

MoneyLion and Continental are subject to this Court's personal jurisdiction and MoneyLion has consented to venue in this Court.

## FACTUAL ALLEGATIONS

**I.     The Relevant Agreements And Issuance Of Certain Shares To The Seller Members**

*A.     Closing Stock Payment*

22.     The Seller Members founded the company Malka, and until November 15, 2021, they owned 100% of Malka's membership interests.

23.     On November 15, 2021, the Seller Members entered into the MIPA, whereby they sold 100% of their membership interests in Malka to MoneyLion, which constituted selling the entirety of Malka to MoneyLion.

24.     Under the terms of the MIPA, MoneyLion agreed to provide the Seller Members with cash consideration and a distribution of MoneyLion shares valued at $30 million (*i.e.*, Closing Stock Payment).  MoneyLion was to deliver the cash and MoneyLion shares constituting the Closing Stock Payment to the Seller Members at the Closing of the transactions contemplated by the MIPA.  *See* MIPA § 2.03(a).

25.     As relevant here, MoneyLion delivered the Closing Stock Payment in the form of restricted MoneyLion shares.  The shares were to vest in four equal installments on December 31, 2021, March 31, 2022, June 30, 2022, and September 30, 2022.  Thus, as of September 30, 2022, the MoneyLion shares constituting the Closing Stock Payment were to be fully vested and freely transferable.  *See* MIPA § 2.03(a)(ii).

26.     Section 2.03(a)(ii) of the MIPA also required the Seller Members to execute a Restricted Stock Agreement (as reflected in Exhibit C to the MIPA) and a Registration Rights Agreement (as reflected in Exhibit D to the MIPA). *See also* MIPA § 5.15.

27.     On or about November 15, 2021, the Seller Members executed a Restricted Stock Agreement ("RSA") and the RRA.

28.     Pursuant to Section 5 of the RSA, the Seller Members were not allowed to vote or transfer the MoneyLion shares issued as part of the Closing Stock Payment until the shares vested, thereby becoming "Earned Shares" under the terms of the RSA.

29.     Section 2 of the RSA reiterated the vesting schedule of Section 2.03(a)(ii) of the MIPA for the MoneyLion shares issued as part of the Closing Stock Payment, which is that the shares would vest in four equal installments on December 31, 2021, March 31, 2022, June 30, 2022, and September 30, 2022.  Thus, under both the MIPA and RSA, the MoneyLion shares issued as part of the Closing Stock Payment would be fully vested (*i.e.*, Earned Shares) by September 30, 2022.

30.     Upon information and belief, MoneyLion filed a registration statement covering all the shares conveyed to the Seller Members as of September 30, 2022, and such shares should all be freely tradeable.  To the extent MoneyLion has not already made this filing, it should immediately do so to cure the continuing breach of its obligation to file.

31.     As provided in Section 9 of the RSA, the shares as conveyed to the Seller Members contained a restrictive legend representing that the shares were "restricted" and the Seller Members could not transfer, pledge or otherwise dispose of such shares ("Restrictive Legend").  In particular, the Restrictive Legend states:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND NEITHER THE SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR SUCH LAWS OR AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT AND SUCH LAWS WHICH, IN THE OPINION OF COUNSEL, IS AVAILABLE.

THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE RESTRICTIONS (INCLUDING RESTRICTIONS ON TRANSFER) SET FORTH IN THE AMENDED AND RESTATED BYLAWS OF THE CORPORATION AS IT MAY BE AMENDED AND/OR RESTATED (A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE CORPORATION AND SHALL BE PROVIDED FREE OF CHARGE TO ANY STOCKHOLDER MAKING A REQUEST THEREFOR).

THE SECURITIES REPRESENTED HEREBY SHALL NO LONGER BE SUBJECT TO FORFEITURE IN FOUR EQUAL INSTALLMENTS ON DECEMBER 31, 2021, MARCH 31, 2022, JUNE 30, 2022, AND SEPTEMBER 30, 2022, AS SET FORTH IN AN AGREEMENT BETWEEN THE CORPORATION AND THE REGISTERED HOLDER, OR SUCH HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION.

