12462924.5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JEFFREY FROMMER, LYUSEN (LOUIS) : 
KRUBICH, DANIEL FRIED and PAT CAPRA, :
:                          Case No. 1:23-cv-06339 JMF
                        Plaintiffs, :
      - against - :
:
MONEYLION TECHNOLOGIES INC., and : OPPOSING DECLARATION
CONTINENTAL STOCK TRANSFER & TRUST :   OF MATTHEW BASDEKIS
COMPANY, :
                        Defendants. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      **I, MATTHEW BASDEKIS,** pursuant to Section 28 U.S.C. 1746, declare under penalty of perjury that the following is true and correct:

      1.     I am currently employed by Malka Media Group LLC ("Malka"), a wholly owned operating subsidiary of Defendant MoneyLion Technologies Inc. ("MoneyLion"). I have held the position of Malka's Head of Finance continuously since March 2020 through the present date, including both before and after November 15, 2021, the date on which MoneyLion acquired Plaintiffs' interests in Malka. Based upon my employment with Malka in that capacity, both before and after Malka was acquired by MoneyLion, I have personal knowledge concerning Malka's historical and current finances and accounting practices, and I offer this declaration to highlight certain facts, which I understand to be relevant in this action and with respect to the pending motion of plaintiffs Jeffrey Frommer, Lyusen (Louis) Krubich, Daniel Fried and Pat Capra ("Plaintiffs" or the "Seller Members") in which they seek a preliminary injunction.

      2.     I received a Bachelor's degree in Finance from the University of Rhode Island in 2008, and since then I have had substantial experience in various roles as a financial analyst and as a manager

12462924.5

of financial operations, principally in the media industry. Prior to joining Malka in March 2020, I held various positions with Hexcel Corporation as a financial analyst, GE Capital as a lead analyst, NBC Sports Group as Director of Finance, and Conde Nast as Director of Finance. While I am not a certified accountant, during the course of my career in finance, including in my current position, I have worked closely with accountants, and I have developed a strong working knowledge of basic accounting and bookkeeping functions and principles.

### *My Work at Malka Prior to The MoneyLion Acquisition*

3.  In my position as Malka's Head of Finance from March 2020 through November 15, 2021, the date of MoneyLion's acquisition of Malka, I was responsible for, among other things, handling accounts receivable and accounts payable, providing direct oversight of client transactional activity for Malka at the direction of the Seller Members, and working with the Seller Members on client account issues. At the Seller Members' direction, I worked extensively with Malka's outside accountants, Curran & Company LLP ("Curran"), to coordinate with their professional staff, as needed, in the preparation of Malka's financial statements. With respect to these matters, I reported to, and worked at the direction of, Plaintiffs Jeffrey Frommer, Louis Krubich and Dan Fried, and under their supervision I was principally responsible for maintaining Malka's financial books and records.

4.  A key part of my responsibilities at Malka was (and still is) to manage invoicing Malka's clients and to manage the company's cash flows. I joined Malka in March 2020, at the very beginning of the COVID-19 pandemic—just before most commercial activity began to sharply decline. As the year progressed and in response to external factors, such as increasingly onerous payment terms imposed by clients and additional upfront costs as a result of the ongoing pandemic, Mr. Frommer, to whom I directly reported, increasingly and repeatedly emphasized the need to invoice Malka's clients

by requiring substantial upfront payments in advance of Malka providing services as a way to maximize Malka's cashflow. Clients would typically receive quotes for proposed work in the form of an invoice generated by the relevant Malka client account manager using Malka's accounting software. Unless required by a client, to the best of my knowledge, it was not customary for Malka to have standardized contracts with its clients. The Seller Members often operated pursuant to "handshake" agreements based on oral or electronic communications with clients. As a result, I was not provided with contracts for purposes of the internal finance approval process. I reviewed invoices generated based on instructions from client account managers, and I was not made aware of the existence of any mandatory contractual terms that required Malka's clients to make substantial payments of fees in advance of services being provided that were universally applied. Nevertheless, given the limited credit available to Malka during this time and the need to make payroll and vendor payments on a timely basis, I was instructed by Mr. Frommer to have the client pay as much of the invoice amount as possible up front at the time of invoicing, regardless of when (and if) Malka's services would be performed.

