# __EXHIBIT 1__

Execution Version

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**") is made and entered into as of the 15th day of November, 2021, by and among MoneyLion Technologies Inc., a corporation organized under the laws of Delaware ("**Buyer**"), Malka Media Group LLC, a New York limited liability company (the "**Company**"), Jeffrey Frommer, Lyusen Krubich, Daniel Fried, and Pat Capra (each a "**Seller Member**" and collectively the "**Seller Members**"), and Jeffrey Frommer, in his capacity as the Sellers' Representative, as described in Section 5.07 (the "**Sellers' Representative**"). The Company and the Seller Members are sometimes referred to herein individually as a "**Seller Party**" and collectively as the "**Seller Parties**." The Buyer and the Seller Parties are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

WHEREAS, the Seller Members collectively own all of the issued and outstanding membership interests (the "**Membership Interests**") in the Company;

WHEREAS, each Seller Member wishes to sell to Buyer, and Buyer wishes to purchase from each Seller Member, all of the Membership Interests owned by such Seller Member (such Membership Interests being purchased hereunder the "**Purchased Interests**"), subject to the terms and conditions set forth herein; and

WHEREAS, a portion of the Aggregate Purchase Price (as defined below) payable by Buyer to the Seller Members shall be placed in escrow by Buyer, the release of which shall be contingent upon certain events and conditions, all as set forth in this Agreement and the Escrow Agreement (as defined below).

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree to be legally bound as follows:

## ARTICLE I
## DEFINITIONS

For the purposes of this Agreement, the following terms have the meanings specified or referred to in this Article I:

"**2021 Annualized Amount**" has the meaning set forth in Section 2.06(b)(v)(C).

"**2021 Earnout Payment**" has the meaning set forth in Section 2.06(b)(v)(A).

"**2021 Earnout Payment Issuance Date**" means the date on which the 2021 Earnout Payment is issued.

"**2021 EBITDA Amount**" has the meaning set forth in Section 2.06(b)(i).

"**2021 Revenue Amount**" has the meaning set forth in Section 2.06(b)(i).

"**2021 Revenue and EBITDA Statement**" has the meaning set forth in Section 2.06(b)(i).

"**2022 Annualized Amount**" has the meaning set forth in Section 2.06(b)(v)(D).

"**2022 Budget**" has the meaning set forth in <u>Section 2.06(d)</u>.

"**2022 Earnout Payment**" has the meaning set forth in <u>Section 2.06(b)(v)(B)</u>.

"**2022 Earnout Payment Issuance Date**" means the date on which the 2022 Earnout Payment is issued.

"**2022 EBITDA Amount**" has the meaning set forth in <u>Section 2.06(b)(i)</u>.

"**2022 Revenue Amount**" has the meaning set forth in <u>Section 2.06(b)(i)</u>.

"**2022 Revenue and EBITDA Statement**" has the meaning set forth in <u>Section 2.06(b)(i)</u>.

"**30-Day VWAP**" means the volume-weighted average of prices measured in hundredths of cents of a share of Parent Stock on the NYSE (or other principal market on which such shares are then traded) for the thirty (30) consecutive trading days immediately prior to the applicable date of calculation (or, if Parent Stock is not listed at such time, the then fair market value of Parent Stock as reasonably determined by the board of directors of Buyer acting in good faith).

"**401(k) Plan**" has the meaning set forth in <u>Section 5.14</u>.

"**ACA**" has the meaning set forth in <u>Section 3.20(m)</u>.

"**Accounting Principles**" means (a) the principles, policies and procedures expressly set forth on **Schedule A**; and (b) to the extent not inconsistent with the foregoing, the historical accounting principles, policies and procedures of the Company.

"**Action**" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"**Affiliate**" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Affiliated Group**" means an "affiliated group" (as defined in Section 1504(a) of the Code without regard to the limitations contained in Section 1504(b) of the Code) that, at any time on or before the Closing Date, includes or has included the Company or any of its Subsidiaries or any direct or indirect predecessor of the Company or any of its Subsidiaries, or any other group of entities filing any Tax Return on a combined, consolidated, unitary or other group basis that, at any time on or before the Closing Date, includes or has included the Company or any of its Subsidiaries or any direct or indirect predecessor of the Company or any of its Subsidiaries.

"**Affiliated Party Transactions**" has the meaning set forth in <u>Section 3.23</u>.

"**Aggregate Closing Payment**" means (i) the Closing Cash Payment; and (ii) the value of the Closing Stock Payment (based on the 30-Day VWAP determined as of the Closing Date).

"**Aggregate Purchase Price**" has the meaning set forth in <u>Section 2.02</u>.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in Section 6.06

"**Ancillary Documents**" means the Escrow Agreement, the Assignment, the Operating Agreement and the Employment Letter Agreements.

"**Anti-corruption Laws**" means Laws relating to anti-bribery or anti-corruption (governmental or commercial), including Laws that prohibit the corrupt payment, offer, promise, or authorization of the payment or transfer of anything of value (including gifts or entertainment), directly or indirectly, to any Government Official or other person to obtain or retain business or otherwise secure a business advantage, including the FCPA, the U.K. Bribery Act of 2010 ("**Bribery Act**"), and all other applicable national and international Laws prohibiting bribery and corruption, including those Laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions.

"**Asset Allocation Statement**" has the meaning set forth in Section 6.06.

"**Assignment**" means an assignment of the Purchased Interests to Buyer in a form and substance satisfactory to Buyer and the Company.

"**Balance Sheet**" has the meaning set forth in Section 3.06.

"**Balance Sheet Date**" has the meaning set forth in Section 3.06.

"**Benefit Plan**" has the meaning set forth in Section 3.20(a).

"**Business Day**" means any day except Saturday, Sunday or any other day on which commercial banks located in New York City, New York are authorized or required by Law to be closed for business.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Indemnitees**" has the meaning set forth in Section 8.03.

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act of 2020 (Pub. L. 116–136) (including any changes in state or local law that are analogous to provisions of the CARES Act or adopted to conform to the CARES Act), including the Paycheck Protection Program Flexibility Act (P.L.116-142), and any legislative or regulatory guidance issued pursuant thereto.

"**Cash**" means the aggregate amount of any cash and cash equivalents of the Company as of 12:01 AM Eastern Time on the Closing Date, which shall include any checks, drafts, wire transfers, and credit transactions deposited or made for the account of the Company, but not yet reflected as available proceeds in the Company's accounts but which shall not include the amount necessary to cover outstanding checks and wire transfers that have been mailed, transmitted, or otherwise delivered by the Company but have not cleared their respective banks or other accounts prior to such time.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"**Change of Control**" means the (a) sale, transfer, or assignment of a majority of the Equity Interests of the Company, Parent  or Buyer following Closing to a Person other than an Affiliate of any of

Execution Version

the foregoing; (b) the merger of the Company, Parent or Buyer with or into another Person such that a majority of the Equity Interests of the surviving company are held by any Person other than Buyer or any Affiliate of Buyer; or (c) the sale of a majority of the assets of the Company to any Person following Closing, including, but not limited to, an Affiliate of Buyer, but not, for the avoidance of doubt, including Parent, Buyer or any wholly owned direct or indirect subsidiary of Buyer.

"**Chase**" has the meaning set forth in <u>Section 3.32</u>.

"**Closing**" has the meaning set forth in <u>Section 2.08</u>.

"**Closing Cash Payment**" means an amount equal to the sum of (a) Twelve Million One Hundred Sixty Two Thousand Six Hundred Seventy Eight Dollars ($12,162,678), plus (b) the Estimated Closing Cash Amount, minus (c) the Purchase Price Adjustment Escrow Amount, minus (d) the Retention Escrow Amount, minus (f) the Estimated Indebtedness Amount, minus (g) the Estimated Transaction Expenses Amount, and plus or minus (as applicable) (h) the Estimated Positive Working Capital Adjustment Amount or the Estimated Negative Working Capital Adjustment Amount.

"**Closing Date**" has the meaning set forth in <u>Section 2.08</u>.

"**Closing Stock Payment**" has the meaning set forth in <u>Section 2.03(a)(ii)</u>.

"**Closing Working Capital**" means the Working Capital of the Company determined as of immediately prior to the Closing.

"**Closing Working Capital Statement**" means the Final Closing Working Capital delivered in accordance with <u>Section 2.05(b)(i)</u>.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the recitals.

"**Company Intellectual Property**" means all Intellectual Property that is owned by the Company.

"**Company IP Agreements**" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, whether written or oral, relating to Intellectual Property to which the Company is a party, beneficiary or otherwise bound, other than Contracts to which the Company is a party which relate, directly or indirectly, to the Company's media production activities undertaken in the ordinary course of its business.

"**Company IP Registrations**" means all Company Intellectual Property that is subject to any issuance, registration or application by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including issued patents, registered trademarks, domain names and copyrights, and pending applications for any of the foregoing.

"**Company PPP Loan**" has the meaning set forth in <u>Section 3.32</u>.

"**Company Privacy Policy**" means each external or internal, past or present privacy policy of the Company, including any policy relating to (a) the privacy of users of the Company Products or of any Company Website, or (b) the collection, storage, disclosure, and transfer of any User Data, Personal Data, or employee information.

"**Company Product**" means any product or service designed, developed, manufactured, marketed, distributed, provided, licensed, or sold at any time by the Company or any predecessor.

"**Company Software**" has the meaning set forth in Section 3.12(k).

"**Company Systems**" has the meaning set forth in Section 3.12(h).

"**Company Website**" means any public or private website owned, maintained, or operated at any time by or on behalf of the Company.

"**ConnectOne**" has the meaning set forth in Section 3.32.

"**Contracts**" means all written contracts, leases, mortgages, licenses, notes, commitments, undertakings, indentures, joint ventures, and all other agreements, commitments and legally binding arrangements to which a Person is bound.

"**COVID-19 Tax Acts**" means the Families First Coronavirus Response Act (Pub. L. 116-127), the CARES Act, the Consolidated Appropriations Act, 2021 (H.R. 133), any U.S. executive order (including the Presidential Memorandum on Deferring Payroll Tax Obligations in Light of the Ongoing COVID-19 Disaster, as issued on August 8, 2020), and any applicable U.S. Treasury regulations or any other applicable Law or other official guidance (including IRS Notice 2020-65 and Notice 2021-11) intended to address the consequences of COVID-19.

"**Current Assets**" means accounts receivable, inventory, prepaid expenses, and other current assets, in all cases, as set forth in the Accounting Principles; but, excluding (a) the portion of any prepaid expense of which Buyer will not receive any benefit following the Closing; (b) current and deferred Tax assets; (c) Cash of the Company, and (d) receivables from any of the Company's Affiliates, managers, directors, employees, officers, equityholders or members and any of their respective Affiliates, determined in accordance with the Accounting Principles.

"**Current Liabilities**" means (a) accounts payable, less the amount necessary to cover any outstanding checks and wire transfers that have been mailed, transmitted, or otherwise delivered by the Company in connection with the payment of such accounts payables, but which have not cleared their respective banks or other accounts prior to such time, and (b) other current liabilities of the Company incurred in its ordinary course of business, including accrued expenses (including accrued commissions, bonuses (whether or not paid off at Closing and accrued rebates), paid time off, and any credit card charges initiated or processed by the Company that have not yet been credited to the Company's account as of the Closing Date), in all cases, as set forth in the Accounting Principles; but, excluding Deferred Revenue, deferred rent, payables to any of the Company's Affiliates, managers, directors, employees, officers, equityholders, or members, and any of their respective Affiliates, current and deferred Tax liabilities, income Tax liabilities, Transaction Expenses and the current portion of any Indebtedness of the Company, determined in accordance with the Accounting Principles.

"**D&O Indemnified Party**" has the meaning set forth in Section 5.11(a).

"**D&O Insurance**" has the meaning set forth in Section 5.11(b).

"**Deductible**" has the meaning set forth in Section 8.08(a).

"**Defense Notice**" has the meaning set forth in Section 8.06(a).

"**Deferred Payroll Taxes**" means (i) the employer portion of any payroll Taxes for a Pre-Closing Tax Period (or the portion of a Straddle Period ending on the Closing Date) in respect of which the Company or any of its Subsidiaries has deferred the payment thereof until after the Closing Date pursuant to any COVID-19 Tax Act (or other similar Law), and (ii) the employee portion of any payroll Taxes for a Pre-Closing Period in respect of which the Company or any of its Subsidiaries has deferred the payment thereof until after the Closing Date pursuant to any COVID-19 Tax Act (or other similar Law), in each case, calculated without giving effect to any Tax credits afforded under any COVID-19 Tax Act to reduce the amount of any such Taxes payable or owed.

"**Deferred Revenue**" means any liability of the Company for the rendering of services pursuant to a Contract, which liability existed, but had not been discharged, as of the Closing.

"**Defense Notice**" has the meaning set forth in Section 8.06(a).

"**Direct Claim**" has the meaning set forth in Section 8.06(c).

"**Disclosure Schedules**" means the Disclosure Schedules delivered by the Company to Buyer concurrently with the execution and delivery of this Agreement.

"**Dispute Notice**" has the meaning set forth in Section 2.05(b)(i).

"**Dollars**" or "**$**" means the lawful currency of the United States.

"**E.O. 11246**" has the meaning set forth in Section 3.21(g).

"**Earnout Payment Amount**" means the aggregate amount of payments in the form of Parent Stock that may be made pursuant to Section 2.06, not to exceed Thirty Five Million Dollars ($35,000,000).

"**EBITDA**" means the combined net income before interest expense, federal, state, local and foreign income taxes, depreciation and amortization of the Company for the applicable period, determined in accordance with GAAP but applied and calculated in a manner consistent with the EBITDA calculation derived from the Financial Statements for the applicable fiscal year, adjusted to exclude (a) any "extraordinary items" of gain or loss as that term shall be defined in GAAP, (b) any gains, losses or profits realized from the sale of any assets other than in the ordinary course of business, (c) legal, accounting or investment banking fees and expenses arising out of this Agreement and related transactions, (d) any management fees, general overhead expenses or other intercompany charges charged by Buyer or any of its affiliates to the Company, if any, (e) any transaction related expenses, including but not limited to professional fees and the amount of any transaction bonus payment, management performance bonus payment contemplated by this Agreement, and all payroll taxes associated with such bonus payments, and (f) any expenses related to equity, equity-based or equity linked compensation granted or issued to any employee of the Company.

"**Employee Payment**" has the meaning set forth in Section 2.07.

"**Employee Payment Participant**" has the meaning set forth in Section 2.07.

"**Employee Payment Participant Agreements**" has the meaning set forth in Section 5.12.

"**Employee Payment Participant RSU Letter Agreements**" means the Employee Payment Participant RSU Letter Agreement to be entered into by each Employee Payment Participant at the Closing, substantially in the form of Exhibit D.

"**Employment Letter Agreements**" has the meaning set forth in <u>Section 5.04</u>.

"**Encumbrance**" means any charge, claim, community property interest, pledge, equitable interest, conditional sale, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership or other encumbrance of any kind.

"**Environmental Attributes**" means any emissions and renewable energy credits, energy conservation credits, benefits, offsets and allowances, emission reduction credits or words of similar import or regulatory effect (including emissions reduction credits or allowances under all applicable emission trading, compliance or budget programs, or any other federal, state or regional emission, renewable energy or energy conservation trading or budget program) that have been held, allocated to or acquired for the development, construction, ownership, lease, operation, use or maintenance of the Company as of: (a) the date of this Agreement; and (b) future years for which allocations have been established and are in effect as of the date of this Agreement.

"**Environmental Claim**" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"**Environmental Law**" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**Environmental Notice**" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"**Environmental Permit**" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"**Equity Interests**" means (a) with respect to a corporation, any and all shares of capital stock and any securities exercisable or convertible into the foregoing, and (b) with respect to a partnership, limited liability company, trust or similar Person, any and all units, membership interests or other partnership/limited liability company interests and any securities exercisable or convertible into the foregoing

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means all employers (whether or not incorporated) that would be treated together with the Company or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**Escrow Agent**" means PNC Bank, N.A.

"**Escrow Agreement**" means the Escrow Agreement to be entered into by Buyer, Sellers' Representative and Escrow Agent at the Closing, substantially in the form of Exhibit B.

"**Escrow Amount**" means the sum of the Purchase Price Adjustment Escrow Amount, *plus* the Retention Escrow Amount, *plus* any interest or other income earned on or from the amounts deposited into escrow.

"**Estimated Closing Cash Amount**" has the meaning set forth in Section 2.05(a)(i).

"**Estimated Closing Working Capital**" has the meaning set forth in Section 2.05(a)(i).

"**Estimated Indebtedness Amount**" has the meaning set forth in Section 2.05(a)(i).

"**Estimated Negative Working Capital Adjustment Amount**" has the meaning set forth in Section 2.05(a)(i).

"**Estimated Positive Working Capital Adjustment Amount**" has the meaning set forth in Section 2.05(a)(i).

"**Estimated Statement**" or "**Estimated Statements**" has the meaning set forth in Section 2.05(a)(i).

"**Estimated Transaction Expenses Amount**" has the meaning set forth in Section 2.05(a)(i).

"**FCPA**" has the meaning set forth in Section 3.26.

"**Final Cash Adjustment**" has the meaning set forth in Section 2.05(b)(iii).

"**Final Closing Cash Amount**" has the meaning set forth in Section 2.05(b)(i).

"**Final Closing Working Capital**" has the meaning set forth in Section 2.05(b)(i).

"**Final Deficiency**" has the meaning set forth in Section 2.05(b)(iv).

"**Final Excess**" has the meaning set forth in Section 2.05(b)(v).

"**Final Indebtedness Adjustment**" has the meaning set forth in Section 2.05(b)(iii).

"**Final Indebtedness Amount**" has the meaning set forth in <u>Section 2.05(b)(i)</u>.

"**Final Negative Working Capital Adjustment**" has the meaning set forth in <u>Section 2.05(b)(iii)</u>.

"**Final Positive Working Capital Adjustment**" has the meaning set forth in <u>Section 2.05(b)(iii)</u>.

"**Final Release Date**" means May 15, 2023.

"**Final Transaction Expenses Adjustment**" has the meaning set forth in <u>Section 2.05(b)(iii)</u>.

"**Final Transaction Expenses Amount**" has the meaning set forth in <u>Section 2.05(b)(i)</u>.

"**Final Statement**" or "**Final Statements**" has the meaning set forth in <u>Section 2.05(b)(i)</u>.

"**Financial Statements**" has the meaning set forth in <u>Section 3.06</u>.

"**FLSA**" has the meaning set forth in <u>Section 3.21(d)</u>.

"**Fraud**" constitutes common law fraud under the laws of the State of Delaware.

"**Fraud-Type Claims**" means any and all Legal Proceedings based upon Fraud.

"**Fundamental Representation**" has the meaning set forth in <u>Section 8.01</u>.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Government Contracts**" has the meaning set forth in <u>Section 3.09(a)(x)</u>.

"**Government Official**" means (a) any elected or appointed governmental official, (b) any employee or person acting for or on behalf of a governmental official, agency, or enterprise performing a governmental function, (c) any candidate for public office, political party officer, employee or person acting for or on behalf of a political party or candidate for public office, or (d) any person otherwise categorized as a Government Official under local Law. As used in this definition, "<u>Government</u>" includes all levels and subdivisions of U.S. and non-U.S. governments (*i.e.*, local, regional, or national as well as administrative, judicial, legislative, or executive).

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Governmental Order**" means any order, writ, judgment, injunction, binding decree or determination, or award of any Governmental Authority.

"**Hazardous Materials**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation, and polychlorinated biphenyls.

"**Indebtedness**" means, without duplication and with respect to the Company, (a) all obligations of such Person for borrowed money, (b) any deficit balance in cash, (c) all obligations evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, (d) all obligations of such Person issued or assumed for deferred purchase price payments, (e) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance, guarantee or similar credit transaction, in each case, that has been drawn or claimed against, (f) all interest rate and currency swaps, caps, collars and similar agreements or hedging devices under which payments are obligated to be made by such Person, whether periodically or upon the happening of a contingency, (g) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (h) all obligations of such Person or another Person secured by an Encumbrance on any asset of such first Person, whether or not such obligation is assumed by such first Person, (i) any prepayment fees or other fees, costs or expenses associated with payment of any Indebtedness, (j) without duplication, the aggregate amount of any compensation which is not paid at the Closing and, as a result of the consummation of the Transactions, is owed to any current or former director, officer and/or employee of the Company (including severance, retention, equity, phantom equity, change of control and similar payment obligations or bonuses), whether or not contingent upon, triggered or accelerated by, or otherwise becomes payable in connection with or as a result of the transactions contemplated by this Agreement, whether alone or in combination with other events or the passage of time, even if further contingent on a cessation of employment or the provision of additional services, plus any payroll or similar Taxes of the Company attributable to such compensation, (k) all Related Party Obligations, (l) all liabilities, accrued as of the Closing Date in accordance with GAAP, of the Company and each of its Subsidiaries for unpaid Taxes (taking into consideration Section 6.03) , (m) any Deferred Payroll Taxes, (n) any guaranty of any Indebtedness of any other Person of the kind referred to in the foregoing clauses (a) through (l), (o) any unpaid interest, prepayment penalties, premiums, costs and fees that would arise or become due as a result of the prepayment of any of the obligations referred to in the foregoing clauses (a) through (m), (p) any accrued but unpaid employer contributions payable under any Company Benefit Plan, and (q) any Deferred Revenue, (r) any amounts payable by the Company under the Company's 401(k) plan. Notwithstanding the foregoing, that amount attributable to any liabilities or items included in the final determination of Closing Working Capital shall not be double counted in the calculation of Indebtedness.

"**Indemnified Party**" has the meaning set forth in <u>Section 8.06(a)</u>.

"**Indemnified Taxes**" means except to the extent such Taxes are Non-Indemnified Taxes (a) any Taxes imposed on the Company or any of its Subsidiaries or for which the Company or any of its Subsidiaries may otherwise be liable, as a result of having been a member of an Affiliated Group (including Taxes for which the Company or any of its Subsidiaries may be liable pursuant to Treasury Regulations Section 1.1502-6 or similar provisions of state, local or foreign Law as a result of having been a member of an Affiliated Group and any Taxes resulting from the Company or any of its Subsidiaries ceasing to be a member of any Affiliated Group), as a transferee or successor or by operation of Law as a result of an event occurring or  transaction entered into before the Closing Date, or by Contract entered into before the Closing Date (other than (i) credit or other commercial agreements the primary purpose of which does not relate to Taxes, and (ii) agreements with respect to leases of property); (b) the portion of the Transfer Taxes for which Seller Members are responsible pursuant to <u>Section 6.08</u>; (c) any Taxes (other than the portion of the Transfer Taxes for which Seller Members are responsible pursuant to <u>Section 6.08</u>) of the Seller Members; (d) any Taxes attributable to any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking or obligation in <u>Article VI</u>; and (e) any Taxes imposed on the Company or any of its Subsidiaries, or for which the Company or any of its Subsidiaries may otherwise be liable, for any Pre-Closing Tax Period (including any Taxes described in Section 965 of the Code and any Deferred Payroll

Taxes), with Taxes for the portion of any Straddle Period ending on the Closing Date determined as described in Section 6.03.

"**Indemnifying Party**" has the meaning set forth in Section 8.06(a).

"**Independent Accountant**" means such accounting firm mutually selected by Buyer and the Sellers' Representative and who is a Person other than Seller Parties' Accountants or Buyer's Accountants.

"**Insurance Policies**" has the meaning set forth in Section 3.16.

"**Intellectual Property**" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("**Patents**"); (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("**Trademarks**"); (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("**Copyrights**"); (d) internet domain names ("**Domain Names**") and social media account or user names (including "handles"), whether or not Trademarks, all associated web addresses, URLs, websites and web pages, social media accounts and pages, and all content and data thereon or relating thereto, whether or not Copyrights; (e) mask works, and all registrations, applications for registration, and renewals thereof; (f) industrial designs, and all Patents, registrations, applications for registration, and renewals thereof; (g) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information and all rights therein ("**Trade Secrets**"); (h) computer programs, operating systems, applications, firmware, and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof; (i) rights of publicity; and (j) all other intellectual or industrial property and proprietary rights.

"**Interim Balance Sheet**" has the meaning set forth in Section 3.06.

"**Interim Balance Sheet Date**" has the meaning set forth in Section 3.06.

"**Interim Financial Statements**" has the meaning set forth in Section 3.06.

"**Key Employees**" means each of Jeffrey Frommer, Lyusen Krubich, Patrick Capra, Daniel Fried and Matt Basdekis.

"**Knowledge Individuals**" means each Seller Member.

"**Law**" means any statute, law, ordinance, regulation, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule having the effect of law of any Governmental Authority.

"**Legal Proceeding**" or "**Proceeding**" means any claim, action, cause of action, demand, hearing, audit, proceeding, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise,

formal or informal, public or private, whether at law or in equity, commenced, brought, conducted or heard by or before any Governmental Authority.

"**Liabilities**" has the meaning set forth in Section 3.07.

"**License Period**" has the meaning set forth in Section 3.12(c).

"**Losses**" means any claims, losses, damages, liabilities, deficiencies, judgments, interest, awards, penalties, fines, lost profits, multiple of lost profits, liabilities, damages, Taxes, costs and expense of every kind and nature (including, unless otherwise provided in this Agreement, reasonable attorneys' fees expert consultant and witness fees, and costs of investigation and expenses, enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers).

"**Malka Sports Equity Rights**" has the meaning set forth in Section 5.13.

"**Material Adverse Effect**" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Company, or (b) the ability of the Seller Members to consummate the transactions contemplated hereby on a timely basis; provided, that a Material Adverse Effect shall not include any event, change, circumstance, occurrence, effect or state of facts (1) generally affecting the industry in which the Company operates, the economy or the financial or securities markets, in the United States, including effects resulting from any regulatory or political conditions or developments in general, (2) any outbreak or escalation of hostilities or declared or undeclared acts of war or terrorism, (3) reflecting or resulting from changes in any Law or GAAP, or (4) resulting from the announcement of the transactions contemplated by this Agreement; except with respect to clauses (1), (2) and (3), to the extent, and only to the extent of such event, change, circumstances, occurrence, effect or state of facts is disproportionately adverse to the Company taken as a whole.

"**Material Contracts**" has the meaning set forth in Section 3.09(a).

"**Material Customers**" has the meaning set forth in Section 3.15(a).

"**Material Suppliers**" has the meaning set forth in Section 3.15(b).

"**Maximum 2021 Revenue Amount**" has the meaning set forth in Section 2.06(b)(v)(A).

"**Maximum 2022 Revenue Amount**" has the meaning set forth in Section 2.06(b)(v)(B).

"**Membership Interests**" has the meaning set forth in the recitals.

"**Minimum 2021 EBITDA Amount**" has the meaning set forth in Section 2.06(b)(v)(A).

"**Minimum 2021 Revenue Amount**" has the meaning set forth in Section 2.06(b)(v)(A).

"**Minimum 2022 EBITDA Amount**" has the meaning set forth in Section 2.06(b)(v)(B).

"**Minimum 2022 Revenue Amount**" has the meaning set forth in Section 2.06(b)(v)(B).

"**Multiemployer Plan**" has the meaning set forth in Section 3.20(e).

"**NYSE**" means the New York Stock Exchange.

"**Non-Indemnified Taxes**" means (a) any Taxes of the Company to the extent of the amount thereof is specifically included in the determination of Working Capital, Indebtedness or Transaction Expenses (each as finally determined by the Parties hereto) (it being understood and agreed that the intent of this provision is to avoid duplication) and (b) any Taxes attributable to any transaction occurring on the Closing Date, after the Closing, outside the ordinary course of business of the Company and taken at the direction of the Buyer, and not contemplated by this Agreement.

"**Operating Agreement**" means the Third Amended and Restated Limited Liability Company Operating Agreement of the Company, substantially in the form of Exhibit F.

"**Organizational Documents**" means (a) in the case of a Person that is a corporation, its articles or certificate of incorporation and its by-laws, regulations or similar governing instruments required by the laws of its jurisdiction of formation or organization; (b) in the case of a Person that is a partnership, its articles or certificate of partnership, formation or association, and its partnership agreement (in each case, limited, limited liability, general or otherwise); (c) in the case of a Person that is a limited liability company, its articles or certificate of formation or organization, and its limited liability company agreement or operating agreement; (d) in the case of a Person that is none of a corporation, partnership (limited, limited liability, general or otherwise), limited liability company or natural person, its governing instruments as required or contemplated by the laws of its jurisdiction of organization; and (e) any amendment, modification, or supplement to the foregoing.

"**Parent**" means MoneyLion Inc.

"**Parent Stock**" means the common stock, par value $0.0001 per share, of MoneyLion Inc.

"**Parent Stock Floor Price**" means Nine Dollars ($9.00) with respect to Closing Stock Payment, Eight Dollars ($8.00) with respect to the 2021 Earnout Payment, and Seven Dollars ($7.00) with respect to the 2022 Earnout Payment.

"**Partnership Income Tax Returns**" has the meaning set forth in Section 6.01(a).

"**Party**" or "**Parties**" has the meaning set forth in the preamble.

"**Permits**" means all permits, licenses, approvals, authorizations, registrations, certificates, variances, and similar rights obtained or consents required to be obtained, from Governmental Authorities.

"**Permitted Encumbrances**" has the meaning set forth in Section 3.10(a).

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"**Personal Information**" means all information and data relating to one or more individual(s) or an individual's device that is personally identifying (i.e., data that identifies an individual or, in combination with any other information or data available to the Company, is capable of identifying an individual or an individual's device); and data that is defined as personal data, personally identifiable information, personal information, or similar term as defined under applicable Privacy Laws, Company Privacy Policies, or Privacy Contracts. Personal Information includes information in any form, whether paper or electronic.

"**Pre-Closing Tax Period**" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

"**PPP Loans**" has the meaning set forth in <u>Section 3.32</u>.

"**Publicly Available Software**" has the meaning set forth in <u>Section 3.12(i)</u>.

"**Purchase Price Adjustment Escrow Amount**" means $325,000.

"**Purchase Price Adjustment Escrow Fund**" has the meaning set forth in <u>Section 2.03(b)(i)</u>.

"**Purchased Interests**" has the meaning set forth in the recitals.

"**Qualified Benefit Plan**" has the meaning set forth in <u>Section 3.20(c)</u>.

"**R&W Policy**" has the meaning set forth in <u>Section 2.04</u>.

"**Real Property**" means the real property owned, leased or subleased by the Company, together with all buildings, structures and facilities located thereon.

"**Related Party**" means (a) each individual who is, or who has at any time been, an officer or member of the Company; (b) each member of the family of each of the individuals referred to in clause (a) above; and (c) any Affiliate, other than the Company, of any of the individuals referred to in clauses (a) or (b).

"**Related Party Obligations**" has the meaning set forth in <u>Section 5.06</u>.

"**Release**" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"**Released Claims**" has the meaning set forth in <u>Section 5.06</u>.

"**Released Liabilities**" has the meaning set forth in <u>Section 5.06</u>.

"**Released Party**" has the meaning set forth in <u>Section 5.06</u>.

"**Releasing Parties**" has the meaning set forth in <u>Section 5.06</u>.

"**Remediation**" means the changes implemented to mitigate the risk of potential violations of FLSA or related employment laws by the Company, upon mutual agreement of the Company, the Sellers' Representative, and Buyer.

"**Remediation Date**" means the date upon which the Remediation concluded.

"**Representative**" means, with respect to any Person, any and all directors, members, managers, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Business**" means, as of any date, any line of business of the type performed by, in active development by, or reasonably contemplated by, the Company, as of such date, including, without limitation, the provision of production services (including, without limitation,  television, internet video or podcast), project management services (including, without limitation, consulting to third parties, such as

influencers, on show or content development), content distribution services (including, without limitation, television, internet video or podcast), and brand strategy services.

"**Restricted Class M1 Common Units**" has the meaning set forth in Section 5.13.

"**Restricted Period**" has the meaning set forth in Section 5.02(a).

"**Restricted Stock Agreement**" means a Restricted Stock Agreement to be entered into by each Seller Member at the Closing, substantially in the form of Exhibit C.

"**Retention Escrow Amount**" means $375,000.

"**Retention Escrow Fund**" has the meaning set forth in Section 2.03(b)(ii).

"**Revenue**" has the meaning set forth in Schedule B.

"**Revenue and EBITDA Calculation Principles**" means (a) the principles, policies and procedures used by Buyer in its calculation of the Company's Revenue and EBITDA for the periods beginning on January 1, 2021 and ended December 31, 2021 and beginning January 1, 2022 and ended December 31, 2022, as set forth on Schedule B attached hereto; and (b) to the extent not inconsistent with the foregoing, the historical accounting principles, policies and procedures of the Company.

"**Revenue and EBITDA Earnout Disputed Amounts**" has the meaning set forth in Section 2.06(b)(iv).

"**Revenue and EBITDA Earnout Resolution Period**" has the meaning set forth in Section 2.06(b)(iii).

"**Revenue and EBITDA Earnout Review Period**" has the meaning set forth in Section 2.06(b)(ii).

"**Revenue and EBITDA Earnout Statement of Objections**" has the meaning set forth in Section 2.06(b)(iii).

"**Revenue and EBITDA Earnout Undisputed Amounts**" has the meaning set forth in Section 2.06(b)(iv).

"**Revenue and EBITDA Statement**" or "**Revenue and EBITDA Statements**" has the meaning set forth in Section 2.06(b)(i).

"**RSUs**" has the meaning set forth in Section 2.07.

"**SBA**" has the meaning set forth in Section 3.32.

"**Section 503**" has the meaning set forth in Section 3.21(g).

"**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"**Securities and Exchange Commission**" has the meaning set forth in Section 3.30(b).

"**Securities Laws**" means, collectively, the Securities Act, the Securities Exchange Act of 1934, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Sarbanes-Oxley Act of

2002, each as amended, any state securities and "blue sky" laws, and the rules and regulations promulgated thereunder."

"**Seller Indemnitees**" has the meaning set forth in Section 8.05.

"**Seller Member**" or "**Seller Members**" has the meaning set forth in the preamble.

"**Seller Party**" or "**Seller Parties**" has the meaning set forth in the preamble.

"**Seller's Knowledge**" or any other similar knowledge qualification, means any matter, fact, or thing that is known to any Knowledge Individual, or which should have been known by any such Knowledge Individual after making due inquiry and reasonable investigation, taking into account their experience, positions and duties with respect to the Company.

"**Sellers' Representative**" has the meaning set forth in the preamble.

"**Selling Percentages**" means, together, in respect of each Seller Member, the Selling Cash Percentage and Selling Equity Percentage the applicable percentage specified on Schedule C.

"**Selling Cash Percentage**" means, in respect of each Seller Member, the applicable percentage specified on Schedule C.

"**Selling Equity Percentage**" means, in respect of each Seller Member, the applicable percentage specified on Schedule C.

"**Special Cap**" has the meaning set forth in Section 8.08(d).

"**Special Deductible**" has the meaning set forth in Section 8.08(d).

"**Straddle Period**" means any taxable period beginning on or before, and ending after, the Closing Date.

"**Subsidiary**" of any Person means another Person, an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body, or, if there are no such voting interests, 50% or more of the equity interests of which is owned directly or indirectly by such first Person or by another subsidiary of such first Person.

"**Subsidiary PPP Loan**" has the meaning set forth in Section 3.32.

"**Target Working Capital**" means $1,489,508.

"**Tax Authority**" means a Governmental Authority responsible for the administration, determination or collection of Taxes.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, escheat, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, whether disputed or not, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Claim**" has the meaning set forth in <u>Section 6.07</u>.

"**Tax Return**" means any return, amendment, declaration, report, claim for refund, information return, or statement, estimate, schedule, notice, notification, form, election, certificate or other document or information filed with or submitted to, or required to be filed with or submitted to, any Tax Authority in connection with the determination, assessment, collection or payment of any Tax (including any attached schedule) or in connection with the administration, implementation or enforcement of or compliance with any applicable Law relating to any Tax.

"**Termination and Release Agreements**" has the meaning set forth in <u>Section 5.13</u>.

"**Territory**" means (a) the United States, Canada and any other international territory in which the Company conducts or has made plans or otherwise taken steps to conduct business as of the Closing, but if such area is determined by judicial action to be too broad, then it means (b) any state or territory in which the Company conducts or has made plans or otherwise taken steps to conduct business as of the Closing.

"**Third Party Claim**" has the meaning set forth in <u>Section 8.06(a)</u>.

"**Third Party Claim Settlement Cap**" has the meaning set forth in <u>Section 8.06(a)</u>.

"**Third Party Consent**" has the meaning set forth in <u>Section 3.05</u>.

"**Transactions**" means all of the transactions provided for in, or contemplated by, this Agreement.

"**Transaction Expenses**" means all fees and expenses incurred by the Company or the Seller Members at or prior to the Closing in connection with the preparation, negotiation and execution of this Agreement and the Ancillary Documents, and the performance and consummation of the Transactions, including, for the avoidance of doubt, the Seller Members' portion of the expenses associated with the R&W Policy in accordance with <u>Section 2.04</u>.

"**Transfer Taxes**" means any and all transfer, sales, use, real property transfer, recording, documentary, stamp, registration, unit transfer and other similar Taxes and fees imposed in respect of the Transactions.

"**Unaudited Financial Statements**" has the meaning set forth in <u>Section 3.06</u>.

"**Union**" has the meaning set forth in <u>Section 3.21(c)</u>.

"**Vesting Dates**" has the meaning set forth in <u>Section 2.06(e)</u>.

"**Vesting Date VWAP**" has the meaning set forth in <u>Section 2.06(e)</u>.

"**VEVRAA**" has the meaning set forth in <u>Section 3.21(g)</u>.

"**User Data**" means any Personal Information or other data or information collected by or on behalf of the Company or any Seller Member from users of the Company Products or of any Company Website.

"**WARN Act**" means the federal Worker Adjustment and Retraining Notification Act of 1988, and similar state, local and foreign laws related to plant closings, relocations, mass layoffs and employment losses.

"**Working Capital of the Company**" or "**Working Capital**" shall mean the Current Assets of the Company, less the Current Liabilities of the Company determined in accordance with and adjusted pursuant to the Accounting Principles.

# ARTICLE II
## PURCHASE AND SALE

**Section 2.01 Purchase and Sale.** Subject to the terms and conditions set forth herein, at the Closing, (a) each Seller Member shall sell to Buyer, and Buyer shall purchase from each Seller Member, all of such Seller Member's right, title, and interest in and to the Purchased Interests, free and clear of all Encumbrances, for the Aggregate Purchase Price as defined in <u>Section 2.02</u> hereof.

**Section 2.02 Purchase Price.** The "**Aggregate Purchase Price**" for the Purchased Interests shall be an amount (subject to adjustment as set forth in this Agreement) equal to the sum of (a) the Aggregate Closing Payment and (b) the Earnout Payment Amount, due to the Seller Members, if at all, in accordance with this Agreement.

    (a)     **Selling Percentages.** Any and all payments and equity issuances to the Seller Members pursuant to this Agreement shall be made to the Seller Members in proportion to the respective Selling Percentages for each Seller Member as set forth on <u>Schedule C</u>. Buyer may rely on <u>Schedule C</u> and the calculation of the Selling Percentages set forth therein (as such may be updated by the Sellers' Representative), and in no event shall Buyer, or any of its respective Affiliates have any liability to any Selling Member or other Person with respect to any dispute relating to the calculation of the Selling Percentages or on account of payments made in accordance with the terms of this Agreement and <u>Schedule C</u>.

**Section 2.03 Payment of the Aggregate Closing Payment.** At the Closing, Buyer shall, in the case of the Closing Cash Payment, pay, or cause to be paid, and, in the case of the Closing Stock Payment, issue, or cause to be issued:

    (a)     to the Seller Members:

        (i)     subject to adjustment pursuant to Section 2.05, (1) the Closing Cash Payment, in accordance with their applicable Selling Cash Percentage, by wire transfer of immediately available funds to the account(s) designated in writing by the Sellers' Representative to Buyer at least three (3) Business Days prior to the Closing Date;

        (ii)     such number of shares of Parent Stock in an amount equal to an aggregate of Thirty Million Dollars ($30,000,000) divided by the greater of (i) the 30-Day VWAP determined as of the Closing Date and (ii) Nine Dollars ($9.00) (such shares of Parent Stock the "**Closing Stock Payment**"), in accordance with their applicable Selling Equity Percentage, rounded down only as to fractional shares to the nearest whole number with respect to each Seller Member, and shall vest in four (4) equal installments on December 31, 2021, March 31, 2022, June 30, 2022, and September 30, 2022. As a condition to the receipt by a Seller Member of any Closing Stock Payment, the 2021 Earnout Payment, or the 2022 Earnout Payment, which, pursuant to this <u>Section 2.03</u> and to <u>Section 2.06</u>, is to be paid through the issuance of Parent Stock, such Seller Member shall execute and deliver to Buyer a Restricted Stock Agreement in the form attached hereto as <u>Exhibit C</u> and a Registration Rights Agreement in the form attached hereto as <u>Exhibit D</u>. As a condition to the receipt by an Employee Payment Participant of any Employee Payment, which, pursuant to <u>Section 2.07</u>, is to be paid through the issuance of RSUs, such

Employee Payment Participant shall execute and deliver to Buyer an Employee Payment Participant RSU Letter Agreement in the form attached hereto as <u>Exhibit E</u>;

(iii)    the Estimated Indebtedness Amount by wire transfer of immediately available funds to the accounts and in the amounts specified on the applicable Estimated Statement; and

(iv)    the Estimated Transaction Expenses by wire transfer of immediately available funds to the accounts and in the amounts specified on the applicable Estimated Statement.

(b)    to the Escrow Agent:

(i)    the Purchase Price Adjustment Escrow Amount (such amount, including any interest or other amounts earned thereon and less any disbursements therefrom in accordance with the Escrow Agreement, the "**Purchase Price Adjustment Escrow Fund**") by wire transfer of immediately available funds to accounts designated by the Escrow Agent; and

(ii)    the Retention Escrow Amount (such amount, including any interest or other amounts earned thereon and less any disbursements therefrom in accordance with the Escrow Agreement, the "**Retention Escrow Fund**") by wire transfer of immediately available funds to accounts designated by the Escrow Agent.

**Section 2.04 R&W Policy**. Concurrently with execution of this Agreement, the Buyer shall procure a customary representation and warranty insurance policy, in substantially in the form delivered to Sellers' Representative prior to the execution of this Agreement, issued to the Buyer in connection with this Agreement with binding effective as of the date of this Agreement (the "**R&W Policy**") with Buyer as the named insured and covering the representations and warranties of the Company and Seller Members under this Agreement. The premium and related costs of the R&W Policy providing for an aggregate coverage amount of $7,500,000 shall be paid 50% by the Buyer, on the one hand, and 50% by the Sellers Members, on the other hand, with Seller Members' portion fully included in the calculation of Transaction Expenses. For the avoidance of doubt, the retention amount of the R&W Policy in the aggregate amount of $750,000 shall be paid 50% by the Buyer, on the one hand, and 50% by the Sellers Members, on the other hand, with Seller Members' portion constituting the Retention Escrow Amount.  The Company and the Seller Members shall reasonably cooperate with the Buyer and provide assistance as reasonably required by the Buyer with respect to the Buyer obtaining and binding the R&W Policy.

**Section 2.05 Purchase Price Adjustment.**

(a)    **Closing Adjustment.**

(i)    Not less than three (3) Business Days prior to the Closing Date, the Seller Members have caused the Company to prepare and deliver to Buyer a calculation of (A) the estimated Closing Working Capital as of 12:01 AM Eastern Time on the Closing Date (the "**Estimated Closing Working Capital**") in accordance with the Accounting Principles, (B) the estimated amount of Cash as of 12:01 AM Eastern Time on the Closing Date (the "**Estimated Closing Cash Amount**"), (C) the estimated amount of Indebtedness as of 12:01 AM Eastern Time on the Closing Date, identifying each Person to whom such Indebtedness is owed, the account designated by such Person to receive payment, and the amount necessary to satisfy in full the Seller Members' and Company's

obligation for such Indebtedness to such Person (the aggregate amount of such Indebtedness, the "**Estimated Indebtedness Amount**"), and (D) all unpaid Transaction Expenses, identifying each Person that provided services that generated Transaction Expenses, the account designated by such Person to receive payment, and the amount necessary to satisfy in full the Seller Members' and Company's obligation for such Transaction Expenses to such Person (the aggregate amount of such Transaction Expenses, the "**Estimated Transaction Expenses Amount**"); each such estimate to be prepared in good faith (each, an "**Estimated Statement**" and together, the "**Estimated Statements**"). To assist Buyer in its review of the Estimated Statements, the Seller Members and Company shall make available to Buyer and its Representatives such information and detail used in connection therewith that is reasonably requested by Buyer. Buyer shall notify the Sellers' Representative of any dispute it has with any Estimated Statement, and the Buyer and the Sellers' Representative shall exercise good faith efforts to agree on the Estimated Statements in advance of the Closing; *provided*, *however*, the acceptance by Buyer of any Estimated Statement shall not limit or otherwise affect Buyer's remedies under this Agreement, including its right to include such changes or other changes in the Closing Balance Sheet, or constitute an acknowledgement by Buyer of the accuracy of any of the Estimated Statements. If the Estimated Closing Working Capital is less than the Target Working Capital, then the Aggregate Closing Payment shall be reduced on a dollar-for-dollar basis by the amount of the deficiency (such deficiency is referred to as the "**Estimated Negative Working Capital Adjustment Amount**"). If the Estimated Closing Working Capital is greater than the Target Working Capital, then the Aggregate Closing Payment shall be increased on a dollar-for-dollar basis by the amount of the excess (such excess is referred to as the "**Estimated Positive Working Capital Adjustment Amount**").

(b)     **Post-Closing Adjustment**.

         (i)     As soon as practicable after the Closing Date, but in any event no later than sixty (60) calendar days following the Closing Date, Buyer shall prepare and deliver to the Sellers' Representative a calculation, all as of 12:01 AM Eastern Time on the Closing Date, of the Closing Working Capital calculated in accordance with the Accounting Principles (the "**Final Closing Working Capital**"), the amount of Cash (the "**Final Closing Cash Amount**"), the amount of Indebtedness (the "**Final Indebtedness Amount**"), and the amount of unpaid Transaction Expenses (the "**Final Transaction Expenses Amount**"); which in each case shall be prepared in good faith (each, an "**Final Statement**" and together the "**Final Statements**"). If the Sellers' Representative disputes the Final Closing Working Capital, Final Closing Cash Amount, Final Indebtedness Amount, or Final Transaction Expenses Amount delivered by Buyer, then the Sellers' Representative shall deliver a written statement to Buyer (the "**Dispute Notice**") describing with reasonable detail the basis for any such dispute within thirty (30) calendar days after receiving the Final Closing Working Capital, Final Closing Cash Amount, Final Indebtedness Amount, and Final Transaction Expenses Amount. If the Sellers' Representative does not deliver the Dispute Notice to Buyer within such thirty (30) calendar day time period, then the determination of the Final Closing Working Capital, Final Closing Cash Amount, Final Indebtedness Amount, and Final Transaction Expenses Amount shall be deemed final and accepted by the Seller Members and the Sellers' Representative. Buyer and the Sellers' Representative shall cooperate and act in good faith in an effort to resolve any such dispute themselves. If such dispute is not finally resolved within thirty (30) calendar days after Buyer's receipt of the Dispute Notice, Buyer, on the one hand, or the Sellers' Representative, on the other hand, may promptly thereafter cause

the Independent Accountant, acting as experts and not arbitrators, to review this Agreement and the disputed items or amounts in determining the Final Closing Working Capital, Final Closing Cash Amount, Final Indebtedness Amount, and Final Transaction Expenses Amount, as applicable. Within thirty (30) calendar days after submission to the Independent Accountant for resolution, Buyer and the Sellers' Representative shall each indicate in writing their position on each disputed matter and each such Party's determination of the amount thereof. The Independent Accountant shall make a written determination, acting as experts and not arbitrators, on each disputed matter no later than thirty (30) calendar days after receipt of each Party's written submission pursuant to the preceding sentence and such determination will be conclusive and binding upon the Parties to this Agreement with respect to that disputed matter, subject to the indemnification rights otherwise contained herein. In conducting its review, the Independent Accountant shall consider only items in dispute, and shall base its determination solely on the written submissions of Buyer and the Sellers' Representative (i.e., no independent investigation) to the Independent Accountant and the definitions and methodologies prescribed herein. The decision of the Independent Accountant for each item and amount in dispute must be within the range of values assigned to each such item as provided in the written submissions to the Independent Accountant by each Party. The proposed Final Closing Working Capital, Final Closing Cash Amount, Final Indebtedness Amount, and Final Transaction Expenses Amount, as applicable, shall be revised as appropriate to reflect the resolution of any such disputes pursuant to this <u>Section 2.05</u>. The fees and expenses of the Independent Accountant shall be paid, by both the Seller Members, on the one hand, and by Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded to the Seller Members or Buyer, respectively, bears to the aggregate amount actually contested by Seller Members and Buyer.

(ii)     Buyer shall provide the Sellers' Representative and its Representatives and, if necessary, the Independent Accountant with reasonable access to the books and records of the Company and any other materials used in the preparation of the calculation of the Final Closing Working Capital, Final Closing Cash Amount, Final Indebtedness Amount, and Final Transaction Expenses Amount, and shall make the Company's staff and advisors available to the Sellers' Representative and its Representatives, and, if necessary, the Independent Accountant, at any reasonable time in connection with (A) the review and determination of the Final Closing Working Capital, Final Closing Cash Amount, Final Indebtedness Amount, and Final Transaction Expenses Amount; and (B) the resolution by Buyer and the Sellers' Representative and/or the Independent Accountant of any objections thereto.

(iii)    The Aggregate Purchase Price will be adjusted if and to the extent that the Final Closing Working Capital as finally determined under this <u>Section 2.05</u> is less than or greater than the Estimated Closing Working Capital. If the Final Closing Working Capital is less than the Estimated Closing Working Capital, then the Aggregate Purchase Price will be decreased on a dollar-for-dollar basis by the entire amount of the deficiency (the "**Final Negative Working Capital Adjustment**"). If the Final Closing Working Capital is greater than the Estimated Closing Working Capital, then the Aggregate Purchase Price will be increased on a dollar-for-dollar basis by the entire amount of the excess (the "**Final Positive Working Capital Adjustment**"). Additionally, the Aggregate Purchase Price shall be adjusted (A) upward on a dollar-for-dollar basis by the entire amount by which the Final Closing Cash Amount is greater than the Estimated Closing Cash Amount, (B) downward on a dollar-for-dollar basis by the entire amount by

21

which the Final Closing Cash Amount is less than the Estimated Closing Cash Amount, (C) upward on a dollar-for-dollar basis by the entire amount by which the Final Indebtedness Amount is less than the Estimated Indebtedness Amount, (D) downward on a dollar-for-dollar basis by the entire amount by which the Final Indebtedness Amount is greater than the Estimated Indebtedness Amount, (E) downward on a dollar-for-dollar basis by the entire amount by which the Final Transaction Expenses Amount is greater than the Estimated Transaction Expenses Amount, and (F) upward on a dollar-for-dollar basis by the entire amount by which the Final Transaction Expenses Amount is less than the Estimated Transaction Expenses Amount. The adjustment for Cash as of the Closing, upwards or downwards, as the case may be, is referred to herein as the "**Final Cash Adjustment**." The adjustment for Indebtedness as of the Closing, upwards or downwards, as the case may be, is referred to herein as the "**Final Indebtedness Adjustment**." The adjustment for Transaction Expenses as of the Closing is referred to herein as the "**Final Transaction Expenses Adjustment**."

(iv)     The Final Negative Working Capital Adjustment or Final Positive Working Capital Adjustment, as applicable, shall be netted with the Final Cash Adjustment, Final Indebtedness Adjustment, and Final Transaction Expenses Adjustment and in the event such netting results in a reduction to the Aggregate Purchase Price (the amount of such reduction, the "**Final Deficiency**"), then Buyer and Sellers' Representative shall, no later than two (2) Business Days after the final determination of the Final Deficiency, direct the Escrow Agent to distribute, within one (1) Business Day of such instruction (A) the amount of the Final Deficiency from the Purchase Price Adjustment Escrow Amount to Buyer; and (B) the remainder of the Purchase Price Adjustment Escrow Amount, if any, to the Seller Members, in accordance with their Selling Cash Percentage. To the extent the Purchase Price Adjustment Escrow Amount is not sufficient to fully satisfy the Final Deficiency, then the Seller Members shall, jointly and severally, be responsible for and shall promptly pay to Buyer any remaining amounts of the Final Deficiency.

(v)     In the event the netting of the Final Negative Working Capital Adjustment or Final Positive Working Capital Adjustment, as applicable, the Final Cash Adjustment, Final Indebtedness Adjustment, and Final Transaction Expenses Adjustment results in an increase to the Aggregate Purchase Price (the amount of such increase, the "**Final Excess**"), then (A) Buyer shall, no later than fifteen (15) days after the final determination of the Final Excess, pay, or cause to be paid, the Final Excess to the Seller Members, in accordance with their Selling Cash Percentage, by wire transfer of immediately available funds to account(s) designated by the Sellers' Representative; and (B) Buyer and Sellers' Representative shall, no later than two (2) Business Days after the final determination of the Final Deficiency, direct the Escrow Agent to distribute, within one (1) Business Day of such instruction, the full Purchase Price Adjustment Escrow Amount to the Seller Members, in accordance with their Selling Cash Percentage.

(c)     **Adjustments for Tax Purposes.** Any payments made pursuant to Section 2.05 shall be treated as an adjustment to the Aggregate Purchase Price by the Parties for Tax purposes, unless otherwise required by Law.

**Section 2.06 Earnout Payment**.

(a)     **Earnout Payment**. As additional consideration for the purchase and sale of the Purchased Interests hereunder, Buyer shall be obligated to remit to the Seller Members or shall cause the

Company to remit to the Seller Members, as applicable, the Earnout Payment Amount, subject to the following conditions, which such consideration shall be due, if at all, as specified in this <u>Section 2.06</u>.

      (b)      **Delivery of Earnout Statement**.

          (i)      **Statement Preparation.** Within thirty (30) days of receipt by Buyer of the Company's audited financial statements for the year ended December 31, 2021, but in no event later than May 31, 2022, Buyer shall deliver to the Sellers' Representative a statement (the "**2021 Revenue and EBITDA Statement**"), prepared in good faith and in accordance with the Revenue and EBITDA Calculation Principles, setting forth Buyer's calculation of the Company's Revenue and EBITDA for the year ended December 31, 2021 (the "**2021 Revenue Amount**" and the **"2021 EBITDA Amount**" respectively). Within thirty (30) days of receipt by Buyer of the Company's audited financial statements for the year ended December 31, 2022 but in no event later than May 31, 2023, Buyer shall deliver to the Sellers' Representative a statement (the "**2022 Revenue and EBITDA Statement**"; and together with the 2021 Revenue and EBITDA Statement, each a "**Revenue and EBITDA Statement**" and collectively the "**Revenue and EBITDA Statements**"), prepared in good faith and in accordance with the Revenue and EBITDA Calculation Principles, setting forth Buyer's calculation of the Company's Revenue and EBITDA for the calendar year ended December 31, 2022 (the "**2022 Revenue Amount**" and the "**2022 EBITDA Amount**" respectively). For the avoidance of doubt, it is the intention of the Parties that the 2021 Revenue Amount and the 2021 EBITDA Amount and the 2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using substantially consistent methods and practices.

          (ii)      **Examination.**  After receipt of a Revenue and EBITDA Statement, Sellers' Representative shall have forty five (45) days (the "**Revenue and EBITDA Earnout Review Period**") to review Buyer's calculation of such Revenue and EBITDA Statement. During the Revenue and EBITDA Earnout Review Period, Buyer shall provide the Sellers' Representative and its Representatives with reasonable access to the books and records of the Company and any other materials used by Buyer in the preparation of the calculation of the applicable Revenue and EBITDA Statement, in all cases as requested by Sellers' Representative, and shall make the Company's staff and advisors available to the Sellers' Representative and its Representatives, as may be reasonably requested by the Sellers' Representative, for the purpose of reviewing the Revenue and EBITDA Statement and to prepare a Revenue and EBITDA Statement of Objections (defined below).

          (iii)      **Objection**. On or prior to the last day of the Revenue and EBITDA Earnout Review Period, Sellers' Representative may object to Buyer's calculation of the Revenue and EBITDA Statement by delivering to Buyer a written statement setting forth Sellers' Representative objections in reasonable detail, indicating each disputed item or amount and the basis for the Sellers' Representative disagreement therewith (the "**Revenue and EBITDA Earnout Statement of Objections**"). If Sellers' Representative fails to deliver the Revenue and EBITDA Earnout Statement of Objections before the expiration of the Revenue and EBITDA Earnout Review Period, such Revenue and EBITDA Statement as calculated by Buyer shall be deemed final and to have been accepted by the Sellers' Representative and the Seller Members. If Sellers' Representative delivers the Revenue and EBITDA Earnout Statement of Objections before the expiration of the Revenue and EBITDA Earnout Review Period, Buyer and Sellers' Representative shall negotiate in good faith to resolve such dispute within thirty (30) days after the

delivery of the Revenue and EBITDA Earnout Statement of Objections (the "**Revenue and EBITDA Earnout Resolution Period**").

(iv)     **Resolution of Disputes**. If Sellers' Representative and Buyer fail to reach an agreement with respect to all of the matters set forth in an Revenue and EBITDA Earnout Statement of Objections before expiration of the Revenue and EBITDA Earnout Resolution Period, then any item or amount remaining in dispute ("**Revenue and EBITDA Earnout Disputed Amounts**" and any items or amounts not so disputed, the "**Revenue and EBITDA Earnout Undisputed Amounts**") shall be submitted for resolution to the office of the Independent Accountant. Within thirty (30) calendar days after submission to the Independent Accountant for resolution, Buyer and the Sellers' Representative shall each indicate in writing their position on each disputed matter and each such Party's determination of the amount thereof. The Independent Accountant shall make a written determination, acting as experts and not arbitrators, resolving the Revenue and EBITDA Earnout Disputed Amounts only and make any adjustments to a Revenue and EBITDA Statement no later than thirty (30) calendar days after receipt of each Party's written submission pursuant to the preceding sentence and such determination will be conclusive and binding upon the Parties to this Agreement with respect to that disputed matter, subject to the indemnification rights otherwise contained herein. In conducting its review, the Independent Accountant shall consider only items in dispute, and shall base its determination solely on the written submissions of Buyer and the Sellers' Representative (i.e., no independent investigation) to the Independent Accountant and the definitions and methodologies prescribed herein. The decision of the Independent Accountant for each item and amount in dispute must be within the range of values assigned to each such item as provided in the written submissions to the Independent Accountant by each Party. The fees and expenses of the Independent Accountant shall be paid, by both the Seller Members, on the one hand, and by Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded to the Seller Members or Buyer, respectively, bears to the aggregate amount actually contested by Seller Members and Buyer. The proposed Revenue and EBITDA Statement (including the 2021 Revenue and EBITDA Amount or the 2022 Revenue and EBITDA Amount, as applicable) shall be revised as appropriate to reflect the resolution of any Revenue and EBITDA Earnout Disputed Amounts pursuant to this Section 2.06(b)(iv).

(v)     **Payment of Earnout Payment**.

(A)     In the event that the Company generates a 2021 Revenue Amount and a 2021 EBITDA Amount of at least (i) Sixteen Million Seven Hundred Fifty Thousand Dollars ($16,750,000) of Revenue ("**Minimum 2021 Revenue Amount**") and (ii) One Hundred Thousand Dollars ($100,000) of EBITDA ("**Minimum 2021 EBITDA Amount**"), respectively, then Seller Members shall be entitled, in accordance with each Seller Member's respective Selling Equity Percentage, to a portion of the Earnout Payment Amount payable in such number of shares of Parent Stock, rounded down to the nearest whole number with respect to each Seller Member (such aggregate number of shares of Parent Stock, the "**2021 Earnout Payment**"), equal to Six Million Seven Hundred Thousand Dollars ($6,700,000), based on a price per share equal to the greater of (i) the 30-Day VWAP determined as of the 2021 Earnout Payment Issuance Date and (ii) Eight Dollars ($8.00). In the event the Company exceeds the Minimum 2021 Revenue Amount, such 2021 Earnout Payment shall increase on a linear basis up to such number of shares of Parent Stock equal to an aggregate value of Ten

Million Dollars ($10,000,000) in proportion to the Company's achievement of up to Twenty Five Million Dollars ($25,000,000) of Revenue ("**Maximum 2021 Revenue Amount**"). For illustrative purposes only, if the Company generates (i) a 2021 EBITDA Amount of One Hundred Thousand Dollars ($100,000) of EBITDA and (ii) a 2021 Revenue Amount of Twenty Million Dollars ($20,000,000) of Revenue (i.e., eighty percent (80%) of the Revenue component of the Maximum 2021 Revenue Amount), then Seller Members shall be entitled to a 2021 Earnout Payment of such number of shares of Parent Stock equal to Eight Million Five Hundred Thousand Dollars ($8,000,000) (e.g., eighty percent (80%) of the Revenue component of the Maximum 2021 Revenue Amount). If such stock is issued to a Selling Member in connection with the 2021 Earnout Payment, it shall vest in four (4) equal installments on March 31, 2022, June 30, 2022, September 30, 2022, and December 31, 2022. For the avoidance of doubt, in the event (i) the 2021 Revenue Amount is less than the Minimum 2021 Revenue Amount or (ii) the 2021 EBITDA Amount is less than the Minimum 2021 EBITDA Amount, then, in either case, no Seller Member shall be entitled to receive, and Buyer shall not be obligated to pay, any corresponding portion of the Earnout Payment Amount.

(B)     In the event that the Company generates a 2022 Revenue Amount and a 2022 EBITDA Amount of at least (i) Twenty Million One Hundred Thousand Dollars ($20,100,000) of Revenue ("**Minimum 2022 Revenue Amount**") and (ii) One Hundred Thousand Dollars ($100,000) of EBITDA ("**Minimum 2022 EBITDA Amount**"), respectively, then Seller Members shall be entitled, in accordance with each Seller Member's respective Selling Equity Percentage, to a portion of the Earnout Payment Amount payable in such number of shares of Parent Stock, rounded down to the nearest whole number with respect to each Seller Member (such aggregate number of shares of Parent Stock, the "**2022 Earnout Payment**"), equal to Sixteen Million Seven Hundred Fifty Thousand Dollars ($16,750,000), based on a price per share equal to the greater of (i) the 30-Day VWAP determined as of the 2022 Earnout Payment Issuance Date and (ii) Seven Dollars ($7.00). In the event the Company exceeds the Minimum 2022 Revenue Amount, such 2022 Earnout Payment shall increase on a linear basis up to such number of shares of Parent Stock equal to an aggregate value of Twenty Five Million Dollars ($25,000,000) in proportion to the Company's achievement of up to Thirty Million Dollars ($30,00,000) of Revenue ("**Maximum 2022 Revenue Amount**"), calculated in the same manner as described in Section 2.06(b)(v)(A). If such stock is issued to a Selling Member in connection with the 2022 Earnout Payment, it shall vest in four (4) equal installments on March 31, 2023, June 30, 2023, September 30, 2023, and December 31, 2023. For the avoidance of doubt, in the event (i) the 2022 Revenue Amount is less than the Minimum 2022 Revenue Amount and (ii) the 2022 EBITDA Amount is less than the Minimum 2022 EBITDA Amount, then, in either case, no Seller Member shall be entitled to receive, and Buyer shall not be obligated to pay, any corresponding portion of the Earnout Payment Amount.

(C)     In the event of a Change of Control prior to December 31, 2021, Buyer shall use commercially reasonable efforts to deliver to Sellers' Representative, no later than ten (10) Business Days prior to the closing of such Change of Control, a calculation of the annualized, full-calendar 2021 Revenue and EBITDA Amount based *pro rata* on the Company's Revenue and EBITDA

Execution Version

through the date such calculation is delivered (the "**2021 Annualized Amount**"). If the 2021 Annualized Amount is equal to or greater than the Minimum 2021 Revenue and EBITDA Amount and as adjusted *pro rata* in the same manner as used to calculate the 2021 Annualized Amount, then any Parent Stock of the Seller Members associated with the Closing Stock Payment, 2021 Earnout Payment, and 2022 Earnout Payment shall immediately vest effective as-of immediately prior to the date of such Change of Control.  The calculation of the 2021 Annualized Amount shall be subject to review, objection and resolution substantially in compliance with the processes set forth in Sections 2.06(b)(ii), (iii) and (iv).

(D)     In the event of a Change of Control prior to December 31, 2022, Buyer shall use commercially reasonable efforts to deliver to Sellers' Representative, no later than ten (10) Business Days prior to the closing of such Change of Control, a calculation of the annualized, full-calendar 2022 Revenue and EBITDA Amount based *pro rata* on the Company's Revenue and EBITDA through the date such calculation is delivered (the "**2022 Annualized Amount**"). If the 2022 Annualized Amount is equal to or greater than the Minimum 2022 Revenue and EBITDA Amount and as adjusted *pro rata* in the same manner as used to calculate the 2022 Annualized Amount, then any Parent Stock of the Seller Members associated with the Closing Stock Payment, 2021 Earnout Payment (to the extent Seller Members are entitled to such payment pursuant to Section 2.06(b)(v)(A)) and 2022 Earnout Payment shall immediately vest effective as-of immediately prior to the date of such Change of Control.  The calculation of the 2022 Annualized Amount shall be subject to review, objection and resolution substantially in compliance with the processes set forth in Sections 2.06(b)(ii), (iii) and (iv).

(c)     **Contingent Payments.** The Earnout Payment Amount is a contingent payment subject to the terms and conditions of this Agreement and the right of the Seller Members to the Earnout Payment Amount (i) is solely a contractual right and is not a security for purposes of any federal or state Securities Laws (and shall confer upon any Seller Member only the rights of a general unsecured creditor under applicable state law); (ii) will not be represented by any form of certificate or instrument; and (iii) may not be sold, assigned, pledged, gifted, conveyed, transferred or otherwise disposed of, and any such action in violation of this Agreement shall be null and void *ab initio*.

(d)     **Operation of the Business**. Except as otherwise set forth herein, in order to maximize the Seller Members' opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment, (i) from the Closing Date and through the end of December 31, 2021, Buyer shall, and shall cause the Company to operate the business of the Company in good faith and substantially similar in all material respects with the past practice of the Company prior to Closing, and will not take any action intended to interfere with or frustrate the Seller Members' opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment, and (ii) with respect to the period from January 1, 2022 and through the end of December 31, 2022, the Buyer shall, and shall cause the Company to operate the business of the Company substantially in accordance with the operating and revenue budget (the "**2022 Budget**") attached hereto as Exhibit B. Notwithstanding the foregoing, Buyer shall be able to make such changes, as it deems reasonably necessary, to the operation of the business of the Company or otherwise to ensure full compliance with all applicable Laws.

(e)     **Make-Whole Right**. In the event that upon each date listed in Section 2.03(a)(ii), Section 2.06(b)(v)(A), and Section 2.06(b)(v)(B) (the "**Vesting Dates**"), the 30-Day VWAP determined as of such Vesting Date (the "**Vesting Date VWAP**") is less than the Parent Stock Price Floor as of (a) the

Closing Date (for the Closing Stock Payment), (b) the 2021 Earnout Payment Issuance Date (for the 2021 Earnout Payment), and (c) the 2022 Earnout Payment Issuance Date (for the 2022 Earnout Payment), as applicable, Buyer shall with respect to the Closing Stock Payment, the 2021 Earnout Payment and the 2022 Earnout Payment, on such Vesting Date, in accordance with each Seller Member's respective Selling Equity Percentage, (i) issue additional Parent Stock to each Seller Member or (ii) pay additional cash to each Seller Member, as determined at Buyer's sole discretion, equivalent to (x) the difference between the Vesting Date VWAP and the Parent Stock Floor Price for such Vesting Date, (y) multiplied by the number of shares of Parent Stock vesting for each Seller Member on such Vesting Date.

Section 2.07 Closing and Earnout Employee Payments. Notwithstanding anything to the contrary in this Agreement, up to ten percent (10%) of the combined Aggregate Closing Payment and, if and as paid, the Earnout Payment Amount due and payable hereunder, may be paid to certain employees of the Company, as may be mutually determined by the Company and the Buyer (the "**Employee Payment Participant**") and as set forth on Schedule 2.07, less any applicable withholding Taxes (an "**Employee Payment**"), subject to the terms and conditions set forth herein. Each Employee Payment shall be made in the form of Restricted Stock Units of the Parent (the "**RSUs**"), pursuant to the MoneyLion Inc. 2021 Employee Stock Purchase Plan and subject to the terms of the Employee Payment Participant RSU Letter Agreements to be executed in connection with this Agreement. For the avoidance of doubt, (i) the portion of the Employee Payment attributable to the 2021 Earnout Payment shall be adjusted in proportion to the Company's achievement of the 2021 Minimum Revenue Amount and 2021 Maximum Revenue Amount, pursuant to Section 2.06(b)(v)(A), and (ii) the portion of the Employee Payment attributable to the 2022 Earnout Payment shall be adjusted in proportion to the Company's achievement of the 2022 Minimum Revenue Amount and 2022 Maximum Revenue Amount, pursuant to Section 2.06(b)(v)(B). For an Employee Payment Participant to be eligible to earn or receive any Employee Payment, such Employee Payment Participant must be employed by or providing services to the Company or any of its Subsidiaries on the date of such payment. The Employee Payment may only be issued to an Employee Payment Participant to the extent such issuance is in compliance with, and the applicable Employee Payment satisfies, all applicable Securities Laws. Notwithstanding anything to the contrary in this Agreement, without duplication of any other provision of this Agreement contemplating the payment to the Employee Payment Participants on the dates on which such payments, if any, are made in furtherance of the provisions of Section 2.03 and Section 2.06, for the avoidance of doubt, (i) the Earnout Payment Amount payable to Seller Members shall be reduced by the sum of (A) the aggregate amounts payable to the Employee Payment Participants plus (B) the employer portion of any payroll Taxes attributable to the Employee Payments, and (ii) all such payments of cash and equity constituting an Earnout Payment made to Employment Payment Participants shall be made net of any required withholding of Taxes under applicable Law.  In the event that, for whatever reason, the Employee Payment Participant is ineligible to earn or receive any portion of his or her Employee Payment, or the Employee Payment is not issued for any reason, any such payments shall be distributed amongst the Seller Members in the same proportion as the Aggregate Closing Payment and any Earnout Payment Amount.

Section 2.08 Closing. Subject to the terms and conditions of this Agreement, the Transactions, including the purchase and sale of the Purchased Interests contemplated hereby, shall take place remotely via the exchange of documents and signatures on the date hereof (the "**Closing**"; the day on which the Closing takes place being the "**Closing Date**").

Section 2.09 Withholding Tax. Buyer, Sellers' Representative and the Company shall be entitled to deduct and withhold from the Aggregate Purchase Price all Taxes that Buyer and the Company may be required to deduct and withhold under any provision of applicable Tax Law. All such withheld amounts shall be treated as delivered to the Seller Members hereunder.

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER PARTIES

Each Seller Member, severally (and individually) and not jointly, make the following representations and warranties set forth in Section 3.01 to Buyer, and the Company makes the following representations and warranties in the other Sections in this Article III to Buyer, each of which is true and correct on the date hereof and shall survive the Closing as provided herein, subject to such exceptions as are disclosed in the Disclosure Schedule of the Seller Parties annexed to this Agreement and incorporated herein by this reference and made a part hereof. For purposes of these representations and warranties (other than those in Sections 3.01, 3.02 and 3.03) the term the "**Company**" shall include any Subsidiaries and predecessor of the Company, unless otherwise noted herein.

**Section 3.01 Representations as to the Seller Members.**

(a)     Binding Authority. Each Seller Member, if an individual, is competent to execute and deliver this Agreement and each Ancillary Document to which such Seller Member is a party and to perform his obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Each Seller Member, if not an individual, is duly formed and organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has all requisite power and authority to execute and deliver this Agreement and each Ancillary Document to which such Seller Member is a party and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by each Seller Member of this Agreement and any Ancillary Document to which such Seller Member is a party, the performance by each Seller Member of its or his obligations hereunder and thereunder, and the consummation by each Seller Member of the transactions contemplated hereby and thereby have been duly and properly authorized by all requisite action on the part of each Seller Member. This Agreement has been duly executed and delivered by each Seller Member, and (assuming due authorization, execution and delivery by Buyer) this Agreement constitutes a legal, valid and binding obligation of each Seller Member enforceable against each such Seller Member in accordance with its terms.

(b)     When each other Ancillary Document to which a Seller Member is or will be a party has been duly executed and delivered by such Seller Member (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of such Seller Member enforceable against it or him in accordance with its terms.

(c)     No Litigation. There is no Action pending or, to Seller's Knowledge, threatened against any Seller Member that, individually or in the aggregate, would reasonably be expected to have a Materially Adverse Effect on the ability of such Seller Member to consummate the transactions contemplated by this Agreement.

(d)     Membership Interests. The Seller Members own, beneficially and of record, free and clear of any Encumbrances, 100% of the Membership Interests and Equity Interests in the Company. Schedule C is an accurate and complete description of the percentage of Membership Interests of the Company held by each Seller Member as of immediately prior to the Closing. Upon delivery of the Aggregate Purchase Price at the Closing, good, marketable and valid title to the Purchased Interests will pass to Buyer, free and clear of any Encumbrances. Except for this Agreement, each such Seller Party (i) is not party to any, and has not granted to any other Person any, and there are no, outstanding options, warrants, subscription rights, rights of first refusal or any other commitments providing for, or restricting, the acquisition, disposition or cancellation of the Purchased Interests; and (ii) is not a party to any voting agreement, voting trust, proxy or other agreement or understanding with respect to the voting of the Purchased Interests.

**Section 3.02 Organization, Authority and Qualification of the Company.** The Company is a limited liability company duly organized, validly existing and in good standing under the Laws of the state of New York

and has full limited liability company power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on its business as it has been and is currently conducted. <u>Section 3.02 of the Disclosure Schedules</u> sets forth each jurisdiction in which the Company is licensed or qualified to do business, and the Company is duly licensed or qualified to do business and is in good standing in California, New Jersey, and any jurisdiction in which the failure to be so qualified and in good standing would reasonably be expected to be material to the operation of its business as currently conducted. makes such licensing or qualification necessary. All corporate actions taken by the Company in connection with this Agreement and the Ancillary Documents will be duly authorized on or prior to the Closing.

**Section 3.03 Capitalization.**

(a)     The authorized and outstanding Equity Interests of the Company consists solely of the Membership Interests. All of the Membership Interests are owned of record and beneficially by the Seller Members in accordance with <u>Schedule C</u>, free and clear of all Encumbrances. Upon consummation of the transactions contemplated by this Agreement, Buyer shall own all of the Purchased Interests of the Company (which constitute all of the Membership Interests of the Company), free and clear of all Encumbrances.

(b)     All of the Equity Interests were issued in compliance with applicable Laws. None of the Membership Interests were issued in violation of the Organizational Documents of the Company or any other Contract to which a Seller Member or the Company is a party or is subject to or in violation of any preemptive or similar rights of any Person.

(c)     There are no outstanding or authorized options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the Membership Interests or other Equity Interests of the Company or obligating any Seller Party to issue or sell any equity of the Company. The Company does not have outstanding or authorized any stock appreciation, phantom stock, profit participation or similar rights. Other than as provided in <u>Section 3.03(c) of the Disclosure Schedules</u>, there are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Membership Interests.

**Section 3.04 No Subsidiaries.** The Company does not own or have any interest in any shares or have an ownership interest in any other Person, other than as provided in <u>Section 3.04 of the Disclosure Schedules</u>.

**Section 3.05 No Conflicts; Consents.** The execution, delivery and performance by each Seller Party of this Agreement and the Ancillary Documents to which it or he is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the Organizational Documents of any Seller Party; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to any Seller Party; (c) except as set forth <u>in Section 3.05 of the Disclosure Schedules</u>, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract to which any Seller Party is a party or by which any Seller Party is bound or to which any of their respective properties and assets are subject (including any Material Contract or any Permit affecting the properties, assets or business of the Company); or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on any properties or assets of the Company. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to any Seller Party in connection with the execution and delivery of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby (each, a "**Third Party Consent**").

**Section 3.06 Financial Statements.** Complete copies of the Company's unaudited financial statements consisting of the balance sheet of the Company as of December 31 in each of the years 2019 and 2020 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended (the "**Unaudited Financial Statements**"), and unaudited financial statements consisting of the balance sheet of the Company as of September 30, 2021 and the related statements of income and retained earnings, stockholders' equity and cash flow for the nine month period then ended (the "**Interim Financial Statements**" and together with the Unaudited Financial Statements, the "**Financial Statements**") are included in the Disclosure Schedules as previously delivered to Buyer. Except as set forth in Section 3.06 of the Disclosure Schedule, the Financial Statements have been prepared in accordance with the Accounting Principles throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Unaudited Financial Statements). The Financial Statements are based on the books and records of the Company, and fairly present the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated. The balance sheet of the Company as of December 31, 2020 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**" and the balance sheet of the Company as of September 30, 2021 is referred to herein as the "**Interim Balance Sheet**" and the date thereof as the "**Interim Balance Sheet Date**". The Company maintains a standard system of accounting established and administered in accordance with the Accounting Principles in all material respects.

**Section 3.07 Undisclosed Liabilities.** Except as set forth in Section 3.07 of the Disclosure Schedule, the Company has no liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, known or unknown, and whether due or to become due, or otherwise ("**Liabilities**"), except (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date, and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

**Section 3.08 Absence of Certain Changes, Events and Conditions.** Except as set forth in Schedule 3.08 of the Disclosure Schedule, since the Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been, with respect to the Company, any:

(a)    event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    amendment of the Organizational Documents of the Company;

(c)    split, combination or reclassification of any of the Membership Interests;

(d)    issuance, sale or other disposition of any of its Membership Interests, or grant of any options, warrants or other rights to purchase or obtain (including upon conversion, exchange or exercise) any of its Membership Interests;

(e)    declaration or payment of any dividends or other Cash distributions (except for customary Tax distributions in accordance with the Organizational Documents of the Company or the applicable Subsidiary) on or in respect of any of its Membership Interests or redemption, purchase or acquisition of its Membership Interests;

(f)    declaration, payment of or any other distributions of Cash to any Seller Party (other than customary Tax distributions in accordance with the Organizational Documents of the Company or the applicable Subsidiary), Related Party or any Affiliates of any of the foregoing other than ordinary course

payments to any of the foregoing in their capacities as employees, consultants, or independent contractors of the Company for any wages, salaries, commissions, or other direct compensation for any service performed for it to the date hereof or amounts required to be reimbursed to such employees, consultants or independent contractors;

(g)    material change in any method of accounting or accounting practice of the Company, except as required by GAAP or as disclosed in the notes to the Financial Statements;

(h)    material change in the Company's cash management practices and its policies, practices and procedures with respect to collection of accounts receivable, establishment of reserves for uncollectible accounts, accrual of accounts receivable, inventory control, prepayment of expenses, payment of trade accounts payable, accrual of other expenses, deferral of revenue and acceptance of customer deposits;

(i)    entry into any Contract that would constitute a Material Contract;

(j)    incurrence, assumption or guarantee of any indebtedness for borrowed money except unsecured current obligations and Liabilities incurred in the ordinary course of business consistent with past practice;

(k)    transfer, assignment, sale or other disposition of any of the assets shown or reflected in the Balance Sheet or cancellation of any debts or entitlements;

(l)    transfer or assignment of or grant of any license or sublicense under or with respect to any Company Intellectual Property other than non-exclusive licenses or sublicenses granted in the ordinary course of business consistent with past practice;

(m)    abandonment or lapse of or failure to maintain in full force and effect any Company IP Registration, or failure to take or maintain reasonable measures to protect the confidentiality or value of any Trade Secrets included in the Company Intellectual Property;

(n)    material damage, destruction or loss (whether or not covered by insurance) to its property;

(o)    any capital investment in, or any loan to, any other Person;

(p)    acceleration, termination, material modification to or cancellation of any material Contract (including, but not limited to, any Material Contract) to which the Company is a party or by which it is bound;

(q)    any material capital expenditures other than the capital expenditures provided in the Interim Balance Sheet;

(r)    imposition of any Encumbrance upon any of the Company properties, capital stock or assets, tangible or intangible;

(s)    except as set forth in Section 3.08(s) of the Disclosure Schedules, (i) the grant of any bonuses, whether monetary or otherwise, or increase in any wages, salary, severance, pension or other compensation or benefits in respect of its current or former employees, officers, directors, independent contractors or consultants, other than as provided for in any written agreements or required by applicable Law, (ii) change in the terms of employment for any employee for which the aggregate costs and expenses

exceed $25,000 per year per individual, (iii) any termination of any employee resulting in the payment of severance, or (iv) action to accelerate the vesting or payment of any compensation or benefit for any current or former employee, officer, director, independent contractor or consultant;

(t)        hiring or promoting any person as or to (as the case may be) an officer or manager or hiring or promoting any employee below officer or manager except to fill a vacancy in the ordinary course of business;

(u)        except as set forth in Section 3.08(s) of the Disclosure Schedules, the adoption, modification or termination of any: (i) employment, severance, retention or other agreement with any current or former employee, officer, director, independent contractor or consultant, (ii) Benefit Plan or (iii) collective bargaining or other agreement with a Union, in each case whether written or oral;

(v)        any loan to (or forgiveness of any loan to), or entry into any other transaction with, any of its stockholders or current or former directors, officers and employees;

(w)       entry into a new line of business or abandonment or discontinuance of existing lines of business;

(x)        adoption of any plan of merger, consolidation, reorganization, liquidation or dissolution or filing of a petition in bankruptcy under any provisions of federal or state bankruptcy Law or consent to the filing of any bankruptcy petition against it under any similar Law;

(y)        purchase, lease or other acquisition of the right to own, use or lease any property or assets for an amount in excess of $25,000, individually (in the case of a lease, per annum) or $50,000 in the aggregate (in the case of a lease, for the entire term of the lease, not including any option term), except for purchases of inventory or supplies in the ordinary course of business consistent with past practice;

(z)        acquisition by merger or consolidation with, or by purchase of a substantial portion of the assets or stock of, or by any other manner, any business or any Person or any division thereof;

(aa)      change in the Tax reporting or Tax accounting policies or practices used by the Company or any of its Subsidiaries; action by the Company or any of its Subsidiaries to make, change or rescind any Tax election or accounting method of the Company or any of its Subsidiaries, or  amend any Tax Return of the Company or any of its Subsidiaries;   entry into a closing agreement within the meaning of Section 7121 of the Code with a Tax Authority, settlement of any Tax claim or assessment with any Tax Authority or consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment of the Company or any of its Subsidiaries (other than in connection with customary extensions of the due date for filing a Tax Return); or filing of any Tax Return in a manner that is materially inconsistent with past practice of the Company or the applicable Subsidiary;  nor

(bb)      any Contract to do any of the foregoing, or any action or omission that would result in any of the foregoing.

**Section 3.09 Material Contracts.**

(a)        Section 3.09(a) of the Disclosure Schedules lists each of the following Contracts of the Company (such Contracts, together with all Contracts concerning the occupancy, management or operation of any Real Property (including without limitation, brokerage contracts) listed or otherwise disclosed in Section 3.10(b) of the Disclosure Schedules, all Contracts with Material Customers disclosed

in <u>Section 3.15(a) of the Disclosure Schedules</u>, and all Contracts with Material Suppliers disclosed in <u>Section 3.15(b) of the Disclosure Schedules</u>, being "**Material Contracts**"):

(i)       each Contract of the Company which cannot be cancelled by the Company without penalty or without more than 90 days' notice;

(ii)      all Contracts that require the Company to purchase its total requirements of any product or service from a third party or that contain "take or pay" provisions;

(iii)     all Contracts that provide for the indemnification by the Company of any Person other than commercial contracts made in the ordinary course of business or the assumption of any Tax, environmental or other Liability of any Person;

(iv)     all Contracts that relate to the acquisition or disposition of any business, a material amount of stock or assets of any other Person or any real property (whether by merger, sale of stock, sale of assets or otherwise);

(v)      all broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion, market research, marketing consulting and advertising Contracts to which the Company is a party;

(vi)     all employment agreements and Contracts with independent contractors or consultants (or similar arrangements) to which the Company is a party and pays more than $50,000 on an annual basis, and which are not cancellable without penalty or without more than ninety (90) days' notice;

(vii)    all severance, deferred compensation, change-in-control (whether direct or indirect), or termination Contracts with employees, independent contractors or consultants of the Company;

(viii)   all Contracts whereby the Company engages a staffing agency to provide the services of employees, independent contractors or consultants;

(ix)     except for Contracts relating to trade receivables, all Contracts relating to indebtedness (including, without limitation, guarantees) of the Company;

(x)      all Contracts with any Governmental Authority to which the Company is a party ("**Government Contracts**");

(xi)     all Contracts that limit or purport to limit the ability of the Company or any Affiliate of the Company to compete in any line of business or with any Person or in any geographic area or during any period of time,

(xii)    all Contracts granting any exclusivity rights, "most favored nation" rights, rights of first refusal, right of first offer, or similar rights  to the Company or with respect to the Company Product;

(xiii)   any Contracts to which the Company is a party that provide for any joint venture, partnership or similar arrangement by the Company;

(xiv)   all Contracts between or among the Company on the one hand and any Seller Member or any Affiliate of any Seller Member (other than the Company) on the other hand;

(xv)   all collective bargaining agreements or Contracts with any Union to which the Company is a party;

(xvi)   all Contracts with a customer of the Company that generate annual revenues for the Company in excess of $100,000;

(xvii)   all Contracts pursuant to which the Company pays any supplier, vendor, independent contractor or similar Person in excess of $50,000 on an annual basis.

(b)   Each Material Contract is valid and binding on the Company in accordance with its terms and is in full force and effect. None of the Company or, to Seller Parties' Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any written notice of any intention to terminate any Material Contract. No event or circumstance has occurred prior to the Closing that, with notice or lapse of time or both, would constitute an event of default under any Material Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of any benefit thereunder. Complete and correct copies of each Material Contract (including all modifications, amendments and supplements thereto and waivers thereunder) have been made available to Buyer.

**Section 3.10 Title to Assets; Real Property.**

(a)   The Company has good and valid title to, or a valid leasehold interest in, all Real Property and personal property and other assets reflected in the Unaudited Financial Statements or acquired after the Balance Sheet Date, other than properties and assets sold or otherwise disposed of in the ordinary course of business consistent with past practice since the Balance Sheet Date. The Company does not own any Real Property. All such properties and assets (including leasehold interests) are free and clear of Encumbrances except for the following (collectively referred to as "**Permitted Encumbrances**"):

(i)   those items set forth in Section 3.10(a) of the Disclosure Schedules;

(ii)   liens for Taxes not yet due and payable or liens for Taxes listed in Section 3.10(a) of the Disclosure Schedules that are being contested in good faith and for which appropriate reserves have been set forth on the Financial Statements in accordance with GAAP;

(iii)   mechanics, carriers', workmen's, repairmen's or other like liens arising or incurred in the ordinary course of business consistent with past practice or amounts that are not delinquent and which are not, individually or in the aggregate, material to the business of the Company;

(iv)   easements, rights of way, zoning ordinances and other similar encumbrances affecting Real Property which are not, individually or in the aggregate, material to the business of the Company; or

(v)   other than with respect to owned Real Property, liens arising under original purchase price conditional sales contracts and equipment leases with third parties

entered into in the ordinary course of business consistent with past practice which are not, individually or in the aggregate, material to the business of the Company.

(b)     Section 3.10(b) of the Disclosure Schedules lists (i) the street address of each parcel of leased Real Property; (ii) the landlord under the lease, the rental amount currently being paid, and the expiration of the term of such lease or sublease for each leased or subleased property; and (iii) the current use of such property. With respect to leased Real Property, each Seller Party has delivered or made available to Buyer true, complete and correct copies of any leases affecting the Real Property. The Company is not a sublessor or grantor under any sublease or other instrument granting to any other Person any right to the possession, lease, occupancy or enjoyment of any leased Real Property. The use and operation of the Real Property in the conduct of the Company's business do not violate in any material respect any Law, covenant, condition, restriction, easement, license, permit or agreement. There are no Actions pending nor, to the Seller's Knowledge, threatened against or affecting the Real Property or any portion thereof or interest therein in the nature or in lieu of condemnation or eminent domain proceedings.

**Section 3.11 Condition and Sufficiency of Assets.** Except as set forth in Section 3.11 of the Disclosure Schedules, the buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property of the Company are structurally sound, are in good operating condition and repair subject to ordinary wear and tear, and are reasonably adequate for the uses to which they are being put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property currently owned or leased by the Company, together with all other properties and assets of the Company, are reasonably sufficient for the continued conduct of the Company's business after the Closing in substantially the same manner as conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the business of the Company as currently conducted.

**Section 3.12 Intellectual Property.**

(a)     Section 3.12(a) of the Disclosure Schedules contains a correct, current, and complete list of (i) all Company IP Registrations, specifying as to each, as applicable: the title of the Patent, the Trademark, Copyright, or Domain Name; the record owner and inventor(s), if any; the jurisdiction by or in which it has been issued, registered, or filed; the patent, registration, or application serial number; the issue, registration, or filing date; and the current status; (ii) all unregistered Trademarks included in the Company Intellectual Property; (iii) all proprietary Software of the Company, and (iv) all other Company Intellectual Property used or held for use in the business as currently conducted. All required filings and fees related to the Company IP Registrations have been timely filed with and paid to the relevant Governmental Authorities and authorized registrars, and all Company IP Registrations are otherwise in good standing. Each Seller Party has provided Buyer with true and complete copies of file histories, documents, certificates, office actions, correspondence and other materials related to all Company IP Registrations.

(b)     Section 3.12(b) of the Disclosure Schedules contains a correct, current, and complete list of all material Company IP Agreements, specifying for each the date, title, and parties thereto. Each Seller Party has provided Buyer with true and complete copies (or in the case of any material oral agreements, a complete and correct written description) of all such Company IP Agreements, including all modifications, amendments and supplements thereto and waivers thereunder. Each such Company IP Agreement contained in Section 3.12(b) of the Disclosure Schedules is valid and binding on the Company in accordance with its terms and is in full force and effect. Neither the Company nor, to the Seller's Knowledge, any other party thereto is, or is alleged to be, in breach of or default under, or, except as set for

in <u>Section 3.12(c) of the Disclosure Schedules</u>, has provided or received any written notice of breach of, default under, or intention to terminate (including by non-renewal) any such Company IP Agreement.

(c)     Except as set forth in <u>Section 3.12(c) of the Disclosure Schedules</u>, the Company is the sole and exclusive legal and beneficial, and with respect to the Company IP Registrations, record, owner of all right, title, and interest in and to the Company Intellectual Property, and has the valid and enforceable right to use all other Intellectual Property used or held for use in or necessary for the conduct of the Company's business as currently conducted, in each case, free and clear of Encumbrances other than Permitted Encumbrances and, in the case of any material Intellectual Property licensed by another Person to the Company, the terms and conditions of the applicable Company IP Agreement. The Company has entered into binding, valid and enforceable, written Contracts with each current and former employee and independent contractor who is or was involved in or has contributed to the invention, creation, or development of any material Intellectual Property during the course of employment or engagement with the Company (i) acknowledging (A) the Company's exclusive ownership of all such Intellectual Property invented, created, or developed by such employee or independent contractor within the scope of his or her employment or engagement with the Company or (B) a license to use such Intellectual Property during the term set forth in the applicable license agreement (each, a "**License Period**"); (ii) grants to the Company (C) a present, irrevocable assignment of any ownership interest such employee or independent contractor may have in or to such Intellectual Property or (D) a license to use and/or exploit such Intellectual Property for the duration of the License Period; and (iii) irrevocably waives any right or interest, including any moral rights, regarding such Intellectual Property, to the extent permitted by applicable Law. Each Seller Party has provided Buyer with true and complete copies of all such material Contracts. The Company has not received any written claim or assertion from any current or former employee or independent contractor relating to any of the Company's Intellectual Property and no such current or former employee or independent contractor has any rights, title or interests in or to any Company Intellectual Property, except as expressly set forth in the applicable Contract.

(d)     Neither the execution, delivery or performance of this Agreement, nor the consummation of the transactions contemplated hereunder, will result in the loss or impairment, invalidation or infringement of or payment of any additional amounts with respect to, nor require the consent of any other Person in respect of, the Company's right to own or use any Company Intellectual Property or any Intellectual Property subject to any Company IP Agreement.

(e)     All of the Company Intellectual Property is valid and, enforceable, and all Company IP Registrations are subsisting and in full force and effect. The Company has taken all reasonable steps to maintain and enforce the Company Intellectual Property and to preserve the confidentiality of all Trade Secrets included in the Company Intellectual Property, including by requiring all Persons having access thereto to execute binding, written non-disclosure agreements. Except as set forth in <u>Section 3.12(e) of the Disclosure Schedules</u>, no Person other than the Company and its authorized distributors, licensees and counterparties to the relevant Material Contracts (to the extent provided therein) has the right to control the commercial exploitation of the Company Intellectual Property owned by the Company and no Person, which was involved in the creation, development and/or production of the Company Intellectual Property on behalf of the Company has any interest therein or right thereto.  The Company has a sufficient right, title and interest in and to Company Intellectual Property to enable it to (x) enter into and perform all Material Contracts pertaining thereto, and (y) charge, earn, realize and retain all fees and profits to which they are entitled thereunder.

(f)     The conduct of the Company's business, as currently and formerly conducted and, to Seller's Knowledge, as proposed to be conducted, and the products, processes and services of the Company, have not infringed, misappropriated or otherwise violated, and, to Seller's Knowledge, will not infringe, misappropriate or otherwise violate, the Intellectual Property or other rights of any Person. Except

as set forth in Section 3.12(f) of the Disclosure Schedules, no Person has infringed, misappropriated or otherwise violated any Company Intellectual Property or Licensed Intellectual Property and no use of any Company Intellectual Property or Licensed Intellectual Property will infringe, misappropriate or otherwise violate, the Intellectual Property or other rights of any Person.

(g)     There are no Actions (including any opposition, cancellation, revocation, review, or other proceeding) settled, pending, or to Seller's Knowledge, threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, dilution or other violation by the Company of the Intellectual Property of any Person; (ii) challenging the validity, enforceability, registrability, patentability, or ownership of any Company Intellectual Property; or (iii) by the Company or any other Person alleging any infringement, misappropriation, or violation by any Person of the Company Intellectual Property. No Seller Party nor the Company is aware of any facts or circumstances that could reasonably be expected to give rise to any such Action. The Company is not subject to any outstanding or prospective Governmental Order (including any motion or petition therefor) that does or could reasonably be expected to restrict or impair the use of any Company Intellectual Property. The Company has taken reasonable and prudent actions to ensure that neither the Company Intellectual Property nor the exploitation thereof slanders, libels, defames or violates the rights of privacy or publicity, or infringes any Intellectual Property, or violates any "moral rights of authors" of any other Person. None of the Company Intellectual Property used in the conduct of the Company's business is owned by or registered in the name of any current or former owner, member, partner, director, executive, officer, employee, salesman, agent, customer, representative, contractor or consultant of the Company or any of their respective Affiliates or predecessors in interest, nor do any such Persons have any interest therein or right thereto, other than the right to royalty payments.

(h)     The computer hardware, servers, networks, digital platforms, data communication lines, and other information technology equipment and related systems, including any outsourced systems and processes, that are owned or used by the Company ("**Company Systems**") are reasonably sufficient for the immediate needs of the Company's business. Except as set forth on Section 3.12(h) of the Disclosure Schedules, to Seller's Knowledge, there has never been any unauthorized access, use, intrusion, or breach of security, or failure, breakdown, performance reduction, or other adverse event affecting any Company Systems, that has caused or could reasonably be expected to cause any: (i) substantial disruption of or interruption in or to the use of such Company Systems or the conduct of the Company's business; (ii) loss, destruction, damage, or harm of or to the Company or its operations, personnel, property, or other assets; or (iii) liability of any kind to the Company. The Company has taken all reasonable actions, consistent with applicable industry best practices, to protect the integrity and security of the Company Systems and the data and other information stored or processed thereon. The Company (A) maintains commercially reasonable backup and data recovery, disaster recovery, and business continuity plans, procedures, and facilities; (B) acts in compliance therewith; and (C) tests such plans and procedures on a regular basis, and such plans and procedures have been proven effective in all respects upon such testing.

(i)     To Seller's Knowledge, the Company Intellectual Property does not include any Publicly Available Software (as defined below) and neither the Company nor any Subsidiary has used Publicly Available Software in whole or in part in the development of any part of the Company Intellectual Property in a manner that subjects the Company Intellectual Property in whole or in part, to all or part of the license obligations of any Publicly Available Software. "**Publicly Available Software**" means any software (i) that is distributed as free software or open source software (e.g. Linux); and (ii) requires as a condition of use, modification, and/or distribution of such software that such software or other software incorporated into, derived from, or distributed with such software: (x) be disclosed or distributed in source code form; (y) be licensed for the purpose of making derivative works; or (z) be redistributable at no or minimal charge. Publicly Available Software includes software licensed or distributed under any of the following licenses or distribution models similar to any of the following: (A) GNU General Public License

(GPL) or Lesser/Library GPL (LGPL); (B) the Mozilla Public License; (C) the Netscape Public License; and (D) the Sun Community Source License (SCSL), the Sun Industry Source License (SISL), and the Apache Server License.

(j)     Except as set forth in Section 3.12(j) of the Disclosure Schedules, (i) the Company has never disclosed any source code included in the Company Intellectual Property to any Person other than to employees of the Company; (ii) to Seller's Knowledge, the Company has at all times used commercially reasonable procedures to protect all source code included in the Company Intellectual Property; and (iii) the Company has deposited any source code included in the Company Intellectual Property into any source code escrows or similar arrangements. If, as disclosed in the Disclosure Schedules, the Company has deposited any source code included in the Company Intellectual Property into source code escrows or similar arrangements, to the Knowledge of the Sellers, no event has occurred that has or could reasonably form the basis for a release of such source code from such escrows or arrangements.

(k)     Except as set forth in Section 3.12(k) of the Disclosure Schedules, the software (including firmware and other software embedded in hardware devices) owned, developed (or currently being developed) used, marketed, distributed, licensed, or sold by the Company (including any software that is part of, is distributed with, or is used in the design, development, manufacturing, production, distribution, testing, maintenance, or support of any Company Product, but excluding any third-party software that is generally available on standard commercial terms and is licensed to the Company solely for internal use on a non-exclusive basis) (collectively, "**Company Software**") (i) is free from material bugs, defects, or programming errors (including any bug, defect, or error relating to or resulting from the display, manipulation, processing, storage, transmission, or use of date data) that materially and adversely affects the use, functionality, or performance of such Company Software or any product or system containing or used in conjunction with such Company Software; (ii) conforms in all material respects to the written functional and design specifications, the object and source code versions, the programmer and user manuals and other such written programmer and operator documentation related to such Company Software; and (iii) complies in all material respects with any applicable warranty or other contractual commitment relating to the use, functionality, or performance of such Company Software. To Seller's Knowledge, no Company Software contains any computer code that (A) is knowingly and intentionally designed to disrupt, disable, harm or otherwise impede in any manner the operation of the software or any hardware, including any "back door," "Trojan horse," "virus," or "worm" (as such terms are commonly understood in the software industry), or (B) would knowingly and intentionally disable or impair the operation of any of the software or hardware based on the elapsing of a period of time or the advancement to a particular date or other numeral (sometimes referred to as "time bombs" or "drop dead" devices).

**Section 3.13 Work In Progress.** All work-in-progress relating to the Company, whether or not reflected in the Balance Sheet, has been performed in a manner which is materially consistent with past practice and in material compliance with the applicable Contract pursuant to which such work is being performed. To Seller's Knowledge, all expected billable time in connection with any work-in-progress as of the Closing Date will be billed at the full billable rate set forth in the applicable Contract.

**Section 3.14 Accounts Receivable.** The accounts receivable reflected on the Interim Balance Sheet and the accounts receivable arising after the date thereof (a) have arisen from bona fide transactions entered into by the Company involving the sale of goods or the rendering of services in the ordinary course of business consistent with past practice; and (b) constitute only valid, and, to Seller's Knowledge, undisputed claims of the Company not subject to claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of business consistent with past practice.

**Section 3.15 Customers and Suppliers.**

(a)    Section 3.15(a) of the Disclosure Schedules sets forth (i) each customer who has paid aggregate consideration to the Company for goods or services rendered in an amount greater than or equal to $100,000 for each of the two (2) most recent fiscal years (collectively, the "**Material Customers**"); and (ii) the amount of consideration paid by each Material Customer during such periods. Except as set forth in Section 3.15(a) of the Disclosure Schedules, the Company has not received any written notice that any of its Material Customers has ceased, or intends to cease after the Closing, to use its goods or services or to otherwise terminate or materially reduce its relationship with the Company.

(b)    Section 3.15(b) of the Disclosure Schedules sets forth (i) each supplier to whom the Company has paid consideration for goods or services rendered in an amount greater than or equal to $50,000 for each of the two (2) most recent fiscal years (collectively, the "**Material Suppliers**"); and (ii) the amount of purchases from each Material Supplier during such periods. Except as set forth in Section 3.15(b) of the Disclosure Schedules, the Company has not received any written (or, to Seller's Knowledge, oral) notice that any of its Material Suppliers has ceased, or intends to cease, to supply goods or services to the Company or to otherwise terminate, materially reduce or adversely change the terms of its relationship with the Company.

**Section 3.16 Insurance.** Section 3.16 of the Disclosure Schedules sets forth a true and complete list of all current policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, directors' and officers' liability, fiduciary liability and other casualty and property insurance maintained by any Seller Party or any of their respective Affiliates (including the Company) and relating to the assets, business, operations, employees, officers and directors of the Company (collectively, the "**Insurance Policies**") and true and complete copies of such Insurance Policies have been made available to Buyer. Such Insurance Policies are in full force and effect and shall remain in full force and effect following the consummation of the transactions contemplated by this Agreement. Neither any Seller Party nor any of their respective Affiliates (including the Company) has received any written notice of cancellation of, premium increase with respect to, or alteration of coverage under, any of such Insurance Policies. All premiums due on such Insurance Policies have either been paid or, if due and payable prior to Closing, will be paid prior to Closing in accordance with the payment terms of each Insurance Policy and all claims, events, and occurrences that may be covered under the Insurance Policies have been noticed pursuant to the applicable terms and conditions. To Seller's Knowledge, the Insurance Policies do not provide for any retrospective premium adjustment or other experience-based liability on the part of the Company. All such Insurance Policies (a) are valid and binding in accordance with their terms; (b) to Seller's Knowledge, are provided by carriers who are financially solvent; and (c) have not been subject to any lapse in coverage. Except as set forth on Section 3.16 of the Disclosure Schedules, there are no claims related to the business of the Company pending under any such Insurance Policies as to which coverage has been questioned, denied or disputed or in respect of which there is an outstanding reservation of rights or where available insurance coverage (inclusive of defense expenses) will be exceeded. To Seller Parties' Knowledge, no Seller Party nor any of their respective Affiliates (including the Company) is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any such Insurance Policy. To Seller's Knowledge, the Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the Company and are sufficient for compliance with all applicable Laws and Contracts to which the Company is a party or by which it is bound.

**Section 3.17 Legal Proceedings; Governmental Orders.**

(a)    Except as set forth in Section 3.17(a) of the Disclosure Schedules, there are no Proceedings pending or, to Seller's Knowledge, threatened (a) against or by the Company affecting any of its properties or assets (or by or against any Seller Party or any Affiliate thereof and relating to the Company); or (b) against or by any Seller Party or any Affiliate of any Seller Party that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. To the Seller's

Knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Proceedings.

(b)     Except as set forth in Section 3.17(b) of the Disclosure Schedules, there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against or affecting the Company or any of its properties or assets. The Company is in compliance with the terms of each Governmental Order set forth in Section 3.17(b) of the Disclosure Schedules. To Seller's Knowledge, no event has occurred or circumstances exist that may constitute or result in (with or without notice or lapse of time) a material violation of any such Governmental Order.

**Section 3.18 Compliance With Laws; Permits.**

(a)     Subject to the representations and warranties provided for in Sections 3.12(f), 3.16, 3.17(b), 3.19(d), 3.20(c), 3.20(m), and 3.30 of this Agreement, the Company has complied, in all material respects, and is now complying in all material respects, with all Laws applicable to it or its business, properties or assets.

(b)     All Permits required for the Company to conduct all material operations of the business have been obtained by it and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full. Section 3.18(b) of the Disclosure Schedules lists all current Permits issued to the Company, including the names of the Permits and their respective dates of issuance and expiration. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in Section 3.18(b) of the Disclosure Schedules.

**Section 3.19 Environmental Matters.**

(a)     The Company is currently and has been in compliance with all Environmental Laws and has not, and no Seller Party has received from any Person any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)     The Company has obtained and is in material compliance with all Environmental Permits (each of which is disclosed in Section 3.19(b) of the Disclosure Schedules) necessary for the ownership, lease, operation or use of the business or assets of the Company and all such Environmental Permits are in full force and effect and shall be maintained in full force and effect by the Company and each Seller Party through the Closing Date in accordance with Environmental Law, and no Seller Party is aware of any condition, event or circumstance that might prevent or impede, after the Closing Date, the ownership, lease, operation or use of the business or assets of the Company as currently carried out. With respect to any such Environmental Permits, the Seller Parties have undertaken, or will undertake prior to the Closing Date, all measures necessary to facilitate transferability of the same, and no Seller Party is aware of any condition, event or circumstance that might prevent or impede the transferability of the same, nor have they received any Environmental Notice or written communication regarding any material adverse change in the status or terms and conditions of the same.

(c)     No real property currently or formerly owned, operated or leased by the Company is listed on, or has been proposed for listing on, the National Priorities List (or the Superfund Enterprise Management System or SEMS) under CERCLA, or any similar state list.

(d)     To Seller's Knowledge, there has been no Release of Hazardous Materials in contravention of Environmental Law with respect to the business or assets of the Company or any real property currently or formerly owned, operated or leased by the Company, and no Seller Party has received a written Environmental Notice that any real property currently or formerly owned, operated or leased in connection with the business of the Company (including soils, groundwater, surface water, buildings and other structure located on any such real property) has been contaminated with any Hazardous Material which could reasonably be expected to result in an Environmental Claim against, or a violation of Environmental Law or term of any Environmental Permit by, any Seller Party.

(e)     Section 3.19(e) of the Disclosure Schedules contains a complete and accurate list of all active or abandoned aboveground or underground storage tanks owned or operated by the Company.

(f)     Section 3.19(f) of the Disclosure Schedules contains a complete and accurate list of all off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by any Seller Party and any predecessors as to which any Seller Party may retain liability, and none of these facilities or locations has been placed or proposed for placement on the National Priorities List (or SEMS) under CERCLA, or any similar state list, and no Seller Party has received any written Environmental Notice regarding potential liabilities with respect to such off-site Hazardous Materials treatment, storage, or disposal facilities or locations used by the Seller Parties.

(g)     No Seller Party has retained or assumed, by contract or operation of Law, any liabilities or obligations of third parties under Environmental Law.

(h)     Each Seller Party has provided or otherwise made available to Buyer and listed in Section 3.19(h) of the Disclosure Schedules, (i) any and all environmental reports, studies, audits, records, sampling data, site assessments, risk assessments, economic models and other similar documents with respect to the business or assets of the Company or any currently or formerly owned, operated or leased real property which are in the possession or control of the Seller Parties related to compliance with Environmental Laws, Environmental Claims or an Environmental Notice or the Release of Hazardous Materials; and (ii) any and all material documents concerning planned or anticipated capital expenditures required to comply with applicable Environmental Laws.

(i)     No Seller Party is aware of or reasonably anticipates, as of the Closing Date, any condition, event or circumstance concerning the Release or regulation of Hazardous Materials that might, after the Closing Date, prevent, impede or materially increase the costs associated with the ownership, lease, operation, performance or use of the business or assets of the Company as currently carried out.

(j)     No Seller Party owns and controls all Environmental Attributes (a complete and accurate list of which is set forth in Section 3.19(j) of the Disclosure Schedules) and has not entered into any contract or pledge to transfer, lease, license, guarantee, sell, mortgage, pledge or otherwise dispose of or encumber any Environmental Attributes as of the date hereof. No Seller Party is aware of any condition, event or circumstance that might prevent, impede or materially increase the costs associated with the transfer (if required) to Buyer of any Environmental Attributes after the Closing Date.

**Section 3.20 Employee Benefit Matters.**

(a)     Section 3.20(a) of the Disclosure Schedules contains a true and complete list of each pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off (PTO), medical, vision, dental, disability, welfare, Code Section 125 cafeteria, fringe benefit and other similar agreement, plan, policy, program or

arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which the Company has maintained or is required to be contributed to by the Company for the benefit of any current or former employee, officer, director, retiree, independent contractor or consultant of the Company or any spouse or dependent of such individual, or under which the Company or any of its ERISA Affiliates has or may have any Liability, or with respect to which Buyer or any of its Affiliates would reasonably be expected to have any Liability, contingent or otherwise (as listed on Section 3.20(a) of the Disclosure Schedules, each, a "**Benefit Plan**"). The Company has separately identified in Section 3.20(a) of the Disclosure Schedules each Benefit Plan that contains a change in control provision.

(b)      With respect to each Benefit Plan, each Seller Party has made available to Buyer accurate, current and complete copies of each of the following: (i) where the Benefit Plan has been reduced to writing, the plan document together with all amendments; (ii) where the Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements or other funding arrangements, custodial agreements, insurance policies and contracts, administration agreements and similar agreements, and investment management or investment advisory agreements, now in effect or required in the future as a result of the transactions contemplated by this Agreement or otherwise; (iv) copies of any summary plan descriptions, summaries of material modifications, summaries of benefits and coverage, COBRA communications, employee handbooks and any other written communications relating to any Benefit Plan; (v) in the case of any Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination, opinion or advisory letter from the Internal Revenue Service and any legal opinions issued thereafter with respect to such Benefit Plan's continued qualification; (vi) in the case of any Benefit Plan for which a Form 5500 must be filed, a copy of the two most recently filed Forms 5500, with all corresponding schedules and financial statements attached; (vii) actuarial valuations and reports related to any Benefit Plans with respect to the two most recently completed plan years; (viii) the most recent nondiscrimination tests performed under the Code; and (ix) copies of material notices, letters or other correspondence from the Internal Revenue Service, Department of Labor, Department of Health and Human Services, Pension Benefit Guaranty Corporation or other Governmental Authority relating to the Benefit Plan.

(c)      To Seller's Knowledge, each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code (a "**Qualified Benefit Plan**") is so qualified and received a favorable and current determination letter from the Internal Revenue Service with respect to the most recent five year filing cycle, or with respect to a prototype or volume submitter plan, can rely on an opinion letter from the Internal Revenue Service to the prototype plan or volume submitter plan sponsor, to the effect that such Qualified Benefit Plan is so qualified and that the plan and the trust related thereto are exempt from federal income taxes under Sections 401(a) and 501(a), respectively, of the Code, and, to Seller's Knowledge, nothing has occurred that could reasonably be expected to adversely affect the qualified status of any Qualified Benefit Plan. To Seller's Knowledge, nothing has occurred with respect to any Benefit Plan that has subjected or could reasonably be expected to subject the Company or any of its ERISA Affiliates or, with respect to any period on or after the Closing Date, Buyer or any of its Affiliates, to a penalty under Section 502 of ERISA or to tax or penalty under Sections 4975 of the Code.

(d)      All benefits, contributions and premiums relating to each Benefit Plan have been timely paid in accordance with the terms of such Benefit Plan and all applicable Laws and accounting principles, and, all benefits accrued under any unfunded Benefit Plan have been paid, accrued or otherwise adequately reserved to the extent required by, and in accordance with, GAAP.

(e)      To Seller's Knowledge, neither the Company nor any of its ERISA Affiliates has ever sponsored, administered or otherwise contributed to (and no Company Benefit Plan is) any of the

following: (1) a plan subject to Section 302 or Title IV of ERISA or Section 412 of the Code; (2) a "multiemployer plan" (as defined under Section 3(37) of ERISA) or a collectively bargained plan subject to Section 413 of the Code; (3) a "single employer plan" (as defined under Section 4001(a)(15) of ERISA) that could result in liability for the Company under Section 4063 or 4064 of ERISA (i.e., a multiple-employer plan); (4) self-insured "group health plan" (as defined under Section 5000(b)(1) of the Code); (5) a "voluntary employees' beneficiary association" (as defined under Section 501(c)(9) of the Code); or (6) a multiple employer welfare arrangement (MEWA).

(f)     Each Benefit Plan can be amended, terminated or otherwise discontinued after the Closing in accordance with its terms, without material liabilities to Buyer, the Company or any of their Affiliates other than ordinary administrative expenses typically incurred in a termination event. The Company has no commitment or obligation and has not made any representations to any employee, officer, director, independent contractor or consultant, whether or not legally binding, to adopt, amend, modify or terminate any Benefit Plan or any collective bargaining agreement, in connection with the consummation of the transactions contemplated by this Agreement or otherwise.

(g)     Except as set forth in Section 3.20(g) of the Disclosure Schedules and other than as required under Sections 601 to 608 of ERISA or other applicable Law, to Seller's Knowledge, no Benefit Plan provides post-termination or retiree health benefits to any individual for any reason, and neither the Company nor any of its ERISA Affiliates has any Liability to provide post-termination or retiree health benefits to any individual or ever represented, promised or contracted to any individual that such individual would be provided with post-termination or retiree health benefits.

(h)     Except as set forth in Section 3.20(h) of the Disclosure Schedules, there is no pending or, to Seller's Knowledge, threatened Action relating to a Benefit Plan (other than routine claims for benefits), and no Benefit Plan has within the five (5) year prior to the date hereof been the subject of an examination or audit by a Governmental Authority or the subject of an application or filing under or is a participant in, an amnesty, voluntary compliance, self-correction or similar program sponsored by any Governmental Authority.

(i)     There has been no amendment to, announcement by any Seller Party, or any of their Affiliates relating to, or change in employee participation or coverage under, any Benefit Plan or collective bargaining agreement that would increase the annual expense of maintaining such plan above the level of the expense incurred for the most recently completed fiscal year (other than on a de minimis basis or for customary market inflation) with respect to any director, officer, employee, independent contractor or consultant, as applicable. No Seller Party nor any of their Affiliates has any commitment or obligation or has made any representations to any director, officer, employee, independent contractor or consultant, whether or not legally binding, to adopt, amend, modify or terminate any Benefit Plan or any collective bargaining agreement with respect to a Benefit Plan.

(j)     Each Benefit Plan that is subject to Section 409A of the Code has been administered in compliance with its terms and the operational and documentary requirements of Section 409A of the Code and all applicable regulatory guidance (including notices, rulings and proposed and final regulations) thereunder. The Company does not have any obligation to gross up, indemnify or otherwise reimburse any individual for any excise taxes, interest or penalties incurred pursuant to Section 409A of the Code.

(k)     Each individual who is classified by the Company as an independent contractor has been properly classified for purposes of participation and benefit accrual under each Benefit Plan.

(l)     Except as set forth in <u>Section 3.20(l) of the Disclosure Schedules</u>, neither the execution of this Agreement nor any of the transactions contemplated by this Agreement will (either alone or upon the occurrence of any additional or subsequent events): (i) entitle any current or former director, officer, employee, independent contractor or consultant of the Company to severance pay or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation (including stock-based compensation) due to any such individual; (iii) limit or restrict the right of the Company to merge, amend, or terminate any Benefit Plan; (iv) increase the amount payable under or result in any other material obligation pursuant to any Benefit Plan; (v) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; or (vi) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code.

(m)     The Company is in compliance in all material respects with all applicable requirements of the Patient Protection and Affordable Care Act of 2010, as amended, and all regulations thereunder (together, the "**ACA**"), as well as any similar provisions of state or local law, including all requirements relating to eligibility waiting periods and the offer of or provision of minimum essential coverage that is compliant with Section 36B(c)(2)(C) of the Code and the regulations issued thereunder to full-time employees as defined in Section 4980H(c)(4) of the Code and the regulations issued thereunder. No excise tax or penalty under the ACA, including Sections 4980D and 4980H of the Code, is outstanding, has accrued, or has arisen with respect to any period prior to the Closing, with respect to any Benefit Plan. To Seller's Knowledge, the Company does not have any unsatisfied obligations to any Company employees or qualified beneficiaries pursuant to the ACA, or any state or local Law governing health care coverage or benefits that would result in any liability to the Company. To Seller's Knowledge, the Company has maintained all records necessary to demonstrate its compliance with the ACA and any other similar state or local law.

**Section 3.21 Employment Matters.**

(a)     <u>Section 3.21(a) of the Disclosure Schedules</u> contains a list of all persons who are employees of the Company as of the date hereof, including any employee who is on a leave of absence of any nature, paid or unpaid, authorized or unauthorized, and sets forth for each such individual the following: (i) name; (ii) title or position (including whether full-time or part-time); (iii) hire or retention date; (iv) current annual base compensation rate or current hourly rate; and (v) commission, bonus or other incentive-based compensation. Except as set forth in <u>Section 3.21(a) of the Disclosure Schedules,</u> as of the date hereof, all earned compensation, including wages, commissions, bonuses, fees and other compensation, payable to all employees of the Company for services performed on or prior to the date hereof have been paid in full (or accrued in full on the audited balance sheet contained in the Closing Working Capital Statement) and there are no outstanding agreements, understandings or commitments of the Company with respect to any compensation, commissions, bonuses or fees to any employees.

(b)     Section 3.21(b) of the Disclosure Schedules contains a list of all Persons engaged by the Company as independent contractors or consultants at any point from January 1, 2021 to the date hereof who received aggregate compensation in excess of $1,000.00 and sets forth for each such Person: (i) name of individual or entity; and (ii) total amount of fees, compensation, or benefits paid or provided by the Company from January 1, 2021 to present. Except as set forth in <u>Section 3.21(b) of the Disclosure Schedules,</u> as of the date hereof, all compensation, including wages, commissions, bonuses, fees and other compensation, payable to all independent contractors or consultants of the Company for services performed on or prior to the date hereof have been paid in full (or accrued in full on the audited balance sheet contained in the Closing Working Capital Statement) and there are no outstanding agreements, understandings or commitments of the Company with respect to any compensation, commissions, bonuses or fees to any independent contractors or consultants.

(c)     Except as set forth in <u>Section 3.21(c) of the Disclosure Schedules</u>, the Company is not, and has never been, a party to, bound by, or negotiating any collective bargaining agreement or other Contract with a union, works council or labor organization (collectively, "**Union**"), and there is not, and has never been, any Union representing or purporting to represent any employee of the Company, and no Union or group of employees is seeking or has sought to organize employees for the purpose of collective bargaining. Except as set forth in <u>Section 3.21(c) of the Disclosure Schedules</u>, there has never been, nor has there been any threat of, any strike, slowdown, work stoppage, lockout, concerted refusal to work overtime or other similar labor disruption or dispute affecting the Company or any of its employees. The Company has no duty to bargain with any Union.

(d)     Except as set forth in <u>Section 3.21(d) of the Disclosure Schedules</u>, (i) in the past three (3) years, the Company has been in material compliance with all applicable Laws in each jurisdiction in which the Company, directly or indirectly, employs or engages any Person pertaining to employment and employment practices to the extent they relate to employees, volunteers, interns, consultants and independent contractors of the Company, including all Laws in each jurisdiction in which the Company, directly or indirectly, employs or engages any Person relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave and unemployment insurance; (ii) in the past six (6) years, all individuals characterized and treated by the Company as independent contractors or consultants are properly classified and treated as independent contractors under all applicable Laws in each jurisdiction in which the Company, directly or indirectly, employs or engages any Person; and (iii)  in the past six (6) years, all employees of the Company classified as exempt under the Fair Labor Standards Act ("**FLSA**") and state and local wage and hour laws are properly classified in all respects.

(e)     Except as set forth on <u>Section 3.21(e) of the Disclosure Schedules</u>, in the past three (3) years, there have been no Actions against the Company pending, or to the Seller's Knowledge, threatened to be brought or filed, by or with any Governmental Authority or arbitrator in connection with the employment or engagement of any current or former applicant, employee, consultant, volunteer, intern or independent contractor of the Company, including, without limitation, any charge, investigation or claim relating to unfair labor practices, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, employee classification, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave, unemployment insurance or any other employment related matter arising under applicable Laws in each jurisdiction in which the Company, directly or indirectly, employs or engages any Person.

(f)     The Company has complied with the WARN Act, and it has no plans to undertake any action in the future that would trigger the WARN Act.

(g)     With respect to any Government Contract, the Company is and has been in compliance in all respects with Executive Order No. 11246 of 1965 ("**E.O. 11246**"), Section 503 of the Rehabilitation Act of 1973 ("**Section 503**") and the Vietnam Era Veterans' Readjustment Assistance Act of 1974 ("**VEVRAA**"), including all implementing regulations. The Company maintains and complies with affirmative action plans in compliance with E.O. 11246, Section 503 and VEVRAA, including all implementing regulations. The Company is not, and has never been, the subject of any audit, investigation or enforcement action by any Governmental Authority in connection with any Government Contract or related compliance with E.O. 11246, Section 503 or VEVRAA. The Company has not been debarred,

suspended or otherwise made ineligible from doing business with the United States government or any government contractor.

(h)     Except as set forth in <u>Section 3.21(h) of the Disclosure Schedules</u>, the Company is in compliance with and has complied with all immigration laws, including Form I-9 and any applicable mandatory E-Verify obligations.

**Section 3.22 Taxes.** Except as set forth in <u>Section 3.22 of the Disclosure Schedules</u>:

(a)     All Tax Returns required to be filed by the Company and each of its Subsidiaries have been timely filed. Such Tax Returns were true, complete and correct in all material respects. All Taxes due and owing by the Company and each of its Subsidiaries (whether or not shown on any Tax Return) have been timely paid.

(b)     The Company and each of its Subsidiaries have withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law.

(c)     No claim has been made by any Tax Authority in any jurisdiction where the Company or any of its Subsidiaries does not file Tax Returns that the Company or such Subsidiary, as applicable is, or may be, subject to Tax by that jurisdiction or required to file Tax Returns in that jurisdiction.

(d)     No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of the Company or any of its Subsidiaries that will have continuing effect after the Closing .

(e)     <u>Section 3.22(e) of the Disclosure Schedules</u> sets forth for the Company and each of its Subsidiaries:

(i)     those years for which examinations by the Tax Authority have been completed; and

(ii)     those taxable years for which examinations by Tax Authority are presently being conducted.

(f)     All deficiencies asserted, or assessments made, against the Company or any of its Subsidiaries as a result of any examinations by any Tax Authority have been fully paid.

(g)     Neither the Company nor any of its Subsidiaries is a party to any Action by any Tax Authority. To each Seller's Knowledge, there are no pending or threatened Actions by any Tax Authority against the Company or any of its Subsidiaries.

(h)     The Company has delivered to Buyer copies of all federal, state, local and foreign income, franchise and similar Tax Returns filed by and examination reports and statements of deficiency assessed against, or agreed to by, the Company or any of its Subsidiaries for all Tax periods ending after December 31, 2016.

(i)     There are no Encumbrances for Taxes upon the assets of the Company or any of its Subsidiaries other than Permitted Encumbrances.

(j)     Neither the Company nor any of its Subsidiaries is a party to, or bound by, any Tax indemnity, Tax sharing or Tax allocation or any similar agreement (other than (i) credit or other commercial agreements the primary purpose of which does not relate to Taxes, and (ii) agreements with respect to leases of property).

(k)     No private letter rulings, technical advice memoranda or similar agreement or rulings have been requested, entered into or issued by any Tax Authority with respect to the Company or any of its Subsidiaries.

(l)     Neither the Company nor any of its Subsidiaries has ever been a member of an Affiliated Group (other than a member of an Affiliated Group of which the Company was the common parent). Neither the Company nor any of its Subsidiaries has any Liability for Taxes of any Person (other than the Company or any of its Subsidiaries) under Treasury Regulations Section 1.1502-6 (or any corresponding provision of state, local or foreign Law), as transferee, successor, by Contract or otherwise.

(m)     Neither the Company nor any of its Subsidiaries will be required to include any item of income in, or exclude any item or deduction from, taxable income for any taxable period or portion thereof ending after the Closing Date as a result of:

(i)     any change in a method of accounting under Section 481 of the Code (or any comparable provision of state, local or foreign Tax Laws) for a taxable period ending on or prior to the Closing Date;

(ii)     use of an improper method of accounting prior to the Closing Date;

(iii)     an installment sale or open transaction occurring on or prior to the Closing Date;

(iv)     a prepaid amount received on or before the Closing Date;

(v)     any closing agreement under Section 7121 of the Code, or similar provision of state, local or foreign Law; or

(vi)     any election under Section 965 of the Code.

(n)     Neither the Company nor any of its Subsidiaries has  been a "distributing corporation" or a "controlled corporation" in connection with a distribution described in Section 355 of the Code.

(o)     Neither the Company nor any of its Subsidiaries has ever been a "United States shareholder" (within the meaning of Section 951(b) of the Code) of a "controlled foreign corporation" (within the meaning of Section 957 of the Code).

(p)     Neither the Company nor any of its Subsidiaries is or has ever been a party to, or a promoter of, a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011 4(b).

(q)     Schedule  3.22(q) sets forth the U.S. federal income tax classification of the Company and each of its Subsidiaries at all times since the date of incorporation or formation of the applicable entity through the Closing Date.  The Company and each of its Subsidiaries has made a timely and effective election out of the centralized partnership audit regime pursuant to Section 6221(b) of the

Code (and any corresponding or similar election for any applicable state or local Tax purposes) solely for the 2020 tax year, and has complied with all notice and disclosure requirements applicable to such election. None of the Company, any of its Subsidiaries, or any Seller Member has taken any action to revoke any such election.

(r)    Neither the Company nor any of its Subsidiaries has a permanent establishment or fixed place of business outside the country of its organization.

(s)    All related party transactions between (i) the Company and any of its Subsidiaries, (ii) the Company or any of its Subsidiaries and any of their Affiliates, and (iii) any of the Company's Subsidiaries have been conducted at arm's length in compliance with Section 482 of the Code, the Treasury Regulations promulgated thereunder (and any similar provision of state, local, or foreign Tax Laws).

(t)    Neither the Company nor any of its Subsidiaries has incurred any Deferred Payroll Taxes.  The Company and each of its Subsidiaries has properly complied with and duly accounted for all credits received under Sections 7001 through 7005 of the Families First Coronavirus Act (Public Law 116-127) and Section 2301 of the CARES Act and any other provision of the COVID-19 Tax Acts.

**Section 3.23 Transactions with Affiliated Parties**. Except as set forth in Section 3.23 of the Disclosure Schedules, none of any Seller Party, any Related Party, any Subsidiary, or, to the Seller's Knowledge, any of their respective directors, officers, managers, equityholders or employees, directly or indirectly: (a) has any ownership interest, directly or indirectly, in any competitor, supplier or customer of the Company; (b) has any outstanding loan or receivable in either event to or from the Company (other than reimbursement of employees for legitimate business expenses incurred in the ordinary course of business); or (c) is a party to, otherwise bound by or has any interest in any Contract or agreement with the Company that includes terms and conditions other than on an arms' length basis ("**Affiliated Party Transactions**").

**Section 3.24 Books and Records.** The corporate governance records of the Company, all of which have been made available to Buyer, are complete and correct in all material respects and have been maintained in accordance with sound business practices. At the Closing, all corporate governance records of the Company will be in the possession of the Company.

**Section 3.25 Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any other Ancillary Document based upon arrangements made by or on behalf of any Seller Party.

**Section 3.26 Anti-corruption Compliance**. Neither the Company nor any of its directors, officers, employees, or agents have, directly or indirectly, taken any actions in violation of the Anti-corruption Laws, including the U.S. Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**") and the Bribery Act. The Company further represents that it has maintained systems of internal controls (including, but not limited to, accounting systems, purchasing systems, and billing systems) and written policies to ensure compliance with the Anti-corruption Laws, and to ensure that all books and records of the Company accurately and fairly reflect, in reasonable detail, all transactions and dispositions of funds and assets. Neither the Company nor, to the Seller's Knowledge, any of its officers, directors, employees, or agents are the subject of any allegation, voluntary disclosure, investigation, prosecution, or other enforcement action related to the Anti-corruption Laws. The Company and its directors, officers, employees, and agents, have complied and are in full compliance with any customer-mandated Anti-corruption Laws compliance requirements, including any such provisions in their Material Contracts.

**Section 3.27 Export Control Laws**. The Company has conducted all export transactions in material accordance with applicable provisions of United States export control laws and regulations, including the Export

Administration Regulations, the International Traffic in Arms Regulations, the regulations administered by the Office of Foreign Assets Control of the U.S. Treasury Department, and the export control laws and regulations of any other applicable jurisdiction. Without limiting the foregoing: (a) the Company has obtained all export licenses and other approvals, timely filed all required filings and has assigned the appropriate export classifications to all products, in each case as required for its exports of products, software and technologies from the United States and any other applicable jurisdiction; (b) the Company is in material compliance with the terms of all applicable export licenses, classifications, filing requirements or other approvals; (c) there are no pending or, to the Seller's Knowledge, threatened claims against the Company with respect to such exports, classifications, required filings or other approvals; (d) there are no pending investigations related to the Company's exports; and (e) there are no actions, conditions, or circumstances pertaining to the Company's export transactions that would reasonably be expected to give rise to any future claims.

Section 3.28     **Harassment**. No allegations of unlawful discrimination or harassment, including without limitation sexual harassment, or retaliation (collectively, "Harassment") have ever been made to the Company against any individual in his or her capacity as an officer, director, equityholder or employee of the Company. There are no, and there have never been, any Actions pending or, to Seller's Knowledge, threatened against the Company or any of its officers, directors, equityholders or employees, involving allegations of Harassment by any current or former officer, employee or independent contractor of the Company. The Company is not, nor has it ever been, a party to a settlement agreement with a current or former officer, employee or independent contractor of the Company resolving allegations of Harassment by any officer, director, equityholder or employee of the Company.

Section 3.29     **Data Privacy**.

(a)     In connection with its collection, storage, processing, transfer (including, without limitation, any transfer across national borders), disclosure and/or use Personal Information (collectively "**Processing**"), the Company is and has been in compliance with all applicable Laws in all relevant jurisdictions ("**Privacy Laws**"), the Company Privacy Policies, and the requirements of any contract or codes of conduct to which the Company is a party ("**Privacy Agreements**"). The Company has commercially reasonable physical, technical, organizational and administrative security measures and policies in place to protect all Personal Information, customer data, and confidential information collected by it or on its behalf or in its possession or control from and against unauthorized access, use and/or disclosure. To the Knowledge of the Company, there has been no unauthorized access, use, loss, destruction, modification, or disclosure of Personal Information, customer data, or confidential information in the possession or control of the Company (a "**Security Breach**"). To the Knowledge of the Company, no third-party processing Personal Information on behalf of Company has experienced a Security Breach affecting Company Personal Information, customer data, or confidential information. The Company is and has been in compliance in all material respects with all applicable Laws relating to data loss, theft and breach of security notification obligations.

(b)     Neither the execution, delivery, or performance of this Agreement (or any of the Ancillary Documents) nor the consummation of any of the transactions contemplated by this Agreement (or any of the Ancillary Documents), nor Buyer's possession or use of the User Data or any data or information in the Company Systems in the operation of the business of the Company, as currently conducted or currently contemplated to be conducted, after the Closing, will result in any violation of any Company Privacy Policy or any Privacy Law, Privacy Agreement, or PCI Requirement.

(c)     The Company is, and at all times has been, in compliance with the applicable requirements of PCI Security Standards Council's Payment Card Industry Data Security Standard and all other applicable rules and requirements by the PCI Security Standards Council, by any member thereof,

or by any entity that functions as a card brand, card association, payment processor, acquiring bank, merchant bank or issuing bank (collectively, "**PCI Requirements**").

(d)     To the Knowledge of the Company, there is no pending, nor has there ever been any, complaint, audit, proceeding, investigation, or claim against the Company initiated by (A) any Person; (B) any Governmental Authority; or (C) or any regulatory or self-regulatory entity – alleging that any Processing by the Company:  (i) is in violation of any applicable Privacy Laws or PCI Requirements, (ii) is in violation of any Privacy Agreements, (iii) is in violation of any Company Privacy Policies, or (iv) otherwise constitutes an unfair, deceptive, or misleading trade practice.

(e)     Company is, and at all times has been in compliance with all applicable Laws pertaining to sales, marketing, and electronic communications, including, without limitation, the CAN-SPAM Act, the Telephone Consumer Protection Act, and the Telemarketing Sales Rule..

**Section 3.30**          **Investment in Parent Stock**. To the extent that a Seller Member may acquire Parent Stock in connection with this Agreement:

(a)     Such Seller Member is an "accredited investor" as that term is defined in Rule 501 of Regulation D under the Securities Act.

(b)     Such Seller Member understands that the Parent Stock has not been registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, such Seller Member's representations as expressed herein. Such Seller Member understands that Parent Stock are "restricted securities" under applicable Securities Laws and that, pursuant to these laws, Seller Member must hold the Parent Stock indefinitely unless they are registered with the United States Securities and Exchange Commission (the "**SEC**") and qualified by state authorities, or an exemption from such registration and qualification requirements is available. In accordance with the foregoing, such Seller Member agrees that the Parent Stock to be issued to Seller Member pursuant to this Agreement may not be sold, transferred, offered for sale, pledged, hypothecated or otherwise disposed of without registration with the SEC under the Securities Act and any applicable state Securities Laws, except pursuant to an exemption from such registration under the Securities Act and in compliance with all applicable Law.

(c)     This Agreement is made with such Seller Member in reliance upon such Seller Member's representation to Buyer that, which by such Seller Member's execution of this Agreement, such Seller Member hereby confirms, that the Parent Stock to be acquired by Seller Member (and beneficially held by such Seller Member, as applicable) will be acquired for investment for such Seller Member's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that such Seller Party has no intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, such Seller Member further represents that such Seller Member does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Parent Stock. Such Seller Member has not been formed for the specific purpose of acquiring the Parent Stock.

(d)     Such Seller Member, nor any of its officers, directors, employees, agents, stockholders or partners has either directly or indirectly, including, through a broker or finder (A) engaged in any general solicitation, or (B) published any advertisement in connection with the issuance of the Parent Stock.

(e)     Such Seller Member has had an opportunity to discuss the Buyer's business, management, financial affairs and the terms and conditions of the issuance of the Parent Stock with Buyer

and each of their representatives, and, that Seller Member's rights and obligations with respect to the Parent Stock shall be as provided in the corporate governance documents of Buyer.

(f)     Such Seller Member understands that the Parent Stock may be notated with one or more legends applicable to the Parent Stock held by other holders of Parent Stock and any legend required by the Securities Laws to the extent such Securities Laws are applicable to the Parent Stock represented by the certificate, instrument, or book entry so legended.

**Section 3.31     Bank Accounts.**  Section 3.31 of the Disclosure Schedules (a) identifies all bank and brokerage accounts used in connection with the operations of the Company, whether or not such accounts are held in the name of the Company and lists the respective signatories therefor and (b) lists the names of all persons holding a power of attorney from the Company and a summary statement of the terms thereof.

**Section 3.32     PPP Loan.**  The Company obtained a Paycheck Protection Program loan in the amount of $939,600 through ConnectOne Bank (the "**Company PPP Loan**") and Malka Sports LLC, a Subsidiary of the Company, obtained a Paycheck Protection Program loan in the amount of $52,547 through JPMorgan Chase Bank, N.A. (the "**Subsidiary PPP Loan**" and together with the Company PPP Loan, the "**PPP Loans**"), in each case guaranteed by the Small Business Administration, an Agency of the United States of America.  The loan applications for such PPP Loans were truthful and accurate and did not omit to include any information required to be included and was based on complete, accurate and truthful information and documentation of the Company's or its Subsidiary's number of employees and payroll. The Company and its Subsidiary used the proceeds of the PPP Loans solely for the purposes permitted by the CARES Act and have complied in all material respects with all requirements of the CARES Act and the Payroll Protection Program described in the CARES Act in connection therewith. The PPP Loans have been forgiven.

**Section 3.33     No Other Representations.**  Except for the representations and warranties expressly set forth in this Agreement, no Seller Party or any other Person makes any other express or implied representation or warranty on behalf of the Seller Party or any of their respective Affiliates with respect to the transactions contemplated by this Agreement or otherwise.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to each Seller Member that the statements contained in this Article IV are true and correct as of the date hereof and shall survive the Closing as provided herein.

**Section 4.01 Organization and Authority of Buyer.**  Buyer is a legal entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization, has the requisite corporate or similar power and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and is qualified to do business (where such concept exists) as a foreign corporation or other legal entity in each jurisdiction where the ownership, leasing or operation of its properties or assets or the conduct of its business requires such qualification, except where the failure to have such power or authority, is not, individually or in the aggregate, reasonably likely to prevent, materially delay or materially impair the ability of Buyer to consummate the transactions contemplated by this Agreement. A correct and complete copy of the Organizational Documents of Buyer has been made available to Sellers, and each such Organizational Document is in full force and effect.

**Section 4.02 Authorization of Transaction; Binding Authority.**  Buyer has the requisite corporate or similar power and authority and has taken all corporate or similar action necessary to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by Buyer, and, assuming the due authorization, execution and

delivery by the Seller Members, constitutes a valid and binding agreement of Buyer, enforceable against Buyer in accordance with its terms, subject to subject to bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws of general applicability relating to or affecting creditor's rights and to general equitable principles, whether considered in a proceeding in equity or at law.

**Section 4.03 No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a material violation or material breach of, or default under, any provision of the Organizational Documents of Buyer; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Buyer; or (c) require the consent, notice or other action by any Person under any Contract to which Buyer is a party. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Buyer in connection with the execution and delivery of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

**Section 4.04 Investment Purpose.** Buyer is acquiring the Purchased Interests solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof. Buyer acknowledges that the Purchased Interests are not registered under the Securities Act, as amended, or any state Securities Laws, and that the Purchased Interests may not be transferred or sold except pursuant to the registration provisions of the Securities Act, as amended or pursuant to an applicable exemption therefrom and subject to state Securities Laws and regulations, as applicable.

**Section 4.05 Brokers.** No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Buyer.

**Section 4.06 Sufficiency of Funds.** Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Aggregate Purchase Price and consummate the transactions contemplated by this Agreement.

**Section 4.07 Legal Proceedings.** There are no Actions pending or, to Buyer's knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**Section 4.08 No Other Representations; Non-Reliance.** Except for the representations and warranties expressly set forth in this Agreement, neither Buyer nor any other Person makes any other express or implied representation or warranty on behalf of Buyer or any of their respective Affiliates with respect the transactions contemplated by this Agreement or otherwise. Buyer further acknowledges and agrees that, except as expressly provided in this Agreement, Buyer is relying solely on its own investigation in entering into this Agreement and the Transactions and not on any information provided or to be provided by the Seller Parties or the Company. Buyer acknowledges, represents and warrants that Buyer is not in a significantly disparate bargaining position with respect to the Sellers in connection with the transactions contemplated by this Agreement; that Buyer freely and fairly agrees to the foregoing as part of the negotiations for the transactions contemplated by this Agreement; and that Buyer is represented by legal counsel in connection with this Agreement and the transactions contemplated hereby and Buyer has conferred with such legal counsel concerning the terms and conditions of this Section 4.08.

# ARTICLE V
# COVENANTS AND OTHER AGREEMENTS

**Section 5.01 Confidentiality.** From and after the Closing, each Seller Party shall, and shall cause their respective Affiliates and each of the Representatives of any of the foregoing, to, hold in confidence any and all information, whether written or oral, concerning the Company or any predecessor thereof, except to the extent that a Seller Party can show that such information (a) is generally available to and known by the public through no fault of any Seller Party, any of their respective Affiliates or any of the respective Representatives of any of the foregoing; or (b) is lawfully acquired by a Seller Party, any of their respective Affiliates or any of the respective Representatives of any of the foregoing from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If any Seller Party or any of their respective Affiliates or any of the respective Representatives of any of the foregoing are compelled to disclose any information by judicial or administrative process or by other requirements of Law, the Seller Members shall promptly notify Buyer in writing of such requirements and shall be permitted to disclose only that portion of such information as required which such Seller Party is advised by its counsel in writing is legally required to be disclosed, *provided that* each Seller Party shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 5.02 Non-Competition; Non-Solicitation.**

(a)     For a period of five (5) years commencing on the Closing Date (the "**Restricted Period**"), no Seller Member shall, and no Seller Member shall permit any of their respective Affiliates or any of the respective Representatives of any of the foregoing to, directly or indirectly (i) other than pursuant to employment or consulting agreements with the Buyer or the Company own, hold interests in, manage, operate, control or participate in (whether as principal, manager, employee, agent, officer, shareholder, director, partner, member or otherwise), consult with, render services, for, or in any other manner engage in the Restricted Business in the Territory; or (ii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between the Company and customers or suppliers of the Company. Notwithstanding the foregoing, a Seller Member may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if such Seller Member is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 2% or more of any class of securities of such Person.

(b)     During the Restricted Period, no Seller Member shall, and no Seller Member shall permit any of their respective Affiliates or any of the respective Representatives of any of the foregoing to, directly or indirectly, (i) induce or attempt to induce any employee or independent contractor of the Company to terminate their employment or engagement with the Company, (ii) otherwise interfere with or disrupt the Company's relationship with its employees or independent contractors, or (iii) solicit, entice, or hire any employee or independent contractor of the Company who has left the Company during the twelve-(12-) month period prior to such hiring. Notwithstanding the foregoing, no Seller Member shall be prohibited from conducting generalized searches by use of general advertisements or solicitations, including but not limited to advertisements or solicitations through newspapers, internet or other media of general circulation or engaging and using a search firm not specifically targeted at the individuals described in this Section 5.02(b).

(c)     During the Restricted Period, no Seller Member shall, and no Seller Member shall permit any of their respective Affiliates or any of the respective Representatives of any of the foregoing to, directly or indirectly, solicit or entice, or attempt to solicit or entice, any clients, customers, or other business relations of the Company for purposes of engaging in the Restricted Business or interfering with the relationship between any such client, customer, or business relation and the Company for purposes of engaging in the Restricted Business.

(d)        Each Seller Member acknowledges that a breach or threatened breach of <u>Sections 5.01</u> and <u>5.02</u> would give rise to irreparable harm to Buyer and its Affiliates, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by any Seller Member of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to seek equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond). In addition, in the event of any breach or violation by any Seller Member of any of the provisions in <u>Sections 5.01</u> and <u>5.02</u>, the time period of such covenant shall be tolled during the period of such breach or violation.

(e)        Each Seller Member acknowledges that the restrictions contained in <u>Sections 5.01</u> and <u>5.02</u> are reasonable and necessary to protect the legitimate interests of Buyer and its Affiliates and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in <u>Sections 5.01</u> and <u>5.02</u> should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable Law. The covenants contained in <u>Sections 5.01</u> and <u>5.02</u> and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 5.03 Books and Records.**

(a)        In order to facilitate the resolution of any claims made against or incurred by a Seller Party prior to the Closing, or for any other reasonable purpose, for a period of seven (7) years after the Closing, Buyer shall:

(i)        retain the books and records (including personnel files) of the Company relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of the Company; and

(ii)        upon reasonable notice, afford the Representatives of the Seller Members reasonable access (including the right to make, at such Seller Member's expense, photocopies), during normal business hours, to such books and records;

*provided, however*, that any books and records related to Tax matters shall be retained pursuant to the periods set forth in <u>Article VI</u>.

(b)        In order to facilitate the resolution of any claims made by or against or incurred by Buyer or the Company after the Closing, or for any other reasonable purpose, for a period of seven (7) years following the Closing, each Seller Party shall:

(i)        retain the books and records (including personnel files) of such Seller Party which relate to the Company and its operations for periods prior to the Closing; and

(ii)        upon reasonable notice, afford the Representatives of Buyer or the Company reasonable access (including the right to make, at Buyer's expense, photocopies), during normal business hours, to such books and records;

*provided, however,* that (i) any books and records related to Tax matters shall be retained pursuant to the periods set forth in Article VI, and (ii) neither Buyer nor any of its Affiliates shall be required to provide any portion of any Tax Return filed on an affiliated, combined, consolidated or unitary basis that does not relate to the Company or any of its Subsidiaries.

(c)     Neither Buyer, the Company nor any Seller Member shall be obligated to provide the other party with access to any books or records (including personnel files) pursuant to this Section 5.03 where such access would violate any Law.

**Section 5.04 Key Employee Agreements**.  Each Key Employee will enter into employment letter agreements or incentive compensation agreements, as determined by Buyer (the "**Employment Letter Agreements**"), with the Company, effective upon the Closing, containing, among other terms and conditions, or pursuant to a separate restrictive covenants agreement, non-disclosure and invention assignment obligations as well as restrictions on competition and solicitation of employees and customers, in a form reasonably satisfactory to the Company and such Key Employees.

**Section 5.05 Indebtedness; Related Party Obligations**.  At or prior to the Closing, the Seller Members shall, and shall cause the Company to, extinguish any Indebtedness of the Company and that Indebtedness set forth in subsections (p), (q), and (r) of the definition of Indebtedness, which shall be paid when due) and shall have caused to be released all Encumbrances related to all Indebtedness (again, other than that Indebtedness set forth in subsections (p), (q), and (r)) of the definition of Indebtedness, which shall be released when paid as set forth above) upon any of the properties and assets of the Company. All Liabilities between or among the Company, on the one hand, and any Seller Party, Related Party or any of their respective Affiliates, on the other hand (the "**Related Party Obligations**"), shall be eliminated from being a future obligation or right of the Company and any Seller Party, Related Party or any of their respective Affiliates, as applicable, at or prior to Closing.

**Section 5.06 Releases.**  Each Seller Party, on behalf of such Seller Party and his, her or its heirs, predecessors, successors, assigns, and each of their respective direct or indirect Affiliates and Subsidiaries and any Representatives of any of the foregoing (collectively, the "**Releasing Parties**") hereby forever, fully, unconditionally and irrevocably waives, releases, remises and discharges each of Buyer, the Company, each of their respective predecessors, successor, and assigns and each of their respective direct or indirect Affiliates and Subsidiaries and any past and present equity holders, members, managers, partners, employees, officers, directors, consultants, attorneys, agents, employee benefit plan and other Representatives of any of the foregoing (the "**Released Party**") from any and all actions, suits, claims, Action, demands, debts, agreements, obligations, promises, judgments, or liabilities of any kind whatsoever in law or equity and causes of action of every kind and nature, or otherwise, whether known or unknown, patent or latent, unanticipated as well as anticipated, asserted or unasserted, absolute or contingent, accrued or unaccrued, disclosed or undisclosed, liquidated or unliquidated, due or to become due, or determined, determinable or otherwise ("**Released Liabilities**") that such Releasing Parties may currently have, or may have in the future in his, her or its capacity as a Seller Party and direct, indirect or otherwise beneficial owner of equity in the Company (collectively, the "**Released Claims**"). Notwithstanding the foregoing, the Released Claims shall not include, (a) rights to payment or other consideration for such Releasing's Party's portion of the Aggregate Purchase Price, or any other amounts or obligations which any Seller Party may be entitled to in this Agreement or any of the Ancillary Documents; (b) any claims or rights such Releasing Party has in any capacity other than as a Seller Party or direct, indirect or otherwise beneficial owner of equity of the Company, including as a director, manager, officer, employee or other service provider of the Company; or (c) any rights or claims a Releasing Party may have pursuant to the terms of this Agreement, any Ancillary Document, or any employment agreement.

**Section 5.07 Sellers' Representative**.  Each Seller Party agrees that Jeffrey Frommer is hereby constituted and appointed as agent and attorney-in-fact as the "Sellers' Representative" with full power and right

of substitution so long as Jeffrey Frommer gives written notice thereof to Buyer and each Seller Party, for and on behalf of each Seller Party, with the sole and exclusive right and power on behalf of each of them to execute and deliver any and all certificates and other documents required to be executed and delivered by any Seller Party hereunder, to give and receive notices and communications hereunder, to make claims against Buyer hereunder, to agree to, object to, negotiate, enter into settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to, without limitation, claims arising under Article VIII of this Agreement and disputes arising under Article II of this Agreement, to make amendments and grant waivers hereunder or any other Ancillary Document, and to take all actions necessary or appropriate in the judgment of Sellers' Representative for the accomplishment of the foregoing and any other actions that the Sellers' Representative may, in his sole discretion, determine to be appropriate in connection with the consummation of the purchase and sale of the Purchased Interests or any of the other transactions contemplated by this Agreement. No bond shall be required of Sellers' Representative, and Sellers' Representative shall receive no compensation for services rendered. Notices or communications to or from Sellers' Representative shall constitute notice to or from the Company and each Seller Members, as applicable. The Seller Members agree and acknowledge that the power of attorney granted in this Section 5.07: (i) is coupled with an interest and is irrevocable; and (ii) may be delegated by the Sellers' Representative. In the event of the death, incapacity or resignation of Jeffrey Frommer, then, the remaining Seller Members shall jointly elect a new Sellers' Representative by a vote of the holders of a majority of the Voting Percentage Interests listed on Schedule C hereto. A decision, act, consent or instruction of Sellers' Representative shall constitute a decision of all of Seller Members and shall be final, binding and conclusive upon each of such Parties, and Buyer may rely upon any written decision, act, consent or instruction of Sellers' Representative as being the decision, act, consent or instruction of each of such Parties and Buyer shall be entitled to deal exclusively with the Sellers' Representative on all matters relating to this Agreement or any of any Ancillary Document. Buyer is hereby relieved from any Liability to any person for any acts done by it in accordance with such decision, act, consent, or instruction of Sellers' Representative. Sellers' Representative shall, at the expense of the Seller Members, be entitled to engage such counsel, experts and other agents and consultants as Sellers' Representative shall deem necessary in connection with exercising his powers and performing his function hereunder and (in the absence of willful misconduct on the part of Sellers' Representative) shall be entitled to conclusively rely on the opinions and advice of such Persons. Sellers' Representative shall have no liability to any of Seller Members for any actions taken by him in his capacity as Sellers' Representative (in the absence of willful misconduct). Each Seller Party will severally indemnify Sellers' Representative and hold Sellers' Representative harmless against any loss, liability or expense incurred without willful misconduct on the part of Sellers' Representative and arising out of or in connection with the acceptance or administration of Sellers' Representative duties hereunder, including each Seller Party's respective share of the reasonable fees and expenses of any legal counsel retained by Sellers' Representative.

Section 5.08 **Escrow**. As a source of payment for the purpose of securing certain indemnification obligations of Seller Members' set forth in Article VIII and the obligations of Seller Members set forth in Section 2.05, Buyer and Sellers' Representative shall enter into the Escrow Agreement at Closing, pursuant to which the Buyer will deposit, or cause to be deposited with the Escrow Agent, the Purchase Price Adjustment Escrow Amount and the Retention Escrow Amount as provided in Section 2.03. In accordance with and subject to the terms and conditions of the Escrow Agreement, any Purchase Price Adjustment Escrow Amount remaining in the Escrow Fund after reduction for any Final Deficiency, shall be remitted to the Seller Members in accordance with Section 2.05(b)(iv) hereof. In accordance with and subject to the terms and conditions of the Escrow Agreement, promptly, and in any event within five (5) days after the Final Release Date, Buyer and the Sellers' Representative shall cause the Escrow Agent to release to the Seller Members any remaining amount of funds then held in the Retention Escrow Amount *less* any amount which is then the subject of any outstanding good faith claims or disputes relating thereto.

Section 5.09 **Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no Party to this Agreement shall make any public announcements in respect of

this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other Party (which consent shall not be unreasonably withheld or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement. Notwithstanding the foregoing, this <u>Section 5.09</u> shall not apply to the extent that the Buyer or its Affiliates are required to make any announcement relating to or arising out of this Agreement by virtue of the Securities Laws or the rules or regulations promulgated thereunder or other rules of the NYSE.

**Section 5.10 Further Assurances.** Following the Closing, each of the Parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**Section 5.11 Director and Officer Liability.**

(a)      During the six (6) year period following the Closing Date and at all times subject to applicable law, Buyer will cause the Company to include and maintain in effect in its Organizational Documents provisions regarding limitation of liability and indemnification of managers, directors, officers and employees (each a "**D&O Indemnified Party**") to the extent such rights currently exist for D&O Indemnified Parties in the Organizational Documents of the Company on the date hereof with respect to alleged pre-Closing acts or omissions; provided, that the Buyer's and Company's liability therefor shall not exceed the amount of coverage provided under the D&O Insurance. The provisions of this <u>Section 5.11</u> are intended to be for the benefit of, and will be enforceable by, each person described in this <u>Section 5.11</u> and his, her or its heirs, representatives, successors and permitted assigns.

(b)      The Company shall, and Buyer shall cause the Company to, purchase and maintain for a period of six (6) years following the Closing Date officers' and directors' liability insurance in respect of acts or omissions occurring at or prior to the Closing covering each D&O Indemnified Party on terms with respect to coverage and amount comparable to such coverage and amount obtained by the Company on the date hereof (the "**D&O Insurance**"). All costs and expenses and other amounts (including broker fees, taxes and fees required by law, underwriting fees, and any other insurer or broker charges) incurred or due in connection with origination of such D&O Insurance, whether incurred prior to or after the Closing, shall be paid 50% by the Seller Members and 50% by Buyer, and to the extent not paid prior to the Closing, the portion paid by Seller Members shall be included in the calculation of Transaction Expenses.

(c)      The obligations of the Company under this <u>Section 5.11</u> shall not be terminated or modified in such a manner as to adversely affect any Person to whom this <u>Section 5.11</u> applies without the consent of such affected Person (it being expressly agreed that the Persons to whom this <u>Section 5.11</u> applies are hereby made express and intended third party beneficiaries of this <u>Section 5.11</u>).

**Section 5.12 Employee Payment Participants.** Each of the Employee Payment Participants will enter into (i) a restrictive covenant agreement (the "**Employee Payment Participant Agreements**") with the Company, effective upon the Closing, containing, among other terms and conditions, non-disclosure and invention assignment obligations as well as restrictions on competition and solicitation of employees and customers, in a form customarily used by Parent, and (ii) an Employee Payment Participant RSU Letter Agreement in accordance with <u>Section 2.07</u> of this Agreement.

**Section 5.13 Restricted Class M1 Common Units and Malka Sports Equity Rights.** At or prior to the Closing, the Seller Members shall, and shall cause the Company to, enter into termination and release agreements (the "**Termination and Release Agreements**") with all Company employees to whom the Company granted (i) profit shares in the form of restricted common units (the "**Restricted Class M1 Common Units**")

and (ii) certain rights to receive equity of Malka Sports LLC, a Subsidiary of the Company (the "**Malka Sports Equity Rights**").

**Section 5.14 Termination of 401(k) Plans**. Effective as of no later than the day immediately preceding the Closing, the Company shall terminate any and all Benefit Plans intended to include a Code Section 401(k) arrangement (each, a "**401(k) Plan**") and no further contributions shall be made to any such 401(k) Plan unless Buyer (or an Affiliate of Buyer) provides written notice to the Company that any or all such 401(k) Plans shall not be terminated.  Prior to the Closing, the Company shall provide Buyer executed resolutions of the board of directors of the Company authorizing such termination, which (i) in Buyer's reasonable judgment are sufficient to assure compliance with all applicable requirements of the Code and regulations thereunder, including such that the tax-qualified status of the 401(k) Plan will be maintained at the time of termination, and (ii) effective prior to termination of the 401(k) Plan provide for the automatic payment of participants' accounts upon plan termination in the form of a lump-sum.  The form and substance of such resolutions shall be subject to reasonable prior review and approval of Buyer.

**Section 5.15 Restricted Stock Agreements and Registration Rights Agreements**. Each of the Seller Members will enter into (i) a Restricted Stock Agreement, and (ii) a Registration Rights Agreement in accordance with Section 2.03(a)(ii) of this Agreement.

## ARTICLE VI
## TAX MATTERS

**Section 6.01 Preparation and Filing of Tax Returns**.

(a)     Sellers' Representative shall prepare (or cause to be prepared) and timely file (or cause to be timely filed) all partnership income Tax Returns of the Company for any Pre-Closing Tax Period ("**Partnership Income Tax Returns**") which are first due (after taking into account any validly obtained extensions) after the Closing Date.  Sellers' Representative shall, at least twenty (20) Business Days prior to filing, submit all such Partnership Income Tax Returns to Buyer for Buyer's review and comment. If there is a disagreement as to whether revisions requested by Buyer should be included in any such Partnership Income Tax Return, any such item of disagreement shall be submitted to the Independent Accountant for resolution in accordance with the procedures set forth in Section 2.05(b) (the expenses of which shall be shared in a manner similar to that set forth in Section 2.05(b)). All Partnership Income Tax Returns that the Sellers' Representative or the Company is required to file or cause to be filed in accordance with this Section 6.01, shall be prepared and filed in a manner consistent with past practice and, on such Tax Returns, no position shall be taken, election made or method adopted that is inconsistent with positions taken, elections made or methods used in preparing and filing similar Tax Returns in prior periods. Sellers' Representative shall cause the "partnership representative" of the Company or any of its Subsidiaries, within the meaning of Section 6223 of the Code, to make the election provided for in Section 6226 of the Code with respect to any "imputed underpayment" determined in connection with any Tax claim, audit or other examination with respect to Taxes for any taxable year of the Company or any of its Subsidiaries ending on or before the Closing Date. Sellers' Representative shall cause the Company and each of its Subsidiaries (as applicable) to make a timely and effective election out of the centralized partnership audit regime pursuant to Section 6221(b) of the Code (and any corresponding or similar election for any applicable state or local Tax purposes) for the 2021 tax year and will comply with all notice and disclosure requirements applicable to such election.

(b)     With respect to any Subsidiary of the Company that is treated as a partnership for U.S. federal income tax purposes, Sellers' Representative shall use commercially reasonable efforts to cause such Subsidiary to make an election under Section 754 of the Code with respect to the taxable period that includes the Closing Date if such an election is not currently in effect.

**Section 6.02 Cooperation**. Buyer and the Seller Members shall, and shall each cause their respective Affiliates to, provide the other with such cooperation and information, as and to the extent reasonably requested, in connection with the filing of any Tax Return, determining liability for Taxes, or in conducting any audit, litigation or other proceeding with respect to Taxes. Such cooperation and information shall include providing copies of all relevant portions of relevant Tax Return and related documents, making its employees available, timely signing and delivering any certificates or forms relating to any Tax matter, to the extent reasonably requested.

**Section 6.03 Straddle Period Taxes**. In the case of Taxes that are payable with respect to a Straddle Period, the portion of any such Taxes that are treated as attributable to the Pre-Closing Tax Period for purposes of this Agreement shall be:

(a) in the case of Taxes (i) based upon, or related to, income, receipts, profits, wages, capital or net worth, (ii) imposed in connection with the sale, transfer or assignment of property, or (iii) required to be withheld, deemed equal to the amount which would be payable if the taxable year ended with the Closing Date; and

(b) in the case of other Taxes, deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

**Section 6.04 Termination of Tax Allocation Arrangements**. Any Tax allocation, Tax indemnity or Tax sharing agreement (other than (i) credit or other commercial agreements the primary purpose of which does not relate to Taxes, and (ii) agreements with respect to leases of property) between the Company, on the one hand, and any Person, on the other hand, shall be terminated as to the Company on or prior to the Closing, and after the Closing the Company shall not have any liability thereunder.

**Section 6.05 Tax Treatment**. The Transactions are intended to be treated as described in Rev. Rul. 99-6 (Situation 2) as though (i) Buyer acquired all of the assets of the Company and (ii) the Seller Members sold the Purchased Interests pursuant to Section 741 of the Code. The parties acknowledge and agree that the Company's tax year will end at 11:59 p.m. on the Closing Date and the Company will be a disregarded entity wholly owned by Buyer beginning on the day immediately following the Closing Date. Each of Buyer and Seller agrees to file all Tax Returns in a manner consistent with the foregoing, and not take any position, whether in any Tax Return, audit, examination, adjustment or action with respect to a Tax, which is inconsistent with such treatment, unless required to do so by applicable Law.

**Section 6.06 Purchase Price Allocation**. Within thirty (30) days after the date upon which the post-closing adjustments described in Section 2.05(b) are finalized, Buyer shall prepare and submit for the Sellers' Representative's review an allocation of the purchase price, as determined for applicable Tax purposes and including, without limitation, assumed liabilities included in such purchase price for applicable Tax purposes (the "**Allocation Schedule**"). The Allocation Schedule shall be prepared in accordance with Section 1060 of the Code and the Treasury Regulations thereunder. The Allocation Schedule shall be deemed final unless the Sellers' Representative notifies the Buyer in writing that the Sellers' Representative objects to one or more items reflected in the Allocation Schedule within ten (10) days after delivery of the Allocation Schedule to Sellers' Representative. In the event of any such objection, the Sellers' Representative and the Buyer shall negotiate in good faith to resolve such dispute; provided that if the Sellers' Representative and the Buyer are unable to resolve any dispute with respect to the Allocation Schedule within twenty (20) days after the delivery of the Allocation Schedule to the Sellers' Representative, such dispute shall be resolved by the Independent Accountant in accordance with the provisions of Section 2.05(b). The allocation, as finalized pursuant to this Section 6.06, is referred to herein as the "**Asset Allocation Statement**." Except with respect to any subsequent adjustments to the purchase price as determined for applicable Tax purposes, Buyer and each Seller Member shall be bound by

the Asset Allocation Statement for purposes of determining any Taxes, preparing and filing any Tax Returns, and the conduct any proceeding before any Tax Authority or otherwise. The Asset Allocation Statement shall be revised to take into account subsequent adjustments to the purchase price as determined for applicable Tax purposes, and the Parties shall cooperate with each other in good faith to promptly amend the Asset Allocation Statement, as applicable, in a manner consistent with the methodology described in this Section 6.06. In the event that an Asset Allocation Statement is disputed by any Tax Authority, the Party receiving notice of such dispute shall promptly notify and consult with the other relevant Party concerning the resolution of such dispute. Buyer and each Seller Member shall cooperate in the preparation and timely filing of (i) IRS Form 8594 Asset Acquisition Statement Under Section 1060 of the Code (or any successor forms thereto), as applicable, and any comparable state or local or foreign forms or reports, and (ii) to the extent permissible by or required by Law, any corrections, amendments or supplements (or additional forms or reports) thereto (including any supplements, amendments, forms or reports arising as a result of any adjustments to the purchase price as determined for applicable Tax purposes). Buyer and Seller Members and their Affiliates covenant and agree that each shall report, act and file Tax Returns in all respects and for all purposes consistent with such allocation. Neither Buyer, any Seller Member, nor any of their Affiliates shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable law.

**Section 6.07 Contests.** Buyer agrees to promptly give written notice to the Sellers' Representative of the receipt of any written notice by the Company, Buyer, or any of their respective Affiliates which involves the assertion of any claim, or the commencement of any Action, in respect of which either the Seller Members may be required to pay Taxes as a result of such claim or Action, or an indemnity may be sought by Buyer or any Buyer Indemnitee for Indemnified Taxes (a "**Tax Claim**"); *provided,* that failure to comply with this provision shall not affect Buyer's or any Buyer Indemnitees' right to indemnification hereunder unless and solely to the extent such failure materially prejudices the Seller Members. The Sellers' Representative shall control contests of Tax Claims relating to any income Tax Returns of the Company or any of its Subsidiaries for a Pre-Closing Tax Period; *provided, however,* that the Seller' Representative shall obtain the prior written consent of the Buyer (which consent shall not be unreasonably withheld or delayed) before entering into any settlement of a claim or ceasing to defend such claim relating to a Pre-Closing Tax Period; and, *provided further,* that the Buyer shall be entitled to participate in the defense of such claim and to employ counsel of its choice for such purpose, the fees and expenses of which separate counsel shall be borne solely by the Buyer. In addition to the foregoing, the Buyer shall obtain the prior written consent of the Sellers' Representative (which consent shall not be unreasonably withheld or delayed) before entering into any settlement of a claim or ceasing to defend such claim relating to any Tax Claim that is not controlled by the Sellers' Representative; and, *provided further*, that the Sellers' Representative shall be entitled to participate in the defense of such claim and to employ counsel of its choice for such purpose, the fees and expenses of which separate counsel shall be borne solely by the Sellers' Representative.

**Section 6.08 Transfer Taxes.**  All Transfer Taxes shall be borne equally by Buyer, on the one hand, and the Seller Members, on the other hand.  The parties shall use commercially reasonable efforts to minimize the incurrence of any such Transfer Taxes.

**Section 6.09 Survival; Overlap**. Notwithstanding anything to the contrary in this Agreement (including Article IX), the obligations of the Parties set forth in this Article VI shall survive the Closing Date until they have been satisfied. If any obligation or responsibility pursuant to Article VIII may overlap with an obligation or responsibility pursuant to this Article VI, the provisions of this Article VI shall govern.

**ARTICLE VII**
**CLOSING DELIVERABLES**

**Section 7.01 Closing Deliverables of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)      The Seller Members shall have received and delivered to Buyer all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 3.05 and Buyer shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 4.03, in each case, in form and substance reasonably satisfactory to Buyer and Seller, and no such consent, authorization, order and approval shall have been revoked.

(b)      The Seller Members and Buyer shall have agreed upon a 2022 Budget referred to in Section 2.06(e), attached hereto as Exhibit B, in form and substance reasonably satisfactory to the Parties.

**Section 7.02 Closing Deliverables of Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(a)      Each Seller Member shall have duly executed and delivered an Assignment to Buyer, duly executed by each Seller Member.

(b)      At least three (3) Business Days before Closing, the Sellers' Representative shall have delivered to Buyer the Estimated Statements contemplated in Section 2.05.

(c)      Buyer shall have received a certificate of an officer of the Company certifying that attached thereto are true and complete copies of the resolutions adopted by the stockholders and board of managers (or equivalent) of the Company authorizing the execution, delivery and performance of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(d)      Buyer shall have received a certificate of an officer of the Company certifying the names and signatures of the officers of the Company authorized to sign this Agreement, the Ancillary Documents and the other documents to be delivered hereunder and thereunder by the Company.

(e)      [Reserved.]

(f)      Sellers' Representative shall have delivered to Buyer a good standing certificate for the Company from the secretary of state or similar Governmental Authority of the jurisdiction under the Laws in which the Company is organized.

(g)      Each Seller Member shall have delivered to Buyer a certificate pursuant to Treasury Regulations Section 1.1445-2(b) that such Seller Member is not a foreign person within the meaning of Section 1445 of the Code.

(h)      At or prior to the Closing, the Seller Members shall, and shall cause the Company to, extinguish any Indebtedness of the Company and shall have caused to be released all Encumbrances related to all Indebtedness in an upon any of the properties and assets of the Company.  The Sellers' Representative shall have delivered to Buyer customary debt payoff letters and, if applicable, lien releases, termination statements under the Uniform Commercial Code and any other applicable Laws, in recordable form, and other instruments as may be reasonably requested by Buyer, in each case, evidencing the

extinguishment of all security interests and other Encumbrances related to the Company or any of its assets or properties, including but not limited to the liens set forth on Schedule 7.02(h);

(i)       Sellers' Representative shall have delivered reasonably satisfactory evidence to Buyer that all Related Party Obligations shall have been eliminated from being a future obligation or right of any Seller Party or any of their respective Affiliates, as applicable, at or prior to Closing.

(j)       Sellers' Representative shall have delivered to Buyer the Employment Letter Agreements, validly executed and delivered by each of the Key Employees, in accordance with Section 5.04 of this Agreement.

(k)       Sellers' Representative shall have delivered to Buyer an executed counterpart signature page to the Escrow Agreement.

(l)       Sellers' Representative shall have delivered to Buyer evidence reasonably satisfactory to Buyer that all of the Domain Names included in the Company Intellectual property are owned by the Company.

(m)       Sellers' Representative shall have delivered to Buyer the Third Party Consents set forth in Schedule 7.02(m).

(n)       Sellers' Representative shall have delivered to Buyer the Employee Payment Participant Agreements and Employee Payment Participant RSU Letter Agreements, validly executed and delivered by each of the Employee Payment Participants, in accordance with Section 5.12 of this Agreement.

(o)       Sellers' Representative shall have delivered to Buyer the Termination and Release Agreements, validly executed and delivered by each of the holders of Restricted Class M1 Common Units and Malka Sports Equity Rights, in accordance with Section 5.13 of this Agreement.

(p)       Sellers' Representative shall have delivered to Buyer executed resolutions of the board of directors of the Company authorizing such termination of the 401(k) Plans, in accordance with Section 5.14 of this Agreement.

(q)       Sellers' Representative shall have delivered to Buyer the Restricted Stock Agreements and Registration Rights Agreements, validly executed and delivered by each of the Seller Members, in accordance with Section 5.15 of this Agreement

(r)       The Seller Members shall have delivered to Buyer such other documents or instruments as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 7.03 Closing Deliverables of the Seller Members.** The obligations of Seller Members and the Sellers' Representative to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or the waiver by the Sellers' Representative, at or prior to the Closing, of each of the following conditions:

(a)       Sellers' Representative shall have received a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer certifying that attached thereto are true and complete copies of all resolutions adopted by the board of directors (or equivalent body) of Buyer authorizing the execution, delivery and performance of this Agreement and the Ancillary Documents and the

consummation of the transactions contemplated hereby and thereby, and that all such resolutions are in full force and effect and are all the resolutions adopted in connection with the transactions contemplated hereby and thereby.

(b)       Buyer shall have delivered, or caused to be delivered, to the Seller Members cash and securities, as applicable, in an amount equal to the Aggregate Closing Payment by wire transfer in immediately available funds, to an account or accounts designated at least two Business Days prior to the Closing Date by the Sellers' Representative in a written notice to Buyer.

(c)       Buyer shall have delivered, or shall have caused to be delivered, to the Escrow Agent by wire transfer of immediately available funds the Retention Escrow Amount and the Purchase Price Adjustment Escrow Amount.

(d)       Buyer shall have delivered to third parties by wire transfer of immediately available funds that amount of money due and owing from the Seller Members to such third parties as Transaction Expenses as set forth on the applicable Estimated Statement.

(e)       Buyer shall have delivered to holders of outstanding Indebtedness, if any, by wire transfer of immediately available funds that amount of money due and owing from the Company to such holder of outstanding indebtedness as set forth on the applicable Estimated Statement.

(f)       Buyer shall have delivered to the Sellers' Representative such other documents or instruments as Sellers' Representative reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(g)       Buyer shall have delivered to the Sellers' Representative an executed counterpart signature page to the Escrow Agreement.

(h)       Buyer shall have delivered a copy of the binder agreement with respect to the issuance of the R&W Policy as of the Closing.

(i)       Buyer shall have delivered an executed counterpart signature page to the Operating Agreement.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.01 Survival of the Company's and Seller Members' Representations, Warranties and Covenants; Time Limits on Indemnification Obligations.** All representations and warranties of the Company and the Seller Members contained in, or arising out of, this Agreement shall survive the Closing hereunder for a period of eighteen (18) months after the Closing Date; *provided, however*, that (a) the representations and warranties set forth in Sections 3.01 (Representations of the Seller Members), 3.02 (Organization, Authority and Qualification of the Company), 3.03 (Capitalization), 3.04 (No Subsidiaries), 3.05 (No Conflicts; Consents), 3.20 (Employment Benefit Matters), Section 3.21 (Employment Matters), 3.22 (Tax Matters), 3.23 (Transactions with Affiliated Parties), and 3.25 (Brokers) (each such foregoing Section, a "**Fundamental Representation**") shall survive until the later of (i) six (6) years from the Closing Date and (ii) thirty (30) days following the expiration of the longest applicable statute of limitations, including the application of all extensions thereto; *provided, however*, that (y) the foregoing survival periods shall not apply in respect of any claims that have been asserted in writing prior to the expiration of the applicable survival period, and (z) clause (i) above shall not apply to the representations and warranties set forth in Section 3.22 (Tax Matters), and such representations and

warranties shall survive only as set forth in clause (ii) above. All post-Closing covenants of the Company and the Seller Members will survive the Closing in accordance with their terms; provided that, no right to indemnification pursuant to this <u>Article VIII</u> in respect of any claim based upon any breach of a covenant, agreement or obligation shall be affected by the expiration of such covenant, agreement or obligation. If the Buyer provides notice of a claim in accordance with the terms of this Agreement prior to the end of the applicable period of survival set forth in this <u>Section 8.01</u>, then the liability for such claim will continue until such claim is fully resolved.

Section 8.02 **Survival of the Buyer's Representations, Warranties and Covenants; Time Limits on Indemnification Obligations.** All representations and warranties of the Buyer contained in, or arising out of, this Agreement shall survive the Closing hereunder for a period of eighteen (18) months after the Closing Date; *provided, however*, that the representations and warranties in <u>Sections 4.01</u> (Organization and Authority) and <u>4.02</u> (Authorization) shall survive until the later of (i) six (6) years from the Closing Date and (ii) thirty (30) days following the expiration of the longest applicable statute of limitations, including the application of all extensions thereto; *provided, however,* that the foregoing survival periods shall not apply in respect of any claims that have been asserted in writing prior to the expiration of the applicable survival period. All post-Closing covenants of the Buyer will survive the Closing in accordance with their terms; provided that, no right to indemnification pursuant to this <u>Article VIII</u> in respect of any claim based upon any breach of a covenant, agreement or obligation shall be affected by the expiration of such covenant, agreement or obligation. If the Sellers' Representative provides notice of a claim in accordance with the terms of this Agreement prior to the end of the applicable period of survival set forth in this <u>Section 8.02</u>, then the liability for such claim will continue until such claim is fully resolved.

Section 8.03 **Indemnification Relating to the Company.** Subject to the terms, conditions and limitations set forth in this <u>Article VIII</u>, from and after the Closing, the Seller Members, jointly and severally, and without any right of contribution from the Company shall indemnify, defend and hold harmless each of Buyer, its Affiliates (including the Company) and the respective Representatives of each of the foregoing (collectively, the "**Buyer Indemnitees**"), from and against, and shall promptly pay or reimburse each Buyer Indemnitee for, any and all Losses sustained or incurred (including any Losses sustained or incurred after the end of the applicable survival period, provided that a claim is made prior to the end of the applicable survival period in accordance with the terms of this Agreement) by any Buyer Indemnitee resulting from:

      (a)      any inaccuracy in or breach of a representation or warranty made by the Company (x) in this Agreement (other than any breach of a Fundamental Representation) and/or (y) in any certificate delivered by the Company pursuant to this Agreement;

      (b)      any inaccuracy in or breach of a Fundamental Representation in this Agreement;

      (c)      any claim or assertion for obligations in respect of Indebtedness or broker's or agent's fees or expenses arising out of the transactions contemplated by this Agreement by a Person claiming to have been engaged by the Company or any of its Affiliates;

      (d)      any Transaction Expenses or Indebtedness of the Company outstanding as of the Closing to the extent not deducted from the Aggregate Closing Payment;

      (e)      any claim by any holder of Equity Interests in the Company or any other Person relating to the allocation or disbursement of the Aggregate Closing Payment or any element or portion thereof;

      (f)      any Fraud-Type Claim with respect to the Company;

(g)    any claim for Indemnified Taxes;

(h)    any claim arising from the misclassification of any service providers to the Company (including, without limitation, "day players" and freelancers) in California and New Jersey as independent contractors rather than employees; provided, however, that a Buyer Indemnitee may not seek indemnification for Losses under this Subsection 8.03(h) if such Buyer Indemnitee is also seeking indemnification relating to the same facts and circumstances under Subsection 8.03(a) or Subsection 8.03(b);

(i)    any claim arising from the misclassification of employees of the Company in California and New Jersey as exempt under the FLSA and similar state laws, including failure to pay overtime wages and to provide meal and rest breaks as required by applicable law; provided, however, that a Buyer Indemnitee may not seek indemnification for Losses under this Subsection 8.03(i) if such Buyer Indemnitee is also seeking indemnification relating to the same facts and circumstances under Subsection 8.03(a) or Subsection 8.03(b);

(j)    any claim arising under Section 409A of the Code with respect to the Restricted Class M1 Common Units and Malka Sports Equity Rights awarded to any employees of the Company;

(k)    any claim arising from the failure of the Company to comply with Form I-9 document verification requirements; provided, however, that a Buyer Indemnitee may not seek indemnification for Losses under this Subsection 8.03(k) if such Buyer Indemnitee is also seeking indemnification relating to the same facts and circumstances under Subsection 8.03(a) or Subsection 8.03(b);

(l)    any claim arising from the participation of the Company's Schedule K-1 partners in the Code Section 125 cafeteria plan;

(m)    notwithstanding Section 8.03(g), any claim relating to business and occupation taxes due by the Company to the State of Washington;

(n)    notwithstanding Section 8.03(g), any claim relating to payroll taxes due by the Company for the year ending December 31, 2020; or

(o)    any claim arising from the Company's suspension or forfeiture in the State of California as a foreign company doing business in the State of California.

**Section 8.04 Indemnification Relating to the Seller Members.** Subject to the terms, conditions and limitations set forth in this Article VIII, from and after the Closing, each Seller Member, severally and not jointly (*provided*, *however*, that the satisfaction of Losses out of the Escrow Amount shall be joint and several), shall indemnify, defend and hold harmless the Buyer Indemnitees from and against, and shall promptly pay or reimburse each Buyer Indemnitee for, any and all Losses sustained or incurred by any Buyer Indemnitee resulting from:

(a)    any inaccuracy in or breach of a representation or warranty made by such Seller Member (x) in this Agreement (other than any breach of a Fundamental Representation) and/or (y) in any certificate delivered by such Seller Member pursuant to this Agreement;

(b)    any inaccuracy in or breach by such Seller Member of a Fundamental Representation in this Agreement;

(c)     any breach by such Seller Member of a post-Closing covenant, agreement or obligation made by such Seller Member in this Agreement; or

(d)     any Fraud-Type Claim with respect to such Seller Member.

**Section 8.05 Indemnification by the Buyer.** Subject to the terms, conditions and limitations set forth in this <u>Article VIII</u>, from and after the Closing, the Buyer shall indemnify, defend and hold harmless each Seller Party and their Affiliates and their respective Representatives (collectively, the "**Seller Indemnitees**") from and against, any and all Losses sustained or incurred by any Seller Indemnitee resulting from:

(a)     any inaccuracy in or breach of a representation or warranty made by the Buyer in this Agreement;

(b)     any breach of a post-Closing covenant, agreement or obligation made by the Buyer in this Agreement; or

(c)     any claim or assertion for broker's or finder's fees or expenses arising out of the transactions contemplated by this Agreement by any Person claiming to have been engaged by either the Buyer or any of its Affiliates.

**Section 8.06 Indemnification Procedures.**

(a)     In the event that subsequent to the Closing, any Person that is or may be entitled to indemnification under this Agreement (an "**Indemnified Party**") receives notice of Legal Proceeding commenced by any Person who is not a Party or an Affiliate of a Party, including, without limitation, any domestic or foreign court or Governmental Authority (a "**Third Party Claim**"), against such Indemnified Party and for which a Party is or may be required to provide indemnification under this Agreement (an "**Indemnifying Party**"), such Indemnified Party shall give written notice thereof, together with a statement of any available information regarding such Third Party Claim to such Indemnifying Party within thirty (30) days after learning of such Third Party Claim; *provided*, *however*, that failure to give such written notice within any particular time period shall not adversely affect the Indemnified Party's right to indemnification except, and to the extent that, the Indemnifying Party can show that the failure to give such notification on a timely basis directly and adversely affected the Indemnifying Party's ability to defend such Third Party Claim. The Indemnifying Party shall have the right upon written notice to the Indemnified Party (the "**Defense Notice**"), within thirty (30) days after receipt from the Indemnified Party of notice of such Third Party Claim, to conduct, at its expense (or at the Seller Members' expense, in the case of the Sellers' Representative), the defense against such Third Party Claim in its own name, or if necessary in the name of the Indemnified Party. In the event that the Indemnifying Party does not elect to conduct the defense of the subject Third Party Claim, then the Indemnified Party may conduct the defense of the subject Third Party Claim and the Indemnifying Party will cooperate with and make available to the Indemnified Party such assistance and materials as may be reasonably requested by the Indemnified Party. In the event that the Indemnifying Party does elect to conduct the defense of the subject Third Party Claim, then the Indemnified Party will cooperate with and make available to the Indemnifying Party such assistance and materials as may be reasonably requested by it, and the Indemnified Party shall have the right to participate in the defense assisted by counsel of its own choosing. The Party defending such Third Party Claim shall have the right to compromise and settle the Third Party Claim only with the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed; *provided*, *however*, that if the Indemnifying Party is the defending Party, it may, without the consent of the Indemnified Party enter into a settlement of any Third Party Claim or cease to defend against such Third Party Claim, so long as, if pursuant to or as a result of such settlement or cessation, (i) no injunctive or other equitable relief would be imposed against the other Party, and (ii) each claimant or plaintiff in such Third Party Claim has

given to the other Party an unconditional release from all Liability with respect to such Third Party Claim. In the event an Indemnifying Party has assumed the defense of and is defending a Third Party Claim and receives an offer to settle such Third Party Claim, but the terms of such settlement do not conform to the requirements of the preceding sentence, and the Indemnified Party withholds its consent to such settlement or compromise, the Indemnifying Party will continue to conduct the defense of such claim, but will have no Liability to indemnify the Indemnified Party for such Third Party Claim in excess of the sum of (i) the Losses set forth in such settlement offer, plus (ii) the aggregate out-of-pocket fees and expenses associated with the defense and for which the Indemnifying Party is responsible through the date of receipt of such settlement offer (the "**Third Party Claim Settlement Cap**"), and in the event the actual Losses and aggregate out-of-pocket fees and expenses for which the Indemnifying Party is ultimately responsible in connection with the defense, settlement, or compromise of such Third Party Claim exceed the Third Party Claim Settlement Cap, the Indemnified Party will waive or reimburse the Indemnifying Party for such excess amounts.

(b)     Notwithstanding anything contained in Section 8.06(a) to the contrary, the Indemnifying Party shall not be entitled to control, and the Indemnified Party shall be entitled to have sole control over, the defense or settlement of any Third Party Claim if any of the following conditions are not satisfied:

(i)     the Indemnifying Party must diligently defend such proceeding;

(ii)    the Indemnifying Party must furnish the Indemnified Party with evidence that the financial resources of the Indemnifying Party (or the funds available in the Escrow Amount with respect to claims against the Escrow Amount), in the Indemnified Party's reasonable judgment, is and will be sufficient (when considering Losses in respect of all other outstanding claims) to satisfy any Losses relating to such proceeding;

(iii)   such proceeding shall not involve criminal actions or allegations of criminal conduct by the Indemnified Party, and shall not involve claims for specific performance or other equitable relief; and

(iv)    there does not exist, in the Indemnified Party's good faith judgment, based on the advice of outside legal counsel, a conflict of interest which, under applicable principles of legal ethics, could reasonably be expected to prohibit a single legal counsel from representing both the Indemnified Party and the Indemnifying Party in such proceeding.

(c)     An Indemnified Party or Parties seeking indemnification in respect of, arising out of or involving a Loss or claim or demand hereunder that does involve a Third Party Claim being asserted against such Indemnified Party or Parties (a "**Direct Claim**") shall deliver written notice thereof to the Indemnifying Party with reasonable promptness after becoming aware of the basis for such Direct Claim (and in no event after the applicable survival period for the claim or claims in question set forth in this Agreement), and shall provide the Indemnifying Party or Parties with such information with respect thereto as it or they may reasonably request.

**Section 8.07 Limitation as to Certain Qualifiers.** For purposes of this Article VIII, any breach of any representation or warranty set forth in this Agreement, and the calculation of the amount of any Losses incurred in connection with any breach of any representation or warranty set forth in this Agreement, shall be determined without regard to any materiality, Material Adverse Effect, or other correlative or similar terms or qualification contained in or otherwise applicable to such representation or warranty; *provided*, *however*, that for purposes of Section 3.07, Section 3.08(a), and the definition of "Material Contracts," the parties agree that all references to

67

"material," "materially," "materiality," or to whether a breach would have a Material Adverse Effect will not be disregarded for any purpose.

**Section 8.08 Limitation on Indemnification; Order of Recovery.**

(a)     The Seller Members shall not be liable hereunder to the Buyer Indemnitees pursuant to Section 8.03(a) unless the aggregate of all Losses arising thereunder exceeds $375,000 (the "**Deductible**") and then only to the extent of any such excess. The Deductible will not apply to any claim for Losses arising under Section 8.04 (other than Section 8.04(a)).

(b)     Except as set forth in Section 9.12, the Retention Escrow Amount and claims against the R&W Policy shall serve as the sole and exclusive sources of indemnification from which a Buyer Indemnitee may recover Losses pursuant to Sections 8.03(a) and 8.04(a), and Losses under Sections 8.03(a) or 8.04(a) shall be satisfied, to the extent the recoverable Losses incurred by the Buyer Indemnitees as a result of such breaches exceed the Deductible, (i) first, an amount equal the Retention Escrow Amount remaining in the Escrow Fund and (ii) second, by submission of claims by Buyer pursuant to the R&W Policy until such time as the policy limit set forth in the R&W Policy has been exhausted.

(c)     Except as set forth in Section 9.12, Losses pursuant to Section 8.04(b) and Section 8.04(c) may be satisfied, without regard to the Deductible in the following order (i) first, an amount equal to the Retention Escrow Amount remaining in the Escrow Fund, (ii) second, in the event that such claim is recoverable under the R&W Policy, by submission of claims by Buyer pursuant to the R&W Policy until such time as the policy limit set forth in the R&W Policy has been exhausted, (iii) thereafter, if the aggregate amount of indemnifiable Losses exceeds the policy limit set forth in the R&W Policy, then by set-off against payment of the Earnout Payment Amount due to the breaching Seller Member, and (iv) thereafter, against the Seller Member to which such breach is attributable.

(d)     Losses pursuant to Sections 8.03(b), 8.03(c), 8.03(d), 8.03(e), 8.03(g), 8.03(h), 8.03(i), 8.03(j), 8.03(k), 8.03(l), 8.03(m), 8.03(n), or 8.03(o) may be satisfied, without regard to the Deductible in the following order: (i) first, an amount equal the Retention Escrow Amount remaining, (ii) second, in the event that such claim is recoverable under the R&W Policy, by submission of claims by Buyer pursuant to the R&W Policy until such time as the policy limit set forth in the R&W Policy has been exhausted, (iii) thereafter, if the aggregate amount of indemnifiable Losses exceeds the policy limit set forth in the R&W Policy, then by set-off against payment of the Earnout Payment Amount (in each case, on a pro rata basis, among the Seller Members in accordance with the applicable Selling Equity Percentages), and (iv) thereafter, against the Sellers Members, jointly and severally.  Notwithstanding any of the foregoing, the Seller Members shall not be liable hereunder to the Buyer Indemnitees pursuant to Section 8.03(h) or Section 8.03(i) by set-off against payment of the Earnout Payment Amount (in each case, on a pro rata basis, among the Seller Members in accordance with the applicable Selling Equity Percentages), and thereafter, against the Seller Members, jointly and severally, unless the aggregate of all Losses arising thereunder exceeds $250,000 (the "**Special Deductible**") and then only to the extent of any such excess up to an aggregate maximum amount of $2,000,000 (the "**Special Cap**"). For purposes of calculating the number shares of Parent Stock to be reduced from the Earnout Payment Amount in the event of set-off hereunder against payment of the Earnout Payment Amount, such number of shares of Parent Stock shall be the quotient of (x) the dollar value of the Losses as agreed upon by the Buyer and the Sellers' Representative or as determined in a final, non-appealable order issued by a court of competent jurisdiction divided by (y) the 30 Day VWAP as of the date of such agreement by the Buyer and Sellers' Representative or the final, non-appealable order issued by a court of competent jurisdiction, as the case may be.

(e)     Losses pursuant to Section 8.03(f) shall be satisfied jointly and severally by the Seller Members.

(f)      Losses pursuant to Section 8.04(d) shall be satisfied solely by the Seller Member as set forth in this Agreement, to which the breach or Fraud-Type Claim in question is attributable.

(g)      Notwithstanding anything in this Agreement to the contrary, in no event shall any Seller Member be personally liable for more than the portion of the Aggregate Purchase Price received by such Seller Member.

(h)      The amount of any and all Losses under this Article VIII shall be determined net of any amounts actually recovered by the Indemnified Party under insurance policies, indemnities or other reimbursement arrangements with respect to such Losses, including for the avoidance of doubt under the R&W Policy with respect to the Buyer Indemnitees. Once Losses exceed any applicable retention amount under the R&W Policy, the Buyer Indemnitees shall first use commercially reasonable efforts to seek full recovery under the R&W Policy covering any Loss to the same extent as they would if such Loss were not subject to indemnification hereunder (but, for the avoidance of doubt, only after the amount of any deductibles, retentions or similar costs have been satisfied and only the extent such policies cover such Loss). In the event any Loss recovered by the Buyer Indemnitees from a Seller Member is subsequently recovered from the R&W Policy or any Company insurance policy, then such amount shall be replenished or reimbursed by Buyer by a corresponding amount. Each Party hereto waives, to the extent permitted under its applicable insurance policies, any subrogation rights that its insurer may have with respect to any indemnifiable Losses.

(i)      Any amount previously taken into account in the Aggregate Closing Payment as finally determined in accordance with Section 2.05 will not be further subject to an indemnification claim.

**Section 8.09 Exclusion of Other Remedies.** The Parties agree that, from and after the Closing Date, the indemnification or reimbursement obligations of the Parties set forth in this Article VIII shall constitute the sole and exclusive remedies of the Parties (other than the Sellers' Representative) for any monetary Losses based upon, arising out of or otherwise in respect of the matters set forth in this Agreement and the transactions contemplated hereby and thereby. The provisions of this Section 8.09 will not, however, prevent or limit a cause of action to enforce any decision or determination of the Independent Accountant. Without limiting the generality of this Section 8.09, the Parties hereby waive any statutory, equitable, or common law rights or remedies that otherwise may be asserted against such Party by any Seller Indemnitees or Buyer Indemnitees, as applicable. In addition, and without limiting the generality of the foregoing, any rights of any issuer of the R&W Policy, including any rights of subrogation, do not affect, expand, or increase any liability or obligation of the Seller Members in connection with the transactions contemplated by this Agreement. The provisions of this Article VIII shall apply even if (a) the R&W Policy is never issued by an insurer, (b) the R&W Policy is revoked, cancelled or modified in any manner after issuance, or (c) Buyer Indemnitees make a claim under the R&W Policy and such claim is denied by the insurer.

**Section 8.10 Tax Treatment.** The Parties acknowledge and agree that any payment pursuant to this Article VIII shall be treated as an adjustment to the Purchase Price under this Agreement for Tax purposes to the maximum extent permitted by applicable Laws.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.01 Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 9.02 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this <u>Section 9.02</u>):

| | |
|---|---|
| If to Sellers' Representative: | Jeffrey Frommer<br>Malka Media Group LLC<br>75 Montgomery Street<br>Jersey City, New Jersey 19473<br>Email: jeff@malkamedia.com |
| with a copy to: | Fox Rothschild LLP<br>101 Park Avenue<br>17th Floor<br>New York, New York 10178<br>Attention: Marc H. Simon<br>Email: <u>msimon@foxrothschild.com</u> |
| If to Buyer: | MoneyLion Technologies Inc.<br>c/o MoneyLion Inc.<br>30 West 21st Street, Ninth Floor<br>New York, New York 10010<br>Attention: General Counsel's Office<br>Email: legal@moneylion.com |
| with a copy to: | DLA Piper LLP (US)<br>51 John F. Kennedy Parkway, Suite 120<br>Short Hills, New Jersey 07078<br>Attention: Andrew Gilbert, Esq.<br>Email: <u>Andrew.gilbert@us.dlapiper.com</u> |

**Section 9.03 Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 9.04 Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 9.05 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in <u>Section 5.03(c)</u>, upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.06 Entire Agreement.** This Agreement and the Ancillary Documents constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 9.07 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns. No Party may assign its rights or obligations hereunder without the prior written consent of the other Parties, which consent shall not be unreasonably withheld or delayed; *provided*, *however*, that Buyer may, without the consent of any other Party, (a) assign its rights, in whole or in part, to one of its Affiliates or Subsidiaries, and (b) collaterally assign its rights under this Agreement to any lender, agent, or collateral trustee for such lender.

**Section 9.08 No Third-party Beneficiaries.** Except as provided in <u>Article VIII</u>, this Agreement is for the sole benefit of the Parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.09 Amendment and Modification; Waiver.** This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by Buyer and the Sellers' Representative. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any Party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

**Section 9.10 Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)      This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction).

(b)      ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY MAY BE INSTITUTED IN THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA OR THE COURTS OF THE STATE OF DELAWARE IN EACH CASE LOCATED IN THE CITY OF WILMINGTON AND COUNTY OF NEW CASTLE, AND EACH

PARTY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION OR PROCEEDING. SERVICE OF PROCESS, SUMMONS, NOTICE OR OTHER DOCUMENT BY MAIL TO SUCH PARTY'S ADDRESS SET FORTH HEREIN SHALL BE EFFECTIVE SERVICE OF PROCESS FOR ANY SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN ANY SUCH COURT. THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR ANY PROCEEDING IN SUCH COURTS AND IRREVOCABLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(c)     EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE ASSIGNMENT, OR THE ANCILLARY DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ASSIGNMENT, THE OTHER ANCILLARY DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.10(c).

Section 9.11 **Disclosure Schedules**. The Disclosure Schedules will be arranged to correspond to the representations and warranties in Article III of this Agreement, and the disclosure in any section of the Disclosure Schedule shall qualify the corresponding section or paragraph in this Agreement and other sections and paragraphs of Article III solely to the extent it is readily apparent on the face of such disclosure that it also specifically qualifies or applies to such other sections and paragraphs. The information set forth in the Disclosure Schedules is disclosed solely for the purposes of this Agreement, and no information set forth therein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever, including of any violation of applicable Law or breach of any Contract.

Section 9.12 **Specific Performance.** The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 9.13 **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 9.14     **Attorney-Client Privilege**.

(a)     If the Sellers' Representative or the Seller Member so desire, and without the need for any consent or waiver by the Buyer, then Fox Rothschild LLP (the "**Existing Counsel**") shall be permitted to represent the Sellers' Representative or any Seller Member after the Closing in connection with any matter related to the transactions contemplated by this Agreement or any disagreement or dispute relating thereto.  Without limiting the generality of the foregoing, after the Closing, the Existing Counsel

shall be permitted to represent the Sellers' Representative or any Seller Member, any of their agents and Affiliates, or any one or more of them, in connection with any negotiation, transaction or dispute (including any Proceeding) with the Buyer, the Company or any of their agents or Affiliates under or relating to this Agreement, any transaction contemplated by this Agreement, and any related matter, such as claims or disputes arising under other agreements entered into in connection with this Agreement, including with respect to any indemnification claims.  Immediately following the Closing, the Company shall cease to have any attorney-client relationship with the Existing Counsel, unless and to the extent the Existing Counsel is specifically engaged in writing by the Company to represent it after the Closing.  Any such representation of the Company by the Existing Counsel after the Closing shall not affect the foregoing provisions hereof.

(b)     Parent further agrees that, as to all privileged communications among the Existing Counsel and the Company, the Sellers' Representative, any Seller Member and/or any of their respective Affiliates and all attorney work product that in either case relate in any way to the negotiation, documentation and consummation of the transactions contemplated by this Agreement (collectively the "**Protected Information**"), the attorney-client privilege, the expectation of client confidence, all attorney work product protections and all similar protections belong to the Sellers' Representative or any such Seller Member, as applicable, and may be controlled by the Sellers' Representative or any such Seller Member and shall not pass to or be claimed by Buyer or the Company or any Affiliate thereof, to the extent such privilege has not been waived. The Protected Information is the property of the Sellers' Representative or the Seller Members, as applicable, and from and after the Closing neither the Company nor the Buyer, or any Person purporting to act on behalf of or through either of them or any of their Affiliates, will seek to obtain such communications or work product, whether by seeking a waiver of the attorney-client privilege or attorney work product protection or through other means, in each case to the extent the privilege with respect to such Protected Information has not been waived.  The Protected Information may be used by the Sellers' Representative, any Seller Member and/or any of their Affiliates in connection with any dispute that relates in any way to the transactions contemplated by this Agreement, including in any claim for indemnification brought by any Indemnified Party.  Notwithstanding the foregoing, in the event that a dispute arises between Buyer, the Company and a third party (other than a party to this Agreement or any of their respective Affiliates) after the Closing, the Company may assert the attorney-client privilege and/or attorney work product protections to prevent disclosure of confidential communications by the Existing Counsel to such third party, to the extent the privilege has not been waived; *provided*, *however*, that the Company may not waive such privilege without the prior written consent of the Sellers' Representative. All communications (including all privileged communications) in any form or format whatsoever between or among the Existing Counsel, on the one hand, and the Company or any of their directors, officers, employees, or other representatives, on the other hand, to the extent they do <u>not</u> relate in any way to the negotiation, documentation, and consummation of the transactions contemplated by this Agreement, any alternative transactions to the transactions contemplated by this Agreement presented to or considered by the Company, or any dispute arising under this Agreement or the Contemplated Transactions (collectively, the "**Non-Deal Communications**"), shall, to the extent privileged, remain privileged after the Closing, and the Non-Deal Communications and the expectation of client confidence relating thereto shall belong solely to and be controlled by the Company, and shall not pass to or be claimed or retained by Seller Representative or any Seller Member.

[signature page follows]

73

Execution Version

IN WITNESS WHEREOF, the Parties hereto have caused this Membership Interest Purchase Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER**:

**MONEYLION TECHNOLOGIES INC.**

By: _Diwakar Choubey_
—————————————————————
Name: Diwakar Choubey
Title: President and Chief Executive Officer

[Signature Page to Membership Interest Purchase Agreement]

IN WITNESS WHEREOF, the Parties hereto have caused this Membership Interest Purchase Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**COMPANY**:

**MALKA MEDIA GROUP LLC**

By: _Jeffrey Frommer_
Name: Jeffrey Frommer
Title: President

**SELLER MEMBERS**:

_Jeffrey Frommer_
Jeffrey Frommer, an individual

_Lyusen Krubich_
Lyusen Krubich, an individual

_Daniel Fried_
Daniel Fried, an individual

_Pat Capra_
Pat Capra, an individual

[Signature Page to Membership Interest Purchase Agreement]

DocuSign Envelope ID: 5B76D206-231D-48FD-8AD3-86815FDEB9EA

**SELLERS' REPRESENTATIVE**:

By: _Jeffrey Frommer_____

Name: Jeffrey Frommer

[Signature Page to Membership Interest Purchase Agreement]

**Schedule A**

Accounting Principles

(see attached)

**Schedule A**
**Accounting Principles**

The Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with:

   (a) U.S. GAAP, except as follows:

      a. the Company's historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained;

      b. the Company's historical cost recognition principles associated with such revenue, which require the Company to recognize costs on contracts as incurred;

      c. invoiced expenses are recognized in related period based on receipt of the invoice (i.e., if the Company receives an invoice in October, it is entered in October and shows as an October expense, even if cash is not paid out until 30 or 60 days from the date of receipt; this applies to contracted costs, variable costs, and overhead);

      d. payroll is recognized in period as earned, paid out on the 15th and last day of every month, with the exception of commission; commission is recognized as expense net 60 from the second payroll of each month that commission was earned (i.e., commission earned in August is paid and recognized with the second EOM payroll cycle of October);

      e. credit card expense is recognized in period incurred

         i. historically, a year end true up was made to reflect it on the Company's annual financials, not on a monthly basis. This year, the Company has adjusted so that each month reflects associated credit card expenses in the month incurred; and

      f. capitalized expenses and depreciation recognized according to GAAP and adjusted annually with a minimal threshold of $2,500.

   (b) the specific accounting principles, policies, procedures, categorizations, definitions, methods, practices, and techniques set forth below ("Specific Policies").

In the event of any conflict among the above, clause (a) shall take precedence over (b).

**Specific Policies**
- The Financial Statements, Estimated Statements and the Final Statements shall be prepared on a consolidated basis as of the Closing Date. Adjustments should be made to eliminate the cost of investment in any subsidiaries and to reconcile and eliminate any balances owed between subsidiaries.
- In preparing the Estimated Statements and the Final Statements, no item shall be included more than once.
- No amount shall be included for changes in assets or liabilities as a result of purchase accounting adjustments.
- COVID Tax Deferral from 2020 of $82,000, expense reflected in Q2 2020, 50% of this is due by 12/31/2021, the other 50% is due 12/31/2022. Adjustment made after 2020 financials submitted to CFGI.
- Jersey City Tax Withholding - $98,000, quarterly expense reflected in related periods from Q120 - Q321. The Company has already paid the Q3 liability - $17K, so total current as of Oct is $81K, payable by end of year. The Company will pay this out in two-

week intervals.  Adjustment made after 2020 financials submitted to CFGI.

- An Accrual in Q3 21 for talent and revenue share expenses tied to the Malka Network business (new to Malka) that were technically incurred in the period, but were based on an estimate and historically have never been invoiced to Malka.  This was reversed in October.

- Approximately $9,000 of pre-paid Getty Images reflected in pre-paid.

**Schedule B**

Revenue and EBITDA Calculation Principles

(see attached)

Execution Version

**Schedule B**

Revenue and EBITDA Calculation Principles

"**Revenue**" refers to revenue recognized according to the Company's historical revenue recognition principles for the combined and consolidated Company.  By way of illustration, the Company's historical revenue recognition principles require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained.  For purposes of this Agreement, Revenue will be calculated in accordance with the following:

1) Revenue shall include intercompany eliminations between Malka Media Group, LLC and Malka Sports LLC to present revenue on a consolidated basis;

2) No adjustment shall be made for intercompany adjustments made between the Company and Buyer;

3) Revenue shall include the difference between the fair market value of the intercompany services provided by the Company to Buyer and the actual charge for the intercompany services provided by the Company to Buyer; and

4) Revenue shall be adjusted for losses or gains related to write offs or provisions.

"**EBITDA**" means the combined and consolidated net income before interest expense, federal, state and local taxes, depreciation and amortization of the Buyer, determined in accordance with U.S. GAAP (including the Company's historical revenue and cost recognition principles) as reviewed or audited by Buyer's independent accountants.

For purposes of this Agreement, EBITDA will be calculated in accordance with the following:

1) EBITDA shall not include "Extraordinary gain or loss" as defined in GAAP and other agreed upon one-time items, including related to loan forgiveness and litigation settlement;

2) EBITDA shall be adjusted for losses or gains related to write offs or provisions;

3) EBITDA shall include intercompany eliminations between Malka Media Group, LLC and Malka Sports LLC;

4) EBITDA shall not be adjusted for intercompany adjustments between the Company and Buyer;

5) EBITDA shall include an allocation of direct expenses incurred by Buyer on behalf of the Company;

6) EBITDA shall exclude any EDITDA that results from subsequent acquisitions of businesses or product lines that are contributed to the Company subsequent to the Company's acquisition;

7) EBITDA shall exclude any expenses related to equity, equity-based or equity linked compensation granted or issued to any employee of the Company;

Execution Version

8)   EBITDA shall exclude any transaction related expenses, including but not limited to professional fees and the amount of any transaction bonus payments or management performance bonus payments in excess of applicable base pay contemplated by this Agreement, and all payroll taxes associated with such bonus payments;

9)   EBITDA shall exclude legal, accounting or investment banking fees and expenses arising out of this Agreement and related transactions;

10)  EBITDA shall not include any indirect or overhead costs allocable to Company by Buyer (i.e. overhead allocation of rent from new office space occupied by Buyer employees);

11)  EBITDA shall not include any management fees charged to the Company by Buyer under the terms of the Company's operating agreement, as amended and restated immediately following the Closing;

12)  EBITDA shall include the expected recognition of the New Jersey Digital Media Tax Credit ("Tax Credit") in the period in which the Tax Credit was applied for.  By way of illustration, the Tax Credit applied for in 2021 was for services provided by the Company for 2019.  The Tax Credit would be added to 2021 EBITDA; and

13)  EBITDA shall include the base salary paid to Jeff Frommer and Louis Krubich, but shall not include the bonus or incentive compensation paid to Jeff Frommer and Louis Krubich for 2021 only.

**Schedule C**

Selling Percentage

| Seller Member | Voting Percentage Interest | Selling Cash Percentage | Selling Equity Percentage |
|---|---|---|---|
| Jeffrey Frommer | 41.625% | 37.00% | 37.14% |
| Lyusen Krubich | 41.625% | 43.75% | 43.92% |
| Daniel Fried | 9.25% | 9.25% | 9.29% |
| Pat Capra | 7.50% | 10.00% | 9.65% |

Execution Version

**Schedule 2.07**

Employee Payment Participants

(see attached)

[Signature Page to Membership Interest Purchase Agreement]

*Assumes (i) closing shares constitute 51.67% of total consideration, (ii) 2021 earnout constitutes 15% of the same, and (iii) 2022 earnout constitutes 33.33% of the same. Earnouts assume maximum earnout payments ($10M in 2021; $25M in 2022) based on achievement of maximum revenue amounts.

| First Name | Last Name | Employe Payment in Equity* | Closing Payment | Minimum 2021 Earnout Payment (Upon Minimum Revenue Amount) | Maximum 2021 Earnout Payment (Upon Maximum Revenue Amount) | Minimum 2022 Earnout Payment (Upon Minimum Revenue Amount) | Maximum 2022 Earnout Payment (Upon Maximum Revenue Amount) |
|---|---|---|---|---|---|---|---|
| Matthew | Basdekis | $ 150,000.00 | $ 77,505.00 | $ 15,075.00 | $ 22,500.00 | $ 33,496.65 | $ 49,995.00 |
| Michael | Mahon | $ 250,000.00 | $ 129,175.00 | $ 25,125.00 | $ 37,500.00 | $ 55,827.75 | $ 83,325.00 |
| Tom | McGrath | $ 100,000.00 | $ 51,670.00 | $ 10,050.00 | $ 15,000.00 | $ 22,331.10 | $ 33,330.00 |
| Kevin | Miller | $ 75,000.00 | $ 38,752.50 | $ 7,537.50 | $ 11,250.00 | $ 16,748.33 | $ 24,997.50 |
| Derek | Brown | $ 100,000.00 | $ 51,670.00 | $ 10,050.00 | $ 15,000.00 | $ 22,331.10 | $ 33,330.00 |
| Dylan | Hankinson | $ 100,000.00 | $ 51,670.00 | $ 10,050.00 | $ 15,000.00 | $ 22,331.10 | $ 33,330.00 |
| David | Stone | $ 100,000.00 | $ 51,670.00 | $ 10,050.00 | $ 15,000.00 | $ 22,331.10 | $ 33,330.00 |
| Eric | Brieva | $ 100,000.00 | $ 51,670.00 | $ 10,050.00 | $ 15,000.00 | $ 22,331.10 | $ 33,330.00 |
| Mitchell | Hooper | $ 250,000.00 | $ 129,175.00 | $ 25,125.00 | $ 37,500.00 | $ 55,827.75 | $ 83,325.00 |
| Brian | Egan | $ 75,000.00 | $ 38,752.50 | $ 7,537.50 | $ 11,250.00 | $ 16,748.33 | $ 24,997.50 |
| Bradley | Howell | $ 75,000.00 | $ 38,752.50 | $ 7,537.50 | $ 11,250.00 | $ 16,748.33 | $ 24,997.50 |
| David | Clanet | $ 75,000.00 | $ 38,752.50 | $ 7,537.50 | $ 11,250.00 | $ 16,748.33 | $ 24,997.50 |
| Jason | Aron | $ 50,000.00 | $ 25,835.00 | $ 5,025.00 | $ 7,500.00 | $ 11,165.55 | $ 16,665.00 |
| Lucy | Weigard | $ 50,000.00 | $ 25,835.00 | $ 5,025.00 | $ 7,500.00 | $ 11,165.55 | $ 16,665.00 |
| Ashley | Ayaz | $ 50,000.00 | $ 25,835.00 | $ 5,025.00 | $ 7,500.00 | $ 11,165.55 | $ 16,665.00 |
| Mark | Cambria | $ 50,000.00 | $ 25,835.00 | $ 5,025.00 | $ 7,500.00 | $ 11,165.55 | $ 16,665.00 |
| Laurie | Holinka | $ 50,000.00 | $ 25,835.00 | $ 5,025.00 | $ 7,500.00 | $ 11,165.55 | $ 16,665.00 |
| Dave | Krupinski | $ 25,000.00 | $ 12,917.50 | $ 2,512.50 | $ 3,750.00 | $ 5,582.78 | $ 8,332.50 |
| Topher | Ziobro | $ 25,000.00 | $ 12,917.50 | $ 2,512.50 | $ 3,750.00 | $ 5,582.78 | $ 8,332.50 |
| Kimberly | Aguenza | $ 25,000.00 | $ 12,917.50 | $ 2,512.50 | $ 3,750.00 | $ 5,582.78 | $ 8,332.50 |
| Jonathan | Fuentes | $ 25,000.00 | $ 12,917.50 | $ 2,512.50 | $ 3,750.00 | $ 5,582.78 | $ 8,332.50 |
| James | Portela | $ 50,000.00 | $ 25,835.00 | $ 5,025.00 | $ 7,500.00 | $ 11,165.55 | $ 16,665.00 |
| Emily | Gabriel | $ 25,000.00 | $ 12,917.50 | $ 2,512.50 | $ 3,750.00 | $ 5,582.78 | $ 8,332.50 |
| Emily | Thompson | $ 25,000.00 | $ 12,917.50 | $ 2,512.50 | $ 3,750.00 | $ 5,582.78 | $ 8,332.50 |
| Junghyun | Park | $ 15,000.00 | $ 7,750.50 | $ 1,507.50 | $ 2,250.00 | $ 3,349.67 | $ 4,999.50 |
| Austin | Kaplan | $ 15,000.00 | $ 7,750.50 | $ 1,507.50 | $ 2,250.00 | $ 3,349.67 | $ 4,999.50 |
| Jake | Roseman | $ 15,000.00 | $ 7,750.50 | $ 1,507.50 | $ 2,250.00 | $ 3,349.67 | $ 4,999.50 |
| Brandon | Langford | $ 15,000.00 | $ 7,750.50 | $ 1,507.50 | $ 2,250.00 | $ 3,349.67 | $ 4,999.50 |
| Marc | Manasse | $ 15,000.00 | $ 7,750.50 | $ 1,507.50 | $ 2,250.00 | $ 3,349.67 | $ 4,999.50 |
| Javier | Guerrero | $ 15,000.00 | $ 7,750.50 | $ 1,507.50 | $ 2,250.00 | $ 3,349.67 | $ 4,999.50 |
| Ciel | Kim | $ 15,000.00 | $ 7,750.50 | $ 1,507.50 | $ 2,250.00 | $ 3,349.67 | $ 4,999.50 |
| Kevin | Malast | $ 225,000.00 | $ 116,257.50 | $ 22,612.50 | $ 33,750.00 | $ 50,244.98 | $ 74,992.50 |
| | **Total** | $ 2,230,000.00 | $ 1,152,241.00 | $ 224,115.00 | $ 334,500.00 | $ 497,983.53 | $ 743,259.00 |

Execution Version

**Schedule 7.02(h)**

Liens

(see attached)

[Signature Page to Membership Interest Purchase Agreement]

<u>Schedule 7.02(h)</u>

Liens

1.    ConnectOne Bank (Filing #201808158373217)

2.    SHI International Corp. (Filing #202001035015729)

3.    SHI International Corp. (Filing #202002255242108)

4.    TIAA Commercial Finance, Inc. (Filing #202009177658475)

5.    ConnectOne Bank (Filing #202101210021931)

6.    ConnectOne Bank (Filing #202108310322453)

7.    ConnectOne Bank (Loan #439646-100)

Execution Version

**Schedule 7.02(m)**

Third Party Consents

(see attached)

[Signature Page to Membership Interest Purchase Agreement]

<u>Schedule 7.02(m)</u>

Third Party Consents

1. Business Loan Agreement, dated August 7, 2018, by and between ConnectOne Bank and the Company, relating to a $500,000 commercial promissory demand note for a working capital line of credit, as amended by that certain Amendment to Loan Documents, dated November 1, 2020
2. Business Loan Agreement, dated August 7, 2018, by and between ConnectOne Bank and the Company, relating to a $600,000 commercial promissory note to pay off a prior working capital line of credit and to finance a new studio and related equipment
3. Business Loan Agreement, dated October 25, 2019, by and between ConnectOne Bank and the Company
4. Business Loan Agreement, dated January 11, 2021, by and between ConnectOne Bank and the Company
5. Promissory Note (Term Loan), dated August 25, 2021, by and among the Company, Malka Sports LLC and ConnectOne Bank
6. Lease Agreement, dated December 7, 2018, by and among Jackett II Union Hills, LLC, Jackett III Union Hills, LLC, and the Company, relating to 1412 14th Street, Santa Monica, California 90404

Execution Version

**Exhibit A**

Form of Escrow Agreement

(see attached)

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT (the "Escrow Agreement") is entered into and effective as of this 15ᵗʰ day of November, 2021 ("Closing Date"), by and among PNC Bank, National Association, a national banking association (the "Escrow Agent"), MoneyLion Technologies Inc., a Delaware corporation ("Buyer") and Jeffrey Frommer (the "Sellers' Representative" and together with Buyer, sometimes referred to individually as "Party" and collectively as the "Parties").  Capitalized terms used but not defined herein shall have the meanings assigned to them in the Purchase Agreement (as defined below).

WHEREAS, pursuant to that certain Membership Interest Purchase Agreement, dated as of the date hereof, by and among Buyer, Sellers' Representative, the seller members (the "Seller Members"), and the other parties thereto (the "Purchase Agreement"), each Seller Member has sold to Buyer such portion of such Seller Member's ownership interest in Malka Media Group, LLC, a New York limited liability company (the "Company") which constitute Purchased Interests and Buyer has purchased such Purchased Interests, in each case upon the terms and conditions set forth in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, Buyer has agreed to deposit certain funds into escrow accounts (each, an "Escrow Account") at the Closing by wire transfer of immediately available cash funds, with such funds to be held, invested and disbursed by the Escrow Agent in accordance with the terms and conditions of this Escrow Agreement; and

WHEREAS, the Parties desire to set forth their understandings with regard to the Escrow Accounts established by this Escrow Agreement.

NOW, THEREFORE, in consideration of the premises herein, the parties hereto agree as follows:

## I. Terms and Conditions

1.1.    <u>Appointment of and Acceptance by Escrow Agent</u>.  Buyer and the Sellers' Representative hereby appoint the Escrow Agent to serve as escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to perform its duties as provided herein.

1.2.    <u>Establishment of Escrow</u>.

(a)    On the Closing Date, Buyer will deposit (or cause to be deposited) into Escrow Accounts pursuant to the wire instructions set forth on Schedule A hereto, in immediately available funds, (a) US$[_____], representing the Purchase Price Adjustment Escrow Amount referred to in the Purchase Agreement (together with all interest and earnings thereon, and, to be retained in a non-interest-bearing escrow (the "Purchase Price Adjustment Escrow Account"), and (b) $[375,000], representing the Retention Escrow Amount referred to in the Purchase Agreement to be retained in a separate non-interest bearing escrow (the "Retention Escrow Account"). The Purchase Price Adjustment Escrow Amount and the Retention Escrow Amount, less any disbursements hereunder, are referred to herein as the "Escrow Funds".

(b)    The Escrow Agent shall hold the Escrow Funds and shall not distribute or release any portion of the Escrow Funds except in accordance with the provisions of this Escrow Agreement.

1.3.    <u>Application of the Escrow Funds</u>. Subject to the terms, conditions and limitations contained herein and in the Purchase Agreement, the Escrow Funds in (a) the Purchase Price Adjustment Escrow Account shall be available to satisfy amounts payable pursuant to Section 2.05 of the Purchase Agreement,

1

and (b) the Retention Escrow Account shall be available to satisfy amounts payable pursuant to Section 8.08 of the Purchase Agreement.

1.4.    <u>Disbursements of the Escrow Funds</u>.  The Escrow Agent shall only disburse amounts from the Escrow Funds as follows:

(a)    <u>Disbursement of the Purchase Price Adjustment Escrow Account</u> .  Upon receipt of a Joint Written Direction with respect to the Escrow Funds in the <u>Purchase Price Adjustment Escrow Account</u>, the Escrow Agent shall promptly disburse all or part of the Escrow Funds in accordance with such Joint Written Direction. "<u>Joint Written Direction</u>" shall mean a written notification, in the form of <u>Exhibit B</u> hereto, delivered to the Escrow Agent and signed by an Authorized Representative of each of Buyer and the Sellers' Representative (a list of whom are provided in <u>Exhibit A-1</u> and <u>Exhibit A-2</u>).

(b)    <u>Disbursement of the Retention Escrow Account</u>

i.    Upon receipt of a Joint Written Direction with respect to the Escrow Funds in the Retention Escrow Account, the Escrow Agent shall promptly disburse all or part of the Escrow Funds in accordance with the Joint Written Direction.

ii.    For so long as any portion of the Retention Escrow Amount is held by the Escrow Agent in accordance with this Escrow Agreement, Buyer shall give prompt written notice to the Escrow Agent and to the Sellers' Representative of any claim for indemnification pursuant to Article VIII of the Purchase Agreement in respect of which any Buyer Indemnitees claim all or part of the Retention Escrow Amount, and shall provide a good faith estimate of the amount of Losses (as defined in the Purchase Agreement) in connection therewith (a "<u>Claim Notice</u>").  Following the final determination in accordance with the Purchase Agreement of the amount of any Losses payable to a Buyer Indemnitee pursuant to Article VIII of the Purchase Agreement and for which Buyer has timely provided a Claim Notice to the Escrow Agent and the Sellers' Representative, Buyer and the Sellers' Representative shall promptly deliver to the Escrow Agent a Joint Written Direction with respect to such Losses.  The Escrow Agent shall promptly, following receipt of (A) a Joint Written Direction or (B) a certified copy of a final and nonappealable order, decree or judgment issued or rendered by a court of competent jurisdiction, certified by the Sellers' Representative or an authorized representative of Buyer to the effect that such order, decree or judgment is final, nonappealable and from a court of competent jurisdiction (a "<u>Final Order</u>"), with respect to the Losses payable to a Buyer Indemnitee with respect to a Claim Notice, release from the Retention Escrow Account, an amount equal to the lesser of (y) the amount of such Losses and (z) the then-remaining Escrow Funds in the Retention Escrow Account.

(c)    <u>Final Disbursements</u>. In accordance with and subject to the terms and conditions of this Escrow Agreement, any amount remaining in the Purchase Price Adjustment Escrow Account after reduction for any Final Deficiency (as defined in the Purchase Agreement), shall be remitted to the Seller Members in accordance with the terms of the Purchase Agreement. In accordance with and subject to the terms and conditions of this Escrow Agreement, promptly, and in any event within five (5) days after the Final Release Date (as defined in the Purchase Agreement), Buyer and the Sellers' Representative shall cause the Escrow Agent pursuant to Joint Written Directions to release to the Seller Members any remaining amount of funds then held in the Retention Escrow Amount *less* any amount which is then the subject of any outstanding good faith claims or disputes relating thereto.

**II. Provisions as to the Escrow Agent**

2.1.    <u>Limited Duties of Escrow Agent</u>.  The Escrow Agent undertakes to perform only such duties as are expressly set forth in this Escrow Agreement that shall be deemed purely ministerial in nature. Under no circumstance will the Escrow Agent be deemed to be a fiduciary to any Party or any other person under this Escrow Agreement.  This Escrow Agreement expressly and exclusively sets forth the duties of the Escrow Agent with respect to any and all matters pertinent hereto and no implied duties or obligations shall be read into this Escrow Agreement against the Escrow Agent.  The Escrow Agent shall not be bound by, deemed to have knowledge of, or have any obligation to determine, make inquiry into or consider, any term or provision of any agreement between the Sellers' Representative, Buyer and/or any other third party or as to which the escrow relationship created by this Escrow Agreement relates, including without limitation the Purchase Agreement or any other documents referenced in this Escrow Agreement.  Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement shall control the actions of the Escrow Agent.

2.2.    <u>Limitations on Liability of Escrow Agent</u>.

(a)        In performing its duties under this Escrow Agreement, Escrow Agent shall not be liable for incidental, indirect, special, consequential or punitive damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action in which such damages are sought, except in cases of the Escrow Agent's fraud, gross negligence, bad faith or willful misconduct. Escrow Agent shall not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that Escrow Agent's fraud, gross negligence, bad faith or willful misconduct was the cause of any direct loss to either Party.

(b)        Except in cases of the Escrow Agent's fraud, gross negligence, bad faith or willful misconduct, the Escrow Agent shall be fully protected (i) in acting in reliance upon any certificate, statement, request, notice, advice, instruction, direction, other agreement or instrument or signature reasonably and in good faith provided by the Sellers' Representative or Parent with respect to such Party's information and believed by the Escrow Agent to be genuine, (ii) in assuming that any person purporting to give the Escrow Agent any of the foregoing in connection with either this Escrow Agreement or the Escrow Agent's duties has been duly authorized to do so and (iii) in acting in good faith in accordance with the terms of this Escrow Agreement on the advice of outside counsel retained by the Escrow Agent.

(c)        The Escrow Agent shall have no liability with respect to the transfer or distribution of any funds effected by the Escrow Agent pursuant to wiring or transfer instructions provided to the Escrow Agent in accordance with the provisions of this Escrow Agreement.  The Escrow Agent shall be entitled to rely upon all bank and account information provided to the Escrow Agent by the applicable Authorized Representative of each of Buyer and the Sellers' Representative set forth on <u>Exhibit A-1</u> and <u>Exhibit A-2</u>. The Escrow Agent shall have no duty to verify or otherwise confirm any written wire transfer instructions except as set forth in Section 2.3 below, but it may do so in its discretion on any occasion without incurring any liability to any party for failing to do so on any other occasion.  The Escrow Agent shall process all wire transfers based on bank identification and account numbers rather than the names of the intended recipient of the funds, even if such numbers pertain to a recipient other than the recipient identified in the payment instructions.  The Escrow Agent shall have no duty to detect any such inconsistencies and shall resolve any such inconsistencies by using the account number.  In connection with any payments that the Escrow Agent is instructed to make by wire transfer, the Escrow Agent shall not be liable for the acts or omissions of (i) the Sellers' Representative, Buyer or other person providing such instructions, including without limitation errors as to the amount, bank information or bank account number; or (ii) any other person or entity, including without limitation any Federal Reserve Bank, any transmission or communications facility, any funds transfer system, any receiver or receiving depository financial institution, and no such person or entity shall be deemed to be an agent of the Escrow Agent.  Any wire

transfers of funds made by the Escrow Agent pursuant to this Escrow Agreement will be made subject to and in accordance with the Escrow Agent's usual and ordinary wire transfer procedures in effect from time to time.

(d)         No provision of this Escrow Agreement shall require the Escrow Agent to risk or advance its own funds or otherwise incur any financial liability or potential financial liability in the performance of its duties or the exercise of its rights under this Escrow Agreement.  The Escrow Agent shall not be obligated to take any legal action or to commence any proceedings in connection with this Escrow Agreement or any property held hereunder or to appear in, prosecute or defend in any such legal action or proceedings.

(e)         Buyer understands and acknowledges that The PNC Financial Services Group, Inc., a Pennsylvania corporation ("PNC") offers a diversified set of financial products and services, and may currently, or in the future, have relationships with parties whose interest may conflict with those of the Buyer.

2.3.    <u>Security Procedure For Funds Transfers</u>.  The Escrow Agent shall confirm each funds transfer instruction received in the name of a Party by telephone call-back to one Authorized Representative specified on <u>Exhibit A-1</u> or <u>Exhibit A-2</u>  at the telephone number specified for such authorized person on <u>Exhibit A-1</u> or <u>Exhibit A-2</u>, as applicable ("Authorized Representative").  Once delivered to the Escrow Agent, <u>Exhibit A-1</u> or <u>Exhibit A-2</u> may be revised or rescinded only by a writing signed by an Authorized Representative of the applicable party.  Such revisions or rescissions shall be effective only after actual receipt and following such period of time as may be necessary to afford the Escrow Agent a reasonable opportunity to act on it.  If a revised <u>Exhibit A-1</u> or <u>Exhibit A-2</u> or a rescission of an existing <u>Exhibit A-1</u>or <u>Exhibit A-2</u> is delivered to the Escrow Agent by an entity that is a successor-in-interest to such party, such document shall be accompanied by additional documentation satisfactory to the Escrow Agent showing that such entity has succeeded to the rights and responsibilities of the applicable authorized representative of each of Buyer and the Sellers' Representative under this Escrow Agreement.  Buyer and the Sellers' Representative understand that the Escrow Agent's inability to receive or confirm funds transfer instructions pursuant to the above security procedure may result in a delay in accomplishing such funds transfer, and agree that the Escrow Agent shall not be liable for any loss caused by any such delay.

2.4.    <u>Depository Role</u>.  The Escrow Agent acts hereunder as a depository only and is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of the subject matter of this Escrow Agreement or any part thereof, or of any person executing or depositing such subject matter.

2.5.    <u>No Duty to Notify</u>.  The Escrow Agent shall in no way be responsible for nor shall it be its duty to notify any Party hereto or any other party interested in this Escrow Agreement of any payment required or maturity occurring under this Escrow Agreement or under the terms of any instrument deposited therewith unless such notice is explicitly provided for in this Escrow Agreement.

2.6.    <u>Other Relationships</u>.  The Escrow Agent may execute any of its powers and perform any of its duties hereunder directly or through affiliates or agents.  The Escrow Agent and its affiliates, and any of their respective directors, officers or employees may become pecuniarily interested in any transaction in which any of the Parties may be interested and may contract and lend money to any such party and otherwise act as fully and freely as though it were not escrow agent under this Escrow Agreement.  Nothing herein shall preclude the Escrow Agent or its affiliates from acting in any other capacity for any such party.

2.7.    <u>Disputes</u>.

(a)         In the event of any disagreement between Buyer and the Sellers' Representative, or between either of them and any other party, resulting in adverse claims or demands being made in connection with the matters covered by this Escrow Agreement, or in the event that the Escrow Agent, in good faith, be in doubt as to what action it should take hereunder, the Escrow Agent may, at its option, refuse to comply with any claims or demands on it, or refuse to take any other action hereunder, so long as such disagreement continues or such doubt exists, and in any such event, the Escrow Agent shall not be or become liable in any way or to any Party for its failure or refusal to act, and the Escrow Agent shall be entitled to continue to refrain from acting until directed by (i) a Final Order, or (ii) as directed otherwise by a Joint Written Direction.

2.8.        Indemnification.  Buyer and the Sellers' Representative jointly and severally agree to defend, indemnify and hold harmless the Escrow Agent and each of the Escrow Agent's officers, directors, agents and employees (the "Indemnitee ") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, litigation, investigations, reasonable and documented out of pocket costs or expenses (including, without limitation, reasonable and documented out of pocket fees and expenses of outside counsel and experts and their staffs and all reasonable expense of document location, duplication and shipment) (collectively "Indemnitee Losses"), arising out of or in connection with (a) Escrow Agent's performance of this Agreement, except to the extent that such Indemnitee Losses are determined by a court of competent jurisdiction to have been caused by fraud, gross negligence, willful misconduct or bad faith of such Indemnitee; and (b) Escrow Agent's following, accepting or acting upon any instructions or directions from the Parties, whether joint or singular, received in accordance with this Agreement; provided, however, that the Indemnitee shall not be entitled in indemnity with respect to Indemnitee Losses that have been caused by fraud, gross negligence, willful misconduct or bad faith of the Indemnitee.  The Parties hereby grant Escrow Agent a lien on and security interest in the Escrow Funds for the payment of any claim for indemnification, reasonable fees and expenses and amounts due to Escrow Agent or an Indemnitee pursuant to this Escrow Agreement. Notwithstanding the foregoing, solely as between Buyer and Sellers' Representative, any indemnity paid to any Indemnitee hereunder shall be borne, severally and not jointly, , one-half by Parent and one-half by Shareholders' Representative and each of Parent and the Shareholders' Representative may seek contribution against one another to recoup any amounts paid in excess of its obligation hereunder. The provisions of this Section 2.8 shall survive the termination of this Escrow Agreement and any resignation or removal of the Escrow Agent.

2.9.        Mergers, Consolidations, Etc.  Any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow business of the Escrow Agent may be transferred, shall be the successor Escrow Agent under this Escrow Agreement and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, in each case without the execution or filing of any instrument or paper or the performance of any further act (other than due notice to Buyer and the Sellers' Representative).

2.10.       Resignation; Removal.

(a)         The Escrow Agent may resign and be discharged from it duties and obligations at any time under this Escrow Agreement by providing written notice to Buyer and the Sellers' Representative. Such resignation shall be effective on the date set forth in such written notice, which shall be no earlier than thirty (30) days after such written notice has been furnished.  Thereafter, the Escrow Agent shall have no further obligation except to hold the Escrow Funds as depository and cooperate reasonably in the transfer of the Escrow Funds to a successor escrow agent.  Buyer and the Sellers' Representative shall promptly appoint a successor escrow agent.  The Escrow Shall refrain from taking any action until it shall

5

receive a Joint Written Direction designating the successor escrow agent. However, in the event no successor escrow agent has been appointed on or prior to the date such resignation is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all funds, equity and other property then held by the Escrow Agent hereunder and the Escrow Agent shall thereupon be relieved of all further duties and obligations under this Escrow Agreement.

(b)        Buyer and the Sellers' Representative acting together shall have the right to terminate the appointment of the Escrow Agent upon thirty (30) days' joint written notice to the Escrow Agent specifying the date upon which such termination shall take effect. Thereafter, the Escrow Agent shall have no further obligation except to hold the Escrow Funds as depository and cooperate reasonably in the transfer of the Escrow Funds to a successor escrow agent. The Escrow Agent shall refrain from taking any action until it shall receive a Joint Written Direction designating the successor escrow agent. However, in the event no successor escrow agent has been appointed on or prior to the date such termination is to become effective, the Escrow Agent shall be entitled to tender into the custody of any court of competent jurisdiction all funds, equity and other property then held by the Escrow Agent hereunder and the Escrow Agent shall thereupon be relieved of all further duties and obligations under this Escrow Agreement.

(c)        In the case of a resignation or removal of the Escrow Agent, the Escrow Agent shall have no responsibility for the appointment of a successor escrow agent hereunder. The successor escrow agent appointed by Buyer and the Sellers' Representative shall execute, acknowledge and deliver to the Escrow Agent and the Parties an instrument in writing accepting its appointment hereunder, and thereafter, the Escrow Agent shall deliver all of the then-remaining balance of the Escrow Funds, less any fees and expenses then incurred by and unpaid to the Escrow Agent, to such successor escrow agent in accordance with the Joint Written Direction of Buyer and the Sellers' Representative and upon receipt of the Escrow Funds, the successor escrow agent shall be bound by all of the provisions of this Escrow Agreement.

2.11.    Compensation of the Escrow Agent.  The Parties agree that upon the execution of this Escrow Agreement, Buyer and the Sellers' Representative will pay the Escrow Agent as stated in the fee schedule attached hereto as Schedule B.

## III. Tax Matters

3.1.    Tax Matters.

The Escrow Funds shall be treated as owned by Buyer for U.S. federal income tax purposes. All Escrow Account Income earned under this Agreement shall be allocated to Buyer and timely reported by Escrow Agent to Buyer, the IRS or other applicable taxing authority, on IRS Form 1099 or 1042S (or other appropriate form) as income earned from the Escrow Funds by Buyer whether or not said income has been distributed during such year. The Parties shall duly complete such tax documentation or other procedural formalities necessary for Escrow Agent to complete required tax reporting and for the relevant Party to receive interest or other income without withholding or deduction of tax in any jurisdiction. Should any information supplied in such tax documentation change, the Parties shall promptly notify Escrow Agent. Escrow Agent shall withhold any taxes it deems appropriate in the absence of proper tax documentation or as required by law, including without limitation, the Foreign Account Tax Compliance Act ("FATCA"), and shall remit such taxes to the appropriate authorities. Notwithstanding the foregoing or anything else contained in this Escrow Agreement, the Escrow Funds shall be retained in a non-interest bearing accounts.

## IV. Miscellaneous

4.1.   <u>Disbursements</u>.  The Escrow Agent shall make no disbursement or other use of funds until and unless it has collected funds. The Escrow Agent shall not be liable for collection items until such proceeds have been received or the Federal Reserve has given the Escrow Agent credit for the funds.

4.2.   <u>No Investment</u>. The Escrow Agent shall retain the Escrow Funds in a PNC Non-Interest Bearing Deposit Account.

4.3.   <u>Accounting</u>.  The Escrow Agent shall provide monthly reports of transactions and holdings to Buyer and the Sellers' Representative as of the end of each month, at the address provided by Buyer and the Sellers' Representative in Section 4.4 below or provide access to the authorized individuals to obtain the account statements through the Escrow Agent's online portal ("PNC PAID" in accordance with the PNC PAID access exhibits ("PNC PAID Access") as set forth on Exhibit A-3 and A-4. The parties acknowledge changes to PNC PAID Access should be made in writing to the Escrow Agent.

4.4.   <u>Notices</u>.  Any notice, request for consent, report, or any other communication required or permitted in this Escrow Agreement shall be in writing and shall be deemed to have been given (i) when delivered personally to any individual party, (ii) when delivered by electronic  mail to the e-mail address given below, provided that written confirmation of receipt (a return electronic mail being sufficient) is obtained promptly from the recipient after completion of the electronic mail transmission or (iii) on the first (1st) Business Day after the date of deposit with an overnight courier with a reputable national overnight delivery service for next day delivery, postage paid, or on the third (3rd) Business Day after deposit in the U.S. mail, certified or registered, return receipt requested, postage prepaid, addressed in all cases to the party at her, his or its respective address set forth below, or to such other address as such party may designate, provided that notices will be deemed to have been given to the Escrow Agent on the actual date received:

If to the Escrow Agent:

PNC Bank, National Association
Attn: Jamie Roseberg
80 South 8th Street, Suite 3715
Minneapolis, MN 55402
Email: pncpaidadmin@pnc.com; jamie.roseberg@pnc.com
Phone: 612-268-7313

If to Buyer:

MoneyLion Technologies Inc.
c/o MoneyLion Inc.
30 West 21st Street, Ninth Floor
New York, New York 10010
Attention: General Counsel's Office
Email: legal@moneylion.com

with a copy (which shall not constitute notice) to

DLA Piper LLP (US)
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey 07078
Attention: Andrew Gilbert, Esq.
Email: Andrew.gilbert@dlapiper.com

7

If to the Sellers' Representative:

Jeffrey Frommer
Malka Media Group, LLC
75 Montgomery Street
Jersey City, New Jersey 19473
Email: jeff@malkamedia.com

with a copy (which shall not constitute notice) to

Fox Rothschild LLP
101 Park Avenue
17th Floor
New York, New York 10178
Attention: Marc H. Simon
Email: msimon@foxrothschild.com

With respect to this Section 4.4, any party hereto may unilaterally designate a different address by giving notice of each change in the manner specified above to each other party hereto.  In all cases, the Escrow Agent shall be entitled to rely on a copy or electronic transmission of any document with the same legal effect as if it were the original of such document.  "Business Day" shall mean any day other than a Saturday, Sunday or any other day on which banking institutions located in the State of Delaware are authorized or obligated by law or executive order to remain closed.

4.5.    Governing Law.  This Escrow Agreement shall be governed by and construed according to the laws of the State of Delaware, without regard to principles of conflicts of law.  The parties hereto consent to the exclusive jurisdiction of the state and federal courts sitting in the state of Delaware and consent to personal jurisdiction of and venue in such courts with respect to any and all matters or disputes arising out of this Escrow Agreement.

4.6.    Waiver of Jury Trial.  TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, EACH PARTY HEREBY WAIVES, AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING IN WHOLE OR IN PART UNDER, RELATED TO, BASED ON OR IN CONNECTION WITH THIS ESCROW AGREEMENT OR THE SUBJECT MATTER HEREOF, WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN TORT OR CONTRACT OR OTHERWISE.  ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 4.6 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

4.7.    Assignment; Binding Effect.    Except as permitted in Section 2.9, neither this Escrow Agreement nor any rights or obligations hereunder may be assigned by any party hereto without the express written consent of each of the other parties hereto; provided, however, that Buyer may, without such consent, assign any of its rights pursuant to this Agreement to any affiliate of Buyer, provided that such assignment shall not relieve Buyer of its obligations hereunder. This Escrow Agreement shall inure to and be binding upon the parties hereto and their respective successors, heirs and permitted assigns. Notwithstanding the foregoing, any entity into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any entity to which all or substantially all the escrow agent business of the Escrow Agent may be transferred, shall be the successor Escrow Agent under this Escrow Agreement

8

and shall have and succeed to the rights, powers, duties, immunities and privileges as its predecessor, in each case without the execution or filing of any instrument or paper or the performance of any further act (other than due notice to the Parties).

4.8.   <u>Amendment and Waiver</u>.  The terms of this Escrow Agreement may be altered, amended, modified or revoked only by an instrument in writing signed by all the parties hereto.  No course of conduct shall constitute a waiver of any terms or conditions of this Escrow Agreement, unless such waiver is specified in writing, and then only to the extent so specified.  A waiver of any of the terms and conditions of this Escrow Agreement on one occasion shall not constitute a waiver of the other terms of this Escrow Agreement, or of such terms and conditions on any other occasion.

4.9.   <u>Severability</u>.  If any provision of this Escrow Agreement shall be held or deemed to be or shall in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatsoever.

4.10.   <u>Further Assurances</u>.  If at any time the Escrow Agent shall determine or be advised that any further agreements, assurances or other documents are reasonably necessary or desirable to carry out the provisions of this Escrow Agreement and the transactions contemplated by this Escrow Agreement, the parties shall execute and deliver any and all such agreements or other documents and do all things reasonably necessary or appropriate to carry out fully the provisions of this Escrow Agreement.

4.11.   <u>No Third Party Beneficiaries</u>.  This Escrow Agreement is for the sole benefit of the parties hereto, and their respective successors and permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Escrow Agreement.

4.12.   <u>Force Majeure</u>.  No party to this Escrow Agreement shall be liable to any other party hereto for losses due to, or if it is unable to perform its obligations under the terms of this Escrow Agreement because of, acts of God, fire, war, terrorism, floods, strikes, electrical outages, equipment or transmission failure, interruption or malfunctions of communications or power supplies, labor difficulties, actions of public authorities or other similar causes reasonably beyond its control.

4.13.   <u>Termination</u>.  This Escrow Agreement shall terminate upon the distribution by the Escrow Agent in accordance with this Escrow Agreement of all funds, equity and property held under this Escrow Agreement or upon the earlier Joint Written Direction of the Parties to distribute all Escrow Funds and terminate this Escrow Agreement.

4.14.   <u>Titles and Headings</u>.  All titles and headings in this Escrow Agreement are intended solely for convenience of reference and shall in no way limit or otherwise affect the interpretation of any of the provisions hereof.

4.15.   <u>Counterparts; Facsimile Execution</u>.  This Escrow Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Delivery of an executed signature page to this Escrow Agreement and agreements, certificates, instruments and documents entered into in connection herewith by facsimile or other electronic transmission (including Adobe PDF format) will be effective as delivery of a manually executed counterpart to this Escrow Agreement or such agreements, certificates, instruments and documents.

4.16.   <u>Entire Agreement; Effect of Purchase Agreement</u>.  This Escrow Agreement constitutes the entire agreement amongst the Escrow Agent and Buyer and the Sellers' Representative in connection with

Execution Version

the subject matter of this Escrow Agreement, and no other agreement entered into between Buyer and the Sellers' Representative, or either of them, including, without limitation, the Purchase Agreement, shall be considered as adopted or binding, in whole or in part, upon the Escrow Agent notwithstanding that any such other agreement may be deposited with the Escrow Agent or the Escrow Agent may have knowledge thereof. The parties hereto acknowledge and agree that the Escrow Agent is not a party to, is not bound by, and has no duties or obligations under the Purchase Agreement, that all references in this Escrow Agreement to the Purchase Agreement are for convenience, and that the Escrow Agent shall have no implied duties beyond the express duties set forth in this Escrow Agreement.

4.17.   <u>Procedures for Opening a New Account</u>.   IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT: in accordance with Section 326 of the USA Patriot Act, to help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. When a party opens an account, the Escrow Agent must obtain each party's name, address, date of birth (as applicable), taxpayer or other government identification number or other appropriate information that will allow the Escrow Agent to identify such party. The Escrow Agent may also ask to see each party's driver's license, passport or other identifying documents. For parties that are business or other legal entities, the Escrow Agent may require such documents as it deems necessary to confirm the legal existence of the entity. The parties to this Escrow Agreement agree to provide all such information as Escrow Agent may reasonably request in order to satisfy the requirements of the USA Patriot Act or any other regulatory requirements, and any policy or procedure implemented by the Escrow Agent to comply therewith.

4.18.   <u>Compliance with Laws</u>.   Buyer hereby represents that (i) it is not a person that is the target of any sanctions program administered by the U.S. Department of the Treasury Office of Foreign Assets Control ("Sanctioned Person"); (ii) it is not directly or indirectly controlled by, or acting hereunder for or on behalf of, any Sanctioned Person; and (iii) none of the funds used to make any payments contemplated under this Agreement are derived from any illegal activity.

4.19.   <u>Compliance with Court Orders</u>.   In the event that a legal garnishment, attachment, levy, restraining notice or court order is served with respect to any of the Escrow Funds, or the delivery thereof shall be stayed or enjoined by an order of a court of competent jurisdiction, Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all such orders so entered or issued, whether with or without jurisdiction, and in the event that Escrow Agent obeys or complies with any such order it shall not be liable to any of the Parties or to any other person by reason of such compliance notwithstanding such order be subsequently reversed, modified, annulled, set aside or vacated.

[*Signature Page Follows*]

10

Execution Version

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed as of the date first above written.

PNC BANK, NATIONAL ASSOCIATION, as the Escrow Agent

By: _____
Name: _____
Title: _____

MONEYLION TECHNOLOGIES INC.

By: _____
Name: _____
Title: _____

JEFFREY FROMMER, solely in his capacity as the Sellers' Representative

By: _____
Name: _____
Title: _____

11

Execution Version

## SCHEDULE A

### Escrow Agent
### Wire Instructions

PNC Bank, National Association
ABA: [_____]
Account: [_____]
Account Name: [Escrow Services]
Reference: [                    ]
Attention: [_____]

Execution Version

**SCHEDULE B**

**Escrow Agent Fee**

# Escrow Agent Fee Schedule for Project Queen

| Contracted Services | Description | Fees (USD) |
|---|---|---|
| **Escrow Administration Fee** | Account set up, agreement negotiation, and account administration for duration of account | ***$2,500** *(if applicable)* |
| **Closing and Post-closing Payments** | Payment processing for ~10 payments total | **Included in the above** **Tax reporting included** |
| **1099 Reporting** | Standard 1099 Tax Reporting (Alternative tax reporting Available at additional cost) | **Electronic Delivery Included** |

Administration fee includes the electronic solicitation of required documents, review & approval, addressing deficiencies, payment and tax reporting for the payees, set up of the account(s), agreement negotiation, and associated 1099B reporting.

Out-of-pocket expenses (when applicable) will be billed at cost at the sole discretion of PNC. Fees for services not specifically covered in this schedule will be billed in accordance with market prevailing rates.

Assumptions:

- Purchase price adjustment escrow: Approximately 90 days from closing. Retention escrow
- Retention escrow to be seller's 50% portion of the R&W policy retention, 18 months from closing
- Approximately 2 distributions 1 for each escrow (subject to change depending on if any distributions from the retention escrow are required), to 4 seller members of the LLC
- *Escrow fee is waived for deposits of at least $1mln for at least 12 months in a non-interest bearing; otherwise, $2,500 fee will apply

Disclosures:

Execution Version

- The escrow agent administration fee is due and payable upon closing.

October 15, 2021

Execution Version

## EXHIBIT A-1

**Certificate of Incumbency**
**(List of Authorized Representatives of Buyer)**

Client Name: MoneyLion Technologies Inc.

As an Authorized Officer of the above referenced entity, I hereby certify that each person listed below is an authorized signor for such entity and is authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of the above referenced entity, and that the title, signature and contact number appearing beside each name is true and correct.

| **Name** | **Title** | **Signature** | **Contact Number** |
|---|---|---|---|
| Salvatore Aliperti | Director, Treasury | | 516.702.1007 |
| Gary Fishler | VP, Finance | | 347.387.3135 |
| | | | |
| | | | |
| | | | |
| | | | |

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:

_____
Date

By: Diwakar Choubey
Its: President & CEO

Execution Version

**EXHIBIT A-2**

**Certificate of Incumbency**
**(List of Authorized Representatives of Sellers' Representative)**

Client Name: [_____]

As an Authorized Officer of the above referenced entity, I hereby certify that each person listed below is an authorized signor for such entity and is authorized to provide direction and initiate or confirm transactions, including funds transfer instructions, on behalf of the above referenced entity, and that the title, signature and contact number appearing beside each name is true and correct.

| <u>Name</u> | <u>Title</u> | <u>Signature</u> | <u>Contact Number</u> |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

IN WITNESS WHEREOF, this certificate has been executed by a duly authorized officer on:

_____
Date

By:_____
Its: Authorized Officer

Execution Version

## **EXHIBIT A-3**

PNC PAID ACCESS

Sellers' Representative instructs the Escrow Agent to grant certain authorized individuals access to information regarding the Escrow Fund through PNC PAID as further detailed below.  Each authorized individual must agree to comply with the PNC PAID terms and conditions and any other provisions required by the Escrow Agent to access PNC PAID.  Buyer must provide written notice to Escrow Agent to change or remove any access previously authorized or granted.

List of authorized individuals:

| Name | Title | Email Address | Contact Number |
|------|-------|---------------|----------------|
| Salvatore Aliperti | Director, Treasury | Saliperti@moneylion.com | 516.702.1007 |
| Gary Fishler | VP, Finance | Gfishler@moneylion.com | 347.387.3135 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Execution Version

## **EXHIBIT A-4**

PNC PAID ACCESS

Buyer instructs the Escrow Agent to grant certain authorized individuals access to information regarding the Escrow Fund through PNC PAID as further detailed below.  Each authorized individual must agree to comply with the PNC PAID terms and conditions and any other provisions required by the Escrow Agent to access PNC PAID.  Buyer must provide written notice to Escrow Agent to change or remove any access previously authorized or granted.

List of authorized individuals:

| Name | Title | Email Address | Contact Number |
|------|-------|---------------|----------------|
|      |       |               |                |
|      |       |               |                |
|      |       |               |                |
|      |       |               |                |
|      |       |               |                |
|      |       |               |                |

Execution Version

**EXHIBIT B**

**JOINT WRITTEN DIRECTION**


Pursuant to that certain Escrow Agreement dated as of [●], 2021, by and among MoneyLion Technologies Inc. ("Buyer"), Jeffrey Frommer (the "Sellers' Representative"), and PNC Bank, National Association, a national banking association (the "Escrow Agent"), Buyer and the Sellers' Representative hereby instruct the Escrow Agent to release funds from the [Purchase Price Adjustment Account] [Retention Escrow Account] in accordance with the following instructions:

| |
|---|
| $ [_____] to Buyer:<br><br>Wire Instructions:<br><br>Account Name:        _____<br>Account Number:     _____<br>Bank Name:           _____<br>Bank ABA Number: _____<br>Bank Address:<br>_____<br><br>For credit to:<br>_____<br>Special Instructions: _____<br><br>Bank Check:<br>Payee Name:<br>_____<br>Mailing Address:     _____ |

IN WITNESS WHEREOF, the parties hereto have caused this Joint Written Direction to be executed as of the date first above written.

| MoneyLion Technologies Inc. | Jeffrey Frommer, solely in his capacity as the Sellers' Representative |
|---|---|
| By:    _____<br>Name: _____<br>Title:  _____ | By:    _____<br>Name: _____<br>Title:  _____ |

Execution Version

**Exhibit B**

2022 Budget

(see attached)

[Signature Page to Membership Interest Purchase Agreement]

| | 2021 | | | | | | | | | | | | |
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Full Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Creative Studio | $948,553 | $2,073,746 | $1,958,607 | $1,646,401 | $1,926,598 | $2,851,278 | $1,479,190 | $1,503,480 | $2,189,761 | $2,855,240 | $3,018,654 | $2,778,869 | $25,230,378 |
| Network | $187,963 | $165,460 | $238,632 | $252,544 | $314,509 | $267,668 | $396,599 | $521,356 | $309,232 | $306,871 | $306,871 | $870,621 | $4,138,326 |
| Talent | $19,667 | $33,467 | $20,667 | $33,367 | $16,667 | $26,667 | $16,667 | $19,922 | $41,667 | $62,165 | $29,420 | $44,420 | $364,762 |
| Total Revenue | $1,156,183 | $2,272,673 | $2,217,906 | $1,932,313 | $2,257,774 | $3,145,613 | $1,892,456 | $2,044,758 | $2,540,660 | $3,224,276 | $3,354,945 | $3,693,910 | $29,733,466 |
| | - | | | | | | - | | | | | | - |
| Variable Cost | $490,647 | $926,256 | $1,119,628 | $1,021,065 | $971,353 | $947,220 | $741,598 | $792,855 | $808,284 | $1,162,157 | $1,217,330 | $1,509,495 | $11,707,887 |
| VM% | 42% | 41% | 50% | 53% | 43% | 30% | 39% | 39% | 32% | 36% | 36% | 41% | 39% |
| | | | | | | | | | | | | | |
| Compensation & Benefits | $1,043,232 | $1,110,848 | $1,147,388 | $1,143,559 | $1,139,493 | $1,158,636 | $1,213,361 | $1,260,668 | $1,335,055 | $1,397,833 | $1,494,538 | $1,591,631 | $15,036,240 |
| Headcount | 132 | 141 | 145 | 147 | 148 | 151 | 154 | 158 | 160 | 169 | 194 | 201 | 201 |
| Overhead | $94,117 | $223,868 | $304,884 | $211,661 | $166,550 | $334,291 | $230,458 | $256,069 | $262,847 | $295,000 | $295,000 | $295,000 | $2,969,745 |
| | | | | | | | | | | | | | |
| Total Expense | $1,627,996 | $2,260,971 | $2,571,900 | $2,376,285 | $2,277,396 | $2,440,146 | $2,185,417 | $2,309,592 | $2,406,186 | $2,854,989 | $3,006,868 | $3,396,126 | $29,713,872 |
| EBITDA | ($471,813) | $11,702 | ($353,994) | ($443,972) | ($19,622) | $705,467 | ($292,961) | ($264,834) | $134,474 | $369,287 | $348,077 | $297,785 | $19,594 |

| | 2021 | | | | | | | | | | | | |
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Full Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Creative Studio | $1,427,920 | $2,547,922 | $2,471,177 | $2,613,266 | $2,417,636 | $3,241,042 | $1,904,551 | $1,894,448 | $2,609,873 | $3,156,764 | $3,177,587 | $2,925,813 | $30,388,000 |
| Network | $567,917 | $567,917 | $567,917 | $567,917 | $567,917 | $567,917 | $567,917 | $567,917 | $567,917 | $627,917 | $627,917 | $627,917 | $6,995,000 |
| Talent | $44,420 | $44,420 | $59,420 | $49,420 | $44,420 | $59,420 | $44,420 | $44,420 | $59,420 | $49,420 | $44,420 | $59,420 | $603,036 |
| Total Revenue | $2,040,257 | $3,160,259 | $3,098,514 | $3,230,603 | $3,029,973 | $3,868,378 | $2,516,887 | $2,506,784 | $3,237,209 | $3,834,100 | $3,849,923 | $3,613,149 | $37,986,036 |
| | - | | - | | - | | - | | - | | - | | - |
| Variable Cost | $746,730 | $1,026,731 | $1,007,544 | $1,043,067 | $994,159 | $1,200,011 | $865,888 | $863,362 | $1,042,218 | $1,214,941 | $1,220,147 | $1,157,203 | $12,382,000 |
| VM% | 37% | 32% | 33% | 32% | 33% | 31% | 34% | 34% | 32% | 32% | 32% | 32% | 33% |
| | | | | | | | | | | | | | |
| Compensation & Benefits | $1,733,710 | $1,733,506 | $1,745,403 | $1,767,310 | $1,776,947 | $1,776,868 | $1,776,988 | $1,776,485 | $1,777,296 | $1,777,302 | $1,776,864 | $1,776,506 | $21,195,185 |
| Headcount | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 |
| Overhead | $353,250 | $353,250 | $353,250 | $353,250 | $353,250 | $353,250 | $353,250 | $353,250 | $353,250 | $353,250 | $353,250 | $353,250 | $4,239,000 |
| | | | | | | | | | | | | | |
| Total Expense | $2,833,690 | $3,113,487 | $3,106,198 | $3,163,627 | $3,124,356 | $3,330,128 | $2,996,126 | $2,993,097 | $3,172,764 | $3,345,493 | $3,350,261 | $3,286,959 | $37,816,185 |
| EBITDA | ($793,433) | $46,772 | ($7,684) | $66,976 | ($94,383) | $538,250 | ($479,239) | ($486,313) | $64,445 | $488,607 | $499,663 | $326,190 | $169,851 |

**Malka Media Group, LLC**
**Malka (Consolidated)**
**Income Statement**
**Full Year 2021**

| Financial Row | Actual Jan 2021 | Actual Feb 2021 | Actual Mar 2021 | Actual Apr 2021 | Actual May 2021 | Actual Jun 2021 | Actual Jul 2021 | Actual Aug 2021 | Total | Actual Sep 2021 | Oct 2021 | Nov 2021 | Dec 2021 | Full Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | 30% | 40% | 45% | |
| **Ordinary Income/Expense** | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | |
| **41121 - Content Revenue** | | | | | | | | | | | | | | |
| 40002 - Creative Revenue | $45,469 | $545,660 | $279,278 | $319,763 | $304,118 | $396,698 | $282,411 | $284,679 | $2,458,075 | $319,231 | $3,015,240 | $3,178,654 | $2,938,869 | $11,910,070 |
| 40003 - Design Revenue | $33,956 | $142,994 | $106,873 | $92,315 | $100,080 | $195,860 | $167,258 | $138,159 | $977,496 | $150,544 | | | | $1,128,040 |
| 40004 - Animation Revenue | $29,074 | $159,701 | $173,374 | $73,771 | $152,429 | $223,474 | $83,632 | $93,019 | $988,472 | $98,826 | | | | $1,087,298 |
| 40005 - Post Production Revenue | $116,584 | $400,210 | $415,074 | $275,978 | $448,847 | $559,685 | $264,272 | $299,172 | $2,779,823 | $331,820 | | | | $3,111,644 |
| **41122 - Production Revenue** | | | | | | | | | | | | | | $0 |
| 40000 - Content Production Revenue | $640,704 | $533,592 | $899,192 | $792,614 | $871,587 | $1,298,445 | $736,219 | $658,702 | $6,431,055 | $1,057,905 | | | | $7,488,960 |
| 40001 - Livestream Production Revenue | $200,025 | $178,125 | $39,412 | $19,500 | $19,338 | $13,063 | $13,838 | $13,785 | $597,135 | $62,217 | | | | $659,351 |
| **Total - 41121 - Production Revenue** | $840,729 | $711,717 | $938,604 | $812,164 | $890,925 | $1,411,508 | $750,056 | $672,487 | $7,028,190 | $1,120,122 | $0 | $0 | $0 | $8,148,312 |
| **Total - 41121 - Content Revenue** | $1,065,812 | $1,960,281 | $1,913,203 | $1,573,991 | $1,896,399 | $2,787,225 | $1,547,630 | $1,487,516 | $14,232,057 | $2,020,543 | $3,015,240 | $3,178,654 | $2,938,869 | $25,365,363 |
| **41132 - Talent Representation Revenue** | | | | | | | | | | | | | | |
| 41002 - Talent Representation - Marketing | $1,500 | $0 | $4,000 | $0 | $0 | $0 | $0 | $0 | $5,500 | $0 | | | | $5,500 |
| 41003 - Talent Representation - Contract | $18,300 | $3,000 | $0 | $0 | $0 | $0 | $0 | $0 | $21,300 | $0 | $62,165 | $29,420 | $44,420 | $157,304 |
| **Total - 41132 - Talent Representation Revenue** | $19,800 | $3,000 | $4,000 | $0 | $0 | $0 | $0 | $0 | $26,800 | $0 | $62,165 | $29,420 | $44,420 | $162,804 |
| **Total - 41131 - Services Revenue** | $19,800 | $3,000 | $4,000 | $0 | $0 | $0 | $0 | $0 | $26,800 | $0 | $62,165 | $29,420 | $44,420 | $162,804 |
| **41141 - Media Revenue** | | | | | | | | | | | | | | |
| 42001 - Programmatic - Video | $11,199 | $1,997 | $336 | $491 | $2,938 | $8,364 | $18,430 | $13,005 | $62,760 | $34,862 | $55,000 | $55,000 | $55,000 | $262,622 |
| 42002 - Sponsorship | $0 | $0 | $11,520 | $74,850 | $89,146 | $36,250 | $138,354 | $309,226 | $659,346 | $142,988 | $36,871 | $36,871 | $600,621 | $1,476,698 |
| 42001 - Programmatic - Audio | | | | | | | | | | $44,799 | $45,000 | $45,000 | $45,000 | $179,799 |
| **Total - 41141 - Media Revenue** | $11,199 | $1,997 | $11,856 | $75,341 | $92,084 | $44,614 | $156,784 | $328,231 | $722,106 | $222,649 | $136,871 | $136,871 | $700,621 | $1,919,119 |
| **41151 - Licensing & Other Revenue** | | | | | | | | | | | | | | |
| 43000 - Content Licensing | $0 | $0 | $7,500 | $0 | $0 | $0 | $0 | $0 | $7,500 | $0 | | | | $7,500 |
| 43002 - Merchandise | $30,067 | $11,074 | $1,902 | $8,127 | $17,660 | $9,143 | $15,212 | $4,487 | $97,672 | $9,784 | $10,000 | $10,000 | $10,000 | $137,456 |
| 43003 - Equipment Fees | $27,875 | $125,638 | $143,521 | $145,898 | $86,400 | $179,150 | $76,937 | $101,669 | $887,088 | $127,630 | | | | $1,014,718 |
| 43004 - T&E Fees | $5,827 | $52,898 | $58,198 | $56,472 | $134,431 | $68,082 | $50,901 | $85,790 | $512,601 | $126,419 | | | | $639,020 |
| 43005 - Location Fees | $5,550 | $104,885 | $33,724 | $27,144 | $5,800 | $18,800 | $20,800 | $1,500 | $218,203 | $3,200 | | | | $221,403 |
| 49000 - Other Revenue | ($9,947) | $12,900 | $44,001 | $45,339 | $25,000 | $38,599 | $24,192 | $35,564 | $215,648 | $30,435 | | | | $246,083 |
| **Total - 41151 - Licensing & Other Revenue** | $59,372 | $307,394 | $288,847 | $282,981 | $269,291 | $313,774 | $188,042 | $229,011 | $1,938,712 | $297,468 | $10,000 | $10,000 | $10,000 | $2,266,180 |
| **Total - Income** | $1,156,183 | $2,272,673 | $2,217,906 | $1,932,313 | $2,257,774 | $3,145,613 | $1,892,456 | $2,044,758 | $16,919,675 | $2,540,660 | $3,224,276 | $3,354,945 | $3,693,910 | $29,733,466 |
| **YOY** | -25% | 28% | 39% | 114% | 159% | 215% | 20% | 76% | | 75% | 28% | 48% | 82% | 53% |
| | | | | | | | | | | | | | | |
| **Cost Of Sales** | | | | | | | | | | | | | | |
| 51122 - Freelancers | $264,448 | $569,126 | $653,773 | $665,350 | $526,245 | $576,756 | $396,803 | $362,990 | $4,015,492 | $361,495 | $679,817 | $716,661 | $697,472 | $6,470,938 |
| 51123 - Equipment | $21,505 | $85,576 | $152,160 | $104,301 | $55,155 | $67,395 | $70,858 | $84,297 | $651,246 | $57,903 | $116,058 | $122,348 | $113,118 | $1,060,673 |
| 51124 - Location Fees | $5,278 | $51,392 | $7,948 | $18,069 | $112,912 | $21,400 | $19,000 | $15,927 | $251,926 | $21,753 | $44,895 | $47,329 | $43,758 | $409,660 |
| 51125 - Materials & Supplies | $6,237 | $35,672 | $33,283 | $12,722 | $21,326 | $41,357 | $10,620 | $7,606 | $138,822 | $10,512 | $24,739 | $26,080 | $24,113 | $224,267 |
| 51126 - Production Travel | $10,401 | $99,392 | $95,993 | $66,758 | $58,550 | $126,563 | $67,311 | $96,832 | $611,800 | $70,926 | $109,028 | $114,937 | $106,267 | $1,012,960 |
| 51127 - Licensing Expense | $8,104 | $0 | $548 | $11,321 | $32,344 | $21,569 | $13,670 | $29,497 | $117,053 | $59,424 | $20,860 | $21,990 | $20,332 | $239,659 |
| 51128 - Revenue Share | $14,000 | $5,580 | $0 | $0 | $0 | $0 | $52,500 | $0 | $72,080 | $104,073 | $61,123 | $61,123 | $399,373 | $697,772 |
| 51130 - Merchandise Expense | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,574 | $4,574 | $4,391 | $815 | $859 | $795 | $11,434 |
| 52000 - Freight & Delivery | $2,727 | $494 | $2,126 | $26 | $4,771 | $79 | $134 | $1,010 | $11,368 | $2,796 | $2,026 | $2,136 | $1,975 | $20,299 |
| 52006 - Permits | $0 | $1,604 | $1,801 | $808 | $0 | $0 | $675 | $0 | $4,697 | $0 | $835 | $881 | $814 | $7,217 |
| 52010 - Production Insurance | $13 | $34,276 | $10,225 | $11,805 | $12,164 | $14,357 | $12,870 | $98,168 | $193,879 | $12,164 | $13,000 | $13,000 | $13,000 | $245,043 |
| 52011 - Data & Hosting Fees | $357 | $2,475 | $27,723 | $12,313 | $6,221 | $24,340 | $10,864 | $5,661 | $89,953 | $19,819 | $16,031 | $16,899 | $15,624 | $158,327 |
| 52012 - Paid Media | $0 | $1,762 | $1,596 | $0 | $6,456 | $2,469 | $3,646 | $501 | $16,432 | $0 | $2,928 | $3,087 | $2,854 | $25,301 |
| 53007 - Other Variable Expenses | $8,574 | $32,731 | $89,683 | $41,918 | $32,853 | $34,385 | $8,853 | $1,648 | $220,645 | $7,880 | $20,000 | $20,000 | $20,000 | $288,525 |
| 58999 - Unreconciled Credit Card Expense | $149,001 | $36,175 | $72,770 | $75,674 | $102,355 | $16,549 | $83,994 | $74,144 | $610,663 | $75,147 | $50,000 | $50,000 | $50,000 | $835,810 |
| **Total - Cost Of Sales** | $490,647 | $926,296 | $1,119,628 | $1,021,065 | $971,353 | $947,220 | $741,598 | $792,855 | $7,010,621 | $808,284 | $1,162,157 | $1,217,330 | $1,509,495 | $11,707,887 |
| **Gross Profit** | $665,536 | $1,346,417 | $1,098,278 | $911,248 | $1,286,421 | $2,198,393 | $1,150,858 | $1,251,903 | $9,909,053 | $1,732,376 | $2,062,120 | $2,137,615 | $2,184,415 | $18,025,580 |
| **%GP** | 58% | 59% | 50% | 47% | 57% | 70% | 61% | 61% | 59% | 68% | 64% | 64% | 59% | 61% |
| **Expense** | | | | | | | | | | | | | | |
| 51121 - Direct Labor | $0 | $0 | $0 | $0 | $0 | $0 | $515 | ($515) | | | | | | $0 |
| **61111 - Overhead Expense** | | | | | | | | | | | | | | |
| 61111 - Overhead Salaries | $28,080 | $6,775 | $7,500 | $7,000 | $41 | $0 | $0 | $0 | $49,397 | $0 | $0 | $0 | $0 | $49,397 |
| **61121 - Compensation & Benefits** | | | | | | | | | | | | | | |
| 60000 - Wages and Salaries | $718,157 | $774,762 | $809,727 | $828,567 | $835,801 | $841,639 | $874,820 | $919,893 | $6,602,365 | $1,019,482 | $1,080,651 | $1,156,297 | $1,237,237 | $11,096,032 |
| 60001 - Bonus | $31,500 | $4,000 | $0 | $1,000 | $500 | $0 | $3,500 | $12,000 | $52,500 | $1,000 | $5,060 | $1,134 | $1,214 | $56,908 |
| 60002 - Health Insurance | $0 | $32,546 | $66,736 | $42,568 | $0 | $40,091 | $44,867 | $39,300 | $266,109 | $26,115 | $27,682 | $29,619 | $31,693 | $381,217 |
| 60003 - 401k | $24,721 | $29,494 | $28,993 | $26,915 | $25,586 | $29,928 | $31,971 | $31,002 | $231,591 | $8,213 | $8,705 | $9,315 | $9,967 | $267,790 |
| 60004 - Payroll Taxes | $94,107 | $82,536 | $89,087 | $82,322 | $86,914 | $81,658 | $84,357 | $87,035 | $688,016 | $89,619 | $94,996 | $101,646 | $108,761 | $1,093,037 |
| 60005 - Other Insurance & Benefits | $291 | $585 | $0 | $135 | $672 | $1,499 | $986 | $1,047 | $5,215 | $2,512 | $2,662 | $2,849 | $3,048 | $16,286 |
| 60007 - Sales Commission | $48,762 | $56,337 | $12,262 | $30,591 | $58,057 | $26,014 | $37,713 | $35,377 | $305,133 | $48,841 | $40,895 | $50,813 | $54,370 | $500,052 |
| 60008 - Weekend Work | $13,475 | $13,350 | $17,175 | $24,225 | $21,725 | $24,075 | $19,625 | $17,700 | $151,350 | $31,775 | $33,682 | $35,366 | $37,941 | $290,013 |
| 60009 - Remote Labor | $0 | $0 | $0 | $0 | $0 | $6,232 | $8,021 | $10,814 | $25,067 | $0 | $0 | $0 | $0 | $25,067 |
| 61000 - Guaranteed Payments - D. Fried | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $183,333 | $22,917 | $22,917 | $22,917 | $22,917 | $275,000 |
| 61001 - Guaranteed Payments - J. Frommer | $35,417 | $35,417 | $40,627 | $35,417 | $35,417 | $35,417 | $35,417 | $35,417 | $288,543 | $35,417 | $35,417 | $35,417 | $35,417 | $430,210 |
| 61002 - Guaranteed Payments - L. Kotch | $35,292 | $35,292 | $40,502 | $35,292 | $35,292 | $35,417 | $35,417 | $35,417 | $287,918 | $35,417 | $35,417 | $35,417 | $35,417 | $429,585 |
| 61003 - Guaranteed Payments - Pat Capra | $18,613 | $13,613 | $18,343 | $13,613 | $13,613 | $13,753 | $13,750 | $13,750 | $120,043 | $13,750 | $13,750 | $13,750 | $13,750 | $175,043 |
| **Total - 61121 - Compensation & Benefits** | $1,043,232 | $1,110,848 | $1,147,388 | $1,143,559 | $1,159,493 | $1,155,636 | $1,213,361 | $1,200,668 | $9,217,184 | $1,335,055 | $1,397,833 | $1,494,536 | $1,591,631 | $15,036,240 |
| **61122 - Marketing Expense** | $5,850 | $3,495 | $695 | $245 | $99 | $1,450 | $0 | $13,998 | $24,491 | $18,850 | $295,000 | $295,000 | $295,000 | $928,331 |
| 61123 - Office Equipment | $0 | $1,280 | $426 | $0 | $7,150 | $150 | $0 | $2,053 | $3,911 | $812 | | | | $4,723 |
| 61124 - Travel & Living Expense | $5,533 | $13,350 | $26,047 | $14,564 | $31,399 | $66,918 | $25,202 | $27,243 | $209,856 | $45,245 | | | | $255,101 |
| 63000 - Shipping & Postage | $2,073 | $6,783 | $5,653 | $3,806 | $3,193 | $4,472 | $3,520 | $2,977 | $32,477 | $457 | | | | $32,934 |
| 63001 - Bank Fees | $460 | $734 | $659 | $176 | $251 | $86 | $81 | $36,576 | $39,024 | $1,076 | | | | $40,100 |
| 63004 - Office Supplies | $115 | $12 | $11,110 | $0 | $52 | $33 | $3,009 | $1,806 | $16,136 | $1,819 | | | | $17,955 |
| 63005 - Legal & Professional Fees | $1,006 | $28,806 | $56,040 | $20,179 | $9,940 | $24,133 | $26,093 | $40,131 | $206,329 | $10,188 | | | | $216,517 |
| 63006 - Consulting Fees | $13,438 | $18,500 | $19,500 | $26,825 | $43,600 | $36,375 | $35,214 | $11,962 | $207,213 | $51,501 | | | | $258,713 |
| 63007 - Postage & Delivery Expense | $39 | $50 | $22 | $50 | $0 | $0 | $0 | $0 | $162 | $0 | | | | $162 |
| 63008 - Telephone | $0 | $790 | $531 | $500 | $890 | $920 | $2,045 | $1,650 | $7,227 | $699 | | | | $7,726 |
| 63010 - Utilities | $936 | $11,119 | $1,609 | $1,336 | $1,213 | $1,291 | $6,515 | $3,607 | $27,626 | $3,729 | | | | $31,555 |
| 63011 - Rent | $0 | $39,555 | $22,860 | $45,720 | $0 | $99,036 | $39,557 | $39,838 | $262,966 | $42,290 | | | | $335,256 |
| 63012 - Computer & Hardware | $15,809 | $21,389 | $32,967 | $11,960 | $373 | $16,101 | $3,903 | $6,849 | $109,050 | $3,131 | | | | $112,181 |
| 63013 - Dues & Subscriptions | $4,728 | $35,041 | $56,717 | $41,798 | $57,840 | $63,584 | $66,828 | $78,747 | $405,284 | $59,165 | | | | $464,449 |
| 63014 - Relocation Fees | $4,000 | $5,000 | $3,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $32,000 | $3,882 | | | | $35,882 |
| 63015 - Recruiting Fees | $0 | $15,060 | $167 | $7,000 | $0 | $45 | $250 | $0 | $22,527 | $4,060 | | | | $26,587 |
| 63016 - Late Fees | $0 | $0 | $0 | $0 | $33 | $1,015 | $98 | $17 | $1,163 | $0 | | | | $1,163 |
| 63017 - Repair & Maintenance | $0 | $5,324 | $3,591 | $3,491 | $4,063 | $6,271 | $5,246 | $4,512 | $33,499 | $4,908 | | | | $38,407 |
| 63019 - Charitable Contribution | $0 | $0 | $0 | $0 | $1,677 | $0 | $2,500 | $100 | $4,277 | $0 | | | | $4,277 |
| 63020 - Overhead Insurance | $2,137 | $0 | $1,291 | $1,389 | $0 | $1,358 | $497 | $0 | $6,672 | $5,467 | | | | $6,158 |
| 69000 - Miscellaneous & Other Overhead | $9,913 | $10,855 | $34,498 | $21,810 | $7,933 | $7,507 | $4,631 | $373 | $101,521 | $16,297 | $1,789,536 | $1,789,536 | $1,886,631 | $15,036,965 |
| **Total - 61111 - Overhead Expense** | $1,137,349 | $1,334,715 | $1,452,272 | $1,355,220 | $1,306,043 | $1,482,927 | $1,443,319 | $1,516,737 | $11,039,082 | $1,597,902 | $1,692,833 | $1,789,536 | $1,886,631 | $18,005,985 |
| **Total - Expense** | $1,137,349 | $1,334,715 | $1,452,272 | $1,355,220 | $1,306,043 | $1,482,927 | $1,443,819 | $1,516,222 | $11,039,082 | $1,597,902 | $1,692,833 | $1,789,536 | $1,886,631 | $18,005,985 |
| **EBITDA** | ($471,813) | $11,702 | ($353,994) | ($443,972) | ($19,622) | $705,467 | ($292,961) | ($264,835) | ($1,130,029) | $134,474 | $369,287 | $348,078 | $297,785 | $19,594 |
| | | | | | | | | | | | | | | 0.1% |
| **Other Income and Expenses** | | | | | | | | | | | | | | |
| **61141 - Other Income** | | | | | | | | | | | | | | |
| 80000 - Interest Income | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1 | $1 | $0 | $0 | $0 | $1 |
| **Total - 61141 - Other Income** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1 | $1 | $0 | $0 | $0 | $1 |
| **Total - Other Income** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1 | $1 | $0 | $0 | $0 | $1 |
| **Other Expense** | | | | | | | | | | | | | | |
| **61131 - Other Expense** | | | | | | | | | | | | | | |
| 70000 - Interest Expense | $7,820 | $10,394 | $10,737 | $11,015 | $10,513 | $10,710 | $10,216 | $10,402 | $81,806 | $15,716 | $15,000 | $15,000 | $15,000 | $142,522 |
| 71002 - Rounding | $0 | $0 | ($0) | $0 | $0 | $0 | $0 | ($0) | $0 | ($0) | | | | $0 |
| 71003 - Taxes | $0 | $0 | $0 | $0 | $20,346 | $4,000 | $0 | $4,790 | $29,136 | $4,603 | | | | $33,739 |
| 71004 - Profit Share | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,000 | $4,000 | $0 | $8,000 |
| **Total - 61131 - Other Expense** | $7,820 | $10,394 | $10,737 | $11,015 | $30,859 | $14,710 | $10,216 | $15,192 | $110,942 | $20,319 | $19,000 | $19,000 | $19,000 | $166,066 |
| Realized Gain/Loss | $0 | $790 | $531 | $512 | $216 | $480 | $117 | $4,716 | $500 | $500 | | | | $7,342 |
| **Total - Other Expense** | $7,820 | $10,394 | $11,268 | $11,546 | $31,074 | $14,925 | $10,696 | $15,309 | $115,658 | $21,019 | $19,500 | $19,500 | $19,500 | $172,782 |
| **Net Other Income** | ($7,820) | ($10,394) | ($11,268) | ($11,546) | ($31,074) | ($14,925) | ($10,695) | ($15,309) | ($115,658) | ($32,363) | $19,500 | ($19,500) | ($19,500) | ($172,781) |
| **Net Income** | ($479,633) | $1,308 | ($367,492) | ($455,518) | ($51,092) | $690,541 | ($303,658) | ($280,143) | ($1,245,687) | $102,112 | $349,787 | $328,578 | $278,285 | ($153,187) |

**Headcount**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Account Management | 11 | 10 | 11 | 11 | 11 | 12 | 12 | 12 | | | 14 | 14 | 14 | 11 |
| Project Management | 3 | 3 | 4 | 5 | 6 | 8 | 7 | 7 | | 7 | 13 | 13 | 13 | 7 |
| Animation Studio | 11 | 12 | 13 | 14 | 13 | 13 | 13 | 14 | | 13 | 13 | 13 | 13 | 13 |
| Creative | 12 | 12 | 13 | 14 | 15 | 16 | 16 | 16 | | 18 | 20 | 20 | 20 | 15 |
| Design Studio | 10 | 10 | 11 | 12 | 13 | 13 | 12 | 12 | | 12 | 11 | 11 | 11 | 11 |
| Strategy | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | | 3 | 5 | 5 | 5 | 3 |
| Producers | 4 | 4 | 4 | 5 | 5 | 5 | 5 | 5 | | 5 | 6 | 6 | 6 | 5 |
| Cinematography & Field Team | 7 | 7 | 7 | 8 | 8 | 8 | 9 | 9 | | 9 | 9 | 9 | 9 | 8 |
| Livestream | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | | 6 | 6 | 6 | 6 | 6 |
| Post Production | 29 | 30 | 31 | 32 | 34 | 35 | 37 | 38 | | 39 | 39 | 40 | 41 | 34 |
| Marketing Services (Network Admin / Marketing) | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | | 3 | 3 | 3 | 3 | 3 |
| Facilities & Operations | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | | 3 | 3 | 3 | 3 | 3 |
| Finance | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | | 3 | 3 | 3 | 3 | 3 |
| Human Resources | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | | 2 | 2 | 2 | 2 | 2 |
| Marketing | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | | 1 | 1 | 1 | 1 | 1 |
| Executive | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | | 4 | 4 | 4 | 4 | 4 |
| **Total Headcount** | 132 | 141 | 145 | 147 | 148 | 151 | 154 | 158 | | 160 | 169 | 180 | 201 | 151 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cost / Head** | $90,406 | $89,746 | $93,940 | $90,855 | $87,684 | $99,000 | $91,609 | $93,060 | $106,944,607 | $96,448 | $96,351 | $89,383 | $91,777 | $91,767 |
| **Sales / AM (Design)** | $99,556 | $225,660 | $208,013 | $184,884 | $195,275 | $257,185 | $143,972 | $131,586 | | $159,839 | $222,446 | $227,047 | $172,875 | $2,468,476 |

**Malka Media Group, LLC**
**Malka (Consolidated)**
**Income Statement**
**Full Year 2022**

| Financial Row | Jan 2022 | Feb 2022 | Mar 2022 | Apr 2022 | May 2022 | Jun 2022 | Jul 2022 | Aug 2022 | Sep 2022 | Oct 2022 | Nov 2022 | Dec 2022 | Full Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ordinary Income/Expense | | | | | | | | | | | | | |
| Income | 45% | 20% | 20% | 50% | 20% | 10% | 20% | 20% | 20% | 10% | 5% | 5% | |
| 41121 - Content Revenue | | | | | | | | | | | | | |
| Studio Revenue | $1,587,920 | $2,707,922 | $2,631,177 | $2,773,266 | $2,577,636 | $3,401,042 | $2,064,551 | $2,054,448 | $2,769,873 | $3,316,764 | $3,337,587 | $3,085,813 | $32,308,000 |
| 40003 - Studio Revenue | | | | | | | | | | | | | $0 |
| 40004 - Animation Revenue | | | | | | | | | | | | | $0 |
| 40005 - Post Production Revenue | | | | | | | | | | | | | $0 |
| 41122 - Production Revenue | | | | | | | | | | | | | $0 |
| 40000 - Content Production Revenue | | | | | | | | | | | | | $0 |
| 40001 - Livestream Production Revenue | | | | | | | | | | | | | $0 |
| Total - 41122 - Production Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total - 41121 - Content Revenue | $1,587,920 | $2,707,922 | $2,631,177 | $2,773,266 | $2,577,636 | $3,401,042 | $2,064,551 | $2,054,448 | $2,769,873 | $3,316,764 | $3,337,587 | $3,085,813 | $32,308,000 |
| 41131 - Services Revenue | | | | | | | | | | | | | |
| 41001 - Strategy Revenue | | | | | | | | | | | | | $0 |
| 41132 - Talent Representation Revenue | | | | | | | | | | | | | |
| Talent Revenue | $44,420 | $44,420 | $59,420 | $49,420 | $44,420 | $59,420 | $44,420 | $44,420 | $59,420 | $49,420 | $44,420 | $59,420 | $603,036 |
| Total - 41132 - Talent Representation Revenue | $44,420 | $44,420 | $59,420 | $49,420 | $44,420 | $59,420 | $44,420 | $44,420 | $59,420 | $49,420 | $44,420 | $59,420 | $603,036 |
| Total - 41131 - Services Revenue | $44,420 | $44,420 | $59,420 | $49,420 | $44,420 | $59,420 | $44,420 | $44,420 | $59,420 | $49,420 | $44,420 | $59,420 | $603,036 |
| 41141 - Media Revenue | | | | | | | | | | | | | |
| 42001 - Programmatic - Video | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $60,000 | $60,000 | $60,000 | $450,000 |
| 42002 - Sponsorship | $347,917 | $347,917 | $347,917 | $347,917 | $347,917 | $347,917 | $347,917 | $347,917 | $347,917 | $347,917 | $347,917 | $347,917 | $4,175,000 |
| 42001 - Programmatic - Audio | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $50,000 | $50,000 | $50,000 | $330,000 |
| Total - 41141 - Media Revenue | $397,917 | $397,917 | $397,917 | $397,917 | $397,917 | $397,917 | $397,917 | $397,917 | $397,917 | $457,917 | $457,917 | $457,917 | $4,955,000 |
| 41151 - Licensing & Other Revenue | | | | | | | | | | | | | |
| 43000 - Content Licensing | | | | | | | | | | | | | $0 |
| 43002 - Merchandise | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $120,000 |
| 43003 - Equipment Fees | | | | | | | | | | | | | $0 |
| 43004 - T&E Fees | | | | | | | | | | | | | $0 |
| 43005 - Location Fees | | | | | | | | | | | | | $0 |
| 49000 - Other Revenue | | | | | | | | | | | | | $0 |
| Total - 41151 - Licensing & Other Revenue | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $120,000 |
| Total - Income | $2,040,257 | $3,160,259 | $3,098,514 | $3,230,603 | $3,029,973 | $3,868,378 | $2,516,887 | $2,506,794 | $3,237,209 | $3,834,100 | $3,849,923 | $3,613,149 | $37,986,036 |
| YOY | 76% | 39% | 40% | 67% | 34% | 22% | 33% | 23% | 27% | 19% | 15% | -2% | 39% |
| | | | | | | | | | | | | | |
| Cost Of Sales | | | | | | | | | | | | | |
| Variable Cost | $396,980 | $676,981 | $657,794 | $693,317 | $644,409 | $850,261 | $516,138 | $513,612 | $692,468 | $829,191 | $834,397 | $771,453 | $8,077,000 |
| 51123 - Equipment | | | | | | | | | | | | | $0 |
| 51124 - Location Fees | | | | | | | | | | | | | $0 |
| 51125 - Materials & Supplies | | | | | | | | | | | | | $0 |
| 51126 - Production Travel | | | | | | | | | | | | | $0 |
| 51127 - Licensing Expense | | | | | | | | | | | | | $0 |
| 51129 - Revenue Share | $244,750 | $244,750 | $244,750 | $244,750 | $244,750 | $244,750 | $244,750 | $244,750 | $244,750 | $280,750 | $280,750 | $280,750 | $3,045,000 |
| 51130 - Merchandise Expense | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $60,000 |
| 52000 - Freight & Delivery | | | | | | | | | | | | | $0 |
| 52006 - Permits | | | | | | | | | | | | | $0 |
| 52010 - Production Insurance | | | | | | | | | | | | | $0 |
| 52011 - Data & Hosting Fees | | | | | | | | | | | | | $0 |
| 52012 - Paid Media | | | | | | | | | | | | | $0 |
| 53007 - Other Variable Expenses | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $1,200,000 |
| Total - Cost Of Sales | $746,730 | $1,026,731 | $1,007,544 | $1,043,067 | $994,159 | $1,200,011 | $865,888 | $863,362 | $1,042,218 | $1,214,941 | $1,220,147 | $1,157,203 | $12,382,000 |
| Gross Profit | $1,293,526 | $2,133,528 | $2,090,969 | $2,187,536 | $2,035,814 | $2,668,368 | $1,651,000 | $1,643,432 | $2,194,991 | $2,619,159 | $2,629,777 | $2,455,946 | $25,604,036 |
| %GP | 63% | 68% | 67% | 68% | 67% | 69% | 66% | 66% | 68% | 68% | 68% | 68% | 67% |
| Expense | | | | | | | | | | | | | |
| 61121 - Compensation & Benefits | | | | | | | | | | | | | |
| 60000 - Wages and Salaries | $1,274,354 | $1,274,354 | $1,274,354 | $1,274,354 | $1,274,354 | $1,274,354 | $1,274,354 | $1,274,354 | $1,274,354 | $1,274,354 | $1,274,354 | $1,274,354 | $15,292,253 |
| Churn | ($45,023) | ($45,227) | ($44,234) | ($44,906) | ($44,869) | ($44,949) | ($44,828) | ($45,331) | ($44,520) | ($44,514) | ($44,953) | ($45,311) | ($538,667) |
| 60001 - Bonus | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $15,000 |
| 60002 - Health Insurance | $32,643 | $32,643 | $32,643 | $32,643 | $32,643 | $32,643 | $32,643 | $32,643 | $32,643 | $32,643 | $32,643 | $32,643 | $391,722 |
| 60003 - 401k | $10,266 | $10,266 | $10,266 | $10,266 | $10,266 | $10,266 | $10,266 | $10,266 | $10,266 | $10,266 | $10,266 | $10,266 | $123,188 |
| 60004 - Payroll Taxes | $112,024 | $112,024 | $112,024 | $112,024 | $112,024 | $112,024 | $112,024 | $112,024 | $112,024 | $112,024 | $112,024 | $112,024 | $1,344,284 |
| 60005 - Other Insurance & Benefits | $3,140 | $3,140 | $3,140 | $3,140 | $3,140 | $3,140 | $3,140 | $3,140 | $3,140 | $3,140 | $3,140 | $3,140 | $37,676 |
| 60007 - Sales Commission | $67,099 | $73,878 | $40,805 | $63,205 | $61,970 | $64,612 | $60,599 | $77,368 | $50,338 | $50,136 | $64,744 | $76,682 | $751,436 |
| 60008 - Weekend Work | $37,841 | $37,841 | $37,841 | $37,841 | $37,841 | $37,841 | $37,841 | $37,841 | $37,841 | $37,841 | $37,841 | $37,841 | $454,094 |
| NEW HEADCOUNT | $119,283 | $112,533 | $156,481 | $156,660 | $167,495 | $164,853 | $168,866 | $152,098 | $179,127 | $179,329 | $164,721 | $152,783 | $1,874,199 |
| 61000 - Guaranteed Payments - D. Fried | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $300,000 |
| 61001 - Guaranteed Payments - J. Frommer | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $450,000 |
| 61002 - Guaranteed Payments - L. Knabch | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $37,500 | $450,000 |
| 61003 - Guaranteed Payments - Pat Capra | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $250,000 |
| Total - 61121 - Compensation & Benefits | $1,733,710 | $1,733,506 | $1,745,463 | $1,747,310 | $1,770,847 | $1,776,860 | $1,776,988 | $1,776,485 | $1,777,296 | $1,777,302 | $1,776,864 | $1,776,506 | $21,195,180 |
| Overhead | $283,250 | $283,250 | $283,250 | $283,250 | $283,250 | $283,250 | $283,250 | $283,250 | $283,250 | $283,250 | $283,250 | $283,250 | $3,399,000 |
| Additional Rent | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $70,000 | $840,000 |
| Total - 61111 - Overhead Expense | $2,086,960 | $2,086,756 | $2,098,653 | $2,120,560 | $2,130,197 | $2,130,118 | $2,130,238 | $2,129,735 | $2,130,546 | $2,130,552 | $2,130,114 | $2,129,756 | $25,434,185 |
| Total - Expense | $2,086,960 | $2,086,756 | $2,098,653 | $2,120,560 | $2,130,197 | $2,130,118 | $2,130,238 | $2,129,735 | $2,130,546 | $2,130,552 | $2,130,114 | $2,129,756 | $25,434,185 |
| EBITDA | ($793,433) | $46,772 | ($7,684) | $66,976 | ($94,383) | $538,250 | ($479,239) | ($486,313) | $64,445 | $488,607 | $499,663 | $326,190 | $169,851 |
| | | | | | | | | | | | | | 0.4% |
| Other Income and Expenses | | | | | | | | | | | | | |
| Other Income | | | | | | | | | | | | | |
| 61141 - Other Income | | | | | | | | | | | | | |
| 80000 - Interest Income | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total - 61141 - Other Income | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Other Expense | | | | | | | | | | | | | |
| 61131 - Other Expense | | | | | | | | | | | | | |
| 70000 - Interest Expense | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $60,000 |
| 71003 - Taxes | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $4,000 | $16,000 |
| 71004 - Profit Share | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $40,000 |
| Total - 61131 - Other Expense | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $116,000 |
| Realized Gain/Loss | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $500 | $2,000 |
| Total - Other Expense | $29,500 | $29,500 | $29,500 | $29,500 | $29,500 | $29,500 | $29,500 | $29,500 | $29,500 | $29,500 | $29,500 | $29,500 | $118,000 |
| Net Other Income | ($29,500) | ($29,500) | ($29,500) | ($29,500) | ($29,500) | ($29,500) | ($29,500) | ($29,500) | ($29,500) | ($29,500) | ($29,500) | ($29,500) | ($118,000) |
| Net Income | ($822,933) | $17,272 | ($37,184) | $37,476 | ($123,883) | $508,750 | ($508,739) | ($515,813) | $34,945 | $459,107 | $470,163 | $296,690 | $51,851 |
| | | | | | | | | | | | | | |
| Headcount | | | | | | | | | | | | | |
| Account Management | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| Project Management | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 |
| Animation Studio | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| Creative | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 |
| Design Studio | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| Strategy | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Producers | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 | 44 |
| Cinematography & Field Team | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 9 |
| Livestream | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 |
| Post Production | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 |
| Marketing Services (Network Admin / Marketing) | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 |
| Facilities & Operations | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| Finance | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| Human Resources | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Marketing | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Executive | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| Total Headcount | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 | 210 |
| | | | | | | | | | | | | | |
| Cost / Head | $95,235 | $94,836 | $97,499 | $97,377 | $97,099 | $97,843 | $98,079 | $97,982 | $98,683 | $98,695 | $97,835 | $97,133 | $97,351 |
| | | | | | | | | | | | | | |
| Sales / AM (Studio) | $93,407 | $159,290 | $154,775 | $163,133 | $151,626 | $200,061 | $121,444 | $120,850 | $162,934 | $195,104 | $196,329 | $181,518 | $1,900,471 |

Execution Version

**Exhibit C**

Restricted Stock Agreement

(see attached)

**Execution Version**

## RESTRICTED STOCK AGREEMENT

This **RESTRICTED STOCK AGREEMENT**, dated as of November 15, 2021 (this "**Agreement**"), is entered into by and between **[       ]** (the "**Holder**") and **MONEYLION INC.**, a Delaware corporation (the "**Company**"). All capitalized terms used but not defined herein shall have the meanings set forth in that certain Membership Interest Purchase Agreement dated as of November 15, 2021 (the "**Purchase Agreement**"), by and among MoneyLion Technologies Inc., a Delaware corporation (the "**Buyer**"), Malka Media Group, LLC, a New York limited liability company ("**Malka**"), the Seller Members, and the Sellers' Representative.

Section 1.    <u>Issuance of Restricted Stock</u>.  Pursuant to the Purchase Agreement, the Company hereby issues to the Holder <mark>___</mark> shares of Common Stock, par value $0.0001, of the Company (the "**Common Stock**"), subject to the terms and conditions set forth herein and conditioned in part on the Holder's execution and delivery of this Agreement.

In the event the Company becomes obligated to pay to Holder any shares of Common Stock in connection with (i) the 2021 Earnout Payment or (ii) the 2022 Earnout Payment, such payment(s) shall be conditioned in part on the Holder's prior execution and delivery of an equivalent Agreement.

Section 2.    <u>Restricted Shares</u>;

(a)    Subject to <u>Section 2(b)</u>, the shares of Common Stock issued to the holder pursuant to <u>Section 1</u> (the "**Restricted Shares**") shall vest in accordance with the following schedule (such vested shares, the "**Earned Shares**"):

(i)    with respect to the Common Stock issued in connection with the Closing Stock Payment, in four (4) equal installments on (a) December 31, 2021, (b) March 31, 2022, (c) June 30, 2022, and (d) September 30, 2022.

(b)    Subject to <u>Section 2(b)(i)</u> and <u>Section 2(b)(ii)</u>, and pursuant to the Purchase Agreement, certain Restricted Shares shall become Earned Shares as of immediately prior to the earlier to occur of the closing of (a) sale, transfer, or assignment of a majority of the Equity Interests of the Company, Malka or Buyer following Closing to a Person other than an Affiliate of any of the foregoing; (b) the merger of the Company, Malka or Buyer with or into another Person such that a majority of the Equity Interests of the surviving company are held by any Person other than Buyer or any Affiliate of Buyer; or (c) the sale of a majority of the assets of Malka to any Person following Closing, including, but not limited to, an Affiliate of Buyer, but not, for the avoidance of doubt, including the Company, Buyer or any wholly owned direct or indirect subsidiary of Buyer (a "**Change of Control**"):

(i)    In the event of a Change of Control prior to December 31, 2021, if the 2021 Annualized Amount is equal to or greater than the Minimum 2021 Revenue and EBITDA Amount and as adjusted *pro rata* in the same manner as used to calculate the 2021 Annualized Amount, then any Restricted Shares associated with the Closing Stock Payment, 2021 Earnout Payment, and 2022 Earnout Payment shall immediately be deemed Earned Shares as-of immediately prior to the date of such Change of Control; and

(ii) In the event of a Change of Control prior to December 31, 2022, If the 2022 Annualized Amount is equal to or greater than the Minimum 2022 Revenue and EBITDA Amount and as adjusted *pro rata* in the same manner as used to calculate the 2022 Annualized Amount, then any Restricted Shares of the Seller Members associated with the Closing Stock Payment, 2021 Earnout Payment (to the extent the Company is obligated to make such payment pursuant to the terms of the Purchase Agreement) and 2022 Earnout Payment shall immediately be deemed Earned Shares as-of immediately prior to the date of such Change of Control.

Section 3.    Valid Issuance of Restricted Shares. The Company represents and warrants to the Holder that the Restricted Shares have been validly issued and are fully paid and nonassessable, free from all taxes, liens and charges created by the Company with respect to the issue thereof (except as may set forth in the Company's Fourth Amended and Restated Certificate of Incorporation (the "**Charter**") and the Company's Bylaws (the "**Bylaws**"), each as may be amended from time to time).

Section 4.    Representations, Warranties and Acknowledgement of Holder.

(a)    The Holder hereby represents and warrants to the Company as follows:

(i)    The Holder has the requisite power and authority to enter into and deliver this Agreement, perform its obligations hereunder, and consummate the transactions contemplated hereby. This Agreement has been duly executed and delivered by the Holder and is a valid, legal and binding obligation of the Holder, enforceable against the Holder in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether such enforcement is considered in a proceeding at law or at equity).

(ii)    The Holder is acquiring the Restricted Shares for its own account as principal, for investment purposes only, not for any other person or entity and not for the purposes of resale or distribution.

(iii)    The Holder is an "accredited investor" as such term is defined in Regulation D promulgated under the Securities Act of 1933, as amended.

(iv)    The execution and delivery of this Agreement by the Holder, the performance by the Holder of its obligations hereunder and the consummation by the Holder of the transactions contemplated hereby do not and will not (a) materially violate or materially conflict with any law applicable to the Holder or any of the Holder's assets or properties or (b) violate or conflict with in any material respect, result in any material breach of, or constitute a material default (or event which with the giving of notice or lapse of time, or both, would become a default) under, any agreement to which the Holder is a party or by which any of its assets or properties is bound. No consent, approval, authorization, license, order or permit of, or declaration, filing or registration with, or notification to, any governmental entity, or any other person or entity, is required to be

2

made or obtained by the Holder in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby.

(b)     The Holder hereby acknowledges that agrees that:

(i)     Except as set forth herein, the Holder has received no representations or warranties from the Company or any other person or entity acting on behalf of the Company.

(ii)    The Restricted Shares are being acquired by the Holder in a transaction not involving any public offering within the meaning of the Securities Act, in reliance on an exemption therefrom.  The Restricted Shares have not been approved or disapproved by the Securities and Exchange Commission or by any other federal or state agency, and no such agency has passed on the accuracy or adequacy of disclosures made to the Holder by the Company.  No federal or state governmental agency has passed on or made any recommendation or endorsement of the Restricted Shares or an investment in the Company.

(iii)   The Restricted Shares have not been registered under the Securities Act, or the securities laws of any state and, unless the Restricted Shares are so registered, they may not be offered, sold, transferred or otherwise disposed of except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable securities laws of any state or foreign jurisdiction.  There is not and will not be any public trading market for the Restricted Shares and, as a result the Holder may be unable to sell or dispose of its interest in the Company.

(iv)    The certificates representing the Restricted Shares, if issued, will bear a legend that prohibits the transfer of the Restricted Shares unless the Restricted Shares is registered or such registration is not required in the opinion of counsel for the Company.

(v)     Holder is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Restricted Shares.

(vi)    The Holder has generally such knowledge and experience in business and financial matters and with respect to investments in securities of privately held companies as to enable such Holder to understand and evaluate the risks of such investment and form an investment decision with respect thereto.

Section 5.      Stockholder Rights.  The Holder, during the duration of this Agreement, shall be considered the record owner of the Restricted Shares issued to Holder and any portion thereof that become Earned Shares; provided, however, that the Holder shall not be entitled to vote such Restricted Shares or transfer such Restricted Shares (subject to Section 8 below) unless and until, and solely to the extent that, such Restricted Shares become Earned Shares in accordance with Section 2 hereof.

Section 6.      Dividends.  The Holder shall be entitled to share in any dividends (whether such dividend is in the form of cash, debt securities, equity securities, rights or other property) in respect of shares of Common Stock declared by the Board pursuant to the terms of the Charter *pro rata* in accordance with the total number of Restricted Shares and Earned Shares owned by the Holder.

Section 7.      Restrictions on Transfer.  In addition to any other limitation on transfer created by applicable securities laws, this Agreement, the Restricted Shares and all rights and obligations of the Holder hereunder shall not be transferred without the prior written consent of the Company, which shall not be unreasonably withheld, conditioned or delayed. Holder shall not Transfer any interest in the Restricted Shares except in compliance with the provisions herein, applicable securities laws, the Charter, the Amended and restated Bylaws of the Company and any other applicable agreement to which the Company, the Holder and/or the proposed transferees may be a party. Any attempted Transfer in violation of this provision shall be void and of no legal force. For purposes of this Agreement, the term "Transfer" shall include any sale, assignment, encumbrance, hypothecation, pledge, conveyance in trust, gift, transfer by request, devise or descent, or other transfer or disposition of any kind, including, but not limited to, transfers to receivers, levying creditors, trustees or receivers in bankruptcy proceedings or general assignees for the benefit of creditors, whether voluntary or by operation of law, directly or indirectly, of any of the Restricted Shares. The Company shall not be required (a) to transfer on its books any shares of Common Stock of the Company which shall have been transferred in violation of any of the provisions set forth in this Agreement or (b) to treat any transferee to whom such shares shall have been so transferred as owner of such shares or to accord any other rights or privileges with respect to such shares

Section 8.      Lock-up. Notwithstanding anything to the contrary in this Agreement, the Restricted Shares and Earned Shares and all rights and obligations of the Holder hereunder shall not be transferred, assigned or delegated, in whole or in part, prior to the termination of the MoneyLion Lock-Up Period. As used herein, the "**MoneyLion Lock-Up Period**" shall mean the period terminating on the earlier of (i) March 21, 2022 and (ii) the date on which the Common Share Price (as defined in that certain Agreement and Plan of Merger (the "**Merger Agreement**"), dated as of February 11, 2021, by and among Fusion Acquisition Corp., ML Merger Sub, Inc. and MoneyLion Inc.) is equal to or greater than $12.00 (provided that, for purposes of this clause (ii), the measurement period for determining the Closing Share Price (as defined in the Merger Agreement) shall commence no earlier than November 21, 2021).

Section 9.      Restrictive Legend. All certificates representing Restricted Shares shall have affixed thereto a legend in substantially the following form, in addition to any other legends that may be required under federal or state securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND NEITHER THE SECURITIES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, TRANSFERRED, PLEDGED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR SUCH LAWS OR AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT

4

AND SUCH LAWS WHICH, IN THE OPINION OF COUNSEL, IS AVAILABLE.

THE SECURITIES REPRESENTED HEREBY ARE SUBJECT TO THE RESTRICTIONS (INCLUDING RESTRICTIONS ON TRANSFER) SET FORTH IN THE AMENDED AND RESTATED BYLAWS OF THE CORPORATION AS IT MAY BE AMENDED AND/OR RESTATED (A COPY OF WHICH IS ON FILE WITH THE SECRETARY OF THE CORPORATION AND SHALL BE PROVIDED FREE OF CHARGE TO ANY STOCKHOLDER MAKING A REQUEST THEREFOR).

THE SECURITIES REPRESENTED HEREBY SHALL NO LONGER BE SUBJECT TO FORFEITURE IN FOUR EQUAL INSTALLMENTS ON DECEMBER 31, 2021, MARCH 31, 2022, JUNE 30, 2022, AND SEPTEMBER 30, 2022, AS SET FORTH IN AN AGREEMENT BETWEEN THE CORPORATION AND THE REGISTERED HOLDER, OR SUCH HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE CORPORATION.

Section 10.    No Employment Rights.  This Agreement is not an employment contract and nothing in this Agreement shall affect in any manner whatsoever the right or power of the Company (or a parent or subsidiary of the Company) to terminate Holder's employment for any reason at any time, with or without cause and with or without notice, or as otherwise set forth in an applicable between the Holder and the Company (or a parent or subsidiary of the Company).

Section 11.    Notices.

All notices or other communications which are required or permitted hereunder shall be in writing and sufficient if delivered personally or sent by registered mail, postage prepaid, return receipt requested, or via facsimile, addressed as follows:

       If to the Company, to:

       MoneyLion Inc.
       30 West 21st Street, Ninth Floor
       New York, New York 10010
       Attention: General Counsel's Office
       Email: legal@moneylion.com

       with a copy to:

       DLA Piper LLP (US)
       51 John F. Kennedy Parkway, Suite 120
       Short Hills, New Jersey 07078
       Attention: Andrew Gilbert, Esq.
       Email: Andrew.gilbert@us.dlapiper.com

If to the Holder, to:

_____

_____

_____

or to such other address as the party to whom notice is to be given may have furnished to the other party in writing in accordance herewith.  If mailed, as aforesaid, any such communication shall be deemed to have been given on the third business day following the day on which the piece of mail containing such communication is posted.

Section 12.    <u>Governing Law; Jurisdiction and Venue; Waiver of Jury Trial</u>.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any law or rule that would cause the laws of any jurisdiction other than the State of Delaware to be applied.

(b)    ANY ACTION OR PROCEEDING AGAINST THE PARTIES RELATING IN ANY WAY TO THIS WARRANT MAY BE BROUGHT AND ENFORCED IN THE COURTS OF THE STATE OF DELAWARE OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE, TO THE EXTENT SUBJECT MATTER JURISDICTION EXISTS THEREFOR, AND THE COMPANY IRREVOCABLY SUBMITS TO THE JURISDICTION OF BOTH SUCH COURTS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING.  THE COMPANY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING IN THE COURTS OF THE STATE OF DELAWARE LOCATED IN NEW CASTLE COUNTY OR THE DISTRICT OF DELAWARE AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN ANY INCONVENIENT FORUM.  ANY JUDGMENT MAY BE ENTERED IN ANY COURT HAVING JURISDICTION THEREOF.

(c)    THE COMPANY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS WARRANT.

Section 13.    <u>Assignment</u>. Except in connection with any transfer of this Agreement in accordance with the terms and conditions herein, no right or obligation arising under this Agreement may be assigned by the Holder without the prior written consent of the Company.  This Agreement shall bind and inure to the benefit of the Company, the Holder and each of their respective permitted successors and permitted assigns.

Section 14.    <u>Counterparts</u>. This Agreement may be executed in counterparts (including by facsimile or email transmission), all of which together shall constitute one and the same agreement.

EAST\186207375.5

Section 15.     <u>No Amendment, Modification, Waiver, etc</u>.    No provision of this Agreement may be amended, modified or waived without the prior written consent of the Company and the Holder.

Section 16.     <u>Severability</u>. If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

* * * *

       **IN WITNESS WHEREOF**, the Company has caused this Agreement to be executed by its duly authorized officer as of the date first written above.

                  **MONEYLION INC.**

                  By: _____
                  Name:
                  Title:

ACKNOWLEDGED AND AGREED:


**[HOLDER]**


_____

Execution Version

**Exhibit D**

Registration Rights Agreement

(see attached)

[Signature Page to Membership Interest Purchase Agreement]

Execution Version

# REGISTRATION RIGHTS AGREEMENT

**THIS REGISTRATION RIGHTS AGREEMENT** (this "*Agreement*"), dated as of November 15, 2021, is made and entered into by and among each of MoneyLion Inc., a Delaware corporation (the "*Company*"), Jeffrey Frommer, Lyusen Krubich, Daniel Fried and Pat Capra (each, a "*Holder*" and collectively, the "*Holders*").

## RECITALS

**WHEREAS**, MoneyLion Technologies Inc., a wholly owned subsidiary of the Company, and the Holders have entered into that certain Membership Interest Purchase Agreement, dated as of November 15, 2021 (the "*Purchase Agreement*"), pursuant to which the Holders sold all of the issued and outstanding membership interests of Malka Media Group LLC, a New York limited liability company, to the Company in exchange for payment by the Company of (i) [__] shares of the Company's common stock, par value $0.0001 per share (the "*Common Stock*"), and (ii) $[_____], on the terms and conditions set forth in the Purchase Agreement;

**WHEREAS**, in connection with the consummation of the transactions contemplated by the Purchase Agreement, the Company and the Holders desire to enter into this agreement in order to provide the Holders with registration rights on the terms set forth herein;

**NOW**, **THEREFORE**, in consideration of the representations, covenants and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1** Definitions. The terms defined in this Article I shall, for all purposes of this Agreement, have the respective meanings set forth below:

"*Adverse Disclosure*" shall mean any public disclosure of material non-public information, which disclosure, in the good faith judgment of the Board or the Chairman, Chief Executive Officer or principal financial officer of the Company (i) would be required to be made in any Registration Statement or Prospectus in order for the applicable Registration Statement or Prospectus not to contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements contained therein (in the case of any Prospectus and any preliminary Prospectus, in the light of the circumstances under which they were made) not misleading, (ii) would not be required to be made at such time if the Registration Statement were not being filed, and (iii) the Company has a bona fide business purpose for not making such information public.

"*Agreement*" shall have the meaning given in the Preamble.

"*Board*" shall mean the Board of Directors of the Company.

"*Business Day*" means any day, other than a Saturday or a Sunday, that is neither a legal holiday nor a day on which banking institutions are generally authorized or required by law or regulation to close in the City of New York, New York.

"*Commission*" shall mean the Securities and Exchange Commission.

"*Common Stock*" shall have the meaning given in the Recitals hereto.

"*Company*" shall have the meaning given in the Preamble.

"*Exchange Act*" shall mean the Securities Exchange Act of 1934, as it may be amended from time to time.

"*Holders*" shall have the meaning given in the Preamble.

"*IPO*" shall have meaning set forth in the Recitals hereto.

"*Maximum Number of Securities*" shall have the meaning given in subsection 2.1.2.

"*MoneyLion Lock-Up Period*" shall mean the period terminating on the earlier of (i) March 21, 2022 and (ii) the date on which the Common Share Price (as defined in that certain Agreement and Plan of Merger (the "Merger Agreement"), dated as of February 11, 2021, by and among Fusion Acquisition Corp., ML Merger Sub, Inc. and MoneyLion Inc.) is equal to or greater than $12.00 (provided that, for purposes of this clause (ii), the measurement period for determining the Closing Share Price (as defined in the Merger Agreement) shall commence no earlier than November 21, 2021).

"*Purchase Agreement*" shall have the meaning set forth in the Recitals hereto.

"*Misstatement*" shall mean an untrue statement of a material fact or an omission to state a material fact required to be stated in a Registration Statement, preliminary Prospectus or Prospectus, or necessary to make the statements in a Registration Statement, preliminary Prospectus or Prospectus, in the case of the preliminary Prospectus or Prospectus, in light of the circumstances under which they were made, not misleading.

"*Permitted Transferees*" shall mean any person or entity to whom a Holder of Registrable Securities is permitted to transfer such Registrable Securities hereunder, under the bylaws of the Company and any other applicable agreement between such Holder and the Company, and to any transferee thereafter.

"*Piggy-back Registration*" shall have the meaning given in Section 2.1.1.

"*Prospectus*" shall mean the prospectus included in any Registration Statement, as supplemented by any and all prospectus supplements and as amended by any and all post-effective amendments and including all materials incorporated by reference in such prospectus.

"*Prospectus Date*" shall mean the date of the final Prospectus filed with the Commission and relating to the IPO.

"*Registrable Security*" shall mean (a) the Common Stock and (b) any other equity security of the Company issued or issuable with respect to any such shares of Common Stock by way of a stock dividend or stock split or in connection with a combination of stock, acquisition, recapitalization, consolidation, reorganization, stock exchange, stock reconstruction and amalgamation or contractual control arrangement with, purchasing all or substantially all of the assets of, or engagement in any other similar transaction; provided, however, that, as to any particular Registrable Security, such securities shall cease to be Registrable Securities when: (i) if a Registration Statement with respect to the sale of such securities shall have become effective under the Securities Act, at the earlier of (A) one year following the date the Registration Statement is declared effective or (B) the date that such securities shall have been sold, transferred, disposed of or exchanged in accordance with such Registration Statement; (ii) such securities may otherwise be transferred, new certificates or book entry credits for such securities not bearing a legend restricting further transfer shall have been delivered by the Company and subsequent public distribution of such securities shall not require registration under the Securities Act; (iii) such securities shall have ceased to be outstanding; or (iv) such securities have been sold to, or through, a broker, dealer or underwriter in a public distribution or other public securities transaction.

"*Registration*" shall mean a registration effected by preparing and filing a Registration Statement or similar document in compliance with the requirements of the Securities Act, and the applicable rules and regulations promulgated thereunder, and such Registration Statement becoming effective.

"*Registration Expenses*" shall mean the out-of-pocket expenses of a Registration, including, without limitation, the following:

(A) all registration and filing fees (including fees with respect to filings required to be made with the Financial Industry Regulatory Authority and any securities exchange on which the Common Stock is then listed);

(B) fees and expenses of compliance with securities or blue sky laws (including reasonable fees and disbursements of counsel for the Underwriters in connection with blue sky qualifications of Registrable Securities);

(C) printing, messenger, telephone and delivery expenses;

(D) reasonable fees and disbursements of counsel for the Company; and

(E) reasonable fees and disbursements of all independent registered public accountants of the Company incurred specifically in connection with such Registration.

"***Registration Statement***" shall mean any registration statement that covers the Registrable Securities pursuant to the provisions of this Agreement, including the Prospectus included in such registration statement, amendments (including post-effective amendments) and supplements to such registration statement, and all exhibits to and all materials incorporated by reference in such registration statement.

"***Securities Act***" shall mean the Securities Act of 1933, as amended from time to time.

"***Underwriter***" shall mean a securities dealer who purchases any Registrable Securities as principal in an Underwritten Offering and not as part of such dealer's market-making activities.

"***Underwritten Registration***" or "***Underwritten Offering***" shall mean a Registration in which securities of the Company are sold to an Underwriter in a firm commitment underwriting for distribution to the public.

## ARTICLE II
## REGISTRATIONS

**2.1** Piggy-back Registration.

**2.1.1** Piggy-back Rights. If, at any time on or after the date hereof, the Company proposes to file a Registration Statement under the Securities Act with respect to an offering of equity securities, or securities or other obligations exercisable or exchangeable for, or convertible into equity securities, for its own account or for the account of stockholders of the Company (or by the Company and by the stockholders of the Company), other than a Registration Statement (i) filed in connection with any employee stock option or other benefit plan, (ii) for an exchange offer, as part of a merger, consolidation or similar transaction or for an offering of securities solely to the Company's existing stockholders, (iii) for an offering of debt that is convertible into equity securities of the Company, or (iv) for a dividend reinvestment plan, then the Company shall give written notice of such proposed filing to all of the Holders of Registrable Securities as soon as practicable but not less than ten (10) days before the anticipated filing date of such Registration Statement, which notice shall (A) describe the amount and type of securities to be included in such offering, the intended method(s) of distribution, and the name of the proposed managing Underwriter or Underwriters, if any, in such offering, and (B) offer to all of the Holders of Registrable Securities the opportunity to register the sale of such number of Registrable Securities as such Holders may request in writing within ten (10) Business Days after receipt of such written notice (such Registration a "***Piggy-back Registration***"). The Company shall, in good faith, cause such Registrable Securities to be included in such Piggy-back Registration and shall use its best efforts to cause the managing Underwriter or Underwriters of a proposed Underwritten Offering to permit the Registrable Securities requested by the Holders pursuant to this subsection 2.1.1 to be included in a Piggy-back Registration on the same terms and conditions as any similar securities of the Company included in such Registration and to permit the sale or other disposition of such Registrable Securities in accordance with the intended method(s) of distribution thereof. All such Holders proposing to distribute their Registrable Securities through an Underwritten Offering under this subsection 2.1.1 shall enter into an underwriting agreement in customary form with the Underwriter(s) selected for such Underwritten Offering by the Company. The Company may postpone or withdraw the filing or the effectiveness of a Piggyback Registration at any time in its sole discretion.

**2.1.2** Reduction of Piggy-back Registration. If the managing Underwriter or Underwriters in an Underwritten Registration that is to be a Piggy-back Registration, in good faith, advises the Company and the Holders of Registrable Securities participating in the Piggy-back Registration in writing that the dollar amount or number of the shares of Common Stock that the Company desires to sell, taken together with (i) the shares of Common Stock, if any, as to which Registration has been demanded pursuant to separate written contractual arrangements with persons or entities other than the Holders of Registrable Securities hereunder and (ii) the shares of Common Stock, if any, as to which Registration has been requested pursuant to separate written contractual piggy-back registration rights of other stockholders of the Company, exceeds the maximum dollar amount or maximum number of equity securities that can be sold in the Underwritten Offering without adversely affecting the proposed offering price, the timing, the

distribution method, or the probability of success of such offering (such maximum dollar amount or maximum number of such securities, as applicable, the "***Maximum Number of Securities***"), then:

(a) If the Registration is undertaken for the Company's account, the Company shall include in any such Registration (A) first, the shares of Common Stock or other equity securities that the Company desires to sell, which can be sold without exceeding the Maximum Number of Securities; and (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the shares of Common Stock, if any, as to which Registration has been requested pursuant to written contractual piggy-back registration rights of other stockholders of the Company which can be sold without exceeding the Maximum Number of Securities; and

(b) If the Registration is pursuant to a request by persons or entities other than the Holders of Registrable Securities, then the Company shall include in any such Registration (A) first, the shares of Common Stock or other equity securities, if any, of such requesting persons or entities, which can be sold without exceeding the Maximum Number of Securities; (B) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (A), the Registrable Securities of Holders exercising their rights to register their Registrable Securities pursuant to subsection 2.1.1 which can be sold without exceeding the Maximum Number of Securities; (C) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A) and (B), the shares of Common Stock or other equity securities that the Company desires to sell which can be sold without exceeding the Maximum Number of Securities; and (D) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (A), (B) and (C), the shares of Common Stock or other equity securities for the account of other persons or entities that the Company is obligated to register pursuant to separate written contractual arrangements with such persons or entities which can be sold without exceeding the Maximum Number of Securities.

**2.1.3** Piggy-back Registration Withdrawal. Any Holder of Registrable Securities shall have the right to withdraw from a Piggy-back Registration for any or no reason whatsoever upon written notification to the Company and the Underwriter or Underwriters (if any) of his, her or its intention to withdraw from such Piggy-back Registration prior to the effectiveness of the Registration Statement filed with the Commission with respect to such Piggy-back Registration. The Company (in its sole discretion or as the result of a request for withdrawal by persons pursuant to separate written contractual obligations) may postpone or withdraw the filing or effectiveness of a Piggy-back Registration. Notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for the Registration Expenses incurred in connection with the Piggy-back Registration prior to its withdrawal under this subsection 2.1.3.

**2.1.4** Termination of Piggy-back Registration Rights. The rights to demand a Piggy-back Registration under this Section 2.1 shall terminate on the second anniversary of the date hereof.

**2.2** Lock-Up. Notwithstanding anything to the contrary in this Agreement, the Company shall not be obligated to effect any Piggy-back Registration of any shares of Common Stock subject to the MoneyLion Lock-Up Period prior to the MoneyLion Lock-Up Period.

### ARTICLE III
### COMPANY PROCEDURES

**3.1** General Procedures. If at any time on or after the date hereof the Company is required to effect the Registration of Registrable Securities, the Company shall use its best efforts to effect such Registration to permit the sale of such Registrable Securities in accordance with the intended plan of distribution thereof, and pursuant thereto the Company shall:

**3.1.1** prepare and file with the Commission a Registration Statement with respect to such Registrable Securities and use its reasonable best efforts to cause such Registration Statement to become effective and remain effective until all Registrable Securities covered by such Registration Statement have been sold;

**3.1.2** prepare and file with the Commission such amendments and post-effective amendments to the Registration Statement, and such supplements to the Prospectus, as may be requested by any Holder or any Underwriter of Registrable Securities or as may be required by the rules, regulations or instructions applicable to the registration form used by the Company or by the Securities Act or rules and regulations thereunder to keep the

Registration Statement effective until all Registrable Securities covered by such Registration Statement are sold in accordance with the intended plan of distribution set forth in such Registration Statement or supplement to the Prospectus and either (i) any underwriter overallotment option has terminated by its terms or (ii) the underwriters have advised the Company that they will not exercise such option or any remaining portion thereof;

**3.1.3** furnish without charge to the Underwriters, if any, and each Holder of Registrable Securities included in such Registration, or such Holders' legal counsel, copies of the Prospectus included in such Registration Statement (including each preliminary Prospectus), and each amendment and supplement thereto (in each case including all exhibits thereto and documents incorporated by reference therein), and such other documents as the Underwriters and each Holder of Registrable Securities included in such Registration or the legal counsel for any such Holders may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such Holders;

**3.1.4** prior to any public offering of Registrable Securities, use its best efforts to (i) register or qualify the Registrable Securities covered by the Registration Statement under such securities or "blue sky" laws of such jurisdictions in the United States as any Holder of Registrable Securities included in such Registration Statement (in light of their intended plan of distribution) may reasonably request and (ii) take such action necessary to cause such Registrable Securities covered by the Registration Statement to be registered with or approved by such other governmental authorities as may be necessary by virtue of the business and operations of the Company and do any and all other acts and things that may be reasonably necessary or advisable to enable the Holders of Registrable Securities included in such Registration Statement to consummate the disposition of such Registrable Securities in such jurisdictions; provided, however, that the Company shall not be required to qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify or take any action to which it would be subject to general service of process or taxation in any such jurisdiction where it is not then otherwise so subject;

**3.1.5** use commercially reasonable efforts to cause all such Registrable Securities to be listed on each securities exchange or automated quotation system on which similar securities issued by the Company are then listed;

**3.1.6** provide a transfer agent or warrant agent, as applicable, and registrar for all such Registrable Securities no later than the effective date of such Registration Statement;

**3.1.7** advise each seller of such Registrable Securities, promptly after it shall receive notice or obtain knowledge thereof, and which shall not be more than three (3) Business Days from the date of such event, of the issuance of any stop order by the Commission suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceeding for such purpose and promptly use its commercially reasonable efforts to prevent the issuance of any stop order or to obtain its withdrawal as soon as reasonably practicable if such stop order should be issued;

**3.1.8** at least five (5) Business Days prior to the filing of any Registration Statement or Prospectus or any amendment or supplement to such Registration Statement or Prospectus or any document that is to be incorporated by reference into such Registration Statement or Prospectus, furnish a copy thereof to each seller of such Registrable Securities and its counsel, including, without limitation, providing copies promptly upon receipt of any comment letters received with respect to any such Registration Statement or Prospectus. The Company shall not include the name of any Holder or any information regarding any Holder in any Registration Statement or Prospectus, any amendment or supplement to such Registration Statement or Prospectus, any document that is to be incorporated by reference into such Registration Statement or Prospectus, or any response to any comment letter, without the prior written consent of such Holder and providing each such Holder a reasonable amount of time to review and comment on such applicable document, which comments the Company shall include unless contrary to applicable law;

**3.1.9** notify the Holders at any time when a Prospectus relating to such Registration Statement is required to be delivered under the Securities Act, of the happening of any event as a result of which the Prospectus included in such Registration Statement, as then in effect, includes a Misstatement, and then to correct such Misstatement as set forth in Section 3.4 hereof;

**3.1.10** in the event of an Underwritten Offering, permit the participating Holders to rely on any "cold comfort" letter from the Company's independent registered public accountants provided to the managing Underwriter of such offering;

**3.1.11** in the event of an Underwritten Offering, permit the participating Holders to rely on any opinion(s) of counsel representing the Company for the purposes of such Registration issued to the managing Underwriter of such offering covering legal matters with respect to the Registration;

**3.1.12** in the event of any Underwritten Offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing Underwriter of such offering;

**3.1.13** make available to its security holders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months beginning with the first of the Company's first full calendar quarter after the effective date of the Registration Statement which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder, and which requirement will be deemed to be satisfied if the Company timely files complete and accurate information on Forms 10-Q, 10-K and 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

**3.1.14** if the Registration involves the Registration of Registrable Securities involving gross proceeds in excess of $25,000,000, use its reasonable efforts to make available senior executives of the Company to participate in customary "road show" presentations that may be reasonably requested by the Underwriter in any Underwritten Offering; and

**3.1.15** otherwise, in good faith, cooperate reasonably with, and take such customary actions as may reasonably be requested by the Holders, in connection with such Registration.

**3.2** <u>Registration Expenses</u>. The Registration Expenses of all Registrations shall be borne by the Company. It is acknowledged by the Holders that the Holders shall bear all incremental selling expenses relating to the sale of Registrable Securities, such as Underwriters' commissions and discounts, brokerage fees, Underwriter marketing costs and fees and expenses of legal counsel representing the Holders in excess or in addition to the legal fees and expenses included as Registration Expenses.  Any reimbursement or payment by the Company shall in no event (a) be duplicative of or (b) limit any provision, in each case which provides for reimbursement of fees and expenses of counsel in any other contract or agreement between the Holders and the Company.

**3.3** <u>Requirements for Participation in Underwritten Offerings</u>. No person may participate in any Underwritten Offering for equity securities of the Company pursuant to a Registration initiated by the Company hereunder unless such person (i) agrees to sell such person's securities on the basis provided in any underwriting arrangements approved by the Company and (ii) completes and executes all customary questionnaires, powers of attorney, indemnities, lock-up agreements, underwriting agreements and other customary documents as may be reasonably required under the terms of such underwriting arrangements.

**3.4** <u>Suspension of Sales; Adverse Disclosure</u>. Upon receipt of written notice from the Company that a Registration Statement or Prospectus contains a Misstatement, each of the Holders shall forthwith discontinue disposition of Registrable Securities until he, she or it is advised in writing by the Company that the use of the Prospectus may be resumed and he, she or it has received copies of a supplemented or amended Prospectus correcting the Misstatement (it being understood that the Company hereby covenants to prepare and file such supplement or amendment as soon as reasonably practicable after the time of such notice) and, if so directed by the Company, each Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Holder's possession, of the Prospectus covering such Registrable Securities at the time of receipt of such notice. If the continued use of a Registration Statement in respect of any Registration at any time would require the Company to make an Adverse Disclosure, or would require the inclusion in such Registration Statement of (i) financial statements that are unavailable to the Company for reasons beyond the Company's control, (ii) audited financial statements as of a date other than the Company's fiscal year end (unless the Holders requesting Registration agree to pay the reasonable expenses of this audit), or (iii) pro forma financial statements that are required to be included in a registration statement, the Company may, upon giving prompt written notice of such action to the Holders, delay the filing or initial effectiveness of, or suspend use of, such Registration Statement for no more than 60 days or not more than two (2) times in any three hundred sixty (360) day period. In the event the Company exercises its rights under the preceding sentence, the Holders agree to suspend, immediately upon their receipt of the notice referred to above, their use of the Prospectus relating to any Registration in connection with any sale or offer to sell Registrable Securities. The Company shall immediately notify the Holders of the expiration of any period during which it exercised its rights under this Section 3.4.

**3.5** <u>Reporting Obligations</u>. As long as any Holder shall own Registrable Securities, the Company, at all times while it shall be reporting under the Exchange Act, covenants to use reasonable best efforts to file timely (or obtain extensions in respect thereof and file within the applicable grace period) all reports required to be filed by the Company after the date hereof pursuant to Sections 13(a) or 15(d) of the Exchange Act and to promptly upon request by a Holder furnish such Holder with true and complete copies of such filings. The Company further covenants that it shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell shares of Common Stock held by such Holder without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 promulgated under the Securities Act, including providing any legal opinions. Upon the request of any Holder, the Company shall deliver to such Holder a written certification of a duly authorized officer as to whether it has complied with such requirements.

**ARTICLE IV**
**INDEMNIFICATION AND CONTRIBUTION**

**4.1** <u>Indemnification</u>.

**4.1.1** The Company agrees to indemnify, to the extent permitted by law, each Holder of Registrable Securities, its officers and directors and each person who controls such Holder (within the meaning of the Securities Act) against all losses, claims, damages, liabilities and expenses (including reasonable attorneys' fees) caused by any untrue or alleged untrue statement of material fact contained in any Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same are caused by or contained in any information furnished in writing to the Company by such Holder expressly for use therein. The Company shall indemnify the Underwriters, their officers and directors and each person who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to the indemnification of the Holder.

**4.1.2** In connection with any Registration Statement in which a Holder of Registrable Securities is participating, such Holder shall furnish to the Company in writing such information and affidavits as the Company reasonably requests for use in connection with any such Registration Statement or Prospectus and, to the extent permitted by law, shall indemnify the Company, its directors and officers and agents and each person who controls the Company (within the meaning of the Securities Act) against any losses, claims, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) resulting from any untrue statement of material fact contained in the Registration Statement, Prospectus or preliminary Prospectus or any amendment thereof or supplement thereto or any omission of a material fact required to be stated therein or necessary to make the statements therein not misleading, but only to the extent that such untrue statement or omission is contained in any information or affidavit so furnished in writing by such Holder expressly for use therein; provided, however, that the obligation to indemnify shall be several, not joint and several, among such Holders of Registrable Securities, and the liability of each such Holder of Registrable Securities shall be in proportion to and limited to the net proceeds received by such Holder from the sale of Registrable Securities pursuant to such Registration Statement. The Holders of Registrable Securities shall indemnify the Underwriters, their officers, directors and each person who controls such Underwriters (within the meaning of the Securities Act) to the same extent as provided in the foregoing with respect to indemnification of the Company.

**4.1.3** Any person entitled to indemnification herein shall (i) give prompt written notice to the indemnifying party of any claim with respect to which it seeks indemnification (provided that the failure to give prompt notice shall not impair any person's right to indemnification hereunder to the extent such failure has not materially prejudiced the indemnifying party) and (ii) unless in such indemnified party's reasonable judgment a conflict of interest between such indemnified and indemnifying parties may exist with respect to such claim, permit such indemnifying party to assume the defense of such claim with counsel reasonably satisfactory to the indemnified party. If such defense is assumed, the indemnifying party shall not be subject to any liability for any settlement made by the indemnified party without its consent (but such consent shall not be unreasonably withheld, conditioned or delayed). An indemnifying party who is not entitled to, or elects not to, assume the defense of a claim shall not be obligated to pay the fees and expenses of more than one counsel (plus local counsel) for all parties indemnified by such indemnifying party with respect to such claim, unless in the reasonable judgment of any indemnified party a conflict of interest may exist between such indemnified party and any other of such indemnified parties with respect to such claim. No indemnifying party shall, without the consent of the indemnified party, consent to the entry of any judgment or enter into any

settlement which cannot be settled in all respects by the payment of money (and such money is so paid by the indemnifying party pursuant to the terms of such settlement) or which settlement does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

 **4.1.4**  The indemnification provided for under this Agreement shall remain in full force and effect regardless of any investigation made by or on behalf of the indemnified party or any officer, director or controlling person of such indemnified party and shall survive the transfer of securities. The Company and each Holder of Registrable Securities participating in an offering also agrees to make such provisions as are reasonably requested by any indemnified party for contribution to such party in the event the Company's or such Holder's indemnification is unavailable for any reason.

 **4.1.5**  If the indemnification provided under Section 4.1 hereof from the indemnifying party is unavailable or insufficient to hold harmless an indemnified party in respect of any losses, claims, damages, liabilities and expenses referred to herein, then the indemnifying party, in lieu of indemnifying the indemnified party, shall contribute to the amount paid or payable by the indemnified party as a result of such losses, claims, damages, liabilities and expenses in such proportion as is appropriate to reflect the relative fault of the indemnifying party and the indemnified party, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and indemnified party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by, or relates to information supplied by, such indemnifying party or indemnified party, and the indemnifying party's and indemnified party's relative intent, knowledge, access to information and opportunity to correct or prevent such action; provided, however, that the liability of any Holder under this subsection 4.1.5 shall be limited to the amount of the net proceeds received by such Holder in such offering giving rise to such liability. The amount paid or payable by a party as a result of the losses or other liabilities referred to above shall be deemed to include, subject to the limitations set forth in subsections 4.1.1, 4.1.2 and 4.1.3 above, any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding. The parties hereto agree that it would not be just and equitable if contribution pursuant to this subsection 4.1.5 were determined by pro rata allocation or by any other method of allocation, which does not take account of the equitable considerations referred to in this subsection 4.1.5. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this subsection 4.1.5 from any person who was not guilty of such fraudulent misrepresentation.

**ARTICLE V**
**MISCELLANEOUS**

 **5.1**  <u>Notices</u>. Any notice or communication under this Agreement must be in writing and given by (i) deposit in the United States mail, addressed to the party to be notified, postage prepaid and registered or certified with return receipt requested, (ii) delivery in person or by courier service providing evidence of delivery, or (iii) transmission by hand delivery, electronic mail or facsimile. Each notice or communication that is mailed, delivered, or transmitted in the manner described above shall be deemed sufficiently given, served, sent, and received, in the case of mailed notices, on the third Business Day following the date on which it is mailed and, in the case of notices delivered by courier service, hand delivery, electronic mail or facsimile, at such time as it is delivered to the addressee (with the delivery receipt of the intended recipient or the affidavit of messenger) or at such time as delivery is refused by the addressee upon presentation. Any notice or communication under this Agreement must be addressed to

 the Company at:

 MoneyLion Inc.
 30 W 21st Street, Floor 9
 New York, NY 10010
 Attention:  General Counsel's Office
 Email:   legal@moneylion.com

 with a copy to:

 DLA Piper LLP (US)

51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey 07078
Attention:          Andrew Gilbert, Esq.
Email:              Andrew.gilbert@us.dlapiper.com

and to the Holders, at such Holder's address referenced in Schedule A.

Any party may change its address for notice at any time and from time to time by written notice to the other parties hereto, and such change of address shall become effective thirty (30) days after delivery of such notice as provided in this Section 5.1.

**5.2** Assignment; No Third Party Beneficiaries.

**5.2.1** This Agreement and the rights, duties and obligations of the Company hereunder may not be assigned or delegated by the Company in whole or in part.. Notwithstanding the above, as it applies to the Registrable Securities, the Holder may transfer such securities to any Permitted Transferee but only if such Permitted Transferee agrees to become bound by the transfer restrictions set forth in this Agreement.

**5.2.2** Except as set forth in subsection 5.2.1 hereof, this Agreement and the rights, duties and obligations of the Holders of Registrable Securities hereunder may be assigned or delegated by such Holder of Registrable Securities in conjunction with and to the extent of any transfer of Registrable Securities by any such Holder.

**5.2.3** This Agreement and the provisions hereof shall be binding upon and shall inure to the benefit of each of the Holders, the permitted assigns and its successors and the permitted assigns of the Holders.

**5.2.4** This Agreement shall not confer any rights or benefits on any persons that are not parties hereto, other than as expressly set forth in this Agreement and Section 5.2 hereof.

**5.2.5** No assignment by any party hereto of such party's rights, duties and obligations hereunder shall be binding upon or obligate the Company unless and until the Company shall have received (i) written notice of such assignment as provided in Section 5.1 hereof and (ii) the written agreement of the assignee, in a form reasonably satisfactory to the Company, to be bound by the terms and provisions of this Agreement (which may be accomplished by an addendum or certificate of joinder to this Agreement). Any transfer or assignment made other than as provided in this Section 5.2 shall be null and void.

**5.3** Counterparts. This Agreement may be executed in multiple counterparts (including facsimile or PDF counterparts), each of which shall be deemed an original, and all of which together shall constitute the same instrument, but only one of which need be produced.

**5.4** Governing Law; Venue. THE PARTIES EXPRESSLY AGREE THAT THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICT OF LAW PROVISIONS OF SUCH JURISDICTION. Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of New York in each case located in the city of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

**5.5** Amendments and Modifications. Upon the written consent of the Company and the Holders of at least a majority in interest of the then outstanding Registrable Securities, compliance with any of the provisions, covenants and conditions set forth in this Agreement may be waived, or any of such provisions, covenants or conditions may be amended or modified; provided, however, that notwithstanding the foregoing, any amendment hereto or waiver hereof that adversely affects one Holder, solely in its capacity as a holder of the shares of capital stock of the Company, in a manner that is materially different from the other Holders (in such capacity) shall require the consent of the Holder so affected. No course of dealing between any Holder or the Company and any other party hereto or any failure or delay on the part of a Holder or the Company in exercising any rights or remedies under this Agreement shall operate as a waiver of any rights or remedies of any Holder or the Company. No single or partial exercise of any rights or remedies

under this Agreement by a party shall operate as a waiver or preclude the exercise of any other rights or remedies hereunder or thereunder by such party.

**5.6** <u>Other Registration Rights</u>. The Company represents and warrants that no person, other than a Holder of Registrable Securities and the Holders party to that certain Registration Rights Agreement of the Company, dated as of September 22, 2021, has any right to require the Company to register any securities of the Company for sale or to include such securities of the Company in any Registration filed by the Company for the sale of securities for its own account or for the account of any other person.

**5.7** <u>Termination</u>. This Agreement shall terminate upon the earlier of (i) the fifth anniversary of the date hereof or (ii) the date as of which (A) all of the Registrable Securities have either been sold pursuant to a Registration Statement or cease to be Registrable Securities (but in no event prior to the applicable period referred to in Section 4(3) of the Securities Act and Rule 174 thereunder) or (B) the Holders of all Registrable Securities are permitted to sell the Registrable Securities under Rule 144 (or any similar provision) under the Securities Act without limitation on the amount of securities sold or the manner of sale. The provisions of Section 3.5 and Article IV shall survive any termination.

**[SIGNATURE PAGES FOLLOW]**

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be executed as of the date first written above.

COMPANY:

**MONEYLION INC.**
a Delaware corporation

By: _____
Name: Diwakar Choubey
Title:  President & CEO

[Signature Page to Registration Rights Agreement]

**HOLDERS:**

By:   _____
Name:  Jeffrey Frommer


By:   _____
Name:  Lyusen Krubich


By:   _____
Name:  Daniel Fried


By:   _____
Name:  Pat Capra

[Signature Page to Registration Rights Agreement]

<u>**Schedule A**</u>

| Holder | Address |
| --- | --- |
| **Jeffrey Frommer** | 85 Columbia Terrace, Apt 1<br>Weehawken, NJ 07086 |
| **Lyusen Krubich** | 14126 Marquesas Way<br>Apt 3352<br>Marina Del Rey CA 90292 |
| **Daniel Fried** | 7 E 14th Street, 1102<br>New York, NY 10003 |
| **Pat Capra** | 19 Franklin St<br>Verona, NJ 07044 |

Execution Version

**Exhibit E**

Employee Payment Participant RSU Letter Agreement

(see attached)

 **MoneyLion**

New York | San Francisco | Salt Lake City | Kuala Lumpur          **Execution Version**

November 15, 2021

**Via E-Mail**
[EMPLOYEE]

Re:      Employee Payment Participant RSU Letter Agreement

Dear [EMPLOYEE],

      In connection with the acquisition of all of the outstanding membership interests of Malka Media Group, LLC (the "Company") by MoneyLion Technologies Inc., a wholly-owned subsidiary of MoneyLion Inc. (the "Parent" and, together with its affiliates, the "Parent Group"), pursuant to that certain Membership Interest Purchase Agreement (the "Purchase Agreement") made and entered into as of November 15, 2021 (the "Transaction"), the Company and the Parent want to reward you for your ongoing contributions to the Company and the Parent Group. Therefore, conditioned on the successful closing of the Transaction, we are pleased to inform you that you are eligible to receive incentive compensation in accordance with the terms of this Employee Payment Participant RSU Letter Agreement (the "Letter Agreement").  All capitalized terms used but not defined herein shall have the meanings set forth in the Purchase Agreement.

1.    <u>Restricted Stock Units</u>.

    a.    The Parent will recommend to its Board (or a committee thereof) that, in connection with (and subject to) the closing of the Transaction, you be granted restricted stock units that settle in shares of publicly traded MoneyLion Inc. common stock, with a value of $[DOLLAR VALUE] based on the 30-Day VWAP of a share of MoneyLion Inc. common stock determined as of the Closing Date, subject to the approval of the grant by the Board and the filing of an effective registration statement on Form S-8 (the "Closing Payment RSU Grant"). The Closing Payment RSU Grant shall vest in four (4) equal installments on December 31, 2021, March 31, 2022, June 30, 2022, and September 30, 2022, subject to your continued employment by or provision of services to the Company or any of its subsidiaries on such dates.

    b.    In the event the Parent becomes obligated to pay the 2021 Earnout Payment, the Parent will recommend to its Board (or a committee thereof) that, in connection with (and subject to) the 2021 Earnout Payment, you be granted restricted stock units that settle in shares of publicly traded MoneyLion Inc. common stock, with a value of at least $[DOLLAR VALUE] and up to $[DOLLAR VALUE], to be determined at the time of the 2021 Earnout Payment, based on the 30-Day VWAP of a share of MoneyLion Inc. common stock determined as of the 2021 Earnout Payment Issuance Date, subject to the approval of the grant by the Board and the filing of an effective registration statement on Form S-8 (the "2021 Earnout Payment RSU Grant"). The 2021 Earnout Payment RSU Grant shall vest in four (4) equal installments on March 31, 2022, June 30, 2022, September 30, 2022, and



New York │ San Francisco │ Salt Lake City │ Kuala Lumpur          **Execution Version**

December 31, 2022, subject to your continued employment by or provision of services to the Company or any of its subsidiaries on such dates.

c. In the event the Parent becomes obligated to pay the 2022 Earnout Payment, the Parent will recommend to its Board (or a committee thereof) that, in connection with (and subject to) the 2022 Earnout Payment, you be granted restricted stock units that settle in shares of publicly traded MoneyLion Inc. common stock, with a value of at least $[DOLLAR VALUE] and up to $[DOLLAR VALUE], to be determined as of the 2022 Earnout Payment Issuance Date, based on the 30-Day VWAP of a share of MoneyLion Inc. common stock on the date the Board approves the restricted stock unit grant, subject to the approval of the grant by the Board and the filing of an effective registration statement on Form S-8 (the "2022 Earnout Payment RSU Grant"). The 2022 Earnout Payment RSU Grant shall vest in four (4) equal installments on March 31, 2023, June 30, 2023, September 30, 2023, and December 31, 2023, subject to your continued employment by or provision of services to the Company or any of its subsidiaries on such dates.

d. The details of such restricted stock unit grants will be provided in a separate document at the time that each grant is approved. The grants are expected to be subject to standard restrictions provided pursuant to the MoneyLion Inc. Omnibus Incentive Plan. For the purposes of this Section 3, "30-Day VWAP" shall mean the volume-weighted average of prices measured in hundredths of cents of a share of MoneyLion Inc. common stock on the NYSE (or other principal market on which such shares are then traded) for the thirty (30) consecutive trading days immediately prior to the applicable date of calculation.

2.      Entire Agreement; Compliance with Laws.  This Letter Agreement represents the entire agreement between the parties relating to this subject matter and supersedes all prior or simultaneous representations, discussions, negotiations, and agreements, whether written or oral. The grants of restricted stock units contemplated herein may only be issued to you to the extent such issuance is in compliance with, and you satisfy, all applicable Securities Laws. All such payments of equity made to you in settlement of vested RSU grants shall be made net of any required withholding of Taxes under applicable Law.

Please indicate your agreement to the terms and conditions of this Letter Agreement by signing the enclosed copy of this Letter Agreement under the acknowledgement below and returning it to Adam Daniels at the following address: adaniels@moneylion.com.

Sincerely,

_____
Diwakar Choubey
President and CEO



**New York** │ **San Francisco** │ **Salt Lake City** │ **Kuala Lumpur**                    **Execution Version**

ACKNOWLEDGEMENT

I have read this Employee Payment Participant RSU Letter Agreement in its entirety and fully understand and agree to the terms and conditions for receiving the restricted stock units detailed herein.

_____                    _____

Employee Signature                                          Date

Execution Version

**Exhibit F**

Operating Agreement

(see attached)

[Signature Page to Membership Interest Purchase Agreement]

Execution Version

**THIRD AMENDED AND RESTATED OPERATING AGREEMENT**
of
**MALKA MEDIA GROUP LLC**
(A New York limited liability company)

This third amended and restated operating agreement of Malka Media Group LLC (the "**Company**"), dated as of November 15, 2021, has been adopted by the Company and by MoneyLion Technologies Inc., as the sole member (the "**Member**") of the Company. The parties hereto have agreed to enter into this third amended and restated operating agreement, which supersedes and replaces all prior operating agreements of the Company.

## ARTICLE I—DEFINITIONS

**1.01      Definitions**. In addition to the terms defined in other provisions of this agreement, the following terms shall have the meanings set forth below unless the context requires otherwise:

"**Act.**" The New York Limited Liability Company Act, and any successor statute, as amended from time to time.

"**Agreement.**" This operating agreement, as amended, modified, supplemented, or restated from time to time.

"**Contribution.**" Property transferred to, services performed for, or another benefit provided to the Company; an agreement to transfer property to, perform services for, or provide another benefit to the Company; or any combination of the foregoing.

"**Certificate.**" The certificate of organization of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the Department of State of the State of New York pursuant to the Act.

"**Company.**" See the preamble.

"**Member.**" See the preamble.

"**Membership Interests.**" The interest of the Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), information, and to consent to or approve actions by the Company, all in accordance with the provisions of this agreement and the Act.

"**Person.**" A natural person, corporation, general or limited partnership, limited liability company, joint venture, trust, estate, association, or other legal entity or organization.

## ARTICLE II—ORGANIZATION

**2.01.      Principal Place of Business; Other Offices.** The principal place of business of the Company shall be at 75 Montgomery Street, Jersey City, New Jersey 19473 or at such other place as the Member may designate from time to time, which need not be in the State of New York or the State of New Jersey. The Company may have such other offices as the Member may designate from time to time.

**2.02.      Purpose.** The Company may have any lawful purpose other than acting as an insurer.

## ARTICLE III—MEMBERSHIP INTERESTS

**3.01.    <u>Transferability of Interest</u>.** A membership interest in the Company is freely transferable or assignable, in whole or in part, either voluntarily or by operation of law.

**3.02.    <u>Admission of Additional Members</u>.**

Additional members of the Company may be admitted to the Company at the direction of the Member only if a new operating agreement or an amendment and restatement of this agreement is executed.

**3.03    <u>Pledge of Membership Interests</u>.**

Any provision to the contrary contained in this Agreement, the Certificate of the Company or any agreement to which the Company is a party or otherwise bound notwithstanding, the Membership Interests issued hereunder or covered hereby and all associated rights and powers may be pledged or assigned to any lender or lenders (or an agent therefor) as collateral for the indebtedness, liabilities and obligations of the Company and/or any of its subsidiaries or affiliates to such lender or lenders on such terms as the Member deems appropriate.  The pledge or assignment of such Membership Interests shall not, except as otherwise may result due to an exercise of rights and remedies under such collateral documentation, cause a Member to cease to be a Member or to forego the power to exercise any rights or powers of a Member.

## ARTICLE IV—FINANCIAL AND TAX MATTERS

**4.01.    <u>Contributions</u>.** The Company shall keep a record of the contributions made by the Member. Except as otherwsie required in the Act, the Member shall not be required to make any contribution to the Company, or be obligated or required under any circumstances to restore any negative balance in the Member's capital account.

**4.02.    <u>Advances by the Member</u>.** The Member may agree to loan funds to or guarantee obligations of the Company. A loan to the Company or guarantee of its obligations by the member is not a capital contribution.

**4.03.    <u>Distributions</u>.**

**(a)    <u>Distributions to Member</u>.** Distributions shall be made to the Member (in cash or in kind) at such times and in such amounts determined by the Member but only if permitted by the provisions of the Act or other applicable law.

**(b)    <u>No Distribution Upon Dissociation</u>.** Unless otherwise determined by the Member, no distribution will be paid to the Member upon the Member's withdrawal from the Company in connection with a voluntary transfer or assignment of the Member's entire membership interest in accordance with the provisions of the Act and this operating agreement.

**4.04.    <u>Title to Company Property</u>.** All real and personal property shall be acquired in the name of the Company and title to any property so acquired shall vest in the Company itself rather than in the Member.

**4.05.    <u>Tax Elections</u>.** Neither the Company nor the Member may make an election for the Company to be taxable as a corporation for federal income tax purposes or to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Internal Revenue Code or

any similar provisions of applicable state law, and no provision of this agreement shall be construed to sanction or approve such an election.

## ARTICLE V—MANAGEMENT

**5.01.** **Management by Member.**

**(a)** **Exclusive Responsibility**. The business and affairs of the Company shall be managed by the Member. The Member, on behalf of the Company, shall have the power to do any and all acts necessary or convenient to, or for the furtherance of, the business and affairs of the Company.

**(b)** **Delegation.** The Member may appoint officers and agents of the Company to which the Member may delegate whatever duties, responsibilities, and authority the Member may desire. Any officer or agent may be removed by the Member at any time. If the Member appoints an officer of the Company with a title that is commonly used for officers of a business corporation, the assignment of title shall constitute the delegation of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made by the Member. Any number of offices may be held by the same person. The salaries and other compensation, if any, of the officers and agents of the Company shall be fixed from time to time by the Member. Jeffrey Frommer and Lyusen Krubich are hereby designated an as initial authorized officers and agents of the Company.

**5.02.** **Conflicts of Interest.** Nothing in this agreement shall be construed to limit the right of the Member (or its affiliates) to enter into any transaction that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Company. The Member does not violate a duty or obligation to the Company merely because the conduct of the Member furthers the interests of the Member. The Member (or its affiliates) may lend money to and transact other business with the Company. The rights and obligations of the Member upon lending money to or transacting business with the Company are the same as those of a person who is not the Member, subject to other applicable law. No transaction with the Company shall be void or voidable solely because the Member (or its affiliates) has a direct or indirect interest in the transaction.

**5.03.** **Compensation.** The Member may be reimbursed for all expenses incurred in managing the Company and may, at the election of the Member, be entitled to compensation for management services rendered, in an amount to be determined from time to time by the Member.

## ARTICLE VI—MEMBER

**6.01.** **Member.** The name and address of the Member are:

> MoneyLion Technologies Inc.
> 30 West 21st Street, Ninth Floor
> New York, New York 10010

**6.02.** **Liability of the Member. Except as otherwsie provided by the Act,** a debt, obligation, or other liability of the Company is solely the debt, obligation, or other liability of the Company. The Member is not personally liable, directly or indirectly, by way of contribution or otherwise, for a debt, obligation, or other liability of the Company solely by reason of being or acting as the Member. The failure of the Member to observe any formalities or requirements relating to the exercise of the powers of the Member or the management of the business and affairs of the Company under this agreement or the Act shall not be grounds for imposing liability on the Member for liabilities of the

Company.

## ARTICLE VII—INDEMNIFICATION OF THE MEMBER, OFFICERS, AND OTHER AUTHORIZED REPRESENTATIVES

**7.01.** **Indemnification.** The Company shall indemnify any person who was or is a party to or is threatened to be made a party to or is otherwise involved in any threatened, pending, or completed action or proceeding, including without limitation actions by or in the right of the Company, whether civil, criminal, administrative, or investigative, by reason of the fact that the person is or was the Member or an officer of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee, agent, fiduciary, or other representative of another corporation (for-profit or not-for-profit), limited liability company, partnership, joint venture, trust, employee benefit plan, or other enterprise, against all liabilities, expenses (including without limitation attorneys' fees), judgments, fines, excise taxes, and amounts paid in settlement in connection with the action or proceeding unless the act or failure to act by the person giving rise to the claim for indemnification is determined by a court to have constituted fraud, deceit, gross negligence, willful misconduct or a wrongful taking. The Company shall have the power to indemnify employees and agents of the Company on the same basis as provided in this section with respect to the Member and officers, and to advance expenses to employees and agents on the same basis as provided in section 7.02, as the Member may from time to time determine or authorize.

**7.02.** **Advancement of Expenses.** Expenses (including without limitation attorneys' fees) incurred by any person who was or is the Member or an officer of the Company in defending any action or proceeding referred to in section 7.01 shall automatically be paid by the Company, without the need for action by the Member, in advance of the final disposition of the action or proceeding upon receipt of an undertaking by or on behalf of the person to repay the amount advanced if it shall ultimately be determined that the person is not entitled to be indemnified by the Company.

**7.03.** **Exception.** Notwithstanding anything in this Article VII to the contrary, the Company shall not be obligated to indemnify an officer under section 7.01 or advance expenses to an officer under section 7.02 with respect to proceedings, claims, or actions commenced by that person, other than mandatory counterclaims and affirmative defenses.

**7.04.** **Interpretation.** The indemnification and advancement of expenses provided by or pursuant to this Article VII shall not be deemed exclusive of any other rights to which any person seeking indemnification or advancement of expenses may be entitled under any insurance policy, agreement, approval of the Member, or otherwise, both as to actions in the person's official capacity and as to actions in another capacity while holding an office, and shall continue as to a person who has ceased to be the Member or an officer and shall inure to the benefit of the heirs, executors, and administrators of the person. If the Act is amended to permit a New York limited liability company to provide greater rights to indemnification and advancement of expenses for its member and officers than the express terms of this Article VII, this Article VII shall be construed to provide for such greater rights.

**7.05.** **Contract.** The duties of the Company to indemnify and to advance expenses to the Member or an officer as provided in this Article VII shall be in the nature of a contract between the Company and each such person, and no amendment or repeal of any provision of this Article VII shall alter, to the detriment of such person, the right of the person to the advancement of expenses or indemnification related to a claim based on an act or failure to act that took place prior to the amendment or repeal or the termination of the service of the person as the Member or officer, whichever is earlier.

## ARTICLE VIII—DISSOLUTION

**8.01.** <u>**Dissolution**</u>.

(a)     The Company shall dissolve, and its affairs shall be wound up, upon the first to occur of the following:

(1)     the written direction of the Member;

(2)     the passage of 180 consecutive days after the Company ceases to have any members unless before the end of such period a representative of the last remaining member consents in writing to continue the Company and to the admission of such representative as a member in accordance with the consent; or

(3)     the entry of a court order dissolving the Company under section 702 of the Act.

(b)     Upon dissolution, the Company shall cease carrying on any and all business other than the winding up of the Company business, but the Company is not terminated and shall continue until the winding up of the affairs of the Company is completed and articles of dissolution have been filed pursuant to the Act. Upon the winding up of the Company, the Company's property shall be distributed (i) first to creditors, including the Member if the Member is a creditor, to the extent permitted by law, in satisfaction of the Company's liabilities; and (ii) then to the Member. Distributions shall be in cash or property or partly in both, as determined by the Member.

(c)     Pursuant to the Act, except as otherwise provided herein, a Member may not resign from the Company prior to the dissolution and winding up of the Company.

## ARTICLE IX—GENERAL PROVISIONS

**9.01.** <u>**Entire Agreement**</u>. This agreement constitutes the entire agreement of the Member and the Company with respect to the subject matter hereof and supersedes all prior agreements, express or implied, oral or written, with respect thereto. The express terms of this agreement control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

**9.02.** <u>**Amendment.**</u> This agreement or the certificate may be amended from time to time only by action of the Member. All amendments must be in record form.

**9.03.** <u>**Binding Effect and Rights of Third Parties.**</u> This agreement has been adopted to govern the operation of the Company, and shall be binding on and inure to the benefit of the Member and the heirs, personal representatives, successors, and assigns of the Member. This agreement is expressly not intended for the benefit of any creditor of the Company or any other person, except a person entitled to indemnification, contribution, or advancement of expenses under Article VII. Except and only to the extent provided by applicable statute, no such creditor or other person shall have any rights under this agreement.

**9.04.** <u>**Governing Law.**</u> This agreement shall be governed by and interpreted and enforced in accordance with the substantive laws of the State of New York (including, without limitation, provisions concerning limitations of actions), without reference to the conflict of laws rules of that or any other jurisdiction, except that federal laws shall also apply to the extent relevant.

**9.05.** <u>**Severability.**</u> If any provision of this agreement or the application thereof to any person or circumstance is held invalid or unenforceable to any extent, the remainder of this agreement and the

application of that provision to other persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by law.

      **9.06.**    **Construction.** Whenever the context requires, the gender of any word used in this agreement includes the masculine, feminine, or neuter, and the number of any word includes the singular or plural. All references to articles and sections refer to articles and sections of this agreement. The headings in this agreement are for convenience only; they do not form a part of this agreement and shall not affect its interpretation.

      **IN WITNESS WHEREOF,** the Company and the Member have caused this agreement to be executed as of the day and year first above written.

**MEMBER:**

**MoneyLion Technologies Inc.**

**By:** _____

**Name:** _____

**Title:** _____