UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JEFFREY FROMMER, LYUSEN (LOUIS)
KRUBICH, DANIEL FRIED and PAT CAPRA,

                      Plaintiffs,

      v.

MONEYLION TECHNOLOGIES INC. and
CONTINENTAL STOCK TRANSFER & TRUST
COMPANY,

                      Defendants,

MONEYLION TECHNOLOGIES INC.,

                Counterclaim Plaintiff,

      v.

JEFFREY FROMMER, LYUSEN (LOUIS)
KRUBICH, DANIEL FRIED and PAT CAPRA,

              Counterclaim Defendants,

MONEYLION INC.,

              Third-Party Plaintiff,

      v.

JEFFREY FROMMER, LYUSEN (LOUIS)
KRUBICH, DANIEL FRIED and PAT CAPRA,

             Third Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 1:23-cv-06339-JMF

**AMENDED ANSWER, AFFIRMATIVE
DEFENSES, COUNTERCLAIMS, AND
THIRD PARTY COMPLAINT**

Defendant MoneyLion Technologies Inc. ("MoneyLion"), by its attorneys, Kleinberg,

Kaplan, Wolff & Cohen, P.C., as and for its Amended Answer, Affirmative Defenses and

Counterclaims, alleges as follows:

## **AMENDED ANSWER TO AMENDED COMPLAINT**

1.      MoneyLion denies the allegations set forth in Paragraph 1, except admits only that this action purports to allege a claim for breach of contract and to seek injunctive relief, and that the Membership Interest Purchase Agreement, dated as of November 15, 2021 (the "MIPA"), was entered into by and among MoneyLion, Malka Media Group LLC, Jeffrey Frommer, Lyusen Krubich, Daniel Fried, and Pat Capra, and Jeffrey Frommer in his capacity as the Sellers' Representative, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

2.      MoneyLion denies the allegations set forth in Paragraph 2, except admits only that MoneyLion purchased Plaintiffs' outstanding membership interests in Malka Media Group LLC ("Malka") for consideration consisting of cash and MoneyLion Inc. restricted common stock at the closing, and that the MIPA provided for additional payments if and only if Malka achieved certain financial targets in 2021 and 2022, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

3.      MoneyLion denies the allegations set forth in Paragraph 3, except admits only that MoneyLion issued Plaintiffs certain MoneyLion Inc. common stock subject to contractual and statutory restrictions and that the shares bore a restrictive legend, and respectfully refers the Court to the MIPA, the Registration Rights Agreement dated November 15, 2021, entered into by and among MoneyLion Inc. and Plaintiffs (the "RRA"), and those certain Restricted Stock Agreements, dated November 15, 2021, March 28, 2022, June 30, 2022, September 30, 2022, and March 14, 2023, entered into by and among MoneyLion Inc. and each of the Plaintiffs individually (the "RSAs") for their complete and accurate content and context.

12483488

4.      MoneyLion denies the allegations set forth in Paragraph 4, except admits only that MoneyLion Inc. has reasonably, and in good faith, declined to consent to the removal of the restrictions on certain of the shares of MoneyLion Inc. common stock previously issued to Plaintiffs.

5.      MoneyLion denies the allegations set forth in Paragraph 5, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

6.      MoneyLion denies the allegations set forth in Paragraph 6, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

7.      MoneyLion denies the allegations set forth in Paragraph 7, except admits only that Plaintiffs have brought this action for purported breach of contract.

8.      MoneyLion denies the allegations set forth in Paragraph 8, and to the extent that it contains legal conclusions, no response is required.

9.      MoneyLion denies the allegations set forth in Paragraph 9, respectfully refers the Court to the MIPA for its complete and accurate content and context, and to the extent that this Paragraph contains legal conclusions, no response is required.

10.      MoneyLion denies the allegations set forth in Paragraph 10, respectfully refers the Court to the MIPA for its complete and accurate content and context, and to the extent that this Paragraph consists solely of legal conclusions, no response is required.

11.      MoneyLion denies the allegations set forth in Paragraph 11, respectfully refers the Court to the MIPA for its complete and accurate content and context, and to the extent that this Paragraph consists solely of legal conclusions, no response is required.

12483488

## PARTIES

12.     MoneyLion denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 12.

13.     MoneyLion denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 13.

14.     MoneyLion denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 14.

15.     MoneyLion denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 15.

16.     MoneyLion admits the allegations set forth in Paragraph 16.

17.     MoneyLion denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 17.

## JURISDICTION AND VENUE

18.     Paragraph 18 consists solely of legal conclusions to which no response is required, but to the extent a response is required, MoneyLion denies the allegations set forth in this Paragraph.

19.     Paragraph 19 consists solely of legal conclusions to which no response is required, except MoneyLion admits only that it maintains offices located in New York.

20.     Paragraph 20 consists solely of legal conclusions to which no response is required, and MoneyLion respectfully refers the Court to the RRA and the MIPA for their complete and accurate content and context.

21.     MoneyLion denies the allegations set forth in Paragraph 21, except as to the legal conclusions to which no response is required.

12483488

## FACTUAL ALLEGATIONS

22.     MoneyLion denies the allegations set forth in Paragraph 22, except admits, upon information and belief, that certain of the Plaintiffs founded Malka and that the Plaintiffs owned 100% of Malka's membership interests until November 15, 2021.

23.     MoneyLion admits the allegations set forth in Paragraph 23, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

24.     MoneyLion denies the allegations set forth in Paragraph 24, except admits that based on the Plaintiffs' representations and warranties as set forth in the MIPA, MoneyLion agreed to provide the Plaintiffs with cash consideration and for MoneyLion Inc. to issue restricted common stock to the Plaintiffs at the closing of the transaction contemplated by the MIPA, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

25.     MoneyLion denies the allegations set forth in Paragraph 25, except admits that the MoneyLion Inc. common stock issued to the Seller Members at the closing of the transactions contemplated by the MIPA was restricted and subject to time-based vesting requirements, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

26.     MoneyLion denies the allegations set forth in Paragraph 26, except admits that Plaintiffs were required to execute the RRA and RSAs, and respectfully refers the Court to the MIPA, the RRA, and the RSAs for their complete and accurate content and context.

27.     MoneyLion admits the allegations set forth in Paragraph 27, and respectfully refers the Court to the MIPA, the RRA, and the RSAs for their complete and accurate content and context.

12483488

28.     MoneyLion denies the allegations set forth in Paragraph 28, except admits that Plaintiffs' voting and transfer rights relating to the MoneyLion Inc. common stock issued to the Seller Members at the closing of the transactions contemplated by the MIPA were restricted, and respectfully refers the Court to the RSAs for their complete and accurate content and context.

29.     MoneyLion denies the allegations set forth in Paragraph 29, except admits that vesting of the Closing Stock Payment was staggered, and respectfully refers the Court to the MIPA and the RSAs for their complete and accurate content and context.

30.     MoneyLion denies the allegations set forth in Paragraph 30.

31.     MoneyLion denies the allegation set forth in Paragraph 31 that the shares issued at the closing of the transactions contemplated by the MIPA were MoneyLion shares, admits instead that the shares that were issued were shares of MoneyLion Inc., and respectfully refers the Court to the RSAs for their complete and accurate content and context.

32.     MoneyLion denies the allegations set forth in Paragraph 32.

33.     MoneyLion denies the allegations set forth in Paragraph 33.

34.     MoneyLion denies that allegation set forth in Paragraph 34 that the additional shares contemplated by the MIPA were MoneyLion shares, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

35.     MoneyLion denies the allegations set forth in Paragraph 35, except admits only that  MoneyLion was wrongfully induced to deliver the 2021 Earnout Payment to the Seller Members on or about March 31, 2022 based upon materially false and inaccurate information supplied by Plaintiffs, including financial information, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

36.     MoneyLion denies the allegations set forth in Paragraph 36, except admits only that the Plaintiffs executed additional Restricted Stock Agreements dated March 28, 2022 (the "2021 Earnout RSAs") and respectfully refers the Court to the 2021 Earnout RSAs for their complete and accurate content and context.

37.     MoneyLion denies the allegations set forth in Paragraph 37, except admits only that the 2021 Earnout RSAs restricted Plaintiffs' voting and transfer rights relating to the MoneyLion Inc. common stock that was wrongly caused to be issued to the Seller Members as a 2021 Earnout Payment, and respectfully refers the Court to the MIPA and the 2021 Earnout RSAs for their complete and accurate content and context.

38.     MoneyLion denies the allegations set forth in Paragraph 38.

39.     MoneyLion denies the allegations set forth in Paragraph 39.

40.     MoneyLion denies the allegations set forth in Paragraph 40, except admits only that the restrictive legend on certain shares of MoneyLion Inc. common stock previously issued to Plaintiffs has not been removed.

41.     MoneyLion denies the allegations set forth in Paragraph 41.

42.     MoneyLion denies the allegations set forth in Paragraph 42, except admits only that certain of the shares of MoneyLion Inc. common stock issued to Plaintiffs remain in the custody of Continental.

43.     MoneyLion denies the allegations set forth in Paragraph 43, and respectfully refers the Court to the MIPA, the RSAs, the 2021 Earnout RSAs, and the RRA for their complete and accurate content and context.

44.     MoneyLion denies the allegations set forth in Paragraph 44.

12483488

45.     MoneyLion denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 45.

46.     MoneyLion denies the allegations set forth in Paragraph 46, except admits only that Plaintiffs' counsel sent a letter dated June 14, 2023 to MoneyLion and Continental.

47.     MoneyLion denies the allegations set forth in Paragraph 47.

48.     MoneyLion denies the allegations set forth in Paragraph 48.

49.     MoneyLion denies the allegations set forth in Paragraph 49, and respectfully refers the Court to the MIPA, the RSAs, the 2021 Earnout RSAs, and the RRA for their complete and accurate content and context.

50.     MoneyLion denies the allegations set forth in Paragraph 50, and to the extent that they consist of legal conclusions, no response is required.

51.     MoneyLion denies the allegations set forth in Paragraph 51, and to the extent that they consist of legal conclusions, no response is required, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

52.     MoneyLion denies the allegations set forth in Paragraph 52 and the accompanying footnotes, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

53.     MoneyLion denies the allegations set forth in Paragraph 53, except admits only that it served a Notice of Delivery of Earnout Statement on April 14, 2023, attached to which as Exhibit A was the 2022 Revenue and EBITDA Statement.

54.     MoneyLion admits the allegations set forth in Paragraph 54.

55.     MoneyLion denies the allegations set forth in Paragraph 55, except admits only that Plaintiffs questioned MoneyLion regarding its financial adjustments, and submitted

12483488

implausible and unfounded objections to the 2022 Earnout Statement, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

56.     MoneyLion denies the allegations set forth in Paragraph 56, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

57.     MoneyLion denies the allegations set forth in Paragraph 57, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

58.     MoneyLion denies the allegations set forth in Paragraph 58, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

59.     MoneyLion denies the allegations set forth in Paragraph 59.

60.     MoneyLion denies the allegations set forth in Paragraph 60.

61.     MoneyLion denies the allegations set forth in Paragraph 61.

62.     MoneyLion denies the allegations set forth in Paragraph 62, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

63.     MoneyLion denies the allegations set forth in Paragraph 63.

64.     MoneyLion denies the allegations set forth in Paragraph 64, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

65.     MoneyLion denies the allegations set forth in Paragraph 65.

66.     MoneyLion denies the allegations set forth in Paragraph 66, except admits that the Plaintiffs' 2022 Earnout Statement Objections were delivered to MoneyLion on May 25, 2023 after which MoneyLion, in good faith, engaged in continued negotiations with the Plaintiffs and their representatives in accordance with the terms of the MIPA.

12483488

67.     MoneyLion denies the allegations set forth in Paragraph 67, except admits only that Plaintiffs and MoneyLion discussed the terms of a potential engagement of an Independent Accountant.

68.     MoneyLion admits the allegations set forth in Paragraph 68.

69.     MoneyLion denies the allegations set forth in Paragraph 69.

70.     MoneyLion denies the allegations set forth in Paragraph 70, except admits that the dispute resolution process set forth in Section 2.06(b)(iv) of the MIPA does not apply to matters involving factual disputes and critical questions of contract interpretation, and respectfully refers the Court to the MIPA and the parties' correspondence for its complete and accurate content and context.

71.     MoneyLion denies the allegations set forth in Paragraph 71.

72.     MoneyLion denies the allegations set forth in Paragraph 72, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

73.     MoneyLion denies the allegations set forth in Paragraph 73.

74.     MoneyLion denies the allegations set forth in Paragraph 74, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

75.     MoneyLion repeats and realleges its responses to Paragraphs 51 through 63, as though fully set forth herein, denies the allegations set forth in Paragraph 75, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

76.     MoneyLion denies the allegations set forth in Paragraph 76.

77.     MoneyLion denies the allegations set forth in Paragraph 77.

78.     MoneyLion denies the allegations set forth in Paragraph 78, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

12483488

79.     MoneyLion denies the allegations set forth in Paragraph 79, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

80.     MoneyLion denies the allegations set forth in Paragraph 80, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

81.     MoneyLion denies the allegations set forth in Paragraph 81.

82.     MoneyLion denies the allegations set forth in Paragraph 82 and respectfully refers the Court to the MIPA for its complete and accurate content and context.

### FIRST CAUSE OF ACTION
### (Breach Of Contract Against MoneyLion)
### (Vested Shares)

83.     MoneyLion repeats and realleges its responses to Paragraphs 1 through 82, as though fully set forth herein.

84.     The allegations set forth in Paragraph 84 consist solely of legal conclusions to which no response is required.  To the extent a response is required, MoneyLion denies the allegations set forth in this Paragraph, except admits that Plaintiffs and MoneyLion are parties to the MIPA, and respectfully refers the Court to the MIPA, the RSAs, and the RRA for their complete and accurate content and context.

85.     MoneyLion denies the allegations set forth in Paragraph 85.

86.     MoneyLion denies the allegations set forth in Paragraph 86, and each of its subparts.

87.     MoneyLion denies the allegations set forth in Paragraph 87.

88.     MoneyLion denies the allegations set forth in Paragraph 88, except admits only that shares of MoneyLion Inc. common stock are publicly traded.

89.     MoneyLion denies the allegations set forth in Paragraph 89.

12483488

**SECOND CAUSE OF ACTION**
**(Injunctive Relief Against Defendants)**
**(Vested Shares)**

90.     MoneyLion repeats and realleges its responses to Paragraphs 1 through 89, as though fully set forth herein.

91.     MoneyLion denies the allegations set forth in Paragraph 91.

92.     MoneyLion denies the allegations set forth in Paragraph 92.

93.     MoneyLion denies the allegations set forth in Paragraph 93.

94.     MoneyLion denies the allegations set forth in Paragraph 94.

95.     MoneyLion denies the allegations set forth in Paragraph 95.

**THIRD CAUSE OF ACTION**
**(Breach of Contract Against MoneyLion)**
**(2022 Earnout Payment)**

96.     MoneyLion repeats and realleges its responses to Paragraphs 1 through 95, as though fully set forth herein.

97.     The allegations set forth in Paragraph 97 consist solely of legal conclusions to which no response is required.  To the extent a response is required, MoneyLion denies the allegations set forth in this Paragraph, except admits that Plaintiffs and MoneyLion are parties to the MIPA, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

98.     MoneyLion denies the allegations set forth in Paragraph 98.

99.     MoneyLion denies the allegations set forth in Paragraph 99.

100.    MoneyLion denies the allegations set forth in Paragraph 100.

101.    MoneyLion denies the allegations set forth in Paragraph 101.

**FOURTH CAUSE OF ACTION**

12483488

**(Alternatively, Specific Performance Against MoneyLion)**
**(2022 Earnout Payment)**

102.    MoneyLion repeats and realleges its responses to Paragraphs 1 through 101, as though fully set forth herein.

103.    The allegations set forth in Paragraph 103 consist solely of legal conclusions to which no response is required.  To the extent a response is required, MoneyLion denies the allegations set forth in this Paragraph, except admits that Plaintiffs and MoneyLion are parties to the MIPA, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

104.    MoneyLion denies the allegations set forth in Paragraph 104.

105.    MoneyLion denies the allegations set forth in Paragraph 105, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

106.    MoneyLion denies the allegations set forth in Paragraph 106.

107.    The allegations set forth in Paragraph 107 consist solely of legal conclusions to which no response is required.  To the extent a response is required, MoneyLion denies the allegations set forth in this Paragraph.

108.    MoneyLion admits the allegations set forth in Paragraph 108, but deny that Plaintiffs are entitled to any relief thereunder, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

109.    The allegations set forth in Paragraph 109 consist solely of legal conclusions to which no response is required.  To the extent a response is required, MoneyLion denies the allegations set forth in this Paragraph.

12483488

110.    The allegations set forth in Paragraph 110 consist solely of legal conclusions to which no response is required.  To the extent a response is required, MoneyLion denies the allegations set forth in this Paragraph.

## FIFTH CAUSE OF ACTION
### (Indemnification Against MoneyLion)

111.    MoneyLion repeats and realleges its responses to Paragraphs 1 through 110, as though fully set forth herein.

112.    MoneyLion denies the allegations set forth in Paragraph 112, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

113.    MoneyLion denies the allegations set forth in Paragraph 113, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

114.    MoneyLion denies the allegations set forth in Paragraph 114, and respectfully refers the Court to the MIPA for its complete and accurate content and context.

115.    MoneyLion denies the allegations set forth in Paragraph 115.

## FACTS RELEVANT TO MONEYLION'S
## AFFIRMATIVE  DEFENSES, AMENDED COUNTERCLAIMS, AND
## THIRD PARTY COMPLAINT

1.    Defendant and Counterclaim Plaintiff MoneyLion Technologies Inc. ("MLTI") and Third-Party Plaintiff MoneyLion Inc. ("MLI" and together with MLTI, "MoneyLion"),  by their attorneys, Kleinberg, Kaplan, Wolff & Cohen, P.C., as and for their Amended Answer, Affirmative Defenses and Counterclaims and Third-Party Claims against Plaintiffs Jeffrey Frommer, Lyusen (Louis) Krubich, Daniel Fried and Pat Capra (the "Seller Members"), allege as follows:

**NATURE OF THE ACTION**

2.      The Seller Members are professional storytellers.  Unfortunately, the story they told MoneyLion of Malka Media Group LLC's ("Malka") strong financial condition~~, the Seller Members'~~ and profitability, their careful stewardship of the Malka business, and their desire to partner with MoneyLion in delivering much-needed financial services to millions of Americans ~~is one riddled with~~was a fiction belied by their fraud, deception and self-dealing.  When the Seller Members' continuing misdeeds ~~recently~~came to light after MLTI's acquisition of Malka, MoneyLion terminated the employment of the Seller Members for cause and issued a stop order on restricted stock previously issued to ~~the Seller Members~~them to protect the interests of MoneyLion and its ~~other~~stakeholders, including ~~its~~public shareholders.

3.      In 2021, the Seller Members ~~sold Malka to MoneyLion.  They~~were handsomely compensated~~,~~ for selling Malka to MoneyLion, receiving $10 million of cash and shares of MoneyLion Inc. common stock worth tens of millions of dollars.  In the spirit of this newly forged partnership, MoneyLion ~~placed~~permitted the Seller Members to remain in senior leadership ~~and executive~~ positions at Malka ~~and~~, while also taking on senior executive positions at MoneyLion, providing them with seats at the table to assist in directing MoneyLion's company strategy and business operations.

