UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                          :
JEFFREY FROMMER et al.,                                   :
                                                          :
                    Plaintiffs,                           :
                                                          :
            -v-                                           :
                                                          :
MONEYLION TECHNOLOGIES INC. et al.,                       :
                                                          :
                    Defendants,                           :
                                                          :
MONEYLION TECHNOLOGIES INC.,                              :
                                                          :
                    Counterclaim Plaintiff,               :
                                                          :
            -v-                                           :
                                                          :          23-CV-6339 (JMF)
JEFFREY FROMMER et al.,                                   :
                                                          :          OPINION AND ORDER
                    Counterclaim Defendants,              :
                                                          :
MONEYLION INC.,                                           :
                                                          :
                    Third-Party Plaintiff,                :
                                                          :
            -v-                                           :
                                                          :
JEFFREY FROMMER et al.,                                   :
                                                          :
                    Third-Party Defendants.               :
                                                          :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Jeffrey Frommer, Lyusen (Louis) Krubich, Daniel Fried, and Pat Capra ("Sellers")

founded and co-owned Malka Media Group LLC ("Malka") until MoneyLion Technologies Inc.

("MLTI") acquired it in November 2021.  In July 2023, Sellers brought this action against MLTI

for breach of contract, alleging that MLTI blocked them from accessing shares of MoneyLion

Inc. ("MLI"), MLTI's parent company, that were issued to Sellers pursuant to the acquisition

agreement.  MLTI and MLI (together, "MoneyLion") parried with Counterclaims and a Third-Party Complaint alleging that Sellers had "engaged in fraud" before and after the acquisition by "presenting financial reporting to MoneyLion that was grossly exaggerated and untrue."  ECF No. 54 ("Counterclaims"), ¶ 4.  Now pending is Sellers' motion to dismiss all of MoneyLion's Counterclaims and MLI's Third-Party Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

The following facts — taken from the Amended Counterclaims and Third-Party Complaint and the documents that are attached to, integral to, or incorporated by reference in the pleadings — are assumed to be true for purposes of this motion.  *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 110-11 (2d Cir. 2010).

### A.  The Parties' Negotiations

MoneyLion is a publicly listed company that provides consumer financial products and services.  Counterclaims ¶¶ 21, 24.  Sellers were the owners and operators of Malka, a company that offers creative media and marketing services to clients across industries.  *Id.* ¶ 22.  In 2021, MoneyLion and Sellers began to discuss a transaction that would result in MoneyLion's acquisition of Malka.  *Id.* ¶ 24.  During the negotiations over the purchase price, Sellers "grossly overstated Malka's growth projections and profit margins."  *Id.* ¶ 28.  More specifically, Sellers projected an aggregate $5.4 million in earnings before interest, taxes, depreciation, and amortization ("EBITDA"), a figure they based on "multiples of the company's EBITDA and revenue estimates for 2021, which they represented were premised upon the same accounting principles and practices used by Malka historically."  *Id.*  Sellers also made "express representations that Malka had historically operated in accordance with the requirements of both

U.S. generally accepted accounting principles ('GAAP') and Accounting Standards Codification 606 ('ASC 606')" in its financial reporting.  *Id.* ¶ 25.  Based on the projections in their pitch deck, Sellers proposed, and MoneyLion accepted, a valuation of $75 million for Malka.  *Id.* ¶ 29.

Despite pressure from Sellers to "close" a deal "as quickly as possible," MoneyLion "insisted on taking appropriate time and measures to conduct formal due diligence," for which it "engaged a well-known and established accounting advisory firm and legal counsel."  *Id.* ¶ 30. During this due diligence process, MoneyLion "reviewed numerous legal, financial, and other documents provided by [Sellers] and other Malka personnel," including Malka's financial statements from 2019 and 2020.  *Id.* ¶ 31.  MoneyLion also relied on information provided by Curran & Co., an accounting firm that served as Malka's accountant and Fried's personal accountant.  *Id.* ¶ 31, 106.  Curran & Co. represented in conference calls with MoneyLion and in Malka's 2019 and 2020 financial statements that Malka was "compliant with ASC 606 revenue recognition requirements, except in certain isolated instances where projects fell behind schedule," even though this was not true.  *Id.* ¶¶ 34, 35 (internal quotation marks omitted).  The 2019 and 2020 financial statements also overreported Malka's gross profit by including "the substantial cost of employees that were billed to clients to generate revenue."  *Id.* ¶ 41.  Curran & Co. based these representations on "applying analytical procedures to [Malka's] management's financial data and making inquiries of company management."  *Id.* ¶ 37.  Frommer also "worked closely with Ryan Curran," Curran & Co.'s owner, in both the due diligence process and the negotiations with MoneyLion.  *Id.* ¶ 45.  "[D]espite knowing that Malka's 2019 and 2020 Financial Statements contained material misrepresentations about Malka's accounting principles, [Sellers] never corrected those misstatements in their dealings with MoneyLion."  *Id.* ¶ 39.

**B.  The Membership Interest Purchase Agreement**

On November 15, 2021, the parties entered into the Membership Interest Purchase Agreement ("MIPA"), which set the overall value of the cash and equity consideration for the acquisition at $75 million, with "a significant portion of the consideration [] tied to revenue- and EBITDA-based earnout targets." *Id*. ¶¶ 29, 43.  More specifically, MoneyLion agreed to purchase all outstanding membership interests in Malka for approximately $10 million in cash and approximately $30 million in shares of MoneyLion common stock ("Closing Payment").  *Id.* ¶ 55.  Sellers would be entitled to an additional $6.7 million in restricted shares of MoneyLion common stock (the "2021 Earnout Payment") if Malka satisfied a revenue threshold of $16,750,000 and an EBITDA threshold of $100,000 for 2021, with the shares to vest in four equal installments on March 31, 2022, June 30, 2022, September 30, 2022, and December 31, 2022. *Id.* ¶¶ 61, 63.  "[T]he 2021 Earnout Payment would increase on a linear basis up to a number of restricted shares of [MoneyLion] common stock equal to an aggregate value of $10,000,000" if Malka overperformed on revenue and met the EBITDA threshold.  *Id.* ¶ 62. Similarly, in 2022, Sellers would be entitled to an earnout payment of $16,750,000 in restricted shares of MoneyLion common stock (the "2022 Earnout Payment") if Malka satisfied a revenue threshold of $21,100,000 and an EBITDA threshold of $100,000, with the shares to vest in four equal installments on March 31, 2023, June 30, 2023, September 30, 2023, and December 31, 2023.  *Id.* ¶¶ 65, 67.  "[T]he 2022 Earnout Payment would increase on a linear basis up to a number of restricted shares of [MoneyLion] common stock equal to an aggregate value of $25,000,000" if Malka overperformed on revenue and met the EBITDA threshold.  *Id.* ¶ 66.

