**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH, DANIEL FRIED AND PAT CAPRA**,**

                         Plaintiffs,

- *against* –

MONEYLION TECHNOLOGIES INC. AND CONTINENTAL STOCK TRANSFER & TRUST COMPANY,

                         Defendants,

MONEYLION TECHNOLOGIES INC.**,**

                    Counterclaim Plaintiff,

- *against* –

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH, DANIEL FRIED and PAT CAPRA,

                    Counterclaim Defendants,

MONEYLION INC.,

                    Third-Party Plaintiff,

- *against* –

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH, DANIEL FRIED and PAT CAPRA,

                    Third Party Defendants.

**Case No. 1:23-cv-06339-JMF**

## MONEYLION TECHNOLOGIES INC. AND MONEYLION INC.'S OBJECTIONS TO SELLERS' DIRECT TESTIMONY AFFIDAVITS

Pursuant to Paragraph 9 of the Scheduling Order (Dkt. 123), MoneyLion Technologies

Inc. and MoneyLion Inc. (collectively, "MoneyLion") respectfully submits the attached chart of

objections to Sellers' direct testimony affidavits.  MoneyLion respectfully requests that the Court

sustain its objections.


Dated: January 7, 2025
        New York, New York

                                    CAHILL GORDON & REINDEL LLP

                                    By:  /s/ Edward N. Moss
                                    Herbert S. Washer
                                    Edward N. Moss
                                    Sheila C. Ramesh
                                    Adam S. Mintz
                                    Danielle Simard
                                    32 Old Slip
                                    New York, New York 10005
                                    212-701-3000
                                    hwasher@cahill.com
                                    emoss@cahill.com
                                    sramesh@cahill.com
                                    amintz@cahill.com
                                    dsimard@cahill.com
                                    *Attorneys for MoneyLion Technologies Inc.
                                    and MoneyLion Inc.*

## BRUCE BINGHAM

| ¶¶ | Text | Objection |
|----|------|-----------|
| 6b | Opinion 2: According to my Fair Market Value analysis, the range of FMV of Malka at the time of the transaction is $18.9 to $21.7 million, with a mid-point of $20.2 million.<br><br>i. I performed my own Fair Market Value analysis of the Company. My analysis indicates a range of enterprise value of $18.9 to $21.7 million for Malka as a going concern as of November 15, 2021 based on the information and data that was known or knowable at the time of the transaction in which MoneyLion acquired Malka (the "Transaction"). | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 10–15) |
| 6c | Opinion 3: The $75 mm purchase price for Malka, paid by MoneyLion, was based primarily on anticipated synergies.<br><br>i. The purchase price of $75 million that MoneyLion agreed to pay for Malka was based primarily on anticipated synergies from adding Malka's digital marketing suite of services to MoneyLion's banking platform. This is discussed in many MoneyLion documents.<br><br>ii. I quantified the buyer-specific synergies associated with MoneyLion's acquisition of Malka and considered estimated revenue and cost synergies resulting from the Transaction. My estimate of the synergies is $48.8 million. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 15–19) |
| 6d | Opinion 4: Industry transactions in the digital marketing space are based on capturing market share. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 19–21) |
| 35 | The CFGI Valuation Report's 'Sources of Information' section states that "*we have received the following data directly from Client/Management…. The prospective financial information of the Company as prepared by management for the five years ending December 31, 2021 through 2026.*"[23] The 'Client' referenced here is | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | MoneyLion and 'Management' is defined as 'Malka Management.' However, **I have been informed by Counsel that they are not aware if any of the four sellers of Malka created the prospective financial information used in the CFGI Valuation Report or when the prospective financial information was created.** I note that the CFGI Valuation Report is dated March 15, 2022 and values the Company as of November 15, 2021. I am advised that Counsel does not know if the projections used in the CFGI Valuation Report were created before or after November 15, 2021.<br><br>[23] JX081, at MoneyLion_01824558. | |
| 36 | After completing my report, a slack conversation between Michelle Lee and Erika Nuno was brought to my attention. This conversation occurred after the acquisition, and strongly suggests that MoneyLion, not the sellers, created the original projections for the years following the 2022 budget in the MIPA. This is demonstrated by a comparison between the projections sent to CFGI by MoneyLion in 2022, and the projections in the slack conversation. I also understand that the 2022 budget in the MIPA (presented by Sellers) is not a projection of future revenue for Malka as a free-standing company, but rather a budget for Malka as a subsidiary of MoneyLion. This budget where Malka is a subsidiary includes a substantially increased level of revenue from MoneyLion from 2021 to 2022, assuming the transaction closes.[24] Thus, beyond the MIPA budget, I don't see a basis for the CFGI projections that Gompers uses as they seem to have originated from MoneyLion and not the sellers.<br><br>[24] *See generally*, testimony of Jeffrey Frommer. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 54 | I have performed my own Fair Market Value analysis of the Company. I too started with the MIPA budget. My analysis indicates a range of enterprise value for Malka of $18.9 to $21.7 million, with a midpoint $20.2 million, as of November 15, 2021 (the "Valuation Date") based | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 10–15) |

| ¶¶ | Text | Objection |
|---|---|---|
| | on the information and data that is known or knowable at the time of the Transaction. | |
| 55 | To reconcile my estimation of the Fair Market Value of the Company to the $75 million purchase price that MoneyLion agreed to, please refer to Section VI of this report, which analyzes the buyer-specific synergies which would add additional synergistic value which I estimate to be approximately $48.8 million that is not reflected in my Fair Market Value analysis. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 15–19) |
| 56 | In compliance with generally accepted valuation standards and methodologies, USPAP Standard 9 and ASA Business Valuation Standards-VI III,[38] I have considered all relevant approaches to value in reaching my conclusions. The following is a summary description of each of the three approaches to value:<br><br>[38] Appraisal Standards Board. "Standard 9: Business Appraisal, Development." Uniform Standards of Professional Appraisal Practice 2014-2015 Edition, p. 60; ASA. "BVS-VI Reaching a Conclusion of Value," ASA Business Valuation Standards, p. 14. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 10–15) |
| 57 | The asset-based approach is a general way of determining a value indication of a business, business ownership interest, security or intangible asset using one or more methods based on the value of the assets net of liabilities.[39] Incorporated in this approach is the economic principle of substitution that provides that an informed purchaser would pay no more for a property than the cost of purchasing or producing a substitute property with the same utility as the purchased property.[40]<br><br>[39] ASA at 25.<br>[40] Pratt at 358. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 58 | In this case, I did not apply the asset-based approach to value the Company as this approach is only relevant in situations where the assets of a company are highly liquid on a standalone basis or when a business is expected to be liquidated. I note that in the CFGI Valuation Report, only the trade names and customer relationships are identified | |

| ¶¶ | Text | Objection |
|---|---|---|
| | intangible assets of the Company[41], and do not have significant value on a stand- alone basis (*i.e.*, they are best used as an assemblage of assets to support the going concern business). Further, based on my review of the documents and testimony in this case, there is no expectation that the Company was to be liquidated as of the Valuation Date.<br><br>[41] JX081, at MoneyLion_01824554. | |
| 59 | The market approach is a general way of determining a value indication of a business, business ownership interest, security or intangible asset using one or more methods that compare the subject to similar businesses, business ownership interests, securities or intangible assets that have been sold.[42] It compares the assets to be valued to comparable assets recently sold or the asking prices of comparable assets ("Comparables").<br><br>[42] ASA at 29. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 10–13) |
| 60 | Market sales are an indicator of the market value since it is assumed that market transactions are conducted under no compulsion between hypothetical buyers and sellers on an arm's length basis. When a number of sales of similar properties occur, a pattern of definable prices may be established.[43]<br><br>[43] Pratt at 360. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 10–13) |
| 61 | Below, I describe two particular market methods that I considered for the purpose of assessing the Fair Market Value of the Company. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 10–13) |
| 62 | I have considered and estimated the value indicated by the Guideline Public Company ("GPC") method because it is a valuable tool for evaluating market expectations (and, ultimately, market required rates of return) for similar investments. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 11–13) |

| ¶¶ | Text | Objection |
|---|---|---|
| 63 | I have selected four guideline public companies which operate in the digital marketing, entertainment, media, and talent representation industries in order to derive valuation multiples of revenue to be applied to the Company. These are: Fluent, Inc.; Dolphin Entertainment, Inc.; IZEA Worldwide, Inc.; and Wilhelmina International, Inc. Descriptions of each of these companies are presented in my Exhibit 7. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 11) |
| 64 | The guideline public companies were selected based on their comparability to the Company, primarily in terms of industry, services offered, and revenue size, among a variety of factors. Based on the closing stock price of each of these guideline companies on the Valuation Date, I calculated the companies' market capitalizations and added the book values of preferred equity, minority interests, and net debt to derive their enterprise values as of the Valuation Date. I then derived the enterprise-value-to-revenue multiples of revenue for the trailing twelve months' ended September 30, 2021 ("EV / TTM Revenue"), the expected revenue for the fiscal year ending December 31, 2021 ("EV / FY 2021E Revenue"), and the budgeted revenue for the fiscal year ending December 31, 2022 ("EV / FY 2022E Revenue"). The indicated multiples are presented below: | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 11–12) |

| ¶¶ | Text | Objection |
|---|---|---|
| | | |
| 65 | Given that there are nine months of historical results captured in both the trailing twelve month ("TTM") ended September 30, 2021 and full year 2021 budgeted revenue figures, to avoid double counting I chose to apply multiples to Malka's actual revenue for TTM September 30, 2021 and 2022 budgeted revenue. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 11–12) |
| 66 | In my analysis of Malka's enterprise value as of the Valuation Date, I did not apply EBITDA multiples because I did not consider Malka's expected EBITDA as projected in the MIPA for the fiscal year 2021[44] and the budgeted EBITDA per the MIPA for the fiscal year 2022[45] to be representative of normalized EBITDA for the Company. These 2021 and 2022 cited EBITDA margins were 0.1% and 0.4%, respectively. The Project Queen Financial and Tax Due Diligence Report prepared by CFGI as of October 5, 2021 shows historical EBITDA margins of 4.4% in 2019 and 14.3% in 2020[46] that are not disclosed in the MIPA. I chose not to capitalize any historical EBITDA figures given the low earnings expectations post-Transaction as compared to historical margins, as well as the fact that I am relying on only information available in the MIPA and Disclosure Schedules. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see generally* Bingham Daubert Motion (Dkt. 135 at 11–12) |

| ¶¶ | Text | Objection |
|---|---|---|
| | [44] JX065, at DLA_006296 - DLA_006297.<br>[45] JX065, at DLA_006296 - DLA_006298.<br>[46] JX020, at MoneyLion_01813360. | |
| 67 | I adjusted revenue multiples indicated by the guideline public companies based on the financial and economic characteristics of the Company relative to the guideline public companies. The adjustments reflect differences between the Company and the guideline public companies in terms of size, profitability, and historical and expected growth. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see generally* Bingham Daubert Motion (Dkt. 135 at 11–12) |
| 68 | I selected the following multiple ranges to apply to the Company's revenues for the applicable periods:<br><br>EV / TTM Revenue of 0.70x – 0.80x<br>EV / FY 2022E Revenue of 0.50x – 0.60x | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 12) |
| 69 | I multiplied the selected multiple ranges by $25.9 million for the TTM as of September 30, 2021 and $38.0 million for the fiscal year ending December 31, 2022. The TTM September 30, 2021 revenue was calculated using the year-to-date September 30, 2021 results per the consolidated financial statements provided in the Disclosure Schedules to the MIPA[47] and the monthly income statements for October through December 2020 that were provided in connection with the Project Queen financial due diligence.[48]<br><br>[47] JX066, at MoneyLion_001043 – MoneyLion_001079.<br>[48] PX099, at MoneyLion_01861600 (produced in native format). | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see generally* Bingham Daubert Motion (Dkt. 135 at 12) |
| 70 | I assigned weightings to the preliminary value range derived from the application of each multiple range as of the TTM September 30, 2021 and the fiscal year ending December 31, 2022 of 60.0% and 40.0%, respectively, to reflect my greater confidence in the historical observation. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see generally* Bingham Daubert Motion (Dkt. 135 at 12) |
| 71 | I added a rounded control premium of 5.0%, based on premiums for voting rights for U.S. companies observed through several studies[49] to the resulting equity value ranges. This is done to reflect the fact that | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 12–13) |

| ¶¶ | Text | Objection |
|---|---|---|
| | the enterprise values of the guideline public companies are on a non-controlling basis given they are based on the trading prices of one share of stock. The resulting indicated range of enterprise value of the Company under this method is $19.2 million to $22.5 million.<br><br>[49] *See* "Quantifying the Valuation Discount for Lack of Voting Rights and Premium for Voting Rights." *American Bankruptcy Institute*. March 2005. | |
| 72 | My analysis under the GPC method is presented in my Exhibits 5 and 6. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 11–13) |
| 73 | I also considered the Guideline Merged and Acquired Company ("GMAC") Method, where one relies on precedent comparable transactions to provide an indication of value.[50] I have identified four acquisitions of target companies considered comparable to Malka. The table below contains details on the four selected transactions.<br><br>$ in millions<br><br>| Closed Date | Target | Buyer | Transaction-Implied Enterprise Value | LTM Revenue | LTM EBITDA | EBITDA Margin | EV / Revenue | EV / EBITDA |<br>|---|---|---|---|---|---|---|---|---|<br>| 5/21/2021 | Digital Media Services Inc. | YANGAROO Inc. | $ 5.5 | $ 4.0 | na | na | 1.4 x | na |<br>| 10/28/2020 | BroadbandTV Corp. | BBTV Holdings Inc. | 233.9 | 140.9 | (2.9) | -2.0% | 1.7 x | nm |<br>| 7/30/2019 | Mad*Pow Media Solutions LLC | Tech Mahindra (Americas) Inc. | 25.7 | 14.7 | na | na | 1.7 x | na |<br>| 12/17/2018 | 495 Communications, LLC | Lighthouse Digital Inc. | 15.0 | 14.4 | 1.9 | 13.2% | 1.0 x | 7.9 x |<br><br>[50] Pratt at 310. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 13) |
| 74 | Based on the limited the limited (*sic*) financial information available concerning these transactions at their closing dates, I applied an EV/TTM Revenue multiple range of 1.0x to 1.10x to Malka's revenue for the TTM ended September 30, 2021. The resulting indicated range of enterprise value is$25.9 (*sic*) million to $28.5 million. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 13) |

| ¶¶ | Text | Objection |
|---|---|---|
| 75 | My analysis under the GMAC method is presented in my Exhibits 8 and 9. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 13) |
| 76 | The Income Approach is a general way of determining a value indication of a business, business ownership interest, security or intangible asset using one or more methods that convert anticipated economic benefits into a present single amount.[51] It considers projections of estimated future income streams associated with a specific asset or business, the remaining life of the asset or business, the average annual rate of return anticipated and market rates of return.[52] A terminal value[53] is determined to account for value of the target company after the projection period. The projected periodic income streams and the terminal value are then discounted at an appropriate risk rate to arrive at an indication of the value of ownership at the valuation date.[54] The discount rate is determined by analyzing the WACC.<br><br>[51] ASA at 28.<br>[52] Pratt at 175.<br>[53] ASA at 21-32.<br>[54] Pratt at 219-20, 242. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 13–14) |
| 77 | In my application of the Income Approach, I have prepared a DCF analysis based on the Company's budget for the fiscal years ending December 31, 2021 and 2022 which are presented in Exhibit B of the MIPA.[55] Projections for the six-week period of 2021 following the November 15, 2021 close are based on the monthly budgets for 2021 as presented in the MIPA. The full- year 2022 budget as presented in the MIPA is also used.<br><br>[55] JX065, Exhibit B. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see generally* Bingham Daubert Motion (Dkt. 135 at 13–14) |
| 78 | In order to derive financial projections for the fiscal years ending December 31, 2023 through 2025, I applied revenue growth rates of 25.0%, 20.0%, and 15.0% in 2023, 2024, and 2025, respectively. The | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 13–14) |

| ¶¶ | Text | Objection |
|---|---|---|
| | *growth rates are based upon my assumptions regarding growth Malka would likely be able to achieve given its historical growth in 2019 and 2020 and expected growth in 2021 and 2022. I arrived at projected EBITDA figures by projecting an EBITDA margin of 9.0% in 2025 based on the average of historically achieved EBITDA margins in 2019 and 2020, as presented in the Project Queen financial and tax due diligence report prepared by CFGI as of October 5, 2021.[56] I linearly grow the EBITDA margin in 2023 and 2024 to reach this 9.0% margin by 2025.*<br><br>[56] JX020, at MoneyLion_01813360. | |
| 79 | I considered projections for a discrete five-year period because this is a well-established, court-endorsed period of time which is intended to represent one typical business cycle. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see generally* Bingham Daubert Motion (Dkt. 135 at 13–14) |
| 80 | I assume a blended Federal and state corporate tax rate of 28.0% based on the U.S. Federal and New Jersey state corporate tax rates. I project capital expenditures to be 1.0% of projected revenues based on a blend of (a) the historical capital expenditures found in the 2019 and 2020 statements of cash flows, and (b) the guideline public companies' historical run rates. I project depreciation and amortization expense as 30.0% of capital expenditures based on the historical 2019 and 2020 run rate. I project net working capital to be 7.0% of revenue based on the trailing-twelve-month run rate. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see generally* Bingham Daubert Motion (Dkt. 135 at 13–14) |
| 81 | Since delivering my report, I have come to learn from seller Patrick Capra's testimony, that the reviewed financials for Malka for 2019 and 2020 do not include $3.3 million in revenue from Malka Sports in 2019, and $4.6 million in revenue from Malka Sports in 2020. If these Malka Sports revenue numbers are added to the 2019 and 2020 Malka financials, the rate of growth from 2019 and 2020 to 2021 would be reduced.[57]<br><br>[57] *See generally* testimony of Patrick Capra. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| 82 | These projections are presented in my Exhibit 2. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 83 | I employed a WACC of 16.25%, based on my estimates of the cost of equity and the after-tax cost of debt described below. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 84 | Using this method, the WACC is comprised of the weighted costs of the various components of permanent financing, that is, the weighted costs of both debt and equity. The return on debt is adjusted to reflect that interest payments are deductible for tax purposes. The formula to determine the WACC can be written as follows:<br><br>$$WACC = R(d) \times (1 - T) \times (D/TC) + R(e) \times (E/TC)$$<br>where:<br><br>$WACC$ = Weighted average cost of capital<br>$R(d)$ = Cost of debt<br>$T$ = Tax rate<br>$D/TC$ = Debt / total capital<br>$R(e)$ = Cost of equity<br>$E/TC$ = Equity / Total Capital | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 85 | My selection of the debt-to-total-capital ratio for the purposes of calculating the WACC is based on the guideline public companies, which are Fluent, Inc.; Dolphin Entertainment, Inc.; IZEA Worldwide, Inc; and Wilhelmina International, Inc. I selected a debt-to-total-capital ratio of 5.74% based on the median of these companies. I did not use the Gompers assumption of "an all-equity capital structure for Malka"[58] because I did not consider that to be appropriate. Were I to rely on his capital structure, that would lead to a higher WACC and a lower indicated enterprise value of the Company. A prudent hypothetical willing buyer would likely use cheaper debt over all equity[59], as shown in the capital structure of my guideline public companies.<br><br>[58] Gompers Report, p. 24. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | [59] Per Trugman, Gary R., *Understanding Business Valuation, A Practical Guide to Valuing Small to Medium Sized Businesses*, Fifth Edition, 2017 at 206 and 554.: *"The economic return to debt holders is interest, and the stockholders' (partners' or members') equity section of the balance sheet is referred to as the equity capital of the business. The economic return to equity holders is profit. Equity capital and debt capital enjoy different rights and risks and, therefore, generally have very different rates of expected returns….The theory behind a WACC is simple. Because a company is financed partly with debt and partly with equity, the return on investment should consider the risk of each element. , if the benefit stream comprises both debt and equity, it would seem logical that the risk is reduced on the overall capital for the investors."* | |
| 86 | Using the median capital structure observed for the selected guideline public companies, I was able to calculate the estimated cost of equity by applying the MCAPM. As discussed in Section IV.D of this report, the following describes the MCAPM formula and the inputs I used to estimate the cost of equity:<br><br>   a.  *R(e) = E(Ri) = Rf + (β x RPm ) + RPs +/- RPc*<br>   b.  *E(Ri)* = Required return on equity or cost of equity.<br>   c.  *Rf* = The risk-free rate. This is the rate of return generated by the risk-free security, typically the interest rate on long-term bonds issued by the United States Government for United States domiciled investments. The risk-free rate of 2.05% was selected based on the yield of 20-year United States Treasury bonds as of the November 15, 2021 Valuation Date.[60]<br>   d.  *β* = Beta measures the level of risk of a specific stock compared to the overall stock market, typically represented by the S&P 500 Index. A beta of 1.0 means the stock being valued has risk commensurate with the overall market. A beta higher than 1.0 is deemed riskier than the overall market, and a beta lower than 1.0 is deemed less risky. The levering process adds consideration of the capital structure and tax rate of the company being valued. Five-year monthly levered betas were obtained from Capital IQ for the selected guideline public | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | companies and were unlevered based on each company's capital structure and effective tax rate as of the Valuation Date. I selected Dolphin Entertainment, Inc.'s unlevered beta of 1.72 as I believe this company to be most comparable to Malka. The unlevered beta[61] of 1.72 was re-levered at the estimated industry optimal capital structure (estimated based on the median of the guideline public companies and their tax rates) to a levered beta[62] of 1.80.<br><br>   e. *RPm* = The equity risk premium. This reflects the incremental return required by market participants to account for the difference in risk between the risk-free rate and the overall stock market. An equity risk premium of 6.00% was selected based on the Kroll Cost of Capital Navigator's cost of capital inputs as of the Transaction Date, reflecting the long-horizon expected risk premium (supply-side).[63]<br><br>   f. *RPs* = The size premium. This accounts for incremental rates of return required by investors to invest in smaller, more risky companies. I have applied a size premium of 3.21%, also based on the Kroll Cost of Capital Navigator, reflecting the incremental return required for companies with market capitalizations ranging from $2.194 million to $451.800 million[64], commensurate with the Transaction-implied enterprise value of $75.0 million less the Company's September 30, 2021 $1.9 million net debt balance.<br><br>   g. *RPc* = Since investors typically require additional returns to compensate for the incremental risk of investing in specifically identified privately held companies over small public companies, I have added a company- specific risk premium of 1.0%. This is intended to capture the risks of the Company as compared to the industry. My selected risk premium reflects consideration of factors such as the projection risk given the | |

| ¶¶ | Text | Objection |
|---|---|---|
| | Company's negative historical profitability and the sizable revenue growth and margin improvement assumed in the projections. This also considers the risk associated with the ability of the four sellers of Malka to leave the Company after 2022, given the lack of provisions in the MIPA preventing them from doing so without penalty.<br><br>[60] Sourced from S&P Capital IQ.<br>[61] Unlevered Beta = Observed Beta / [1 + (1 - Tax Rate) * (D/E)].<br>[62] Levered Beta = Unlevered Beta * [1 + (1 - Tax Rate) * (D/E)].<br>[63] Kroll. *Cost of Capital Inputs – Risk-Free Rates and Equity Risk Premium*, Cost of Capital Navigator. https://costofcapital.kroll.com/coc-inputs/rfr-and-erp. (Last visited October 25, 2024)<br>[64] Kroll. *Cost of Capital Inputs – Size Premium*, Cost of Capital Navigator. https://costofcapital.kroll.com/coc- inputs/size-premium. (Last visited October 25, 2024) | |
| 87 | Based on the inputs described above, I have calculated a cost of equity of 17.08% for Malka. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 88 | To estimate the after-tax cost of debt, I applied my estimated tax rate of 28.0% to the pre-tax cost of debt of 3.33%, which represents the average yield of constituent corporate bonds that have been given Moody's Baa credit rating as of the Valuation Date. The resulting post-tax cost of debt is 2.40%. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 89 | Based on the estimated cost of equity, after-tax cost of debt, and an industry-based debt and equity structure, I calculated a WACC of 16.25%. I applied a sensitivity of 1.0% on both the high and low ends of my discount rate range to arrive at a range of 15.25% to 17.25%. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 90 | These WACC calculations are presented in my Exhibit 4. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 91 | The terminal value (also called the residual value) is the value as of the end of the discrete projections period in a DCF model.[65] Key to this definition is the assumption that a business being valued does not simply close or go out of business at the end of the projection period. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | Unless clearly specified, the business is assumed to continue and generate positive cash flow and/or earnings.<br><br>[65] ASA at 31-32. | |
| 92 | The Gordon Growth model is used in the business valuation community to determine the value of the company not captured by the discrete projection period.[66] The last projected year's earnings are increased by the assumed perpetual growth rate, are then capitalized by the capitalization rate (calculated as the WACC less the selected perpetual growth rate) and finally discounted back to a net present value to estimate the terminal value after the projection period. The terminal value plus each of the projected year's present values equals the indication of value derived from the DCF method.<br><br>[66] *See* Pratt, *Valuing a Business* at 242, *"represent[s] a technically correct simplification of the basic discounted economic income model, provided that the critical assumption underlying this simplification is met – that is, the economic income variable is expected to have a constant average annually compounded rate of growth in perpetuity."* (emphasis omitted). | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 93 | In my estimation of the terminal value of the Company, I apply a terminal growth rate of 3.0% to the 2025 revenue to arrive at the terminal revenue figure. In my sensitivity analysis, I applied a range of 2.5% to 3.5%. The selected growth rate is based on projected long-term growth rates provided in industry reports published by IBISWorld for digital advertising agencies,[67] video post-production services,[68] and audio production studios.[69] I apply the projected 2025 EBITDA margin of 9.0% to arrive at the terminal- year EBITDA. I set the depreciation and amortization expense equal to the capital expenditures for the terminal year, while my net working capital and capital expenditure assumptions remained consistent with the discrete period. I then divided the calculated terminal-year free cash flow by the capitalization rate (calculated by subtracting the terminal growth rate from the discount rate) in order to derive the residual value at the | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see generally* Bingham Daubert Motion (Dkt. 135 at 6) |

| ¶¶ | Text | Objection |
|---|---|---|
| | terminal year. I discounted this residual value to the present at the WACC.<br><br>[67] Le, Thi. *Digital Advertising Agencies*, IBISWorld, August 2021.<br>[68] Ristoff, Jared. *Video Postproduction Services in the US*, IBISWorld, November 2021.<br>[69] Egan, Sean. *Audio Production Services in the US*, IBISWorld, May 2021. | |
| 94 | I applied the concluded WACC to discount the Company's projected free cash flows in the discrete and terminal periods and then summed the present values of the discrete and terminal period cash flows. This resulted in an indicated enterprise value of $18.3 million. This analysis is presented in Exhibit 2. Based on my WACC and terminal growth rate ranges, I derived a range of enterprise value of $17.2 million to $19.6 million for the Company as of November 15, 2021.<br><br>| | Long-term growth rate | | |<br>|---|---|---|---|<br>| Discount Rate | 2.5% | 3.0% | 3.5% |<br>| 15.25% | **$19,600** | $20,300 | $21,100 |<br>| 16.25% | $17,800 | **$18,300** | $19,000 |<br>| 17.25% | $16,200 | $16,700 | **$17,200** | | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see generally* Bingham Daubert Motion (Dkt. 135 at 6) |
| 95 | The below table illustrates my indicated ranges of enterprise value for Malka as of November 15, 2021. I assigned weightings of 50%, 40%, and 10% to the DCF analysis, the public company analysis, and the transaction analysis, respectively. The weightings are based on my assessment of the strengths and weaknesses of each valuation approach. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 14–15) |

| ¶¶ | Text | Objection |
|---|---|---|

| $ in thousands | | Malka Media Group LLC | | |
|---|---|---|---|---|
| Valuation Methodology | Weighting | Low | Mid | High |
| Income Approach: Discounted Cash Flow Analysis | 50.0% | $17,200 | $18,300 | $19,600 |
| Market Approach: Public Company Analysis | 40.0% | 19,200 | 20,850 | 22,500 |
| Market Approach: Transaction Analysis | 10.0% | 25,900 | 27,200 | 28,500 |
| | 100.0% | | | |
| Indicated Enterprise Value Range (rounded) | | $18,900 | $20,200 | $21,700 |

| ¶¶ | Text | Objection |
|---|---|---|
| 96 | **Based upon the facts, assumptions, and procedures described herein, it is my opinion that the range of Fair Market Value of Malka as of November 15, 2021 is $18.9 million to $21.7 million.** | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 6–7, 14–15) |
| 97 | For purposes of addressing the assertions related to damages in the hypothetical scenario where the claims asserted in the Gompers Report are accepted by the Court, I was instructed by Counsel to prepare an alternate scenario. Under this scenario, I estimated the fair market value of the Company at the Transaction Date considering certain revenue and EBITDA assumptions in Gompers' "But For" analysis. I applied the same valuation approaches and methods I used in my Fair Market Value analysis discussed above. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see generally* Bingham Daubert Motion (Dkt. 135 at 6–7) |
| 98 | I performed a DCF analysis under the Income Approach, as well as two Market Approach analyses. The details regarding the assumptions I used and how they differ in this alternative scenario from my Fair Market Value analysis are discussed in Appendix C. My conclusions are presented in the table below: | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see generally* Bingham Daubert Motion (Dkt. 135 at 6–7) |

Alternate Scenario

| $ in thousands | | Malka Media Group LLC | | |
|---|---|---|---|---|
| Valuation Methodology | Weighting | Low | Mid | High |
| Income Approach: Discounted Cash Flow Analysis | 50.0% | $5,100 | $5,700 | $6,400 |
| Market Approach: Public Company Analysis | 40.0% | 18,700 | 20,300 | 21,800 |
| Market Approach: Transaction Analysis | 10.0% | 24,700 | 25,900 | 27,100 |
| | 100.0% | | | |
| Indicated Enterprise Value Range (rounded) | | $12,500 | $13,600 | $14,600 |

| ¶¶ | Text | Objection |
|---|---|---|
| 99 | The difference between my concluded range of value under my Fair Market Value analysis of $18.9 to $21.7 million and this alternate scenario concluded range of $12.5 to $14.6 million ranges from $6.4 to $7.1 million. Thus, this illustrates that under fair market value at the Transaction date, Gompers' quantification of asserted damages to | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 6–7) |

| ¶¶ | Text | Objection |
|---|---|---|
| | MoneyLion is grossly overstated. Gompers applies a 25% discount to Malka for lack of liquidity. Gompers should also have applied a 25% or 30% discount for lack of liquidity to the $30 million of restricted shares paid at the closing. | |
| 100 | I note that the projections Gompers uses in his "But For" scenario are based on a statement by MoneyLion's CFO as to, hypothetically, what is, in his opinion, the highest EBITDA margin for Malka in the "But For" world[70]. Gompers makes no attempt to substantiate this statement. Based on my study of the data, I have no reason to believe performance would be so limited.<br><br>[70] Gompers Report, Figure 8, footnote 4. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 101 | The purchase price of $75 million that MoneyLion agreed to pay for Malka was based primarily on anticipated synergies from adding Malka's digital marketing suite of services to MoneyLion's banking platform. I understand that Malka had been providing services to MoneyLion for several years prior to the Transaction and that MoneyLion approached Malka about a potential transaction. Thus, MoneyLion was likely familiar with Malka's capabilities, age and size. It is clear that expectations of potential synergies that a transaction could facilitate with MoneyLion's existing business was the primary driver of MoneyLion's interest in acquiring Malka. I assume, based on the data available, MoneyLion saw more synergistic value from Malka than a hypothetical, willing buyer would see. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 15–19) |
| 102 | When I consider the significant difference between my Fair Market Value estimate of $20.2 million and Gompers's investment value of approximately $60 million, I can only conclude that MoneyLion, with upfront payments of $10 million cash and $30 million in stock, was anticipating significant near-term synergies in the form of cost savings from Malka's creative platform and talented workforce. The subsequent years' earnouts appear to be common transactional practices to reward post- Transaction performance. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 15–19) |

| ¶¶ | Text | Objection |
|---|---|---|
| 103 | Numerous MoneyLion sources mention potential synergies that MoneyLion considered to be achievable with an acquisition of Malka. Potential benefits discussed in these documents include anticipated revenue increases and cost benefits such as reductions in customer acquisition costs. The specific documents which discuss potential synergies include the following:<br><br>  a. From Project Queen Overview, July 2021:<br>    i. *"Aggregating a network of both 1st and 3rd party products is critical to becoming a trusted source of advice"*[71]<br>    ii. *"...by adding engaging, personalized content and a marketplace network, we will emerge as the industry's first full-scale aggregator."*[72]<br>    iii. *"Accelerates "daily destination" end-game with engagement lead acquisition and growth strategy..."*[73]<br>    iv. *"...clear fit within the MoneyLion logical architecture"*[74]<br>  b. From MoneyLion Board Meeting Minutes, November 9, 2021:[75]<br>    i. *"A discussion ensued on MALKA's content capabilities and its strategic fit within the Company's vision, with Messrs. Choubey and Correia discussing the creation of influencer content to drive engagement on the Company's platform and the potential for new affiliate partnerships with MALKA's existing clients."*<br>    ii. *"Mr. Correia added that the MALKA acquisition aligned with the Company's previously stated communications strategy regarding mergers and acquisitions activity to add content capabilities that* | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 16–17) |

| ¶¶ | Text | Objection |
|---|---|---|
|  | *increase customer engagement with Company and affiliate products."* <br><br> c. From the MoneyLion Board Meeting presentation on November 9, 2021 entitled "Q3 2021 Meeting of the Board of Directors":[76] <br><br> i. Malka is referred to as "*[a] category leader & innovator in digital media content*" and "*a diversified and fully integrated digital media ecosystem reaching today's always-on consumer.*" The presentation also stated, "*MALKA is leading in the fastest growing digital media sectors….a $1T+ annual market opportunity and rapidly expanding.…MALKA is capturing the entire consumer content landscape….MALKA is designed for hyper scale across all emerging channels and has powered significant growth.*" <br><br> ii. The presentation referred to the Transaction as a "*Strategic Combination Building FinTech 3.0.*" According to the presentation, Malka and MoneyLion had "*A Shared Vision: Disrupting & Rewiring legacy industry models. MALKA's content engine will be integrated with MoneyLion's personalization technology to power consumer advice at scale inside the app platform and across all social channels. MoneyLion customers to consume hyper-personalized content, advice, and education which will inform real-time financial decisions within MoneyLion feeds. MoneyLion's members will be able to activate financial solutions and purchase products while consuming personalized content. Integrating product, advice and marketplace will make MoneyLion the first full- scale aggregator."* |  |

| ¶¶ | Text | Objection |
|---|---|---|
| | iii.  The presentation states that *"The Opportunity"* of the Transaction: <br><br> 1. *"Accelerates 'daily destination' end-game with engagement lead acquisition and growth strategy:* <br>  a. *Leverage capabilities to create proprietary content* <br>  b. *Create growth loops through network relationships* <br>  c. *Use established influencer network as MoneyLion spokespeople* <br> 2. *Ready built 'network engine' equipped with business development and content management system capabilities* <br> 3. *Immediate access to creative & content production marketing talent, with proven team that has a longstanding relationship with MoneyLion."* <br><br> iv.  The presentation went on to describe the "Business Lines" as including "Creative content production that also offers integrated project & financial mgmt.. systems and meta-tagging for content (through AWS)"; "Comprehensive marketing solutions to leverage entertainment focused content; develops their own proprietary content"; and "Emerging agency model combined with consultative platform approach and broad access creates a captive group of influencers." <br><br> d.  From additional material in this same presentation at the MoneyLion Board Meeting on November 9, 2021:[77] <br><br> i.  The '*Transaction Overview*' slide in the presentation to the Board entitled "*MoneyLion & MALKA: Strategic* | |

|  |  | *Combination Building Fintech 3.0*" included the following: |  |
|---|---|---|---|

        1. Purchase price of $75mm

        2. Statement indicating valuation was based on Malka revenue multiples of 2.7x for 2021 and 2.5x for 2022

        3. Indications of MoneyLion revenue valuation multiples presented, presumably to demonstrate that the Malka multiples were lower than the market pricing of MoneyLion.

