UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- x

JEFFREY FROMMER, *et al.*,

                  Plaintiffs,

               v.

MONEYLION TECHNOLOGIES INC., *et ano.*,

                  Defendants.

---------------------------------------------------------------------- x

Case No. 1:23-cv-06339-JMF

## <u>DECLARATION OF JEFFREY FROMMER</u>

I, JEFFREY FROMMER, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.      I submit this declaration as my direct trial testimony, pursuant to the Court's Order dated August 29, 2024 (ECF No. 123) and Paragraph 6.E.i. of the Court's Individual Rules and Practices in Civil Cases.

2.      In preparation for this testimony, I have reviewed numerous documents to refresh my recollection and to ensure the accuracy of my testimony as to the parties' various oral and written communications during 2021-2024. These include documents and audio files which were produced in this litigation, as well as publicly available documents.

3.      I am one of the plaintiffs in this action, along with Louis Krubich, Daniel Fried, and Pat Capra (together, "Sellers"). I understand that I may be cross-examined in person at trial by counsel for MoneyLion Technologies Inc. and MoneyLion (together, "MoneyLion").

4.      I have described the facts set forth in this declaration to the best of my recollection based upon my personal knowledge as well as a review of the relevant records.

**PX415**

5.     Each of the Sellers is a prior owner-member of Malka Media Group LLC ("Malka") and a party to the Membership Interest Purchase Agreement, dated November 15, 2021 (the "MIPA"), pursuant to which MoneyLion acquired Sellers' membership interests in Malka (the "Acquisition").   Following the Acquisition, Malka became a wholly owned subsidiary of MoneyLion, and I remained an employee of Malka and MoneyLion until May 19, 2023.

## EDUCATIONAL AND WORK HISTORY

6.     I live in Weehawken, New Jersey.  I graduated from Rutgers University in 2007 with a bachelor's degree in economics. I met and befriended Mr. Krubich at Rutgers, as he was one year below me.

7.     After graduation, I worked as a sales representative at Intercall, an audio conferencing company, before joining Adobe Systems as an account manager.

8.     In or about 2014, I joined Malka (which Mr. Krubich had founded) as its President. As President, my role was to help Mr. Krubich operationalize the business, and to grow it through driving sales.

## MALKA'S OPERATIONS

9.     In 2015, Mr. Fried, with whom Mr. Krubich had worked at Comedy Central prior to founding Malka, joined Malka as a managing partner and Mr. Krubich and I agreed to add Mr. Fried as a member of Malka.  Messrs. Krubich and Fried were both experienced in creative media and marketing, and both had connections to prominent people in the entertainment industry in Los Angeles.  Mr. Fried brought a unique creative experience to the table from the agency side of the business, and we felt that he would round out the leadership team with respect to skillsets and culture.

10.     In contrast to Messrs. Krubich and Fried, who spent the majority of their time working with Malka's media clients, I oversaw the company's sales and account management

functions, working primarily to grow our client base. Given my enterprise sales experience at Adobe, Malka had success in working with B2B (business-to-business) and enterprise clients such as IBM, KPMG, Amazon Web Services, and many others.

11. Mr. Capra was and is a sports agent, and I met him through Mr. Krubich in about 2014, as Malka had begun producing content for some of Mr. Capra's athlete clients. As one example, Malka had filmed and produced the Tackle Sickle Cell philanthropic event organized by the McCourty twins, both NFL players and clients of Mr. Capra's.

12. Later, in about 2017 or 2018, the four of us formed Malka Sports LLC ("Malka Sports") since linking a creative and marketing content production agency (whose clients were mostly corporate brands) with a sports agency (whose clients were prominent athletes who could be featured in brand marketing) seemed like an excellent opportunity. Malka Sports had two members, each with a 50 percent interest: Mr. Capra and Malka—the latter's members in turn being Messrs. Krubich, Fried, and myself.

13. On or about June 18, 2021, Mr. Capra assigned his 50 percent interest in Malka Sports to Malka, and all four Sellers entered into a Second Amended and Restated Operating Agreement, whereby Mr. Capra was admitted as the fourth member of Malka. PX059 (MoneyLion_01397872) is a true and correct copy of the assignment agreement with Mr. Capra; and PX057 (MoneyLion_00997752) is a true and correct copy of the Second Amended and Restated Operating Agreement.

14. I became acquainted with MoneyLion through Bill Davaris, whom I had met several years earlier as he was leaving his Chief Creative Officer role at Ogilvy, a marketing and public relations agency. Subsequently, Malka did some creative work for an agency which Mr. Davaris co-founded. When he became Chief Marketing Officer of MoneyLion, he hired Malka

3

and, over time, the client relationship grew. I recall that Malka helped MoneyLion with its initial NASCAR sponsorship announcement, various product videos, marketing support for customer acquisition, and numerous other content and creative services needs.

### MALKA'S PRE-ACQUISITION ACCOUNTING, FINANCE, AND INVOICING

15.    In or about late 2016, Mr. Krubich and I interviewed and hired Ryan Curran, a Certified Public Accountant with his own firm then called Curran Unger LLP (now known as Curran LLP) to prepare Malka's tax returns. Mr. Curran also prepared my personal tax returns and still does. To my knowledge, neither Mr. Curran nor anyone from his firm was ever involved in Malka's client invoicing, which was handled internally by Malka's Client Services and Finance teams.

16.    As Malka expanded, we hired a Client Services team of client account managers, who were primarily responsible for negotiating the terms of client agreements and statements of work and for most day-to-day client relationship management, including invoicing.

17.    Malka's Finance team worked with the Malka's Client Services team to manage invoicing based on the contracts and statements of work negotiated by the Client Services team. Malka's Finance team also was responsible for, among other things, maintaining Malka's financial books and records, managing Malka's cash flows, and handling accounts receivable and accounts payable.

18.    In or about March 2020, Malka hired Matthew Basdekis as Head of Finance. Mr. Basdekis reported regularly to me and the other Sellers about Malka's finances and profitability, and I viewed Mr. Basdekis as highly competent, capable, and trustworthy. I felt that Sellers could rely on Mr. Basdekis and his Finance team to manage Malka's books and keep us apprised of its financial performance (as he did throughout the time we worked together).

## INVOICING UPON MILESTONES

19.     Malka typically would invoice its customers at the start of the project and upon completion.  Many Malka clients had preferences as to the timing and intervals of invoices, and Malka accommodated its clients' preferences whenever possible, so our statements of work and other project documentation could and often did specify different invoicing dates.  These invoicing dates were typically requested by and negotiated with the client based on its own business and financial considerations.  Malka did not send client invoices at unexpected or random times.  I cannot recall any instance in which a client complained that it had received an unexpected invoice, and I strongly doubt that it ever happened.

20.     In preparation for my trial testimony, I have reviewed some representative examples of Malka's statements of work that I executed on behalf of Malka.  These have refreshed my recollection as to certain of Malka's invoicing practices prior to the Acquisition.

21.     For example, PX034 (MoneyLion_02042043-52) is a true and correct copy of a Statement of Work dated January 12, 2021 between Malka and ADP, Inc. (the "ADP SOW").  The ADP SOW was created in the ordinary course of Malka's business, and it was Malka's ordinary course of business to create such statements of work.  The ADP SOW provides that Malka will produce a series of award videos for ADP's 2021 Meeting of the Minds Event taking place in April 2021.  The ADP SOW defines certain dates as "milestone dates" that are tied to certain "milestone names."  The "milestone names" include "Pre-Production," "Production," "Post-Production," and "Quality Control."  The ADP SOW provides that the project will be performed for a fixed fee not to exceed $96,960 and that Malka will invoice ADP 25 percent of this fee at execution of the ADP SOW / Pre Production (first "milestone"), 25 percent at Production (second "milestone"), 25 percent at Post Production (third "milestone"), and 25 percent at Quality Control & Final Delivery (fourth "milestone").

22.     The ADP SOW is consistent with my understanding that milestones referred to points in a contract, meaning events or dates, determined by Malka and its customers. Sometimes, as in the ADP SOW, the project documentation used the word "milestones," and sometimes it just referred to the event or date on which an invoice would be sent. As in the ADP SOW, the first milestone was often the execution of the statement of work or other project documentation.

23.     PX045 (MoneyLion_02074892) is a true and correct copy of a Statement of Work dated March 29, 2021 between Malka and S-Dice Inc. (the "S-Dice SOW"). The S-Dice SOW provides for Malka to provide certain professional consulting services for S-Dice. The S-Dice SOW provides for an upfront payment of 30 percent of the total $41,250 fee ($12,375) "due prior to commencement of the SOW," with another $18,500 due on May 1, 2021, and the final $10,375 due June 1, 2021. Thus, this is another example of Malka invoicing a client at specified intervals. The S-Dice SOW was provided to MoneyLion in the due diligence data room prior to the Acquisition.

24.     I have also reviewed Malka's monthly sales detail by customer for 2019 and 2020 that was provided to MoneyLion in the due diligence data room prior to the Acquisition. PX027 (MoneyLion_02075225.) That file reflects that in 2019 and 2020, Malka regularly invoiced customers, such as ADP, Verizon Media, Morgan Stanley, MongoDB, and Slugger Creative on the occurrence of certain "milestones."

## UPFRONT DEPOSITS

25.     Malka's monthly sales detail by customer for 2019 and 2020 (PX027 (MoneyLion_02075225)) also reflects that in 2019 and 2020, Malka regularly invoiced customers, such as ADP, IBM, New York Road Runner, Verizon Media, National Society of Leadership and Success, Twitch, Washington Post, MongoDB, and others a "50% deposit" or "first 50%" and then a "final 50%" or "last 50%." This is consistent with my recollection that Malka agreed with many

clients to send two invoices:  (1) a 50 percent upfront fee or deposit upon execution of the statement or work or other project documentation and (2) 50 percent due upon completion of the project.

26.    For example, PX085 (MoneyLion_02043807-12) is an example of a statement of work that I signed on August 31, 2021 between Malka and Sway, wherein Malka agreed to produce one sizzle reel for Sway and to invoice Sway 50 percent upon signature and 50 percent upon project completion (the "Sway SOW").

27.    PX039 (MoneyLion_02042287) is a true and correct copy of a work order effective February 18, 2021, between Malka and Amazon.  This work order was created in the ordinary course of Malka's business, and it was Malka's ordinary course of business to create such work orders.  The deliverables would be seven Global All Hands Meeting Videos, to be filmed across 12 days in 6-7 locations in the United States and Europe.  Amazon was to pay 50 percent of the anticipated total fee of $333,600 as an upfront deposit and the remaining balance "will be billed upon tracked production burn . . ."  PX039 at MoneyLion_02042287.

28.    Based on my review of documents that I signed, my recollection is also refreshed that Malka's statements of work often included language that "[i]f Client cancels the services herein contracted, MMG shall retain the full sum of the Fee paid by Client."  For example, PX042 (MoneyLion_02072535-37) is a true and correct copy of an agreement dated March 16, 2021 between Malka (signed by me) and Penn National Gaming (the "Penn Agreement").  The Penn Agreement provides that Penn National Gaming will paid Malka a retainer of $20,000 a month for six months within 30 days of receipt of an invoice.  The Penn Agreement, which was provided to MoneyLion in the due diligence data room prior to the Acquisition, includes the language regarding cancellation that I quoted above.  The Sway SOW also includes the same language. PX085 at MoneyLion_02043809.

29.     Mr. Basdekis, as Malka's Head of Finance, was highly familiar with Malka's invoicing practices, and his Finance team worked with the Client Services team to manage the invoicing process.  The Client Services team had almost sole responsibility for generating invoices, while Mr. Basdekis was responsible for determining whether and how revenue and expenses were recognized for accounting purposes.

30.     Both before and after the Acquisition, I relied on Mr. Basdekis, and Mr. Curran, for accounting-related matters and did not have independent knowledge of how Malka recognized revenue or expenses prior to the Acquisition.  Any knowledge that I had about Malka's pre-Acquisition revenue or expense recognition practices came from Mr. Basdekis and Mr. Curran.

**THE CONNECTONE LOAN AND THE 2019 AND 2020 REVIEWED FINANCIALS**

31.     In 2020, Malka sought and obtained a line of credit from ConnectOne Bank ("ConnectOne").  In connection with that line of credit, ConnectOne requested that Malka provide it with financials statements reviewed by an accountant, so Mr. Curran prepared the requested financial statements for Malka.  To the best of my recollection, I had no role in preparing Malka's financial statements for ConnectOne.  I relied on Mr. Basdekis's team and Mr. Curran to analyze and organize the underlying information and prepare these documents.  My role was to facilitate this process, getting from Mr. Basdekis and/or Mr. Curran whatever ConnectOne had requested.

32.     In connection with my preparation of this testimony, I reviewed an email exchange between myself and Mr. Curran dated March 1-2, 2021, in which Mr. Curran referenced his review of Malka's financial statements for ConnectOne.  JX002 (MoneyLion_01995321-23) is a true and correct copy of that email exchange.  Mr. Curran wrote to me that he was preparing "the annual reviewed financial statement that the bank requires. We basically do a deep dive into the numbers and prepare a GAAP financial statement in accordance with CNOB's requirements. The financial statement is also useful for your creditors and vendors who request CPA quality financials."

JX002 at MoneyLion_01995322-23.  CNOB refers to ConnectOne.  I then responded, "[w]ould this also be what an investor requires. Audited financials?" Mr. Curran corrected me, "[t]hese aren't audited, they are reviewed. It's similar, but one less level of assurance. An investor would be interested in these statements, absolutely."  JX002 at MoneyLion_01995322.

33.    I have no understanding of what makes a financial statement a GAAP financial statement or not.  However, this exchange refreshes my recollection that Mr. Curran informed me on March 1, 2021 that he was preparing a GAAP financial statement for CNOB.

## THE ACQUISITION

34.    On or about June 9, 2021, Mr. Krubich and I attended a dinner in New York with MoneyLion's Dee Choubey (CEO), Rick Correia (President, CFO, and Treasurer), and Bill Davaris (Chief Marketing Officer), who remained my closest acquaintance at MoneyLion.  At the dinner, the MoneyLion executives said that MoneyLion was going public soon and was interested in acquiring Malka.  The MoneyLion team expressed that they saw Malka's creative and marketing content production as a potential differentiating factor within a crowded field of financial technology companies with which MoneyLion competed.  PX078 (MoneyLion_01111205-07) is a true and correct copy of an email chain referencing our dinner meeting and another meeting at MoneyLion's offices in New York on June 11, 2021.

35.    As these executives explained to me, MoneyLion saw significant value in acquiring a company that could create high-quality marketing and promotional content (sometimes featuring famous athletes and other celebrities, in fact), as Malka had already been doing for MoneyLion for about four years—and thereby expand MoneyLion's customer base and brand recognition.

36.    Around that time, Sellers were open to the idea of a potential acquisition, but did not engage an investment bank or other service providers in search of buyers.  We were happy to continue running Malka if the right opportunity did not present itself.

