UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

JEFFREY FROMMER, *et al.*,                    :
                                               :
                         Plaintiffs,           :
                                               :
              v.                               :    Case No. 1:23-cv-06339-JMF
                                               :
MONEYLION TECHNOLOGIES INC., *et ano.*,        :
                                               :
                         Defendants.           :
                                               :
------------------------------------------------------------------------ x

### DECLARATION OF LYUSEN (LOUIS) KRUBICH

I, LYUSEN (LOUIS) KRUBICH, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.      I submit this declaration as my direct trial testimony, pursuant to the Court's Order dated August 29, 2024 (ECF No. 123) and Paragraph 6.E.i. of the Court's Individual Rules and Practices in Civil Cases.

2.      I am one of the plaintiffs in this action, along with Jeffrey Frommer, Daniel Fried, and Pat Capra (together, the "Sellers").  I understand that I may be cross-examined in person at trial by counsel for MoneyLion Technologies Inc. and MoneyLion (together, "MoneyLion").

3.      I have described the facts set forth in this declaration to the best of my recollection based upon my personal knowledge as well as a review of the relevant records.

4.      Each of the Sellers is a prior owner-member of Malka Media Group LLC ("Malka") and a party to the Membership Interest Purchase Agreement, dated November 15, 2021 (the "MIPA"), pursuant to which MoneyLion acquired Sellers' membership interests in Malka (the "Acquisition").  Following the Acquisition, Malka became a wholly-owned subsidiary of MoneyLion, and I remained an employee of Malka and MoneyLion until May 19, 2023.

**PX416**

## EDUCATIONAL AND WORK HISTORY

5.      I live in Marina del Rey, California.  I graduated from Rutgers University in 2008 with a bachelor's degree in communications.  I met and befriended Mr. Frommer while we were both undergraduates at Rutgers.

6.      After graduating, I took a job at MTV Networks' channel Comedy Central, producing promotional content for movie studios looking to market their films, in both long-and short-form formats, as well as custom promotional content.

7.      Around 2010 or 2011, I observed a pivotal shift in the production industry.  The gap between consumer-level tools and professional-grade equipment had begun to narrow, making Hollywood-quality content production more accessible and scalable than ever before.  This evolution not only empowered companies to elevate their internal content capabilities, but also set the stage for them to produce high-quality digital content at unprecedented speed and scale.

8.      Recognizing this opportunity, I formed Malka as a New York limited liability company on or about August 8, 2011.  I decided to leave MTV and dedicate myself full-time to building my own creative and marketing content production company, Malka.  The company was named after my grandmother's Hebrew name, which means "queen."  Malka was at first entirely self-funded and I ran it from my apartment, working all hours of the day to build the business.  As Malka's sole founder and CEO, I was dedicated to hiring the best people I could find and creating top-tier content.

9.      In those early years, I prioritized fostering meaningful relationships with executives from Fortune 500 companies like Luxottica, L'Oréal, Brooks Brothers, and Amazon.  Over time, Malka grew from a three-person operation in a small apartment to a bicoastal studio employing over 200 people.

2

## MALKA'S OPERATIONS

10.    Mr. Frommer joined Malka as its President in or about 2014, and Mr. Fried (my coworker at Comedy Central) joined as a managing partner in or about 2015.

11.    Mr. Capra was and is a sports agent, whom I met through a mutual friend.  In or about 2013, Malka began producing content for some of Mr. Capra's athlete clients.  In 2018, the four of us decided to form Malka Sports LLC ("Malka Sports") so as to capitalize on the natural synergies between Malka's creative and marketing capabilities and Mr. Capra's client base of prominent athletes.

12.    On or about June 18, 2021, Mr. Capra assigned his 50 percent interest in Malka Sports to Malka, and all four Sellers entered into a Second Amended and Restated Operating Agreement, whereby Mr. Capra was admitted as the fourth member of Malka.    PX059 (MoneyLion_01397872) is a true and correct copy of the assignment agreement with Mr. Capra; and PX057 (MoneyLion_00997752) is a true and correct copy of the Second Amended and Restated Operating Agreement.

13.    In Malka's early years, we all wore multiple hats, taking on responsibilities that spanned business development and production execution.  It was a true team effort, with everyone stepping up to ensure the business ran smoothly.

14.    By 2018 or 2019, as Malka launched its original network of podcast series and other episodic programming, and as Malka Sports grew, my role evolved such that I was splitting my time between production and managing the business.  At that time, Mr. Frommer concentrated on building and overseeing a dedicated sales team as well as business development, working to ensure that Malka continued to scale strategically.  Mr. Fried and I focused on overseeing the production team, which had become the largest and most integral part of our business, and Mr. Capra headed Malka Sports.

15.    The "Malka x MoneyLion" video, which was produced by Malka to announce the Acquisition, provides an illustration how Malka's content production could benefit MoneyLion's brand.  This 73-second promotional video quickly features a bevy of athletes and celebrities who appear in Malka-produced podcast series and other media content, including such recognizable faces as Snoop Dogg, Sylvester Stallone, Mike Tyson, and Kevin Hart.  PX402 (https://vimeo.com/1039495293/) is a true and correct copy of this video.

16.    As another example, Malka created a 2-minute, 18-second video recap of MoneyLion's "Lion's Den" livestream during the 2022 Super Bowl, hosted by Mike Tyson.  The video also highlighted former NFL player Brandon Marshall and former mixed martial artists Brendan Schaub and Daniel Cormier, among numerous other notables who participated in the event.  PX403 (https://vimeo.com/1039499685) is a true and correct copy of this video.

17.    Each Seller had certain top clients for which he was primarily responsible.  In the approximate timeframe of 2018 to 2021, my clients included Luxottica, L'Oréal, Twitch, Amazon, Showtime, and the podcasts *Below the Belt* (hosted by Brendan Schaub) and *All the Smoke* (co-hosted by former National Basketball Association players Matt Barnes and Stephen Jackson).  Over time, I transitioned more responsibility for these client relationships to the Client Services team, so that I could focus on growing Malka's professional network and (with Mr. Capra) its sports agency.

18.    Also during this time, Malka added new series such as *Hotboxin' with Mike Tyson*, *Hawk vs Wolf* with former professional skateboarders Tony Hawk and Jason Ellis, *The Stephen A. Smith Show*, *Certified* with National Basketball Association Hall of Famer Kevin Garnett, and *Morning Kombat* hosted by two CBS Sports analysts, among others.  Malka's network was one of

the fastest growing original digital series networks in the industry. Alongside these shows, Malka launched digital channels for the Showtime network, such as Showtime Basketball.

### MALKA'S PRE-ACQUISITION ACCOUNTING, FINANCE AND INVOICING

19.    In or about late 2016, I was introduced to Ryan Curran, a Certified Public Accountant with his own firm then called Curran Unger LLP (now known as Curran LLP), through mutual friends from Rutgers. Mr. Frommer and I interviewed and hired Mr. Curran to prepare Malka's tax returns. Around the same time, Mr. Curran also started to prepare my personal tax returns and still prepares my personal tax returns.

20.    To my knowledge, neither Mr. Curran nor anyone from his firm was ever involved in Malka's client invoicing, which was handled internally by Malka's Client Services and Finance teams.

21.    By about 2017 or 2018, Malka had grown to roughly 50-60 employees. At that point, we hired a Client Services team of account managers, who were responsible for negotiating the detailed terms of client contracts and statements of work, and I became less involved in such negotiations after that point. The Client Services team was also responsible for most day-to-day client relationship management, and (in coordination with the Finance team) for invoicing our clients. The Client Services team members would receive commissions based on their sales and it was Malka's consistent practice to confirm that commissions were supported by actual client projects.

22.    Malka's Finance team worked with Malka's Client Services team to manage invoicing. The Finance team was also responsible for Malka's financial books and records, managing cash flows, and handing accounts receivable and accounts payable.

23.    In about March 2020, Malka hired Matthew Basdekis as its Head of Finance. Until then, Malka's accounting had been overseen by staff from Mr. Curran's accounting firm. Mr.

Basdekis and his team were responsible for all finance and accounting.  I felt that Mr. Basdekis was highly competent and capable in finance and accounting, and that he could be trusted to manage Malka's books.  He reported regularly to Sellers about Malka's finances and profitability.

24.    Shortly after Malka hired Mr. Basdekis, Malka transitioned its accounting software from QuickBooks to NetSuite, per Mr. Basdekis's recommendation.  I understand that this transition allowed for greater detail and sophistication in how Mr. Basdekis organized and tracked Malka's accounting.  Mr. Basdekis's team was responsible for managing Malka's use of this software.

25.    The Finance team would prepare Malka's invoices and submit them to clients and would forecast payment dates based on the contracts or statements of work created by the Client Services team.

## INVOICING ON MILESTONES

26.    Before the Acquisition (and after), Malka's general practice was to invoice its customers on the occurrence of project-specific and client-driven milestones or benchmarks.  Typically, Malka sent an initial invoice to a client upon execution of the contract or statement of work, which was often for 50 percent (and sometimes more) of the total project cost.  This upfront deposit was the first milestone, and it was nearly always non-refundable, whether the written statement of work or agreement explicitly said so or not.  Clients of course would be entitled to their money back if Malka was unable to perform for some reason, but they could not unilaterally cancel a project once the contract had been executed.

27.    I cannot recall any instance in which a Malka client cancelled a project after work had begun.

28.    Subsequent invoices were tied to additional, project-specific and client-driven milestones.  Final delivery of the contracted-for "asset" (such as a graphic design image, video, or livestream recording) was very often the last milestone.

