UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------------------  x
JEFFREY FROMMER, et al.,                                             :
                                                                     :
                              Plaintiffs,                            :
                                                                     :
                      v.                                             :    Case No. 1:23-cv-06339-JMF
                                                                     :
MONEYLION TECHNOLOGIES INC., et ano.,                                :
                                                                     :
                              Defendants.                            :
                                                                     :
-------------------------------------------------------------------  x
```

## <u>DECLARATION OF DANIEL FRIED</u>

I, DANIEL FRIED, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.      I submit this declaration as my direct trial testimony, pursuant to the Court's Order dated August 29, 2024 (ECF No. 123) and Paragraph 6.E.i. of the Court's Individual Rules and Practices in Civil Cases.

2.      I am one of the plaintiffs in this action, along with Jeffrey Frommer, Lyusen (Louis) Krubich, and Pat Capra (together, the "Sellers"). I understand that I may be cross-examined in person at trial by counsel for MoneyLion Technologies Inc. and MoneyLion (together, "MoneyLion").

3.      I have described the facts set forth in this declaration to the best of my recollection based upon my personal knowledge as well as a review of the relevant records.

4.      Each of the Sellers is a prior owner-member of Malka Media Group LLC ("Malka") and a party to the Membership Interest Purchase Agreement, dated November 15, 2021 (the "MIPA"), pursuant to which MoneyLion acquired Sellers' membership interests in Malka (the

**PX418**

"Acquisition"). Following the Acquisition, Malka became a wholly-owned subsidiary of MoneyLion, and I remained an employee of Malka and MoneyLion until May 19, 2023.

### EDUCATIONAL AND WORK HISTORY

5.      I live in Los Angeles. I am 40 years old. I graduated from Bucknell University in 2006 with a degree in European history and geography.

6.      After graduating, I moved to New York City and took a job at the cable television channel ESPN, first for two years in its sports marketing department and then for two years in its integrated marketing department.

7.      From about 2010 to 2013, I worked in an integrated marketing role at the cable television channel Comedy Central. One of my coworkers was Mr. Krubich, whom I met there in approximately 2010 or 2011. My work at Comedy Central focused on weaving brands into television shows such as *The Colbert Report* and *Workaholics*.

8.      In or about 2013, I left my position at Comedy Central and took an integrated marketing position at Universal McCann, a media and advertising agency. This was similar to my prior role at Comedy Central, except that now my job was to approach integrated marketing from the perspective of the brands rather than the television studio.

9.      I remember discussing Mr. Krubich's company, Malka, with him beginning in or around 2014 or 2015, which was when I met Mr. Frommer (who I understood was already working with Mr. Krubich). Malka's work intrigued me because it had both media production and creative content capabilities as well as a client base of major companies, who would want their brands associated with high-quality and entertaining media content. This seemed like a naturally synergistic relationship, whereas my previous jobs had approached marketing from either the entertainment side or the corporate brand side.

2

10.   In approximately July 2015, I left Universal McCann and joined the Malka team, with Messrs. Krubich and Frommer.  I became the third member of Malka through an operating agreement dated January 1, 2016.

11.   My responsibilities at Malka focused on content production on behalf of brands and agencies—such as advertisements and other creative content for television, websites, and social media.

12.   I met Mr. Capra in approximately 2015 or 2016.  I learned about his sports agency business, and the four of us (Sellers) concluded that it could further enhance Malka's synergistic capabilities.  On or about January 31, 2018, Messrs. Krubich, Frommer, and I, through our respective membership interests in Malka, and Mr. Capra founded Malka Sports LLC ("Malka Sports") as a New Jersey limited liability company.

13.   From its formation until in or about June 2021, Malka Sports was owned 50 percent by Malka and 50 percent by Mr. Capra.  My ownership interest was therefore determined pursuant to my membership interest in Malka under the then-operative Malka operating agreement.

14.   On or about June 18, 2021, Mr. Capra assigned his 50 percent interest in Malka Sports to Malka, and all four Sellers entered into a Second Amended and Restated Operating Agreement, whereby Mr. Capra was admitted as the fourth member of Malka. PX059 (MoneyLion_01397872) is a true and correct copy of the assignment agreement with Mr. Capra; and PX057 (MoneyLion_00997752) is a true and correct copy of the Second Amended and Restated Operating Agreement.

15.   Prior to the Acquisition, with few exceptions, Malka paid only very small bonuses (typically in annual amounts of less than $1,000) and very small severance amounts to particular employees.

3

## MALKA'S INVOICING

16.    In or about 2020, Malka hired Matthew Basdekis to be its Head of Finance.  Mr. Basdekis reported regularly to me and the other Sellers about Malka's finances and profitability, I viewed Mr. Basdekis as highly competent, capable, and trustworthy.  I felt that Sellers could rely on Mr. Basdekis and his team to manage Malka's financial books and records and keep us updated on Malka's financial performance.

17.    Mr. Basdekis and the Finance team members who reported to him were responsible for accounting matters, managing invoicing (with the Client Services team), maintaining Malka's books and records, and handling accounts payable and accounts receivable, among other things.

