UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- x

JEFFREY FROMMER, *et al.*,

                        Plaintiffs,

                           v.

MONEYLION TECHNOLOGIES INC., *et ano.*,

                        Defendants.

Case No. 1:23-cv-06339-JMF

-------------------------------------------------------------------- x

## DECLARATION OF PAT CAPRA

I, PAT CAPRA, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1. I submit this declaration as my direct trial testimony, pursuant to the Court's Order dated August 29, 2024 (ECF No. 123) and Paragraph 6.E.i. of the Court's Individual Rules and Practices in Civil Cases.

2. I am one of the plaintiffs in this action, along with Jeffrey Frommer, Lyusen (Louis) Krubich, and Daniel Fried (together, the "Sellers"). I understand that I may be cross-examined in person at trial by counsel for MoneyLion Technologies Inc. and MoneyLion (together, "MoneyLion").

3. I have described the facts set forth in this declaration to the best of my recollection based upon my personal knowledge as well as a review of the relevant records.

4. Each of the Sellers is a prior owner-member of Malka Media Group LLC ("Malka" or "Malka Media") and a party to the Membership Interest Purchase Agreement, dated November 15, 2021 (the "MIPA"), pursuant to which MoneyLion acquired Sellers' membership interests in Malka (the "Acquisition"). Following the Acquisition, Malka became a wholly-owned subsidiary

PX419

of MoneyLion, and I remained an employee of Malka and MoneyLion, as well as the CEO of the Malka Sports division, until May 19, 2023.

## EDUCATIONAL AND WORK BACKGROUND

5.      I live in Verona, New Jersey.  I graduated from Ithaca College in 2000 with a bachelor's degree in communications.  My career ambition at that time was to be a sports broadcaster.

6.      After graduation, I took a job with the New York Giants, a National Football League ("NFL") team.  I worked with the Giants for the 2000-2001 season, during which time I developed relationships with players on the team and began helping them arrange appearances and endorsements.  Eventually, one of the players suggested I become a certified sports agent because of the work that I was already doing.

7.      I applied and passed the examination to become an NFLPA (NFL Players Association) Certified Contract Advisor in 2001.  This is the professional certification required for a sports agent who represents NFL players.

8.      I left the Giants and took a job with the New Jersey Nets (now the Brooklyn Nets) in 2001.  I left that position in January 2004 to start my own full-time sports agency, Lunar Sports Group.

9.      In or about 2010, I met Mr. Krubich through a mutual friend.  Not long after he founded his business (Malka Media), I introduced him to several of my sports contacts, and Malka began producing content for some athlete clients of mine.  I met Messrs. Frommer and Fried after they were already working with Mr. Krubich at Malka Media.

## MALKA SPORTS

10.     On or about January 31, 2018, I formed Malka Sports LLC ("Malka Sports") with the other three Sellers as a New Jersey limited liability company.  At that time, Malka Sports had

two members, each with 50 percent ownership: (1) myself and (2) Malka Media (whose three members were the other Sellers).

11.    We saw Malka Sports as a great opportunity to link Malka Media, a creative, marketing and media production agency, whose clients were mostly corporate brands, with my sports agency, whose clients were primarily NFL players who could be featured in brand marketing.

12.    Malka Sports' clients included Jason and Devin McCourty, Sebastian Joseph-Day, and Michael Burton.  I represented the McCourty twins with respect to their marketing and charitable activities, and Messrs. Joseph-Day and Burton in their contract negotiations and other business matters.

13.    Malka Sports' fee structure was standard for the industry—namely, Malka Sports would charge a 3 percent commission for any NFL player contract deal, and a 20 percent commission for a marketing deal.

14.    Malka Sports benefited (and benefited from) its partnership with Malka Media through synergistic relationships.  Malka Sports often had corporate clients that were interested in hiring an athlete for a sponsorship deal.  This would create an opportunity for my partners at Malka Media to pitch broader creative production and marketing services from Malka Media.

15.    For example, Malka Media filmed a Pepsi commercial starring the McCourty twins (both represented by Malka Sports).  This was an important differentiator in the market for both Malka Media and Malka Sports.  It allowed for Malka to become a one-stop shop for brands and/or agencies, both supplying them with name talent and creating and producing the content for their marketing or other campaigns.

16.     Some clients (for example, the nonprofit charity and advocacy organization Players Coalition) paid Malka Sports a monthly retainer to create social media content, which was also facilitated by Malka Sports' partnership with Malka Media.  PX021 (MoneyLion_02072538-41) is a true and correct copy of Malka Sports' agreement with Players Coalition dated as of November 15, 2020, which provides that Players Coalition will pay Malka Sports an annual fee of $200,000 in twelve monthly payments of $16,667.67 due on the first day of each month, beginning on December 1, 2020 with the last payment due on November 1, 2021.    PX165 (MoneyLion_02045581-84) is a true and correct copy of Malka Sports' agreement with Players Coalition dated as of November 15, 2021, which provides that Players Coalition will pay Malka Sports an annual fee of $200,000 in twelve monthly payments of $16,667.67 due on the first day of each month, beginning on December 1, 2021, with the last payment due on November 1, 2022.

