UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
JEFFREY FROMMER, *et al.*,                                    :
                                                              :
                          Plaintiffs,                         :
                                                              :
              v.                                              :    Case No. 1:23-cv-06339-JMF
                                                              :
MONEYLION TECHNOLOGIES INC., *et ano.*,                       :
                                                              :
                          Defendants.                         :
                                                              :
-------------------------------------------------------------------- x

### DECLARATION OF RYAN S. CURRAN

I, RYAN S. CURRAN, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1.      I submit this declaration as my direct trial testimony.

2.      I am not a party to this action.  I understand that my affidavit will be submitted to the Court by counsel for Jeffrey Frommer, Lyusen (Louis) Krubich, Daniel Fried, and Pat Capra (together, the "Sellers" or "Plaintiffs") and that I may be cross-examined in person at trial by counsel for MoneyLion Technologies Inc. and MoneyLion Inc. (together, "MoneyLion").

3.      I have described the facts set forth in this affidavit to the best of my recollection based upon my personal knowledge as well as a review of the relevant records.

### BACKGROUND AND INTRODUCTION TO SELLERS

4.      I am a Principal at Curran & Company LLP, a full-service tax, accounting, and advisory firm that I founded in 2012.  I am a Certified Public Accountant licensed in the State of New Jersey since 2009 and in the State of New York since 2012.  I am also an attorney licensed to practice law in New Jersey.  I started my career in public accounting in 2007 while finishing my undergraduate education.  I earned a Bachelor of Science in Accounting and Finance from Rutgers

PX417

Business School in Newark, New Jersey, and I graduated from Rutgers Law School with a Juris Doctor degree, after attending evening classes from 2012 to 2016.

5.    I first met Mr. Frommer and Mr. Krubich in or about 2016 through mutual friends from Rutgers.  After being interviewed, my firm (formerly known as Curran Unger LLP) was engaged by Malka Media Group LLC ("Malka") to provide certain accounting and tax services, including the preparation of Malka's tax returns.  JX001 (CURRAN_0002401-03) is a true and correct copy of the first engagement letter between my firm and Malka dated December 27, 2016. JX001 was created in the ordinary course of business by my firm, and it was my firm's ordinary course of business to create such engagement letters.

6.    The engagement letter accurately reflects the services that my firm agreed to provide for Malka in or around December 2016, with the exception of the preparation of monthly financial statements, which my firm was not engaged to do in 2016.  *See* JX001 at CURRAN-0002401, Section 1b.

7.    In or about 2016, through my work with Malka, I also met Mr. Fried.  Since in or about 2016, I have been engaged by Messrs. Frommer, Krubich and Fried as their personal accountant and have prepared their personal tax returns.  Since in or about 2019, from time to time, I also have provided certain personal business advice to Messrs. Frommer and Fried.  In or about 2019, through my work with Malka, I met Mr. Capra and have been his personal accountant and prepared his personal tax returns since that time.  I have provided Mr. Capra with personal business advice on occasion, but not often.  For about the past year, I have provided personal business advice from time to time to Mr. Krubich as well.  Over the years, Mr. Frommer and I also have developed a personal friendship.

## WORK FOR MALKA IN 2016-2018

8.     In 2016, my firm prepared Malka's tax return.  Given that Malka was then a smaller business and did not hit the revenue threshold required to prepare tax returns on an accrual basis, we prepared Malka's 2016 return using its cash-basis trial balance from its accounting software, QuickBooks online.  In my experience, smaller businesses like Malka generally filed tax returns on a cash basis, so my firm prepared Malka's tax return using cash-basis figures.

9.     To the best of my recollection, I was given access to Malka's QuickBooks online account so that I could access Malka's cash-basis trial balance for use in its tax return.  QuickBooks online—and in my experience all accounting software—allows you to toggle between cash and accrual basis figures.  My firm continued to prepare Malka's tax returns for the years 2017 and 2018 on a cash basis following the same process that we used for 2016.

10.     In or about 2018, in addition to preparing Malka's tax returns, my firm started to provide some back-office support to Malka.  To the best of my recollection, one or two people on my staff started to provide a certain number of hours per week of general accounting support to Malka's two in-house finance employees.  I was not personally involved in providing any of the back-office accounting support to Malka in 2018.  I relied on a manager to supervise the work being done, which included, to my knowledge, help with payroll and certain transactions in QuickBooks online.

11.     To the best of my recollection, neither I nor anyone from my firm was ever involved with Malka's invoicing.

## CONNECTONE BANK LOAN AND PREPARATION
## OF 2019 AND 2020 REVEIWED FINANCIAL STATEMENTS

12.     In or about 2018, I provided advice and assistance to Malka in connection with its obtaining a bank loan from ConnectOne Bank ("ConnectOne").  To the best of my recollection,

the purpose of the loan was to finance an equipment expansion for new production equipment and office space for Malka.

13.    I recall that ConnectOne requested that Malka provide it with certain financial information, including, among other things, accrual-basis financial statements, which I believe were exported from QuickBooks by Malka's in-house finance employee and/or a member of my staff.

14.    In 2019, my firm continued to support Malka's back office and to prepare its tax returns on a cash basis. In or around March of 2020, Malka hired Matthew Basdekis to be Malka's Head of Finance. At or around that time, my firm's back-office support for Malka was phased out.

15.    In 2020, Malka sought and obtained a new line of credit from ConnectOne. In connection with that line of credit, ConnectOne requested that Malka provide it with reviewed financial statements for the year ended December 31, 2019. My staff and I worked primarily with Mr. Basdekis to prepare Malka's 2019 reviewed financial statements for ConnectOne. PX017 (MoneyLion_02038640-42) is an example of a communication that I had with Mr. Basdekis in connection with my review of Malka's 2019 financial statements.

16.    Unlike an audit, a review involves a less extensive analysis of a company's financial statements and requires an accountant to perform procedures to obtain limited assurance as a basis for reporting whether the accountant is aware of any material modifications that should be made to the company's financial statements for them to be in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

17.    As a general matter, the process for preparing Malka's 2019 reviewed financial statements involved, among other things, my staff obtaining an accrual-basis trial balance from Malka's QuickBooks, requesting certain support for different balance sheet accounts, looking at a

bank reconciliation and bank statement, looking at accounts receivable aging, calculating depreciation, and conducting analytical procedures to compare balances year over year. A review does not require an accountant to look at invoices or contracts with customers, and we did not do so in connection with the review of Malka's 2019 financial statements.

18.    We completed the review of Malka's 2019 financial statements on or about August 28, 2020. JX066 (at MoneyLion_001043-58) is a true and correct copy of Malka's reviewed financial statements for the year ended December 31, 2019 (the "2019 Reviewed Financials"). In the 2019 Reviewed Financials, my firm concluded that "[b]ased on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in accordance with accounting principles generally accepted in the United States of America." JX066 at MoneyLion_001045. The 2019 Reviewed Financials also state that "Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America[.]" *Id.* In my view, "Management" as used in the 2019 Reviewed Financials refers to Mr. Frommer and Mr. Basdekis, although Mr. Basdekis, as Malka's Head of Finance, signed the management representation letter in connection with the 2019 Reviewed Financials.

