**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED AND PAT CAPRA**,**

                              Plaintiffs,

- *against* —

MONEYLION TECHNOLOGIES INC. AND
CONTINENTAL STOCK TRANSFER & TRUST
COMPANY,

                              Defendants,

MONEYLION TECHNOLOGIES INC.,

                    Counterclaim Plaintiff,

- *against* —

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

                    Counterclaim Defendants,

MONEYLION INC.,

                         Third-Party Plaintiff,

- *against* —

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

                    Third Party Defendants.

**Case No. 1:23-cv-06339-JMF**

---

## TRIAL AFFIDAVIT OF MATTHEW BASDEKIS[1]

---

[1] Cited herein are true and correct copies of emails, slack exchanges, and their attachments sent or received by me on or about the date indicated in the document.

MoneyLion's Exhibit
No. 1:23-cv-06339-JMF
DX-592

Matthew Basdekis declares, pursuant to Title 28, United States Code, Section 1746:

## Background

1.     My name is Matthew Basdekis.  I am currently employed as the Chief of Staff at Malka Media Group LLC ( "Malka").  Malka is a wholly owned and operated subsidiary of MoneyLion Technologies Inc. (together with MoneyLion Inc., "MoneyLion").  Before becoming Chief of Staff, I was the Head of Finance at Malka from March 2020 until February 2024, including both before and after November 15, 2021, the date on which MoneyLion acquired Malka (the "Acquisition").

2.     During my time at Malka, I have worked remotely from my home in Westchester County, New York, with the exception of a few days when I worked from Malka's New Jersey offices (pre-Acquisition), or MoneyLion's New York City offices (post-Acquisition).

3.     I am experienced with financial concepts and, since my graduation from the University of Rhode Island in 2008, I have had various roles as a financial analyst and as a manager of financial operations, principally in the media industry.  Before joining Malka, I worked at Hexcel Corporation as a financial analyst, GE Capital as a lead analyst, NBC Sports Group as Director of Finance, and Conde Nast as Director of Finance.  While I am not a certified public accountant ("CPA"), I have worked closely with accountants throughout my approximately 16-year professional career, and I have developed a strong working knowledge of basic accounting and bookkeeping functions and principles, including Generally Accepted Accounting Principles ("GAAP") and Accounting Standards Codification ("ASC") 606.

## Malka's Historical Accounting Practices

2

4.      When I started as Malka's Head of Finance in March 2020, my responsibilities included, among other things, handling accounts receivable and accounts payable, providing direct oversight of client transactional activities for Malka, working with clients on their specific account issues, and maintaining Malka's financial books and records.  I reported to, and worked directly for, Jeff Frommer, Malka's President, and Louis Krubich, Malka's Chief Executive Officer ("CEO") (along with Pat Capra and Daniel Fried, the "Sellers").

5.      In my role as Head of Finance, I also worked with Malka's outside accountants, Curran & Company LLP ("Curran & Co.") and, in particular, its principal, Ryan Curran.  Mr. Curran, who is a CPA, and his firm had been working with Malka since before my arrival, and they continued to work with Malka after my arrival.  I learned during my time at Malka that, in addition to their professional relationship, Mr. Frommer and Mr. Curran are personal friends.

6.      During my work as Head of Finance, and prior to the Acquisition, I gained an understanding of Malka's accounting practices.  With respect to revenue recognition, Malka recognized revenue as soon as an invoice was generated in our accounting system, without regard to whether any work had been completed, or the extent of any such work.  Although Malka sometimes issued invoices as work performance obligations were satisfied, far more often it did not—meaning the timing of invoices was *not* tied to any work performance obligations.  Moreover, Malka did not recognize revenue in connection with any "noncancelable deposit" terms in its contracts or Statements of Work ("SOW").  To the contrary, as discussed below, I did not hear the term "noncancelable deposits" until Mr. Curran first invoked it in October 2021, when the parties were negotiating the Membership Interest Purchase Agreement ("MIPA") in connection with the Acquisition.

3

7.    Since my arrival, Malka's accounting system has always been set up to recognize revenue upon the generation of an invoice.  When I joined Malka, we used a system called QuickBooks, and that system was set to recognize revenue upon invoicing.  Sometime in late 2020, we decided to transition to a new system that would integrate our accounting system with other functions (such as project management and customer relationship management).  We chose a system called NetSuite, which could be programmed to recognize revenue in several different ways, including to comply with GAAP.  We worked with the customer service team at NetSuite to program our system, consistent with our historical practices, to recognize revenue upon invoicing without regard to when or whether any work had been done.  The name we used for this setting, which I understand was bespoke and created for Malka, was "***On Billing***."  All four Sellers were fully aware of, and kept updated about, the move to NetSuite.  Specifically, among other things, they were aware of the bespoke "On Billing" setup, which everyone involved knew was created in order to maintain our past practice of recognizing revenue upon invoicing without regard to whether any work had been performed.  Malka implemented NetSuite on January 1, 2021.

