UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH, DANIEL FRIED AND PAT CAPRA**,**

                              Plaintiffs,

- *against* –

MONEYLION TECHNOLOGIES INC. AND CONTINENTAL STOCK TRANSFER & TRUST COMPANY,

                              Defendants,

MONEYLION TECHNOLOGIES INC.**,**

                              Counterclaim Plaintiff,

- *against* –

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH, DANIEL FRIED and PAT CAPRA,

                              Counterclaim Defendants,

MONEYLION INC.,

                              Third-Party Plaintiff,

- *against* –

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH, DANIEL FRIED and PAT CAPRA,

                              Third Party Defendants.

Case No. 1:23-cv-06339-JMF

## TRIAL AFFIDAVIT OF MICHELLE LEE[1]

---

[1] Cited herein are true and correct copies of written communications and their attachments, sent or received by me on or about the dates indicated in the documents.

MoneyLion's Exhibit
No. 1:23-cv-06339-JMF
DX-597

Michelle Lee, being duly sworn, deposes and states:

1. My name is Michelle Lee. I am a Senior Manager, Strategic Finance at MoneyLion Inc. and its wholly owned subsidiary, MoneyLion Technologies Inc. (together, "MoneyLion").

2. This affidavit serves as my direct testimony at trial in the case referenced above.

**Background**

3. I have been employed by MoneyLion since April 2021, when I started as a Strategic Finance Manager. I was promoted to Senior Manager, Strategic Finance in 2022.

4. I received my Bachelor's Degree from Washington University in St. Louis in 2015, where I double-majored in Mathematics and Classics. I also received a minor in Finance. After graduating college, I worked in various investment banking-related positions at Financial Technology Partners LLC, Stifel Financial Corp., and the Macquarie Group.

5. I do not have any educational or professional background in accounting. However, I am broadly familiar with the concept of Generally Accepting Accounting Principles ("GAAP") and the related concept of accrual accounting.

6. When MoneyLion acquired Malka Media Group LLC ("Malka") on November 15, 2021 (the "Acquisition"), I was the most junior employee in my reporting line in MoneyLion's Strategic Finance department. Since I joined MoneyLion in 2021 and continuing through today, I have reported to Erika Nuno, MoneyLion's Head of Strategic Finance. Ms. Nuno, in turn, reports to Richard Correia, MoneyLion's Chief Financial Officer. No employees have ever reported directly to me.

7. Prior to my July 2024 deposition, I had neither been deposed nor testified in any litigation. I have struggled (and continue to struggle) with anxiety about public speaking. During my deposition, I was asked questions about documents and communications from several years ago. While I did not have a full recollection of those documents at the time I was deposed, I have since reviewed additional documents that refreshed my recollection of these events. I have prepared this affidavit to provide additional context for key documents and events.

### MoneyLion's Acquisition of Malka

8. I played two principal roles in MoneyLion's acquisition of Malka. First, I was tasked with analyzing Malka's financial projections and forecasting how the Acquisition would impact MoneyLion's financial metrics. My second job was to act as a liaison between MoneyLion's and Malka's respective deal teams.[2]

9. As a junior employee, I never had any decision-making power, nor did I ever negotiate terms with Jeffrey Frommer, Louis Krubich, Daniel Fried, or Pat Capra (the "Sellers"). To my knowledge, all negotiation decisions (including those related to Malka's accounting principles) were made by Mr. Correia and other senior MoneyLion personnel.

### Malka's Financials and Due Diligence

10. I generally remember participating in several calls with CFGI, LLC ("CFGI"), MoneyLion's accounting consultant, in connection with the diligence process. As part of the

---

[2] For example, when MoneyLion negotiated Schedules A and B of the Membership Interest Purchase Agreement ("MIPA"), I collected feedback from my superiors (including Mr. Correia) and implemented their revisions. This was a purely administrative role that involved transmitting information from one set of decision makers to another.

diligence process, I recall that CFGI prepared a list of requested data, which was then sent to Sellers. Sellers then uploaded data for CFGI's review in its data room.

