UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED AND PAT CAPRA,

                              Plaintiffs,

        - against –

MONEYLION TECHNOLOGIES INC. AND
CONTINENTAL STOCK TRANSFER & TRUST
COMPANY,

                              Defendants,

MONEYLION TECHNOLOGIES INC.,

            Counterclaim Plaintiff,

        - against –

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

           Counterclaim Defendants,

MONEYLION INC.,

           Third-Party Plaintiff,

        - against –

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,
                     Third Party Defendants.

Case No. 1:23-cv-06339-JMF

## TRIAL AFFIDAVIT OF MICHAEL SCALIA[1]

---

[1] Cited herein are true and correct copies of written communications and their attachments, sent or received by me on or about the dates indicated in the documents.

1

MoneyLion's Exhibit
No. 1:23-cv-06339-JMF
DX-598

DX-598.001

Michael Scalia being duly sworn, deposes and states:

1. My name is Michael Scalia. I am the Director of U.S. Securities and Exchange Commission ("SEC") Reporting, Technical Accounting, and Sarbanes-Oxley Act ("SOX") Compliance at MoneyLion Inc. and its wholly owned subsidiary, MoneyLion Technologies Inc. (collectively, "MoneyLion").

2. This affidavit serves as my direct testimony at trial in the case referenced above.

### Background

3. I hold Bachelor's and Master's Degrees in Accounting from the University of Connecticut, and I am a licensed certified public accountant. During and after my graduate studies, I worked as an Assurance Manager for RSM U.S., LLP ("RSM"), a position I held until 2017. In 2017, I left that company to join the Siegfried Group as a Manager. I held that role until 2019, when I was promoted to Senior Manager. Later in 2019, I joined Resideo Technologies, Inc., where I worked as a Senior Technical Accounting Manager until November 2021. I joined MoneyLion as Director of SEC Reporting in December 2021. At first, SEC Reporting was my sole role. Over time, I took on Technical Accounting and SOX Compliance roles, in addition to my SEC Reporting duties.

4. Specifically, my role at MoneyLion predominantly concerns (i) the preparation of MoneyLion's SEC filings; (ii) the design and implementation of SOX policies and procedures; and (iii) consultation with MoneyLion's Finance Department regarding complex accounting matters.

### MoneyLion's Obligation to Present a GAAP-Compliant 10-K

5. One of my first tasks when I joined MoneyLion in December 2021 was to prepare the company's annual 10-K filing. *See* DX204 (MoneyLion Form 10-K for fiscal year 2021). All financial data in a 10-K must generally be calculated in accordance with Generally Accepted

Accounting Principles ("GAAP").  GAAP is a common set of accounting rules, requirements, and practices recognized in the United States and issued by the Financial Accounting Standards Board and the Governmental Accounting Standard Boards.

6. To confirm that MoneyLion's financial statements complied with GAAP, I verified that in certain cases, unusual and previously un-reviewed transactions recognized revenue according to Accounting Standards Codification ("ASC") 606.  ASC 606 is a GAAP standard that requires the recognition of revenue as work is completed on a project.

7. When MoneyLion acquired Malka Media Group LLC ("Malka") on November 15, 2021 (the "Acquisition"), MoneyLion became responsible for reporting Malka's financials with its own, including from the date of the Acquisition through December 31, 2021 (the "Stub Period"). Because MoneyLion was not responsible for reporting Malka's financials prior to the Stub Period, my work on the 10-K focused exclusively on accounting during the Stub Period.

8. In order to fulfill MoneyLion's reporting requirements, I worked with Malka's then-Head of Finance, Matthew Basdekis, from January through March 2022 to prepare the 10-K.  Over the course of our work together, Mr. Basdekis informed me that during the Stub Period, Malka recognized revenue from contracts at invoicing.  Sometimes the invoices were issued as work performance obligations were satisfied (which would have complied with GAAP), while at other times they were not (which would not have complied with GAAP).  *See* DX428 at MoneyLion_01817988  (January 21, 2022 email from Matthew Basdekis, copying myself, in which Mr. Basdekis describes Malka's revenue recognition practices).  I do not know how often Malka's invoices were connected to project developments.

9. In an abundance of caution, to ensure that Malka's financials complied with MoneyLion's GAAP reporting requirements, Mr. Basdekis and I applied a "straight-line" methodology to

3

Malka's figures.  *See* JX070 at MoneyLion_01818125 (January 12, 2022 email from myself to Matthew Basdekis and others scheduling a call to discuss the approach to revenue recognition adjustments).  The straight-line method reallocated the recognition of revenue over time so that Malka recognized revenue evenly over the course of a contract.  For example, if a contract generated $100,000 in revenue for work performed over a ten-day period, the straight-line method would recognize $10,000 of revenue on each of the ten days.  Straight-lining is intended to approximate the recognition of revenue as work progresses on a project and, as a result, make the revenue recognition process GAAP-compliant.

