**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED AND PAT CAPRA**,**

                                        Plaintiffs,

- *against* –

MONEYLION TECHNOLOGIES INC. AND
CONTINENTAL STOCK TRANSFER & TRUST
COMPANY,

                                        Defendants,

MONEYLION TECHNOLOGIES INC.**,**

                            Counterclaim Plaintiff,

- *against* –

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

                            Counterclaim Defendants,

MONEYLION INC.,

                                Third-Party Plaintiff,

- *against* –

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

                            Third Party Defendants.

**Case No. 1:23-cv-06339-JMF**

## **TRIAL AFFIDAVIT OF MARK TOROSSIAN[1]**

---

[1] Cited herein are true and correct copies of written communications and their attachments, sent or received by me on or about the dates indicated in the documents.

MoneyLion's Exhibit
No. 1:23-cv-06339-JMF
DX-599

Mark Torossian, being duly sworn, deposes and states:

1.      This affidavit serves as my direct testimony at the trial in this matter.

2.      My name is Mark Torossian.  I am the Chief Accounting Officer of MoneyLion Inc. and its wholly owned subsidiary, MoneyLion Technologies Inc. (together, "MoneyLion").

## Background

3.      I received my Bachelor's Degree in Public Accounting from Pace University in 2005, and my Master's Degree in Finance from Pace University in 2010.  After graduating from college in 2005, I worked at Merrill Lynch in various finance roles.  Beginning in 2008, I worked at BNY Mellon in various finance roles, and ultimately became the Chief Financial Officer of the Americas division of Asset Servicing.  In 2020, I became Senior Vice President of Finance at OnDeck Capital.  In 2021, I became the Chief Accounting Officer of Salt Blockchain.

4.      I joined MoneyLion in January 2022 as Chief Accounting Officer, and was subsequently appointed as Principal Accounting Officer (as required by Section 16 of the Securities Exchange Act) in April 2022.  As Chief Accounting Officer, I report directly to MoneyLion's President, Chief Financial Officer, and Treasurer, Richard Correia.  I also supervise several subordinates, including Gary Fishler, MoneyLion's Corporate Controller, and Michael Scalia, MoneyLion's Director of U.S. Securities and Exchange Commission ("SEC") Reporting, Technical Accounting, & Sarbanes-Oxley Act Compliance.  Finally, I oversee MoneyLion's engagement of outside auditors and valuation specialists.

5.      As Chief Accounting Officer, I am responsible for ensuring that MoneyLion reports its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"),

DX-599.002

which are a set of accounting rules and standards that ensure the accuracy and consistency of financial reporting across various industries in the United States.

6.      A key component of GAAP is ***accrual accounting***, which governs how companies recognize revenue and expenses.  Accrual accounting requires that a company recognize revenue in the period when it is earned, and recognize expenses in the period when they are incurred.  This practice facilitates corporate transparency by preventing a company from painting a misleading picture of revenue and cost trends, such as by strategically booking revenue and expenses in different time periods.

7.      The Accounting Standards Codification ("ASC"), which I would describe as a GAAP Handbook, contains specific policies addressing particular types of accrual accounting, including a policy known as Topic 606 ("ASC 606").  ASC 606 requires that revenue earned from contracts be recognized as the work required by the contract is performed.  For example, if a company received a $100,000 contract in January for work that would not be performed until June, the Company would be prohibited from recognizing the revenue until June.

8.      ASC 606 is designed to prevent companies from artificially inflating revenue and profitability.  This is particularly important when contracts are awarded and performed in separate fiscal periods.  Without ASC 606, a company could "cram" revenue for a multi-period contract into a single time period, which would artificially inflate that period's purported profitability.  By tying the recognition of revenue to the completion of work, ASC 606 standardizes the timing of revenue recognition and prevents gamesmanship.

DX-599.003

**Post-Acquisition Integration of Malka**

9.      I joined MoneyLion on January 31, 2022, after its November 15, 2021 acquisition of Malka Media Group LLC ("Malka") (the "Acquisition").  As a result, I was not involved in any of the diligence or negotiations preceding the Acquisition, and have no personal knowledge of any of the representations made by Jeffrey Frommer, Louis Krubich, Dan Fried, or Pat Capra (the "Sellers") during that time.  I was, however, involved in the post-Acquisition work required to integrate Malka's accounting records with MoneyLion's financial statements.  This type of accounting integration is typical following an acquisition.

10.      Following the Acquisition,  MoneyLion was required to include Malka's financials in MoneyLion's public SEC filings.  For the 2021 fiscal year, MoneyLion was only required to report Malka's financial information for the six-week period during which Malka was formally part of MoneyLion: November 15, 2021 to December 31, 2021 (the "Stub Period").

11.      As Director of SEC Reporting, Michael Scalia was tasked with ensuring that Malka's revenue from the Stub Period was adjusted to comply with MoneyLion's public reporting requirements for the 2021 fiscal year.  I understood that Mr. Scalia worked with Malka's then-Head of Finance, Matthew Basdekis, to apply a "straight-line" methodology to Malka's financials for the Stub Period, which reallocated the recognition of revenue evenly over the course of a contract. Although I was aware of the Stub Period straight-lining exercise that Mr. Scalia performed with Mr. Basdekis, I did not substantively evaluate or participate in the straight-lining exercise.

12.      The sole purpose of Mr. Scalia's straight-lining exercise was to ensure that Malka's revenue from the Stub Period conformed to MoneyLion's public filing requirements.  I never

4

instructed Mr. Scalia to examine whether Malka's Stub Period revenue recognition was consistent with the accounting principles set forth in the November 15, 2021 Membership Interest Purchase Agreement ("MIPA"). Nor did I ever ask Mr. Scalia to review any revenue outside of the six-week Stub Period, as that would have been beyond the scope of our public reporting requirements.

