**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED AND PAT CAPRA**,**

                     Plaintiffs,

*- against –*

MONEYLION TECHNOLOGIES INC. AND
CONTINENTAL STOCK TRANSFER & TRUST
COMPANY,

                   Defendants,

MONEYLION TECHNOLOGIES INC.**,**

              Counterclaim Plaintiff,

*- against –*

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

            Counterclaim Defendants,

MONEYLION INC.,

              Third-Party Plaintiff,

*- against –*

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

           Third Party Defendants.

**Case No. 1:23-cv-06339-JMF**

---

**TRIAL AFFIDAVIT OF RICHARD CORREIA[1]**

---

[1] Cited herein are true and correct copies of written communications and their attachments, sent or received by me on or about the dates indicated in the documents.

**MoneyLion's Exhibit
No. 1:23-cv-06339-JMF
DX-594**

Richard Correia being duly sworn, deposes and states:

1.      This affidavit serves as my direct testimony at the trial in this matter.

2.      I am the President, Chief Financial Officer ("CFO") and Treasurer of MoneyLion Inc. and its wholly owned subsidiary, MoneyLion Technologies Inc. (together, "MoneyLion"). MoneyLion is a New York-based financial technology company that provides consumers with access to banking, lending, and various investment services.  Since 2021, MoneyLion shares have traded on the New York Stock Exchange ("NYSE").

## Background

3.      I received my Bachelor's Degree in Commerce from Queen's University in Kingston, Ontario, Canada in 1995.  After graduating, I worked in various auditing and consulting roles for Arthur Anderson.  In 1999, I left Arthur Anderson and co-founded a consulting company called Zefer, which was subsequently acquired by Deloitte Consulting where I worked until 2001. Through my experience at Arthur Anderson, Zefer, Deloitte, and MoneyLion, I am familiar with U.S. Generally Accepted Accounting Principles ("GAAP") and industry standards for financial reporting.

4.      From 2001 to 2008, I was employed at Merrill Lynch, where I focused on strategic Mergers and Acquisition ("M&A") transactions and alternative investments.  From 2008 to 2016, I worked in a similar capacity for Citadel Securities, where I also served as Chief Operating Officer of Surveyor Capital, one of Citadel's asset management businesses.

DX-594.002

5.    Over the course of my career, I have been involved in over 100 proposed or completed M&A transactions in varying capacities. Most of these were private M&A transactions. Based on my experience, I am familiar with industry standards and practices in M&A transactions, including those relating to accounting and due diligence.

6.    In 2016, Dee Choubey, MoneyLion's CEO and founder, invited me to join the MoneyLion executive team. I accepted, and joined MoneyLion as its Chief Financial Officer ("CFO") in December 2016. I later took on the positions of President and Treasurer, and still hold all three positions.

7.    As President and CFO of MoneyLion, I oversee several of MoneyLion's departments, including its strategic finance, accounting, corporate development, treasury, tax, human resources, risk, legal, and compliance functions. While I rely on subordinates to manage these functions on a day-to-day basis, I receive regular updates on important issues that require my approval. Finally, as CFO, I am responsible for ensuring MoneyLion's compliance with its public company reporting requirements, including its compliance with GAAP.

DX-594.003

**MoneyLion's Pre-Acquisition Relationship with Malka**

8.      Beginning in 2018, MoneyLion engaged Malka Media Group LLC (together with its subsidiary Malka Sports LLC, "Malka") to provide marketing and educational content. Typically, MoneyLion would commission videos and other marketing or educational content from Malka, and then deploy that content on MoneyLion's website and mobile applications.  Malka generally charged MoneyLion on a project or hourly basis for these engagements.

9.      MoneyLion's primary point of contact at Malka was Jeff Frommer, Malka's President.[2]  Through Mr. Frommer, MoneyLion built a strong commercial relationship with Malka. While I was familiar with Malka's work in content creation, I was not privy to Malka's internal corporate matters, such as its financial condition or accounting practices.  I only began to discuss those issues with Mr. Frommer in the months leading up to MoneyLion's November 2021 acquisition of Malka (the "Acquisition").

**Negotiations to Acquire Malka**

10.      On June 9, 2021, Mr. Choubey, Bill Davaris (MoneyLion's then-Chief Marketing Officer), and I had dinner with Mr. Frommer at Kyma, a restaurant in Manhattan.[3]  During the dinner, we discussed our long-term plans for our respective companies, including that MoneyLion was in the process of going public (as discussed below at paragraph 27 and footnote 5).  In this context, the concept of a potential transaction involving the two companies (MoneyLion and

---

[2] In this affidavit, I will refer to Mr. Frommer, Louis Krubich, Daniel Fried, and Pat Capra collectively as the "Sellers."

[3] It is possible that at least one of the other Sellers (possibly Mr. Krubich) may have also attended the June 9th dinner, although I do not recall specifically.

DX-594.004

Malka) came up, including a potential acquisition of Malka by MoneyLion.  Mr. Frommer also indicated that he was speaking with one or more investment banks concerning a potential buyer for Malka.  I remember that Mr. Frommer, based on his tone and behavior, appeared enthusiastic about the prospect of an acquisition of Malka by MoneyLion.

11.    On June 10, 2021, the day after our dinner, Mr. Frommer followed up with an email stating that an acquisition of Malka by MoneyLion would be "the smart play" and "a strong partnership to build a billion-dollar future on the backs of both our success."  DX035 at MoneyLion_01152704 (June 10, 2021 email from Jeff Frommer to myself, Dee Choubey, Bill Davaris, and Louis Krubich).  Mr. Frommer stated that he would "give [us] a better overview of . . . the current and future state of revenue and financials" in a planned upcoming meeting to continue discussing the Acquisition.  DX035 at MoneyLion_01152704.

12.    On June 11, 2021, Mr. Frommer and Mr. Krubich met with me, Mr. Choubey, MoneyLion's Head of Corporate Development Jon Stevenson, and other MoneyLion employees at MoneyLion's headquarters in Manhattan.  During our June 11, 2021 meeting, Mr. Frommer and Mr. Krubich walked Mr. Choubey and me through a pitch deck discussing Malka's financial performance.  Mr. Frommer emailed this pitch deck to me after the meeting.  DX035 at MoneyLion_01152704.

13.    In reviewing the pitch deck presented by Mr. Frommer and Mr. Krubich, I was primarily interested in whether Malka was operating profitably.  This was partly because

5

MoneyLion was well into the process of transitioning into being a public company.[4]  At the time, MoneyLion was operating at a loss, but we were positioning ourselves for profitable growth, and I would not have wanted an acquisition to be a drag on our future profitability.

14.    One important measure of profitability is Earnings Before Interest, Taxes Depreciation, and Amortization ("EBITDA").[5]  If a company reports positive EBITDA, that typically indicates that the company is operating profitably.  As discussed in more detail below, the pitch deck presented by Mr. Frommer and Mr. Krubich portrayed Malka as a company that had been operating profitably for years and whose EBITDA was trending upwards.  On that basis, Malka was projected to operate even more profitably in the coming years.  Had I known that Malka was in fact operating less profitably than represented in the pitch deck, and was in fact *declining* in profitability such that it was on track to record a negative EBITDA during 2021 and in the following years, I would not have allowed MoneyLion to pursue the Acquisition further.

15.    Mr. Frommer specifically noted in his June 11, 2021 presentation that Malka had "reviewed financials."[6]  Mr. Frommer also mentioned that Malka had recently obtained financing

---

[4] MoneyLion went public through a merger with a business commonly referred to as a Special Purpose Acquisition Company ("SPAC").  MoneyLion signed a SPAC merger agreement in February 2021, beginning the process of becoming a publicly-traded company.  By the time of the June 11, 2021 meeting, MoneyLion was involved in the Securities and Exchange Commission's ("SEC") review of the Registration Statement (Form S-4) relating to MoneyLion's SPAC merger, which included detailed questions about MoneyLion's financial information and disclosures.  MoneyLion shares first traded publicly on the NYSE on September 23, 2021.

[5] A company reporting under GAAP reports its "net income" rather than EBITDA.  Net income is a more precise measure of profitability that includes the earnings reflected in EBITDA, but subtracts the costs of interest, taxes, depreciation, and amortization.  If company has a positive net income, then by definition that company will also have a positive EBITDA.

[6] Based on my experience and familiarity with accounting practices, "reviewed financials" are effectively one step below fully audited financials.  To obtain reviewed financials, a company typically retains an independent accountant to review the company's internal financial records and controls.  The key difference between reviewed and audited

from a bank.  I interpreted Mr. Frommer's statements to mean that Malka's reviewed financial statements had been submitted to the bank, which gave me an added level of comfort that Mr. Frommer and Mr. Krubich were presenting us with accurate financial data and we could proceed with further exploring the combination.

