# **EXHIBIT B**



November 15, 2021

To: Jonathan Lee
    Marsh USA Inc
    1166 Avenue of Americas
    New York, NY 10036

Re: Binder for Primary Buyer-Side Representations and Warranties Insurance for Project Queen

Dear Jon,

DUAL Transactional Risk, a division of DUAL Commercial LLC, is pleased to offer the attached conditional binder for the MoneyLion Technologies Inc.  The commission payable for this placement is 17%.

Please contact our team with any issues with the conditional binder.   Thank you for placing your business with DUAL Transactional Risk.

Sincerely,

Daniel Simnowitz
Executive Vice President
DUAL Transactional Risk, a division of Dual Commercial LLC
dansimnowitz@dualcommercial.com

**PX 153**

Binder for Master Policy # TRA090202

Dual_001093

**CONFIDENTIAL**



**Date: November 15, 2021**

**Master Policy #:** TRA090202

**All capitalized terms used but not defined in this Binder Agreement (along with the Exhibits attached hereto) (the "Binder") shall have the respective meanings assigned to them in the Draft Policy (as defined below).**

| | | |
|---|---|---|
| 1. | **Named Insured** | MoneyLion Technologies Inc.<br>c/o MoneyLion Inc.<br>30 West 21st Street, Ninth Floor<br>New York, New York 10010<br>Attention: General Counsel's Office<br>Email: legal@moneylion.com |
| 2. | **Additional Insureds** | Buyer Indemnitees (other than the Named Insured), whether now in existence or formed after the date hereof.<br><br>Collectively, the Named Insured, the Additional Insureds and their respective successors and permitted assigns of the foregoing are referred to herein as the "Insureds," and "Insured" means any one of them. |
| 3. | **Coverage Type** | Primary Buyer-Side Representations and Warranties Insurance for Loss in excess of the Retention, subject to the terms and conditions of the policy attached hereto as Exhibit A (the "Draft Policy"). |

| | | | | | | |
|---|---|---|---|---|---|---|
| 4. | **Insurers** | **Insurer** | **Policy Number** | **Quota Share Percentage** | **Quota Share Limit of Liability** | **Premium** |
| | | Columbia Casualty Company ("CNA") | 711266348 | 80% | $6,000,000 | $297,600 |
| | | Palms Insurance Company, Limited ("Palms") | NPPLTLAA0131-1121 | 20% | $1,500,000 | $74,400 |

The obligations of each Insurer in this Item 2 are limited to its Quota Share Percentage of Loss up to its Quota Share Limit of Liability. In no event, shall an Insurer reimburse or pay any amounts in excess of its Quota Share Percentage of Loss up to its Quota Share Limit of Liability, it being understood that the failure or inability of any Insurer to pay any amount due under this Policy shall not release the

Dual_001094

**CONFIDENTIAL**

| | |
|---|---|
| | other Insurer from its liability for its Quota Share Limit of Liability. Unless otherwise specified in this Policy, Insurer means all "Insurers" in this Item 2. |
| 5. Policy Term | From November 15, 2021 ("Inception") until November 15, 2024 (the "Expiration Date"); provided that the Expiration Date with respect to the Fundamental Representations and the Pre Closing Tax Indemnity shall be November 15, 2027 .<br><br>The applicable Expiration Date shall be as of 11:59pm local time at the address set forth in Item 1. |
| 6. Limit of Liability | $7,500,000 in the aggregate. |
| 7. Retention | $750,000, in the aggregate (the "Retention"), inclusive of any amounts to be borne by the Buyer Indemnitees in respect of the Deductible set forth in the Acquisition Agreement.<br><br>Subject to Section III.B(ii) of this Policy, to the extent that the then-remaining Retention is greater than $375,000 in the aggregate on the eighteen-month anniversary of the Closing Date (the "Retention Dropdown Date"), then the Retention shall be reduced to $375,000. |
| 8. Premium | Non-Terrorism Portion:        $372,000<br>Terrorism Portion:            $0<br><br>Premium:                      $372,000<br><br>The Premium is exclusive of any applicable surplus lines, self-procurement or premium tax and any other applicable excise or other tax, fee or surcharge. It is the Insureds' responsibility to pay any such applicable amount. The Premium is non-refundable. For the avoidance of doubt, the Insureds are not responsible for the payment of any taxes or other amounts that are imposed on or determined by reference to income of the Insurer or the Insurance Broker or are imposed in lieu of an income tax. |
| 9. Commission | The Premium is inclusive of a 17% brokerage commission. |
| 10. Acquisition Agreement | Membership Interest Purchase Agreement as of the 15th day of November, 2021, by and among MoneyLion Technologies Inc., Malka Media Group, LLC, Jeffrey Frommer, Lyusen Krubich, Daniel Fried, and Pat Capra, and Jeffrey Frommer, in his capacity as the Sellers' Representative. |
| 11. Insurance Broker | Marsh USA Inc<br>1166 Avenue of Americas<br>New York, NY 10036 |
| 12. Underwriting Representative | DUAL Transactional Risk, a division of DUAL Commercial LLC |
| 13. Termination | Unless accepted by the Insured, this Binder expires 30 calendar days from the date above. |

Dual_001095

| | |
|---|---|
| | Issuance of the final, executed buyer-side representations and warranties policy contemplated by this Binder and the Draft Policy (the "Policy") shall be subject to the satisfaction (or waiver by the Underwriting Representative or Insurer) of the following conditions: |
| | a)  Within 30 days after the Closing Date, the Underwriting Representative shall have received (i) the full amount of the Premium in accordance with the wire transfer instructions set forth in the invoice attached as <u>Exhibit B</u>, and (ii) the Underwriting Fee of $40,000 in accordance with the wire transfer instructions set forth in the underwriting fee invoice issued by the Underwriting Representative. |
| | b)  Within 60 days after the Closing Date, the Underwriting Representative shall have received copies of (i) the final, executed Acquisition Agreement (and any amendments thereto) and (ii) the closing deliveries exchanged pursuant to the Acquisition Agreement. |
| | c)  Within 60 days after the Closing Date, the Underwriting Representative shall have received a USB drive,DVD/CD-ROM, or other satisfactory electronic filecontaining, to the Name Insured's Actual Knowledge, a complete copy of the data room maintained by the Seller in connection with the transaction. The USB drive/DVD/CD-ROM package should be marked with project name and sent to Michael Ellis,107 Muscovy Way, Maryville, TN 37801. Any encryption password related to the USB Drive/DVD/CD-ROM can be provided by email to mellis@dualcommercial.com. |
| **14. Conditions** | d)  Neither the Insureds nor any of their respective Affiliates shall have (i) amended, supplemented or rescinded the Acquisition Agreement (or entered into any agreement or arrangement which would have such an effect), (ii) given any consent or waiver thereunder, or (iii) granted any authority to take any actions in the clauses (i) or (ii) above, in each case, without the prior written consent (not to be unreasonably conditioned, delayed or withheld) of the Underwriting Representative if such amendment, supplement, rescission, agreement, arrangement, consent, waiver or grant would reasonably be expected to actually prejudice the Insurer or its rights or liabilities under the Binder or the Draft Policy (with the Insurer having the burden of proving such actual prejudice); provided, however that should such amendment, consent, or waiver be made or given without the consent of the Underwriting Representative, then the Insurer's obligation under the Draft Policy shall only be relieved to the extent that Loss (that would not have otherwise existed) has been created or increased by such amendment, consent, or waiver. |
| | e)  On or immediately before the date of this Binder, the Underwriting Representative shall have received a No Claims Declarations, executed by an authorized representative of the Named Insured as of Inception, in the form attached as <u>Exhibit D</u> to the Draft Policy. |
| | f)  Prior to Policy issuance, the Underwriting Representative shall have received an executed copy of the Surplus Lines Form, attached as <u>Exhibit C</u>. |
| | Issuance of the Policy shall be deemed to be confirmation by the Underwriting Representative and Insurer that the foregoing conditions have been satisfied or waived. Following issuance of the Policy, the Policy shall be the exclusive document for determining coverage of Losses thereunder. |

Binder for Master Policy # TRA090202

Dual_001096

| | |
|---|---|
| **15. Failure of Conditions** | If any conditions set forth in Section 14 above are not satisfied when required to be satisfied pursuant to its terms, the Underwriting Representative shall be entitled to terminate this Binder by providing ten (10) Business Days prior written notice to the Named Insured (but only with respect to any unsatisfied conditions that have not been cured during such prior notice period).<br><br>If (x) this Binder is terminated or (y) the Acquisition Agreement is terminated pursuant to the terms and conditions thereof (a "Termination Event"), then this Binder shall be *void ab initio* and have no force or effect and the Underwriting Representative shall have no obligation or liability thereunder.<br><br>The Underwriting Representative shall be entitled to receive an amount equal to ten (10) percent of the Premium (the "Termination Fee") if a Termination Event occurs. Within five days of the Termination Event, the Named Insured shall tender the Termination Fee to the Underwriting Representative pursuant to the wire transfer instructions attached as Exhibit B. |
| **16. Authorization** | As set forth in Section IX.A. of the Draft Policy. |
| **17. Governing Law; Alternative Dispute Resolution** | As set forth in Section X. of the Draft Policy. |
| **18. Assignment** | As set forth in Section XI.D. of the Draft Policy. |
| **19. Amendments** | This Binder may not be amended, altered or modified except by written consent of the parties hereto. |
| **20. Entire Agreement** | This Binder constitutes the entire agreement and understanding concerning the subject matters of this Binder and supersedes the terms and conditions of any prior written or oral discussions, agreements, or communications between the Underwriting Representative, the Insurer and the Insureds and their respective affiliates concerning the subject matter of this Binder. |
| **21. Counterparts** | This Binder may be executed and delivered by the parties hereto in counterparts, each of which when executed shall be deemed to be an original, and all of which, when taken together, shall constitute one and the same agreement. |
| **22. Effectiveness of Agreement** | Notwithstanding anything to the contrary herein, including the Underwriting Representative's signature below, if this Binder is not signed by the Named Insured and returned to the Underwriting Representative on the date hereof, then the offer provided in this Binder shall automatically terminate and expire, whereupon this Binder shall be void *ab initio* and have no force or effect, and neither the Underwriting Representative nor the Insurer shall have any obligation or liability thereunder. |

*[Signature page follows]*

Binder for Master Policy # TRA090202

**CONFIDENTIAL**

**IN WITNESS WHEREOF**, the parties have caused this Binder to be duly executed as of the date first mentioned above.

DUAL Transactional Risk, a division of DUAL Commercial LLC

By: _____

Name: Daniel Simnowitz

Title: Executive Vice President

MoneyLion Technologies Inc.

