# **EXHIBIT C**

P435fro1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JEFFREY FROMMER, *et al.*,

        Plaintiffs,

      v.                                      23 CV 06339

MONEYLION TECHNOLOGIES, INC.,
*et al.*,

        Defendants.
                                     Conference
------------------------------x
                                    New York, N.Y.
                                    April 3, 2025
                                    9:30 a.m.

Before:

              HON. JESSE M. FURMAN,

                            District Judge

                  APPEARANCES

KATTEN, MUCHIN, ROSENMAN, LLP
    Attorneys for Plaintiffs
BY:  ELIOT LAUER
    JULIA BLAIR MOSSE
    GABRIEL HERTZBERG
    NATHANIEL CALEB AMENT-STONE

CAHILL, GORDON & REINDEL, LLP
    Attorneys for Defendants
BY:  HERBERT SCOTT WASHER
    EDWARD NATHANIEL MOSS
    SHEILA CHITHRAN RAMESH
    DANIELLE SIMARD

1  A.  Yes.
2  Q.  And you gave notice to the insurer, right?
3  A.  I believe so.
4  Q.  It's been almost two years since you claim that you
5  first -- or MoneyLion first understood that it had a claim for
6  breach of the reps and warranties, right?
7  A.  Yes.
8  Q.  And am I correct that, other than sending the notice,
9  MoneyLion has taken no steps, commercially reasonable or
10 otherwise, to enforce the insurance policy?
11 A.  I don't know if that's right.
12 Q.  You have not initiated litigation, have you?
13 A.  No.
14         THE COURT:  Do you mean litigation against the
15 insurer?
16         MR. LAUER:  Against the insurer.  Thank you, your
17 Honor.
18         THE WITNESS:  Oh, no.
19 BY MR. LAUER:
20 Q.  No, right?
21         So, in two years, despite the MIPA requiring you to
22 first use commercially reasonable efforts to seek full recovery
23 under the R&W policy, you have not done anything other than
24 sending the insurer notice of claim, right?
25 A.  No.  I believe we've been working with them.

1  Q.  Really?
2      Have you brought a lawsuit against them?
3  A.  No.
4  Q.  What steps have you taken to recover $7.5 million?
5  A.  I think I'd be out of my area of expertise on this one.
6  Q.  Is your answer that you cannot testify, as the CFO and
7  someone to whom the legal department reports, that you don't
8  know what steps beyond the notice of claim MoneyLion took?
9  A.  I can tell you we have not -- we have not taken litigation
10 against DUAL.
11 Q.  Have you been in any of the discussions with DUAL or their
12 representatives?
13 A.  Not that I recall.  I think I may have had maybe a call --
14 I just don't recall exactly, no.
15 Q.  Have you received any reports from anyone who you say may
16 have been in contact with DUAL?
17 A.  Reports?  No.
18 Q.  Now, in order to recover from DUAL, you'd have to convince
19 DUAL that there is a breach of the reps and warranty provision
20 in 3.06, right?
21 A.  Yes.
22 Q.  Am I correct that Continental holds almost 600,000 shares,
23 fully vested, that are held in the name of the four sellers?
24 A.  Yes.
25 Q.  I'd like to show you PX 318.

1  GAAP, GAAP, GAAP.
2  Q. You testified that you had some conversations with
3  Mr. Frommer; is that correct?
4  A. Yes.
5  Q. Did you communicate anything to Mr. Frommer about the
6  importance of GAAP to you and MoneyLion?
7  A. Yes. It was important for us to be able to acquire them.
8  Q. What did you tell him?
9  A. Just that we were going to be a newly minted public
10 company, I was impressed that they had indicated that they had
11 some GAAP financials, and so we -- basically, I expressed that
12 we would have to be able to do that to be able to move forward
13 and to be able to integrate them into the company.
14 Q. What, if anything, did Mr. Frommer say to you in response?
15 A. That we have GAAP financials, we're GAAP-compliant.
16 Q. Now, I'm going to switch briefly to the insurance topic,
17 just because it's top of mind for me.
18         Mr. Lauer was asking you about litigation with DUAL,
19 and I think you testified that you did not commence any
20 litigation, right?
21 A. Correct.
22 Q. But did you receive any money from DUAL in a settlement
23 under that policy?
24 A. Yes, we did.
25 Q. And do you recall, of the $7.5 million policy, how much you

1  received?
2  A.  I think around 6 million.
3  Q.  So it's about 80 percent?
4  A.  About that, yes.
5  Q.  Did you ever tell DUAL that you didn't think you had a good
6  breach of rep claim?
7  A.  No.  We had to basically put forth the argument in order to
8  actually get those proceeds.
9  Q.  And when you say "We had to actually put forth the
10 argument," can you, just for the record, explain what you mean,
11 please?
12 A.  We had to put our case forward and present to DUAL why we
13 felt that we had a claim.
14 Q.  For a breach of rep?
15 A.  For a breach of rep, yes.
16 Q.  So, let's move to CFGI.  I won't spend too much time on the
17 report, but I want to put CFGI in a little context.
18      Had CFGI ever done any work for MoneyLion prior to
19 this quality of earnings engagement?
20 A.  Yes.
21 Q.  What was that work, sir?
22 A.  When we decided to go public in December of 2020, we
23 engaged CFGI to supplement our finance team to help the process
24 of going public and meeting with the SEC.
25 Q.  And you testified about the SEC's focus on GAAP.

1           Do you see it?
2  A.  Yes.
3  Q.  Okay.  So he writes, "Erika, the 310K is the all-in number
4  called out on our finance call last month for the full event as
5  the additional asks had just come in for Even."
6           Do you see that?
7  A.  I do.
8  Q.  Now, you testified that you reached a settlement with DUAL,
9  right?
10 A.  Yes.
11 Q.  When did you reach a settlement with DUAL?
12 A.  Oh, I don't remember the exact date, but past --
13 Q.  Is the settlement reflected in documents?
14 A.  I don't know.
15 Q.  Well, how did you know that a settlement was reached?
16 A.  Because I spoke internally, I was asked to approve the
17 transaction.
18 Q.  And did you know that throughout this litigation the seller
19 plaintiffs have been demanding any further production beyond
20 the correspondence between MoneyLion and DUAL in the spring of
21 2023, but nothing has been produced?  Do you know that?
22 A.  No.
23           MR. MOSS:  Objection.
24           MR. LAUER:  No further questions.
25           THE COURT:  Sustained.

P43KFRO6

1           Can I just follow up.  You said you were asked to
2  approve the settlement?  Is that what you said?
3           THE WITNESS:  Yes.
4           THE COURT:  Microphone.
5           THE WITNESS:  Yes.
6           THE COURT:  And I presume that would be in writing?
7  With a public company, I have to imagine that you would have
8  received that request in writing and given your approval in
9  writing; is that correct?
10           THE WITNESS:  Yes.
11           THE COURT:  And I would also assume that when you
12  settle for a seven-figure number with an insurance company,
13  there would be some documentation of that between you and the
14  insurance company.
15           Is that a fair assumption?
16           THE WITNESS:  Yes.
17           THE COURT:  All right.
18           Anything else, Mr. Moss?
19           MR. MOSS:  No, thank you, your Honor.
20           THE COURT:  All right.  Very good.
21           Mr. Correia, you may step down.  You're excused.
22           (Witness excused)
23           THE COURT:  Hand your affidavit to Mr. Moss on your
24  way past, please.  You can take the waters, though.
25           So, I assume that concludes the factual portion of