32.     This Restrictive Legend should have been removed from the Seller Members' shares issued as part of the Closing Stock Payment by MoneyLion once the shares became fully vested and freely tradeable as of September 30, 2022.

33.     However, to date, MoneyLion has not removed the Restrictive Legend despite repeated requests from the Seller Members to do so.

### B.     2021 Earnout Payment

34.     Under the MIPA, MoneyLion also agreed to provide the Seller Members with additional MoneyLion shares valued at $10 million if Malka achieved certain financial targets in 2021 (*i.e.*, 2021 Earnout Payment).  *See* MIPA §§ 2.06(a) and 2.06(b)(v)(A).

35.     Malka achieved the financial targets set for 2021, and MoneyLion delivered the 2021 Earnout Payment to the Seller Members on or about March 31, 2022.  The shares were to vest in four equal installments on March 31, 2022, June 30, 2022, September 30, 2022, and December 31, 2022.  Thus, as of December 31, 2022, the MoneyLion shares constituting the 2021 Earnout Payment were to be fully vested and freely transferable.  *See* MIPA § 2.06(b)(v).

36.     In connection with the 2021 Earnout Payment, the Seller Members executed another Restricted Stock Agreement, which has substantially the same terms as the November 15, 2021 RSA.

37.     As a result, the Seller Members were not allowed to vote or transfer the MoneyLion shares issued as part of the 2021 Earnout Payment until the shares vested, thereby becoming "Earned Shares" under the terms of the RSA.  In other words, the MoneyLion shares issued as part of the 2021 Earnout Payment would be fully vested (*i.e.*, Earned Shares) by December 31, 2022.

38.     Upon information and belief, MoneyLion filed a registration statement covering all the shares conveyed to the Seller Members as of December 31, 2022, and such shares should all be freely tradeable.  To the extent MoneyLion has not already made this filing, it should immediately do so to cure the continuing breach of its obligation to file.

39.     However, again, the MoneyLion shares issued as part of the 2021 Earnout Payment contained the Restrictive Legend, and it has not been removed even though the shares are fully vested and freely tradeable as of December 31, 2022.

40.     To date, MoneyLion has not removed the Restrictive Legend despite repeated requests from the Seller Members to do so.

## II.     MoneyLion Fails To Remove Stock Restrictions In Breach Of The MIPA, RSA And RRA

41.     As detailed above, MoneyLion should have removed the Restrictive Legend from the shares issued as part of the Closing Stock Payment and the 2021 Earnout Payment when such shares became fully vested and freely tradeable as of September 30, 2022 and December 31, 2022, respectively.

42.     All of the Seller Members' shares subject to the Restrictive Legend are in the custody and control of MoneyLion's transfer agent, Continental.  As such, MoneyLion should have directed Continental to remove the Restricted Legend.

43.     Instead, in breach of its obligations under the MIPA, RSA and RRA, MoneyLion failed to direct, and continues to fail to direct, Continental to remove the Restrictive Legend.

44.     Despite due demand on both MoneyLion and Continental by the Seller Members, Defendants have refused to remove the Restrictive Legend or otherwise permit the Seller Members to access their shares free of the restrictions imposed by the Restrictive Legend.

45.     For example, in or around early June 2023, the Seller Members contacted Continental to request the removal of the Restrictive Legend from their shares.  In response, Continental advised the Seller Members that MoneyLion had issued a "stop order" for their shares, and that Continental could not remove the Restrictive Legend without MoneyLion's consent.

46.     Thereafter, on or about June 14, 2023, counsel for the Seller Members sent a letter to representatives for MoneyLion and Continental requesting the removal of the Restrictive Legend and all other restrictions on the Seller Members shares.  The letter outlined the fact that there was no justification for continuing to restrict the Seller Members shares within Continental's custody when the shares had fully vested.