5. I understand that Malka's historical practices concerning revenue recognition are relevant to the issues being addressed in the current litigation between the parties. At least since the time I became employed as Malka's Head of Finance in early 2020 through the eventual integration of Malka's operations into MoneyLion's business post-acquisition, Malka's internal accounting practice was always to recognize revenue at the time Malka issued client invoices, *regardless of whether any fees were paid in advance or when the work was to be performed by Malka*. In other words, as soon as a client invoice was generated, Malka's computerized accounting system recognized the invoice amount as revenue.

6. Indeed, when Malka transitioned accounting software in the beginning of 2021, from QuickBooks to NetSuite, the new system was specifically programmed to recognize revenue

12462924.5

automatically upon the generation of a client invoice. Absent a special arrangement with the client and manual adjustments made in the accounting system, all client revenue was automatically recognized in Malka's accounting books and records as of the time an invoice was sent to the client. I was never asked to, nor did I ever, book journal entries or make other adjustments in Malka's QuickBooks or NetSuite bookkeeping systems which would alter the recognition of revenue at the time of invoicing. My responsibilities at year-end were to provide Curran, the company's outside accountants, with whatever financial, accounting and bookkeeping information they would require to prepare and review Malka's financial statements and the company's tax filings. My involvement in the financial statements ended there: I do not recall receiving a draft of the company's Financial Statement for the year ended December 31, 2020 to review at any time before it was issued by Curran in the Spring of 2021.

### *My Work at Malka Post-Acquisition*

7. I learned of MoneyLion's contemplated purchase of Malka from Mr. Frommer sometime in the third quarter of 2021, and I was informed by the Seller Members that no one else at Malka (other than the Seller Members) should be made aware of the impending sale until shortly after the Seller Members informed the rest of the Malka employees before the transaction closed. From time to time prior to closing, Mr. Frommer and the other Seller Members asked me to provide certain financial, accounting and operational information to MoneyLion and its advisors engaged for financial and tax due diligence purposes. I was not directly involved in any of the negotiations between the parties and was not invited to attend any meetings with respect to the negotiation of terms or the drafting of the transactional agreements prior to the finalization of the parties' Membership Interest Purchase Agreement ("MIPA"). My primary role in the due diligence process was to gather information and documents listed on checklists and schedules provided to Malka by MoneyLion and its advisors. I also

4

attended a due diligence meeting with MoneyLion's advisors, Mr. Frommer and Ryan Curran (from the Curran accounting firm), where we responded to the advisor's questions regarding Malka's historical financial statements and finance and accounting practices. To my recollection, on the Malka side, it was Mr. Frommer and Ryan Curran who were most involved in the negotiations with MoneyLion and who, together with Malka's legal team from Fox Rothschild, were principally involved in the drafting of the transactional documents, with very limited input from me.[1]

8. After the MoneyLion acquisition closed in November 2021, I retained my position as Malka's Head of Finance, and continued to handle the internal bookkeeping function as I had before the closing, recording financial data in Malka's NetSuite accounting system in the same manner as before, without making any technical adjustments to the accounting system to conform to the MIPA.

9. Toward the end of the first quarter of 2022, as efforts were made to integrate Malka's operations into MoneyLion, MoneyLion's finance team became more involved in overseeing Malka's operations and its bookkeeping functions and we began to meet on a regular monthly basis. My understanding at the time was that MoneyLion, as a public company, was required to maintain its accounting system and to report its finances in strict compliance with generally accepted accounting principles, or "GAAP." Based upon my extensive finance experience as a financial analyst and director of finance for several large public companies before joining Malka (including Hexcel Corporation, NBC and GE Capital), I was familiar with GAAP and understood completely the need for MoneyLion's oversight.