4.      All the while, the Seller Members ~~had ulterior motives.  They~~were scheming to line their pockets at MoneyLion's expense while concealing the unprofitability of Malka's business.  As MoneyLion has recently unearthed, the Seller Members engaged in fraud ~~even~~ before the acquisition by materially misrepresenting Malka's financial condition and financial practices during due diligence, and materially misrepresenting Malka's financials in the parties' acquisition agreement.  This deceit continued even post-acquisition, as the Seller Members

manipulated Malka's finances to their own benefit, disregarding grossly abused the trust placed in them as the senior management of Malka and newly-anointed members of MoneyLion's Executive Committee by presenting financial reporting to MoneyLion that was grossly exaggerated and untrue, in complete disregard of their fiduciary obligations and the terms of the agreement they had struck and presenting financial information to MoneyLion that was grossly exaggerated and untrue.  When all else failed, the Seller Members fabricated financial practices to claimed to be entitled to rely on undefined, unstated "historical" accounting principles to distort Malka's financial performance metrics and advance their self-interested goal of receiving millions more in MoneyLion equity.

5.      In reliance on these the Seller Members' material misrepresentations about Malka's accounting practices and its actual performance, MoneyLion overpaid for Malka and issued the Seller Members common stock that they had no right to—both at the closing of the acquisition and subsequently as part of a $10 million 2021 earnout payment.  And the Seller Members seek to use these fraudulent misrepresentations to secure a $25 million earnout payment for 2022 that they also have not earned at the end of 2021.

6.      If their financial manipulation deceit were not enough, the Seller Members also further abused their positions as corporate fiduciaries, by misappropriating hundreds of thousands of dollars in company funds to fuel their lavish lifestyle lifestyles and obtain benefits to which they were not entitled.

7.      Shortly after the Seller Members' employment was terminated for cause and the Seller Members were explicitly told that their MoneyLion and Malka office access was revoked, one of the Seller Members burglarized Malka's Santa Monica offices, brazenly removing electronics and other materials belonging to MoneyLion, as captured on security camera footage.

16

8.   7. Now, in a their most striking act of hubris, the Seller Members ask this Court to help perpetuate them bring their fraudulent scheme. to fruition and reward them for their bad conduct.  The Seller Members seek to have the Court bless their fraudulent misrepresentations and award them a $25 million "earnout" payment for 2022 that they clearly have not earned in light of Malka's negative EBITDA of almost $3 million for that year.

9.   8. The Seller Members' claims against MoneyLion lack merit are meritless.  Their Amended Complaint, haphazard and devoid of any connection to legal and factual realities, should be viewed for what it is: a pretext for extracting tens of millions of dollars from MoneyLion that to which they are not entitled to, while obfuscating or simply ignoring their own well-documented misconduct.[1]

10.   9. As a result, MoneyLion is entitled to declaratory judgment, compensatory damages or rescission, an order invalidating the restricted shares of MoneyLion Inc. common stock issued to the Seller Members at the closing and in connection with the 2021 earnout, reasonable costs and expenses incurred in this action, and such other relief as this Court may deem just and proper.

**THE PARTIES**

11.   10. Counterclaim-Plaintiff MLTI is a Delaware corporation with a principal place of business located at 30 West 21st Street, Ninth Floor, New York, New York 10010.

12.   11. Third-Party Plaintiff MLI is a Delaware corporation with a principal place of business located at 30 West 21st Street, Ninth Floor, New York, New York 10010.[2]

---

[1] MoneyLion's investigation of the Seller Members' wrongful acts is continuing, and MoneyLion reserves the right to seek leave to amend and supplement this pleading with additional allegations regarding their wrongdoing at the appropriate time.
[2] MLI and MLTI are collectively referred to herein as "MoneyLion."

13.   12. Upon information and belief, Counterclaim-Defendant Frommer is a natural person who is a citizen and resident of the State of New Jersey.

14.   13. Upon information and belief, Counterclaim-Defendant Krubich is a natural person who is a citizen and resident of the State of California.

15.   14. Upon information and belief, Counterclaim-Defendant Fried is a natural person who is a citizen and resident of the State of California.

16.   15. Upon information and belief, Counterclaim-Defendant Capra is a natural person who is a citizen and resident of the State of New Jersey.[23]

## JURISDICTION AND VENUE

17.   16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

18.   17. The Seller Members have waived any and all objections to personal jurisdiction and venue in the Southern District of New York by having commenced suit here.

19.   18. Furthermore, the Seller Members have consented to personal jurisdiction and venue in this Court.  Section 5.4 of the Registration Rights Agreement dated November 15, 2021, entered into by and among MLI and the Seller Members (the "RRA") provides that "[a]ny legal suit, action or proceeding arising out of or based upon [the RRA] or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of New York in each case located in the city of New York, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding."

---

[23] The Counterclaim-Defendants are collectively referred to herein as the "Seller Members."

20.   ~~19.~~ In addition, venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions giving rise to the claims occurred in New York, and in that both Counterclaim-Plaintiffs and the Seller Members are subject to this Court's personal jurisdiction and the Seller Members have consented to venue in this Court.

**FACTS RELEVANT TO AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**

**A.**   **Historical Relationship Among the Parties**

21.   ~~20.~~ MoneyLion is a leading provider of consumer financial products and services~~, with a mission to deliver~~. It delivers financial access, education~~,~~ and empowerment to ~~the~~ millions of consumers who have been left behind by traditional financial institutions. MoneyLion's offerings include a core suite of innovative first-party financial services, along with third-party products and offers available through its consumer financial marketplace.

22.   ~~21.~~ MoneyLion also offers creative media and marketing services to clients across industries through its media division, Malka, a wholly owned subsidiary of MLTI, ~~and leverages~~leveraging these same creative resources to ~~produce and deliver~~provide engaging and dynamic content to consumers in support of MoneyLion's product and service offerings.  Malka works with brands and businesses to develop original content, advertising campaigns, films, graphic design, and livestream productions.  Malka's subsidiary, Malka Sports LLC, is a hybrid sports management and creative content agency.  Until November 15, 2021, Malka was owned and operated by the Seller Members.

23.   ~~22.~~ The relationship between MoneyLion and Malka began in August 2018, when MoneyLion engaged Malka to provide marketing services for its financial services offerings.

19

12483488

24.    23. In September 2021, MLI completed its business combination with Fusion Acquisition Corp. and became a publicly listed company, with MLI common stock and public warrants trading on the New York Stock Exchange. During this time, the Seller Members—who together owned all outstanding membership interests in Malka—made it known to informed MoneyLion that they were exploring a transaction that would result in Malka being acquired. MoneyLion, in turn, had an interest in bolstering its content creation and marketing capabilities in order to better promote and develop to enhance its position as the go-to destination for consumer financial products and services and marketplace solutions. The potential acquisition of Malka seemed like an ideal way to strategically incorporate those capabilities into MoneyLion's business.

## B.    Acquisition of MALKA and the Seller Members' Material Misrepresentations Made During Due Diligence

25.    24. To structure the Malka acquisition and determine a purchase price for the deal, MoneyLion and its advisors reasonably relied upon financial and other information provided by the Seller Members and their advisors, including. That information included the Seller Members' express representations that Malka had historically operated in accordance with the requirements of both U.S. generally accepted accounting principles ("GAAP") and Accounting Standards Codification 606 ("ASC 606").[3][4] Unfortunately for MoneyLion and its shareholders, these those representations turned out to be entirely false, inducing MoneyLion to pay an amount above the more than fair value of Malka in order to acquire the company Malka.

---

[3] [4] ASC 606 is the most recent guidance from the Financial Accounting Standard Board with respect to proper revenue recognition under GAAP. ASC 606 provides a comprehensive, industry-neutral model for recognizing revenue from contracts with customers and emphasizes the importance of accurately reflecting the amount and timing of revenue recognition to provide more useful and comparable financial information. Because any reliable evaluation of a business's EBITDA is driven in large part by revenues, the Seller Members' assurances that Malka was compliant with ASC 606 revenue recognition requirements were of critical importance in determining a fair purchase price for the Seller Members' interests in Malka.

~~25. After the parties first met to discuss a potential acquisition in the summer of 2021, the Seller Members  particularly Frommer and Krubich  pressed to close MoneyLion's acquisition of Malka as quickly as possible.  But MoneyLion insisted on taking appropriate time and measures to conduct formal due diligence and to ensure that the acquisition was appropriately structured and vetted.  As part of the acquisition negotiation process, MoneyLion engaged a well-known and established accounting advisory firm and legal counsel to spearhead MoneyLion's financial, accounting, tax and legal due diligence of Malka.~~

26.     In negotiating the purchase price for the acquisition, the Seller Members based the value of the Malka business upon multiples of the company's projected EBITDA and revenues estimates for 2021.  The Seller Members proposed multiples of ten to twelve times projected 2021 EBITDA for the Creative Studio portion of the business, and four to six times projected 2021 revenue for the Entertainment portion of the business, —for a combined valuation of $75 million.

27.     The Seller Members were undeniably motivated to overstate Malka's historical and projected financial performance, in terms of revenues and expenses, because these metrics were directly related to the purchase price that they would receive, not only upon closing of the MoneyLion acquisition, but also with respect to "earnout" payments to be earned based upon Malka's continuing revenues and EBITDA for 2021 and 2022.  Unbeknownst to MoneyLion and its diligence team as the acquisition progressed, the Seller Members had knowingly misstated and omitted key facts about Malka's financial performance to MoneyLion and its advisors.

~~27. As is typical of mergers and acquisitions transactions, as part of the pre-closing diligence and deal negotiation process, MoneyLion and its advisors reviewed numerous legal, financial and other documents ~~regarding Malka~~ provided by the Seller Members and other~~

Malka personnel.  This included Malka's historical reviewed financial statements for the years ending December 31, 2019 and December 31, 2020 (the "2019 and 2020 Financial Statements").  MoneyLion and its finance and legal teams and external advisors (including its accounting advisory firm) also participated in numerous conference calls with Frommer, Malka's then-President, and Ryan Curran of Curran & Company LLP ("Curran & Co."), Malka's external accountant that had prepared the 2019 and 2020 Financial Statements.

28.  MoneyLion's accounting advisory firm used the information gathered in these calls, analyses, and reviews to prepare a quality of earnings analysis of Malka and present key findings to MoneyLion, consisting of a net working capital analysis, a debt and debt-like items analysis, and a proof of cash analysis.  MoneyLion's accounting advisory firm also presented MoneyLion with tax due diligence considerations, an income statement analysis, and a balance sheet analysis.

29. MoneyLion's accounting advisory firm submitted to MoneyLion a comprehensive financial and tax due diligence report, in which it detailed the results of its various analyses and findings, all of which were based on the Seller Members' representations during the due diligence period.

30. Unbeknownst to MoneyLion and its diligence team, the Seller Members had repeatedly misstated and omitted key facts about Malka to MoneyLion and its advisors throughout the due diligence process.

28.  31. For exampleInitially, the Seller Members prepared and distributed to MoneyLion a Summary Information Memomemorandum and pitch deck presentation ("SIM"), whichthat grossly overstated Malka's growth projections and profit margins.  In the context of negotiating the purchase price for their interests in Malka, the Seller Members

~~projected~~ purported to project the value of the Malka business based upon multiples of the company's ~~purported~~ EBITDA and revenue estimates for 2021, which they represented were ~~supposedly~~ premised upon ~~GAAP-compliant~~ the same accounting principles and practices used by Malka historically, *i.e.*, as represented in its 2019 and 2020 Financial Statements and June 2021 year-to-date financial metrics.   ~~On~~ Based on this false premise, in June 2021 the Seller Members ~~were *projecting* a~~ projected an aggregate $~~4.5~~ 5.4 million EBITDA for the entire business by year-end 2021—in sharp contrast to Malka's *actual GAAP-based EBITDA for 2021,* ~~which MoneyLion later documented in its~~ *of approximately negative $1,245,000,* calculated in accordance with the accounting principles in Schedules A and B to the MIPA (as defined below) and as set forth in MoneyLion's recalculated 2021 Revenue and EBITDA Statement ~~to be approximately **negative $930,000**~~.

29.   ~~32. In the SIM~~ Based upon Malka's historical accounting practices and principles purportedly applied in their financial statements for the prior two years, and as more elaborately presented in the pitch deck, the Seller Members proposed a valuation of $75 million for the Malka business.   That misleading figure, which was based on grossly inflated EBITDA and revenue projections for 2021 ~~and misrepresentations~~ predicated on the false assertion that Malka's financial statements ~~were~~ had been prepared largely in accordance with GAAP, ~~was what led~~ induced MoneyLion to agree to set the overall value of the cash and equity consideration for the acquisition at $75 million, and to propose an acquisition structure where a significant portion of the consideration was tied to revenue- and EBITDA-based earnout targets. MoneyLion required this earnout-based structure to ensure that the Seller Members were held accountable for operating Malka's business in a manner that would compensate them only upon achievement of the financial projections disclosed to MoneyLion in due diligence.   In other

words, the Seller Members agreed that they would not be paid the full amount of consideration if Malka did not meet certain financial hurdles that would ensure that it was profitable on a standalone basis and would not require any cash infusion from MoneyLion.

30.     To obtain their first and largest tranche of compensation and in light of the increasing financial difficulties that Malka faced at the time of closing and failed to disclose to MoneyLion, the Seller Members—particularly Frommer and Krubich—pressed to close MoneyLion's acquisition of Malka as quickly as possible.  But MoneyLion insisted on taking appropriate time and measures to conduct formal due diligence and to ensure that the acquisition was appropriately structured and vetted.  As part of the acquisition negotiation process, MoneyLion engaged a well-known and established accounting advisory firm and legal counsel to spearhead MoneyLion's financial, accounting, tax, and legal due diligence of Malka.

31.     As is typical of mergers and acquisitions transactions, MoneyLion and its advisors reviewed numerous legal, financial and other documents provided by the Seller Members and other Malka personnel as part of the pre-closing diligence and deal negotiation process.  This included Malka's historical financial statements for the years ending December 31, 2019 and December 31, 2020 (the "2019 and 2020 Financial Statements").  MoneyLion and its finance and legal teams and external advisors (including its accounting advisory firm) also participated in numerous conference calls with Frommer, Malka's then-President, and Ryan Curran of Curran & Company LLP ("Curran & Co."), Malka's external accountant that had for years worked closely with Frommer and the other Seller Members to prepare the 2019 and 2020 Financial Statements.

32.     MoneyLion's accounting advisory firm used the information gathered in these calls, analyses, and reviews to prepare a quality of earnings analysis of Malka and present key findings to MoneyLion, consisting of a net working capital analysis, a debt and debt-like items

24

12483488

analysis, and a proof of cash analysis.  MoneyLion's accounting advisory firm also presented MoneyLion with tax due diligence considerations, an income statement analysis, and a balance sheet analysis.

33.    MoneyLion's accounting advisory firm submitted to MoneyLion a comprehensive financial and tax due diligence report, which detailed the results of its various analyses and findings, all of which were based on the Seller Members' representations during the due diligence period, including most significantly the 2019 and 2020 Financial Statements.

34.    33. Further, in its Quality of Earnings Analysisquality of earnings analysis in its financial and tax due diligence report, MoneyLion's accounting advisory firm reported that the Seller Members directly and in concert with Curran & Co., "represented that the Company [Malka] is compliant with ASC 606 revenue recognition requirements," except in certain isolated instances where projects fell behind schedule, but that any impact on revenue recognition as the result of noncompliance with ASC 606 would "be minimal."  Malka and Curran & Co. had made those representations to MoneyLion's accounting advisory firm, but the representations were false, as Malka had never complied with GAAP-based ASC 606 revenue recognition requirements at all.

34. Additional misrepresentations regarding Malka being GAAP-compliant were contained in Malka's reviewed historical financial statements.

35.    In both of theMalka's 2019 and 2020 Financial Statements, contained additional misrepresentations about Malka being GAAP and ASC 606 compliant.  There, the Seller Members as Malka's management, through Curran & Co. represented,  misrepresented that:

> Revenue is *recognized under the accrual basis of accounting and recorded as revenue when work is completed and invoiced to the Company's customers.* The Company's revenue is generated from a combination of project-based purchase orders that have various stages of completion whereby additional

revenue is earned, and standalone billing.  The Company's contracts are generally short-term in nature and are completed in less than one-year.  ***The Company has adopted ASC 606 as of December 31, 2019 [and as of December 31, 2020] regarding accounting for income from contracts and all revenues recognized by the Company for the year then ended are covered through ASC 606. General and administrative expenses are charged to expense as incurred.***

36.    It has since become clear that those representations (later incorporated in the MIPA via Section 3.06 and the Disclosure Schedules, as detailed below) were false. MoneyLion's investigation since November 2021 has determined that Malka never implemented ASC 606 revenue recognition principles into its internal accounting methodology.

37.    ~~36. Curran & Co. concluded in its report and further represented that "based on our review, we are~~ Each of the 2019 and 2020 Financial Statements further represented that based on Curran & Co.'s review—which review in turn was based primarily on "applying analytical procedures to management's financial data and making inquiries of company management"— Curran & Co. was "not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in accordance with accounting principles generally accepted in the United States of America."

~~37. In short, Curran & Co. concluded in its report and further represented that the financial statements were compliant with GAAP.~~

38.    Those representations, as incorporated in the MIPA, also turned out to be false.

39.    These misrepresentations were not isolated statements made by the Seller Members through Curran & Co. in connection with the 2019 and 2020 Financial Statements. Upon information and belief, the statements were made by the Seller Members and included by Curran & Co. to set the stage for a potential acquisition of Malka by making Malka a more appealing target for potential acquirors.  Yet, despite knowing that Malka's 2019 and 2020 Financial Statements contained material misrepresentations about Malka's accounting principles

26

and (by extension) Malka's actual financial performance, the Seller Members never corrected those misstatements in their dealings with MoneyLion.

40.    The Seller Members continued to make deliberate and well-coordinated falsehoods in due diligence and the negotiation process to deceive MoneyLion into believing that Malka's historical financial performance was much stronger than it actually was, assuming its performance had been measured in accordance with the accounting principles stated in its historical financial reporting (*i.e.*, GAAP with immaterial enumerated exceptions.)

41.    38. In addition to misrepresenting that Malka's financial statements were largely GAAP-compliant, the Seller Members made misstatements relating to, knowingly and with the intent to deceive, misstated Malka's gross profit in the 2019 and 2020 Financial Statements and the Malka's interim financial statements for the nine-month period ending on September 30, 2021 (the "2021 Interim Financial Statements.") because Malka's gross profit did not include the substantial cost of employees that were billed to clients to generate revenue. Revenue-generating employees are properly characterized as costs of goods sold, a clearly defined GAAP item, but the Seller Members incorrectly included the cost of revenue-generating employees under general & administrative within operating expenses.  The result was a further misrepresented and materially inflated picture of Malka's profitability.