The MIPA defined "Accounting Principles" to mean "the principles, policies, and procedures expressly set forth on Schedule A[] and . . .  to the extent not inconsistent with the

foregoing, the historical accounting principles, policies and procedures of [Malka]." *Id.* ¶ 47; *see* ECF No. 63-1 ("MIPA"), at 2.  Schedule A, in turn, provided that the relevant "Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with . . . U.S. GAAP" with certain exceptions, including Malka's "historical revenue recognition principles, which require [Malka] to recognize into revenue noncancelable deposits on contracts," as well as its "historical cost recognition principles."  Counterclaims ¶ 49; *see* MIPA at 79.  (MoneyLion would later discover that, "[i]n reality, Malka . . . *never*" required clients to make noncancelable deposits on their contracts; instead, "Malka almost always recognized revenue immediately upon invoicing."  Counterclaims ¶ 72.)  Schedule B, titled "Revenue and EBITDA Calculation Principles," provided that revenue would be calculated "precisely as defined in Schedule A" and that EBITDA would be "determined in accordance with U.S. GAAP (including [Malka]'s historical revenue and cost recognition principles)."  *Id.* ¶¶ 51-52; *see* MIPA at 82-83.  In Section 3.06 of the MIPA, the parties memorialized Sellers' prior representations that Malka's 2019 and 2020 financial statements had been "prepared in accordance with the Accounting Principles."  MIPA at 30.  The MIPA's "extensive references to GAAP, coupled with [Seller's] express assurances during due diligence and representations" convinced MoneyLion that "recognition of GAAP and ASC 606 was the starting point for valuing Malka and determining the purchase price, for understanding Malka's historical 'Accounting Principles,' and for any calculation of Earnout Payments."  Counterclaims ¶ 54.

On November 16, 2021, MoneyLion announced that it had acquired Malka and that Krubich and Frommer would continue to lead Malka's day-to-day operations alongside Capra and Fried.  *Id.* ¶ 73.  MoneyLion's expectation was that Sellers "would be long-term partners in MoneyLion's business following the acquisition" and, based on this expectation, appointed

Frommer, Krubich, and Fried to MoneyLion's Executive Committee and Frommer and Krubich to MoneyLion's Disclosure Committee. *Id.* ¶¶ 74-75.

## C. The 2021 Earnout Payment

In accordance with the MIPA, MoneyLion calculated the 2021 Revenue and EBITDA Statement based on Malka's Unaudited 2021 Financial Statement, which was delivered to MoneyLion's finance team in the first quarter of 2022. *Id.* ¶ 84. Because MoneyLion had owned and operated Malka for only the last six weeks of 2021, MoneyLion was not required to conduct an audit of Malka's financial statements for the period prior to the acquisition. *Id.* Instead, MoneyLion relied upon Sellers' "prior representations in concluding that [Malka's] Unaudited 2021 Financial Statement was prepared in a substantially similar manner (i.e., consistent with GAAP), and accepted as accurate [Sellers'] presentation of Malka's performance and profitability for the purposes of calculating the 2021 Earnout Payment." *Id.* ¶ 85. MoneyLion's calculations indicated that Malka had achieved the revenue and EBITDA thresholds necessary to issue the 2021 Earnout Payment in full, and Sellers received the first tranche of the 2021 Earnout Payment on or about March 31, 2022. *Id.* ¶¶ 87-88.

As MoneyLion would later recalculate, "Malka's *actual* GAAP-based EBITDA for 2021, calculated in accordance with the accounting principles in Schedules A and B to the MIPA . . . turned out to be approximately negative $1,245,000, far below the positive $100,000 required EBITDA threshold for 2021." *Id.* ¶ 91. Among other problems, Sellers' Unaudited 2021 Financial Statement violated the Accounting Principles by "recogniz[ing] revenues at the moment that Malka issued customer invoices, regardless of whether any fees were paid in advance or when the work was to be performed by Malka," *id.* ¶¶ 92-94; "deferr[ing] costs well beyond the date on which they were incurred, artificially inflating Malka's EBITDA figures," *id.*

¶ 95; and counting as revenue promissory notes totaling $260,000 (that Sellers then assigned to Malkalo LLC, their personal investment vehicle), advance payments for unperformed work totaling $400,000, and escrow funds totaling $50,000, *id.* ¶¶ 114-23.  Furthermore, "[d]uring the parties' [pre-acquisition] negotiations and as reflected in Schedule B of the MIPA, MoneyLion had agreed to add the 'expected recognition' of a New Jersey Digital Media Tax Credit" in the amount of $890,904.80 to the 2021 or 2022 EBITDA calculation "if such recognition occurred 'in the period in which the Tax Credit was applied for.'"  *Id.* ¶ 78.  MoneyLion agreed to do so in reliance on Frommer's statement that the tax credit was "money good" and would be approved any day.  *Id.*  In late 2021 and early 2022, Frommer stated, "both orally and in writing, that the 2019 Tax Credit was 'approved' towards the end of 2021."  *Id.* ¶ 80.  But the tax credit was not formally approved until May 2023 "in an amount materially less than the amount applied for, and MoneyLion has yet to monetize the value of that 2023 asset."  *Id.* ¶ 81.

**D.  The 2022 Earnout Payment**

"It soon became clear" that Malka was not operating profitably and, in the first quarter of 2022, MoneyLion's finance team began sending monthly payments to fund Malka's operations. *Id.* ¶ 99.  In the meantime, Frommer began to engage in "clandestine 'tracking'" to check whether Malka was on track to meet its revenue and EBITDA targets by "record[ing] and flag[ging] GAAP adjustments made in the official statements and compar[ing] them against Malka's" internal financial practices.  *Id.* ¶ 100.  For this purpose, and "[u]nder pressure from Frommer, Malka's Head of Finance proceeded to keep two separate sets of books" and was "led to believe by Frommer that [Malka's] internal bookkeeping, without any GAAP adjustments, was the proper set of financial records that would be used at year end to calculate Malka's revenues and EBITDA" for determining the 2022 Earnout Payment under the MIPA.  *Id.* ¶ 101.