        4. Requirements for Malka metrics needed for the sellers to receive the 2021 and 2022 earnouts, which included achieving revenue of $25mm in 2021 and $30mm in 2022 and EBITDA targets of $100,000 each year.

  ii.    The 'Financial Overview' slide in that same presentation included 2021 and 2022 projections of revenue and gross profit for Malka as well as MoneyLion.

  iii.    This presentation includes no mention of Malka EBITDA projections. This is a notable change from the June 11, 2021 Malka presentation to MoneyLion, and the July 2021 MoneyLion presentation, both of which included projections both of Malka revenue and EBITDA.[78]

  iv.    The projected Malka revenues in this November presentation to the Board were $27.7mm for 2021 and $30.4mm for 2022. These were considerably lower than the revenue projections used in the June 11, 2021 presentation and July 2021 presentation of $32.4mm for 2021 and $46.8mm for 2022.

| ¶¶ | Text | Objection |
|---|---|---|
| | [71] PX071, at MoneyLion_01831201.<br>[72] PX071, at MoneyLion_01831202.<br>[73] PX071, at MoneyLion_01831212.<br>[74] PX071, at MoneyLion_01831215.<br>[75] PX145, at MoneyLion_02038256.<br>[76] PX146, at MoneyLion_02038445 - MoneyLion_02038455.<br>[77] PX146, at MoneyLion_02038456 and MoneyLion_02038457.<br>[78] PX061, at MoneyLion_01831237; PX071, at MoneyLion_01831213. | |
| 104 | I observe the following:<br><br>  a. The purchase price of $75mm in the November presentation is unchanged from the amount proposed in the June and July presentations, despite the decrease in the revenue projections and the findings by CFGI in their diligence analysis that certain adjustments may be needed to the Malka financial statements.<br>  b. The EBITDA targets needed for Malka's sellers to receive the earnouts were only $100,000 in 2021 and 2022, despite an increase in revenue target in 2022 over 2021. These are relatively nominal EBITDA targets which seem to indicate that MoneyLion did not have expectations of significant profitability from Malka in the short term. Further, the MIPA stipulates that the expected recognition of the New Jersey Digital Media Tax Credit can be applied to the EBITDA calculation for the period in which this tax credit is applied for.[79] The MIPA indicates that this application would be expected to occur in 2021 and thus applied to 2021 EBITDA.[80] The actual tax credit in 2021 was $890,905 and this amount was added to EBITDA in MoneyLion's evaluation of Malka's results.[81] I understand there was also a tax credit applied for in 2022. Thus, given the expectation of the receipt of this tax credit in these years, it is possible that Malka could have experienced sizably negative EBITDA before application of the tax credit, | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 16–17) |

| ¶¶ | Text | Objection |
|---|---|---|
| | but after the tax credit was applied, would exceed the $100,000 EBITDA threshold for the earnout. | |

c. Thus, it is apparent that MoneyLion was not evaluating Malka primarily based on revenue projections or Malka's ability to impact EBITDA, but was instead focused on the synergistic impacts of the acquisition. This assertion is further supported by the unchanged $75mm purchase price despite the lower November revenue projections as compared to June and July, as well as the findings of the CFGI diligence report[82] that some Malka numbers were not consistent with GAAP.

d. From the November 16, 2021 MoneyLion Press Release announcing the acquisition:[83]

    i. *"….we will create a durable advantage that accelerates MoneyLion's customer growth and helps us serve our mission of providing financial access and advice…."* (quoting Dee Choubey)

    ii. *"Through this acquisition, which we anticipate will be accretive and cash flow positive in 2022, we will now be able to fully leverage MALKA's capabilities…."* (quoting Dee Choubey)

    iii. *"….Investing in evergreen content and building a platform where creators and consumers can come together is a more efficient and smarter way to support our marketing investments and brand building. This fundamental shift will allow us to own and not rent the relationships we are cultivating with new and existing MoneyLion customers,"* commented Bill Davaris, CMO of MoneyLion."

[79] JX065, Schedule B.
[80] Id.

| ¶¶ | Text | Objection |
|---|---|---|
| | [81] JX083, at MoneyLion_01826070. The amount of the 2021 tax credit is presented on page 5 of this document.<br>[82] JX020.<br>[83] MoneyLion Acquires Leading Creator Network and Content Platform, MALKA Media, November 16, 2021. | |
| 105 | While the following citations about the anticipated synergies expected by MoneyLion are dated after the Transactions, they show the ongoing importance of the synergies from the Malka acquisition.<br><br>    a.  From the MoneyLion December 31, 2021 10-K filing:[84]<br>        i.  *"Our acquisition of MALKA accelerates our ability to engage with consumers across all digital and emerging channels, allowing us to expand our vision of a daily destination….We estimate that in the fourth quarter of 2021, MALKA's content creators provided over 69 million MoneyLion brand impressions. MoneyLife will drive additional prospective customers to MoneyLion and increase customer engagement and cross-sell opportunities for both MoneyLion and its affiliate partners….MALKA's content capabilities can drive industry-leading customer acquisition and retention at scale to help accelerate MoneyLion's customer growth. By combining MALKA's capabilities with MoneyLion's financial products and extensive first-party data, we hope to turn the MoneyLion mobile application into a daily destination for our customers with personalized content that educates, informs, and supports customers' financial decisions."*<br><br>    b.  From the MoneyLion March 10, 2022 Earnings Call:[85]<br>        i.  *"The creator network becomes a brand amplification engine for MoneyLion to engage with fans who are actively turning to social channels for financial education and opportunities."* | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 16–17) |

| ¶¶ | Text | Objection |
|---|---|---|
| |      ii.   *"We estimate Malka's creators provided over 69 million MoneyLion brand impressions in Q4 alone, and this doesn't include a $4 million earned brand benefit that MoneyLion achieved through Malka's network to create a massive Super Bowl campaign hosted by Mike Tyson."*<br><br>     iii.  *"From a performance perspective, we continue to see strong unit economics. We saw 60%-plus adjusted gross profit margins, we had a $70 average revenue per user with upside to over $135 for mature cohorts, and from an acquisition perspective we continue to see efficient payback periods with a less than six month payback period on customer acquisition costs."*<br><br>     iv.  *"When you look at what our trend was in terms of CAC, we've always had that market leading CAC. We saw a slight increase to that when were in Q3, and in Q4 we saw that coming back in, and that's part of that strategy in terms of the brand awareness and the investment that we've made with the Malka Media acquisition. We continue to see that translate into what is a low 20s CAC for us, and so that's where you'll see the value from those impressions."*<br><br>  c.  From the CFGI Valuation Report, dated March 15, 2022:[86]<br><br>     i.  The 'Transaction Rationale' section quotes Dee Choubey: *"We have seen first-hand how Malka's content capabilities can drive industry- leading customer acquisition and retention at scale. By combining their capabilities with MoneyLion's financial products and extensive first party data, we will create a durable advantage that accelerates MoneyLion's customer growth and helps us serve our mission of* | |

| ¶¶ | Text | Objection |
|---|---|---|
| | *providing financial access and advice to hardworking Americans."* <br><br> d.  From the MoneyLion May 12, 2022 Earnings Call:[87] <br>    i.  *"So look this is the big differentiator for MoneyLion. Our investments in the today [ph] fee where the strategy is to become the daily destination for money, adjacent conversations powered by influencers, creators by owning the culture of money is driving a lot of word of mouth as well as social proliferation of the MoneyLion brand and the MoneyLion product."* <br>  e.  From an article interviewing the MoneyLion CEO in June 2022:[88] <br><br>    i.  *"The Malka platform is already paying off big time helping the company decrease their CAC. From Q4 '21 to Q1 '22, the company's CAC (customer acquisition cost) decreased from $25 to $16, allowing the company to achieve a less than 6 month payback period. Powerful….On top of the synergies for the consumer app, it is important to point out just how powerful Even Financial & Malka are as standalone entities….Malka Media was expected to do more than $25 m in 2021 revenue and expected to be cash flow positive in 2022."* <br>  f.  From the MoneyLion August 11, 2022 Earnings Call:[89] <br>    i.  *"We continued to add record new customers in the quarter while reducing our customer acquisition cost for the quarter as well. This continues to be a key differentiator for MoneyLion, and we expect to build on this advantage. Lastly, our Media division, which was established through our acquisition of MALKA Media, generates revenue from providing content production* | |

| ¶¶ | Text | Objection |
|---|---|---|
| | *and management and creator and influencer management services to creators, influencers, and corporate clients - an important benefit for generating Enterprise revenue. We also realize synergies by providing low-cost content and customer acquisition in our Consumer business."*<br><br>   g. From the MoneyLion November 10, 2022 Earnings Call:[90]<br>      i. *"Our ownership of a content studio truly gives us differentiated customer acquisition and retention capabilities….the synergies that we talked about that we would be realizing through the Even and the MALKA acquisitions are really manifesting themselves in the new customer ads….With a consistently low CAC, a compounding data strategy and an expanding network of enterprise partners, we're able to both drive better outcomes for our customers and scale our business efficiently."*<br><br>[84] PX214 at 11.<br>[85] PX218.<br>[86] PX176 at MoneyLion_01824565.<br>[87] PX238.<br>[88] PX241.<br>[89] PX249.<br>[90] PX260. | |
| 106 | In order to quantify the buyer-specific synergies associated with MoneyLion's acquisition of Malka, I considered both revenue and cost savings synergies resulting from the Transaction. My estimate of the quantifiable benefit of these synergies is based in part on assumptions and facts that were not knowable as of the transaction date, but I was able to rely on assumptions that were knowable within a year of the closing of the transaction. My estimate of the synergies is $48.8 million. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 17–19) |

| ¶¶ | Text | Objection |
|---|---|---|
| 107 | The revenue synergies are the cash flows associated with the additional revenue derived from new MoneyLion customers acquired as a direct result of the Malka acquisition, specifically Malka customers that might not otherwise have become MoneyLion customers. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 17–18) |
| 108 | I started with the 2021 customer base growth rate of 135.7%, based on comparing the actual reported MoneyLion customer count as of year-end 2021 to the prior year-end count. I then projected the customer base growth for the years 2022-2025, incrementally tapering down the growth rate, and adding a terminal year with the same 3.0% terminal growth rate assumptions as the DCF analysis for in my Fair Market Value analysis. I note that these tapered growth rates are lower than the actual growth rates in 2022 and 2023 achieved by MoneyLion (based on information reported in MoneyLion December 31, 2023 10-k filings). | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 17–18) |
| 109 | Based on these growth assumptions, I determined the number of new MoneyLion customers added each year. I assumed that 5.0% of new MoneyLion customers acquired can be attributed to Malka – in other words, in the absence of the Malka acquisition, MoneyLion would not have attained these customers. I consider this to be a conservative assumption and expect the actual percentage could be significantly higher, thereby increasing the indicated synergy value. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 17–18) |
| 110 | I then multiplied the number of new customers MoneyLion attributed to Malka by the twelve- month average revenue per user ("ARPU") of $70, sourced from the fourth-quarter and full-year 2021 earnings call transcript dated March 10, 2022.[91] I multiplied the resulting revenue figure by the EBITDA margin for each year to derive the earnings associated with the additional revenue. Tax expense was then applied to calculate the post-tax cash flow each year. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 17–18) |

| ¶¶ | Text | Objection |
|---|---|---|

| | [91] PX218 | |
| 111 | I understand that the primary synergistic benefit from the transaction is MoneyLion's savings on marketing costs with Malka serving as MoneyLion's in-house content creation team post-Transaction. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 18–19) |
| 112 | A newsletter posted on Workweek entitled "MoneyLion: Sitting Down With the CEO" stated that the Malka acquisition reduced MoneyLion's customer acquisition cost ("CAC") from $25 to $16 between 4Q21 and 1Q22.[92] This implies a reduction in CAC of $9 per customer. Although this was published on June 23, 2022, I consider it reasonable to rely on these estimates as they were knowable before, or certainly within several months of, the Transaction.<br><br>[92] PX241. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 16 n.2, 18–19) |
| 113 | I can therefore calculate the costs that Malka saves MoneyLion as the $9 per customer reduction in CAC multiplied by the number of all new MoneyLion customers acquired. I used the estimate of new MoneyLion customers acquired each year that I used in my analysis of revenue synergies described above, and multiply that number of new clients by the CAC reduction of $9. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 18–19) |

| ¶¶ | Text | Objection |
|---|---|---|
| 114 | My analysis assumes that MoneyLion incurs these cost savings on all newly acquired customers, not just those brought in by Malka products specifically. This assumption is based in part on the following quote from the Workweek newsletter: "The Malka platform is already paying off big time helping the company decrease their CAC. From Q4 '21 to Q1 '22, the company's CAC (customer acquisition cost) decreased from $25 to $16, allowing the company to achieve a less than 6 month payback period."[93]<br><br>[93] Id. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 18–19) |
| 115 | I tax-affected these cost savings to calculate the post-tax incremental cash flow each year.<br><br> | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 18–19) |
| 116 | I summed the post-tax revenue and cost savings synergies, discounted them at the WACC of 16.25% applied in my DCF analysis (to reflect an estimate of the risk profile of the synergies[94]) and capitalized the terminal year synergy cash flow.<br><br>[94] I applied the same WACC that I estimated for Malka for purposes of discounting the synergies in this analysis. However, I recognize that there may be different risk factors applicable to MoneyLion. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 18–19) |
| 117 | I summed up the discrete period and terminal year synergies to arrive at the total indicated synergies of $48.8 million. This analysis is presented below, as well as in my Exhibit 14. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 18–19) |

| ¶¶ | Text | Objection |
|---|---|---|

| FY:December 31, | 11/15 - 12/31 2021 | FY 2022 | 2023 | 2024 | 2025 | Terminal Year |
|---|---|---|---|---|---|---|
| $ in thousands | 1.5 months | 12 months | 12 months | 12 months | 12 months | 12 months |
| **Total Synergies** | | | | | | |
| Post-tax net revenue synergies | $ 10 | $ 28 | $ 120 | $ 280 | $ 409 | $ 74 |
| Post-tax cost synergies | 2,219 | 16,038 | 9,356 | 11,694 | 11,694 | 2,105 |
| **Total post-tax synergies** | $ 2,229 | $ 16,066 | $ 9,475 | $ 11,974 | $ 12,104 | $ 2,179 |
| Partial period factor | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | |
| Discount period | 0.0639 | 0.6278 | 1.6278 | 2.6278 | 3.6278 | |
| Present value factor: WACC 16.25% | 0.9904 | 0.9098 | 0.7826 | 0.6732 | 0.5791 | |
| **Present value of synergy cash flows** | 2,207 | 14,617 | 7,416 | 8,061 | 7,009 | |
| Sum of the Present Value of Discrete-Year Synergies | $ 39,311 | | **Terminal Value: Gordon Growth Model** | | | |
| Present Value of Terminal Synergies | 9,522 | | Terminal-year post-tax synergies | | $ 2,179 | |
| **Indicated Value of Synergies (rounded)** | $ 48,800 | (8) | Divided by capitalization rate | | 13.25% | |
| | | | Residual value at terminal year | | 16,443 | |
| | | | Present value factor | | 0.5791 | |
| | | | Present value of terminal synergies | | 9,522 | |

| 118 | Industry transactions in the digital marketing space have been based primarily on capturing market share and achieving revenue growth. This is evidenced by the fact that revenue multiples are the basis for pricing acquisitions in this industry, not multiples based on EBITDA or other measures of profitability. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 19–21) |
|---|---|---|
| 119 | This is clearly illustrated when considering two of my publicly traded comparable companies in the digital marketing space. One of these companies, Dolphin Entertainment, Inc. ("Dolphin")[95], was cited in the Gompers Report as a comparable company and is included in my Market Approach analysis. IZEA Worldwide, Inc. ("IZEA")[96] is another company in the industry that I included in my Market Approach. Both Dolphin and IZEA have had negative EBITDA margins historically but are publicly traded. For valuation purposes, given their negative margins, revenue multiples must be relied upon for their valuations. A DCF valuation that includes negative EBITDA for some time periods may not be an impediment to calculating projections for a DCF valuation.<br><br>[95] Dolphin operates as an independent entertainment marketing and production company in the United States. The company operates in two segments, | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 20–21) |

| ¶¶ | Text | Objection |
|---|---|---|
| | Entertainment Publicity, and Marketing and Content Production. See Exhibit 7 in my analysis for additional description of this company's business.<br>[96] IZEA offers software and professional services to connect brands and content creators in North America, Asia Pacific, and internationally. See Exhibit 7 in my analysis for additional description of the company's business. | |
| 120 | The reliance in this industry on revenue multiples instead of multiples based on profitability for pricing transactions is also apparent when considering precedent transactions. I considered ten transactions involving digital marketing and content creation companies for which valuation and financial information was publicly available. These transactions took place during the three years leading up to the Transaction date. **I note that all but one of the ten transactions are priced based on revenue multiples rather than EBITDA multiples.** A summary of the pertinent information related to these transactions is presented in my Exhibit 15. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 19–20) |
| 121 | Revenue is a metric commonly used in the market to evaluate and/or price companies which provide software-as-a-service ("SaaS") as well as those that provide subscription services and marketing companies. These types of companies are relevant to Malka due to the way in which they deliver their products and services to customers. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 21) |
| 122 | SaaS is defined by Software Equity Group ("SEG") as a business model that *"Primarily offers solutions via the cloud and through a subscription or transaction-based pricing model."*[97] This description is applicable to Malka's products. SEG discusses the use of revenue multiples when valuing SaaS companies as follows: *"Heightened buyer demand for SaaS companies drove a breakout in EV/Revenue multiples over the prior trend. On an annual basis, M&A EV/Revenue multiples have nearly doubled over the past decade."*[98]<br><br>[97] SEG (Software Equity Group) Annual Report, 2021.<br>[98] Id. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 21) |
| 123 | The use of revenue multiples when valuing SaaS companies was also discussed by a fund which focuses on this market: *"Revenue growth is one of the most important considerations when valuing SaaS* | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 21) |

| ¶¶ | Text | Objection |
|---|---|---|
| | *companies….Most high growth SaaS companies aggressively reinvest cash flow into research and development and sales and marketing. Revenue growth is typically more accretive than cash flow generation, particularly early in the development cycle. Today, SaaS unit economics are well understood and easily digested. As a result, the investor community has embraced cash burn when market dynamics and unit economics (sales and marketing efficiency, retention, etc.) support increased investment. Not surprisingly, most public SaaS companies were unprofitable as they scaled to $50 million in sales…at the time of their IPOs, only 43% of SaaS companies reported positive EBITDA margins."*[99]<br><br>[99] River Cities SaaS Operating Metrics and Valuation Benchmark Study, 2017. | |
| 124 | Revenue and customer retention are key metrics for subscription businesses, which is directly applicable since the Company's revenues are largely generated from subscription customers. Forbes discusses these metrics as follows: "*In traditional "asset" purchase models, customers pay a large amount upfront for the product or service as a perpetual license fee and then pay more for maintenance, support and upgrades. In the subscription business model, customers pay a subscription amount each month or year that is less than the traditional model while getting access to the latest version of the product or service as it is released. As you can imagine, most businesses in the past focused on filling the sales pipeline rather than retaining existing customers. **With the subscription model, the primary focus is on boosting customer retention for cross-selling and upselling.**"*[100] **[emphasis added]**<br><br>[100] How A Subscription Business Can Increase Business Valuation, Forbes, October 26, 2020. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 21) |
| 125 | Finally, I considered critical metrics for marketing companies since Malka provides digital marketing services. Salesforce identifies the primary key performance indicators ("KPIs") considered by marketing | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 21) |

| ¶¶ | Text | Objection |
|---|---|---|
| | companies as follows: "*KPIs focus on revenue…the three most common marketing KPIs align with the sales function…*"[101] Salesforce reported the following list of "Ranked popularity of Marketing Metrics/KPIs": (1) Marketing/sales pipeline; (2) Revenue; (3) Marketing/sales funnel; (4) Web/mobile analytics; (5) Customer retention rates; (6) Content engagement; (7) Customer acquisition costs; (8) Customer satisfaction metrics; (9) Customer referral rates/volume; (10) Customer lifetime value."[102] <br><br> [101] State of Marketing, 9th Edition, Salesforce, 2024. <br><br> [102] Id. | |
| 126 | None of these ten metrics are focused on profitability, but rather on revenue and factors which drive revenue growth such as customer retention and acquisition. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702), *see* Bingham Daubert Motion (Dkt. 135 at 21) |
| 127 | The importance of revenue growth and market share gain, as well as lack of focus on profitability, in transactions and valuations of companies in the industries discussed is illustrated when considering certain metrics of MoneyLion itself shortly following the Transaction. MoneyLion reported negative EBITDA for the year ended December 31, 2021 of approximately -$67.2mm, which was a decline from 2020 year-end EBITDA of -$25.04mm.[103] MoneyLion was taken public on September 22, 2021 and as of the date of the Malka Transaction had a market cap of approximately $1.3 billion.[104] As of December 31, 2021 MoneyLion's market cap was approximately $0.92 billion.[105] Thus, the market was recognizing MoneyLion's value despite significantly negative EBITDA. <br><br> [103] PX214 at 75. <br> [104] Sourced from CapitalIQ. <br> [105] Id. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 128 | Malka's income statement and balance sheet for the nine-months ended September 30, 2021 were included in the Disclosure Schedules to the | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | MIPA.[106] Malka's income statement for the nine-months ended September 30, 2021 reflects Net Ordinary Income of ($1,064,993.17).[107] I understand that Net Ordinary Income as used in Malka's income statement refers to Malka's EBITDA and that, for purposes of the 2021 earnout, MoneyLion calculated Malka's EBTIDA (before adjustments) using Malka's Net Ordinary Incomeas reflected in Malka's unadjusted income statement for the year ended December 31, 2021.[108] Thus, Malka's income statement for the nine-months ended September 30, 2021, which was included in the Disclosure Schedules to the MIPA, reflected negative EBITDA of ($1,064,993.17). This is consistent with my observation that MoneyLion does not appear to have been evaluating Malka based on Malka's ability to impact EBITDA. I also note that any Malka EBITDA losses for that period (or for any period in 2021) would likely not have significantly impacted MoneyLion results, particularly given the large losses that MoneyLion had for the year 2021.<br><br>[106] JX066, at MoneyLion_001076 - MoneyLion_001079.<br>[107] JX066, at MoneyLion_001076.<br>[108] JX083. | |

| ¶¶ | Text | Objection |
|---|---|---|
| 13 | **Malka Sports' fee structure was standard for the industry**—namely, Malka Sports would charge a 3 percent commission for any NFL player contract deal, and a 20 percent commission for a marketing deal. | Lack of Personal Knowledge, Foundation as to industry standards (Federal Rule of Evidence 602) |
| 14 | **Malka Sports benefited (and benefited from) its partnership with Malka Media through synergistic relationships.** Malka Sports often had corporate clients that were interested in hiring an athlete for a sponsorship deal. This would create an opportunity for my partners at Malka Media to pitch broader creative production and marketing services from Malka Media. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Vague, Conclusory |
| 16 | Some clients (for example, the nonprofit charity and advocacy organization Players Coalition) paid Malka Sports a **monthly retainer** to create social media content, which was also facilitated by Malka Sports' partnership with Malka Media. PX021 (MoneyLion_02072538-41) is a true and correct copy of Malka Sports' agreement with Players Coalition dated as of November 15, 2020, which provides that Players Coalition will pay Malka Sports an annual fee of $200,000 in twelve monthly payments of $16,667.67 due on the first day of each month, beginning on December 1, 2020 with the last payment due on November 1, 2021. PX165 (MoneyLion_02045581-84) is a true and correct copy of Malka Sports' agreement with Players Coalition dated as of November 15, 2021, which provides that Players Coalition will pay Malka Sports an annual fee of $200,000 in twelve monthly payments of $16,667.67 due on the first day of each month, beginning on December 1, 2021, with the last payment due on November 1, 2022. | Mischaracterization |
| 20 | In 2020, Malka Media hired Matthew Basdekis as its Head of Finance. Mr. Basdekis and the Finance team members who | Vague, Conclusory |

| ¶¶ | Text | Objection |
|---|---|---|
| | reported to him were responsible for accounting matters as to both Malka Media and Malka Sports beginning in 2020, including having primary responsibility for invoicing Malka and Malka Sports clients and tracking accounts receivable and accounts payable. **As none of the Sellers had expertise in accounting, we relied on Mr. Basdekis and his team for such matters.** | |
| 23 | **Malka Sports was an important part of the Malka business prior to the Acquisition.** In fiscal year 2019, according to records I have reviewed that I understand were shared with MoneyLion prior to the Acquisition, Malka Sports' revenue was approximately $3,335,000. In fiscal year 2020, Malka Sports' revenue was approximately $4,648,000—representing a 39 percent growth in revenue year over year. PX025 (MoneyLion_02052253) and PX032 (MoneyLion_02052229) are true and correct copies of Malka Sports Sales Detail, Balance Sheet, Profit and Loss Statement, and Statement of Cash Flows for January 2019 through December 2020. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Vague, Conclusory |
| | Malka Sports was an important part of the Malka business prior to the Acquisition. **In fiscal year 2019, according to records I have reviewed that I understand were shared with MoneyLion prior to the Acquisition, Malka Sports' revenue was approximately $3,335,000.** In fiscal year 2020, Malka Sports' revenue was approximately $4,648,000—representing a 39 percent growth in revenue year over year. PX025 (MoneyLion_02052253) and PX032 (MoneyLion_02052229) are true and correct copies of Malka Sports Sales Detail, Balance Sheet, Profit and Loss Statement, and Statement of Cash Flows for January 2019 through December 2020. | Mischaracterization of document that speaks for itself |

| ¶¶ | Text | Objection |
|---|---|---|
| 24 | MoneyLion was not the only company that contemplated an acquisition of Malka. At some point, the leading agency Excel Sports Management had expressed interest in acquiring Malka for its creative production capabilities. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602) |
| 25 | I learned in approximately June 2021, from Messrs. Frommer and Krubich, that MoneyLion was interested in acquiring Malka.  I understood that MoneyLion viewed Malka as an amplifier and accelerator for MoneyLion's business, because Malka's content production, marketing, and sports agency business would provide in-house services to MoneyLion that it did not otherwise have and would help drive new customer growth for MoneyLion by reaching a new audience. | Hearsay (Federal Rule of Evidence 802); Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602) |
| 31 | One contractual term which I do remember discussing with Fox Rothschild is that some of the Sellers were concerned that if the restricted shares which we would be paid in the Closing Stock Payment, and which we hoped and expected to receive in the 2021 and 2022 Earnout Payments, were conditioned on our employment with MoneyLion, then we could lose the shares if MoneyLion decided to terminate us. | Hearsay (Federal Rule of Evidence 802) |
| 37 | Sellers had agreed to sell our business to MoneyLion and relied entirely on MoneyLion to act in good faith and in accordance with our binding agreements.  **We had agreed to take so much of the total purchase price as MoneyLion restricted shares, because we were willing to bet on MoneyLion's ability to build an even larger and more successful organization with the synergistic assistance of Malka's creative and marketing capabilities as well as its sports talent.  We expected to benefit from the upside in MoneyLion's future share price, once MoneyLion became a truly thriving enterprise.** | Vague, Conclusory |
| 42 | Brandon Copeland, 10-year NFL linebacker  who was also a University of Pennsylvania professor and financial literacy | Relevance (Federal Rules of Evidence 401, 403); Cumulative (Federal Rule of Evidence 403); Lack of |

| ¶¶ | Text | Objection |
|---|---|---|
| | expert, was a Malka Sports client. Given his passion and platform for financial literacy, MoneyLion utilized him to host a content series called "Know Money" for MoneyLion. This four-part course taught personal finance in a fun and relatable way, with examples that brought each idea to life. The content was filmed and produced by Malka Media and Malka Sports received its usual 20 percent commission from the marketing deal for Mr. Copeland, further helping MoneyLion's financial bottom line. The series was nominated for a Webby Award. A promotional video for the course is available online at https://www.youtube.com/watch?v=tM3hy5AMye4 (last accessed December 19, 2024). | Personal Knowledge, Foundation (Federal Rule of Evidence 602); Vague, Conclusory |
| 43 | In July 2021, the National Collegiate Athletic Association began to allow college athletes the opportunity to earn money from their name, image, and likeness ("NIL"). Brands started leveraging these athletes as endorsers, due to their popularity and influence. Malka Sports helped MoneyLion secure a high-profile group of college athlete endorsers for a marketing campaign, including college basketball stars Azzi Fudd and Armando Bacot, among other athletes. PX207 (https://www.youtube.com/watch?v=-30m6prnPw0) is a true and correct copy of the "Inaugural MoneyLion NIL Athletes" video posted by MoneyLion on November 17, 2022. | Relevance (Federal Rules of Evidence 401, 403); Cumulative (Federal Rule of Evidence 403); Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Vague, Conclusory |
| 44 | Malka Sports introduced MoneyLion to 23XI Racing, a NASCAR team owned by the legendary Michael Jordan. Malka Sports helped to facilitate a multi-year partnership wherein MoneyLion became the Official Digital Banking and Cryptocurrency Partner of 23XI. MoneyLion was excited to join forces with arguably the most iconic athlete in U.S. history, while also getting to work with 23XI's popular drivers Bubba Wallace and Kurt Busch. PX411 | Relevance (Federal Rules of Evidence 401, 403); Cumulative (Federal Rule of Evidence 403); Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Vague, Conclusory |