37.     On June 14, 2021, in advance of an anticipated meeting with MoneyLion about the Acquisition, I sent a number of documents to MoneyLion's New York-based officers and executives including Messrs. Choubey, Correia, and Davaris, and Adam VanWagner (Chief Legal Officer and Secretary).  Among these documents were Malka's 2019 and 2020 financial statements that Mr. Curran had reviewed, a pitch slide deck prepared by Mr. Basdekis and myself (the "June 2021 Pitch Deck"), Malka's income statement for the first quarter of 2021 (prepared by Mr. Basdekis), and information about Malka's accounts receivable and partially invoiced sales orders as of that date.  JX005 (MoneyLion_01149848) is a true and correct copy of the email that I sent with all its attachments.

38.     As set forth in the June 2021 Pitch Deck, one of the most valuable aspects of Malka was its Network of episodic podcast and video series.  The Network, which included series featuring notable athletes and other celebrities, had 40 million followers on social media and a reach of 350 million monthly impressions.  As the June 2021 Pitch Deck showed, these Malka-produced series included, just as a few examples: *Hotboxin'*, hosted by former boxer Mike Tyson; *Below the Belt*, hosted by former mixed martial artist and standup comedian Brendan Schaub; *Morning Kombat*, co-hosted by former CBS Sports analysts Luke Thomas and Brian Campbell; and *Run That Back!*, hosted by rapper and record producer Wyclef Jean (formerly of the Fugees). (JX005 at MoneyLion_01149888-89.)

39.     The June 2021 Pitch Deck included historical revenue figures for 2014 through 2021 year-to-date, actual and projected 2021-2024 revenue and EBITDA figures for Malka. (JX005 at MoneyLion_00149891-96.)  Mr. Basdekis took the lead in preparing these figures for inclusion in the June 2021 Pitch Deck.

40.     After Mr. Krubich and I presented the June 2021 Pitch Deck, I do not recall anyone at MoneyLion or MoneyLion ever asking any follow-up questions about the revenue and EBITDA projections.  My strong impression and recollection based on conversations with Mr. Correia is that MoneyLion merely wanted Malka to be slightly profitable, but was far more focused on revenue.  As set forth below, the EBITDA target that we ultimately agreed to in the MIPA for purposes of the 2021 and 2022 earnouts was $100,000 for both years.  That number bore no relation to the EBTIDA projections in the June 2021 Pitch Deck.

41.     One part of the June 2021 Pitch Deck for which I was primarily responsible was setting forth the proposed sales multiples based on Mr. Basdekis's revenue and EBITDA figures to support our initial ask of $75 million for Malka.  (JX005 at MoneyLion_01149900.)

42.     In the June 2021 Pitch Deck, I supported the $75 million asking price by using multiples based on a Google search of multiples for businesses that I viewed as comparable to Malka.  I cannot recall which companies I used as comparators, but as someone who had never sold a business before, I did find comparators which appeared to support our asking price.

43.     As it happened, MoneyLion did not counteroffer with a different valuation or purchase price.  Instead, the next day, June 15, 2021, MoneyLion accepted our proposal of $75 million, but it offered to pay $10 million in cash and up to $65 million in equity, consisting of MoneyLion shares valued and issued on particular dates.

44.     Specifically, Mr. Correia sent a spreadsheet to Mr. Krubich and myself, writing, "Guys, if we all do our parts, we will never forget today.  Let's go."    JX006 (MoneyLion_01147421-22) is a true and correct copy of Mr. Correia's email and spreadsheet. This spreadsheet proposed $10 million in upfront cash, upfront equity of MoneyLion restricted stock valued at $30 million, then a 2021 Earnout Payment of stock valued at $20 million and a

2022 Earnout Payment of stock valued at $15 million.  The parties would ultimately agree to shift $10 million from the 2021 Earnout Payment to the 2022 Earnout Payment.

45.  Mr. Correia's spreadsheet also proposed that the Closing Stock Payment and 2021 Earnout Payment would each vest in tranches through the end of 2023, and the 2022 Earnout Payment would vest in tranches through the end of 2024.

46.  Mr. Krubich and I felt that MoneyLion's initial offer extended the earnout payments too far into the future.  We pushed back, such that in the final MIPA the final tranche of the: (i) Closing Stock Payment vested September 30, 2022; (ii) 2021 Earnout Payment vested December 31, 2022; and (iii) 2022 Earnout Payment should have vested December 31, 2023.

47.  Mr. Correia's spreadsheet also noted that if MoneyLion's stock price doubled, the total value of the Acquisition to Sellers would be $140 million.  (JX006 at MoneyLion_00147422.)

48.  The June 2021 Pitch Deck had also informed MoneyLion about Malka's expected monetization for tax years 2021 and 2022 of the Tax Credit, based on Malka's digital media production work during 2019 and 2020.  (JX005 at MoneyLion_01149899.)  Mr. Basdekis calculated at the time that our expected monetization of the Tax Credit would be approximately $800,000 for our digital media production work in 2019; $1.2 million for 2020; and $2.2 million for 2021.

49.  On June 18, 2021, Mr. VanWagner sent a draft Letter of Intent "reflecting the deal structure Rick laid out the other day," which confirmed that MoneyLion's offer was for $10 million in cash and the respective values of $30 million in the Closing Stock Payment, $20 million in the 2021 Earnout Payment, and $15 million in the 2022 Earnout Payment, with the various tranches of stock to fully vest by the end of 2023 and 2024, respectively.  The draft did not specify the

revenue and EBITDA targets needed to achieve either earnout payment. PX058 (MoneyLion_01148050-61) is a true and correct copy of this email and attached draft.

50.    Sellers preferred that our eligibility for earnout payments be determined based solely on revenue targets, rather than both revenue and EBITDA. We discussed this with Malka's outside counsel (Fox Rothschild LLP) as it drafted revisions to MoneyLion's draft Letter of Intent. PX068 (MoneyLion_01124918) is a true and correct copy of an email chain involving Mr. Krubich, Fox Rothschild, and myself. (*See id.* at MoneyLion_01124933.)

51.    On June 23, 2021, following a meeting on or about June 22 at MoneyLion's New York office that I attended to discuss the potential deal, I sent Sellers' markup of the draft Letter of Intent to Messrs. Choubey, Correia, and VanWagner. Among other revisions, we proposed to increase the cash portion of the total purchase price to $20 million and increase the 2021 Earnout Payment to $25 million, eliminating the 2022 Earnout Payment. We also proposed that the 2021 Earnout Payment be based solely on revenue targets, not EBITDA. PX060 (MoneyLion_01142096-01142119) is a true and correct copy of this email and the attached draft.

52.    On June 30, 2021, Mr. Correia sent to Mr. Krubich and myself a revised offer, which matched the final agreement in these respects: the upfront cash payment would be $10 million, the 2021 Earnout Payment would be $10 million worth of MoneyLion stock, and the 2022 Earnout Payment would be $25 million worth of MoneyLion stock, with both earnout payments determined based on both revenue and EBITDA targets. Also, as in the final MIPA, the 2022 Earnout Payment would finish vesting in Q4 2023. Unlike in the MIPA, in MoneyLion's June 30, 2021 proposal, the Closing Stock Payment would finish vesting in Q2 2022 and the 2021 Earnout Payment would vest in a single tranche in Q4 2021. PX063 (MoneyLion_01136900-01) is a true and correct copy of this email and its attachment.

53.     That same day, Mr. Krubich and I spoke with Messrs. Choubey and Correia by telephone about the potential Acquisition.  I recorded this phone call because I had no experience with a corporate acquisition and wanted to ensure I could refer back to an accurate record of our discussions.  In preparation for my trial testimony, I have reviewed both the recording and a transcript thereof, which is appended hereto as PX414 (SELLERS00004091).  Based on my review of both, PX414 is a true and accurate transcript of the conversation.

54.     Mr. Correia explained during the call that, pursuant to MoneyLion's anticipated purchase price structure for the Acquisition, Sellers would be compensated partly in MoneyLion shares that would vest on a quarterly schedule.  He further explained that "we basically have $50 million guaranteed to you guys.  And so that's basically two-thirds [of the total $75 million] within the year of the transaction."  (PX414 at 1) (emphasis added).  In other words, according to Mr. Correia, it was "guaranteed" that Sellers would receive $10 million in cash, plus the Closing Stock Payment and the 2021 Earnout Payment.

55.     Mr. Correia added that once the shares vested and after an initial six-month lockup period post-Acquisition, "you guys can sell, like all of us, we can sell whenever we're vested." (PX414 at 4.)  He did not mention anything about any additional lockup or freeze period, or that trading might only be permitted during limited open windows.

56.     On the call, I raised the point that the earnouts should be focused on revenue rather than EBITDA targets. Mr. Correia responded that MoneyLion was "focused on revenue as well" and "would have a minimum floor of EBITDA, meaning the EBITDA target is not the target you gave us."  (PX414 at 1-2).  Mr. Correia reiterated MoneyLion's view that "we think this is such a strategic transaction."  (PX414 at 6.)

57.    As I noted in an email to Fox Rothschild on June 30, 2021, MoneyLion was "focused on the revenue targets," not EBITDA.  (JX008 at MoneyLion_01136949.)

58.    Sometime in or around July 2021, Messrs. Choubey and Correia, along with MoneyLion's Chief Product Officer, Tim Hong, visited Malka's offices in Santa Monica, California, so they could see where some of Malka's videos and social media content were produced.  I cannot recall whether Mr. Davaris visited with them.

59.    On July 2, 2021, I had another phone conversation with Mr. Correia, which I also recorded.  In preparation for my trial testimony, I have reviewed both the recording and a transcript thereof, which is appended hereto as PX065 (SELLERS00004087).  Based on my review of both, PX065 is a true and accurate transcript of the conversation.

60.    During that call, Mr. Correia explained that, because the anticipated purchase price structure involved the payment of some number of shares valued as of a particular date:

> With the upside, if we crush it, then you can play with the upside scenarios.  So you have downside protection in every case. The risk that we have and that our—my lawyers are just like, "You know what this could mean, right?"  Which is, they [Sellers] could own a greater percentage of the company if we have to basically—and this is, they're just giving me extreme scenarios—let's say the company for some crazy reason came down to be trading at a dollar, right? . . . You guys would have to receive $25 million worth of a company that is trading at a dollar that might have a market cap of 100 million.

(PX065 at 2-3.)

61.    On the call, Mr. Correia and I also discussed the revenue targets that Malka would need to achieve for the earnouts, and Mr. Correia stated that "no one sets a target at the actual number they saw in diligence."  (PX065 at 5.)

62.    Mr. Correia saw the value of Malka as creating and securing MoneyLion's future presence in the media space.  As I recall clearly, Mr. Correia said to me: "[D]on't tell anyone 'cause they think I'm building a financial services company; I'm building a media company."  He

15

reiterated this point later, saying that he and Mr. Choubey's shared view was "[t]hat the right answer is actually not to have any new financial services company, we've built a [expletive] better media company.  So let's just do that."  (PX065 at 8, 11.)

63.     On July 8, 2021, MoneyLion sent Sellers a markup of the draft Letter of Intent that generally proposed the same structure that MoneyLion had sent to and discussed with Sellers on June 30, 2021.  PX067 (MoneyLion_01139563-82) is a true and correct copy of MoneyLion's July 8, 2021 email with attachments.  MoneyLion's July 8 draft proposed a revenue target of $25 million and EBITDA target of $100,000 for the 2021 earnout and a revenue target of $30 million and EBITDA target of $100,000 for the 2022 earnout.  (PX067 at MoneyLion_001139578).

64.     On July 8, 2021, I shared MoneyLion's markup with Fox Rothschild, and asked Fox Rothschild, "[F]or the earnout component, they are ensuring we hit 100K in EBITDA for both years. Do we have to call out here if this is on a cash or accrual basis as it is not stated? We would of course want it on an accrual basis – should we add in this qualification?"  PX068 (MoneyLion_01124918-41), at MoneyLion_01124920.  Michael Weiner, then a partner at Fox Rothschild, responded, "My suggestion is to specify that all accounting will be done on the same basis as the company's historical practices, assuming that you have used accrual."  (PX068 at MoneyLion_01124920).  I responded, "Ok we have issued financial statement on an accrual basis aligned with GAAP so yes lets use/include that language."  (PX068 at MoneyLion_01124920).

65.     MoneyLion and Malka entered into the final Letter of Intent on July 12, 2021.  Ex. PX070 (MoneyLion_01833533) is a true and correct copy of the Letter of Intent, which provided in part:

> Due Diligence.  Each party will provide the other party and its counsel and advisors reasonable access during normal business hours to all books, records, assets and contracts of such party to complete its diligence investigation for purposes of the Transaction [Acquisition].  Each party will make available key personnel as

16

necessary to assist in this diligence effort.  Company [Malka] will permit Buyer [MoneyLion] to contact key customers and suppliers (both as mutually agreed) as part of the due diligence process.

(PX070 at MoneyLion_01833534.)

66.    The appended Non-Binding Summary of Terms (the "Term Sheet") provided for the following purchase price structure:

Buyer has based its purchase price structure on a deemed enterprise value of the Company of $75 million and assumes a cash-free, debt-free transaction, with the exception of the assumption by Buyer of a $2.5 million credit facility, as well as current accounts payable incurred by the Company in the ordinary course of its business and a targeted level of net working capital at the closing agreed to by the parties in the definitive agreement.  The total purchase price (the "Purchase Price") would be paid in a combination of cash and stock and would be composed of four components:

(1) payment of an aggregate of $10 million in cash to equity holders of the Company at closing;

(2) restricted stock equal to an aggregate of $30 million in value upon issuance at a per share price based upon the 30-day VWAP [volume-weighted average price] on the closing date, to be issued at closing to the equity holders of the Company (25% to vest quarterly on each of 9/30/21, 12/31/21, 3/31/22 and 6/30/22);

(3) earnout restricted stock equal to an aggregate of $10 million in value at a per share price based upon the 30-day VWAP on the closing date, which would be issued to the equity holders of the Company based on the Company's achievement of $25 million in revenue and $100,000 in EBITDA for 2021.  Such earnout restricted stock shall be issued only upon achieving 67% of the foregoing revenue and EBITDA milestones, and upon exceeding such threshold, shall be issued on a linear basis up to achievement of 100% of such targets; and

(4) earnout restricted stock equal to an aggregate of $25 million in value at a per share price based upon the 30-day VWAP on the closing date, which would be issued to the equity holders of the Company based on the Company's achievement of $30 million in revenue and $100,000 in EBITDA for 2022.  Such earnout restricted stock shall be issued only upon achieving 67% of the foregoing revenue and EBITDA milestones, and upon exceeding such threshold, shall be issued on a linear basis up to achievement of 100% of such targets.  If such stock is earned and

issued, 25% of such stock shall vest quarterly on each of 3/31/23, 6/30/23, 9/30/23 and 12/31/23.

All accounting will be done on the same basis as the Company's historical practices. . . .