29.    However, milestones could include almost any date, event, or step in the project, such as the day(s) when a production or livestream was filmed or certain other dates specified in a written agreement.  For example, a client could agree to pay some percentage upfront, another percentage the next month (or at another specified interval), and another percentage upon completion of work.  Typically, Malka worked with clients to plan milestones around the timing of large expenses (such as the costs associated with filming).

30.    A small number of Malka's clients paid retainers and therefore may have been exceptions to this general practice.  In some such cases, Malka performed the work and then invoiced the client at the end of the month or other agreed-upon billing period.  Rarely, a client would pay a retainer, and Malka would send an invoice after the fact, reflecting work that we performed pursuant to the retainer payment.  However, retainer-based invoicing was not the norm.

31.    Malka's clients had different preferences about the timing and intervals of invoices, and different net payment terms—for example, I recall that some clients (like Luxottica) frequently had net payment terms of 45 or 60 days, at least for small projects.

32.    Malka accommodated its clients' invoicing and payment preferences whenever feasible, and I cannot recall any instance in which a client complained that it had received an unexpected invoice.

33.    Malka's contracts or statements of work were not always formal documents.  Our agreements for smaller projects on behalf of regular clients were sometimes memorialized informally, such as in an email.

7

34.    For certain clients, Malka would enter into a master agreement and then would perform individual projects pursuant to individual statements of work or purchase orders.

35.    The amounts that Malka charged its customers for a particular project were generally based on an estimate of the number of hours various service providers (*i.e.*, graphic designer, art director, production assistant and many other positions) would need to spend working on the project, multiplied by each service provider's hourly rate.  On top of that, Malka generally charged its customers (other than MoneyLion, as I describe below) a 20 percent production management fee.

36.    In preparation for my trial testimony, I have reviewed some representative examples of Malka's statements of work.  These have refreshed my recollection as to certain of Malka's invoicing practices prior to the Acquisition.

37.    PX008 (MoneyLion_02074526-43) is a true and correct copy of a Master Commercial Production Agreement made as of January 1, 2018 between Showtime and Malka Sports, as producer ("Showtime MSA").  The Showtime MSA, which I signed on behalf of Malka Sports, provides that Malka Sports will perform certain production services for Showtime as described in an applicable statement of work and that Malka Sports will be compensated the amount in the statement of work.  The Showtime MSA attaches a statement of work providing, among other things, that: (a) Malka Sports will produce 30 pieces of original content each month for a three-year period and Showtime will pay Malka Sports $20,000 per month for the first year, $22,000 per month for the second year, and $24,000 per month for the third year; and (b) Malka Sports will provide creative services to develop Showtime's "Brand Identity Project" and Showtime will pay Malka Sports a flat fee of $150,000 with 50 percent due on execution of the

statement of work, 25 percent at the next milestone of the receipt of a logo; and the final 25 percent at the final milestone of delivery of all remaining deliverables.  *Id.* at MoneyLion_02074537-38.

38.     PX009 (MoneyLion_02076554-57), PX029 (MoneyLion_02077701-09), and PX088 (MoneyLion_02071274-78) are true and correct copies of additional agreements between Malka and Showtime in which Malka agreed to provide production services in connection with various Showtime programs and Showtime agreed to compensate Malka on the occurrence of certain milestones or dates.  Under two of these agreements (PX029 and PX088), Malka was also entitled to a share of the revenue generated from sponsorship and advertising.

39.     PX020 (MoneyLion_02078744-48) is a true and correct copy of a contract dated October 27, 2020, between Malka and Amazon.  This contract was created in the ordinary course of Malka's business, and it was Malka's ordinary course of business to create such contracts.  The contract covered a range of film production projects throughout Q4 of 2020.  Amazon was to pay 50 percent of the total fee of $162,795 as an upfront deposit and 50 percent at completion of the project.  The statement of work provided that "[i]f Client cancels the services herein contracted, MMG [Malka] shall retain the full sum of the Fee paid by Client."  *Id.* at MoneyLion_02078745.

40.     PX022 (MoneyLion_02042513-17) is a true and correct copy of a contract dated November 25, 2020, between Malka and Amazon.  The contract covered a range of film production projects throughout Q4 of 2020 and the beginning of 2021.  Amazon was to pay 50 percent of the total fee of $649,730 as an upfront deposit and 50 percent at completion of the project.  The statement of work provided that "[i]f Client cancels the services herein contracted, MMG [Malka] shall retain the full sum of the Fee paid by Client."  *Id.* at MoneyLion_02042514.

41.     PX172 (MoneyLion_02054914) is a true and correct copy of a statement of work dated September 28, 2021, between Malka and Twitch Interactive, Inc.  This statement of work

was created in the ordinary course of Malka's business, and it was Malka's ordinary course of business to create such statements of work. The deliverable was a custom live-action 30-second commercial for Uber Eats. Twitch was to pay 50 percent of the total fee of $124,998 as an upfront deposit, which was explicitly non-refundable, and 50 percent due at final delivery.

42.    PX062 (MoneyLion_02071920-25) is a true and correct copy of a statement of work dated July 9, 2021, between Malka and MoneyLion. The statement of work provides that Malka will provide "on-demand creative production services on a monthly basis for MoneyLion" and that "[c]reative services will be estimated and approved by MoneyLion on a rolling basis, tracked on an hourly basis, and summarized in a bi-weekly report generated by MALKA Media and sent to MoneyLion." *Id.* at MoneyLion_02071920. MoneyLion was to pay a total fee of $150,000 in six payments of $25,000 with the first payment due upon execution, and subsequent payments due on the first every month through December 1, 2021. *Id.* at MoneyLion_02071923. I signed this statement of work for Malka and MoneyLion's CFO, Rick Correia, signed for MoneyLion. *Id.* at MoneyLion_02071925.

43.    Several examples from March 2021 reflect that Luxottica was billed 100 percent in a single payment for relatively smaller projects. PX043 (MoneyLion_02039044), PX044 (MoneyLion_02039110), and PX227 (MoneyLion_02039223) are true and correct copies of statements of work between Malka and Luxottica, with expected due dates of March 19, 2021; March 25, 2021; and March 28, 2022, respectively. These statements of work were for amounts ranging between $765 and $19,650, with deliverables including a livestream video and livestream event resources, graphics and webpage design, and short videos for social media. The largest project (for $19,650) was 100 percent payable upon signature, while the other two, smaller projects had net payment terms of 45 days and 60 days, respectively. To be clear, these net payment terms

constituted a processing window for Malka to receive payment—they did not allow a client to withhold or reduce the payment owed.

44.     Mr. Basdekis, as Malka's Head of Finance, was highly familiar with Malka's invoicing practices and was solely responsible for determining whether and how an invoice was recognized as revenue or an expense.

45.     Both before and after the Acquisition, I relied on Mr. Basdekis, and Mr. Curran, for accounting-related matters and did not have independent knowledge of how Malka recognized revenue or expenses prior to the Acquisition.

46.     I did not ever discuss with any of the other Sellers the possibility of manipulating the timing or amounts of Malka invoices so as to increase our chances of receiving either the 2021 or 2022 Earnout Payments.

47.     After the Acquisition, MoneyLion continually encouraged Sellers to send out invoices promptly.  I recall MoneyLion's CEO, Dee Choubey, saying this to me on a number of occasions, specifically toward the end of quarters and of the calendar year, when his message was that aggressive invoicing would help with MoneyLion's reported profitability.

## THE ACQUISITION

A.    **MoneyLion Expresses an Interest in Buying Malka and We Sign a Letter of Intent**

48.     Malka began providing creative and marketing services to MoneyLion in approximately 2017.  Mr. Frommer was the partner who had primary responsibility for the MoneyLion relationship.

49.     In early June 2021, I learned that MoneyLion was interested in a potential acquisition and had approached Mr. Frommer about it.  On or about June 9, 2021, Mr. Frommer and I had a dinner meeting in New York City with Mr. Choubey, Mr. Correia, and Bill Davaris (MoneyLion's Chief Marketing Officer), to discuss the potential acquisition.    PX078

(MoneyLion_01111205-07) is a true and correct copy of an email chain referencing our dinner meeting and another meeting at MoneyLion's offices on June 11, 2021.

50.    I recall that I was visiting from Los Angeles at the time, and Mr. Frommer mentioned to me that we had a dinner with MoneyLion (then a client of Malka's), which was planning to go public and would be significantly increasing its projects with Malka. I was interested to see where the conversation would go.

51.    At the dinner meeting, Messrs. Choubey and Correia told me that their interest in Malka was primarily because they wanted the ability to tap into Malka's creative network and content production capabilities in order to expand MoneyLion's customer base. The conversation focused on the Malka network's celebrity partners, audience reach, and the potential synergies between Malka's star-studded network and content production capabilities and MoneyLion's products.

52.    I was open to a potential acquisition; however, I was also happy to continue running the business that I had built with my partners and felt no particular urgency to sell.

53.    MoneyLion was not the first to express an interest in acquiring Malka. At different times in 2019, the sports-marketing businessman Maverick Carter and the agency Excel Sports Management both expressed interest in the possibility of acquiring Malka. I recall that Mr. Frommer and I met with Mr. Carter twice and he visited Malka's offices in California. Our discussions with Excel went further, as after they met with us several times and visited our offices, Malka's leadership made a presentation to Excel's entire executive team at their offices.