18.    Malka's Client Services team was responsible for invoicing our clients, negotiating statements of work and other project documentation, and for most day-to-day relationship management with clients.

19.    Prior to the acquisition, each Seller had certain top clients for which he was primarily responsible.  I had primary responsibility for Proximo Spirits and Sotheby's International Realty, in addition to other smaller clients.

20.    Malka's general practice with respect to client invoicing was to send an initial invoice shortly after a client had hired us for a particular project or scope of work (such as one content production, or a series of productions in a given period) and another invoice upon completion of the project.

21.    Malka typically required clients to make an upfront payment of at least 50 percent of the total project cost, because Malka had considerable "hard costs" (fixed expenses) once projects got underway and wanted to ensure that it had sufficient funds in the door to cover expenses before work was underway.  Some clients agreed or even preferred to pay more than 50 percent upfront.

22.     After the initial, upfront invoice, Malka's general practice was to invoice clients on various client-driven milestones, which could be, for example, particular dates, stages of project completion, or other events.  To the best of my recollection, the client-driven milestones were often spelled out in Malka's statements of work.

23.     The timing of when Malka would send invoices subsequent to the initial invoice could depend on a range of factors.  To the best of my recollection, it was always agreed upon with the client, and was nearly always driven by the client's own business and financial considerations. For example, a client might have leftover marketing budget toward the end of the calendar year that it wanted to spend or might have other business or financial considerations such that it preferred to be invoiced most of the cost upfront or invoiced at particular intervals.

24.     Malka did not send client invoices at unexpected or random times.  I cannot recall any instance in which a client complained that it had received an unexpected invoice.

25.     PX11 (MoneyLion_02072339-50) is a true and correct copy of a Supplier Agreement between Malka and Sotheby's International Realty Affiliates LLC ("Sotheby's").  The contract was for Malka to crate short-form (90-second and 15-second) real estate profile videos for a price of $6,500 per video.  Sotheby's was to pay 50 percent of the total fee as an upfront deposit and the remainder upon completion.  PX11 at MoneyLion_02072350.

26.     PX46 (MoneyLion_02075872-73) is a true and correct copy of a Task Order entered into between Malka and Morgan Stanley and effective as of April 6, 2021.  I signed this agreement on behalf of Malka.  The agreement provides that Malka will create social media assets on a weekly basis for Morgan Stanley between April 2021 through December 2021 and that Malka will invoice Morgan Stanley $22,222 per month between April and November 2021 and $22,224 in December.

27.     Sometimes Malka's statement of work consisted of an informal writing, such as an email, or an oral commitment, because many of our smaller projects with recurring clients were short in duration (*i.e.*, one or two months) and for small amounts (*i.e.*, less than $50,000).

28.     The fourth quarter of a given calendar year was typically Malka's busiest and most lucrative quarter because, in the marketing business, clients often find they have remaining, unallocated funds to be spent on certain priority projects or initiatives.

29.     Mr. Basdekis, as Malka's Head of Finance, was highly familiar with Malka's invoicing and was responsible for the company's revenue and expense recognition practices.

30.     Both before and after the Acquisition, I relied on Mr. Basdekis, and Mr. Curran, for accounting-related matters and did not have independent knowledge of how Malka recognized revenue or expenses prior to the Acquisition.

## THE ACQUISITION

31.     To the best of my knowledge, Malka began providing creative and marketing services to MoneyLion in or about 2017 or 2018.  Mr. Frommer was the partner who had primary responsibility for the MoneyLion relationship.

32.     In or around June 2021, I learned from Mr. Krubich that MoneyLion had approached him about a potential acquisition of Malka, and that he and Mr. Frommer had met with MoneyLion executives over dinner in New York to discuss the possibility.

33.     As I recall, MoneyLion was not the only company that had expressed interest in acquiring Malka.  Before MoneyLion, we had been approached at some point by Excel Sports Management, a major sports agency.

34.     To the best of my knowledge, as of the time when Messrs. Frommer and Krubich met with MoneyLion about a potential acquisition, Malka had not been "shopping around" for

potential acquirors and had not engaged an investment bank or other advisors or service providers with an acquisition in mind.

35.     I do not recall having meaningful involvement in the parties' early negotiations and discussions surrounding the Acquisition, other than participating in regular discussions among Sellers about the status and progress of negotiations.  For example, I do not think I played a role in negotiating the parties' Letter of Intent and Term Sheet, although I was generally aware that this was taking place.  Because this was my first experience with a potential acquisition, I had few expectations and limited understanding about the process.

36.     I met Dee Choubey (MoneyLion's CEO) and Rick Correia (MoneyLion's CFO, President, and Treasurer) for the first time at MoneyLion's offices on July 29, 2021, after the parties had already entered into a Letter of Intent outlining the structure and other major terms of the Acquisition.