17.     When our client was a corporate brand rather than an athlete, Malka Sports did not charge a percentage-based fee or commission, but would instead use the client's allocated budget to hire talent.

18.     Malka Sports' invoicing practices were driven by client needs.  Invoices were not issued arbitrarily, nor at my whim or the whim of others at Malka.  Rather, some clients preferred to receive regular invoices, while others preferred fewer invoices in larger amounts, or to be billed before the end of the calendar year for tax reasons.

19.     In addition, NFL players are paid over 36 weeks (formerly 18 weeks) of the year, and NFLPA rules do not allow sports agencies to invoice players before they are paid.  Therefore, Malka Sports would not send an invoice to its player clients until after they had received a paycheck.  For this reason, Malka Sports' invoicing would sometimes lag behind the work already performed.

20.    In 2020, Malka Media hired Matthew Basdekis as its Head of Finance.  Mr. Basdekis and the Finance team members who reported to him were responsible for accounting matters as to both Malka Media and Malka Sports beginning in 2020, including having primary responsibility for invoicing Malka and Malka Sports clients and tracking accounts receivable and accounts payable.  As none of the Sellers had expertise in accounting, we relied on Mr. Basdekis and his team for such matters.

## THE ACQUISITION

21.    MoneyLion was a client of Malka Media (but not of Malka Sports) for several years before the Acquisition.

22.    Sometime in early 2021, Sellers began discussing the possibility of merging Malka Media and Malka Sports.  Among numerous other reasons, we contemplated that a merger would make the combined content production, marketing, and sports agency business an attractive target for a potential acquisition.  After a few months of negotiations, on June 18, 2021, I assigned my 50 percent interest in Malka Sports to Malka Media, and became the fourth member of the combined Malka by entering into a Second Amended and Restated Operating Agreement with the other three Sellers.  PX059 (MoneyLion_01397872) is a true and correct copy of the assignment agreement; and PX057 (MoneyLion_00997752) is a true and correct copy of the Second Amended and Restated Operating Agreement.  I remained CEO of Malka Sports, which was now part of Malka.

23.    Malka Sports was an important part of the Malka business prior to the Acquisition.  In fiscal year 2019, according to records I have reviewed that I understand were shared with MoneyLion prior to the Acquisition, Malka Sports' revenue was approximately $3,335,000.  In fiscal year 2020, Malka Sports' revenue was approximately $4,648,000—representing a 39 percent growth in revenue year over year.    PX025 (MoneyLion_02052253) and PX032

(MoneyLion_02052229) are true and correct copies of Malka Sports Sales Detail, Balance Sheet, Profit and Loss Statement, and Statement of Cash Flows for January 2019 through December 2020.

24.    MoneyLion was not the only company that contemplated an acquisition of Malka. At some point, the leading agency Excel Sports Management had expressed interest in acquiring Malka for its creative production capabilities.

25.    I learned in approximately June 2021, from Messrs. Frommer and Krubich, that MoneyLion was interested in acquiring Malka. I understood that MoneyLion viewed Malka as an amplifier and accelerator for MoneyLion's business, because Malka's content production, marketing, and sports agency business would provide in-house services to MoneyLion that it did not otherwise have and would help drive new customer growth for MoneyLion by reaching a new audience.

26.    I had little involvement in the Acquisition negotiations with MoneyLion, or in the drafting of the MIPA or other agreements governing the Acquisition. However, I regularly discussed the progress of the Acquisition with the other three Sellers. I was also generally aware that over the summer and into the fall of 2021, MoneyLion and its advisors conducted a due diligence process. I recall being included on a handful of emails during the course of that diligence process, although my personal involvement was little to none.

27.    With respect to the accounting-related provisions in the MIPA, including Section 3.06, Schedules A and B, and Section 3.06 of the Disclosure Schedules, I relied on Malka's outside counsel (Fox Rothschild LLP), Head of Finance (Mr. Basdekis), and outside accountant (Ryan Curran). I did not have a detailed understanding of these matters.

28.    I am not familiar with Malka's historical accounting principles.  For these matters, I relied on Malka's finance and accounting team, including Mr. Basdekis and others who reported to him.

29.    I do not recall discussing Malka's historical accounting principles, or its representations and warranties about accounting principles, with anyone during the drafting of the MIPA.

30.    The only written agreement I entered into with MoneyLion governing my employment was an Incentive Compensation Letter Agreement, which provided that I was an at-will employee.  PX163 (MoneyLion_001186) is a true and correct copy of the agreement.

31.    One contractual term which I do remember discussing with Fox Rothschild is that some of the Sellers were concerned that if the restricted shares which we would be paid in the Closing Stock Payment, and which we hoped and expected to receive in the 2021 and 2022 Earnout Payments, were conditioned on our employment with MoneyLion, then we could lose the shares if MoneyLion decided to terminate us.