19.    The Notes to the 2019 Reviewed Financials describe, among other things, Malka's significant accounting policies. The Notes provide:

> Revenue is recognized under the accrual basis of accounting and recorded as revenue when work is completed and invoice[d] to the Company's customers. The Company's revenue is generated from a combination of project-based purchase orders that have various stages of completion whereby additional revenue is earned, and standalone billing. The Company's contracts are generally short-term in nature and are complete in less than one-year.

JX066 at MoneyLion_001050. To the best of my recollection, my understanding about Malka's revenue recognition practices came from Mr. Basdekis. I personally inserted a line into the Notes to Malka's 2019 Reviewed Financials that states that "[t]he Company has adopted ASC 606 as of December 31, 2019 regarding accounting for income from contracts and all revenues recognized by the Company for the year then ended are covered through ASC 606." JX066 at MoneyLion_001050.

20.     Accounting Standards Codification Topic 606 ("ASC 606") came into effect in 2019 and is a set of accounting guidelines that establish a framework to determine how much revenue to recognize from customer contracts and when revenue is recognized. At a high level, ASC 606 provides that an entity recognizes revenue on customer contracts when goods or services are transferred to the customer, meaning that revenue is recognized when performance obligations are satisfied.

21.     At the time I prepared the 2019 Reviewed Financials, I felt comfortable that both my conclusion that no material modifications were needed to comply with U.S. GAAP and that the statements in the Notes regarding Malka's revenue recognition practices were accurate. I understood that the intended user of the 2019 Reviewed Financials was ConnectOne, a lender, and I considered what might be material to a lender when I did my work. Although I never conducted detailed testing to confirm that Malka recognized revenue in accordance with ASC 606 as of December 31, 2019, I felt comfortable adding the language regarding compliance with ASC 606 to the Notes because, in my view, there would not need to be any material adjustment to Malka's revenue in order to comply with ASC 606. I was comfortable that whatever adjustment there might be would not be material to ConnectOne. I believed Malka's 2019 Reviewed Financial

Statements were materially in compliance with U.S. GAAP for purposes of the ConnectOne bank loan.

22.     My firm conducted a substantially similar review of Malka's financial statements for the year ended December 31, 2020, also in connection with the ConnectOne line of credit. Like the 2019 review, we did not review contracts or invoices in connection with the review of Malka's 2020 financial statements. We completed the review of Malka's 2020 financial statements on or about March 18, 2021. JX066 (at MoneyLion_001059-75) is a true and correct copy of Malka's reviewed financial statements for the year ended December 31, 2020 (the "2020 Reviewed Financials").

23.     In the 2020 Reviewed Financials, my firm concluded that "[b]ased on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in accordance with accounting principles generally accepted in the United States of America." JX066 at MoneyLion_001061. The 2020 Reviewed Financials also state that "Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America[.]" JX066 at MoneyLion_001061. In my view, "Management" as used in the 2020 Reviewed Financials refers to Mr. Frommer and Mr. Basdekis, although Mr. Basdekis, as Malka's Head of Finance, signed the management representation letter in connection with the 2020 Reviewed Financials.

24.     As I did for the 2019 Reviewed Financials, I also included in the Notes to the 2020 Reviewed Financials that Malka "has adopted ASC 606 as of December 31, 2020 regarding accounting for income from contracts and all revenues recognized by the Company for the year then ended are covered through ASC 606." JX066 at MoneyLion_001066.

25.    At the time I prepared the 2020 Reviewed Financials, I felt comfortable that both my conclusion that no material modifications were needed to comply with U.S. GAAP and that the statements in the Notes regarding Malka's revenue recognition practices were accurate.  Like in the prior year, I understood that the intended user of the 2020 Reviewed Financials was ConnectOne, and I had considered what might be material to a lender.  Again, although I never conducted detailed testing to confirm that Malka recognized revenue in accordance with ASC 606 as of December 31, 2020, I felt comfortable adding the language regarding compliance with ASC 606 to the Notes because, in my view, there would not need to be any material adjustment to Malka's revenue in order to comply with ASC 606.  I was comfortable that whatever adjustment there might be would not be material to ConnectOne.  I believed Malka's 2020 Reviewed Financial Statements were materially in compliance with U.S. GAAP for purposes of the ConnectOne bank loan.

26.    The 2019 Reviewed Financials and the 2020 Reviewed Financials only included financial information for Malka Media, not for Malka Sports.

## THE TRANSACTION WITH MONEYLION

27.    In or around June 2021, I became aware that the Sellers' membership interests in Malka might be purchased by MoneyLion.  I understood that MoneyLion and its advisors, including a company called CFGI, were conducting due diligence in connection with the potential transaction and that, as part of the diligence, MoneyLion and its advisors had requested and were provided with the 2019 Reviewed Financials, the 2020 Reviewed Financials and certain interim financial statements for 2021.

28.    I understood that CFGI was conducting financial, tax and accounting diligence in connection with the potential acquisition and would be preparing a Quality of Earnings Report for

MoneyLion. I am aware that CFGI, MoneyLion, and MoneyLion's counsel, DLA Piper, requested certain documents and information from Malka in the course of their due diligence and that a data room was set up to facilitate the transfer of those documents and information.

29.    I recall participating in at least two calls with CFGI over the summer of 2021. I recall that Mr. Basdekis was also on those calls. My interactions with CFGI primarily related to its tax due diligence, and I do not recall discussing Malka's accounting with CFGI. My understanding is that Mr. Basdekis primarily liaised with CFGI with respect to financial due diligence, as he was Malka's Head of Finance.

30.    Fox Rothschild was Malka's counsel in connection with the potential acquisition by MoneyLion. In the months leading up to the close of the transaction in November 2021, I worked as part of the team with Sellers, Mr. Basdekis, and Fox Rothschild to review and comment on certain transaction documents and provide feedback to Sellers in connection with the transaction.

## DRAFTING OF SCHEDULE A AND SCHEDULE B

31.    On October 27, 2021, Mr. Frommer forwarded to me and Mr. Basdekis an email from Malka's counsel that attached MoneyLion's initial draft of Schedule A, Accounting Principles, together with a draft of the Membership Interest Purchase Agreement ("MIPA") between Sellers and MoneyLion. JX031 (MoneyLion_01044886-010448975) is a true and correct copy of the email and attachments that I received on October 27, 2021 from Mr. Frommer.

32.    I understood that Schedule A was to set forth Malka's historical accounting principles that had been used to prepare Malka's unaudited financial statements for the years ended December 31, 2019 and December 31, 2020, and for the nine-month period ended September 30, 2021 (together, the "Financial Statements"). The draft of the MIPA that I received on October 27,

2021 included in Section 3.06 a representation that "[t]he Financial Statements have been prepared in accordance with the Accounting Principles[,]" *i.e.*, Schedule A. JX031 at MoneyLion_01044923.