**Jeffrey Frommer and the Other Sellers**

8.    From the time I began working at Malka, I worked extensively and closely with Mr. Frommer, to whom I reported directly.  Two things became clear to me through my work with Mr. Frommer prior to the Acquisition.

9.    First, as I learned very quickly, Mr. Frommer ruled with an iron fist, and he was not somebody you wanted to upset.  When I was interviewing at Malka, I worked with a Human Resources professional named Eddiana Rosen.  But by the time I was hired, I learned from a colleague that Ms. Rosen no longer worked at Malka because the two of them had a dispute.  I

4

understood that Mr. Frommer accused Ms. Rosen of filming him, and approached her in a menacing way and attempted to grab her cell phone to try and confirm his suspicions. This story, whether true or not, guided my interactions with Mr. Frommer. My job was important to me, and because I wanted to keep it, I did my best to never get on Mr. Frommer's bad side. I also personally experienced Mr. Frommer's volatility. During one meeting, I was called on to present to senior people at Malka and, within a few minutes into my presentation, Mr. Frommer brushed me aside and said something to the effect of "nobody wants to hear about that."

10.     Second, Mr. Frommer understood Malka's accounting practices. There is no question in my mind about that. Malka was a relatively small private company, and as its President, Mr. Frommer—who served as one of the principal points of contact for Mr. Curran— was intimately involved with virtually every aspect of Malka's business, especially its financials. Mr. Frommer had access to both QuickBooks and NetSuite, and I recall him using Malka's accounting systems to generate invoices himself. (I asked Mr. Frommer not to do so because, on at least one occasion, he caused confusion by issuing an invoice to a customer even though somebody from the finance team had already issued that same invoice to that same customer.) Anyone who used these systems would know that they were set up to recognize revenue upon invoicing, and I specifically recall discussing with Mr. Frommer the fact that this was Malka's practice.

11.     Mr. Frommer and I had detailed discussions about Malka's finances, and he understood certain financial and accounting concepts. For example, we discussed terms such as GAAP, accrual-basis accounting, and cash-basis accounting. Based on our discussions, I understood that Mr. Frommer knew what those terms (and other financial-related terms) meant.

5

12.     My interaction with the other Sellers was less than with Mr. Frommer, but still substantial.  For example, from the time I began working at Malka, the finance team held weekly meetings with all four Sellers (Mr. Frommer, Mr. Krubich, Mr. Fried, and Mr. Capra).  During those meetings, we would discuss all things financial, including, for example, Malka's financial results, its cash position, and its business trends.  At some point, we moved our weekly discussion with Mr. Capra to a separate meeting, which was devoted to the sports business (but we still continued the other weekly meeting with the other three Sellers).  Based on our discussions during these meetings, and my other experience at Malka working with the Sellers, I am confident that, along with Mr. Frommer, Messrs. Krubich, Fried, and Capra had a solid working knowledge of Malka's financials, and that they were familiar with Malka's historical accounting practices, including revenue recognition.

**Preliminary Discussions About the Acquisition**

13.     Mr. Frommer first informed me about a possible transaction involving MoneyLion sometime in June 2021, when he asked me to assist him in drafting a slide deck that I understood he and the other Sellers would be presenting to MoneyLion (the "pitch deck").  Mr. Frommer referred to the possible transaction as a "potential partnership" (or something along those lines), and I did not know at the time that the possible transaction was a potential acquisition.

14.     In a series of June 10, 2021 Slack messages, Mr. Frommer and I communicated about information that would be included in the pitch deck.  JX004 at MoneyLion_01642783.  For example, Mr. Frommer asked if I had "the EBITDA numbers from the previous years," and sent me revenue projections for Malka.  JX004 at MoneyLion_01642783.  As the communication makes clear, Mr. Frommer knew what EBITDA was and that I would be able to access Malka's

6

historical figures for that metric, which I did and provided to him. As for the revenue projections that Mr. Frommer sent me, I had no involvement in creating them, I do not know on what information they were based, and I cannot think of anyone who worked at Malka at the time who would have had sufficient knowledge to create them other than Mr. Frommer. These projections eventually were incorporated into the final pitch deck at Slides 10, 12, 14, and 16. DX035 at MoneyLion_01152714, MoneyLion_01152716, MoneyLion_01152718, and MoneyLion_01152720. The pitch deck also included EBITDA projections. DX035 at MoneyLion_01152721. As with the revenue projections, I had no involvement in creating the EBITDA projections, I do not know on what information they were based, and I cannot think of anyone who worked at Malka at the time who would have had sufficient knowledge to create them other than Mr. Frommer.