11. On October 5, 2021, CFGI delivered the first draft of its due diligence report. *See* ~~DX96~~ JX020 at MoneyLion_01813352 (October 5, 2021 email from Robert DeLuca to myself and Erika Nuno). The report identified several types of finance and accounting controls that MoneyLion would have to address to integrate Malka after the Acquisition. ~~DX96~~ JX020 at MoneyLion_01813370 ("While Management represented that the Company was compliant with ASC 606 . . . Management acknowledged that in certain instances where projects fell behind schedule, the Company invoiced customers based on the planned rather than actual timeline(s). Management noted that this dynamic can impact revenue recognition but noted any noncompliance to be minimal."). Nothing in the report, however, indicated to me that the financial data provided by Sellers was unreliable, fraudulent, or materially noncompliant with GAAP.

12. My recollection is that, on a follow-up call discussing the report, CFGI agreed that any accounting or finance issues that it had identified were minor. This recollection is based on my October 18, 2021 Slack chat with Ms. Nuno, in which I noted that CFGI "[did not] think that it would be too much work to clean up [Malka's] financials." DX508 at MoneyLion_01813620 (October 18, 2021 Slack chat between myself and Erika Nuno). This was consistent with my understanding at the time that Malka had some minor, non-material GAAP deviations that would need to be resolved for public reporting purposes. These findings were in line with my expectation that MoneyLion would have to take some steps to standardize Malka's accounting with its own after the Acquisition. I do not recall anyone on the MoneyLion or CFGI teams ever expressing

any concern that the deviations identified by CFGI in its report were so systematic or significant that they rendered the historical financial data provided by Sellers entirely unreliable.

### Negotiation of the Accounting Principles

13. Following our review of CFGI's due diligence, I was involved in assisting Mr. Correia and the MoneyLion team in drafting Schedules A and B of the MIPA. In order to facilitate the drafting of these sections, I believe that MoneyLion's external counsel, DLA Piper, provided templates for each schedule.

14. I believe that I used DLA Piper's template to prepare an initial draft of Schedule B for Mr. Correia and the MoneyLion team to review and revise. *See* DX112 at MoneyLion_01832508 (October 26, 2021 email from myself to MoneyLion finance department and CFGI personnel). To my understanding, Schedule B governed the contingent consideration that would be available to Sellers after the Acquisition. For 2021, Sellers would be eligible to receive $10,000,000 in additional compensation if they achieved a total revenue of $30,000,000 and an EBITDA of $100,000 (the "2021 Earnout"). For 2022, Sellers would be eligible to receive $25,000,000 in additional compensation if Sellers achieved a total revenue of $40,000,000 and an EBITDA of $100,000 (the "2022 Earnout," and together with the 2021 Earnout, the "Earnouts"). Schedule B set forth the accounting principles that would determine whether Sellers met the revenue and EBITDA requirements for each Earnout.

15. On October 30, 2021, I received Sellers' edits to Schedule B from MoneyLion's lawyers. ~~DX122~~ JX037 at MoneyLion_01832446 (October 30, 2021 email from Tim Sharkey to me and others at MoneyLion attaching comments from Sellers' counsel). Sellers' proposed edits struck

5

**DX-597.005**

the provision requiring Malka's revenue to be calculated in accordance with GAAP and ASC-606 accrual accounting. Instead, Sellers proposed that its revenue would be recognized according to Malka's "historical revenue recognition principles," which "require the Company to recognize into revenue noncancelable cash deposits." ~~DX122~~ JX037 at MoneyLion_01832458.

16. I was initially confused by Sellers' revisions to Schedule B because I was not expecting Sellers to suggest that Malka did not have to comply with GAAP. This is because I understood that Malka's "historical" principles did not materially deviate from GAAP, so I expected Sellers to opt to simply convert their revenue-recognition practices from their "historical" principles to GAAP. Given my confusion, and after reviewing Sellers' edits to Schedule B, I asked Ms. Nuno if Mr. Correia had spoken to Mr. Frommer and agreed to non-GAAP accounting metrics. JX044 ~~DX413~~ at MoneyLion_01813635 (November 1, 2021 Slack chat between myself and Erika Nuno). Ms. Nuno responded that we should confirm with Mr. Correia before sending comments back to make sure that we understood the context of Sellers' proposed changes. JX044 ~~DX413~~ at MoneyLion_01813635

17. Around the same time, Ms. Nuno and I discussed Sellers' proposed edits to Schedule B with MoneyLion's Head of Finance Operations, Mr. Tony Orokos. DX509 at MoneyLion_01813812 (November 1, 2021 Slack chat between myself, Erika Nuno, and Tony Orokos). I asked Mr. Orokos whether Sellers could rely on Malka's "historical" principles in lieu of GAAP and ASC-606. Mr. Orokos stated that Malka would ideally report its financials according to GAAP, which would make post-closing integration easier. DX509 at MoneyLion_01813812.