10. To streamline processes going forward and integrate Malka's books and records with MoneyLion's accounting systems, I also worked with Mr. Basdekis to draft an ASC 606 memorandum outlining MoneyLion's revenue recognition policy.  DX194 at MoneyLion_01817291 (February 26, 2022 email from Matthew Basdekis to myself discussing the ASC 606 memorandum).  We included our straight-lining methodology in the memorandum.  Mr. Basdekis and I sent the memorandum to RSM, MoneyLion's auditor, which agreed that our proposed adjustments made Malka's financials GAAP-compliant.  DX428 at MoneyLion_01817988  (January 21, 2022 email from Brandon Hollis agreeing with my and Matthew Basdekis's straight-line methodology and requesting it be included in the ASC 606 memorandum).

### Development of the Straight-line Spreadsheet.

11. In January 2022, I worked with Mr. Basdekis to create a spreadsheet entitled "Malka Media Group LLC, Malka (Consolidated), Malka - Sales Orders Generated by Period November 1, 2021 - December 31, 2021," to apply the straight-line methodology to Malka's financials (the "Straight-line Spreadsheet").  DX471 at MoneyLion_01817376 (February 2, 2022 email from myself to

4

Brandon Hollis and others attaching the Straight-line Spreadsheet). The Straight-line Spreadsheet included 26 columns. The first 16 columns (columns A through Q) contained revenue recognition details for Malka projects from November 15, 2021, through December 31, 2021, including amounts billed, billing schedules, and project dates, among other things. Mr. Basdekis populated these columns with Malka's accounting figures. The last 10 columns (columns R through Z) contained formulas that I helped create that converted the figures from columns A through Q to straight-line revenue recognition.

12. I relied on Mr. Basdekis to populate the Straight-line Spreadsheet with the correct figures from Malka's accounting books. I did not scrutinize or independently verify the Malka figures supplied by Mr. Basdekis, as doing so would have been a burdensome exercise beyond the scope of my responsibilities. In any event, at the time I did not have access to Malka's NetSuite Instance, the database where Malka houses its contractual data, to conduct such a review. At the time, I had no reason to doubt the authenticity of Malka's numbers and only considered them within the narrow scope of my responsibility to prepare MoneyLion's SEC filings.

### The Straight-line Spreadsheet Related Only to SEC Reporting.

13. The only purpose of the Straight-line Spreadsheet was to prepare Malka's accounting numbers for inclusion in MoneyLion's 10-K filing. DX470 at MoneyLion_01823827 (February 8, 2022 email from myself to Brandon Hollis, stating "Attached please find . . . an excel I have been working on to develop the Opening Balance Sheet ("OBS") for 10-K disclosure"). My work with Malka's financial figures occurred after the Acquisition and was limited to the narrow scope of considering those financials in the context of MoneyLion's broader SEC filing obligations.

14. I did not review any provisions of the November 15, 2021 Membership Interest Purchase Agreement (the "MIPA") concerning Malka's revenue recognition practices, including Schedules

5

A or B, until 2023, well after Mr. Basdekis and I created the straight-line methodology for Malka's financials in January and February 2022. Because I joined MoneyLion in December 2021, after the November 15, 2021 Acquisition, I had no personal knowledge of any discussions with or representations by Jeffrey Frommer, Louis Krubich, Dan Fried, and Pat Capra (the "Sellers") during the course of the diligence and negotiations preceding the Acquisition. As a result, I did not, and could not, verify whether Sellers complied with the terms of the MIPA after the Acquisition. Instead, I simply conformed the Malka figures provided to me by Mr. Basdekis in the narrow context of my work concerning MoneyLion's SEC reporting obligations.

### Earnout Valuations

15. Sometime in early 2022, I learned that Sellers could seek stock compensation if Malka achieved certain revenue and EBITDA metrics in 2021 and 2022 (the "2021 Earnout" and the "2022 Earnout", collectively the "Earnout Payments"). I was not directly involved in calculating the 2021 and 2022 Earnout Payments.

16. MoneyLion retained CFGI to calculate the fair value of the contingent consideration of the Earnout Payments for inclusion in MoneyLion's financials. In order to calculate these valuations, CFGI sent requests for accounting information to MoneyLion every quarter. I relayed those requests to the appropriate personnel within MoneyLion's Finance Department. After the relevant MoneyLion employees populated Malka figures in CFGI's valuation model, I performed a high-level, "clerical" review, in which I reviewed the form of the model for clerical errors. For example, I checked to see that variables that were applied as described (*e.g.*, if the document said there was a 5% discount rate, I would verify that a 5% discount rate was applied). I then sent the requested information back to CFGI. *See, e.g.*, DX468 at MoneyLion_01817787 (February 4, 2022 email from myself to Chris Murphy and others, in which I provide "the opening balance sheet" to

"finalize the valuation and related intangibles"). I never performed any audit or forensic accounting of the requested financials and information, as doing so would have been beyond the scope of my responsibility and authority.

The foregoing is true and correct to the best of my knowledge and belief.

Dated at New York, New York this 19th day of December, 2024

_____
Michael Scalia

Virginia
Prince William County

Subscribed and sworn before me
this 19th day of December, 2024

_____
Notary Public
Commission Expires: 01/31/2025



Notarized remotely online using communication technology via Proof.

8

DX-598.008