### The 2021 Earnout

13.    The MIPA provided that Sellers would receive contingent consideration if Malka achieved certain revenue and profitability metrics during the 2021 and 2022 fiscal years. Specifically, Sellers would receive $10,000,000 if Malka recorded a total of at least $25,000,000 in revenue and $100,000 in EBITDA during the 2021 fiscal year (the "2021 Earnout"). Sellers would also receive an additional $25,000,000 if Malka recorded at least $30,000,000 in revenue and $100,000 in EBITDA during the 2022 fiscal year (the "2022 Earnout").

14.    In March 2022, I was not involved in reviewing or performing the 2021 Earnout calculation. However, I later became aware that the data Sellers submitted for the 2021 Earnout showed that Malka had recorded $30,806,976 of total revenue and $921,497 of EBITDA for the 2021 fiscal year. In addition, Sellers included a purported $890,905 tax credit in their calculation, which further increased Malka's EBITDA above the necessary $100,000 threshold to trigger the 2021 Earnout. Based on these reported metrics, I understand that Malka received the full 2021 Earnout on March 15, 2022. *See* DX512 at MoneyLion_01851278 (attachment to May 15, 2023 email from Erika Nuno to myself, Adam VanWagner, Richard Correia, and Ben Probber).

15.    At the time the 2021 Earnout was issued, I did not audit, nor did I instruct anyone on my team to audit, Malka's reported 2021 income statement for compliance with the MIPA. I had

5

no personal knowledge of any representations made in the MIPA, as I had only joined MoneyLion on January 31, 2022.  I had no reason to suspect that Malka was misrepresenting its accounting figures.  If I had any reason to believe that Sellers had submitted inaccurate or fraudulent financial data to obtain the 2021 Earnout, I would have immediately reported the issue to Mr. Correia or Mr. Choubey.

### Sellers Mask Their True Accounting Practices from MoneyLion in 2022

16.    Following the issuance of the 2021 Earnout, as part of my duties as Chief Accounting Officer, I received periodic updates from Sellers on Malka's financial performance, as is typical in any parent-subsidiary corporate relationship.  These reports typically included (i) detailed spreadsheets and raw data exported from Malka's NetSuite; and (ii) periodic presentations from Malka management (including Mr. Frommer) on its financial trends.  However, neither I nor anyone else in MoneyLion's accounting or finance department required access to the underlying raw data stored on Malka's NetSuite accounting system.  The only reason that we would have needed direct access to Malka's NetSuite is if we did not trust the Sellers to provide us with accurate data from NetSuite.  Until December 2022, I had no reason to suspect that Sellers could not be trusted to report their own finances accurately.  I would never have considered bypassing Malka management and auditing Malka's NetSuite directly, especially given that MoneyLion generally allowed Malka to operate autonomously.

17.    I have reviewed a log identifying individuals and the dates on which they obtained access to Malka's NetSuite, and I have confirmed that neither I nor any of my subordinates in the MoneyLion accounting department had credentials to access Malka's NetSuite system until

6

December 19, 2022.  *See* JX99 at MoneyLion_01842888 (December 19, 2022 Slack between Erika Nuno and myself, in which I report that Gary Fishler is "getting access to netsuite today.");  DX505 at Row 408 (NetSuite Access Logs showing that Mr. Fishler was the first MoneyLion finance or accounting department employee to receive access to NetSuite, on December 19, 2022).[2]

18.    As a result, throughout 2022, my team and I trusted Malka to accurately record and calculate its own financial data for the purposes of the 2022 Earnout.  For example, in an August 2022 email chain, Mr. Basdekis circulated an Excel spreadsheet, generated from NetSuite, to provide MoneyLion with an update on Malka's purported progress towards the 2022 Earnout.[3]  DX239 at MoneyLion_0176084 (August 31, 2022 email from Matt Basdekis to myself, Erika Nuno, Michelle Lee, and Sellers, attaching "NonGAAP Income Statement – MMG YTD July 2022.").  These types of emails were representative of some of the financial "updates" we received from Malka in 2022.  Once a month, I also met with Mr. Basdekis, Mr. Correia, Ms. Nuno, Mr. Frommer, and, sometimes, Mr. Krubich for monthly financial updates where we discussed Malka's status, including Malka's GAAP financial results.  Neither I nor anyone else in the accounting department would have been able to verify the figures (or the methodology on which they were based) because we did not have access to Malka's NetSuite.

---

[2] Based on the log I reviewed, the only employee with a MoneyLion email address to receive access to Malka's NetSuite prior to Mr. Fishler was Julie Levin (who was formerly employed in MoneyLion's Marketing department), who appears to receive credentials on May 2, 2022.  DX505 at Row 351.  Ms. Levin ceased working at MoneyLion in June 2022, never worked in MoneyLion's Finance or Accounting departments, and I never spoke with her about Malka's accounting practices. I do not know why or under what circumstances Ms. Levin was granted this access.

[3] The spreadsheet attached by Mr. Basdekis claimed that Malka had posted, as of August 2022, an EBITDA of $621,953.  DX239.

7

19.     With regard to Mr. Basdekis's periodic "NonGAAP Income Statements," it was always my understanding that Malka was permitted under Schedule B of the MIPA to record certain non-GAAP items for the purposes of its Earnout calculations, such as intercompany revenue. Accordingly, when Malka personnel referred to "non-GAAP" accounting from time to time, I understood them to be referring to financial data that included the specific line-item adjustments permitted under the MIPA for the sole purpose of the Earnout.  Prior to late 2022, however, I never suspected that Sellers were using an entirely different set of non-GAAP accounting principles (including wholly non-GAAP revenue recognition policies) for the purposes of calculating their Earnouts.