16.    According to Mr. Frommer and Mr. Krubich, Malka's Creative Studio and Entertainment businesses posted an EBITDA of $700,000 in 2019, and $1.9 million in 2020. According to a chart in Mr. Frommer's deck, Malka's Creative Studio and Entertainment businesses were on pace to nearly *triple* their profitability in the 2021 fiscal year.  DX035 at MoneyLion_01152721:

---

financials relates to the depth of that review.  For reviewed financials, an accountant typically relies on representations provided by management.  For audited financials, an auditor might demand independent third-party data (such as by seeking confirmations of balances held by banks).  I was comfortable relying on Malka's reviewed financial statements because, as outlined below, Malka management—including Sellers—took responsibility for their accuracy.  At its core, I knew that Malka having reviewed financials represented an assurance based on those representations and an independent accountant's analysis that there were no material changes necessary for the Malka financials to be in conformity with GAAP.  And, as discussed below, MoneyLion also conducted extensive confirmatory pre-Acquisition diligence on Malka.

DX-594.007



17.    Notably, according to the pitch deck presented by Mr. Frommer and Mr. Krubich, Malka's Creative Studio and Entertainment businesses recorded revenues of $15.2 million in 2019 and $18.2 million in 2020.  Mr. Frommer's and Mr. Krubich's deck also stated that these Malka businesses were on pace to nearly double their revenue in 2021, with an expected total revenue of $32.4 million.  DX035 at MoneyLion_01152718.  This increase in revenue, coupled with the history of profitability, was significant to me, as it indicated that Malka's business was growing and on track to further increase its profitability.

18.    In addition, Malka's projected future EBITDA and revenue was based on its historical year-to-year trends.  Accordingly, Malka's historical performance combined with reviewed financial statements (in 2019 and 2020) was important to me, as it was a substantial part of the basis for the deck's EBITDA and revenue projections.

8

19.     Based on Mr. Frommer and Mr. Krubich's June 11, 2021 pitch, I agreed to another meeting, to be held on June 15, 2021.  The day before the meeting, June 14, 2021, Mr. Frommer sent additional documents to me and other MoneyLion executives.  Mr. Frommer emphasized that he again "wanted to share as much financial detail [sic] about our business heading into tomorrow's conversation."  Mr. Frommer then stated that he had "attached a number of documents and financial disclosures," including "the Malka Media Group, LLC *reviewed financials for FY 2019 and FY 2020* . . . ."   JX005 at MoneyLion_01149848 (June 14, 2021 email from Jeff Frommer to myself, Dee Choubey, Adam VanWagner, Bill Davaris, and Louis Krubich attaching 2019 and 2022 Malka Reviewed Financials, 2021 Malka Receivable Outlook, 2021 Malka Income Statement, and the pitch deck).

20.     The language that Mr. Frommer used in his June 14, 2021 email confirmed my understanding from our June 11, 2021 meeting that the Sellers knew what "reviewed financials" meant, and that they were familiar with the significance of reviewed financials in terms of reliability.  Overall, Mr. Frommer's email gave me the impression that Mr. Frommer understood Malka's business intimately, especially with respect to its finances and accounting practices.

21.     As Mr. Frommer's June 14, 2021 email indicated, he attached Malka's financial statements for 2019 and 2020 (the "2019 Financial Statements" and the "2020 Financial Statements," respectively, and together, the "2019 and 2020 Financial Statements," or the "Financial Statements"), which stated that the 2019 and 2020 Financial Statements had been reviewed by an independent accountant.  JX005 at MoneyLion_01149849 ("Malka Media Group LLC Financial Statements – December 31, 2019 – With Independent Accountants' Review

9

Report"); JX005 at MoneyLion_01149865 ("Malka Media Group LLC Financial Statements –

December 31, 2020 –With Independent Accountants' Review Report.").  To me, the 2019 and

2020 Financial Statements were the most important documents Mr. Frommer attached to his June

14, 2021 email, and among the most important documents Sellers provided to MoneyLion in

connection with the Acquisition.

22.     The reviewed 2019 and 2020 Financial Statements presented by Mr. Frommer were

of critical importance to me in weighing whether to proceed with the Acquisition of Malka that

Sellers were proposing, since they supported the historical data referenced in Mr. Frommer's and

Mr. Krubich's pitch deck, and the historical data in turn supported Sellers' projections.

23.     The 2019 and 2020 Financial Statements both included identical representations

from Malka's management.  JX005 at MoneyLion_01149851:

> **MANAGEMENT'S RESPONSIBILITY FOR THE FINANCIAL STATEMENTS**
> Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement whether due to fraud or error.

I understood "management" as used in this representation to be the Sellers.

10

24.    In addition, the 2019 and 2020 Financial Statements presented by Mr. Frommer and Mr. Krubich included a confirmation of Malka's GAAP compliance made by Malka's independent accountant, Curran & Co., stating that they knew of no material deviations from GAAP in the 2019 and 2020 Financial Statements.  JX005 at MoneyLion_01149851:

---

**2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

Revenue Recognition
Revenue is recognized under the accrual basis of accounting and recorded as revenue when work is completed and invoice to the Company's customers.  The Company's revenue is generated from a combination of project-based purchase orders that have various stages of completion whereby additional revenue is earned, and standalone billing. The Company's contracts are generally short-term in nature and are completed in less than one-year.

The Company has adopted ASC 606 as of December 31, 2020 regarding accounting for income from contracts and all revenues recognized by the Company for the year then ended are covered through ASC 606.

General and administrative expenses are charged to expense as incurred.

---

25.    The 2019 and 2020 Financial Statements presented by Mr. Frommer also contained an explicit representation relating to Malka's revenue recognition policies and practices. Specifically, the Financial Statements represented that Malka had adopted Federal Accounting Standards Board Topic 606 ("ASC 606"), which is a GAAP revenue recognition principle that requires that a company's revenue be recognized when the associated work is completed:

---

ACCOUNTANTS' RESPONSIBILITY
Our responsibility is to conduct the review engagements in accordance with Statements on Standards for Accounting and Review Services promulgated by the Accounting and Review Services Committee of the AICPA. Those standards require us to perform procedures to obtain limited assurance as a basis for reporting whether we are aware of any material modifications that should be made to the financial statements for them to be in accordance with accounting principles generally accepted in the United States of America. We believe that the results of our procedures provide a reasonable basis for our conclusion.

ACCOUNTANTS' CONCLUSION
Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in accordance with accounting principles generally accepted in the United States of America.

---

11

JX005 at MoneyLion_01149851. ASC 606-based revenue recognition is also known as accrual-based revenue recognition. This method of accounting is important to me, because it ensures that a company's revenue is accurately reported in accordance with a standardized system. If revenue recognition is not tied to the performance of work, a company's revenue could appear to be substantially higher in a fiscal year than it actually is. For example, if a company received a $1,000,000 contract in December 2019 for work that would not begin until May 2020, recognizing that revenue for the fiscal year ending in 2019 would artificially inflate the company's 2019 fiscal year performance. ASC 606 sets clear and consistent rules for when revenue can be recognized, and guards against such manipulation of reported revenue.

26.    For me, as the CFO of a public company, GAAP as a whole serves similar purposes, by setting consistent standards, vetted by the accounting industry, for reliably recording and reporting financial information. GAAP-based accounting policies, practices and reporting help ensure reported financial information is "real." For these reasons, Sellers' GAAP and ASC 606 representations in the 2019 and 2020 Financial Statements were vital to my decision to proceed with the transaction. These representations gave me confidence that Malka's historical financial data accurately represented Malka's overall financial condition—*i.e.*, that Malka was profitable and on track to remain so. The GAAP and ASC 606 representations also strengthened the credibility of Malka's financial projections, which were based on Malka's historical financial data.

27.    Moreover, at the time I reviewed these representations, as indicated, MoneyLion was in the process of an exhaustive SEC review of MoneyLion's own financial statements and disclosures as part of becoming a publicly-traded company. In our discussions with the SEC, and

12

in comment letters, the SEC had repeatedly emphasized the need for MoneyLion to ensure it was compliant with GAAP in its policies, practices, and reporting.  In light of the SEC's rigorous GAAP compliance requirements, which are standard for public companies, it was imperative that any company MoneyLion acquired be immediately capable of adhering to MoneyLion's GAAP-based financial reporting infrastructure.  I would not have allowed MoneyLion to take on the risk of purchasing a company that followed an unprincipled, or "wild west" approach to accounting, which could have jeopardized MoneyLion's ability to integrate the target's financials into MoneyLion's own GAAP financials to ensure accurate reporting to public shareholders.  This was another reason I found Sellers' GAAP and ASC 606 representations so critical.  These representations were indicators of strong accounting controls, which would reduce risks to MoneyLion in post-closing integration.

28.     For all of these reasons, if I had known in June of 2021, or at any time before the Acquisition, that Sellers' GAAP and ASC 606 representations were false, I would not have allowed MoneyLion to proceed any further in negotiating the Acquisition.