By: _____

Name: Diwakar Choubey

Title: CEO and President

Binder for Master Policy # TRA090202

**CONFIDENTIAL**

EXHIBIT A

**DRAFT POLICY**

Binder for Master Policy # TRA090202

Dual_001099

**CONFIDENTIAL**



### Buyer-Side Representations and Warranties Insurance Policy

NOTICE: THE INSURERS NAMED HEREIN ARE NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER, NOT PROTECTED BY THE GUARANTY FUND. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE STATE OF NEW YORK PERTAINING TO POLICY FORMS.

NOTICE: THIS IS A CLAIMS MADE AND REPORTED POLICY. SUBJECT TO THE TERMS AND CONDITIONS OF THIS POLICY, COVERAGE IS LIMITED TO CLAIMS THAT THE NAMED INSURED REPORTS TO THE INSURER DURING THE POLICY TERM OR WITHIN THE 60-DAY PERIOD IMMEDIATELY FOLLOWING THE EXPIRATION OF THE APPLICABLE POLICY TERM. PLEASE READ THIS POLICY CAREFULLY AND DISCUSS IT WITH YOUR INSURANCE AGENT OR BROKER.

NOTICE: DEFENSE COSTS AND PROSECUTION COSTS COVERED UNDER THIS POLICY ARE PART OF LOSS AND AS SUCH ARE SUBJECT TO THE RETENTION AND THE LIMIT OF LIABILITY.

NOTICE: THE INSURERS DO NOT ASSUME ANY DUTY TO DEFEND. NOTWITHSTANDING THE FOREGOING, IF THE RETENTION HAS BEEN COMPLETELY EXHAUSTED, THEN, IN ACCORDANCE WITH AND SUBJECT TO THE TERMS AND CONDITIONS OF THIS POLICY, THE INSURERS SHALL REIMBURSE THE INSUREDS FOR DEFENSE COSTS COVERED UNDER THIS POLICY.

Dual_001100

CONFIDENTIAL

## DECLARATIONS

### Master Policy No.: TRA090202

| Item 1. | Named Insured: | MoneyLion Technologies Inc.<br>c/o MoneyLion Inc.<br>30 West 21st Street, Ninth Floor<br>New York, New York 10010<br>Attention: General Counsel's Office<br>Email: legal@moneylion.com |
|---|---|---|

| | Additional Insureds: | Buyer Indemnitees (other than the Named Insured), whether now in existence or formed after the date hereof. |
|---|---|---|

Collectively, the Named Insured, the Additional Insureds and their respective successors and permitted assigns of the foregoing are referred to herein as the "Insureds," and "Insured" means any one of them.

**Item 2. Insurer:**

| Insurers | Policy Number | Quota Share Percentage | Quota Share Limit of Liability | Premium |
|---|---|---|---|---|
| Columbia Casualty Company ("CNA") | 711266348 | 80% | $6,000,000 | $297,600 |
| Palms Insurance Company, Limited ("Palms") | NPPLTLAA0131-1121 | 20% | $1,500,000 | $74,400 |

The obligations of each Insurer in this Item 2 are limited to its Quota Share Percentage of Loss up to its Quota Share Limit of Liability. In no event, shall an Insurer reimburse or pay any amounts in excess of its Quota Share Percentage of Loss up to its Quota Share Limit of Liability, it being understood that the failure or inability of any Insurer to pay any amount due under this Policy shall not release the other Insurer from its liability for its Quota Share Limit of Liability. Unless otherwise specified in this Policy, Insurer means all "Insurers" in this Item 2.

| Item 3. | Policy Term: | From November 15, 2021 ("Inception") until November 15, 2024 (the "Expiration Date"); provided that the Expiration Date with respect to the Fundamental Representations and the Pre-Closing Tax Indemnity shall be November 15, 2027. |
|---|---|---|

The applicable Expiration Date shall be as of 11:59pm local time at the address set forth in Item 1.

| Item 4. | Limit of Liability: | $7,500,000 in the aggregate. |
|---|---|---|

Dual_001101

CONFIDENTIAL

| Item 5. | **Retention:** | $750,000, in the aggregate (the "Retention"), inclusive of any amounts to be borne by the Buyer Indemnitees in respect of the Deductible set forth in the Acquisition Agreement. |
|---|---|---|

Subject to Section III.B(ii) of this Policy, to the extent that the then-remaining Retention (as eroded from time to time pursuant to the terms of this Policy) is greater than $375,000 in the aggregate on the eighteen-month anniversary of the Closing Date (the "Retention Dropdown Date"), then the Retention shall be reduced to $375,000.

| Item 6. | **Notices:** | A. | Dual Transactional Risk, a division of DUAL Commercial LLC ("Underwriting Representative")<br>88 Wall Street – Suite 2200<br>New York, NY 10005<br>Email: TransactionalClaims@dualcommercial.com |
|---|---|---|---|

B.  CNA – Claims Reporting
P.O. Box 8317
Chicago, IL 60680-8317
Fax Number: 866-773-7504
Email: TransactionLiabilityNotice@cna.com

C.  Palms Insurance Company, Limited
Claims Reporting
700 Universe Boulevard
Juno Beach, FL 33408
Email: claims@palms-insurance.com

| Item 7. | **Acquisition Agreement:** | Membership Interest Purchase Agreement as of the 15th day of November, 2021, by and among MoneyLion Technologies Inc., Malka Media Group, LLC, Jeffrey Frommer, Lyusen Krubich, Daniel Fried, and Pat Capra, and Jeffrey Frommer, in his capacity as the Sellers' Representative |
|---|---|---|

| Item 8. | **Premium:** | Non-Terrorism Portion: | $372,000 |
|---|---|---|---|
| | | Terrorism Portion: | $0 |
| | | Premium: | $372,000 |

The Premium is inclusive of a 17% brokerage commission. The Premium is exclusive of any applicable surplus lines, self-procurement or premium tax and any other applicable excise or other tax, fee or surcharge. It is the Insureds' responsibility to pay any such applicable amount. The Premium is non-refundable. For the avoidance of doubt, the Insureds are not responsible for the payment of any taxes or other amounts that are imposed on or determined by reference to income of the Insurer or the Insurance Broker or are imposed in lieu of an income tax. The Premium is non-refundable.

| Item 9. | **Insurance Broker:** | Marsh USA Inc<br>1166 Avenue of Americas |
|---|---|---|

3

**CONFIDENTIAL**

New York, NY 10036

The Insurance Broker is the surplus lines broker of record and, in accordance with applicable state surplus lines laws, is responsible for the collection, reporting and payment of applicable surplus lines, self-procurement or premium tax and any other applicable excise or other tax, fee or surcharge.

| | | |
|---|---|---|
| **Item 10.** | **Exhibits Forming Part of Policy:** | Exhibit A: Acquisition Agreement<br>Exhibit B: Ancillary Documents<br>Exhibit C: Deal Team Members<br>Exhibit D: No Claims Declaration<br>Exhibit E: Claim Notice |

**THESE DECLARATIONS, THE POLICY FORM AND ANY EXHIBITS AND ENDORSEMENTS ATTACHED HERETO, CONSTITUTE THE ABOVE NUMBERED INSURANCE POLICY (THE "POLICY").**

**Authorized Representatives:**

_____

Chairman
Columbia Casualty Company

_____

Dennis Kearns, Managing Principal of DUAL Transactional Risk for DUAL Commercial LLC as authorized signatory of Palms Insurance Company, Limited

**Date:** _____

4

Dual_001103

**CONFIDENTIAL**



## Buyer-Side Representations and Warranties Insurance Policy

In consideration of the payment of the Premium, the Insurer and the Insureds each agree as follows:

**I.    INSURING AGREEMENT**

The Insurer shall indemnify and reimburse the Insureds for, or pay on their behalf, Loss that the Insureds report to the Insurer in accordance with the Section IV. of this Policy.

**II.   EXCLUSIONS**

The Insurer shall not be liable to make any payment for that portion of Loss to the extent (and only to the extent):

A.  such portion proximately relates to the substantive content of a material inaccuracy in a No Claims Declaration (but only to the extent the Insurer is actually prejudiced by such material inaccuracy, with the Insurer having the burden of proving such prejudice);

B.  such portion arises out of:

1.  any Breach of which any of the Deal Team Members had Actual Knowledge prior to Inception;

2.  any asbestos or Polychlorinated Biphenyls;

3.  the monetary amount by which (a) any employee defined benefit plan is unfunded or underfunded, or (b) any withdrawal liabilities relating to any multiemployer benefit plan;

4.  the availability or unavailability, in any taxable period beginning after the Closing Date, of any previously unused federal or state income tax net operating loss carryforward of the Company or any of its Subsidiaries from any Pre-Closing Tax Period; provided that this exclusion shall not apply to any Taxes paid or payable by or with respect to the Company or any of its Subsidiaries for any Pre-Closing Tax Period;

5.  Tax consequences resulting from the Company's failure to comply with applicable transfer pricing regulations;

6.  the Company's failure to protect their employees and contractors from the transmission of COVID–19;

7.  the application, and receipt of, the PPP Loan, including any failure of such loan to be forgivable;

8.  the failure of the Company to comply with the CARES Act with respect to the deferral of payroll Taxes or the use of employee retention credits;

9.  the misclassification of any service providers (including, without limitation, "day players" and freelancers) in California and New Jersey as independent contractors rather than employees;

10. the misclassification of employees in California and New Jersey as exempt under the Fair Labor Standards Act and similar state laws, including failure to pay overtime wages and to provide meal and rest breaks as required by applicable law;

5

**CONFIDENTIAL**

11. Section 409A of the Internal Revenue Code with respect to the Restricted Class M1 Common Unit awards to any employees;

12. the failure to comply with I-9 document verification requirements;

13. the participation of K-1 partners in the Section 125 cafeteria plan;

14. any matters listed on Section 8.03(h) of the Disclosure Schedules;

15. any claim arising from the Company's suspension or forfeiture in the State of California as a foreign company doing business in the State of California;

16. [the Company's failure to properly complete and file Forms 1094-C for all applicable years before 2020][1]

C. such portion actually adjusts, dollar for dollar, the purchase price pursuant to the Purchase Price adjustment as finally determined under the terms of the Acquisition Agreement, and the Insured directly or indirectly recovered for such portion of Loss (as determined on a "with and without" such Loss basis, with the intent of this provision to merely be to avoid "double counting" and not to otherwise limit any right to recover for such Loss arising out of or resulting from any Breach in excess of the amount thereof); provided, however, that if the Acquisition Agreement provides that any indemnification made for a Breach shall be deemed an adjustment to the purchase price, such a provision shall not itself constitute a post-Closing Purchase Price adjustment.