47.     MoneyLion has never responded to the June 14th letter.

48.     As of July 20, 2023, the Seller Members have fully vested MoneyLion shares within the custody and control of Continental that are improperly subject to the Restricted Legend as follows:

|                 | MoneyLion Shares |
|-----------------|------------------|
| Jeffrey Frommer | 241,968          |
| Lyusen Krubich  | 246,466          |
| Daniel Fried    | 60,786           |
| Pat Capra       | 48,873           |

49.     MoneyLion's refusal to remove the restrictions on the Seller Members' shares, including the Restrictive Legend, breached its obligations under the MIPA, RSA and RRA.  It is evident that MoneyLion does not intend to ever remove the restrictions on the Seller Members' shares unless ordered to do by this Court.

50.     Accordingly, the Seller Members have no adequate remedy at law, and injunctive relief from this Court is necessary to have the Restrictive Legend and other purported restrictions removed from their shares.

### III.   MoneyLion Fails To Deliver 2022 Earnout Payment In Breach Of The MIPA

#### A.     *MoneyLion Refuses To Recognize That The Seller Members Earned The 2022 Earnout Payment*

51.     As with the 2021 Earnout Payment, under the MIPA, the Seller Members were also entitled to additional MoneyLion shares valued at $25 million if Malka achieved certain financial targets in 2022 (*i.e.*, 2022 Earnout Payment).  *See* MIPA §§ 2.06(a) and 2.06(b)(v)(B).

52.     Pursuant to Section 2.06(b)(v)(B) of the MIPA, to be entitled to the 2022 Earnout Payment, Malka was required to achieve two financial targets: revenue in excess of $30 million ("Maximum 2022 Revenue Amount") and EBITDA in excess of $100,000 ("Minimum 2022 EBITDA Amount").[2]  If Malka did not achieve both financial targets, it would not receive any earnout payment for 2022.  *See* MIPA § 2.06(b)(v)(B).[3]

---

[2] EBITDA generally refers to Earnings Before Interest, Taxes, Depreciation, and Amortization.  The specific definition of EBITDA applicable here is defined in Article I of the MIPA.

[3] Under Section 2.06(b)(v)(B) of the MIPA, the Seller Members could have received less than $25 Million in shares as the 2022 Earnout Payment if Malka's revenue was less than $30 million and more than $20.1 million.  Because Malka's 2022 revenue – even as underreported by MoneyLion – exceeded the Maximum 2022 Revenue Amount (*i.e.*, $30 million), there is no dispute that the amount of the 2022 Earnout Payment owed to the Seller Members is the maximum amount of $25 million in shares.

53.    Based upon Malka's 2022 financial records, the Seller Members achieved the financial targets, but MoneyLion claimed that Malka did not achieve the financial targets after MoneyLion made a number of adjustments to Malka's financial records.   MoneyLion's adjustments were reflected in a Notice of Delivery of Earnout Statement dated April 14, 2023, which attached Malka's adjusted 2022 Earnout Statement ("2022 Earnout Statement").

54.    Based upon MoneyLion's 2022 Earnout Statement, Malka achieved the Maximum 2022 Revenue Amount (*i.e.*, $30 million) with revenue of approximately $40 million for 2022. For EBITDA, however, the 2022 Earnout Statement reflected approximately negative $2.8 million, meaning according to MoneyLion, Malka did not achieve the Minimum 2022 EBITDA Amount (*i.e.*, $100,000).

55.    Following receipt of the 2022 Earnout Statement, as permitted by the MIPA, the Seller Members questioned MoneyLion regarding its financial adjustments and submitted detailed objections to the 2022 Earnout Statement ("Seller Members' 2022 Earnout Statement Objections") on May 25, 2023.  *See* MIPA § 2.06(b)(ii)-(iii).