10. The Seller Members and I met with the MoneyLion finance team on a monthly basis to report Malka's internal monthly financials. As required by the MoneyLion finance team, the financials

---

[1] *See infra* at 11 & n.2.

12462924.5

included in our monthly presentation were prepared in accordance with GAAP. Nevertheless, I was instructed by the Seller Members to continue to record all of Malka's accounting and bookkeeping entries on NetSuite, in the same manner that was done before the merger transaction, and to make special note of any adjustments that were made in accordance with GAAP for purposes of tracking Malka's achievement of the earnout calculation thresholds. To clarify, I am aware that Malka's historical method of recognizing revenue at the time of invoicing and expenses at the time of billing is inconsistent with GAAP, which requires that revenue and expenses be recognized over the time of the relevant agreement or performance obligation. Mr. Frommer informed me that the internal NetSuite bookkeeping, without any adjustments made in accordance with GAAP, would be used at year end to calculate Malka's revenues and EBITDA to determine the Seller Members' entitlement to additional Earnout Payments under the MIPA. However, the bookkeeping that I and others on the Malka finance team kept in NetSuite was not modified from a technical standpoint to conform to the accounting or calculation principles agreed to between MoneyLion and the Seller Members under the MIPA, including the specific terms and exclusions in Schedules A and B – per direction from the Seller Members, we simply continued to book finances in the same manner as we had done pre-acquisition.

11. The Seller Members were constantly asking me for updates regarding Malka's internal NetSuite bookkeeping and asked me regularly to report to them whether Malka was "on track" to meet its revenue and EBITDA targets. I was frequently asked to assess how transactions impacting Malka's revenue and EBITDA would impact their ability to achieve the 2022 Earnout. This became a serious distraction for the Malka finance team, particularly during the typically busy fourth quarter of 2022, when we were being pressured to help Malka meet the earnout thresholds. Following the end of MoneyLion's second quarter audit in late July 2022, Mr. Frommer instructed me to email the

6

12462924.5

MoneyLion finance team for confirmation that Malka was on its way toward meeting those Revenue and EBITDA targets.

### *My Relationships with the Seller Members Became Increasingly Strained*

12. As time went on, it became increasingly difficult for me to manage my legitimate workload as Head of Finance. Malka's three-person finance team, which consisted of me, an analyst, and a manager, had already been overburdened prior to MoneyLion's acquisition of Malka. Following the acquisition, we needed to adjust quickly to being the subsidiary of a public company, as well as the increased oversight and auditing accompanying such a change, and to working with MoneyLion's larger and more specialized finance team.

13. I was also feeling substantial stress from the Seller Members, particularly Mr. Frommer, use Malka's funds directly on purchases without providing expense reporting, receipts, or business reason for the expense. This made it very difficult to distinguish between the Seller Members' personal use or company use on items like legal and accounting expenses and other personal expenses completely unrelated to Malka's business. Even before the merger closed, I warned Mr. Frommer and the other Seller Members that once Malka became an operating subsidiary of MoneyLion, they would no longer be able to expense personal legal and accounting expenses, or for their extravagant lifestyle, which included air travel, hotel and dining and entertainment expenses – the Seller Members had routinely used company funds on items that appeared to be personal expenditures. While some of that abated after the merger (mostly in connection with their personal automobile lease payments), Mr. Frommer and the other Seller Members continued to spend Malka's funds on substantial personal expenses including for food, travel and entertainment expenses. The Seller Members did not express any concern as to whether these transactions were business or personal in nature, and when questioned,

7

12462924.5

they would attempt to characterize these activities as business-related even when there did not appear to be any legitimate business purpose. To my knowledge, Mr. Frommer was charging expenses but never submitted an expense report during the entire period of his employment at Malka – the result being that every expense he ever charged to his corporate credit card was paid for with Malka's funds, regardless of whether they were personal or business expenses.