42.    Based upon the foregoing, each of the Seller Members had actual knowledge of the contents of the 2019 and 2020 Financial Statements, as they participated directly in the creation of those documents and discussed them with MoneyLion at various times. Alternatively, knowledge of the contents of the 2019 and 2020 Financial Statements and 2021 Interim Financial Statements should be imputed to the Seller Members, as Curran & Co.'s review of those financial statements was based primarily on "applying analytical procedures to

27

management's financial data and making inquiries of company management," with the express understanding that "[m]anagement [wa]s responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America."

**C.    The Seller Members Repeat and Continue Their Financial Misrepresentations in the Membership Interest Purchase Agreement**

43.    ~~39.~~ On November 15, 2021, MLTI and the Seller Members entered into the Membership Interest Purchase Agreement (hereinafter referred to as the "MIPA").

44.    ~~40.~~ The MIPA, the terms of which were negotiated with the Seller Members and their advisors, ~~clearly and repeatedly~~ incorporated ~~and emphasized the Seller Members' representations~~ by reference the material misrepresentations in the 2019 and 2020 Financial Statements regarding Malka's historical and ~~going-forward~~ prospective compliance with GAAP and ASC 606, as well as those in the 2021 Interim Financial Statements. As MoneyLion recently learned, ~~this was~~ these representations all were false.

45.    The Seller Members made these representations to MoneyLion in the MIPA knowing full well that they were false and misleading, as evidenced by the fact that Malka ***never*** maintained its financial books and records or prepared its financial statements in accordance with GAAP or ASC 606. The Seller Members' intent to deceive is further evidenced by the facts that: (i) the Seller Members represented their compliance with GAAP to Curran & Co. in connection with its contemporaneous review of Malka's financial statements, intending that MoneyLion or another acquiror eventually would rely upon such representations when Curran & Co.'s work product was reviewed and incorporated into the transaction documents; (ii) Frommer worked closely with Ryan Curran in both the due diligence process and the negotiations with MoneyLion and, together with Curran, represented to MoneyLion and its accounting advisory

28

12483488

firm that Malka "is compliant with ASC 606 revenue recognition requirements"; and ultimately (iii) the Seller Members expressly represented to MoneyLion in the MIPA that if Notes to the 2021 Interim Financial Statement were presented, they "would not differ materially from those presented in the Unaudited Financial Statements"—namely those in the 2019 and 2020 Financial Statements which expressly represent, *inter alia,* that "***all revenues recognized by the Company for the year then ended are covered through ASC 606***."  *See supra* para. 35.

46.   41. The MIPA included several material ~~representations~~misrepresentations upon which MoneyLion reasonably relied concerning Malka's 2019 and 2020 Financial Statements and 2021 Interim Financial Statements, and the company's purported historical GAAP-compliant revenue and cost recognition practices.  These ~~representations~~misrepresentations included, ~~but were not limited to~~most prominently, the representation in Section 3.06 of the MIPA~~, which stated~~ stating that the copies of the 2019 and 2020 Financial Statements~~,~~ which the Seller Members had provided to MoneyLion during due diligence and which were expressly incorporated into the MIPA in the Section 3.06 Disclosure Schedule~~,~~ were "prepared in accordance with the Accounting Principles throughout the period involved" and "fairly present[ed] the financial condition of [Malka] as of the respective dates they were prepared and the results of the operations of [Malka] for the periods indicated."  The Seller Members also represented that the 2021 Interim Financial Statements were subject to the absence of notes ~~but~~ "that, if presented, would not differ materially from those presented in [the 2019 and 2020 Financial Statements]~~."~~— *i.e.*, that the 2021 Interim Financial Statements also were prepared in accordance with GAAP and ASC 606, as the 2019 and 2020 Financial Statements unambiguously stated.

47. 42. The term "Accounting Principles" is defined in Article I of the MIPA as "(a) the principles, policies and procedures expressly set forth on Schedule A; and (b) to the extent not inconsistent with the foregoing, the historical accounting principles, policies and procedures of [Malka]."

48. 43. Malka's so-called "historical accounting principles, policies and procedures" are not defined anywhere in the MIPA, except as narrowly described below., and as may be gleaned from the fact that the 2019 and 2020 Financial Statements were purportedly prepared in accordance with GAAP during periods in which the Company represented it had "adopted ASC 606."

49. 44. Schedule A to the MIPA, entitled Accounting Principles, states in relevant part as relevant here:

**Accounting Principles**

(a) The [2019 and 2020] Financial Statements, Estimated Statements and the Final Statements *shall be prepared in accordance with U.S. GAAP*, except as follows:

    a. [Malka]'s historical revenue recognition principles, which require [Malka] to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained;

    b. [Malka]'s historical cost recognition principles associated with such revenue, which require [Malka] to recognize costs on contracts as incurred;

    c. invoiced expenses are recognized in related period based on receipt of the invoice (i.e., if [Malka] receives an invoice in October, it is entered in October and shows as an October expense, even if cash is not paid out until 30 or 60 days from the date of receipt; this applies to contracted costs, variable costs, and overhead) . . . .

50. 45. Schedule B to the MIPA, entitled *Revenue and EBITDA Calculation Principles*, includes definitions of both Revenue and EBITDA which incorporate the terms of Schedule A.

51. ~~46.~~ "Revenue" is defined in Schedule B, with certain enumerated adjustments, as:

revenue recognized according to [Malka]'s historical revenue recognition principles for the combined and consolidated [Malka]. By way of illustration, [Malka]'s historical revenue recognition principles require [Malka] to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained [**_precisely as defined in Schedule A_**]. . . .

52. ~~47.~~ "EBITDA" is expressly defined in Schedule B, with certain enumerated adjustments, as:

the combined and consolidated net income before interest expense, federal, state and local taxes, depreciation and amortization of [MLTI], **_determined in accordance with U.S. GAAP_** (including [Malka]'s historical revenue and cost recognition principles) as reviewed or audited by [MLTI]'s independent accountants. . . .

53. ~~48.~~ Consistent with the documents and representations made to MoneyLion during the due diligence process, ~~the above-referenced~~these provisions of the MIPA unambiguously confirmed that Malka's historic accounting principles applied in the preparation of the 2019 and 2020 Financial Statements ~~historically had complied with~~were GAAP compliant, subject only to the particularized exceptions specifically set forth in Schedules A and B of the MIPA, none of which was expected to materially affect the valuation of Malka.

54. ~~49.~~ Additionally, the MIPA's extensive references to GAAP, coupled with the Seller Members' express assurances during due diligence and representations that the 2019 and 2020 Financial Statements and 2021 Interim Financial Statements were prepared in accordance with GAAP (again, subject to limited enumerated exceptions), confirmed that recognition of GAAP and ASC 606 was the starting point for valuing Malka and determining the purchase price, for understanding Malka's historical "Accounting Principles," and for any calculation of Earnout Payments that might be due to the Seller Members under the terms of the MIPA.

31

55.   50. In determining what MoneyLion reasonably believed to be a fair and reasonable purchase price for the Seller Members' interests in Malka, and in committing to issue additional shares ("Earnout Shares") to each of them the Seller Members based upon the future performance of Malka, MoneyLion relied upon the Seller Members' clear and unequivocal representations that Malka's 2019 and 2020 Financial Statements and 2021 Interim Financial Statements were GAAP and ASC 606 compliant, and that the required EBITDA calculation would be "determined in accordance with U.S. GAAP." On this basis, MLTI MoneyLion agreed to purchase all outstanding membership interests in Malka in exchange for a closing cash payment of approximately $10,000,000 and MLI shares of common stock equal to an aggregate value of $30,000,000 (the "Closing Shares" and, together with the closing cash payment, the "Closing Payment").

56.   In the context of negotiating the purchase price for their interests in Malka, the Seller Members projected the value of the Malka business based upon multiples of the company's projected EBITDA and revenue for 2021, which were premised upon the purportedly GAAP-compliant Financial Statements for 2019 and 2020 and Interim Financial Statements for 2021. On this basis, the Seller Members were projecting a $5.4 million EBITDA for 2021—in sharp contrast to Malka's *actual GAAP-based EBITDA for 2021 of approximately negative $1,245,000*, calculated in accordance with the accounting principles in Schedules A and B to the MIPA and as set forth in MoneyLion's recalculated 2021 Revenue and EBITDA Statement.

57.   MoneyLion estimates, upon information and belief based upon its own analysis, that a correct calculation of EBITDA, applying the GAAP-based terms and formulae set forth in the MIPA and in Schedules A and B thereto, would have resulted in materially lower, or even negative, EBITDA and revenue figures for the years ended December 31, 2019 and December

32

31, 2020, which in turn would have resulted in a materially lower purchase price for the Seller Members' membership interests in Malka.  Instead, MoneyLion was fraudulently induced to agree to an artificially inflated purchase price of $75 million.

58.  Had MoneyLion known that the Seller Members were misrepresenting Malka's gross profit and Malka's compliance with GAAP and ASC 606, it would not have agreed to the acquisition of Malka in the first instance, or (if it had agreed) it would have insisted upon structuring the deal to pay (a) a lower total amount of consideration; and (b) a lower amount of cash consideration up front, with the consideration paid to Seller Members being more heavily weighted towards the achievement of the earnout targets for 2021 and 2022.

59.  51. TheInstead, $10,000,000 ofin cash consideration was paid in full at the closing of the acquisition on November 15, 2021.  In addition, approximately $20,000,000 in value of the Closing Shares was issued on the November 15, 2021 closing date, subject to a vesting schedule and the terms of the RSAs entered into on November 15, 2021, between each Seller Member and MLI, in a form substantially identical to Exhibit C attached to the MIPA, and a Registration Rights Agreement entered into on November 15, 2021, between the Seller Members and MLI, in a form substantially identical to Exhibit D attached to the MIPA.  Pursuant to a make-whole provision in Section 3.06(e) of the MIPA, the remaining value of the Closing Shares was issued to the Seller Members over a one-year period following the closing date.  Each issuance was subject to the same vesting schedule and the terms of the Restricted Stock Agreements between MoneyLion Inc. and each of the Seller Members (the "RSAs") entered into between each Seller Member and MLI at the time of each issuance.[5]

---

[5] Pursuant to a make-whole provision in Section 2.06(e) of the MIPA, the remaining value of the Closing Shares was issued to the Seller Members over a one-year period following the closing date.  Each issuance was subject to the same vesting schedule and the terms of the Restricted Stock Agreements between MoneyLion Inc. and each of the Seller Members (the "RSAs") entered into between each Seller Member and MLI at the time of each issuance.

60.    ~~52.~~ As additional consideration, MLTI agreed to remit to the Seller Members an "Earnout Payment" for calendar years 2021 and 2022, subject to the conditions set forth in Section 2.06 of the MIPA, including the requirements that Malka meet certain revenue and EBITDA thresholds during those years.  The amounts used to determine if the Seller Members were to be eligible to receive an Earnout Payment in either year were to be calculated in accordance with the GAAP-based Accounting Principles set forth in Schedule A to the MIPA and the GAAP-based Revenue and EBITDA definitions in Schedule B of the MIPA.

61.    ~~53.~~ Specifically, Section 2.06(b)(v)(A) of the MIPA provided that if Malka satisfied a revenue threshold of $16,750,000 and an EBITDA threshold of $100,000 for 2021, the Seller Members would be entitled to a portion of the earnout payment for 2021 (the "2021 Earnout Payment") equal to $6,700,000 in restricted shares of MLI common stock (the "2021 Earnout Shares," and together with the Closing Shares, the "Restricted Shares").

62.    ~~54.  In the event~~ If Malka exceeded $16,750,000 in revenue and satisfied its EBITDA requirement for 2021, and proportionate to its achievement of up to $25,000,000 in revenue for 2021, Section 2.06(b)(v)(A) of the MIPA provided that the 2021 Earnout Payment would increase on a linear basis up to a number of restricted shares of MLI common stock equal to an aggregate value of $10,000,000.

63.    ~~55.~~ Section 2.06(b)(v)(A) of the MIPA further provided that these restricted shares of MLI common stock would vest in four equal installments on March 31, 2022, June 30, 2022, September 30, 2022, and December 31, 2022.

64.    ~~56.~~ Finally, and critically, Section 2.06(b)(v)(A) of the MIPA provided that if the 2021 revenue amount were less than $16,750,000 *or* the 2021 EBITDA amount were less than

$100,000, no Seller Member would be entitled to receive, and MLTI would not be obligated to pay or cause MLI to issue, any corresponding portion of the 2021 Earnout Payment.

65.   57. For the 2022 Earnout, Section 2.06(b)(v)(B) of the MIPA similarly provided that if Malka satisfied a revenue threshold of $21,100,000 and an EBITDA threshold of $100,000 for 2022, the Seller Members would be entitled to a portion of the 2022 Earnout Payment equal to $16,750,000 in restricted shares of MLI common stock (the "2022 Earnout Shares").

66.   58. In the event Malka exceeded $21,100,000 in revenue and satisfied its EBITDA requirement for 2022, and proportionate to its achievement of up to $30,000,000 in revenue for 2022, Section 2.06(b)(v)(B) of the MIPA provided that the 2022 Earnout Payment would increase on a linear basis up to a number of restricted shares of MLI common stock equal to an aggregate value of $25,000,000.

67.   59. Section 2.06(b)(v)(B) of the MIPA further provided that these restricted shares of MLI common stock would vest in four (4) equal installments on March 31, 2023, June 30, 2023, September 30, 2023, and December 31, 2023.

68.   60. Finally, Section 2.06(b)(v)(B) also provided that if the 2022 revenue amount were less than $21,100,000 *or* the 2022 EBITDA amount were less than $100,000, no Seller Member would be entitled to receive, and MLTI would not be obligated to pay or cause MLI to issue, any corresponding portion of the 2022 Earnout Payment.

61. The Closing Shares, the 2021 Earnout Shares and the 2022 Earnout Shares (if issued, in the case of the Earnout Shares) were all subject to a make-whole right under Section 2.06(e) of the MIPA, pursuant to which a portion of the relevant shares was issued upfront and the remaining portion would be issued on a quarterly basis over the subsequent one-year

~~period.  With respect to the 2021 Earnout Payment, approximately $5,400,000 in value of the 2021 Earnout Shares was issued on or about March 31, 2022, with the remaining value of the 2021 Earnout Shares issued over a one-year period following such date.~~

69.    ~~62.~~ The overall purchase price for the Seller Members' outstanding interests in Malka, as well as the process for measuring Malka's post-Closing profitability—including the calculations of revenue and EBITDA to determine Earnout Payments in 2021 and 2022—~~was~~were predicated upon the ~~representations~~material misrepresentations made by the Seller Members ~~and their external accountants~~ during due diligence and in the MIPA itself with regard to Malka's historical compliance with GAAP and ASC 606.  MoneyLion has now learned that at no point had Malka complied with either GAAP or ASC 606 as an accounting practice, either historically or in connection with the 2019 and 2020 Financial Statements and 2021 Interim Financial Statements.

70.    ~~63.~~ MoneyLion has also learned that the so-called "historical practices" of Malka, to the extent described in the MIPA and in Malka's 2019 and 2020 Financial Statements, were not as expressly represented in either the MIPA or the ~~financial statements~~2019 and 2020 Financial Statements or the 2021 Interim Financial Statements.

71.    ~~64.~~ In fact, Malka did not follow any "historical practices" at all and had no consistent system with regard to revenue and cost recognition, and its so-called "historical principles" evolved over time as the Seller Members devised new ways to falsely increase their revenue recognition and decrease their cost recognition in order to artificially manipulate the Earnout Payment calculations.  They did this ~~such as by~~by, among other things, repeatedly invoicing projects for larger amounts than required, or invoicing large amounts upfront in order to misleadingly increase revenue recognition within ~~any~~a particular calendar year.

36

72.   65. By way ofFor example, MoneyLion has discovered that the narrow exceptions from GAAP reporting in both the Schedule A *Accounting Principles* and the Schedule B definition of "Revenue" for "noncancelable deposits on contracts, most of which are short-term in nature (3 months or less)" significantly misrepresented Malka's historicalactual practices, as. In reality, Malka rarely entered into written client contracts and *never* took the position with clients that they were obligated to make "noncancelable deposits on contracts."  In stark contrast, Malka almost always recognized revenue immediately upon invoicing, and not "as milestones are attained" as it later represented in Schedules A and B to the MIPA.

73.   66. On November 16, 2021, MoneyLion announced that it had acquired Malka and stated that following the acquisition, Malka would continue to operate independently. Krubich (Malka's Founder and CEO) and Frommer (Malka's Co-Founder and President) continued to lead Malka's day-to-day operations alongside Capra and Fried.

67. Immediately after the Closing, Frommer, Krubich, and Fried began serving as active members of MoneyLion's Executive Committee, in addition to their senior executive roles in Malka's continuing operations, while Capra remained as President of Malka Sports LLC.  Additionally, Frommer was appointed MoneyLion's Chief Content Officer in April 2022.

74.   68. Unaware that the Seller Members' goals were focused entirely on short-term personal profit, MoneyLion's expectation was that the Seller Members would be long-term partners in MoneyLion's business following the acquisition, and was willing to appoint them to MoneyLion's Executive Committee in addition to their continued executive functions with Malka.  MoneyLion was not aware, of course, that the Seller Members' goals were focused entirely on short-term personal profitand Disclosure Committee.

37

75.     In addition to maintaining their senior executive roles in Malka's continuing operations as a wholly owned subsidiary of MLTI, immediately after the closing Frommer, Krubich, and Fried began serving as active members of MoneyLion's Executive Committee, which included the dozen or so most senior managers at MoneyLion and functions as the managerial-level corporate governance body at MoneyLion.  Frommer and Krubich also were appointed to consecutive terms as Malka's representative on MoneyLion's Disclosure Committee, a corporate governance body that is directly responsible for ensuring that MoneyLion's public disclosures are accurate and complete and fairly present MoneyLion's financial condition.

**D.     MoneyLion Is Wrongly Induced to Issue the 2021 Earnout Payment**

76.     After the acquisition of Malka closed on November 15, 2021, the Seller Members wasted no time in using their newly assumed positions of trust within the MoneyLion organization to their own advantage and to the detriment of MoneyLion and its shareholders. Having already convinced MoneyLion that Malka's historical accounting principles and practices for 2019, 2020, and 2021 through the November 15 closing were GAAP and ASC-606 compliant (subject to specifically enumerated exceptions set forth in the MIPA), they needed only to continue their ruse for the few remaining weeks of 2021 to qualify improperly for the 2021 Earnout Payment.

77.     As detailed below (*see infra* ¶¶ 114-124), MoneyLion recently learned of myriad examples of the Seller Members' fraudulent manipulation of Malka's finances to "satisfy" their EBITDA benchmark in connection with the 2021 Earnout Payment—all or most of which, upon information and belief, took place post-closing after Frommer, Krubich, and Fried assumed their positions on MoneyLion's Executive Committee and Frommer and Krubich assumed positions

on MoneyLion's Disclosure Committee.  The Seller Members' fraudulent manipulation included their wrongful recognition of revenues in 2021, which were either never actually earned or were earned more than a year later, long after the close of that fiscal year, coupled with wrongful deferral of costs actually incurred in 2021, and their fraudulent invoicing of client projects for which Malka had not actually been engaged.