Unlike in 2021, MoneyLion audited Malka's 2022 financial statements before calculating its revenue and EBITDA.  *Id.* ¶ 110.  On April 14, 2023, MoneyLion completed and delivered to Sellers the 2022 Revenue and EBITDA Statement, which reflected that Malka's gross revenues exceeded the required revenue threshold but that its EBITDA was approximately negative $2,840,000, well below the $100,000 mark required for the 2022 Earnout Payment.  *Id.* ¶¶ 111-12.  Given Sellers' failure to meet the 2022 EBITDA threshold, MoneyLion asked Malka's Head of Finance to review Malka's previous financial statements.  *Id.* ¶ 113.  Upon such review, he concluded that, contrary to Sellers' representations during the negotiation process, "ASC 606 was not Malka's revenue recognition practice in 2020 or 2021."  *Id.*  He "brought to MoneyLion's attention several instances in which [Sellers] had manipulated [Malka's] Unaudited 2021 Financial Statement" along the lines indicated above.  *Id.* ¶¶ 113-23.  During this process, MoneyLion learned that Sellers had counted the same promissory notes, advance payments, and escrow funds as revenue *again* in its 2022 financial statements, *id.*, and that they had also "delay[ed] the year-end reconciliation of $106,000 in fees payable to a technology company . . . in order to push the expenses into 2023 so as to avoid having to recognize the expense in 2022."  *Id.* ¶ 124.  MoneyLion also learned that Sellers had, at the time of the closing, failed to disclose their ownership of Malka subsidiaries (including one that continued to own Malka's intellectual property), in breach of Sections 3.04 and 3.12 of the MIPA.  *Id.* ¶¶ 143-44.  Based on these revelations, MoneyLion determined that the MoneyLion shares delivered as part of the Closing Payment and the 2021 Earnout Payment were "improperly issued" and advised Continental Stock Transfer and Trust Company, MoneyLion's transfer agent, that they would "not at this time honor any attempt by [Sellers] to sell, transfer, or otherwise dispose of their Restricted Shares."  *Id.* ¶ 160.

In May 2023, Sellers sent MoneyLion their formal objections to the 2022 Revenue and EBITDA Statement, denying, "for the first time," that GAAP and ASC 606 apply to the required EBITDA calculation.  *Id.* ¶ 126.  Sellers further argued that MoneyLion had "in effect waived the GAAP compliance requirements" by failing to raise any objections in advance of the Closing Payment or the 2021 Earnout Payment.  *Id.* ¶ 129.  Ultimately, the parties "failed to reach an agreement with respect to all matters set forth in [Sellers'] written statement of objections."  *Id.* ¶ 137.  MoneyLion then proposed appointing an Independent Accountant pursuant to Section 2.06(iv) of the MIPA, which sets forth a dispute resolution process, and authorizing that accountant "to engage its own counsel to adjudicate the legal issues" regarding the applicable Accounting Principles.  *Id.* ¶¶ 137-38.  But Sellers "ultimately discontinued the parties' negotiations" in favor of a more "narrowly defined dispute resolution process" that is "intended only for a purely accounting-based dispute involving competing calculations of revenue and EBITDA."  *Id.* ¶ 139.  MoneyLion intend to submit to this "streamlined" dispute resolution process, but only after the threshold legal and factual issues presented in this case have been resolved.  *Id.* ¶ 141.

**E.  Sellers' Employment at MoneyLion**

In October 2022, Malka's Head of Finance informed MoneyLion that he intended to resign, but he consented to stay when MoneyLion agreed to restructure his reporting obligations so that he would report directly to MoneyLion's Chief Accounting Officer rather than to Sellers. *Id.* ¶ 102.  Malka's Head of Finance then revealed to MoneyLion that he was "feeling substantial pressure from [Sellers], particularly Frommer," to approve "their use of Malka's funds to pay expenses that [he] viewed as entirely personal to [Sellers] and not related to Malka's business operations."  *Id.* ¶ 103.  These expenses included "approximately $140,000 in legal fees incurred

in connection with personal legal advice rendered by [Sellers'] attorneys at Fox Rothschild LLP," *id.* ¶ 104; fees "in connection with tax advice" by Curran & Co. regarding Fried's personal tax returns, *id.* ¶ 106; as well as "gym subscriptions, family travel expenses, parking and toll expenses, personal meals, and even Frommer's nearly $10,000 personal airfare to travel to the World Cup in Qatar in late 2022," *id.* ¶ 108.  Frommer and Krubich also "circumvented the standard invoicing process at Malka" as to the legal fees owed to Fox Rothschild and "directly reviewed and approved the invoices for payment using Malka's funds."  *Id.* ¶ 105.

On May 19, 2023, MoneyLion terminated Sellers' employment "for cause."  *Id.* ¶ 151. Sellers were instructed to vacate Malka's offices in New Jersey and California and to return any property belonging to Malka.  *Id.*  Contrary to those instructions, on May 21, 2023, Krubich "burglarized" Malka's California offices by entering through a garage door and removing computer equipment and other materials without authorization.  *Id.* ¶ 152.  Sellers also disclosed material non-public information — including "confidential details of their current dispute with MoneyLion concerning the 2022 Earnout Statement, the termination of their employment as executives of Malka," and "relevant terms of the acquisition that had not been previously disclosed publicly" — in their June 2, 2023 Schedule 13D filing with the Securities and Exchange Commission.  *Id.* ¶ 146.  Finally, Sellers proceeded to solicit Malka's clients in breach of the MIPA's non-compete and non-solicitation provisions.  *Id.* ¶ 147.

## F.  Sellers' Complaint and MoneyLion's Counterclaims

In July 2023, Sellers brought breach of contract claims (based on MoneyLion's "stop order" to Continental) and sought an order requiring MoneyLion "to remove all restrictions on [Sellers'] shares in the custody and control of Continental."  ECF No. 1 ("Complaint"), ¶ 95.  By Order dated October 17, 2023, the Court denied Sellers' request for a preliminary injunction,

explaining that money damages awarded in the normal course of litigation would adequately compensate them for any wrongful withholding of publicly traded stock.  *See* ECF No. 56. Thereafter, MoneyLion filed its Answer and the Counterclaims and Third-Party Complaint at issue in this Opinion, ECF No. 54, bringing claims against Sellers for a declaratory judgment "concerning the interpretation and construction of" the MIPA's definition of "Accounting Principles" (Count I), Counterclaims ¶¶ 178-84; a declaratory judgment that MoneyLion was entitled to "withhold its consent to the release of restrictions on the restricted Closing Shares and 2021 Earnout Shares" (Count II), *id.* ¶¶ 185-89; violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder (Count III), common law fraud (Count IV), and negligent misrepresentation (V), based on misrepresentations and omissions made "prior to and at the closing . . . and in connection with the issuance of the 2021 Earnout Shares" (Count III), *id.* ¶¶ 190-225; breach of fiduciary duty for "misappropriating company assets," "wrongfully manipulating the calculation of revenue and EBIDA," "directing subordinate employees to deliberately misstate Malka's finances," and "forming a voting group . . . without notifying management or filing the proper public disclosures" (Count VI), *id.* ¶¶ 226-230; conversion of the Closing Shares and the 2021 Earnout Shares (Count VII), *id.* ¶¶ 231-36; breach of Sections 3.04, 3.06, 3.12, 3.14, 3.15, and 3.17 of the MIPA for improper calculation of Malka's revenue and EBITDA and/or failure to disclose facts material to the acquisition (Counts VIII, IX, X, XI, XIII, and XIV), *id.* ¶¶ 237-65, 278-95; breach of Section 5.01 of the MIPA for disclosing "material non-public information of a confidential and proprietary nature" in Sellers' Schedule 13D filing (Count XV), *id.* ¶¶ 296-302; breach of Section 9.01 of the MIPA for misappropriating Malka's funds (Count XVI), *id.* ¶¶ 303-11; breach of Section 5.02 of the MIPA by soliciting MoneyLion clients and competing directly with MoneyLion (Count XVII), *id.*