| ¶¶ | Text | Objection |
|---|---|---|
| | (https://www.moneylion.com/learn/moneylion-teams-up-with-23xi-racing-bubba-wallace-and-kurt-busch/) is a true and correct copy of a MoneyLion press release dated February 3, 2022 announcing this partnership. | |
| 45 | The "Malka x MoneyLion" video, which was produced by Malka to announce the Acquisition, provides an illustration how Malka's content production could benefit MoneyLion's brand.  This 73-second promotional video quickly features a bevy of athletes and celebrities who appear in Malka-produced podcast series and other media content, including such recognizable faces as Snoop Dogg, Sylvester Stallone, Mike Tyson, and Kevin Hart.  PX402 (https://vimeo.com/1039495293) is a true and correct copy of this video. | Relevance (Federal Rules of Evidence 401, 403); Cumulative (Federal Rule of Evidence 403); Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Vague, Conclusory |
| 46 | As another example, Malka helped MoneyLion tap into pop culture by producing a Super Bowl party called "The Lion's Den," which was livestreamed and hosted by Mike Tyson. Malka was responsible for producing Mr. Tyson's podcast, Hotboxin' with Mike Tyson, and Malka utilized its talent procurement capabilities to secure Mr. Tyson, as well as former NFL player Brandon Marshall and former mixed martial artists Brendan Schaub and Daniel Cormier, among numerous other notables who participated in the event.  A 2-minute, 18-second video recap captured the excitement of the event.  PX403 (https://vimeo.com/1039499685) is a true and correct copy of this video. | Relevance (Federal Rules of Evidence 401, 403); Cumulative (Federal Rule of Evidence 403); Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Vague, Conclusory |
| 55 | **However, MoneyLion executives advised Sellers at the time that we were legally considered corporate insiders who, in fact, could not sell any shares without taking additional steps required by insider trading laws.**  I am not aware of any reason why I qualified as an insider (or whether | Hearsay (Federal Rule of Evidence 802); Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
| | I truly did), as I had no knowledge of any significant nonpublic plans or information regarding MoneyLion. | |
| 63 | Between the Acquisition and December 12, 2022, according to records I have reviewed, MoneyLion's market capitalization declined from an estimated $1.3287 billion to $126.8 million, a decline of 91.5 percent. PX358 (SELLERS00004094) is a true and correct copy of these records. PX358 is also the type of market report that Sellers shared with one another and relied upon in the ordinary course of Malka's business. These figures accord with my personal recollection of MoneyLion's historical market capitalization, which I discussed with the other Sellers and MoneyLion executives. | Argumentative, Conclusory |
| 66 | By mid-December 2022, MoneyLion was demanding that Sellers refrain from selling additional vested shares, and this created a serious problem for us because of our tax obligations. I understand from discussions with Messrs. Frommer and Krubich that they explained this problem to Messrs. Choubey and Correia. | Hearsay (Federal Rule of Evidence 802); Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602) |
| 67 | I learned from the other Sellers on or about December 14, 2022 that Messrs. Choubey and Correia had demanded that the four of us agree to defer the distribution of the 2022 Earnout Payment and our forthcoming make-whole shares relating to the Closing Stock Payment and 2021 Earnout Payment until 2024, by which time they hoped MoneyLion's share price would rebound. Since the MIPA provided that any make-whole shares and 2022 Earnout Payment shares would be paid and vest on a quarterly basis, we became concerned that MoneyLion was suddenly asking to rewrite binding agreements to our detriment. | Hearsay (Federal Rule of Evidence 802) |
| 68 | **Mr. Frommer wanted all of the Sellers to hear what MoneyLion was proposing.** I attended a phone call with the | Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of |

| ¶¶ | Text | Objection |
|---|---|---|
| | other Sellers and Messrs. Choubey and Correia on December 15, 2022. I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX273 (SELLERS00003787 Tr.). Based on my review, PX273 is a true and accurate transcript of the conversation. | Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 69 | At the time, with just 16 days until year-end, all indications were that Malka had already satisfied the revenue target and was assured to satisfy the EBITDA target needed to obtain the 2022 Earnout Payment. Messrs. Choubey and Correia explained that they did not want to issue $25 million worth of shares when the stock price was around $0.50 and MoneyLion's market capitalization had declined about 91.5 percent since the Acquisition. PX273. | Argumentative, Mischaracterization, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 70 | I understood during the December 15, 2022 call that Messrs. Choubey and Correia were using the urgency of Sellers' tax obligations in order to exact concessions from us that were inconsistent with the deal we had agreed to. | Argumentative, Mischaracterization, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 71 | During the call, Mr. Choubey said that he and Mr. Correia would "use every corporate lever to then make sure that those shares aren't coming to market," referring to make-whole shares and/or 2022 Earnout Payment shares which MoneyLion was obligated to pay Sellers under the MIPA. PX273 at 18. | Completeness (Federal Rule of Evidence 106); Lack of Personal Knowledge, Foundation as to what Mr. Choubey's statements meant (Federal Rule of Evidence 602); Argumentative, Mischaracterization, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 72 | During the call, Mr. Correia acknowledged that MoneyLion owed Sellers "75 million bucks one way or another" and reassured us that MoneyLion was "not proposing . . . to not give you your $25 million," but said that MoneyLion's board would likely resist issuing additional shares to Sellers while the share price remained around $0.50. PX273 at 19, 23. | Completeness (Federal Rule of Evidence 106); Argumentative, Mischaracterization, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |

| ¶¶ | Text | Objection |
|---|---|---|
| 73 | Mr. Choubey agreed: "You're going to get the full $25 million, just at a later date. PX273 at 23. | Completeness (Federal Rule of Evidence 106); Argumentative, Mischaracterization, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 74 | Sellers did not agree to accept the deferred vesting of our shares. In my view, this was an inappropriate attempt by MoneyLion executives to rewrite the binding agreements whereby we had sold our company to them—simply because MoneyLion apparently no longer found the terms sufficiently favorable. | Completeness (Federal Rule of Evidence 106); Argumentative, Mischaracterization, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 79 | As mentioned above, given where Malka's business stood in late December 2022, it was clear that we were on track to achieve the Maximum 2022 Earnout Payment. | Foundation (Federal Rule of Evidence 602); Argumentative, Conclusory |
| 80 | Despite Malka's performance and the assurances we were given by Messrs. Choubey and Correia about the 2022 Earnout Payment, on April 14, 2023, MoneyLion informed Mr. Frommer (and he then informed the other three Sellers) that based on its analysis, we would not be entitled to receive any earnout payment for 2022. | Vague, Argumentative, Conclusory, Mischaracterization |
| 81 | Sellers hired legal counsel and accountants and objected to MoneyLion's 2022 Earnout Statement in May 2023. Between May and July 2023, Sellers attempted to engage in good faith negotiations with MoneyLion. However, in around July 2023, negotiations broke down. At the same time, we remained unable to transfer our vested shares and had been substantially delayed in receiving the 2022 Earnout Payment to which we were entitled. Seeing no alternative to litigation, we filed this lawsuit. | Vague, Argumentative, Conclusory, Mischaracterization |
| 86 | To the extent any of Fox Rothschild's post-Acquisition work for Sellers was personal in nature and not related to Malka's | Vague, Argumentative, Conclusory |

| ¶¶ | Text | Objection |
|---|---|---|
| | work at MoneyLion, I would have expected to be advised by Mr. Basdekis, or someone else in Finance, that bills were received that appeared to include personal charges. I understand that these bills were sent directly to MoneyLion for reimbursement. | |
| 88 | Sellers made repeated written requests to MoneyLion to provide the challenged billing records, credit card statements, and invoices that were the purported cause for our terminations, beginning with a letter to MoneyLion on May 23, 2023. JX118 (SELLERS00000026-27) is a true and correct copy of that letter. | Argumentative, Conclusory |
| 89 | Only 15 months later, on August 16, 2024—which I understand was the last day of fact discovery in this litigation—did MoneyLion finally produce the Fox Rothschild invoices which it contended were improper personal expenses. | Argumentative, Conclusory |
| 90 | **I have reviewed these invoices, and my review confirms that a substantial portion of Fox Rothschild's bills were properly reimbursable because they related to the Kalo dispute, which concerns an account receivable owed to MoneyLion and which I discuss in paragraphs 112-118 below.** However, I recognize that there are other bills for legal services which could be non-reimbursable, as they were not for the benefit of MoneyLion. Sellers would bear responsibility for such expenses, which could constitute a modest offset to our claims. Had any personal expenses been brought to my attention before Sellers were terminated (or, indeed, before August 16, 2024), I would have addressed them promptly. | Argumentative, Conclusory |
| 90 | I have reviewed these invoices, and my review confirms that a substantial portion of Fox Rothschild's bills were properly reimbursable because they related to the Kalo dispute, which | Speculation |

| ¶¶ | Text | Objection |
|---|---|---|
|  | concerns an account receivable owed to MoneyLion and which I discuss in paragraphs 112-118 below. However, I recognize that there are other bills for legal services which could be non-reimbursable, as they were not for the benefit of MoneyLion. Sellers would bear responsibility for such expenses, which could constitute a modest offset to our claims. **Had any personal expenses been brought to my attention before Sellers were terminated (or, indeed, before August 16, 2024), I would have addressed them promptly.** |  |
| 92 | To the best of my knowledge, MoneyLion left the sports agency business at that time, and has not operated in the sports agency space since, which is not surprising since MoneyLion was not in the sports agency space prior to the Acquisition and only got into it because of Malka Sports. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Argumentative, Conclusory |
| 99 | I have incurred attorneys' fees and costs as a result of MoneyLion's baseless non-compete claim. | Argumentative |
| 104 | I expected that, by selling our company to MoneyLion in return for $10 million in cash and a much larger portion of stock, I would be free to use my MoneyLion shares as any investor could—that I could choose to sell some shares, hold some shares long-term, or use the shares as I otherwise saw fit. At no point did the parties agree that MoneyLion would have a right to effectively freeze my shares after the respective stock vesting dates had passed. | Vague, Argumentative, Conclusory, Speculation |
| 105 | Nevertheless—without any basis in any agreement to which I am a party— MoneyLion has apparently placed a "stop order" with Continental which prevents me from freely exercising my shareholder rights, including the right to transfer my shares to my broker and to sell them into the public market. PX318 (SELLERS00004431) is a true and correct copy of the email from Continental informing Sellers of this fact. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Argumentative |

| ¶¶ | Text | Objection |
|---|---|---|
| 118 | To the best of my knowledge, Kalo's payments under the Promissory Note have always gone to Malka, not Malkalo LLC. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Speculation |
| 121 | To the best of my understanding, Mr. Basdekis continued to use the same historical revenue and expense recognition principles that Malka had used pre-closing when he calculated revenue and EBITDA for purposes of the 2021 Earnout Payment and 2022 Earnout Payment. At no time, including to the present, has Mr. Basdekis or anyone from MoneyLion indicated to me that Mr. Basdekis' accounting practices used to calculate Malka's revenue and EBITDA for the 2021 Earnout Payment and 2022 Earnout Payment differed from Malka's historical revenue and expense recognition principles. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Speculation |

| ¶¶ | Text | Objection |
|---|---|---|
| 18 | We completed the review of Malka's 2019 financial statements on or about August 28, 2020. JX066 (at MoneyLion_001043-58) is a true and correct copy of Malka's reviewed financial statements for the year ended December 31, 2019 (the "2019 Reviewed Financials"). In the 2019 Reviewed Financials, my firm concluded that "[b]ased on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in accordance with accounting principles generally accepted in the United States of America." JX066 at MoneyLion_001045. The 2019 Reviewed Financials also state that "Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America[.]" *Id.* **In my view, "Management" as used in the 2019 Reviewed Financials refers to Mr. Frommer and Mr. Basdekis, although Mr. Basdekis, as Malka's Head of Finance, signed the management representation letter in connection with the 2019 Reviewed Financials**. | Foundation, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation |
| 19 | The Notes to the 2019 Reviewed Financials describe, among other things, Malka's significant accounting policies. The Notes provide:<br><br>Revenue is recognized under the accrual basis of accounting and recorded as revenue when work is completed and invoice[d] to the Company's customers. The Company's revenue is generated from a combination of project-based purchase orders that have various stages of completion whereby additional | Foundation, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation |

| ¶¶ | Text | Objection |
|---|---|---|
| | revenue is earned, and standalone billing. The Company's contracts are generally shortterm in nature and are complete in less than one-year.<br><br>JX066 at MoneyLion_001050. **To the best of my recollection, my understanding about Malka's revenue recognition practices came from Mr. Basdekis. I personally inserted a line into the Notes to Malka's 2019 Reviewed Financials that states that "[t]he Company has adopted ASC 606 as of December 31, 2019 regarding accounting for income from contracts and all revenues recognized by the Company for the year then ended are covered through ASC 606."** JX066 at MoneyLion_001050. | |
| 23 | In the 2020 Reviewed Financials, my firm concluded that "[b]ased on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in accordance with accounting principles generally accepted in the United States of America." JX066 at MoneyLion_001061. The 2020 Reviewed Financials also state that "Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America[.]" JX066 at MoneyLion_001061. **In my view, "Management" as used in the 2020 Reviewed Financials refers to Mr. Frommer and Mr. Basdekis, although Mr. Basdekis, as Malka's Head of Finance, signed the management representation letter in connection with the 2020 Reviewed Financials**. | Foundation, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation |
| 40 | I recall participating on a phone call with Mr. Frommer and Mr. Basdekis on or about October 28, 2021 to discuss MoneyLion's initial drafts of Schedules A and B. I recall Mr. Frommer conveying to me and Mr. Basdekis that MoneyLion | Hearsay (Federal Rule of Evidence 802) |

| ¶¶ | Text | Objection |
|---|---|---|
| | was going to permit Sellers to edit Schedules A and B to describe Malka's historical accounting principles as well as the calculation principles that would be used for purposes of the earnout. I recall Mr. Frommer asking that Mr. Basdekis and I be very specific with the language that we included in Schedule A and Schedule B so that we clearly defined Malka's historical accounting principles as well as the revenue and EBITDA calculation principles for the earnout. | |
| 44 | As set forth below, MoneyLion ultimately agreed to our edits to Schedules A and B to remove any representation or reference as to compliance with ASC 606. As a result, there was no need to perform the additional testing that I would have considered necessary had MoneyLion insisted upon including a representation as to compliance with ASC 606 in Schedule A. | Completeness (Federal Rule of Evidence 106), Mischaracterization |
| 45 | Had MoneyLion insisted upon including a representation in Schedule A that the 2019 Reviewed Financials and 2020 Reviewed Financials were prepared in accordance with ASC 606, I also would have wanted to restate those financial statements to add a liability account for deferred revenue, which would have impacted the balance sheet. However, I never communicated to Sellers that such a restatement was necessary, because after MoneyLion agreed to our edits to Schedules A and B removing any representation or reference as to compliance with ASC 606 (as described below), I was comfortable that no such restatement was necessary. | Speculation |
| 46 | In my view, Schedule A essentially rendered irrelevant any statements in the 2019 Reviewed Financials and 2020 Reviewed Financials as to compliance with U.S. GAAP and ASC 606, because the MIPA made clear that those financial statements (and the interim financial statements for the nine-months ended September 30, 2021) were prepared in | Relevance (Federal Rule of Evidence 401, 403), Improper Lay Opinion (Federal Rule of Evidence 701), Completeness (Federal Rule of Evidence 106), Mischaracterization, Speculation |

| ¶¶ | Text | Objection |
|---|---|---|
|  | accordance with the "Accounting Principles," i.e. Schedule A, and Schedule A, as edited by us, contained no representation as to compliance with ASC 606. |  |
| 49 | Although I initially took the pen on editing Schedule B, it was very important to me that any edits to both Schedule B and Schedule A be reviewed and approved by Mr. Basdekis before they were sent to MoneyLion. **I understood that Mr. Frommer wanted Schedules A and B to be accurate and correct,** and, based upon my experience working with Mr. Basdekis and Sellers, my view was that Mr. Basdekis was the only person on the Malka side who fully understood the details of Malka's invoicing and revenue recognition practices. Therefore, I asked that Mr. Basdekis review and approve of my edits given that he had the detailed understanding of Malka's historical practices. | Hearsay (Federal Rule of Evidence 802), Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602) |
| 53 | When I wrote this, I wanted to highlight what I understood to be the way in which Malka's revenue recognition practices did not comply with ASC 606 so that it was clear that Malka's revenue for purposes of the earnout would not be determined in accordance with U.S. GAAP or ASC 606. My understanding at the time was that Malka's agreements with its customers generally provided that Malka would invoice its customers 50% upfront upon execution of the contract and 50% upon completion of work. With respect to the 50% upfront payment, my understanding was that it was noncancelable in nature, meaning that Malka could keep the upfront payment even if the work did not happen. I understood that Malka recognized the upfront payment into revenue when it was invoiced to the customer, even though work might have not yet been performed. | Foundation, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation |

| ¶¶ | Text | Objection |
|---|---|---|
| 54 | Although I had not reviewed Malka's invoices or contracts with its customers, a little over a week before I edited Schedule B, Mr. Basdekis had brought to my attention what he referred to as "cancellation language in [Malka's] template SOW," which provided that "[i]f Client cancels the services herein contracted, MMG shall retain the full sum of the Fee paid by Client." PX104 (MoneyLion_01051578-80) is a true and correct copy of Mr. Basdekis's October 20, 2021 email to me. I had this language in mind when I edited Schedule B, although I did not intend to limit the term "noncancelable deposit" as used in Schedule B to refer only to instances where Malka's agreements with its customers included this provision. In my view, a noncancelable deposit as the term is used in Schedule B (and Schedule A) could exist even in the absence of this language as long as Malka received an upfront payment from its customer and did not have to return the upfront payment even if the contract was cancelled or work was not performed. | Relevance (Federal Rule of Evidence 401, 403), Improper Lay Opinion (Federal Rule of Evidence 701), Hearsay (Federal Rule of Evidence 802) |
| 63 | I am not aware of Mr. Basdekis ever communicating to me, to any of the Sellers, or to Fox Rothschild that the markups of Schedule B that I and Fox Rothschild circulated on October 29, 2021 were incorrect or inaccurate in any way. To the contrary, on October 29, 2021, Mr. Basdekis responded to my email requesting that he review my proposed edits to Schedule B and wrote, "Good with this[.]" JX035 (MoneyLion_01040452-67) is a true and correct copy of the email that I received from Mr. Basdekis on October 29, 2021. | Foundation, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation |
| 64 | On October 31, 2021, Mr. Frommer wrote to me and Mr. Basdekis, copying Fox Rothschild, to remind us to review and comment on Schedule A. **He wanted to make sure that we were "explicit" in the way we defined Malka's accounting principles.** I responded the same day that "[t]o the best of my | Foundation, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation |

| ¶¶ | Text | Objection |
|---|---|---|
| | knowledge, revenue has been consistently booked from 2018 through present using the same principle we defined in Schedule B." JX038. Again, because I recognized that Mr. Basdekis was the one with the actual detailed knowledge of Malka's revenue recognition principles, I added, "Matt not sure if you have a different perspective" so that Mr. Basdekis could express his agreement or disagreement with what I wrote. JX038. | |
| 74 | I am not aware of Mr. Basdekis ever communicating to me, to any of the Sellers, or to Fox Rothschild that Malka's historical revenue recognition principles described in the markups of Schedule A that I or Fox Rothschild circulated on November 1, 2021 were incorrect or inaccurate in any way. Again, I was confident that if I had incorrectly described Malka's historical revenue recognition principles, Mr. Basdekis, who was very familiar with those principles, would call any inaccuracy to my attention so that it could be corrected. That did not happen. | Foundation, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation |
| 80 | In the version of Schedule B that I attached to my November 3, 2021 email, I edited the definition of "EBITDA" to include a parenthetical that referred to Malka's historical revenue and cost recognition principles. Specifically, I edited the definition of "EBITDA" to read, "'EBITDA' means the combined and consolidated net income before interest expense, federal, state and local taxes, depreciation and amortization of the Buyer, determined in accordance with U.S. GAAP (*__including the Company's historical revenue and cost recognition principles__*) as reviewed or audited by Buyer's independent accountant." JX047 at MoneyLion_01037493 (emphasis added). I did not delete the confusing language regarding EBITDA of "the Buyer," i.e., MoneyLion, but I clearly understood that Malka's EBITDA, | Argumentative, Mischaracterization |

| ¶¶ | Text | Objection |
|---|---|---|
| | not MoneyLion's, was relevant for purposes of determining whether Sellers would be entitled to the earnout payments contemplated by the MIPA. I inserted the parenthetical to make clear that Malka's EBITDA would be determined for earnout purposes in the same manner it had been pre-acquisition. | |
| 99 | Prior to the close of the transaction on November 15, 2021, I am not aware of Mr. Basdekis ever expressing any disagreement with or edits to any of the language that Fox Rothschild included in the updated draft of Schedule A that it sent to me and Mr. Basdekis on November 5 and again on November 9, 2021. | Foundation, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation |
| 100 | In light of the fact that Mr. Basdekis was knowledgeable about the details as to how Malka historically recognized revenue and expenses, the fact that Mr. Basdekis approved of Schedule A as drafted communicated to me and gave me comfort that we had accurately described in Schedule A the ways that Malka's historical revenue and expense recognition principles differed from U.S. GAAP. As noted above, I also understood that those same historical revenue and expense recognition principles would be used for purposes of calculating revenue and EBITDA for the 2021 and 2022 earnouts. | Foundation, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation |
| 101 | Prior to the closing of the transaction on November 15, 2021, I am not aware of anyone from MoneyLion or its advisors ever asking anyone from the Sellers' side what the terms "historical revenue recognition principles," "noncancelable deposits" or "milestones" meant as those terms were used in Schedule A and Schedule B. I am also not aware of anyone from the MoneyLion side ever asking what the words "[b]y way of illustration" meant as those words were used in Schedule B. Nor am I aware of anyone from MoneyLion or | Foundation, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation |

| ¶¶ | Text | Objection |
|---|---|---|
| | its advisors asking for the MIPA to quantify the impact of any exception to U.S. GAAP or ASC 606. | |
| 104 | My understanding was that, in addition to the potential to achieve the 2021 and 2022 earnouts, the purchase price that MoneyLion agreed to pay Sellers in the MIPA included cash consideration and the number of shares of MoneyLion Inc. restricted stock in an amount equal to an aggregate of $30 million divided by the greater of the 30-day volume-weighted average price ("VWAP") of the stock as of November 15, 2021 or $9.00 (the "Closing Stock Payment"). See JX065 at DLA_006202-03, Section 2.03(a)(ii). Under the MIPA, the Closing Stock Payment vested in four equal installments on December 31, 2021, March 31, 2022, June 30, 2022 and September 30, 2022 and was subject to a make-whole right as set forth in the MIPA. Thus, when calculating Sellers' individual tax liabilities for 2022, it was necessary to consider each Sellers' tax liability in respect of his portion of the Closing Stock Payment. | Foundation, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation |
| 106 | The CVA Report expressed CVA's opinion as to the fair market value of a restricted share of MoneyLion, Inc. stock on each of the three vesting dates in 2022 – March 31, 2022, June 30, 2022 and September 30, 2022. PX266 at MoneyLion_00157382. CVA defined "fair market value" "as the amount of money at which a restricted common share of the Company [MoneyLion, Inc.] would likely exchange between a willing buyer and willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of all relevant facts." PX266 at MoneyLion_00157380. | Mischaracterization |
| 107 | CVA concluded that based on its review of "19 studies that have been concluded over a 33-year period" and its analysis of "18 factors which can positively or negatively affect the | Mischaracterization |

| ¶¶ | Text | Objection |
|---|---|---|
| | marketability of a restricted share," it was necessary to apply a 30% "lack of marketability discount" to the value of the restricted shares of MoneyLion, Inc. stock as of each vesting date. PX266 at MoneyLion_00157381-82. CVA explained the bases for its conclusion in the CVA Report and included the results of the 19 studies and 18 factors considered in the exhibits to the CVA Report. *See* PX266 at MoneyLion_00157380-90. | |

| ¶¶ | Text | Objection |
|---|---|---|
| 22 | After the initial, upfront invoice, Malka's general practice was to invoice clients on various client-driven milestones, which could be, for example, particular dates, stages of project completion, or other events. To the best of my recollection, the client-driven milestones were often spelled out in Malka's statements of work. | Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Foundation (Federal Rule of Evidence 602) |
| 23 | The timing of when Malka would send invoices subsequent to the initial invoice could depend on a range of factors. To the best of my recollection, it was always agreed upon with the client, and was nearly always driven by the client's own business and financial considerations. For example, a client might have leftover marketing budget toward the end of the calendar year that it wanted to spend or might have other business or financial considerations such that it preferred to be invoiced most of the cost upfront or invoiced at particular intervals. | Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Foundation (Federal Rule of Evidence 602) |
| 29 | Mr. Basdekis, as Malka's Head of Finance, was highly familiar with Malka's invoicing and was responsible for the company's revenue and expense recognition practices. | Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Foundation (Federal Rule of Evidence 602) |
| 32 | In or around June 2021, I learned from Mr. Krubich that MoneyLion had approached him about a potential acquisition of Malka, and that he and Mr. Frommer had met with MoneyLion executives over dinner in New York to discuss the possibility. | Hearsay (Federal Rule of Evidence 802) |
| 33 | As I recall, MoneyLion was not the only company that had expressed interest in acquiring Malka. Before MoneyLion, we had been approached at some point by Excel Sports Management, a major sports agency. | Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Foundation (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
| 34 | To the best of my knowledge, as of the time when Messrs. Frommer and Krubich met with MoneyLion about a potential acquisition, Malka had not been "shopping around" for potential acquirors and had not engaged an investment bank or other advisors or service providers with an acquisition in mind. | Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Foundation (Federal Rule of Evidence 602) |
| 54 | I recall that MoneyLion's executive team directed Sellers, specifically around the close of fiscal quarters, to send invoices as promptly as possible and to try to defer expenses into the next quarter. | Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Foundation (Federal Rule of Evidence 602) |
| 68 | Thus, after about March 14, 2023, I owned 1,823,580 shares of MoneyLion stock which were paid to me pursuant to the MIPA as a combination of the Closing Stock Payment, the 2021 Earnout Payment, and make-whole shares associated with each. After a 1:30 Reverse Stock Split that occurred in April 2023, as I discuss in paragraphs 107-110 below, these became 60,786 shares. PX410 (MoneyLion_00120986-89) is a true and correct copy of my Continental account statement dated May 2, 2023. | Mischaracterization |
| 70 | After the Acquisition, Malka continued to provide creative and marketing services to MoneyLion. Based on my contemporaneous discussions with the other Sellers and Mr. Basdekis, I understand that MoneyLion and Malka entered into an agreement or statement of intercompany services work for 2022. This would include several extremely time- and resource-intensive MoneyLion projects. | Hearsay (Federal Rule of Evidence 802), Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Foundation (Federal Rule of Evidence 602) |
| 71 | Based on my discussions with the other Sellers and Mr. Basdekis, I also understand that Malka billed discounted "internal" rates for its employees' time spent on MoneyLion | Hearsay (Federal Rule of Evidence 802), Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Foundation (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
| | projects, compared with the higher "external" rates charged to other Malka clients. | |
| 74 | Additionally, and again based on my contemporaneous discussions with the other Sellers and Mr. Basdekis, I understand that Malka did not charge MoneyLion a production management fee. I cannot recall a single Malka client, other than MoneyLion, with whom I worked without charging our standard 20 percent production management fee. Sometimes our clients paid additional fees for contingencies, on top of the 20 percent fee. | Hearsay (Federal Rule of Evidence 802), Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Foundation (Federal Rule of Evidence 602) |
| 80 | I recall that, by early December 2022, Mr. Basdekis informed Sellers that Malka had far surpassed the revenue threshold for achieving the Maximum 2022 Earnout Payment, and was on target to easily surpass the EBITDA threshold as well. This meant that, in addition to Sellers soon receiving the fourth tranche of 2021 Earnout Payment shares, we would receive over the course of 2023, additional 2022 Earnout Payment shares valued at $25 million as of a particular date, and at very low prices—given the collapse of MoneyLion's share price at the time. | Foundation (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Hearsay (Federal Rule of Evidence 802) |
| 88 | As noted above, by late 2022, Sellers were under financial pressure because of our tax obligations. At the same time, MoneyLion was making it unreasonably difficult for us to sell additional vested shares, and MoneyLion executives chastised Sellers with increasing severity whenever we wanted to sell, as the stock price continued to decline. This created a serious problem for us, which I understand Messrs. Frommer and Krubich had raised with Messrs. Choubey and Correia. | Argumentative, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Foundation (Federal Rule of Evidence 602) |
| 89 | Messrs. Frommer and Krubich informed me in December 2022 about their thus-far unsuccessful efforts to persuade | Argumentative, Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of |

| ¶¶ | Text | Objection |
|---|---|---|
| | MoneyLion to free up some of our vested shares, so that we could pay our taxes. It seemed that MoneyLion had refused to sign a Rule 10b5-1 form and was intent on extracting additional concessions from Sellers as a precondition to allowing us to sell additional shares. In that context, Mr. Frommer asked Mr. Krubich and me to join a telephone call with Messrs. Choubey and Correia. | Evidence 602), Foundation, Hearsay (Federal Rule of Evidence 802) |
| 90 | On December 14, 2022, we held the call, during which Messrs. Choubey and Correia asked the three Sellers present (myself, Mr. Frommer and Mr. Krubich) to agree to defer vesting of our next quarterly tranche of make-whole shares, and of the 2022 Earnout Payment shares, for another year (until January 1, 2024). My recollection is that this was the first I had heard of any such proposal. | Completeness, Mischaracterization, Argumentative |
| 91 | According to Messrs. Choubey and Correia during the call, the steep decline in MoneyLion's share price at that time meant that, if Sellers were to be paid, and then resell, a large number of MoneyLion shares, it could spook investors and cause further declines in the share price. | Completeness, Mischaracterization, Argumentative, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 92 | Messrs. Choubey and Correia demanded that we cooperate with this plan—despite MoneyLion's binding commitments in the MIPA to pay us our make-whole shares and the 2022 Earnout Payment, if Malka satisfied the applicable revenue and EBITDA thresholds—and took the position that they could not allow us to receive shares worth $25 million while the share price was around $0.50. Therefore, Sellers were effectively told to accept the yearlong deferment of payments to which we were contractually entitled, or else. | Completeness, Mischaracterization, Argumentative, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 94 | During the call, Mr. Choubey said: | Completeness, Mischaracterization, Argumentative, Hearsay as to the transcript (Federal Rule of Evidence |

| ¶¶ | Text | Objection |
|---|---|---|
| | I think the reality of the matter is it's essentially gonna take a year longer for us to get you that $70,000,000 in shares as we build the business together and build it back up. I mean that's the fact of the matter for a real talk if you really want to get to brass tacks.<br><br>PX271 at 5. | 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 95 | As Mr. Correia explained, if the share price eventually recovered to $2 or $3, Sellers' shares could be worth $300 million. PX271 at 7. | Completeness, Mischaracterization, Argumentative, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 96 | During the call, Mr. Correia acknowledged, "[A]re we breaking the agreement, sure," but reassured the three of us that we would still get the 2022 Earnout Payment; "[i]t's just going to take a little bit more time." PX271 at 7-8 (emphasis added). | Completeness, Mischaracterization, Argumentative, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 97 | Mr. Choubey added: "There is no scenario where the current make-whole construct can be the way it is." PX271 at 8 (emphasis added). | Completeness, Mischaracterization, Argumentative, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 99 | Mr. Choubey said that he intended "to use every corporate lever to then make sure that those shares aren't coming to market . . ." PX273 at 18. | Completeness, Mischaracterization, Argumentative, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 100 | During the call, Mr. Correia acknowledged that MoneyLion owed Sellers "75 million bucks one way or another" and reassured us that MoneyLion was "not proposing . . . to not give you your $25 million," by which he was referring to the 2022 Earnout Payment shares. However, he said that | Completeness, Mischaracterization, Argumentative, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |

| ¶¶ | Text | Objection |
|---|---|---|
| | MoneyLion's board would likely resist issuing additional shares to Sellers while the share price remained around $0.50. PX273 at 19, 23. | |
| 101 | Mr. Choubey agreed: "You're going to get the full $25 million, just at a later date. PX273 at 23. | Completeness, Mischaracterization, Argumentative, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 102 | Sellers did not agree to the proposal by Messrs. Choubey and Correia that we defer vesting of our shares. In my view, this was an inappropriate attempt by MoneyLion executives to rewrite the binding agreements whereby we had sold our company to them—simply because MoneyLion apparently no longer found the terms sufficiently favorable. | Mischaracterization, Argumentative, Speculation, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 104 | During the call, Mr. Choubey said:<br><br>We asked you to defer the 12/31 make-whole to 2024, and you guys didn't want to do that. . . . [A]lso with the company having to issue so many shares and forcing a 50-cent stock potentially to go to 30 cents, right? Because the value of the company is the value of the company, the more shares you issue the lower the stock price goes. . . . 100% categorically no one had the 10b5-1. . . . The lawyers were telling us arguably that our insider trading policy should have been interpreted that when you're in a cure period no insider should be able to sell stock, right? So I think it would have just been a horrible look if we had put those in place, so that's why we made the call there on that one. I hope you understand that one.<br><br>PX277 at 15-16 | Completeness, Mischaracterization, Argumentative, Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |

| ¶¶ | Text | Objection |
|---|---|---|
| 105 | I understood Mr. Choubey's words to mean that, in the opinion of MoneyLion's counsel, Sellers were still restricted from selling or perhaps even transferring our shares out of Continental without additional authorization, because we qualified as corporate insiders. | Completeness, Mischaracterization, Argumentative |
| 115 | To the extent any of Fox Rothschild's post-Acquisition work for Sellers was personal in nature and not related to Malka's work at MoneyLion, I would have expected to be advised by Mr. Basdekis, or someone else in Finance, that bills were received that appeared to include personal charges. Prior to being terminated, I had no notice of any bills that MoneyLion contended included personal charges of the Sellers. | Vague, Conclusory, Argumentative |
| 116 | Sellers made repeated written requests to MoneyLion to provide the challenged billing records, credit card statements, and invoices that were the purported cause for our terminations, beginning with a letter to MoneyLion on May 23, 2023. JX118 (SELLERS00000026) is a true and correct copy of that letter. | Argumentative, Conclusory |
| 117 | Only 15 months later, on August 16, 2024—which I understand was the deadline for fact discovery in this litigation—did MoneyLion finally produce the Fox Rothschild invoices which it contended were improper personal expenses. | Argumentative, Conclusory |
| 118 | I have reviewed all of the invoices which MoneyLion produced in support of its claim that it wrongfully paid Sellers' personal legal expenses. Based on my review, a number of the challenged Fox Rothschild bills concern the Kalo promissory note and the related receivable dispute between Malka and Kalo's majority member, HillviewMed. It is puzzling that MoneyLion challenges these expenses as | Argumentative, Conclusory |

| ¶¶ | Text | Objection |
|---|---|---|
|  | personal, because this work relates to efforts to enforce a receivable due to Malka, which ultimately benefits MoneyLion as its owner and parent. |  |
| 119 | Other bills reflect Fox Rothschild's work on transaction-related matters, such as interpreting the terms of the MIPA and other Acquisition-related documents, registration of MoneyLion shares, or other matters directly relating to the Acquisition and Sellers' obligations thereunder. Given that several interpretive questions arose in the course of Sellers' dealings with MoneyLion and MoneyLion sought to change certain terms of the Acquisition after the fact, it should come as no surprise that Sellers engaged outside counsel to review the agreements and proposed amendments thereto. | Argumentative, Conclusory |
| 120 | To the extent any of Fox Rothschild's post-Acquisition work for Sellers is deemed to have been personal in nature, meaning it was not for the benefit of Malka's business or of MoneyLion with respect to implementing the Acquisition, I acknowledge that Sellers are responsible for those items, and this could constitute a modest offset to Sellers' claims against MoneyLion. Had any personal expenses been brought to my attention at the time, I would have addressed them promptly. | Speculation (Federal Rule of Evidence 602) |
| 121 | I would have expected that any Fox Rothschild bills which were truly personal in nature would have been sent to Sellers for approval, not MoneyLion's accounting department. In fact, I did personally pay a number of Fox Rothschild bills relating to my individual legal matters, such as tax and estate planning. | Argumentative, Conclusory, Speculation (Federal Rule of Evidence 602) |
| 126 | I expected that, by selling our company to MoneyLion in return for $10 million in cash and a much larger portion of stock, I would be free to use my MoneyLion shares as any | Vague, Argumentative, Conclusory, Speculation (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
| | investor could—that I could choose to sell some shares, hold some shares long-term, and use some shares as margin for a diversified portfolio. At no point did the parties agree that MoneyLion would have a right to effectively freeze my shares after the respective stock vesting dates had passed. | |
| 127 | Nevertheless—without any basis in any agreement to which I am a party— MoneyLion has apparently placed a "stop order" with Continental which prevents me from freely exercising my shareholder rights, including the right to transfer my shares to my broker and to sell them into the public market. PX318 (SELLERS00004431) is a true and correct copy of the email from Continental informing Sellers of this fact. | Argumentative, Foundation (Federal Rule of Evidence 602), Lack of Personal Knowledge (Federal Rule of Evidence 602) |
| 130 | To the best of my understanding, Mr. Basdekis continued to use the same historical revenue and expense recognition principles that Malka had used pre-closing when he calculated revenue and EBITDA for purposes of the 2021 Earnout Payment and 2022 Earnout Payment. At no time, including to the present, has Mr. Basdekis or anyone from MoneyLion indicated to me that Mr. Basdekis' accounting practices used to calculate Malka's revenue and EBITDA for the 2021 Earnout Payment and 2022 Earnout Payment differed from Malka's historical revenue and expense recognition principles. | Lack of Personal Knowledge (Federal Rule of Evidence 602), Speculation (Federal Rule of Evidence 602), Foundation (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
| 19 | Malka typically would invoice its customers at the start of the project and upon completion. Many Malka clients had preferences as to the timing and intervals of invoices, and Malka accommodated its clients' preferences whenever possible, so our statements of work and other project documentation could and often did specify different invoicing dates. These invoicing dates were typically requested by and negotiated with the client based on its own business and financial considerations. Malka did not send client invoices at unexpected or random times. I cannot recall any instance in which a client complained that it had received an unexpected invoice, and **I strongly doubt that it ever happened**. | Speculation, Foundation (Federal Rule of Evidence 602) |
| 27 | PX039 (MoneyLion_02042287) is a true and correct copy of a work order effective February 18, 2021, between Malka and Amazon. This work order was created in the ordinary course of Malka's business, and it was Malka's ordinary course of business to create such work orders. The deliverables would be seven Global All Hands Meeting Videos, to be filmed across 12 days in 6-7 locations in the United States and Europe. Amazon was to pay 50 percent of the anticipated total fee of $333,600 **as an upfront deposit** and the remaining balance "will be billed upon tracked production burn . . ." PX039 at MoneyLion_02042287. | Mischaracterization |
| 29 | Mr. Basdekis, as Malka's Head of Finance, was highly familiar with Malka's invoicing practices, and his Finance team worked with the Client Services team to manage the invoicing process. **The Client Services team had almost sole responsibility for generating invoices**, while Mr. Basdekis was responsible for determining whether and how revenue and expenses were recognized for accounting purposes. | Vague, Conclusory |

| ¶¶ | Text | Objection |
|---|---|---|
| 38 | As set forth in the June 2021 Pitch Deck, **one of the most valuable aspects of Malka was its Network of episodic podcast and video series**. The Network, which included series featuring notable athletes and other celebrities, had 40 million followers on social media and a reach of 350 million monthly impressions. As the June 2021 Pitch Deck showed, these Malkaproduced series included, just as a few examples: Hotboxin', hosted by former boxer Mike Tyson; Below the Belt, hosted by former mixed martial artist and standup comedian Brendan Schaub; Morning Kombat, co-hosted by former CBS Sports analysts Luke Thomas and Brian Campbell; and Run That Back!, hosted by rapper and record producer Wyclef Jean (formerly of the Fugees). (JX005 at MoneyLion_01149888-89.) | Conclusory |
| 40 | After Mr. Krubich and I presented the June 2021 Pitch Deck, I do not recall anyone at MoneyLion or MoneyLion ever asking any follow-up questions about the revenue and EBITDA projections. **My strong impression and recollection based on conversations with Mr. Correia is that MoneyLion merely wanted Malka to be slightly profitable, but was far more focused on revenue.** As set forth below, the EBITDA target that we ultimately agreed to in the MIPA for purposes of the 2021 and 2022 earnouts was $100,000 for both years. **That number bore no relation to the EBTIDA projections in the June 2021 Pitch Deck**. | Foundation (Federal Rule of Evidence 602) |
| 43 | As it happened, MoneyLion did not counteroffer with a different valuation or purchase price. Instead, <u>the next day</u>, June 15, 2021, **MoneyLion accepted our proposal of $75 million, but it offered to pay $10 million in cash and up to $65 million in equity, consisting of MoneyLion shares valued and issued on particular dates.** | Mischaracterization |

| ¶¶ | Text | Objection |
|---|---|---|
| 47 | Mr. Correia's spreadsheet also noted that if MoneyLion's stock price doubled, the **total value of the Acquisition to Sellers would be $140 million**. (JX006 at MoneyLion_00147422.) | Mischaracterization |
| 54 | Mr. Correia explained during the call that, pursuant to MoneyLion's anticipated purchase price structure for the Acquisition, Sellers would be compensated partly in MoneyLion shares that would vest on a quarterly schedule. He further explained that "we basically have $50 million <u>guaranteed</u> to you guys. And so that's basically two-thirds [of the total $75 million] within the year of the transaction." (PX414 at 1) (emphasis added). **In other words, according to Mr. Correia, it was "guaranteed" that Sellers would receive $10 million in cash, plus the Closing Stock Payment and the 2021 Earnout Payment.** | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602), Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law, Mischaracterization |
| 55 | Mr. Correia added that once the shares vested and after an initial six-month lockup period post-Acquisition, "you guys can sell, like all of us, we can sell whenever we're vested." (PX414 at 4.) He did not mention anything about any additional lockup or freeze period, or that trading might only be permitted during limited open windows. | Completeness (Federal Rule of Evidence 106), Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law, Mischaracterization |
| 56 | On the call, I raised the point that the earnouts should be focused on revenue rather than EBITDA targets. Mr. Correia responded that MoneyLion was "focused on revenue as well" and "would have a minimum floor of EBITDA, meaning the EBITDA target is not the target you gave us." (PX414 at 1-2). Mr. Correia reiterated MoneyLion's view that "we think this is such a strategic transaction." (PX414 at 6.) | Completeness (Federal Rule of Evidence 106), Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law, Mischaracterization |
| 57 | As I noted in an email to Fox Rothschild on June 30, 2021, MoneyLion was "focused on the revenue targets," not EBITDA. (JX008 at MoneyLion_01136949.) | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602) |
| 58 | Sometime in or around July 2021, Messrs. Choubey and Correia, along with MoneyLion's Chief Product Officer, Tim Hong, | Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of |

| ¶¶ | Text | Objection |
|---|---|---|
| | visited Malka's offices in Santa Monica, California, so they could see where some of Malka's videos and social media content were produced. I cannot recall whether Mr. Davaris visited with them | Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 59 | On July 2, 2021, I had another phone conversation with Mr. Correia, which I also recorded. In preparation for my trial testimony, I have reviewed both the recording and a transcript thereof, which is appended hereto as PX065 (SELLERS00004087). Based on my review of both, PX065 is a true and accurate transcript of the conversation. | Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 60 | During that call, Mr. Correia explained that, because the anticipated purchase price structure involved the payment of some number of shares valued as of a particular date: <br><br> With the upside, if we crush it, then you can play with the upside scenarios. So you have downside protection in every case. The risk that we have and that our—my lawyers are just like, "You know what this could mean, right?" Which is, they [Sellers] could own a greater percentage of the company if we have to basically— and this is, they're just giving me extreme scenarios—let's say the company for some crazy reason came down to be trading at a dollar, right? . . . You guys would have to receive $25 million worth of a company that is trading at a dollar that might have a market cap of 100 million. <br><br> (PX065 at 2-3.) | Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 61 | On the call, Mr. Correia and I also discussed the revenue targets that Malka would need to achieve for the earnouts, and Mr. Correia stated that "no one sets a target at the actual number they saw in diligence." (PX065 at 5.) | Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 62 | Mr. Correia saw the value of Malka as creating and securing MoneyLion's future presence in the media space. As I recall | Foundation (Federal Rule of Evidence 602), Hearsay as to the transcript (Federal Rule of Evidence 802), |

| ¶¶ | Text | Objection |
|---|---|---|
| | clearly, Mr. Correia said to me: "[D]on't tell anyone 'cause they think I'm building a financial services company; I'm building a media company." He reiterated this point later, saying that he and Mr. Choubey's shared view was "[t]hat the right answer is actually not to have any new financial services company, we've built a [expletive] better media company. So let's just do that." (PX065 at 8, 11.) | Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 72 | **To the best of my knowledge, Malka gave MoneyLion, its counsel, and its due diligence advisors (a company called CFGI) access to all documents and information that they requested in the course of due diligence**. MoneyLion was never refused a request for documents in the due diligence process. I do not recall anyone from the MoneyLion side of the Acquisition complaining that our disclosures were inadequate, and if any issues arose, I worked with Fox Rothschild and others at Malka to address them as promptly and effectively as we could. | Foundation (Federal Rule of Evidence 602) |
| 100 | I wanted this language to ensure that Sellers received the benefit of the Tax Credit in each of the earnout years, 2021 and 2022. As I discussed with Mr. Correia prior to the Acquisition, the **Tax Credit represented an effective cash windfall to MoneyLion**. As I wrote to Fox on July 9, 2021:<br><br>We are currently waiting on our NJEDA Digital Media Tax Credit submission for 2019 which we should know about in the next couple weeks about approval—which would be around 900K. Given that the target EBITDA is 100K, and this wouldn't hit that number and the number we are being acquired for also does not factor this in, this 900K would be a windfall to MoneyLion. The 2020 tax credit we would be applying for (if 2019 is approved) would be around 2M. Is there a way to include this somehow into the calculations to help us ensure we hit | Foundation (Federal Rule of Evidence 602), Hearsay (Federal Rule of Evidence 802) |

| ¶¶ | Text | Objection |
|---|---|---|
| | that revenue or EBITDA target, so that if this is approved, these amounts would be accretive to the benchmarks?<br><br>(PX068 at MoneyLion_01124919.) | |
| 102 | **Consistent with my email**, on October 29, 2021, Mr. Basdekis responded to Mr. Curran's email requesting that Mr. Basdekis review his proposed edits to Schedule B and wrote, "Good with this[.]" JX035 (MoneyLion_01040452-67) is a true and correct copy of the email that I received from Mr. Basdekis on October 29, 2021. | Conclusory, Argumentative |
| 122 | In the final version of the MIPA, MoneyLion agreed to Sellers' proposed revisions to Schedules A and B, **including the deletions of all references to ASC 606 and the replacement language incorporating Malka's historical revenue and cost recognition principles**. JX065 (DLA_006185-006332) is a true and correct copy of the execution version of the MIPA, which I signed. | Mischaracterization |
| 136 | In agreeing to the 2022 Budget, I understood that MoneyLion was committing to support the reflected level of expenses as the Malka teams transitioned to their new focus within MoneyLion. **This is consistent with one of the recorded telephone conversations that I and Mr. Krubich had with Mr. Choubey and Mr. Correia on June 30, 2021** (prior to the Acquisition). (PX414.) On the call, Mr. Krubich raised the concern that post-closing, Malka would be converting "20%, 30%, 50% of the team to fully focus" on MoneyLion and asked how MoneyLion would respond to a request for "$2-5 million dollars because we got to staff the right way" or because "we have to eliminate some of our revenue with our clients." (PX414 at 4-5.) Mr. Choubey responded: | Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law, Conclusory |

| ¶¶ | Text | Objection |
|---|---|---|
| | I think we want to accelerate your network, right? Let's get more influencers, more content creators, and if we need to book that expense as part of MoneyLion—the parent company's—marketing budget, we can do that. That doesn't need to go into your P&L for the purposes of a calculation on the earnout.<br><br>(PX414 at 5.) | |
| 150 | Thus, after March 14, 2023, I owned 7,259,055 shares of MoneyLion stock which were paid to me pursuant to the MIPA as a combination of the Closing Stock Payment, the 2021 Earnout Payment, and make-whole shares associated with each. (PX310.) | Mischaracterization |
| 153 | MoneyLion's public statements following the Acquisition **very much accord with what Messrs. Choubey and Correia had explained to me in summer 2021 about the reasons why the Acquisition was attractive to MoneyLion**. PX168 (https://investors.moneylion.com/news/detail/62/moneylion-acquires-leading-creator-networkand-content) for example, is a true and correct copy of a press release from MoneyLion dated November 16, 2021 (one day after the Acquisition). In this press release, Mr. Choubey was quoted as follows:<br><br>This transaction is the evolution of a successful four-year partnership between MALKA and MoneyLion. We have seen first-hand how MALKA's content capabilities can drive industry-leading customer acquisition and retention at scale. By combining their capabilities with MoneyLion's financial products and extensive first party data, we will create a durable advantage that accelerates MoneyLion's customer growth and helps us serve our mission of providing financial access and advice to hardworking Americans. . . . | Foundation (Federal Rule of Evidence 602), Conclusory |

| ¶¶ | Text | Objection |
|---|---|---|
| | Through this acquisition, which we anticipate will be accretive and cash flow positive in 2022, we will now be able to fully leverage MALKA's capabilities so that the MoneyLion brand can truly live wherever our customers are investing their attention.<br><br>(PX168 at 2.) | |
| 167 | On March 2, 2022, I had a Slack conversation with Mr. Basdekis in which I inquired about the status of RSM's (MoneyLion's external auditor) audit and the 2021 earnout. As in his January 30, 2022 email, Mr. Basdekis explained that RSM's audit "is based on GAAP accounting," and unrelated to the earnout. **I understand from my conversations with Mr. Basdekis around that time that he had worked with MoneyLion to track Malka's financials on a GAAP basis on NetSuite, separately tracking the same information (also on NetSuite) in accordance with Schedule B for earnout purposes.** Mr. Basdekis also informed me that he had provided MoneyLion "our historical accounting principal [sic] view of 2021 . . . a few weeks ago[.]" In the same exchange, Mr. Basdekis also sent me a number of invoices to MoneyLion for intercompany services performed in 2022—**likely because I was the responsible Malka partner for the MoneyLion client relationship.** PX210 (MoneyLion_00017455-70) is a true and correct copy of this Slack thread and its attachments. | Hearsay (Federal Rule of Evidence 802), Foundation (Federal Rule of Evidence 602) |
| 173 | Sometime in 2022, **Mr. Basdekis informed me that he had filed Malka's application for a Tax Credit of $1,590,603 based on its 2020 digital media production work**. As I testified above, Schedule B required that the parties include in Malka's calculated EBITDA for earnout purposes the expected Tax Credit | Hearsay (Federal Rule of Evidence 802) |

| ¶¶ | Text | Objection |
|---|---|---|
| | recognition "in the period in which the Tax Credit was applied for," which here would mean in 2022. (JX065 at DLA_006267.) | |
| 189 | In the first quarter of 2023, MoneyLion advised Malka that there was an available budgetary "pool" for employee bonuses for calendar year 2022. Payment of these budgeted-for bonuses would not be based on any formal 2022 performance review, either as to Malka itself or individual employees. Ultimately, in 2023, MoneyLion paid bonuses to a number of Malka personnel. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602) |
| 190 | No one at MoneyLion ever informed me that it would attempt to use a total figure of $544,500 in employee bonuses, which was $529,500 above the amount in Malka's 2022 Budget, in order to reduce Malka's calculated 2022 EBITDA for earnout purposes. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602), Argumentative, Conclusory |
| 193 | I recall that, by early December 2022, **Mr. Basdekis informed Sellers that Malka had long surpassed the revenue threshold for achieving the Maximum 2022 Earnout Payment, and was on target to easily surpass the EBITDA threshold as well**. This meant that, in addition to Sellers soon receiving the fourth tranche of 2021 Earnout Payment shares, we would receive over the course of 2023, additional 2022 Earnout Payment shares valued at $25 million as of a particular date, and at very low prices— given the collapse of MoneyLion's share price at the time. | Hearsay (Federal Rule of Evidence 802) |
| 196 | Between the Acquisition and December 12, 2022, according to records I have reviewed, MoneyLion's market capitalization declined from an estimated $1.3287 billion to $126.8 million, a decline of 91.5 percent. PX358 (SELLERS00004094) is a true and correct copy of these records. PX358 is also the type of market report that Sellers shared with one another and relied upon in the ordinary course of Malka's business. **These figures accord with my personal recollection of MoneyLion's historical market capitalization**, which I discussed contemporaneously with the other Sellers and MoneyLion executives. | Argumentative, Conclusory |

| ¶¶ | Text | Objection |
|---|---|---|
| 201 | As noted above, in December 2022, Sellers were under financial pressure because we had to pay our capital gains taxes arising out of the Acquisition. **At the same time, MoneyLion was not permitting us to sell additional vested shares**, and this created a serious problem for us, which Mr. Frommer and I discussed with Messrs. Choubey and Correia. Our discussions convinced me that **MoneyLion was intent on extracting additional concessions** from Sellers as a precondition to allowing us to sell additional shares. In that context, Messrs. Krubich, Fried, and I spoke with Messrs. Choubey and Correia by telephone on December 14, 2022. | Mischaracterization |
| 203 | Although Messrs. Choubey and Correia freely admitted on the call that MoneyLion had binding commitments in the MIPA to pay us our make-whole shares on particular dates, and the 2022 Earnout Payment on particular dates (assuming Malka satisfied the applicable revenue and EBITDA thresholds to receive the earnout payment)—they took the position that they could not allow us to receive shares worth $25 million while the share price was around $0.50. Therefore, Sellers were effectively told to accept a yearlong delay in payments to which we were contractually entitled, or else. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602), Argumentative, Mischaracterization |
| 204 | Messrs. Choubey and Correia made clear that the reason for this unfair proposal to Sellers was MoneyLion's falling share price at the time. MoneyLion was willing to violate or ignore the basic terms of the Acquisition, and to do whatever else it took in order to avoid paying us the shares that we had rightly earned under the MIPA—because paying us our shares could have resulted in additional dilution and/or reduction in the share price. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602), Argumentative, Mischaracterization |
| 206 | During the call, Mr. Choubey said:<br><br>I think the reality of the matter is it's essentially gonna take a year longer for us to get you that $70,000,000 in | Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |

| ¶¶ | Text | Objection |
|---|---|---|
| | shares as we build the business together and build it back up. I mean that's the fact of the matter for a real talk if you really want to get to brass tacks.<br><br>(PX271 at 5.) | |
| 207 | As Mr. Correia explained, if the share price eventually recovered to $2 or $3, Sellers' shares could be worth $300 million. (PX271 at 7.) | Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 209 | During the December 14, 2022 call, Mr. Correia acknowledged, "[A]re we breaking the agreement, sure," but reassured the three of us that we would still get the 2022 Earnout Payment; "[i]t's just going to take a little bit more time." (PX271 at 7-8) (emphasis added). | Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law, Argumentative, Mischaracterization |
| 210 | Mr. Choubey added: "There is no scenario where the current make-whole construct can be the way it is." (PX271 at 8) (emphasis added). | Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law |
| 211 | The next day, all four Sellers had another telephone conversation with Messrs. Choubey and Correia about their proposed deferment of the 2022 Earnout Payment. Again, I recorded this call. I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX273. Based on my review, PX273 is a true and accurate transcript of the conversation. | Completeness (Federal Rule of Evidence 106), Argumentative, Mischaracterization |
| 212 | Mr. Choubey said that he intended "to use every corporate lever to then make sure that those shares aren't coming to market . . ." (PX273 at 18.) | Completeness (Federal Rule of Evidence 106), Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law, Argumentative, Mischaracterization |

| ¶¶ | Text | Objection |
|---|---|---|
| 213 | During the call, Mr. Correia acknowledged that MoneyLion owed Sellers "75 million bucks one way or another" and reassured us that MoneyLion was "not proposing . . . to not give you your $25 million," by which he was referring to the 2022 Earnout Payment shares. However, he said that MoneyLion's board would likely resist issuing additional shares to Sellers while the share price remained around $0.50. (PX273 at 19, 23.) | Completeness (Federal Rule of Evidence 106), Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law, Argumentative, Mischaracterization |
| 214 | Mr. Choubey agreed: "You're going to get the full $25 million, just at a later date. (PX273 at 23.) | Completeness (Federal Rule of Evidence 106), Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law, Argumentative, Mischaracterization |
| 215 | Sellers did not agree to the proposal by Messrs. Choubey and Correia that we accept the deferred vesting of our shares. In my view, this was an inappropriate attempt by MoneyLion executives to rewrite the binding agreements whereby we had sold our company to them—simply because MoneyLion apparently no longer found the terms sufficiently favorable. I did not understand by what authority MoneyLion could unilaterally change the terms of our deal. | Completeness (Federal Rule of Evidence 106), Argumentative, Mischaracterization |
| 217 | During the call, Mr. Choubey said:

We asked you to defer the 12/31 make-whole to 2024, and you guys didn't want to do that. . . . [A]lso with the company having to issue so many shares and forcing a 50-cent stock potentially to go to 30 cents, right? Because the value of the company is the value of the company, the more shares you issue the lower the stock price goes. . . . 100% categorically no one had the 10b5-1. . . . The lawyers were telling us arguably that our insider trading policy should have been interpreted that when you're in a | Hearsay as to the transcript (Federal Rule of Evidence 802), Authenticity as to the transcript (Federal Rule of Evidence 901), Object to the extent the underlying audio recording is illegal under local law, Mischaracterization |

| ¶¶ | Text | Objection |
|---|---|---|
| | cure period no insider should be able to sell stock, right? So I think it would have just been a horrible look if we had put those in place, so that's why we made the call there on that one. I hope you understand that one.<br><br>(PX277 at 15-16.) | |
| 219 | I have no idea why I qualified as an insider (or if, indeed, I truly did), as I do not recall having knowledge of any significant nonpublic plans or information regarding MoneyLion. To this day, I am unaware of how MoneyLion could prevent me from selling some of my shares on that basis. | Argumentative |
| 220 | As I testified above, MoneyLion would choose to pay Sellers' Q4 2022 make-whole shares related to the 2021 Earnout Payment as a mix of equity and cash on March 14, 2023, unlike its previous issuances of the Closing Stock Payment and 2021 Earnout Payment shares. **This reflected MoneyLion's evident concerns about dilution while its share price remained below $1.00.** | Argumentative |
| 226 | It was against the backdrop of MoneyLion's falling share price—and **Messrs. Choubey's and Correia's threats at the end of 2022**—that Mr. Basdekis provided his 2022 Malka revenue and EBITDA calculations to MoneyLion in January 2023. **To the best of my knowledge, he did so using the same NetSuite accounting records system that he had used for the 2021 revenue and EBITDA calculations, and for Malka's regular accounting activities**. | Foundation (Federal Rule of Evidence 602), Argumentative, Mischaracterization, Speculation |
| 229 | True to his word, Mr. Choubey made good on his threat not to issue the 2022 Earnout Payment, and MoneyLion proceeded to substitute its own, completely different set of calculations in the Revenue and EBITDA Statement transmitted to me on April 14, 2023. That decision by MoneyLion precipitated this dispute. JX112 (MoneyLion_01826072-76) is a true and correct copy of the Revenue and EBITDA Statement. | Argumentative, Mischaracterization |

| ¶¶ | Text | Objection |
|---|---|---|
| 231 | On May 25, 2023, as required by the MIPA and after consulting with the other Sellers, and with external counsel and accountants, Sellers submitted their Detailed Statement of Objections to the 2022 Revenue and EBITDA Statement. JX119 (MoneyLion_000057-65) is a true and correct copy of that Detailed Statement of Objections. As our cover letter stated, **we had been advised that MoneyLion's reliance upon its own, alternative revenue and EBITDA calculations contravened Schedule B**, and we were prepared to "begin the good faith negotiations to resolve this matter" pursuant to Section 2.06(b)'s dispute resolution procedures. (Id. at MoneyLion_000057-59.) | Hearsay (Federal Rule of Evidence 802) |
| 234 | I recall that, during the June 9 meeting, MoneyLion's external accountants from FTI expressed the view that while Sellers were entitled to the Tax Credit for purposes of the 2022 Earnout Payment, FTI opined that the "expected recognition" of the Tax Credit should be discounted by approximately 15 to 20 percent from the amount for which Mr. Basdekis had applied ($1,590,603). | Hearsay (Federal Rule of Evidence 802) |
| 243 | Second, MoneyLion claimed that Sellers had breached Section 3.06 of the MIPA by classifying the cost of revenue-generating employees under General & Administrative rather than as costs of goods sold. However, as this claim implies and as we pointed out to MoneyLion in our reply, the **cost of these employees was fully disclosed in Malka's financial statements**. | Argumentative |
| 246 | Finally, as we reminded MoneyLion in our reply, MoneyLion was obligated pursuant to Section 5.08 of the MIPA to release the Retention Escrow Amount of $375,000 to Sellers, less any amounts disputed in good faith. **Because none of MoneyLion's claims raised a good-faith dispute, MoneyLion should have released the Retention Escrow Amount forthwith— but it did not.** | Argumentative |

| ¶¶ | Text | Objection |
|---|---|---|
| 250 | Therefore, only after MoneyLion learned that Sellers had decided to hire counsel in anticipation of the need for dispute resolution under Section 2.06(b)(iv) of the MIPA with respect to MoneyLion's false 2022 earnout statement did MoneyLion manufacture purported "cause" for our terminations, asserting for the first time (to my knowledge) that we had improperly used company funds for personal expenses. These allegedly personal expenses included certain (but at the time, unspecified) Fox Rothschild legal bills and (also unspecified) "credit card and invoiced personal charges." (JX115.) | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602), Argumentative, Mischaracterization |
| 251 | I do not recall Mr. Basdekis or any other MoneyLion employee ever raising any concern with me regarding the company's payment of any personal or legal expenses of Sellers, prior to my termination. **This is not surprising because** I did not create expense reports or otherwise record my business expenses. Instead, MoneyLion's finance team would review monthly expenses with me from time to time, and I recall at least one meeting with Ms. Nuno to answer questions she had about particular expenses. I do not recall her asking me about any Fox Rothschild bills. | Argumentative |
| 252 | To the extent any of Fox Rothschild's post-Acquisition work for Sellers was personal in nature and not related to Malka's work at MoneyLion, **I would have expected to be advised by Mr. Basdekis, or someone else in Finance, that bills were received that appeared to include personal charges**. Prior to being terminated, I **had no notice** of any bills that MoneyLion contended included Sellers' personal charges. | Legal Conclusion, Argumentative |
| 257 | Based upon my review of these invoices, which total $143,404.73, it appears that at least $28,572.00 of that amount related to the Kalo Brands LLC dispute, which concerns an account receivable owed to Malka (and thus to MoneyLion). Other invoices also reflected postAcquisition legal services | Speculation |

| ¶¶ | Text | Objection |
|---|---|---|
| | which were for the benefit of Malka's business, or for the benefit of MoneyLion with respect to implementing the Acquisition. To the extent any Fox Rothschild bills were for legal services that were truly personal to Sellers, Sellers are responsible to pay them, and they could constitute a modest offset to Sellers' claims against MoneyLion. **Had any personal expenses been brought to my attention before Sellers were terminated (or, indeed, before August 16, 2024), I would have addressed them promptly.** | |
| 265 | I have incurred attorneys' fees and costs as a result of MoneyLion's **baseless** noncompete claim. | Argumentative |
| 273 | Based on publicly available records of MoneyLion's stock price, I have determined that had MoneyLion made the 2022 Earnout Payment to which Sellers were entitled on June 24, 2023—30 days from Sellers' delivery to MoneyLion of its objections to the 2022 Earnout Statement, and the expiration of the 2022 Resolution Period—the 30-day VWAP for one MoneyLion share would have been approximately $11.11 ($11.1062143). Dividing the $25 million total by this price, **Sellers should have received a combined 2,250,992 shares, paid in equal installments that would have vested and become fully earned on a quarterly basis on March 31, June 30, September 30, and December 31, 2023, respectively**. | Conclusory, Argumentative |
| 274 | Based on publicly available records publicly available records of MoneyLion's stock price, I have determined that had MoneyLion made the 2022 Earnout Payment to which Sellers were entitled on August 23, 2023—the date by which a properly selected Independent Accountant should have issued a decision under the terms of the MIPA—the 30-day VWAP for one MoneyLion share would have been approximately $13.74. **Dividing the $25 million total by this price, Sellers should have received a combined 1,819,328 shares, paid in equal installments that** | Conclusory, Argumentative |