All restricted stock to be issued to the equity holders of the Company shall be issued based upon the 30-day VWAP immediately prior to Closing; provided, however, that in the event that upon vesting, the shares previously issued to the recipients thereof represent a value less than the value such shares represented upon closing of the Transaction, then the Buyer shall be obligated to issue additional shares or pay additional cash, such determination to be made in the Buyer's sole discretion, as a make-whole payment such that the recipients, in the aggregate, receive, in shares and/or cash, no less than the aggregate share value received upon the initial issuance of such shares. The parties will work together to determine the most efficient means to memorialize the foregoing make-whole right. . . .

In order to maximize the selling equity holders' opportunity to achieve the earn-out payments, Buyer agrees that: (i) during the earnout period relating to achievement of revenue and EBITDA targets for 2021 described in subsection (3) above, the Company will continue to be operated by existing Company management in a manner substantially similar in all material respects to the operations of the Company prior to the closing; and (ii) with respect to the earnout period relating to achievement of revenue and EBITDA targets for 2022 described in subsection (4) above, the definitive agreement shall provide for a closing deliverable of an operating and revenue budget pursuant to which the Company shall be operated during such earnout period, which shall be negotiated and agreed to by the parties, acting in good faith.

The closing payment would be adjusted (up or down) on a dollar-for-dollar basis to the extent the Company's actual net working capital at the closing exceeds or is less than a target range of net working capital based on the average of Company's net working capital for the six consecutive month-ends preceding the closing date.

(PX070 at MoneyLion_01833537-39) (first emphasis in original, other emphasis added).

67.     The Term Sheet also provided:

Prior to closing, Buyer shall use commercially reasonable efforts to obtain a buyer-side representation and warranty insurance policy (the "RWI Policy"). The selling equity holders would pay 50% of the cost of the premium for the RWI Policy with Buyer paying the other 50% and the selling equity holders would be responsible for 50% of the retention amount under the RWI Policy (which amount will be placed in an indemnity escrow account at closing). Other than recourse to the indemnity escrow set forth above or in the event of fraud, the RWI Policy shall provide

Buyer's exclusive remedy for claims of indemnification based on breaches of representations and warranties.

(PX070 at MoneyLion_01833540) (emphasis in original).

68.     MoneyLion sent its Preliminary Due Diligence Request List to Mr. Krubich and myself on July 15, 2021.  PX072 (MoneyLion_01127347-74) is a true and correct copy of this email and attached list.

69.     The four Sellers agreed that I would act as Sellers' Representative to deal directly and through Fox Rothschild with MoneyLion, and its counsel (DLA Piper LLP) and advisors, throughout the ensuing negotiations and due diligence.

70.     During that negotiation and due diligence process, my role was akin to that of a project manager.  By this, I mean that my responsibility was to assist Fox Rothschild in obtaining the information requested by MoneyLion from knowledgeable Malka personnel as well as from Mr. Curran, so that the requested information could be shared with MoneyLion in a timely fashion.

71.     I recall that I worked with Fox Rothschild, Mr. Basdekis, Mr. Curran, and others to prepare, organize, and disclose materials responsive to MoneyLion's and its advisors' inquiries. These materials including written answers, various recent and historical documents and agreements, and updated financial disclosures reflecting Malka's and Malka Sports' results through September 30, 2021, as well as detailed monthly sales information by customer for 2019 and 2020.  By all appearances, MoneyLion was a sophisticated public company with capable and experienced advisors.

72.     To the best of my knowledge, Malka gave MoneyLion, its counsel, and its due diligence advisors (a company called CFGI) access to all documents and information that they requested in the course of due diligence.  MoneyLion was never refused a request for documents in the due diligence process.  I do not recall anyone from the MoneyLion side of the Acquisition

complaining that our disclosures were inadequate, and if any issues arose, I worked with Fox Rothschild and others at Malka to address them as promptly and effectively as we could.

73.     I recall that I maintained and regularly updated a Google Doc of MoneyLion's due diligence request list, which I shared with Mr. Basdekis, Mr. Curran, and Fox Rothschild in order to identify who was responsible for which document- and information-gathering tasks.

74.     All four Sellers attended a meeting with MoneyLion executives and officers at MoneyLion's New York offices on July 29, 2021, to discuss the Acquisition and introduce our respective teams.  PX076 (MoneyLion_01115500-05) is a true and correct copy of MoneyLion's working session agenda.

75.     Malka and MoneyLion did not hold any meetings with one another in Delaware. No members of the Fox Rothschild team representing Malka were located in Delaware.

76.     I recall attending at least one conference call with CFGI, Mr. Basdekis, and Mr. Curran in approximately August 2021.  I may have attended other calls with CFGI, but I do not think I ever spoke with CFGI in the absence of either Mr. Basdekis and/or Mr. Curran.

77.     I do not recall Mr. Basdekis or Mr. Curran ever expressing any doubts or concerns about the accuracy of information that we had provided to CFGI.

78.     I do not recall personally making any representations to CFGI about Malka's compliance with ASC 606, an accounting standard with which I am not familiar.

79.     In the weeks before the Acquisition, when Fox Rothschild and DLA Piper were exchanging draft language for the MIPA and other documents governing the Acquisition, I continued to serve in a project manager–type role.  I relied on Fox Rothschild, with input from Mr. Basdekis and Mr. Curran, to draft accurate and appropriate contractual language.

80.     My review of documents in preparation for this trial testimony has refreshed my recollection as to some details about the drafting of Schedules A and B to the MIPA.  Schedule A described Malka's historical accounting principles, and Schedule B connected these historical accounting principles to a specific set of Revenue and EBITDA Calculation Principles that would be used to determine whether Sellers had met the revenue and EBITDA targets needed to obtain the 2021 and 2022 Earnout Payments.

## A.    The Drafting of Schedules A and B

81.     On October 27, 2021, I received and forwarded to Messrs. Basdekis and Curran MoneyLion's initial draft of Schedule A (Accounting Principles), along with the then-current draft of the MIPA.  JX031 (MoneyLion_01044886-01044975) is a true and correct copy of this email and its attachments.

82.     Section 3.06 of the draft MIPA included a representation that "[t]he Financial Statements have been prepared in accordance with the Accounting Principles," *i.e.*, Schedule A. (JX031 at MoneyLion_01044923.)

83.     MoneyLion's initial draft of Schedule A included the following language: "The Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with: (a) U.S. GAAP including, but not limited to, FASB issued Accounting Standards Update (ASC) No. 2014-09, Revenue from Contracts with Customers (Topic 606)."  (JX031 at MoneyLion_01044892.)

84.     In response to my email forwarding Messrs. Curran and Basdekis MoneyLion's initial draft of Schedule A, on October 27, 2021, Mr. Curran wrote to me and Mr. Basdekis that "[w]e can represent that we are adhering to GAAP in all material respects through 2020" and "[l]et's make sure that all Accounts Receivable as of 9/30/2021 and revenue we have booked is in

line with ASC 606[.]"  JX026 (MoneyLion_01048208-15) is a true and correct copy of my email exchange with Messrs. Curran and Basdekis.

85.     Also on October 27, 2021, I received and forwarded to Messrs. Basdekis and Curran MoneyLion's initial draft of Schedule B (Revenue and EBITDA Calculation Principles). JX032 (MoneyLion_01048332-39) is a true and correct copy of this email and its attachments. MoneyLion's initial draft of Schedule B similarly defined "Revenue" as "revenue recognized according to ASC 606 revenue recognition requirements for the combined and consolidated Company and determined in accordance with U.S. GAAP as reviewed or audited by Buyer's independent accountants."  (JX032 at MoneyLion_01048338.)

86.     In response to my email forwarding MoneyLion's initial draft of Schedule B, Mr. Curran suggested to Mr. Basdekis on October 27, 2021, "Matt, I think should do a selection of accounts receivable as of 9/30/21 and review the contracts to make sure we are in compliance with 606 as of 9/30/21."  JX027 (MoneyLion_01048309) is a true and correct copy of this email chain.

87.     On or about October 28, 2021, I recall participating in a phone call with Mr. Basdekis and Curran to discuss MoneyLion's initial drafts of Schedules A and B.  I recall conveying to Mr. Curran and Mr. Basdekis that MoneyLion was going to permit Sellers to edit Schedules A and B to describe Malka's historical accounting principles as well as the calculation principles that would be used for purposes of the earnout.

88.     My recollection is consistent with an email that I sent to Mr. Basdekis and others on October 19, 2021.  JX022 (MoneyLion_01049219) is a true and correct copy of that email.  On October 19, 2021, I wrote to Mr. Basdekis:

> Matt, know you are talking to Tony at ML tomorrow and just a heads up after talking to his boss today, they're gonna wanna talk about GAAP. He (Rick) was open to having our business run on its current way of revenue recognition and ebitda calculations for purposes of earnouts while having a

separate book to align with their GAAP for public filing purposes. Maybe not something to bring up but something to keep in mind as you guys are connecting.

89.     In my email, "Tony" refers to Tony Orokos, MoneyLion's former Head of Accounting and "Rick" refers to Rick Correia, MoneyLion's CFO.  This email refreshes my recollection that at some point between July 9, 2021—when I wrote to Fox that Malka had issued financial statements aligned with GAAP (PX068 at MoneyLion_01124920)—and October 19, 2021—when I wrote the above email to Mr. Basdekis—Mr. Basdekis must have advised me that Malka did not follow GAAP in recognizing revenue.  This email also refreshes my recollection that I discussed Malka's historical accounting practice with Mr. Correia.

90.     Turning back to my October 28, 2021 call with Messrs. Basdekis and Curran, I recall asking them to be very specific with the language that we included in Schedule A and Schedule B so that we clearly defined Malka's historical accounting principles, as well as the revenue and EBITDA calculation principles for the earnout.

91.     On October 28, 2021, following our phone call, Mr. Curran wrote to Mr. Basdekis, me, and Fox Rothschild that "Jeff, Matt, and I spoke this morning and have the following requests / clarifications needed with respect to Schedule B.  For purposes of the Earnout, the Company [Malka] would like to continue to maintain our existing accounting principles with respect to revenue recognition and cost recognition associated with revenue through 12/31/2022 that have been utilized historically."  JX036 (MoneyLion_01044617-33) is a true and correct copy of this October 28, 2021 email exchange.

92.     On October 29, 2021, Mr. Curran circulated his proposed edits to MoneyLion's initial draft of Schedule B to Fox Rothschild, me and Mr. Basdekis.  Mr. Curran wrote: "My edits

to Schedule B attached. Matt, please take a look, approve these, and let us know if you want to add anything." (JX036 at MoneyLion_01044617.)

93.    That same day, Fox Rothschild circulated to me, Mr. Curran, and Mr. Basdekis a redline of Schedule B.  Michael Harrington of Fox Rothschild wrote:  "Jeff, Ryan, and Matt: Attached are my edits to Schedule B, clean and blacklined. Please review closely and let me know if there [are] any further issues to address or discuss. Thanks." PX121 (MoneyLion_01042455-73) is a true and correct copy of the email with attachments that I received from Mr. Harrington on October 29, 2021.

94.    The markup of Schedule B that I received from Mr. Curran and Fox on October 29, 2021 deleted the references to "ASC 606" and "U.S. GAAP" that MoneyLion had included in the initial definition of "Revenue" and edited the definition to read that "Revenue" for purposes of the earnouts "means revenue recognized according to the Company's historical revenue recognition principles for the combined and consolidated Company."  (JX036 at MoneyLion_01044632; PX121 at MoneyLion_01042470.)  The following redline from Fox reflects these edits:

**Schedule B**

Revenue and EBITDA Calculation Principles

"**Revenue**" refers to revenue recognized according to ~~ASC 606~~ the Company's historical revenue recognition ~~requirements~~ principles for the combined and consolidated Company ~~and determined in accordance with U.S. GAAP as reviewed or audited by Buyer's independent accountants~~. By way of illustration, the Company's historical revenue recognition principles require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained. For purposes of this Agreement, Revenue will be ~~adjusted for~~calculated in accordance with the following:

1) ~~Intercompany~~ Revenue shall not include intercompany eliminations between Malka Media Group, LLC and Malka Sports LLC to present revenue on a consolidated basis~~, but not any intercompany adjustments between the Company and Buyer;~~

2) No adjustment shall be made for intercompany adjustments made between the Company and Buyer;

3) Revenue shall include the difference between the fair market value of the intercompany services provided by the Company to Buyer and the actual charge for the intercompany services provided by the Company to Buyer;

2) ~~Any impact for accrual based accounting in historical periods if not accurately reflected previously;~~

4) ~~3)Losses~~ Revenue shall be reduced by losses or gains related to write offs or provisions~~.~~; and

5) Revenue shall include the expected recognition of the New Jersey Digital Media Tax Credit ("Tax Credit") in the period in which the Tax Credit was applied for. By way of illustration, the Tax Credit applied for in 2021 was for services provided by the Company for 2019. The Tax Credit would be added to 2021 EBITDA.

95.    I viewed this as consistent with my conversation with Mr. Correia, wherein he agreed that Malka could use its historical accounting practices, not GAAP, for purposes of the earnouts.

96.    I also noted that Mr. Curran's and Fox's markup of Schedule B added that Malka's revenue for purposes of the earnouts would include the "[d]ifference between the fair market value of the intercompany services provided by the Company to Buyer and the actual charge for the intercompany services provided by the Company to the Buyer." (PX121 at MoneyLion_01042470.)

25

97.     I viewed this as an important addition to protect Sellers' ability to achieve the 2022 earnout because after MoneyLion acquired Malka, the plan was for Malka to provide substantial intercompany services for MoneyLion at a discount to the amount that it charged third-party customers for the same services, which generally included a 20 percent production management fee.  This language was intended to add back to Malka's revenue for earnout purposes the difference between the rates and amounts charged to third parties and the discounted rates and amounts charged to MoneyLion.

98.     I recall that Sellers initially contemplated Malka providing what I estimated as approximately $15 million of intercompany services to MoneyLion in 2022.  However, we agreed with MoneyLion on an agreement for intercompany services of $10 million, which likely would come at the expense of not doing more profitable work for third-party customers.  The result would be an increase in revenue from the MoneyLion business, but a net decline in overall income due to the lost revenue from higher-paying third-party customers.

99.     Another addition to MoneyLion's initial draft of Schedule B that Mr. Curran and Fox proposed at my request was that EBITDA for purposes of the earnouts shall include "the expected recognition of the New Jersey Digital Media Tax Credit ('Tax Credit') in the period in which the Tax Credit was applied for.  By way of illustration, the Tax Credit applied for in 2021 was for services provided by the Company for 2019.  The Tax Credit would be added to 2021 EBITDA."  (PX121 at MoneyLion_01042471.)

100.    I wanted this language to ensure that Sellers received the benefit of the Tax Credit in each of the earnout years, 2021 and 2022.  As I discussed with Mr. Correia prior to the Acquisition, the Tax Credit represented an effective cash windfall to MoneyLion.  As I wrote to Fox on July 9, 2021:

> We are currently waiting on our NJEDA Digital Media Tax Credit submission for 2019 which we should know about in the next couple weeks about approval—which would be around 900K. Given that the target EBITDA is 100K, and this wouldn't hit that number and the number we are being acquired for also does not factor this in, this 900K would be a windfall to MoneyLion. The 2020 tax credit we would be applying for (if 2019 is approved) would be around 2M. Is there a way to include this somehow into the calculations to help us ensure we hit that revenue or EBITDA target, so that if this is approved, these amounts would be accretive to the benchmarks?