54.    I hoped and expected that an acquisition by MoneyLion would enable Malka to produce content and service our clients with previously unimagined scale and resources. PX404 (https://www.linkedin.com/posts/activity-6866409125853704192-

j8nz/?utm_source=share&utm_medium=member_ios) is a true and correct copy of a LinkedIn

post and linked 10-minute video in which Mr. Frommer and I publicly announced the Acquisition.

55.     Shortly after our June 9 and 11 meetings, Mr. Frommer shared with MoneyLion a

pitch deck (the "June 2021 Pitch Deck") about the potential acquisition.    JX005

(MoneyLion_01149848, at MoneyLion_01149882-01149901) is a true and correct copy of the

June 2021 Pitch Deck.

56.     The June 2021 Pitch Deck included historical revenue figures and revenue and

EBITDA projections for 2021 and 2022, and also estimated Malka's expected monetization for

tax years 2021 and 2022 of the New Jersey Digital Media Tax Credit (the "Tax Credit"), for which

Malka was eligible based on its digital media production activities in the State of New Jersey

during 2019 and 2020.

57.     After Mr. Frommer and I made this presentation to MoneyLion, I do not recall ever

again discussing the 2021 and 2022 revenue and EBITDA projections in the presentation with

anyone at MoneyLion.  As set forth below, the EBITDA target that we ultimately agreed to in the

MIPA for purposes of the 2021 and 2022 earnouts was $100,000 for both years.  That number bore

no relation to the EBTIDA projections in the June 2021 Pitch Deck.  As Mr. Correia expressed to

me and Mr. Frommer on a call that I describe below, MoneyLion was focused on Malka's revenue,

not EBITDA.

58.     In the June 2021 Pitch Deck, we included an ask for Malka of $75 million.  At the

time, I felt comfortable selling Malka—which I had spent nearly a decade building from the ground

up—for a price between approximately $60 million and $75 million.  If no one was willing to pay

that much, I was happy to continue growing the business and Malka's excellent network of creative

talent, and its reliable base of corporate and athletic clients.

13

59.    I recall that we proposed a purchase price of $75 million and MoneyLion rapidly accepted it without a counteroffer, except that MoneyLion preferred to pay most of this price as equity rather than cash, which we were fine with because of the potential upside if MoneyLion's stock price went up, as we hoped and expected it would.  In fact, there was no negotiation whatsoever about the $75 million price, only about the mix of cash and equity and the timing that our MoneyLion shares would vest.

60.    On or about June 15, 2021, Mr. Frommer and I had another meeting with MoneyLion, which I recall was virtual.  In advance of that meeting, Mr. Frommer sent a set of documents to Messrs. Choubey, Correia, Davaris, and Adam VanWagner (MoneyLion's Chief Legal Officer and Secretary).  These included the same June 2021 Pitch Deck, Malka Media's (not including Malka Sports') reviewed financials for fiscal years 2019 and 2020, Malka Sports' income statement for fiscal year 2020, and Q1 (first quarter) 2021 income statements for both Malka entities.  JX005.

61.    On June 15, 2021, MoneyLion accepted our proposal of $75 million, but it offered to pay $10 million in cash and up to $65 million in equity, consisting of MoneyLion shares valued and issued on particular dates.

62.    On that day, Mr. Correia sent a spreadsheet to Mr. Frommer and myself, writing, "Guys, if we all do our parts, we will never forget today.  Let's go."    JX006 (MoneyLion_01147421-22) is a true and correct copy of Mr. Correia's email and spreadsheet.  The spreadsheet proposed $10 million in upfront cash, upfront equity of MoneyLion restricted stock equal to $10 million, then a 2021 Earnout Payment of stock equal to $20 million and a 2022 Earnout Payment of stock equal to $15 million.  Unlike the final purchase price structure agreed to in the MIPA, the Closing Stock Payment and 2021 Earnout Payment would each vest in tranches

14

through the end of 2023, and the 2022 Earnout Payment would vest in tranches through the end of 2024.

63.     The spreadsheet also noted that if MoneyLion's stock price doubled, the total value of the Acquisition to Sellers would be $140 million.  JX006 at MoneyLion_00147422.

64.     I felt that this proposal extended the earnout payments too far into the future.  We pushed back such that in the final MIPA the final tranche of the: (i) Closing Stock Payment vested September 30, 2022; (ii) 2021 Earnout Payment vested December 31, 2022; and (iii) 2022 Earnout Payment should have vested December 31, 2023.

65.     On June 18, 2021, Mr. VanWagner sent a draft Letter of Intent "reflecting the deal structure Rick laid out the other day," which confirmed that MoneyLion's offer was for $10 million in cash and the respective values of $30 million in the Closing Stock Payment, $20 million in the 2021 Earnout Payment, and $15 million in the 2022 Earnout Payment, with the various tranches of stock to fully vest by the end of 2023 and 2024, respectively.  The draft did not specify the revenue and EBITDA targets needed to achieve either earnout payment.     PX058 (MoneyLion_01148050-61) is a true and correct copy of this email and attached draft.

66.     Sellers preferred that our eligibility for earnout payments be determined based solely on revenue targets, rather than both revenue and EBITDA.  We discussed this with Malka's outside counsel (Fox Rothschild LLP) as it drafted revisions to MoneyLion's draft Letter of Intent. PX068 (MoneyLion_01124918) is a true and correct copy of an email chain involving Mr. Frommer, Fox Rothschild, and myself.  *See id.* at MoneyLion_01124933.

67.     Mr. Frommer and Fox Rothschild took the lead in negotiating the terms of the Letter of Intent and the MIPA with MoneyLion and its outside counsel, DLA Piper LLP.  While I left negotiating and drafting to others, as Malka's founder, I took a keen interest in the negotiations,

and Mr. Frommer and Fox Rothschild kept me informed about any important developments.  I was also copied on numerous emails discussing the Letter of Intent and the MIPA.

68.    On June 23, 2021, Mr. Frommer sent Sellers' markup of the draft Letter of Intent to Messrs. Choubey, Correia, and VanWagner.  Among other revisions, we proposed to increase the cash portion of the total purchase price to $20 million and increase the 2021 Earnout Payment to $25 million, eliminating the 2022 Earnout Payment.  We also proposed that the 2021 Earnout Payment be based solely on revenue targets, not EBITDA.  PX060 (MoneyLion_01142096-01142119) is a true and correct copy of this email and the attached draft.

69.    On June 30, 2021, Mr. Correia sent to Mr. Frommer and myself a revised offer, which matched the final agreement in these respects: the 2021 Earnout Payment would be at $10 million worth of MoneyLion stock, the 2022 Earnout Payment would be $25 million worth of MoneyLion stock, with both earnout payments determined based on both revenue and EBITDA targets.  Also, as in the final MIPA, the 2022 Earnout Payment would finish vesting in Q4 2023.  Unlike in the MIPA, in MoneyLion's June 30, 2021 proposal, the Closing Stock Payment would finish vesting in Q2 2022 and the 2021 Earnout Payment would vest in a single tranche in Q4 2021.  PX063 (MoneyLion_01136900-01) is a true and correct copy of this email and its attachment.

70.    Also on June 30, 2021, Messrs. Choubey, Correia, Frommer, and I had a telephone conversation that was recorded by Mr. Frommer.  In preparation for my trial testimony, I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX414.  Based on my review of both, PX414 is a true and accurate transcript of the conversation.

71.    On the call, we discussed a number of points, including the mechanics of MoneyLion's proposed quarterly stock payments to Sellers, the Tax Credit, and upcoming steps

in due diligence, including the need for a Quality of Earnings Assessment. Mr. Correia explained that based on MoneyLion's anticipated purchase price structure for the Acquisition, in which Sellers would be compensated partly in shares that would vest on a quarterly schedule, "we basically have $50 million guaranteed to you guys. And so that's basically two-thirds [of the total $75 million purchase price, including the 2022 Earnout Payment] within the year of the transaction." PX414 at 1.

72.    In other words, according to Mr. Correia, MoneyLion viewed the 2021 Earnout Payment as "guaranteed."

73.    Mr. Correia added that, once the initial six-month post-acquisition lockup period ended and our shares had vested, "you guys can sell, like all of us, we can sell whenever we're vested." He did not mention that trading might only be permitted during limited open windows; in fact, he said that "once we get past the initial lockup—which everyone, every pipe investor, every trust investor, Dee, myself, everyone at our firm is locked up, every investor—you can sell immediately." PX414 at 3-4.

74.    On the call, Mr. Frommer raised the point that the earnouts should be focused on revenue rather than EBITDA targets. Mr. Correia responded that MoneyLion was "focused on revenue as well" and "would have a minimum floor of EBITDA, meaning the EBITDA target is not the target you gave us." PX414 at 1-2. Mr. Correia reiterated MoneyLion's view that "we think this is such a strategic transaction." PX414 at 6.

75.    On the call, I raised the concern that post-closing, Malka would be converting "20%, 30%, 50% of the team to fully focus" on MoneyLion and I asked how MoneyLion would respond to a request for "$2-5 million dollars because we got to staff the right way" or because "we have to eliminate some of our revenue with our clients." PX414 at 4-5. I was concerned that

17

by dedicating a large percentage of our team to MoneyLion projects, we would lose revenue on

other client projects while simultaneously increasing operating expenses, all of which could impact

our ability to hit the 2021 and 2022 earnout targets.  I wanted to know that MoneyLion was willing

to commit to provide the financial support we needed for operating expenses so that our ability to

achieve the maximum 2021 and 2022 Earnout Payments was not jeopardized.