37.     I also do not recall playing a significant role in responding to MoneyLion's and its advisors' due diligence requests during the summer and fall of 2021, although I may have compiled some due diligence information at the request of Mr. Frommer or Malka's outside counsel (Fox Rothschild LLP).

38.     One contractual term that I do remember discussing with Fox Rothschild is that I was concerned that if the restricted shares that Sellers would be paid in the 2021 and 2022 Earnout Payments were conditioned on our employment with MoneyLion, then we could lose the shares if we were terminated.  I had no expectation of leaving MoneyLion voluntarily or being terminated after the Acquisition, but I did not want MoneyLion to be able to terminate me (an at-will employee), and then use that termination as a basis for withholding or clawing back shares that it had been contractually obligated to pay me.

39.    With respect to the accounting-related provisions in the MIPA, including Section 3.06, Schedules A and B, and Section 3.06 of the Disclosure Schedules, I relied on Fox Rothschild, Mr. Basdekis, and Malka's outside accountant (Ryan Curran).  I did not have a detailed understanding of these matters.

40.    I do not recall discussing Malka's historical accounting principles, or its representations and warranties about accounting principles, with anyone during the drafting of the MIPA.

41.    The only written employment agreement I entered into with MoneyLion was an Incentive Compensation Letter Agreement, which provided that I was an at-will employee, among other terms.  JX067 (SELLERS00003110) is a true and correct copy of this agreement.

42.    The parties' negotiations resulted in contractual language in the Restricted Stock Agreements (the "RSAs"), Exhibit C to the MIPA.  The RSAs provided that Sellers' Closing Stock Payment restricted shares would vest and become Earned Shares on each of the respective, quarterly vesting dates, and therefore were not tied to our employment.  JX065 (DLA_006185-006332) is a true and correct copy of the execution version of the MIPA, including the first RSA as Exhibit C thereto.  *Id.* at DLA_006300.

43.    The first RSA provided that Sellers' restricted shares could not be transferred without MoneyLion's consent, "which shall not be unreasonably withheld, conditioned or delayed," subject to a lock-up period "terminating on the earlier of (i) March 21, 2022 and (ii) the date on which" MoneyLion's share price was "equal to or greater than $12.00 . . ."  JX065 at DLA_006303.

44.    Sellers and MoneyLion entered into additional RSAs governing the 2021 Earnout Payment shares and make-whole shares for both the Closing Stock Payment and the 2021 Earnout

Payment.    JX085    (MoneyLion_01870073,    at    MoneyLion_01870083-90);    JX088

(MoneyLion_01868481-90);    JX103    (MoneyLion_01863666-76);    and    JX108

(MoneyLion_01863152-59) are true and correct copies of my additional RSAs.

45.    Exhibit D to the MIPA was a Registration Rights Agreement ("RRA"), Section 3.5

of which required MoneyLion to take any actions reasonably requested by a Seller to enable such

Seller to sell shares consistent with the securities laws.  JX065 at DLA_006315.

46.    In the months following the Acquisition, Mr. Frommer took on additional

responsibilities at MoneyLion and I assumed some of his former operational and management

responsibilities at Malka.  Reflecting this shift, at some point after the Acquisition, my title was

changed to President of Malka.

## PROXIMO

47.    As I mentioned above, I was primarily responsible for managing and maintaining

Malka's relationship with Proximo, a major client.  Malka created advertisements, digital and

social media content, and consumer marketing for various of Proximo's liquor brands.  I recall that

Proximo told me that Malka was its cheapest vendor for marketing and promotional content.

48.    Proximo hired Malka for a variety of significant marketing projects during 2021

and 2022, including ad campaigns with mixed martial artist and professional boxer Conor

McGregor for Proper Twelve whiskey and with television personality Nicole "Snooki" Polizzi for

Kraken Rum.

49.    In approximately November 2021, Proximo informed me that it had an additional

$400,000 in its marketing and production budget at the end of 2021, which it wanted to spend with

Malka.  This is one example of how Malka's invoicing was client driven.  Malka provided services

for a variety of Proximo's brands, which had different projects and initiatives, timelines, and

preferred billing dates and milestones.

50.    Proximo wished to allocate this $400,000 to a specific sub-brand and had specific timing milestones in mind for particular scopes of work.

51.    Following and implementing Proximo's request, I then instructed Mr. Basdekis and the Client Services Team to send Proximo four invoices for $100,000 each, for work which was anticipated to be performed in 2022.

52.    I do not know on what dates Proximo paid any of the four $100,000 invoices, but I was informed that they were paid.

53.    I did not know at the time whether Malka recognized the revenue from any of those four $100,000 Proximo invoices in 2021 or in another calendar year.

54.    I recall that MoneyLion's executive team directed Sellers, specifically around the close of fiscal quarters, to send invoices as promptly as possible and to try to defer expenses into the next quarter.