32.    Although I had no expectation of leaving MoneyLion (voluntarily or otherwise) after the Acquisition, I was selling my life's work to MoneyLion and did not know them well, so I wanted some assurance that any shares paid to me in the Closing Stock Payment and 2021 and 2022 Earnout Payments (which made up the vast majority of the consideration for the Acquisition) would vest, regardless of my employment status.  In other words, I wanted to be sure that MoneyLion could not avoid paying me for my company by firing me shortly after the close of the Acquisition.

33.    In connection with the Acquisition, the parties entered into Restricted Stock Agreements ("RSAs"), which provided that the Closing Stock Payment and 2021 and 2022

Earnout Payment restricted shares were not tied to our employment, but rather would vest and thereby become Earned Shares on each of the respective, quarterly vesting dates. JX065 (DLA_006185-006332) is a true and correct copy of the execution version of the MIPA, including the first RSA as Exhibit C thereto. *Id.* at DLA_006300.

34.     The first RSA provided that Sellers' restricted shares could not be transferred without MoneyLion's consent, "which shall not be unreasonably withheld, conditioned or delayed," subject to a lock-up period "terminating on the earlier of (i) March 21, 2022 and (ii) the date on which" MoneyLion's share price was "equal to or greater than $12.00 . . ." JX065 at DLA_006303.

35.     Sellers and MoneyLion entered into additional RSAs governing the 2021 Earnout Payment shares and make-whole shares for both the Closing Stock Payment and the 2021 Earnout Payment. JX085 (MoneyLion_01870073, at MoneyLion_01870075-82); JX089 (MoneyLion_01951465-74); JX104 (MoneyLion_01942350-59); and JX110 (MoneyLion_01939480-87) are true and correct copies of my additional RSAs.

36.     Exhibit D to the MIPA was a Registration Rights Agreement ("RRA"), Section 3.5 of which required MoneyLion to take any actions reasonably requested by a Seller to enable such Seller to sell shares consistent with the securities laws. JX065 at DLA_006315.

37.     Sellers had agreed to sell our business to MoneyLion and relied entirely on MoneyLion to act in good faith and in accordance with our binding agreements. We had agreed to take so much of the total purchase price as MoneyLion restricted shares, because we were willing to bet on MoneyLion's ability to build an even larger and more successful organization with the synergistic assistance of Malka's creative and marketing capabilities as well as its sports

talent.   We expected to benefit from the upside in MoneyLion's future share price, once MoneyLion became a truly thriving enterprise.

38.     Sellers had also agreed to become at-will employees of MoneyLion who depended on MoneyLion honoring the terms of our deal.

39.     I did not engage in any intentionally dishonest act, statement, or omission with respect to the Acquisition or my dealings with MoneyLion.   I have no knowledge of any of the Sellers—nor of anyone advising Sellers in connection with the Acquisition, including Mr. Basdekis, Mr. Curran, or Fox Rothschild—acting in bad faith or with any intent to deceive or defraud MoneyLion or anyone else.

## MY WORK AT MONEYLION

40.     At the time of the Acquisition, Malka's total number of employees was around 170. At Malka Sports' peak size, 9 employees reported to me.

41.     After the Acquisition, Malka Sports began to introduce its clients to MoneyLion and created partnership opportunities to leverage the power and popularity of sports to get MoneyLion in front of new audiences.   A few examples of these synergies follow below.

42.     Brandon Copeland, 10-year NFL linebacker who was also a University of Pennsylvania professor and financial literacy expert, was a Malka Sports client.   Given his passion and platform for financial literacy, MoneyLion utilized him to host a content series called "Know Money" for MoneyLion.   This four-part course taught personal finance in a fun and relatable way, with examples that brought each idea to life.   The content was filmed and produced by Malka Media and Malka Sports received its usual 20 percent commission from the marketing deal for Mr. Copeland, further helping MoneyLion's financial bottom line.   The series was nominated for a Webby   Award.    A   promotional   video   for   the   course   is   available   online   at https://www.youtube.com/watch?v=tM3hy5AMye4 (last accessed December 19, 2024).

43.    In July 2021, the National Collegiate Athletic Association began to allow college athletes the opportunity to earn money from their name, image, and likeness ("NIL").  Brands started leveraging these athletes as endorsers, due to their popularity and influence.  Malka Sports helped MoneyLion secure a high-profile group of college athlete endorsers for a marketing campaign, including college basketball stars Azzi Fudd and Armando Bacot, among other athletes.  PX207  (https://www.youtube.com/watch?v=-30m6prnPw0) is a true and correct copy of the "Inaugural MoneyLion NIL Athletes" video posted by MoneyLion on November 17, 2022.