33.    When I reviewed the initial draft of Schedule A prepared by MoneyLion and its counsel, DLA Piper, I saw that the draft included the following language: "The Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with: (a) U.S. GAAP including, but not limited to, FASB issued Accounting Standards Update (ASC) No. 2014-09, Revenue from Contracts with Customers (Topic 606)[.]" JX031 at MoneyLion_01044892.

34.    On October 27, 2021, I wrote to Mr. Frommer and Mr. Basdekis that "[w]e can represent that we are adhering to GAAP in all material respects through 2020" and "[l]et's make sure that all Accounts Receivable as of 9/30/2021 and revenue we have booked is in line with ASC 606[.]" JX026 (MoneyLion_01048208-15, at MoneyLion_01048208). At that time, I felt comfortable that Malka could represent that it was adhering to U.S. GAAP in all material respects through 2020 given my view that no material modifications would need to be made to Malka's financial statements for the years ended December 31, 2019 and December 31, 2020 in order for them to comply with U.S. GAAP. Before making any representation as to the nine months ended September 30, 2021, I wanted Mr. Basdekis to confirm that revenue was booked for that time period in accordance with ASC 606.

35.    On October 27, 2021, Mr. Basdekis responded that he identified certain projects in NetSuite—Malka's accounting software that it switched to from QuickBooks in or about January 2021—for which revenue had been recognized but work had not yet been performed. JX026 is a true and correct copy of my email exchange with Mr. Basdekis, copying Mr. Frommer, on October

27, 2021.  This confirmed to me that additional testing would need to be done in order to validate compliance with ASC 606 if a representation as to compliance with ASC 606 was to be included in Schedule A.

36.    Also on October 27, 2021, Mr. Frommer forwarded to me what I understood to be MoneyLion's initial draft of Schedule B, Revenue and EBITDA Calculation Principles.  I understood that the purpose of Schedule B was to set forth the principles that were to be followed when calculating whether Malka hit the revenue and EBITDA thresholds necessary to achieve the 2021 and 2022 earnout payments that were contemplated by the MIPA.

37.    When I reviewed the initial draft of Schedule B prepared by MoneyLion and its counsel, DLA Piper, I saw that "Revenue" was defined as "revenue recognized according to ASC 606 revenue recognition requirements for the combined and consolidated Company and determined in accordance with U.S. GAAP as reviewed or audited by Buyer's independent accountants."  JX032 is a true and correct copy of this document.

38.    Seeing that MoneyLion had included specific references to ASC 606 in its initial drafts of Schedules A and B, I wanted to ensure that if the language in the proposed drafts was going to remain unchanged, and Sellers were going to make a representation as to compliance with ASC 606 or agree to calculate revenue for purposes of the earnout using ASC 606, that we first performed additional testing to confirm compliance with ASC 606 as of September 30, 2021. Although I felt comfortable with the statements in the 2019 Reviewed Financials and the 2020 Reviewed Financials as to compliance with ASC 606 given the materiality of such financials to ConnectOne, now that we were in the context of a potential acquisition by MoneyLion, I felt that additional testing was needed to confirm compliance with ASC 606 if the representations as to ASC 606 were to remain in Schedules A and B.

11

39.     To that end, on October 27, 2021, I wrote again to Mr. Basdekis and told him "I think [we] should do a selection of accounts receivable as of 9/30/21 and review the contracts to make sure we are in compliance with 606 as of 9/30/21." JX027 (MoneyLion_01048309-15) is a true and correct copy of my October 27, 2021 email to Mr. Basdekis, copying Mr. Frommer.

40.     I recall participating on a phone call with Mr. Frommer and Mr. Basdekis on or about October 28, 2021 to discuss MoneyLion's initial drafts of Schedules A and B. I recall Mr. Frommer conveying to me and Mr. Basdekis that MoneyLion was going to permit Sellers to edit Schedules A and B to describe Malka's historical accounting principles as well as the calculation principles that would be used for purposes of the earnout. I recall Mr. Frommer asking that Mr. Basdekis and I be very specific with the language that we included in Schedule A and Schedule B so that we clearly defined Malka's historical accounting principles as well as the revenue and EBITDA calculation principles for the earnout.

41.     On October 28, 2021, I wrote to Mr. Basdekis, Mr. Frommer and Fox Rothschild that "Jeff, Matt, and I spoke this morning and have the following requests / clarifications needed with respect to Schedule B. For purposes of the Earnout, the Company [Malka] would like to continue to maintain our existing accounting principles with respect to revenue recognition and cost recognition associated with revenue through 12/31/2022 that have been utilized historically." JX036 (MoneyLion_01044617-33) is a true and correct copy of my October 28, 2021 email. I also wrote that "I think their [MoneyLion's] financial due diligence folks [CFGI] got a handle on what that looked like. Down payments on signed deals are booked into revenue as they are technically noncancelable, costs are recognized as incurred." JX036 at MoneyLion_01044617.

42.     At the same time, I still wanted to ensure that if MoneyLion ended up insisting on any representation as to compliance with ASC 606 in either Schedule A or Schedule B, that

additional testing was first done to confirm compliance.  Without having performed the additional testing, I would not have been comfortable proceeding with an unqualified representation as to compliance with U.S. GAAP or ASC 606.

43.    Thus, on October 29, 2021, I wrote an email to Mr. Frommer and Mr. Basdekis with the subject line "ASC 606" and wrote: "Hey Matt, We have to do an analysis of this [ASC 606] for 2018-2020 and YTD 2021. It looks like Revenue for purposes of earnout is going to need to be recalculated pursuant to the more complex public company standards related to 606 to avoid any issues."  PX120 (MoneyLion_01040738-39) is a true and correct copy of my October 29, 2021 email to Messrs. Frommer and Basdekis.

44.    As set forth below, MoneyLion ultimately agreed to our edits to Schedules A and B to remove any representation or reference as to compliance with ASC 606.  As a result, there was no need to perform the additional testing that I would have considered necessary had MoneyLion insisted upon including a representation as to compliance with ASC 606 in Schedule A.

45.    Had MoneyLion insisted upon including a representation in Schedule A that the 2019 Reviewed Financials and 2020 Reviewed Financials were prepared in accordance with ASC 606, I also would have wanted to restate those financial statements to add a liability account for deferred revenue, which would have impacted the balance sheet.  However, I never communicated to Sellers that such a restatement was necessary, because after MoneyLion agreed to our edits to Schedules A and B removing any representation or reference as to compliance with ASC 606 (as described below), I was comfortable that no such restatement was necessary.