15. A few days later, on June 13, 2021, Mr. Frommer sent an email asking Mr. Curran and me for additional information, including the 2019 and 2020 financial statements for Malka, as well as the "2021 ytd *accrual base financial statements* for [M]alka [M]edia." DX036 at MoneyLion_01149785. Mr. Frommer prefaced his request by saying "I'm sure they're gonna wanna see" the information he was requesting, and I understood that the "they" to whom Mr. Frommer was referring was MoneyLion. DX036 at MoneyLion_01149785. Based on my discussions with Mr. Frommer generally, I knew that he was familiar with Malka's financial statements and accounting practices, and that he understood what "accrual-basis" financial statements meant. In that same request, Mr. Frommer asked me about whether certain revenue was "being tracked accounted/for." DX036 at MoneyLion_01149785. I responded, "Yes, but on a cash basis, we aren't accruing for it." DX036 at MoneyLion_01149785. Mr. Frommer responded, "Can we?"—which I understood was because he wanted to show higher revenues to

7

MoneyLion.  DX036 at MoneyLion_01149784.  And I explained to him in detail why we could not: essentially because we would have to split that revenue with business partners once it came in, and so we could not simply accrue for all of it ourselves, even once the work had been completed.  DX036 at MoneyLion_01149784.  This exchange confirms a fact I already knew to be true based on my discussions with Mr. Frommer: he understood Malka's accounting practices and accounting concepts, including the difference between cash-basis and accrual-basis accounting.

16.     Other interactions with Mr. Frommer confirm this.  For example, in a February 24, 2022 Slack, Mr. Frommer and I were discussing monthly revenue targets.  DX489 at MoneyLion_00017302.  He asked me to "add" into a document the target for "jan[uary]" as well as "what we invoiced in jan[uary]."  DX489 at MoneyLion_00017302.  In other words, Mr. Frommer wanted to compare our actual January 2022 revenues—*i.e.*, "what we invoiced"—to what we had targeted.  Based on these and other exchanges, and my experience in general, there is no doubt in my mind that Mr. Frommer knew that Malka's historical revenue recognition practices were to always recognize revenue upon invoicing, without regard to whether any work had been performed.

**MoneyLion's Due Diligence and Mr. Frommer's Misrepresentations About Malka's Accounting Practices**

17.     As part of the potential sale of Malka to MoneyLion, I became aware that MoneyLion hired CFGI to conduct due diligence on Malka ahead of the potential Acquisition.  Mr. Frommer ran point for Malka on the diligence, and I worked under his supervision and at his direction.  My primary role in the due diligence process was to respond to requests by gathering information and documents and providing them to CFGI.  In my role, I searched for and provided

**DX-592.008**

certain Malka invoices, contracts, and SOWs. I could not locate all, or nearly all, of these materials because there was no central repository for them. I did not provide anyone from MoneyLion or CFGI with access to NetSuite during the course of due diligence, nor did I (or, to my knowledge, anyone else at Malka) ever disclose to MoneyLion or CFGI that our version of NetSuite had a bespoke "On Billing" feature. Based on my understanding of how due diligence works, as well as my general knowledge of accounting, I do not believe MoneyLion would have been able to determine, based on the information we provided during due diligence, that Malka's revenue recognition practice was to always recognize revenue upon invoicing without regard to whether work was completed.

18.     In August 2021, I attended at least one financial due diligence call with Mr. Frommer, CFGI, and possibly Mr. Curran. Mr. Frommer took the lead on these calls, and I recall specifically during one call that Mr. Frommer told CFGI that Malka complied with GAAP and that any deviation from GAAP was minimal. My recollection of this call is strong because I was surprised that Mr. Frommer would tell CFGI that Malka complied with GAAP (and downplay the supposed deviations) when in fact Malka did not comply with GAAP at all—and because I knew Mr. Frommer knew that.

19.     The day after that call, I had a "regroup" call with Mr. Frommer. I do not recall whether Mr. Curran was on that call. During the call, I told Mr. Frommer that his statements to CFGI were not accurate because Malka did not follow GAAP, but rather that the most accurate and straightforward way to present Malka's accounting practices would be to say that Malka always recognized revenue upon invoicing. I also explained that we had no way of knowing if Malka's supposed GAAP deviations were minimal, because we did not follow GAAP at all and thus had no basis to make (or even estimate) the results of such a calculation. Mr. Frommer told

DX-592.009

me not to worry about it, and words to the effect that he would "take care of it" or "handle it."
Based on that conversation, I understood that Mr. Frommer wanted to be in charge of how Malka
presented its financials and accounting to MoneyLion, and I believed that Mr. Frommer wanted to
portray Malka as GAAP-compliant because he knew that would make it more attractive to
MoneyLion. In light of my past experience with Mr. Frommer and what I knew about how he
operated and treated employees who disagreed with him, I did not continue to press the issue
during that call.