DX-597.006

18. Later that day, we received similar comments from Sellers relating to Schedule A. As with Schedule B, Sellers again proposed an exception to GAAP accounting practices that provided for revenue recognition pursuant to Malka's "historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts." ~~DX131~~ JX040 at MoneyLion_01832572 (November 1, 2021 email from Tim Sharkey to me and others at MoneyLion, attaching comments to Schedule A from Sellers' counsel).

19. I was confused by Sellers' edits to Schedule A. This is reflected in my 4:39 PM Slack message to Ms. Nuno, where I wrote "they sent us back schedule a and it[']s basically like no we will not follow gaap." ~~DX413~~ JX044 at MoneyLion_01813639 (November 1, 2021 Slack chat between myself and Erika Nuno). My off-the-cuff comment did not actually reflect Sellers' proposed edits. Indeed, Schedule A, even with Sellers' proposed revisions, still contained representations that Malka was GAAP compliant. In fact, Sellers' proposed edits to Schedule A represented that Malka had prepared its historical financial statements in accordance with "U.S. GAAP, except" for certain specified deviations. *See* ~~DX131~~ JX040 at MoneyLion_01832586 (attachment to November 1, 2021 email from Tim Sharkey to MoneyLion deal team):



20. Ultimately, Ms. Nuno and I agreed to discuss Sellers' proposed non-GAAP exceptions with Mr. Correia. ~~DX413~~ JX044, at MoneyLion_01813640 (November 1, 2021 5:39 PM Slack chat between myself and Erika Nuno, in which Ms. Nuno asks if I am "free now to talk to rick?").

21. While I do not recall the specifics of the conversation between myself, Ms. Nuno, and Mr. Correia, I believe that Mr. Correia told us that he would speak with Mr. Frommer to clarify why Sellers had modified our proposed GAAP accounting principles. This recollection is based on my subsequent email to the deal team, in which I reported that Mr. Correia intended to discuss the revisions with Mr. Frommer, and that we planned to push back on the proposed edits. ~~DX130~~ JX039 at MoneyLion_01832555 (November 1, 2021 6:30 PM email from myself to MoneyLion deal team, in which I stated that "[w]e discussed these [edits] with Rick and he also plans to discuss briefly with Jeff before we send this back over to them.").

22. Mr. Correia later informed me that he had spoken with Mr. Frommer. I do not recall the details of my conversation with Mr. Correia or what Mr. Frommer conveyed to him. I do, however, recall that Mr. Correia confirmed that he was comfortable with Sellers' revisions to Schedules A and B based on his conversation with Mr. Frommer and authorized me to accept Sellers' edits. As a result, MoneyLion accepted Sellers' proposed non-GAAP exceptions in Schedules A and B. *See* DX420 at MoneyLion_01832182–3 (November 2, 2021 email in which I informed the MoneyLion deal team that "[w]e are ok with Schedule A given that we now understand it pertains to historical periods only").

23. At the time of the closing, I understood that Malka's historical accounting policies generally followed GAAP, other than the enumerated deviations identified in Schedules A and B. Schedule A, as executed, stated that Malka's historical financial statements would be prepared in accordance with "U.S. GAAP," absent certain exceptions. ~~DX169~~ JX065 at DLA_006263 (MIPA Execution Version, Schedule A). Schedule B, as executed, also stated that Malka's EBITDA would be determined "in accordance with U.S. GAAP (including the Company's historical revenue and cost recognition principles)." ~~DX169~~ JX065 at DLA_006266 (MIPA Execution Version, Schedule B).

24. Prior to the Acquisition, I was never aware that Malka regularly recognized revenue upon creation of an invoice and before work was performed, without any receipt of a noncancelable cash deposit.