20.     Sometime after the 2021 Earnout was issued, I became aware that Malka's NetSuite was configured to recognize revenue at the time of invoicing.  *See* DX220 at MoneyLion_01828110 (May 19, 2022 email from Matthew Basdekis, in which Mr. Basdekis informed me that "[t]he way our NetSuite was set up was to push through rev rec entries automatically when an invoice is created, to recognize revenue as billed based on historical accounting principles.").  Nothing in Mr. Basdekis' email indicated to me that Malka's default practice was to issue invoices without regard to whether or when work was performed, including for work that had not even started.  I interpreted Mr. Basdekis's comment as indicating that Malka sent invoices as work occurred on a project, which would automatically recognize revenue in compliance with GAAP.  Through the middle of 2022, I continued to believe that most of the time, Malka issued invoices as work on a project developed, although I understood that it sometimes issued invoices at the time of contracting for noncancelable cash deposits.

8

21.    I did not fully understand Sellers' fraudulent accounting practices (and certainly not the extent to which they wholly diverged from GAAP) in 2022.  Until at least late 2022, I believed that Sellers' post-Acquisition accounting followed GAAP except for the specific, minor deviations identified in Schedule B.    *See* JX65, at DLA_006266 (MIPA Execution Version, Schedule B) (requiring that EBITDA, for the purposes of the Earnouts, be calculated "in accordance with U.S. GAAP (including the Company's historical revenue and cost recognition principles) as reviewed or audited by [MoneyLion's] independent accountants.").  Sellers' policy of recognizing revenue before performing any work (including work that would not start until months later and in the following fiscal year) did not comply with GAAP or Section B of the MIPA.

## My Investigation of Sellers' Accounting Practices

22.    On December 8, 2022, MoneyLion held its 2022 "investor day" presentation ("Investor Day").  As part of Investor Day, Malka and MoneyLion agreed that Malka would perform various marketing services for MoneyLion, including the creation of videos, presentations, and graphic designs.

23.    When Malka performed services for MoneyLion, Malka recorded the payment it would charge to MoneyLion as intercompany revenue.  Typically, this type of intercompany revenue is excluded from a GAAP income statement.  However, under Schedule B of the MIPA, Malka was permitted to consider intercompany revenue (i.e., revenue received from MoneyLion) in its calculation for the 2022 Earnout.  *See* JX65, at DLA_006266 (stating that "[n]o adjustment will be made for intercompany adjustments made between the [Malka] and [MoneyLion].").  Schedule B also allowed Malka to include the difference between the "fair market value" of its intercompany

9

services and the actual charges to MoneyLion in its Earnout calculation.  JX65, at DLA_006266. For example, if Malka performed $100,000 of *bona fide* and authorized work for MoneyLion, but only charged MoneyLion $25,000, Malka could add $75,000 to its revenue for purposes of the Earnout.

24.     Prior to Investor Day, I understood that MoneyLion and Sellers had agreed to a $150,000 budget for Malka's services.  *See* DX271 at MoneyLion_01842993 (December 16, 2022 Slack chat between myself, Rick Correia, Dee Choubey, and Erika Nuno).  In this December 16, 2022 chat, Mr. Choubey asked what Malka's budget was for the event.  I told Mr. Choubey that I understood the budget to be $150,000, but that Sellers had already exceeded their $150,000 budget. DX271 at MoneyLion_01842993.

25.     Soon after, I learned that Sellers had billed more than *twice* the authorized amount to MoneyLion in connection with Investor Day.  *See* DX514 at MoneyLion_01842285 (December 18, 2022 Slack chat between myself and Erika Nuno, in which I informed Ms. Nuno that Sellers had already submitted $310,000 in Investor Day expenses).  This made me concerned as to whether Sellers were seeking to inflate their revenue by overcharging MoneyLion for internal corporate work that MoneyLion had not authorized.

26.     On or about December 15, 2022, I spoke with Mr. Correia about the Investor Day overcharges.  I shared my concern with Mr. Correia that Sellers were attempting to improperly inflate their intercompany revenue in order to achieve the 2022 Earnout.  Mr. Correia instructed me to conduct a "forensic accounting" of Malka's revenue and expenses to ensure that the 2022 Earnout was calculated correctly.  *See* JX98 at MoneyLion_01842730 (December 16, 2022 Slack chat between myself and Erika Nuno, in which I described my "forensic work").  In my experience,

10

"forensic accounting" is a type of investigation that is employed when there is reason to suspect that financial data may be unreliable or fraudulent. In referring to my work as "forensic," I was expressing the fact that I had lost faith in Sellers' self-calculated financials.

27.     As part of my forensic investigation, I found several of Sellers' accounting practices to be concerning. For example, I observed that Sellers were "billing" MoneyLion for the cost of salaried Malka employees who worked on MoneyLion projects at margins well beyond the actual cost of those employees. This practice violated a key principle of Schedule B, which only permitted Malka to recognize into revenue, for the purposes of the Earnout calculations, the "fair market value" of the services it provided to MoneyLion.

28.     In the course of my investigation, I also realized that Sellers were billing MoneyLion for the cost of Malka employees who were *also* performing services for Malka's external clients. I viewed this as improper, as Malka was effectively "double-billing" MoneyLion.

29.     As my investigation proceeded, I determined that Sellers' improper accounting practices were widespread and systematic. Among other things, MoneyLion had improperly "double-billed" MoneyLion for hundreds of thousands of dollars. *See* DX515 at MoneyLion_01845876 (January 3, 2023 Slack Chat between myself and Mr. Fishler, in which I reviewed data from Malka's NetSuite and expressed my view that the data "insinuates we are being double-billed").