29.     The GAAP and ASC 606 representations in the 2019 and 2020 Financial Statements were also among the very first descriptions I received from the Sellers regarding their accounting practices.  Accordingly, these GAAP and ASC 606 representations informed how I understood Sellers' later references to Malka's "historical" accounting principles.  More specifically, when Sellers later referred to Malka's "historical accounting principles" or "historical revenue recognition principles" in negotiating our eventual Membership Interest Purchase Agreement ("MIPA"), I interpreted those terms in the context of the GAAP and ASC 606

13

representations in the historical 2019 and 2020 Financial Statements presented to MoneyLion by Mr. Frommer, and for which Malka's management, the Sellers, explicitly claimed responsibility. Because these Financial Statements represented that Malka had no material deviations from GAAP—and because of other explicit representations by Sellers in the MIPA and related discussions (described below)—I understood that Sellers' historical accounting practices did not materially deviate from GAAP, including ASC 606 revenue recognition principles, a critical foundation for the beginning of the combination.

DX-594.014

30.    According to the 2019 and 2020 Financial Statements—and consistent with Mr. Frommer's pitch deck—Malka was profitable in both 2019 and 2020.   The 2019 Financial Statements reported that Malka posted net revenues of $13,621,310, a gross profit of $7,572,760, and a net income of $569,407 for the 2019 fiscal year. *See* JX005 at MoneyLion_01149854:

MALKA MEDIA GROUP LLC.

STATEMENT OF INCOME & MEMBERS' EQUITY

YEAR END DECEMBER 31, 2019

| | | |
|---|---|---|
| NET REVENUES | $ | 13,621,310 |
| COST OF GOODS SOLD | | 6,048,550 |
| GROSS PROFIT | | 7,572,760 |
| OPERATING EXPENSES | | |
| General and administrative | | 6,903,424 |
| Total Operating Expenses | | 6,903,424 |
| INCOME FROM OPERATIONS | | 669,336 |
| OTHER INCOME (EXPENSES) | | |
| Interest income | | 341 |
| Earnings from partnership | | 28,327 |
| Interest expense | | (126,851) |
| Total other income (expense) | | (98,183) |
| INCOME BEFORE INCOME TAXES | | 571,153 |
| INCOME TAX EXPENSE | | 1,746 |
| NET INCOME | $ | 569,407 |

15

31.    Malka's 2020 Financial Statements reported net revenues of $16,983,069, a gross profit of $11,573,092, and net income of $2,413,990.  *See* JX005 at MoneyLion_01149870:

MALKA MEDIA GROUP LLC.

STATEMENTS OF INCOME & MEMBERS' EQUITY

YEAR END DECEMBER 31, 2020

| | | |
|---|---|---|
| NET REVENUES | $ | 16,983,069 |
| COST OF GOODS SOLD | | 5,409,977 |
| GROSS PROFIT | | 11,573,092 |
| OPERATING EXPENSES | | |
| General and administrative | | 10,039,356 |
| Total Operating Expenses | | 10,039,356 |
| INCOME FROM OPERATIONS | | 1,533,736 |
| OTHER INCOME (EXPENSES) | | |
| Interest income | | 4,004 |
| Forgiveness of SBA PPP loan & EIDL grant | | 949,600 |
| Earnings from partnership | | 67,549 |
| Interest expense | | (138,348) |
| Total other income (expense) | | 882,805 |
| INCOME BEFORE INCOME TAXES | | 2,416,541 |
| INCOME TAX EXPENSE | | 2,551 |
| NET INCOME | $ | 2,413,990 |

32.    The Financial Statements showed that Malka was not only profitable, but growing significantly in profitability from year to year.  Indeed, according to the financial statements, Malka's net income more than *quadrupled* from 2019 to 2020, from $569,407 to $2,413,990.  This tended to support Sellers' representations in the pitch deck that Mr. Frommer and Mr. Krubich presented on June 11, 2021, projecting large increases in revenue and EBITDA through 2024.

16

33.    In addition, the 2019 and 2020 Financial Statements showed that Malka recorded strong gross profit in both 2019 and 2020.  Gross profit measures the difference between a company's revenue and its cost of goods sold ("COGS"), excluding fixed operating costs (for example, rent).  In my experience, a company's gross profit is a critical metric to investors, as it is used to determine gross profit margin (which is calculated by dividing the company's gross profit by its revenue). Gross profit margin, in turn, shows how additional revenue will grow the company's profitability. For example, if a company's margin was 60 percent, the company would earn 60 cents in gross profit for every additional revenue dollar earned.  A higher margin means that the company has higher earnings potential as the company scales.

34.    In my experience, changes in gross profit margin can impact a company's stock price and valuation significantly.  Investors place significant focus on a company's gross profit trends.  If gross profit margin declines even a small amount, the market can react negatively, as it could indicate that a company is not as scalable (*i.e.*, able to grow while remaining profitable) as expected.  Accordingly, I paid close attention to Malka's gross profit margin, as represented by Sellers in the 2019 and 2020 Financial Statements.  This was also because Malka's gross profit metrics would consolidate into MoneyLion's after the Acquisition.  If Malka's gross profit margin was lower than MoneyLion's, it would lower MoneyLion's overall margin and risk dragging down MoneyLion's stock price.  However, so long as Malka's gross profit margin matched or exceeded MoneyLion's, acquiring Malka would not reduce MoneyLion's overall profit margin.

35.    As shown above, in 2019, Sellers reported a GAAP-based gross profit of approximately $7.6 million against revenue of $13.6 million.  *See* JX005 at

17

MoneyLion_01149854.  This meant that, according to Sellers' representations, Malka's 2019 gross profit margin was approximately **56 percent**.  In 2020, Sellers reported a GAAP-based gross profit of approximately $11.6 million against a revenue of approximately $17 million.  Accordingly, Sellers' representations meant that Malka's 2020 gross profit margin was approximately **68 percent.**  *See* JX005 at MoneyLion_01149870.

36.    According to Sellers' representations in the 2019 and 2020 Financial Statements, the gross profit margin recorded by Malka was higher than MoneyLion's, which was approximately 51 percent in 2020, and approximately 61 percent in 2021.  *See* DX204 (March 17, 2022 10-K Statement).  Accordingly, based on Sellers' representations, I was comfortable that acquiring Malka would not decrease MoneyLion's gross profit margin.  If anything, based on the Financial Statements presented by Sellers, I expected acquiring Malka to *increase* MoneyLion's gross profit margin.

37.    After reviewing the 2019 and 2020 Financial Statements supplied by Mr. Frommer, Mr. Choubey and I met with Mr. Frommer and Mr. Krubich at Malka's offices on June 15, 2021. During the meeting, Mr. Frommer and Mr. Krubich suggested MoneyLion pay $75 million in cash to acquire Malka, with all consideration to be paid immediately at time of deal closing.  I was not willing to accept this offer.  Instead, I negotiated an alternative deal structure with Sellers during the last two weeks of June 2021.  This consisted of an initial purchase price of $40 million, consisting of $10 million in cash and $30 million in restricted MoneyLion shares, which would be paid to Sellers at closing.  The transaction would then provide potential contingent consideration

18

to Sellers following the purchase, if Sellers were able to achieve specified EBITDA and revenue targets.

38.     More specifically, if Malka had positive EBITDA of $100,000 in 2021 and met specified revenue targets, the Sellers would be eligible for an earnout payment of up to $10 million in restricted MoneyLion shares (the "2021 Earnout").  And if Malka had at least $100,000 in EBITDA in 2022 and met specified revenue targets, the Sellers would be eligible for up to $25 million in restricted MoneyLion shares (the "2022 Earnout").

39.     The $100,000 EBITDA requirement that I agreed to was relatively low and designed to be easily achievable, especially given that, as discussed above, Sellers represented that they had achieved an EBITDA of approximately $1,900,000 in 2020.  I agreed to a low EBITDA earnout threshold because, as I told Mr. Frommer in a June 30, 2021 conversation (which Mr. Frommer secretly recorded without my knowledge), what I cared about most was that Malka not lose money.  *See* JX009 at SELLERS00004091 at 2–3 (Transcript of June 30, 2021 call between myself, Mr. Frommer, Mr. Krubich, and Mr. Choubey, in which I explained to Mr. Frommer that "[t]he EBITDA target is going to be a target that we're jointly going to segue into this saying, 'Hey, you're not going to lose money.'").  While immediate profitability mattered to me, I trusted the Sellers based on their reviewed Financial Statements, which showed that Malka had considerable profit expansion potential.  I wanted to structure a deal that would allow the Sellers some time to achieve that self-professed profit expansion potential, while at the same time incentivizing them not to lose money, which would be harmful to MoneyLion.

19

40.    I subsequently directed one of my Finance team members, Erika Nuno, to prepare a presentation to the MoneyLion Board summarizing the financial data provided by Sellers and the benefits of a potential transaction. *See* DX518 at MoneyLion_01831197. The data presented to the Board was sourced directly from the Sellers' reviewed 2019 and 2020 Financial Statements and the financial data presented in Sellers' June 11, 2021 pitch deck:



41.    The analysis presented to the Board concluded that a purchase of Malka would improve MoneyLion's annual EBITDA, and that the purchase would be *accretive* for MoneyLion, meaning that it would increase the value of MoneyLion. Our Board members reacted favorably to this analysis. For example, following the presentation, Chris Sugden, one of MoneyLion's independent directors, emailed me and other members of MoneyLion management that "the

valuation is pretty compelling given the accretion from a P&L perspective."[7]   DX057 at MoneyLion_01831175 (July 15, 2021 from Mr. Sugden to me, the MoneyLion Board, and various members of MoneyLion management).