For the avoidance of doubt, if only part of the Loss is excluded under this Section II, the Insurer shall remain liable for that part of the Loss which is not so excluded, and the burden of proving the applicability of any of the foregoing exclusions to any portion of Loss shall be on the Insurer.

## III. LIMIT OF LIABILITY UNDER THIS POLICY; RETENTION; CALCULATION OF LOSS; REIMBURSEMENT

A. <u>Limit of Liability</u>

The Limit of Liability set forth in Item 4 of the Declarations is the maximum aggregate liability of the Insurer for Loss under this Policy. For the avoidance of doubt, the Retention is not part of the Limit of Liability. Defense Costs and Prosecution Costs are part of, and not in addition to, the Limit of Liability. Loss incurred within the Retention shall erode the Retention but not erode the Limit of Liability.

The liability of each Insurer is several and not joint with any other Insurer. The obligations of each Insurer for Loss are limited to the extent of its Quota Share Percentage up to its Quota Share Limit of Liability set forth in Item 2. of the Declarations, it being understood that the failure or inability of any Insurer to pay any amount due under this Policy shall not release the other Insurer from its liability for its Quota Share Limit of Liability. In no event, shall an Insurer reimburse or pay any amounts in excess of its Quota Share Percentage of Loss up to its Quota Share Limit of Liability

B. <u>Retention</u>

1. The Insurer shall only be liable for Loss (or the aggregate of all individual Losses) in excess of the Retention. The Retention is an aggregate one and shall only be eroded by Loss (or the aggregate of all individual Losses) for which the Insurer would be liable under this Policy but for the Retention ("<u>Erosion Losses</u>").

2. To the extent there are any Pending Matters as of the Retention Dropdown Date, then, upon resolution

---

[1] Note: subject to removal in the event that Moneylion receives the completed 1094/1095s and confirmation of filing within 30 days of Closing.

6

**CONFIDENTIAL**

of any such Pending Matters (including determination of the Loss related to such Pending Matters), the Insurer shall pay to the Insureds an amount such that the Insureds receive payments in respect of all Loss that the Insureds would have received had the amount of Loss in respect of such Pending Matters been known and finally resolved prior to the Retention Dropdown Date, and the Retention had been eroded, or adjusted, taking into account the Loss related to such Pending Matters and all other Loss.

3. Erosion Losses shall, as applicable, erode the Retention and/or be recoverable as Loss under this Policy prior to and not conditioned upon seeking or obtaining recovery from or taking any action against the Seller or any other third party pursuant to the Acquisition Agreement or any Ancillary Documents with respect to any Loss notwithstanding that the Insureds may have a right to claim against the Seller for such Loss under the Acquisition Agreement. The Insurer acknowledges and agrees that Seller has no indemnity obligation to the Insureds pursuant to the Acquisition Agreement or any Ancillary Document.

C. Calculation of Loss

Loss shall be reduced by any Recovered Amounts to the extent such Recovered Amounts are actually received by an Insured. To the extent any Recovered Amount is actually received or realized after payment by the Insurer hereunder, such Recovered Amount shall be applied in the following order: first, to reimburse the Insureds for any Loss borne by them in excess of the Limit of Liability; second, to reduce any Loss incurred by the Insureds which is covered by this Policy; and third, to reimburse the Insureds in respect of any Loss which the Insureds have retained by reason of the Retention. Any amounts recovered and retained by the Insurers shall serve to replenish the Limit of Liability herein.

Loss shall not be reduced, pursuant to the above, by: (1) any retentions or deductibles paid or incurred by the Insureds under any other available, applicable, valid and collectible insurance policies; (2) any increase in premium under such policies directly attributable to the Loss giving rise to such offsetting recoveries; (3) any reasonable costs and expenses incurred by the Insureds in connection with the recovery of such offsetting recoveries; or (4) any amounts recovered from Seller (or any Affiliates thereof); provided that there shall be no double recovery for any Loss. The Insured shall not be required to proceed or offset against any party (including Seller) for any recovery of Loss as a condition precedent to making a claim or receiving payment of any Loss hereunder.

## IV. REPORTING

A. The Named Insured shall deliver, or caused to be delivered, a notice of a Breach, Third Party Demand or Loss in writing, substantially in the form attached as Exhibit E (a "Claim Notice") to this Policy, to the Insurer and the Underwriting Representative as set forth in Item 6. of the Declarations as soon as reasonably practicable and in any event within 60 days after any Specified Person acquires Actual Knowledge of any Breach, Third Party Demand, or Loss. The Claim Notice shall reference this Policy and shall include, in as much detail as reasonably practicable (in light of the information then reasonably available) and to the extent a Specified Person has Actual Knowledge, a reasonably detailed description of the facts, matters or circumstances that are the subject of the Claim Notice, including a specific reference to the representations and warranties that are, to the Insureds' Actual Knowledge, implicated.

B. The information provided in or pursuant to any Claim Notice or any information any Insured subsequently provides to the Insurer in connection with a Claim Notice shall be provided solely for the purpose of making a claim under this Policy, and no information so disclosed shall be deemed to be an admission by any Insured to any party of any matter whatsoever (including any violation of law or breach of contract). In disclosing such information, the Insureds expressly do not waive any attorney-client privilege associated with such communications and information or any protection afforded by the work-product doctrine or other legal protection and/or privilege with respect to any of the matters disclosed or discussed therein. No information contained in any Claim Notice shall be deemed to be an admission by any Insured to any third-party of any matter whatsoever (including any violation of law or breach of contract).

7

CONFIDENTIAL

C.  If during the Policy Period or within sixty (60) days following the applicable Expiration Date the Insured gives the Insurer notice of facts or circumstances that could reasonably be expected to give rise to a Breach or Third Party Demand, then the ensuing Breach or Third Party Demand shall be deemed to have been reported to the Insurer within the Policy Period.

D.  In no event may a Claim Notice be delivered to the Insurer later than 60 days after the applicable Expiration Date. If a Claim Notice is provided to the Insurer during the Policy Term or the 60-day period immediately following the applicable Expiration Date, then any subsequent Loss arising out of any Breach, facts, matters or circumstances or Third Party Demand identified in the Claim Notice shall be deemed reported at the time such Claim Notice was received by the Insurer. Nothing in this Section IV.C shall be construed or interpreted as preventing the Insureds from supplementing a Claim Notice as additional facts and circumstances relating to the matters in such Claim Notice become actually known to the Insureds.

E.  As soon as reasonably practicable after the Insurer receives a Claim Notice (and in any event within 60 days of receipt) such Insurer shall respond in writing and in reasonable detail, by acknowledging or denying coverage for the Breach or Loss claimed (including reasons in the case where the Insurer has denied claimed Loss or claimed Erosion Loss). If the Insurer is not in a position to determine whether the Breach or Loss is covered by this Policy based on the information provided in the Claim Notice, then the Insurer's response shall state why it is unable to do so in reasonable detail and request such additional information as it may reasonably request from the Named Insured. Notwithstanding that the Insurer is not in a position to confirm the amount of Loss, and if required by the Named Insured, the Insurer shall respond by acknowledging or denying the claimed Breach or, if the Insurer is not in a position to confirm the Breach based on the information provided in the Claim Notice, then the Insurer shall state why it is unable to do so in reasonable detail and request such additional information as it may reasonably require from the Named Insured. The Insurer shall use commercially reasonable efforts to respond to any Claim Notice in a manner which provides the Insureds sufficient time to satisfy any litigation or similar deadlines of which the Insurer is made aware that relate to the subject matter of the Claim Notice.

F.  Any deficiency in the timeliness of the notice, or substance of the information or detail conveyed, shall not limit the Insured's rights, reduce the liability of the Insurer for the Loss to which the Claim Notice relations or otherwise relieve the Insurer of its obligations under this Policy, except to the extent that the Insurer has been actually prejudiced by the deficiency, and only to the extent of such prejudice, with the Insurer bearing the burden to prove any such actual prejudice, so long as any such notice from the Insured is provided during the Policy Period or within sixty (60) days after the applicable Expiration Date.

## V.  CORRESPONDENCE; COOPERATION; MAINTENANCE OF RECORDS; CONFIDENTIALITY

A.  Correspondence

The Insureds shall, at the written request of the Insurer and to the extent reasonably practicable, provide to the Insurer copies of any material formal and written correspondence, pleadings or other material documents relating to a Claim Notice that are delivered or filed by or on behalf of the Insureds or any other person, in each case, to the extent in the Named Insureds' possession; provided that the Insureds shall not be required to disclose or cause the disclosure of any information if doing so would violate any law or confidentiality agreement to which any Insured is a party or subject. To the extent the Insureds are prohibited from providing any such information, the Insureds shall use commercially reasonable efforts to seek the consent of the other party to such confidentiality agreement (if applicable) to allow the Insurer access to such information and shall cooperate with the Underwriting Representative in good faith to provide comparable documents or information.