56.    The Seller Members' 2022 Earnout Statement Objections detailed specific line items that MoneyLion improperly adjusted to underreport Malka's revenue and increase Malka's expenses to deny the Seller Members the 2022 Earnout Payment.   In particular, the Seller Members' 2022 Earnout Statement Objections highlighted the fact that MoneyLion's calculations disregarded the fact that the MIPA required the calculation of revenue and EBITDA for 2022 earnout purposes to be based upon Malka's historical accounting principles – not MoneyLion's

accounting principles that followed GAAP – and consistent with Malka's method of calculation for the 2021 earnout period.[4]

57.    For example, under Section 2.06(b)(i) of the MIPA, MoneyLion was required to prepare the 2022 Earnout Statement "in good faith and in accordance with the Revenue and EBITDA Calculation Principles," which are detailed in Schedule B of the MIPA.  Schedule B provides that the appropriate calculation of the Revenue Amount is "revenue recognized according to [Malka's] historical revenue recognition principles…."  Likewise, under Schedule B, the EBITDA Amount is to be calculated by applying "[Malka's] historical revenue and cost recognition principles."  Schedule B also refers to other adjustments that must be made in determining the appropriate Revenue Amount and EBITDA Amount, and it is evident that Malka's historical principles are the proper starting point.

58.    MoneyLion's adjustments in the 2022 Earnout Statement miscalculated the Revenue Amount and EBITDA Amount, as defined in the MIPA.  As detailed in the Seller Members' 2022 Earnout Statement Objections, if MoneyLion had properly calculated Malka's Revenue Amount and EBITDA Amount for 2022, the Seller Members would be entitled to the maximum Earnout Payment of MoneyLion shares valued at $25 million.  *See* MIPA § 2.06(v)(B).

59.    As to the Revenue Amount, MoneyLion does not dispute that Malka exceeded the Maximum 2022 Revenue Amount ($30 million) because its own underreported calculation of the Revenue Amount (*i.e.*, $40 million) exceeds that threshold.  However, if the Revenue Amount were properly calculated, as required by the MIPA, then Malka's Revenue Amount would have

---

[4]  GAAP refers to United States generally accepted accounting principles.

been at least approximately $42.5 million, plus $1.8 million to reflect the discount Malka gave MoneyLion for intercompany services.

60.      As to the EBITDA Amount, when properly calculated in accordance with the MIPA, Malka's EBITDA was at least approximately $1.62 million, plus the additional $1.8 million in revenue, as noted above, and an additional $1.6 million for a New Jersey Tax Credit disregarded by MoneyLion, for a total EBITDA of at least approximately $5 million.  Thus, Malka easily exceeded the Minimum 2022 EBITDA Amount ($100,000).

61.      In addition to making improper adjustments in the 2022 Earnout Statement, MoneyLion's calculations for the 2022 Earnout Statement – and utter disregard for Malka's historical accounting practices – were inconsistent with past practice because MoneyLion had not suggested any of these adjustments related to the 2021 Earnout Payment.  MoneyLion accepted Malka's financial records in 2021, which were based upon historical accounting practices and Schedule B of the MIPA, and subsequently issued the 2021 Earnout Payment shares.

62.      MoneyLion's departure from its acceptance of Malka's financials in 2021 was not only odd, but it was also prohibited by the MIPA.  Under Section 2.06(b) of the MIPA, the parties agreed:

> For the avoidance of doubt, it is the intention of the Parties that the 2021 Revenue Amount and the 2021 EBITDA Amount and the 2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using substantially consistent methods and practices.

63.      Despite this clear expression of the parties' intentions, MoneyLion's 2022 Earnout Statement ignored how the parties actually calculated revenue and EBITDA in the prior year (2021) for determining the Earnout Payment.  As in 2021, the Seller Members exceeded the revenue and EBITDA targets for 2022, and they are entitled to the maximum 2022 Earnout Payment.