14. On many occasions, I asked the Seller Members whether their legal expenses or other expenses were personal or business in nature, and every time I was ignored. They continuously refused to take accountability for accurately reporting expenses and providing business reasons behind the transactions. In the fourth quarter of 2022, we received a batch of invoices from the Fox Rothschild law firm that had previously been sent to an incorrect email account, such that many of the invoices already were overdue. Malka's Finance team reviewed the invoices and flagged for the Seller Members that based on the descriptions of the work performed, many of the invoices appeared to relate to legal services that were personal in nature. The Seller Members, fully aware of the personal nature of these invoices, proceeded to spend Malka's funds in order to pay Fox Rothschild. Mr. Frommer and Mr. Krubich also circumvented the standard invoicing process at Malka with respect to their personal legal expenses related to the matters including their acquisition consideration, their employment by MoneyLion and other outside business interests that were invoiced from Fox Rothschild, so that Mr. Frommer and Mr. Krubich directly reviewed the invoices submitted to Malka for payment and were aware that by doing so, they were using Malka's funds without any concern or effort to either reject their payment or reimburse the company.

15. As time went on, I became increasingly uncomfortable, as the Seller Members continued to ask me to perform tasks that I believed to be inappropriate and disruptive. I finally decided in October 2022 to leave Malka for an employment opportunity elsewhere. After I made my intention to resign

8

known to Mr. Frommer, I was contacted by Rick Correia, MoneyLion's Chief Financial Officer. I was hesitant to approach Mr. Correia directly, as I believed that he would misinterpret my concerns based upon his own relationships with the Seller Members, which would only further complicate my dealings with Mr. Frommer and the other Seller Members. However, after discussing my dissatisfaction in the most general terms, I had several further discussions with Mr. Correia over the next few weeks during which he was understanding and encouraged me to stay on at Malka. I agreed to stay on since it seemed like the right thing for me to do given that we were still transitioning—barely a year had passed since Malka had been acquired by MoneyLion—and Mr. Correia was willing to restructure my reporting lines to work directly with his finance team. I began reporting directly to MoneyLion's Chief Accounting Officer as of January 1, 2023.

16. During the first quarter of 2023, I was working with the MoneyLion finance team to assist in the preparation of MoneyLion's audited financial statements for the year ending December 31, 2022 and to review Malka's financial and accounting information. Although I was not involved in the actual preparation of the 2022 Revenue and EBITDA Statement required under the MIPA to determine if the Seller Members were entitled to an Earnout Payment or the underlying calculation of revenues and EBITDA, I learned from the Seller Members that MoneyLion's 2022 Revenue and EBITDA Statement showed that Malka posted an EBITDA of approximately negative $2.8 million for the year ended December 31, 2022, which was almost three million dollars below the $100,000 threshold under the MIPA that would entitle the Seller Members to the 2022 Earnout Payment.

### *My Understanding of the Issues Relevant to this Dispute*

17. I am told that the dispute pending before the Court involves Plaintiffs' claimed entitlement to a 2022 Earnout Payment (and their rights to certain MoneyLion Inc. shares of Common

9

12462924.5

Stock previously issued to them at closing and as a 2021 Earnout Payment). I was subsequently advised by members of the MoneyLion finance team that Plaintiffs have asserted that the agreed-upon metrics for the calculation of revenue and EBITDA for 2021 and 2022 earnout purposes was to be based upon Malka's historical accounting principles, "***not MoneyLion's accounting principles that followed GAAP***." However, Plaintiffs' position cannot be reconciled with the express representations to the contrary contained in Malka's Financial Statement for the year ended December 31, 2020 and in the MIPA with respect to that Financial Statement and the Interim Financial Statements for the period ending September 30, 2021, which were required to be delivered to MoneyLion at the closing of the Malka acquisition under the MIPA.