78.     Another example of the Seller Members' stealthy use of their positions of trust after the closing involved their knowingly false representations, upon which MoneyLion reasonably relied, concerning the purportedly recognizable value of $890,904.80 for Malka's 2019 New Jersey Digital Media Tax Credit that Malka had applied for during 2021.  During the parties' negotiations and as reflected in Schedule B of the MIPA, MoneyLion had agreed to add the "expected recognition" of a New Jersey Digital Media Tax Credit to the 2021 or 2022 EBITDA calculation if such recognition occurred "in the period in which the Tax Credit was applied for."  This was a departure from normal EBITDA calculations (which always exclude tax items) that MoneyLion agreed to based upon representations by the Seller Members, and Frommer in particular, concerning the status of these potential credits and Frommer's statement, in no uncertain terms, that the New Jersey Digital Media Tax Credit was "***money good***" and would be approved any day.

79.     MoneyLion was led to believe that Malka had the opportunity to achieve some "expected recognition" of the New Jersey Digital Media Tax Credit applied for during each of the 2021 and 2022 earnout years (*i.e.*, value that could reasonably be ascribed as a contribution to Malka's business performance in that earnout year).  As a result, MoneyLion agreed that if an expected recognition from the Tax Credit application process was achieved during the respective calendar year, then it would be added to EBITDA pursuant to Schedule B of the MIPA for

purposes of that year's Earnout Payment.  After all, the agreement among the parties was to measure the overall Malka business performance during each relevant calendar year measurement period (2021 and 2022, respectively).  Conversely, if no expected recognition was achieved during that relevant calendar year, no amount would be added to EBITDA.

80.    But both before and during MoneyLion's review of Malka's full-year 2021 unaudited financial and accounting records (the "Malka Unaudited 2021 Financial Statement") in late 2021 and early 2022, Frommer, as the Sellers' Representative, continued to represent to MoneyLion that the New Jersey Digital Media Tax Credit was "money good" and went so far as to state, both orally and in writing, that the 2019 Tax Credit was "approved" towards the end of 2021.  On this basis, MoneyLion agreed to, and did, include the "expected" 2019 Tax Credit in the 2021 EBITDA calculation as a good faith accommodation to the Seller Members premised upon Frommer's knowingly false assurances.

81.    In fact, the 2019 Tax Credit was not "money good," certainly not in the amount that was applied for, nor was it even approved in 2021.  In fact, the New Jersey Digital Media Tax Credit for 2019 was not formally approved by the State of New Jersey until May 2023 in an amount materially less than the amount applied for, and MoneyLion has yet to monetize the value of that 2023 asset.  Upon information and belief, Frommer's representations that the 2019 Tax Credit was "money good" and had already been approved in 2021 were premised upon nothing other than his own self-interest in inflating Malka's 2021 EBITDA calculation.[6]

82.    69. Section 2.06 of the MIPA governs the process for issuing an Earnout Payment for 2021 (or 2022).  Following MLTI's receipt of Malka's audited financial statements for 2021

---

[6] MoneyLion has now learned that to date, there are *no previous instances* of anyone having bought or sold a New Jersey Digital Media Tax Credit.

(or 2022), MLTI was required to deliver to Frommer, as Sellers' Representative, a statement setting forth MLTI's calculation of Malka's revenue and EBITDA for the year in question. The MIPA stated that the revenue and EBITDA amounts for 2021 and 2022 would be calculated using substantially consistent methods and practices.

83. 70. The MIPA further provided the Seller Members with an opportunity to review MLTI's calculations and to object by delivering to MLTI "a written statement setting forth [Frommer's] objections in reasonable detail, indicating each disputed item or amount and the basis for [Frommer's] disagreement therewith." In the event the Seller Members objected, the Seller Members and MLTI were required to negotiate in good faith to resolve such dispute within thirty days.

84. 71. Following In accordance with the end of 2021 MIPA, MoneyLion calculated the 2021 Revenue and EBITDA Statement based upon Malka's full-year 2021 unaudited financial and accounting records (the "the Malka Unaudited 2021 Financial Statement") that were was delivered to the MoneyLion finance team in the first quarter of 2022. Since MoneyLion had owned and operated Malka for just only the last six weeks of the year 2021, MoneyLion was not required to conduct an audit of Malka's financial statements for that six-week the period prior to the acquisition as part of MoneyLion's 2021 year-end audit, and it would have been impractical and wasteful for MoneyLion to do so.

85. 72. Again Rather, based upon the Seller Members' express representations that Malka's financials had could be relied upon as having been prepared in accordance with GAAP and ASC 606 as per the company's "historical accounting practices and principles," and based upon the express representation in the MIPA that the Notes to the 2019 and 2020 Financial Statements would also apply to the Interim Financial Statement for the nine months ending

September 30, 2021, MoneyLion reasonably relied upon the Seller Members' prior representations ~~to conclude~~in concluding that the Malka Unaudited 2021 Financial Statement was prepared in a substantially similar manner, (i.e., consistent with GAAP), and accepted as accurate the Seller Members' presentation of Malka's performance and profitability for the purposes of calculating the 2021 Earnout Payment.

86.   ~~73.~~ When the initial determination regarding the Seller Members' achievement of the 2021 Earnout Payment was required to be made pursuant to the MIPA, MoneyLion had no reason to question whether the Malka Unaudited 2021 Financial Statement was ~~prepared in accordance with GAAP, given the clear documentation and representations~~accurate.   Nor did MoneyLion have reason to suspect at the time that the Seller Members ~~made to MoneyLion regarding Malka's accounting principles that had been in place historically during 2019, 2020 and 2021 and reflected in Malka's 2019 and 2020 Financial Statements and in the Interim Financial Statements for 2021.~~ had, over the prior few months, intentionally inflated Malka's revenues and under-reported its expenses in order to falsely inflate Malka's 2021 EBITDA, or that Frommer had knowingly lied about the approval of Malka's New Jersey Digital Media Tax Credit application.

87.   Based on the information provided to it, MLTI's calculations ~~suggested~~indicated that Malka had achieved the revenue and EBITDA thresholds necessary to issue the 2021 Earnout Payment in full.

88.   ~~74.~~ Accordingly, ~~on or about~~around March 31, 2022, MoneyLion issued the first tranche of 2021 Earnout Shares to the Seller Members and then made quarterly issuances for the subsequent year ~~pursuant to the make-whole provision of the MIPA~~.

89.   75. MoneyLion was not aware, at thatthe time, that the Seller Members knew full well that the Malka Unaudited 2021 Financial Statement had not been prepared in accordance with GAAP.  In fact, the Seller Members had completely disregarded GAAP in the Malka Unaudited 2021 Financial Statement, despite GAAP-based financial reporting being an essential element of the Accounting Principles set forth in Schedule A to the MIPA as well as a foundational metric, stated clearly in Schedule B to the MIPA, in determining Revenue and EBITDA in connection with the 2021 Earnout Payment.

90.   Based upon the foregoing, MoneyLion was deceived into accepting as accurate the Seller Members' presentation of Malka's performance and profitability.

76. Another example of the Seller Members' fraudulent representations upon which MoneyLion reasonably relied in issuing the 2021 Earnout Payment involved the represented recognizable value of Malka's 2019 New Jersey Digital Media Tax Credit that Malka had applied for during 2021.  During the parties' negotiations and as reflected in Schedule B to the MIPA, MoneyLion agreed to add the "expected recognition" of a New Jersey Digital Media Tax Credit to the 2021 or 2022 EBITDA calculation if such recognition occurred "in the period in which the Tax Credit was applied for."  This was a departure from normal EBITDA calculations (which always exclude tax items) that MoneyLion agreed to based on representations by the Seller Members about the status of these potential credits.

77. MoneyLion was led to believe that Malka had the opportunity to achieve some "expected recognition" of the New Jersey Digital Media Tax Credit applied for during each of the 2021 and 2022 earnout years, so MoneyLion agreed that if an expected recognition from the Tax Credit application process was achieved during the respective calendar year, then it would be added to EBITDA pursuant to Schedule B of the MIPA for purposes of that year's

Earnout Payment.  After all, the agreement among the parties was to measure the overall Malka business performance during each relevant calendar year measurement period (2021 and 2022, respectively).  Conversely, if no expected recognition was achieved during that relevant calendar year, no amount would be added to EBITDA.

78. However, both before and during MoneyLion's review of the Malka Unaudited 2021 Financial Statement, Frommer, as the Sellers' Representative, represented to MoneyLion in no uncertain terms that the New Jersey Digital Media Tax Credit was "***money good***" and would be approved any day.  On this basis, MoneyLion agreed to, and did, include the "expected" 2019 Tax Credit in the 2021 EBITDA calculation as a good faith accommodation to the Seller Members premised upon Frommer's repeated assurances, orally and in writing, that the 2019 Tax Credit was approved towards the end of 2021.

79. In fact, the 2019 Tax Credit was not "money good," certainly not in the amount that was applied for, nor was it approved in 2021.  In fact, the New Jersey Digital Media Tax Credit for 2019 was not formally approved by the State of New Jersey until May 2023, and MoneyLion has yet to monetize the value of that 2023 asset.

80. As detailed below (*see infra* ¶¶ 102-118), MoneyLion has learned of myriad examples of the Seller Members' fraudulent manipulation of Malka's finances in order to "satisfy" their EBITDA benchmark in connection with the 2021 Earnout Payment.  This included wrongful recognition of revenues in 2021 which were either never actually earned or were earned more than a year later—long after the close of that fiscal year—coupled with wrongful deferral of costs actually incurred in 2021 and fraudulent invoicing of client projects for which Malka was not yet engaged to do work.

81. MoneyLion accepted as accurate the Seller Members' presentation of Malka's

44

~~performance and profitability, as well as their misrepresentations regarding the "money good" character of the New Jersey Digital Media Tax Credit, for purposes of calculating the 2021 Earnout Payment.~~

91.    ~~82.~~ But for the Seller Members' fraudulent use of the grossly distorted non-GAAP Malka Unaudited 2021 Financial Statement, their misrepresentations regarding the approval of the New Jersey Digital Media Tax Credit, and the Seller Members' deceitful manipulation of Malka's 2021 EBITDA by overstating revenues and understating expenses, the 2021 Earnout Payment—including the 2021 Earnout Shares—would never have been issued to any of the Seller Members.    Malka's *actual* GAAP-based EBITDA for 2021, ~~which MoneyLion documented in its~~ calculated in accordance with the accounting principles in Schedules A and B to the MIPA and as set forth in MoneyLion's recalculated 2021 Revenue and EBITDA Statement, turned out to be approximately ***negative $~~930,000~~1,245,000***, far below the positive $100,000 required EBITDA threshold for 2021.

92.    MoneyLion has since confirmed that the representations regarding revenue recognition and compliance with GAAP in the 2019 and 2020 financial statements made by the Seller Members in collaboration with Curran & Co., Malka's external accounting firm, were entirely false.  Contrary to GAAP-based reporting, Malka has historically recognized revenues at the moment that Malka issued customer invoices, regardless of whether any fees were paid in advance or when the work was to be performed by Malka.  This practice clearly is inconsistent with ASC 606, which requires that companies recognize revenue when the services are performed for the customer and earned over time.

93.    Moreover, it is now apparent that the GAAP-based Accounting Principles set forth in Schedule A to the MIPA and the EBITDA formula set forth in Schedule B to the MIPA

45

12483488

(including the specific enumerated exceptions) were entirely incongruous with Malka's *actual* historical accounting principles, as discovered by MoneyLion after the acquisition.

94.     For example, Schedule A states that Malka's historical revenue recognition principles require Malka "to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained," despite the fact that Malka rarely entered into written customer contracts and never received "noncancelable deposits on contracts."  Again, Malka almost always recognized revenue immediately upon invoicing and only rarely, upon a client's request, "as milestones are attained."

95.     Additionally, while Schedule A provided that Malka's "historical cost recognition principles … require [Malka] to recognize costs on contracts as incurred,"  MoneyLion has since determined that Malka had no such practice, and in some instances deferred costs well beyond the date on which they were incurred, artificially inflating Malka's EBITDA figures.

96.     Incongruities such as these between the language of Schedules A and B to the MIPA and Malka's actual historical practices make clear that the Seller Members deliberately negotiated for the inclusion of seemingly innocuous "non-GAAP" adjustments in an effort to deceive MoneyLion about the extent of their deviations from GAAP and ASC 606 and conclude the transaction as quickly as possible, before MoneyLion noticed their ongoing deception and the grossly inflated nature of their accounting figures.  Had MoneyLion known of Malka's actual historical practices, MoneyLion would never have acquired Malka on the terms it did.

**E.     The Seller Members' Post-Closing Misconduct Results in Their Termination ~~of the Seller Members~~**

97.     ~~83.~~ During ~~the course of~~ 2022, Malka's accounting and finance functions were integrated into MoneyLion's finance department, and MoneyLion became more involved in

12483488

overseeing and monitoring Malka's business operations and financial record-keeping and reporting.

98. 84. MoneyLion, as a public company, is required to maintain its accounting system and to report its finances in accordance with GAAP. Beginning in March 2022, MoneyLion held regular monthly finance meetings with several of the Seller Members during which its finance team would review Malka's monthly performance based upon GAAP-driven financials submitted by the Seller Members.

99. 85. It soon became clear to MoneyLion that Malka was not operating profitably. MoneyLion's finance team expressed growing dissatisfaction with Malka's performance during the regular monthly finance meetings and in conversations between MoneyLion's finance team and the Seller Members. During these sessions, MoneyLion personnel were quite vocal about the fact that Malka did not appear to be operating profitably based on GAAP. In fact, MoneyLion's finance team needed to send monthly payments to fund Malka's operations beginning in the first quarter of 2022.

100. 86. Behind the scenes, Frommer was repeatedly asking Malka's Head of Finance for updates on whether Malka was "on track" to meet its revenue and EBITDA Earnout Payment targets under the MIPA, instead of focusing on his added responsibilities as MoneyLion's Chief Content Officer and as a member of MoneyLion's Executive Committee and Disclosure Committee. MoneyLion subsequently learned that this clandestine "tracking" was based on Malka's internal bookkeeping, which was used to record and flag GAAP adjustments made in the official statements and compare them against Malka's historical financial statements based solely on the Seller Members' grossly strained misinterpretation of the MIPA provisions and

47

12483488

~~without verification~~practices (which were not set forth in any written document and could not be verified by MoneyLion or ~~other parties~~its financial consultants).

101. ~~87.~~ Under pressure from Frommer, Malka's Head of Finance proceeded to keep two separate sets of books. Even though Malka officially reported its internal accounting to the MoneyLion finance team in accordance with GAAP, Malka's Head of Finance ~~was nevertheless instructed by the Seller Members to continue~~continued to record all of Malka's accounting and bookkeeping entries separately on Malka's internal bookkeeping system, as Malka had done before the merger transaction closed, ~~and to~~ separately ~~flag~~flagging any adjustments made in accordance with GAAP.  Malka's Head of Finance was led to believe by Frommer that ~~the~~this internal bookkeeping, without any GAAP adjustments, was the proper set of financial records that would be used at year end to calculate Malka's revenues and EBITDA to determine the Seller Members' entitlement to additional Earnout Payments under the MIPA.  Accordingly, Malka continued to separately record financial data in its internal bookkeeping system in the same manner as before the closing of the acquisition, without making any technical adjustments to the accounting system to conform to the requirements of the MIPA.

102. ~~88.~~ In October 2022, almost exactly one year after the acquisition, Malka's Head of Finance informed MoneyLion that he intended to resign his position at Malka and accept another job offer.  Given his familiarity with Malka and its accounting and financial reporting, his ~~solid~~strong performance during his tenure after the acquisition and in an effort to improve transparency and eliminate any problems he had working for the Seller Members, MoneyLion agreed to restructure the reporting obligations of Malka's Head of Finance so that he would report directly to MoneyLion's Chief Accounting Officer.

~~89. Over the next several months, Malka's Head of Finance revealed that it had~~

48

12483488

~~become increasingly difficult for him to manage his legitimate workload.  Malka's Head of Finance already had been overburdened, and following the acquisition he needed to adjust quickly to Malka being an operating subsidiary of a public company, as well as the increased oversight and auditing accompanying such a change, and to working with MoneyLion's larger and more specialized finance team.~~

103. ~~90.~~ Malka's Head of Finance revealed that he was feeling substantial pressure from the Seller Members, particularly Frommer, ~~regarding~~about their use of Malka's funds to pay expenses that Malka's Head of Finance viewed as entirely personal to the Seller Members and not related to Malka's business operations.  The Seller Members ~~did not express any~~had expressed no concern as to whether these transactions were business or personal in nature~~,~~ and, when questioned, they would attempt to characterize these activities as business-related, even when there did not appear to be any legitimate business purpose.  ~~For instance~~Most egregiously, Frommer used a Malka-issued corporate credit card extensively but never submitted an expense report during the entire period of his employment at Malka~~— the result being—~~meaning that every expense he ever charged to his corporate credit card was paid for with Malka's funds, regardless of whether they were personal or business expenses.

104. ~~91.~~ It would soon become evident to MoneyLion that the Seller Members were systematically misappropriating Malka funds for the payment of personal legal and accounting fees and other purely personal expenses, totaling approximately $180,000 between November 2021 and May 2023.  These included ~~substantial~~approximately $140,000 in legal fees incurred in connection with personal legal advice rendered by the Seller Members' attorneys at Fox Rothschild LLP ~~("Fox Rothschild").  MoneyLion later learned that the Seller Members used Malka funds for the payment of approximately $140,000 in invoices for personal legal advice~~

49

12483488

~~unrelated to Malka' business needs~~, as reflected in invoices dated from November 2021 through March 2023.

105. ~~92.~~ In the fourth quarter of 2022, Malka received a ~~batch~~series of invoices from Fox Rothschild that had previously been sent to an incorrect email account, such that many of the invoices already were overdue.  Malka's Finance team reviewed the invoices and flagged for the Seller Members that based on the descriptions of the work performed, many of the invoices appeared to relate to legal services that were personal in nature, including their acquisition consideration, their employment by MoneyLion, and other outside business interests ~~that were invoiced from Fox Rothschild~~.  The Seller Members, fully aware of the personal nature of these invoices, nevertheless ignored the concerns expressed by Malka's Finance team and proceeded to spend Malka's funds ~~in order~~to pay Fox Rothschild.  In doing so, Frommer and Krubich also circumvented the standard invoicing process at Malka with respect to ~~their personal~~ legal expenses, so that Frommer and Krubich directly reviewed and approved the invoices for payment using Malka's funds.

106. ~~93.~~ Additionally, Fried had submitted an invoice for reimbursement dated April 5, 2022 in connection with tax advice received from Malka's ~~purportedly "independent"~~ external accounting firm, Curran & Co., in connection with Fried's personal tax return in March 2022.

107. ~~94.~~ Even more pervasive, however, were the Seller Members' frequent use of Malka funds for payment of expenses that they had charged to their corporate American Express and Chase credit cards for wholly personal activities.

108. ~~95.~~ These personal expenses included~~, but were not limited to,~~ various membership fees, ~~including~~such as for gym subscriptions, family travel expenses, parking and toll expenses, personal meals, and even Frommer's nearly $10,000 personal airfare to travel to

the World Cup in Qatar in late 2022—a trip he had ~~clearly stated~~admitted to MoneyLion's management team was personal in nature~~, not in furtherance of Malka business~~.