¶¶ 312-18; conversion of a promissory note that Sellers assigned to Malkalo LLC, their personal investment vehicle (Count XII), *id.* ¶¶ 266-77; unjust enrichment (Count XVIII), *id.* ¶¶ 319-23; and conversion of Malka's office equipment and other property (Count XIX), *id.* ¶¶ 324-33.

## LEGAL STANDARDS

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008). A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

Because MoneyLion alleges fraud under both federal securities laws and common law, it must also satisfy the heightened pleading requirements of both Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). To satisfy Rule 9(b), a plaintiff generally "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). To satisfy the

PSLRA, a complaint must, "with respect to each act or omission alleged to [constitute securities fraud], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 88 n.14 (2d Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(2)); *see In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 22 (S.D.N.Y. 2016) (noting that a plaintiff "must allege facts supporting a strong inference with respect to each defendant"). The "strong inference" must be "more than merely plausible or reasonable." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). The necessary inquiry is "inherently comparative." *Id.* at 323. That is, the Court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. Thus, a complaint alleging securities fraud will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

In this Circuit, a plaintiff may satisfy the scienter pleading requirement in either of two ways: "by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The former requires a plaintiff to allege that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 307-08 (2d Cir. 2000)). The latter requires allegations of either actual intent or "conscious recklessness — *i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015). More specifically, a plaintiff must allege conduct by a defendant that is, "at the least, conduct

which is highly unreasonable and which represents an extreme departure from the standards of
ordinary care to the extent that the danger was either known to the defendant or so obvious that
the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).
As a general matter, courts have approved of claims when plaintiffs "have specifically alleged
defendants' knowledge of facts or access to information contradicting their public statements.
Under such circumstances, defendants knew or, more importantly, should have known that they
were misrepresenting material facts related to the corporation." *Novak*, 216 F.3d at 308.

## DISCUSSION

In moving to dismiss MoneyLion's Counterclaims, Sellers advance literally dozens of
arguments. But they develop only some of these arguments sufficiently. They raise others
merely in passing, in single sentences or throwaway phrases supported by little or no legal
authority. For example, Sellers present a one-sentence laundry list of arguments calling for
dismissal of Counts IX, X, XI, XII, and XIV, ECF No. 62 ("Sellers' Mem."), at 24-25;
alternatively argue in a single sentence that these counts must be dismissed because they "do not
state a claim for damages in excess of the MIPA's $375,000 floor," *id.* at 25; and make scattered
references to impermissible group pleading, *see, e.g.*, *id.* at 21-24. The Court need not, and will
not, consider arguments raised in such a "perfunctory manner." *Tolbert v. Queens Coll.*, 242
F.3d 58, 75 (2d Cir. 2001) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by
some effort at developed argumentation, are deemed waived."); *see, e.g.*, *Norton v. Sam's Club*,
145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered
waived . . . ."); *SOHC, Inc. v. Zentis Food Sols. N. Am., LLC*, No. 14-CV-2270 (JMF), 2014 WL
6603951, at *1 (S.D.N.Y. Nov. 20, 2014) ("[A] 'single, conclusory, one-sentence argument' is
insufficient to raise an issue in the first instance." (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 112

n.4 (2d Cir. 2000))).  That includes all of Sellers' arguments for dismissal of Counts IX, X, XI, XII, and XIV, so their motion must be and is denied as to those claims.

In a similar vein, the Court rejects Sellers' barely substantiated call to dismiss MLI's "third-party complaint . . . in its entirety."  Sellers' Mem. 25.  Contrary to Sellers' argument, the fact that MLI is not a party to the MIPA is of limited significance because only MLTI brings claims for breach of the MIPA, Counterclaims ¶¶ 237-65, 278-318, and asserts, as Malka's acquiror, "a property interest" over a promissory note covering money owed from one of Malka's clients, *id.* ¶ 274-75.  In the absence of any other substantive argument, there is no basis to dismiss MLI's Third-Party Complaint.  MoneyLion plainly alleges that its counterclaims "relate to MLI common stock, issued to [Sellers] subject to the [Restricted Stock Agreements] (exclusively entered into between [Sellers] and MLI), and that the associated effects and damages are independently felt by MLI and its public shareholders."  ECF No. 65 ("MoneyLion Opp'n"), at 25; *see, e.g.*, Counterclaims ¶¶ 55, 59 n.5, 61-68, 145, 158-64, 169.  And the MIPA explicitly implicates MLI, which the agreement describes as MLTI's "parent," MIPA at 13, and its common stock, which is a primary component of the payments made to (or withheld from) Sellers at the time of closing and for their 2021 and 2022 earnouts, *see id.* at 18, 24-25.

Sellers' motion is flawed in one other respect that warrants mention at the outset.  In reviewing a motion to dismiss, "a court may consider only: (1) the factual allegations in the complaint, which are accepted as true; (2) documents attached to the complaint as an exhibit or incorporated in it by reference; (3) matters of which judicial notice may be taken; and (4) documents either in plaintiff's possession or of which plaintiff had knowledge and relied on in bringing suit."  *Ratermann v. Pierre Fabre USA, Inc.*, No. 22-CV-325 (JMF), 2023 WL 7627425, at *1 n.2 (S.D.N.Y. Nov. 14, 2023) (quoting *JRLDDS, LLC v. Hartford Fin. Servs.*

*Grp. Inc.*, No. 21-CV-9487 (JMF), 2022 WL 3018152, at *2 (S.D.N.Y. July 29, 2022)).  In

blatant disregard of this well-established rule, Sellers filed a declaration and sixteen exhibits with

their motion.  *See* ECF No. 63.  The Court may not and will not consider any of these

submissions save the MIPA and the MIPA's Disclosure Schedules, which are incorporated by

reference into the Counterclaims.  As discussed below, that dooms many of Sellers' arguments.