| ¶¶ | Text | Objection |
|---|---|---|
| | **would have vested and become fully earned on a quarterly basis on March 31, June 30, September 30, and December 31, 2023, respectively**. | |
| 281 | To the best of my understanding, **Mr. Basdekis continued to use the same historical revenue and expense recognition principles that Malka had used pre-closing when he calculated revenue and EBITDA for purposes of the 2021 Earnout Payment and 2022 Earnout Payment**. At no time, including to the present, has Mr. Basdekis or anyone from MoneyLion indicated to me that Mr. Basdekis' accounting practices used to calculate Malka's revenue and EBITDA for the 2021 Earnout Payment and 2022 Earnout Payment differed from Malka's historical revenue and expense recognition principles. | Foundation (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
| 15 | The "Malka x MoneyLion" video, which was produced by Malka to announce the Acquisition, provides an illustration how Malka's content production could benefit MoneyLion's brand. This 73-second promotional video quickly features a bevy of athletes and celebrities who appear in Malka-produced podcast series and other media content, including such recognizable faces as Snoop Dogg, Sylvester Stallone, Mike Tyson, and Kevin Hart. PX402 (https://vimeo.com/1039495293/) is a true and correct copy of this video. | Speculation; Relevance (Federal Rules of Evidence 401, 403); Lack of personal knowledge, Foundation (Federal Rule of Evidence 602); Conclusory |
| 16 | As another example, Malka created a 2-minute, 18-second video recap of MoneyLion's "Lion's Den" livestream during the 2022 Super Bowl, hosted by Mike Tyson. The video also highlighted former NFL player Brandon Marshall and former mixed martial artists Brendan Schaub and Daniel Cormier, among numerous other notables who participated in the event. PX403 (https://vimeo.com/1039499685) is a true and correct copy of this video. | Speculation; Relevance (Federal Rules of Evidence 401, 403); Lack of personal knowledge, Foundation (Federal Rule of Evidence 602); Conclusory |
| 18 | Also during this time, Malka added new series such as Hotboxin' with Mike Tyson, Hawk vs Wolf with former professional skateboarders Tony Hawk and Jason Ellis, The Stephen A. Smith Show, Certified with National Basketball Association Hall of Famer Kevin Garnett, and Morning Kombat hosted by two CBS Sports analysts, among others. **Malka's network was one of the fastest growing original digital series networks in the industry.** Alongside these shows, Malka launched digital channels for the Showtime network, such as Showtime Basketball. | Speculation; Foundation (Federal Rule of Evidence 602) |
| 20 | To my knowledge, neither Mr. Curran nor anyone from his firm was ever involved in Malka's client invoicing, which | Speculation; Lack of personal knowledge, Foundation (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
| | was handled internally by Malka's Client Services and Finance teams. | |
| 26 | Before the Acquisition (and after), Malka's general practice was to invoice its customers on the occurrence of project-specific and client-driven milestones or benchmarks. Typically, Malka sent an initial invoice to a client upon execution of the contract or statement of work, which was often for 50 percent (and sometimes more) of the total project cost. This upfront deposit was the first milestone, and it was nearly always non-refundable, whether the written statement of work or agreement explicitly said so or not. Clients of course would be entitled to their money back if Malka was unable to perform for some reason, but they could not unilaterally cancel a project once the contract had been executed. | Speculation; Lack of personal knowledge, Foundation (Federal Rule of Evidence 602); Mischaracterization; Argumentative |
| 28 | Subsequent invoices were tied to additional, project-specific and client-driven milestones. Final delivery of the contracted-for "asset" (such as a graphic design image, video, or livestream recording) was very often the last milestone. | Speculation; Lack of personal knowledge, Foundation (Federal Rule of Evidence 602) |
| 29 | However, milestones could include almost any date, event, or step in the project, such as the day(s) when a production or livestream was filmed or certain other dates specified in a written agreement. For example, a client could agree to pay some percentage upfront, another percentage the next month (or at another specified interval), and another percentage upon completion of work. Typically, Malka worked with clients to plan milestones around the timing of large expenses (such as the costs associated with filming). | Speculation; Lack of personal knowledge, Foundation (Federal Rule of Evidence 602) |
| 30 | A small number of Malka's clients paid retainers and therefore may have been exceptions to this general practice. In some such cases, Malka performed the work and then invoiced the client at the end of the month or other agreed- | Speculation; Lack of personal knowledge; Foundation (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
| | upon billing period. Rarely, a client would pay a retainer, and Malka would send an invoice after the fact, reflecting work that we performed pursuant to the retainer payment. However, retainer-based invoicing was not the norm. | |
| 39 | PX020 (MoneyLion_02078744-48) is a true and correct copy of a contract dated October 27, 2020, between Malka and Amazon. This contract was created in the ordinary course of Malka's business, and it was Malka's ordinary course of business to create such contracts. The contract covered a range of film production projects throughout Q4 of 2020. Amazon was to pay 50 percent of the total fee of $162,795 as an upfront deposit and 50 percent at completion of the project. The statement of work provided that "[i]f Client cancels the services herein contracted, MMG [Malka] shall retain the full sum of the Fee paid by Client." *Id.* at MoneyLion_02078745. | Mischaracterization; Argumentative |
| 40 | PX022 (MoneyLion_02042513-17) is a true and correct copy of a contract dated November 25, 2020, between Malka and Amazon. The contract covered a range of film production projects throughout Q4 of 2020 and the beginning of 2021. Amazon was to pay 50 percent of the total fee of $649,730 as an upfront deposit and 50 percent at completion of the project. The statement of work provided that "[i]f Client cancels the services herein contracted, MMG [Malka] shall retain the full sum of the Fee paid by Client." *Id.* at MoneyLion_02042514. | Mischaracterization; Argumentative |
| 41 | PX172 (MoneyLion_02054914) is a true and correct copy of a statement of work dated September 28, 2021, between Malka and Twitch Interactive. This statement of work was created in the ordinary course of Malka's business, and it was Malka's ordinary course of business to create such statements of work. The deliverable was a custom live-action 30-second commercial for Uber Eats. Twitch was to pay 50 percent of the total fee of $124,998 **as an upfront deposit, which was** | Mischaracterization; Argumentative (the document does not state that the deposit is fully non-refundable and instead states that if the client cancels the services the deposit is non-refundable) |

| ¶¶ | Text | Objection |
|---|---|---|
| | **explicitly non-refundable**, and 50 percent due at final delivery. | |
| 44 | Mr. Basdekis, as Malka's Head of Finance, was highly familiar with Malka's invoicing practices and was solely responsible for determining whether and how an invoice was recognized as revenue or an expense. | Argumentative; Conclusory |
| 47 | After the Acquisition, MoneyLion continually encouraged Sellers to send out invoices promptly. I recall MoneyLion's CEO, Dee Choubey, saying this to me on a number of occasions, specifically toward the end of quarters and of the calendar year, when his message was that aggressive invoicing would help with MoneyLion's reported profitability | Argumentative |
| 50 | I recall that I was visiting from Los Angeles at the time, **and Mr. Frommer mentioned to me that we had a dinner with MoneyLion (then a client of Malka's)**, which was planning to go public and would be significantly increasing its projects with Malka. I was interested to see where the conversation would go. | Hearsay (Federal Rule of Evidence 802) |
| 54 | I hoped and expected that an acquisition by MoneyLion would enable Malka to produce content and service our clients with previously unimagined scale and resources. PX404 (https://www.linkedin.com/posts/activity-6866409125853704192-j8nz/?utm_source=share&utm_medium=member_ios) is a true and correct copy of a LinkedIn post and linked 10-minute video in which Mr. Frommer and I publicly announced the Acquisition. | Speculation |
| 55 | Shortly after our June 9 and 11 meetings, Mr. Frommer shared with MoneyLion a pitch deck (the "June 2021 Pitch Deck") about the potential acquisition. JX005 (MoneyLion_01149848, at MoneyLion_01149882-01149901) is a true and correct copy of the June 2021 Pitch Deck. | Foundation (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
| 61 | On June 15, 2021, MoneyLion accepted our proposal of $75 million, but it offered to pay $10 million in cash and up to $65 million in equity, consisting of MoneyLion shares valued and issued on particular dates. | Mischaracterization, the document speaks for itself |
| 63 | The spreadsheet also noted that if MoneyLion's stock price doubled, the total value of the Acquisition to Sellers would be $140 million. JX006 at MoneyLion_00147422. | Mischaracterization, the document speaks for itself |
| 64 | I felt that this proposal extended the earnout payments too far into the future. We pushed back such that in the final MIPA the final tranche of the: (i) Closing Stock Payment vested September 30, 2022; (ii) 2021 Earnout Payment vested December 31, 2022; and (iii) 2022 Earnout Payment should have vested December 31, 2023. | Mischaracterization, the document speaks for itself |
| 70 | Also on June 30, 2021, Messrs. Choubey, Correia, Frommer, and I had a telephone conversation that was recorded by Mr. Frommer. In preparation for my trial testimony, I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX414. Based on my review of both, PX414 is a true and accurate transcript of the conversation. | Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 71 | On the call, we discussed a number of points, including the mechanics of MoneyLion's proposed quarterly stock payments to Sellers, the Tax Credit, and upcoming steps in due diligence, including the need for a Quality of Earnings Assessment. Mr. Correia explained that based on MoneyLion's anticipated purchase price structure for the Acquisition, in which Sellers would be compensated partly in shares that would vest on a quarterly schedule, "we basically have $50 million guaranteed to you guys. And so that's basically two-thirds [of the total $75 million purchase price, including the 2022 Earnout Payment] within the year of the transaction." PX414 at 1. | Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |

| ¶¶ | Text | Objection |
|---|---|---|
| 72 | In other words, according to Mr. Correia, MoneyLion viewed the 2021 Earnout Payment as "guaranteed." | Lack of Personal Knowledge, Foundation as to what Mr. Correia's statements meant (Federal Rule of Evidence 602); Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 73 | Mr. Correia added that, once the initial six-month post-acquisition lockup period ended and our shares had vested, "you guys can sell, like all of us, we can sell whenever we're vested." He did not mention that trading might only be permitted during limited open windows; in fact, he said that "once we get past the initial lockup—which everyone, every pipe investor, every trust investor, Dee, myself, everyone at our firm is locked up, every investor—you can sell immediately." PX414 at 3-4. | Mischaracterization, the document speaks for itself; Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 74 | On the call, Mr. Frommer raised the point that the earnouts should be focused on revenue rather than EBITDA targets. Mr. Correia responded that MoneyLion was "focused on revenue as well" and "would have a minimum floor of EBITDA, meaning the EBITDA target is not the target you gave us." PX414 at 1-2. Mr. Correia reiterated MoneyLion's view that "we think this is such a strategic transaction." PX414 at 6. | Mischaracterization, the document speaks for itself; Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 75 | On the call, Mr. Frommer raised the point that the earnouts should be focused on revenue rather than EBITDA targets. Mr. Correia responded that MoneyLion was "focused on revenue as well" and "would have a minimum floor of EBITDA, meaning the EBITDA target is not the target you gave us." PX414 at 1-2. Mr. Correia reiterated MoneyLion's view that "we think this is such a strategic transaction." PX414 at 6. | Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |

| ¶¶ | Text | Objection |
|---|---|---|
| 76 | On the call, I raised the concern that post-closing, Malka would be converting "20%, 30%, 50% of the team to fully focus" on MoneyLion and I asked how MoneyLion would respond to a request for "$2-5 million dollars because we got to staff the right way" or because "we have to eliminate some of our revenue with our clients." PX414 at 4-5. I was concerned that by dedicating a large percentage of our team to MoneyLion projects, we would lose revenue on other client projects while simultaneously increasing operating expenses, all of which could impact our ability to hit the 2021 and 2022 earnout targets. I wanted to know that MoneyLion was willing to commit to provide the financial support we needed for operating expenses so that our ability to achieve the maximum 2021 and 2022 Earnout Payments was not jeopardized. | Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 84 | I understood from Mr. Frommer and Fox Rothschild that the process included submitting written answers, various documents and agreements, and other disclosures to MoneyLion and DLA Piper, phone calls with CFGI, and preparing updated financial disclosures reflecting Malka's and Malka Sports' results through September 30, 2021, as well as detailed monthly sales information by customer for 2019 and 2020. | Hearsay (Federal Rule of Evidence 802) |
| 85 | I am not aware of Malka or Fox Rothschild ever refusing to provide MoneyLion or its advisors with a document or information they requested in the diligence process. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602) |
| 87 | In any event, it was my strong impression based on Mr. Correia's statement and MoneyLion's proposed EBITDA target of just $100,000 in order for Sellers to receive both the 2021 and 2022 Earnout Payments, that Malka's profitability was not MoneyLion's primary concern in the Acquisition. Rather, it seemed MoneyLion wanted to acquire Malka for its | Speculation; Lack of Personal Knowledge, Foundation as to MoneyLion's state of mind (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
|  | synergistic potential, as an experienced and high-quality content creator which offered MoneyLion access to (and therefore brand collaborations with) high-profile athletes and other celebrities, whose popularity could grow its customer base. |  |
| 101 | Other than being copied on these emails, I do not recall discussing Malka's historical accounting principles, or its representations and warranties about accounting principles, with anyone during the drafting of the MIPA. I had no doubt that Fox Rothschild, Mr. Curran, and Mr. Basdekis were representing my and the other Sellers' interests, and were correctly and accurately editing all transaction documents, as needed. | Speculation; Foundation as to MoneyLion's state of mind (Federal Rule of Evidence 602) |
| 104 | The final version of Schedule B further provided that Malka's EBITDA<br><br>     shall include the expected recognition of the New Jersey Digital Media Tax Credit ("Tax Credit") in the period in which the Tax Credit was applied for. By way of illustration, the Tax Credit applied for in 2021 was for services provided by the Company for 2019. The Tax Credit would be applied to 2021 EBITDA. JX065 at DLA_006267.<br><br>The Tax Credit was something that we had addressed with MoneyLion in the June 2021 Pitch Deck and in other discussions prior to the close of the Acquisition. My understanding was that MoneyLion agreed to add to Malka's EBITDA for purposes of the 2021 and 2022 earnouts the amount of the Tax Credit applied for in each earnout year.. | Mischaracterization, the document speaks for itself |

| ¶¶ | Text | Objection |
|---|---|---|
| 118 | MoneyLion elected to pay a portion of the final tranche of 2021 Earnout Payment make-whole in cash, rather than shares (which the MIPA allowed it to do). **I understood that the reason for the cash payment was to avoid the dilutive effect of issuing additional earnout shares to Sellers at the then very low MoneyLion stock price (as I describe below).** Thus, in addition to the 1,461,550 shares transferred to me on March 14, 2023, I also received $153,720 in cash in respect of the 2021 Earnout Payment final make-whole payment. | Lack of personal knowledge, Foundation as to MoneyLion's state of mind (Federal Rule of Evidence 602) |
| 124 | Based on my discussions with the other Sellers and Mr. Basdekis, I understand that the retainer which MoneyLion paid to Malka resulted in MoneyLion's paying effectively discounted "internal" rates for Malka employees' time spent on MoneyLion projects, compared with the higher "external" rates charged to other Malka clients. | Speculation; Lack of personal knowledge, Foundation (Federal Rule of Evidence 602); Hearsay (Federal Rule 802) |
| 128 | Malka's retained teams for its intercompany services to MoneyLion in 2022 was expected to remain available for MoneyLion matters, in addition to any work for other Malka clients. This was an **excellent deal** for MoneyLion, which had priority over any external Malka client. If MoneyLion wanted a livestream or graphic design to be arranged on short notice, Malka would scramble to find external support for our other clients' needs. This was more expensive than servicing clients ourselves, and at times I would even say MoneyLion's demands impacted our ability to provide top-quality service to those other clients. | Speculation; Lack of personal knowledge, Foundation (Federal Rule of Evidence 602); Vague; Conclusory |
| 129 | I am not aware of anyone from MoneyLion ever complaining or communicating to me or Sellers in 2022 that an insufficient amount of work was being performed by either the retained or shared creative teams. To the best of my knowledge, all work | Speculation; Lack of personal knowledge, Foundation (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
| | requested by MoneyLion in 2022 was performed in 2022, and MoneyLion timely paid for that work. | |
| 136 | No one at MoneyLion ever informed me that it would attempt to use these 2023 expenses to reduce Malka's 2022 EBITDA for earnout purposes. In fact, it was my clear understanding from my communications with MoneyLion executives and officers, including Kate Fallon (MoneyLion's Chief People Officer), that MoneyLion's decision to pay additional bonuses would not affect the 2022 earnout calculations. I asked Mr. Basdekis to confirm the same information, and he told me that he had done so. | Lack of personal knowledge, Foundation as to MoneyLion's state of mind (Federal Rule of Evidence 602) |
| 141 | Between the Acquisition and December 12, 2022, according to records I have reviewed, MoneyLion's market capitalization declined from an estimated $1.3287 billion to $126.8 million, a decline of 91.5 percent. PX358 (SELLERS00004094) is a true and correct copy of these records. PX358 is the type of market report that Sellers shared with one another and relied upon in the ordinary course of Malka's business. These figures accord with my personal recollection of MoneyLion's historical market capitalization, which I discussed with the other Sellers and MoneyLion executives. | Argumentative; Conclusory |
| 146 | As noted above, by late 2022, Sellers were under financial pressure because of our tax obligations. At the same time, MoneyLion was making it unreasonably difficult for us to sell additional vested shares, and MoneyLion executives reprimanded Sellers with increasing severity whenever we wanted to sell, as the stock price continued to decline. This created a serious problem for us, which Mr. Frommer and I discussed with Messrs. Choubey and Correia. **Our discussions convinced me that MoneyLion was intent on** | Speculation; Lack of personal knowledge, Foundation as to MoneyLion's state of mind (Federal Rule of Evidence 602); Relevance (Federal Rules of Evidence 401, 403); Argumentative; Conclusory |

| ¶¶ | Text | Objection |
|---|---|---|
| | **extracting additional concessions from Sellers as a precondition to allowing us to sell additional shares.** | |
| 148 | Although Messrs. Choubey and Correia freely admitted on the call that MoneyLion had binding commitments in the MIPA to pay us our make-whole shares on particular dates, and the 2022 Earnout Payment on particular dates (assuming Malka satisfied the applicable revenue and EBITDA thresholds to receive the earnout payment)—they took the position that they could not allow us to receive shares worth $25 million while the share price was around $0.50. Therefore, Sellers were effectively told to accept a year-long delay in payments to which we were contractually entitled, or else. | Lack of personal knowledge, Foundation (Federal Rule of Evidence 602); Speculation; Argumentative; Conclusory |
| 149 | It was my strong impression based on this conversation that the direct impetus for Messrs. Choubey's and Correia's unfair proposal to Sellers was MoneyLion's falling share price at the time. It seemed that MoneyLion was willing to violate or ignore the basic terms of the Acquisition, and to do whatever else it took in order to avoid paying us the shares that we had rightly earned under the MIPA—because paying us our shares could have resulted in additional dilution and/or reduction in the share price. | Speculation; Relevance (Federal Rules of Evidence 401, 403); Lack of personal knowledge, Foundation as to MoneyLion's state of mind (Federal Rule of Evidence 602); Argumentative; Conclusory |
| 150 | I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX271 (SELLERS00003790 Tr.). Based on my review, PX271 is a true and accurate transcript of the conversation. | Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 151 | During the call, Mr. Choubey said:<br><br>I think the reality of the matter is it's essentially gonna take a year longer for us to get you that $70,000,000 in shares as we build the business together and build it back up. I mean that's the fact of the matter for a real talk if you really want to get to brass tacks. | Mischaracterization; Argumentative; Completeness (Federal Rules of Evidence 106); Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |

| ¶¶ | Text | Objection |
|---|---|---|
| | PX271 at 5. | |
| 152 | As Mr. Correia explained, if the share price eventually recovered to $2 or $3, Sellers' shares could be worth $300 million. PX271 at 7. | Mischaracterization; Argumentative; Completeness (Federal Rules of Evidence 106); Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 153 | During the call, Mr. Correia acknowledged, "[A]re we breaking the agreement, sure," but reassured the three of us that we would still get the 2022 Earnout Payment; "[i]t's just going to take a little bit more time." PX271 at 7-8 (emphasis added). | Mischaracterization; Argumentative; Completeness (Federal Rules of Evidence 106); Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 154 | Mr. Choubey added: "There is no scenario where the current make-whole construct can be the way it is." PX271 at 8 (emphasis added). | Mischaracterization; Argumentative; Completeness (Federal Rules of Evidence 106); Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 155 | The next day, all four Sellers had another telephone conversation with Messrs. Choubey and Correia about their proposed deferment of the 2022 Earnout Payment. Mr. Frommer recorded the call. I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX273 (SELLERS00003787 Tr.). Based on my review, PX273 is a true and accurate transcript of the conversation. | Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 156 | Mr. Choubey said that he intended "to use every corporate lever to then make sure that those shares aren't coming to market . . ." PX273 at 18. | Mischaracterization; Argumentative; Completeness (Federal Rules of Evidence 106); Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of |

| ¶¶ | Text | Objection |
|---|---|---|
| | | Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 157 | During the call, Mr. Correia acknowledged that MoneyLion owed Sellers "75 million bucks one way or another" and reassured us that MoneyLion was "not proposing . . . to not give you your $25 million," by which he was referring to the 2022 Earnout Payment shares. However, he said that MoneyLion's board would likely resist issuing additional shares to Sellers while the share price remained around $0.50. PX273 at 19, 23. | Mischaracterization; Argumentative; Completeness (Federal Rules of Evidence 106); Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 158 | Mr. Choubey agreed: "You're going to get the full $25 million, just at a later date. PX273 at 23. | Mischaracterization; Argumentative; Completeness (Federal Rules of Evidence 106); Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 159 | Sellers did not agree to the proposal by Messrs. Choubey and Correia that we accept the deferred vesting of our shares. In my view, this was an inappropriate attempt by MoneyLion executives to rewrite the binding agreements whereby we had sold our company to them—simply because MoneyLion apparently no longer found the terms sufficiently favorable. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Relevance (Federal Rules of Evidence 401, 403); Mischaracterization; Argumentative; Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 160 | On December 20, 2022, Mr. Choubey had another telephone conversation with Messrs. Frommer, Fried, and myself, which Mr. Frommer recorded. I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX277 (SELLERS00004093 Tr.). Based on my | Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |

| ¶¶ | Text | Objection |
|---|---|---|
| | review, PX277 is a true and accurate transcript of the conversation. | |
| 161 | During the call, Mr. Choubey said:<br><br>We asked you to defer the 12/31 make-whole to 2024, and you guys didn't want to do that. . . . [A]lso with the company having to issue so many shares and forcing a 50-cent stock potentially to go to 30 cents, right? Because the value of the company is the value of the company, the more shares you issue the lower the stock price goes. . . . 100% categorically no one had the 10b5-1. . . . The lawyers were telling us arguably that our insider trading policy should have been interpreted that when you're in a cure period no insider should be able to sell stock, right? So I think it would have just been a horrible look if we had put those in place, so that's why we made the call there on that one. I hope you understand that one.<br><br>PX277 at 15-16. | Mischaracterization; Argumentative; Completeness (Federal Rules of Evidence 106); Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 162 | I understood Mr. Choubey's words to mean that, in the opinion of MoneyLion's counsel, Sellers were still restricted from transferring their shares out of Continental without additional authorization, because we qualified as corporate insiders. | Mischaracterization; Argumentative; Completeness (Federal Rules of Evidence 106); Speculation; Hearsay as to the transcript (Federal Rule of Evidence 802); Authenticity as to the transcript (Federal Rule of Evidence 901); Object to the extent the underlying audio recording is illegal under local law |
| 163 | I have no idea why I qualified as an insider (or if, indeed, I truly did), as I had no knowledge of any significant nonpublic plans or information regarding MoneyLion. To this day, I am unaware of how MoneyLion could prevent me from selling some of my shares on that basis. | Mischaracterization; Argumentative; Completeness (Federal Rules of Evidence 106); Speculation; |

| ¶¶ | Text | Objection |
|---|---|---|
| 168 | In December 2022, MoneyLion's share price was continuing to fall and **Messrs. Choubey and Correia were threatening Sellers.** The next month, in January 2023, Mr. Basdekis provided his 2022 Malka revenue and EBITDA calculations to MoneyLion. | Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Argumentative |
| 169 | As reflected on the January 18, 2023 income statement that Mr. Basdekis sent to me, Mr. Frommer and Mr. Fried, Mr. Basdekis calculated that Malka's 2022 revenue for "Earnout" purposes was $42,516,536 and Malka's 2022 EBITDA, or "Net Ordinary Income," was $1,508,501, before counting the Tax Credit. JX101. Thus, Mr. Basdekis had concluded that Sellers had earned the Maximum 2022 Earnout Payment of shares of MoneyLion restricted stock equal to $25 million worth in shares, valued as of the contractual date. | Mischaracterization; Argumentative; Completeness (Federal Rules of Evidence 106); Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Speculation |
| 171 | Mr. Choubey made good on his threat not to issue the 2022 Earnout Payment, and MoneyLion proceeded to substitute its own, completely different set of calculations in the Revenue and EBITDA Statement transmitted to Mr. Frommer on April 14, 2023. That decision by MoneyLion precipitated this dispute. | Speculation; Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602); Conclusory; Argumentative |
| 176 | To the extent any of Fox Rothschild's post-Acquisition work for Sellers was personal in nature and not related to Malka's work at MoneyLion, I would have expected to be advised by Mr. Basdekis, or someone else in Finance, that bills were received that appeared to include personal charges. Prior to being terminated, I had no notice of any bills that MoneyLion contended included personal charges of the Sellers. | Vague; Conclusory; Argumentative |
| 177 | Sellers made repeated written requests to MoneyLion to provide the challenged billing records, credit card statements, and invoices that were the purported cause for our terminations, beginning with a letter to MoneyLion on May | Conclusory; Argumentative |

| ¶¶ | Text | Objection |
|---|---|---|
| | 23, 2023. JX118 (SELLERS00000026) is a true and correct copy of the May 23, 2023 letter. | |
| 178 | Only 15 months later, on August 16, 2024—which I understand was the deadline for fact discovery in this litigation—did MoneyLion finally produce the Fox Rothschild invoices which it contended were improper personal expenses. | Conclusory; Argumentative |
| 179 | I have reviewed these invoices, and my review confirms that a substantial portion of Fox Rothschild's bills were properly reimbursable because they related to the Kalo Brands LLC dispute, which concerns an account receivable owed to Malka (ultimately benefitting MoneyLion). Other invoices reflect post-Acquisition legal services which were for the benefit of either Malka's business or MoneyLion with respect to implementing the Acquisition. For example, I recall that Fox Rothschild advised Sellers about restricted shares and the process for selling them not just for Sellers' own benefit, but for the benefit of all Malka employees who had received MoneyLion shares as a result of the Acquisition. Because MoneyLion did not provide us meaningful information on this topic, we sought advice on behalf of the entire Malka team. | Conclusory; Argumentative |
| 180 | I recognize that there are other bills for legal services that might be deemed personal in nature. Sellers would bear responsibility for such expenses, which could constitute a modest offset to our claims. Had any personal expenses been brought to my attention before Sellers were terminated (or, indeed, before August 16, 2024), I would have addressed them promptly. | Speculation |
| 181 | I would have expected that any Fox Rothschild bills that were truly personal in nature would have been sent to Sellers for approval, not MoneyLion's accounting department. In fact, | Speculation; Conclusory; Argumentative |

| ¶¶ | Text | Objection |
|---|---|---|
| | several Fox Rothschild invoices regarding tax and estate planning were sent to me personally, and I paid them directly. | |
| 189 | I have incurred attorneys' fees and costs as a result of MoneyLion's **baseless** non-compete claim. | Speculation; Conclusory; Argumentative |
| 190 | MoneyLion has accused me of "burglarizing" Malka's Santa Monica offices on May 21, 2023, two days after my termination and one day before I read the termination notice. This scurrilous allegation bears no resemblance to what happened. I went to the offices on that day specifically to retrieve my own personal property. I did not remove any company property from the premises. | Argumentative |
| 196 | I expected that, by selling our company to MoneyLion in return for $10 million in cash and a much larger portion of stock, I would be free to use my MoneyLion shares as any investor could, including selling some shares and holding some shares long-term. At no point did the parties agree that MoneyLion would have a right to effectively freeze my shares after the respective stock vesting dates had passed. | Speculation; Foundation (Federal Rule of Evidence 602); Argumentative |
| 197 | Nevertheless—without any basis in any agreement to which I am a party— MoneyLion has apparently placed a "stop order" with Continental which prevents me from freely exercising my shareholder rights, including the right to transfer my shares to my broker and to sell them into the public market. PX318 (SELLERS00004431) is a true and correct copy of the email from Continental informing Sellers of this fact | Speculation; Foundation (Federal Rule of Evidence 602); Argumentative |
| 200 | To the best of my understanding, Mr. Basdekis continued to use the same historical revenue and expense recognition principles that Malka had used pre-closing when he calculated revenue and EBITDA for purposes of the 2021 Earnout Payment and 2022 Earnout Payment. At no time, including to the present, has Mr. Basdekis or anyone from MoneyLion indicated to me that Mr. Basdekis' accounting practices used | Speculation; Lack of Personal Knowledge, Foundation (Federal Rule of Evidence 602) |

| ¶¶ | Text | Objection |
|---|---|---|
| | to calculate Malka's revenue and EBITDA for the 2021 Earnout Payment and 2022 Earnout Payment differed from Malka's historical revenue and expense recognition principles. | |