(PX068 at MoneyLion_01124919.)

101.    On October 29, 2021, I responded to Fox Rothschild's email of the same day sending their redline of Schedule B and wrote, "Michael, I spoke with Matt/Ryan, this is good to share with DLA."  Mr. Harrington responded, "Thank you. We will share this new Schedule B with DLA" and reminded Mr. Curran and Mr. Basdekis to review the draft of Schedule A that we had received on October 27, 2021.  JX034 (MoneyLion_01040169-82) is a true and correct copy of this October 29, 2021 email exchange with Mr. Harrington, Mr. Curran, Mr. Basdekis and others.

102.    Consistent with my email, on October 29, 2021, Mr. Basdekis responded to Mr. Curran's email requesting that Mr. Basdekis review his proposed edits to Schedule B and wrote, "Good with this[.]"  JX035 (MoneyLion_01040452-67) is a true and correct copy of the email that I received from Mr. Basdekis on October 29, 2021.

103.    On October 29, 2021, Fox Rothschild sent the revised draft of Schedule B to DLA Piper.  JX030 (DLA_001802-09) is a true and correct copy of this email and its attachments.

104.    On October 31, 2021, I sent an email to Messrs. Basdekis and Curran reminding them to weigh in regarding the language of Schedule A.  As I had told them before, I wanted to make sure that we were "explicit" in the way we defined Malka's accounting principles.  JX038 (MoneyLion_01041381) is a true and correct copy of this email chain.

105.    That same day, Mr. Curran replied: "To the best of my knowledge, revenue has been consistently booked from 2018 through present using the same principle we defined in Schedule B.  Accordingly, I don't see it as an issue to address.  Matt not sure if you have a different perspective."  (JX038.)  Mr. Basdekis then replied: "Agree with the exception of intercompany, which is all eliminated regardless so no impact."  (*Id*.)

106.    On November 1, 2021, Mr. Curran sent me, Mr. Basdekis, and Fox Rothschild his comments to Schedule A.  JX043 (MoneyLion_00976958-65) is a true and correct copy of the email with attachment that I received from Mr. Curran on November 1, 2021.  That same day, Fox Rothschild sent the same group a markup of Schedule A.  JX041 (MoneyLion_00976972-81) is a true and correct copy of the email with attachment that I received on November 1, 2021 from Fox Rothschild.

107.    As reflected in the following redline, Fox Rothschild edited Schedule A to remove the reference to ASC 606 and to read as follows:

**Schedule A**
**Accounting Principles**

The Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with:

(a) ~~U.S. GAAP including, but not limited to, FASB issued Accounting Standards Update (ASU) No. 2014-09, Revenue from Contracts with Customers (Topic 606);~~

(b) ~~the Buyer's Significant Accounting Policies disclosed within the Buyer's annual Audited Consolidated Financial Statements;~~

(a) U.S. GAAP, except as follows:

    a. the Company's historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained, and

    b. the Company's historical cost recognition principles associated with such revenue, which require the Company to recognize costs on contracts as incurred.

(b) ~~(c)~~ the specific accounting principles, policies, procedures, categorizations, definitions, methods, practices, and techniques set forth below ("Specific Policies").

108.

(JX041 at MoneyLion_00976980.)

109.    On November 1, 2021, Mr. Curran wrote to Fox Rothschild, copying me, saying he was fine with these edits.  PX127 (MoneyLion_00976990-97) is a true and correct copy of the November 1, 2021 email communication that I received from Mr. Curran.

110.    Mr. Basdekis never communicated to me that Malka's historical revenue recognition principles described in the markups of Schedule A that Mr. Curran or Fox Rothschild circulated on November 1, 2021 were incorrect or inaccurate in any way.

111.    On November 1, 2021, Fox Rothschild sent the revised draft of Schedule A to DLA Piper.  JX042 (DLA_001978-83) is a true and correct copy of this email communication.

112.    On November 3, 2021, Fox Rothschild forwarded to me, Mr. Curran, and Mr. Basdekis an email from MoneyLion's counsel, DLA Piper, in which DLA Piper wrote, "[p]lease find attached i) Schedule A to the MIPA accepting your client's revisions and which we can

consider final, and ii) our client's comments to Schedule B to the MIPA, with redline against your client's last version." PX136 (MoneyLion_01037477-84) is a true and correct copy of the email with attachments that I received from Fox Rothschild on November 3, 2021. (*See id.* at MoneyLion_01037477.) Fox Rothschild wrote to Mr. Curran and Mr. Basdekis: "[p]lease see below and attached. I'd like both of you to review the changes they made to Schedule B and let me know if there are any issues with their changes or comments that I need to address. In particular, they have removed the Tax Credit from revenue but are allowing it to remain as an item of EBITDA. Maybe that gets us where we want to be but I really need both of you to be sure this is acceptable to us." (PX136 at MoneyLion_01037477.)

113.    On November 3, 2021, Mr. Curran responded to Fox Rothschild, copying Mr. Basdekis and me, and wrote, "I have one additional change to tie EBITDA to our historical revenue / cost recognition principles. Otherwise I'm good." JX047 (MoneyLion_01037491-94) is a true and correct copy of the November 3, 2021 email with attachment that I received from Mr. Curran Fox Rothschild.

114.    On November 3, 2021, Fox Rothschild responded to Mr. Curran's email, copying Mr. Basdekis and me, and wrote, "Thanks for your quick response. Will you be getting me that one additional change, or have you inserted it into this? If so, please make your change obvious to me because I am not seeing it in what was attached." PX135 (MoneyLion_01035485-88) is a true and correct copy of the November 3, 2021 email exchange with Fox Rothschild, Mr. Curran and Mr. Basdekis. (*See id.* at MoneyLion_01035486.) Mr. Curran responded, "[m]y change [to Schedule B] was just made in the intro EBITDA definition. I added a callout to revenue recognition and cost recognition." (*Id.* at MoneyLion_01035485.) Fox Rothschild replied all asking Mr. Basdekis to "chime in when you can," and the same day, Mr. Basdekis responded, "Agree - ok

with this - having it [the tax credit] in EBITDA is the essential piece of this. No risk to revenue number in 2021, was not in any of our projections for 2022 from a revenue perspective anyway." (*Id*.)

115.    On November 4, 2021, Fox Rothschild sent the markup of Schedule B to DLA Piper.  JX053 (DLA_002359-63) is a true and correct copy of this email communication and its attachment.  As reflected in the redline, Mr. Curran and Fox Rothschild had edited the definition of "EBITDA" to read:

> "**EBITDA**" means the combined and consolidated net income before interest expense, federal, state and local taxes, depreciation and amortization of the Buyer, determined in accordance with U.S. GAAP (including the Company's historical revenue and cost recognition principles) as reviewed or audited by Buyer's independent accountants.

(JX047 at MoneyLion_01037493) (emphasis added).

116.    That same day, DLA Piper responded to Fox Rothschild, "Thank you, Michael. We will review and let you know."  JX051 (MoneyLion_01039352) is a true and correct copy of this email.  DLA Piper then added:

> Separately, we have received the following feedback from the RWI insurer regarding Schedule A (Accounting Principles):
>
> **With respect to the Accounting Principles, the Company is essentially making the representation that its financial statements have been historically prepared under GAAP except revenue recognition and contract costs. However, based on the diligence, the Company operates [on] an cash basis with numerous other GAAP deviations identified, including lack of accruals for commissions, payroll, professional fees, pre-paid licenses and pre-paid insurance. So we expect all Accounting Principles to reflect <u>all</u> non-GAAP items (not just those listed in previous sentence) or the Accounting Principles to acknowledge that the business operates on a cash basis.**
>
> To that end, can your client please revise Schedule A to include those additional areas, aside from revenue recognition and contract costs?

(JX051 at MoneyLion_01039352) (bold and underline in original).

117.    On November 5, 2021, Mr. Curran replied all to the email to from Fox Rothschild, copying me, and wrote, "Matt, what are your thoughts?"  JX054 (MoneyLion_01032410-20) is a true and correct copy of the November 5, 2021 email exchange with Mr. Basdekis, Mr. Curran and Fox Rothschild, including the attached updated draft of Schedule A.    (*See id.* at MoneyLion_01032412.)    Mr. Basdekis replied all and wrote, "[a]side from the outlined exceptions, this is how I would define our expense recognition[,]" and Mr. Basdekis then listed three expense recognition practices, and four "[n]otes and exceptions through Sep 2021[.]"  (*Id.* at MoneyLion_01032412.)  Mr. Curran responded to Mr. Basdekis, copying Fox Rothschild and me, and wrote, "[t]his is great, please list this in Schedule A."  (*Id.* at MoneyLion_01032411.)

118.    Fox Rothschild added Mr. Basdekis' edits into an updated draft of Schedule A, which Mr. Harrington sent to Mr. Curran and Mr. Basdekis, copying me, on November 5, 2021 and wrote, "Ryan and Matthew:  Thanks for the information below.  I have taken this and inserted it into Schedule A.  Attached is a clean and blackline version of Schedule A.  Please review and let me know if this is acceptable to now send to DLA."  (JX054 at MoneyLion_01032410.)

119.    On November 9, 2021, Mr. Harrington of Fox Rothschild followed up again with Mr. Curran and Mr. Basdekis, copying me, about Schedule A and reattached the updated draft that he had sent to us on November 5, 2021.  JX060 (MoneyLion_01032140-50) is a true and correct copy of the email with attachments that I received from Fox Rothschild on November 9, 2021.  Mr. Harrington wrote, "Ryan and Matthew:  I would like to get your final approval on this so we can send it to DLA/ML for approval.  Please let me know if my changes are accurate and acceptable."  (*Id.* at MoneyLion_01032140.)

120.    That same day, Mr. Curran replied all to Fox Rothschild and Mr. Basdekis, copying me, and wrote, "[n]o objections."  JX061 (MoneyLion_01032131-39) is a true and correct copy of the email that I received from Mr. Curran on November 9, 2021.

121.    Also on November 9, 2021, in response to Mr. Harrington's email, Mr. Basdekis wrote to Mr. Harrington, copying me and Mr. Curran, "Good on my end!"    JX059 (MoneyLion_01032119-27) is a true and correct copy of the November 9, 2021 email that I received from Mr. Basdekis.  I understood that Mr. Basdekis was communicating his sign off on the updated draft of Schedule A that Fox Rothschild had circulated for his approval on November 5 and on November 9, 2021.

122.    In the final version of the MIPA, MoneyLion agreed to Sellers' proposed revisions to Schedules A and B, including the deletions of all references to ASC 606 and the replacement language incorporating Malka's historical revenue and cost recognition principles.    JX065 (DLA_006185-006332) is a true and correct copy of the execution version of the MIPA, which I signed.

123.    As described above, Messrs. Basdekis and Curran both approved the language in Schedule A and Schedule B.  Prior to the close of the transaction on November 15, 2021, neither Mr. Basdekis nor Mr. Curran ever expressed to me, in words or in substance, that any of the language in Schedule A or Schedule B, or in any part of the MIPA, was incomplete or inaccurate.

124.    Prior to the close of the transaction on November 15, 2021, neither anyone from MoneyLion nor its advisors ever asked me what the terms "historical revenue recognition principles," "noncancelable deposits," or "milestones" meant as those terms were used in Schedule A and Schedule B.

**B.     The MIPA**

125.    Sellers and MoneyLion entered into the MIPA on November 15, 2021.  That same day, Mr. Krubich and I entered into Employment Agreements with MoneyLion.  PX160 (MoneyLion_000258) is a true and correct copy of my Employment Agreement, and PX161 (MoneyLion_000284) is a true and correct copy of Mr. Krubich's.

126.    Section 2.06 of the MIPA prescribed the procedures for determining whether Sellers had satisfied the revenue and EBITDA thresholds necessary to achieve the 2021 and 2022 Earnout Payments, in which case MoneyLion was "obligated to remit" these payments to Sellers pursuant to Section 2.06(a).  (JX065 at DLA_006206-07.)

127.    Section 2.06(b)(i) of the MIPA provided that within 30 days of receipt of Malka's annual financial statements, MoneyLion would deliver to me, as Sellers' Representative, a statement, "prepared in good faith and <u>in accordance with the Revenue and EBITDA Calculation Principles</u>" of Schedule B to the MIPA, setting forth its calculation of Malka's revenue and EBITDA for the year.  (JX065 at DLA_006207) (emphasis added).

128.    Section 2.06(b)(i) further provided:  "For the avoidance of doubt, it is the intention of the Parties that the 2021 Revenue Amount and the 2021 EBITDA Amount and the 2022 Revenue Amount and the 2022 EBITDA Amount <u>shall be calculated using substantially consistent methods and practices</u>."  (JX065 at DLA_006207) (emphasis added).

129.    Section 2.06(b)(ii) of the MIPA provided that Sellers would have 45 days to review MoneyLion's revenue and EBITDA calculations and to submit any objections thereto in writing. MoneyLion was required under this subsection to provide Sellers and our advisors with access to Malka's books and records "and any other materials used by" MoneyLion in preparing its Revenue and EBITDA Statement, "and shall make the Company's [Malka's] staff and advisors available"

to Sellers and our advisors, "for the purpose of reviewing the Revenue and EBITDA Statement and to prepare a Revenue and EBITDA Statement of Objections." (JX065 at DLA_006207.)

130.    Section 2.06(b)(iii) of the MIPA provided that, if Sellers did not object, MoneyLion's Revenue and EBITDA Statement would "be deemed final and to have been accepted by" Sellers. If I did object, the parties would "negotiate in good faith to resolve such dispute within thirty (30) days." (JX065 at DLA_006207-08.)

131.    Section 2.06(b)(iv) of the MIPA provided that, if the parties failed to reach agreement within 30 days of Sellers' objections, the dispute would be submitted to an Independent Accountant for resolution. The parties would then have 30 days to make written submissions to the Independent Accountant. After that, the Independent Accountant would have an additional 30 days to make a "conclusive and binding" determination of the disputed issues. The Independent Accountant was only authorized to consider the parties' written submissions and the items in dispute between Sellers and MoneyLion, "(i.e., no independent investigation)," and could only make a decision "within the range of values assigned to each such item as provided in the written submissions." Finally, the Independent Accountant's fees and expenses would be apportioned among the parties based on the percentage of the disputed amount that was ultimately awarded. (JX065 at DLA_006208.)

132.    Pursuant to Section 2.06(b)(v) of the MIPA, if Malka generated revenue of $25 million and EBITDA of $100,000, Sellers would receive the maximum 2021 Earnout Payment, which is the number of MoneyLion restricted shares equal to $10 million based on a share price equal to the greater of the 30-day VWAP as of the 2021 Earnout Issuance Date or $8.00. The 2021 Earnout Payment vested in four quarterly installments through December 31, 2022. (JX065 at DLA_006208-09.)