76.    Mr. Choubey confirmed that MoneyLion was willing to do so.  He responded to

me:

> I think we want to accelerate your network, right?  Let's get more
> influencers, more content creators, and if we need to book that expense as
> part of MoneyLion—the parent company's—marketing budget, we can do
> that.  That doesn't need to go into your P&L for the purposes of a calculation
> on the earnout.

PX414 at 5.

77.    On July 8, 2021, MoneyLion sent Sellers a markup of the draft Letter of Intent that

generally proposed the same structure that MoneyLion had sent to and discussed with Sellers on

June 30, 2021.  PX067 (MoneyLion_01139563-82) is a true and correct copy of MoneyLion's July

8, 2021 email with attachments.  MoneyLion's July 8, 2021 draft proposed a revenue target of $25

million and EBITDA target of $100,000 for the 2021 earnout and a revenue target of $30 million

and EBITDA target of $100,000 for the 2022 earnout.  *Id.* at MoneyLion_001139578.

78.    On July 12, 2021, Malka and MoneyLion entered into a Letter of Intent and

appended Non-Binding Summary of Terms (the "Term Sheet"), which outlined the major terms of

the Acquisition.  PX070 (MoneyLion_01833533) is a true and correct copy of the Letter of Intent

and Term Sheet.  The Letter of Intent provided:

> Due Diligence.  Each party will provide the other party and its counsel and advisors
> reasonable access during normal business hours to all books, records, assets and
> contracts of such party to complete its diligence investigation for purposes of the
> Transaction [Acquisition].   Each party will make available key personnel as

necessary to assist in this diligence effort. Company [Malka] will permit Buyer [MoneyLion] to contact key customers and suppliers (both as mutually agreed) as part of the due diligence process.

PX070 at MoneyLion_01833534 (emphasis in original).

79.     The Term Sheet provided for the following purchase price structure:

Buyer has based its purchase price structure on a deemed enterprise value of the Company of $75 million and assumes a cash-free, debt-free transaction, with the exception of the assumption by Buyer of a $2.5 million credit facility, as well as current accounts payable incurred by the Company in the ordinary course of its business and a targeted level of net working capital at the closing agreed to by the parties in the definitive agreement. The total purchase price (the "<u>Purchase Price</u>") would be paid in a combination of cash and stock and would be composed of four components:

(1)  payment of an aggregate of $10 million in cash to equity holders of the Company at closing;

(2)  restricted stock equal to an aggregate of $30 million in value upon issuance at a per share price based upon the 30-day VWAP [volume-weighted average price] on the closing date, to be issued at closing to the equity holders of the Company (25% to vest quarterly on each of 9/30/21, 12/31/21, 3/31/22 and 6/30/22);

(3)  earnout restricted stock equal to an aggregate of $10 million in value at a per share price based upon the 30-day VWAP on the closing date, which would be issued to the equity holders of the Company based on the Company's achievement of $25 million in revenue and $100,000 in EBITDA for 2021. Such earnout restricted stock shall be issued only upon achieving 67% of the foregoing revenue and EBITDA milestones, and upon exceeding such threshold, shall be issued on a linear basis up to achievement of 100% of such targets; and

(4)  earnout restricted stock equal to an aggregate of $25 million in value at a per share price based upon the 30-day VWAP on the closing date, which would be issued to the equity holders of the Company based on the Company's achievement of $30 million in revenue and $100,000 in EBITDA for 2022. Such earnout restricted stock shall be issued only upon achieving 67% of the foregoing revenue and EBITDA milestones, and upon exceeding such threshold, shall be issued on a linear basis up to achievement of 100% of such targets. If such stock is earned and issued, 25% of such stock shall vest quarterly on each of 3/31/23, 6/30/23, 9/30/23 and 12/31/23.

19

<u>All accounting will be done on the same basis as the Company's historical practices.</u> . . .

All restricted stock to be issued to the equity holders of the Company shall be issued based upon the 30-day VWAP immediately prior to Closing; provided, however, that in the event that upon vesting, the shares previously issued to the recipients thereof represent a value less than the value such shares represented upon closing of the Transaction, then the Buyer shall be obligated to issue additional shares or pay additional cash, such determination to be made in the Buyer's sole discretion, as a make-whole payment such that the recipients, in the aggregate, receive, in shares and/or cash, no less than the aggregate share value received upon the initial issuance of such shares.  The parties will work together to determine the most efficient means to memorialize the foregoing make-whole right. . . .

<u>In order to maximize the selling equity holders' opportunity to achieve the earn-out payments,</u> Buyer agrees that: (i) during the earnout period relating to achievement of revenue and EBITDA targets for 2021 described in subsection (3) above, the Company will continue to be operated by existing Company management in a manner substantially similar in all material respects to the operations of the Company prior to the closing; and (ii) with respect to the earnout period relating to achievement of revenue and EBITDA targets for 2022 described in subsection (4) above, the definitive agreement shall provide for a closing deliverable of an operating and revenue budget pursuant to which the Company shall be operated during such earnout period, which shall be negotiated and agreed to by the parties, acting in good faith.

The closing payment would be adjusted (up or down) on a dollar-for-dollar basis to the extent the Company's actual net working capital at the closing exceeds or is less than a target range of net working capital based on the average of Company's net working capital for the six consecutive month-ends preceding the closing date.

PX070 at MoneyLion_01833537-39 (first emphasis in original, other emphasis added).

80.    At no point after the Letter of Intent was executed and through closing on November 15, 2021 did anyone at MoneyLion request a purchase price reduction, or attempt to renegotiate with Sellers either the amount or structure of the agreed-upon purchase price.

B.    **The Due Diligence Process**

81.    MoneyLion sent its Preliminary Due Diligence Request List to Mr. Frommer and myself on July 15, 2021.  PX072 (MoneyLion_01127347-74) is a true and correct copy of this email and attached list.

82.    All four Sellers attended a meeting with MoneyLion executives and officers at MoneyLion's New York offices on July 29, 2021, to discuss the Acquisition and introduce our respective teams.  PX076 (MoneyLion_01115500-05) is a true and correct copy of MoneyLion's working session agenda.

83.    Between approximately July and October 2021, Messrs. Basdekis, Curran, and Frommer worked with Fox Rothschild to respond to all of MoneyLion's due diligence requests and inquiries, as well as those from its due diligence advisor (CFGI).  I had limited involvement in this process, although I recall being copied on emails during that time and I was generally kept up to date.

84.    I understood from Mr. Frommer and Fox Rothschild that the process included submitting written answers, various documents and agreements, and other disclosures to MoneyLion and DLA Piper, phone calls with CFGI, and preparing updated financial disclosures reflecting Malka's and Malka Sports' results through September 30, 2021, as well as detailed monthly sales information by customer for 2019 and 2020.

85.    I am not aware of Malka or Fox Rothschild ever refusing to provide MoneyLion or its advisors with a document or information they requested in the diligence process.

86.    I recall that Malka had to devote significant resources to work in support of the Acquisition, including responding to inquiries from the MoneyLion side and compiling documents and information to be shared in an electronic data room as well as formal disclosures.  Although I viewed this work as important, it meant that Malka committed more resources to the Acquisition than anticipated during Q3 and Q4, which affected our ability to meet earlier projections of financial performance during those two quarters.  In fact, after the Acquisition, MoneyLion would

give Mr. Frommer the title of MoneyLion Chief Content Officer, further shifting Malka's resources and focus from its own business development toward creating content for MoneyLion.

87.    In any event, it was my strong impression based on Mr. Correia's statement and MoneyLion's proposed EBITDA target of just $100,000 in order for Sellers to receive both the 2021 and 2022 Earnout Payments, that Malka's profitability was not MoneyLion's primary concern in the Acquisition.   Rather, it seemed MoneyLion wanted to acquire Malka for its synergistic potential, as an experienced and high-quality content creator which offered MoneyLion access to (and therefore brand collaborations with) high-profile athletes and other celebrities, whose popularity could grow its customer base.

C.    **The MIPA**

88.    The Term Sheet's provisions, including with respect to the $10 million cash payment, the Closing Stock Payment of shares of MoneyLion restricted stock equal to $30 million, the 2021 Earnout payment of shares of MoneyLion restricted stock equal to $10 million, the 2022 Earnout Payment of shares of MoneyLion restricted stock equal to $25 million, and the RWI Policy, were incorporated into the MIPA, which Sellers and MoneyLion entered into on November 15, 2021.   That same day, Mr. Frommer and I entered into Employment Agreements with MoneyLion.   JX065 (DLA_006185-006332) is a true and correct copy of the MIPA; and PX161 (MoneyLion_000284) is a true and correct copy of my Employment Agreement.

89.    I understood that our attorneys at Fox Rothschild added language into the MIPA to protect Sellers' opportunity to receive the 2021 and 2022 Earnout Payments.   In particular, Section 2.06(d) of the MIPA, provides that "in order to maximize the Seller Members' opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment," MoneyLion was required, through December 31, 2021, "to operate the business of the Company in good faith and substantially similar in all material respects with the past practice of the Company prior to

Closing," and could not "take any action intended to interfere with or frustrate the Seller Members' opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment."  With respect to calendar year 2022, MoneyLion was "to operate the business of the Company substantially in accordance with the operating and revenue budget (the '2022 Budget') attached hereto as Exhibit B."  JX065 at DLA_006210 (emphasis in original).

90.    The 2022 Budget, attached as Exhibit B to the MIPA budgeted $15,000 in Malka employee bonuses for 2022.  JX065 at DLA_006298.