55.    I did not ever discuss with any of the other Sellers the possibility of manipulating the timing or amounts of Malka invoices so as to increase our chances of receiving either the 2021 or 2022 Earnout Payments.  While, of course, I hoped and expected we would achieve the revenue and EBITDA thresholds required by the MIPA to obtain both earnout payments, my view was that the best way to accomplish that was to continue aggressive business development efforts throughout late 2021 and 2022, just as Sellers had always done before.  In other words, my strategy for generating revenue for Malka did not change after the Acquisition.

56.    At no time has anyone from MoneyLion suggested to me that any of Malka's expenses were concealed, or not fully or accurately recognized in Malka's accounting records.

## MY MONEYLION SHARES

57.    On November 15, 2021, at the closing, MoneyLion paid me $810,430.96 in cash as my allocated share of the Closing Cash Payment.

10

58.     The same day, MoneyLion instructed its transfer agent, Continental Stock Transfer & Trust Company ("Continental"), to issue 297,853 shares of MoneyLion stock to me, as my allocated share of the Closing Stock Payment.  Continental did so.  PX164 is a true and correct copy of MoneyLion's instruction letter.  (MoneyLion_01834755, at MoneyLion_01834759.)

59.     On December 31, 2021, MoneyLion instructed Continental to issue 90,603 shares as my allocated Closing Stock Payment make-whole shares.  Continental did so.  PX180 is a true and correct copy of MoneyLion's instruction letter.    (MoneyLion_01849262, at MoneyLion_01849265.)

60.     On March 15, 2022, MoneyLion notified Mr. Frommer, as Sellers' Representative, that Malka had achieved the maximum 2021 Earnout Payment.

61.     On March 28, 2022, MoneyLion instructed Continental to issue 112,371 shares as my allocated share of the 2021 Earnout Payment.  Continental did so.  PX225 is a true and correct copy of MoneyLion's instruction letter.  (MoneyLion_01820743, at MoneyLion_01820748.)

62.     On March 31, 2022, MoneyLion instructed Continental to issue 209,885 shares as my allocated Closing Stock Payment make-whole shares, and 66,336 shares as my allocated 2021 Earnout Payment make-whole shares.  Continental did so.  PX229 is a true and correct copy of MoneyLion's instruction letter.  (MoneyLion_01853256, at MoneyLion_01853260-61.)

63.     On April 7, 2022, MoneyLion instructed Continental to cancel 1,415 shares that had been over-issued to me pursuant to MoneyLion's instruction letter of March 31, 2022.  Continental did so.   PX231 is a true and correct copy of MoneyLion's instruction letter.  (MoneyLion_01853245, at MoneyLion_01853247.)

64.     On June 30, 2022, MoneyLion instructed Continental to issue 341,699 shares as my allocated Closing Stock Payment make-whole shares, and 111,498 shares as my allocated 2021

Earnout Payment make-whole shares.  Continental did so.  PX243 is a true and correct copy of MoneyLion's instruction letter.  (MoneyLion_01851889, at MoneyLion_01851893-94.)

65.     On September 30, 2022, MoneyLion instructed Continental to issue 433,347 shares as my allocated Closing Stock Payment make-whole shares, and 142,263 shares as my allocated 2021 Earnout Payment make-whole shares.  Continental did so.  PX251 is a true and correct copy of MoneyLion's instruction letter.  (MoneyLion_01851766, at MoneyLion_01851770-71.)

66.     Based on a review of my personal financial records, between December 9 and 20, 2022, I sold 290,000 of my MoneyLion shares for a total of $159,644.26 (an average of $0.55 per share).   I understand that MoneyLion had filed an amendment to a federal securities registration statement on June 10, 2022, which permitted me to sell up to 297,853 shares.   PX240 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001807846/000121390022032231/fs12022a 2_moneylion.htm) is a true and correct copy of this amendment.

67.     On or about March 14, 2023, MoneyLion paid me $32,515 in cash and Continental issued 309,148 shares, presumably as instructed by MoneyLion (although I have not seen MoneyLion's instruction letter).  In combination, this was my allocated 2021 Earnout Payment make-whole payment.

68.     Thus, after about March 14, 2023, I owned 1,823,580 shares of MoneyLion stock which were paid to me pursuant to the MIPA as a combination of the Closing Stock Payment, the 2021 Earnout Payment, and make-whole shares associated with each.  After a 1:30 Reverse Stock Split that occurred in April 2023, as I discuss in paragraphs 107-110 below, these became 60,786 shares.  PX410 (MoneyLion_00120986-89) is a true and correct copy of my Continental account statement dated May 2, 2023.

69.      I am relying on MoneyLion instruction letters and Continental account statements for all of the foregoing information about my shares.

### MALKA'S INTERCOMPANY SERVICES TO MONEYLION

70.      After the Acquisition, Malka continued to provide creative and marketing services to MoneyLion.  Based on my contemporaneous discussions with the other Sellers and Mr. Basdekis, I understand that MoneyLion and Malka entered into an agreement or statement of intercompany services work for 2022.  This would include several extremely time- and resource-intensive MoneyLion projects.

71.      Based on my discussions with the other Sellers and Mr. Basdekis, I also understand that Malka billed discounted "internal" rates for its employees' time spent on MoneyLion projects, compared with the higher "external" rates charged to other Malka clients.