44.    Malka Sports introduced MoneyLion to 23XI Racing, a NASCAR team owned by the legendary Michael Jordan.  Malka Sports helped to facilitate a multi-year partnership wherein MoneyLion became the Official Digital Banking and Cryptocurrency Partner of 23XI.  MoneyLion was excited to join forces with arguably the most iconic athlete in U.S. history, while also getting to work with 23XI's popular drivers Bubba Wallace and Kurt Busch.    PX411 (https://www.moneylion.com/learn/moneylion-teams-up-with-23xi-racing-bubba-wallace-and-kurt-busch/) is a true and correct copy of a MoneyLion press release dated February 3, 2022 announcing this partnership.

45.    The "Malka x MoneyLion" video, which was produced by Malka to announce the Acquisition, provides an illustration how Malka's content production could benefit MoneyLion's brand.  This 73-second promotional video quickly features a bevy of athletes and celebrities who appear in Malka-produced podcast series and other media content, including such recognizable faces as Snoop Dogg, Sylvester Stallone, Mike Tyson, and Kevin Hart.    PX402 (https://vimeo.com/1039495293) is a true and correct copy of this video.

46.    As another example, Malka helped MoneyLion tap into pop culture by producing a Super Bowl party called "The Lion's Den," which was livestreamed and hosted by Mike Tyson.

Malka was responsible for producing Mr. Tyson's podcast, *Hotboxin' with Mike Tyson*, and Malka utilized its talent procurement capabilities to secure Mr. Tyson, as well as former NFL player Brandon Marshall and former mixed martial artists Brendan Schaub and Daniel Cormier, among numerous other notables who participated in the event.  A 2-minute, 18-second video recap captured the excitement of the event.  PX403 (https://vimeo.com/1039499685) is a true and correct copy of this video.

47.     To my knowledge, Malka Sports never paid bonuses to its employees prior to the Acquisition.  After the Acquisition, I had no expectation that I or other Malka personnel would receive bonuses.  I was surprised to learn sometime in the first quarter of 2023 both that MoneyLion had budgeted for Malka employee bonuses for 2022, and that MoneyLion would pay bonuses to the other three Sellers but not to me.

### MY MONEYLION SHARES

48.     On November 15, 2021, at the closing, MoneyLion paid me $930,195.63 in cash as my allocated share of the Closing Cash Payment.

49.     The same day, MoneyLion instructed its transfer agent, Continental Stock Transfer & Trust Company ("Continental"), to issue 309,395 shares of MoneyLion stock to me, as my allocated share of the Closing Stock Payment.    Continental did so.    PX164 (MoneyLion_01834755, at MoneyLion_01834759) is a true and correct copy of MoneyLion's instruction letter.

50.     On December 31, 2021, MoneyLion instructed Continental to issue 94,114 shares as my allocated Closing Stock Payment make-whole shares.  Continental did so.  PX180 (MoneyLion_01849262, at MoneyLion_01849265) is a true and correct copy of MoneyLion's instruction letter.

51.     On March 28, 2022, MoneyLion instructed Continental to issue 116,725 shares as my allocated share of the 2021 Earnout Payment.    Continental did so.    PX225 (MoneyLion_01820743, at MoneyLion_01820748) is a true and correct copy of MoneyLion's instruction letter.

52.     On March 31, 2022, MoneyLion instructed Continental to issue 218,019 shares as my allocated Closing Stock Payment make-whole shares, and 68,907 shares as my allocated 2021 Earnout Payment make-whole shares.    Continental did so.    PX229 (MoneyLion_01853256, at MoneyLion_01853260-61) is a true and correct copy of MoneyLion's instruction letter.

53.     On April 7, 2022, MoneyLion instructed Continental to cancel 1,469 shares that had been over-issued to me pursuant to MoneyLion's instruction letter of March 31, 2022. Continental did so.    PX231 (MoneyLion_01853245, at MoneyLion_01853247) is a true and correct copy of MoneyLion's instruction letter.

54.     MoneyLion filed an amendment to a federal securities registration statement on June 10, 2022, which permitted me to sell up to 309,395 shares.    PX40 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001807846/000121390022032231/fs12022a 2_moneylion.htm) is a true and correct copy of this amendment.

55.     However, MoneyLion executives advised Sellers at the time that we were legally considered corporate insiders who, in fact, could not sell any shares without taking additional steps required by insider trading laws.    I am not aware of any reason why I qualified as an insider (or whether I truly did), as I had no knowledge of any significant nonpublic plans or information regarding MoneyLion.

56.     On June 30, 2022, MoneyLion instructed Continental to issue 354,940 shares as my allocated Closing Stock Payment make-whole shares, and 115,819 shares as my allocated 2021

Earnout Payment make-whole shares.  Continental did so.  PX243 (MoneyLion_01851889, at MoneyLion_01851893-94) is a true and correct copy of MoneyLion's instruction letter.

57.    On September 30, 2022, MoneyLion instructed Continental to issue 450,140 shares as my allocated Closing Stock Payment make-whole shares, and 147,776 shares as my allocated 2021 Earnout Payment make-whole shares.  Continental did so.  PX251 (MoneyLion_01851766, at MoneyLion_01851770-71) is a true and correct copy of MoneyLion's instruction letter.