46.    In my view, Schedule A essentially rendered irrelevant any statements in the 2019 Reviewed Financials and 2020 Reviewed Financials as to compliance with U.S. GAAP and ASC

606, because the MIPA made clear that those financial statements (and the interim financial statements for the nine-months ended September 30, 2021) were prepared in accordance with the "Accounting Principles," *i.e.* Schedule A, and Schedule A, as edited by us, contained no representation as to compliance with ASC 606.

47.     On October 29, 2021, I circulated my proposed edits to MoneyLion's initial draft of Schedule B to Fox Rothschild, Mr. Frommer and Mr. Basdekis.  I wrote:  "My edits to Schedule B attached. Matt, please take a look, approve these, and let us know if you want to add anything." JX036 (MoneyLion_01044617-33) is a true and correct copy of my October 29, 2021 email attaching my edits to Schedule B.

48.     I incorporated my edits to Schedule B directly into MoneyLion's initial draft and did not send a redline.  However, a few hours after I sent my edits, on October 29, 2021, Fox Rothschild circulated to me, Mr. Frommer and Mr. Basdekis a redline that more clearly reflected the edits that I made to Schedule B, plus additional edits from Fox Rothschild.  Michael Harrington of Fox Rothschild wrote to us:  "Jeff, Ryan, and Matt: Attached are my edits to Schedule B, clean and blacklined. Please review closely and let me know if there [are] any further issues to address or discuss. Thanks."  PX121 (MoneyLion_01042455-73) is a true and correct copy of the email with attachments that I received from Mr. Harrington on October 29, 2021.

49.     Although I initially took the pen on editing Schedule B, it was very important to me that any edits to both Schedule B and Schedule A be reviewed and approved by Mr. Basdekis before they were sent to MoneyLion.  I understood that Mr. Frommer wanted Schedules A and B to be accurate and correct, and, based upon my experience working with Mr. Basdekis and Sellers, my view was that Mr. Basdekis was the only person on the Malka side who fully understood the details of Malka's invoicing and revenue recognition practices.  Therefore, I asked that Mr.

Basdekis review and approve of my edits given that he had the detailed understanding of Malka's historical practices.

50.    The edits that I made to Schedule B and circulated on October 29, 2021 were intended to clarify that for purposes of the 2021 and 2022 earnouts, revenue would be recognized in accordance with Malka's historical revenue recognition principles and not U.S. GAAP or ASC 606.  I intentionally deleted the references to "ASC 606" and "U.S. GAAP" that MoneyLion had included in the initial definition of "Revenue" and edited the definition to read that "Revenue" for purposes of the earnouts "means revenue recognized according to the Company's historical revenue recognition principles for the combined and consolidated Company."    JX036 at MoneyLion_01044632; PX121 at MoneyLion_01042470.  I did this to make clear that for purposes of the earnouts, revenue would be determined in the same manner that Malka had recognized revenue prior to the acquisition and would not be determined in accordance with U.S. GAAP or ASC 606, as MoneyLion had originally suggested in its initial draft of Schedule B.

51.    I knew that because MoneyLion was a public company, after the acquisition closed, Malka's financial statements would be consolidated into MoneyLion's, and MoneyLion would be required to report the consolidated revenue figure in accordance with U.S. GAAP and ASC 606.  My understanding and intention in editing Schedule B was that Malka's revenue for purposes of the 2021 and 2022 earnouts would not be calculated in accordance with U.S. GAAP and ASC 606, but would be calculated using the same revenue recognition principles that Malka had actually used prior to the closing of the transaction.

52.    I also added the following sentence to the definition of "Revenue" in Schedule B: "By way of illustration, the Company's historical revenue recognition principles require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-

term in nature (3 months or less) and recognize the remaining revenue on such contracts as milestones are attained." JX036 at MoneyLion_01044632; PX121 at MoneyLion_01042470.

53.    When I wrote this, I wanted to highlight what I understood to be the way in which Malka's revenue recognition practices did not comply with ASC 606 so that it was clear that Malka's revenue for purposes of the earnout would not be determined in accordance with U.S. GAAP or ASC 606. My understanding at the time was that Malka's agreements with its customers generally provided that Malka would invoice its customers 50% upfront upon execution of the contract and 50% upon completion of work. With respect to the 50% upfront payment, my understanding was that it was noncancelable in nature, meaning that Malka could keep the upfront payment even if the work did not happen. I understood that Malka recognized the upfront payment into revenue when it was invoiced to the customer, even though work might have not yet been performed.

54.    Although I had not reviewed Malka's invoices or contracts with its customers, a little over a week before I edited Schedule B, Mr. Basdekis had brought to my attention what he referred to as "cancellation language in [Malka's] template SOW," which provided that "[i]f Client cancels the services herein contracted, MMG shall retain the full sum of the Fee paid by Client." PX104 (MoneyLion_01051578-80) is a true and correct copy of Mr. Basdekis's October 20, 2021 email to me. I had this language in mind when I edited Schedule B, although I did not intend to limit the term "noncancelable deposit" as used in Schedule B to refer only to instances where Malka's agreements with its customers included this provision. In my view, a noncancelable deposit as the term is used in Schedule B (and Schedule A) could exist even in the absence of this language as long as Malka received an upfront payment from its customer and did not have to return the upfront payment even if the contract was cancelled or work was not performed.

55.    At the time I edited Schedule B, my understanding was that but for noncancelable deposits, Malka recognized revenue as milestones were attained. I do not recall from whom I got that understanding. In my mind, I equated milestones with the completion of performance obligations. However, I did not confirm this view with Mr. Basdekis or Sellers, and I recognize that they might have had a different view and may use the term "milestones" more broadly and not limited to actual levels of performance.

56.    Because I had not performed detailed testing to confirm Malka's compliance with ASC 606, I never quantified the impact that Malka's practice of recognizing into revenue noncancelable deposits when invoiced had on Malka's reported revenue. While I believed that this practice would not materially impact Malka's reported revenue, I did not include any such representation in the MIPA because I had not performed an audit or detailed testing. Accordingly, I did not include any language in Schedule B (or Schedule A) that quantified the impact that this revenue recognition practice would have. I simply (a) made clear in my edits to Schedule B that revenue for purposes of the earnouts would be determined in accordance with Malka's historical revenue recognition principles and not U.S. GAAP or ASC 606, and (b) highlighted, "by way of illustration," the way that I understood Malka's historical revenue recognition principles did not comply with U.S. GAAP or ASC 606.

57.    While I was not aware of any other ways in which Malka's historical revenue recognition principles did not comply with U.S. GAAP or ASC 606, I recognized that I was not intimately involved in Malka's invoicing and revenue recognition practices nor had I conducted an audit or detailed testing to ascertain any other potential differences between Malka's historical revenue recognition principles and U.S. GAAP or ASC 606. For example, at my deposition in this matter, I was shown CFGI's Quality of Earnings report, which I had not previously seen. I note

that in the section of its report on revenue recognition, CFGI reported that "Management acknowledged that in certain instances where projects fell behind schedule, the Company [Malka] invoiced customers based on planned rather than actual timeline(s)."    JX020 at MoneyLion_01813370.  At the time I edited Schedule B, I was not aware of this practice, which appears to not comply with ASC 606.