20. During the course of this litigation, I read CFGI's due diligence report (the "QoE
Report"). It confirmed that Mr. Frommer had not "taken care of" nor "handled" his
misrepresentations to CFGI that Malka complied with GAAP. Instead, the QoE Report stated that
Malka's management, defined as Mr. Frommer, Mr. Curran, and myself "represented that [Malka]
is compliant with ASC 606 revenue recognition requirements" and that in "certain instances where
projects fell behind schedule, [Malka] invoiced customers based on the planned rather than actual
timeline(s)[,]" but noted "any noncompliance to be minimal." JX020 at MoneyLion_01813358,
MoneyLion_01813370. The QoE Report also stated that "[c]ustomers are invoiced upon
completion of milestones set forth in respective contracts." JX020 at MoneyLion_01813401.
Although I do not recall Mr. Frommer making these specific statements to CFGI (and I certainly
did not), it is consistent with my recollection that Mr. Frommer represented that Malka complied
with GAAP and downplayed any supposed GAAP deviations.

21. In addition to speaking with CFGI about GAAP, I also know that Mr. Frommer
spoke with Richard Correia, MoneyLion's Chief Financial Officer ("CFO"), about Malka's
accounting practices and GAAP. On October 19, 2021, Mr. Frommer sent me an email informing
me that he had spoken with Mr. Correia about Malka's "current way of revenue recognition" and

10

to give me a "heads up" in advance of my scheduled call the next day with a member of Mr. Correia's MoneyLion finance team (Tony Orokos, MoneyLion's then-Head of Finance Operations) that "they're gonna wanna talk about GAAP." JX022 at MoneyLion_01049219. Mr. Frommer told me that, as for his conversation with Mr. Correia, it was "[m]aybe not something to bring up but something to keep in mind as you guys are connecting." JX022 at MoneyLion_01049219. This reinforced for me what I understood to be true based on my call with Mr. Frommer during which I raised concerns about what he had told CFGI: Mr. Frommer wanted to control what information we conveyed to MoneyLion about Malka's accounting practices.

**MoneyLion and Malka Negotiate the MIPA**

22.    Before entering into the Acquisition, MoneyLion and the Sellers negotiated the contract that would govern the Acquisition, the MIPA. The MIPA contains two schedules: Schedule A, which sets out the relevant accounting principles for Malka's historical financial statements, and Schedule B, which sets out the method for calculating the earnout payments (collectively, the "Schedules").

23.    I did not speak directly to MoneyLion or its representatives in connection with the MIPA. Those discussions were led by Mr. Frommer and Malka's outside counsel, Fox Rothschild and FisherBroyles. I was, however, asked by Mr. Frommer and Fox Rothschild to provide input on certain drafts of the Schedules, which I did. I also participated in internal discussions with Mr. Frommer and Mr. Curran about the Schedules and, in that context, Malka's historical accounting practices.

24.    On October 27, 2021, an attorney at DLA Piper representing MoneyLion, Tim Sharkey, circulated an initial draft of Schedule A, which provided that Malka's financial

**DX-592.011**

statements "shall be prepared in accordance with U.S. GAAP[,]" including ASC 606. JX031 at MoneyLion_01044892. Malka's outside counsel forwarded the document to Mr. Frommer and suggested that Malka's CPA (Mr. Curran) and CFO (I presume he meant me, though that was not my title) review it. JX031 at MoneyLion_01044886. Mr. Frommer then forwarded the draft to Mr. Curran and me. JX031 at MoneyLion_01044886.

25.     Mr. Curran responded to Mr. Frommer (copying me) and stated that "[w]e can represent that we are adhering to GAAP in all material respects through 2020" but suggested we "make sure that all Accounts Receivable as of 9/30/2021 and revenue we have booked is in line with ASC 606." JX026 at MoneyLion_01048208. Mr. Curran then pasted a definition of ASC 606, which provided, among other things, that "[t]he entity may recognize revenue when it satisfies its obligations under a contract by transferring goods or services to its customer. (That is, when the entity performs, it should recognize revenue.)." JX026 at MoneyLion_01048208. That, however, was not the way Malka recognized revenue at all—as Mr. Frommer knew and as I had reminded him after our discussion with CFGI. However, because I did not want to anger Mr. Frommer, I responded to Mr. Curran in a way that I believed to be clear, yet tactful. JX026 at MoneyLion_01048208. I explained that, "Starting with the obvious – These are the projects I see in NetSuite *that we have recognized revenue for, but I do not see any time or expense against.*" JX026 at MoneyLion_01048208. I then listed certain projects, including "Roman," for which I explained that "invoices went on the books in Sep, [but] we have since learned all those reads are pushed and delayed." JX026 at MoneyLion_01048208. I was explaining that we had recognized revenue for projects for which no work had been done (including the "Roman" sponsorship), which meant that Malka did *not* follow ASC 606 (again, something Mr. Frommer already knew). Mr.

12

Frommer did not send a substantive response by email but instead asked to schedule a call the next morning (October 28, 2021). JX026 at MoneyLion_01048208.

26.     Later on that same day (October 27, 2021), Mr. Sharkey sent the initial draft of Schedule B, which Mr. Frommer also sent to Mr. Curran and me. JX032 at MoneyLion_01048332. The draft defined revenue as "recognized according to ASC 606 revenue recognition requirements" and defined EBITDA "in accordance with U.S. GAAP[.]" JX032 at MoneyLion_01048338.