**Post-Closing Integration & 2021 Earnout**

25. From January through March 2022, MoneyLion's accounting department reviewed Malka's financials for the last six weeks of 2021—the period of time from November 15, 2021 to December 31, 2021, when Malka was on MoneyLion's books (the "Stub Period"). Although I did not participate in this Stub Period reconciliation exercise, I understood that the accounting group was working with Malka's then-Head of Finance, Matthew Basdekis, to conform Malka's Stub Period revenue figures with MoneyLion's GAAP protocols for public filing. After the Stub Period reconciliation was complete, Gary Fishler, MoneyLion's Corporate Controller, sent the results to Ms. Nuno and me on March 2, 2022. DX506 at MoneyLion_01845685 (March 2, 2022 Slack chat between myself, Erika Nuno, and Gary Fishler).

26. On March 3, 2022, the day after I received the results from Mr. Fishler, I emailed Monroe Capital, one of MoneyLion's lenders. Monroe Capital had previously requested Malka's 2021 financial data. In providing the data, I noted that Malka "was not previously following GAAP accounting (they were more on a cash basis)" and that "we made some changes that are not reflected here." ~~DX432~~ JX076 at MoneyLion_01821878 (March 3, 2022 email from myself to Alex Childs and Erika Nuno). By "cash basis," I believe that I was referring to Malka's ability to recognize into revenue nonrefundable cash deposits under the MIPA. This is based on my understanding that "cash basis" accounting permits recognition of revenue when cash is received. When I wrote that "we made some changes," I believe that I was referring to the Stub Period revenue reconciliation adjustments performed by MoneyLion's accounting team.

27. Later in March, I discussed the accounting team's revenue adjustments with MoneyLion's Director of U.S. Securities and Exchange Commission Reporting, Technical Accounting, and Sarbanes-Oxley Act Compliance, Michael Scalia, who was chiefly responsible for the Stub Period reconciliation exercise. *See* ~~DX434~~ JX080 at MoneyLion_01825463 (March 11, 2022 Slack chat between myself, Michael Scalia, and Erika Nuno). Mr. Scalia informed us that Mr. Basdekis generated the data in columns A through Q, and that Mr. Scalia converted Mr. Basdekis's data for MoneyLion's public filings. ~~DX434~~ JX080 at MoneyLion_01825464 (in which Mr. Scalia stated that "if [your] questions are to the left of Q, Matt is the far better option.").

28. On March 11, 2022, I asked Mr. Basdekis about the revenue reconciliation exercise. *See* DX435 at MoneyLion_01815375 (March 11, 2022 email from myself to Mr. Basdekis, in which I asked Mr. Basdekis whether the items in column K had been billed to the applicable

10

clients). On March 14, 2022—the day before MoneyLion issued the 2021 Earnout—Mr. Basdekis replied. Mr. Basdekis stated that the Stub Period reconciliation was intended to align revenue with MoneyLion's accrual-based metrics, because "as for historical principal [sic], revenue was always recognized when we invoiced." DX435 at MoneyLion_01815375. Mr. Basdekis explained that, as part of this process, some revenue was removed from Malka's Stub Period revenue and deferred into 2022. DX435 at MoneyLion_01815375

29. At the time, I was not concerned by Mr. Basdekis's comment that Malka recognized revenue at invoicing. This was because I understood that the MIPA provided detailed terms governing Malka's historical and current accounting practices based on my work with the legal team during the Acquisition. I am not an accountant and am not an expert in GAAP accounting, so I did not (and could not) consider whether Malka's policy complied with GAAP. When I received this email, I had no reason to believe that the practice described by Mr. Basdekis was inconsistent with what was authorized by the MIPA, and certainly had no evidence to suspect that Malka had misrepresented its financial condition to MoneyLion. As a result, I thanked Mr. Basdekis for his clarification and did not press further.