30.     In addition, I began to notice a concerning trend in Sellers' intercompany "charges" to MoneyLion. Specifically, I observed an unusually significant uptick in Sellers' invoices to MoneyLion beginning in September 2022. *See* JX98 at MoneyLion_01842732 (December 16, 2022 Slack chat in which I explained to Ms. Nuno that I was "breaking the [intercompany] invoices out

11

by month and you will see how things start to ramp up and what starts happening in [S]eptember onwards."). This increase in invoices appeared to correspond with the fact that Sellers' GAAP-reported EBITDA noticeably declined in the same quarter, putting Sellers at risk of not achieving the Earnout. In addition, the data that I was seeing conflicted with the trends Mr. Frommer had described to me. In previous conversations (specifically our periodic financial updates), Mr. Frommer had emphasized that Malka's best quarter was always the fourth quarter of the year. But Malka's fourth quarter GAAP numbers showed the opposite. The sudden and unexplained increase in "invoices" to MoneyLion as Malka approached the end of the fiscal year (even as Malka showed relatively poor performance under GAAP) further heightened my suspicion that Sellers were seeking to improperly inflate Malka's profitability at the end of 2022 in order to achieve their minimum revenue and EBITDA thresholds for the 2022 Earnout.

### The 2022 Earnout

31.    In light of these developments, I decided that I could no longer trust the accuracy of any data provided by Sellers. I therefore directed Gary Fishler to obtain access to Malka's NetSuite program on December 19, 2022. *See* JX99 at MoneyLion_01842889. I then instructed Mr. Fishler to generate his own reports within Malka's version of NetSuite, rather than relying on the information provided by Sellers. I asked Mr. Fishler to request access because I wanted to keep my forensic investigation covert at this point. If I had directly requested access, it might have alerted the Sellers that I was scrutinizing their accounting practices.

32.    At all points in time, I and the other MoneyLion team members were committed to calculating Malka's 2022 financial figures fairly and to determining objectively whether Sellers had

achieved the 2022 Earnout.  I was never instructed by any person at MoneyLion to deny Malka the 2022 Earnout.  Indeed, as I informed Ms. Nuno, "***if the answer [was] they got it, they got it, if they didn't, they didn't.***"  DX513 at MoneyLion_01842897 (December 20, 2022 Slack chat between myself and Ms. Nuno).  In the same chat, I also stated that "***as a fiduciary I am not just going to accept what someone sends.***"  DX513 at MoneyLion_01842897.  This reflected my understanding that as a MoneyLion employee, I had a fiduciary obligation to the MoneyLion shareholders to ensure that the figures used to determine whether Sellers had achieved the 2022 Earnout complied with the GAAP-based system of accounting required by Schedule B.

33.    On January 25, 2023, I asked Mr. Basdekis to provide me with Malka's 2021 non-GAAP income statement, which I understood to reflect the adjustments allowed by Schedule B.  Mr. Basdekis provided me with a 2022 income statement produced using Malka's internal accounting metrics.  *See* JX102 at MoneyLion_01820691 (January 25, 2023 email between myself and Mr. Basdekis, in which I requested Malka's full-year 2021 income statement).  Mr. Basdekis's reply copied Mr. Frommer, Mr. Krubich, and Mr. Fried, which I found to be strange, as I had not copied the Sellers on my initial email.  JX102 at MoneyLion_01820688.  Mr. Basdekis's inclusion of Sellers in his response indicated to me that the Sellers were concerned and trying to control the flow of information.  The spreadsheet attached by Mr. Basdekis showed that there was a surprising difference between Malka's EBITDA as calculated for Malka's *actual* 2022 GAAP-reported financials and Malka's self-calculated EBITDA under Schedule B:

**Figure 1**



| N | O | P | Q | R | S |
|---|---|---|---|---|---|
| **22 Earnout** | | **22 As Reported** | | **Difference** | |
| $1,492,712.89 | | ($602,367.27) | | $2,095,080.16 | |

DX-599.013

34.     As shown in **Figure 1,** excerpted from JX102 at MoneyLion_01820691, Mr. Basdekis's spreadsheet indicated that there was a **$2 million dollar difference** between Malka's self-calculated Earnout statement and its GAAP-reported financial statements.  I immediately escalated this to Mr. Correia and indicated that I would "do a deeper dive on this."  JX102 at MoneyLion_01820691.  By this, I meant that I would examine why Malka claimed to have posted a near-$1.5 million profit, when our reported financials indicated Malka was unprofitable by a significant measure.

35.     In light of these developments, in addition to my previous concerns regarding Sellers' improper intercompany billing practices, I also began to question whether Sellers' accounting practices involved more systematic (and troubling) deviations from Schedule B.  I began to work closely with Mr. Basdekis to examine how Sellers could claim that Malka was profitable when its GAAP-based statements showed it to have incurred significant losses.

36.     During my subsequent conversations with Mr. Basdekis, I was surprised to learn that Sellers had issued a significant number of invoices in late 2022 for work that would occur throughout 2023, which they recorded as revenue for 2022.  Mr. Basdekis provided me with a spreadsheet explaining the impact of this practice in a February 26, 2023 Slack Chat, DX456 at MoneyLion_01815903:

14

**Figure 2**

| Project | Doc Number | Start | End | Billed in 2022 | Total Deal Size | Defered to 2023 |
|---|---|---|---|---|---|---|
| ITK Eats Recipe Videos S02 2023 | SO-N-0981 | 12/12/2022 | 3/31/2023 | 199,000 | 199,000 | (162,818) |
| 2022 KG Certified Custom Content | SO-N-0344 | 1/1/2023 | 12/31/2023 | 500,000 | 1,000,000 | (500,000) |
| 2023 EBB Sizzles Q1-Q4 | SO-M-1306 | 1/10/2023 | 10/30/2023 | 30,120 | 120,480 | (30,120) |
| Path to Net Zero Video | SO-M-1331 | 12/5/2022 | 1/11/2023 | 90,000 | 90,000 | (26,053) |
| G-League Ignite Content Series | SO-M-1333 | 12/9/2022 | 4/30/2023 | 150,000 | 150,000 | (125,874) |
| HR OneProfile Launch Retainer 2022-202 | SO-M-1343 | 12/15/2022 | 2/28/2023 | 75,000 | 75,000 | (58,224) |
| Skills Guild Customer Testimonials | SO-M-1351 | 12/27/2022 | 4/28/2023 | 100,000 | 100,000 | (95,935) |
| Branding & Design | SO-M-1353 | 12/29/2022 | 2/28/2023 | 62,805 | 125,610 | (56,727) |
| Samsung Branded Store Pop-Up San Fran | SO-M-1360 | 12/21/2022 | 1/31/2023 | 53,640 | 53,640 | (39,591) |
| Ninja Double Oven Video Production 202 | SO-M-1361 | 12/8/2022 | 3/27/2023 | 129,255 | 258,510 | (72,853) |
| With Authority Pilot | SO-N-0351 | 11/9/2022 | 2/28/2023 | 81,205 | 81,205 | (42,778) |
| | | | | | Total | (1,210,973) |

37.    **Figure 2** (excerpted from the spreadsheet attached at DX456 at MoneyLion_01819506) revealed to me that Malka had billed over **$1.2 million** in November and December of 2022 for work that largely would not even be performed until 2023. I was alarmed by this discovery, as I communicated to Mr. Basdekis. DX456 at MoneyLion_01819503 (in which I asked Mr. Basdekis: "all the billed invoices in November and December of 2022, are those for work that will be done in 2023?").

38.    I was concerned by the information that Mr. Basdekis shared with me. As discussed, *supra*, at Paragraph 30, I had already observed that Malka appeared to issue an unusually large number of invoices at the end of the fiscal year. By issuing those invoices at the end of 2022, Malka recognized the revenue associated with these contracts, while deferring the costs associated with that work until 2023. This would artificially inflate Malka's profitability for the 2022 fiscal year, because Malka would recognize the revenue received from contracts without subtracting any of the associated costs. This was the first time I fully appreciated the scale of Sellers' improper accounting practices.

15

39.     My work with Mr. Basdekis also led me to realize that Malka's use of GAAP accounting  (which was the default rule under the MIPA) was virtually non-existent.  As I learned from Mr. Basdekis, Malka's practice was to record future revenue **regardless** of whether the client provided an advance deposit—meaning that the client was free to cancel the work entirely.  I was confused by this practice, as reflected in my other questions to Mr. Basdekis.  *See* DX456 at MoneyLion_01819503 "(W]hat happens if a client decides they don't want to do that project? Do you refund them what they paid?").

40.     Having learned that Malka had been obviously failing to follow basic GAAP principles, I paid careful attention to ensuring that the 2022 Earnout was calculated in compliance with Schedule B.  I began with Malka's internal financials, which, after removing revenue improperly booked by Sellers in 2022, included $41,611,577 in total revenue and *negative* $849,599 in EBITDA.

41.     I then made two adjustments to Malka's as-reported financials.  First, I subtracted $218,170 in revenue billed by employees who worked for Malka's external clients, but whose full-time salary and benefits were paid by MoneyLion.  This corrected for Sellers' practice of "double-billing" employees to both MoneyLion and external clients.  Second, I added the cost of $544,500 in bonuses that were paid to Malka employees, at Sellers' discretion, out of the MoneyLion company-wide bonus pool.  This, too, corrected for employee costs that were not included in Malka's income statement.

42.     I next applied the lone exception to GAAP-based revenue recognition contemplated by Schedule B: Malka's receipt of noncancellable cash deposits.  However, in my review, I discovered that Malka virtually never required noncancellable cash deposits in order to issue

16

invoices. Instead, Sellers agreed to work orders without any deposit, and then issued invoices at their discretion.

43.     Finally, I reviewed individual line items of Schedule B and made adjustments accordingly, including the difference between the intercompany revenue charged by Malka (which, as discussed below, was marked up significantly) and the fair market value of that intercompany revenue.

44.     My independent calculation revealed that, contrary to Sellers' self-calculated claims of profitability, Malka had achieved a *negative* EBITDA for 2022, even after accounting for the adjustments permitted by Schedule B. As a result, I determined that Sellers did not qualify for the 2022 Earnout. *See* JX106, MoneyLion_02038246 (showing a detailed analysis of my 2022 Earnout calculation).

45.     On April 14, 2023, I formally notified Sellers on behalf of MoneyLion that they had failed to qualify for the 2022 Earnout. *See* JX112 at MoneyLion_01826072 (April 14, 2023 letter from myself to Sellers, attaching 2022 Earnout Statement**).**

17

**Sellers' Embezzlement of MoneyLion Funds**

46.      As part of my investigation, I also examined several suspicious expenses that were charged by the Sellers to their corporate credit cards.  I discovered that Sellers had been systematically using those cards for personal expenses, and then paying the card statements with MoneyLion corporate funds.  Sellers used the misappropriated funds for a variety of obvious personal expenses, including lavish travel charges that lacked any legitimate business purpose. Notable examples include (i) Frommer's airfare to the Qatar World Cup; (ii) trips to the NFL Super Bowl; and (iii) numerous travel expenses for family members, including Mr. Frommer's wife and children.[4]  *See, e.g.* DX463 at MoneyLion_01844249 (showing November 14, 2022 charge for $7,923 for Qatar Airways) (Figure 3):

**Figure 3**



47.      I later learned that Sellers had also been using MoneyLion funds to pay for personal legal services.  DX342 at MoneyLion_02038654 lists the total amount of disbursements that MoneyLion made to Sellers' personal legal counsel, Fox Rothschild.  While Fox Rothschild served as Malka's corporate counsel during the Acquisition, it also provided personal legal services to the

---

[4] I have reviewed the expenses listed at: DX 256; DX 463, DX 261, and DX 463 and confirmed that each of these expenses was charged to MoneyLion during the listed date.