42.     If I had known in July of 2021 that Sellers had improperly inflated their calculations of Malka's EBITDA and revenue, I would not have allowed the transaction to go forward.

<div align="center"><b>MoneyLion's Due Diligence on Malka</b></div>

43.     While it was vital to me that, through the 2019 and 2020 Financial Statements, Sellers and their independent accountant represented Malka's accounting to be GAAP and ASC 606-compliant, MoneyLion and I had an obligation to ensure that Malka's financial disclosures were properly diligenced.  Accordingly, in or about July 2021, MoneyLion enlisted CFGI, a leading, highly-experienced third-party advisor, to conduct due diligence on Malka.  CFGI's diligence included a Quality of Earnings Analysis ("QoE") on Malka's historical financial statements.  CFGI had assisted MoneyLion in our going-public transaction and therefore was well-aware of the importance of GAAP compliance to MoneyLion.

44.     A QoE is a financial analysis that reviews data provided by a target company, and then compares that data to the company's as-reported financial information.  The QoE then adjusts the target company's as-reported financials for any deviations that are identified.  As part of the QoE analysis, the diligence team relies on management interviews, data and direct representations provided by the company's management.

---

[7] "P&L" is a common finance term meaning "profit and loss."

DX-594.021

45.     MoneyLion's engagement letter with CFGI set forth the scope of the QoE.  *See*

~~DX065~~ ^JX011 at MoneyLion_01833117 (July 27, 2021 letter from CFGI Partner Matthew Estadt to me).

For example, the engagement letter states that CFGI, as part of the QoE, will "discuss with

management . . . significant accounting policies." ~~DX065~~ ^JX011 at MoneyLion_01833119.  Among other

things, CFGI agreed to "inquire as to whether the Company has adopted accounting standard ASC

606 in relation to revenue recognition and commissions" and whether Malka followed its as-

represented accounting practices.  ~~DX065~~ ^JX011 at MoneyLion_01833120.

46.     The scope of CFGI's QoE was consistent with industry standards.  A QoE is not an

audit, and is not intended to be an audit.  In the fifty-plus private M&A deals I have worked on, I

have never once seen an audit performed as part of diligence.  Audits take months, and would be

impractical to commission in an M&A transaction.  Audits are also disruptive to a target

company's operations, and require the auditors to speak to a broader base of employees and

counterparties that would increase the risk that information about the deal could be leaked.  In my

experience, in the private M&A context, the diligence team typically relies on the representations

made by, and information provided by, the target's management (including consecutive annual

financial statements reviewed by an independent accounting firm), and representations are built

into the acquisition agreement which, if breached, protect the acquirer (as is the case in the MIPA).

47.     As part of the diligence process, my team instructed CFGI to request from Sellers

any data CFGI required for their due diligence analysis.  I oversaw the diligence process by

checking in regularly with the MoneyLion Finance team, and monitoring email correspondence

among the Finance team, Sellers, CFGI, and the parties' deal counsel.  On September 30, 2021,

22

Mr. Frommer represented to me and other MoneyLion employees in an email that "all of the CFGI financial . . . requests has [sic] been provided in full."  DX087 at MoneyLion_01069860 (September 30, 2021 email from Jeff Frommer to myself, Adam VanWagner, Marc Simon (Sellers' counsel), Louis Krubich, Ben Probber, and Jon Stevenson).  I took this to mean that Sellers had provided full and complete financial data in response to CFGI's requests, and had not withheld any material information relating to Malka's financial or accounting practices.

48.     While the information about Malka made available by Sellers appeared to me to be standard in an M&A transaction, and I believed nothing material had been withheld, neither I nor any other MoneyLion employees or advisors had unrestricted access to Malka's internal data.  For example, we did not have direct access to Malka's internal NetSuite accounting software program.  Instead, Sellers provided us and CFGI with data exported from NetSuite at our request, which I believed the Sellers had delivered without manipulation.  *See* JX005, at MoneyLion_01149848 (June 14, 2021 email from Mr. Frommer, in which Mr. Frommer stated that "[o]ur financial accounting tool is NetSuite so we can run reports any which way as needed.").  Nor did MoneyLion or CFGI have direct access to all Malka employees in connection with our diligence exercise.  As is customary in an M&A transaction, we liaised with a select group of Malka personnel who coordinated our requests in order to streamline the deal process and maintain confidentiality.  In my experience, it would have been highly unusual for us to receive broader access than we did in an M&A diligence process.  Until closing, Malka remained an independent business with operations to run, and neither party had formally committed to the Acquisition.  It would have been inappropriate for MoneyLion to request, let alone receive, direct access to all of Malka's

23

internal systems, data, and personnel.  This would have exposed all of Malka's proprietary data to us before a deal was signed, and could have unfairly disrupted their business operations.

49.    MoneyLion's Finance team received CFGI's draft due diligence report on October 5, 2021.[8]  *See* JX016 at MoneyLion_01812973 (October 5, 2021 email from Bob DeLuca to Michelle Lee, Erika Nuno and Tony Orokos (MoneyLion's then-Head of Finance) attaching "Project Queen – Draft Financial Due Diligence Report_10.5.21.pdf").  Ms. Lee (one of the junior managers in MoneyLion's Finance Department) then forwarded this report to me.  In the report, CFGI analyzed Malka's financial data and made any adjustments to Malka's as-reported financials that CFGI deemed necessary in order to present a normalized picture of Malka's financials.  As context, to normalize a company's financials, the QoE team adjusts for revenue received from non-operational or extraordinary events (such as one-time payments received from the COVID-19 Paycheck Protection Program).  After making these adjustments, the CFGI report concluded that Malka's "diligence adjusted" EBITDA was $0.7 million in 2019 and $1.0 million in 2020.  JX016

---

[8] CFGI sent MoneyLion its final report, which was identical to the draft (with the exception of removing the "draft" marker), on October 15, 2021. ~~DX096~~, at MoneyLion_01813351.
JX020

DX-594.024

at MoneyLion_01812982.  CFGI also concluded that Malka had achieved a positive $1.2 million

in EBITDA over the twelve months from June 2020 to June 2021:

| Consolidated Quality of Earnings Analysis | | | | LTM | YTD | YTD |
|---|---|---|---|---|---|---|
| $ in 000s | Ref | FY19 | FY20 | Jun-21 | Jun-20 | Jun-21 |
| Revenue | | 14,421 | 18,885 | 23,715 | 7,774 | 12,605 |
| Out-of-period write offs | 6 | - | (601) | 117 | (167) | 551 |
| COVID-19 impact | 10 | - | +/-NQ | +/-NQ | +/-NQ | +/-NQ |
| Accrual accounting | 11 | +/-NQ | +/-NQ | +/-NQ | +/-NQ | +/-NQ |
| Revenue adjustments (+/-NQ) | | - | (601) | 117 | (167) | 551 |
| Adjusted net revenue (+/-NQ) | | 14,421 | 18,284 | 23,833 | 7,607 | 13,155 |
| Net income | | (7) | 2,301 | 2,200 | (151) | (252) |
| Interest | | 121 | 138 | 146 | 53 | 61 |
| Depreciation | | 527 | 267 | 267 | - | - |
| Income taxes | | - | - | 24 | - | 24 |
| Reported EBITDA | | 642 | 2,706 | 2,637 | (98) | (167) |
| as a % of net revenue | | 4.4% | 14.3% | 11.1% | -1.3% | -1.3% |
| **Management adjustments** | | | | | | |
| Non-recurring expense | 1 | - | 17 | 40 | 4 | 27 |
| Management adjusted EBITDA | | 642 | 2,723 | 2,677 | (94) | (140) |
| as a % of net revenue | | 4.4% | 14.4% | 11.3% | -1.2% | -1.1% |
| **Diligence adjustments** | | | | | | |
| PPP loan proceeds | 2 | - | (950) | (950) | - | - |
| One-time repair and office expenses | 3 | 133 | - | - | - | - |
| Run-rate rent | 4 | 72 | 44 | 9 | 7 | (27) |
| Run-rate NetSuite expense | 5 | (164) | (164) | (82) | (82) | - |
| Out-of-period write offs | 6 | - | (601) | 117 | (167) | 551 |
| Unprocessed expense reports | 7 | - | - | (531) | - | (531) |
| Earnings from partnership | 8 | (27) | (68) | (68) | - | - |
| Litigation settlement | 9 | - | 20 | 20 | - | - |
| COVID-19 impact | 10 | - | +/-NQ | +/-NQ | +/-NQ | +/-NQ |
| Accrual accounting | 11 | +/-NQ | +/-NQ | +/-NQ | +/-NQ | +/-NQ |
| Revenue recognition | 12 | +/-NQ | +/-NQ | +/-NQ | +/-NQ | +/-NQ |
| Payroll taxes | 13 | +/-NQ | +/-NQ | +/-NQ | +/-NQ | +/-NQ |
| Diligence adjustments (+/-NQ and OPEN) | | 14 | (1,718) | (1,483) | (242) | (8) |
| Diligence adjusted EBITDA (+/-NQ and OPEN) | | 655 | 1,005 | 1,194 | (336) | (148) |
| as a % of adjusted net revenue | | 4.5% | 5.3% | 5.0% | -4.3% | -1.2% |