B.  Cooperation

Where legally permissible, the Named Insured and its Subsidiaries shall use commercially reasonable efforts to provide the Insurer with any information, assistance and cooperation reasonably requested in writing by the Insurer in connection with a Claim Notice or other matter relating to this Policy. Such cooperation shall include permitting:

CONFIDENTIAL

1. the Insurer and its representatives to examine, photocopy and take extracts from the books, data, files, records and information of the Insureds to the extent reasonably and materially related to any Claim Notice and only during normal business hours and upon prior reasonable advance written notice to and consent of the Named Insured (such consent not to be unreasonably withheld); and

2. reasonable access to the Insured and its representatives for interviews during normal business hours and at reasonable locations and only upon reasonable advance written notice to and consent of the Named Insured (such consent not to be unreasonably withheld).

The provision of such information, cooperation and information shall be subject to existing confidentiality agreements by and between the Insureds and the Insurer, and shall be at the sole cost and expense of the Insurer (which shall not reduce the Limit of Liability hereunder) and subject to Section III.D of this Policy.

C.  Maintenance of Records

Until the later of 45 days after the Expiration Date or the final resolution of all claims or disputes relating to this Policy, the Insureds shall, to the extent within their control and in accordance with their respective record retention policies, if any, use commercially reasonable efforts to maintain any material documentation in their possession relating to the negotiation of the Acquisition Agreement and due diligence conducted in connection with the transactions contemplated thereby; provided that the Insureds may destroy documents in the ordinary course of the Insureds' business and their document retention guidelines so long as such destruction is not done with the intent to harm the Insurer. The destruction or loss of any such documents shall not be a defense to coverage unless and until the Insurer establishes that such document was destroyed with the actual intent to harm the Insurer with respect to this Policy. The burden to establish that materials were destroyed with the intent to harm the Insurers shall rest with the Insurer.

D.  Privilege; Fifth Amendment Protection

With respect to any documents or information referenced in Section IV or this Section V that are protected by attorney-client privilege, work product doctrine or other legal protections and/or privileges, the Insurer shall cooperate in good faith with the Insureds to preserve the privileged status of any such document or information (including by signing a joint defense or similar agreement acceptable to the Insurer and the Named Insured); provided that after such efforts to preserve attorney-client privilege, work product doctrine, or other legal protections and privileges, the Named Insured agrees that if providing any such document or information would constitute a breach of such attorney-client privilege, work product doctrine, or other legal protections and privileges, the Insureds shall not be required to provide such document or information, but the Named Insured shall, and shall cause the other Insureds to, reasonably cooperate (in accordance with Section V.B of this Policy) in good faith with the Insurer to provide the Insurer, to the extent reasonably practicable, with comparable documents or information while still preserving the privileged status of (or applicability of work product doctrine to) any such documents or information. Nothing in this Policy shall be construed to require the waiver of any Fifth Amendment or similar protection or to require any cooperation or disclosure if doing so may reasonably be expected to violate any law or confidentiality agreement to which any Insured is a party, or require any action that could reasonably be expected to cause the loss of the attorney-client privilege, work product doctrine or other privileges or protections. The Insurer shall keep this Policy and details of any notice or dispute relating to it confidential except, as required by law or regulatory authority. The Insurer shall keep the Acquisition Agreement and any other information provided by the Insured in connection with the underwriting of this Policy confidential, except as required by law or regulatory authority.

## VI. DEFENSE; SETTLEMENT; PAYMENT OF LOSS

A.  Third Party Demand and Claims Participation

The Insurer does not assume any duty to defend the Insureds with respect to any Third Party Demand. The Insureds, to the extent provided under the Acquisition Agreement, shall defend and contest any Third Party

9

CONFIDENTIAL

Demand with the Approved Firm or other counsel consented to by the Insurer in writing (such consent not to be unreasonably withheld, conditioned or delayed. For the avoidance of doubt, such consent is not required with respect to the Approved Firm). With respect to any Third Party Demand, the Insureds shall not knowingly take any action or omit to take any action that the Insureds reasonably expect to actually prejudice the Insurer's position or its potential or actual rights of recovery (with the Insurer having the burden of proving such prejudice), except to the extent required by law, regulation or unappealable judicial or similar order. The Insurer shall have the right, at its sole cost and expense (which shall not reduce the Limit of Liability hereunder), to effectively associate in the investigation, defense and settlement of any Third Party Demand or other matter reasonably likely to affect the Insurer's rights under this Policy in respect of a claim; provided that, if the Insureds' rights to control or participate in the defense of such Third Party Demand or other matter are limited by the Acquisition Agreement, the Insurer shall have the right to effectively associate to the same extent as the Insureds. For purposes of clarity and without limiting any other rights or obligations set forth in this Policy, the right of effective association does not include decision making power with respect to the defense, prosecution, negotiation and settlement of any Third Party Demand.

B.  Defense Costs and Prosecution Costs

Once the applicable Retention is exhausted, the Insurer shall promptly reimburse the Insureds for Defense Costs and Prosecution Costs incurred and set forth in an applicable invoice as soon as reasonably practicable and in any event within 60 days of the Insurer's receipt of such invoice.

C.  Settlements and Judgments

With respect to any settlement, voluntary judgments, compromises or other agreements related to a Third Party Demand, only Loss (other than Defense Costs or Prosecution Costs) resulting from settlements, voluntary judgments, compromises or other agreements consented to by the Insurer in writing (such consent not to be unreasonably withheld, conditioned or delayed), and such consent shall not be required with respect to settlements, stipulation or judgments entered into by the Company prior to Closing, or resulting from a final judgment by a court of competent jurisdiction or arbitral panel, shall deplete the Retention or be recoverable as Loss; provided, that with respect to any settlement, voluntary judgment or compromise that is solely within the Retention, the Insurer's consent shall not be required until the sum of Loss incurred by the Insured, including the amount of (i) such settlement, judgment or compromise, (ii) Loss previously incurred by Insured, and (iii) any Loss (including Defense Costs or Prosecution Costs, if applicable) incurred in connection with any pending claims (the "Total Settlement Amount") exceeds 50% of the then-remaining Retention; provided, further that subject to the consent rights expressly given the Insurer in this Section VI.C, the Insureds shall control all decisions with respect to the defense, prosecution, negotiation, and settlement of any Third Party Demand.

D.  Approved Firm

The Insurer agrees that the Approved Firm is counsel or advisor to the Insureds and that the Insureds intend to engage the Approved Firm for matters related to this Policy (including in connection with a Claim Notice). The Insurer agrees that the Approved Firm may represent the Insureds and shall not challenge the Insureds' engagement of the Approved Firm as being unreasonable or in any way violating this Policy (including the Insureds' payment of the then remaining prevailing rates of the Approved Firm).

E.  Payment of Loss

Payment of any Erosion Loss by the Insurer shall be made to the Named Insured as representative of all of the Insureds or to such person or entity as the Named Insured instructs the Insurer pursuant to Section IX of this Policy. Once the Retention is exhausted, the Insurer shall pay Loss (other than Defense Costs and Prosecution Costs) as soon as reasonably practicable and in any event within 60 days.

F.  Territory

This Policy extends to Breaches and Losses taking place or being incurred, as applicable, anywhere in the world.

Dual_001109

CONFIDENTIAL

## VII. MITIGATION; SUBROGATION; OTHER INSURANCE

A.  Mitigation

1.  To the extent required by applicable law or as reasonably and specifically requested in writing by the Insurer, the Insureds shall use commercially reasonable efforts within their control to mitigate any Loss or potential Loss (other than, in each case, with respect to Taxes) after any Specified Person has Actual Knowledge of any Breach, Third Party Demand, or matter under investigation by such Specified Person which would reasonably be expected to give rise to any Loss; provided that the failure of any Insured to so mitigate, where such mitigation was within its control, shall only reduce the rights of the Insureds to recover for Loss under this Policy to the extent of the Loss that would have been avoided by such mitigation, and the burden of proving such amount shall be on the Insurer and shall not otherwise diminish or delay coverage hereunder; provided further, that the Insureds shall not be required or obligated to seek recovery or recourse under the Acquisition Agreement from the Seller (or any Affiliate thereof) except as provided in Section VII.B of this Policy in connection with the subrogation rights of the Insurer. Any costs borne by the Insured in its mitigation efforts hereunder shall constitute Loss under this Policy. The Insurer will not delay, condition or withhold payment of Loss under this Policy while the Insureds pursue any such mitigation. If the Insurer believes the Insureds should take any additional actions to comply with its obligations pursuant to this Section VII.A(1), the Insurer shall request such actions in writing.

2.  If the Insurer reasonably believes the Insureds should take any additional actions to comply with their obligations pursuant to this Section VII.A, the Insurer shall request such actions promptly in writing; provided that in no event shall any Insured be required to initiate any litigation, arbitration or other formal recovery proceeding to mitigate Loss or to take any other action outside the ordinary course of business.

3.  Nothing in this Section VII.A is intended to limit the obligations of the Insureds pursuant to Section VII.B of this Policy.

B.  Subrogation

1.  To the extent the Insurer is entitled to subrogation rights hereunder, the Insureds shall take commercially reasonable steps to (a) preserve any indemnification or other rights against any other person or entity for any Loss, which rights would offset the Insurer's obligations hereunder, and (b) use commercially reasonable efforts to preserve the Insurer's subrogation rights with respect thereto; provided that the Insureds shall not be required to preserve any indemnification or subrogation rights in connection with the Acquisition Agreement, the Ancillary Documents, and the transactions contemplated thereby, against the Seller unless such Seller engaged in Fraud.