**B.**     *MoneyLion Derails The Resolution Process For The 2022 Earnout Payment*

64.     Section 2.06(b)(iii)-(iv) of the MIPA contains a resolution process for disputes related to the Earnout Payment.  Following delivery of the Seller Members' objections to MoneyLion's earnout calculations, the parties are required to "negotiate in good faith to resolve such dispute within thirty (30) days."  If there are remaining disputes, then the matter is required to be submitted to an Independent Accountant for resolution.  The Independent Accountant is to be mutually agreed upon by the parties.  *See* MIPA, Article I (definition of "Independent Accountant").

65.     Although the Seller Members have faithfully followed the MIPA's procedure for resolving their objections to MoneyLion's 2022 Earnout Statement, MoneyLion has acted in bad faith by holding to meritless positions even after they have been refuted and by delaying and obfuscating the process – rendering the MIPA's procedures futile.

66.     The Seller Members' 2022 Earnout Statement Objections were delivered to MoneyLion on May 25, 2023, but MoneyLion never provided a written response to the Seller Members' detailed objections.  In fact, as of today – nearly 60 days later – MoneyLion has not provided a written response to the Seller Members' detailed objections or provided a single point to address the bulk of the Seller Members' objections to its adjustments.

67.     Because of MoneyLion's failure to engage in good faith negotiations, as required by the MIPA, the Seller Members requested a list of possible Independent Accountants that it would find acceptable.  MoneyLion provided a list of three potential Independent Accountants, and the Seller Members agreed to use one of the Seller Members' proposals ("Selected Independent Accountant").

68.    On or about June 27, 2023, the parties contacted the Selected Independent Accountant.  Following an initial call with the Selected Independent Accountant, the parties received an engagement letter to formally retain the Selected Independent Accountant.

69.    The Seller Members advised MoneyLion that they were agreeable with the engagement letter, with some revisions, but MoneyLion never acquiesced to the engagement letter. In fact, despite the passage of two weeks, MoneyLion did not provide any comments on the engagement letter.

70.    Instead of moving forward with the Selected Independent Accountant – a person MoneyLion proposed – MoneyLion again delayed and ignored the Seller Members' requests to finalize the engagement letter.  When MoneyLion finally responded to the Seller Members' multiple emails and calls, it indicated that the MIPA's resolution process is not appropriate here.

71.    In other words, MoneyLion was never going to move forward with retaining the Selected Independent Accountant or any Independent Accountant.

72.    In fact, MoneyLion stated that it would only participate further with the Independent Accountant process if the Seller Members agreed to materially change the MIPA resolution terms to expand the scope of the Independent Accountant's contractual role as set forth in the MIPA.  This insistence on material deviation of the MIPA represents yet another breach.

73.    MoneyLion has not cooperated promptly or reasonably with the Seller Members on retaining an Independent Accountant.  Indeed, MoneyLion's actions throughout the MIPA's resolution process reflect a bad faith attempt to delay and deprive the Seller Members of the 2022 Earnout Payment as long as possible.

74.    MoneyLion's bad faith is also evident from its failure to award the Seller Members the 2022 Earnout Payment because it has no basis to deny that Malka achieved the financial targets

for 2022.  The MIPA sets forth a contractual obligation to address the financial issues in good faith, which required MoneyLion to act reasonably and maintain some basis for each of its "adjustments."  *See* MIPA § 2.06(b)(iii) (noting that MoneyLion and the Seller Members "shall negotiate in good faith to resolve such dispute within thirty (30) days after the delivery of the [Seller Members' 2022 Earnout Statement Objections]").  MoneyLion disregarded this undertaking despite being given irrefutable proof that the bulk of its adjustments were meritless.

75.     As set forth in paragraphs 51-63, above, the Seller Members have satisfied the financial targets to receive the maximum 2022 Earnout Payment of shares valued at $25 million. This has been made clear to MoneyLion on multiple occasions, and it has offered no valid counter.

76.     Indeed, the fact that Malka achieved the financial targets was clear once MoneyLion received Malka's 2022 financial records, and further confirmed once MoneyLion received the Seller Members' 2022 Earnout Statement Objections.  And confirmed again during the 30-day "good faith' negotiation process, where MoneyLion had no substantive response to the Objections.