18. I was recently asked to review Malka's 2019 and 2020 Financial Statements, which was the first time that I actually noticed Curran's notes to the financial statements. In the past, in the few instances that I looked at Malka's 2019 and 2020 Financial Statements, I would typically only look for the relevant financial table. My recollection is that the financial tables did not vary materially from the data in our NetSuite accounting system, which suggests that Curran did not make significant accounting adjustments in the course of their review. Nevertheless, after reading the language provided by Curran, Malka's independent outside accounting firm, that expressly represented in its Report of Malka's 2019 and 2020 Financial Statements that "[r]evenue is recognized under the accrual basis of accounting and recorded as revenue when work is completed and invoiced to the Company's customers." I can confidently express that *this is simply not true – this was the exception, not the rule.*

19. Malka never to my knowledge applied GAAP or ASC 606, which would require revenue to be recognized only when Malka performed the agreed upon work. As I stated earlier, Malka recorded and recognized revenues "at the time we issued client invoices, regardless of whether any fees were paid in advance or when the work was to be performed by Malka." (*See*, par. 5, *supra*). Other than in

10

DocuSign Envelope ID: 60B6F776-E02B-4F00-8DA7-94F1D765C0D9A8
Case 1:23-cv-06339-JMF    Document 40    Filed 08/31/23    Page 11 of 14

12462924.5

a few limited instances during my tenure as Head of Finance, beginning in March 2020 when I assumed that position, where clients required Malka to invoice according to project milestones, did Malka ever consider whether or when the work was to be (or was ever) completed in recognizing revenues in QuickBooks or the NetSuite accounting systems.

20.     I can confidently state that the accounting principles I was asked by the Seller Members to apply in maintaining Malka's financial books and records during my tenure as Head of Finance *were not U.S. GAAP compliant.* Simply stated, Malka's general approach to recognize revenue was to record it in NetSuite in the period that client invoices for such revenue were generated, except for a few clients who had Malka invoice them upon achievement of project milestones. In a similar manner, expenses were generally recognized in the period that such expenses were billed to Malka.

21.     Frankly, it was even more glaring to read further in the *Notes to Financial Statement* for both years that "[t]he Company has adopted ASC 606 as of December 31, 2019 [and December 31, 2020][2] regarding accounting for income from contracts and all revenues recognized by the Company for the year then ended are covered through ASC 606." My understanding of ASC 606—which is the *Financial Accounting Standards Board's* most current guidance on U.S. GAAP revenue recognition principles—is that companies are required to recognize revenue only when the promised goods or services are transferred to, or performed for, the client, which typically occurs over the term of an agreement in the professional services industry. I can state unequivocally that this basic accounting principle was not practiced universally by Malka in 2020 or 2021.

---

[2] To my further surprise, Section 3.06 of the MIPA states that if Notes to the Interim Financial Statements for the nine-month period ended September 30, 2021 were presented they "would not differ materially from those presented in the Unaudited Financial Statements [for December 31, 2019 and 2020]." However, it is simply untrue that the Interim Financial Statements were prepared in accordance with ASC 606 principles of revenue recognition.

11

DocuSign Envelope ID: 60B6F776-E02B-4F00-8DA7-04F1D75C0D9A8
Case 1:23-cv-06339-JMF    Document 40    Filed 08/31/23    Page 12 of 14

12462924.5

22. I have also been asked to review Schedule A to the MIPA entitled Accounting Principles.[3] It states plainly that Malka's Financial Statements "shall be prepared in accordance with U.S. GAAP, except" with respect to specific items spelled out in Schedule A, including "the Company's historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained." I found this provision to be incongruous with Malka's historical revenue recognition principles as I understood and applied them as Malka's Head of Finance. First, to the best of my knowledge, Malka rarely entered into standard, Malka originated written client contracts and never to my knowledge had mutual agreement on terms that outlined "noncancelable deposits on contracts." Even more confusing is the reference to recognizing "the remaining revenue on such contracts as milestones are attained." This was rarely the case unless specifically requested by the client, as Malka almost always recognized revenue immediately upon invoicing, and not "as milestones are attained." The so-called "Accounting Principles" set forth in Schedule A to the MIPA are not completely consistent with the guidance I provided to the Seller Members and Fox Rothschild during the drafting process and do not reflect all of the information I conveyed to them regarding Malka's historical practices.