109. ~~96.~~ These actions, the full extent of which remain unknown to MoneyLion and will be developed through the course of discovery, constituted not only breaches by the Seller Members of the expense covenant contained in Section 9.01 of the MIPA, but also fraud and misappropriation of corporate assets~~, as the~~. The Seller Members incurred personal expenses and had those expenses paid by Malka, whose finances are ultimately funded through MoneyLion~~.~~, despite knowing that those expenses were not properly reimbursable.  Thus, even after they no longer owned Malka, and even after they were warned that such conduct was improper, the Seller Members continued to use Malka's treasury as their personal piggy-bank.

~~97. As a result of the myriad misdeeds detailed above, on May 19, 2023, the Seller Members were fired for cause and separated from MoneyLion and Malka.~~

~~98. MoneyLion has since confirmed that the representations regarding revenue recognition and compliance with GAAP in the 2019 and 2020 financial statements made by Curran & Co., Malka's supposed "independent" external accounting firm, were entirely false. Contrary to GAAP-based reporting, Malka has historically recognized revenues at the moment that Malka issued customer invoices, regardless of whether any fees were paid in advance or when the work was to be performed by Malka.~~

~~99. This practice clearly is inconsistent with ASC 606, which requires that companies recognize revenue when the services are performed for the customer and earned over time.~~

~~100. Moreover, it is now apparent that the GAAP-based Accounting Principles set forth in Schedule A to the MIPA and the EBITDA formula set forth in Schedule B to the MIPA were entirely incongruous with Malka's actual historical revenue recognition principles,~~

51

12483488

~~as discovered by MoneyLion after the acquisition.~~

~~101.   For example, Schedule A states that Malka's historical revenue recognition principles require Malka "to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained," despite the fact that Malka rarely entered into written customer contracts and never received "noncancelable deposits on contracts."   Again, Malka almost always recognized revenue immediately upon invoicing and only rarely, upon a client's request, "as milestones are attained."~~

**F.     The Seller Members Attempt To ~~Further~~Continue Their Fraud in the 2022 Earnout Process**

110.   ~~102.~~In preparation for 2022 year-end reporting and the 2022 Earnout Payment evaluation process outlined in the MIPA, the MoneyLion finance team took great care to review Malka's financial and accounting reports and its operating books and records as required under the MIPA.  During the year-end audit closing, MoneyLion continued to work on the Malka 2022 Revenue and EBITDA Statement, which could not be finalized until the audit closing procedures were completed.

111.   ~~103.~~On April 14, 2023, MoneyLion completed and delivered to Frommer, as the MIPA-designated Sellers' Representative, the 2022 Revenue and EBITDA Statement in accordance with Section 2.06(b) of the MIPA.

112.   ~~104.~~While the 2022 Revenue and EBITDA Statement reflected that Malka's gross revenues exceeded the required revenue threshold under Section 2.06(b)(v)(A) of the MIPA, Malka's 2022 EBITDA was an approximately ***negative $~~2.8 million~~2,840,000***, well below the positive $100,000 mark required under that section of the MIPA in order for the Seller Members to have earned any 2022 Earnout Payment.

~~105. Shortly thereafter, Malka's Head of Finance informed MoneyLion about certain revenue and cost recognition issues that materially impacted the 2021 EBITDA calculation.~~

113. ~~106. Specifically~~Thereafter, Malka's Head of Finance was asked to review Malka's 2019 and 2020 Financial Statements, at which point he noticed ~~Curran & Co.'s notes to the financial statements~~the Notes to the Financial Statements and was surprised to read that ~~Curran & Co., Malka's independent outside accounting firm,~~the Seller Members had expressly represented in ~~its~~the Report of Malka's 2019 and 2020 Financial Statements that "[r]evenue is recognized under the accrual basis of accounting and recorded as revenue when work is completed and invoiced to [Malka's] customers" and that Malka "has adopted ASC 606 as of December 31, 2019 [and December 31, 2020] regarding accounting for income from contracts and all revenues recognized by the Company for the year then ended are covered through ASC 606." Malka's Head of Finance informed MoneyLion that ~~the~~this foundational representation regarding recognition of revenue under the accrual basis of accounting was simply not true——this was the exception at Malka, not the rule——and that ASC 606 was not Malka's revenue recognition practice in 2020 or 2021.

114. ~~107.~~Malka's Head of Finance confirmed that since at least February 2020—when he first joined Malka—Malka did not record revenues in accordance with GAAP~~,~~ and instead recognized revenues at the time that Malka issued its invoices, regardless of whether or when Malka actually performed services, which in some instances would occur more than a year from the invoice date or not at all.

115. ~~108.~~Malka's Head of Finance also informed MoneyLion of multiple instances where legitimate and substantial expenses were incurred by Malka and were not recognized in the period when incurred, but rather were deferred to the following year, a practice wholly

inconsistent with Malka's general practice of recognizing revenue upon the issuance of invoices. This practice of recognizing revenue upon invoicing had the intended effect of inflating Malka's EBITDA, because the associated expenses for such revenues were not recognized until they were paid at a later date.

116.   109.  Malka's Head of Finance also brought to MoneyLion's attention several instances in which the Seller Members had manipulated the Malka Unaudited 2021 Financial Statement to include, among other things, (i) the receipt of settlement proceeds from previously undisclosed disputes with customers from prior years (the "Receivable Transaction"); (ii) a substantial $400,000 advance payment recognized in 2021 against a series of six-figure invoices for future work, most of which was not performed or earned until well into 2023 (the "Advance Payment Transaction"); and (iii) the recognition of revenues consisting of client payments, the majority of which were earmarked for celebrity endorsements which Malka was obligated to pay out upon receipt but were not ultimately paid until the following calendar year, thereby inflating the revenue amount for the prior calendar year (the "Celebrity Transaction").

117.   110.  First, Malka's Head of Finance informed MoneyLion of the Receivable Transaction.   MoneyLion learned that Malka was carrying a delinquent $336,000 account receivable for one of its customers, which had been recognized as revenue in periods prior to 2021.  In keeping with their professed "historical practice," Malka had recognized the $336,000 receivable as revenue at the time of the invoice.

118.   111.  MoneyLion also learned that in mid-2021, the client in the Receivable Transaction discontinued making payments against the outstanding receivable, and Malka agreed to restructure the receivable into promissory notes totaling approximately $260,000.   This amount was then recognized and recorded as 2021 and 2022 revenue in Malka's internal

bookkeeping program, in a manner inconsistent with GAAP.  Only a few monthly payments were made under the promissory note before the client again ceased payments in early 2022 and the relationship between the client and Malkalo LLC, a personal investment vehicle of the Seller Members, led to a commercial dispute.  In the first quarter of 2023—after the end of the 2022 Earnout Period—the Seller Members finally told Malka's Head of Finance that Malka would not be able to collect on the promissory notes and instructed him to write off the remaining value as bad debt.  ~~This should never have been treated~~The treatment of that debt as revenue ~~under GAAP~~was not consistent with GAAP and artificially inflated Malka's 2021 and 2022 revenue figures.

119.  ~~112.~~ Additionally, this settlement should have been included on the MIPA disclosure schedules, but was not disclosed to MoneyLion at the ~~Closing~~closing of the acquisition.  Through the Receivable Transaction, the Seller Members breached their representations and warranties in Section 3.14 through their failure to disclose a past due account receivable and that such account receivable was subject to dispute as of the Closing.  Further exacerbating the Seller Members' bad acts, they assigned from Malka to Malkalo LLC (their personal investment vehicle) a promissory note that covered the approximately $260,000 owed ~~was subsequently assigned from Malka to Malkalo LLC~~, without MoneyLion's knowledge or consent.  Thus, Malka, in fact, will not receive any revenue as a result of the Receivable Transaction.

120.  ~~113.~~The Seller Members also breached their representations and warranties in (i) Section 3.15 of the MIPA by falsely disclosing the client related to the Receivable Transaction as a "2020 Top Client" despite it being a delinquent account receivable, and (ii) Section 3.17 ~~through their failure~~of the MIPA by failing  to disclose the dispute regarding the

55

12483488

Receivable Transaction ~~with respect to~~over outstanding invoices that totaled approximately $113,000 as of the ~~Closing~~closing, which resulted in Malka including a reserve in its financial statements of approximately $253,000 as of the end of December 31, 2022.

121.   ~~114.~~ Second, Malka's Head of Finance informed MoneyLion of the Advance Payment Transaction, which involved an account managed by Fried (the "Advance Payment Client").  In the last weeks of 2021, as the Seller Members were laser focused on meeting their Earnout Payment requirements, Fried advised Malka's Head of Finance that the Advance Payment Client had engaged Malka for a particular project for an agreed-upon fee of $400,000.  Although there apparently was no customer contract stating terms for this project, Fried instructed Malka's Head of Finance to stagger the Advance Payment Client invoicing into four separate invoices, each in the amount of $100,000, to be issued during the last few weeks of the year.

122.   ~~115.~~ This $400,000 was recognized as revenues in the Malka 2021 Unaudited Financial Statement, *even though the work performed by Malka did not begin until the first quarter of 2023*.  Malka ~~thus~~ booked this revenue when the potential future client work was "~~billed~~invoiced,~~"~~ even though the work was not otherwise subject to ~~a~~any signed contract when the associated "revenue" was booked as represented by the accounting principles set forth in Schedule A of the MIPA.

123.   ~~116.~~ Third, Malka's Head of Finance informed MoneyLion of a Malka customer whose project involved a celebrity endorsement (the "Celebrity Transaction").  For the Celebrity Transaction, Malka recognized $50,000 of the invoice amount as 2021 revenue (of which 80% was to be paid out as the celebrity endorsement fee), and then held off on recording the $40,000

expense paid to the celebrity until the following calendar year in order to falsely decrease Malka's 2022 expenses and ~~exaggerate~~inflate its 2021 EBITDA.

124. ~~117.~~Unfortunately, and again unbeknownst to MoneyLion, this type of deceitful accounting ~~manipulation~~by the Seller Members continued into 2022.

~~118.~~   For example, the Seller Members insisted on delaying the year-end reconciliation of $106,000 in fees payable to a technology company through which Malka purchased licenses and servers to operate in a cloud-based environment, in order to push the expenses into 2023 so as to avoid having to recognize the expense in 2022.  Similarly, in the case of another technology licensing vendor, the Seller Members went to great lengths to defer recording that expense until 2023, which had the same effect of artificially ~~enhancing~~inflating Malka's EBITDA for 2022.

## G.    The 2022 Earnout Payment Dispute

125. ~~119.~~In their formal objections to the 2022 Revenue and EBITDA Statement, the Seller Members essentially challenged MoneyLion's calculations on two distinct~~,~~ and equally flawed grounds.

126. ~~120.~~First, the Seller Members astonishingly, and for the first time, denied that the Accounting Principles, which were defined in Schedule A of the MIPA as ~~primarily~~ GAAP-based, were even applicable to the required EBITDA calculation.  In fact, the May 25, 2023 letter accompanying the Seller Members' objections and the enclosed multi-page schedule never mentions GAAP or ASC 606 even once.

127. ~~121.~~Instead, the Seller Members and their advisors ~~put forth~~insisted upon the application of an undefined, and to this day unidentified, set of "***Company's* historical revenue and cost recognition principles**" to support their challenge to the 2022 Statement.

128. ~~122.~~ The Seller Members continued to ignore completely the defined Accounting Principles contained in Schedule A to the MIPA, the EBITDA formula set forth in Schedule B, and the express representations in the 2019 and 2020 Financial Statements that "the Company has adopted ASC 606 as of December 31, 2019 [and as of December 31, 2020] regarding accounting for income from contracts and all revenues recognized by the Company for the year then ended are covered through ASC 606."  Instead, disregarding the requirement in the MIPA that any Earnout calculations be based upon Schedule B's Revenue and EBITDA Calculation Principles, and further ignoring that the definition of EBITDA contained therein states that EBITDA should be "determined in accordance with U.S. GAAP (including the Company's historical revenue and cost recognition principles)," the Seller Members bizarrely objected to the 2022 Statement on the grounds that "it is evident that [Malka's] historical principles are the proper starting point."

129. ~~123.~~ Even more alarming, and the main impetus for MoneyLion to look more closely at the Malka Unaudited 2021 Financial Statement and Malka's records supporting the 2021 Statement, was the Seller Members' second argument: ~~The~~the Seller Members insisted that MoneyLion had in effect *waived* the GAAP compliance requirements that are clearly articulated in the MIPA and which are consistent with the accounting principles applied in the preparation of Malka's 2019 and 2020 Financial Statements and 2021 Interim Financial Statements.

130. ~~124.~~ Relying blindly on otherwise benign language in the MIPA stating that Malka's EBITDA for 2021 and 2022 "shall be calculated using substantially consistent methods and practices," the Seller Members concocted ~~a baseless~~an objection based upon their own fraudulent misconduct.  In so many words, the Seller Members' position was that *since they had ~~and~~ gotten away with scamming MoneyLion in 2021, they got to do it again in 2022*.

131. ~~125.~~ The Seller Members ignored their contractual obligation to engage in good faith negotiations to resolve their dispute with MoneyLion by not addressing MoneyLion's substantive conclusions regarding Malka's revenues and expenses in 2022.  They refused to acknowledge ~~either~~ that ~~(i)~~ Malka's 2019 and 2020 Financial Statements and 2021 Interim Financial Statements ~~accurately~~ represented Malka's "historical revenue and cost recognition principles" as being GAAP compliant.  They also refused to acknowledge that Malka's 2019 and 2020 Financial Statements misrepresented that Malka "has adopted ASC 606 as of December 31, 2019 [and as of December 31, 2020] regarding accounting for income from contracts and all revenues recognized by the Company for the year then ended are covered through ASC 606," and that "[g]eneral and administrative expenses are charged to expense as incurred" and that Malka's 2021 Interim Financial Statements were prepared in a materially similar manner.

132. ~~126.~~ The Seller Members similarly refused to recognize the requirements in Schedules A and B to the MIPA or that GAAP and ASC 606 controlled those calculation principles.  And while remaining mute as to the issue of whether Malka had, in fact, complied with GAAP, the Seller Members and their advisors offered no meaningful definition of Malka's "historical and cost recognition principles" despite their allegedly pivotal role in calculating revenue and EBITDA.

133. ~~127.~~ Despite the mounting evidence to the contrary, the Seller Members and their advisors simply refused to recognize that the differences in the parties' calculations of revenue and EBITDA for purposes of the 2022 Earnout Payment were not "mathematical," but rather were a legal question rooted in the parties' ~~competing interpretations of~~ disagreement about Malka's "historical revenue and cost recognition principles" (MoneyLion did not know what

those were, and the Seller Members refused to say) and the proper ~~calculation of~~methodology for calculating revenue and EBITDA in accordance with the MIPA.

134. ~~128.~~ In an effort to better understand the Seller Members' confusing stance, MoneyLion and its advisors posed a series of questions to the Seller Members and their advisors in the course of several calls and email communications during the Earnout Payment review period, but MoneyLion never received any response to the majority of these questions.

135. ~~129.~~ In the end, and despite a thorough review of the significant instances whereby the Seller Members had wrongfully manipulated revenue and EBITDA in 2021, the Seller Members and their advisors refused to concede that the express requirements for GAAP-based revenue and cost recognition in Schedules A and B to the MIPA controlled. Instead, they insisted that the 2021 Earnout Payment Statement was not only correct under their self-serving and undefined version of "historical revenue and cost recognition principles," but that it also constituted an immutable baseline for the 2022 Earnout Payment calculation.[7]

136. ~~130.~~ MoneyLion continued to proceed in good faith toward a private resolution of these matters, with senior executives at MoneyLion devoting numerous hours to evaluate these issues and address the Seller Members' questions promptly and thoroughly.

137. ~~131.~~ Section 2.06(iv) of the MIPA set forth a dispute resolution process to be followed in the event that the Seller Members and MLTI failed to reach an agreement with respect to all matters set forth in a written statement of objections, which included that any items

---

[7] The Seller Members continued to be evasive about the nature of those principles even after filing this case. It was not until September 21, 2023, in their reply brief in support of their motion for preliminary injunctive relief (Dkt. 51), that the Seller Members finally conceded what by then had become painfully obvious: that Malka's historical accounting principles (whatever those may be) did not even remotely comply with GAAP and ASC 606. The Seller Members have thus conceded that the financial statements they provided to MoneyLion during the due diligence process were in breach of Section 3.06 of the MIPA, as they were indisputably not prepared in accordance with the Accounting Principles (as defined in Article I and Schedule A of the MIPA).

or amounts remaining in dispute be submitted for a streamlined resolution to the office of an Independent Accountant.  Pursuant to the MIPA, the Independent Accountant was to act as "experts and not arbitrators" and would only have authority to resolve disputed *amounts* and make adjustments to the figures contained in MLTI's Revenue and EBITDA Statement.

138.   132.  Given the serious issues concerning the Seller Members' material misrepresentations regarding Malka's 2019 and 2020 Financial Statements and the accounting principles historically employed by Malka, and their continued refusal to acknowledge the Accounting Principles defined in Schedule A or the EBITDA formula stated in Schedule B, MoneyLion and its advisors suggested that the Seller Members consider a supplemental process for the development of a factual record, beyond the extremely narrow process set forth in the MIPA.  One approach suggested was to authorize the Independent Accountant to engage its own counsel to adjudicate the legal issues, a process that the accountant who the parties were considering had offered to endorse.  Another was to possibly engage an independent arbitrator to adjudicate the myriad legal and contract construction issues being disputed by the Seller Members.

139.   133.  The Seller Members ultimately discontinued the parties' negotiations, insisting instead to move forward with the narrowly defined dispute resolution process set forth in the MIPA.  That process, which did does not authorize the Independent Accountant to engage in fact finding fact-finding or legal analysis and which was designed and intended only for a purely accounting-based dispute involving competing calculations of revenue and EBITDA, which this dispute was not.

140.   134.  The dispute resolution process in Section 2.06 of the MIPA does not provide, and was not intended by the parties to provide, an appropriate dispute resolution mechanism

61

under the current circumstances the parties are in, which involve fundamentally different interpretations of the same contractual language and a series of underlying misrepresentations and fraudulent acts that got the parties to where they areresulted in the competing revenue and EBITDA figures submitted by the two sides.

141.    135. MoneyLion intends to submit to the streamlined dispute resolution process described in Section 2.06 of the MIPA, but only after these pivotalthreshold legal and factual issues have been adjudicated to ensure that the Independent Accountant applies the proper standards for calculating Malka's revenue and EBITDA that the parties agreed to in the MIPA and in Schedules A and B thereto (to the extent that the Court deems it appropriate for such calculations to be made).

**H.    Additional Misconduct**

142.    136. While reassessing Malka's historical financials and in the aftermath of the Seller Members' termination, MoneyLion has learned of additional misconduct and misrepresentations by the Seller Members.

143.    137. In Section 3.04 of the MIPA, the Seller Members represented that Malka "does not own or have any interest in any shares or have an ownership interest in any other Person, other than as provided in Section 3.04 of the Disclosures Schedules."