With that, the Court turns to Sellers' arguments that were adequately raised.[1]

## A.  Timeliness

First, Sellers argue that the Counts III, IV, V, VIII, XIII, and XV are untimely under

Section 8.01 of the MIPA, which provides that "[a]ll representations and warranties . . .

contained in, or arising out of, [the MIPA] shall survive the Closing . . . for a period of eighteen

(18) months after the Closing Date," which ended May 15, 2023.  MIPA at 63.

Counts III, IV, and V are MoneyLion's claims for fraud and misrepresentation.  *See*

Counterclaims ¶ 193 (Count III); *id.* ¶ 215 (Count IV); *id.* ¶ 221 (Count V).  On their face, the

MIPA's indemnification provisions apply to these claims.  *See* MIPA § 8.03(f).  And MoneyLion

does not appear to dispute that it failed to raise the claims within the "period of eighteen (18)

months" prescribed in Section 8.01 of the MIPA.  Instead, relying on *Abry Partners V, L.P. v.*

*F&W Acquisition LLC*, 891 A.2d 1032 (Del. Ch. 2006), it contends that the claims are timely

because contractual provisions cannot nullify intentional fraud claims.  MoneyLion Opp'n 6-8.

The Court agrees.  In *Abry Partners*, as here, a buyer sued a seller for misrepresenting

accounting principles applicable to the financial documents that would determine future payouts.

Denying the seller's motion to dismiss the buyer's fraud claims as barred by the indemnification

---

[1]      MoneyLion withdraws Count II in its opposition.  *See* MoneyLion Opp'n 6 n.9.
Accordingly, Sellers' motion is granted on consent as to Count II.

provisions in the stock purchase agreement, then-Vice Chancellor Strine held that "when a seller intentionally misrepresents a fact embodied in a contract[,] . . . public policy will not permit a contractual provision to limit the remedy of the buyer." *Id.* at 1036.  The court later extended this "seminal decision" to survival clauses like the one at issue here, explaining that a seller "cannot invoke a clause in a contract allegedly procured by fraud to eviscerate a claim that the contract itself is an instrument of fraud." *Online HealthNow, Inc. v. CIP OCL Investments, LLC*, No. 20-654 (JRS), 2021 WL 3557857, at *16-18 (Del. Ch. Aug. 12, 2021); *see also GRT, Inc. v. Marathon GFT Tech., Ltd.*, No. 5571 (CS), 2011 WL 2682898, at *13 n.68 (Del. Ch. July 11, 2011) ("'[U]nless fraud is present*, a court will generally enforce the clear expression of the parties' intent' with respect to whether or not the representations and warranties will survive the closing . . . ." (cleaned up) (emphases altered)).  That is sufficient to defeat Sellers' contention that Section 8.01 of the MIPA requires dismissal of Counts III, IV, and V.[2]

By contrast, MoneyLion does not substantively respond to Sellers' argument that Counts VIII, XIII, and XV should be dismissed as untimely; it merely points to the section of their brief regarding the timeliness of Counts III, IV, and V.  *See* MoneyLion Opp'n 23 (citing *id.* at 6-8). That is reason enough to grant Sellers' motion as to Counts VIII, XIII, and XV.  But, in any

---

[2]     None of the cases that Sellers cite in response to MoneyLion's reliance on *Abry Partners* call for a different conclusion.  *See* ECF No. 66 ("Sellers' Reply"), at 3 (citing *Sterling Network Exch., LLC v. Digital Phoenix Van Buren, LLC*, No. 07C-08-050 (WLW), 2008 WL 2582920, at *5 (Sup. Ct. Del. Mar. 28, 2008); *ENI Holdings, LLC v. KBR Grp. Holdings, LLC*, No. 8075 (VCG), 2013 WL 6186326, at *16 (Del. Ch. Nov. 27, 2013); *Protter v. Nathan's Famous Sys., Inc.*, 667 N.Y.S.2d 301 (2d Dep't 1998); *CingleVue Int'l Pty, Ltd. v. eXo Platform NA, LLC*, No. 13-CV-818 (GLS), 2014 WL 3400856, at *4-5 (N.D.N.Y. July 10, 2014)).  To begin, all of the cases predate *Online HealthNow*, which not only reaffirmed the central holding of *Abry Partners* but extended it to survival clauses like the one at issue here.  Furthermore, the Court shares the Delaware Court of Chancery's "skepticism" that the Delaware Superior Court's opinion in *Sterling Network Exchange*, "is an accurate expression of Delaware law," for substantially the reasons explained by Vice Chancellor Slights in *Online HealthNow*.  2021 WL 3557857, at *18.

event, MoneyLion's own analysis makes plain that the *Abry Partners* principle applies only to claims premised on fraud and misrepresentation.  *See id.* at 8-9; *Abry Partners V*, 891 A.2d at 1059 (explaining that the relevant question is whether parties may "premise a contract on defined representations but promise in advance to accept a less-than-adequate remedy if one of them has been induced by lies about one of those material facts").  Counts VIII, XIII, and XV are not premised on fraud or misrepresentation; instead, they allege breach of the MIPA.[3]  Accordingly, the *Abry Partners* principle does not apply to any of Counts VIII, XIII, and XV.

On a motion to dismiss, "the defendant bears the burden of proving that a limitations period has lapsed and that a claim is time-barred."  *Winner Acceptance Corp. v. Return on Cap. Corp.*, No. 3088 (VCP), 2008 WL 5352063, at *14 (Del. Ch. Dec. 23, 2008).  But when, as here, "a complaint asserts a cause of action that on its face accrued outside the statute of limitations," the plaintiff has the burden to plead facts "leading to a reasonable inference that one of the tolling doctrines adopted by Delaware courts applies."  *Id.*; *see also State ex rel. Brady v. Pettinaro Enters.*, 870 A.2d 513, 524-25 (Del. Ch. 2005); *Blake v. Prudential Ins. Co. of Am.*, No. 14-CV-7042 (RJS), 2016 WL 1301183, at *3 (S.D.N.Y. Mar. 31, 2016).  Unprotected by the *Abry Partners* principle, Counts VIII, XIII, and XV are plainly untimely.  This action was filed