## JENNIFER LARSON

| ¶¶ | Text | Objection |
|---|---|---|
| 7a | ***Opinion 1***: Buyer's utilization of a generally accepted accounting principles ("GAAP") -based income statement, rather than one based on the Company's historical accounting practices, to calculate revenue and expenses for purposes of the 2022 Earnout is unsupported and inconsistent with the Revenue and EBITDA Calculation Principles set forth in Schedule B of the MIPA, resulting in an understatement of Revenue and EBITDA. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 7d | ***Opinion 4***: Buyer's 2022 Earnout Statement improperly includes a downward adjustment resulting from the Buyer's corporate-level decision to pay bonuses to Company employee in a manner inconsistent with the 2022 Budget, thereby understating 2022 EBITDA by $529,500. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 13−14)) |
| 7e | ***Opinion 5***: Buyer's 2022 Earnout Statement improperly includes a downward adjustment for "retained teams," thereby understating 2022 Revenue and EBITDA by $218,170. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14)) |
| 8a | ***Rebuttal Opinion 1:*** Mr. Dudney incorrectly assumes that Malka had zero contracts that contained non-cancelable deposits, resulting in flawed conclusions and adjustments to Revenue and EBITDA. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 8b | ***Rebuttal Opinion 2:*** Mr. Dudney's calculated adjustments to Malka's revenue rely upon a series of unsupported assumptions, each of which is contradicted by evidence in this matter. As a result, Mr. Dudney's conclusions and adjustments are fundamentally flawed. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 8d | ***Rebuttal Opinion 4:*** The Dudney Rebuttal Report fails to meaningfully rebut my opinions related to the 2022 Earnout Payment. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| 25 | The MIPA requires the Buyer to take certain steps "in order to maximize the Seller Members' opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment[.]"[13]<br><br>In particular, the MIPA provides that:<br><br>(i) from the Closing Date and through the end of December 31, 2021, the Buyer shall, and shall cause the Company to operate the business of the Company in good faith and substantially similar in all material respects with the past practice of the Company prior to Closing, and will not take any action intended to interfere with or frustrate the Seller Members' opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment, and<br><br>(ii) with respect to the period from January 1, 2022 and through the end of December 31, 2022, the Buyer shall, and shall cause the Company to operate the business of the Company substantially in accordance with the operating and revenue budget (the "**2022 Budget**") attached hereto as Exhibit B.[14]<br><br>13. JX065, MIPA § 2.06(d).<br><br>14. JX065, MIPA § 2.06(d) (bold and underline in original). | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 28 | Specifically, Schedule B defines "Revenue" by reference to "the Company's historical revenue recognition principles" and EBITDA by reference to "the Company's historical revenue and cost recognition principles" and provides specific principles/exceptions for calculating revenue and EBITDA for purposes of the Earnout Payments.[18]<br><br>18. JX065, MIPA, Schedule B. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 43 | Based on my professional experience, my analysis of the MIPA and its schedules, and my analysis of documents and testimony, it is my opinion that in its 2022 Earnout Statement, Buyer used Buyer's preferred GAAP-based income statement to calculate revenue and expenses and, therefore, failed to calculate revenue and expenses in a manner consistent with the Company's historical accounting practices as required by | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | the MIPA and its schedules. As a result, in my opinion, Buyer understated the Company's 2022 Revenue by \$895,517 and understated the Company's 2022 EBITDA by \$1,935,823. | |
| 44 | With respect to the matter at hand, I have read the MIPA and its schedules, including but not limited to Schedules A and B. My reading of the plain language of these documents based on my professional experience as an accountant is that the Company's historical non-GAAP practices were to be applied in the context of the Earnout Payments.[38] As described below, my reading is consistent with the manner in which MoneyLion (i) calculated Final Closing Working Capital (defined below), (ii) calculated and approved of the maximum 2021 Earnout Payment, and (iii) tracked Malka's progress towards the 2022 Earnout Payment throughout 2022. <br><br> 38. Based on my experience throughout my career, it is common for CPAs like myself to read and understand contractual terms. Typically, CPAs analyze such documents to understand how to account for transactions in a company's books and records. For example, GAAP outlined in ASC 842 (discussed below) requires accountants to review certain elements of a contract in order to determine whether the terms qualify the arrangement as a lease for accounting purposes. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 45 | Schedule B, which sets forth the Revenue and EBITDA Calculation Principles to be used for purposes of the Earnout Payments, defines "Revenue" as "revenue recognized according to the Company's **historical revenue recognition principles** for the combined and consolidated Company."[39] Schedule B defines EBITDA as "the combined and consolidated net income before interest expense, federal, state and local taxes, depreciation and amortization of the Buyer, determined in accordance with U.S. GAAP (**including the Company's historical revenue and cost recognition principles**) as reviewed or audited by Buyer's independent accountants."[40] <br><br> 39. JX065, MIPA, Schedule B (emphasis added). <br><br> 40. JX065, MIPA, Schedule B (emphasis added). | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 46 | Schedule A provides that the Company's historical financial statements were "prepared in accordance with U.S. GAAP, *except*"[41] for various exceptions from GAAP (set forth above) including, but not limited to, "the Company's historical | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | revenue recognition principles" and "the Company's historical cost recognition principles[.]"[42]<br><br>41. JX065, MIPA, Schedule A (emphasis added).<br><br>42. JX065, MIPA, Schedule A (emphasis added). | (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 47 | It is common for private companies to maintain their financial books and records on a non-GAAP basis in certain respects for various reasons including, but not limited to, a preference for a tax basis of accounting or lack of applicability due to the nature of a business. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 48 | Mr. Basdekis explained in his deposition testimony that prior to the Closing Date, the Company's practice of recording revenue was based on "when invoices were generated"[43] and that the Company also had "no [expense] accrual process other than some exceptions."[44] Throughout his deposition, he repeatedly stated that such historical practice "is not consistent with GAAP…."[45]<br><br>43. Transcript of Deposition of Matthew Basdekis dated July 18, 2024 ("Basdekis Tr.") 25:2-18.<br><br>44. Basdekis Tr. 153:1-4.<br><br>45. *See, e.g.*, Basdekis Tr. 25:2-18, 74:21-24, 76:14-17, 79:1-3, 152:11-15. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 49 | After the Closing Date, Mr. Basdekis was retained as an employee of Buyer and maintained two sets of books and records for Malka based on both (i) the Company's non-GAAP historical practices for purposes of the Earnouts Payments and (ii) Buyer's preferred method of GAAP accounting.[46] Mr. Basdekis further testified that he maintained both methodologies in part because he understood that the MIPA required such terms for the calculation of the Earnout Payments.[47] Mr. Basdekis further explained in his deposition that when Malka became part of a public company after the Closing Date, they "had to create journal entries and be GAAP compliant"[48] and he worked with RSM (Buyer's external auditor) to ensure that "anything post acquisition be GAAP compliant."[49]<br><br>46. Basdekis Tr. 120 :1-12. *See also generally*, Basdekis Tr. 153-154.<br><br>47. Basdekis Tr. 118:5-10. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | 48. Basdekis Tr. 119-126 and 189-183. | |
| | 49. Basdekis Tr. 142:1-20. | |
| 50 | I have seen documents reflecting that Mr. Basdekis shared Malka's non-GAAP financial statements and reports (based on its historical accounting principles) with MoneyLion personnel throughout 2022, and that these non-GAAP financials were used by MoneyLion for purposes of calculating Final Closing Working Capital and the 2021 Earnout Payment (as described below), and were also used by MoneyLion and its advisors to track Malka's progress towards the 2022 Earnout Payment (as also described below). Such testimony and documents clearly demonstrate to me that the Company's historical accounting practices, and not strict GAAP, were to be used for purposes of the 2022 Earnout. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 51 | Section 2.05(a)(i) of the MIPA provides that no later than three business days before the Closing Date (*i.e.*, by November 12, 2021), Sellers shall "cause[] the Company to prepare and deliver to Buyer a calculation of (A) the estimated Closing Working Capital as of 12:01 AM Eastern Time on the Closing Date (the '**Estimated Closing Working Capital**') in accordance with the Accounting Principles...."[50]<br><br>50. JX065, at DLA_006203 (bold in original). | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 52 | Section 2.05(b)(i) of the MIPA provides that no later than 60 days after the Closing Date (i.e., by January 15, 2022) "Buyer shall prepare and deliver to [Sellers] a calculation, all as of 12:01 AM Eastern Time on the Closing Date, of the Closing Working Capital calculated in accordance with the Accounting Principles (the '**Final Closing Working Capital**') ...."[51]<br><br>51. JX065, at DLA_006204. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 53 | The MIPA defines "Accounting Principles" as "(a) the principles, policies and procedures expressly set forth on **Schedule A** ...."[52] The MIPA defines "Working Capital" as "the Current Assets of the Company, less the Current Liabilities of the Company determined in accordance with and adjusted pursuant to the Accounting Principles." [53]<br><br>52. JX065, at DLA_006186 (bold in original). | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | 53. JX065, at DLA_006202. | |
| 54 | Working capital, sometimes referred to as "net working capital," is defined by GAAP as "the excess of current assets over current liabilities and identifies the relatively liquid portion of total entity capital that constitutes a margin or buffer for meeting obligations within the ordinary operating cycle of the entity." [54] Said differently, working capital measures a company's ability to pay its near-term obligations with its relatively liquid assets. GAAP provides guidance as to the classification and presentation of current assets and current liabilities in the context of audited financial statements.<br><br>54. PX391, ASC Master Glossary at "Working Capital" | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 55 | GAAP defines current assets as "those that are reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business." [55] ASC 210 also notes that current assets "generally include … [t]rade accounts, notes, and acceptances receivable." [56] Accounts receivable is a term used to refer to outstanding payments owed to an entity arising from sales and other transactions. [57] Typically, when a sales transaction occurs, an entity records an increase in its accounts receivable balance and a corresponding increase in revenue. [58] Therefore, because working capital is based on currents assets, and accounts receivable is a current asset, an entity's revenue recognition can impact the calculation of working capital, particularly through accounts receivable balance.<br><br>55. PX391, ASC Master Glossary at "Current Assets."<br><br>56. PX389.<br><br>57. PX388.<br><br>58. *See generally*, ASC 606. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 56 | The following timeline summarizes various documentation illustrating the non-GAAP practices utilized in Buyer's calculation of Final Closing Working Capital:<br><br>    a. Consistent with the MIPA's requirement to provide a calculation three days prior to the Closing Date, [59] on November 12, 2021, Mr. Basdekis sent Buyer a calculation of the Company's estimated net working capital, which Mr. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | Basdekis calculated as $2,145,182, consisting of $3,959,291 of accounts receivable (*i.e.* current assets) less $1,814,109 of Total Liabilities (made up of Accounts Payable, Other Current Liabilities and Credit Card). [60]<br><br>b. On November 29, 2021, Mr. Basdekis sent Buyer the Company's balance sheet as of the Closing Date, with the account mapping to MoneyLion accounts.[61] As seen in the attachment, the balance sheet reflects third-party accounts receivable in the amount of $3,657,081.32. [62]<br><br>c. On December 8, 2021, Michelle Lee, an employee in Strategic Finance at MoneyLion referred to the balance sheet that Mr. Basdekis sent on November 29, 2021, stating, "[i]f it is final, then we can use this to calculate the final working capital number." [63]<br><br>d. On January 7, 2022, Ms. Lee sent Richard Correia, MoneyLion's CFO, a "draft of the final schedule for the purchase adjustments to release the purchase escrow for Malka." [64] In the attached file, Ms. Lee included Mr. Basdekis's November 12, 2021 estimated working capital calculation of $2,145,182, and she calculated Final Closing Working Capital as $1,912,511. [65]<br><br>e. On January 10, 2022, Ms. Lee sent Sellers "the final schedules … for working capital and purchase price adjustments (which includes final cash and final transaction expense amounts) per the MIPA."[66] In the attached files, which include the Company's balance sheet as of the Closing Date, Buyer calculated Net Working Capital (*i.e.* Final Closing Working Capital) as $1,912,511, consisting of $3,657,081 accounts receivable (*i.e.*, the same accounts receivable figure that Mr. Basdekis sent to Buyer on November 29, 2021) less total liabilities of $1,744,570. [67]<br><br>f. Mr. Correia testified at his deposition that at the time that Buyer sent this Final Closing Working Capital calculation to Sellers, Buyer believed that it had calculated the Final Closing Working Capital amount in accordance with Schedule A. [68]<br><br>g. It is noteworthy to me that the Final Closing Working Capital Amount and, in particular, the $3,657,081 of accounts receivable did not include adjustments | |

| ¶¶ | Text | Objection |
|---|---|---|
| | to the Company's historical revenue recognition practices to comply with GAAP. I know this because I have analyzed documents reflecting that the Buyer made adjustments to the $3,657,081 accounts receivable figure as part of its audit for the year-ended December 31, 2021; however, those GAAP adjustments were not made to the Final Closing Working Capital calculation, as I will describe below. | |
| | h. Specifically, on February 2, 2022, Michael Scalia, Director of SEC Reporting at MoneyLion sent MoneyLion's auditors, RSM US LLP ("RSM") and MoneyLion's outside advisor, CFGI, a spreadsheet of Malka's sales orders for November and December 2021 with proposed adjustments to revenue recorded for certain customers.[69] This communication between Buyer and its external auditors and advisors clearly show adjustments to be made to the Company's historical revenue recognition practices in order to arrive at GAAP-compliant financial statements for the year ended December 31, 2021.[70] Such GAAP-based financial statements were required for Buyer's financial reporting obligations as a publicly traded company.[71] In this spreadsheet, Buyer makes certain adjustments to the Company's opening balance sheet ("OBS"), including adjustments to the Company's accounts receivable for the purpose of compiling a GAAP- comporting opening accounts receivable balance for Malka.[72] Mr. Scalia explained at his deposition that "[o]pening balance sheet is a term used particularly in merger and acquisition accounting referencing to the date of acquisition," i.e., a balance sheet for Malka as of November 15, 2021.[73] Buyer calculates that the accounts receivable reflected in the Company's OBS should be adjusted by $1,013,749 to comply with GAAP.[74] | |
| | i. On February 4, 2022, Mr. Scalia sent CFGI an adjusted OBS for Malka.[75] Notably, the OBS that Mr. Scalia sent starts with an amount for third-party accounts receivable of $3,657,081– the same amount as originally calculated by Mr. Basdekis as of the Closing Date and used by Buyer to calculate the Final Closing Working Capital amount.[76] However, in Mr. Scalia's GAAP-adjusted OBS, the accounts receivable amount is adjusted by $1,013,749 (the | |

| ¶¶ | Text | Objection |
|---|---|---|
| | same figure reflected in the spreadsheet that Mr. Scalia sent to RSM and CFGI on February 2, 2022[77]) per "Rev Rec Adjustment to OBS per Malka rev rec adjustment calc workbook" to reach the final OBS number for GAAP reporting purposes.[78]<br><br>j. Mr. Scalia's February 2 and February 4, 2022 spreadsheets confirm to me that Buyer's Final Closing Working Capital calculation did not include adjustments to Malka's historical revenue recognition practices to comply with GAAP. This is significant because if Schedule A required strict adherence to GAAP, then I would have expected Buyer to have made GAAP adjustments to the Company's Final Closing Working Capital calculation (and, in particular, to accounts receivable) given that the MIPA is clear that that calculation needed to be prepared in accordance with Schedule A.[79] | |
| | 59. JX065, MIPA § 2.05(a)(i). | |
| | 60. JX064, at MoneyLion_01254517. | |
| | 61. PX173, at MoneyLion_01811951. | |
| | 62. PX173, at MoneyLion_01811953 (produced in native excel). | |
| | 63. PX176, at MoneyLion_01832077. | |
| | 64. PX184, at MoneyLion_01826005. | |
| | 65. PX184, at MoneyLion_0126006 (produced in native excel). | |
| | 66. PX185, at MoneyLion_01878901. | |
| | 67. PX185, at MoneyLion_0187802 (produced in native excel) and MoneyLion_0187803. | |
| | 68. Transcript of Deposition of Richard Correia dated August 13, 2024 ("Correia Tr."), 201:18-22. | |
| | 69. PX196, at MoneyLion_01817934. | |
| | 70. PX196, at MoneyLion_0187935. | |
| | 71. MoneyLion Technologies Inc. is a wholly owned subsidiary of MoneyLion Inc., which is a publicly traded company on the New York Stock Exchange (See MoneyLion Inc. 2022 Form 10-K). As a result, it is required to file audited financial statements under Section 13(a) of the Securities Exchange Act of 1934. | |

| ¶¶ | Text | Objection |
|---|---|---|
| | 72. PX196, at MoneyLion_0187935 (produced in native excel). | |
| | 73. Transcript of Deposition of Michael Scalia dated August 1, 2024 ("Scalia Tr."), 63:2-13. | |
| | 74. PX196, at MoneyLion_0187935 (produced in native excel). | |
| | 75. PX198 at MoneyLion_01817787. | |
| | 76. PX173; PX 185. | |
| | 77. PX196, at MoneyLion_01817935. | |
| | 78. PX198, at MoneyLion_01817788 (produced in native excel). | |
| | 79. JX065, MIPA § 2.05(b)(i). | |
| 57 | The documents and testimony that I analyzed relating to the Buyer's approval of the maximum 2021 Earnout Payment serve as further confirmation that the 2022 Earnout Payment also was to be calculated using the Company's historical accounting practices and not strict GAAP.[80]<br><br>80. As noted above, Section 2.06(b)(i) of the MIPA states: "For the avoidance of doubt, it is the intention of the Parties that the 2021 Revenue Amount and the 2021 EBITDA Amount and the 2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using substantially consistent methods and practices." JX065, MIPA § 2.06(b)(i). | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 58 | The following timeline summarizes various documentation I have considered illustrating that the Company's historical non-GAAP practices, particularly those with respect to revenue recognition, were applied in the calculation of the 2021 Earnout Payment:<br><br>    a. As previously mentioned, on February 2, 2022, Mr. Scalia sent RSM and CFGI a spreadsheet of Malka's sales orders for November and December 2021 with proposed adjustments to revenue recorded for certain customers.[81] In addition to making adjustments to Malka's OBS to comply with GAAP, Mr. Scalia also made adjustments to Malka's revenue for the "stub period" to comply with GAAP. In the context of Buyer's acquisition of the membership interests of Malka, the "stub period" refers to the period between November 15, 2021 (the Closing Date) through December 31, 2021, which is the 6-week period of time in late 2021 during which Buyer owned Malka.[82] As Mr. Scalia | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | explained at his deposition, "[t]here were schedules created to make sure that we could present Malka's numbers in a GAAP compliant manner in our 10-K that was going to be coming out … in 2022, related to a stub period from when we acquired them."[83] The schedule that Mr. Scalia sent to RSM and CFGI on February 2, 2022 reflects that the variance between Malka's revenue for the "stub period" using its historical revenue recognition practices versus using GAAP is $1,094,132.[84] | |
| | b. On February 14, 2022, Mr. Basdekis wrote to CFGI and Buyer: "The earnout calculation is based off of our historical accounting principals [sic] so not sure what impact audit findings would have on the calculation. Similarly – closing WC was calculated based on historical accounting principals [sic] as well and exclusive of rev rec adjustments to AR, for example."[85] On February 15, 2021, CFGI replied to Mr. Basdekis, copying Buyer, and asked Mr. Basdekis to send "the full year 2021 P&L based [] off of the historical accounting principles[.]"[86] On the same day, Mr. Basdekis responded, sending a file "2021 Unadjusted Income Statement – Consolidated MMG.xlsx" and noting in his cover email "Yes – attaching here the unadjusted P&L for 2021 – only thing not reflected is the tax credit which is allowable under MIPA."[87] The file that Mr. Basdekis sent has the heading "Malka Media Group, LLC Malka Consolidated Unadjusted Income Statement From Jan 2021 to Dec 2021" and reflects "Total Income" of $30,806,976.43 and "Net Ordinary Income" of $921,497.13.[88] | |
| | c. On March 15, 2022, Ms. Lee sent Mr. Frommer "the 2021 Revenue and EBITDA statement related to the earnout as per the purchase agreement."[89] Ms. Lee wrote that "[b]ased on this calculation, Malka has achieved the full earnout amount for 2021."[90] The 2021 Revenue and EBITDA Statement attached to Ms. Lee's email reflects that Malka's "Total Revenue" for 2021 was $30,806,376 and EBITDA for 2021 was $921,497.[91] These are the same amounts included in the "2021 P&L based [] off of the historical accounting principles" that Mr. Basdekis sent to Buyer and CFGI on February 15, 2022.[92] In the 2021 Revenue and EBITDA Statement, Buyer also added $890,905 to | |

| ¶¶ | Text | Objection |
|---|---|---|
| | EBITDA for the "2019 Tax Credit[,]" making the "EBITDA plus Tax Credit" $1,812,402.[93] | |
| | d. I have seen no indication that any of the GAAP adjustments that Buyer made to Malka's revenue for the "stub period," and that are reflected on the spreadsheet that Mr. Scalia sent to RSM and CFGI on February 2, 2022, were applied to Malka's 2021 Revenue or EBITDA for purposes of determining Sellers' entitlement to the 2021 Earnout Payment. This confirms that, consistent with Mr. Basdekis's February 15, 2022 email, Malka's historical accounting principles, and not strict GAAP, were used for purposes of the 2021 Earnout Payment. | |
| | 81. PX196, at MoneyLion_0187935 (produced in native excel). | |
| | 82. Scalia Tr. 30:10-18. | |
| | 83. Scalia Tr. 29:24-30:5. | |
| | 84. PX196, at MoneyLion_0187935 (produced in native excel). | |
| | 85. JX074, at MoneyLion_01817462. | |
| | 86. JX074, at MoneyLion_01817462. | |
| | 87. JX074, at MoneyLion_01817462. | |
| | 88. JX074, at MoneyLion_01817466 (produced in native excel). | |
| | 89. JX083, at MoneyLion_01826070. | |
| | 90. JX083, at MoneyLion_01826070. | |
| | 91. JX083. | |
| | 92. JX074. | |
| | 93. JX083. | |
| 59 | Further confirming my opinion that the Company's historical accounting principles, and not strict GAAP, were to be applied for purposes of the 2022 Earnout Payment are the documents and testimony I have reviewed reflecting that throughout 2022, Buyer and CFGI tracked the Company's performance towards the 2022 Earnout using | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | financial reports prepared in accordance with the Company's historical accounting principles. In particular: | (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| | a. On April 29, 2022, CFGI emailed Erika Nuno in the Strategic Finance group at MoneyLion ("Ms. Nuno") asking for "the Malka revenue and EBITDA numbers for Q1[.]"[94] The same day, Ms. Nuno responded, "[f]or purposes of earnout? Asking since the calcs are different in that case."[95] CFGI responded, "Yea, sorry should've clarified for the purposes of the earnout. We want to true up the estimates to align with the final number that was calculated."[96] At his deposition, Mark Torossian the Chief Accounting Officer at MoneyLion ("Mr. Torossian") explained that CFGI provided valuations of Buyer's earnout liability on a quarterly basis in 2022 because, under GAAP, Buyer had to value and report the liability for the Earnout Payment as contingent consideration.[97] | |
| | b. On May 2, 2022, Ms. Lee emailed Mr. Basdekis and asked him to send "Q1 2022 financials in the historical accounting principles view" so that Buyer "could see how Malka is currently tracking towards the earn-out."[98] The same day, Mr. Basdekis responded to Ms. Lee, attaching an excel file with the heading "Malka Media Group, LLC Malka (Consolidated) GAAP vs Non GAAP Income Statement Jan 2022, Q1 2022, Feb 2022, Mar 2022" that reflects "Total – Income" of $7,747,413.35 and "Net Ordinary Income" of ($2,253,930.80).[99] Also on May 2, 2022, Ms. Lee wrote to CFGI (in the same thread in which CFGI asked on April 29, 2022 for "revenue and EBITDA numbers for Q1"): "here are the Malka financials for Q1 using their historical accounting principles for purposes of the earnout."[100] The file that Ms. Lee sent to CFGI appears to be the same file with the same heading as the one that Mr. Basdekis sent to her on the same day.[101] | |
| | c. On October 4, 2022, CFGI wrote to Buyer: "In anticipation of the Q3 review and valuation updates, our valuation team has requested the following: … Actual Malka revenue and EBITDA for the period beginning 1/1/2022 and ending 9/30/2022 (or 8/31/2022)" and "[p]rojected Malka revenue and EBITDA for the period beginning 10/1/2022 and ending 12/31/2022[.]"[102] Mr. | |

| ¶¶ | Text | Objection |
|---|---|---|
| | Torossian testified that this request from CFGI appeared to be in connection with its quarterly valuation work to value the Buyer's earnout liability. [103] | |
| | d. On October 13, 2022, Ms. Lee responded to CFGI: "please see attached for the updated excel. The Malka financials are based on their historical accounting principles (not GAAP) which is what the earn-out is based on, so will not match GAAP financials."[104] The file attached to Ms. Lee's email includes "Actual" Malka revenue and EBITDA numbers for January through August 2022 and "Projections" of Malka's revenue and EBITDA for September through December 2022. [105] According to this file, Sellers were on track to achieve the 2022 Earnout Payment. [106] | |
| | e. On October 20, 2022, CFGI sent Mr. Scalia, copying Mr. Torossian, "the Q3 Malka and Even Earnout valuations." [107] By CFGI's calculation, Malka met the Maximum 2022 Revenue Amount and the Minimum 2022 EBITDA Amount and would achieve the maximum 2022 Earnout Payment. [108] | |
| | f. On October 21, 2022, in response to questions from Mr. Scalia about its Q3 2022 earnout valuation, CFGI wrote to Mr. Scalia, copying Mr. Torossian: "[m]aximum revenue threshold achievement is now a lock (actuals through 9/30 of $31mm vs max threshold of $30mm). It also looks like the odds of achieving the minimum $100k EBITDA threshold have improved." [109] | |
| | 94. JX236, at MoneyLion_01835166. | |
| | 95. JX236, at MoneyLion_01835166. | |
| | 96. JX236, at MoneyLion_01835166. | |
| | 97. Transcript of Deposition of Mark Torossian dated July 29, 2024 ("Torossian Tr."), 42:12-43:8. | |
| | 98. JX086. | |
| | 99. JX086. | |
| | 100. JX236, at MoneyLion_01835166. | |
| | 101. JX236, at MoneyLion_01835166; JX086. | |
| | 102. PX254, at MoneyLion_01834199. | |

| ¶¶ | Text | Objection |
|---|---|---|
| | 103. Torossian Tr. 130:2-5. | |
| | 104. PX254, at MoneyLion_01834199. | |
| | 105. PX 254, at MoneyLion_01834199. | |
| | 106. PX254, at MoneyLion_01834199. | |
| | 107. PX256, at MoneyLion_01836909. | |
| | 108. PX256, at MoneyLion_01836916. | |
| | 109. PX257, at MoneyLion_01836920. | |
| 60 | These communications between Buyer and CFGI further confirm to me that, as Ms. Lee wrote on October 13, 2022, Malka's "historical accounting principles (not GAAP)" are "what the earn-out is based on[.]"[110]<br><br>110. PX254, at MoneyLion_01834199. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 61 | In the 2022 Earnout Statement, Buyer failed to calculate revenue in a manner consistent with the Company's historical practices, in violation of the MIPA's Revenue and EBITDA Calculation Principles. Specifically, the Revenue and EBITDA Calculation Principles define Revenue to mean, in part, "revenue recognized according to the Company's historical revenue recognition principles for the combined and consolidated Company."[111] However, Buyer calculated Revenue for the 2022 Earnout Statement utilizing Buyer's accounting practices, *i.e.* strict compliance with GAAP, not the Company's historical revenue recognition principles, thereby understating Revenue and subsequently EBITDA. Under the Company's historical practices, Revenue would be $895,517 higher than what Buyer calculated in the 2022 Earnout Statement.<br><br>111. JX065, MIPA, Schedule B. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 62 | As I described in Section A above in this report, based on my analysis of the terms of the MIPA, it is my opinion that both Schedule A (Accounting Principles) and Schedule B (Revenue and EBITDA Calculation Principles) clearly contemplate that revenue for purposes of the 2022 Earnout should be calculated in accordance with the Company's historical practices, including specific instances where such historical | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | practices include exceptions from GAAP. In particular, Schedule A to the MIPA includes "the Company's historical revenue recognition practices" in a series of exceptions to GAAP to be utilized in calculation of revenue and expenses. [112] Similarly, Schedule B specifically contemplates that revenue is to be recognized "according to the Company's historical revenue recognition principles". [113]<br><br>112. JX065, MIPA, Schedule A.<br><br>113. JX065, MIPA, Schedule B. | |
| 63 | Despite the plain language of the MIPA requiring revenue for the 2022 Earnout to be calculated consistently with the Company's historical practices, Buyer has admittedly utilized its own preferred GAAP method of accounting for revenue in Buyer's 2022 Earnout Statement. Mr. Torossian, who was responsible for preparing Buyer's 2022 Earnout Statement, acknowledged that Buyer calculated the Company's revenue as $41,611,677, which is consistent with Buyer's "reported GAAP revenue number" for the Company. [114] However, Mr. Torossian also acknowledged that the Company's revenue, before the Buyer's GAAP adjustments, would be $42,506,536[115]- a difference of approximately $895,000.<br><br>114. Torossian Tr. 312:3-23.<br><br>115. Torossian Tr. 243-246. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 64 | Mr. Basdekis also acknowledged a difference in the calculation of revenue under the Company's historical practices compared to the Buyer's accounting practices, admitting that his own comparative analysis of "GAAP" versus "Earnout" revenue for 2022 would result in a variance of $905,517. [116]<br><br>116. Basdekis Tr. 193. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 65 | Based on my analysis, as an accountant, of the terms of the MIPA and the information in this matter, it is my opinion that the Buyer's usage of its preferred accounting practices for calculation of Revenue for the 2022 Earnout Statement is a deviation from both the Company's historical practices and the MIPA. The MIPA and the testimony of Mr. Basdekis make clear that the Company historically recognized revenue when invoices were generated – regardless of whether the revenue had been earned (*i.e.*, the goods and services had been provided). By contrast, Buyer is | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | attempting to utilize its own preferred accounting practices to calculate revenue for the 2022 Earnout Statement, resulting in an understatement of revenue of at least $895,000. | |
| 66 | As with revenue, in its calculation of the 2022 Earnout Statement, Buyer failed to calculate expenses in a manner consistent with the Company's historical practices, in violation of the MIPA. Specifically, Schedule B to the MIPA (Revenue and EBITDA Calculation Principles) contemplates that EBITDA should be calculated including "the Company's historical revenue and cost recognition principles."[117] Moreover, the Accounting Principles outlined in Schedule A of the MIPA clearly articulate the Company's historical cost recognition principles and how those differ from GAAP.[118] Indeed, at deposition, Mr. Dudney agreed that Sellers made clear in Schedule A that Malka did not historically recognize expenses in accordance with GAAP.[119]<br><br>117. JX065, MIPA, Schedule B.<br><br>118. JX065, MIPA, Schedule A.<br><br>119. Dudney Dep. Tr., 108:16-110:4, 254:24-255:12. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 67 | However, Buyer calculated expenses for the 2022 Earnout Statement utilizing Buyer's own preferred post-closing accounting practices, thereby deviating from the requirements of the MIPA and understating EBITDA. As I will describe herein, under the Company's historical practices, costs should be $1,935,823 less than what Buyer has included in the 2022 Earnout Statement, comprised of the following differences in | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | the following accounts: [120] | |

| | |
|---|---|
| 51122 – Freelancers | 58,558 |
| 51128 - Revenue Share | 436,455 |
| 52010 - Production Insurance | 70,714 |
| 53007 - Other Variable Expenses | 112,240 |
| 60003 - 401k | 163,302 |
| 60005 - Other Insurance & Benefits | 18,116 |
| 60007 - Sales Commission | 13,656 |
| 60011 – Severance | 150,000 |
| 60401 - Payroll Taxes: FICA and Medicare | 31,709 |
| 60433 - Payroll Taxes: ML | 8,955 |
| 60441 - Payroll Taxes: Other | 112,097 |
| 63011 – Rent | 620,937 |
| 63013 - Dues & Subscriptions | 65,562 |
| 69000 - Miscellaneous & Other Overhead | 73,521 |
| *Total* | *$1,935,823* |