35

133.    Pursuant to the same provision, if Malka generated revenue of $30 million and EBITDA of $100,000, Sellers would receive the maximum 2022 Earnout Payment, which is the number of MoneyLion restricted shares equal to $25 million based on a share price equal to the greater of the 30-day VWAP as of the 2022 Earnout Issuance Date or $7.00.  The 2022 Earnout Payment was to vest in four quarterly installments through December 31, 2023.  (JX065 at DLA_006209.)

134.    Section 2.06(d) of the MIPA included language protecting Sellers' opportunity to receive the 2021 and 2022 Earnout Payments (JX065 at DLA_006210), which Fox Rothschild had added on our behalf, as reflected in the following redline that Fox Rothschild sent to DLA on October 21, 2021:

```
11              (d)    Operation of the Business. Except as otherwise set forth herein, in order to
12    maximize the Seller Members' opportunity to receive the 2021 Earnout Payment and the 2022 Earnout
13    Payment, (i) from the Closing Date and through the end of December 31, 2021, Buyer shall, and shall cause
14    the Company to operate the business of the Company in good faith and substantially similar in all material
15    respects with the past practice of the Company prior to Closing, and will not take any action intended to
16    interfere with or frustrate the Seller Members' opportunity to receive the 2021 Earnout Payment and the
17    2022 Earnout Payment, and (ii) with respect to the period from January 1, 2022 and through the end of
18    December 31, 2022, the Buyer shall, and shall cause the Company to operate the business of the Company
19    substantially in accordance with the operating and revenue budget (the "2022 Budget") attached hereto as
20    Exhibit B. Notwithstanding the foregoing, Buyer shall be able to make such changes, as it deems reasonably
21    necessary, to the operation of the business of the Company or otherwise to ensure full compliance with all
22    applicable Laws.
```

PX105 (DLA_001076-001164) is a true and correct copy of the October 21, 2021 email that I received from Michael Weiner at Fox attaching the markup of the MIPA that Fox shared with DLA.

135.    The 2022 Budget, attached as Exhibit B to the MIPA, included total Malka revenue of $37,986,036 and EBITDA of $169,851.  (JX065 at DLA_006298.)  This budget was not a projection of Malka as a standalone business, but rather assumed that the deal would close and Malka would pick up about $10 million in intercompany revenue, but at discounted amounts to

what otherwise would be earned from third-party customers.  I discuss the intercompany services in greater detail in paragraphs 175-183 below.

136.    In agreeing to the 2022 Budget, I understood that MoneyLion was committing to support the reflected level of expenses as the Malka teams transitioned to their new focus within MoneyLion.  This is consistent with one of the recorded telephone conversations that I and Mr. Krubich had with Mr. Choubey and Mr. Correia on June 30, 2021 (prior to the Acquisition). (PX414.)   On the call, Mr. Krubich raised the concern that post-closing, Malka would be converting "20%, 30%, 50% of the team to fully focus" on MoneyLion and asked how MoneyLion would respond to a request for "$2-5 million dollars because we got to staff the right way" or because "we have to eliminate some of our revenue with our clients."  (PX414 at 4-5.)  Mr. Choubey responded:

> I think we want to accelerate your network, right?  Let's get more influencers, more content creators, and if we need to book that expense as part of MoneyLion—the parent company's—marketing budget, we can do that.  That doesn't need to go into your P&L for the purposes of a calculation on the earnout.

(PX414 at 5.)

137.    Consistent with that conversation, in its initial markup of the MIPA that Fox sent to DLA on October 21, 2021, Fox added the following language as a placeholder for the 2022 Budget:  "To include provisions confirming MoneyLion's commitment to provide adequate financial and other resources reasonably necessary to support the anticipated operating expenses to be incurred by Malka in order to achieve, at a minimum, the Maximum Revenue Amount and Minimum EBITDA Amount for 2021 and 2022."  (PX105 at DLA_001163.)

138.    The 2022 Budget included $15,000 in Malka employee bonuses for 2022.  (JX065 at DLA_006298.)

139.    Exhibit C to the MIPA was a Restricted Stock Agreement ("RSA"), which provided that Sellers' Closing Stock Payment restricted shares would vest and thereby become Earned Shares on each of the respective, quarterly vesting dates.  (JX065 at 006300.)  Sellers and MoneyLion entered into additional RSAs governing the 2021 Earnout Payment shares and make-whole shares for both the Closing Stock Payment and the 2021 Earnout Payment.  JX085 (MoneyLion_01870073,  at  MoneyLion_01870091-98);  JX093  (MoneyLion_01897528-37); JX096 (MoneyLion_01864825-34); and JX111 (MoneyLion_01885098-01885105) are true and correct copies of my additional RSAs.

140.    Exhibit D to the MIPA was a Registration Rights Agreement, Section 3.5 of which required MoneyLion to take any actions reasonably requested by a Seller to enable such Seller to sell shares consistent with the securities laws.  (JX065 at DLA_006315.)

## MY MONEYLION SHARES

141.    On November 15, 2021, at the closing, MoneyLion paid me $3,441,723.85 in cash as my allocated share of the Closing Cash Payment.

142.    The same day, MoneyLion instructed its transfer agent, Continental Stock Transfer & Trust Company ("Continental"), to issue 1,190,770 shares of MoneyLion stock to me, as my allocated share of the Closing Stock Payment.  Continental did so.  PX164 is a true and correct copy of MoneyLion's instruction letter.  (MoneyLion_01834755, at MoneyLion_01834759.)

143.    On December 31, 2021, MoneyLion instructed Continental to issue 362,217 shares as my allocated Closing Stock Payment make-whole shares, at a 30-day VWAP of $4.06. Continental did so.  PX180 is a true and correct copy of MoneyLion's instruction letter. (MoneyLion_01849262, at MoneyLion_01849265.)  PX284 (MoneyLion_01820717-18) is a true and correct copy of an email from Michael Scalia, MoneyLion's Director of SEC Reporting and Technical Accounting, attaching MoneyLion's regularly updated spreadsheet reflecting its

calculations of Closing Stock Payment and 2021 Earnout Payment issuances to Sellers, including related make-whole shares.

144.    On March 28, 2022, MoneyLion instructed Continental to issue 449,243 shares as my allocated share of the 2021 Earnout Payment, at a 30-day VWAP of $4.02 (measured as of December 31, 2021).  Continental did so.  PX225 is a true and correct copy of MoneyLion's instruction letter.  (MoneyLion_01820743, at MoneyLion_01820748.)

145.    On March 31, 2022, MoneyLion instructed Continental to issue 839,098 shares as my allocated Closing Stock Payment make-whole shares, and 265,204 shares as my allocated 2021 Earnout Payment make-whole shares, each at a 30-day VWAP of $2.38.  Continental did so. PX229 is a true and correct copy of MoneyLion's instruction letter.  (MoneyLion_01853256, at MoneyLion_01853260-61.)

146.    On April 7, 2022, MoneyLion instructed Continental to cancel 5,656 shares that had been over-issued to me pursuant to MoneyLion's instruction letter of March 31, 2022. Continental did so.  PX231 is a true and correct copy of MoneyLion's instruction letter. (MoneyLion_01853245, at MoneyLion_01853247.)

147.    On June 30, 2022, MoneyLion instructed Continental to issue 1,366,060 shares as my allocated Closing Stock Payment make-whole shares, and 445,755 shares as my allocated 2021 Earnout Payment make-whole shares, each at a 30-day VWAP of $1.61.  Continental did so. PX243 is a true and correct copy of MoneyLion's instruction letter.  (MoneyLion_01851889, at MoneyLion_01851893-94.)

148.    On September 30, 2022, MoneyLion instructed Continental to issue 1,732,457 shares as my allocated Closing Stock Payment make-whole shares, and 568,749 shares as my allocated 2021 Earnout Payment make-whole shares, each at a 30-day VWAP of $1.32.

Continental did so.    PX251 is a true and correct copy of MoneyLion's instruction letter. (MoneyLion_01851766, at MoneyLion_01851770-71.)

149.    On March 14, 2023, MoneyLion paid me $129,990 in cash and Continental issued 1,235,928 shares, at a 30-day VWAP of $0.57, presumably as instructed by MoneyLion (although I have not seen MoneyLion's instruction letter).  In combination, this was my allocated 2021 Earnout Payment make-whole payment.    PX310 (MoneyLion_00314603) is a true and correct copy of my Continental account statement dated April 4, 2023.  PX311 (MoneyLion_01862502-04) is a true and correct copy of an email from Ben Probber, Associate General Counsel at MoneyLion, dated April 4, 2023 and attaching MoneyLion's spreadsheet reflecting its calculations of this issuance to Sellers.

150.    Thus, after March 14, 2023, I owned 7,259,055 shares of MoneyLion stock which were paid to me pursuant to the MIPA as a combination of the Closing Stock Payment, the 2021 Earnout Payment, and make-whole shares associated with each.  (PX310.)

151.    I recall that each quarter, MoneyLion would send Sellers a spreadsheet reflecting the 30-day VWAP and other calculations underlying each issuance of the Closing Stock Payment, the 2021 Earnout Payment, and make-whole shares to each Seller.

152.    I am relying on MoneyLion instruction letters and Continental account statements for all of the foregoing information about my shares.

### MONEYLION'S PUBLIC STATEMENTS ABOUT THE ACQUISITION

153.    MoneyLion's public statements following the Acquisition very much accord with what Messrs. Choubey and Correia had explained to me in summer 2021 about the reasons why the    Acquisition    was    attractive    to    MoneyLion.    PX168 (https://investors.moneylion.com/news/detail/62/moneylion-acquires-leading-creator-network-and-content) for example, is a true and correct copy of a press release from MoneyLion dated

November 16, 2021 (one day after the Acquisition). In this press release, Mr. Choubey was quoted as follows:

> This transaction is the evolution of a successful four-year partnership between MALKA and MoneyLion. We have seen first-hand how MALKA's content capabilities can drive industry-leading customer acquisition and retention at scale. By combining their capabilities with MoneyLion's financial products and extensive first party data, we will create a durable advantage that accelerates MoneyLion's customer growth and helps us serve our mission of providing financial access and advice to hardworking Americans. . . .
>
> Through this acquisition, which we anticipate will be accretive and cash flow positive in 2022, we will now be able to fully leverage MALKA's capabilities so that the MoneyLion brand can truly live wherever our customers are investing their attention.

(PX168 at 2.)

154.    In the same press release, Mr. Davaris was quoted as follows:

> With MALKA's creator network we no longer need to just go through gatekeepers and monopolistic intermediaries to directly communicate with our audience and communities. Investing in evergreen content and building a platform where creators and consumers can come together is a more efficient and smarter way to support our marketing investments and brand building. This fundamental shift will allow us to own and not rent the relationships we are cultivating with new and existing MoneyLion customers.

(PX168 at 2.)

155.    Also on November 16, 2021, MoneyLion publicly released a slide deck which said that "MALKA is designed for hyper scale across all emerging channels" and touted a "[u]nique model that unifies content creation, publishing & distribution, under one roof." PX167 (MoneyLion_01847140-56) is a true and correct copy of this slide deck. (*Id.* at 5.)

156.    The presentation dubbed the Acquisition "Strategic Combination Building FinTech 3.0," further stating:

> MALKA's network to drive new audiences to MoneyLion / Creator network to directly connect brand to new audiences and communities at scale, giving MoneyLion the advantage to acquire customers more efficiently . . . MoneyLion's

members will be able to activate financial solutions and purchase products while consuming hyper-personalized content that engages and educates customers, daily.

(PX167 at 6-9.)

157.    On February 24, 2022, the website Boardroom Alpha published a video interview with Choubey in which he discussed the Acquisition. PX206 (https://www.boardroomalpha.com/moneylion-ceo-dee-choubey-on-its-despac-and-the-road-ahead/) is a true and correct copy of this interview, in which Mr. Choubey was quoted as saying:

> There are lots of super apps. But you know, we're playing a different strategy. And I think one of our strategies, one of the most interesting ones, we recently acquired a media company [MALKA Media Group] so we now can create our own content. We have thousands of creators, that are athletes, celebrities, influencers. And a lot of people didn't understand why we acquired that company, because it wasn't traditionally what a challenger bank fintech company would do. But what it allows us to do is it really allows us to own an authentic conversation about the culture of money, it allows us to engage with segments of the population that haven't really been taught about financial services in the right way or in a thorough way. So it allows us to acquire those consumers as listeners to our conversation in a way that's highly differentiated.

158.    In March 2022, I was given the title of MoneyLion's Chief Content Officer, and MoneyLion continued to publicly tout the Acquisition throughout 2022.

159.    For example, PX218 (https://d1io3yog0oux5.cloudfront.net/_f1782cce74f0cf1a4eb3822c1c6111b2/moneylion/db/1937/17809/file/MoneyLion+4Q+and+Full+Year+2021+Earnings+Call+Transcript.pdf) is a true and correct copy of the transcript of MoneyLion's 4Q and Full Year 2021 Earnings Call on March 10, 2022. During this call, Mr. Choubey said:

> As part of the MoneyLion team Malka is able to provide access to its vast network of creators which can amplify social messages, increase awareness, and drive customer engagement.
>
> The creator network becomes a brand amplification engine for MoneyLion to engage with fans who are actively turning to social channels for financial education and opportunities. We estimate Malka's creators provided over 69 million

MoneyLion brand impressions in Q4 alone, and this doesn't include a $4 million earned brand benefit that MoneyLion achieved through Malka's network to create a massive Super Bowl campaign hosted by Mike Tyson. . . .

From a performance perspective, we continue to see strong unit economics. We saw 60%-plus adjusted gross profit margins, we had a $70 average revenue per user with upside to over $135 for mature cohorts, and from an acquisition perspective we continue to see efficient payback periods with a less than six month payback period on customer acquisition costs.

(PX218 at 3-5.)

160.    During the same earnings call, Mr. Choubey was asked how to quantify "in terms of value to you" the "69 million impressions from Malka in the quarter." He replied:

When you look at what our trend was in terms of CAC [customer acquisition cost], we've always had that market leading CAC. We saw a slight increase to that when were in Q3, and in Q4 we saw that coming back in, and that's part of that strategy in terms of the brand awareness and the investment that we've made with the Malka Media acquisition. We continue to see that translate into what is a low 20s CAC for us, and so that's where you'll see the value from those impressions.

(PX218 at 12.)

161.    PX238

(https://d1io3yog0oux5.cloudfront.net/_83c441241e87c31327fd3222cff21501/moneylion/db/193 7/17824/file/MoneyLion+1Q22+Earnings+Call+Transcript.pdf) is a true and correct copy of the transcript of MoneyLion's 1Q 2022 Earnings Call on May 12, 2022. During this call, Mr. Choubey said that CAC

is the big differentiator for MoneyLion. Our investments in the today [ph] fee where the strategy is to become the daily destination for money, adjacent conversations powered by influencers, creators by owning the culture of money is driving a lot of word of mouth as well as social proliferation of the MoneyLion brand and the MoneyLion product.