91.    Exhibit C to the MIPA was a Restricted Stock Agreement ("RSA"), which provided that Sellers' Closing Stock Payment restricted shares would vest and thereby become Earned Shares on each of the respective, quarterly vesting dates.   JX065 at 006300.   Sellers and MoneyLion entered into additional RSAs governing the 2021 Earnout Payment shares and make-whole shares for both the Closing Stock Payment and the 2021 Earnout Payment.   JX085 (MoneyLion_01870073, at MoneyLion_01870099-01870106); JX087 (MoneyLion_01928363-72; JX094 (MoneyLion_01925414-24); and JX109 (MoneyLion_01918846-53) are true and correct copies of my additional RSAs.

92.    The initial RSA dated November 15, 2021 and governing the Closing Stock Payment provided that Sellers' restricted shares could not be transferred without MoneyLion's consent, "which shall not be unreasonably withheld, conditioned or delayed," subject to a lock-up period "terminating on the earlier of (i) March 21, 2022 and (ii) the date on which" MoneyLion's share price was "equal to or greater than $12.00 . . ."  (JX065 at DLA_006303.)

93.    Exhibit D to the MIPA was a Registration Rights Agreement, Section 3.5 of which required MoneyLion to take any actions reasonably requested by a Seller to enable such Seller to sell shares consistent with the securities laws.  (JX065 at DLA_006315.)

D.    **Schedule A and Schedule B**

94.    With respect to the accounting-related provisions in the MIPA, including Section 3.06, Schedules A and B, and Section 3.06 of the Disclosure Schedules, I relied on Fox Rothschild and Messrs. Basdekis and Curran.  My high-level understanding was that Schedule A set forth Malka's historical accounting principles that were used by Mr. Basdekis and his team and Schedule B set forth the revenue and EBITDA calculation principles that would be used for the 2021 and 2022 Earnout Payments.  I did not have a detailed personal understanding of these matters, but I was copied on emails where drafts of Schedules A and B were discussed and exchanged and where Messrs. Basdekis and Curran expressed their agreement with the language of Schedules A and B.

95.    For example, JX025 (MoneyLion_01044757) is a true and correct copy of an email dated October 27, 2021, which I received, in which Fox Rothschild's co-counsel representing us in the Acquisition, Michael Weiner of FisherBroyles, LLP, shared MoneyLion's first draft of Schedule A and suggested it "should be reviewed by Malka's CPA [meaning Mr. Curran] and CFO [meaning Mr. Basdekis] . . ."

96.    JX030 (DLA_001802-09) is a true and correct copy of an email dated October 29, 2021, which I received, in which Fox Rothschild sent our side's revisions to the draft of Schedule B to MoneyLion's counsel.

97.    JX038 (MoneyLion_01041381) is a true and correct copy of an email dated October 31, 2021, which I received, in which Messrs. Basdekis and Curran discussed Malka's revenue recognition principles in relation to both Schedules A and B.

98.    On November 1, 2021, Mr. Curran sent Mr. Basdekis, Fox Rothschild, Mr. Frommer, Mr. Fried, and me his comments to Schedule A.  JX043 (MoneyLion_00976958-65) is a true and correct copy of the email with attachment that I received from Mr. Curran on November 1, 2021.  That same day, Fox Rothschild sent the same group a markup of Schedule A.  JX041

(MoneyLion_00976972-81) is a true and correct copy of the email with attachment that I received on November 1, 2021 from Fox Rothschild.

99.    On November 1, 2021, Mr. Curran wrote to Fox Rothschild, copying me, saying he was fine with these edits.  PX127 (MoneyLion_00976990-97) is a true and correct copy of the November 1, 2021 email communication that I received from Mr. Curran.

100.    On November 1, 2021, Fox Rothschild sent the revised draft of Schedule A to DLA Piper.  JX042 (DLA_001978-83) is a true and correct copy of this email communication.

101.    Other than being copied on these emails, I do not recall discussing Malka's historical accounting principles, or its representations and warranties about accounting principles, with anyone during the drafting of the MIPA.  I had no doubt that Fox Rothschild, Mr. Curran, and Mr. Basdekis were representing my and the other Sellers' interests, and were correctly and accurately editing all transaction documents, as needed.

102.    The final version of Schedule B included in the MIPA provided that Malka's revenue "shall include the difference between the fair market value of the intercompany services provided by the Company to Buyer and the actual charge for the intercompany services provided by the Company to Buyer."  JX065 at DLA_006266.

103.    I understood at the time that Malka was going to provide a substantial amount of intercompany services to MoneyLion at a discount to the rates charged to third-party customers, and Sellers, including myself, wanted to ensure that for purposes of the two earnouts, Malka's revenue would be increased by the difference between the fair market value of Malka's services that would be charged to an unrelated third party and the discounted intercompany rates charged to MoneyLion.

104.    The final version of Schedule B further provided that Malka's EBITDA:

> shall include the expected recognition of the New Jersey Digital Media Tax Credit ("Tax Credit") in the period in which the Tax Credit was applied for. By way of illustration, the Tax Credit applied for in 2021 was for services provided by the Company for 2019. The Tax Credit would be applied to 2021 EBITDA.

JX065 at DLA_006267. The Tax Credit was something that we had addressed with MoneyLion in the June 2021 Pitch Deck and in other discussions prior to the close of the Acquisition. My understanding was that MoneyLion agreed to add to Malka's EBITDA for purposes of the 2021 and 2022 earnouts the amount of the Tax Credit applied for in each earnout year..

105.    Prior to the close of the transaction on November 15, 2021, neither anyone from MoneyLion nor its advisors ever asked me what the terms "historical revenue recognition principles," "noncancelable deposits," or "milestones" meant as those terms were used in Schedule A and Schedule B.

## MY MONEYLION SHARES

106.    On November 15, 2021, at the closing, MoneyLion paid me $4,069,605.90 in cash as my allocated share of the Closing Cash Payment.

107.    The same day, MoneyLion instructed its transfer agent, Continental Stock Transfer & Trust Company ("Continental"), to issue 1,408,149 shares of MoneyLion stock to me, as my allocated share of the Closing Stock Payment. Continental did so. PX164 (MoneyLion_01834755, at MoneyLion_01834759) is a true and correct copy of MoneyLion's instruction letter.

108.    On December 31, 2021, MoneyLion instructed Continental to issue 428,340 shares as my allocated Closing Stock Payment make-whole shares. Continental did so. PX180 (MoneyLion_01849262, at MoneyLion_01849265) is a true and correct copy of MoneyLion's instruction letter.

109.    On March 15, 2022, MoneyLion notified Mr. Frommer, as Sellers' Representative, that Malka had achieved the maximum 2021 Earnout Payment.

110.    On March 28, 2022, MoneyLion instructed Continental to issue 531,253 shares as my allocated share of the 2021 Earnout Payment.    Continental did so.    PX225 (MoneyLion_01820743, at MoneyLion_01820748) is a true and correct copy of MoneyLion's instruction letter.

111.    On March 31, 2022, MoneyLion instructed Continental to issue 992,278 shares as my allocated Closing Stock Payment make-whole shares, and 313,618 shares as my allocated 2021 Earnout Payment make-whole shares.    Continental did so.    PX229 (MoneyLion_01853256, at MoneyLion_01853260-61) is a true and correct copy of MoneyLion's instruction letter.

112.    On April 7, 2022, MoneyLion instructed Continental to cancel 6,689 shares that had been over-issued to me pursuant to MoneyLion's instruction letter of March 31, 2022. Continental did so.    PX231 (MoneyLion_01853245, at MoneyLion_01853247) is a true and correct copy of MoneyLion's instruction letter.

113.    On June 30, 2022, MoneyLion instructed Continental to issue 1,615,438 shares as my allocated Closing Stock Payment make-whole shares, and 527,128 shares as my allocated 2021 Earnout Payment make-whole shares.    Continental did so.    PX243 (MoneyLion_01851889, at MoneyLion_01851893-94) is a true and correct copy of MoneyLion's instruction letter.

114.    On September 30, 2022, MoneyLion instructed Continental to issue 2,048,723 shares as my allocated Closing Stock Payment make-whole shares, and 672,576 shares as my allocated 2021 Earnout Payment make-whole shares.    Continental did so.    PX251 (MoneyLion_01851766, at MoneyLion_01851770-71) is a true and correct copy of MoneyLion's instruction letter.

115.    Based on a review of my personal financial records, between August 31 and September 15, 2022, I sold 1,408,149 of my MoneyLion shares for a total of $1,932,860.52 (an average of $1.37 per share).  MoneyLion had filed an amendment to a federal securities registration statement on June 10, 2022, which permitted me to sell up to 1,408,149 shares.  PX240 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001807846/000121390022032231/fs12022a 2_moneylion.htm) is a true and correct copy of this amendment.

116.    Between November 28 and December 15, 2022, I sold another 1,190,221 of my MoneyLion shares for a total of $714,947.71 (an average of $0.60 per share).

117.    On March 14, 2023, presumably as instructed by MoneyLion (although I have not seen MoneyLion's instruction letter), Continental issued 1,461,550 shares as my allocated 2021 Earnout Payment make-whole shares.  PX313 (MoneyLion_00581722) is a true and correct copy of my Continental account statement dated April 17, 2023.

118.    MoneyLion elected to pay a portion of the final tranche of 2021 Earnout Payment make-whole in cash, rather than shares (which the MIPA allowed it to do).  I understood that the reason for the cash payment was to avoid the dilutive effect of issuing additional earnout shares to Sellers at the then very low MoneyLion stock price (as I describe below).  Thus, in addition to the 1,461,550 shares transferred to me on March 14, 2023, I also received $153,720 in cash in respect of the 2021 Earnout Payment final make-whole payment.