72.      Malka's 2022 rate card for the "ML Brand Team" (a team of Malka employees that was part of the "retained team" for MoneyLion) shows that the effective hourly rates of employees on the team, which provided intercompany services to MoneyLion, were heavily discounted from their standard rates.  PX190 (MoneyLion_01858090) is a true and correct copy of such a rate card from August 2022.  PX190 was created in the ordinary course of Malka's business, and it was Malka's ordinary course of business to create such rate cards.

73.      In August 2022, MoneyLion was charged an effective hourly rate of $89.09 for an art director's time compared with $150.00 that would be charged to other clients pursuant to Malka's Standard Rate Card.  PX190.

74.      Additionally, and again based on my contemporaneous discussions with the other Sellers and Mr. Basdekis, I understand that Malka did not charge MoneyLion a production management fee.  I cannot recall a single Malka client, other than MoneyLion, with whom I

worked without charging our standard 20 percent production management fee. Sometimes our clients paid additional fees for contingencies, on top of the 20 percent fee.

75.    PX210 (MoneyLion_00017455-73) and PX234 (MoneyLion_00017573) are true and correct copies of sample Malka statements of work, which illustrate that MoneyLion was not charged the production management fee that was charged to other clients in 2022. PX210 and PX234 were created in the ordinary course of Malka's business, and it was Malka's ordinary course of business to create such statements of work.

76.    Although I did not have an intricate knowledge of Malka's intercompany services provided to MoneyLion in 2022, I observed that MoneyLion's dedicated team of Malka employees repeatedly sought additional support from other Malka employees as the scope of Malka's intercompany services expanded, imposing upon the time and resources of other Malka employees. This created an opportunity cost for Malka in that its employees had to forgo time they would have billed to clients who paid our higher, "external" rates and the 20 percent production management fee.

77.    I am not aware of anyone from MoneyLion ever complaining or communicating to me or Sellers in 2022 that an insufficient amount of work was being performed by Malka personnel for MoneyLion. To the best of my knowledge, all work requested by MoneyLion and invoiced to MoneyLion in 2022 was performed in 2022, and MoneyLion timely paid for that work.

## TRACKING PROGRESS TOWARDS THE 2022 EARNOUT

78.    During the course of 2022, Mr. Basdekis tracked Malka's progress towards the 2022 Earnout Payment and shared his findings at weekly meetings with Sellers and at monthly meetings with Sellers and MoneyLion's finance and accounting team. To the best of my recollection, on the MoneyLion side, these monthly meetings were attended by Erika Nuno, Michelle Lee, and sometimes Mr. Correia and/or Mark Torossian.

79.     JX091 (MoneyLion_00176083-84) is a true and correct copy of an August 31, 2022 email from Mr. Basdekis to Ms. Nuno and Ms. Lee, copying me, Mr. Frommer, Mr. Krubich, and Mr. Torossian, with the subject line "Historical Principal P&L MMG" and attaching a file called "NonGAAP Income Statement – MMG YTD July 2022."  In the body of his email, Mr. Basdekis wrote, "Attached as discussed." The heading of the attached Excel file reads, "Non GAAP Income Statement From Jan 2022 to Jul 2022 Excludes Rev Rec, Accruals, and non-Historical Accounting Treatment."  This is a typical example of the documents that Mr. Basdekis would prepare and present at these monthly meetings with MoneyLion in 2022, and my recollection is that he presented updated Malka financial data in subsequent months.

80.     I recall that, by early December 2022, Mr. Basdekis informed Sellers that Malka had far surpassed the revenue threshold for achieving the Maximum 2022 Earnout Payment, and was on target to easily surpass the EBITDA threshold as well.  This meant that, in addition to Sellers soon receiving the fourth tranche of 2021 Earnout Payment shares, we would receive over the course of 2023, additional 2022 Earnout Payment shares valued at $25 million as of a particular date, and at very low prices—given the collapse of MoneyLion's share price at the time.

## MONEYLION'S SHARE PRICE

81.     I recall that MoneyLion's share price declined from about $5.80 at the time of the Acquisition      to      about      $0.60      in      December      2022.      PX395 (https://finance.yahoo.com/quote/ML/history/) is a true and correct copy of MoneyLion's historical share prices from Yahoo! Finance, which are conformed so as to reflect the 1:30 Reverse Stock Split that occurred in April 2023.

82.     Between the Acquisition and December 12, 2022, according to records I have reviewed, MoneyLion's market capitalization declined from an estimated $1.3287 billion to $126.8 million, a decline of 91.5 percent.  PX358 (SELLERS00004094) is a true and correct copy

of these records.  PX358 is also the type of market report that Sellers shared with one another and relied upon in the ordinary course of Malka's business.  These figures accord with my personal recollection of MoneyLion's historical market capitalization, which I discussed with the other Sellers and MoneyLion executives.

83.    As a result of the Acquisition and the sale of our Malka shares to MoneyLion, the four Sellers had to pay substantial capital gains taxes, and the only way any of us expected we could do so was by selling some of our MoneyLion shares.