58.    MoneyLion authorized Sellers to make some sales during very limited trading windows.  Based on a review of my personal financial records, between November 14 and December 13, 2022, I sold 759,282 shares, for a total of $486,450 (an average share price of $0.64).

59.    On or about March 14, 2023, MoneyLion paid me $33,775 in cash and Continental issued 321,128 shares, presumably as instructed by MoneyLion (although I have not seen MoneyLion's instruction letter).  In combination, this was my allocated 2021 Earnout Payment make-whole payment.

60.    Thus, after about March 14, 2023, I owned 1,436,212 shares of MoneyLion stock which were paid to me pursuant to the MIPA as a combination of the Closing Stock Payment, the 2021 Earnout Payment, and make-whole shares associated with each.  After a 1:30 Reverse Stock Split that occurred in April 2023, as I discuss in paragraphs 75-78 below, these became 47,873 shares.  PX409 (MoneyLion_01493620-23) is a true and correct copy of my Continental account statement dated May 8, 2023.

61.    I am relying on MoneyLion instruction letters and Continental account statements for all of the foregoing information about my shares.

**MONEYLION'S SHARE PRICE**

62.    I recall that MoneyLion's share price declined from about $6.00 at the time of the Acquisition    to    about    $0.60    in    December    2022.    PX395

(https://finance.yahoo.com/quote/ML/history/) is a true and correct copy of MoneyLion's historical share prices from Yahoo! Finance, which are conformed so as to reflect the 1:30 Reverse Stock Split that occurred in April 2023.

63.     Between the Acquisition and December 12, 2022, according to records I have reviewed, MoneyLion's market capitalization declined from an estimated $1.3287 billion to $126.8 million, a decline of 91.5 percent.  PX358 (SELLERS00004094) is a true and correct copy of these records.  PX358 is also the type of market report that Sellers shared with one another and relied upon in the ordinary course of Malka's business.  These figures accord with my personal recollection of MoneyLion's historical market capitalization, which I discussed with the other Sellers and MoneyLion executives.

64.     As a result of the Acquisition and the sale of our Malka shares to MoneyLion, the four Sellers had to pay substantial capital gains taxes, and the only way any of us expected we could do so was by selling some of our MoneyLion shares.  My tax obligation for 2022 was roughly $1,010,000.  PX272 (MoneyLion_01864072) is a true and correct copy of an email chain dated December 14-15, 2022, between Sellers and MoneyLion's Dee Choubey (CEO), Rick Correia (CFO, President, and Treasurer), and Adam VanWagner (Chief Legal Officer and Secretary), reflecting that we shared this information with MoneyLion.

65.     In light of Sellers' tax obligations, at Mr. Curran's suggestion, Sellers engaged a company called Corporate Valuation Advisors to perform a valuation of our restricted shares.  The valuation report concluded that our shares were subject to a 30 percent discount for "lack of marketability."   PX266 (MoneyLion_00157371-90, at MoneyLion_00157381-82) is a true and correct copy of this valuation report.  As reflected in PX272 if this discount were accepted by tax authorities, it could reduce my tax obligation for 2022 to roughly $700,000.

14

## **MONEYLION DECIDES NOT TO HONOR ITS AGREEMENT**

66.     By mid-December 2022, MoneyLion was demanding that Sellers refrain from selling additional vested shares, and this created a serious problem for us because of our tax obligations. I understand from discussions with Messrs. Frommer and Krubich that they explained this problem to Messrs. Choubey and Correia.

67.     I learned from the other Sellers on or about December 14, 2022 that Messrs. Choubey and Correia had demanded that the four of us agree to defer the distribution of the 2022 Earnout Payment and our forthcoming make-whole shares relating to the Closing Stock Payment and 2021 Earnout Payment until 2024, by which time they hoped MoneyLion's share price would rebound. Since the MIPA provided that any make-whole shares and 2022 Earnout Payment shares would be paid and vest on a quarterly basis, we became concerned that MoneyLion was suddenly asking to rewrite binding agreements to our detriment.

68.     Mr. Frommer wanted all of the Sellers to hear what MoneyLion was proposing. I attended a phone call with the other Sellers and Messrs. Choubey and Correia on December 15, 2022. I have reviewed both the recording of this phone call and a transcript thereof, which is appended hereto as PX273 (SELLERS00003787 Tr.). Based on my review, PX273 is a true and accurate transcript of the conversation.

69.     At the time, with just 16 days until year-end, all indications were that Malka had already satisfied the revenue target and was assured to satisfy the EBITDA target needed to obtain the 2022 Earnout Payment. Messrs. Choubey and Correia explained that they did not want to issue $25 million worth of shares when the stock price was around $0.50 and MoneyLion's market capitalization had declined about 91.5 percent since the Acquisition. PX273.

70.    I understood during the December 15, 2022 call that Messrs. Choubey and Correia were using the urgency of Sellers' tax obligations in order to exact concessions from us that were inconsistent with the deal we had agreed to.