58.    When I edited Schedule B on October 29, 2021 and asked for Mr. Basdekis to review and approve of my edits, I was confident that if I had incorrectly described Malka's historical revenue recognition principles, Mr. Basdekis, who was very familiar with those principles, would call any inaccuracy to my attention so that it could be corrected.  That did not happen.

59.    In addition to the edits described above, I also edited MoneyLion's initial draft of Schedule B to provide that Malka's revenue for purposes of the earnouts would include the "[d]ifference between the fair market value of the intercompany services provided by the Company to Buyer and the actual charge for the intercompany services provided by the Company to the Buyer."  JX036 at MoneyLion_01044632.  I added this language (which Fox Rothschild cleaned up slightly, *see* PX121 at MoneyLion_01042470) because I understood that after MoneyLion acquired Malka, Malka would provide substantial intercompany services for MoneyLion at a discount to the amount that it charged other customers for the same services, so this language was intended to add back to Malka's revenue for earnout purposes the difference between the fair market value of Malka's services (*i.e.*, the amount that a third-party customer paid for the services) as compared to the discounted amount of the intercompany services that Malka charged to MoneyLion.

60.     In my October 29, 2021 edits to Schedule B, I also added language to make clear that EBITDA for purposes of the earnouts shall include "the expected recognition of the New Jersey Digital Media Tax Credit ('Tax Credit') in the period in which the Tax Credit was applied for." JX036 at MoneyLion_01044633; PX121 at MoneyLion_01042473.  As of October 29, 2021, Malka had applied for, but not yet received, a tax credit from the State of New Jersey in respect of digital media work performed in 2019.  I included this language in Schedule B so that Malka's EBITDA for purposes of the 2021 and 2022 earnouts would be increased by the amount of the tax credit applied for in each of 2021 and 2022.  To that end, I added the following language in Schedule B: "By way of illustration, the Tax Credit applied for in 2021 was for services provided by the Company for 2019. The Tax Credit would be added to 2021 EBITDA."  JX036 at MoneyLion_01044633; PX121 at MoneyLion_01042473.  The emphasis was on the year "applied for" as the expectation was that the actual cash benefit from the tax credit likely would come one or more years after 2021 and 2022, the only relevant years for purposes of the earnout.

61.     In its additional edits to Schedule B on October 29, 2021, Fox Rothschild included the add on for the New Jersey tax credit to revenue in addition to EBITDA.  *See* PX121 at MoneyLion_01042470-71 (Revenue #3, EBITDA #12).

62.     On October 29, 2021, Mr. Frommer responded to Fox Rothschild's email of the same day sending their redline of Schedule B and wrote, "Michael, I spoke with Matt/Ryan, this is good to share with DLA."  Mr. Harrington responded, "Thank you. We will share this new Schedule B with DLA" and reminded me and Mr. Basdekis to review the draft of Schedule A that we had received on October 27, 2021.  JX034 (MoneyLion_01040169-82) is a true and correct copy of this October 29, 2021 email exchange with Mr. Harrington, Mr. Frommer, Mr. Basdekis and others.

63.     I am not aware of Mr. Basdekis ever communicating to me, to any of the Sellers, or to Fox Rothschild that the markups of Schedule B that I and Fox Rothschild circulated on October 29, 2021 were incorrect or inaccurate in any way.  To the contrary, on October 29, 2021, Mr. Basdekis responded to my email requesting that he review my proposed edits to Schedule B and wrote, "Good with this[.]"  JX035 (MoneyLion_01040452-67) is a true and correct copy of the email that I received from Mr. Basdekis on October 29, 2021.

64.     On October 31, 2021, Mr. Frommer wrote to me and Mr. Basdekis, copying Fox Rothschild, to remind us to review and comment on Schedule A.  He wanted to make sure that we were "explicit" in the way we defined Malka's accounting principles.  I responded the same day that "[t]o the best of my knowledge, revenue has been consistently booked from 2018 through present using the same principle we defined in Schedule B."  JX038.  Again, because I recognized that Mr. Basdekis was the one with the actual detailed knowledge of Malka's revenue recognition principles, I added, "Matt not sure if you have a different perspective" so that Mr. Basdekis could express his agreement or disagreement with what I wrote.  JX038.

65.     Mr. Basdekis responded the same day, "Agree with the exception of intercompany, which is all eliminated regardless so no impact."  JX038 (MoneyLion_01041381-88) is a true and correct copy of my October 31, 2021 email exchange with Mr. Basdekis and Mr. Frommer, copying Fox Rothschild.  I understood Mr. Basdekis to be communicating his agreement with my statement that "revenue has been consistently booked from 2018 through the present using the same principle we defined in Schedule B."

66.     On October 31, 2021, I attempted to circulate my comments to Schedule A to Mr. Basdekis, Mr. Frommer and Fox Rothschild, but I neglected to include the attachment.  On November 1, 2021, I sent the same group my comments to Schedule A.    JX043

(MoneyLion_00976958-65) is a true and correct copy of the email with attachment that I sent on November 1, 2021.

67.    In light of Mr. Basdekis' confirmation that Malka's historical revenue recognition principles were consistent with those described in the updated draft of Schedule B, I edited Schedule A to be consistent with my edits to Schedule B.  As with my edits to Schedule B, I edited Schedule A to remove any reference to ASC 606 because I wanted to be clear that Malka was not representing in Schedule A that it had historically recognized revenue in accordance ASC 606.

68.    Editing Schedule A in this regard was important to me because I recognized that the 2019 Reviewed Financials and 2020 Reviewed Financials included the statement in the Notes that Malka had adopted ASC 606, but I had not done detailed testing to confirm compliance with ASC 606.  Therefore, I wanted to be clear in my edits to Schedule A that regardless of what was stated in the Notes to the 2019 Reviewed Financials and 2020 Reviewed Financials, Malka was not representing in Schedule A that the Financial Statements were prepared in accordance with U.S. GAAP or ASC 606 with respect to revenue recognition.

69.    Consistent with this, I struck the language that MoneyLion had in its initial draft that the "Financial Statements … shall be prepared in accordance with: (a) U.S. GAAP including, but not limited to FASB issued Accounting Standards Update (ASC) No. 2014-09, Revenue from Contracts with Customers (Topic 606) . . ."   I replaced that language with the "Financial Statements . . . shall be prepared in accordance with: (a) U.S. GAAP, but for the Company's historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained, and but for the

Company's historical cost recognition principles associated with such revenue, which require the Company to recognize costs on contracts as incurred." JX043 at MoneyLion_00976965.