27.     In response to Mr. Frommer's email forwarding the initial draft of Schedule B, Mr. Curran again wrote that we should confirm that Malka is in compliance with ASC 606 as of September 30, 2021. JX027 at MoneyLion_01048309. Specifically, Mr. Curran wrote to me and suggested that we "do a selection of accounts receivable as of 9/30/21 and review the contracts to make sure we are in compliance with [ASC] 606 as of 9/30/21." JX027 at MoneyLion_01048309.

28.     The next morning (October 28, 2021), Mr. Frommer, Mr. Curran, and I had the call that Mr. Frommer had requested the previous day, and we discussed Malka's accounting practices in the context of the Schedules. During the call, I reiterated that Malka did not comply with ASC 606 (which means it did not comply with GAAP), but rather it recognized revenue upon invoicing without regard to whether work had been done. However, based on the discussion, my sense was that Mr. Frommer and Mr. Curran were trying to figure out a way to present Malka as being as close to GAAP as possible. It was on this call (or on another call right around the same time) that Mr. Curran first raised the idea that Malka might have essentially followed GAAP because its contracts had what he referred to as "noncancelable deposits," and Malka was permitted to book that revenue upon invoicing because of the supposed "noncancelable" nature. Mr. Frommer did

DX-592.013

not seem surprised by this concept, which was news to me, and so I believe that Mr. Frommer and Mr. Curran likely had discussed this "noncancelable deposit" notion prior to the call among the three of us. Prior to that point, during my tenure at Malka, I had never seen a contract with a "noncancelable deposit" term, nor had I heard or used the term "noncancelable deposit."

29.     Based on my experience, Malka did not have any contracts or SOWs that provided for "noncancelable deposits," which I interpret as an upfront fee that Malka would be permitted to keep even if no work were done. As a result, after the call, I went back and reviewed Malka's form SOW to try to understand what Mr. Curran was talking about. DX521 at MoneyLion_02079396. While I saw certain references to "non-refundable fees," I did not see anything to demonstrate that such fees would always be paid before any work was done (although sometimes that was the case). I also did not see any language referencing "deposits" let alone "noncancelable" ones. In fact, with respect to cancellation, the form SOW provided the opposite: that "[i]n the event that the final edit of the video cannot be agreed upon by the parties, the parties agree that **the Client shall . . . [b]e permitted to recover the fee paid to date** . . . ." DX521 at MoneyLion_02079397. In other words, despite the reference to fees being non-refundable, they were in fact refundable under certain circumstances. That said, I deferred to Mr. Curran on the issue of GAAP representations because he was the CPA and, again, I was not going to get in Mr. Frommer's way.

30.     Later that day (October 28, 2021), Mr. Curran wrote to Fox Rothschild to report on that morning's call (among Mr. Frommer, Mr. Curran, and me) and informed them of the solution he and Mr. Frommer had come up with. DX116 at MoneyLion_01041162. He explained for purposes of the earnout (Schedule B), Malka "would like to continue to maintain [its] existing accounting principles with respect to revenue recognition… that have been utilized historically."

14

DX116 at MoneyLion_01041162.  He then wrote: "I think their [meaning MoneyLion's] financial due diligence folks got a handle on what that looked like.  Down payments on signed deals are booked into revenue as they are technically noncancelable . . ."  DX116 at MoneyLion_01041162. This language was inaccurate because Malka's historical revenue recognition practices were to recognize revenue upon invoicing without regard to whether any work was done, and because its contracts and SOWs did not contain provisions for "noncancelable deposits."  Moreover, I was confused by Mr. Curran's statement that MoneyLion's financial due diligence team "got a handle" on the supposed fact that Malka's historical revenue recognition practice was to book revenue on "technically" noncancelable deposits, DX116 at MoneyLion_01041162, because I do not recall that concept ever coming up with CFGI—and I did not see it in the QoE Report when I had reviewed that document.

31.     The next day, because the then-current versions of the Schedules contained GAAP and ASC 606 language, Mr. Curran suggested that we needed to confirm that Malka's historical revenues had all been calculated under GAAP and ASC 606.  DX120 at MoneyLion_01257459. He made the following "recommendation"—"Each contract signed has to be estimated for completion timeline.  We have to recognize a pro [r]ata portion of the revenue over the estimated timeline, on a monthly basis.  The policy also needs to be implemented on a go forward."  DX120 at MoneyLion_01257459.  Mr. Curran explained that "We have to do an analysis of this for 2018-2020 and YTD 2021.  It looks like Revenue for purposes of earnout is going to need to be recalculated pursuant to the more complex public company standards related to 606 to avoid any issues.  It shouldn't be a heavy lift as long as we have access to historical signed contracts. Something we can wrap by next week."  DX120 at MoneyLion_01257459.  I responded, "[e]asier said than done, hard enough to find contracts for this year."  DX120 at MoneyLion_01257459.