30. Because this was new information, I sent Mr. Correia a Slack message to share that Mr. Basdekis had told me that Malka's financial statements were "not cash based and [we]re actually partly accrual based, so they recognize[d] revenue when things [we]re billed, not when cash [wa]s collected." ~~DX200~~ JX082 at MoneyLion_01826066 (March 15, 2022 Slack chat between myself, Erika Nuno, and Rick Correia). This off-the-cuff summary reflected my evolving understanding of Malka's historical accounting practices and was based on Mr. Basdekis's prior

explanation. I do not remember ever comparing Malka's actual accounting practices (as described by Mr. Basdekis) to the representations Sellers made prior to the Acquisition or in the MIPA. I always assumed that Sellers prepared their financials in good faith and in compliance with the principles set forth in the MIPA. I never had any reason to suspect that Sellers had deliberately issued large numbers of invoices for future work near the end of fiscal year 2021 in order to artificially inflate Malka's profitability.

**2021 Earnout**

31. MoneyLion issued the 2021 Earnout on March 15, 2022. The 2021 Earnout was based entirely on financial data provided to my team and me by Malka.

32. Mr. Basdekis sent Malka's 2021 full-year financial statement to me and others at MoneyLion and CFGI in the February 15, 2022 email marked as ~~DX192~~ JX074 at MoneyLion_01817462 (February 15, 2022 email from Matthew Basdekis to Chris Murphy, cc'ing myself, Michael Scalia, Gary Fishler, Tom Carr, and Erika Nuno). The Excel file attached to that e-mail, *Id*. at MoneyLion_01817466, shows Malka's 2021 performance.

33. To calculate the Earnout, I first created a new tab within the Malka Excel spreadsheet. I then copied the figures provided by Sellers into the "Total Revenue" and "EBITDA" fields. Finally, I added Sellers' as-represented amount of the New Jersey tax credit.[3] *See* ~~DX201~~ JX083 at MoneyLion_01826071:

---

[3] I understood that Schedule B permitted Malka to include the value of a New Jersey Tax Credit in its EBITDA calculation. Mr. Frommer had previously informed Ms. Nuno and me that he had "received approval for the NJEDA Tax Credit in the amount of $890,904." *See* DX 507, at MoneyLion_00288354 (December 22, 2021 email from Jeff Frommer to Erika Nuno, myself, Jon Stevenson, Gary Fishler, Tony Orokos, Louis Krubich, and Matthew Basdekis).

|              | 2021         |
|--------------|--------------|
| **Earnout Amounts** | |
| Revenue Min  | $16,750,000  |
| Revenue Max  | $25,000,000  |
| EBITDA Min   | $100,000     |
| | |
| **2021 Financials** | |
| | |
| Total Revenue | $30,806,976 |
| | |
| EBITDA       | $921,497     |
| 2019 Tax Credit | $890,905  |
| EBITDA plus Tax Credit | $1,812,402 |

34.     Based on the information provided by Sellers, I determined that Malka had satisfied the criteria necessary to achieve the 2021 Earnout. I then sent the calculation to Mr. Correia, who approved the Earnout. Following Mr. Correia's approval, I informed Sellers that they had achieved the 2021 Earnout. ~~DX201~~ JX083 at MoneyLion_01826070.

35.     When MoneyLion issued the 2021 Earnout in March 2022, I believed that Sellers had provided us with financial metrics that were prepared faithfully in accordance with Schedule B of the MIPA. As a result, I did not think it would be necessary for MoneyLion to audit independently Sellers' calculations or verify that Malka's actual accounting practices were consistent with what Sellers had represented in the MIPA.

36.     If I had known in March 2022 what I know now about Malka's true accounting practices, I would not have relied on the 2021 financial statement submitted by Malka in preparing the 2021 Earnout calculation.

---

Mr. Frommer did not inform us that this was only a provisional approval, and that the actual tax credit would not be received until years later (and for a lower amount). At the time, therefore, I believed that Malka could claim the full value of the $890,904 credit. I therefore added this to the EBITDA (net income) figure reported by Malka.

The foregoing is true and correct to the best of my knowledge and belief.

Dated at New York, New York this 19th day of December, 2024

*Michelle Lee*

Michelle Lee

State of Nevada, County of Clark
Subscribed and sworn before me
this 19th day of December, 2024
by   Michelle Jeanwoo Lee

Notary Public
Commission Expires:  05/10/2025

LAZARO OSVALDO LEON CERVINO
NOTARY PUBLIC
STATE OF NEVADA
Appt. No. 21-4351-01
Expires May 10, 2025

Notarized remotely using audio-video communication technology via Proof.

14

**DX-597.014**