DX-599.018

Sellers after the Acquisition.  These personal legal services were paid using MoneyLion funds, and totaled over $140,000.[5]  In addition, Mr. Fried charged MoneyLion $2,000 of personal accounting expenses incurred by Ryan Curran.[6]

48.    I subsequently informed Mr. Correia that Sellers appeared to have engaged in widespread misappropriation of MoneyLion corporate funds for personal use.  Mr. Correia later informed me that Sellers were being terminated, in part, for this misconduct.

### MoneyLion Revisits the 2021 Earnout & Closing

49.    The MIPA enabled Sellers to challenge MoneyLion's 2022 Earnout statement. Sellers submitted their objections on May 25, 2023.  MoneyLion's legal team subsequently forwarded these objections to me.  *See* DX516 at MoneyLion_01848259 (May 25, 2023 email from Geoffrey Young to Adam VanWagner, attaching correspondence) (the "Earnout Objections").

50.    In their Earnout Objections, Sellers took the position that the MIPA permitted them to use an entirely non-GAAP set of "historical revenue recognition principles" that allowed Sellers to recognize revenue as they saw fit.  Most notably, Sellers claimed that the starting point for my

---

[5] Sellers charged a total of $140,853.23 in Fox Rothschild to MoneyLion for personal legal services following the Acquisition.  *See* DX 342 MoneyLion_02038654 (showing total invoice amounts).  For individual invoices, *see* DX 198 at MoneyLion_02008388; DX 214 at MoneyLion_02008393; DX 218 at MoneyLion_02008400; DX 224 MoneyLion_02008411;  DX  225  MoneyLion_02008414;  DX  228  MoneyLion_02008417;  DX  237  at MoneyLion_02008423;  DX  236  at  MoneyLion_02008420;  DX  248  at  MoneyLion_02008425;  DX  185  at MoneyLion_02038643;  DX  222  MoneyLion_02008404;  DX  223  at  MoneyLion_02008407;  DX254  at MoneyLion_02008428;  DX  255  at  MoneyLion_02008432;  DX  267  MoneyLion_02008435;  DX  268  at MoneyLion_02008440;  DX  289  at  MoneyLion_02008443;  DX  290  at  MoneyLion_02008448;  DX  292  at MoneyLion_02008459;  DX  291  at  MoneyLion_02008452;  DX  301  at  MoneyLion_02008464;  DX  302  at MoneyLion_02008467; DX 186 at MoneyLion_02038649; DX 190 at MoneyLion_02038651.  I have reviewed these invoices and confirmed that MoneyLion paid each invoice.

[6] *See* DX 210 at CURRAN-0001728.  DX 210 reflects an April 2022 $2,000 invoice that was paid by MoneyLion for services including personal tax returns.  The invoice was addressed to an individual residing at 7 East 14th St, Apt 1102, New York, NY 10003.  DX 93 at MoneyLion_00981800 shows that Mr. Fried resides at this address.

calculations (before adjustments)—MoneyLion's 2022 GAAP-based revenue and EBITDA figures—was wrong. Instead, Sellers argued that "the Company's historical principles are the proper starting point" for the Earnout calculation—not GAAP. Sellers then argued that, under Malka's "historical revenue recognition principles," Malka's revenue (and thus EBITDA) would have been $895,517 higher than what I had determined under GAAP. DX516 at MoneyLion_01848268. Sellers' position, as expressed in their Earnout Objections, appeared to be that **_there were no rules_** under Schedule B. In effect, Sellers took the position that they could recognize revenue without performing work **_or_** receiving cash deposits.

51.    Sellers' suggestion that they wholly failed to comply with GAAP and instead relied upon non-GAAP "historical" principles to prepare their financial statements raised questions as to whether Sellers' pre-2022 financial statements were accurate. As a result, in June 2023, I, with members of MoneyLion's accounting department, revisited Malka's 2021 Earnout statement, which had been approved in early 2022 by MoneyLion's finance department.

52.    In analyzing Malka's 2021 Earnout statement, I made certain adjustments to conform Malka's 2021 financials to Schedule B. My June 2023 analysis determined that Malka had not even come close to meeting the criteria for the 2021 Earnout. Indeed, my June 2023 recalculation showed that in contrast to the $921,497 positive EBITDA reported by Malka in March of 2022, Malka's actual 2021 EBITDA was in fact **_negative_** $929,471**.**

53.    I reported the findings of my initial recalculation in June 2023 to Mr. Correia. I understand that subsequently MoneyLion restricted Sellers' already-issued 2021 Earnout shares based on my determination that Sellers were ineligible for the 2021 Earnout, and had therefore dishonestly obtained the 2021 Earnout using improper calculations.

54.    My recalculation of Malka's 2021 performance (current as of October of 2023) was included in MoneyLion's Supplemental Responses and Objections to Plaintiffs' Amended Second Set of Interrogatories, dated June 14, 2024, reproduced here as **Figure 4** for ease of reference.

**Figure 4**

| 2021 Earnout Adjustments[7] | | | |
|---|---|---|---|
| | **Revenue** | **EBITDA** | **Explanation** |
| **Original 2021 Earnout Calculation (As Reported By Malka – March 2022)** | | | |
| | 30,806,976 | 921,497 | |
| **2023 Adjustments** | | | |
| NJ Tax Credit | | No Credit Expected[8] | |
| FMV of Intercompany Revenue | | | |
| GAAP Expense Entries (COGS) | | (315,747) | Expenses relating to the cost of goods sold (COGS) that were improperly excluded from 2021. |
| GAAP Expense Entries (Non COGS) | | (336,041) | Expenses not relating to the cost of goods sold (Non COGS) that were improperly excluded from 2021. |
| 2021 Sales Exclusions | (1,094,132) | (1,094,132) | Sales orders should have been recognized in other years, but |

---

[7] These calculations were made before MoneyLion engaged a team of outside forensic accountants as part of this litigation, who have supplied updated calculations through expert discovery.