50.    CFGI's adjusted numbers—while lower than what Sellers calculated in their pitch

deck after the relevant adjustments were made—reinforced my belief that Malka was a profitable

company.  The CFGI-adjusted figures also showed that Malka's EBITDA was trending upwards

each year.   Accordingly, I viewed the report as generally consistent with what Sellers had

DX-594.025

represented to us in their pre-diligence pitch.  I also discussed the CFGI report with members of my Finance team, as well as with MoneyLion's Head of Corporate Development, Jon Stevenson. Mr. Stevenson later confirmed by email that the CFGI report had not identified any "showstoppers," which I took to mean major items that would cause us to reconsider material deal terms or cancel the deal.  *See* JX018 at MoneyLion_01843457 (October 12, 2021 Slack message from Jon Stevenson to MoneyLion team, reporting that "Tony/Michelle/Rick/Jon reviewed CFGI findings on QoE report. No showstoppers; but several items to address post-close.").[9]

51.    With regard to GAAP compliance and revenue recognition specifically, the CFGI report confirmed what Sellers had already represented in their 2019 and 2020 Financial Statements.  For example, CFGI reported that Sellers confirmed that Malka was "compliant with ASC 606 revenue recognition principles" and that any noncompliance was "minimal."  JX016,  at MoneyLion_01812991:

> 12. **Revenue recognition** – While Management represented that the Company is compliant with ASC 606 revenue recognition requirements, it has not performed a detailed assessment to confirm or validate compliance. Further, Management acknowledged that in certain instances where projects fell behind schedule, the Company invoiced customers based on the planned rather than actual timeline(s). Management noted that this dynamic can impact revenue recognition but noted any noncompliance to be minimal. Following this transaction, we understand that the Buyer plans to align the Company's accounting policies including in relation to revenue recognition, with that of MoneyLion.

---

[9] When Mr. Stevenson referred to "items to address post-close," I understood this to refer to minor matters that must be addressed when one company acquires another (such as employee benefit plans, taxation impacts, and so forth).

DX-594.026

52.    While the CFGI report defined Malka's "management" as Mr. Frommer, Matthew Basdekis (Malka's Head of Finance), and Ryan Curran (Malka's outside accountant), my dealings with Sellers were always led by Mr. Frommer, and at times Mr. Krubich.  Accordingly, I understood that either Mr. Frommer or Mr. Krubich was providing information to CFGI.

53.    The CFGI report also described Sellers' invoicing practices, stating that "**[c]ustomers are invoiced upon completion of milestones set forth in respective contracts**":

**Accounts Receivable**
- Customers are invoiced upon completion of milestones set forth in respective contracts. While customer payment terms range between 15 to 90 days, most pay within 60 days. Management noted that the Company does not typically experience issues regarding collectability, and as such, it does not maintain an allowance for doubtful accounts.

This was consistent with what Sellers represented in their 2019 and 2020 Financial Statements, which is that revenue was recognized "when work is completed and invoiced."  JX016 at MoneyLion_01813022.

54.    On October 15, 2021, Mr. Stevenson reported to me that he had discussed the report with CFGI and "[a]ll items [were] understood / reviewed / addressable."  *See* JX019 at MoneyLion_01843459 (October 15, 2021 Slack message from Jon Stevenson to MoneyLion team).

55.    Shortly after receiving the CFGI diligence report, on or about October 19, 2021, I again spoke with Mr. Frommer to confirm that there were no outstanding issues based on the report's findings.  While I do not remember the exact details of the conversation, I recall going

27

through the report's findings, including that Malka's revenue recognition was GAAP-compliant, and Mr. Frommer confirming this was the case.

56.     During this conversation, Mr. Frommer and I also discussed whether Sellers could include additional line-items (such as intercompany revenue) for the purposes of Sellers' 2021 and 2022 Earnout calculations, even though those items would not traditionally be in Malka's GAAP-compliant financial statements.  I told Mr. Frommer that I had no issue including these one-off exceptions for the purpose of Sellers' earnout.  For example, I told Mr. Frommer that allowing Sellers' earnout calculations to include intercompany revenues in their earnout calculations would incentivize Sellers to allocate resources to MoneyLion.  At no time during this conversation did Mr. Frommer ever suggest that Malka would calculate the 2021 and 2022 Earnouts based on revenue recognition principles that were utterly divorced from GAAP and ASC 606, as Sellers had described in the 2019 and 2020 Financial Statements and had confirmed to CFGI.  I would have never agreed to allow Malka to use an entirely different set of accounting principles as the basis for calculating the 2021 and 2022 Earnouts.

57.     At no point in due diligence did Mr. Frommer or any of the Sellers disclose to me that, contrary to the 2019 and 2020 Financial Statements presented by Sellers, and Sellers' representations to CFGI, that Malka's prevailing practice was to issue invoices *weeks or months before work was performed* and recognize the full amount of those invoices into revenue immediately upon issuance of an invoice.  Had I known that Malka was systematically recognizing revenue in this manner, and not materially in accordance with GAAP and ASC 606, I would have immediately terminated negotiations to acquire Malka.

28

**Drafting of the MIPA**

58.    Following the completion of the CFGI report, my focus with respect to the Acquisition shifted to drafting the MIPA.

59.    As ultimately executed, the MIPA included two representations relating to Malka's accounting and financial statements, both of which were vitally important to me in allowing the Acquisition to go forward.  The first provision—Section 3.06—incorporated by reference Malka's 2019 and 2020 Financial Statements (and interim 2021 financial statements), and represented that they "are based on the books and records of the Company, and fairly present the financial condition of the Company as of the respective dates they were prepared."  JX065 at DLA_006214:

> Execution Version
>
> **Section 3.06 Financial Statements.** Complete copies of the Company's unaudited financial statements consisting of the balance sheet of the Company as of December 31 in each of the years 2019 and 2020 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended (the "**Unaudited Financial Statements**"), and unaudited financial statements consisting of the balance sheet of the Company as of September 30, 2021 and the related statements of income and retained earnings, stockholders' equity and cash flow for the nine month period then ended (the "**Interim Financial Statements**" and together with the Unaudited Financial Statements, the "**Financial Statements**") are included in the Disclosure Schedules as previously delivered to Buyer. Except as set forth in Section 3.06 of the Disclosure Schedule, the Financial Statements have been prepared in accordance with the Accounting Principles throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Unaudited Financial Statements). The Financial Statements are based on the books and records of the Company, and fairly present the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated. The balance sheet of the Company as of December 31, 2020 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**" and the balance sheet of the Company as of September 30, 2021 is referred to herein as the "**Interim Balance Sheet**" and the date thereof as the "**Interim Balance Sheet Date**". The Company maintains a standard system of accounting established and administered in accordance with the Accounting Principles in all material respects.

60.    Accordingly, Section 3.06 represented that the 2019 and 2020 Financial Statements (including their representations as to GAAP and ASC 606) were accurate, and I understood the representation in this way.

29

**DX-594.029**

61.    Section 3.06 also stated that "[e]xcept as set forth in Section 3.06 of the Disclosure Schedule, the Financial Statements have been prepared in accordance with the Accounting Principles."  The MIPA separately defined "Accounting Principles" as those expressly set forth in Schedule A of the MIPA.  JX065 at DLA_006186 ("Accounting Principles' means (a) the principles, policies, and procedures expressly set forth in Schedule A; and (b) to the extent not inconsistent with the foregoing, the historical accounting principles, policies, and procedures of the Company.").  Notably, at Section 3.06 of the Disclosure Schedule, where Sellers *could* have set forth exceptions to this representation, Sellers wrote a single word:  "None."  In this way, Sellers represented that there were no such exceptions, and that the 2019 and 2020 Financial Statements were prepared in accordance with the practices, policies and procedures expressly set forth in Schedule A.  JX066 at MoneyLion_001042:

<div style="border:1px solid black; padding:20px">

**Section 3.06**

**<u>Financial Statements</u>**

(see attached)

None.

</div>

62.    Separately, Section 2.06(b) of the MIPA outlined the process for calculating whether Malka achieved the revenue and EBITDA thresholds necessary for the 2021 and 2022 Earnouts.  According to Section 2.06(b), MoneyLion would prepare 2021 and 2022 Earnout Statements calculating Sellers' eligibility for the Earnouts "in accordance with the Revenue and

EBITDA Calculation Principles." JX065 at DLA_006207. Those "Revenue and EBITDA Calculation Principles" were defined as those set forth in Schedule B to the MIPA. JX065 at DLA_006199 ("(a) the principles, policies and procedures used by Buyer in its calculation of the Company's Revenue and EBITDA for the periods beginning on January 1, 2021 and ended December 31, 2021 and beginning January 1, 2022 and ended December 31, 2022, as set forth on Schedule B attached hereto; and (b) to the extent not inconsistent with the foregoing, the historical accounting principles, policies and procedures of the Company.").