2.  In the event of any payment of Loss under this Policy, the Insurer shall be subrogated to the extent of such payment to, and the Insureds shall assign to the Insurer, all of the Insureds' rights of recovery with respect to such payment against any person or entity; provided that the Insurer shall not be entitled to subrogate, and the Insurer hereby waives and agrees to not pursue, directly or indirectly, any and all rights of subrogation in connection with the Acquisition Agreement, the Ancillary Documents, and the transactions contemplated thereby, against (1) any Insured, (2) the Company, (3) any direct or indirect past, present or future shareholder, member, partner, stockholder, employee, director or officer (or the functional equivalent of any such position) of any of the foregoing, (4) the Seller, including any direct or indirect past, present or future shareholder, member, partner, stockholder, employee, director or officer (or the functional equivalent of any such position) of any of the Seller, or (5) the Approved Firm, except in the case of items (1) and (3) above, if both (a) associated with the Company prior to Closing and (b) in connection with Loss for which there is an assignable or subrogatable right of recovery therefrom and, with respect to management and employees of the Company, in a manner that is not inconsistent with the terms of the Acquisition Agreement, and in the case of item (4) above, Fraud by the Seller (or by any direct or indirect past or present shareholder, member, partner, stockholder, employee, director

11

**CONFIDENTIAL**

or officer (or the functional equivalent of any such position) of Seller). At the sole cost and expense of the Insurer (which shall not reduce the Limit of Liability hereunder) and to the extent consistent with the granting of subrogation hereunder, the Insureds shall use commercially reasonable efforts to execute all papers reasonably required and take all steps reasonably requested by the Insurer to secure and further such subrogation. In no event shall the Insureds knowingly and intentionally waive any rights in a manner that would reasonably be expected to actually prejudice any such subrogation or assignment right. The Insurer agrees that this Section VII may not be amended or modified without the prior written consent of Seller as it relates to Seller and Seller's Affiliates.

3. With respect to a subrogation claim against a customer, client or supplier of any person or entity described in items (1)–(3) of Section VII.B(2) of this Policy, the Insurer shall not be entitled to subrogate without the prior written consent of the Named Insured (such consent not to be unreasonably withheld, conditioned or delayed) until the aggregate amount of all such Loss for which recovery would be available against any such customer, client, distributor or supplier exceeds $500,000 with respect to such applicable customer, client, distributor or supplier (the "Subrogation Threshold"). After such Losses with respect to such customer, client, distributor or supplier exceed the Subrogation Threshold, the Insurer may subrogate against such customers, clients, distributors and suppliers without the consent of the Named Insured, and the Insurer shall only be required to provide 30 days advance written notice to the Named Insured of its intent to institute such subrogation claim. Upon the request of the Named Insured, the Insurer shall provide reasonable updates with respect to the status of and circumstances relating to such subrogation claim. The Named Insured shall be entitled to effectively associate in the prosecution, negotiation and settlement of any subrogation claims against any customers, clients or suppliers or other material business relations of the Company.

4. The Insurer shall bear all fees, costs, charges, expenses, including Loss and other similar amounts incurred in connection with any subrogation efforts undertaken by the Insurer, and shall promptly reimburse the Insureds and their Affiliates for any reasonable fees, costs, charges, expenses, and other similar amounts incurred in connection with any subrogation efforts in connection with Section VII.B of this Policy (which reimbursement shall not be subject to the Retention or erode the Limit of Liability); provided, that the Insureds shall defend at their own expense, and satisfy any liability with respect to, any counterclaim or third party demand against the Insureds asserted in connection with any subrogation claim pursued by the Insurer that does not arise out of the same or similar facts or allegations out of which such subrogation arose or if successful would not be reasonably expected to result in Loss with respect to a Breach.

5. Any amounts recovered by the Insurer through subrogation or assignment of rights in accordance with this Section VII.B shall be applied in the following order: (1) first, to reimburse the Insurer and the Insureds (to the extent the Insureds have not already been reimbursed) for any reasonable fees, costs, charges, expenses, and other similar amounts incurred in connection with such recovery (allocated pro-rata based on the total amount of such fees, costs, charges, expenses, and other similar amounts incurred by the Insurer and the Insureds); (2) second, to reimburse the Insureds for any Loss borne in excess of the Limit of Liability (only to the extent of such excess); (3) third, to reimburse the Insurer in respect of any Loss paid to, or on behalf of, the Insureds under this Policy and for which subrogation rights were assigned hereunder to the Insurer; and (4) fourth, to reimburse the Insureds in respect of any Loss which the Insureds have retained by reason of the Retention. The Limit of Liability shall be reinstated immediately by an amount equal to the amounts recovered by the Insurer pursuant to item (3) of the foregoing sentence.

C. Other Insurance

The coverage provided under this Policy for Loss shall be excess to any other available, applicable, valid and collectible insurance that provides coverage for such Loss, including all available, applicable, valid and collectible insurance listed in Section 3.16 of the Disclosure Schedules, except for any deductibles, self-insured retentions, or similar provisions thereunder. The Named Insured shall (i) at the Insurer's reasonable written request, discuss with the Insurer whether any preexisting bond, indemnity or other insurance policy is applicable and available with respect to the matters described in any Claim Notice, and (ii) if any such

CONFIDENTIAL

bond, indemnity or other insurance policy is applicable and available, utilize good faith efforts to collect thereunder; provided that (1) any dispute as to the applicability of, or delay in obtaining, such coverage shall not be a basis for delay or refusal of payment hereunder, and (2) after such good faith efforts, the Insurer shall not use the terms of the first sentence of this Section VII.C to deny or delay acknowledging or paying coverage for the matters described in such Claim Notice; provided further, that it is understood that the foregoing shall not limit the Insurer's rights of subrogation against other insurance policies or other sources of recovery to the extent provided for in Section VII.B of this Policy. The Named Insured shall not be obligated to first pursue claims for Breach against any other insurance policy or any other source of recovery prior to being eligible for any payment under this Policy, and if there is a dispute as to whether the coverage under this Policy shall be excess of other coverage or if other coverage shall be excess of the coverage under this Policy, the Insureds may recover under this Policy, and the Insurer shall be subrogated to the extent provided in Section VII.B of this Policy to the Insureds' rights to such other coverage. Notwithstanding the foregoing, any amounts payable by any Insured under a deductible, retention or similar provision of a valid, collectible and applicable insurance policy, where such amounts are directly related to a Loss, shall constitute Loss (and shall, to the extent the Retention is not fully eroded, be applied to satisfy the Retention).

## VIII. NOTICE

A.   All notices to the Insurer or the Underwriting Representative under this Policy (including any Claim Notice) shall be given in writing to the Insurer and the Underwriting Representative at the address or, as appliable, the e-mail address set forth in Item 6 of the Declarations. The Underwriting Representative is authorized to act and give/receive all notices and communications on behalf of the Insurer with respect to the negotiation and acceptance of all Policy terms and conditions (including but not limited to the negotiation and acceptance of any endorsements hereunder) and all other matters under this Policy.

B.   All notices to the Insureds under this Policy shall be given in writing to the Named Insured at the address or, as applicable, the e-mail address set forth in Item 1 of the Declarations, with a copy (unless otherwise directed in writing by the Named Insured) to:

DLA Piper LLP (US)
51 John F. Kennedy Parkway, Suite 120
Short Hills, New Jersey 07078
Attention: Andrew Gilbert, Esq.
Email: Andrew.gilbert@us.dlapiper.com

For purposes of convenience only, and not as a condition to any rights under this Policy, a copy of any such notice or other communication shall be sent simultaneously to the Insurance Broker at its mailing address set forth in Item 9 of the Declarations, unless otherwise directed in writing by the Named Insured.

C.   Any notices under this Policy shall be in writing and shall be deemed to have been given (i) by mail, hand delivery or prepaid express courier, in each case, as such notice would be effective and deemed received pursuant to the Acquisition Agreement, or (ii) if applicable, by e-mail as such notice would be effective and deemed received pursuant to the Acquisition Agreement.

## IX. AUTHORIZATION AND ACKNOWLEDGEMENTS

A.   Authorization of Named Insured

By accepting this Policy, the Named Insured acknowledges and agrees that the Insurer and the Underwriting Representative shall be entitled to rely exclusively upon any written notice given by the Named Insured and that the Insurer and the Underwriting Representative shall not be liable in any manner for any action taken or not taken in reliance upon any notice given by the Named Insured.

B.   Authorization of the Underwriting Representative

Dual_001112

**CONFIDENTIAL**

The Underwriting Representative is authorized to act on behalf of the Insurer with respect to all matters relating to this Policy, including the negotiation and acceptance of any terms and conditions of this Policy (including any Endorsements hereunder), and the giving and receipt of any notices and consents to or from the Insureds as provided in this Policy. The Insurer has not granted any authority to the Underwriting Representative to settle or compromise any claim under this Policy. The Insurer shall be bound by the communications made by the Underwriting Representative to the Insureds. The Insureds shall be entitled to rely on communications made to or received from (or made on behalf of) the Underwriting Representative as the authorized representative for the Insurer. All communications to the Insurer from the Insureds in respect to any Claim Notice, Breach or Third Party Claim shall be deemed to be effectively made if sent to the Underwriting Representative. The Insureds shall have no obligation to inquire as to the authority of the Underwriting Representative to act or to receive notices and communications on behalf of, and bind, the Insurer hereunder or to provide any notice or other communications required hereunder other than to the Underwriting Representative (who shall be deemed to have received any such notice or communication on behalf of the Insurer). The Underwriting Representative is not an Insurer and shall not be liable for any Loss or claim whatsoever.

C.  Other Acknowledgments

By accepting this Policy, each of (i) the Named Insured, on behalf of itself and each of the Additional Insureds, (ii) the Underwriting Representative, on behalf of itself, and (iii) the Insurer, on behalf of itself, acknowledges that such parties were represented by competent and experienced legal counsel of their choice in connection with this Policy and are entering into this Policy with full knowledge and acceptance of its terms and conditions.

## X.  GOVERNING LAW; JUDICIAL PROCEEDING OR ARBITRATION

A.  Governing Law

The construction, validity and performance of this Policy shall be interpreted under the laws of the State of Delaware, without reference to conflict-of-law principles that would require or allow the application of the law of any other jurisdiction. For the purposes of this Policy, the Acquisition Agreement and the Ancillary Documents shall be interpreted under the laws of the jurisdiction chosen therein, and where no jurisdiction is chosen, the Acquisition Agreement and the Ancillary Documents shall be interpreted by the laws of the State of Delaware, without reference to conflict-of-law principles that would require or allow the application of the law of any other jurisdiction. Nothing in this Section X.A shall affect or override the definition of Most Favorable Jurisdiction in this Policy.