77.     Thus, it is an unmistakable fact that Malka exceeded the Maximum 2022 Revenue Amount ($30 million) and the Minimum 2022 EBITDA Amount ($100,000), and, therefore, the Seller Members are entitled to the maximum 2022 Earnout Payment.

78.     MoneyLion's failure to accept this fact at any point during the MIPA's resolution process, and deliver the 2022 Earnout Payment is a breach of the MIPA.

79.     In addition, by refusing to retain the Selected Independent Accountant, or reasonably cooperate with the selection of any Independent Accountant, MoneyLion has breached the MIPA.

80. Because of MoneyLion's breaches to deprive the Seller Members of the 2022 Earnout Payment, the Seller Members are entitled to the recovery of the full amount of the $25 million shares, in cash plus interest or shares, whichever is greater. *See* MIPA § 2.06(v)(B).

81. The shares issued as part of the 2022 Earnout Payment were also subject to a vesting schedule similar to the 2021 Earnout Payment, where they were to vest in four equal installments on March 31, 2023, June 30, 2023, September 30, 2023, and December 31, 2023. *See id.*

82. Alternatively, because of MoneyLion's breaches, the Seller Members request specific performance, and an order requiring MoneyLion to comply with its obligations under Sections 2.06(b)(v) and 2.06(e) to deliver the 2022 Earnout Payment and the number of shares that would have been conveyed in Q1 2023 under the formula set forth in the MIPA had MoneyLion timely complied with its contractual obligations. In so ruling, the Court should determine that Malka's 2022 EBITDA exceeded the $100,000 threshold and the Seller Members are owed the 2022 Earnout Payment.

## FIRST CAUSE OF ACTION
### (Breach Of Contract Against MoneyLion)
### (Vested Shares)

83. Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

84. The MIPA, RSA and RRA constitute valid and enforceable contracts between Plaintiffs and MoneyLion. New York law governs the RRA, and Delaware law governs the MIPA and RSA. *See* RRA § 5.4; MIPA § 9.10; RSA § 12.

85. Plaintiffs have complied with their obligations under the MIPA, RSA and RRA.

86. MoneyLion's actions, as set forth above, have breached multiple provisions of the parties' contracts. For example, MoneyLion's breaches include, but are not limited to, the following:

a) Sections 2.02 and 2.03(a) of the MIPA, where MoneyLion was obligated to deliver the Aggregate Purchase Price to the Seller Members, which included the Closing Stock Payment – which has yet to be fully delivered to the Seller Members due to Defendants' improper restrictions on the issued shares.

b) Sections 2.06(a) and 2.06(b)(v) of the MIPA, where MoneyLion was obligated to deliver the Earnout Payment Amount to the Seller Members as "additional consideration" for the transaction, which included the 2021 Earnout Payment – which has yet to be fully delivered to the Seller Members due to Defendants' improper restrictions on the issued shares.

c) Section 5.10 of the MIPA, where MoneyLion was obligated to "execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions [of the MIPA] and give effect to the transactions contemplated by this Agreement."

d) Sections 2 and 5 of the RSA, where MoneyLion was obligated to remove all restrictions associated with shares issued to the Seller Members once they become vested (defined as Earned Shares).

e) Section 3.5 of the RRA, where MoneyLion was obligated to "take such further action as any [Seller Member] may reasonably request, all to the extent required from time to time to enable such [Seller Member] to sell shares of Common Stock held by such [Seller Member] without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 promulgated under the Securities Act, including providing any legal opinions."

87.     As a result of MoneyLion's multiple breaches, Plaintiffs are unable to access the shares MoneyLion agreed to distribute and make freely available to Plaintiffs.