*Accounting Irregularities*

23. Beyond the issue of whether Malka's historical accounting practices were GAAP-compliant, I am also aware of certain specific accounting irregularities in 2021 that I recently brought

---

[3] I recognized Schedules A and B as documents I was asked to look at when the MIPA was being drafted. I had been asked by Ryan Curran and Malka's attorneys at Fox Rothschild at times to review the language describing Malka's historical financial and accounting practices on Schedules A and B, and I offered my input. However, the language on those schedules evolved over a period of time during back and forth negotiations between the parties. I do not recall seeing the final edits to either schedule and cannot speak to any subsequent adjustments that may have been made by the Seller Members, Curran or Fox Rothschild.

12462924.5

to the attention of MoneyLion's finance team because they were intentional deviations by the Seller Members from our business practices in the ordinary course. For example, Malka was carrying a delinquent $336,000 account receivable for one of its clients (which was in a business relationship with an entity called Malkalo LLC which was owned by the Seller Members), which had been recognized as revenue in periods prior to 2021. Then, in mid-2021, the client discontinued to make payments against the outstanding receivable, Malka agreed to restructure the client's receivable into promissory notes totaling approximately $260,000, which amount was then recognized and recorded as 2021 revenue in Malka's NetSuite accounting program, in a manner inconsistent with GAAP. Only a few monthly payments were made under the promissory note before the client again ceased payments in early 2022 and the relationship between the client and Malkalo led to a commercial dispute. Although I repeatedly asked the Seller Members for an update regarding the status of the promissory notes, it wasn't until the first quarter of 2023—after the end of the 2022 Earnout Period—that the Seller Members finally told me that Malka would not be able to collect on the promissory notes and instructed me to write off the remaining value as bad debt. Based on the Seller Members' repeated efforts to manipulate the earnout thresholds, it should not have surprised me that the Seller Members waited until after the client's receivable was included as revenue for purposes of the 2022 Earnout calculation to instruct me to write off this receivable.

24.     Another example of accounting manipulation relates to a client account that was managed by Mr. Fried. In the last weeks of 2021, as the Seller Members were laser focused on meeting their 2021 Earnout requirements, Mr. Fried advised my finance team to send invoices to this client for an agreed-upon fee of $400,000. Although there was no client contract for this project, my team was instructed to stagger the client's invoicing into four separate invoices, each in the amount of $100,000, to be issued during the last few weeks of the year. Consistent with Malka's actual revenue recognition

13

12462924.5

practices as directed to me by the Seller Members, the $400,000 was recognized as revenues in 2021, *even though the work performed by Malka did not even take place until 2023 – even after receiving verbal confirmation the work was complete in early 2022.* I cannot recall any other example of a past project where we invoiced a client for such a significant amount of work and then did not commence work until more than a year later.

25.  And, in the case of yet another Malka client managed directly by Mr. Capra, whose project involved a celebrity endorsement, Malka recognized $50,000 of the invoice amount as 2021 revenue (of which 80% was to be paid out as the celebrity endorsement fee), and then held off on recording the $40,000 expense paid to the celebrity until the following calendar year.

26.  This type of accounting manipulation continued into 2022. For example, regarding a technology company through which Malka purchased licenses and servers to operate in a cloud-based environment, Plaintiffs insisted, in the late summer of 2022, on delaying the year-end reconciliation of the $106,000 fees payable to the vendor, with the obvious intention of pushing the expenses into 2023 so as to avoid having to recognize the expense in 2022. This had the obvious effect of falsely enhancing Malka's EBITDA calculation by deferring the recognition of expenses which should have properly been recognized during the year in which they were actually incurred. And, in the case of another technology licensing vendor, Plaintiffs went to great lengths to defer recording that expense until the following year, which had the same effect of artificially enhancing Malka's EBITDA for that year.

Dated: August 31, 2023

                                                       *Matthew Basdekis*
                                                       MATTHEW BASDEKIS