138.    The Seller Members breached this representation and warranty through Malka's ownership of a subsidiary called Run That Back LLC, a Delaware limited liability company formed on September 8, 2020, which was not disclosed in Section 3.04 of the Disclosure Schedules.

144.    139. Additionally, the Seller Members breached the representations and warranties contained in Section 3.12 of the MIPA, which governs Malka's intellectual property,

through their continued ownership of Malka Holdings LLC, a personal investment vehicle owned by the Seller Members in their individual capacities.

145. ~~140.~~ The Seller Members also breached the confidentiality covenants in Section 5.01 of the MIPA by filing a Schedule 13D with the U.S. Securities and Exchange Commission on June 2, 2023, seemingly in response to MoneyLion informing the Seller Members that they appeared to be operating as a voting group relating to their shares in MLI common stock without notifying management or filing the proper public disclosures under the federal securities laws, and in an effort to cleanse themselves of possession of material nonpublic information.

146. ~~141.~~ Rather than simply describing the *purpose of the transaction*—which is the singular objective of Item 4—the Schedule 13D filed by the Seller Members after the market closed on Friday, June 2, 2023 contained material non-public information of a confidential and proprietary nature, including the confidential details of their current dispute with MoneyLion concerning the 2022 Earnout Statement, the termination of their employment as executives of Malka, relevant terms of the acquisition that had not been previously disclosed publicly, the positions taken by each party, the amounts and number of shares in controversy, the current status of the internal dispute resolution process and the range of potential outcomes.

147. ~~142.~~ The Seller Members also breached, and are continuing to breach, Section 5.02 of the MIPA in which the Seller Members agreed to robust non-compete and non-solicitation provisions by attempting to solicit or entice certain clients of Malka for purposes of interfering with the relationship between such clients and Malka for purposes of engaging in "Restricted Business," as that term is defined in the MIPA.

148. ~~143.~~ Shortly after his termination, Fried ~~reached out to~~ contacted at least two of MoneyLion's clients in an explicit effort to move those clients away from Malka. Fried

reportedly indicated to these clients that Malka was no longer capable of fulfilling their needs, directly interfering with Malka's existing relationships with these clients.

149.   ~~144.~~ Additionally, Krubich directly called the manager ~~for~~ of one of the podcast shows that Malka produces and suggested that, following the Seller Members' departure, Malka was not capable of fulfilling that client's needs, directly interfering with Malka's existing relationship with this client.

150.   ~~145.~~ As recently as July 26, 2023, MoneyLion learned that Capra had acted as agent to a current Malka client in connection with a one-year professional football contract, constituting a clear breach of Section 5.02 of the MIPA.

**I.    The Seller Members' Termination and Krubich's Burglary of the Malka Offices**

151.   As a result of the myriad misdeeds detailed above, on May 19, 2023, the Seller Members' employment at MoneyLion and Malka was terminated for cause. The Seller Members were instructed to vacate Malka's offices in Jersey City, New Jersey and Santa Monica, California, and to coordinate with MoneyLion's human resources team to return any property belonging to Malka.

152.   In yet another brazen demonstration of the Seller Members' disregard for the law and their legal obligations, Defendant Krubich ignored MoneyLion's instructions that he not return to Malka's Santa Monica offices, and instead burglarized those offices at approximately 3:53pm on the following Sunday, May 21, 2023. After disabling the alarm using another Malka employee's access code and entering through a garage door, Krubich was captured on security cameras removing computer equipment and other materials from the Malka office without authorization, as shown in the images below:

(Added)



(Added)



12483488

(Added)



**J.** ~~I.~~ **The** **Seller Members Fraudulently Induced the Issuance of the** **MoneyLion Inc. Shares**

153. ~~146.~~ The issuances of restricted MLI shares in connection with both the Closing Payment and the 2021 Earnout Payment have been, and continue to be, carefully scrutinized by MoneyLion based upon the recently discovered facts set forth above, including the material misrepresentations in Malka's historical financial statements that significantly ~~affect~~undermine the bases upon which the purchase price was calculated and the Closing Payment was made, as well as the calculations purportedly supporting the issuance of the 2021 Earnout Payment.

154. ~~147.~~ In light of the foregoing facts and circumstances which form the basis for MoneyLion's counterclaims, MoneyLion maintains a good faith, reasonable belief that ~~(i)~~ the 2021 Earnout Shares should not have been issued to the Seller Members based upon their material misrepresentations that Malka's 2021 EBITDA calculation was made in accordance with the formula in Schedule B to the MIPA and the Accounting Principles defined under Schedule B to the MIPA~~,~~ (which it was not~~; and (ii)~~ ), that Seller Members had, over the prior few months, intentionally inflated Malka's revenues and under-reported its expenses in order to

66

falsely inflate Malka's 2021 EBITDA, and that Frommer had knowingly lied about the approval of Malka's New Jersey Digital Media Tax Credit application and the credit being "money good" in 2021.

155.    Additionally, MoneyLion maintains a good faith, reasonable belief that the Closing Shares were improperly issued at closing based upon a grossly inflated purchase price for the Seller Members' interests in Malka resulting from their.  That price resulted directly from the Seller Members' deceitful presentation of the projected value of the Malka business based on financial information that was not prepared in accordance with GAAP or the revenue recognition principles reflected in ASC 606, as falsely representednotwithstanding their representations to that effect in Malka's 2019 and 2020 Financial Statements and by extension, the 2021 Interim Financial Statements.

156.    148. Notwithstanding the Seller Members' repeated urging to the contrary, the Restricted Shares are not now, nor were they ever intended to be, "freely tradeable" or "freely transferable" upon vesting.  The Restricted Shares are subject to the terms of the RSAs.  Section 7 of each RSA requires, among other things, that the Seller Members may only transfer their interests in the Restricted Shares "in compliance with the provisions herein, applicable securities laws, the Charter, the Amended and restated Bylaws of the Company and any other applicable agreement to which the Company, the Holder and/or the proposed transferees may be a party." Importantly, one of the key agreements to which Holders are party to is the MIPA.

157.    Section 7 of the RSA further provides that the Seller Members' Restricted Shares "shall not be transferred without the prior written consent of the Company, which shall not be unreasonably withheld, conditioned or delayed."

12483488

158. ~~149.~~ In accordance with the RSA, ~~MoneyLion~~MLI is under no obligation "to transfer on its books any shares of Common Stock of the Company which shall have been transferred in violation of any of the provisions set forth in this Agreement" or "to treat any transferee to whom such shares shall have been so transferred as owner of such shares or to accord any other rights or privileges with respect to such shares."

159. ~~150.~~ The Seller Members, among other things, materially breached the terms of the MIPA when they engineered the issuance of the Restricted Shares through their deceitful and false misrepresentations concerning the value of their interests in Malka at closing, and thereafter actively falsified Malka's revenue and EBITDA calculations for the year 2021 by ~~using~~manipulating invoicing and expenses practices and taking advantage of an undefined set of "historical accounting principles" known only to them, instead of the Accounting Principles required under Schedules A and B of the MIPA. ~~Therefore, MoneyLion~~Under the circumstances, MLI has a good faith, reasonable basis for withholding consent to the transfer of the Seller Members' Restricted Shares.

160. ~~151.~~ On this basis, and with every intention that MoneyLion would ~~be seeking~~seek to hold the Seller Members accountable for their egregious misconduct leading to the issuance of shares under false pretenses, ~~MoneyLion~~MLI advised Continental Stock Transfer and Trust Company ("Continental"), ~~MoneyLion's~~MLI's transfer agent, by letter dated June 6, 2023, of ~~MoneyLion's~~MLI's good faith, reasonable belief that the Restricted Shares had been improperly issued to the Seller Members "under circumstances which, if true, would nullify their rights to those shares," and further advised Continental that ~~MoneyLion~~MLI would not at this time honor any attempt by the Seller Members to sell, transfer or otherwise dispose of their Restricted Shares.

161. ~~152.~~ In view of the foregoing, ~~MoneyLion~~MLI is *not unreasonably withholding, delaying or conditioning its consent* to any transfer of the Seller Members' Restricted Shares or the removal of the restrictive legends on the Restricted Shares.  To the contrary, ~~MoneyLion~~MLI is acting in good faith and in the best interests of its shareholders to protect against unwarranted ~~dilution~~destruction of its share value by continuing to restrict, and ultimately seeking to cancel, the Restricted Shares that were previously issued to the Seller Members based upon fraudulent pretenses.

162. ~~153.~~ The facts set forth herein significantly impact the Seller Members' putative rights to their restricted Closing Shares and 2021 Earnout Shares, and rightly so, as MoneyLion has a good faith and reasonable belief that it was fraudulently induced to agree to purchase the Seller Members' membership interests in Malka and to issue the restricted Closing Shares and 2021 Earnout Shares to the Seller Members.

163. ~~154.~~ Until the claims against the Seller Members are finally adjudicated, ~~MoneyLion~~MLI is obligated to protect its interests and those of its shareholders against the wrongful dilution and potential destruction of the value of MLI shares by maintaining the restrictions on the Seller Members' restricted Closing Shares and 2021 Earnout Shares.

164. ~~155.~~ Given ~~MoneyLion's~~MLI's good faith and reasonable belief that the Seller Members' restricted Closing Shares and 2021 Earnout Shares were improperly issued to the Seller Members under circumstances which, if true, would nullify their rights to those shares, MoneyLion has rightfully determined to maintain the restrictions on the Seller Members' restricted Closing Shares and 2021 Earnout Shares subject to the further order of the Court.

**K.**     **MoneyLion's Damages**

165.     MoneyLion agreed to pay up to $75 million for the Seller Members' interests in Malka, reasonably relying upon the Seller Members' express representations concerning Malka's historical and projected financial performance and the calculation of Malka's market value, all of which rested upon the materially false and misleading premise that its actual performance was accurately and reliably presented in accordance with generally accepted accounting principles in the United States, or GAAP, subject to limited exceptions.  The presentation of Malka's historical revenues and EBITDA calculated in this manner was the foundation of its agreement to enter into the acquisition transaction and the deciding factor in MoneyLion's agreement to pay the Seller Members' asking purchase price.

166.     MoneyLion had every reasonable expectation that it could rely upon the Seller Members' express representations that the 2019 and 2020 Financial Statements and the Interim Financial Statements accurately reflected Malka's historical accounting practices and principles, that those practices and principles complied with GAAP and ASC 606, and that it was agreeing to a purchase price based upon Malka's projected EBITDA and revenue which were calculated in accordance with those same practices and principles.

167.     But instead of acquiring an ongoing business that operated profitably with an EBITDA of $700,000 and $1.9 million in 2019 and 2020, respectively, as represented by the Seller Members in their pitch deck, and which the Malka Sellers *projected* would have an EBITDA of $5.4 million for 2021, its *actual* GAAP-based EBITDA using the accounting principles set forth in Schedule A to the MIPA was an approximate ***negative*** $1,245,000 in 2021, and an abysmal ***negative*** $2,840,000 for 2022.

70

12483488

168.    Unfortunately, Malka's trend of operating losses continues into 2023, with quarterly GAAP-based EBITDAs of negative $2,587,349 for Q1, negative $465,921 for Q2, and negative $486,834 for Q3.

169.    MoneyLion has already paid $10 million in cash and MLI has issued more than $54 million in MLI stock to acquire Malka's unprofitable business operations, which continue to lose money quarter over quarter.  Moreover, Malka's continued unprofitability has forced MoneyLion to incur expenses to recapitalize Malka by as much as $8.1 million since November 2021.  As such, MoneyLion was damaged by reason of the Seller Members' material misrepresentations.

## AFFIRMATIVE DEFENSES TO THE AMENDED COMPLAINT

### FIRST AFFIRMATIVE DEFENSE

170. 156. The Amended Complaint fails to state any claim on which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

171. 157. The Seller Members' claims are barred because the Seller Members have committed material breaches of the contracts on which they base their causes of action, such that MoneyLion is discharged from further performance.

### THIRD AFFIRMATIVE DEFENSE

172. 158. The Seller Members' claims are barred because the contracts on which they base their causes of action were entered into on the basis of unilateral mistakes of fact.

### FOURTH AFFIRMATIVE DEFENSE

173. 159. The Seller Members' claims are barred because MoneyLion was fraudulently induced to enter into the contracts on which the Seller Members base their causes of action.

### FIFTH AFFIRMATIVE DEFENSE

174. 160. The Seller Members' claims are barred because the Seller Members repeatedly defrauded MoneyLion, both in connection with the calculation of MoneyLion's purchase price for the Seller Members' interests in Malka and in connection with the earnout process and calculation in 2021 and 2022.

### SIXTH AFFIRMATIVE DEFENSE

175. 161. The Seller Members' claims are barred, in whole or in part, by the doctrine of unclean hands.

72

## SEVENTH AFFIRMATIVE DEFENSE

176. ~~162.~~ The Seller Members' claims are barred, in whole or in part, by the doctrine of equitable estoppel.

## EIGHTH AFFIRMATIVE DEFENSE

177. ~~163.~~ The Seller Members' claims are barred, in whole or in part, by the faithless servant doctrine.

WHEREFORE, MoneyLion denies that the Seller Members are entitled to any of the relief they seek in the Amended Complaint and respectfully demands judgment dismissing the Amended Complaint with prejudice.

## COUNTERCLAIMS

### COUNT I
### Declaratory Judgment
### (Against All Counterclaim-Defendants)

178. ~~164.~~ MLTI and MLI repeat and reallege each and every allegation contained above as if fully set forth herein.

179. ~~165.~~ As set forth in Paragraphs ~~39-82, 119-135~~ 43-72, 125-141, *supra*, there presently exists between the Counterclaim-Plaintiffs and Counterclaim-Defendants an actual and justiciable controversy with respect to the construction of various terms in the MIPA and Schedules A and B thereto, which terms are to be applied by the Independent Accountant in connection with the dispute resolution process required under the MIPA.

180. ~~166.~~ In Section 3.06 of the MIPA, the Seller Members represented that the copies of the 2019 and 2020 Financial Statements, which the Seller Members had provided to MoneyLion during due diligence and which were expressly incorporated into the MIPA in the Section 3.06 Disclosure Schedule, as well as the 2021 Interim Financial Statements, were

"prepared in accordance with the Accounting Principles throughout the period involved" and "fairly present[ed] the financial condition of [Malka] as of the respective dates they were prepared and the results of the operations of [Malka] for the periods indicated."

181.   ~~167.~~ The Accounting Principles at Schedule A of the MIPA further state that "[t]he Financial Statements, Estimated Statements and the Final Statements ***shall be prepared in accordance with U.S. GAAP* . . . .**" except for specific exceptions delineated therein.

182.   ~~168.~~ "EBITDA" is defined in Schedule B as "the combined and consolidated net income before interest expense, federal, state and local taxes, depreciation and amortization of [MLTI], ***determined in accordance with U.S. GAAP*** (including [Malka]'s historical revenue and cost recognition principles) as reviewed or audited by [MLTI]'s independent accountants."

183.   ~~169.~~ The MIPA thus confirmed that Malka historically had complied with GAAP, subject only to narrow and particularized exceptions specifically set forth in the MIPA.

184.   ~~170.~~ Accordingly, Counterclaim-Plaintiffs are entitled to a declaration that in light of the parties' disputes concerning the interpretation and construction of the aforementioned sections of the MIPA and Schedules A and B:

> ~~a.~~ a.   The applicable Accounting Principles to be used in preparing the 2021 and 2022 financial statements must be applied as written in Schedule A—to wit: "***prepared in accordance with U.S. GAAP, except for the specific exceptions,*** *e.g.*, (a) the Company's historical revenue recognition principles, ***which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained***; (b) the Company's historical cost recognition principles

74

12483488

associated with such revenue, ***which require the Company to recognize costs on contracts as incurred***";

b. b.   The principles, policies and procedures expressly set forth in Schedule A of the MIPA, *i.e.*, ***in accordance with U.S. GAAP***, shall take precedence over Malka's historical accounting principles, policies and procedures, which may be applied only to the extent not inconsistent with the foregoing;

c. c.   Malka's Financial Statement for the year ending December 31, 2021 was incorrectly prepared based upon the Seller Members' intentional misapplication of the required Accounting Principles, including the improper recognition of revenue and wrongful deferral of actual expenses; and the Independent Accountant shall be empowered and directed to correct the 2021 Earnout Payment statement and 2021 revenue and EBITDA earnout calculation in accordance with the Court's adjudication as prayed for herein;

d. d.   Subject to the Court's direction, the Independent Accountant shall apply the Accounting Principles in accordance with the foregoing declarations and shall be empowered and directed to calculate the Revenue and EBITDA earnout calculation in accordance with the Court's adjudicated findings as prayed for herein; and

e. e.   The stated "intention of the Parties that the 2021 Revenue Amount and the 2021 EBITDA Amount and the 2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using substantially consistent methods and practices" shall be subject to the Court's determination concerning the intentions of the parties, which shall not require the Independent Accountant to apply the same accounting principles improperly

75

applied to calculate the 2021 Revenue Amount and the 2021 EBITDA Amount when calculating the 2022 Revenue Amount and the 2022 EBITDA Amount.

## COUNT II
### Declaratory Judgment
### (Against All Counterclaim-Defendants)

185. ~~171.~~ MLI and MLTI repeat and reallege each and every allegation contained above as if fully set forth herein.

186. ~~172.~~ As set forth in Paragraphs ~~24-38, 69-82, 119-135, 146-155~~43-72, 76-96, 153-169, *supra*, there presently exists between the Counterclaim-Plaintiffs and Counterclaim-Defendants an actual and justiciable controversy with respect to the ownership and distribution of the Closing Shares and 2021 Earnout Shares.

187. ~~173.~~ The facts set forth herein and the relief requested by Counterclaim-Plaintiffs significantly impact the Seller Members' putative rights to ~~their~~the restricted Closing Shares and 2021 Earnout Shares, as MoneyLion has a good faith and reasonable belief that it was wrongly induced to issue the restricted Closing Shares and 2021 Earnout Shares to the Seller Members.

188. ~~174. Until this litigation is resolved~~As a result of the controversy described above, MoneyLion ~~must~~ the rightful owner of the Closing Shares and 2021 Earnout Shares—sought to protect its interests and those of its shareholders by maintaining the restrictions on the Seller Members' restricted Closing Shares and 2021 Earnout Shares pending the resolution of this case.

189. ~~175.~~ Accordingly, Counterclaim-Plaintiffs are entitled to a declaration that in light of the parties' disputes concerning the interpretation and construction of the aforementioned sections of the MIPA and Schedules A and B thereto, and the ~~Seller Members'~~terms of the RSAs, and the conduct alleged herein giving rise to Counterclaim-Plaintiffs' further causes of action described in Counts III through XIX below, MLI was entitled to exercise its contractual

right under Section 7  of the RSAs to withhold its consent to the release of restrictions on the restricted Closing Shares and 2021 Earnout Shares ~~shall remain restricted under the care and custody of Continental Stock Transfer & Trust Company until final judgment of the Court allowing MLI to invalidate those shares as prayed for herein.~~ pending the Court's adjudication of the merits of this case, and such exercise was reasonable under the circumstances and continues to be so today.