---

[3]     That is obvious as to Count XV, which alleges that Sellers breached a provision of the MIPA governing their post-acquisition management of Malka by disclosing "material non-public information" in their Schedule 13D filing.  Counterclaims ¶ 297.  At first glance, Counts VIII and XIII do appear to rely on allegations of misrepresentations: Count VIII alleges that Sellers made "misstatements" about Malka's gross profits and compliance with the Accounting Principles, *id.* ¶ 238, and Count XIII alleges that Sellers "falsely disclos[ed]" a delinquent account as a "Top Client," *id.* ¶ 279.  At bottom, however, these claims are breach of contract claims rather than fraud claims precisely because they take the contract, which MoneyLion separately alleges is a product of fraud, for granted.  In other words, they are necessarily premised on the assumption that the contractual provisions at issue mean what MoneyLion, *not Sellers*, say they mean.  *Cf. Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 198 (S.D.N.Y. 2011) (dismissing fraud claims as duplicative of the breach of contract claims because they "implicate[]" the relevant contractual provisions).

on July 21, 2023, more than two months past the deadline set in Section 8.01 of the MIPA.  *See* Sellers' Mem. 13, 24.  Furthermore, the Counterclaims do not include any allegations "leading to a reasonable inference" that MoneyLion raised the claims within the eighteen months.  And perhaps more tellingly, MoneyLion does not dispute Sellers' account that Sellers' letter dated May 15, 2023 provided no notice of any claims for breaches of Sections 3.15 and 5.01 of the MIPA, and that the letter "made no mention of GAAP, ASC 606, Schedules A or B, or any opinion or statement from independent accountants" to the extent it noticed a claim for breach of Section 3.06.  Sellers' Mem. 7.  Counts VIII, XIII, and XV therefore must be and are dismissed as untimely.

**B.  Arbitration**

Sellers' sole non-perfunctory challenge to Counts VI, XVI, XVII, and XIX is their argument that Frommer's and Krubich's employment agreements with MoneyLion require "arbitration of any disputes relating to . . . Sellers' employment or termination, including but not limited to claims for compensation, breach of contract or covenants, and employment-related torts."  Sellers' Mem. 21-22.  This argument can be swiftly rejected.  Sellers neither "ask[] the [C]ourt to order arbitration . . . nor indicate[] that [they] would seek to force [MoneyLion] to arbitrate in the future."  *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016).  Accordingly, the Court construes their motion to be a motion to dismiss under Rule 12(b)(6), not a motion to compel arbitration.  That dooms Sellers' argument because it is premised on documents — namely, Frommer's and Krubich's employment agreements — that are neither referenced nor incorporated by reference in MoneyLion's pleadings.  *See* ECF Nos. 63-10, 63-11

(employment agreements); *see* Sellers' Mem. 22-23.[4]  Sellers' motion therefore must be and is denied as to Counts VI, XVI, XVII, and XIX.

## C.  Counts III and IV

Next, Sellers argue that Counts III and IV — MoneyLion's fraud claims — are barred by Section 4.08 of the MIPA, which provides that, "except as expressly provided in this Agreement, [MoneyLion] . . . rel[ied] solely on its own investigation in entering into [the] Agreement and the Transaction and not on any information provided or to be provided by the Seller Parties."  MIPA § 4.08.  This argument fails to persuade for several reasons.  First, although Delaware courts have not spoken directly on the issue, both the Second and Third Circuits have held that Section 29(a) of the Exchange Act prevents non-reliance clauses "from acting as an absolute bar to securities claims under Rule 10b-5 premised on statements not contained within the relevant agreement."  *Kronenberg v. Katz*, 872 A.2d 568, 598 (Del. Ch. May 19, 2004) (citing *AES Corp v. Dow Chem. Co.*, 325 F.3d 174, 180-81 (3d Cir. 2003)); *see also Vacold LLC v. Cerami*, 545 F.3d 114, 122 (2d Cir. 2008).  Second, and more generally, the Court agrees with MoneyLion that the misrepresentations and omissions at issue were "expressly provided" in the MIPA and therefore lie outside of Section 4.08.  Indeed, all of the misrepresentations and omissions at issue here — including those allegedly made during "the due diligence process" and the "negotiation process" in the lead up to the contract, Counterclaims ¶¶ 193, 213 — concern the accounting principles that apply to Malka's financial statements, which both parties agree are expressly set forth in the MIPA.  *See, e.g.*, Sellers' Mem. 4; MoneyLion Opp'n 9-10.  Finally, Sellers'

---

[4]     For the same reason, the Court may not and does not consider the May 25, 2023 letter from MoneyLion's counsel to Sellers' counsel, in which MoneyLion "first raised" the allegation that Sellers had breached the non-compete provision of the MIPA and cited "'their on-going restrictive covenant obligations under' both the MIPA and 'their former employment agreements.'"  Sellers' Mem. 23 (quoting ECF No. 63-13).

argument defeats itself, as they cannot simultaneously cite Section 4.08 as confirmation that MoneyLion did not rely "on any information provided" by Sellers *and* contend that MoneyLion cannot allege justifiable reliance because "Sellers [] gave" it "unrestricted access to Malka's books and records, accountants, and officers," Sellers' Mem. 14-15 — all information that Sellers provided. *Cf. Labyrinth, Inc. v. Urich*, No. 23-327 (MTZ), 2024 WL 295996, at *17 (Del. Ch. Jan. 26, 2024) (observing that a clause providing that a buyer "conducted its own independent investigation" from information that a seller provided "can be read to reflect that Buyer was expressly representing it *did rely* on extra-contractual information"). The Court therefore concludes that neither Count III nor Count IV is barred by Section 4.08 of the MIPA.

More generally, Sellers argue that MoneyLion cannot allege justifiable reliance as required for both Section 10b-5 claims and common law fraud claims because MoneyLion is a sophisticated party that had "unrestricted access" to the resources mentioned above (in addition to "a comprehensive virtual data room") and reported "GAAP-based figures for Malka . . . in public filings." Sellers' Mem. 15-16. That argument, if true, would go a long way to discrediting MoneyLion's claim of justifiable reliance. The problem, however, is that none of that "unrestricted access" is apparent on the face of the Complaint or can be reasonably inferred from MoneyLion's allegations. If anything, MoneyLion alleges that it "insisted on taking appropriate time and measures to conduct formal due diligence and to ensure that the acquisition was appropriately structured and vetted"; that they "engaged a well-known and established accounting advisory firm and legal counsel to spearhead [its] financial, accounting, tax, and legal due diligence of Malka"; and that even that accounting advisory firm relied on Sellers' representations that Malka "is compliant with ASC 606 revenue recognition requirements." Counterclaims ¶¶ 30-34. Given that MoneyLion "adequately plead[s] justifiable reliance," the

Court declines to weigh Sellers' unsupported factual assertions against MoneyLion's allegations — precisely the type of inquiry "generally considered inappropriate for determination on a motion to dismiss." *Glidepath Holding B.V. v. Spherion Corp.*, 590 F. Supp. 2d 435, 459 (S.D.N.Y. 2007).[5]