120. JX102, at MoneyLion_01820691 (produced in native excel).

| ¶¶ | Text | Objection |
|---|---|---|
| 68 | As set forth above, both Schedule A (Accounting Principles) and Schedule B (Revenue and EBITDA Calculation Principles) clearly contemplate that costs for purposes of the 2022 Earnout Payment should be calculated in accordance with the Company's historical practices, including specific instances where such historical practices differ from GAAP. In particular, Schedule A articulates exceptions from GAAP including, but not limited to, "the Company's historical revenue recognition principles," "the Company's historical cost recognition principles … which require the Company to recognize costs on contracts as incurred," and the principle that "invoiced expenses are recognized in related period based on receipt of the invoice." [121] Both points are clear departures from GAAP. For example, GAAP requires costs to be accrued in the period incurred – not the period invoiced, as articulated in sub-section c of Schedule A.<br><br>121. JX065, MIPA, Schedule A. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 69 | Schedule B to the MIPA, "Revenue and EBITDA Calculation Principles", further demonstrates to me that the Company's historical practices were to be utilized when | Unreliable and unhelpful testimony, legal opinion |

| ¶¶ | Text | Objection |
|---|---|---|
| | calculating the 2022 Earnout Payment. Namely, the definition of "EBITDA" in Schedule B specifically states that EBITDA is to be calculated "including the Company's historical revenue and cost recognition principles".[122]<br><br>122. JX065, MIPA, Schedule B. | (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 70 | The provisions of Schedule A and Schedule B clearly evidence to me that the 2022 Earnout Statement should include costs calculated in a manner consistent with the Company's historical practices, including instances when such historical practices differ from GAAP. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 71 | In the 2022 Earnout Statement, Buyer attempts to use its own accounting practices and application of GAAP as the basis for the Company's expense recognition, the effect of which incorrectly reduces EBITDA. Namely, Buyer attempts to increase expenses via expense accruals, GAAP promulgated in ASC 842, and other Buyer-elected reserves - none of which are consistent with the Company's historical practices or the MIPA's requirement that the "2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using substantially consistent methods and practices" as those used to calculate the 2021 Revenue Amount and 2021 EBITDA Amount.[123] I will describe each of these categories in detail below.<br><br>123. JX065, MIPA § 2.06(d). | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 72 | As an initial overarching point, the Buyer's own records and testimony of its employees make clear that for purposes of the 2022 Earnout Statement, Buyer recorded expenses based on Buyer's own preferred accrual basis of accounting, rather than the Company's historical practices.[124] First, Mr. Torossian testified that the file he prepared to calculate the 2022 Earnout Statement utilized an amount for EBITDA from the Company's reported GAAP results (not historical practice).[125] Further, Mr. Basdekis testified that he prepared a file which illustrated a side-by-side analysis of the Company's 2022 income statement under historical practices, versus Buyer's preferred accounting practices.[126] The testimony and analysis of Buyer's own personnel make clear that Buyer deviated from the Company's historical practices and the practices Buyer used for the 2021 Earnout in preparing costs to be included in the 2022 Earnout. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | 124. Torossian Tr. 309. | |
| | 125. Torossian Tr. 309. | |
| | 126. *See* JX101, cited in Basdekis Tr. 191-202. | |
| 73 | As confirmed in the testimony of Mr. Basdekis, pre-closing, the Company historically did not accrue expenses,[127] but rather recorded expenses when an invoice was received (a practice which was memorialized in Schedule A to the MIPA).[128] Nonetheless, testimony and documentation from Buyer reveals many instances where Buyer did just that – replaced historical practice with Buyer's own accrual practices. Based on my analysis of the available information, Buyer's approach is plainly at odds with the requirements of the MIPA, and each of the following ledger accounts should be adjusted accordingly: <br><br> | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| General ledger account | Difference in historical practices vs. Buyer's GAAP practices |
|---|---|
| 51122 – Freelancers | 58,558 |
| 51128 - Revenue Share | 436,455 |
| 52010 - Production Insurance | 70,714 |
| 53007 - Other Variable Expenses | 112,240 |
| 60005 - Other Insurance & Benefits | 18,116 |
| 60007 - Sales Commission | 13,656 |
| 60401 - Payroll Taxes: FICA and Medicare | 31,709 |
| | |
| 60433 - Payroll Taxes: ML | 8,955 |
| 60441 - Payroll Taxes: Other | 112,097 |
| 63013 - Dues & Subscriptions | 65,562 |
| 69000 - Miscellaneous & Other Overhead | 73,521 |
| *Sub-Total* | $1,001,583 |

| ¶¶ | Text | Objection |
|---|---|---|
| | 127. Basdekis Tr. 196-198. | |
| | 128. JX065, MIPA, Schedule A. | |
| 74 | Mr. Basdekis's side by side analysis of the Company's 2022 income statement based on historical practices versus Buyer's practice included a column for specific comments about "Key Drivers" of difference between the two approaches.[129] Notably, | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
|  | each of the above-listed accounts included comments such as "Accrued Expenses", "Net Impact of Accruals and Reversals", and other comments indicating accrual accounting primarily drove the difference between historical practice and Buyer's implemented practices.[130] Further, when asked specifically about three payroll tax-related ledger accounts with differences, Mr. Basdekis testified that "it looks to be accrual activity."[131] | (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
|  | 129. JX102, at MoneyLion_01820691 (produced in native excel). |  |
|  | 130. JX102, at MoneyLion_01820691 (produced in native excel). |  |
|  | 131. Basdekis Tr. 198. |  |
| 75 | In addition to recording multiple expense accounts on an accrual basis, Buyer has also admittedly deviated from the Company's historical practices in recording rent expense included in the 2022 Earnout calculation.[132] Buyer's change in practice contradicts the MIPA, resulting in an understatement of EBITDA for purposes of calculating the 2022 Earnout by $620,937. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
|  | 132. Basdekis Tr. 198; Torossian Tr. 253. |  |
| 76 | As previously described, the MIPA states that the Company's historical practice for expenses is to recognize the expense in the "related period based on receipt of the invoice (i.e., if the Company receives and invoice in October, it is entered in October and shows as an October expense, even if cash is not paid out until 30 or 60 days from the date of receipt; this applied to contracted costs, variable costs, and overhead)".[133] Mr. Basdekis confirmed that this historical practice extended to the Company's practices for recording rent expenses.[134] In 2022, the Company moved to a new office space; as part of the Company's contract for its new lease, the Company's landlord waived three months of rent payments.[135] Accordingly, since the Company did not receive invoices for these three months of rent, the Company did not record three months of rent expense in 2022, consistent with its historical practice.[136] | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
|  | 133. JX065, MIPA, Schedule A. |  |
|  | 134. Basdekis Tr. 184-185. |  |
|  | 135. Basdekis Tr. 184:20-185:12. |  |

| ¶¶ | Text | Objection |
|---|---|---|
| | 136. Basdekis Tr. 184-185. | |
| 77 | In contrast to the Company's historical practices, GAAP – specifically ASC 842 – requires companies to accrue and recognize rent expenses over the total life of the contract, regardless of when cash for such lease obligations is actually paid.[137] Despite specifically acknowledging this difference between GAAP and the Company's historical practices, Buyer nonetheless calculated EBITDA for purposes of the 2022 Earnout Statement utilizing Buyer's calculation of 2022 rent expense under ASC 842.[138] Buyer's approach is a clear departure from the MIPA, and accordingly should be rejected.<br><br>137. Torossian Tr. 253; ASC 842.<br><br>138. Torossian Tr. 253-254; Basdekis Tr. 198-199. I note that ASC 842 did not go into effect until January 1, 2022. PX396. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 78 | Buyer's calculations of costs included in the 2022 Earnout Statement also include instances where Buyer elected to implement other of its own preferred post-closing accounting practices and decisions, again departing from the Company's historical practices in violation of the MIPA. Specifically, Buyer has recorded 401(k) expenses and severance expenses that exceed the amounts of those expenses that Mr. Basdekis calculated using the Company's historical practices in the following amounts:[139]<br><br>| 60003 – 401(k) | 163,302 |<br>| 60011 – Severance | 150,000 |<br>| Sub-Total | $313,302 |<br><br>139. JX102 at MoneyLion_01820691. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 79 | I confirmed with Mr. Basdekis Malka historically only paid 1% to employees' 401(k). With respect to 401(k) expenses, the Company historically offered a plan to its employees whereby the Company would match 1% of employees' 401(k) contributions.[140] Buyer, however, offers employees a 4% match.[141] Buyer's decision to offer Company employees a higher 401(k) match during the Earnout period is inconsistent with the Company's historical practices. Moreover, increasing 401(k) expenses due to the decision at the Buyer corporate level to do a 4% match instead of a 1% match is inconsistent with Section 2.06(d) of the MIPA, which provides that Buyer | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | "will not take any action intended to interfere with or frustrate the Seller Members' opportunity to receive the … 2022 Earnout Payment[.]"[142] Accordingly, in my opinion, this increased expense amount should not be included in EBITDA for purposes of calculating Seller's entitlement to the 2022 Earnout Payment.<br><br>140. Basdekis Tr. 195.<br><br>141. Basdekis Tr. 195.<br><br>142. JX065, MIPA § 2.06(d)(i). | |
| 80 | Similarly, in the 2022 Earnout Statement, Buyer has also included severance payments based on Buyer's own post-closing severance-related decisions, deviating from the Company's historical practices and the MIPA. In 2022, the Buyer undertook a company-wide cost savings initiative which included eliminating certain roles.[143] As Mr. Torossian testified, these termination decisions were made at the corporate level, resulting in a "pool" of severance to be paid out to separated employees.[144] Buyer elected to "push down" $150,000 of this severance pool to the Company and included this amount as an expense in Buyer's calculation of EBITDA for purposes of the 2022 Earnout Statement.[145] Based on my experience as an accountant and my analysis of the available information, this is a clear departure from the Company's historical practices and should not be included for purposes of calculating Seller's entitlement to the 2022 Earnout Payment.<br><br>143. Torossian Tr. 209.<br><br>144. Torossian Tr. 209.<br><br>145. Torossian Tr. 209. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 97 | In the 2022 Earnout Statement, Buyer included a downward adjustment to EBITDA totaling $544,500 related to cash bonuses paid in 2023.[173] Buyer explained that such adjustment was for "bonuses for Malka employees held at ML Corporate level."[174] Such adjustment is improper as it is a corporate expense in the year 2023 resulting from Buyer's decisions at the corporate level, which are inconsistent with the Company's 2022 Budget, in violation of the MIPA. As such, 2022 EBITDA is understated by $529,500. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 13−14)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | 173. JX119, at MoneyLion_000066. | |
| | 174. JX119, at MoneyLion_000066. | |
| 98 | Historically, the bonuses paid at the Malka level were limited in both frequency and amount and related to employee referral bonuses, new-hire signing bonuses, miscellaneous "spot" bonuses, and sales incentive bonuses.[175] On/around January 26, 2023, Mr. Basdekis circulated to Kate Fallon, Buyer's Chief People Officer ("Ms. Fallon"), information regarding Malka's historical compensation structure, including historical bonus amounts paid to employees in 2021.[176] Mr. Basdekis wrote to Ms. Fallon that he ran the "prior two year bonus amounts, and vast majority is related to spot / stay or referral bonus."[177] Also on January 26, 2023, Mr. Krubich wrote to Ms. Fallon that "we traditionally weren't in positions to give bonuses[.]"[178] A file that Mr. Basdekis prepared reflected that bonuses paid in 2021 totaled $64,195 and only included $13,000 for "Year End Bonus."[179] Another file that Mr. Basdekis sent to Ms. Fallon on February 2, 2023 similarly reflected that Malka had paid $13,000 of 2020 "Year End Bonus[es]" in 2021 and had paid $17,125 of 2021 "Year End Bonus[es]" in 2022.[180] | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 13−14)) |
| | 175. PX296. | |
| | 176. PX295, at MoneyLion_00141957. | |
| | 177. PX295, at MoneyLion_00141957. | |
| | 178. PX294. | |
| | 179. PX296, at MoneyLion_00023201. | |
| | 180. PX297, at MoneyLion_00143236 (Bonus History tab) (produced in native excel). | |
| 99 | Buyer's adjustment included in its 2022 Earnout Statement consisted of bonus payments totaling $544,500. Based on my analysis of the available information, Buyer is attempting to push the cost of decisions made at the MoneyLion corporate level down to Sellers. As explained by Mr. Torossian, such bonus pool was determined by the Buyer's Board at the corporate level and paid at the corporate level.[181] Mr. Torossian further testified that the "board makes determinations at the comp[ensation] committee for bonuses related to the entire company"[182] and that the "compensation committee approves the budget pool … that's being able to be allocated to employees | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 13−14)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | across MoneyLion."[183] At his deposition, Mr. Krubich testified that "MoneyLion dictated to us the bonus pool and asked us who to give bonuses to."[184] Buyer elected to include this corporate bonus as an expense of the Company for purposes of calculating the 2022 Earnout, resulting in a corresponding downward adjustment to the 2022 EBITDA.<br><br>181. Torossian Tr. 181:17-25; 184:13-25.<br><br>182. Torossian Tr. 181:17-19.<br><br>183. Torossian Tr. 184:14-16.<br><br>184. Transcript of Deposition of Louis Krubich ("Krubich Tr.") dated July 10, 2024, 319:5-7. | |
| 100 | Buyer's decision to allocate corporate bonuses is also contrary to Section 2.06(d) of the MIPA, which requires consistency with the 2022 Budget. Section 2.06(d) of the MIPA requires that for the period from January 1, 2022 and through December 31, 2022, the Buyer "shall, and shall cause the Company to *operate the business of the Company substantially in accordance with the operating and revenue budget.*"[185] The 2022 Budget was attached to the MIPA as Exhibit B and included only $15,000 of bonuses.[186]<br><br>185. JX065, MIPA § 2.06(d)(ii).<br><br>186. JX065, MIPA, Exhibit B. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 13−14)) |
| 101 | In my experience, it is common for parties to agree to a budget, forecast, and/or business plan when the transaction involves an earnout, typically because prospective sellers anticipate having limited control of the business after the transaction closes. In this matter the 2022 Budget only included $15,000 of bonuses. Buyer's adjustment of $544,500 is more than 10 times the budgeted amount and the amount paid by Malka in | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 13−14)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | 2021 and 2022, as illustrated in the table below: | |

**Monthly Bonus Payments**

| Month | Actual Bonuses Paid by Malka in 2021[187] | Estimated Malka Bonuses in 2022 Budget[188] | Actual Bonuses Paid by Malka in 2022[189] | Bonuses Included in 2022 Earnout Calculation by MoneyLion[190] |
|---|---|---|---|---|
| | *Decided upon and paid by Malka* | | | *Decided upon and paid by MoneyLion* |
| January | $31,500 | $1,250 | $10,750 | |
| February | $4,000 | $1,250 | $0 | |
| March | $0 | $1,250 | $12,875 | |
| April | $1,000 | $1,250 | $0 | |
| May | $500 | $1,250 | $1,000 | |
| June | $0 | $1,250 | $1,000 | *(Monthly Amounts Unspecified)* |
| July | $3,500 | $1,250 | $1,000 | |
| August | $12,000 | $1,250 | $500 | |
| September | $1,000 | $1,250 | $0 | |
| October | $0 | $1,250 | $500 | |
| November | $2,500 | $1,250 | $500 | |
| December | $8,195 | $1,250 | $0 | |
| **Total** | **$64,195** | **$15,000** | **$28,125** | **$544,500** |

187. PX297, at MoneyLion_00143236 (Bonus History tab) (produced in native excel).

188. JX065, MIPA, Exhibit B.

189. PX297, at MoneyLion_00143236 (Bonus History tab) (produced in native excel).

190. JX119, at MoneyLion_000066.

| ¶¶ | Text | Objection |
|---|---|---|
| 102 | As shown in the table above, the bonuses decided on and paid at the Malka-level in 2022 is much closer to the 2022 Budget than Buyer's proposed adjustment. This further underscores how egregious Buyer's attempt is to reduce the Company's 2022 EBITDA. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 13−14)) |
| 103 | The documentation cited above collectively demonstrates that Buyer clearly disregarded the Company's historical practices and budgets by pushing down corporate bonuses. Based on the terms of Section 2.06(d) of the MIPA, any amounts | Unreliable and unhelpful testimony (Federal Rule of |

| ¶¶ | Text | Objection |
|---|---|---|
| | over the $15,000 budgeted amount should be rejected. The amounts actually paid in 2022 by the Company (excluding corporate allocations) is $28,125, less than 10% of what Buyer claimed in its adjustment. At a minimum, any amounts in excess of such paid amounts should be rejected and excluded from the calculation of 2022 EBITDA. | Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 13−14)) |
| 104 | In the 2022 Earnout Statement, Buyer included a downward adjustment to 2022 revenue and EBITDA of $218,170 asserting that it represents a "double count of retained teams." [191] Buyer claims that certain Company employees who served the MoneyLion account post-Closing Date were not 100% dedicated to the MoneyLion account but were instead charging time to other clients.[192] Such adjustment is improper as it is not specifically contemplated by the MIPA, and Buyer offers no justification for the inclusion of such adjustment.<br><br>191. JX119, at MoneyLion_000066.<br><br>192. JX119, at MoneyLion_000061, MoneyLion_000066. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14)) |
| 105 | As an initial point, it is important to understand the construct of the team and services provided by the Company to MoneyLion post-Closing Date. Malka and the Buyer agreed that Malka would establish a team of professionals who would primarily work on MoneyLion projects. Importantly, although the parties commonly refer to this team of professionals as a "retained team", these employees of Malka remained employees of Malka during the 2022 Earnout period, and were not contractually precluded from serving projects or clients outside of MoneyLion. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14)) |
| 106 | Based on my analysis of the available information, an adjustment for time spent by the "retained team" is not specifically contemplated by the MIPA. Neither the Revenue Principles nor the EBITDA Principles on Schedule B include any adjustment for "retained teams" when those personnel work on other clients. Buyer attempts to retroactively create adjustments that neither party agreed upon. Mr. Torossian admitted that "the premise of retained teams is not listed anywhere … of [sic] a defined term within the MIPA."[193] However, the MIPA *does* require that EBITDA be calculated consistent with historical practice. It is my understanding that Malka did not have any historical practices of excluding revenue and associated costs related to | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | certain personnel working across multiple clients. As such, I see no term under the MIPA that would justify such an adjustment.<br><br>193. Torossian Tr. 341:11-14. | |
| 107 | Even putting aside the lack of contractual terms supporting Buyer's adjustment, Buyer also failed to support this adjustment and offered no justification for the adjustment under the MIPA. Mr. Torossian claimed that certain Malka employees "were hired in Malka to be 100 percent dedicated to MoneyLion and MoneyLion only."[194] However, he was unable to provide any basis or explanation for such assertion.[195]<br><br>194. Torossian Tr. 217:12-14.<br><br>195. Torossian Tr. 217:16-24. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14)) |
| 108 | Buyer has not alleged that the revenue was not earned or the work was not performed. Likewise, Buyer offers no evidence to suggest the Company's work for Buyer was not completed in a timely manner, that its contract was somehow not satisfied, nor that the results were of inadequate quality.[196]<br><br>196. As set forth below, Mr. Dudney curiously testified that the retained teams worked *zero hours* for MoneyLion in 2022 resulting in an approximately *$2 million* downward adjustment to Malka's revenue for 2022, notwithstanding the fact that MoneyLion itself has never raised this argument nor has anyone from MoneyLion ever asserted that the retained Malka teams that it was paying for in 2022 did not perform any work (*See* Dudney Tr. 378:21-382:13). Instead, MoneyLion's position has always been that while the retained teams performed the work requested of them by MoneyLion, they *also* performed some work for other customers, resulting in MoneyLion's proposed $218,170 downward adjustment to revenue and EBITDA. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14)) |
| 109 | Furthermore, based on the contract for these services, Buyer purchased *services* and there is no indication that individual service providers could not be substituted as necessary. As an illustrative example, one invoice from Malka includes specific terms stating, "Client [MoneyLion] agrees to compensate MMG [Malka] $165,220.00 [] *for the services* described in Exhibit A …"[197] Exhibit A of the invoices described the project scope and description of service related to "Brand Team Retained Creative Services for Jan and Feb 2022."[198] Neither the terms nor Exhibit A ever mention the sole right or secondment of Malka personnel to MoneyLion. Nevertheless, Buyer included 21 employees in its calculation of this adjustment.[199] It is unclear how Buyer | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14)) |

| ¶¶ | Text | Objection |
|---|---|---|
|  | could justify an adjustment based on number of hours or revenue collected on other services/projections unrelated to their contract with the Company.<br><br>197. PX210, at MoneyLion_00017463 (emphasis added).<br><br>198. PX210, at MoneyLion_00017463.<br><br>199. PX003, at MoneyLion_02038248. |  |
| 110 | In summary, the MIPA does not specifically contemplate an adjustment related to retained teams working on other clients besides MoneyLion. Instead, the MIPA does require that EBITDA be calculated consistent with historical practice. The Company has a practice of hiring personnel to work on potentially multiple client accounts and were not hired as seconded employees. MoneyLion purchased services from Malka, not individual employees. Buyer failed to support this adjustment by offering no justification for the adjustment under the MIPA. As such, Buyer's downward adjustment of $218,170 to 2022 revenue and EBITDA is improper and should be excluded from the 2022 Earnout Statement. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14)) |
| 115 | Based upon these opinions, if calculated utilizing the income statement prepared based on the Company's historical practices, and correcting for Buyer's flawed adjustments and omissions, Malka would exceed the Maximum 2022 Revenue Amount and the Minimum 2022 EBITDA Amount. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 118 | Mr. Dudney concludes that, based on his analysis, he did not identify *any* Malka projects with "noncancelable deposits" as contemplated in Schedule A to the MIPA. This conclusion is undermined by the documentation produced in this matter, and Mr. Dudney's own report. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 119 | Tellingly, in Footnote 86 of his report, Mr. Dudney admits he identified the following language in certain of the project documentation that he reviewed: "[i]f Client cancels the services herein contracted, MMG shall retain the full sum of the Fee paid by Client[.]"[204] Mr. Dudney claims he "only identified this clause in a handful of projects" with initial invoices in 2021 and admits he was told by MoneyLion to assume that such language "does not reflect a 'noncancelable deposit' as described in Schedule A to the MIPA."[205] At his deposition, Mr. Dudney confirmed that if he did | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | not see the precise words "noncancelable deposit" in a statement or work or other project documentation, he assumed that the project did not include a noncancelable deposit as the term is used in Schedules A and B.[206] In doing so, Mr. Dudney selectively ignores the clear, plain language included in many of Malka's agreements with clients.<br><br>204. Dudney Report, p. 22, footnote 86.<br><br>205. Dudney Report, p. 22, footnote 86.<br><br>206. Dudney Dep. Tr., at 50:15-54:11. | |
| 120 | As discussed in greater detail below, I reviewed hundreds of documents related to the projects included in Mr. Dudney's calculated adjustments and found indication of noncancelable deposits in many of the projects I analyzed for which Mr. Dudney claims adjustments in the nine months ended September 2021. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 121 | During his deposition, Mr. Dudney provided revised exhibits in which he considered projects I identified as Category 1 and 2A in my rebuttal report as non-cancellable. Specifically, the adjustment amounts in Mr. Dudney's revised Exhibit 3A and 3B were determined by "treat[ing] the first invoice as the non-cancelable deposit amount and then straightlin[ing] the rest of the activity in the same way that [Mr. Dudney] did before with time cards" for projects identified in my Category 1 and Categories 1 and 2A, respectively.[207] However, even with this revised analysis, Mr. Dudney still fails to calculate all of Malka's revenue consistent with historical practice, which Mr. Basdekis testified means when invoices are issued. Instead, he spreads (e.g., straight-lines) the remaining revenue evenly over an arbitrary time period for each project. Such methodology does not consider other factors such as the billing cadences for each customer and project (e.g., monthly or quarterly billing) as well as Malka's historical practice of recognizing revenue when invoices are issued. Mr. Dudney's blatant disregard for the Company's historical practices with respect to revenue are discussed further below.<br><br>207. Dudney Tr. 449:13-20. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 122 | Mr. Dudney's analysis contains a string of unsupported assumptions, either provided directly by MoneyLion's attorneys or that lack basis in the MIPA. As I describe | Unreliable and unhelpful testimony (Federal Rule of |

| ¶¶ | Text | Objection |
|---|---|---|
| | below, each of these assumptions are contradicted by documents, deposition testimony and other information produced in this matter. | Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 123 | Mr. Dudney's assumptions result in circuitous logic and flawed conclusions. I have summarized below my understanding of Mr. Dudney's basis for his claimed adjustments, as well as the facts undermining each node in the wheel:<br><br> | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 124 | Mr. Dudney's conclusions only hold if each link in his circuitous wheel holds true, however, as I will describe in greater detail herein, Mr. Dudney ignores evidence that undermines each link, thus rendering his position unreliable. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 125 | Mr. Dudney asserts that the "Accounting Principles incorporate U.S. GAAP, which codifies its revenue recognition guidance in Accounting Standards Codification 606 – "Revenue Recognition."[208] While I agree that the Accounting Principles *mention* U.S. GAAP, Schedule A makes no mention of ASC 606. Rather, Schedule A states that the Financial Statements, Estimated Statements and Final Statements shall be prepared in | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | accordance with "U.S. GAAP, except as follows: … the Company's historical revenue recognition principles".[209] Further, Schedule B (the Revenue and EBITDA Calculation Principles governing the Earnout Calculation) goes on to define "Revenue" as "revenue recognized according to the Company's historical revenue recognition principles",[210] with no reference to U.S. GAAP or ASC 606. 208. Dudney Report, pp. 5, 18. 209. JX065, MIPA, Schedule A. 210. JX065, MIPA, Schedule A. | |
| 126 | Notably, prior to closing, the parties exchanged several drafts of Schedules A and B to the MIPA, and the initial drafts prepared by MoneyLion did reference ASC 606, but those references were removed and do not appear in the executed final version of the MIPA.[211] While Mr. Dudney acknowledges, "language specifically referencing ASC 606 was removed from a draft of the MIPA," he claims that any assertion made about this fact is "inconsistent with the representation that the financial statements shall be prepared in accordance with GAAP … and with the notes to the financial statements included in the MIPA."[212] In making this assertion, Mr. Dudney relies on Section 3.06 of the MIPA which includes a representation by Sellers that "the Financial Statements have been prepared **in accordance with the Accounting Principles** throughout the period involved …"[213] However, Mr. Dudney fails to acknowledge that this representation does not refer to U.S. GAAP or ASC 606, but instead refers to the **Accounting Principles** (*i.e.*, Schedule A), which include explicit exceptions to U.S. GAAP, including specifically for revenue recognition.[214] 211. Dudney Report, footnote 73; JX065, MIPA, Schedules A&B. 212. Dudney Report, footnote 73. 213. Dudney Report, p. 18 (emphasis added). 214. JX065, MIPA, Section 3.06 & Schedule A. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 127 | Mr. Dudney claims that "Sellers represented that, except only for noncancelable deposits, it recognized revenue 'as milestones are attained,' which would be consistent with GAAP and ASC 606's requirement that revenue be recognized when | Unreliable and unhelpful testimony (Federal Rule of |

| ¶¶ | Text | Objection |
|---|---|---|
|  | performance obligations are satisfied."[215] Mr. Dudney mischaracterizes Schedule A by conflating the word "milestones" - which appears zero times in the ASC 606 definition of performance obligations - with the words "performance obligations" which are specifically defined in ASC 606.[216] Testimony confirms that "milestones", as the term was historically used by Malka, is not synonymous with the specific term "performance obligations" found in U.S. GAAP in ASC 606.[217] Rather, "milestones", as used by the Company, represented any pre-determined billing or payment date agreed with a customer, regardless of when revenue would be considered earned under GAAP.[218]<br><br>215. Dudney Report, pp. 19-20.<br><br>216. PX393.<br><br>217. Krubich Tr., 61:25-67:17, 203:20-15; Basdekis Tr., 28:19-29:21, 245:9-25.<br><br>218. Krubich Tr., 203:25-204:22. | Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 128 | For example, Mr. Krubich confirmed in his testimony that the word "milestones" may, but does not necessarily, refer to when work is performed or completed, but rather that "anything" could be a milestone under Malka's historical practices, even just signing the contract with the customer.[219] Mr. Krubich explained that Malka would determine milestones "on a per project basis to manage our clients."[220] Similarly, when asked "when did you generally send out an invoice for your clients[,]" Mr. Fried responded, "generally speaking, client-driven directives, milestones, times of the year; you know, these things were all - - were all done in collaboration with our clients wanting to do business with us."[221] Mr. Krubich's explanation and Mr. Fried's use of the word milestone is consistent with a functionality available within Malka's accounting software. Namely, NetSuite contains a drop-down field called "Milestones" which Malka could utilize to track billing dates or other customer milestones.[222] Mr. Dudney seems to ignore Mr. Krubich's and Mr. Fried's testimony, as well as the NetSuite milestone functionality.<br><br>219. Krubich Tr., 204:8-15.<br><br>220. Transcript of Deposition of Daniel Fried dated July 17, 2024 ("Fried Tr"). 180:21-181:4; *see also* Fried Tr. 137:22138:5 ("Q. ... Did you decide when the invoice was going out or did the finance team? A. It would - - it would generally be a client-driven milestone, so, you know, we would try to - - if a | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | project was approved and a client needed an invoice to be sent, we would work with them to send an invoice."), 146:24-147:8 ("Generally speaking, invoices would be sent when clients were expecting them to be received. ... Those times were client-driven, so it would have likely been odd to send it when a client wasn't expecting, and we wouldn't have sent them."). <br><br> 221. Transcript of Deposition of Daniel Fried dated July 17, 2024 ("Fried Tr"). 180:21-181:4; *see also* Fried Tr. 137:22138:5 ("Q. ... Did you decide when the invoice was going out or did the finance team? A. It would - - it would generally be a client-driven milestone, so, you know, we would try to - - if a project was approved and a client needed an invoice to be sent, we would work with them to send an invoice."), 146:24-147:8 ("Generally speaking, invoices would be sent when clients were expecting them to be received. ... Those times were client-driven, so it would have likely been odd to send it when a client wasn't expecting, and we wouldn't have sent them."). <br><br> 222. PX047. | |
| 129 | Information contained in CFGI's quality of earnings report dated October 5, 2021 (the "CFGI Report") also aligns with Mr. Krubich's description of milestones, stating in part that "**[c]ustomers are invoiced upon completion of milestones set forth in respective contracts**. While customer payment terms range between 15 to 90 days, most pay within 60 days. Management noted that the Company does not typically experience issues regarding collectability, and as such, it does not maintain an allowance for doubtful accounts."[223] At my deposition, I was shown another portion of the CFGI Report that also aligns with Mr. Krubich's and Mr. Fried's testimony. CFGI noted that "[t]he Company recognizes revenue and invoices customers on the achievement of agreed project-based milestones (e.g., stages of completion) as specified in customer contracts."[224] This is consistent with Mr. Krubich's and Mr. Fried's testimony that milestones are project specific and customer driven and could be, *for example*, stages of completion, but could also be another date or event agreed upon by Malka's customers. <br><br> 223. JX020, at MoneyLion_01813401 (emphasis added). <br><br> 224. JX014, CFGI Report at MoneyLion_01813080. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 130 | The CFGI Report further illustrates that MoneyLion had information prior to the Closing Date that indicated Malka was not following GAAP. Specifically, the CFGI Report states, "The Company generally does not prepare its financial statements on a full accrual basis of accounting, and **we anticipate net working capital would be** | Unreliable and unhelpful testimony (Federal Rule of |

| ¶¶ | Text | Objection |
|---|---|---|
| | **significantly different if the Company reported under GAAP."**[225] As noted above, because working capital includes current assets, and accounts receivable is a current asset, an entity's revenue recognition can impact the calculation of working capital, particularly through the accounts receivable balance. Nonetheless, even with this express statement from CFGI that net working capital would be significantly different under GAAP, Mr. Dudney assumes that the use of the word milestones in the MIPA is synonymous with GAAP and ASC 606.[226]<br><br>225. JX020, at MoneyLion_01813374 (emphasis added).<br><br>226. Notably, and as I will discuss later herein, MoneyLion still did not make GAAP adjustments to net working capital when it prepared the Final Statements in early 2022. | Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 131 | It is a well-established fact that Malka historically recorded revenue based on when invoices were sent to customers.[227] Furthermore, as set forth below, I have seen many instances where the Company's project documentation included billing terms which clearly indicate that Malka would issue invoices at specific times, and those specific times are disconnected from when the work was performed/completed. However, Mr. Dudney ignores this information and incorrectly assumes that Malka should have recognized revenue only as work was performed (which is required by GAAP), because he incorrectly conflates the use of the word milestones with performance obligations. In addition, he followed the instruction to disregard non-cancelable deposits. Mr. Dudney also ignores the fundamental fact that Malka's historical revenue recognition practices are listed as an *exception* to GAAP in Schedule A. As a result, Mr. Dudney's calculation of claimed adjustments is flawed.<br><br>227. See, e.g., Basdekis Tr., 25:2-18, 74:21-24, 76:14-17, 79:1-3, 152:11-15, 153:1-4; Transcript of Deposition of Ryan Curran dated August 15, 2024 ("Curran Tr."), 200:16-201:3; and Scalia Tr., 55:15-23. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 132 | Mr. Dudney states that he analyzed over 1,500 documents to support his proposed revenue adjustments.[228] In his report, he identifies five examples in which he claims Malka "improperly recognized revenue for items that were not non-refundable deposits, where work had not been performed, and where the invoices were not sent according to the SOW's planned project timeline."[229] Of the 2,644 projects in Mr. Dudney's Exhibit 4, I was able to locate documents produced in this matter for | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | approximately 1,000 projects. I reviewed contracts, SOWs, and similar documentation related to those projects.<br><br>228. Dudney Report, p. 22.<br><br>229. Dudney Report, p. 22. | |
| 133 | The nine-month period from January to September 2021 ("September 2021 YTD") is the last period included in the financial statements of the Company as defined in Section 3.06 of the MIPA.[230] I focused my analysis on the projects Mr. Dudney included in his proposed revenue adjustment for this September 2021 YTD period, totaling $(958,778), as a downward adjustment to revenue recognized by Malka.[231] Such adjustments span across 254 projects, of which I was able to match 168 projects to produced documents identified in Exhibit 7 of Mr. Dudney's report. I was not able to identify in Mr. Dudney's Exhibit 7 information for the remaining 86 projects included in Mr. Dudney's adjustments.<br><br>230. JX065, MIPA, § 3.06.<br><br>231. Dudney Report, p. 38, Exhibit 4. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 134 | I have analyzed the 168 projects matched to produced documents to assess whether the documentation included indications of non-cancellable deposits.[232] Based on my analysis of the project documentation, I have categorized these projects as follows: | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |

| ¶¶ | Text | Objection |
|---|---|---|

| Non-Cancellable Deposits Summary (September 2021 YTD) | | |
|---|---|---|
| Category Description | Count of Projects | Adjustment Amount (Decrease to Revenue)[233] |
| Category 1: The documentation included language indicating that the payment is made prior to work commencing, and Malka could keep those fees paid if the project was cancelled. | 21 | $(299,447) |
| Category 2A: The documentation included language indicating that Malka could keep fees if the project was cancelled.[234] | 21 | $(286,834) |
| Category 2B: The documentation was silent or unclear as to whether Malka could keep fees if the project was cancelled.[33] | 111 | $(699,271) |
| Category 3: The documentation included language indicating that Malka could not keep the fees paid if the project was cancelled. | 15 | $(225,737) |
| Subtotal | 168 | $(1,511,289) |
| Add: Projects without documents in Dudney's Exhibit 7 | 86 | $552,511 |
| Total Dudney September 2021 YTD Adjustments | 254 | $(958,778) |

232. I am not expressing a legal opinion as to whether or not the project documentation legally qualifies as a non-cancelable deposit.

233. The adjustment amounts listed in the table reflect the net adjustment amount proposed for each project by Mr. Dudney in his Exhibits 3 and 4 to the Dudney Report. Based on his testimony at his deposition, the adjustment amounts in Mr. Dudney's revised Exhibit 3A and 3B were determined by "treat[ing] the first invoice as the non-cancelable deposit amount and then straightlin[ing] the rest of the activity in the same way that [Mr. Dudney] did before with time cards" (Dudney Tr. 449:13-20) for projects identified in my Category 1 and Categories 1 and 2A, respectively.