(PX238 at 8-9.)

162.    PX249

(https://d1io3yog0oux5.cloudfront.net/_83c441241e87c31327fd3222cff21501/moneylion/db/193

7/17845/file/MoneyLion+2Q22+Earnings+Call+Transcript.pdf) is a true and correct copy of the

transcript of MoneyLion's 2Q 2022 Earnings Call on August 11, 2022.  During this call, Mr.

Choubey said:

> We continued to add record new customers in the quarter while reducing our
> customer acquisition cost in the quarter as well.  This continues to be a key
> differentiator for MoneyLion, and we expect to build on this advantage. . . .
>
> Lastly, our Media division, which was established through our acquisition of
> MALKA Media, generates revenue from providing content production and
> management and creator and influencer management services to creators,
> influencers, and corporate clients—an important benefit for generating Enterprise
> revenue.  We also realize synergies by providing low-cost content and customer
> acquisition in our Consumer business.

(PX249 at 4, 6.)

163.    PX260

(https://d1io3yog0oux5.cloudfront.net/_601fe21e660a9cdcc0d9d2eafd9b3a3c/moneylion/db/193

6/17853/earnings_call_transcript/CORRECTED+TRANSCRIPT++MoneyLion%2C+Inc.%28M

L-US%29%2C+Q3+2022+Earnings+Call%2C+10-November-2022+8+30+AM+ET.pdf) is a true

and correct copy of the transcript of MoneyLion's 3Q 2022 Earnings Call on November 10, 2022.

During this call, Mr. Choubey said, "Our ownership of a content studio truly gives us differentiated

customer acquisition and retention capabilities. . . . With a consistently low CAC, a compounding

data strategy and an expanding network of enterprise partners, we're able to both drive better

outcomes for our customers and scale our business efficiently."  (PX260 at 4-6.)

164.    As yet another example, at MoneyLion's Investor Day event on December 8, 2022,

where I was one of the speakers, MoneyLion's Chief People Officer, Kate Fallon, introduced me

and said the following: "MALKA, our award-winning creative studio, which we acquired in

November 2021 and integrated into our media division, powers some of the largest brands in

American storytelling."    PX267    (https://moneylion.nyc3.cdn.digitaloceanspaces.com/wp-

content/uploads/2022/12/13194144/CONSUMER_CONTENT_STRATEGY.pdf) is a true and correct copy of the transcript of Ms. Fallon's introduction and of my remarks.

### MONEYLION'S POST-CLOSING
### CALCULATION OF MALKA'S NET WORKING CAPITAL

165.    The MIPA required that, within 60 days after November 15, 2021, MoneyLion had to calculate Malka's Final Closing Working Capital as of November 15, 2021 in accordance with Schedule A.    (JX065 at § 2.05(b), DLA_006204-06.)    On January 10, 2022, I (as Sellers' Representative) received an email from Michelle Lee at MoneyLion, copying others, in which Ms. Lee sent me MoneyLion's "final schedules . . . for working capital and purchase price adjustments . . . per the MIPA."  PX185 (MoneyLion_01878901-03) is a true and correct copy of the email with attachments that I received from Ms. Lee.

166.    I forwarded Ms. Lee's email with attachments to Mr. Basdekis and asked him to review them to make sure they were accurate.  On January 30, 2022, Mr. Basdekis responded to me, copying Mr. Curran and Mr. Krubich:

> For year end close (which is being done in accordance with GAAP and ACS [sic] 606, NOT our accounting principals [sic] which is what the earnout is based off of) we are just about at the finish line for recording revenue recognition entries. . . .
> . . .
> [] At the same time, a significant amount of revenue will be moving out of the 11/15-12/31 period and into 2022. This reduces our 2021 revenue and EBITDA. This impact is shaping up to be $1.1M+ that will leave 2021 all together.  Again, these adjustments are being made in accordance with GAAP principles, not our historical accounting principles.

JX071 (MoneyLion_01877199-01877201) is a true and correct copy of my email exchange with Mr. Basdekis.

167.    On March 2, 2022, I had a Slack conversation with Mr. Basdekis in which I inquired about the status of RSM's (MoneyLion's external auditor) audit and the 2021 earnout.  As in his January 30, 2022 email, Mr. Basdekis explained that RSM's audit "is based on GAAP accounting,"

and unrelated to the earnout. I understand from my conversations with Mr. Basdekis around that time that he had worked with MoneyLion to track Malka's financials on a GAAP basis on NetSuite, separately tracking the same information (also on NetSuite) in accordance with Schedule B for earnout purposes. Mr. Basdekis also informed me that he had provided MoneyLion "our historical accounting principal [*sic*] view of 2021 . . . a few weeks ago[.]" In the same exchange, Mr. Basdekis also sent me a number of invoices to MoneyLion for intercompany services performed in 2022—likely because I was the responsible Malka partner for the MoneyLion client relationship. PX210 (MoneyLion_00017455-70) is a true and correct copy of this Slack thread and its attachments.

168.    On March 2, 2022, I wrote to Ms. Lee and Erika Nuno of MoneyLion, and inquired as to the status of the 2021 earnout. JX075 (MoneyLion_00223167-69) is a true and correct copy of this email.

169.    Ultimately, on March 15, 2022, MoneyLion wrote to me, as Sellers' Representative: "[P]lease see attached for the 2021 Revenue and EBITDA Statement related to the earnout as per the purchase agreement. Based on this calculation, Malka has achieved the full earnout out for 2021." The 2021 Revenue and EBITDA Statement that Ms. Lee sent me calculated Malka's 2021 revenue as $30,806,976, Malka's 2021 EBITDA as $921,497, and added $890,905 for the "2019 Tax Credit," making Malka's "EBITDA plus Tax Credit" $1,812,402. JX083 (MoneyLion_01826070-71) is a true and correct copy of the 2021 Revenue and EBITDA Statement transmitted to me on March 15, 2022.

170.    Sellers did not object to the 2021 Revenue and EBITDA Statement. As I testified above, Continental issued my allocated portion of the 2021 Earnout Payment, including the related make-whole shares, on the respective vesting dates.

171.    MoneyLion explicitly encouraged Malka to send out invoices promptly, and before the end of the calendar year whenever possible.  In my experience, this is a common business practice.  As I testified above, none of these invoices were unexpected for our clients.  I did not ever manipulate or misreport the timing or amounts of Malka invoices so as to increase Sellers' chances of receiving either the 2021 or 2022 Earnout Payments.

### THE 2019 AND 2020 TAX CREDITS

172.    Sometime in December 2021, I was notified by the New Jersey tax authorities that Malka had received initial approval for the Tax Credit for 2019, in the full amount that Malka had applied for ($890,904.80).  I shared this information with MoneyLion, and Ms. Nuno, who worked on MoneyLion's Strategic Finance team, told me that "we'll ensure that the adjustment for the credit is made pursuant to the agreement so that you're getting the credit for it," as required by Schedule B.  PX177 (MoneyLion_00288354) is a true and correct copy of this email.

173.    Sometime in 2022, Mr. Basdekis informed me that he had filed Malka's application for a Tax Credit of $1,590,603 based on its 2020 digital media production work.  As I testified above, Schedule B required that the parties include in Malka's calculated EBITDA for earnout purposes the expected Tax Credit recognition "in the period in which the Tax Credit was applied for," which here would mean in 2022.  (JX065 at DLA_006267.)

174.    On December 8, 2022, the New Jersey tax authorities notified Mr. Basdekis and me that Malka's 2020 tax credit application "ha[d] been deemed complete" and would "be added to the approval queue and file transmitted to Underwriting for review. . . . Because the application was seeking less than $3MM in credits ($1,590,603), the project does not have to go to board for approval and will be approved at the staff delegated level once the review is complete."  PX268 (MoneyLion_00155283) is a true and correct copy of this email.

## MALKA'S INTERCOMPANY SERVICES TO MONEYLION

175.    After the Acquisition, Malka provided substantial creative and marketing services to MoneyLion, pursuant to an Intercompany Services Agreement effective as of November 15, 2021.    I recall that it was Sellers' idea to put the agreement in writing.    PX159 (MoneyLion_00017823-30) is a true and correct copy of this agreement, whereby MoneyLion agreed to engage Malka to provide $10 million of services during 2022.

176.    In 2022, Malka personnel provided intercompany services to MoneyLion as "retained teams" and "shared creative" teams as well as for particular MoneyLion projects.    PX289 (MoneyLion_01863633-39) is a true and correct copy of an email and attached spreadsheet sent by Mr. Basdekis on January 20, 2023.  This exhibit shows that throughout 2022, Malka regularly invoiced MoneyLion for the services being performed by both of these teams and for MoneyLion projects.

177.    The services that Malka provided to MoneyLion in 2022 were discounted.  Malka never charged MoneyLion the 20 percent production management fee that Malka generally charged third parties.    PX210    (MoneyLion_00017459;    MoneyLion_00017463; MoneyLion_00017467; MoneyLion_00017470) and PX234 (MoneyLion_00017573) are true and correct copies of sample Malka statements of work, which illustrate that MoneyLion was not charged the production management fee that was charged to other clients in 2022.

178.    In addition, the "internal" rates that Malka charged to MoneyLion were lower than the rates generally charged by Malka to "external" third parties. Malka's 2022 rate card for the "ML Brand Team" shows that the effective hourly rates of employees on the team, which provided intercompany services to MoneyLion, were heavily discounted from their standard rates.  PX190 (MoneyLion_01858090) is a true and correct copy of such a rate card from August 2022.  PX190

was created in the ordinary course of Malka's business, and it was Malka's ordinary course of business to create such rate cards.

179.    As just one example, for that month, MoneyLion was charged an effective hourly rate of $89.09 for an art director's time compared with $150.00 that would be charged to other clients pursuant to Malka's Standard Rate Card.  (PX190.)

180.    Malka's retained team members for its intercompany services to MoneyLion in 2022 did not submit timesheets or any similar documentation of their time spent on MoneyLion matters.  Rather, they were expected to remain available on a full-time basis for MoneyLion matters, in addition to any work for other Malka clients.  Malka's invoices to MoneyLion therefore used an assumed 10-hour workday to derive an employee's notional, hourly billing rate, which was substantially discounted.  (PX190.)

181.    Other Malka employees were part of the "shared creative services" team, meaning they did some work for MoneyLion but were not expected to maintain full-time availability for MoneyLion projects.  These employees did submit timesheets.

182.    I understand that Mr. Basdekis's team maintained Malka's accounting records, including all such records relating to intercompany services, on NetSuite.  Therefore, all of these records were (and presumably still are) readily available to MoneyLion at any time.

183.    I am not aware of anyone from MoneyLion ever complaining or communicating to me or Sellers in 2022 that an insufficient amount of work was being performed by either the retained or shared creative teams (or by any Malka personnel providing any services for MoneyLion in 2022).  To the best of my knowledge, all work requested by MoneyLion in 2022 was performed in 2022, and MoneyLion timely paid for that work.

## MONEYLION 2022 BONUSES FOR MALKA

184.    Prior to the Acquisition, Malka rarely paid bonuses and only in small amounts.  The bonuses that Malka did pay were limited in both frequency and amount and related to employee referral bonuses, new-hire signing bonuses, and miscellaneous "spot" bonuses, each only in particular cases and not as a general practice.

185.    PX296 (MoneyLion_00023200) is a true and correct copy of a Slack thread between Messrs. Basdekis, Fried, Krubich, and myself dated January 29, 2023.  According to Mr. Basdekis's figures, Malka paid only $13,000 in year-end bonuses in 2021 and $17,125 in 2022, along with certain referral, sales incentive, and spot or sign-on bonuses.  Including all of these types of incentive-based compensation, Malka paid total bonuses of $64,195 in 2021 and $28,125 in 2022.

186.    On July 23, 2022, I wrote to Messrs. Choubey and Correia with respect to the 15 Malka employees who were functioning as full-time MoneyLion employees.  The Malka employees who were dedicated to MoneyLion were compensated differently from MoneyLion employees because, as I mentioned, Malka did not historically pay bonuses, but MoneyLion did.  When I wrote to Messrs. Choubey and Correia, I asked whether MoneyLion could put in place a bonus program for these 15 Malka employees who were working on the MoneyLion account full time to align their compensation with MoneyLion's.  Messrs. Choubey and Correia said that was not possible.  JX090 (MoneyLion_00110294-95) is a true and correct copy of my Slack exchange with Mr. Choubey and Mr. Correia on January 25, 2023.

187.    On January 18, 2023, Mr. Basdekis sent me, Mr. Krubich and Mr. Fried a file called "Earn Out vs GAAP Income Statement FY 2022."  The attached spreadsheet compared Malka's 2022 "GAAP" numbers versus its 2022 "Earnout" numbers.  For bonuses, Mr. Basdekis' spreadsheet had $28,125 for both "GAAP" and "Earnout."  JX101 (MoneyLion_00023193-95) is

a true and correct copy of my January 18, 2023 Slack exchange with Mr. Basdekis and the attachment he sent.

188.    Other than this $28,125, I am not aware of any Sellers, or Mr. Basdekis, taking any steps or action to provide for additional bonuses in calendar year 2022.

189.    In the first quarter of 2023, MoneyLion advised Malka that there was an available budgetary "pool" for employee bonuses for calendar year 2022.  Payment of these budgeted-for bonuses would not be based on any formal 2022 performance review, either as to Malka itself or individual employees.  Ultimately, in 2023, MoneyLion paid bonuses to a number of Malka personnel.

190.    No one at MoneyLion ever informed me that it would attempt to use a total figure of $544,500 in employee bonuses, which was $529,500 above the amount in Malka's 2022 Budget, in order to reduce Malka's calculated 2022 EBITDA for earnout purposes.

### TRACKING PROGRESS TOWARDS THE 2022 EARNOUT

191.    During 2022, Mr. Basdekis regularly tracked Malka's progress toward the 2022 Earnout Payment and shared his findings at weekly Malka meetings with Sellers, and at monthly meetings with Sellers and MoneyLion's finance and accounting team (usually consisting of Ms. Nuno, Ms. Lee, and sometimes Mr. Correia and/or MoneyLion's Chief Accounting Officer, Mark Torossian—to whom Mr. Basdekis reported).

192.    JX091 (MoneyLion_00176083-84) is a true and correct copy of an August 31, 2022 email from Mr. Basdekis to Ms. Nuno, Ms. Lee, and Mr. Torossian attaching a Malka income statement through July 2022.  This is a typical example of the documents that Mr. Basdekis would prepare and present at these monthly meetings, and my recollection is that he presented updated Malka financial data in subsequent months.  I note that the subject line of the email is "Historical

Principal [*sic*] P&L – MMG," referring to Malka Media Group, and that the attachment is titled "NonGAAP Income Statement – MMG YTD July 2022."

193.    I recall that, by early December 2022, Mr. Basdekis informed Sellers that Malka had long surpassed the revenue threshold for achieving the Maximum 2022 Earnout Payment, and was on target to easily surpass the EBITDA threshold as well.  This meant that, in addition to Sellers soon receiving the fourth tranche of 2021 Earnout Payment shares, we would receive over the course of 2023, additional 2022 Earnout Payment shares valued at $25 million as of a particular date, and at very low prices—given the collapse of MoneyLion's share price at the time.