119.    Thus, after about March 14, 2023, I owned 7,393,994 shares of MoneyLion stock which were paid to me pursuant to the MIPA as a combination of the Closing Stock Payment, the 2021 Earnout Payment, and make-whole shares associated with each.

### MALKA'S INTERCOMPANY SERVICES TO MONEYLION

120.    After the Acquisition, Malka continued to provide creative and marketing services to MoneyLion, pursuant to an Intercompany Services Agreement entered into contemporaneously

28

with the Acquisition on November 15, 2021. PX159 (MoneyLion_00017823-30, at MoneyLion_00017825) is a true and correct copy of this agreement, whereby MoneyLion agreed to engage Malka to provide $10 million of services during 2022. To the best of my recollection, this agreement was later updated to increase the amount of intercompany services that Malka was to provide to MoneyLion to approximately $12 million during 2022.

121.    In 2022, Malka personnel provided intercompany services to MoneyLion as "retained teams" and "shared creative" teams as well as for particular MoneyLion projects. PX289 (MoneyLion_01863633-39) is a true and correct copy of a January 20, 2023 email and attached spreadsheet that Mr. Basdekis sent to Erika Nuno at MoneyLion, copying me and others. This exhibit shows that throughout 2022, Malka regularly invoiced MoneyLion for the services being performed by both of these teams and for MoneyLion projects and the total amount invoiced to MoneyLion by Malka in 2022 was about $9.15 million.

122.    The services that Malka provided to MoneyLion in 2022 were discounted. Also, Malka never charged MoneyLion the 20 percent production management fee that Malka generally charged third parties. PX210 (MoneyLion_00017459; MoneyLion_00017463; MoneyLion_00017467; MoneyLion_00017470) and PX234 (MoneyLion_00017573) are true and correct copies of sample Malka statements of work, which illustrate that MoneyLion was not charged the production management fee that was charged to other clients in 2022.

123.    I cannot recall a single Malka client, other than MoneyLion, with whom I worked without charging our standard 20 percent production management fee. Sometimes our clients paid additional fees for contingencies, on top of the 20 percent fee.

124.    Based on my discussions with the other Sellers and Mr. Basdekis, I understand that the retainer which MoneyLion paid to Malka resulted in MoneyLion's paying effectively

discounted "internal" rates for Malka employees' time spent on MoneyLion projects, compared with the higher "external" rates charged to other Malka clients.

125.    Malka's 2022 rate card for the "ML Brand Team" shows that the effective hourly rates of employees on the team, which provided intercompany services to MoneyLion, were heavily discounted from their standard rates.  PX190 (MoneyLion_01858090) is a true and correct copy of such a rate card from August 2022.  PX190 was created in the ordinary course of Malka's business, and it was Malka's ordinary course of business to create such rate cards.

126.    For that month, MoneyLion was charged an effective hourly rate of $89.09 for an art director's time compared with $150.00 that would be charged to other clients pursuant to Malka's Standard Rate Card.  PX190.

127.    Malka employees who were assigned to provide intercompany services to MoneyLion had to forgo time they would have billed to clients who paid our higher, "external" rates and the 20 percent production management fee.  Malka's work for MoneyLion in 2022 was therefore less profitable to Malka than work for its other clients.  This is why, when MoneyLion and Sellers were drafting the MIPA, our counsel added language providing that any difference between Malka's discounted rate to MoneyLion and its standard rates (which difference included the 20 percent production fee) would be added to revenue calculations for purposes of the 2021 and 2022 Earnout Payments.

128.    Malka's retained teams for its intercompany services to MoneyLion in 2022 was expected to remain available for MoneyLion matters, in addition to any work for other Malka clients.  This was an excellent deal for MoneyLion, which had priority over any external Malka client.  If MoneyLion wanted a livestream or graphic design to be arranged on short notice, Malka would scramble to find external support for our other clients' needs.  This was more expensive

than servicing clients ourselves, and at times I would even say MoneyLion's demands impacted our ability to provide top-quality service to those other clients.

129.    I am not aware of anyone from MoneyLion ever complaining or communicating to me or Sellers in 2022 that an insufficient amount of work was being performed by either the retained or shared creative teams.  To the best of my knowledge, all work requested by MoneyLion in 2022 was performed in 2022, and MoneyLion timely paid for that work.

## MONEYLION 2022 BONUSES FOR MALKA

130.    Malka historically did not pay employee bonuses, except for occasional spot bonuses in very small amounts (usually in the hundreds of dollars).

131.    Prior to the Acquisition, Malka paid severance only in a handful of particular cases and also in very small amounts.

132.    PX296 (MoneyLion_00023200-02) is a true and correct copy of a Slack thread between Messrs. Basdekis, Frommer, Fried, and myself dated January 29, 2023.  According to Mr. Basdekis's figures, Malka paid only $13,000 in year-end bonuses in 2021 and $17,125 in 2022, along with certain referral, sales incentive, and spot or sign-on bonuses.  Including all of these types of incentive-based compensation, Malka paid total bonuses of $64,195 in 2021 and $28,125 in 2022.

133.    On January 18, 2023, Mr. Basdekis sent me, Mr. Frommer, and Mr. Fried a file called "Earn Out vs GAAP Income Statement FY 2022."  The attached spreadsheet compared Malka's 2022 "GAAP" numbers versus its 2022 "Earnout" numbers.  For bonuses, Mr. Basdekis' spreadsheet had $28,125 for both "GAAP" and "Earnout."  JX101 (MoneyLion_00023193-95) is a true and correct copy of my January 18, 2023 Slack exchange with Mr. Basdekis and the attachment he sent.

134.    Other than the $15,000 allocated to bonuses in the 2022 Budget attached to the MIPA, and Mr. Basdekis' January 18, 2023 spreadsheet, I am not aware of any Sellers, or Mr. Basdekis, taking any steps or action to provide for additional bonuses in calendar year 2022.

135.    In approximately the first quarter of 2023, MoneyLion informed Malka that there was an available budgetary "pool" for employee bonuses for calendar year 2022.  Payment of these budgeted-for bonuses would not be based on any formal 2022 performance review, either as to Malka itself or individual employees.  Ultimately, in 2023, MoneyLion paid bonuses to a number of Malka personnel.

136.    No one at MoneyLion ever informed me that it would attempt to use these 2023 expenses to reduce Malka's 2022 EBITDA for earnout purposes.  In fact, it was my clear understanding from my communications with MoneyLion executives and officers, including Kate Fallon (MoneyLion's Chief People Officer), that MoneyLion's decision to pay additional bonuses would <u>not</u> affect the 2022 earnout calculations.  I asked Mr. Basdekis to confirm the same information, and he told me that he had done so.

## TRACKING PROGRESS TOWARDS THE 2022 EARNOUT PAYMENT

137.    Sometime about halfway through 2022, I requested Mr. Basdekis to share his tracking of Malka's progress toward the 2022 Earnout Payment, so that MoneyLion and Sellers were aligned on the relevant figures.  Mr. Basdekis shared his findings at weekly Malka meetings with Sellers, and at monthly meetings with Sellers and MoneyLion's finance and accounting team (usually consisting of Erika Nuno, Michelle Lee, and sometimes Mr. Correia and/or MoneyLion's Chief Accounting Officer, Mark Torossian).  The earnout was not the only topic of discussion at these meetings, which generally covered Malka's performance, finances, and various other topics.

138.    JX091 (MoneyLion_00176083-84) is a true and correct copy of an August 31, 2022 email from Mr. Basdekis to Ms. Nuno and Ms. Lee, copying me, Mr. Frommer, Mr. Fried and Mr.

Torossian, with the subject line "Historical Principal P&L MMG" and attaching a file called "NonGAAP Income Statement – MMG YTD July 2022."  In the body of his email, Mr. Basdekis wrote, "Attached as discussed."  The heading of the attached Excel file reads, "Non GAAP Income Statement From Jan 2022 to Jul 2022 Excludes Rev Rec, Accruals, and non-Historical Accounting Treatment."  This is a typical example of the documents that Mr. Basdekis would prepare and present at these monthly meetings with MoneyLion in 2022, and my recollection is that he presented updated Malka financial data in subsequent months.

139.    I recall that, by early December 2022, Mr. Basdekis informed Sellers that Malka had far surpassed the revenue threshold for achieving the Maximum 2022 Earnout Payment and was on target to easily surpass the EBITDA threshold as well.  This meant that, in addition to Sellers soon receiving the fourth tranche of 2021 Earnout Payment shares, we would receive over the course of 2023, additional 2022 Earnout Payment shares valued at $25 million as of a particular date, and at very low prices—given the collapse of MoneyLion's share price at the time.

## MONEYLION'S SHARE PRICE

140.    According to records I have reviewed, MoneyLion's share price declined from about $5.80 at the time of the Acquisition to about $0.60 in December 2022.  PX395 (https://finance.yahoo.com/quote/ML/history/) is a true and correct copy of MoneyLion's historical share prices from Yahoo! Finance, which are conformed so as to reflect the 1:30 Reverse Stock Split that occurred in April 2023, as I discuss below.

141.    Between the Acquisition and December 12, 2022, according to records I have reviewed, MoneyLion's market capitalization declined from an estimated $1.3287 billion to $126.8 million, a decline of 91.5 percent.  PX358 (SELLERS00004094) is a true and correct copy of these records.  PX358 is the type of market report that Sellers shared with one another and relied upon in the ordinary course of Malka's business.  These figures accord with my personal

33

recollection of MoneyLion's historical market capitalization, which I discussed with the other Sellers and MoneyLion executives.