84.    My tax obligation for 2022 was roughly $950,000.    PX272 (MoneyLion_01864072) is a true and correct copy of an email chain dated December 14-15, 2022, between Sellers and Messrs. Choubey, Correia, and Adam VanWagner (MoneyLion's Chief Legal Officer and Secretary), reflecting that we shared this information with MoneyLion.

85.    Sellers informed MoneyLion of our tax obligations and MoneyLion begrudgingly allowed us to sell shares in very brief open windows after earnings reports were released.  As noted in paragraph 66 above, I sold 290,000 shares in December 2022.

86.    My recollection is that, between the vesting schedule pursuant to the MIPA and the very limited windows during which MoneyLion would permit us to sell shares, there were only a few weeks in 2022 when Sellers would be even hypothetically free to trade using our vested shares—even though the contractual lock-up period under the RSA had ended no later than March 21, 2022.

87.    In light of Sellers' tax obligations, at Mr. Curran's suggestion, Sellers engaged a company called Corporate Valuation Advisors to perform a valuation of our restricted shares.  The valuation report concluded that our shares were subject to a 30 percent discount for "lack of

marketability." PX266 (MoneyLion_00157371-90, at MoneyLion_00157381-82) is a true and correct copy of this valuation report.

## MONEYLION DECIDES TO BREACH THE MIPA

88.     As noted above, by late 2022, Sellers were under financial pressure because of our tax obligations. At the same time, MoneyLion was making it unreasonably difficult for us to sell additional vested shares, and MoneyLion executives chastised Sellers with increasing severity whenever we wanted to sell, as the stock price continued to decline. This created a serious problem for us, which I understand Messrs. Frommer and Krubich had raised with Messrs. Choubey and Correia.

89.     Messrs. Frommer and Krubich informed me in December 2022 about their thus-far unsuccessful efforts to persuade MoneyLion to free up some of our vested shares, so that we could pay our taxes. It seemed that MoneyLion had refused to sign a Rule 10b5-1 form and was intent on extracting additional concessions from Sellers as a precondition to allowing us to sell additional shares. In that context, Mr. Frommer asked Mr. Krubich and me to join a telephone call with Messrs. Choubey and Correia.

90.     On December 14, 2022, we held the call, during which Messrs. Choubey and Correia asked the three Sellers present (myself, Mr. Frommer and Mr. Krubich) to agree to defer vesting of our next quarterly tranche of make-whole shares, and of the 2022 Earnout Payment shares, for another year (until January 1, 2024). My recollection is that this was the first I had heard of any such proposal.

91.     According to Messrs. Choubey and Correia during the call, the steep decline in MoneyLion's share price at that time meant that, if Sellers were to be paid, and then resell, a large number of MoneyLion shares, it could spook investors and cause further declines in the share price.

92.     Messrs. Choubey and Correia demanded that we cooperate with this plan—despite MoneyLion's binding commitments in the MIPA to pay us our make-whole shares and the 2022 Earnout Payment, if Malka satisfied the applicable revenue and EBITDA thresholds—and took the position that they could not allow us to receive shares worth $25 million while the share price was around $0.50.  Therefore, Sellers were effectively told to accept the yearlong deferment of payments to which we were contractually entitled, or else.

93.     In preparation for my trial testimony, I have reviewed both the recording of this phone call and a transcript of the call, which is appended hereto as PX271 (SELLERS00003790 Tr.).  Based on my review, PX271 is a true and accurate transcript of the conversation.

94.     During the call, Mr. Choubey said:

> I think the reality of the matter is it's essentially gonna take a year longer for us to get you that $70,000,000 in shares as we build the business together and build it back up.  I mean that's the fact of the matter for a real talk if you really want to get to brass tacks.

PX271 at 5.

95.     As Mr. Correia explained, if the share price eventually recovered to $2 or $3, Sellers' shares could be worth $300 million.  PX271 at 7.

96.     During the call, Mr. Correia acknowledged, "[A]re we breaking the agreement, sure," but reassured the three of us that we would still get the 2022 Earnout Payment; "[i]t's just going to take a little bit more time."  PX271 at 7-8 (emphasis added).

97.     Mr. Choubey added: "There is no scenario where the current make-whole construct can be the way it is."  PX271 at 8 (emphasis added).

98.     The next day, all four Sellers had another telephone conversation with Messrs. Choubey and Correia about their proposed deferment of the 2022 Earnout Payment.  I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto

as PX273 (SELLERS00003787 Tr.).  Based on my review, PX273 is a true and accurate transcript of the conversation.

99.    Mr. Choubey said that he intended "to use every corporate lever to then make sure that those shares aren't coming to market . . ."  PX273 at 18.

100.    During the call, Mr. Correia acknowledged that MoneyLion owed Sellers "75 million bucks one way or another" and reassured us that MoneyLion was "not proposing . . . to not give you your $25 million," by which he was referring to the 2022 Earnout Payment shares. However, he said that MoneyLion's board would likely resist issuing additional shares to Sellers while the share price remained around $0.50.  PX273 at 19, 23.