71.    During the call, Mr. Choubey said that he and Mr. Correia would "use every corporate lever to then make sure that those shares aren't coming to market," referring to make-whole shares and/or 2022 Earnout Payment shares which MoneyLion was obligated to pay Sellers under the MIPA.  PX273 at 18.

72.    During the call, Mr. Correia acknowledged that MoneyLion owed Sellers "75 million bucks one way or another" and reassured us that MoneyLion was "not proposing . . . to not give you your $25 million," but said that MoneyLion's board would likely resist issuing additional shares to Sellers while the share price remained around $0.50.  PX273 at 19, 23.

73.    Mr. Choubey agreed: "You're going to get the full $25 million, just at a later date. PX273 at 23.

74.    Sellers did not agree to accept the deferred vesting of our shares.  In my view, this was an inappropriate attempt by MoneyLion executives to rewrite the binding agreements whereby we had sold our company to them—simply because MoneyLion apparently no longer found the terms sufficiently favorable.

**THE REVERSE STOCK SPLIT**

75.    At some point in late 2022 or early 2023, as I learned from discussions with the other Sellers and with MoneyLion officers, the New York Stock Exchange warned MoneyLion that its stock would be delisted if it could not achieve the minimum share price of $1.00.

76.    On March 31, 2023, MoneyLion filed a proxy statement announcing a special meeting to be held April 19, 2023, for shareholder approval of the Reverse Stock Split at a ratio of between 1:2 and 1:30.   PX308 (https://investors.moneylion.com/filings-financials/all-sec-

filings/content/0001213900-23-025534/0001213900-23-025534.pdf) is a true and correct copy of this proxy statement.

77.     MoneyLion disclosed that "[t]he primary goal of the Reverse Stock Split is to increase the per share market price of the Class A Common Stock to meet the minimum per share price requirement for continued listing on the New York Stock Exchange."  PX308 at 7.

78.     I was listed as the MoneyLion shareholder of record and received a proxy solicitation to vote my shares at the special meeting, which I did.  The Reverse Stock Split was approved by shareholder vote, and was subsequently implemented at the maximum ratio of 1:30. This meant that if a MoneyLion shareholder owned 30 shares before the Reverse Stock Split, he would own 1 share after it.

## THE DISPUTE ARISES

79.     As mentioned above, given where Malka's business stood in late December 2022, it was clear that we were on track to achieve the Maximum 2022 Earnout Payment.

80.     Despite Malka's performance and the assurances we were given by Messrs. Choubey and Correia about the 2022 Earnout Payment, on April 14, 2023, MoneyLion informed Mr. Frommer (and he then informed the other three Sellers) that based on its analysis, we would not be entitled to receive any earnout payment for 2022.

81.     Sellers hired legal counsel and accountants and objected to MoneyLion's 2022 Earnout Statement in May 2023.  Between May and July 2023, Sellers attempted to engage in good faith negotiations with MoneyLion.  However, in around July 2023, negotiations broke down.  At the same time, we remained unable to transfer our vested shares and had been substantially delayed in receiving the 2022 Earnout Payment to which we were entitled.  Seeing no alternative to litigation, we filed this lawsuit.

## <u>TERMINATION AND ALLEGEDLY PERSONAL EXPENSES</u>

82.　　On May 19, 2023, MoneyLion terminated all four Sellers.　I learned that MoneyLion had terminated me not from anyone at MoneyLion, but from Mr. Krubich, who told me about the terminations while I was in Virginia attending my niece's graduation from George Mason University.

83.　　I eventually received a notice of termination from MoneyLion.　JX117 (SELLERS00003742) is a true and correct copy of the notice of termination I received.

84.　　MoneyLion terminated Sellers on the alleged basis that we had improperly used company funds for personal expenses.　I recall that these allegedly personal expenses included certain Fox Rothschild legal bills.

85.　　Prior to my termination, I do not recall Mr. Basdekis or anyone from MoneyLion ever raising any concern with me regarding the company's payment of any personal or legal expenses of the Sellers.

86.　　To the extent any of Fox Rothschild's post-Acquisition work for Sellers was personal in nature and not related to Malka's work at MoneyLion, I would have expected to be advised by Mr. Basdekis, or someone else in Finance, that bills were received that appeared to include personal charges.　I understand that these bills were sent directly to MoneyLion for reimbursement.

87.　　I have no personal knowledge about any corporate credit card charges that have been challenged by MoneyLion.

88.　　Sellers made repeated written requests to MoneyLion to provide the challenged billing records, credit card statements, and invoices that were the purported cause for our terminations, beginning with a letter to MoneyLion on May 23, 2023.　JX118 (SELLERS00000026-27) is a true and correct copy of that letter.

89.     Only 15 months later, on August 16, 2024—which I understand was the last day of fact discovery in this litigation—did MoneyLion finally produce the Fox Rothschild invoices which it contended were improper personal expenses.