70.     I intended my description of Malka's historical revenue recognition principles in Schedule A to match the principles described in Schedule B, which I had edited first. Although I did not use the words "by way of illustration" in Schedule A as I had in Schedule B, my intent in using the words "the Company's historical revenue recognition principles**, which**" was to communicate the same concept as in Schedule B, where I wrote that revenue for purposes of the earnouts "means revenue recognized according to the Company's historical revenue recognition principles for the combined and consolidated Company**. By way of illustration** …." JX036 (MoneyLion_01044632); PX121 (MoneyLion_01042470) (emphasis added). In both cases, I was making clear that Malka's historical revenue recognition principles were an "except[ion]" to U.S. GAAP.

71.     On November 1, 2021, as it had with Schedule B, Fox Rothschild circulated to me and Mr. Basdekis "final clean-up edits to Schedule A" and asked us to "review and let [them] know if this is good to be sent to ML [MoneyLion]." JX041 (MoneyLion_00976972-81) is a true and correct copy of the email with attachment that I received on November 1, 2021 from Fox Rothschild.

72.     In Fox Rothschild's clean-up edits to Schedule A, it broke up what I had included as exceptions to U.S. GAAP for Malka's historical revenue recognition principles and historical cost recognition principles into two separate points. JX041 at MoneyLion_00976980. As edited by Fox Rothschild, Schedule A read:

> The Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with:
>
> (a) U.S. GAAP, except as follows:

a. the Company's historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained, and
b. the Company's historical cost recognition principles associated with such revenue, which require the Company to recognize costs on contracts as incurred.

JX041 at MoneyLion_00976980.

73.    On November 1, 2021, I confirmed to Fox Rothschild that I was fine with these edits.  PX127 (MoneyLion_00976990-97) is a true and correct copy of my November 1, 2021 email communication to Fox Rothschild.

74.    I am not aware of Mr. Basdekis ever communicating to me, to any of the Sellers, or to Fox Rothschild that Malka's historical revenue recognition principles described in the markups of Schedule A that I or Fox Rothschild circulated on November 1, 2021 were incorrect or inaccurate in any way.  Again, I was confident that if I had incorrectly described Malka's historical revenue recognition principles, Mr. Basdekis, who was very familiar with those principles, would call any inaccuracy to my attention so that it could be corrected.  That did not happen.

75.    On November 3, 2021, Fox Rothschild forwarded to me and Mr. Basdekis an email from MoneyLion's counsel, DLA Piper, in which DLA Piper wrote, "[p]lease find attached i) Schedule A to the MIPA accepting your client's revisions and which we can consider final, and ii) our client's comments to Schedule B to the MIPA, with redline against your client's last version." PX136 at MoneyLion_01037477.  Fox Rothschild wrote to me and Mr. Basdekis, "[p]lease see below and attached. I'd like both of you to review the changes they made to Schedule B and let me know if there are any issues with their changes or comments that I need to address. In particular, they have removed the Tax Credit from revenue but are allowing it to remain as an item of

EBITDA. Maybe that gets us where we want to be but I really need both of you to be sure this is acceptable to us." PX136 (MoneyLion_01037477-84) is a true and correct copy of the email with attachments that I received from Fox Rothschild on November 3, 2021.

76.    As DLA Piper wrote, MoneyLion had accepted our edits to Schedule A, including the deletion of ASC 606 and the addition of the referenced exceptions to U.S. GAAP for the Company's historical revenue recognition principles and historical cost recognition principles. *See* PX136 at MoneyLion_01037484.  Once I saw that MoneyLion had accepted these edits, I no longer felt the need to insist that Malka conduct testing to confirm compliance with ASC 606 as of September 30, 2021, because I understood that MoneyLion was not requiring any representation from Malka that it had prepared its Financial Statements in accordance with ASC 606.

77.    With respect to Schedule B, as Fox Rothschild noted in its cover email to me and Mr. Basdekis, MoneyLion had deleted the add on to revenue for the New Jersey tax credit but had accepted that the tax credit would be an add on to EBITDA for earnout purposes. *See* PX136 at MoneyLion_01037481.  MoneyLion also accepted the language that we added regarding the add on to revenue for purposes of the earnout for the difference between the fair market value and the actual charge of the intercompany services provided by Malka to MoneyLion. *See* PX136 at MoneyLion_01037481.

78.    When I reviewed this markup on November 3, 2021, I noticed that in my first round of edits to Schedule B on October 29, 2021, I had not edited the definition of EBITDA to tie the calculation of EBTIDA for purposes of the earnout to Malka's historical revenue and cost recognition principles, as I had done to the definition of revenue.

79.    Accordingly, on November 3, 2021, I responded to Fox Rothschild, copying Mr. Basdekis and Mr. Frommer, and wrote, "I have one additional change to tie EBITDA to our

historical revenue / cost recognition principles. Otherwise I'm good." JX047 (MoneyLion_01037491-94) is a true and correct copy of my November 3, 2021 email with attachment to Fox Rothschild.

80.    In the version of Schedule B that I attached to my November 3, 2021 email, I edited the definition of "EBITDA" to include a parenthetical that referred to Malka's historical revenue and cost recognition principles.  Specifically, I edited the definition of "EBITDA" to read, "'EBITDA' means the combined and consolidated net income before interest expense, federal, state and local taxes, depreciation and amortization of the Buyer, determined in accordance with U.S. GAAP *(including the Company's historical revenue and cost recognition principles)* as reviewed or audited by Buyer's independent accountant."  JX047 at MoneyLion_01037493 (emphasis added).  I did not delete the confusing language regarding EBITDA of "the Buyer," *i.e.*, MoneyLion, but I clearly understood that Malka's EBITDA, not MoneyLion's, was relevant for purposes of determining whether Sellers would be entitled to the earnout payments contemplated by the MIPA.  I inserted the parenthetical to make clear that Malka's EBITDA would be determined for earnout purposes in the same manner it had been pre-acquisition.

81.    I included this parenthetical in Schedule B to ensure that there was no inconsistency between the way that revenue would be calculated for purposes of the earnout and the way that EBITDA would be calculated for purposes of the earnout, meaning that both would be calculated using the same principles for revenue recognition and (in the case of EBITDA) cost recognition that Malka had been using prior to the transaction with MoneyLion.  This was consistent with my understanding that the parties had agreed that Malka could use its historical accounting principles, and not U.S. GAAP or ASC 606, for purposes of the earnouts.

82.     On November 3, 2021, Fox Rothschild responded to my email, copying Mr. Basdekis and Mr. Frommer, and wrote, "Thanks for your quick response. Will you be getting me that one additional change, or have you inserted it into this? If so, please make your change obvious to me because I am not seeing it in what was attached." PX135 at MoneyLion_01035486. PX135 (MoneyLion_01035485-88) is a true and correct copy of my November 3, 2021 email exchange with Fox Rothschild and Mr. Basdekis. Fox Rothschild also asked me to confirm that I was ok with only including the tax credit as an add on to EBITDA, instead of to both revenue and EBITDA, as we had initially proposed. PX135 at MoneyLion_01035486. I responded the same day and wrote, "[m]y understanding is that the revenue target is basically a lock for 2021, so I don't have tremendous conviction on keeping it [the tax credit] in Revenue. I think if we get it for EBITDA that is good from our side but the Malka team can weigh in further. My change [to Schedule B] was just made in the intro EBITDA definition. I added a callout to revenue recognition and cost recognition." PX135 at MoneyLion_01035485.