DX-592.015

32.     Based on this email, Mr. Curran (a CPA) obviously understood that in order to be GAAP-compliant, a company must recognize revenue as work is completed and that Malka needed to "recalculate" its revenues for 2018-2020 and YTD 2021 to "avoid any issues" with the potential Acquisition and meet the GAAP standard.  In other words, Mr. Curran was saying that Malka did not follow GAAP and that it should recalculate its financial statements in accordance with GAAP. My response was intended to convey that recalculating the revenues for those three-and-a-half years to make them GAAP-compliant was impossible to do in a week (as Mr. Curran had suggested) and likely not possible at all, because it would be extremely difficult to find the contracts for 2021—let alone for the preceding three years.  As noted above, we did not have a central repository for those documents, and trying to collect them would have taken a huge effort and an extraordinary amount of time—and still might have been unsuccessful.  I also was not aware whether, or to what extent, Malka even had contracts for its customers.

33.     On October 31, 2021, Mr. Frommer circulated a revised Schedule B, from which he struck the "ASC 606" language from the "Revenue" section but did not strike the "GAAP" language from the "EBITDA" section.  DX125 at MoneyLion_01041398, MoneyLion_01041489. Mr. Frommer explained that he had stricken "[ASC] 606" because "***we discussed 606 being something of possible concern***" and "we wanted to be explicit in what our accounting principles would be defined as it relates to hitting the earnout targets."  DX125 at MoneyLion_01041398, MoneyLion_01041489.  (I understand the "discussion" Mr. Frommer was referencing to be our October 28, 2021 call during which I reiterated that Malka did not comply with GAAP and Mr. Curran raised the concept of noncancelable deposits.)  In place of the ASC 606 language in Schedule B, Mr. Frommer added the language that revenue would be recognized according to "[Malka's] historical revenue recognition principles" and, in the next sentence, he added the

16

"noncancelable deposit" language that Mr. Curran had first suggested to try to solve the ASC 606 "concern." DX125 at MoneyLion_01041489.

34.     Mr. Frommer also attached the original draft of Schedule A (which he had not commented on yet) and advised that "the accounting principles [in Schedule A] are just as important in calculating the earnout revenue/ebitda." DX125 at MoneyLion_01041398. Mr. Frommer then offered his interpretation of the interplay between the Schedules and asked us to "ensure in the Schedules we are *explicit in how we define things moving forward, not in the past*." DX125 at MoneyLion_01041398. I understand Mr. Frommer to mean that he wanted to make sure there was no issue in Malka hitting the earnouts in the future (something he and the other Sellers became obsessed with in the last two months of 2021), but that *he did not want to be explicit* with respect to the representations about the "past"—because he did not want to admit that Malka did not follow GAAP.

35.     Mr. Curran responded to Mr. Frommer's email and wrote that "[t]o the best of my knowledge, revenue has been consistently booked from 2018 through present using the same principle we defined in Schedule B." JX038 at MoneyLion_01041381. And again, the current draft of Schedule B, as edited by Mr. Frommer, provided that revenue would be "recognized according to [Malka's] historical revenue recognition principles . . ." DX125 at MoneyLion_01041489. I responded that I agreed because that sentence is technically true (and means nothing without a comprehensive list of all the historical principles). JX038 at MoneyLion_01041381. And although the next sentence mentioned the supposed "noncancelable deposits," JX038 at MoneyLion_01041381, my "agreement" was not to that sentence. I had already acquiesced to that language, even though I believed it was false, both because I deferred

17

to Mr. Curran as the CPA, and because it was very clear to me that Mr. Frommer did not want me to get in his way on the all-important GAAP issue.

36.     Similarly, when I was asked the next day by Fox Rothschild to "sign off" on the financial representations in Section 3.06 of the MIPA (which essentially says that Malka's historical financial statements have been prepared in accordance with Schedule A), I was very careful in my response: "If 3.06, boiled down, states we've submitted financials consistent with the accounting princip[les] and definitions we have outlined, I generally agree, especially caveating the section with knowing year end adjustments are coming, and what the threshold of materiality is." JX045 at MoneyLion_01038109. In other words, I was "generally" agreeing with the proposition that Malka had historically recognized revenue according to its own historical practices, deferring to Mr. Curran and Mr. Frommer on the "noncancelable deposit" language (for the reasons discussed), and caveating that I did not know what the "materiality" threshold was for deviations. JX045 at MoneyLion_01038109. Essentially, I had no choice but to drop the issue given the circumstances, but because I still had serious concerns, I heavily caveated my "signoff."