[8] As discussed below, Malka indicated that it had been "approved" for an $890,905 New Jersey Tax Credit in 2021. At the time that I performed these calculations, Malka still had not received the tax credit. Accordingly, I determined that there was no "expected recognition" of the 2019 tax credit during the 2021 fiscal year.

DX-599.021

| | | | |
|---|---|---|---|
| | | | were improperly recognized as occurring in 2021.[9] |
| 2020 Sales Inclusions | 362,587 | 362,587 | Revenue that was improperly recognized in 2020, but should have been recognized in 2021. |
| Proximo Adjustments | (504,422) | (504,422) | Specific adjustments for Proximo projects that did not begin until 2022. |
| Hillview Medical Adjustments | (158,926) | (158,926) | Specific adjustments for income received as part of a settlement and promissory note arising from work completed prior to 2021. |
| Additional Client-Specific Adjustments | (120,035) | (120,035) | Additional revenue adjusted for work not completed in fiscal year 2021. |
| | | | |
| **Total Adjustments** | **(1,514,927)** | **(1,850,968)** | |
| | | | |
| **Revised 2021 Calculation** | **29,292,049** | **(1,245,218)** | |

---

[9] This data was taken directly from Mr. Scalia's spreadsheet reconciling Malka's revenue for the last six weeks of 2021. It does not include adjustments beyond that timeframe.

DX-599.022

55.    I note that my 2023 recalculation includes items that I added for Malka's benefit, including approximately $362,000 revenue that Malka had improperly excluded from its own 2021 calculation by front-loading the revenue to 2020.  Even with these favorable adjustments, Malka still did not come close to satisfying the criteria for the 2021 Earnout.  As demonstrated by Figure 4, contrary to Sellers' claims of profitability, Malka's actual 2021 performance was more than ***negative*** $1.2 million.

56.    I performed this analysis on an expedited basis beginning in June 2023 (and later updated it in October 2023).  In June 2023 and October 2023, I relied upon a narrower set of data than what was provided to the forensic accountants whom MoneyLion subsequently engaged for this litigation.  For example, the number reflected in "2021 Sales Exclusions" relates only to data from the last six weeks of 2021.  Upon revisiting Mr. Scalia's 2022 GAAP conversions, I observed that Mr. Scalia had already performed this analysis, and used his adjustments as the baseline.  I did not, however, revisit Malka's entire 2021 performance.  Instead, I relied on Mr. Basdekis and Mr. Scalia's already-existing reconciliation, which focused solely on reconciling Sellers' revenue figures from the last six weeks of 2021.  As a result, the exclusions included in my analysis may be narrower than those identified by MoneyLion's forensic accountants in this litigation.

### Line-Item Disputes in the 2022 Earnout

*The 2020 New Jersey Digital Media Tax Credit*

57.    I understand that Sellers have focused on the fact that MoneyLion included the 2019 New Jersey Digital Media Tax Credit in its calculation of the 2021 Earnout, but not for the 2022 Earnout.

58.     The New Jersey Digital Media Tax Credit ("Tax Credit") is a program that awards content creation studios like Malka specific tax breaks for qualifying work performed in New Jersey. Schedule B permitted Malka to include the value of the Tax Credit when calculating its EBITDA figures for both the 2021 and 2022 Earnouts.   JX65 at DLA_006266.   Specifically, Schedule B provides that "EBITDA shall include the ***expected recognition*** of the New Jersey Digital Media Tax Credit . . . in the period in which the Tax Credit was applied for.   By way of illustration, the Tax Credit applied for in 2021 was for services provided by the Company for 2019.   The Tax Credit would be added to the 2021 EBITDA."

59.     I never understood Schedule B to create a blanket exception allowing Sellers to apply for a Tax Credit and include the value of the Tax Credit in Malka's EBITDA.   Instead, Schedule B provides that Sellers may only include the Tax Credit in EBITDA if they "expected recognition" of the Tax Credit during that fiscal year.

60.     I understand that, in 2021, MoneyLion permitted Sellers to include the value of the 2021 Tax Credit (which was purportedly approved in December 2021) in their 2021 Earnout statement.   MoneyLion did not receive proceeds from the 2019 tax credit until April 16, 2024 and for an amount significantly less ($637,060.97) than what Sellers represented it would receive.

61.     In 2022, Sellers asked that I include the value of their purported 2020 Tax Credit in the 2022 Earnout Statement.   For example, on November 28, 2022, Mr. Frommer asked if I needed anything further for the "nj digital media approved tax credit being applied to our 2022 Earnout." DX517 at MoneyLion_00103513.   I told Mr. Frommer that I would look into whether the credit could   be   recognized,   and   that   I   would   discuss   it   with   Mr.   Basdekis.     DX517   at MoneyLion_00103513.

24

62.    During my conversation with Mr. Basdekis, I learned that:

i.    The "initial approval" of the tax credit was simply a rubber-stamp sent by the state agency that had no bearing on the tax credit's ultimate amount.

ii.    The final approval amount could be materially lower than what Sellers claimed they were "approved" for.

iii.    The actual tax credit, once approved, was often not awarded until years after approval.

iv.    Once received, the tax credit needed to be sold on a secondary market, which incurred additional transaction costs.

63.    Based on the information I learned from Mr. Basdekis—as well as the fact that MoneyLion still had not received the 2019 "approved" tax credit—I concluded that the 2019 Tax Credit had been erroneously included in Malka's 2021 Earnout Statement.  *See* DX287 at MoneyLion_01825935 (January 27, 2023 Slack Chat between myself and Ms. Lee, in which I informed Ms. Lee that "[W]e didn't know then that they don't get the full amount [of the 2019 Tax Credit] and they have to sell it.").