**Drafting of Schedules A and B**

63.    On October 27, 2021, I reviewed drafts of Schedule A and Schedule B prepared by MoneyLion's deal team. *See* DX112 at MoneyLion_01832510 (October 26, 2021 email from Michelle Lee to MoneyLion deal team attaching draft Schedule B); DX513 at DLA_008276 (October 26, 2021 email from Chris Murphy to MoneyLion deal team attaching draft Schedule A). MoneyLion's draft of Schedule B stated that for the purposes of the Earnouts, revenue would be "recognized according to ASC 606." DX112 at MoneyLion_01832510.

31

64.    MoneyLion received Malka's edits to Schedule B on October 30, 2021.  *See* JX037 at MoneyLion_01832446 (October 30, 2021 email from Tim Sharkey to myself and various members of the MoneyLion deal team).  In the edits, Malka struck MoneyLion's reference to ASC 606, and inserted proposed language stating that Malka's revenue recognition would be governed by Malka's "historical revenue recognition principles," which, "by way of illustration, require [Malka] to recognize into revenue noncancelable cash deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained."  *See* JX037 at MoneyLion_01832458 (October 30, 2021 Schedule B Redline):



**Schedule B**

Revenue and EBITDA Calculation Principles

"**Revenue**" refers to revenue recognized according to ~~ASC 606~~ the Company's historical revenue recognition ~~requirements~~ principles for the combined and consolidated Company ~~and determined in accordance with U.S. GAAP as reviewed or audited by Buyer's independent accountants~~. By way of illustration, the Company's historical revenue recognition principles require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained. For purposes of this Agreement, Revenue will be ~~adjusted for~~calculated in accordance with the following:

32

65.    MoneyLion's draft of Schedule A stated that for the purposes of the representations in Section 3.06 of the MIPA, Malka's Financial Statements were prepared in accordance with GAAP and ASC 606.   On November 1, 2021, Malka returned Schedule A, retaining the representation with respect to GAAP compliance but adding certain exceptions, and striking the reference to ASC 606.   JX040 at MoneyLion_01832586 (November 1, 2021 email from Tim Sharkey to MoneyLion deal team):

---

**Schedule A**
**Accounting Principles**

The Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with:

(a) U.S. GAAP including, but not limited to, FASB issued Accounting Standards Update (ASU) No. 2014-09, Revenue from Contracts with Customers (Topic 606);

(b) the Buyer's Significant Accounting Policies disclosed within the Buyer's annual Audited Consolidated Financial Statements;

(a) U.S. GAAP, except as follows:

    a.    the Company's historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained, and

    b.    the Company's historical cost recognition principles associated with such revenue, which require the Company to recognize costs on contracts as incurred.

(b) (c)the specific accounting principles, policies, procedures, categorizations, definitions, methods, practices, and techniques set forth below ("Specific Policies").

In the event of any conflict among the above, clause (a) shall take precedence over (b) and (c), and clause (b) shall take precedence over clause (c).

---

66.    On November 1, 2021, I discussed Sellers' proposed edits to Schedules A and B with Ms. Nuno and Ms. Lee.  In our discussion, my initial reaction was to push back on these edits. This was because Sellers had already represented in the 2019 and 2020 Financial Statements that Malka followed GAAP and ASC 606.  Accordingly, I was confused as to why the Sellers would

DX-594.033

replace ASC 606 with "historical revenue recognition principles," given that Malka's "historical" practices (as represented by Sellers) already followed ASC 606. Following our conversation, Ms. Lee reported to the MoneyLion deal team that "we are just not accepting" the Sellers' edits striking the GAAP representations, and would "push back on their edit and insist on GAAP accounting." JX039 at MoneyLion_01832555 (November 1, 2021 email from Michelle Lee to MoneyLion deal team). I then resolved to call Mr. Frommer for an explanation. *See* JX039 at MoneyLion_01832555 (November 1, 2021 Email from Michelle Lee to MoneyLion deal team, stating that "we discussed with Rick and he also plans to discuss briefly" with Mr. Frommer).

67. I spoke with Mr. Frommer by phone regarding the Schedules on or about November 1 or 2, 2021, from my office at MoneyLion's headquarters in Manhattan. While I do not recall the exact words we used, I recall the substance of the discussion clearly, since the accuracy of Malka's financials was so important to me, and my decision to proceed with the transaction over the last four months had been rooted in Sellers' repeated representations that they were GAAP-compliant.

68. I began the conversation by asking Mr. Frommer why Sellers had edited the accounting Schedules as they had. I explained my confusion as to why Mr. Frommer would strike ASC 606 from Malka's revenue recognition principles, given that the Sellers had already represented to us that Malka followed ASC 606 in their 2019 and 2020 Financial Statements. Mr. Frommer told me that the Sellers' changes were mere technicalities, designed to ensure the representations in the Schedules were comprehensive. Mr. Frommer said, in sum and substance, that the edits were made to account for rare and one-off occurrences.

DX-594.034

69.    I then asked Mr. Frommer what he meant by that. Mr. Frommer explained that in rare instances in the past, Malka recognized as revenue certain noncancelable cash deposits received from a client at the time that deposits were received, rather than at the time that work was performed. Mr. Frommer elaborated that these deposits were sometimes required because of cash-flow issues that Malka had in the past. Because of Malka's small size, Mr. Frommer explained, Malka at times had lacked the capital required to complete client jobs. According to Mr. Frommer, in these instances, a client would send Malka payment immediately upon accepting the deal, to help Malka fund up-front costs relating to those projects. Even if the client later cancelled, Malka would be entitled to retain the deposit. Mr. Frommer stated that this was a past, not ongoing practice at Malka.

70.    I told Mr. Frommer that I would have no problem with Malka recognizing these rare instances of cash deposits as revenue for purposes of the earnouts, provided that there was no material impact on Malka's reported financial information. Mr. Frommer assured me that these noncancelable cash deposits had no material impact on Malka's financials, which he reiterated were prepared according to GAAP. Mr. Frommer also stated that these rare noncancelable cash deposits were Malka's only deviation from GAAP-compliant revenue recognition. I also stated, and Mr. Frommer agreed, that this lone revenue-recognition exception relating to noncancelable deposits would only be applicable for historical purposes and for the Sellers' potential achievement of the earnouts. I emphasized that, post-closing, all of Malka's revenues would need to be recognized in accordance with ASC 606 when consolidated into MoneyLion's financials. Mr. Frommer indicated that understood this.

DX-594.035

71.     Based on Mr. Frommer's representation, I believed that Sellers' addition of "historical revenue recognition principles" to the Schedules simply confirmed that Malka followed GAAP-based revenue recognition principles, with the sole exception of the immaterial and rare noncancelable cash deposits Mr. Frommer described to me.

72.     At no point during our conversation did Mr. Frommer reveal the true nature of Malka's accounting practices: that Malka systematically failed to follow GAAP with respect to revenue recognition, and instead recognized all revenue immediately upon generation of an invoice, regardless of whether a deposit was actually received, and regardless of whether any work had been done on the contract.  As described above, Mr. Frommer assured me that it was the very opposite: the exception for noncancelable deposits was the only exception to Malka's otherwise GAAP-compliant revenue recognition practices.

73.     Overall, Mr. Frommer's representations led me to believe that Malka's "historical revenue recognition principles" were materially consistent with GAAP, with the exception of its "historical" practice of recognizing immaterial, noncancelable cash deposits.  Based on this false representation, I agreed to accept Mr. Frommer's proposed revisions to the Schedules, and instructed my team to do so.  This is memorialized in a subsequent email sent by Ms. Lee.  *See* DX519 at MoneyLion_01832103 (November 2, 2021 email from Michelle Lee to MoneyLion deal team stating that "[w]e are ok with Schedule A *given that we now understand it pertains to historical periods only*.").

**Schedules A and B Are Further Revised to List All GAAP Deviations**

74.     Schedules A and B went through another key round of revisions before the deal closed.  At Sellers' request, MoneyLion had previously engaged a Representations & Warranties Insurer ("RWI") to provide coverage for any representations subsequently breached by Sellers.[10] That RWI insurer—DUAL—performed its own diligence on Sellers before agreeing to underwrite the policy.

75.     After reviewing CFGI's report (which had, as indicated, identified certain GAAP revenue recognition deviations, which Sellers had represented were "minimal", as well as certain costs that were not tracked on a full accrual basis), DUAL insisted, in a November 9, 2021, email, that Schedule A "enumerate each of [Malka's] historical deviations from GAAP."  DX519 at MoneyLion_01832102.

---

[10] This is standard practice in M&A deals.