B.  Dispute Resolution Options

All disputes or disagreements with respect to this Policy (including with regard to whether this Policy is void or voidable), whether arising before or after the termination of this Policy, and whether arising in connection with the interpretation thereof, shall be submitted by the Insurer, the Underwriting Representative or the Named Insured, to either (i) a court of competent jurisdiction through commencement of a judicial proceeding, or (ii) arbitration; provided, however, that in each case, the type of forum for resolution of such dispute, whether a court of competent jurisdiction or arbitration, shall be at the Named Insured's sole election, and upon the making of such election, such choice of forum shall be binding on both parties.

C.  Other Dispute Resolution Rules

The Named Insured shall act on behalf of all Insureds under this Section X. In connection with any dispute hereunder, no award or judgment, including any award or judgment of fees, costs, charges, expenses, or other amounts, shall be entered or payable in an amount exceeding the remaining Limit of Liability.

## XI.  MISCELLANEOUS

A.  Entire Agreement

CONFIDENTIAL

This Policy constitutes the entire agreement among the Underwriting Representative, the Insurer and the Insureds concerning the subject matter of this Policy. This Policy supersedes any prior or contemporaneous oral or written discussions, agreements or communications among the Insurer, the Underwriting Representative, and the Insureds and their respective Affiliates concerning the subject matter of this Policy.

B.  Construction

This Policy has been negotiated among, and agreed to by, informed and knowledgeable parties, at arm's-length and represented by legal counsel. This Policy shall be construed in the manner most consistent with the relevant terms and conditions of this Policy without regard to authorship of language and without any presumption in favor of either the Insurer, on the one hand, or the Insureds, on the other hand.

C.  Amendment

This Policy may not be amended, altered or modified except by a written consent of (x) on the one hand the Named Insured (y) on the other hand, the Insurer or the Underwriting Representative.

D.  Assignment

This Policy and any rights and obligations hereunder may not be assigned or transferred by the Insureds without the prior written consent of the Insurer (such consent not to be unreasonably withheld, conditioned or delayed). Notwithstanding the immediately preceding sentence, upon written notice to the Insurer, this Policy may be assigned (in whole or in part) by the Insureds (so that, in effect, an additional party may be added as an Additional Insured) without the prior written consent of the other parties hereto to (i) an Affiliate of the Insureds, (ii) a subsequent direct or indirect purchaser, assignee, transferee or successor-in-interest of the Insureds or the business or any of the assets acquired pursuant to the Acquisition Agreement (whether by merger, consolidation, acquisition, reorganization or sale of all or substantially all assets), or (iii) any lender to the Insureds as collateral security. The Insurer may not assign this Policy without the prior written consent of the Named Insured; provided that the Insurer may assign this Policy to another insurer that is a subsidiary or affiliate of the Insurer provided such other insurer's financial strength rating (Moody's or Standard & Poor's) is equal to or better than that of the Insurer as of the date of such assignment. Notwithstanding anything to the contrary in this Policy, in no event may an assignee of the Named Insured be an entity formed in a jurisdiction outside of the United States or an individual that is not a citizen or permanent resident of the United States, except with the prior written consent of the Insurer.

E.  Failure to Comply

Any failure of the Insureds to comply with any of the provisions of Sections IV. through VII. of this Policy shall not relieve the Insurer of its obligations under this Policy except and only to the extent that the Insurer is actually materially prejudiced thereby (with the Insurer having the burden of proving such prejudice and which shall not otherwise diminish or delay coverage).

F.  Loss Payee

Upon written notice to the Insurer, the Named Insured may assign the Insureds' rights to receive proceeds payable under this Policy to any bank(s) and/or holder(s) of debt securities and/or financial institution(s) and/or hedge counterparties and/or any other person lending money or making other banking facilities available to any Insured and/or the Company or any of its Subsidiaries (a "Loss Payee"). Except for the right of a Loss Payee to receive any such proceeds payable under this Policy and subject to Section XI.D of this Policy, no Loss Payee shall have any rights or obligations under this Policy or be deemed to be an Insured under this Policy, and the Insurer shall owe no duties to any such Loss Payee in connection with this Policy. Any payment made to the Loss Payee by the Insurer in accordance herewith shall be considered payment under this Policy in respect of such payment, and such payment will deplete the Limit of Liability to the extent such payment would deplete such Limit of Liability if paid to an Insured in accordance with the terms of this Policy.

CONFIDENTIAL

G.   Benefit

This Policy shall inure only to the benefit of the Insurer, the Underwriting Representative, and the Insureds and the respective successors and assigns of the foregoing, and no other person shall have any legal or equitable right, remedy or claim under or in respect of this Policy (except Seller is an express third party beneficiary of, and may enforce the provisions of, Section VII.B of this Policy with respect to the Insurer's subrogation rights against the Seller). Notwithstanding any other terms or conditions of this Policy, no Insurer shall be deemed to provide coverage hereunder and will not make any payments, nor provide any service or benefit hereunder to any Additional Insured or any other party (other than the Named Insured), to the extent that (i) such coverage, payment, service or benefit would violate any insurance law or regulation applicable to the Insurer solely by reason of the Insurer's lack of authorization in any such relevant jurisdiction, or (ii) any Insured, or the Insurer, would as a result become liable to report and pay in any country, other than that of the Named Insured, any insurance premium tax or parafiscal tax or other levy. To the extent the Insurer is prohibited by applicable insurance law or regulation to provide coverage, to make any payments, or to provide any service or benefit hereunder, in each case to any Additional Insured or any other party by the operation of the preceding sentence, then, the Named Insured shall instead be indemnified for any such Loss, with the intent of this Policy being that in all circumstances the Named Insured shall be entitled to, and shall receive from the Insurer, the aggregate of all sums which it or any and all other Insureds should have been entitled to receive under this Policy had the preceding sentence been of no effect.

H.   Acquisition Agreement

The Insureds shall not knowingly and intentionally (i) amend, supplement or rescind the Acquisition Agreement, (ii) give any consent or waiver under the Acquisition Agreement, or (iii) grant any authority to do any of the foregoing, in each case, without the prior written consent of the Insurer or the Underwriting Representative (such consent not to be unreasonably withheld, conditioned or delayed) to the extent such amendment, supplement, rescission, consent or waiver would reasonably be expected to actually prejudice the Insurer's rights or liabilities under this Policy (with the Insurer having the burden of proving such prejudice). Should such amendment, consent, or waiver be made or given without the consent of the Underwriting Representative or the Insurer, then the Insurer's obligation hereunder shall only be relieved to the extent that Loss (that would not have otherwise existed) has been created or increased by such amendment, consent, or waiver.

I.   Severability

If any term, provision, agreement, covenant or restriction of this Policy is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, agreements, covenants and restrictions of this Policy shall remain in full force and effect and shall in no way be affected, impaired or invalidated in any way.

J.   Counterparts

This Policy may be executed (including by facsimile transmission or by email of a .pdf attachment) in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

## XII.  ECONOMIC SANCTIONS

Notwithstanding any other provisions hereunder, the Insurer shall not be liable under this policy in respect of any trade or activity which is subject to any applicable economic, political or trade sanction, prohibition or restriction. The Insurer shall not be deemed to provide cover, and the Insurer shall not be liable to pay any amounts or provide any other benefit hereunder to the extent that the provision of such cover, payment of any amounts or any other benefit is prohibited by any applicable economic, political or trade sanction, prohibition or restriction, including but not limited to, those of the United States, the United Nations, European Union or United Kingdom.

16

CONFIDENTIAL

## XIII. PREMIUM REFUNDS AND CANCELLATION

This Policy is non-cancelable, non-rescindable and non-renewable, and the Premium hereunder is earned fully on the Closing Date.

## XIV. DEFINITIONS

All capitalized terms used but not defined in this Policy (including the Declarations) shall have the meanings assigned to such terms in the Acquisition Agreement. As used in this Policy, the following terms have the meanings set forth below:

A. "Acquisition Agreement" means the Acquisition Agreement set forth in Item 7 of the Declarations and attached as Exhibit A to this Policy, including the disclosure schedules and any related exhibits, certificates, schedules, other attachments or side letters thereto (as such agreement may be amended, supplemented, and restated from time to time in accordance with their terms and the terms and conditions of this Policy).

B. "Actual Knowledge" means (i) with respect to a particular fact, event or condition, that the relevant person has an actual conscious awareness of such fact, event or condition, and (ii) with respect to a Breach, that such person has an actual conscious awareness of the underlying fact, event or condition and that such underlying fact, event or condition actually constitutes a Breach. Actual Knowledge does not include any constructive, implied or imputed knowledge of a person, nor does it include any actual, constructive, implied or imputed knowledge of any outside advisor, employee or agent of such person (nor shall it require any duty or obligation of inquiry, except to the extent required by the terms of this Policy). The Insurer shall bear the burden of proving that any such person had Actual Knowledge of any fact, event or condition and that such fact, event or condition constituted a Breach, with the burden of proof being the burden which would be required before the applicable arbitral panel or court of law in which the Insurer would be required to prove such Actual Knowledge.

C. "Additional Insureds" means the persons or entities set forth in Item 1 of the Declarations.

D. "Affiliate" shall have the same meaning as in the Acquisition Agreement.

E. "Ancillary Documents" means any certificate, instrument, document or agreement set forth in Exhibit B to this Policy.

F. "Approved Firm" means DLA Piper LLP (US).

G. "Breach" means:

  1. any breach, misrepresentation or misstatement of, or inaccuracy in, any of the representations and warranties set forth (a) in Article III of the Acquisition Agreement as of the date of Closing, or (b) in the Ancillary Documents; or

  2. the incurrence by the Insureds or any of their Affiliates of any amounts referenced in the definition of Pre-Closing Tax Indemnity.

Breach shall be determined without regard, or giving effect to any Limitation Provisions.

For purposes of the Policy, the Acquisition Agreement shall be deemed amended as follows:

  1. 3.06 – deem deleted "(the effect of which will not be materially adverse)"
  2. 3.07(a) – deem deleted "adequately"
  3. 3.08(bb) – deem deleted "or any action or omission that would result in any of the foregoing"
  4. 3.09(b) – deem inserted "written" before "notice"; knowledge qualify "No event or circumstance.."