88.     Because the MoneyLion shares are publicly traded, Plaintiffs are involuntarily subject to the volatility and potential decline of MoneyLion's shares with no recourse.  Until Plaintiffs are able to freely sell or hypothecate their fully vested MoneyLion shares, the shares remain vulnerable to price volatility in the market.  Indeed, regardless of the stock price, Plaintiffs remain unable to realize any of the value from these shares while they are improperly restricted.

89.     Plaintiffs have no adequate remedy at law.  The harm caused to Plaintiffs is continuing and irreparable, and can only be cured through an order directing Defendants to remove all restrictions on the shares in the custody and control of Continental, including the Restrictive Legend.

## SECOND CAUSE OF ACTION
### (Injunctive Relief Against Defendants)
### (Vested Shares)

90.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

91.     Plaintiffs are informed and believe that MoneyLion is continuing and will continue to violate provisions of the MIPA, RSA and RRA, causing irreparable injury to Plaintiffs.

92.     Given Defendants' refusal to remove the restrictions on Plaintiffs' shares in Continental's custody and control, including the Restrictive Legend, despite clear contractual language deeming the shares fully vested and freely tradeable, without a legitimate legal basis and despite multiple demands from Plaintiffs, Plaintiffs have no adequate remedy at law that will protect them from suffering irreparable harm and loss unless injunctive relief is granted.

93.     Such injunctive relief is reasonably necessary to protect Plaintiffs' legitimate interests in the MoneyLion shares issued to them and contractually owed free and clear of any restrictions.

94.     There are no genuine grounds for Defendants to deem Plaintiffs' shares as restricted.

95.     Plaintiffs are entitled to an injunction mandating Defendants to remove all restrictions on Plaintiffs' shares in the custody and control of Continental, including removing the Restrictive Legend.

**THIRD CAUSE OF ACTION**
**(Breach of Contract Against MoneyLion)**
**(2022 Earnout Payment)**

96.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

97.     The MIPA constitutes a valid and enforceable contract between Plaintiffs and MoneyLion.  Delaware law governs the MIPA.  *See* MIPA § 9.10.

98.     Plaintiffs have complied with their obligations under the MIPA.

99.     MoneyLion's actions, as set forth above, have breached the MIPA by (1) failing to act in good faith with regard to the 2022 earnout dispute, including refusing to negotiate in good faith and refusing to drop its financial adjustments that were conclusively shown to lack any merit, in contravention of Section 2.06(b); (2) refusing to retain the Selected Independent Accountant, in contravention of Section 2.06(b); and (3) failing to award the Seller Members the maximum 2022 Earnout Payment despite uncontested and conclusive evidence that the financial targets were achieved, in contravention of Section 2.06(b).

100.    As a result of MoneyLion's multiple breaches, Plaintiffs have been improperly deprived of the 2022 Earnout Payment, which MoneyLion was contractually required to deliver under the MIPA.

101.    Accordingly, Plaintiffs are entitled to damages in an amount to be determined, including but not limited to the $25 million in MoneyLion shares representing the 2022 Earnout Payment, attorneys' fees, costs and expenses, or if greater at the time of judgment, $25 million plus prejudgment interest from the date of breach, and such other and further relief that the Court deems just and proper.

### FOURTH CAUSE OF ACTION
### (Alternatively, Specific Performance Against MoneyLion)
### (2022 Earnout Payment)

102.    Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

103.    The MIPA constitutes a valid and enforceable contract between Plaintiffs and MoneyLion.  Delaware law governs the MIPA.  *See* MIPA § 9.10.

104.    Plaintiffs have complied with their obligations under the MIPA.

105.    MoneyLion has breached the MIPA by failing to timely deliver the 2022 Earnout in accordance with the MIPA, including Sections 2.06(b)(v) and 2.06(e).

106.    As a result of MoneyLion's breaches, Plaintiffs have been and continue to be damaged.

107.    Under Section 9.12 of the MIPA, Plaintiffs are entitled to an order directing specific performance of MoneyLion's obligations under Sections 2.06(b)(v) and 2.06(e) to deliver the 2022 Earnout Payment and the number of shares that would have been conveyed in Q1 2023 under the formula set forth in the MIPA.  In so ruling, the Court should determine that Malka's 2022

EBITDA exceeded the $100,000 threshold and the Seller Members are owed the 2022 Earnout Payment.