**COUNT III**
**Violations of Section 10(b) of the Securities Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against All Counterclaim-Defendants)**

190. ~~176.~~ MLI and MLTI repeat and reallege each and every allegation contained above as if fully set forth herein.

191. Section 10(b) of the Securities Exchange Act of 1934 provides that it "shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

192. Rule 10b-5 adopted by the U.S. Securities and Exchange Commission provides that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, [all] in connection with the purchase or sale of any security."

193. ~~177.~~ As set forth in Paragraphs ~~24-65, 69-88, 98-101, 105-118~~ 25-75 and 153-164, *supra*, the Seller Members continuously and repeatedly made, and/or caused Curran & Co. to

make, false and material misrepresentations and omissions to MoneyLion throughout the due diligence process, in connection with the negotiation of the MIPA and acquisition.

194. 178. During due diligence, the Seller Members prepared and distributed to MoneyLion a SIM and pitch deck presentation, which intentionally overstated Malka's growth projections and profit margins, andthrough which the Seller Members knowingly falsely projected the value of the Malka business based upon multiples of the company's projected EBITDA and revenues for 2021, which in turn were premised upon purportedly GAAP-compliant Financial Statements forthe knowingly false representation that the 2019 and 2020 Financial Statements and Interim Financial Statements for 2021 were GAAP-compliant.

195. 179. Further, the Seller Members knowingly and falsely represented to MoneyLion that Malka was compliant with GAAP and ASC 606 revenue recognition requirements, except in certain isolated instances where projects fell behind schedule, but that any impact on revenue recognition as the result of noncompliance would "be minimal."

196. 180. The Seller Members also, knowingly and with the intent to deceive, provided MoneyLion copies of Malka's reviewed financial statements for the years ended December 31, 2019 and December 31, 2020, each of which falsely represented that they were prepared in accordance with GAAP and that revenue was recognized under the accrual basis of accounting and recorded as revenue when work is completed and invoiced to Malka's customers, and that Malka had adopted ASC 606, when in fact revenues were grossly inflated.

197. 181. The MIPASeller Members knowingly and falsely represented in the MIPA unambiguously and misleadingly confirmed that Malka historically had complied with GAAP, subject only to narrow and particularized exceptions specifically set forth in the MIPA, and extensive references to GAAP in the MIPA, coupled with the Seller Members' assurances during

79

due diligence, confirmed that GAAP and ASC 606 were the starting point for calculating the purchase price, for understanding Malka's historical Accounting Principles, and for any calculation of Earnout Payments that might be due to the Seller Members under the terms of the MIPA.

198. ~~182.~~ The overall purchase price for the Seller Members' outstanding interests in Malka, including the Closing Shares, as well as the process for measuring Malka's post-Closing profitability and calculating revenue and EBITDA to determine whether the Seller Members would be entitled to receive the Earnout Payments (including the Earnout Shares) in 2021 and 2022, were predicated upon these knowingly false representations.

199. Through the conduct alleged herein, the Seller Members, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to fraudulently create and/or conceal material information from MoneyLion prior to and at the closing of the acquisition of their membership interests in Malka and in connection with the issuance of the 2021 Earnout Shares.

200. Through the conduct alleged herein, the Seller Members, individually and in concert: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon MoneyLion, all in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

201. The misconduct by the Seller Members was in connection with the purchase or sale of securities because MoneyLion issued to the Seller Members shares of MoneyLion Inc.

common stock in connection with its acquisition of all of the Seller Members membership interests in Malka upon closing, and further agreed to issue additional shares under the earnout terms of the MIPA.

202. ~~183.~~ The Seller Members continued to make knowingly false and material misrepresentations and omissions to MoneyLion post-closing in connection with the Earnout Payment process for both 2021 and 2022.

~~184. MoneyLion, in reliance upon the Seller Members' prior representations as repeated throughout the MIPA~~ that Malka's 2019 and 2020 Financial Statements ~~and the 2021 Interim Financial Statements had been prepared in accordance with GAAP and ASC 606, reasonably relied upon the Malka Unaudited 2021 Financial Statement  consistent with historical practices  in that it had been prepared in a substantially similar manner in accordance with GAAP and ASC 606, particularly given the proximity to~~ the closing of the acquisition.

203. ~~185.~~ The Seller Members ~~knew,~~ knowingly and with the intent to deceive MoneyLion, misrepresented that the Malka Unaudited 2021 Financial Statement had ~~not~~ been prepared in accordance with GAAP, as required under Schedules A and B of the MIPA, ~~and~~ ~~had~~when in fact that had completely disregarded GAAP, despite GAAP being an essential element of the Accounting Principles set forth in Schedule A to the MIPA as well as a foundational metric, stated clearly in Schedule B to the MIPA, in determining EBITDA in connection with the 2021 Earnout Payment.

204. ~~186.~~ The Seller Members also fraudulently manipulated Malka's finances in order to "satisfy" their EBITDA requirement in connection with the 2021 Earnout Payment, including wrongful recognition of revenues in 2021 which were either never actually earned or were earned

81

more than a year later—long after the close of that fiscal year—coupled with wrongful deferral of costs actually incurred in 2021 and fraudulent invoicing of client projects for which Malka was not yet engaged to do work.

205.   187. Additionally, MoneyLion agreed to include the 2019 Tax Credit in the 2021 EBITDA calculation based on the knowingly false representationrepresentations by Frommer, as the Sellers' Representative, that the New Jersey Digital Media Tax Credit was "money good" and washad been approved at the end of 2021. The, when in fact the 2019 Tax Credit was not "money good," certainly not in the amount of the application and certainly not in 2021, and did not receive final approval from the State of New Jersey until May 2023, almost a year and a half later. MoneyLion has made efforts to sell the 2019 Tax Credit since it was approved in May 2023 and has been unable to do so to date.

206.   188. But for the Seller Members' fraudulent use of the grossly distorted non-GAAP Malka Unaudited 2021 Financial Statementforegoing material misrepresentations made by the Seller Members with knowledge of their falsity and with the intent to deceive MoneyLion, the 2021 Earnout Payment—including the 2021 Earnout Shares—would never have been issued to any of the Seller Members.

207.   189. The Seller Members employed this scheme to defraud MoneyLion, acting in concert to falsely induce MoneyLion to acquire their membership interests in Malka atand to pay an inflated purchase price and to issueincluding the issuance of the 2021 Earnout Payment, and with the intent that MoneyLion would issue the 2022 Earnout Payment based on the same false premises.

208.   190. Additionally, the Seller Members' actions, practices, and course of conduct in dealing with MoneyLion operated as a fraud or deceit upon MoneyLion in connection with the

purchase or sale of MLI securities, as the Seller Members' goal throughout was to induce MoneyLion to purchase their membership interests in Malka and to issue MLI stock to the Seller Members in reliance upon the Seller Members' fraudulent misstatements and omissions.

209. 191. At all times, the Seller Members knew that their misrepresentations and omissions were false and materially misleading, or at best recklessly disregarded the truth of their statements.

210. 192. MLI and MLTI have suffered significant damages as a result of their reasonable and justified reliance on the Seller Members' false misrepresentations and omissions, as MoneyLion was induced to purchase their membership interests in Malka and to pay an amount abovewell in excess of the fair value of Malka in order to acquire the company and was further induced to issue the 2021 Earnout Payment despite Malka not meeting the EBITDA threshold in the MIPA.

211. 193. As a result of the foregoing, MLI and MLTI are entitled tosustained substantial losses and in this action seek rescission, restitution or compensatory damages, including but not limited to the invalidation of the restricted Closing Shares and 2021 Earnout Shares in an amount to be determined at trial.

**COUNT IV**
**Common Law Fraud**
**(Against All Counterclaim-Defendants)**

212. 194. MLI and MLTI repeat and reallege each and every allegation contained above as if fully set forth herein.

213. 195. As set forth in Paragraphs 24-65, 69-88, 98-101, 105-11825-96, 110-141, and 153-164, *supra*, the Seller Members continuously and repeatedly made false misrepresentations and omissions to MoneyLion throughout the acquisition due diligence and

12483488

negotiation process, in the MIPA, and in connection with the Earnout Payment process for both the 2021 Earnout Payment and potential 2022 Earnout Payment.

214.   196. At all times, the Seller Members knew that their representations and omissions were false and materially misleading to MoneyLion, or at best were recklessly indifferent to the truth of their statements.

215.   197. The Seller Members made these false misrepresentations and omissions in order to induce MoneyLion to proceed with its acquisition at ~~the agreed upon~~an artificially inflated purchase price and to issue the 2021 and 2022 Earnout Payments.

216.   198. Additionally, the Seller Members incurred personal expenses and had those expenses paid by Malka or MoneyLion.

217.   199. MLI and MLTI have suffered significant damages as a result of their reliance on the Seller Members' false misrepresentations and omissions, as MoneyLion was induced to pay an amount above the fair value of Malka in order to acquire the company and was induced to issue the 2021 Earnout Payment despite Malka not meeting the EBITDA threshold in the MIPA.

218.   200. As a result of the foregoing, MLI and MLTI ~~are entitled to~~sustained substantial losses and in this action seek rescission, restitution or compensatory damages~~, including but not limited to the invalidation of the restricted Closing Shares and 2021 Earnout Shares~~ in an amount to be determined at trial.

**COUNT V**
**Negligent Misrepresentation**
**(Against All Counterclaim-Defendants)**

219.   201. MLI and MLTI repeat and reallege each and every allegation contained above as if fully set forth herein.

84

12483488

220. As a result of Frommer, Krubich, and Fried's status as members of MoneyLion's Executive Committee and Frommer and Krubich's status as members of MoneyLion's Disclosure Committee, as well as Frommer's role as MLI's Chief Content Officer, Frommer, Krubich, and Fried owed fiduciary duties of honesty and utmost good faith to MLI and its shareholders.

221. ~~202.~~ As set forth in Paragraphs ~~24-65, 69-88, 98-101, 105-118, *supra*, the Seller Members repeatedly~~76-96, 110-141, and 153-164, *supra*, during all relevant times after closing when they were active members of MoneyLion's Executive Committee and Disclosure Committee, as applicable, Frommer, Krubich, and Fried knowingly made false misrepresentations and omissions to MoneyLion ~~throughout the due diligence process,~~and employed deceitful means and artifices in connection with ~~the negotiation of the MIPA and acquisition, and in connection with~~ the Earnout Payment process for both 2021 and 2022.

~~203. The Seller Members made these false misrepresentations and omissions with the intent to induce MoneyLion to proceed with the acquisition at the agreed-upon purchase price and to issue the 2021 and 2022 Earnout Payments.~~

222. As members of MoneyLion's Executive Committee and Disclosure Committee, as applicable, these Seller Members were duty bound to act honestly in their relationships with MoneyLion's management and not in their own self-interest, and yet they made these false misrepresentations and omissions with the intent to induce MoneyLion to issue the 2021 and 2022 Earnout Payments for their individual self-interest.

223. ~~204.~~ MoneyLion reasonably and ~~justifiably~~ relied upon the Seller Members' false misrepresentations and omissions.

~~205. As a result of Frommer, Krubich, and Fried's status as members of MLI's~~

12483488

~~Executive Committee, as well as Frommer's role as MLI's Chief Content Officer, Frommer, Krubich, and Fried owed fiduciary duties of honesty and utmost good faith to MLI and its shareholders.~~

224. ~~206.~~ MLI and MLTI have suffered significant damages as a result of their reliance on the Seller Members' false misrepresentations and omissions as aforementioned, as MoneyLion ~~was induced to pay an amount above the fair value of Malka in order to acquire the company and~~ was induced to  issue the 2021 Earnout Payment ~~despite~~based upon the false premise that Malka ~~not meeting~~had met the EBITDA threshold set forth in the MIPA.

225. ~~207.~~ As a result of the foregoing, MLI and MLTI ~~are entitled to~~sustained substantial losses and in this action seek rescission, restitution or compensatory damages~~, including but not limited to the invalidation of the restricted Closing Shares and 2021 Earnout Shares~~ in an amount to be determined at trial.

## COUNT VI
## Breach of Fiduciary Duty
### (Against Frommer, Krubich, and Fried)

226. ~~208.~~ MLI and MLTI repeat and reallege each and every allegation contained above as if fully set forth herein.

227. ~~209.~~ Frommer, as Chief Content Officer of MLI, ~~and~~ Frommer, Krubich and Fried, as members of ~~MLI's~~MoneyLion's Executive Committee, and Frommer and Krubich as members of MoneyLion's Disclosure Committee, owed to MLI and all of its shareholders a fiduciary duty of loyalty and utmost good faith at all times while serving in such roles.

228. ~~210.~~ As set forth in Paragraphs ~~71-82, 90-97, 102-118, 140~~76-150 and 153-164, *supra*, Frommer, Krubich and Fried breached their fiduciary duties to MLI and its shareholders during the time that they were active members of MoneyLion's Executive Committee and

Disclosure Committee, as applicable, Frommer was MoneyLion's Chief Content Officer by: (i) misappropriating company assets for their own personal gain at the expense of MLI; (ii) wrongfully manipulating the calculation of revenue and EBITDA in connection with the 2021 and 2022 Earnout Payment processes by ignoring GAAP as required under the MIPA, and by overstating revenues and understating costs and expenses for the purpose of advancing their own personal gain to the detriment of MLI and its shareholders; (iii) directing subordinate employees to deliberately misstate Malka's finances; and (iv) by forming a voting group relating to their shares in MLI common stock without notifying management or filing the proper public disclosures under the federal securities laws.

229.   211. MLI and MLTI have suffered significant damages as a result of these myriad breaches of fiduciary duty, as MoneyLion was induced to issue the 2021 Earnout Payment despite Malka not meeting the EBITDA threshold in the MIPA.

230.   212. As a result of the foregoing, MLI and MLTI are entitled to compensatory damages, including but not limited to the invalidation of the 2021 Earnout Shares.

**COUNT VII**
**Conversion of Closing Shares and 2021 Earnout Shares**
**(Against All Counterclaim-Defendants)**

231.   213. MLI and MLTI repeat and reallege each and every allegation contained above as if fully set forth herein.

232.   214. As set forth in Paragraphs 24-38, 69-82, 146-155 25-72, 76-96, 153-169, *supra*, the Seller Members have wrongfully exerted dominion over the Closing Shares and 2021 Earnout Shares.

233.   215. MLI and MLTI have a property interest in the Closing Shares and 2021 Earnout Shares.

234. ~~216.~~ MLI and MLTI have a right to possess the Closing Shares and 2021 Earnout Shares.

235. ~~217.~~ MLI and MLTI have suffered significant damages as a result of the Seller Members' conversion of the Closing Shares and 2021 Earnout Shares.

236. ~~218.~~ As a result of the foregoing, MLI and MLTI are entitled to compensatory damages, including but not limited to the invalidation of the restricted Closing Shares and 2021 Earnout Shares.

**COUNT VIII**
**Breach of Contract – Section 3.06 of the MIPA**
**(Against All Counterclaim-Defendants)**

237. ~~219.~~ MLTI repeats and realleges each and every allegation contained above as if fully set forth herein.

238. ~~220.~~ As set forth in Paragraphs ~~31, 35-50, 62-65, 72-73, 98-101~~25-42, *supra*, the Seller Members breached Section 3.06 of the MIPA by making misstatements relating to Malka's financial statements, including by, among other things, misrepresenting Malka's ~~Gross Profit~~gross profit and misrepresenting Malka's compliance with GAAP and ASC 606 in connection with Malka's financial statements for 2019 and 2020.

239. ~~221. According to~~The Seller Members, knowingly and with the intent to deceive, misstated Malka's ~~2021 Unaudited~~gross profit in the 2019 and 2020 Financial Statements~~, Gross Profit~~ and the 2021 Interim Financial Statements because Malka's gross profit did not include the substantial cost of employees that were billed to clients to generate revenue.

240. Revenue generating-employees are properly characterized as costs of goods sold, a clearly defined GAAP item, but the Seller Members incorrectly included the cost of revenue-generating employees under ~~General & Administrative within Operating~~

88

~~Expenses~~general & administrative within operating expenses, resulting in a misrepresented and materially inflated picture of Malka's profitability.

241.   ~~222.~~ Additionally, the Seller Members represented that Malka's financial statements for 2019 and 2020, which were reviewed by Curran & Co., were compliant with GAAP and ASC 606 for revenue recognition and that any noncompliance with ASC 606 was minimal, which MoneyLion has since recently learned is grossly inaccurate and materially misleading.

242.   ~~223.~~ Furthermore, the Seller Members failed to maintain a standard system of accounting established and administered in accordance with the Accounting Principles set forth in Schedule A of the MIPA in all material respects, as evidenced by the Seller Members' aforementioned breaches of this representation and warranty.

243.   Each of the Seller Members had actual knowledge of the contents of the 2019 and 2020 Financial Statements and 2021 Interim Financial Statements, as they participated directly in the creation of those documents and discussed them with MoneyLion at various times.

244.   Alternatively, knowledge of the contents of the 2019 and 2020 Financial Statements should be imputed to the Seller Members, as Curran & Co.'s review of those financial statements was based primarily on "applying analytical procedures to management's financial data and making inquiries of company management," with the express understanding that "[m]anagement [wa]s responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America."

245.   MLI and MLTI have been damaged by these numerous breaches of Section 3.06 of the MIPA.

246.    As a result of the foregoing, MLI and MLTI seek rescission, restitution or compensatory damages in an amount to be determined at trial.

**COUNT IX**
**Breach of Contract – Section 3.04 of the MIPA**
**(Against All Counterclaim-Defendants)**

247.    MLTI repeats and realleges each and every allegation contained above as if fully set forth herein.

248.    ~~224.~~ As set forth in Paragraph ~~138~~143, *supra*, the Seller Members ~~also~~ breached Section 3.04 of the MIPA through Malka's ownership of a subsidiary named Run That Back LLC, a Delaware limited liability company formed on September 8, 2020~~, which was not disclosed in Section 3.04 of the Disclosure Schedules~~.

249.    Malka's ownership of Run That Back LLC was not disclosed in Section 3.04 of the Disclosure Schedules, as was required under Section 3.04 of the MIPA.

250.    MLI and MLTI have been damaged by this breach of the MIPA, in that the Seller Members' breach resulted in MLI and MLTI assuming liabilities and legal obligations not properly disclosed to them by the Seller Members prior to execution of the MIPA.

251.    As a result of the foregoing, MLI and MLTI seek rescission, restitution or compensatory damages in an amount to be determined at trial.

**COUNT X**
**Breach of Contract – Section 3.12 of the MIPA**
**(Against All Counterclaim-Defendants)**

252.    MLTI repeats and realleges each and every allegation contained above as if fully set forth herein.

253.    ~~225.~~ As set forth in Paragraph ~~139~~144, *supra*, the Seller Members ~~also~~ breached Section 3.12 of the MIPA, which governs Malka's intellectual property, through their continued

90

ownership of Malka Holdings LLC, a personal investment vehicle owned by the Seller Members in their individual capacity.

254.   Upon information and belief, Malka Holdings LLC continues to own certain valuable Company Intellectual Property (as defined in the MIPA), the extent of which currently is unknown to MoneyLion and will be revealed in discovery.