Next, Sellers argue that MoneyLion fails to plead scienter because (1) there is no "adequately pleaded connection between . . . any representation by Sellers" and the representation by Curran & Co., Malka's external accountant, that Malka is compliant with ASC 606 revenue recognition requirements, Sellers' Reply 5; *see* Sellers' Mem. 16; (2) Schedule A was "Sellers' exclusive, authoritative representation about Malka's Accounting Principles," Sellers' Reply 5; (3) the parties later "revised Schedule A to . . . delete[] references in Schedule B to ASC 606" at MoneyLion's request, Sellers' Mem. 16-17; and (4) MoneyLion does not "allege with particularity how or why the challenged accounting practices or allegedly inflated EBITDA were fraudulent," *id.* at 17. The Court disagrees. Starting with the third point, Sellers once again rely on extrinsic evidence that the Court may not consider because it is "not integral to the complaint." *DiFolco*, 622 F.3d at 111; *see* Sellers' Mem. 17 (citing ECF Nos. 63-3, 63-4 (email communications between Sellers' and MoneyLion's legal counsel)).[6] The first, second, and fourth points, meanwhile, are plainly contradicted by the Counterclaims. For example,

---

[5]     Sellers invoke *McBeth v. Porges*, 171 F. Supp. 3d 216 (S.D.N.Y. 2016), in which this Court stated that "[w]hether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss." *Id.* at 225. In *McBeth*, however, the Court concluded that a non-reliance clause barred the claims at issue, obviating the need for any fact-specific inquiry. *See id.* at 226.

[6]     Furthermore, the Court declines to assume that these e-mails were "documents either in plaintiff[s'] possession or of which plaintiff[s] had knowledge and relied on in bringing suit," *Ratermann*, 2023 WL 7627425, at *1 n.2, as both Sellers and MoneyLion were represented by different counsel at the time of the e-mails.

MoneyLion alleges that Sellers "represented their compliance with GAAP to Curran & Co. in connection with its contemporaneous review of Malka's financial statements, intending that MoneyLion or another acquiror eventually would rely upon such representations," Counterclaims ¶ 45; that Curran based its review of Malka's financial statements on "making inquiries of company management," i.e., Sellers, *id.* ¶ 42; that "Frommer worked closely with Ryan Curran [the owner of Curran & Co.] in both the due diligence process and the negotiations with MoneyLion," *id.* ¶ 45; and that Sellers' challenged accounting practices inflated Malka's EBITDA by, for example, including "the cost of revenue-generating employees under general & administrative within operating expenses," *id.* ¶ 240, and counting disputed invoices and a dubiously available state tax credit as revenue, *id.* ¶¶ 78, 259, 267.  Contrary to Sellers' argument, therefore, Counts III and IV are a far cry from the dismissed claims in *One Communications Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75 (2d Cir. 2010) (summary order), where the plaintiff had merely alleged that the defendant's failure to comply with GAAP requirements rendered its "warranties and covenants . . . false throughout the remaining diligence period, and . . . false at the time the transaction closed," *id.* at 79-80.

Sellers' next argument as to Counts III and IV — that MoneyLion fails "to adequately plead a loss" because no component of the transaction "was tied to any figure contained in Malka's financial statements," Sellers' Mem. 17-18 — is also easily rejected.  Contrary to Sellers' argument, MoneyLion claims that Sellers would not have been eligible for the Closing Payment or the 2021 Earnout Payment had they compiled Malka's financial statements in accordance with the accounting principles set forth in the MIPA, *see* Counterclaims ¶ 159, and that MoneyLion has instead "already paid $10 million in cash and . . . issued more than $54 million in [] stock to acquire Malka's unprofitable business operations," *id.* ¶ 169.  MoneyLion

also alleges that it has had to expend "as much as $8.1 million" to recapitalize Malka.  *Id.*

Because "[R]ule 9(b) does not require that claimants plead injury with particularity in fraud

claims," these allegations are sufficient to withstand a motion to dismiss as to both Counts III

and IV.  *Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 305 (S.D.N.Y. 2011); *see also*

*In re Credit Suisse First Boston Corp. Sec. Litig.*, No. 97-CV-4760 (JGK), 1998 WL 734365, at

*12 (S.D.N.Y. Oct. 20, 1998) ("Damages for securities fraud under § 10(b) or Rule 10b-5 need

not be pleaded with specificity, particularly at the pleading stage of the litigation.").

Finally, all of Sellers' arguments specific to the 2021 Earnout Transaction are easily

rejected in light of MoneyLion's allegations.  The gravamen of those arguments is that

MoneyLion already "knew that [Malka's 2021 financial statement] had been prepared in

accordance with Schedule B, not GAAP or ASC 606" and nevertheless "failed to challenge

Malka's accounting during the contractual period" of forty-five days.  Sellers' Mem. 19.  But

Sellers once again impermissibly rely on extrinsic evidence.  *See* Sellers' Reply 8 (citing ECF

Nos. 63-8, 63-9).  And Sellers' argument that it "defies belief" that MoneyLion "did not discover

that [Sellers] were keeping a separate set of books and records until months after the 2021

Revenue and EBITDA Statement had been issued" because Schedule B sets forth "a different

methodology from strict GAAP or ASC 606" principles is a non-starter.  *Id.* at 7-8.  The main

controversy in this case, after all, is about what MoneyLion knew and when, including the

substance and meaning of the accounting principles laid out in Schedule B.  *See, e.g.*,

Counterclaims ¶ 89 ("MoneyLion was not aware at the time that the Seller Members had

completely disregarded GAAP in the Malka Unaudited 2021 Financial Statement, despite

GAAP-based financial reporting being an essential element of the Accounting Principles set

forth in Schedule A to the MIPA as well as a foundational metric, stated clearly in Schedule B to

the MIPA, in determining Revenue and EBITDA in connection with the 2021 Earnout

Payment.").

  For all of these reasons, Sellers' motion must be and is denied as to Counts III and IV.

## D. Count V

  Sellers seek to dismiss Count V, which alleges negligent misrepresentation, on the

ground that MoneyLion fails to plead "a special relationship sufficient to support a claim for

negligent misrepresentation."  Sellers' Mem. 20-21 (quoting *Kwon v. Yun*, 606 F. Supp. 2d 344,

356 (S.D.N.Y. 2009)).  Sellers point out that MoneyLion acquired Malka in an arm's length

transaction and that "courts have routinely held that the employer-employee relationship does not

constitute a special relationship sufficient to support a claim for negligent misrepresentation."