234. I understand from Counsel that these projects in Category 2 may qualify as non-cancellable deposits from a legal perspective. When performing my analysis, I reviewed documentation relied upon by Mr. Dudney. Therefore, when I indicate that documentation was silent as to whether fees were refundable or silent as to a specific billing schedule, that does not mean that no such document exists that sets forth those terms for a given project. Rather, it means that these terms were simply not present in the documents Mr. Dudney relied upon.

| ¶¶ | Text | Objection |
|---|---|---|
| 135 | Therefore, adding Category 1 and Category 2A arrives at ($586,282), which is approximately 39% of Mr. Dudney's claimed adjustments of ($1,511,289) for these 168 projects. Adding Category 1, Category 2A, and Category 2B arrives at ($1,285,552), which is approximately 85% of Mr. Dudney's claimed adjustments of ($1,511,289) for these 168 projects. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 136 | Below are examples of language included in project documentation that indicated that Malka could keep fees if the project was cancelled:<br><br>ADP Compliance Solutions Incentives Manager: *"If Client cancels the services herein contracted, MMG shall retain the full sum of the Fee paid by Client."*[235]<br><br>H&M Robbinsville NJ Plant Shoot: *"If Client cancels the services herein contracted without cause, MMG shall retain the full sum of the Fee paid by Client. Fees associated with cancellations cannot be applied to any other services."*[236]<br><br>Bytedance TikTok Global All Hands Conference November 2022: *"If Client cancels the services herein contracted, MMG shall retain the full sum of the Fee paid by Client, except that MMG shall cooperate, whenever practicable to assist Client with repurposing Deliverables towards Client's designated replacement project wherever Fees have been allocated but are yet unexpended."*[237]<br><br>235. For example, see PX232. I understand that this document is an example of Malka's "standard form" SOW template, frequently used for client projects.<br><br>236. For example, see PX222.<br><br>237. For example, see PX095. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 137 | Together, Categories 1 and 2A comprise $(586,282) or 61% of the total adjustment of ($958,778) proposed by Mr. Dudney for September 2021 YTD.[238] Categories 1, 2A, and 2B collectively total ($1,285,552) or 134% of the total adjustment of ($958,778) proposed by Mr. Dudney for September 2021 YTD.[239] Mr. Dudney himself acknowledges that noncancellable deposits is a defined exception in the MIPA, yet despite these projects in Categories 1 and 2A containing language indicating non-cancellable deposits, he ignores clear evidence of such deposits in Malka's historical | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |

| ¶¶ | Text | Objection |
|---|---|---|
|  | project documentation. [240] Thus, Mr. Dudney's proposed adjustments for September 2021 YTD are flawed and should be rejected. | |
|  | 238. Calculated as sum of Categories 1 and 2A: $299,447 + $286,834. | |
|  | 239. Calculated as sum of Categories 1, 2A, and 2B: $299,447 + $286,834 + $699,271. | |
|  | 240. Dudney Report, p. 22. | |
| 138 | While there are 111 projects in Category 2B and 15 projects in Category 3 - in which I identified either terms that were unclear or silent on refundability or terms suggesting fees could be refundable - Mr. Dudney's proposed adjustments for those projects, totaling $(925,007), are still flawed. I have analyzed these 126 total projects to assess whether the documentation contained indications that the Company would bill for its services based on "milestones" as the term was historically used. Based on my analysis of the project documentation, I have categorized these projects as follows: | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |

| ¶¶ | Text | Objection |
|---|---|---|

| Billing Structures for Categories 2B and 3 Projects Summary (Sept. 21 YTD) | | | |
|---|---|---|---|
| Category | Description | Count | Adjustment Amount (Decrease to Revenue) |
| Category A | Documents indicate a payment on the date of execution or references a retainer or bucket of hours to be used throughout the term. Alternatively, documents indicated a one-time payment but is ambiguous about the timing of such payment. | 5 | $(82,560) |
| Category B | Documents did not include specified billing terms. | 59 | $(368,377) |
| Category C | Documents indicate payment based on an achieved event, milestone, or percentage of completed work denoted in the terms. Alternatively, documents indicate multiple payments that are not due to percentage of completion but another form of tracked progress or dates (e.g., end of month, quarterly). | 57 | $(404,573) |
| Category D | Documents indicate payment to be made after work is competed (e.g., upon delivery). | 5 | $(69,497) |
| Total Category 2B and 3 Contracts with September 2021 YTD Adjustments | | 126 | ($925,007) |

| ¶¶ | Text | Objection |
|---|---|---|
| 139 | As shown above, of the 126 projects in Categories 2B and 3, 53% of Mr. Dudney's adjustments fall in Category A, C or D, wherein the documentation had billing terms indicating payments were due on milestones as the term was historically used. The following represent examples of such language from project documentation.<br><br>• Purchase Order dated January 2021; "Description: JAN-21 – FEB-21"; "Payment Terms: Immediate."[241] | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |

| ¶¶ | Text | Objection |
|---|---|---|
| | • Purchase Order dated May 2021; "Pmnt Terms: Immediate Bank Transfer"; "Delivery Date: 12/31/21"[242]<br><br>241. PX035.<br><br>242. PX049. | |
| 140 | Notably, in addition to the 126 projects in Categories 2B and 3, I also analyzed the remaining 42 projects comprising Mr. Dudney's claimed adjustments for September 2021 YTD for which I had documentation. I have not included these 42 projects in the table above, so as to avoid double- counting Mr. Dudney's claimed adjustments, however, refer to the table below for a summary of my analysis for all 168 projects included in Mr. Dudney's September 2021 YTD adjustment for which I identified documentation. My analysis demonstrates to me that many projects had language indicating both non-cancellable deposits and milestones | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |

**Billing Structures Summary (September 2021 YTD)**

| Category Description | Count of Projects | Adjustment Amount (Decrease to Revenue) |
|---|---|---|
| Category A: Documents indicate a payment on the date of execution or references a retainer or bucket of hours to be used throughout the term. Alternatively, documents indicated a one-time payment but is ambiguous about the timing of such payment. | 16 | $(258,775) |
| Category B: Documents did not include specified billing terms. | 71 | $(590,703) |
| Category C: Documents indicate payment based on an achieved event, milestone, or percentage of completed work denoted in the terms. Alternatively, documents indicate multiple payments that are not due to percentage of completion but another form of tracked progress or dates (e.g., end of month, quarterly). | 75 | $(511,279) |
| Category D: Documents indicate payment to be made after work is competed (e.g., upon delivery). | 6 | $(150,532) |
| **Subtotal** | **168** | **$(1,511,289)** |
| **Add: Projects without documents in Dudney's Exhibit 7** | **86** | **$552,511** |
| **Total Dudney September 2021 YTD Adjustments** | **254** | **$(958,778)** |

| ¶¶ | Text | Objection |
|---|---|---|
| 141 | My analysis and the examples above demonstrate to me that, consistent with the testimony in this matter, the Company historically recognized revenue as invoices were issued and milestones were attained – even though such milestones were not in all cases tied to completion of work. As a result, Mr. Dudney's proposed adjustments to September 2021 YTD are flawed and should be rejected. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 142 | In summary, the documents, information and testimony in this matter make it clear that the Company's past practice was to issue an invoice and record revenue when project milestones were achieved. Mr. Dudney ignores testimony indicating the Company's historical use of the word milestone "could mean anything" and incorrectly asserts that the word milestones is synonymous with the term performance obligations in ASC 606. Mr. Dudney ignores the fact that ASC 606 never mentions the word milestones in the definition of performance obligations. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 143 | Mr. Dudney relies on Schedule A to assert that the "Accounting Principles incorporate U.S. GAAP, which codifies its revenue recognition guidance in Accounting Standards Codification 606 – "Revenue Recognition." [243] However, Schedule A makes no mention of ASC 606. [244] Further, Mr. Dudney ignores that the parties specifically negotiated the *removal* of all language referring to ASC 606 in the MIPA and that MoneyLion's own advisor CFGI acknowledged that the Company did not follow a full accrual basis of accounting in its pre-closing analysis.<br><br>243. Dudney Report, pp. 5, 18.<br><br>244. JX065, MIPA, Schedule A. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 144 | Moreover, Mr. Dudney inexplicably ignores clear language that comports with his own identified "narrow exception" to GAAP in the form of non-noncancelable deposits. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 145 | For these reasons Mr. Dudney's proposed adjustments for September 2021 YTD are flawed and should be rejected. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |

| ¶¶ | Text | Objection |
|---|---|---|
| 146 | Mr. Dudney states, "It is my understanding that, at the time, MoneyLion believed that Malka prepared the 2021 financial statements used to prepare the 2021 Earnout Statement in accordance with Schedules A and B of the MIPA (i.e., in accordance with GAAP except for the items enumerated in Schedules A and B of the MIPA). I understand that MoneyLion now asserts that the 2021 financial statements used to prepare the 2021 Earnout Statement were not prepared in accordance with Schedules A and B of the MIPA."[245] As I described in my first opinion above, MoneyLion and Mr. Dudney incorrectly assume that the MIPA contemplates only "narrow exceptions" to GAAP for purposes of calculating revenue. Moreover, as I have described herein, Malka's historical accounting practices – including those used in the 2021 financial statements used to prepare the 2021 Earnout Statement – were clearly described and documented both prior to and following the Closing Date. Mr. Dudney's failure to acknowledge this contemporaneous evidence further undermines the reliability of his conclusions.<br><br>245. Dudney Report, pp. 16-17. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 147 | First, Schedule B of the MIPA relates to the calculation of Revenue and EBITDA for the purposes of the Earnout Calculations.[246] The definition of "Financial Statements" in Section 3.06 of the MIPA only references the Accounting Principles, which are included in Schedule A.[247] Such section does not reference Schedule B. Second, contrary to Mr. Dudney's claims, Schedule A does not provide for solely a "narrow exception to the application of GAAP regarding Malka's recording of revenues."[248] However, even if Schedules A and B contemplated only a "narrow exception" to GAAP as Mr. Dudney asserts, then I would have expected Buyer to have adjusted the Company's Final Closing Working Capital calculation (including, for example, accounts receivable) and 2021 Earnout Statement to comply with GAAP. But Buyer made no such changes.<br><br>246. JX065, MIPA, Schedule B.<br><br>247. JX065, MIPA, § 3.06, Schedule A.<br><br>248. Dudney Report, p, 22; *see also* Dudney Dep. Tr., 50:4-7 ("Q: Okay. You're aware that the word 'narrow' doesn't appear in Schedule A? A: Correct. That's a characterization that I apply"). | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| 150 | Moreover, as explained above, MoneyLion accepted Malka's historical non-GAAP practices, including with respect to revenue recognition, when it approved of the 2021 Earnout Payment on March 15, 2022.[252] By March 15, 2022, MoneyLion had completed its GAAP adjustments to Malka's revenue for the 2021 "stub period," which resulted in a difference of $1,094,132.[253] Nonetheless, MoneyLion did not apply this adjustment to Malka's revenue for purposes of the 2021 Earnout and instead approved of the 2021 Earnout Payment on the basis of Malka's 2021 unadjusted financial statements prepared using its historical accounting practices.[254] As with Final Closing Working Capital, if Schedules A and B required strict compliance with GAAP for purposes of revenue recognition, I would have expected Buyer to have made the GAAP adjustments to Malka's revenue for the 2021 stub period that had already been made for SEC reporting purposes as of March 15, 2022.[255]<br><br>252. *See* ¶ 58, *supra.*<br><br>253. *See* ¶ 58, *supra.*; PX 196 at MoneyLion_0187935 (produced in native excel).<br><br>254. *See* ¶ 57, *supra.*; JX 74 at MoneyLion_01817462; JX 83 at MoneyLion_01826070.<br><br>255. As set forth above, Buyer and its advisors also tracked Malka's performance towards the 2022 Earnout using the Company's unadjusted financial statements prepared using its historical accounting principles, and not strict GAAP, even though MoneyLion had access to Malka's GAAP-adjusted financials throughout 2022. *See* ¶ 59, *supra.* | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 151 | In his report, Mr. Dudney calls out five examples of projects that he claims "evidence Malka's departure from the Accounting Principles," which Mr. Dudney incorrectly concludes means ASC 606.[256] Mr. Dudney's reliance on these examples is misplaced. For all five projects, Mr. Dudney claims that work was performed, at least in part, in 2022 and, therefore, Malka improperly recognized revenue on the projects, at least in part, in 2021.[257] However, Mr. Dudney ignores that MoneyLion had the opportunity to review Malka's 2021 revenue prior to approving of the 2021 Earnout Statement, yet chose not to make any adjustments to Malka's 2021 financial statements even though it had already completed its stub period GAAP adjustments prior to approving of the 2021 Earnout, which reflected a difference between Malka's historical revenue recognition practices and GAAP.[258] Further, revenue for four out of five of the projects that Mr. Dudney emphasizes was recognized by Malka after the Closing Date | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | of November 15, 2021, and revenue for the fifth project, was recognized in part after the Closing Date.[259] Thus, not only was revenue in connection with these projects recognized at a time when MoneyLion owned Malka, but to the extent that revenue was recognized after September 30, 2021, it was not included in the financial statements for the nine-month period from January to September 2021, which is the last period included in the financial statements of the Company as defined in Section 3.06 of the MIPA. [260] | |
| | 256. Dudney Report, pp. 23-32 | |
| | 257. Dudney Report, pp. 23-32. | |
| | 258. PX0196, at MoneyLion_0187935 (produced in native excel). | |
| | 259. Dudney Report, pp. 23-32. | |
| | 260. JX065, MIPA, § 3.06. | |
| 152 | Perhaps most notably, the following two projects emphasized by Mr. Dudney were actually reviewed and adjusted by MoneyLion as part of its stub-period work in early 2022: | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 153 | Mr. Dudney's first example is a project for Malka's customer Proximo titled "2022 Three Olives Retainer." [261] In connection with this project, Malka invoiced Proximo $400,000 (in four, $100,000 invoices) on November 19, 2021, and recognized revenue at that time, while work on the project began in 2022. [262] November 19, 2021 was after the Closing Date and was part of the "stub period" for which MoneyLion made GAAP adjustments to Malka's 2021 revenue for SEC reporting purposes. Thus, not only did MoneyLion own Malka at the time that it both invoiced Proximo and recognized revenue in connection with this project, but MoneyLion also actually made adjustments to the way that Malka recognized revenue for this Proximo project as part of its stub period adjustments in early 2022, as reflected on the spreadsheet that Mr. Scalia shared with MoneyLion's auditors and CFGI in early February 2022. [263] MoneyLion's GAAP adjustments to revenue recognized in connection with the Proximo "2022 Three Olives Retainer" could have been, but were not, included for purposes of the 2021 Earnout. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
|  | 261. Dudney Report, pp. 23-26. | |
|  | 262. Dudney Report, pp. 23.26. | |
|  | 263. PX0196, at MoneyLion_0187935 (produced in native excel), Row 8. | |
| 154 | I also note that Mr. Fried was asked about this project at his deposition and about Malka's invoicing practices with respect to Proximo as a client.[264] Mr. Fried testified that he believed that there was a master services agreement between Malka and Proximo and that "the invoicing practice with Proximo was a client-driven invoicing process" where "they had a variety of different brands, that each had different initiatives around different timelines and milestones. So we would work with them based on the needs of their specific brands and their specific initiatives."[265] With respect to the Proximo "2022 Three Olives Retainer" project in particular, Mr. Fried explained that Proximo—which he described as a "good marquee client for Malka, for MoneyLion"[266]—"had an additional ….$400,000" at the end of 2021 "that they wanted to spend with us."[267] Mr. Fried explained that "Q4 is typically … Malka's busiest quarter, because, in marketing, clients typically find remainders of money and they need to allocate it to certain initiatives or to certain projects."[268] Mr. Fried received a "direction" from Proximo to invoice them $400,000 "for a specific subbrand," Three Olives vodka, and Mr. Fried "believe[s] the client had specific timing milestones that they were attributing some of the different work to," so he instructed that Proximo be invoiced $400,000 in four different $100,000 invoices tied to different projects.[269] | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
|  | 264. Fried Tr., 304:3-319:20. | |
|  | 265. Fried Tr., 305:16-306:13. | |
|  | 266. Fried Tr., 319:13-17. | |
|  | 267. Fried Tr., 310:9-14. | |
|  | 268. Fried Tr., 312:2-12. | |
|  | 269. Fried Tr., 311:3-314:22. | |

| ¶¶ | Text | Objection |
|---|---|---|
| 155 | Mr. Dudney ignores both that MoneyLion itself made GAAP adjustments to the Proximo "2022 Three Olives Retainer" in early 2022 and Mr. Fried's testimony. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 156 | In his report, Mr. Dudney refers to six additional Proximo projects for which revenue was recognized in 2021, and he claims that adjustments should be made to each project to move revenue out of 2021.[270] I note that, like the 2022 Three Olives Retainer project, each of these six other Proximo projects were invoiced *after* the Closing Date and were specifically addressed in Mr. Scalia's February 2, 2022 stub-period schedule of GAAP-based revenue recognition adjustments, and Mr. Scalia adjusted revenue recognized for each of these projects for SEC reporting purposes.[271] However, as with the 2022 Three Olives Retainer, even though MoneyLion had made GAAP adjustments to these projects prior to March 15, 2022, it nonetheless approved of the 2021 Earnout based on Malka's historical non-GAAP revenue recognition practices, without including these adjustments.<br><br>270. Dudney Report, p. 26, Figure 8.<br><br>271. PX0196, at MoneyLion_0187935 (produced in native excel), Row 16 (Kraken Rum 2022 Social Content), Row 17 (Proper Twelve 2022 Proper No. 12 – Lifestyle Shoot), Row 24 (Proper Twelve 2022 Super Bowl Planning), Row 11 (P12 2021 EOY Social Assets), Row 44 (Proper Twelve ITK Bowl 2022 Sponsorship), Row 45 (Three Olives Vodka ITK Bowl 2022 Sponsorship). | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 157 | Mr. Dudney's second example is a project for BetMGM that was memorialized in a written contract dated October 15, 2021.[272] Mr. Dudney claims that Malka incorrectly recognized $500,000 of revenue in connection with this project on December 9, 2021, the date the invoice was sent to the client, while work was performed in 2022.[273] Like the Proximo projects, the revenue in connection with the BetMGM project was invoiced *after* the Closing Date and was recognized after the Closing Date, and was reviewed and adjusted by Mr. Scalia in early 2022 as part of his stub period work, prior to approval of the 2021 Earnout.[274] In fact, as early as January 2022, Mr. Scalia was working with MoneyLion's outside auditors, RSM, to review the BetMGM project as part of the "rev rec analysis" that they were performing at that time.[275]<br><br>272. Dudney Report, pp. 26-29; PX192 at MoneyLion_01818144. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | 273. Dudney Report, ¶ 54. | |
| | 274. PX196, at MoneyLion_0187935 (produced in native excel), Row 6. | |
| | 275. JX070 (Jan. 12, 2022 Email from Scalia re: Agenda for RSM Malka Rev Rec Meeting); PX192 (Jan. 14, 2022 Email from Scalia to RSM, copying Basdekis and CFGI, attaching BetMGM SOW). | |
| 158 | Furthermore, the contract between Malka Sports and BetMGM provides for milestone billing, as described by Mr. Krubich and Mr. Fried. In particular, it provides that Malka Sports "shall receive a payment equal to a flat, all-in fee of One Million U.S. Dollars … payable as follows: (i) Fifty percent (50%) upon execution hereof, and (ii) Fifty percent (50%) payable in four equal installments (e.g., $125,000 per installment) on each of the following dates: March 31, 2022, June 30, 2022, September 30, 2022, and December 31, 2022."[276] "The aforesaid compensation will be payable within thirty (30) days of the receipt of an invoice or statement of work" from Malka Sports.[277] MoneyLion's schedule reflecting its adjustments to Malka's 2021 stub period revenue recognition likewise reflects that the "Billing Schedule" for the BetMGM project is "50 - 12.5 - 12.5 - 12.5 - 12.5."[278]<br><br>276. PX192, at MoneyLion_01818156.<br><br>277. PX192, at MoneyLion_01818156.<br><br>278. PX196, at MoneyLion_0187935 (produced in native excel), Row 2, Column I. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 159 | Mr. Dudney ignores MoneyLion's stub period adjustments for this project and the fact that the BetMGM contract provides for milestone-based billing. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 160 | In summary, while Mr. Dudney acknowledges that "MoneyLion believed that Malka prepared the 2021 financial statements used to prepare the 2021 Earnout Statement in accordance with Schedules A and B of the MIPA …", he fails to acknowledge that the methodology negotiated by the Parties and memorialized in the MIPA for determining the 2021 Earnout Calculation and 2021 Final Closing Working Capital was distinctly different from MoneyLion's GAAP practices.[279] The revenue amount utilized to determine the 2021 Earnout Payment was the same revenue amount included in the financials that MoneyLion's Director of SEC Reporting and MoneyLion's external auditors were discussing in early 2022. When MoneyLion prepared the 2021 Earnout | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | Statement, they easily could have, but did not, make GAAP adjustments to the 2021 Revenue or EBITDA amounts included in the 2021 Earnout Statement. 279. Dudney Report, p. 16. | |
| 161 | In the Dudney Report, Mr. Dudney states, "I am not offering an opinion on the accuracy of the 2022 Earnout Statement at this time, however, I reserve the right to respond to any criticisms of the 2022 Earnout Statement Malka and its experts may offer." [280] In the Dudney Rebuttal Report, Mr. Dudney responds to certain opinions that I expressed in my first report regarding the 2022 Earnout Calculation. None of Mr. Dudney's responses to my opinions change my views. 280. Dudney Report, footnote 68. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 162 | <u>First</u>, Mr. Dudney states that my opinion regarding revenue recognition in the 2022 Earnout Statement is flawed, because I relied on Malka's actual pre-closing accounting practices, which, according to Mr. Dudney, are inconsistent with Schedule A. [281] As set forth in detail above, my opinion is that the MIPA required Buyer to calculate Malka's revenue for purposes of the 2022 Earnout Payment using Malka's historical non-GAAP revenue recognition practices, as it did for the 2021 Earnout Payment, and that by failing to do so, Buyer understated Malka's revenue by at least $895,517. [282] Mr. Dudney's disagreement with my opinion, and insistence that revenue for purposes of the 2022 Earnout Payment must be calculated in accordance with ASC 606, is based upon his same flawed reading of the MIPA and disregard for the contemporaneous records, which I describe in detail above. 281. Dudney Rebuttal Report, pp.4-8. 282. *See* ¶¶ 43 and 61, *supra*. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 163 | In footnote 26 of the Dudney Rebuttal Report, Mr. Dudney states that "based on my project-by-project analysis, adjustment Malka's 2022 NetSuite revenue amounts based on project start and end dates would reduce Malka's revenue recognized by approximately $3.5 million (Initial Report, Ex. 4)." [283] Approximately $2.5 million of this proposed adjustment relates to MoneyLion projects for "Retained Creative Services." [284] Mr. Dudney testified that such adjustment is due to the fact that there was no time card data for these projects in 2022. [285] Mr. Dudney ignores the fact that | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | MoneyLion's wholly owned subsidiary its parent company for work in 2022 and instead relies solely on time card data to conclude that absolutely no work was performed and therefore no revenue can be recognized in 2022.[286] Additionally, Mr. Dudney is the first person to raise the allegation that no work was performed by the retained teams. This is in direct contradiction to Mr. Torossian's assertion that the retained teams were working on both MoneyLion and other clients and a significant departure from MoneyLion's own 2022 Earnout Statement. To my knowledge, MoneyLion did not raise this allegation during good faith negotiations. Instead, the negotiations were based on MoneyLion's proposed adjustments to revenue of only $895,517. | |
| | 283. Dudney Rebuttal Report, p. 8 n. 26. | |
| | 284. Dudney Initial Report, Ex. 4. | |
| | 285. Dudney Tr. 378:21-24, 379:14-15. | |
| | 286. Dudney Tr. 381:3-13. | |
| 164 | Second, in the Dudney Rebuttal Report, Mr. Dudney states that my opinions related to certain categories of expenses included in the 2022 Earnout Statement are unreliable.[287] In particular, Mr. Dudney notes that MoneyLion's position is that "the 2022 Earnout Statement should record expenses in accordance with GAAP."[288] I disagree with this position for the reasons set forth above. I understand that the Court will determine the legal meaning of the MIPA, but my accountant's reading, based on the documents and information I considered, is that both revenue and expenses for purposes of the 2022 Earnout Statement should be determined using Malka's historical accounting principles, not GAAP, consistent with Schedules A and B and MoneyLion's practice for the 2021 Earnout Statement. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| | 287. Dudney Rebuttal Report, pp. 9-16. | |
| | 288. Dudney Rebuttal Report, p. 11. | |
| 165 | Mr. Dudney also refers to MoneyLion's claim that "Malka failed to disclose that the costs of personnel directly involved in servicing its clients were excluded from its cost of goods sold, leading to overstated gross profits in its financial statements." However, Mr. Dudney ignores the fact that Malka's financial statements for the years ended | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | 2019 and 2020 and the nine months ended September 30, 2021, which were available to Buyer prior to the Closing Date and included in the Disclosures Schedules to the MIPA, specifically disclosed the salaries and wages line item under General and Administrative Expenses. Thus, Mr. Dudney's "Gross Profit Adjustment" is improper and unsupported. | |
| 166 | <u>Third</u>, in the Dudney Rebuttal Report, Mr. Dudney states that my analysis supporting the inclusion of the New Jersey Tax Credit is unreliable. [289] Mr. Dudney notes that MoneyLion asserts that the 2019 Tax Credit should not have been included in the 2021 Earnout Statement, but he fails to mention the fact that when Mr. Basdekis sent MoneyLion Malka's unadjusted (*i.e.* non-GAAP) financial statements for purposes of the 2021 Earnout on February 15, 2022, he noted that "the only thing not reflected is the tax credit which is allowable under MIPA." [290] When preparing the final 2021 Earnout Statement, which MoneyLion sent to Sellers on March 15, 2022, *MoneyLion itself* added the full amount of the New Jersey Tax Credit in the amount of $890,905. [291]  289. Dudney Rebuttal Report, pp. 16-20.  290. JX074.  291. JX083. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 167 | In addition, Mr. Dudney claims that "from an accounting standpoint, the 'expected recognition' of the Tax Credit would be similar to the recognition of a contingent gain. Under GAAP, contingent gains are not recognized until the gain is realized or realizable." [292] The MIPA does not require GAAP to be applied in the determination of the expected recognition of the New Jersey Tax Credit. As such, it is not appropriate to interpret the undefined term "expected recognition" through a GAAP lens. Doing so would be reading language into the MIPA that was not agreed upon by the Parties. The MIPA could have, but did not, define "expected recognition." Further, the MIPA also could have, but did not, include specifications or guidance for calculating the expected recognition. As a result, one should only read the words as they are written – e.g., "expected recognition" plainly means that one **expects** the Company to **recognize** (i.e., record) the New Jersey Tax Credit in the year it is applied for. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |

| ¶¶ | Text | Objection |
|---|---|---|
| | 292. Dudney Rebuttal Report, p. 17. | |
| 168 | <u>Fourth</u>, Mr. Dudney states that my opinion regarding the fair market value of intercompany services provided by Malka to MoneyLion in 2022 is unreliable. He cites to a section of ASC 606 related to "Allocation of Transaction Price to Performance Obligations" as well as the IRS's guidance on arm's length transfer price.[293] Neither source is applicable for the determination of fair market value in this dispute. First, the portion of ASC 606 cited relates to how a company should allocate an already established purchase price to multiple performance obligations.[294] This literature in ASC 606 is only applicable in scenarios where a transaction price (e.g., the amount a marketplace buyer is willing to pay) is established and does not apply to establishing what the transaction price should be at the onset. <br><br> 293. Dudney Rebuttal Report, p. 22. <br><br> 294. PX392, at 606-10-05-4, 606-10-32-28, 606-10-32-31. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 169 | Further, the IRS publication cited is titled "LB&I International Practice Service Transaction Unit" and states that "IRC section 482 provides the authority for the IRS to make allocations between controlled parties to clearly reflect the income of each of the parties. The arm's length standard is the standard the IRS has adopted for implementing the clear reflection of income principle for controlled transactions under IRC section 482."[295] This earnout calculation does not involve the IRS making allocations between controlled parties and nowhere in the MIPA does it required the earnout be calculated in accordance with IRS standards. <br><br> 295. 26 CFR § 1.482-9; "LB&I International Practice Service Transaction Unit," *Internal Revenue Service*, https://www.irs.gov/pub/int practice units/ISI9422 09 06.PDF. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) |
| 170 | <u>Fifth</u>, Mr. Dudney states that my opinion regarding the improper inclusion of corporate level bonuses in the 2022 Earnout Statement fails to consider that Sellers requested the bonuses and that bonuses were not inconsistent with the overall 2022 Budget. The emails cited by Mr. Dudney show that when Mr. Frommer initially requested whether MoneyLion could put in place a bonus program for a set group of employees working on the MoneyLion account, MoneyLion said that was not possible and no bonuses were paid in 2022. Then, as I describe above, in 2023, MoneyLion | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 13−14)) |

| ¶¶ | Text | Objection |
|---|---|---|
|  | informed Sellers that MoneyLion had budgeted for a pool of employee bonuses and bonuses were ultimately paid in 2023.[296] Further, Mr. Dudney's claim that the total "Compensation & Benefits" is consistent with the 2022 Budget, is irrelevant. The 2022 Budget (Exhibit B of MIPA) clearly has a line item titled "Bonus" within the "Compensation & Benefits" grouping which only included $15,000 of bonuses for 2022. Whether the total Compensation & Benefits category overall was in line with the overall budget is irrelevant and ignores the core issue. In my experience, the inclusion of a budget in an agreement providing for an earnout, such as this one, is to protect sellers (and their potential earnout payments) from decisions made by buyers postclosing. In this instance, bonuses were considerably more than the $15,000 budgeted for in 2022 and therefore, not consistent with the 2022 Budget.<br><br>296. *See* ¶¶ 99-101, *supra*. |  |
| 171 | <u>Sixth</u>, Mr. Dudney states that my analysis of the adjustment related to the MoneyLion retained teams is flawed. As mentioned above, Mr. Dudney testified that there was no time card data for retained teams projects in 2022.[297] However, MoneyLion's position has always been that while the retained teams performed work for MoneyLion, they also performed some work for other customers. Such assertion is the basis for their proposed downward adjustment of $218,170 to revenue and EBITDA in the 2022 Earnout Statement. If Mr. Dudney's assertion that retained teams did not perform *any* work on MoneyLion projects during 2022 is correct, then one would have expected MoneyLion's proposed adjustment to reduce such services to $0, rather than reducing them by $218,170. As such, Mr. Dudney's assertion is illogical and contradictory to MoneyLion's proposed adjustments.<br><br>297. Dudney Tr. 378:21-24, 379:14-15. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14)) |
| 176 | Buyer's utilization of a GAAP-based income statement, rather than one based on the Company's historical accounting practices, to calculate revenue and expenses for purposes of the 2022 Earnout is unsupported and inconsistent with the Revenue and EBITDA Calculation Principles set forth in Schedule B of the MIPA, resulting in an understatement of Revenue and EBITDA. | Unreliable and unhelpful testimony, legal opinion (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |

| ¶¶ | Text | Objection |
|---|---|---|
| 179 | Buyer's 2022 Earnout Statement improperly includes a downward adjustment resulting from the Buyer's corporate-level decision to pay bonuses to Company employee in a manner inconsistent with the 2022 Budget, thereby understating 2022 EBITDA by $529,500. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |
| 180 | Buyer's 2022 Earnout Statement improperly includes a downward adjustment for "retained teams," thereby understating 2022 revenue and EBITDA by $218,170. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14)) |
| 183 | Mr. Dudney incorrectly assumes that Malka had zero contracts that contained noncancelable deposits, resulting in flawed conclusions and adjustments to Revenue and EBITDA. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 184 | Mr. Dudney's calculated adjustments to Malka's revenue rely upon a series of unsupported assumptions, each of which is contradicted by evidence in this matter. As a result, Mr. Dudney's conclusions and adjustments are fundamentally flawed. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (Larson *Daubert* Motion (Dkt. 143 at 14−18)) |
| 186 | The Dudney Rebuttal Report fails to meaningfully rebut my opinions related to the 2022 Earnout Payment. | Unreliable and unhelpful testimony (Federal Rule of Evidence 702) (*See generally* Larson *Daubert* Motion (Dkt. 143)) |