### MONEYLION'S SHARE PRICE

194.    I recall that MoneyLion's share price declined from about $5.80 at the time of the Acquisition    to    about    $0.60    in    December    2022.    PX395 (https://finance.yahoo.com/quote/ML/history/) is a true and correct copy of MoneyLion's historical share prices from Yahoo! Finance, which are conformed so as to reflect the 1:30 Reverse Stock Split that occurred in April 2023, which I discuss in paragraphs 221-225 below.  For example, Yahoo! Finance shows that MoneyLion's share price (reflecting the number of shares outstanding <u>after</u> the Reverse Stock Split) on December 12, 2022 would have been $16.62, but in reality is was 1/30 of that.

195.    When MoneyLion's SPAC transaction was announced in February 2021, the post-transaction enterprise was valued at $2.4 billion.  PX037 (https://investors.moneylion.com/filings-financials/sec-filings/annual-reports/content/0001213900-21-009118/ea135553-425_fusionacq.htm) is a true and correct copy of MoneyLion's Employee FAQ on MoneyLion SPAC Transaction, dated February 12, 2021.

196.    Between the Acquisition and December 12, 2022, according to records I have reviewed, MoneyLion's market capitalization declined from an estimated $1.3287 billion to

$126.8 million, a decline of 91.5 percent.  PX358 (SELLERS00004094) is a true and correct copy of these records.  PX358 is also the type of market report that Sellers shared with one another and relied upon in the ordinary course of Malka's business.  These figures accord with my personal recollection of MoneyLion's historical market capitalization, which I discussed contemporaneously with the other Sellers and MoneyLion executives.

197.    As a result of the sale of our Malka shares to MoneyLion in the Acquisition, towards the end of 2022, the four Sellers each had to pay substantial capital gains taxes, and the only way any of us expected we could do so was by selling some of our MoneyLion shares.  Sellers informed MoneyLion of our tax obligations.  PX272 (MoneyLion_01864072) is a true and correct copy of a December 14-15, 2022 email chain involving Sellers and Messrs. Choubey, Correia, and VanWagner.  My projected tax obligation for 2022 was about $2.85 million.

198.    Sellers were authorized to make sales during extremely limited open trading windows.  When I asked MoneyLion executives why this was, I was advised that we were legally considered corporate insiders who, in fact, could not sell any shares outside of those trading windows without taking additional steps required by insider trading laws.  I recall that Mr. Krubich proposed to file Rule 10b5-1 forms so that we could make sales to satisfy our tax obligations—but MoneyLion rejected this idea, demanding to know exactly how many shares each of us needed to sell in order to satisfy our tax obligations.

199.    Based on a review of my personal financial records, between November 14 and December 15, 2022, I sold 1,190,770 MoneyLion shares, raising $717,746.18 in cash (an average of $0.60 per share) and incurring a tax loss of -$1,789,534.

200.    In light of Sellers' tax obligations, at Mr. Curran's suggestion, Sellers engaged a company called Corporate Valuation Advisors to perform a valuation of our restricted shares.  The

valuation report concluded that our shares were subject to a 30 percent discount for "lack of marketability."  PX266 (MoneyLion_00157371-90) is a true and correct copy of this valuation report.  (*See id.* at MoneyLion_00157381-82.)

## MONEYLION'S DECISION TO BREACH THE MIPA

201.    As noted above, in December 2022, Sellers were under financial pressure because we had to pay our capital gains taxes arising out of the Acquisition.  At the same time, MoneyLion was not permitting us to sell additional vested shares, and this created a serious problem for us, which Mr. Frommer and I discussed with Messrs. Choubey and Correia.  Our discussions convinced me that MoneyLion was intent on extracting additional concessions from Sellers as a precondition to allowing us to sell additional shares.  In that context, Messrs. Krubich, Fried, and I spoke with Messrs. Choubey and Correia by telephone on December 14, 2022.

202.    I recorded this call because it had become apparent to me that MoneyLion was intent on interfering with Sellers' ability to sell our vested shares and to run Malka in the same manner that we had been doing.  During the December 14 call, Messrs. Choubey and Correia asked the three Sellers present to agree to defer vesting of our next quarterly tranche of make-whole shares, and of the 2022 Earnout Payment shares, for another year (until January 1, 2024).  According to them, the steep decline in MoneyLion's share price at that time meant that, if Sellers were to be paid, and then resell, a large number of MoneyLion shares, it could startle investors and cause further declines in the share price.

203.    Although Messrs. Choubey and Correia freely admitted on the call that MoneyLion had binding commitments in the MIPA to pay us our make-whole shares on particular dates, and the 2022 Earnout Payment on particular dates (assuming Malka satisfied the applicable revenue and EBITDA thresholds to receive the earnout payment)—they took the position that they could not allow us to receive shares worth $25 million while the share price was around $0.50.

Therefore, Sellers were effectively told to accept a yearlong delay in payments to which we were contractually entitled, or else.

204.    Messrs. Choubey and Correia made clear that the reason for this unfair proposal to Sellers was MoneyLion's falling share price at the time.  MoneyLion was willing to violate or ignore the basic terms of the Acquisition, and to do whatever else it took in order to avoid paying us the shares that we had rightly earned under the MIPA—because paying us our shares could have resulted in additional dilution and/or reduction in the share price.

205.    I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX271 (SELLERS00003790 Tr.).  Based on my review, PX271 is a true and accurate transcript of the conversation.

206.    During the call, Mr. Choubey said:

I think the reality of the matter is it's essentially gonna take a year longer for us to get you that $70,000,000 in shares as we build the business together and build it back up.  I mean that's the fact of the matter for a real talk if you really want to get to brass tacks.

(PX271 at 5.)

207.    As Mr. Correia explained, if the share price eventually recovered to $2 or $3, Sellers' shares could be worth $300 million.  (PX271 at 7.)

208.    Thus, the "crazy" scenario that Mr. Correia had described to me back on July 2, 2021—in which MoneyLion was now a penny stock and Sellers' equity ownership of MoneyLion stood to increase significantly—had come to pass.  (PX271 at 2-3.)

209.    During the December 14, 2022 call, Mr. Correia acknowledged, "[A]re we breaking the agreement, sure," but reassured the three of us that we would still get the 2022 Earnout Payment; "[i]t's just going to take a little bit more time."  (PX271 at 7-8) (emphasis added).

210.    Mr. Choubey added: "<u>There is no scenario where the current make-whole construct can be the way it is.</u>"  (PX271 at 8) (emphasis added).

211.    The next day, all four Sellers had another telephone conversation with Messrs. Choubey and Correia about their proposed deferment of the 2022 Earnout Payment.  Again, I recorded this call.  I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX273.  Based on my review, PX273 is a true and accurate transcript of the conversation.

212.    Mr. Choubey said that he intended "to use every corporate lever to then make sure that those shares aren't coming to market . . ."  (PX273 at 18.)

213.    During the call, Mr. Correia acknowledged that MoneyLion owed Sellers "75 million bucks one way or another" and reassured us that MoneyLion was "not proposing . . . to not give you your $25 million," by which he was referring to the 2022 Earnout Payment shares.  However, he said that MoneyLion's board would likely resist issuing additional shares to Sellers while the share price remained around $0.50.  (PX273 at 19, 23.)

214.    Mr. Choubey agreed: "You're going to get the full $25 million, just at a later date.  (PX273 at 23.)

215.    Sellers did not agree to the proposal by Messrs. Choubey and Correia that we accept the deferred vesting of our shares.  In my view, this was an inappropriate attempt by MoneyLion executives to rewrite the binding agreements whereby we had sold our company to them—simply because MoneyLion apparently no longer found the terms sufficiently favorable.  I did not understand by what authority MoneyLion could unilaterally change the terms of our deal.

216.    On December 20, 2022, Mr. Choubey had another telephone conversation with Messrs. Krubich, Fried, and myself, which I also recorded.  I have reviewed both the recording of

this phone call and a transcript thereof, which is appended hereto as PX277.  Based on my review,

PX277 is a true and accurate transcript of the conversation.

217.     During the call, Mr. Choubey said:

We asked you to defer the 12/31 make-whole to 2024, and you guys didn't want to do that. . . . [A]lso with the company having to issue so many shares and forcing a 50-cent stock potentially to go to 30 cents, right?  Because the value of the company is the value of the company, the more shares you issue the lower the stock price goes. . . . 100% categorically no one had the 10b5-1. . . . The lawyers were telling us arguably that our insider trading policy should have been interpreted that when you're in a cure period no insider should be able to sell stock, right?  So I think it would have just been a horrible look if we had put those in place, so that's why we made the call there on that one.  I hope you understand that one.

(PX277 at 15-16.)

218.     I understood Mr. Choubey's words to mean that, in the opinion of MoneyLion's counsel, Sellers were still restricted from transferring our shares out of Continental without additional authorization, because we ostensibly qualified as corporate insiders.

219.     I have no idea why I qualified as an insider (or if, indeed, I truly did), as I do not recall having knowledge of any significant nonpublic plans or information regarding MoneyLion.  To this day, I am unaware of how MoneyLion could prevent me from selling some of my shares on that basis.

220.     As I testified above, MoneyLion would choose to pay Sellers' Q4 2022 make-whole shares related to the 2021 Earnout Payment as a mix of equity and cash on March 14, 2023, unlike its previous issuances of the Closing Stock Payment and 2021 Earnout Payment shares.  This reflected MoneyLion's evident concerns about dilution while its share price remained below $1.00.

## THE REVERSE STOCK SPLIT

221.     At some point in late 2022 or early 2023, as I learned from discussions with the other Sellers and with MoneyLion officers, the New York Stock Exchange warned MoneyLion that its stock would be delisted if it could not achieve the minimum share price of $1.00.

222.    On March 31, 2023, MoneyLion filed a proxy statement announcing a special meeting to be held April 19, 2023, for shareholder approval of the Reverse Stock Split at a ratio of between 1:2 and 1:30.  PX308 is a true and correct copy of this proxy statement. https://investors.moneylion.com/filings-financials/all-sec-filings/content/0001213900-23-025534/0001213900-23-025534.pdf.

223.    MoneyLion disclosed that "[t]he primary goal of the Reverse Stock Split is to increase the per share market price of the Class A Common Stock to meet the minimum per share price requirement for continued listing on the New York Stock Exchange."  (PX308 at 7.)

224.    I recall that MoneyLion executives and officers including Sean Horgan, Head of Investor Relations, repeatedly instructed Sellers that we should vote for the Reverse Stock Split and repeatedly asked whether we had done so.

225.    The Reverse Stock Split was approved by shareholder vote, and was subsequently implemented at the maximum ratio of 1:30.  This meant that if a MoneyLion shareholder owned 30 shares before the Reverse Stock Split, he would own 1 share after it.

## THE 2022 EARNOUT AND ENSUING NEGOTIATIONS

226.    It was against the backdrop of MoneyLion's falling share price—and Messrs. Choubey's and Correia's threats at the end of 2022—that Mr. Basdekis provided his 2022 Malka revenue and EBITDA calculations to MoneyLion in January 2023.  To the best of my knowledge, he did so using the same NetSuite accounting records system that he had used for the 2021 revenue and EBITDA calculations, and for Malka's regular accounting activities.

227.    As reflected on the January 18, 2023 income statement that Mr. Basdekis sent to me, Mr. Krubich and Mr. Fried, Malka's revenue for 2022 for "Earnout" purposes was $42,516,536 and EBITDA, or "Net Ordinary Income" was $1,508,501, before counting the Tax Credit.  (JX101 at MoneyLion_00023195.)  Thus, Mr. Basdekis had concluded that Sellers had

earned the Maximum 2022 Earnout Payment of $25 million worth in shares, valued as of the contractual date.

228.    This was not a surprise given where Malka's business stood in late December 2022, as reflected in Sellers' conversations with Messrs. Choubey and Correia.    PX291 (MoneyLion_00145664-65) is a true and correct copy of the 2022 revenue and EBITDA calculations transmitted from Mr. Basdekis to MoneyLion.

229.    True to his word, Mr. Choubey made good on his threat not to issue the 2022 Earnout Payment, and MoneyLion proceeded to substitute its own, completely different set of calculations in the Revenue and EBITDA Statement transmitted to me on April 14, 2023.  That decision by MoneyLion precipitated this dispute.  JX112 (MoneyLion_01826072-76) is a true and correct copy of the Revenue and EBITDA Statement.

230.    After receiving the 2022 Revenue and EBITDA Statement, Sellers retained outside counsel and accountants to advise us as we prepared to submit written objections pursuant to Section 2.06(b)(ii) of the MIPA.  We also requested access to MoneyLion personnel, including Mr. Basdekis.

231.    On May 25, 2023, as required by the MIPA and after consulting with the other Sellers, and with external counsel and accountants, Sellers submitted their Detailed Statement of Objections to the 2022 Revenue and EBITDA Statement.  JX119 (MoneyLion_000057-65) is a true and correct copy of that Detailed Statement of Objections.  As our cover letter stated, we had been advised that MoneyLion's reliance upon its own, alternative revenue and EBITDA calculations contravened Schedule B, and we were prepared to "begin the good faith negotiations to resolve this matter" pursuant to Section 2.06(b)'s dispute resolution procedures.  (*Id.* at MoneyLion_000057-59.)

232. In the Detailed Statement of Objections, among other points, Sellers disputed MoneyLion's decisions to: (i) use GAAP for revenue and expense recognition in complete disregard of multiple provisions of the MIPA and its Schedules; (ii) subtract $529,500 from Malka's EBITDA for bonuses paid in 2023 and which were not contemplated in the 2022 Budget or were many multiples larger than what Malka paid in 2022 as reflected on Mr. Basdekis' income statement; (iii) subtract $1,242,248 from revenue and EBITDA relating intercompany services even though Malka charged MoneyLion less for the same services than it charged third-party customers; and (iv) exclude from EBITDA the Tax Credit for which Mr. Basdekis had duly applied in 2022. (JX119 at MoneyLion_000061-63.)

233. On June 9, 2023, as required by the MIPA, Sellers and MoneyLion met (by Zoom) to conduct negotiations regarding the 2022 Revenue and EBITDA Statement and Sellers' objections thereto. Both sides' outside counsel and external accounting consultants were present as well.

234. I recall that, during the June 9 meeting, MoneyLion's external accountants from FTI expressed the view that while Sellers were entitled to the Tax Credit for purposes of the 2022 Earnout Payment, FTI opined that the "expected recognition" of the Tax Credit should be discounted by approximately 15 to 20 percent from the amount for which Mr. Basdekis had applied ($1,590,603).

235. I can recall no other substantive comments from MoneyLion or its advisors during the June 9, 2021 Zoom meeting.

236. When the parties were unable to reach agreement during the 30-day period of negotiations, the parties then discussed the appointment of an Independent Accountant and jointly agreed on one, Matt Bialecki of Alvarez & Marsal.