142.    As a result of the Acquisition and the sale of our Malka shares to MoneyLion, the four Sellers had to pay substantial capital gains taxes, and the only way any of us expected we could do so was by selling some of our MoneyLion shares.

143.    My tax obligation for 2022 was approximately $3,100,000.    PX272 (MoneyLion_01864072) is a true and correct copy of an email chain dated December 14-15, 2022, between Sellers and Messrs. Choubey, Correia, and VanWagner, reflecting that we shared this information with MoneyLion.

144.    Sellers informed MoneyLion of our tax obligations and MoneyLion allowed us to sell shares in very brief open windows after earnings reports were released.  As noted in paragraph 115 above, between August 31 and September 15, 2022, I sold 1,408,149 of my MoneyLion shares and between November 28 and December 15, 2022, I sold another 1,190,221 of my MoneyLion shares.  I received a total of approximately $2.647 million from those sales, which I put towards my tax obligation for 2022.

145.    In light of Sellers' tax obligations, at Mr. Curran's suggestion, Sellers engaged a company called Corporate Valuation Advisors to perform a valuation of our restricted shares.  The valuation report concluded that our shares were subject to a 30 percent discount for "lack of marketability."  PX266 (MoneyLion_00157371-90, at MoneyLion_00157381-82) is a true and correct copy of this valuation report.

## MONEYLION DECIDES TO BREACH THE MIPA

146.    As noted above, by late 2022, Sellers were under financial pressure because of our tax obligations.  At the same time, MoneyLion was making it unreasonably difficult for us to sell additional vested shares, and MoneyLion executives reprimanded Sellers with increasing severity

whenever we wanted to sell, as the stock price continued to decline. This created a serious problem

for us, which Mr. Frommer and I discussed with Messrs. Choubey and Correia. Our discussions

convinced me that MoneyLion was intent on extracting additional concessions from Sellers as a

precondition to allowing us to sell additional shares.

147.    In that context, Messrs. Frommer, Fried, and I spoke with Messrs. Choubey and

Correia by telephone on December 14, 2022. Mr. Frommer recorded the call. During this call,

Messrs. Choubey and Correia asked the three Sellers present to agree to defer vesting of our final

quarterly tranche of make-whole shares for the 2021 Earnout Payment, and also to defer vesting

of the 2022 Earnout Payment shares, for another year (until January 1, 2024). According to them,

the steep decline in MoneyLion's share price at that time meant that, if Sellers were to be paid,

and then resell, a large number of MoneyLion shares, it could startle investors and cause further

declines in the share price.

148.    Although Messrs. Choubey and Correia freely admitted on the call that MoneyLion

had binding commitments in the MIPA to pay us our make-whole shares on particular dates, and

the 2022 Earnout Payment on particular dates (assuming Malka satisfied the applicable revenue

and EBITDA thresholds to receive the earnout payment)—they took the position that they could

not allow us to receive shares worth $25 million while the share price was around $0.50.

Therefore, Sellers were effectively told to accept a year-long delay in payments to which we were

contractually entitled, or else.

149.    It was my strong impression based on this conversation that the direct impetus for

Messrs. Choubey's and Corriea's unfair proposal to Sellers was MoneyLion's falling share price

at the time. It seemed that MoneyLion was willing to violate or ignore the basic terms of the

Acquisition, and to do whatever else it took in order to avoid paying us the shares that we had

rightly earned under the MIPA—because paying us our shares could have resulted in additional dilution and/or reduction in the share price.

150.    I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX271 (SELLERS00003790 Tr.).  Based on my review, PX271 is a true and accurate transcript of the conversation.

151.    During the call, Mr. Choubey said:

> I think the reality of the matter is it's essentially gonna take a year longer for us to get you that $70,000,000 in shares as we build the business together and build it back up.  I mean that's the fact of the matter for a real talk if you really want to get to brass tacks.

PX271 at 5.

152.    As Mr. Correia explained, if the share price eventually recovered to $2 or $3, Sellers' shares could be worth $300 million.  PX271 at 7.

153.    During the call, Mr. Correia acknowledged, "[A]re we breaking the agreement, sure," but reassured the three of us that we would still get the 2022 Earnout Payment; "[i]t's just going to take a little bit more time."  PX271 at 7-8 (emphasis added).

154.    Mr. Choubey added: "There is no scenario where the current make-whole construct can be the way it is."  PX271 at 8 (emphasis added).

155.    The next day, all four Sellers had another telephone conversation with Messrs. Choubey and Correia about their proposed deferment of the 2022 Earnout Payment.  Mr. Frommer recorded the call.  I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX273  (SELLERS00003787 Tr.).  Based on my review, PX273 is a true and accurate transcript of the conversation.

156.    Mr. Choubey said that he intended "to use every corporate lever to then make sure that those shares aren't coming to market . . ."  PX273 at 18.

157.    During the call, Mr. Correia acknowledged that MoneyLion owed Sellers "75 million bucks one way or another" and reassured us that MoneyLion was "not proposing . . . to not give you your $25 million," by which he was referring to the 2022 Earnout Payment shares. However, he said that MoneyLion's board would likely resist issuing additional shares to Sellers while the share price remained around $0.50.  PX273 at 19, 23.

158.    Mr. Choubey agreed: "You're going to get the full $25 million, just at a later date. PX273 at 23.

159.    Sellers did not agree to the proposal by Messrs. Choubey and Correia that we accept the deferred vesting of our shares.  In my view, this was an inappropriate attempt by MoneyLion executives to rewrite the binding agreements whereby we had sold our company to them—simply because MoneyLion apparently no longer found the terms sufficiently favorable.

160.    On December 20, 2022, Mr. Choubey had another telephone conversation with Messrs. Frommer, Fried, and myself, which Mr. Frommer recorded.  I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX277 (SELLERS00004093 Tr.).  Based on my review, PX277 is a true and accurate transcript of the conversation.

161.    During the call, Mr. Choubey said:

> We asked you to defer the 12/31 make-whole to 2024, and you guys didn't want to do that. . . . [A]lso with the company having to issue so many shares and forcing a 50-cent stock potentially to go to 30 cents, right?  Because the value of the company is the value of the company, the more shares you issue the lower the stock price goes. . . . 100% categorically no one had the 10b5-1. . . . The lawyers were telling us arguably that our insider trading policy should have been interpreted that when you're in a cure period no insider should be able to sell stock, right?  So I think it would have just been a horrible look if we had put those in place, so that's why we made the call there on that one.  I hope you understand that one.

PX277 at 15-16.

162.    I understood Mr. Choubey's words to mean that, in the opinion of MoneyLion's counsel, Sellers were still restricted from transferring their shares out of Continental without additional authorization, because we qualified as corporate insiders.

163.    I have no idea why I qualified as an insider (or if, indeed, I truly did), as I had no knowledge of any significant nonpublic plans or information regarding MoneyLion.  To this day, I am unaware of how MoneyLion could prevent me from selling some of my shares on that basis.

## THE REVERSE STOCK SPLIT

164.    At some point in late 2022 or early 2023, as I learned from discussions with the other Sellers and with MoneyLion officers, the New York Stock Exchange warned MoneyLion that its stock would be delisted if it could not achieve the minimum share price of $1.00.

165.    On March 31, 2023, MoneyLion filed a proxy statement announcing a special meeting to be held April 19, 2023, for shareholder approval of the Reverse Stock Split at a ratio of between 1:2 and 1:30.   PX308  (https://investors.moneylion.com/filings-financials/all-sec-filings/content/0001213900-23-025534/0001213900-23-025534.pdf) is a true and correct copy of this proxy statement.

166.    MoneyLion disclosed that "[t]he primary goal of the Reverse Stock Split is to increase the per share market price of the Class A Common Stock to meet the minimum per share price requirement for continued listing on the New York Stock Exchange."  PX308 at 7.

167.    The Reverse Stock Split was approved by shareholder vote and was subsequently implemented at the maximum ratio of 1:30.  This meant that if a MoneyLion shareholder owned 30 shares before the Reverse Stock Split, he would own 1 share after it.

## THE 2022 EARNOUT PAYMENT

168.     In December 2022, MoneyLion's share price was continuing to fall and Messrs. Choubey and Correia were threatening Sellers.  The next month, in January 2023, Mr. Basdekis provided his 2022 Malka revenue and EBITDA calculations to MoneyLion.

169.     As reflected on the January 18, 2023 income statement that Mr. Basdekis sent to me, Mr. Frommer and Mr. Fried, Mr. Basdekis calculated that Malka's 2022 revenue for "Earnout" purposes was $42,516,536 and Malka's 2022 EBITDA, or "Net Ordinary Income," was $1,508,501, before counting the Tax Credit.  JX101.  Thus, Mr. Basdekis had concluded that Sellers had earned the Maximum 2022 Earnout Payment of shares of MoneyLion restricted stock equal to $25 million worth in shares, valued as of the contractual date.

170.     This was not a surprise given where Malka's business stood in late December 2022, as reflected in Sellers' conversations with Messrs. Choubey and Correia.

171.     Mr. Choubey made good on his threat not to issue the 2022 Earnout Payment, and MoneyLion proceeded to substitute its own, completely different set of calculations in the Revenue and EBITDA Statement transmitted to Mr. Frommer on April 14, 2023.  That decision by MoneyLion precipitated this dispute.

## TERMINATION AND ALLEGEDLY PERSONAL EXPENSES

172.     I learned that MoneyLion had terminated Sellers in a meeting with Mr. Choubey, Mr. Correia, Ms. Fallon, Ben Probber (MoneyLion's in-house counsel), and Messrs. Frommer and Fried.  I do not remember what reasons, if any, were given by MoneyLion officers at this meeting.