101.    Mr. Choubey agreed: "You're going to get the full $25 million, just at a later date. PX273 at 23.

102.    Sellers did not agree to the proposal by Messrs. Choubey and Correia that we defer vesting of our shares.  In my view, this was an inappropriate attempt by MoneyLion executives to rewrite the binding agreements whereby we had sold our company to them—simply because MoneyLion apparently no longer found the terms sufficiently favorable.

103.    On December 20, 2022, Mr. Choubey had another telephone conversation with Messrs. Frommer, Krubich, and myself.  I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX277 (SELLERS00004093 Tr.).  Based on my review, PX277 is a true and accurate transcript of the conversation.

104.    During the call, Mr. Choubey said:

We asked you to defer the 12/31 make-whole to 2024, and you guys didn't want to do that. . . . [A]lso with the company having to issue so many shares and forcing a 50-cent stock potentially to go to 30 cents, right?  Because the value of the company is the value of the company, the more shares you issue the lower the stock price goes. . . . 100% categorically no one had the 10b5-1. . . . The lawyers were telling us arguably that our insider trading policy should have been interpreted that when

19

you're in a cure period no insider should be able to sell stock, right?  So I think it would have just been a horrible look if we had put those in place, so that's why we made the call there on that one.  I hope you understand that one.

PX277 at 15-16.

105.    I understood Mr. Choubey's words to mean that, in the opinion of MoneyLion's counsel, Sellers were still restricted from selling or perhaps even transferring our shares out of Continental without additional authorization, because we qualified as corporate insiders.

106.    Although I attended Executive Committee meetings beginning sometime in the second half of 2022, I rarely (if ever) spoke at them and do not recall any significant nonpublic plans or information regarding MoneyLion.  To this day, I am unaware of how MoneyLion could prevent me from selling some of my shares on the purported basis that I was an insider.

## THE REVERSE STOCK SPLIT

107.    At some point in late 2022 or early 2023, as I learned from discussions with the other Sellers and with MoneyLion officers, the New York Stock Exchange warned MoneyLion that its stock would be delisted if it could not achieve the minimum share price of $1.00.

108.    On March 31, 2023, MoneyLion filed a proxy statement announcing a special meeting to be held April 19, 2023, for shareholder approval of a reverse stock split (the "Reverse Stock Split") at a ratio of between 1:2 and 1:30.  PX308 (https://investors.moneylion.com/filings-financials/all-sec-filings/content/0001213900-23-025534/0001213900-23-025534.pdf) is a true and correct copy of this proxy statement.

109.    MoneyLion disclosed that "[t]he primary goal of the Reverse Stock Split is to increase the per share market price of the Class A Common Stock to meet the minimum per share price requirement for continued listing on the New York Stock Exchange."  PX308 at 7.

110. The Reverse Stock Split was approved by shareholder vote, and was subsequently implemented at the maximum ratio of 1:30. This meant that if a MoneyLion shareholder owned 30 shares before the Reverse Stock Split, he would own 1 share after it.

## TERMINATION AND ALLEGEDLY PERSONAL EXPENSES

111. On May 19, 2023, MoneyLion terminated all four Sellers. JX114 (SELLERS00003746-49) is a true and correct copy of the termination notice I received.

112. I learned that MoneyLion had terminated Sellers in an in-person meeting with Mr. Choubey, Mr. Correia, Ben Probber (MoneyLion's in-house counsel), Kate Fallon (MoneyLion's Chief People Officer), and Messrs. Frommer and Krubich. I do not remember what reasons, if any, were given by MoneyLion officers at this meeting.

113. I have come to understand that of the purported basis for our termination was that we had improperly used company funds for personal expenses. These allegedly personal expenses included certain (but, at the time, unspecified) Fox Rothschild legal bills.

114. I do not recall Mr. Basdekis or any other MoneyLion employee ever raising any concern with me regarding the company's payment of any personal or legal expenses of Sellers, prior to my termination.

115. To the extent any of Fox Rothschild's post-Acquisition work for Sellers was personal in nature and not related to Malka's work at MoneyLion, I would have expected to be advised by Mr. Basdekis, or someone else in Finance, that bills were received that appeared to include personal charges. Prior to being terminated, I had no notice of any bills that MoneyLion contended included personal charges of the Sellers.

116. Sellers made repeated written requests to MoneyLion to provide the challenged billing records, credit card statements, and invoices that were the purported cause for our

terminations, beginning with a letter to MoneyLion on May 23, 2023. JX118
(SELLERS00000026) is a true and correct copy of that letter.

117.    Only 15 months later, on August 16, 2024—which I understand was the deadline
for fact discovery in this litigation—did MoneyLion finally produce the Fox Rothschild invoices
which it contended were improper personal expenses.