90.     I have reviewed these invoices, and my review confirms that a substantial portion of Fox Rothschild's bills were properly reimbursable because they related to the Kalo dispute, which concerns an account receivable owed to MoneyLion and which I discuss in paragraphs 112-118 below.  However, I recognize that there are other bills for legal services which could be non-reimbursable, as they were not for the benefit of MoneyLion.   Sellers would bear responsibility for such expenses, which could constitute a modest offset to our claims.   Had any personal expenses been brought to my attention before Sellers were terminated (or, indeed, before August 16, 2024), I would have addressed them promptly.

## ALLEGED NON-COMPETE VIOLATIONS

91.     After terminating me in May 2023, in approximately July 2023, MoneyLion eliminated entirely the Malka Sports division and terminated all three remaining Malka Sports employees.

92.     To the best of my knowledge, MoneyLion left the sports agency business at that time, and has not operated in the sports agency space since, which is not surprising since MoneyLion was not in the sports agency space prior to the Acquisition and only got into it because of Malka Sports.

93.     Following MoneyLion's elimination of Malka Sports, I formed Legend Agency LLC, a New Jersey limited liability company, on or around August 16, 2023.  Legend is a sports agency, and I have resumed my work with some former Malka Sports clients who chose to terminate their relationships with Malka Sports after my departure.  These former Malka Sports clients include the McCourty twins and Mr. Copeland.

94.     I did not solicit any former Malka Sports clients or employees.

95.     On March 6, 2024, MoneyLion sent a purported cease-and-desist letter to Sellers alleging that all four of us had violated non-compete and non-solicitation provisions of the MIPA, including an allegation that "Mr. Capra is still actively acting as agent for several of his former Malka Sports LLC clients and is currently operating as the CEO of his own talent agency, in violation of his contractual obligations under Section 5 of the MIPA." PX333 is a true and correct copy of this letter.

96.     On March 14, 2024, Sellers replied in writing to deny these allegations and to request additional details of the allegations. PX334 is a true and correct copy of this letter.

97.     MoneyLion never replied to our March 14 letter.

98.     Nevertheless, MoneyLion has not withdrawn or dismissed its public claim against me for violating contractual non-compete clauses, Count XVII of MoneyLion's Amended Counterclaims, despite having no evidence to support it, and despite MoneyLion's voluntary departure from the sports agency business in or around July 2023.

99.     I have incurred attorneys' fees and costs as a result of MoneyLion's baseless non-compete claim.

## EXERCISES OF MY SHAREHOLDER RIGHTS

100.    The amount of my fully vested MoneyLion shares is <u>47,873</u>, consisting of (a)

22,195 Closing Shares; and (b) 25,678 2021 Earnout Shares. I arrive at those numbers as follows:

| | |
|---|---:|
| Total Closing Shares Received | 1,425,139 |
| Total 2021 Earnout Shares Received | 770,355 |
| Total Shares Received | 2,195,494 |
| Shares sold pursuant to June 2022 Registration Statement | 309,395 |
| Other sales | 449,887 |
| Remaining Closing Shares (*assuming FIFO*) | 839,991 |
| Remaining 2021 Earnout Shares (*assuming FIFO*) | 596,221 |
| Total Remaining Shares | 1,436,212 |
| | |
| 1:30 Split Adjusted | |
| Remaining Closing Shares | 27,999.7 |
| Remaining 2021 Earnout Shares | 19,874.03 |
| **Totals** | **47,873.73** |

101.    This calculation uses a first-in, first-out method to assume that I sold my oldest-

issued shares first (*i.e.*, I sold all of the shares issued to me on November 15, 2021, December 31,

2021, March 28, 2022, and a portion of the shares issued to me on March 31, 2022).

102.    I am both the holder of record and the beneficial owner of these shares.

103.    I have repeatedly exercised my voting rights as a vested shareholder.  For example,

I voted my shares at the April 2023 special meeting, at which the Reverse Stock Split was

approved, and at MoneyLion's 2023 annual meeting.

104.    I expected that, by selling our company to MoneyLion in return for $10 million in

cash and a much larger portion of stock, I would be free to use my MoneyLion shares as any

investor could—that I could choose to sell some shares, hold some shares long-term, or use the

shares as I otherwise saw fit.  At no point did the parties agree that MoneyLion would have a right

to effectively freeze my shares after the respective stock vesting dates had passed.

105.    Nevertheless—without any basis in any agreement to which I am a party—MoneyLion has apparently placed a "stop order" with Continental which prevents me from freely exercising my shareholder rights, including the right to transfer my shares to my broker and to sell them into the public market.  PX318 (SELLERS00004431) is a true and correct copy of the email from Continental informing Sellers of this fact.