83.     Fox Rothschild replied all asking Mr. Basdekis to "chime in when you can," and the same day, Mr. Basdekis responded, "Agree - ok with this - having it [the tax credit] in EBITDA is the essential piece of this. No risk to revenue number in 2021, was not in any of our projections for 2022 from a revenue perspective anyway." PX135 at MoneyLion_01035485.

84.     On November 4, 2021, Fox Rothschild sent our markup of Schedule B, including the parenthetical that I added to EBITDA, to DLA Piper. JX051 (MoneyLion_01039352-55) is a true and correct copy of this email thread. That same day, DLA Piper responded to Fox Rothschild, "Thank you, Michael. We will review and let you know." JX051 at MoneyLion_01039252. DLA Piper then added:

> Separately, we have received the following feedback from the RWI insurer regarding Schedule A (Accounting Principles):

> **With respect to the Accounting Principles, the Company is essentially making the representation that its financial statements have been historically prepared under GAAP except revenue recognition and contract costs. However, based on the diligence, the Company operates [on] an cash basis with numerous other GAAP deviations identified, including lack of accruals for commissions, payroll, professional fees, pre-paid licenses and pre-paid insurance. So we expect all Accounting Principles to reflect <u>all</u> non-GAAP items (not just those listed in previous sentence) or the Accounting Principles to acknowledge that the business operates on a cash basis.**
>
> To that end, can your client please revise Schedule A to include those additional areas, aside from revenue recognition and contract costs?

JX051 at MoneyLion_01039352 (bold and underline in original).

85.     That same day, Fox Rothschild forwarded to me and Mr. Basdekis, copying Mr. Frommer, the email from DLA Piper with the feedback from the RWI insurer and wrote, "Matthew and Ryan, See below. If you agree with this statement, please revise Schedule A to address these items. Attached is the most recent version of Schedule A."  JX051 at MoneyLion_01039352.

86.     I understood the text in bold in DLA Piper's email to be the feedback that DLA Piper had received from MoneyLion's RWI (representations and warranty) insurer regarding Schedule A and that the text in regular font was written by DLA Piper.

87.     I understood the RWI insurer's comment to mean that it had reviewed Schedule A, "Accounting Principles," and based on that review, it saw that Malka was representing that it had prepared its historical financial statements in accordance with U.S. GAAP, "except for revenue recognition and contract costs[,]" which is exactly how we had drafted it to read.  I read the RWI insurer's comment to also mean that MoneyLion's diligence conducted by CFGI (which I had not seen at the time) had revealed "numerous other GAAP deviations" including lack of accruals for the items listed in the RWI insurer's comment.  JX051 at MoneyLion_01039352.

88.     Therefore, when DLA Piper wrote at the bottom of its email, "[t]o that end, can your client please revise Schedule A to include those *additional* areas, *aside from* revenue

recognition and contract costs[,]" (JX051 at MoneyLion_01039352 (emphasis added)), I understood that DLA Piper was asking us to revise Schedule A to reflect ways *other than* revenue recognition and contract costs that Malka's financials differed from U.S. GAAP.  I did not read DLA Piper's email as requesting that any edits be made to the already-disclosed exceptions to U.S. GAAP for revenue recognition and contract costs, as the RWI insurer was clearly already aware of those exceptions.

89.     Again, because Mr. Basdekis was the most familiar with Malka's historical accounting principles, I deferred to him to address the RWI insurer's and DLA Piper's comments. Thus, on November 5, 2021, I replied all to the email to me and Mr. Basdekis from Fox Rothschild and wrote, "Matt, what are your thoughts?"  JX054 (MoneyLion_01032410-20) is a true and correct copy of my November 5, 2021 email exchange with Mr. Basdekis and Fox Rothschild, including the attached updated draft of Schedule A.  I then added that "[n]one of these accruals or prepaids [listed in the RWI insurer's comment] were material to the P&L based on our review. But I believe you are accruing for certain of these items as well. Payroll accruals aren't relevant since the company pays on 1st and 15th. It also doesn't have a PTO accrual due to unlimited PTO policy." JX054.

90.     Mr. Basdekis replied all and wrote, "[a]side from the outlined exceptions, this is how I would define our expense recognition[,]" and Mr. Basdekis then listed three expense recognition practices, and four "[n]otes and exceptions through Sep 2021[.]"  JX054 at MoneyLion_01032412.  Mr. Basdekis did not provide any comments to or feedback on the already-included language of Schedule A that set forth the exception to U.S. GAAP for Malka's historical revenue recognition principles.

91.    In his November 5, 2021 email defining Malka's expense recognition practices, Mr. Basdekis wrote, among other things, that "[i]nvoiced expenses are recognized in related period based on receipt of the invoice. If we receive an invoice in October, it is entered in October and shows as an October expense, even if cash is not paid out until 30 or 60 days from the date of receipt. This applies to contracted costs, variable costs, and overhead."    JX054 at MoneyLion_01032412.

92.    I responded to Mr. Basdekis, copying Fox Rothschild and Mr. Frommer, shortly after receiving his email and wrote, "[t]his is great, please list this in Schedule A."    JX054 at MoneyLion_01032411.  Mr. Basdekis then added one additional expense recognition practice with respect to capitalized expenses and sent me and Fox Rothschild, copying Mr. Frommer, an updated email reflecting what he described as Malka's expense recognition practices.    JX054 at MoneyLion_01032410-11.

93.    Fox Rothschild copied and pasted Mr. Basdekis' listed expense recognition practices directly into an updated draft of Schedule A, which Mr. Harrington sent to me and Mr. Basdekis, copying Mr. Frommer, on November 5, 2021 and wrote, "Ryan and Matthew: Thanks for the information below. I have taken this and inserted it into Schedule A. Attached is a clean and blackline version of Schedule A. Please review and let me know if this is acceptable to now send to DLA."  JX054 at MoneyLion_0132410.

94.    The updated draft of Schedule A that Fox Rothschild sent on November 5, 2021 made no edits to the portion of Schedule A that addressed the exception to U.S. GAAP for Malka's historical revenue recognition principles, except to delete the word "and" at the end of the sentence now that there were more than two categories of exceptions to U.S. GAAP listed in Schedule A. *See* JX054 at MoneyLion_01032417.