37.     A few days later (on November 5, 2021), I was forwarded an email from Mr. Sharkey, in which he listed several expense-related GAAP deviations, and passed along a request from the representation and warranty insurer that Sellers make sure that "all Accounting Principles . . . reflect all non-GAAP items" and not just the expense-related ones he had listed. JX059 at MoneyLion_01032123. Given the context, I interpreted this to mean all expense-related GAAP deviations (and, again, I had already deferred to Mr. Frommer and Mr. Curran on the false revenue recognition description). I suggested adding all of the expense-related GAAP deviations of which I was aware. JX059 at MoneyLion_01032120. Outside counsel at Fox Rothschild then included those items in Schedule A and sent me a revised version, and I wrote "Good on my end!" JX059

18

at MoneyLion_01032119. All I meant to convey with that statement was that the additions I had proposed had been added into Schedule A. Any suggestion that I was signing off on Schedule A as accurate in its entirety is simply untrue. To the contrary, I believe (and have always believed) that Schedule A is inaccurate when it comes to revenue recognition because Malka did not follow GAAP with a limited exception for contracts with noncancelable deposits. Malka's revenue recognition did not follow GAAP at all. Rather, Malka historically recognized revenue upon invoicing without regard to whether any work had been done.

**Sellers Accelerate Invoicing to Achieve the 2021 Earnout**

38.  At some point shortly after November 15, 2021, Mr. Frommer instructed me to generate as many invoices as possible through the end of the year, regardless of whether any work would even begin that year. I knew from my discussions with Mr. Frommer that he understood how Malka recognized revenue, and I understood that he was giving me this instruction in order to "generate revenue" for purposes of the 2021 earnout calculations (the "2021 Earnout Financials Calculations").

39.  As we got closer to the end of 2021, Mr. Frommer became more and more concerned about achieving the 2021 earnout. In a December 8, 2021 exchange of Slack messages, I sent Mr. Frommer, in response to his request, a spreadsheet showing him "where Dec[ember] needs to come in to hit [the $100,000 EBITDA earnout] target without [the New Jersey] tax credit." DX499 at MoneyLion_01643377. Mr. Frommer presumably reviewed the spreadsheet and wrote, "$110,584 . . . that's pretty tight . . . +/- 10% to get to 100K ebitda." I responded by explaining that I thought hitting the target could still be "realistic," noted that in November we had "processed 3x more . . . invoices . . . than any other month," and explained that "[a]t the end of the day, we

19

need to have a month that looks like October and we[']re golden." DX499 at MoneyLion_01643377. Mr. Frommer responded that I should "make sure tom and partners have this info to drive." DX499 at MoneyLion_01643377. In other words, I was giving Mr. Frommer the state of play, which included a report on invoicing (*i.e.*, recognition of revenue), and he wanted to make sure I gave the same report to Thomas McGrath, Malka's Director of Account Management, as well as Messrs. Krubich, Fried, and Capra so that they could "drive" revenue (*i.e.*, process more invoices).

40.     The other Sellers were also focused on the earnout post-Acquisition. For example, a few days after the Acquisition, on November 18, 2021, Mr. Fried sent me a Slack instructing me that "we will need to bill for in the coming week" his client, Proximo Spirits, for $400,000 of work that had not yet taken place. DX172 at MoneyLion_01529631. Mr. Fried also asked for a call to chat and, either during that call or another call around the same time, he asked me how generating these invoices would affect the likelihood that Sellers would achieve the 2021 earnout. I told him that it would increase the likelihood and, consistent with its past practices, Malka booked all $400,000 in revenue for 2021 upon generation of the invoices, even though no work was done on the relevant Proximo Spirits project until 2022.

41.     Mr. Capra had the same focus. Also at the end of 2021, at Mr. Capra's direction, Malka sent a $50,000 invoice to Dan O'Brien Auto Group because a Malka Sports client, Devin McCourty, had done an endorsement for that customer. Malka recognized all $50,000 as revenue in 2021 even though it actually owed $40,000 to Mr. McCourty (*i.e.*, Malka got a 20% commission). Malka, however, did not recognize the $40,000 expense until 2022.

DX-592.020

42.     On February 15, 2022, at Sellers' direction and for purposes of the 2021 Earnout Financials Calculations, I sent to MoneyLion and others Malka's "unadjusted P&L for 2021," with information pulled directly from NetSuite.  JX074 at MoneyLion_01817462.  Mr. Frommer and the other Sellers understood that the financials I submitted to MoneyLion for the 2021 Earnout Financials Calculations were based on Malka's method for recognizing revenue—always upon invoice regardless of whether work was completed.  JX074 at MoneyLion_01817462.

### Escalating Concerns with Sellers

43.     After I sent the 2021 earnout information to MoneyLion, Sellers continued to focus on whether Malka had achieved the target.  On March 2, 2022 Mr. Frommer asked for a status update and for confirmation that MoneyLion is "not actually auditing us regarding our earnout?"  DX500 at MoneyLion_00017456.  Later that day, Mr. Frommer pressed MoneyLion's finance team for "confirmation of our 2021 earnout targets and confirmation of their release."  DX501 at MoneyLion_00223184.