64.    Accordingly, in my ultimate calculation of the 2022 Earnout, I refused to award Sellers' credit for the 2020 Tax Credit that they claim had been approved in 2022.  Contrary to Mr. Frommer's representations, I saw no evidence indicating that there was any expected recognition of the 2020 Tax Credit at the time the Earnout was issued.  In fact, MoneyLion *still* has not received the 2020 tax credit that Mr. Frommer claimed had been "approved" in 2022. *See* DX517 at MoneyLion_00103513 (November 28, 2022 Slack chat between myself and Mr. Frommer, in which Mr. Frommer asked me if I needed anything to "confirm" the "nj digital media approved tax credit

25

being applied to our 2022 Earnout.").  As later emails indicated, in fact, Malka had only *applied* for the 2020 Tax Credit.  DX274 at MoneyLion_00152102 (December 20, 2022 email from Mr. Frommer, forwarding December 8, 2022 email from New Jersey Economic Development Authority stating that "The application has been deemed complete and we have everything that we need."). This was well below the threshold of what is required to credit the "expected recognition" of the tax credit, which, again, MoneyLion *still* has not received more than two years later.

*Fair Market Value Adjustments*

65.     I understand that Sellers claim that MoneyLion unfairly reduced the 2022 Earnouts by deducting the amount of intercompany revenue charged by Malka.

66.     My adjustments to Malka's fair market value calculations can be found on the "Revenue #3 – FMV" tab of JX106 MoneyLion_02038246 (**Figure 5**).  In this tab, I explain how Malka billed MoneyLion a markup of approximately 28 percent on average compared to other customers, or **$1,242,248.**  Accordingly, I reduced Malka's intercompany revenue & EBITDA by $1,242,248—the amount for which Malka overcharged MoneyLion beyond the typical cost of its services.

## Figure 5

| Category | Billed to ML (Revenue) | Adjustment 1 | Updated Revenue | Cost | Margin | Markup % | Corrected Costs | FMV | New Revenue | Rev Difference |
|---|---|---|---|---|---|---|---|---|---|---|
| Headcount for Retained Teams | 2,870,095 | (218,170) | 2,651,925 | 1,527,581 | 1,342,514 | 88% | 1,407,101 | 42% | 2,001,455 | (650,470) |
| Jeff Frommer | - | | - | 435,532 | (435,532) | -100% | - | 0% | - | - |
| **Total Retained Team - Headcount Only** | **2,870,095** | **(218,170)** | **2,651,925** | **1,963,113** | **906,982** | **46%** | **1,407,101** | **42%** | **2,001,455** | **(650,470)** |
| Claudio | 293,050 | | 293,050 | 148,714 | 144,336 | 97% | 148,714 | 0% | 148,714 | (144,336) |
| Austin Hankwitz | 368,500 | | 368,500 | 402,075 | (33,575) | -8% | 402,075 | 0% | 402,075 | 33,575 |
| **Total Retained Team** | **3,531,645** | **(218,170)** | **3,313,475** | **2,513,902** | **1,017,743** | **40%** | **1,957,890** | | **2,552,245** | **(761,231)** |
| | | | | | | | | | | |
| Shared Creative Services | 1,102,245 | | 1,102,245 | 722,053 | 380,193 | 53% | 722,053 | 42% | 1,027,045 | (75,200) |
| Matt K Shared Creative | 330,000 | | 330,000 | | 330,000 | 0% | - | 42% | - | (330,000) |
| **Total Shared Creative** | **1,432,245** | **-** | **1,432,245** | **722,053** | **710,193** | **98%** | **722,053** | **42%** | **1,027,045** | **(405,200)** |
| | | | | | | | | | | |
| Hardcosts | 3,336,589 | | 3,336,589 | 3,548,272 | (211,683) | -6% | 3,548,272 | 0% | 3,548,272 | 211,683 |
| | | | | | | | | | | |
| **Total MoneyLion Studio** | **8,300,479** | **(218,170)** | **8,082,310** | **6,784,226** | **1,516,253** | **22%** | **6,228,214** | | **7,127,562** | **(954,748)** |
| Network | 850,000 | | 850,000 | 375,000 | 475,000 | 127% | 375,000 | 50% | 562,500 | (287,500) |
| **Total MoneyLion** | **9,150,479** | **(218,170)** | **8,932,310** | **7,159,226** | **1,991,253** | **28%** | **6,603,214** | | **7,690,062** | **(1,242,248)** |

*Bonuses Paid to Sellers and Malka Employees*

67.    I also understand that Sellers have claimed that I improperly subtracted bonuses paid to MoneyLion employees from Sellers' EBITDA for the 2022 Earnout.

68.    In calculating the 2022 Earnout, I subtracted $544,500 in bonuses that were paid to Malka employees, including Sellers personally.  Among other employees, Mr. Frommer received a bonus of $72,000, Mr. Krubich received a bonus of $72,000, and Mr. Fried received a bonus of $48,000.  Although these bonuses were accrued by MoneyLion, they were paid through Malka's payroll.  Nonetheless, they did not appear on Malka's internal income statement.

69.    MoneyLion never agreed to exclude bonuses paid to Sellers and Malka employees from the Earnout calculation.  Bonuses were accrued at the corporate level, and thus added as an expense incurred by Malka.  *See* JX106 at "Adjustment 2" tab.

27

The foregoing is true and correct to the best of my knowledge and belief.

Dated at New York, New York this 20th day of December, 2024

_Mark Torossian_
Mark Torossian

Subscribed and sworn before me
this 20th day of December, 2024

_Paul Anthony Leamon_
Notary Public
Commission Expires: 01/30/2027



Electronically signed and notarized online using the Proof platform.

28

**DX-599.028**