37

76.     In response to DUAL's request, Sellers again revised Schedule A to include any and all additional historical GAAP deviations.  *See* DX519 at MoneyLion_01832102 (November 9, 2021 email from Tim Sharkey, DUAL's counsel, to MoneyLion's deal team reporting that "***these [changes] were made in response in response to the RWI insurer's note that Schedule A should enumerate each of Queen's [Malka's] historical deviations from GAAP***"):

77.     Particularly in light of these final revisions to Schedule A—made by Sellers in response to DUAL's insistence that Schedule A include *all* of Malka's historical deviations from GAAP—I understood that Sellers had disclosed all of Malka's deviations from GAAP in Schedule A, regardless of materiality.  For example, in response to DUAL's request, Sellers disclosed in Schedule A items as small as $9,000 in payments to Getty Images.     DX519 at MoneyLion_01832121:

> • Jersey City Tax Withholding - $98,000, quarterly expense reflected in related periods from Q120 - Q321.  The Company has already paid the Q3 liability - $17K, so total current as of Oct is $81K, payable by end of year.  The Company will pay this out in two-week intervals.  Adjustment made after 2020 financials submitted to CFGI.
> • An Accrual in Q3 21 for talent and revenue share expenses tied to the Malka Network business (new to Malka) that were technically incurred in the period, but were based on an estimate and historically have never been invoiced to Malka.  This was reversed in October.
> • Approximately $9,000 of pre-paid Getty Images reflected in pre-paid.

78.     The MIPA was signed on November 15, 2021, completing the Acquisition.  Upon the closing of the Acquisition, Mr. Frommer retained his position as President of Malka (now a subsidiary of MoneyLion), Mr. Krubich retained his position as CEO of Malka, Mr. Fried retained his position as Executive Producer of Malka, and Mr. Capra retained his position as CEO of Malka Sports LLC, a subsidiary of Malka (and therefore also a subsidiary of MoneyLion).  All of the Sellers became employees of MoneyLion, responsible for adhering to all of MoneyLion's employee policies and codes of conduct.  Mr. Frommer, Mr. Krubich, and Mr. Fried also became members of MoneyLion's Executive Committee, and Mr. Frommer became MoneyLion's Chief Content Officer.

DX-594.039

**Period from the Closing to the 2021 Earnout**

79.     As set forth in the MIPA, MoneyLion agreed not to take any action to frustrate Sellers' achievement of the 2021 and 2022 Earnouts.  JX065 at DLA_006210 (MIPA § 2.06(d)). To further ensure Sellers had a fair opportunity to achieve Malka's 2021 and 2022 Earnout targets, MoneyLion was required to allow Sellers to operate Malka in a substantially similar manner to how it was operated before the Acquisition.  JX065 at DLA_006210.  Specifically, Section 2.06(d) stated that MoneyLion would "operate [Malka] substantially in accordance with the operating and revenue budget" attached at Exhibit B to MIPA.  JX065 at DLA_006210.  I had discussed this provision with Mr. Frommer prior to the Acquisition, and we had agreed that the MIPA budget would be intended to serve as a guidepost for *overall* revenue and expense levels going forward. The budget was not intended to be adhered to on a line-by-line basis.  It was designed to be flexible, and give the Sellers flexibility in choosing how to allocate Malka's resources.  Consistent with the foregoing, I and the MoneyLion Finance team generally gave Sellers a "wide berth" so as not to intrude on Malka's operations.  I was careful to leave the management and operation of Malka to the Sellers, and took pains not to micro-manage Malka's business.

80.     MoneyLion's post-Acquisition visibility into Malka's finances was what would be expected for a parent company.  MoneyLion received Seller-generated reports from Sellers' NetSuite program, and received other financial reporting from Malka to ensure the proper flow of information to MoneyLion's financial and accounting functions.  I trusted that these reports were accurately prepared in accordance with the principles outlined in the MIPA. Accordingly, I believed we had sufficient visibility into Sellers' and Malka's revenue recognition and other

40

accounting practices, having recently undertaken diligence of Malka (aided by CFGI and deal counsel), and received reviewed financial statements and concrete representations from Sellers concerning Malka's accounting practices.

81.    Prior to late 2022, I never had any reason to suspect that MoneyLion could not trust the Seller-generated financial data, and thus never believed it was necessary for MoneyLion to circumvent the Sellers and directly access Malka's NetSuite protocol.  We had just completed extensive diligence on the Sellers, and I had no reason to suspect that Sellers could not be trusted to abide by their fiduciary duties to report accurate financial data to their parent company.  Indeed, MoneyLion had appointed Mr. Frommer and Mr. Krubich to MoneyLion's Disclosure Committee, reflecting the significant trust that we placed in them.  On a personal level, I saw the Sellers as business partners, and I wanted to set our relationship up for success.  It would have been harmful to our partnership if I indicated to the Sellers that I did not trust them to manage their own business that they had years of experience running.

82.    Sellers did not provide any MoneyLion finance or accounting employees with direct access to Malka's NetSuite accounting program until December 2022, when suspicions arose over Sellers' accounting practices.  DX505 at MoneyLion_02079803 (Malka NetSuite Access Log).

83.    I now understand that, following the Acquisition, MoneyLion's accounting team performed a limited revenue recognition adjustment of Malka's financial statements for the last 6 weeks of 2021: the post-closing "stub period" in which Malka's financials were included on MoneyLion's books for 2021.  The purpose of this reconciliation was to ensure MoneyLion's

DX-594.041

compliance with GAAP for the purposes of its public SEC filings, not to audit Malka's compliance with the MIPA.  This is a business-as-usual exercise that every public company undertakes with respect to all of its operations.  The accounting team who performed the adjustments (chiefly Michael Scalia, Director of SEC Reporting) were not involved in the MIPA negotiations, nor were they ever instructed to compare Malka's actual historical practices to what was required by the MIPA.  I was not aware of the results of the post-Acquisition GAAP reconciliations until after this litigation was filed.  Moreover, to the extent that any adjustments were made to Malka's 2021 revenue after the Acquisition, I would have viewed those adjustments as indicative of good-faith mistakes or clerical errors, ordinary-course year-end reconciliations, or the few instances of immaterial "noncancelable deposits" referenced in Schedules A and B and my November 2021 discussion with Mr. Frommer.  I certainly would not have viewed them as indicative of an intentional scheme to misrepresent or obfuscate Malka's true financial condition.

84.     Nor did anything I learned in early 2022 reveal the truth of Sellers' and Malka's accounting practices to me.  For example, in a March 15, 2022 Slack chat, Ms. Lee informed me that, based on her conversation with Malka's accounting team, Malka's practice was to "recognize revenue when things are billed, not when cash is collected."  *See* JX082 at MoneyLion_01826066 (March 15, 2022 Slack from Michelle Lee to myself and Erika Nuno attaching 2021 Earnout calculation).  To me, Ms. Lee's report was not in any way inconsistent with what I understood to be Sellers' as-represented historical accounting principles.  Malka's historical financial statements

42

indicated that Malka recognized revenue "**when work is completed and invoice[d] to the Company's customers.**"  *See* JX005 at MoneyLion_01149876:

---

**2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

Revenue Recognition
Revenue is recognized under the accrual basis of accounting and recorded as revenue when work is completed and invoice to the Company's customers.  The Company's revenue is generated from a combination of project-based purchase orders that have various stages of completion whereby additional revenue is earned, and standalone billing. The Company's contracts are generally short-term in nature and are completed in less than one-year.

---

85.     Accordingly, Malka's post-Acquisition comments to the Finance team that Malka "recognize[d] revenue when things are billed" was not inconsistent with Sellers' representations, since invoicing and recognizing revenue "when work is completed" would be consistent with ASC 606-compliant accrual accounting.  It was also consistent with the CFGI report, which had concluded that "[c]ustomers are **invoiced upon completion of milestones** set forth in respective contracts."  JX016 at MoneyLion_01813022.  And the disclosure that Malka' current revenue recognition practice was not based on "when cash is collected" was consistent with my early November 2021 conversation with Mr. Frommer, in which Mr. Frommer had represented that Malka's lone GAAP exception of recognizing into revenue noncancelable cash deposits was a rare and largely historic practice.

86.     In or about mid-February 2022, my team received Malka's completed year-end 2021 financial statement.  This statement indicated that Malka had met the EBITDA and revenue targets required for Sellers to receive the 2021 Earnout.   JX082 at MoneyLion_01826067.  As of that time, Malka had only joined MoneyLion three months prior, and I had no reason to doubt the reliability of Malka's accounting practices, nor the accuracy of Sellers' accounting representations.

43

I approved the issuance of restricted shares for the 2021 Earnout in mid-March 2022, based on Sellers' representations that they had achieved the required revenue and EBITDA thresholds.

87.    When I approved the issuance of the 2021 Earnout, I believed Sellers to have faithfully prepared their 2021 year-end financial statement in accordance with the same practices described and represented in the 2019 and 2020 Financial Statements and as expressly set forth in Schedules A and B.  I had no reason to suspect that any of the Sellers had misled MoneyLion as to the true nature of their accounting practices or breached the accounting principles set forth in Schedules A and B.  In addition, at that time I had no reason to believe that the Sellers had misrepresented their accounting practices in Schedule A, nor in the 2019 and 2020 Financial Statements, which included explicit representations of compliance with GAAP and accrual-based revenue recognition principles.