17

CONFIDENTIAL

5.  3.12(b) – deem inserted "written" before "notice"
6.  Deem deleted all references to "or as proposed to be conducted", "or currently contemplated to be conducted" and "the anticipated needs of the Company's business"
7.  3.12(c) – deem inserted "written" before "claim"
8.  3.12(f) – knowledge-qualify "no person has infringed.."
9.  3.13, 3.22(r), 3.22(t), 3.30, 3.32 – deem deleted
10. 3.14 – deem deleted "and to the Seller's Knowledge, are collectible in full within 90 days after billing"
11. 3.15(a), 3.29(b) – deem inserted "immediately" before "after the Closing"

The existence of any Breach shall be determined without regard or giving effect to the Materiality Qualifiers, as if such words, clauses or phrases, as applicable, were deleted from the representations and warranties contained in Article III of the Acquisition Agreement.

H.  "Claim Notice" has the meaning set forth in Section IV.A of this Policy.

I.  "Company" means, collectively, the "Company" and each "Subsidiary" as such terms are defined in the Acquisition Agreement.

J.  "Damages" means any claims, losses, damages, liabilities, deficiencies, judgments, interest, awards, penalties, fines, ,  Taxes, costs, punitive damages, and expense of every kind and nature (including, reasonable attorneys' fees expert consultant and witness fees, and costs of investigation and expenses, enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers other than the Insurer).

K.  "Deal Team Members" means those individuals set forth in Exhibit C to this Policy.

L.  "Defense Costs" means any reasonable fees, costs, disbursements, charges, expenses, and other similar amounts (including the fees, costs, charges and expenses of Deal Team Members, financial advisors, attorneys, accountants, brokers, consultants, experts and other professionals) incurred by or on behalf of the Insureds in the investigation (including all underlying facts and circumstances), mitigation, adjustment, defense, prosecution, negotiation, settlement, resolution or appeal of: (i) any Third Party Demand; or (ii) a potential Third Party Demand (including the investigation of the underlying facts and circumstances thereof) made and reported pursuant to the terms and conditions of this Policy (and for the avoidance of doubt, whether such Third Party Demand is successful or not); or (iii) any claim related to amounts described in the definition of Pre-Closing Tax Indemnity. The Insurer agrees that the then prevailing rates of the Approved Firm shall be deemed reasonable. All Defense Costs submitted by the Insureds shall be presumed reasonable and the burden of proving such amounts are unreasonable shall be on the Insurer. Defense Costs shall include premiums for any appeal, attachment or similar bonds, provided that the Insurer shall have no obligation to apply for or furnish any such bonds. Defense Costs do not include any salaries, benefits or other similar compensation of any employee, officer, director, member or partner of the Insureds (other than employees and consultants retained in connection with the matters described in this definition).

M.  "Disclosure Schedules" means the "Disclosure Schedules" as such term is defined in the Acquisition Agreement.

N.  "Expiration Date" means the date set forth in Item 3 of the Declarations.

B.  "Fundamental Representations" means the representations and warranties set forth in Sections 3.01 (Representations of the Seller Members), 3.02 (Organization, Authority and Qualification of the Company), 3.03 (Capitalization), 3.04 (No Subsidiaries), 3.05 (No Conflicts; Consents), 3.22 (Taxes), 3.23 (Transactions with Affiliated Parties) and 3.25 (Brokers) of the Acquisition Agreement

O.  "Fraud" has the meaning ascribed to such term in the Acquisition Agreement.

CONFIDENTIAL

P.   "Inception" has the meaning set forth in Item 3 of the Declarations.

Q.   "Insurance Broker" has the meaning set forth in Item 9 of the Declarations.

R.   "Insureds" has the meaning set forth in Item 1 of the Declarations.

S.   "Insurer" means, collectively, the "Insurers" set forth in Item 2. of the Declarations.

T.   "Limit of Liability" has the meaning set forth in Item 4 of the Declarations.

U.   "Limitation Provisions" means any dollar cap, dollar basket, dollar threshold, time limitations, survival periods, or any other limitations imposed in the Acquisition Agreements that limits recovery against the Seller or the Company for a Breach, including, but not limited to, the provisions set forth in Article 8 of the Acquisition Agreement.

V.   "Loss" means the aggregate of (i) the amount of Damages (other than Defense Costs or Prosecution Costs) that the Insureds have incurred or sustained arising out of, resulting from, or related to a Breach or Third Party Demand, (ii) any Defense Costs, (iii) any Prosecution Costs in each case, determined without regard to or giving effect to the Limitation Provisions, as if such words, clauses or phrases, as applicable, were deleted from the Acquisition Agreement

Loss does not include that portion of any Loss to the extent that such portion constitutes punitive or exemplary damages or any civil fines or civil penalties or any criminal fines or criminal penalties (with the Insurer bearing the burden of proving such portion of Loss constitutes punitive damages or criminal fines or penalties), except to the extent such punitive damages, fines or penalties are (a) insurable under the applicable law of any/the Most Favorable Jurisdiction, and (b) awarded or assessed against the Insureds in connection with a Third Party Demand pursuant to (1) a final settlement consented to in writing by the Insurer (such consent not to be unreasonably withheld, conditioned or delayed) or (2) a final (x) order of a government or regulatory agency, (y) judgment of a court of competent jurisdiction or (z) award of an arbitrator, arbitration panel or similar adjudicative body; provided that the Defense Costs or Prosecution Costs relating to the foregoing shall be Loss hereunder.

The amount of Loss shall be determined without regard or giving effect to the Materiality Qualifiers, as if such words, clauses or phrases, as applicable, were deleted from the representations and warranties contained in Article III of the Acquisition Agreement.

W.   "Materiality Qualifiers" means materiality, Material Adverse Effect, or other correlative or similar terms or qualification contained in or otherwise applicable a representation or warranty, the inclusion of which would limit or potentially limit a claim by any Buyer Indemnitees; provided, however, that for purposes of Section 3.07, Section 3.08(a), and the definition of "Material Contracts," the parties agree that all references to "material," "materially," "materiality," or to whether a breach would have a Material Adverse Effect will not be disregarded for any purpose.

X.   "Most Favorable Jurisdiction" means any jurisdiction where (i) the act, error or omission giving rise to the Breach or the Loss took place, (ii) the Third Party Demand was made, (iii) any relief was awarded, (iv) any Insured is incorporated, in existence as a domestic Person or has its principal place of business (v) the jurisdiction designated pursuant to the choice of law provisions in this Policy or in the Acquisition Agreement or (vi) the Insurer is incorporated or has its principal place of business, in each case where the applicable law would most favor coverage for the Insureds. Notwithstanding the foregoing, this Most Favored Jurisdiction definition may not be applied to the Insurer in a manner which would require the Insurer to violate any law that applies to this Policy; provided, the Insurer shall use commercially reasonable efforts to take all actions reasonably necessary to be taken in order to apply this definition in a manner that would give effect to the definition and the intention of the parties without violating any such law.

19

**CONFIDENTIAL**

Y.   "Named Insured" has the meaning set forth in Item 1 of the Declarations.

Z.   "No Claims Declarations" means the signed No Claims Declaration attached to this Policy as Exhibit D.

AA. "Pending Matter" means any (i) Breach, (ii) Third Party Demand, or (iii) matter under active investigation by any Specified Person that would reasonably be expected to give rise to a Breach or Third Party Demand, which has not been resolved with the Insurer (i.e., remains an "open" Claim Notice or has not yet been reported to the Insurer pursuant to Section IV.A of this Policy).

BB. "Policy Term" has the meaning set forth in Item 3 of the Declarations.

CC. "Pre-Closing Tax Period" has the meaning set forth in the Acquisition Agreement

DD. "Pre-Closing Tax Indemnity" means the indemnity set forth in Section 8.03(g) of the Acquisition Agreement for Indemnified Taxes (solely with respect to clause (a) of the definition) for which the Insured is liable, except for:

   (i)   any Transfer Taxes resulting from the consummation of the transactions contemplated by the Acquisition Agreement;

   (ii)  any matters specifically identified in the Disclosure Schedules to the extent that it is reasonably apparent on its face that such disclosed matters if ultimately resolved adversely, could reasonably be expected to result in Taxes of the Company and its Subsidiaries for any Pre-Closing Tax Period or the portion of any Straddle Period ending on the Closing Date;

   (iii) Taxes accurately accrued or reserved (1) in the Financial Statements, or (2) in the formal books and records of the Company or any of its Subsidiaries as provided to the Named Insured as of the Closing Date; or

   (iv)  any Taxes solely attributable to the Seller.

EE. "Premium" has the meaning set forth in Item 8 of the Declarations.

FF. "Prosecution Costs" means any fees, costs, disbursements, charges, expenses and other amounts (including the reasonable fees, costs, charges and expenses of attorneys, accountants, brokers, consultants, experts and other professionals, and premiums for any appeal bond, attachment bond or similar bond, but without any obligation to apply for or furnish any such bond, (it being understood and agreed that once the Insureds have provided reasonable support for their Prosecution Costs, the burden shall be on the Insurer to demonstrate that such Prosecution Costs are unreasonable and it being further understood and agreed that the representations of the Insureds by an Approved Firm at its prevailing hourly billing rates at the time services are rendered is reasonable) incurred by or on behalf of the Insureds in connection with the Insureds' investigation, adjustment, mitigation, defense, prosecution, settlement or appeal against the Seller for any Breach (or potential Breach) the Insureds believe in good faith has occurred. The Insurer agrees that the then prevailing rates of the Approved Firm shall be deemed reasonable. Prosecution Costs shall include premiums for any appeal, attachment or similar bonds, provided that the Insurer shall have no obligation to apply for or furnish any such bonds. Prosecution Costs do not include any salaries, benefits or other compensation of any employee, officer, director, member or partner of the Insureds (other than part time employees and consultants retained in connection with the matters described in this definition).

GG.  "Purchase Price Adjustment" has the meaning set forth in Section 2.05 of the Acquisition Agreement.

HH.  "Quota Share Limit of Liability" has the meaning set forth in Item 2. of the Declarations.