108.     Section 9.12 of the MIPA provides:

The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity

109.     Plaintiffs have no adequate remedy at law with respect to MoneyLion's failure to timely deliver the 2022 Earnout Payment in accordance with the MIPA.  Indeed, the parties agreed that they would have no adequate remedies at law for breaches of the MIPA like those here, and thus agreed that specific performance would be the appropriate remedy for such breaches.

110.     Plaintiffs are also entitled to the recovery of their attorneys' fees, costs and expenses, prejudgment and post-judgment interest, and such other and further relief that the Court deems just and proper.

<u>**FIFTH CAUSE OF ACTION**</u>
<u>**(Indemnification Against MoneyLion)**</u>

111.     Plaintiffs incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows.

112.     Section 8.05(b) of the MIPA provides that MoneyLion will indemnify Plaintiffs for any breach by MoneyLion of a post-closing covenant, agreement or obligation made by MoneyLion in the MIPA.   In particular, Section 8.05(b) provides that MoneyLion "shall indemnify, defend and hold harmless each Seller Party and their Affiliates and their respective Representatives (collectively, the "Seller Indemnitees") from and against, any and all Losses sustained or incurred by any Seller Indemnitee resulting from … (b) any breach of a post-Closing covenant, agreement or obligation made by the [MoneyLion] in this Agreement…."

113.    Section 8.06(c) of the MIPA also provides that any breaches by MoneyLion will be treated as Direct Claims entitling Plaintiffs to sue for breach and recover any and all of their Losses sustained by Plaintiffs, including their attorneys' fees.

114.    Losses is defined in Article I of the MIPA, and broadly includes any claims, losses, damages and other expenses.   The definition of Losses also specifically includes reasonable attorneys' fees as well as costs of investigation and expenses related to "enforcing any right to indemnification" under the MIPA.

115.    Accordingly, as a result of MoneyLion's multiple breaches, as detailed above, Plaintiffs are entitled to recover all of the Losses for these Direct Claims, including the recovery of Plaintiffs' reasonable attorneys' fees, costs and expenses related to this action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter an order awarding Plaintiffs:

a)  Injunctive relief, as requested herein;

b)  Damages in an amount to be determined, including but not limited to the $25 million in MoneyLion shares representing the 2022 Earnout Payment, or if greater at the time of judgment, $25 million plus prejudgment interest from the date of breach;

c)  Alternatively, specific performance in the form of an order directing MoneyLion to comply with its obligations under Sections 2.06(b)(v) and 2.06(e) to deliver the 2022 Earnout Payment and the number of shares that would have been conveyed in Q1 2023 under the formula set forth in the MIPA, including determining that Malka's 2022 EBITDA exceeded the $100,000 threshold and the Seller Members are owed the 2022 Earnout Payment;

d)  All Losses (as defined in the MIPA) incurred by Plaintiffs, including attorneys' fees, costs and expenses reasonably incurred, related to this action, as indemnification from MoneyLion in accordance with Sections 8.05 and 8.06 of the MIPA;

e)  Pre-judgment and post-judgment interest, where applicable; and

f)  Such further relief as this Honorable Court deems necessary, just, and proper.

Dated:  New York, New York
       July 21, 2023

                Respectfully submitted,

                KATTEN MUCHIN ROSENMAN LLP

                By: */s/ Eliot Lauer*
                      Eliot Lauer
                      Geoffrey G. Young
                50 Rockefeller Plaza
                New York, New York 10020
                T: (212) 940-8800
                F: (212) 940-8776

                *Counsel for Plaintiffs Jeffrey Frommer, Lyusen (Louis) Krubich, Daniel Fried and Pat Capra*