255.   MLI and MLTI have been damaged by this breach of the MIPA, in that the Seller Members' breach resulted in the Seller Members retaining valuable intellectual property that should properly have been transferred to MLI and MLTI pursuant to the MIPA.

256.   As a result of the foregoing, MLI and MLTI seek rescission, restitution or compensatory damages in an amount to be determined at trial.

**COUNT XI**
**Breach of Contract – Section 3.14 of the MIPA**
**(Against All Counterclaim-Defendants)**

257.   MLTI repeats and realleges each and every allegation contained above as if fully set forth herein.

258.   226. As set forth in Paragraphs 110-113 116-120, *supra*, the Seller Members also breached Section 3.14 of the MIPA through their failure to disclose the past due account receivable with the Receivable Client and that such account receivable was subject to dispute as of the Closing.

259.   Malka was carrying a delinquent $336,000 account receivable for the Receivable Client, which had been recognized as revenue in periods prior to 2021.  In keeping with their professed "historical practice," Malka had recognized the $336,000 receivable as revenue at the time of the invoice.

260. In mid-2021, the Receivable Client discontinued making payments against the outstanding receivable, and Malka agreed to restructure the receivable into promissory notes totaling approximately $260,000. This amount was then recognized and recorded as 2021 revenue in Malka's internal bookkeeping program, in a manner inconsistent with GAAP.

261. Only a few monthly payments were made under the promissory note before the client again ceased payments in early 2022 and the relationship between the client and Malkalo LLC, a personal investment vehicle of the Seller Members, led to a commercial dispute.

262. In the first quarter of 2023—after the end of the 2022 Earnout Period—the Seller Members finally told Malka's Head of Finance that Malka would not be able to collect on the promissory notes and instructed him to write off the remaining value as bad debt. The treatment of that debt as revenue was not consistent with GAAP and artificially inflated Malka's 2021 revenue figures.

263. This settlement should have been included on the MIPA disclosure schedules, but was not disclosed to MoneyLion at the closing of the acquisition.

264. MLI and MLTI have been damaged by this breach of the MIPA.

265. As a result of the foregoing, MLI and MLTI seek rescission, restitution or compensatory damages in an amount to be determined at trial.

**COUNT XII**
**Conversion of Promissory Note**
**(Against All Counterclaim-Defendants)**

266.    MLTI repeats and realleges each and every allegation contained above as if fully set forth herein.

267.    As set forth in Paragraphs 116-120, *supra*, Malka was carrying a delinquent $336,000 account receivable for the Receivable Client, which had been recognized as revenue in periods prior to 2021.  In keeping with their professed "historical practice," Malka had recognized the $336,000 receivable as revenue at the time of the invoice.

268.    In mid-2021, the Receivable Client discontinued making payments against the outstanding receivable, and Malka agreed to restructure the receivable into promissory notes totaling approximately $260,000.  This amount was then recognized and recorded as 2021 revenue in Malka's internal bookkeeping program, in a manner inconsistent with GAAP.

269.    Only a few monthly payments were made under the promissory note before the client again ceased payments in early 2022 and the relationship between the client and Malkalo LLC, a personal investment vehicle of the Seller Members, led to a commercial dispute.

270.    In the first quarter of 2023—after the end of the 2022 Earnout Period—the Seller Members finally told Malka's Head of Finance that Malka would not be able to collect on the promissory notes and instructed him to write off the remaining value as bad debt.  The treatment of that debt as revenue was not consistent with GAAP and artificially inflated Malka's 2021 revenue figures.

271. The Seller Members assigned from Malka to Malkalo LLC (their personal investment vehicle) a promissory note that covered the approximately $260,000 owed, without MoneyLion's knowledge or consent.

272. Thus, Malka, in fact, will not receive any revenue as a result of the Receivable Transaction.

273. The Seller Members have wrongfully exerted dominion over the promissory note that covered the approximately $260,000 owed to Malka.

274. MLTI has a property interest in the promissory note that covered the approximately $260,000 owed to Malka.

275. MLTI has a right to possess the promissory note that covered the approximately $260,000 owed to Malka.

276. MLTI has suffered damages as a result of the Seller Members' conversion of the promissory note that covered the approximately $260,000 owed to Malka.

277. As a result of the foregoing, MLTI is entitled to compensatory damages.

**COUNT XIII**
**Breach of Contract – Section 3.15 of the MIPA**
**(Against All Counterclaim-Defendants)**

278. MLTI repeats and realleges each and every allegation contained above as if fully set forth herein.

279. As set forth in Paragraphs 116-120, *supra*, the Seller Members breached Section 3.15 of the MIPA by falsely disclosing the client related to the Receivable Transaction as a "2020 Top Client" despite it being a delinquent account receivable.

280. Malka was carrying a delinquent $336,000 account receivable for the Receivable Client, which had been recognized as revenue in periods prior to 2021. In keeping with their

94

professed "historical practice," Malka had recognized the $336,000 receivable as revenue at the time of the invoice.

281.   In mid-2021, the Receivable Client discontinued making payments against the outstanding receivable, and Malka agreed to restructure the receivable into promissory notes totaling approximately $260,000.  This amount was then recognized and recorded as 2021 revenue in Malka's internal bookkeeping program, in a manner inconsistent with GAAP.

282.   Only a few monthly payments were made under the promissory note before the client again ceased payments in early 2022 and the relationship between the client and Malkalo LLC, a personal investment vehicle of the Seller Members, led to a commercial dispute.

283.   In the first quarter of 2023—after the end of the 2022 Earnout Period—the Seller Members finally told Malka's Head of Finance that Malka would not be able to collect on the promissory notes and instructed him to write off the remaining value as bad debt.  The treatment of that debt as revenue was not consistent with GAAP and artificially inflated Malka's 2021 revenue figures.

284.   The Seller Members falsely disclosing the client related to the Receivable Transaction as a "2020 Top Client" despite it being a delinquent account receivable.

285.   MLI and MLTI have been damaged by this breach of the MIPA.

286.   As a result of the foregoing, MLI and MLTI seek rescission, restitution or compensatory damages in an amount to be determined at trial.

**COUNT XIV**
**Breach of Contract – Section 3.17 of the MIPA**
**(Against All Counterclaim-Defendants)**

287.   MLTI repeats and realleges each and every allegation contained above as if fully set forth herein.

288.   As set forth in Paragraphs 116-120, *supra*, the Seller Members breached Section 3.17 of the MIPA through their failure to disclose the dispute with the Receivable Client with respect to outstanding invoices that totaled as of the Closing.

289.   Malka was carrying a delinquent $336,000 account receivable for the Receivable Client, which had been recognized as revenue in periods prior to 2021.  In keeping with their professed "historical practice," Malka had recognized the $336,000 receivable as revenue at the time of the invoice.

290.   In mid-2021, the Receivable Client discontinued making payments against the outstanding receivable, and Malka agreed to restructure the receivable into promissory notes totaling approximately $260,000.  This amount was then recognized and recorded as 2021 revenue in Malka's internal bookkeeping program, in a manner inconsistent with GAAP.

291.   Only a few monthly payments were made under the promissory note before the client again ceased payments in early 2022 and the relationship between the client and Malkalo LLC, a personal investment vehicle of the Seller Members, led to a commercial dispute.

292.   In the first quarter of 2023—after the end of the 2022 Earnout Period—the Seller Members finally told Malka's Head of Finance that Malka would not be able to collect on the promissory notes and instructed him to write off the remaining value as bad debt.  The treatment of that debt as revenue was not consistent with GAAP and artificially inflated Malka's 2021 revenue figures.

293.   ~~227. As set forth in Paragraphs  110-113, *supra*, the~~The Seller Members ~~also~~ ~~breached Section 3.17 of the MIPA through their failure~~failed to disclose the dispute with the Receivable Client with respect to outstanding invoices that totaled as of the Closing, which

resulted in Malka including a reserve in its financial statements of approximately $253,000 as of the end of December 31, 2022.

294.    MLI and MLTI have been damaged by this breach of the MIPA.

295.    As a result of the foregoing, MLI and MLTI seek rescission, restitution or compensatory damages in an amount to be determined at trial.

**COUNT XV**
**Breach of Contract – Section 5.01 of the MIPA**
**(Against All Counterclaim-Defendants)**

296.    MLTI repeats and realleges each and every allegation contained above as if fully set forth herein.

297.    228. As set forth in Paragraphs 140-141145-146, *supra*, the Seller Members also breached the covenants in Section 5.01 of the MIPA by filing a Schedule 13D on June 2, 2023 containing material non-public information of a confidential and proprietary nature.

298.    On June 2, 2023, the Seller Members filed a Schedule 13D with the U.S. Securities and Exchange Commission, seemingly in response to MoneyLion informing the Seller Members that they appeared to be operating as a voting group relating to their shares in MLI common stock without notifying management or filing the proper public disclosures under the federal securities laws, and in an effort to cleanse themselves of possession of material nonpublic information.

299.    Rather than simply describing the purpose of the transaction—which is the singular objective of Item 4—the Schedule 13D filed by the Seller Members after the market closed on Friday, June 2, 2023 contained material non-public information of a confidential and proprietary nature.

300.    This material non-public information included the confidential details of the Seller Members' current dispute with MoneyLion concerning the 2022 Earnout Statement, the termination of their employment as executives of Malka, relevant terms of the acquisition that had not been previously disclosed publicly, the positions taken by each party, the amounts and number of shares in controversy, the current status of the internal dispute resolution process, and the range of potential outcomes.

301.    MLI and MLTI have been damaged by this breach of the MIPA.

302.    As a result of the foregoing, MLI and MLTI seek rescission, restitution or compensatory damages in an amount to be determined at trial.

**COUNT XVI**
**Breach of Contract – Section 9.01 of the MIPA**
**(Against All Counterclaim-Defendants)**

303.    MLTI repeats and realleges each and every allegation contained above as if fully set forth herein.

304.    ~~229.~~ As set forth in Paragraphs ~~90-96~~103-109, *supra*, the Seller Members also breached Section 9.01 of the MIPA, as the Seller Members incurred personal expenses and had those expenses paid by Malka or MoneyLion.

305.    The Seller Members systematically misappropriated Malka funds for the payment of personal legal and accounting fees and other purely personal expenses, totaling approximately $180,000 between November 2021 and May 2023.

306.    These personal expenses included approximately $140,000 in legal fees incurred in connection with personal legal advice rendered by the Seller Members' attorneys at Fox Rothschild LLP, as reflected in invoices dated from November 2021 through March 2023.

307.    Additionally, Fried submitted an invoice for reimbursement dated April 5, 2022 in connection with tax advice received from Malka's external accounting firm, Curran & Co., in connection with Fried's personal tax return in March 2022.

308.    The Seller Members also frequently used Malka funds for payment of expenses that they had charged to their corporate American Express and Chase credit cards for wholly personal activities.

309.    These personal expenses included various membership fees, such as for gym subscriptions, family travel expenses, parking and toll expenses, personal meals, and even Frommer's nearly $10,000 personal airfare to travel to the World Cup in Qatar in late 2022—a trip he had admitted to MoneyLion's management team was personal in nature.

310.    ~~230.~~ MLI and MLTI have been damaged by ~~these numerous breaches~~this breach of the MIPA.

311.    ~~231.~~ As a result of the foregoing, MLI and MLTI ~~are entitled to~~seek rescission, restitution or compensatory damages~~, including but not limited to the invalidation of the restricted Closing Shares and 2021 Earnout Shares~~ in an amount to be determined at trial.

**COUNT ~~IX~~XVII**
**Breach of Contract – Section 5.02 of the MIPA**
**(Against All Counterclaim-Defendants)**

312.    ~~232.~~ MLTI repeats and realleges each and every allegation contained above as if fully set forth herein.

313.    ~~233.~~ The Seller Members were subject to restrictive covenants set forth in Section 5.02 of the MIPA that continued post-employment.

314.   ~~234.~~ As set forth in Paragraphs ~~142-145~~147-150, *supra*, the Seller Members have breached these restrictive covenants by soliciting MoneyLion clients and competing directly with MoneyLion.

315.   ~~235.~~ Shortly after his termination, Fried reached out to at least two of Malka's clients and Krubich reached out to a third Malka client in an explicit effort to poach those clients from Malka and MoneyLion.  Fried and Krubich reportedly indicated to these clients that Malka and MoneyLion were not capable of fulfilling their needs, directly interfering with Malka and MoneyLion's existing relationships with these clients.

316.   ~~236.~~ As recently as July 26, 2023, Capra acted as agent to a current MoneyLion client in connection with a one-year professional football contract.

317.   ~~237.~~ MLTI has been, and will continue to be, damaged by the Seller Members' breaches of these restrictive covenants.

318.   ~~238.~~ As a result of the foregoing, MLTI is entitled to compensatory damages.

**COUNT ~~XI~~XVIII**
**Unjust Enrichment**
**(Against All Counterclaim-Defendants)**

319.   ~~239.~~ MLTI and MLI repeat and reallege each and every allegation contained above as if fully set forth herein.

320.   ~~240.~~ The Seller Members have been enriched at the expense of Counterclaim-Plaintiffs.

321.   ~~241.~~ As set forth in Paragraphs ~~24-65, 69-88, 98-101, 105-118~~25-96 and 153-169, *supra*, the Counterclaim-Plaintiffs have suffered significant damages as a result of their reliance on the Seller Members' false misrepresentations and omissions, as MoneyLion was induced to

100

pay an amount above the fair value of Malka in order to acquire the company and was induced to issue the 2021 Earnout Payment despite Malka not meeting the EBITDA threshold in the MIPA.

322.   242.   Under these circumstances, equity and good conscience demand that MoneyLion be given restitution for the amount by which it overpaid for Malka and the amount paid in connection with the 2021 Earnout Payment.

323.   243.   As a result of the foregoing, MLTI and MLI are entitled to compensatory damages, including but not limited to the invalidation of the restricted Closing Shares and 2021 Earnout Shares.

**COUNT XIX**
**Conversion of Malka Office Equipment and Other Property**
**(Against Krubich)**

324.   MLTI and MLI repeat and reallege each and every allegation contained above as if fully set forth herein.

325.   As set forth in Paragraphs 151-152, *supra*, on May 19, 2023, the Seller Members' employment at MoneyLion and Malka was terminated for cause, and the Seller Members were instructed to vacate Malka's offices in Jersey City, New Jersey and Santa Monica, California, and to coordinate with MoneyLion's People team to return any property belonging to Malka.

326.   Defendant Krubich ignored MoneyLion's instructions that he not return to Malka's Santa Monica offices, and instead burglarized those offices at approximately 3:53pm on the following Sunday, May 21, 2023.

327.   After disabling the alarm using another Malka employee's access code and entering through a garage door, Krubich was captured on security cameras removing computer equipment and other materials from the Malka office without authorization.

328.    The equipment and materials taken by Krubich from the Malka office without authorization are reasonably believed to exceed $5,000 in value.

329.    Krubich has wrongfully exerted dominion over the equipment and materials taken by Krubich from the Malka office without authorization.

330.    MLI and MLTI have a property interest in the equipment and materials taken by Krubich from the Malka office without authorization.

331.    MLI and MLTI have a right to possess the equipment and materials taken by Krubich from the Malka office without authorization.

332.    MLI and MLTI have suffered damages as a result of the Krubich's conversion of the equipment and materials taken by Krubich from the Malka office without authorization.

333.    As a result of the foregoing, MoneyLion is entitled to compensatory damages.

12483488

**PRAYER FOR RELIEF**

**WHEREFORE**, MLI and MLTI respectfully demand judgment against Counterclaim-Defendants as follows:

a)   (a)  An order declaring that in light of the parties' disputes concerning the interpretation and construction of the MIPA and Schedules A and B thereto, (i) the applicable Accounting Principles to be used in preparing the 2021 and 2022 financial statements must be applied as written in Schedule A—to wit: "***prepared in accordance with U.S. GAAP, except for the specific exceptions***, *e.g.*, (a) the Company's historical revenue recognition principles, ***which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained***; (b) the Company's historical cost recognition principles associated with such revenue, ***which require the Company to recognize costs on contracts as incurred***"; (ii) the principles, policies and procedures expressly set forth in Schedule A of the MIPA, *i.e.*, ***in accordance with U.S. GAAP***, shall take precedence over Malka's historical accounting principles, policies and procedures, which may be applied only to the extent not inconsistent with the foregoing; (iii) Malka's 2021 financial statement was incorrectly prepared based upon the Seller Members' intentional misapplication of the required Accounting Principles, including the improper recognition of revenue and wrongful deferral of actual expenses; and the Independent Accountant shall be empowered and directed to correct the 2021 Earnout Payment statement and Revenue and EBITDA earnout calculation in accordance with the Court's adjudication as prayed for herein; (iv) Subject to the Court's direction, the Independent Accountant shall apply the Accounting Principles in accordance with the foregoing declarations and shall be empowered and directed to calculate the Revenue and EBITDA earnout

103

calculation in accordance with the Court's adjudication as prayed for herein; and (v) the stated "intention of the Parties that the 2021 Revenue Amount and the 2021 EBITDA Amount and the 2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using substantially consistent methods and practices" shall be subject to the Court's determination concerning the intentions of the parties, which shall not require the Independent Accountant to apply the same accounting principles improperly applied to calculate the 2021 Revenue Amount and the 2021 EBITDA Amount when calculating the 2022 Revenue Amount and the 2022 EBITDA Amount.

b)    (b) An order declaring that in light of the parties' disputes concerning the interpretation and construction of the MIPA and Schedules A and B thereto, the Closing Shares and 2021 Earnout Shares shall remain restricted under the care and custody of Continental Stock Transfer & Trust Company until final judgment of the Court allowing MLI to invalidate those shares as prayed for herein;

c)    (c) Awarding MLI and MLTI compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Counterclaim-Defendants' wrongdoing, including pre-judgment and post-judgment interest, and punitive damages as allowed by law;

(d) or, in the alternative, granting equitable rescission to MLTI with respect to the MIPA, including an An order invalidating the restricted Closing Shares and 2021 Earnout Shares;

d)    (e) Awarding MLI and MLTI their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

e)    (f) Awarding such other relief as this Court may deem just and proper.

Dated: ~~August 31~~<u>October 13</u>, 2023

KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

By:_____

David M. Levy
Marc R. Rosen
Joshua K. Bromberg
Alisa Benintendi
Taeler Lanser

500 Fifth Avenue
New York, New York 10110
Telephone: (212) 986-6000
Facsimile: (212) 986-8866
dlevy@kkwc.com
mrosen@kkwc.com
jbromberg@kkwc.com
abenintendi@kkwc.com
tlanser@kkwc.com

Attorneys for Defendant and Counterclaim Plaintiff
**MONEYLION TECHNOLOGIES INC.** and
Third-Party Plaintiff **MONEYLION INC.**

12483488

| Summary report: Litera Compare for Word 11.3.0.46 Document comparison done on 10/13/2023 5:16:04 PM | |
|---|---|
| **Style name:** Default No Text Box | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** MoneyLion - Answer, Affirmative Defenses, and Counterclaims(12467844.18).docx | |
| **Modified filename:** Amended Answer and Counterclaims-12483488-v15.docx | |
| **Changes:** | |
| Add | 920 |
| Delete | 590 |
| Move From | 73 |
| Move To | 73 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 3 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1659 |