*Kwon*, 606 F. Supp. 2d at 356.  But MoneyLion's negligent misrepresentation claim focuses on

Sellers' actions *after* the parties executed the MIPA, and it is well established under New York

law that a "special relationship" exists where there is "privity of contract."  *Barron Partners, LP*

*v. LAB123, Inc.*, 593 F. Supp. 2d 667, 674 (S.D.N.Y. 2009); *cf. Amusement Indus., Inc. v. Stern*,

786 F. Supp. 2d 758, 779 (S.D.N.Y. 2011) ("[C]ommercial parties acting at arms' length *in*

*negotiating a contract* are not in a special relationship." (emphasis added) (quoting *MBIA Ins.*

*Corp. v. Royal Bank of Canada*, 28 Misc. 3d 1225(A), 2010 WL 3294302, at *34 (N.Y. Sup. Ct.

Aug. 19, 2010))).  Sellers' argument that they were MoneyLion's employees after the Closing is

somewhat more compelling, *see Kwon*, 606 F. Supp. 2d at 356, but ultimately unpersuasive.  In

contrast to MoneyLion's claim for breach of fiduciary duty, its claim for negligent

misrepresentation focuses on actions that Sellers took first and foremost as parties to the MIPA,

rather than as employees.  In fact, Count V's bottom line is that while Sellers "were duty bound

to act honestly in their relationships with MoneyLion's management" as officers on

MoneyLion's management committees, they instead prioritized "their own self-interest" as sellers awaiting further payouts from MoneyLion under the MIPA.  Counterclaims ¶ 222; *see Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 103 (2d Cir. 2001) (explaining that the "special relationship" inquiry is fact-intensive and calls for consideration of "whether a special relationship of trust or confidence existed between the parties" (quoting *Kimmell v. Schaefer*, 89 N.Y.2d 257, 264 (1996))).  Sellers' motion is therefore denied as to Count V as well.

## E.  Duplicative Claims

That leaves Counts I, VII, and XVIII, MoneyLion's claims for a declaratory judgment, conversion of the Closing Shares and the 2021 Earnout Payment, and unjust enrichment, respectively.  These claims are all easily dismissed as duplicative of MoneyLion's fraud and misrepresentation claims.  The decision whether to grant declaratory relief under the Declaratory Judgment Act ("DJA") is subject to the Court's "broad discretion," to be informed by a variety of factors including "considerations of practicality and wise judicial administration."  *Admiral Ins. Co. v. Niagara Transformer Corp.*, 57 F.4th 85, 99-100 (2d Cir. 2023).  In view of such considerations, courts "generally reject a DJA claim when other claims in the suit will resolve the same issues."  *EFG Bank AG v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 99 (S.D.N.Y. 2018) (citing cases); *see, e.g.*, *Optanix, Inc. v. Alorica Inc.*, No. 20-CV-9660 (GHW), 2021 WL 2810060, at *3 (S.D.N.Y. July 6, 2021); *Personal Watercraft Prod. SARL v. Robinson*, No. 16-CV-9771 (AJN), 2017 WL 4329790, at *11 (S.D.N.Y. Sept. 1, 2017).  Similarly, courts in this Circuit routinely dismiss unjust enrichment and conversion claims that are "duplicative" of fraud claims.  *See, e.g.*, *Cachet Fin. Servs. v. MyPayrollHR*, No. 19-CV-1181 (FJS), 2020 WL 5232275, at *9 (N.D.N.Y. Sept. 2, 2020); *Weinstein v. Cardis Enters. Int'l N.V.*, No. 16-CV-

2661 (SJF) (SIL), 2016 WL 11264710, at *9 (E.D.N.Y. Dec. 22, 2016), *report and recommendation adopted as modified by* 2017 WL 354191 (E.D.N.Y. Jan. 24, 2017); *In re Ford Fusion & C-Max Fuel Econ. Litig.*, No. 13-MD-2450 (KMK), 2015 WL 7018369, at *39 (S.D.N.Y. Nov. 12, 2015) (collecting cases as to unjust enrichment); *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 296-97 (S.D.N.Y. 2015); *Ebin v. Kangadis Food Inc.*, No. 13-CV-2311 (JSR), 2013 WL 6504547, at *7 (S.D.N.Y. Dec. 11, 2013).  Here, Count I seeks a declaration that, among other things, resolves the parties' dispute over the substance of the "Accounting Principles to be used in preparing the 2021 and 2022 financial statements" and deems "Malka's Financial Statement for the year ending December 31, 2021 . . . incorrectly prepared."  Counterclaims ¶ 184.  Count XVIII, the unjust enrichment claim, seeks damages resulting from MoneyLion's "reliance on [Sellers'] false misrepresentations and omissions" in their financial statements, and Count VII, the conversion claim, seeks recovery of the Closing Shares and 2021 Earnout Payment awarded based on those financial statements.  *See id.* ¶¶ 236, 321.  These claims will necessarily "resolve the same issues" as Counts III, IV, and V, the fraud and misrepresentation claims.  *EFG Bank AG*, 309 F. Supp. 3d at 99.  Counts I, VII, and XVIII are therefore dismissed as duplicative of MoneyLion's fraud and misrepresentation claims.

## CONCLUSION

For the foregoing reasons, Sellers' motion to dismiss is GRANTED as to Counts I, II, VII, VIII, XIII, XV, and XVIII and DENIED as to Counts III, IV, V, VI, IX, X, XI, XII, XIV, XVI, XVII, and XIX.

With respect to the dismissed claims, the Court declines to *sua sponte* grant MoneyLion leave to amend.  To be sure, leave to amend a pleading should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  But it is "within the sound discretion of the district court to

grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), and there are several reasons to exercise that discretion to deny leave here.  First, the problems with MoneyLion's dismissed claims are substantive, so amendment would be futile.  *See, e.g.*, *Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (citing cases).  Second, MoneyLion does not request leave to amend or suggest that it is in possession of facts that would cure the problems with the dismissed claims.  *See, e.g.*, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if [it] fails to specify how amendment would cure the pleading deficiencies in [its] complaint."); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505-06 (2d Cir. 2014).  Finally, MoneyLion already amended its original counterclaims once, with the Court's leave, in response to Sellers' first motion to dismiss.  Moreover, the Court warned MoneyLion then that it would "not be given any further opportunity to amend the Counterclaims and Third-Party Complaint to address issues raised by the motion to dismiss."  ECF No. 53.

Unless and until the Court orders otherwise, Sellers shall file their Answers to MoneyLion's remaining Counterclaims within **two weeks** of the date of this Opinion and Order.  *See* Fed. R. Civ. P. 12(a)(4)(A).

The Clerk of Court is directed to terminate ECF No. 61.

SO ORDERED.

Dated: May 14, 2024
New York, New York

_____
JESSE M. FURMAN
United States District Judge