237.    On June 29, 2023, Sellers' counsel sent a letter to Mr. Bialecki advising him that Sellers and MoneyLion had jointly agreed to engage him.  JX321 is a true and correct copy of this letter.

238.    While counsel for both sides was negotiating the language of Mr. Bialecki's engagement letter in July 2023, for reasons I do not understand, MoneyLion advised that they were rethinking going to the Independent Accountant and suggested that the parties should first go to court to resolve various legal determinations.

239.    I understand that negotiations thereafter broke down, and Sellers filed this lawsuit on July 21, 2023.

## NOTICE OF CLAIM

240.    On May 15, 2023, while Sellers were still preparing our Detailed Statement of Objections, MoneyLion sent a purported Notice of Claim seeking indemnification under the MIPA with respect to certain issues.  JX113 (SELLERS00000022) is a true and correct copy of MoneyLion's letter.

241.    On June 6, 2023, Sellers replied in writing to MoneyLion's Notice of Claim.  Ex. JX120 (SELLERS00000041) is a true and correct copy of Sellers' reply.

242.    First, MoneyLion claimed that Sellers had breached Section 3.04 of the MIPA by failing to disclose Malka's ownership of Run That Back LLC.  However, since sometime before the Acquisition, Run That Back LLC had remained an empty shell with no operating agreement, assets, or tax or other filing obligations; and we informed MoneyLion of this in our reply.

243.    Second, MoneyLion claimed that Sellers had breached Section 3.06 of the MIPA by classifying the cost of revenue-generating employees under General & Administrative rather than as costs of goods sold.  However, as this claim implies and as we pointed out to MoneyLion in our reply, the cost of these employees was fully disclosed in Malka's financial statements.

244.     Third, MoneyLion claimed that Sellers had breached Section 3.12 of the MIPA through continued ownership of Malka Holdings LLC, a personal investment vehicle.  However, as we reminded MoneyLion in our reply, this holding company, which engages in no business and has never used the Malka name in commerce, was disclosed in Section 3.23 of the Disclosure Schedules.  JX066 (MoneyLion_001037-001113) is a true and correct copy of the Disclosure Schedules.  Section 3.23 is at MoneyLion_001112.

245.     Fourth and fifth, MoneyLion claimed that Sellers had breached Sections 3.14 and 3.17 of the MIPA by failing to disclose the past-due account receivable and dispute arising out of Kalo Brands LLC's promissory note.  However, as we informed MoneyLion in our reply, the promissory note was disclosed in Sections 3.08 and 3.23 of the Disclosure Schedules; and the legal dispute regarding Kalo's debts did not materialize until after the Acquisition.  (JX066 at MoneyLion_001081, MoneyLion_001112.)

246.     Finally, as we reminded MoneyLion in our reply, MoneyLion was obligated pursuant to Section 5.08 of the MIPA to release the Retention Escrow Amount of $375,000 to Sellers, less any amounts disputed in good faith.  Because none of MoneyLion's claims raised a good-faith dispute, MoneyLion should have released the Retention Escrow Amount forthwith— but it did not.

## SELLERS' TERMINATION AND ALLEGEDLY PERSONAL EXPENSES

247.     On May 19, 2023, MoneyLion sent notices of termination to all four Sellers.  Ex. JX115 (SELLERS00003750) is a true and correct copy of the termination notice that MoneyLion sent to me.  JX114 (SELLERS00003746), JX116 (SELLERS00003754), and JX117 (SELLERS00003742) are true and correct copies of the other three termination notices.

248.    I recall that approximately a week before Sellers were terminated, Lisa Gersh, a member of MoneyLion's board of directors, had asked me over breakfast whether I thought MoneyLion should sell Malka and whether the relationship was working out for the best.

249.    Although I was an at-will employee, MoneyLion was obligated to pay six months' severance and a pro rata performance-based bonus, if it terminated either me or Mr. Krubich without cause.  (PX160 at MoneyLion_000264-65; PX161 at MoneyLion_000290-91.)

250.    Therefore, only after MoneyLion learned that Sellers had decided to hire counsel in anticipation of the need for dispute resolution under Section 2.06(b)(iv) of the MIPA with respect to MoneyLion's false 2022 earnout statement did MoneyLion manufacture purported "cause" for our terminations, asserting for the first time (to my knowledge) that we had improperly used company funds for personal expenses.  These allegedly personal expenses included certain (but at the time, unspecified) Fox Rothschild legal bills and (also unspecified) "credit card and invoiced personal charges."  (JX115.)

251.    I do not recall Mr. Basdekis or any other MoneyLion employee ever raising any concern with me regarding the company's payment of any personal or legal expenses of Sellers, prior to my termination.  This is not surprising because I did not create expense reports or otherwise record my business expenses.  Instead, MoneyLion's finance team would review monthly expenses with me from time to time, and I recall at least one meeting with Ms. Nuno to answer questions she had about particular expenses.  I do not recall her asking me about any Fox Rothschild bills.

252.    To the extent any of Fox Rothschild's post-Acquisition work for Sellers was personal in nature and not related to Malka's work at MoneyLion, I would have expected to be advised by Mr. Basdekis, or someone else in Finance, that bills were received that appeared to

include personal charges.  Prior to being terminated, I had no notice of any bills that MoneyLion contended included Sellers' personal charges.

253.   On May 23, 2023, Sellers wrote to MoneyLion denying these assertions and requested the Fox Rothschild billing records, credit card statements, and any other invoices which MoneyLion contended were improperly paid.  JX118 (SELLERS00000026) is a true and correct copy of our letter.

254.   Sellers also told MoneyLion that we were "disappointed that the Company never raised these concerns with them before taking the extraordinary action of termination," and inquired how we could "obtain [our] personal items from [our] offices."  (JX118 at SELLERS00000027.)

255.   Sellers made additional requests to MoneyLion after May 23, 2023, including in correspondence from our litigation counsel during 2023 and 2024, to provide the challenged billing records, credit card statements, and invoices that were the purported cause for our terminations.

256.   Only 15 months later, on August 16, 2024—which I understand was the deadline for fact discovery in this litigation—did MoneyLion finally produce the Fox Rothschild invoices that it contended were improper personal expenses.

257.   Based upon my review of these invoices, which total $143,404.73, it appears that at least $28,572.00 of that amount related to the Kalo Brands LLC dispute, which concerns an account receivable owed to Malka (and thus to MoneyLion).  Other invoices also reflected post-Acquisition legal services which were for the benefit of Malka's business, or for the benefit of MoneyLion with respect to implementing the Acquisition.  To the extent any Fox Rothschild bills were for legal services that were truly personal to Sellers, Sellers are responsible to pay them, and they could constitute a modest offset to Sellers' claims against MoneyLion.  Had any personal

expenses been brought to my attention before Sellers were terminated (or, indeed, before August 16, 2024), I would have addressed them promptly.

258.    I still have not received the specific credit card statements and invoices, which Sellers requested on May 23, 2023.  MoneyLion did inform Sellers on May 9, 2024 of certain recurring charges on an American Express card of which I lost direct oversight after the Acquisition, when the account ownership was transferred to Mr. Basdekis's team.  I worked with American Express to temporarily restore my access to the account, pay the balance, and then close the account.  Sellers advised MoneyLion of this.

## ALLEGED NON-COMPETE VIOLATIONS

259.    On March 6, 2024, MoneyLion sent a purported cease-and-desist letter to Sellers alleging that we had violated non-compete and non-solicitation provisions of the MIPA and of Mr. Krubich's and my Employment Agreements, and listed alleged instances involving Messrs. Krubich, Capra, and myself.  PX333 is a true and correct copy of this letter.

260.    MoneyLion's allegations about me were as follows:

(i)     The Seller Members have formed, and/or are operating, competing businesses in direct violation of the foregoing restrictions;

(iv)    Mr. Frommer, individually and through his newly launched "Frommer Group" (frommergroup.com), currently is consulting and performing services for business clients which compete directly with MoneyLion and Malka, in violation of his contractual non-compete obligations under the MIPA and his Employment Agreement; . . .

(vi)    Messrs. Frommer and Krubich are actively collaborating to solicit several former Malka employees to provide production work for a number of Malka clients who recently cut ties with Malka and MoneyLion, including projects for Stephen A. Smith, Health Thyself and Morning Kombat, in violation of their non-solicitation covenants in the MIPA and their Employment Agreements.

(PX333 at 1-2.)

261.    Sellers replied to MoneyLion's letter on March 14, 2024.  PX334 is a true and correct copy of this reply letter.

262.    MoneyLion never replied to our March 14 letter.

263.    I have not at any time formed or operated a business that competes with MoneyLion.  Frommer Investment Group, LLC (which MoneyLion's letter referred to as "Frommer Group"), simply holds equity in portfolio companies in which I have personally invested.

264.    I have not "actively collaborat[ed] to solicit" any former Malka employees.  To the best of my recollection, I did not converse with anyone on the referenced teams after my termination.

265.    I have incurred attorneys' fees and costs as a result of MoneyLion's baseless non-compete claim.

### EXERCISES OF MY SHAREHOLDER RIGHTS

266.    The amount of my fully vested MoneyLion shares is <u>241,968</u>, consisting of (a) 143,139 Closing Shares; and (b) 98,829 2021 Earnout Shares. I arrive at those numbers as follows:

| | |
|---|---|
| Total Closing Shares Received | 5,484,946 |
| Total 2021 Earnout Shares Received | 2,964,879 |
| Total Shares Received | 8,449,825 |
| Shares sold pursuant to June 2022 Registration Statement | 1,190,770 |
| Other sales | 0 |
| Remaining Closing Shares (*assuming FIFO*) | 4,294,176 |
| Remaining 2021 Earnout Shares (*assuming FIFO*) | 2,964,879 |
| Total Remaining Shares | 7,259,055 |
| | |
| <u>1:30 Split Adjusted</u> | |
| Remaining Closing Shares | 143,139.20 |
| Remaining 2021 Earnout Shares | 98,829.30 |
| **Totals** | **241,968.50** |

267.    This calculation uses a first-in, first-out method, since all of the shares that I sold were issued to me in the Closing Stock Payment on November 15, 2021.

268.    I am both the holder of record and the beneficial owner of these shares.

269.    I have repeatedly exercised my voting rights as a vested shareholder.  For example, after receiving proxy solicitations from MoneyLion, I voted my shares at the April 2023 special meeting, at which the Reverse Stock Split was approved; and at MoneyLion's annual meetings held in June 2023 and 2024, respectively.

270.    I expected that, by selling our company to MoneyLion in return for $10 million in cash and a much larger portion of stock, I would be free to use my MoneyLion shares as any investor could—that I could choose to sell some shares, hold some shares long-term, and use some shares as margin for a diversified portfolio.  I was a believer in MoneyLion and did not necessarily expect to sell most of my shares once they were saleable.  In any event, at no point did the parties agree that MoneyLion would have a right to effectively freeze my shares after the respective stock vesting dates had passed.

271.    Nevertheless—without any basis in any agreement to which I am a party—MoneyLion has apparently placed a "stop order" with Continental which prevents me from freely exercising my shareholder rights, including the right to transfer my shares to my broker and to sell them into the public market.  PX318 (SELLERS00004431) is a true and correct copy of the email from Continental informing Sellers of this fact.

## CALCULATION OF 30-DAY VWAP FOR 2022 EARNOUT PAYMENT

272.    Based on publicly available records of MoneyLion's stock price, I have determined that had MoneyLion made the 2022 Earnout Payment to which Sellers were entitled on May 31, 2023—45 days from MoneyLion's delivery of the 2022 Earnout Statement—the 30-day VWAP

for one MoneyLion share would have been approximately $13.70 ($13.6966448, equivalent to about $0.46 prior to the Reverse Stock Split). Dividing the $25 million total by this price, Sellers should have received a combined 1,825,264 shares, paid in equal installments that would have vested and become fully earned on a quarterly basis on March 31, June 30, September 30, and December 31, 2023, respectively.

273.    Based on publicly available records of MoneyLion's stock price, I have determined that had MoneyLion made the 2022 Earnout Payment to which Sellers were entitled on June 24, 2023—30 days from Sellers' delivery to MoneyLion of its objections to the 2022 Earnout Statement, and the expiration of the 2022 Resolution Period—the 30-day VWAP for one MoneyLion share would have been approximately $11.11 ($11.1062143). Dividing the $25 million total by this price, Sellers should have received a combined 2,250,992 shares, paid in equal installments that would have vested and become fully earned on a quarterly basis on March 31, June 30, September 30, and December 31, 2023, respectively.

274.    Based on publicly available records publicly available records of MoneyLion's stock price, I have determined that had MoneyLion made the 2022 Earnout Payment to which Sellers were entitled on August 23, 2023—the date by which a properly selected Independent Accountant should have issued a decision under the terms of the MIPA—the 30-day VWAP for one MoneyLion share would have been approximately $13.74. Dividing the $25 million total by this price, Sellers should have received a combined 1,819,328 shares, paid in equal installments that would have vested and become fully earned on a quarterly basis on March 31, June 30, September 30, and December 31, 2023, respectively.

275.    The highest intermediate share price during the 90 days following May 31, 2023 (*i.e.*, through August 29, 2023) was $19.805 on August 23, 2023. (PX395.)

276.    The highest intermediate share price during the 90 days following June 30, 2023 (*i.e.*, through September 28, 2023) was $25.1827 on September 20, 2023.  (PX395.)

277.    The highest intermediate share price during the 90 days following September 30, 2023 (*i.e.*, through December 28, 2023) was $66.47 on December 28, 2023.  (PX395.)

(*cont'd on next page*)

278.    The highest intermediate share price during the 90 days following December 31, 2023 (*i.e.*, through March 30, 2024) was $79.26 on March 26, 2024.  (PX395.)

## **RESPONSE TO MONEYLION'S FRAUD CLAIM**

279.    I understand that I, and the other Sellers, have been accused by MoneyLion of defrauding them by deliberately misrepresenting the manner in which Malka historically recognized revenue.  I categorically deny this.

280.    As I stated above, I relied entirely on Mr. Basdekis for all matters related to Malka's accounting, including recognition of revenue and expenses.  I relied on Fox Rothschild, Mr. Basdekis, and Mr. Curran to correctly and accurately describe Malka's historical accounting practices in the MIPA.  At no time did Mr. Basdekis tell me in words or substance that the representations that were made in the MIPA or Schedule A did not accurately communicate Malka's historical approach to recognizing revenue or expenses.

281.    To the best of my understanding, Mr. Basdekis continued to use the same historical revenue and expense recognition principles that Malka had used pre-closing when he calculated revenue and EBITDA for purposes of the 2021 Earnout Payment and 2022 Earnout Payment.  At no time, including to the present, has Mr. Basdekis or anyone from MoneyLion indicated to me that Mr. Basdekis' accounting practices used to calculate Malka's revenue and EBITDA for the 2021 Earnout Payment and 2022 Earnout Payment differed from Malka's historical revenue and expense recognition principles.

Executed on this 18th day of December, 2024 at Weehawken, New Jersey.

_____

Jeffrey Frommer