173.     I received a written Notice of Termination dated May 19, 2023, but I did not read it until the following Monday, May 22, 2023.  JX116 (SELLERS0003754) is a true and correct copy of my Notice of Termination.

174.    I have come to understand that of the purported basis for our termination was that we had improperly used company funds for personal expenses.  These allegedly personal expenses included certain (but, at the time, unspecified) Fox Rothschild legal bills.

175.    I do not recall Mr. Basdekis or any other MoneyLion employee ever raising any concern with me regarding Malka's payment of any personal or legal expenses of Sellers, prior to my termination.

176.    To the extent any of Fox Rothschild's post-Acquisition work for Sellers was personal in nature and not related to Malka's work at MoneyLion, I would have expected to be advised by Mr. Basdekis, or someone else in Finance, that bills were received that appeared to include personal charges.  Prior to being terminated, I had no notice of any bills that MoneyLion contended included personal charges of the Sellers.

177.    Sellers made repeated written requests to MoneyLion to provide the challenged billing records, credit card statements, and invoices that were the purported cause for our terminations, beginning with a letter to MoneyLion on May 23, 2023.    JX118 (SELLERS00000026) is a true and correct copy of the May 23, 2023 letter.

178.    Only 15 months later, on August 16, 2024—which I understand was the deadline for fact discovery in this litigation—did MoneyLion finally produce the Fox Rothschild invoices which it contended were improper personal expenses.

179.    I have reviewed these invoices, and my review confirms that a substantial portion of Fox Rothschild's bills were properly reimbursable because they related to the Kalo Brands LLC dispute, which concerns an account receivable owed to Malka (ultimately benefitting MoneyLion). Other invoices reflect post-Acquisition legal services which were for the benefit of either Malka's business or MoneyLion with respect to implementing the Acquisition.  For example, I recall that

Fox Rothschild advised Sellers about restricted shares and the process for selling them not just for Sellers' own benefit, but for the benefit of <u>all</u> Malka employees who had received MoneyLion shares as a result of the Acquisition.  Because MoneyLion did not provide us meaningful information on this topic, we sought advice on behalf of the entire Malka team.

180.    I recognize that there are other bills for legal services that might be deemed personal in nature.  Sellers would bear responsibility for such expenses, which could constitute a modest offset to our claims.  Had any personal expenses been brought to my attention before Sellers were terminated (or, indeed, before August 16, 2024), I would have addressed them promptly.

181.    I would have expected that any Fox Rothschild bills that were truly personal in nature would have been sent to Sellers for approval, not MoneyLion's accounting department.  In fact, several Fox Rothschild invoices regarding tax and estate planning <u>were</u> sent to me personally, and I paid them directly.

## ALLEGED NON-COMPETE VIOLATIONS

182.    On March 6, 2024, MoneyLion sent a purported cease-and-desist letter to Sellers alleging that all four Sellers had violated non-compete and non-solicitation provisions of the MIPA and of Mr. Frommer's and my Employment Agreements, and listed alleged instances involving Messrs. Frommer, Capra, and myself.  PX333 is a true and correct copy of this letter.

183.    MoneyLion's allegations about me were as follows:

(i)    The Seller Members have formed, and/or are operating, competing businesses in direct violation of the foregoing restrictions;

(ii)    Mr. Krubich has repeatedly solicited Stephen A. Smith's business manager about moving existing and future production and sales distribution work from Malka to a new production company with Mr. Krubich's involvement, falsely representing, among other things, that Malka does not have the available resources necessary to support Stephen A. Smith's business needs, in violation of Section 5.02 of the MIPA and Section 4.4.1 of his Employment Agreement, and which led to the loss of the Stephen A. Smith business; . . .

41

(vi)    Messrs. Frommer and Krubich are actively collaborating to solicit several former Malka employees to provide production work for a number of Malka clients who recently cut ties with Malka and MoneyLion, including projects for Stephen A. Smith, Health Thyself and Morning Kombat, in violation of their non-solicitation covenants in the MIPA and their Employment Agreements.

PX333 at 1-2.

184.    Sellers replied to MoneyLion's letter on March 14, 2024.  PX334 is a true and correct copy of this reply letter.

185.    MoneyLion never replied to our March 14 letter.

186.    I have not at any time formed or operated a business that competes with MoneyLion.

187.    I have not at any time solicited Stephen A. Smith's business manager.  I recall returning a phone call from this person the day after my termination and informing him that I had been terminated and was no longer with Malka.  We have not spoken since then.

188.    I have not "actively collaborat[ed] to solicit" any former Malka employees.  I recall speaking with some people on the *Stephen A. Smith*, *Health Thyself*, and *Morning Kombat* podcast teams since my termination, but I did not attempt to solicit anyone.  None of these people is employed by MoneyLion today, and most were laid off.

189.    I have incurred attorneys' fees and costs as a result of MoneyLion's baseless non-compete claim.

## ALLEGED CONVERSION

190.    MoneyLion has accused me of "burglarizing" Malka's Santa Monica offices on May 21, 2023, two days after my termination and one day before I read the termination notice. This scurrilous allegation bears no resemblance to what happened.  I went to the offices on that day specifically to retrieve my own personal property. I did not remove any company property from the premises.

191.    I have conducted an inventory of all items that I removed from Malka's offices. The complete list is as follows: film posters; a candle and snuffer; cocoa powder, maple syrup, and chocolate; a portable keychain phone charger; a hunting knife; an Inc. 5000 award letter; client holiday cards; a New York Jets firefighter helmet; iPhone cables; a Kevin Garnett gift set, a KG Slam magazine, and a KG Slam sweatshirt; trophies, including my 40 Under 40 award trophy; framed family photographs and drawings and papers by my children; a Nitro Circus event book; a copy of *The Align Method* by Aaron Alexander; and thank-you notes from Malka clients.  All of these personal belongings and effects are currently stored at my house.

## EXERCISES OF MY SHAREHOLDER RIGHTS

192.    The current amount of my fully vested MoneyLion shares is 246,466, consisting of (a) 147,304 Closing Shares; and (b) 99,162 2021 Earnout Shares.  I arrive at those numbers as follows:

| | |
|---|---|
| Total Closing Shares Received | 6,486,239 |
| Total 2021 Earnout Shares Received | 3,506,125 |
| Total Shares Received | 9,992,364 |
| Shares sold pursuant to June 2022 Registration Statement | 1,408,149 |
| Other sales | 1,190,221 |
| Remaining Closing Shares (*assuming FIFO*) | 4,474,509 |
| Remaining 2021 Earnout Shares (*assuming FIFO*) | 2,919,485 |
| Total Remaining Shares | 7,393,994 |
| <u>1:30 Split Adjusted</u> | |
| Remaining Closing Shares | 149,150.3 |
| Remaining 2021 Earnout Shares | 97,316.17 |
| **Totals** | **246,466.47** |

193.    This calculation uses a first-in, first-out method to assume that I sold my oldest-issued shares first (*i.e.*, I sold all of the shares issued to me on November 15, 2021, December 31, 2021, March 28, 2022, and a portion of the shares issued to me on March 31, 2022).

194.    I am both the holder of record and the beneficial owner of my fully vested MoneyLion shares.

195.    I have repeatedly exercised my voting rights as a vested shareholder.  For example, I voted my shares at the April 2023 special meeting, at which the Reverse Stock Split was approved; and at MoneyLion's annual meetings held in June 2023 and 2024, respectively.

196.    I expected that, by selling our company to MoneyLion in return for $10 million in cash and a much larger portion of stock, I would be free to use my MoneyLion shares as any investor could, including selling some shares and holding some shares long-term.  At no point did the parties agree that MoneyLion would have a right to effectively freeze my shares after the respective stock vesting dates had passed.

197.    Nevertheless—without any basis in any agreement to which I am a party—MoneyLion has apparently placed a "stop order" with Continental which prevents me from freely exercising my shareholder rights, including the right to transfer my shares to my broker and to sell them into the public market.  PX318 (SELLERS00004431) is a true and correct copy of the email from Continental informing Sellers of this fact.

**RESPONSE TO MONEYLION'S FRAUD CLAIM**

198.    I understand that I, and the other Sellers, have been accused by MoneyLion of defrauding them by deliberately misrepresenting the manner in which Malka historically recognized revenue.  I categorically deny this.

199.    As I stated above, I relied entirely on Mr. Basdekis for all matters related to Malka's accounting, including recognition of revenue and expenses.  I relied on Fox Rothschild, Mr. Basdekis, and Mr. Curran to correctly and accurately describe Malka's historical accounting practices in the MIPA.  At no time did Mr. Basdekis tell me in words or substance that the

representations that were made in the MIPA or Schedule A did not accurately communicate Malka's historical approach to recognizing revenue or expenses.

200.    To the best of my understanding, Mr. Basdekis continued to use the same historical revenue and expense recognition principles that Malka had used pre-closing when he calculated revenue and EBITDA for purposes of the 2021 Earnout Payment and 2022 Earnout Payment.  At no time, including to the present, has Mr. Basdekis or anyone from MoneyLion indicated to me that Mr. Basdekis' accounting practices used to calculate Malka's revenue and EBITDA for the 2021 Earnout Payment and 2022 Earnout Payment differed from Malka's historical revenue and expense recognition principles.


Executed on this 19th day of December, 2024 at Marina del Rey, California.

_____

Lyusen (Louis) Krubich