118.    I have reviewed all of the invoices which MoneyLion produced in support of its
claim that it wrongfully paid Sellers' personal legal expenses. Based on my review, a number of
the challenged Fox Rothschild bills concern the Kalo promissory note and the related receivable
dispute between Malka and Kalo's majority member, HillviewMed. It is puzzling that MoneyLion
challenges these expenses as personal, because this work relates to efforts to enforce a receivable
due to Malka, which ultimately benefits MoneyLion as its owner and parent.

119.    Other bills reflect Fox Rothschild's work on transaction-related matters, such as
interpreting the terms of the MIPA and other Acquisition-related documents, registration of
MoneyLion shares, or other matters directly relating to the Acquisition and Sellers' obligations
thereunder. Given that several interpretive questions arose in the course of Sellers' dealings with
MoneyLion and MoneyLion sought to change certain terms of the Acquisition after the fact, it
should come as no surprise that Sellers engaged outside counsel to review the agreements and
proposed amendments thereto.

120.    To the extent any of Fox Rothschild's post-Acquisition work for Sellers is deemed
to have been personal in nature, meaning it was not for the benefit of Malka's business or of
MoneyLion with respect to implementing the Acquisition, I acknowledge that Sellers are
responsible for those items, and this could constitute a modest offset to Sellers' claims against

MoneyLion.  Had any personal expenses been brought to my attention at the time, I would have addressed them promptly.

121.    I would have expected that any Fox Rothschild bills which were truly personal in nature would have been sent to Sellers for approval, not MoneyLion's accounting department.  In fact, I did personally pay a number of Fox Rothschild bills relating to my individual legal matters, such as tax and estate planning.

### EXERCISES OF MY SHAREHOLDER RIGHTS

122.    The amount of my fully vested MoneyLion shares is <u>60,786</u>, consisting of (a) 36,066 Closing Shares; and (b) 24,720 2021 Earnout Shares. I arrive at those numbers as follows:

| | |
|---|---|
| Total Closing Shares Received | 1,371,972 |
| Total 2021 Earnout Shares Received | 741,608 |
| Total Shares Received | 2,113,580 |
| Shares sold pursuant to June 2022 Registration Statement | 290,000 |
| Other sales | 0 |
| Remaining Closing Shares (*assuming FIFO*) | 1,081,972 |
| Remaining 2021 Earnout Shares (*assuming FIFO*) | 741,608 |
| Total Remaining Shares | 1,823,580 |
| | |
| <u>1:30 Split Adjusted</u> | |
| Remaining Closing Shares | 36,065.73 |
| Remaining 2021 Earnout Shares | 24,720.27 |
| **Totals** | **60,786.00** |

123.    This calculation uses a first-in, first-out method, since all of the shares that I sold were issued to me in the Closing Stock Payment on November 15, 2021.

124.    I am both the holder of record and the beneficial owner of these shares.

125.    I have repeatedly exercised my voting rights as a vested shareholder.  For example, I voted my shares at the April 2023 special meeting, at which the Reverse Stock Split was approved; and at MoneyLion's annual meetings held in June 2023 and 2024, respectively.

126.     I expected that, by selling our company to MoneyLion in return for $10 million in cash and a much larger portion of stock, I would be free to use my MoneyLion shares as any investor could—that I could choose to sell some shares, hold some shares long-term, and use some shares as margin for a diversified portfolio.  At no point did the parties agree that MoneyLion would have a right to effectively freeze my shares after the respective stock vesting dates had passed.

127.     Nevertheless—without any basis in any agreement to which I am a party—MoneyLion has apparently placed a "stop order" with Continental which prevents me from freely exercising my shareholder rights, including the right to transfer my shares to my broker and to sell them into the public market.  PX318 (SELLERS00004431) is a true and correct copy of the email from Continental informing Sellers of this fact.

## RESPONSE TO MONEYLION'S FRAUD CLAIM

128.     I understand that I, and the other Sellers, have been accused by MoneyLion of defrauding them by deliberately misrepresenting the manner in which Malka historically recognized revenue.  I categorically deny this.

129.     As I stated above, I relied entirely on Mr. Basdekis for all matters related to Malka's accounting, including recognition of revenue and expenses.  I relied on Fox Rothschild, Mr. Basdekis, and Mr. Curran to correctly and accurately describe Malka's historical accounting practices in the MIPA.  At no time did Mr. Basdekis tell me in words or substance that the representations that were made in the MIPA or Schedule A did not accurately communicate Malka's historical approach to recognizing revenue or expenses.

130.     To the best of my understanding, Mr. Basdekis continued to use the same historical revenue and expense recognition principles that Malka had used pre-closing when he calculated revenue and EBITDA for purposes of the 2021 Earnout Payment and 2022 Earnout Payment.  At

no time, including to the present, has Mr. Basdekis or anyone from MoneyLion indicated to me that Mr. Basdekis' accounting practices used to calculate Malka's revenue and EBITDA for the 2021 Earnout Payment and 2022 Earnout Payment differed from Malka's historical revenue and expense recognition principles.

Executed on this 19th day of December, 2024 at New York, New York.

_____
Daniel Fried