### DAN O'BRIEN AUTOMOTIVE

106.    MoneyLion has alleged that Sellers engaged in "deceitful accounting" and gives the example of a project with Dan O'Brien Automotive, a car dealership that entered into an endorsement agreement with Devin McCourty, an NFL player-client of Malka Sports, in July 2021.  Under that agreement, Mr. McCourty agreed to endorse the dealership through various advertising and marketing opportunities, for which Dan O'Brien Automotive agreed to compensate Mr. McCourty $8,333 per month for one year (totaling $100,000) payable to Malka Sports.  Mr. McCourty's agreement with Malka Sports was that, once Malka Sports received the payment from Dan O'Brien Automotive, Malka Sports would keep 20 percent as a fee and remit the remaining 80 percent to Mr. McCourty.

107.    PX412 (https://www.youtube.com/watch?v=d_CJxVKslaA) is a true and correct copy of a 30-second video posted by Dan O'Brien Chrysler, Dodge, Jeep & Ram on YouTube on February 25, 2022, which includes an endorsement appearance by Mr. McCourty.

108.    I do not know how Mr. Basdekis and his team recognized revenue or expenses in connection with this project.  I was only aware of invoices going out, money coming in, and money going out to Mr. McCourty.  Based on documents I have reviewed, I do recall that on February 18, 2022, Mr. Basdekis notified me that the "Dan O'Brien retainer was selected in our audit by RSM and they are requesting a copy of the contract."  In response, I sent Mr. Basdekis a copy of the Endorsement Agreement between Dan O'Brien Automotive and Mr. McCourty.  PX203

22

(MoneyLion_00026076-84) is a true and correct copy of my February 18, 2022 exchange with Mr. Basdekis with the attached agreement.

109.    At no time has anyone from MoneyLion suggested to me that any of Malka's expenses were concealed, or not fully or accurately recognized in Malka's accounting records.

110.    I was not involved in the process for calculating Malka's revenue and EBITDA for earnout purposes for either of calendar years 2021 or 2022.  Instead, that process was led and managed by Mr. Basdekis.

111.    I did not ever discuss with any of the other Sellers the possibility of manipulating the timing or amounts of Malka invoices, so as to increase our chances of receiving either the 2021 or 2022 Earnout Payments, and I am not aware of any such activity by any of the Sellers at any time, let alone in 2021 or 2022.

## KALO PROMISSORY NOTE

112.    HillviewMed ("Hillview") is a cannabis company based in New Jersey, which is owned Ken VandeVrede.  I know Mr. VandeVrede because our children went to nursery school together.

113.    Hillview owns several businesses including one called Kalo, which is a hemp-infused seltzer product.  Kalo was a client of Malka's.

114.    At some point, Hillview fell behind in its payments to Malka for the creative and marketing services provided by Malka to Kalo.  Malka and Kalo entered into a Promissory Note on May 25, 2021, which stated that Kalo owed Malka $260,000.00.    JX003 (MoneyLion_02031616-21) is a true and correct copy of the Promissory Note.

115.    I do not know how Mr. Basdekis accounted for the Promissory Note in Malka's accounting software, whether as a revenue item or otherwise.  I had no input into how to account for the revenue, the receivable, or any other aspect of this transaction.

116.    Malkalo LLC is an entity formed by Sellers specifically to hold equity in Kalo.  It does not own other assets or conduct any business.  Malka, not Malkalo LLC, is the holder of the Promissory Note.  JX003.  The Promissory Note was never transferred from Malka to Malkalo LLC.

117.    A dispute arose between Kalo and Malka when Kalo insisted that Sellers were obligated to invest additional capital into Kalo as a condition of maintaining our equity (held via Malkalo).

118.    To the best of my knowledge, Kalo's payments under the Promissory Note have always gone to Malka, not Malkalo LLC.

### RESPONSE TO MONEYLION'S FRAUD CLAIM

119.    I understand that I, and the other Sellers, have been accused by MoneyLion of defrauding them by deliberately misrepresenting the manner in which Malka historically recognized revenue.  I categorically deny this.

120.    As I stated above, I relied entirely on Mr. Basdekis for all matters related to Malka's accounting, including recognition of revenue and expenses.  I relied on Fox Rothschild, Mr. Basdekis, and Mr. Curran to correctly and accurately describe Malka's historical accounting practices in the MIPA.  At no time did Mr. Basdekis tell me in words or substance that the

(*cont'd on next page*)

representations that were made in the MIPA or Schedule A did not accurately communicate Malka's historical approach to recognizing revenue or expenses.

121.    To the best of my understanding, Mr. Basdekis continued to use the same historical revenue and expense recognition principles that Malka had used pre-closing when he calculated revenue and EBITDA for purposes of the 2021 Earnout Payment and 2022 Earnout Payment.  At no time, including to the present, has Mr. Basdekis or anyone from MoneyLion indicated to me that Mr. Basdekis' accounting practices used to calculate Malka's revenue and EBITDA for the 2021 Earnout Payment and 2022 Earnout Payment differed from Malka's historical revenue and expense recognition principles.

Executed on this 19th day of December, 2024 at Verona, New Jersey.

*Pat Capra*

_____

Pat Capra