29

95.    On November 9, 2021, Mr. Harrington of Fox Rothschild followed up again with me and Mr. Basdekis, copying Mr. Frommer, about Schedule A and reattached the updated draft that he had sent to us on November 5, 2021.  Mr. Harrington wrote, "Ryan and Matthew: I would like to get your final approval on this so we can send it to DLA/ML for approval. Please let me know if my changes are accurate and acceptable."  JX060 at MoneyLion_01032140.  JX060 (MoneyLion_01032140-50) is a true and correct copy of the email with attachments that I received from Fox Rothschild on November 9, 2021.

96.    That same day, I replied all to Fox Rothschild and Mr. Basdekis, copying Mr. Frommer, and wrote, "[n]o objections."  PX147 (MoneyLion_0132131-39) is a true and correct copy of the email that I sent to Fox Rothschild, copying Mr. Basdekis and Mr. Frommer, on November 9, 2021.

97.    Also on November 9, 2021, in response to Mr. Harrington's email attaching the updated version of Schedule A and asking me and Mr. Basdekis to let Mr. Harrington know if his "changes are accurate and acceptable," Mr. Basdekis wrote to Mr. Harrington, copying me and Mr. Frommer, "Good on my end!"  JX059 (MoneyLion_01032119-27) is a true and correct copy of the November 9, 2021 email that I received from Mr. Basdekis.

98.    When Mr. Basdekis wrote "Good on my end!" in response to Fox Rothschild's email attaching the updated draft of Schedule A, I understood that Mr. Basdekis was communicating his sign off on the updated draft of Schedule A that Fox Rothschild had circulated to us for our approval on November 5 and again on November 9, 2021 and that he had no additional edits.

99.    Prior to the close of the transaction on November 15, 2021, I am not aware of Mr. Basdekis ever expressing any disagreement with or edits to any of the language that Fox Rothschild

included in the updated draft of Schedule A that it sent to me and Mr. Basdekis on November 5 and again on November 9, 2021.

100.    In light of the fact that Mr. Basdekis was knowledgeable about the details as to how Malka historically recognized revenue and expenses, the fact that Mr. Basdekis approved of Schedule A as drafted communicated to me and gave me comfort that we had accurately described in Schedule A the ways that Malka's historical revenue and expense recognition principles differed from U.S. GAAP.  As noted above, I also understood that those same historical revenue and expense recognition principles would be used for purposes of calculating revenue and EBITDA for the 2021 and 2022 earnouts.

101.    Prior to the closing of the transaction on November 15, 2021, I am not aware of anyone from MoneyLion or its advisors ever asking anyone from the Sellers' side what the terms "historical revenue recognition principles," "noncancelable deposits" or "milestones" meant as those terms were used in Schedule A and Schedule B.  I am also not aware of anyone from the MoneyLion side ever asking what the words "[b]y way of illustration" meant as those words were used in Schedule B.  Nor am I aware of anyone from MoneyLion or its advisors asking for the MIPA to quantify the impact of any exception to U.S. GAAP or ASC 606.

102.    The updated version of Schedule A that Mr. Basdekis and I signed off on on November 9, 2021 is the final version of Schedule A that appears in the execution version of the MIPA dated November 15, 2021.  JX065 at DLA_006263-64.

## POST-CLOSING TAX WORK

103.    Following the close of the transaction on November 15, 2021, I continued provide tax advice to the Sellers and to prepare their individual tax returns.  In late 2022, in an effort to determine the Sellers' tax liabilities for the year ended December 31, 2022, I worked with the

Sellers to engage a valuation firm, Corporate Valuation Advisors, to perform a valuation of the restricted shares of MoneyLion, Inc. that the Sellers received as consideration for the purchase of their membership interests in Malka.

104.    My understanding was that, in addition to the potential to achieve the 2021 and 2022 earnouts, the purchase price that MoneyLion agreed to pay Sellers in the MIPA included cash consideration and the number of shares of MoneyLion Inc. restricted stock in an amount equal to an aggregate of $30 million divided by the greater of the 30-day volume-weighted average price ("VWAP") of the stock as of November 15, 2021 or $9.00 (the "Closing Stock Payment").  *See* JX065 at DLA_006202-03, Section 2.03(a)(ii).   Under the MIPA, the Closing Stock Payment vested in four equal installments on December 31, 2021, March 31, 2022, June 30, 2022 and September 30, 2022 and was subject to a make-whole right as set forth in the MIPA.  Thus, when calculating Sellers' individual tax liabilities for 2022, it was necessary to consider each Sellers' tax liability in respect of his portion of the Closing Stock Payment.

105.    Corporate Valuation Advisors prepared a valuation report dated December 2, 2022 (the "CVA Report") that it sent to me and the Sellers on that date. PX266 (MoneyLion_00157371-78-90) is a true and correct copy of the December 2, 2022 email that I received from Corporate Valuation Advisors and the attached valuation report.

106.    The CVA Report expressed CVA's opinion as to the fair market value of a restricted share of MoneyLion, Inc. stock on each of the three vesting dates in 2022 – March 31, 2022, June 30, 2022 and September 30, 2022.  PX266 at MoneyLion_00157382.  CVA defined "fair market value" "as the amount of money at which a restricted common share of the Company [MoneyLion, Inc.] would likely exchange between a willing buyer and willing seller, neither being

under any compulsion to buy or sell and both having reasonable knowledge of all relevant facts." PX266 at MoneyLion_00157380.

107.    CVA concluded that based on its review of "19 studies that have been concluded over a 33-year period" and its analysis of "18 factors which can positively or negatively affect the marketability of a restricted share," it was necessary to apply a 30% "lack of marketability discount" to the value of the restricted shares of MoneyLion, Inc. stock as of each vesting date. PX266 at MoneyLion_00157381-82.   CVA explained the bases for its conclusion in the CVA Report and included the results of the 19 studies and 18 factors considered in the exhibits to the CVA Report.  *See* PX266 at MoneyLion_00157380-90.

108.    My firm relied upon the conclusions set forth in the CVA Report as to the fair market value of a restricted share of MoneyLion Inc. stock when calculating the Sellers' individual tax liabilities for 2022.  For example, on December 22, 2022, I sent Mr. Frommer a stock sale calculator that I prepared that calculated his personal tax liability for 2022.    PX408 (MoneyLion_00360133-35) is a true and correct copy of the email with attachment that I sent to Mr. Frommer on December 22, 2022.  When calculating Mr. Frommer's total taxable income for 2022 from his award of MoneyLion Inc. restricted stock, I applied CVA's 30% discount for lack of marketability to the 30-day VWAP of the stock on each vesting date to calculate the fair market value of the restricted stock as of each vesting date.  PX408 at MoneyLion_00360135 (Rows 2 and 18).  I then multiplied the fair market value of the restricted stock (including the 30% discount) by the total shares issued on each vesting date to determine Mr. Frommer's total taxable income.

I followed the same process, including applying the 30% discount for lack of marketability, to determine each of the other Sellers' total taxable incomes for 2022.

Executed on this _20_ day of December, 2024 in _NEWARK_, New Jersey.

_____
Ryan S. Curran