44.     Later in the year, they began asking about the 2022 earnout.  For example, Mr. Frommer and Mr. Krubich asked that Henry Marx, Malka's Financial Analyst, and I keep them informed on Malka's monthly tracking toward the 2022 earnout calculations (the "2022 Earnout Financial Calculations").  DX502 at MoneyLion_00038842 (April 1, 2022 Slack in which Louis Krubich asks Henry Marx "how are we looking on total for Q1?").  In July 2022, Mr. Frommer instructed me to confirm with MoneyLion that Malka was on target to hit the revenue and EBITDA targets for the 2022 Earnout Financial Calculations.  DX503 at MoneyLion_00184607 (July 20, 2022 email from me to MoneyLion's finance team, writing "Coming out of the Q2 close and audit, we were wondering if we could align and confirm where we stand against the earnout target.  Is

this something we can regroup on possibly after the Q2 earnings release? We do not want to lose sight of where we stand, and it would be great to lock in a mid-year number and look ahead to finishing the year out strong").

45.     Throughout the course of 2022, Sellers' focus on the earnouts became a distraction, which made it more difficult for me (and others) to do their jobs.

46.     Sellers added an additional distraction: using company funds to pay for personal expenses. Even before the Acquisition, I warned Mr. Frommer and the other Sellers that once Malka became an operating subsidiary of MoneyLion, they would no longer be able to expense personal, legal, and accounting expenses for their extravagant lifestyles, which included air travel, hotel, dining, and entertainment expenses. This included personal legal work conducted by Fox Rothschild for Sellers. But Sellers did not listen to me, and following the Acquisition they continued to spend Malka (now MoneyLion) funds on personal expenses. I am not aware of Mr. Frommer ever submitting a single expense report.

47.     These issues became too difficult for me to manage along with my many other responsibilities, and in October 2022 I decided to resign as Malka's Head of Finance. I told Mr. Frommer and then spoke with Mr. Correia about the decision. I explained to Mr. Correia that it had become impossible to manage the many tasks as Malka's Head of Finance, in addition to Sellers' additional pressure regarding the earnouts. Mr. Correia convinced me to stay by agreeing to help mitigate tensions and be on notice for stress caused by the Sellers, offering an open door to come to him, and offering to restructure my position so that I reported directly to his finance team, rather than Mr. Frommer.

**The 2022 Earnout**

48.     Even with my reporting lines changed, Sellers pressed me with respect to the 2022 earnout, the same way they had done with the 2021 earnout.  They stressed the importance of submitting as many invoices as possible by the end of 2022 in order to inflate revenue for the 2022 Earnout Financial Calculations.  For example, on December 30, 2022, Mr. Fried told me to issue an invoice, and he "just want[ed] to make certain we can count for 2022."  DX472 at MoneyLion_00052858.  Mr. Frommer made similar requests.

49.     In January 2023, I pulled Malka's 2022 financial information off of NetSuite, which was based on revenue recognition at the time of invoicing without regard to whether any work had been performed, in order to assist MoneyLion in its 2022 Earnout Financial Calculations."  Again, these were based on information taken from NetSuite and were based on revenue recognition at the time of invoicing without regard to whether any work had been performed.  Rather than go directly to MoneyLion, Sellers asked that I share it with them first.     JX100 at MoneyLion_00023192.  This was not surprising to me, given Mr. Frommer's near-singular focus on the earnouts.  On January 18, 2023, I shared my "comparison of earn out vs GAAP and the reasons for variances," and reminded the Sellers that it is just "a starting point to any adjustments [MoneyLion] make[s]."  JX101 at MoneyLion_00023194.  On January 25, 2023, I shared Malka's 2022 financial information with Mark Torossian, MoneyLion's Chief Accounting Officer.  DX504 at MoneyLion_00145664.

## Jeffrey Frommer's Intimidation

50.     Mr. Frommer was an intimidating boss.  As stated above, I knew what happened to employees who crossed Mr. Frommer, and I fell in line because I did not want to become one of those stories.  After I started reporting to the MoneyLion team, my relationship with Mr. Frommer

**DX-592.023**

became quite strained.  And once the matter resulted in litigation, particularly after I submitted an affidavit in the preliminary injunction proceeding, I became nervous that Mr. Frommer would attempt to intimidate me, as he had when I worked for him.

51.     Unfortunately, I turned out to be correct.  I was deposed in this matter on July 18, 2024.  On or around August 9, 2024, Mr. Frommer made the following post on LinkedIn, DX511:



52.     Given the substance of the post, and its timing in relation to my deposition, I believe that Mr. Frommer was speaking about me.  To the extent he was, I take issue with any accusation that I have lied in the context of this case (or otherwise).  I have not.

24

The foregoing is true and correct to the best of my knowledge and belief.

Dated at New York, New York this 20th day of December, 2024

*Matthew Basdekis*
_____
Matthew Basdekis

State of Texas
County of Tarrant

Subscribed and sworn before me
this 20th day of December, 2024


_____
Notary Public  State of Texas
Commission Expires:  01/24/2028



Shannon Johnson

ID NUMBER
134729043
COMMISSION EXPIRES
January 24, 2028

Electronically signed and notarized online using the Proof platform.

**DX-592.025**