88.    After issuing the restricted shares related to the 2021 Earnout,[11] I began to see indications suggesting that Malka was not as profitable as expected, and could even be on pace to operate at a loss.  By 2022, Malka was subject to MoneyLion's GAAP reporting processes, which gave us more insight into Malka's monthly performance.  In addition, throughout the fiscal 2022 year, the Sellers repeatedly requested that MoneyLion inject capital into Malka to help cover operating expenses.  I approved of these requests (which totaled over $8 million over the next 12 – 14 months), because I wanted the Sellers to have the resources they needed to succeed.  However, I found it surprising that Sellers needed these injections, given that, in seeking the 2021 Earnout,

---

[11] Under the MIPA, the shares issued in connection with the purchase of Malka and the Earnouts bore a restricted legend, and could not be traded by the Sellers unless and until certain conditions were met.

DX-594.044

had reported that Malka had positive EBITDA of over $1.8 million.  Still, I had no reason to suspect prior to late 2022 that Sellers were engaged in any improper accounting practices.

### Events After the 2021 Earnout

89.    In December 2022, I was informed by Mark Torossian, MoneyLion's Chief Accounting Officer, that Sellers were submitting questionable intercompany invoices to MoneyLion.  *See* DX271 at MoneyLion_01842993 (December 16, 2022 Slack message exchange between myself, Mark Torossian, Dee Choubey, Erika Nuno).  I asked Mr. Torossian to examine Malka's accounting practices in more detail.  Over the next several months, Mr. Torossian reported a series of deeply troubling discoveries to me.  Among other things, in the Spring of 2023, Mr. Torossian informed me that he had uncovered many personal expenses billed by the Sellers to their corporate credit cards, the balance on which MoneyLion paid.  These personal expenses included trips to the NFL Super Bowl, the NBA All Star Game, and the Qatar World Cup, as well as domestic family vacations.  I also learned from Mr. Torossian that Malka's legal bills showed that Sellers were using MoneyLion funds to pay external counsel for their personal legal work.

90.    Separately, in early 2023, Mr. Torossian began the process of calculating Malka's 2022 EBITDA and revenue for the purposes of determining whether Sellers were eligible for the 2022 Earnout.  Mr. Torossian worked directly with Mr. Basdekis (Malka's Head of Finance) to do this, and by this time had access to Malka's NetSuite accounting software.  Mr. Torossian subsequently reported to me that Sellers had missed the EBITDA target by almost $2.9 million.  On April 14, 2023 at my direction, Mr. Torossian delivered to the Sellers a statement indicating

DX-594.045

that they had missed the 2022 Earnout target. *See* JX112 at MoneyLion_01826072 (April 14, 2023

Email from Mark Torossian to Sellers and MoneyLion management team attaching 2022 Earnout

Statement).

91.    Sellers objected to MoneyLion's 2022 Earnout calculation by letter dated May 25,

2023. In this letter, Sellers stated that MoneyLion's baseline revenue calculations—which were

based on GAAP—were inconsistent with Malka's "historical revenue recognition principles."

Sellers' letter did not once reference GAAP or accrual-based revenue recognition, seeming to state

that Malka's revenue recognition was completely divorced from GAAP, rather than anchored in

GAAP with a single immaterial exception, as Schedules A and B (and consistent with the 2019

and 2020 Financial Statements), and as Mr. Frommer assured me in our early November 2021

conversation. *See* DX516 at MoneyLion_01848262 (May 25, 2023 Email from Geoffrey G.

Young (counsel for Sellers) to Adam VanWagner attaching "Objections to the 2022 Earnout

Statement Letter").

92.    From this May 25, 2023 letter, for the first time, I began to understand that Sellers'

representations in the MIPA and Schedules A and B, and Mr. Frommer's representations in the

2019 and 2020 Financial Statements and our early November 2021 call, were false. Prior to this

point, I had always assumed that when Sellers referred to their "historical" practices, they were

referring to the GAAP-based principles outlined in those 2019 and 2020 Financial Statement.

Sellers' May 25, 2023 letter, however, made clear to me that Sellers' "historical" practices did not

even resemble GAAP.

DX-594.046

93.     Had I known Sellers' actual accounting practices before the MIPA was signed, I would never have permitted it to be signed, and MoneyLion would not have acquired Malka. Moreover, had I known, prior to the issuance of the 2021 Earnout shares, that Sellers' 2021 Earnout calculations were inconsistent with their representations and the MIPA—and that, as I later learned, a proper calculation under the MIPA would have resulted in Sellers missing the 2021 Earnout targets—I would not have approved the issuance of the 2021 Earnout shares.

94.     In the spring of 2023, I was also informed by Mr. Torossian that his accounting team had discovered additional financial reporting irregularities at Malka that suggested an intentional effort by the Sellers to make Malka appear more profitable than it actually was. These included inflating inter-company revenue by including the full costs of employees even where the employees were working on non-MoneyLion projects.

95.     This made me and others at MoneyLion re-evaluate an issue that arose in mid-2022 concerning Malka's gross profit. There, Sellers had classified revenue-generating employees (*i.e.*, those that were billed to projects) as fixed operating expenses, rather than including the employees in Malka's COGS, as would have been proper under GAAP. This made Malka's reported COGS appear lower than it actually was, and inflated Malka's gross profits. In 2022, I had attributed the gross profit miscalculation to an innocent mistake by Malka's accounting department. The information I received in 2023, however, led me to conclude that Malka's gross profit "miscalculation" was in fact part of an intentional effort to mislead MoneyLion as to Malka's profitability, both prior to and after the Acquisition. Around this time, I also learned that MoneyLion personnel had discovered several other potential breaches of the MIPA, including

47

other false representations that Sellers made regarding Malka's corporate structure and accounts receivable at the time of the Acquisition. Based on this new information, MoneyLion filed a notice of claim against the Sellers in a May 15, 2023 letter to Mr. Frommer from MoneyLion's outside counsel, which lays out these breaches of the MIPA. *See* JX113.

96.    In or about May 2023, I discussed with Mr. Choubey and other members of the Board of Directors of MoneyLion the findings of Mr. Torossian's review of Sellers' expenses and misuse of MoneyLion funds. Mr. Choubey and the Board determined that each of the Sellers should be terminated for cause, which they were, effective May 19, 2023. We informed Sellers of their terminations at an in-person meeting that day, and followed up with a letter advising the Sellers that the investigation of their "serious misconduct" was ongoing. *See* JX114 (May 19, 2023 Letter to Dan Fried); JX115 (May 19, 2023 Letter to Jeff Frommer); JX116 (May 19, 2023 to Louis Krubich); JX117 (May 19, 2023 Letter to Pat Capra).

97.    The revelation that Sellers had been operating under entirely non-GAAP revenue recognition principles prompted urgent discussions among myself, Mr. Torossian, Mr. Choubey, and other senior MoneyLion personnel. We escalated these issues to MoneyLion's Board of Directors. In our discussions with the Board, the Board expressed concerns that Sellers may have falsely induced us into issuing the 2021 Earnout using the wholly non-GAAP historical accounting principles that Sellers now wanted MoneyLion to use to award them the 2022 Earnout. The Board agreed that my team should revisit the 2021 Earnout to confirm whether Sellers' shares had been obtained under false pretenses.

48

98.     Accordingly, I instructed Mr. Torossian to revisit the 2021 Earnout calculation and confirm whether or not our independent GAAP-based calculation (adjusted for the minor deviations listed in Schedule B of the MIPA) was consistent with the 2021 financial information that Sellers had submitted in support of the Earnout.  Mr. Torossian reported to me that, using proper accounting consistent with Schedule B, Malka failed to achieve the 2021 Earnout.

99.     On June 6, 2023, in light of these serious findings, MoneyLion placed a stop order at Continental Transfer and Trust Co., MoneyLion's transfer agent.  The stop order requested that Continental not transfer any restricted shares still held at Continental that had been issued to the Sellers in connection with the purchase of Malka and the 2021 Earnout.  I believed then that we had a fiduciary obligation to do so, as the evidence indicated that Sellers had perpetrated a fraud on MoneyLion and its shareholders and should not be permitted to capitalize further on that fraud.

100.    I later learned that on June 5, 2023, the Sellers had written to Continental, and demanded the removal of the restricted legend so Sellers could sell their shares.   In accordance with the stop order MoneyLion had put in place, Continental refused Sellers' request to remove the restricted legend, and on June 14, 2023, Sellers wrote MoneyLion's external counsel demanding removal of the restricted legend.  Naturally MoneyLion has not done so.[12]

---

[12] As of December 19, 2024, MoneyLion has incurred $14,945,006.99 in legal fees and expenses to defend and prosecute this action.  MoneyLion is submitting invoices to substantiate this.  *See* DX510; DX520.

The foregoing is true and correct to the best of my knowledge and belief.

Dated at New York, New York this 19th day of December, 2024



Richard Correia

Subscribed and sworn before me
this 19th day of December, 2024

Texas
Galveston

Notary Public
Commission Expires: 04/28/2027

NOTARY PUBLIC
STATE OF TEXAS

Kenneth Wyatt Lightfoot IV

ID NUMBER
13433248-0
COMMISSION EXPIRES
April 28, 2027

Electronically signed and notarized online using the Proof platform.

50

**DX-594.050**