Dual_001119

CONFIDENTIAL

II.    "Quota Share Percentage" has the meaning set forth in Item 2. of the Declarations.

JJ.   "Recovered Amounts" means, in relation to any Loss, the net amount (after any costs and expenses incurred in connection with such recovery) of (i) any related offsetting recoveries (including from other insurance policies or third party indemnities) that have been actually received by the Insureds from an unaffiliated third party (other than any amounts paid or payable pursuant to the Acquisition Agreement) during the tax year in which such Loss occurs and (ii) the net amount of any Tax Benefit actually received or realized by any Insured in respect of such Loss. For the avoidance of doubt, Loss shall not be reduced pursuant to the immediately preceding sentence (x) by deductibles paid or incurred by the Insureds under other insurance policies, (y) if any such other insurance policy does not provide for recovery for such Loss or (z) by any increases in insurance premiums (and retro-premium adjustments) directly attributable to a Loss, but only to the extent of such increase.

KK. "Retention" has the meaning set forth in Item 5 of the Declarations.

LL.   "Retention Dropdown Date" has the meaning set forth in Item 5 of the Declarations.

MM.  "Seller" means the persons or entities designated as "Seller Parties", as such term is defined in the Acquisition Agreement.

NN. "Specified Person" means (i) the chief executive officer, chief financial officer, general counsel or any person who holds a functionally equivalent position at the applicable time of determination at the Named Insured and (ii) any Deal Team Member (to the extent such person is employed by the Named Insured or any Affiliate thereof as of the date of a Claim Notice). Notwithstanding the foregoing, with respect to any particular Loss, Specified Person shall not include the chief executive officer, chief financial officer, general counsel or any person who holds a functionally equivalent position of the Company or any of its Subsidiaries as of immediately prior to the Closing unless such person both (x) is a Specified Person at the time of such determination, and (y) intentionally and willfully withholds or conceals from another Specified Person any information first obtained after Closing that would reasonably be expected to give rise to Actual Knowledge of a Breach by another Specified Person. The burden of proving that a Specified Person intentionally and willfully withholds or conceals information, and that such information was first obtained after Closing, shall be on the Insurer.

OO.   "Tax Benefit" means any reduction in any Taxes actually realized by the Insureds' as a result of a Loss equal to the positive difference, if any, between: (i) the Insureds' liability for Taxes in the year the Loss is incurred not taking into account such Loss or the payment under this Policy on account of such Loss; and (ii) the Insureds' liability for Taxes in such year taking into account the Loss and taking into account the payment under this Policy on account of such Loss, with the Loss treated as the last Item of expense or deduction realized for such year, and net of any reasonable expenses incurred in connection with claiming such reduction, in each case, determined in accordance with applicable Tax Law.

PP.  "Third Party Demand" means any claim, notice, complaint, demand, arbitration, investigation, proceeding, legal action or similar action made, threatened in writing, or brought against, or the initiation of a tax or regulatory audit or examination of (regardless of whether, at the time of such initiation, the relevant taxing or regulatory authority asserts the existence of any tax or other liability or whether the insureds have reason to believe there might be a tax or other liability), any Insured by any person or entity (other than (i) an affiliate of such Insured at the time of such action, (ii) any other Insured (except for an officer, director, employee or agent of any Insured who was an officer, director, employee or agent of the Company or an affiliate of the Company prior to Closing) or (iii) the Insurer acting in connection with this Policy) which, if successful, would result in Loss with respect to a Breach.

QQ.  "Underwriting Representative" has the meaning set forth in Item 6 of the Declarations.

21

CONFIDENTIAL

**Endorsement 1**

**NOTICE – OFFER OF TERRORISM COVERAGE; DISCLOSURE OF PREMIUM**

**THIS NOTICE DOES NOT FORM A PART OF THE POLICY, GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

As used herein, 1) "we" means the insurer listed on the Declarations or the Certificate of Insurance, as applicable; and 2) "you" means the first person or entity named on the Declarations or the Certificate of Insurance, as applicable.

You are hereby notified that under the Terrorism Risk Insurance Act, as extended and reauthorized ("("Act"),"), you have a right to purchase insurance coverage of losses arising out of acts of terrorism, as defined in Section 102(1) of the Act, subject to all applicable Policy provisions. The Terrorism Risk Insurance Act established a federal program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks.

This Notice is designed to alert you to coverage restrictions and to certain terrorism provisions in the Policy. If there is any conflict between this Notice and the Policy (including its endorsements), the provisions of the Policy (including its endorsements) apply.

CHANGE IN THE DEFINITION OF A CERTIFIED ACT OF TERRORISM

The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. Originally, the Act provided that to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest to coerce the government or population of the United States. However, the 2007 re-authorization of the Act removed the requirement that the act of terrorism must be committed by or on behalf of a foreign interest, and now certified acts of terrorism may encompass, for example, a terrorist act committed against the United States government by a United States citizen, when the act is determined by the federal government to be ""a certified act of terrorism.".

In accordance with the Act, we are required to offer you the ability to purchase coverage for losses resulting from an act of terrorism that is certified under the federal program. The other provisions of this Policy, including nuclear, war or military action exclusions, will still apply to such an act.

DISCLOSURE OF FEDERAL PARTICIPATION IN PAYMENT OF TERRORISM LOSSES

The Department of the Treasury will pay a share of terrorism losses insured under the federal program. In 2015, the federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention and shall decrease by 1 percentage point per calendar year until equal to 80%.

LIMITATION ON PAYMENT OF TERRORISM LOSSES

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

Further, this coverage is subject to a limit on our liability pursuant to the federal law where, if aggregate insured losses attributable to terrorist acts certified under the Act exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion. In such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

CONFIRMATION OF ACCEPTANCE OF COVERAGE

In accordance with the Act, we offered you coverage for losses resulting from an act of terrorism that is certified under the federal program. This notice confirms that you have chosen to accept our offer of coverage for certified acts of terrorism. The Policy's other provisions, including nuclear, war or military action exclusions, will still apply to such an

**CONFIDENTIAL**

act. The premium charge for terrorism coverage, if any, is shown separately on the Declarations or the Certificate of Insurance, as applicable.

Dual_001122

**CONFIDENTIAL**

### Endorsement 2

### SERVICE OF SUIT ENDORSEMENT

Pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Insurer hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the below-named as the person to whom the said officer is authorized to mail such process or true copy thereof.

Service of process in such suit shall be made upon the following:

General Counsel
Columbia Casualty Company
151 North Franklin Street
Chicago, IL 60606

General Counsel
Palms Insurance Company, Limited
700 Universe Boulevard
Juno Beach, FL 33408

and in any suit instituted against such person upon this policy, the Insurer will abide by the final decision of such court or of any appellate court in the event of an appeal.

The General Counsel is authorized and directed to accept service of process on behalf of the Insurer in any such suit and, upon the request of the Named Insured, to give a written undertaking to the Named Insured that he will enter a general appearance upon the Insurer's behalf in the event such suit shall be instituted.

All other terms and conditions of the Policy remain unchanged.

Dual_001123

CONFIDENTIAL

**Exhibit A**

**<u>Acquisition Agreement</u>**

See attached.

Dual_001124

**Exhibit B**
**Ancillary Documents**

The certificates delivered pursuant to Section 7.02(g) of the Acquisition Agreement

Dual_001125

**Exhibit C**
**Deal Team Members**

Rick Correia

Jon Stevenson

Dual_001126

**CONFIDENTIAL**

DocuSign Envelope ID: C505D5FF-C322-4CB1-88FD-8169C7B59BB3

## Exhibit D
## <u>No Claims Declaration</u>

The undersigned, on behalf of the Named Insured as its duly authorized signatory and not in any individual or personal capacity, hereby certifies, as of immediately prior to Inception, that:

1. The Acquisition Agreement represents as of the date hereof, the material documents executed and delivered by the parties thereof concerning the matters described therein.

2. After having made reasonable inquiries of the Deal Team Members, to the Actual Knowledge of the undersigned, each of the Deal Team Members has read the Acquisition Agreement and the due diligence reports referred to in <u>Section 3</u> below, and no Deal Team Member has any Actual Knowledge of any Breach, except as disclosed below:

   _____
   _____
   _____
   _____
   _____.

3. The Insurer has been provided with true and complete copies of the Acquisition Agreement and any formal, final (or to the extent not final, the most current draft) written due diligence reports prepared by the Insureds or their third-party advisors and provided to the Named Insured and the Deal Team Members in connection with the transactions contemplated by the Acquisition Agreement.

All capitalized terms used but not defined herein shall have the meanings assigned to such term in the Buyer-Side Representations and Warranties Master Insurance Policy No. TRA090202

By: _Diwakar Choubey_

Name: Diwakar Choubey

Title: CEO and President

Date: 11/15/2021

**CONFIDENTIAL**

**Exhibit E**
**Claim Notice**

In accordance with the terms of Buyer-Side Representations and Warranties Insurance Policy No. TRA090202 (the "Policy") issued to the Named Insured, this Claim Notice is delivered to the Insurer under the Policy pursuant to Section VIII of the Policy on _____, _____.

The undersigned, on behalf of the Named Insured, as its duly authorized signatory and not in any individual capacity, hereby reports that (check all that apply):

| 1. | ☐ | Notice of Breach or Potential Breach | A Specified Person is aware of a Breach or facts, circumstances, or other matters that could reasonably be expected to result in a Breach. Attached hereto is a reasonably detailed description of said Breach or potential Breach, including the representations or warranties which may have been breached, the date any Insured first became aware of said Breach or facts, circumstances, or other matters and the estimated amount of Loss which is reasonably expected to result. |
|----|----|----|----|
| 2. | ☐ | Third Party Demand | A Specified Person is aware of a Third Party Demand that was asserted against _____ by _____ in the amount of $_____ on _____. Attached hereto is a reasonably detailed description of the facts, circumstances and issues relating to said Third Party Demand, including the representations and warranties which allegedly contain a Breach, the facts, circumstances, or issues alleged in the Third Party Demand, the date any Insured first became aware of such Third Party Demand and the estimated amount of Loss which could reasonably be expected to result. |
| 3. | ☐ | Loss | A $_____ Loss occurred on _____. Attached hereto is a reasonably detailed description of the facts, circumstances, or other matters relating to said Loss, including the representations or warranties which allegedly contain a Breach and the date any Insured first became aware of such Loss. |

By: _____
Name:
Title:

**CONFIDENTIAL**