UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

JEFFREY FROMMER, *et al.*,

                     Plaintiffs,

                     v.

MONEYLION TECHNOLOGIES INC., *et ano.*,

                     Defendants.

------------------------------------------------------------------------ x

Case No. 1:23-cv-06339-JMF

## DECLARATION OF JENNIFER L. LARSON, CPA, CFE

I, Jennifer L. Larson, declare pursuant to 28 U.S.C. § 1746 as follows:

    1. My name is Jennifer L. Larson. I am a Partner in Deloitte Financial Advisory Services LLP ("Deloitte FAS") and the US Leader of Deloitte's Investigations & Disputes practice.

    2. I am a resident of the State of Illinois, over the age of 18, and competent to make this statement. I submit this affidavit as my direct trial testimony.

## SUMMARY OF ASSIGNMENT

    3. Deloitte FAS has been engaged by Katten Muchin Rosenman LLP ("Katten" or "Counsel") on behalf of its clients, Jeffrey Frommer, Lyusen (Louis) Krubich, Daniel Fried, and Pat Capra (collectively, the "Sellers"), in connection with a dispute concerning the Membership Interest Purchase Agreement (the "MIPA")[1] entered into as of November 15, 2021 by and among MoneyLion Technologies Inc. ("MoneyLion" or "Buyer"), Malka Media Group LLC ("Malka" or the "Company"), and the Sellers.

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the MIPA.

PX422

4. On July 21, 2023, Sellers filed a complaint against Buyer[2] (the "Complaint") and, on July 26, 2023, Sellers filed an amended complaint against Buyer[3] (the "Amended Complaint"), alleging, among other things, that "MoneyLion has claimed that certain adjustments to Malka's revenue and EBITDA are warranted, but these adjustments disregard the proper calculations and methodologies explicitly set forth in the MIPA."[4]  Sellers further claim that "if MoneyLion had properly calculated Malka's Revenue Amount and EBITDA Amount for 2022, the Seller Members would be entitled to the maximum Earnout Payment of MoneyLion shares valued at $25 million."[5]

5. Prior to the filing of the Complaint, I was engaged on April 24, 2023 to assist Sellers in its good-faith negotiations with Buyer related to the calculation of the earnout payment for the year ending December 31, 2022. My assistance included, among other things, analyzing the MIPA, reviewing supporting documentation provided by Buyer and Sellers, and interviewing Sellers, Buyer, Malka's former head of finance Matthew Basdekis (who is currently employed by Buyer), MoneyLion's Chief Accounting Officer Mark Torossian, and Associate General Counsel of MoneyLion Benjamin Probber.

6. In this declaration, consistent with reports I submitted during expert discovery, I was asked by Counsel for Sellers to opine as to Buyer's adjustments to the Company's revenue and EBITDA calculations for purposes of the 2022 Earnout Payment (defined below) and, in particular, as to each of the disputed items (the "Disputed Items") in Sellers' Notice of Objections delivered to Buyer on May 25, 2023[6] (the "Objection Notice").  I was also asked by Counsel for Sellers to respond to the Expert Report of Louis G. Dudney, CPA, CFF dated September 20, 2024 (the

---

[2] PX324.
[3] PX406.
[4] PX406.
[5] PX406.
[6] JX119.

"Dudney Report") and the Expert Rebuttal Report of Louis G. Dudney, CPA, CFF dated October 28, 2024 (the "Dudney Rebuttal Report").

## **SUMMARY OF OPINIONS**

7. Based on my professional experience and the documents and information referred to below and in **Exhibit B**, my opinions are as follows:

a.    ***Opinion 1***: Buyer's utilization of a generally accepted accounting principles ("GAAP") -based income statement, rather than one based on the Company's historical accounting practices, to calculate revenue and expenses for purposes of the 2022 Earnout is unsupported and inconsistent with the Revenue and EBITDA Calculation Principles set forth in Schedule B of the MIPA, resulting in an understatement of Revenue and EBITDA.

b.    ***Opinion 2***: Buyer's 2022 Earnout Statement improperly fails to include the New Jersey Digital Media Tax Credit applied for in 2022, thereby understating 2022 EBITDA by $1,590,603.

c.    ***Opinion 3***: Buyer's 2022 Earnout Statement improperly includes a downward adjustment to revenue and EBITDA for the "fair market value" of intercompany services provided by the Company to Buyer, thereby understating 2022 Revenue and EBITDA by $1,242,248.

d.    ***Opinion 4***: Buyer's 2022 Earnout Statement improperly includes a downward adjustment resulting from the Buyer's corporate-level decision to pay bonuses to Company employee in a manner inconsistent with the 2022 Budget, thereby understating 2022 EBITDA by $529,500.

e.      ***Opinion 5***: Buyer's 2022 Earnout Statement improperly includes a downward adjustment for "retained teams," thereby understating 2022 Revenue and EBITDA by $218,170.

f.      ***Opinion 6***: Buyer's 2022 Earnout Statement improperly includes a downward adjustment for an allocation of costs associated with Buyer's in-house legal counsel, thereby understating 2022 EBITDA by $58,438.

Nothing in the Dudney Report or the Dudney Rebuttal Report caused me to change my opinions.

8. With respect to the Dudney Report and the Dudney Rebuttal Report, I have the following rebuttal opinions:

a.      ***Rebuttal Opinion 1:*** Mr. Dudney incorrectly assumes that Malka had zero contracts that contained non-cancelable deposits, resulting in flawed conclusions and adjustments to Revenue and EBITDA.

b.      ***Rebuttal Opinion 2:*** Mr. Dudney's calculated adjustments to Malka's revenue rely upon a series of unsupported assumptions, each of which is contradicted by evidence in this matter. As a result, Mr. Dudney's conclusions and adjustments are fundamentally flawed.

c.      ***Rebuttal Opinion 3:*** Mr. Dudney fails to acknowledge the contemporaneous evidence in MoneyLion's own records which clearly demonstrates the accounting practices used for the 2021 Earnout Calculation and Final Closing Working Capital, and how such practices differ from GAAP.

d.      ***Rebuttal Opinion 4:*** The Dudney Rebuttal Report fails to meaningfully rebut my opinions related to the 2022 Earnout Payment.

9. My work in this matter has been performed in accordance with the guidance set forth in the American Institute of Certified Public Accountants ("AICPA") Statement on Standards for Forensic Services No. 1.

10. I offer no legal opinions in this testimony. To the extent I refer to legal or contractual terms, it is based upon my experience with and reading of such terms as an accountant or assumptions provided to me by Counsel.

11. As with my expert reports, in forming my opinions set forth in this declaration, my staff, working under my direct supervision, and I have reviewed certain pleadings, declarations, documents produced, and deposition testimony given in this matter and information obtained from discussions with Counsel, Buyer personnel, and Seller personnel. I have also considered GAAP, other relevant accounting literature (including relevant accounting guidance from the Financial Accounting Standards Board), and other publicly available information.

12. I formed my opinions in this matter based on an independent assessment of the documents and information, as described in this declaration and my reports (and reflected on **Exhibit B**), as well as my general knowledge, professional training and experience, and analysis of the information available to me in this matter.

13. My testimony is based on documents and information available to me as of the date of this declaration. I reserve the right to amend my testimony to reflect any new information made available to me throughout the process of this litigation.

## **QUALIFICATIONS**

14. I am a Certified Public Accountant ("CPA") licensed in the State of Illinois and a Certified Fraud Examiner ("CFE"). I am a member of the AICPA, the Illinois Society of Certified

Public Accountants, and the Association of Certified Fraud Examiners. I obtained a Bachelor of Science in Finance from the University of Illinois.

15. I have over 22 years of experience providing forensic accounting, merger and acquisition ("M&A") due diligence, and litigation and dispute support services to clients and their legal counsel. In that time, I have been retained as an accounting expert, damages expert, independent accountant, or neutral arbitrator in hundreds of disputes, including post-closing M&A transactions, purchase price adjustments (including earnouts and reverse earnouts), breach of contract, and other matters that involve the application and interpretation of U.S. GAAP. On several occasions, I have provided expert testimony in these areas in deposition and before federal and state courts.

16. In my professional experience assisting companies with post-closing purchase price adjustments, my work routinely involves obtaining an understanding of the relevant contractual provisions of the purchase agreement, as well as assessing the accounting and financial implications of such provisions. I frequently draw upon my training and skills as a CPA, my understanding of accounting rules, principles, and guidance set forth under GAAP and other sources of accounting guidance, and my professional experience to assist me in understanding and applying the accounting and financial provisions of each contract.

17. Deloitte FAS is being compensated for the services of its personnel and personnel of its affiliates at various hourly rates ranging from $475 to $750 per hour and is being reimbursed for out-of-pocket expenses. My rate for this engagement is $750 per hour. Deloitte FAS's compensation is not contingent upon the opinions or conclusions I reach, nor the outcome of this matter.

18. My curriculum vitae ("CV"), which summarizes my qualifications and professional experience and includes a list of all publications that I authored in the last ten years and a list of all cases in which I testified as an expert at trial or by deposition in the last four years is appended as **Exhibit A**.

## BACKGROUND FOR OPINIONS

### A.    The Parties

19. Malka, a New York limited liability company, was founded in or about 2012 and provides marketing and media services as a "creative agency, production house, and technology platform."[7] Sellers collectively owned all the issued and outstanding membership interests in Malka prior to November 15, 2021 (the "Closing Date").

20. On the Closing Date, MoneyLion acquired the membership interests in Malka from Sellers through the MIPA. MoneyLion, a corporation organized under the laws of Delaware, provides "consumer financial products and services and marketplace solutions, providing curated money-related content to engage, educate and empower customers."[8] MoneyLion is a wholly owned subsidiary of MoneyLion Inc., which is a publicly traded company on the New York Stock Exchange.[9]

### B.    The Earnout Calculation Under the MIPA

21. The MIPA required Sellers to transfer all membership interests in Malka to the Buyer. In consideration, the Buyer agreed to compensate the Sellers through a combination of cash and shares of MoneyLion Inc. common stock (defined in the MIPA as "Parent Stock") valued at $30 million as of the Closing Date.[10]

---

[7] PX397
[8] PX283 at 1.
[9] PX283 at ii.
[10] JX065, at MIPA §§ 2.02, 2.03.

22. Additionally, the MIPA provides that Buyer shall provide the Sellers with additional shares of Parent Stock as earnout payments under the following circumstances:

23. With respect to the "2021 Earnout Payment," Section 2.06(b)(v)(A) of the MIPA provides, in relevant part:

> In the event the Company generates a 2021 Revenue Amount and a 2021 EBITDA Amount of at least (i) Sixteen Million Seven Hundred Fifty Thousand Dollars ($16,750,000) of Revenue ("**Minimum 2021 Revenue Amount**") and (ii) One Hundred Thousand Dollars ($100,000) of EBITDA ("**Minimum 2021 EBITDA Amount**"), respectively, then Seller Members shall be entitled … to a portion of the Earnout Payment Amount payable in such number of shares of Parent Stock … (… the "**2021 Earnout Payment**"), equal to Six Million Seven Hundred Thousand Dollars ($6,700,000) based on a price per share equal to the greater of (i) the 30-day VWAP determined as of the 2021 Earnout Payment Issuance Date and (ii) Eight Dollars ($8.00). In the event the Company exceeds the Minimum 2021 Revenue Amount, such 2021 Earnout Payment shall increase on a linear basis up to such number of shares of Parent Stock equal to an aggregate value of Ten Million Dollars ($10,000,000) in proportion to the Company's achievement of up to Twenty Five Million Dollars ($25,000,000) of Revenue ("**Maximum 2021 Revenue Amount**").[11]

24. With respect to the "2022 Earnout Payment," Section 2.06(b)(v)(B) of the MIPA provides, in relevant part:

> In the event the Company generates a 2022 Revenue Amount and a 2022 EBITDA Amount of at least (i) Twenty Million One Hundred Thousand Dollars ($20,100,000) of Revenue ("**Minimum 2022 Revenue Amount**") and (ii) One Hundred Thousand Dollars ($100,000) of EBITDA ("**Minimum 2022 EBITDA Amount**"), respectively, then Seller Members shall be entitled … to a portion of the Earnout Payment Amount payable in such number of shares of Parent Stock … (… the "**2022 Earnout Payment**"), equal to Sixteen Million Seven Hundred Fifty Thousand Dollars ($16,750,000) based on a price per share equal to the greater of (i) the 30-day VWAP determined as of the 2022 Earnout Payment Issuance Date and (ii) Seven Dollars ($7.00). In the event the Company exceeds the Minimum 2022 Revenue Amount, such 2022 Earnout Payment shall increase on a linear basis up to such number of shares of Parent Stock equal to an aggregate value of Twenty Five Million Dollars ($25,000,000) in proportion to the Company's achievement of up to Thirty Million Dollars ($30,000,000) of Revenue ('**Maximum 2022 Revenue Amount**') calculated in the same manner as described in <u>Section 2.06(b)(v)(A)</u>.[12]

---

[11] JX065, MIPA § 2.06(b)(v)(A) (bold in original).
[12] JX065, MIPA § 2.06(b)(v)(B) (bold and underline in original).

25. The MIPA requires the Buyer to take certain steps "in order to maximize the Seller Members' opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment[.]"[13] In particular, the MIPA provides that:

> (i) from the Closing Date and through the end of December 31, 2021, the Buyer shall, and shall cause the Company to operate the business of the Company in good faith and substantially similar in all material respects with the past practice of the Company prior to Closing, and will not take any action intended to interfere with or frustrate the Seller Members' opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment, and (ii) with respect to the period from January 1, 2022 and through the end of December 31, 2022, the Buyer shall, and shall cause the Company to operate the business of the Company substantially in accordance with the operating and revenue budget (the "**2022 Budget**") attached hereto as <u>Exhibit B</u>.[14]

26. The MIPA sets forth the process by which the Parties were to determine whether the Sellers are entitled to the Earnout Payments. In particular, Section 2.06(b)(i) of the MIPA provides that within 30 days of receiving the Company's financial statements from Sellers, Buyer is required to provide Sellers with a statement "prepared in good faith and ***in accordance with the Revenue and EBITDA Calculation Principles***, setting forth Buyer's calculation of the Company's Revenue and EBITDA" for the years ended December 31, 2021 and December 31, 2022, respectively.[15] The MIPA then clarifies, "[f]or the avoidance of doubt, it is the intention of the Parties that the 2021 Revenue Amount and the 2021 EBITDA Amount and the 2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using ***substantially consistent methods and practices***."[16]

27. The MIPA defines "Revenue and EBITDA Calculation Principles" as:

(a) the principles, policies and procedures used by Buyer in its calculation of the Company's Revenue and EBITDA for the periods beginning on January 1, 2021 and ended December 31, 2021 and beginning January 1, 2022 and ended December 31, 2022, ***as set***

---

[13] JX065, MIPA § 2.06(d).
[14] JX065, MIPA § 2.06(d) (bold and underline in original).
[15] JX065, MIPA § 2.06(d)(i) (emphasis added).
[16] JX065, MIPA § 2.06(b)(i) (emphasis added).

***forth on <u>Schedule B</u> attached hereto***; and (b) to the extent not inconsistent with the foregoing, the historical accounting principles, policies and procedures of the Company.[17]

28. Schedule B to the MIPA is entitled "Revenue and EBITDA Calculation Principles" and provides guidelines for calculating amounts related to the Company's revenue and EBITDA for purposes of the Earnout Payments. Specifically, Schedule B defines "Revenue" by reference to "the Company's historical revenue recognition principles" and EBITDA by reference to "the Company's historical revenue and cost recognition principles" and provides specific principles/exceptions for calculating revenue and EBITDA for purposes of the Earnout Payments.[18]

29. In addition to Schedule B, the MIPA also includes "Schedule A Accounting Principles" that set forth the Company's historical (*i.e.*, pre-Closing Date) accounting principles that were used to prepare the Company's financial statements for the years ended December 31, 2019, December 31, 2020, and the nine months ended September 30, 2021.[19] Specifically, Schedule A requires that the Financial Statements, Estimated Statements, and the Final Statement "be prepared in accordance with U.S. GAAP, ***except*** as follows:"[20]

> "(a) the Company's historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained;
>
> (b) the Company's historical cost recognition principles associated with such revenue, which require the Company to recognize costs on contracts as incurred;
>
> (c) invoiced expenses are recognized in related period based on receipt of the invoice (i.e., if the Company receives an invoice in October, it is entered in October and shown as an October expense, even if cash is not paid out until 30 or 60 days from the date of receipt; this applies to contracted costs, variable costs, and overhead);

---

[17] JX065, MIPA at DLA_006199 (emphasis added; underline in original).
[18] JX065, MIPA, Schedule B.
[19] JX065, MIPA, Schedule A; § 3.06.
[20] JX065, MIPA, Schedule A (emphasis added).

(d) payroll is recognized in period as earned, paid out on the 15th and last day of every month with the exception of commission; commission is recognized as expense net 60 from the second payroll of each month that commission was earned (i.e., commission earned in August is paid and recognized with the second EOM payroll cycle of October);

(e) credit card expense is recognized in period incurred

(i) historically, a year end true up was made to reflect it on the Company's annual financials, not on a monthly basis. This year, the Company has adjusted so that each month reflects associated credit card expenses in the month incurred;

(f) and capitalized expenses and depreciation recognized according to GAAP and adjusted annually with a minimum threshold of $2,500."[21]

30. I will discuss specific provisions of Schedules A and B and the MIPA throughout this declaration as they relate to the Disputed Items. In addition, I will discuss additional facts as they relate to each of my opinions.

## C.    Dispute Over 2022 Earnout Payment

31. On January 25, 2023, Matthew Basdekis, Head of Finance of Malka and then and currently employed by Buyer, sent Buyer a financial statement for the year ended December 31, 2022 that, among other things, used Malka's historical accounting principles for purposes of the 2022 Earnout Payment and calculated Malka's revenue for earnout purposes as $42,506,536.05 and Malka's EBITDA for earnout purposes as $1,492,712.89.20.[22] Based on these numbers, Mr. Basdekis calculated that Malka achieved the maximum 2022 Earnout Payment.[23]

---

[21] JX065, MIPA, Schedule A.
[22] JX102, at MoneyLion_01820691 (produced in native excel). In his file, Mr. Basdekis noted that his calculations did not include certain items, such as the adjustment to EBITDA for the New Jersey Digital Media Tax Credit (described below). JX102, at MoneyLion_01820691 (Row 13, Columns M-N).
[23] JX102 at MoneyLion_01820691 (produced in native excel).

32. On April 14, 2023, Buyer delivered to the Sellers a 2022 Revenue and EBITDA Statement (the "2022 Earnout Statement") and Notice of Delivery.[24] In the 2022 Earnout Statement, rather than using the Company's historical accounting principles to calculate revenue and EBITDA (as it had for purposes of the 2021 Earnout Payment, as described below), Buyer used the Company's GAAP-adjusted revenue and EBITDA for the year ended December 31, 2022 and made further downward adjustments that, as I describe below, in my opinion were inconsistent with the MIPA and its schedules. As a result, Buyer calculated the Company's 2022 revenue as $40,151,259 and 2022 EBITDA as negative $2,778,845.[25] While this revenue number exceeded the Maximum 2022 Revenue Amount set forth in Section 2.06(b)(v)(B) of the MIPA, the EBITDA number did not meet the Minimum 2022 EBITDA Amount and, therefore, Buyer claimed that Sellers were not entitled to the 2022 Earnout Payment.

33. On May 25, 2023, Sellers sent Buyer the Objection Notice setting forth the Disputed Items.[26]

34. After the parties were unable to resolve their dispute out of Court, this lawsuit ensued.

**D.    Background Regarding GAAP And EBITDA**

35. Under the MIPA, "GAAP" is defined as "United States generally accepted accounting principles in effect from time to time."[27] United States generally accepted accounting principles (referred to hereinafter as "GAAP") is a set of accounting rules and procedures that govern accounting and financial reporting.[28] GAAP is wide-ranging in scope and covers a myriad of accounting principles in addition to those relating to revenue and expenses.[29]

---

[24] JX112, at MoneyLion_01826076.
[25] JX112, at MoneyLion_01826076.
[26] JX119.
[27] JX065, MIPA at DLA_006193.
[28] PX407.
[29] PX407.

36. GAAP is promulgated by the Financial Accounting Standards Board ("FASB").[30] The FASB has published the FASB Accounting Standards Codification ("ASC"), which is the source of authoritative GAAP recognized by the FASB to be applied to nongovernmental entities.[31] The FASB has also published the FASB Concepts Statements ("FASCON"), which are intended to set the objectives, qualitative characteristics, and other concepts that guide the FASB in developing sound accounting principles, and provide the FASB and its constituents with an understanding of the appropriate content and inherent limitations of financial reporting.[32]

37. GAAP requires an accrual basis of accounting. Accrual accounting depicts the effects of transactions, and other events and circumstances, on a reporting entity's economic resources and claims in the periods in which those effects occur, even if the resulting cash receipts and payments occur in a different period.[33] For example, if a company following GAAP did not pay its October electric bill until November, the company would still record the electric bill as an October expense because October is when the electricity usage occurred.

38. Importantly, publicly traded companies in the US are required by the Securities and Exchange Commission ("SEC") to follow GAAP; however, GAAP is not required in all instances for privately held companies. Private companies may choose to follow GAAP but are not required by regulators to do so and may instead adopt a different, non-GAAP basis of accounting, such as a cash basis of accounting, a tax basis of accounting, or a combination of GAAP-based and non-GAAP based accounting. Using the same previous example of an October electric bill paid in November, a company following a cash basis of accounting would record that expense in November – when cash was paid – even though the electricity was used in October.

---

[30] PX407.
[31] ASCs are effective for interim and annual periods ending after September 15, 2009. PX390.
[32] PX394.
[33] PX386, FASCON 8, Chapter 4, pp. 24-27.

39. Another example of the accrual basis of accounting is recording revenue in accordance with GAAP. In the context of revenue, GAAP requires that a series of specific conditions be met before an entity records revenue in its income statement. ASC 606 outlines the steps an organization must take to recognize revenue, which can be summarized as: 1) identify the contract with the customer; 2) identify the performance obligations in the contract; 3) identify the transaction price; 4) allocate the transaction price to each performance obligation; and 5) recognize revenue as each performance obligation is satisfied.[34] While an organization's assessment and application of the individual criteria of ASC 606 can be complex, the key underlying theme of revenue recognition under GAAP is that the revenue must be earned before it is recognized. Said differently, before an organization can record revenue, the organization must provide its customer with the goods or services promised in exchange for the revenue. Importantly, the obligation to earn revenue is separate and distinct from the timing of when cash is potentially received. For example, if a company sells a customer a pair of custom-made shoes, the company cannot consider the revenue earned until the shoes have been made and delivered to the customer – even if the customer pays upfront for the product.

40. Costs – also commonly referred to as expenses – are "outflows or other using up of assets of an entity or incurrences of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or carrying out other activities."[35] GAAP also requires that costs be recorded on an accrual basis of accounting. To reiterate the prior example, GAAP would require a company to record in October its expense for electricity used in October, even if the electric company did not send the company an invoice until November.

---

[34] PX392.
[35] PX386, at FASCON 8, Chapter 4, E81.

41. In accounting and financial reporting, EBITDA refers to "earnings before interest, taxes, depreciation and amortization." EBITDA is a commonly used metric to measure an entity's financial performance. Generally, users of financial statements look to EBITDA to measure a company's profit without the effects of certain non-operating expenses. For example, if a company owns a significant amount of equipment with a useful life of 10 years, the company would record a depreciation expense each year for 10 years (even though no cash will ever leave the company for depreciation). In this example, the company's EBITDA would reflect the company's earnings without the effect of that depreciation expense, thus giving users more insight into how the company is performing in its daily business operations.

42. Although EBITDA is a commonly used measure of financial performance, it is critical to note that EBITDA is not a measure of performance defined in GAAP. Rather, it is specifically acknowledged by the SEC, FASB, and other authorities as a non-GAAP measure of financial performance.[36] Therefore, there is no authoritative GAAP ruleset for calculating EBITDA. Accordingly, and specifically in the context of post-closing earnout calculations, parties calculating EBITDA must establish contractual definitions to calculate EBITDA. This is precisely what the parties did in this matter, wherein the parties included Schedule B to the MIPA articulating the Revenue and EBITDA Calculation Principles to be used in calculating EBITDA for purposes of the Earnout Payments and included certain contractually-agreed upon adjustments to EBITDA, such as the New Jersey Digital Media Tax Credit.[37]

---

[36] PX399. See also PX 283, at 75 and FASB, www.fasb.org/page/PageContent?pageId=/about-us/Advisory-Groups/fasac/meeting-recap/fasac- meeting-recap-march-7-2023.html (last visited Sept. 19, 2024).
[37] JX065, MIPA, Schedule B.

<u>**DETAILED STATEMENT OF OPINIONS AND BASES FOR OPINIONS**</u>

I.     <u>**AFFIRMATIVE OPINIONS RELATED TO 2022 EARNOUT**</u>

    A.     **Opinion 1: Buyer's utilization of a GAAP-based income statement, rather than one based on the Company's historical accounting practices, to calculate revenue and expenses for purposes of the 2022 Earnout is unsupported and inconsistent with the Revenue and EBITDA Calculation Principles set forth in Schedule B of the MIPA, resulting in an <u>understatement of Revenue and EBITDA.</u>**

    43. Based on my professional experience, my analysis of the MIPA and its schedules, and my analysis of documents and testimony, it is my opinion that in its 2022 Earnout Statement, Buyer used Buyer's preferred GAAP-based income statement to calculate revenue and expenses and, therefore, failed to calculate revenue and expenses in a manner consistent with the Company's historical accounting practices as required by the MIPA and its schedules. As a result, in my opinion, Buyer understated the Company's 2022 Revenue by $895,517 and understated the Company's 2022 EBITDA by $~~1,935,823~~ 1,262,756.

    1.     **As Confirmed by the Buyer's Calculation of Net Working Capital and the 2021 Earnout Payment, the Company's Historical Accounting Principles, Rather than Strict GAAP, Were to be Applied in the Context of the Earnout Payments.**

    44. With respect to the matter at hand, I have read the MIPA and its schedules, including but not limited to Schedules A and B. My reading of the plain language of these documents based on my professional experience as an accountant is that the Company's historical non-GAAP practices were to be applied in the context of the Earnout Payments.[38] As described below, my

---

[38] Based on my experience throughout my career, it is common for CPAs like myself to read and understand contractual terms. Typically, CPAs analyze such documents to understand how to account for transactions in a company's books and records. For example, GAAP outlined in ASC 842 (discussed below) requires accountants to

reading is consistent with the manner in which MoneyLion (i) calculated Final Closing Working Capital (defined below), (ii) calculated and approved of the maximum 2021 Earnout Payment, and (iii) tracked Malka's progress towards the 2022 Earnout Payment throughout 2022.

45. Schedule B, which sets forth the Revenue and EBITDA Calculation Principles to be used for purposes of the Earnout Payments, defines "Revenue" as "revenue recognized according to the Company's ***historical revenue recognition principles*** for the combined and consolidated Company."[39] Schedule B defines EBITDA as "the combined and consolidated net income before interest expense, federal, state and local taxes, depreciation and amortization of the Buyer, determined in accordance with U.S. GAAP (***including the Company's historical revenue and cost recognition principles***) as reviewed or audited by Buyer's independent accountants."[40]

46. Schedule A provides that the Company's historical financial statements were "prepared in accordance with U.S. GAAP, ***except***"[41] for various exceptions from GAAP (set forth above) including, but not limited to, "the Company's historical revenue recognition principles" and "the Company's historical cost recognition principles[.]"[42]

47. It is common for private companies to maintain their financial books and records on a non-GAAP basis in certain respects for various reasons including, but not limited to, a preference for a tax basis of accounting or lack of applicability due to the nature of a business.

48. Mr. Basdekis explained in his deposition testimony that prior to the Closing Date, the Company's practice of recording revenue was based on "when invoices were generated"[43] and that

---

review certain elements of a contract in order to determine whether the terms qualify the arrangement as a lease for accounting purposes.

[39] JX065, MIPA, Schedule B (emphasis added).
[40] JX065, MIPA, Schedule B (emphasis added).
[41] JX065, MIPA, Schedule A (emphasis added).
[42] JX065, MIPA, Schedule A (emphasis added).
[43] Transcript of Deposition of Matthew Basdekis dated July 18, 2024 ("Basdekis Tr.") 25:2-18.

the Company also had "no [expense] accrual process other than some exceptions."[44] Throughout his deposition, he repeatedly stated that such historical practice "is not consistent with GAAP…."[45]

49. After the Closing Date, Mr. Basdekis was retained as an employee of Buyer and maintained two sets of books and records for Malka based on both (i) the Company's non-GAAP historical practices for purposes of the Earnouts Payments and (ii) Buyer's preferred method of GAAP accounting.[46] Mr. Basdekis further testified that he maintained both methodologies in part because he understood that the MIPA required such terms for the calculation of the Earnout Payments.[47] Mr. Basdekis further explained in his deposition that when Malka became part of a public company after the Closing Date, they "had to create journal entries and be GAAP compliant"[48] and he worked with RSM (Buyer's external auditor) to ensure that "anything post acquisition be GAAP compliant."[49]

50. I have seen documents reflecting that Mr. Basdekis shared Malka's non-GAAP financial statements and reports (based on its historical accounting principles) with MoneyLion personnel throughout 2022, and that these non-GAAP financials were used by MoneyLion for purposes of calculating Final Closing Working Capital and the 2021 Earnout Payment (as described below), and were also used by MoneyLion and its advisors to track Malka's progress towards the 2022 Earnout Payment (as also described below). Such testimony and documents clearly demonstrate to me that the Company's historical accounting practices, and not strict GAAP, were to be used for purposes of the 2022 Earnout.

---

[44] Basdekis Tr. 153:1-4.
[45] *See, e.g.,* Basdekis Tr. 25:2-18, 74:21-24, 76:14-17, 79:1-3, 152:11-15.
[46] Basdekis Tr. 120 :1-12. *See also generally*, Basdekis Tr. 153-154.
[47] Basdekis Tr. 118:5-10.
[48] Basdekis Tr. 119-126 and 183-189 ~~189-183~~.
[49] Basdekis Tr. 142:1-20.

2.    **Buyer Used Malka's Historical Accounting Principles, not Strict GAAP, to Calculate Malka's Final Closing Working Capital under the MIPA.**

51. Section 2.05(a)(i) of the MIPA provides that no later than three business days before the Closing Date (*i.e.*, by November 12, 2021), Sellers shall "cause[] the Company to prepare and deliver to Buyer a calculation of (A) the estimated Closing Working Capital as of 12:01 AM Eastern Time on the Closing Date (the '**Estimated Closing Working Capital**') in accordance with the Accounting Principles…."[50]

52. Section 2.05(b)(i) of the MIPA provides that no later than 60 days after the Closing Date (i.e., by January 15, 2022) "Buyer shall prepare and deliver to [Sellers] a calculation, all as of 12:01 AM Eastern Time on the Closing Date, of the Closing Working Capital calculated in accordance with the Accounting Principles (the '**Final Closing Working Capital**') …."[51]

53. The MIPA defines "Accounting Principles" as "(a) the principles, policies and procedures expressly set forth on **Schedule A** …."[52] The MIPA defines "Working Capital" as "the Current Assets of the Company, less the Current Liabilities of the Company determined in accordance with and adjusted pursuant to the Accounting Principles."[53]

54. Working capital, sometimes referred to as "net working capital," is defined by GAAP as "the excess of current assets over current liabilities and identifies the relatively liquid portion of total entity capital that constitutes a margin or buffer for meeting obligations within the ordinary operating cycle of the entity."[54] Said differently, working capital measures a company's ability to pay its near-term obligations with its relatively liquid assets. GAAP provides guidance as to the

---

[50] JX065, at DLA_006203 (bold in original).
[51] JX065, at DLA_006204.
[52] JX065, at DLA_006186 (bold in original).
[53] JX065, at DLA_006202.
[54] PX391, ASC Master Glossary at "Working Capital"

classification and presentation of current assets and current liabilities in the context of audited financial statements.

55. GAAP defines current assets as "those that are reasonably expected to be realized in cash or sold or consumed during the normal operating cycle of the business."[55] ASC 210 also notes that current assets "generally include … [t]rade accounts, notes, and acceptances receivable."[56] Accounts receivable is a term used to refer to outstanding payments owed to an entity arising from sales and other transactions.[57] Typically, when a sales transaction occurs, an entity records an increase in its accounts receivable balance and a corresponding increase in revenue.[58] Therefore, because working capital is based on currents assets, and accounts receivable is a current asset, an entity's revenue recognition can impact the calculation of working capital, particularly through accounts receivable balance.

56. The following timeline summarizes various documentation illustrating the non-GAAP practices utilized in Buyer's calculation of Final Closing Working Capital:

> a.    Consistent with the MIPA's requirement to provide a calculation three days prior to the Closing Date,[59] on November 12, 2021, Mr. Basdekis sent Buyer a calculation of the Company's estimated net working capital, which Mr. Basdekis calculated as $2,145,182, consisting of $3,959,291 of accounts receivable (*i.e.* current assets) less $1,814,109 of Total Liabilities (made up of Accounts Payable, Other Current Liabilities and Credit Card).[60]

---

[55] PX391, ASC Master Glossary at "Current Assets."
[56] PX389.
[57] PX388.
[58] *See generally*, ASC 606.
[59] JX065, MIPA § 2.05(a)(i).
[60] JX064, at MoneyLion_01254517.

b.      On November 29, 2021, Mr. Basdekis sent Buyer the Company's balance sheet as of the Closing Date, with the account mapping to MoneyLion accounts.[61] As seen in the attachment, the balance sheet reflects third-party accounts receivable in the amount of $3,657,081.32.[62]

c.      On December 8, 2021, Michelle Lee, an employee in Strategic Finance at MoneyLion referred to the balance sheet that Mr. Basdekis sent on November 29, 2021, stating, "[i]f it is final, then we can use this to calculate the final working capital number."[63]

d.      On January 7, 2022, Ms. Lee sent Richard Correia, MoneyLion's CFO, a "draft of the final schedule for the purchase adjustments to release the purchase escrow for Malka."[64] In the attached file, Ms. Lee included Mr. Basdekis's November 12, 2021 estimated working capital calculation of $2,145,182, and she calculated Final Closing Working Capital as $1,912,511.[65]

e.      On January 10, 2022, Ms. Lee sent Sellers "the final schedules … for working capital and purchase price adjustments (which includes final cash and final transaction expense amounts) per the MIPA."[66] In the attached files, which include the Company's balance sheet as of the Closing Date, Buyer calculated Net Working Capital (*i.e.* Final Closing Working Capital) as $1,912,511, consisting of $3,657,081 accounts receivable (*i.e.*, the same accounts receivable figure that Mr. Basdekis sent to Buyer on November 29, 2021) less total liabilities of $1,744,570.[67]

---

[61] PX173, at MoneyLion_01811951.
[62] PX173, at MoneyLion_01811953 (produced in native excel).
[63] PX176, at MoneyLion_01832077.
[64] PX184, at MoneyLion_01826005.
[65] PX184, at MoneyLion_0126006 (produced in native excel).
[66] PX185, at MoneyLion_01878901.
[67] PX185, at MoneyLion_0187802 (produced in native excel) and MoneyLion_0187803.

f.    Mr. Correia testified at his deposition that at the time that Buyer sent this Final Closing Working Capital calculation to Sellers, Buyer believed that it had calculated the Final Closing Working Capital amount in accordance with Schedule A.[68]

g.    It is noteworthy to me that the Final Closing Working Capital Amount and, in particular, the $3,657,081 of accounts receivable did <u>not</u> include adjustments to the Company's historical revenue recognition practices to comply with GAAP. I know this because I have analyzed documents reflecting that the Buyer made adjustments to the $3,657,081 accounts receivable figure as part of its audit for the year-ended December 31, 2021; however, those GAAP adjustments were not made to the Final Closing Working Capital calculation, as I will describe below.

h.    Specifically, on February 2, 2022, Michael Scalia, Director of SEC Reporting at MoneyLion sent MoneyLion's auditors, RSM US LLP ("RSM") and MoneyLion's outside advisor, CFGI, a spreadsheet of Malka's sales orders for November and December 2021 with proposed adjustments to revenue recorded for certain customers.[69] This communication between Buyer and its external auditors and advisors clearly show adjustments to be made to the Company's historical revenue recognition practices in order to arrive at GAAP-compliant financial statements for the year ended December 31, 2021.[70] Such GAAP-based financial statements were required for Buyer's financial reporting obligations as a publicly

---

[68] Transcript of Deposition of Richard Correia dated August 13, 2024 ("Correia Tr."), 201:18-22.
[69] PX196, at MoneyLion_01817934.
[70] PX196, at MoneyLion_0187935.

traded company.[71] In this spreadsheet, Buyer makes certain adjustments to the Company's opening balance sheet ("OBS"), including adjustments to the Company's accounts receivable for the purpose of compiling a GAAP- comporting opening accounts receivable balance for Malka.[72] Mr. Scalia explained at his deposition that "[o]pening balance sheet is a term used particularly in merger and acquisition accounting referencing to the date of acquisition," *i.e.*, a balance sheet for Malka as of November 15, 2021.[73] Buyer calculates that the accounts receivable reflected in the Company's OBS should be adjusted by $1,013,749 to comply with GAAP.[74]

i.      On February 4, 2022, Mr. Scalia sent CFGI an adjusted OBS for Malka.[75] Notably, the OBS that Mr. Scalia sent starts with an amount for third-party accounts receivable of $3,657,081– the same amount as originally calculated by Mr. Basdekis as of the Closing Date and used by Buyer to calculate the Final Closing Working Capital amount.[76] However, in Mr. Scalia's GAAP-adjusted OBS, the accounts receivable amount is adjusted by $1,013,749 (the same figure reflected in the spreadsheet that Mr. Scalia sent to RSM and CFGI on February 2, 2022[77]) per "Rev Rec Adjustment to OBS per Malka rev rec adjustment calc workbook" to reach the final OBS number for GAAP reporting purposes.[78]

---

[71] MoneyLion Technologies Inc. is a wholly owned subsidiary of MoneyLion Inc., which is a publicly traded company on the New York Stock Exchange (See MoneyLion Inc. 2022 Form 10-K). As a result, it is required to file audited financial statements under Section 13(a) of the Securities Exchange Act of 1934.
[72] PX196, at MoneyLion_0187935 (produced in native excel).
[73] Transcript of Deposition of Michael Scalia dated August 1, 2024 ("Scalia Tr."), 63:2-13.
[74] PX196, at MoneyLion_0187935 (produced in native excel).
[75] PX198 at MoneyLion_01817787.
[76] PX173; PX 185.
[77] PX196, at MoneyLion_01817935.
[78] PX198, at MoneyLion_01817788 (produced in native excel).

j.    Mr. Scalia's February 2 and February 4, 2022 spreadsheets confirm to me that Buyer's Final Closing Working Capital calculation did <u>not</u> include adjustments to Malka's historical revenue recognition practices to comply with GAAP. This is significant because if Schedule A required strict adherence to GAAP, then I would have expected Buyer to have made GAAP adjustments to the Company's Final Closing Working Capital calculation (and, in particular, to accounts receivable) given that the MIPA is clear that that calculation needed to be prepared in accordance with Schedule A.[79]

### 3.    Buyer Used Malka's Historical Accounting Principles, not Strict GAAP, When it Approved of the 2021 Earnout Payment.

57.  The documents and testimony that I analyzed relating to the Buyer's approval of the maximum 2021 Earnout Payment serve as further confirmation that the 2022 Earnout Payment also was to be calculated using the Company's historical accounting practices and not strict GAAP.[80]

58. The following timeline summarizes various documentation I have considered illustrating that the Company's historical non-GAAP practices, particularly those with respect to revenue recognition, were applied in the calculation of the 2021 Earnout Payment:

a.    As previously mentioned, on February 2, 2022, Mr. Scalia sent RSM and CFGI a spreadsheet of Malka's sales orders for November and December 2021 with proposed adjustments to revenue recorded for certain customers.[81] In addition to making adjustments to Malka's OBS to comply with GAAP, Mr. Scalia also made

---

[79] JX065, MIPA § 2.05(b)(i).
[80] As noted above, Section 2.06(b)(i) of the MIPA states: "For the avoidance of doubt, it is the intention of the Parties that the 2021 Revenue Amount and the 2021 EBITDA Amount and the 2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using substantially consistent methods and practices."  JX065, MIPA § 2.06(b)(i).
[81] PX196, at MoneyLion_0187935 (produced in native excel).

adjustments to Malka's revenue for the "stub period" to comply with GAAP. In the context of Buyer's acquisition of the membership interests of Malka, the "stub period" refers to the period between November 15, 2021 (the Closing Date) through December 31, 2021, which is the 6-week period of time in late 2021 during which Buyer owned Malka.[82] As Mr. Scalia explained at his deposition, "[t]here were schedules created to make sure that we could present Malka's numbers in a GAAP-compliant manner in our 10-K that was going to be coming out … in 2022, related to a stub period from when we acquired them."[83] The schedule that Mr. Scalia sent to RSM and CFGI on February 2, 2022 reflects that the variance between Malka's revenue for the "stub period" using its historical revenue recognition practices versus using GAAP is $1,094,132.[84]

b.      On February 14, 2022, Mr. Basdekis wrote to CFGI and Buyer: "The earnout calculation is based off of our historical accounting principals [sic] so not sure what impact audit findings would have on the calculation. Similarly – closing WC was calculated based on historical accounting principals [sic] as well and exclusive of rev rec adjustments to AR, for example."[85] On February 15, 2021, CFGI replied to Mr. Basdekis, copying Buyer, and asked Mr. Basdekis to send "the full year 2021 P&L based [] off of the historical accounting principles[.]"[86] On the same day, Mr. Basdekis responded, sending a file "2021 Unadjusted Income Statement – Consolidated MMG.xlsx" and noting in his cover email "Yes –

---

[82] Scalia Tr. 30:10-18.

[83] Scalia Tr. 29:24-30:5.

[84] PX196, at MoneyLion_0187935 (produced in native e

[85] JX074, at MoneyLion_01817462.

[86] JX074, at MoneyLion_01817462.

attaching here the unadjusted P&L for 2021 – only thing not reflected is the tax credit which is allowable under MIPA."[87] The file that Mr. Basdekis sent has the heading "Malka Media Group, LLC Malka Consolidated Unadjusted Income Statement From Jan 2021 to Dec 2021" and reflects "Total Income" of $30,806,976.43 and "Net Ordinary Income" of $921,497.13.[88]

c.    On March 15, 2022, Ms. Lee sent Mr. Frommer "the 2021 Revenue and EBITDA statement related to the earnout as per the purchase agreement."[89] Ms. Lee wrote that "[b]ased on this calculation, Malka has achieved the full earnout amount for 2021."[90] The 2021 Revenue and EBITDA Statement attached to Ms. Lee's email reflects that Malka's "Total Revenue" for 2021 was $30,806,376 and EBITDA for 2021 was $921,497.[91] These are the same amounts included in the "2021 P&L based [] off of the historical accounting principles" that Mr. Basdekis sent to Buyer and CFGI on February 15, 2022.[92] In the 2021 Revenue and EBITDA Statement, Buyer also added $890,905 to EBITDA for the "2019 Tax Credit[,]" making the "EBITDA plus Tax Credit" $1,812,402.[93]

d.    I have seen no indication that any of the GAAP adjustments that Buyer made to Malka's revenue for the "stub period," and that are reflected on the spreadsheet that Mr. Scalia sent to RSM and CFGI on February 2, 2022, were applied to Malka's 2021 Revenue or EBITDA for purposes of determining Sellers' entitlement to the 2021 Earnout Payment. This confirms that, consistent with Mr.

---

[87] JX074, at MoneyLion_01817462.
[88] JX074, at MoneyLion_01817466 (produced in native excel).
[89] JX083, at MoneyLion_01826070.
[90] JX083, at MoneyLion_01826070.
[91] JX083.
[92] JX074.
[93] JX083.

Basdekis's February 15, 2022 email, Malka's historical accounting principles, and not strict GAAP, were used for purposes of the 2021 Earnout Payment.

### 4. Buyer and its Advisors Tracked the Company's Performance Towards the 2022 Earnout Using the Company's Historical Accounting Principles, not Strict GAAP.

59. Further confirming my opinion that the Company's historical accounting principles, and not strict GAAP, were to be applied for purposes of the 2022 Earnout Payment are the documents and testimony I have reviewed reflecting that throughout 2022, Buyer and CFGI tracked the Company's performance towards the 2022 Earnout using financial reports prepared in accordance with the Company's historical accounting principles. In particular:

    a.    On April 29, 2022, CFGI emailed Erika Nuno in the Strategic Finance group at MoneyLion ("Ms. Nuno") asking for "the Malka revenue and EBITDA numbers for Q1[.]"[94] The same day, Ms. Nuno responded, "[f]or purposes of earnout? Asking since the calcs are different in that case."[95] CFGI responded, "Yea, sorry should've clarified for the purposes of the earnout. We want to true up the estimates to align with the final number that was calculated."[96] At his deposition, Mark Torossian the Chief Accounting Officer at MoneyLion ("Mr. Torossian") explained that CFGI provided valuations of Buyer's earnout liability on a quarterly basis in 2022 because, under GAAP, Buyer had to value and report the liability for the Earnout Payment as contingent consideration.[97]

---

[94] PX236 ~~JX236,~~ at MoneyLion_01835166.
[95] PX236 ~~JX236,~~ at MoneyLion_01835166.
[96] PX236 ~~JX236,~~ at MoneyLion_01835166.
[97] Transcript of Deposition of Mark Torossian dated July 29, 2024 ("Torossian Tr."), 42:12-43:8.

b.    On May 2, 2022, Ms. Lee emailed Mr. Basdekis and asked him to send "Q1 2022 financials in the historical accounting principles view" so that Buyer "could see how Malka is currently tracking towards the earn-out."[98] The same day, Mr. Basdekis responded to Ms. Lee, attaching an excel file with the heading "Malka Media Group, LLC Malka (Consolidated) GAAP vs Non GAAP Income Statement Jan 2022, Q1 2022, Feb 2022, Mar 2022" that reflects "Total – Income" of $7,747,413.35 and "Net Ordinary Income" of ($2,253,930.80).[99] Also on May 2, 2022, Ms. Lee wrote to CFGI (in the same thread in which CFGI asked on April 29, 2022 for "revenue and EBITDA numbers for Q1"): "here are the Malka financials for Q1 using their historical accounting principles for purposes of the earnout."[100] The file that Ms. Lee sent to CFGI appears to be the same file with the same heading as the one that Mr. Basdekis sent to her on the same day.[101]

c.    On October 4, 2022, CFGI wrote to Buyer: "In anticipation of the Q3 review and valuation updates, our valuation team has requested the following: … Actual Malka revenue and EBITDA for the period beginning 1/1/2022 and ending 9/30/2022 (or 8/31/2022)" and "[p]rojected Malka revenue and EBITDA for the period beginning 10/1/2022 and ending 12/31/2022[.]"[102] Mr. Torossian testified that this request from CFGI appeared to be in

---

[98] JX086.
[99] JX086.
[100] PX236 JX236, at MoneyLion_01835166.
[101] PX 236 JX236, at MoneyLion_01835166; JX086.
[102] PX254, at MoneyLion_01834199.

connection with its quarterly valuation work to value the Buyer's earnout liability.[103]

d.   On October 13, 2022, Ms. Lee responded to CFGI: "please see attached for the updated excel. The Malka financials are based on their historical accounting principles (not GAAP) which is what the earn-out is based on, so will not match GAAP financials."[104] The file attached to Ms. Lee's email includes "Actual" Malka revenue and EBITDA numbers for January through August 2022 and "Projections" of Malka's revenue and EBITDA for September through December 2022.[105] According to this file, Sellers were on track to achieve the 2022 Earnout Payment.[106]

e.   On October 20, 2022, CFGI sent Mr. Scalia, copying Mr. Torossian, "the Q3 Malka and Even Earnout valuations."[107] By CFGI's calculation, Malka met the Maximum 2022 Revenue Amount and the Minimum 2022 EBITDA Amount and would achieve the maximum 2022 Earnout Payment.[108]

f.   On October 21, 2022, in response to questions from Mr. Scalia about its Q3 2022 earnout valuation, CFGI wrote to Mr. Scalia, copying Mr. Torossian: "[m]aximum revenue threshold achievement is now a lock (actuals through 9/30 of $31mm vs max threshold of $30mm). It also looks like the odds of achieving the minimum $100k EBITDA threshold have improved."[109]

---

[103] Torossian Tr. 130:2-5.
[104] PX254, at MoneyLion_01834199.
[105] PX 254, at MoneyLion_01834199.
[106] PX254, at MoneyLion_01834202.
[107] PX256, at MoneyLion_01836909.
[108] PX256, at MoneyLion_01836916.
[109] PX257, at MoneyLion_01836920.

60. These communications between Buyer and CFGI further confirm to me that, as Ms. Lee wrote on October 13, 2022, Malka's "historical accounting principles (not GAAP)" are "what the earn-out is based on[.]"[110]

### 5. Buyer's calculation of revenue in the 2022 Earnout Statement deviates from the Revenue and EBITDA Calculation Principles, understating 2022 Revenue by $895,517.

61. In the 2022 Earnout Statement, Buyer failed to calculate revenue in a manner consistent with the Company's historical practices, in violation of the MIPA's Revenue and EBITDA Calculation Principles. Specifically, the Revenue and EBITDA Calculation Principles define Revenue to mean, in part, "revenue recognized according to the Company's historical revenue recognition principles for the combined and consolidated Company."[111] However, Buyer calculated Revenue for the 2022 Earnout Statement utilizing Buyer's accounting practices, *i.e.* strict compliance with GAAP, not the Company's historical revenue recognition principles, thereby understating Revenue and subsequently EBITDA. Under the Company's historical practices, Revenue would be $895,517 higher than what Buyer calculated in the 2022 Earnout Statement.

a.    The MIPA requires consistency with historical practice for calculating Revenue and the 2022 Earnout

62. As I described in Section A above in this report, based on my analysis of the terms of the MIPA, it is my opinion that both Schedule A (Accounting Principles) and Schedule B (Revenue and EBITDA Calculation Principles) clearly contemplate that revenue for purposes of the 2022 Earnout should be calculated in accordance with the Company's historical practices, including specific instances where such historical practices include exceptions from GAAP. In particular,

---

[110] PX254, at MoneyLion_01834199.
[111] JX065, MIPA, Schedule B.

Schedule A to the MIPA includes "the Company's historical revenue recognition practices" in a series of exceptions to GAAP to be utilized in calculation of revenue and expenses.[112] Similarly, Schedule B specifically contemplates that revenue is to be recognized "according to the Company's historical revenue recognition principles".[113]

        b.    Buyer calculated revenue in the 2022 Earnout Statement using the Buyer's own revenue recognition practices, deviating from the <u>Company's historical practices and contradicting the MIPA.</u>

63. Despite the plain language of the MIPA requiring revenue for the 2022 Earnout to be calculated consistently with the Company's historical practices, Buyer has admittedly utilized its own preferred GAAP method of accounting for revenue in Buyer's 2022 Earnout Statement. Mr. Torossian, who was responsible for preparing Buyer's 2022 Earnout Statement, acknowledged that Buyer calculated the Company's revenue as $41,611,677, which is consistent with Buyer's "reported GAAP revenue number" for the Company.[114] However, Mr. Torossian also acknowledged that the Company's revenue, before the Buyer's GAAP adjustments, would be $42,506,536[115] - a difference of approximately $895,000.

64. Mr. Basdekis also acknowledged a difference in the calculation of revenue under the Company's historical practices compared to the Buyer's accounting practices, admitting that his own comparative analysis of "GAAP" versus "Earnout" revenue for 2022 would result in a variance of $905,517.[116]

65. Based on my analysis, as an accountant, of the terms of the MIPA and the information in this matter, it is my opinion that the Buyer's usage of its preferred accounting practices for

---

[112] JX065, MIPA, Schedule A.
[113] JX065, MIPA, Schedule B.
[114] Torossian Tr. 312:3-23.
[115] Torossian Tr. 243-246.
[116] Basdekis Tr. 193.

calculation of Revenue for the 2022 Earnout Statement is a deviation from both the Company's historical practices and the MIPA. The MIPA and the testimony of Mr. Basdekis make clear that the Company historically recognized revenue when invoices were generated – regardless of whether the revenue had been earned (*i.e.*, the goods and services had been provided). By contrast, Buyer is attempting to utilize its own preferred accounting practices to calculate revenue for the 2022 Earnout Statement, resulting in an understatement of revenue of at least $895,000.

> 6.    **Buyer's calculation of costs in the 2022 Earnout Statement deviates from the Revenue and EBITDA Calculation Principles, understating 2022 EBITDA by $~~1,935, 823~~.**
> 1,262,756

66. As with revenue, in its calculation of the 2022 Earnout Statement, Buyer failed to calculate expenses in a manner consistent with the Company's historical practices, in violation of the MIPA. Specifically, Schedule B to the MIPA (Revenue and EBITDA Calculation Principles) contemplates that EBITDA should be calculated including "the Company's historical revenue and cost recognition principles."[117] Moreover, the Accounting Principles outlined in Schedule A of the MIPA clearly articulate the Company's historical cost recognition principles and how those differ from GAAP.[118]  Indeed, at deposition, Mr. Dudney agreed that Sellers made clear in Schedule A that Malka did not historically recognize expenses in accordance with GAAP.[119]

67. However, Buyer calculated expenses for the 2022 Earnout Statement utilizing Buyer's own preferred post-closing accounting practices, thereby deviating from the requirements of the MIPA and understating EBITDA. As I will describe herein, under the Company's historical practices, costs should be $~~1,935,823~~ less than what Buyer has included in the 2022 Earnout
1,262,756
Statement, comprised of the following differences in the following accounts:[120]

---

[117] JX065, MIPA, Schedule B.
[118] JX065, MIPA, Schedule A.
[119] Dudney Dep. Tr., 108:16-110:4, 254:24-255:12.
[120] JX102, at MoneyLion_01820691 (produced in native excel) (rounded to the nearest dollar)

| | | |
|---|---|---|
| 51122 – Freelancers | | 58,558 |
| 51128 - Revenue Share | 341,430 | ~~436,455~~ |
| 52010 - Production Insurance | | 70,714 |
| 53007 - Other Variable Expenses | 97,240 | ~~112,240~~ |
| 60003 - 401k | | 163,302 |
| 60005 - Other Insurance & Benefits | | 18,116 |
| 60007 - Sales Commission | | 13,656 |
| 60011 – Severance | | 150,000 |
| 60401 - Payroll Taxes: FICA and Medicare | | 31,709 |
| 60433 - Payroll Taxes: ML | | 8,955 |
| 60441 - Payroll Taxes: Other | | 112,097 |
| 63011 – Rent | 70,519 | ~~620,937~~ |
| 63013 - Dues & Subscriptions | | 65,562 |
| 69000 - Miscellaneous & Other Overhead | 60,898 | ~~73,521~~ |
| *Total* | $1,262,756 | *$1,935,823* |

> a.  The MIPA requires consistency with historical practice for cost recognition when calculating EBITDA and the 2022 Earnout Payment

68. As set forth above, both Schedule A (Accounting Principles) and Schedule B (Revenue and EBITDA Calculation Principles) clearly contemplate that costs for purposes of the 2022 Earnout Payment should be calculated in accordance with the Company's historical practices, including specific instances where such historical practices differ from GAAP. In particular, Schedule A articulates exceptions from GAAP including, but not limited to, "the Company's historical revenue recognition principles," "the Company's historical cost recognition principles … which require the Company to recognize costs on contracts as incurred," and the principle that "invoiced expenses are recognized in related period based on receipt of the invoice."[121] Both points are clear departures from GAAP. For example, GAAP requires costs to be accrued in the period incurred – not the period invoiced, as articulated in sub-section c of Schedule A.

---

[121] JX065, MIPA, Schedule A.

69. Schedule B to the MIPA, "Revenue and EBITDA Calculation Principles", further demonstrates to me that the Company's historical practices were to be utilized when calculating the 2022 Earnout Payment. Namely, the definition of "EBITDA" in Schedule B specifically states that EBITDA is to be calculated "including the Company's historical revenue and cost recognition principles".[122]

70. The provisions of Schedule A and Schedule B clearly evidence to me that the 2022 Earnout Statement should include costs calculated in a manner consistent with the Company's historical practices, including instances when such historical practices differ from GAAP.

> b.    Buyer calculated expenses in the 2022 Earnout Statement using the Buyer's own preferred accounting practices, deviating from the Company's historical practices and contradicting the MIPA

71. In the 2022 Earnout Statement, Buyer attempts to use its own accounting practices and application of GAAP as the basis for the Company's expense recognition, the effect of which incorrectly reduces EBITDA. Namely, Buyer attempts to increase expenses via expense accruals, GAAP promulgated in ASC 842, and other Buyer-elected reserves - none of which are consistent with the Company's historical practices or the MIPA's requirement that the "2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using substantially consistent methods and practices" as those used to calculate the 2021 Revenue Amount and 2021 EBITDA Amount.[123] I will describe each of these categories in detail below.

72. As an initial overarching point, the Buyer's own records and testimony of its employees make clear that for purposes of the 2022 Earnout Statement, Buyer recorded expenses based on Buyer's own preferred accrual basis of accounting, rather than the Company's historical

---

[122] JX065, MIPA, Schedule B.
[123] JX065, MIPA § 2.06(d).

practices.[124] First, Mr. Torossian testified that the file he prepared to calculate the 2022 Earnout Statement utilized an amount for EBITDA from the Company's reported GAAP results (not historical practice).[125] Further, Mr. Basdekis testified that he prepared a file which illustrated a side-by-side analysis of the Company's 2022 income statement under historical practices, versus Buyer's preferred accounting practices.[126] The testimony and analysis of Buyer's own personnel make clear that Buyer deviated from the Company's historical practices and the practices Buyer used for the 2021 Earnout in preparing costs to be included in the 2022 Earnout.

        c.    Buyer's calculations of accrued expenses in the 2022 Earnout
             <u>Statement are inconsistent with the Company's historical practices</u>

73. As confirmed in the testimony of Mr. Basdekis, pre-closing, the Company historically did not accrue expenses,[127] but rather recorded expenses when an invoice was received (a practice which was memorialized in Schedule A to the MIPA).[128] Nonetheless, testimony and documentation from Buyer reveals many instances where Buyer did just that – replaced historical practice with Buyer's own accrual practices. Based on my analysis of the available information, Buyer's approach is plainly at odds with the requirements of the MIPA, and each of the following ledger accounts should be adjusted accordingly:

| General ledger account | Difference in historical practices vs. Buyer's GAAP practices |
|---|---|
| 51122 – Freelancers | 58,558 |
| 51128 - Revenue Share | 341,430 ~~436,455~~ |
| 52010 - Production Insurance | 70,714 |
| 53007 - Other Variable Expenses | 97,240 ~~112,240~~ |
| 60005 - Other Insurance & Benefits | 18,116 |
| 60007 - Sales Commission | 13,656 |
| 60401 - Payroll Taxes: FICA and Medicare | 31,709 |

---

[124] Torossian Tr. 309.
[125] Torossian Tr. 309.
[126] *See* JX101, cited in Basdekis Tr. 191-202.
[127] Basdekis Tr. 196-198.
[128] JX065, MIPA, Schedule A.

| | |
|---|---|
| 60433 - Payroll Taxes: ML | 8,955 |
| 60441 - Payroll Taxes: Other | 112,097 |
| 63013 - Dues & Subscriptions | 65,562 |
| 69000 - Miscellaneous & Other Overhead | 60,898   ~~73,521~~ |
| *Sub-Total* | $878,935   ~~*$1,001,583*~~ |

74. Mr. Basdekis's side by side analysis of the Company's 2022 income statement based on historical practices versus Buyer's practice included a column for specific comments about "Key Drivers" of difference between the two approaches.[129] Notably, each of the above-listed accounts included comments such as "Accrued Expenses", "Net Impact of Accruals and Reversals", and other comments indicating accrual accounting primarily drove the difference between historical practice and Buyer's implemented practices.[130] Further, when asked specifically about three payroll tax-related ledger accounts with differences, Mr. Basdekis testified that "it looks to be accrual activity."[131]

> d.    Buyer's accrual of rent expense under ASC 842 is inconsistent with the Company's historical practices

75. In addition to recording multiple expense accounts on an accrual basis, Buyer has also admittedly deviated from the Company's historical practices in recording rent expense included in the 2022 Earnout calculation.[132] Buyer's change in practice contradicts the MIPA, resulting in an understatement of EBITDA for purposes of calculating the 2022 Earnout by $~~620,937~~  70,519.

76. As previously described, the MIPA states that the Company's historical practice for expenses is to recognize the expense in the "related period based on receipt of the invoice (i.e., if the Company receives and invoice in October, it is entered in October and shows as an October expense, even if cash is not paid out until 30 or 60 days from the date of receipt; this applied to

---

[129] JX102, at MoneyLion_01820691 (produced in native excel).
[130] JX102, at MoneyLion_01820691 (produced in native excel).
[131] Basdekis Tr. 198.
[132] Basdekis Tr. 198; Torossian Tr. 253.

contracted costs, variable costs, and overhead)".[133] Mr. Basdekis confirmed that this historical practice extended to the Company's practices for recording rent expenses.[134] In 2022, the Company moved to a new office space; as part of the Company's contract for its new lease, the Company's landlord waived three months of rent payments.[135] Accordingly, since the Company did not receive invoices for these three months of rent, the Company did not record three months of rent expense in 2022, consistent with its historical practice.[136]

77. In contrast to the Company's historical practices, GAAP – specifically ASC 842 – requires companies to accrue and recognize rent expenses over the total life of the contract, regardless of when cash for such lease obligations is actually paid.[137] Despite specifically acknowledging this difference between GAAP and the Company's historical practices, Buyer nonetheless calculated EBITDA for purposes of the 2022 Earnout Statement utilizing Buyer's calculation of 2022 rent expense under ASC 842.[138] Buyer's approach is a clear departure from the MIPA, and accordingly should be rejected.

e.    Other Buyer-elected changes are inconsistent with the Company's historical practices

78. Buyer's calculations of costs included in the 2022 Earnout Statement also include instances where Buyer elected to implement other of its own preferred post-closing accounting practices and decisions, again departing from the Company's historical practices in violation of the MIPA. Specifically, Buyer has recorded 401(k) expenses and severance expenses that exceed

---

[133] JX065, MIPA, Schedule A.
[134] Basdekis Tr. 184-185.
[135] Basdekis Tr. 184:20-185:12.
[136] Basdekis Tr. 184-185.
[137] Torossian Tr. 253; ASC 842.
[138] Torossian Tr. 253-254; Basdekis Tr. 198-199. I note that ASC 842 did not go into effect until January 1, 2022. PX396.

the amounts of those expenses that Mr. Basdekis calculated using the Company's historical practices in the following amounts:[139]

| | |
|---|---|
| 60003 – 401(k) | 163,302 |
| 60011 – Severance | 150,000 |
| *Sub-Total* | *$313,302* |

79. I confirmed with Mr. Basdekis Malka historically only paid 1% to employees' 401(k). With respect to 401(k) expenses, the Company historically offered a plan to its employees whereby the Company would match 1% of employees' 401(k) contributions.[140] Buyer, however, offers employees a 4% match.[141] Buyer's decision to offer Company employees a higher 401(k) match during the Earnout period is inconsistent with the Company's historical practices. Moreover, increasing 401(k) expenses due to the decision at the Buyer corporate level to do a 4% match instead of a 1% match is inconsistent with Section 2.06(d) of the MIPA, which provides that Buyer "will not take any action intended to interfere with or frustrate the Seller Members' opportunity to receive the … 2022 Earnout Payment[.]"[142] Accordingly, in my opinion, this increased expense amount should not be included in EBITDA for purposes of calculating Seller's entitlement to the 2022 Earnout Payment.

80. Similarly, in the 2022 Earnout Statement, Buyer has also included severance payments based on Buyer's own post-closing severance-related decisions, deviating from the Company's historical practices and the MIPA. In 2022, the Buyer undertook a company-wide cost savings initiative which included eliminating certain roles.[143] As Mr. Torossian testified, these termination decisions were made at the corporate level, resulting in a "pool" of severance to be paid out to

---

[139] JX102 at MoneyLion_01820691.
[140] Basdekis Tr. 195.
[141] Basdekis Tr. 195.
[142] JX065, MIPA § 2.06(d)(i).
[143] Torossian Tr. 209.

separated employees.[144] Buyer elected to "push down" $150,000 of this severance pool to the Company and included this amount as an expense in Buyer's calculation of EBITDA for purposes of the 2022 Earnout Statement.[145] Based on my experience as an accountant and my analysis of the available information, this is a clear departure from the Company's historical practices and should not be included for purposes of calculating Seller's entitlement to the 2022 Earnout Payment.

### B. Opinion 2: Buyer's 2022 Earnout Statement improperly fails to include the New Jersey Digital Media Tax Credit applied for in 2022, thereby understating 2022 EBITDA by $1,590,603.

81. In the 2022 Earnout Statement, Buyer failed to include a positive adjustment for the New Jersey Digital Media Tax Credit (the "Tax Credit") in the amount of $1,590,603. Buyer alleges that such adjustment is improper as there is "no expected recognition of tax credits applied for."[146] In my view, such a claim is unsubstantiated and improper based on the plain language of the MIPA. Moreover, Buyer has access to documentation of the Tax Credit applied for in 2022.

82. Schedule B of the MIPA includes specific provisions related to the calculation of EBITDA. The twelfth of these provisions requires that EBITDA "shall include the expected recognition of the New Jersey Digital Media Tax Credit … in the period in which the Tax Credit was applied for" ("MIPA EBITDA Principle #12").[147] Further, the MIPA provides the following example, "By way of illustration, the Tax Credit applied for in 2021 was for services provided by the Company for 2019. The Tax Credit would be added to 2021 EBITDA[.]"[148] The MIPA's definition and illustrative example make clear to me that the Tax Credit should be included in the

---

[144] Torossian Tr. 209.
[145] Torossian Tr. 209.
[146] JX112, at MoneyLion_01826076.
[147] JX065, MIPA, Schedule B.
[148] JX065, MIPA, Schedule B.

year of application. Indeed, in the 2021 Revenue and EBITDA Statement, Buyer <u>did</u> give Sellers credit for the Tax Credit.[149]

83. The Tax Credit for 2020 was applied for in 2022. Specifically, Mr. Basdekis prepared and submitted the application for the 2020 Tax Credit to the New Jersey Economic Development Authority ("NJEDA") on November 11, 2022.[150] In the application, Mr. Basdekis included the amount of the "Estimated Tax Credit" as $1,590,603 based on the Company's books and records.[151] At his deposition, Mr. Basdekis testified that at the time he submitted this application, he believed that he had provided accurate information to the State of New Jersey.[152]

84. On December 8, 2022, Mr. Frommer and Mr. Basdekis received a notice of receipt of the Tax Credit application from an NJEDA employee who indicated that "the application was deemed complete" and would proceed to the review phase.[153] On February 8, 2023, Malka received notification from the NJEDA approving the Tax Credit in the amount of $1,590,603.[154] On February 21, 2023, the NJEDA sent Mr. Basdekis further confirmation of the award of the Tax Credit in the amount of $1,590,603.[155]

85. The plain language of the MIPA unequivocally stipulates in MIPA EBITDA Principle #12 that the Tax Credit must be included in the calculation of EBITDA "in the period in which the Tax Credit was applied for."[156] The Tax Credit was applied for within the 2022 calendar year as evidenced by the submission of the application on November 11, 2022 and the NJEDA's notice of receipt received by Mr. Frommer and Mr. Basdekis in December of 2022.[157] Comprehensive

---

[149] JX083.
[150] PX263 Basdekis Tr. 221:3-224:11.
[151] PX263; Basdekis Tr. 221:23-22:10.
[152] Basdekis Tr. 223:24-224:4.
[153] PX268.
[154] PX298.
[155] PX298.
[156] JX065, MIPA, Schedule B.
[157] PX263; MoneyLion_00155283-84.

documentation of the application for the Tax Credit as demonstrated by the timeline presented above was readily available and accessible to the Buyer. The Tax Credit was applied for in 2022 with an estimated and expected value of $1,590,603.[158] As such, it is my opinion that the Tax Credit should be included in the 2022 Earnout Statement in the amount of $1,590,603.

86. In summary, MIPA EBITDA Principle #12 makes it clear that the Tax Credit should be included in the calculation, *in the period it was applied for*. Documentation of the application for the Tax Credit applied for in 2022, including the filing date, is readily available and accessible. As such, the Tax Credit should be included in the calculation of 2022 EBITDA at its full value of $1,590,603.

**C.    Opinion 3: Buyer's 2022 Earnout Statement improperly includes a downward adjustment to revenue and EBITDA for the "fair market value" of intercompany services provided by the Company to Buyer, thereby understating 2022 revenue and EBITDA by $1,242,248.**

87. In the 2022 Earnout Statement, Buyer includes a downward adjustment to 2022 revenue and 2022 EBITDA of $1,242,248 that Buyer claims is required under Schedule B of the MIPA and was "made to only include difference between FMV & Actual charge of intercompany services."[159] Such amount is wholly unsubstantiated as Buyer has failed to provide any documentation that the intercompany services provided by the Company to Buyer were not provided at fair market value. Moreover, Buyer appears to fundamentally misunderstand the concept of fair market value, further underscoring the flaws in Buyer's claim.

88. Schedule B of the MIPA includes specific provisions related to the calculation of revenue. The third of these provisions requires that revenue "include the difference between the

---

[158] Buyer attempts to argue that no amount for the Tax Credit should be included in the 2022 Earnout Statement because the "expected value" was uncertain; however, contemporaneous and subsequent facts and circumstances demonstrate to me that Buyer's claim is without merit. Not only was the Tax Credit applied for in December 2022, in 2023 the Company engaged in discussions regarding sale of this credit to a third party.

[159] JX119 at MoneyLion_000066.

fair market value of the intercompany services provided by the Company to Buyer and the actual charge for the intercompany services provided by the Company to Buyer" ("MIPA Revenue Principle #3").[160]

89. While the MIPA does not define "fair market value," accountants and finance professionals generally understand this term to mean the amount an arm's length, third party buyer would pay for goods or services.[161] Notably, fair market value is calculated at the revenue level, that is, the gross dollar amount determined to be the market rate for the goods or services. In my experience as an accountant and an expert in quantifying economic damages, determining fair market value is a complex process involving the analysis of various data sets and elements including, but not limited to: market conditions, industry trends, competitor research and analysis, benchmarking, and internal assessments of factors such as type of services, quality, and customer satisfaction.

90. Despite putting forth an adjustment of $1.2 million, Buyer has made no attempt to conduct a proper fair market value assessment. Instead, Buyer prepared its purported "fair market value" adjustment based on margin, attempting to conflate the meaning of margin with the meaning of fair market value.[162] Buyer's confused and conflated concepts have no basis in accounting or common business sense. Margin, sometimes referred to as "profit margin" or "operating margin," refers to a calculation of the difference between an entity's gross sales revenue and its costs/operating expenses incurred to achieve that revenue. Similar to EBITDA, margin is not a GAAP measure of performance but rather is used in various industries as a non-GAAP measure of financial performance. Entities can, and typically do, create their own calculations of

---

[160] JX065, MIPA, Schedule B.
[161] *See generally*, PX391 FINANCIAL ACCOUNTING STANDARDS BOARD, ASC Master Glossary at "Fair Value."
[162] PX003 at MoneyLion_02038248.

Type text here

margin internally to measure certain aspects of profitability and overall financial performance. In contrast, fair market value measures the gross revenue (not including any costs incurred to generate that revenue) that would arise from the same goods or services being sold in a marketplace to a third-party buyer. In other words, fair market value represents the amount a third party would pay in the market – not the amount of profit the company might ultimately record.

91. Mr. Torossian testified that Buyer calculated this $1.2 million adjustment to "fair market value" by calculating "margin" as "revenue minus cost."[163] He then asserted that "fair market value would be, you know, the cost, it would be the same as a markup."[164] Based on my experience, it is surprising to me that a Chief Accounting Officer of a public company would conflate profit margin with fair market value, since these metrics track and measure very different concepts of financial performance. Indeed, at his deposition, Mr. Torossian admitted that he is "not aware" of "any published guidance that defines fair market value by reference to seller's margins."[165] Nonetheless, Mr. Torossian continued to conflate "costs, at a fair market value" (e.g., profit margin) across business segments, such as Malka's studio segment, with the analysis of the fair market value of services provided to MoneyLion for the purposes of this adjustment.[166] Moreover, even if margin were an appropriate measure of fair market value – which it is not – Buyer's calculation remains flawed because it is overly simplistic and based solely on variable costs.[167]

---

[163] Torossian Tr. 346:20-21.
[164] Torossian Tr. 347:12-14.
[165] Torossian Tr. 20:20-23.
[166] Torossian Tr. 349:4-17.
[167] Buyer multiplies variable costs by the inverse of 42%. Mr. Torossian explained in his deposition that this 42% originates from a variable margin calculation from the income statement included on the Buyer's 2022 Earnout Statement. The 42% variable margin calculation is the "Total Production" revenue for the Studio segment subtracted from the "Total Variable Costs excl Revenue share" divided by the "Total Production" for Studio. The "Total Production" revenue includes internal production amounts, yet there are no allocated internal variable costs, creating an inconsistency in the high-level components of the calculation's amounts. These components are hardcoded and

92. In the absence of a true fair market value analysis, Buyer could have approximated fair market value by comparing the rates the Company charged Buyer to that of the Company's external clients. However, Buyer did not conduct such analysis. Nevertheless, based on my own analysis, it is my view that had Buyer performed such analysis, Buyer would have realized that it received services from the Company *below* fair market value. Based on the information I have analyzed, and contrary to Buyer's claim, I have identified several examples where the Company charged Buyer *below* market value for the services provided to Buyer when compared to third parties, who generally were charged a 20% production fee on services that was typically not charged to Buyer.

93. As an example, Malka invoiced Proximo Spirits, Inc. in September 2022 for production services related to a "Super Bowl Campaign" which included a "Production Management" fee of 23.5% of the production fees.[168] Similarly, Malka invoiced Sportico Media, LLC in November 2022 for "stage/AV" services which included a "Production Management" fee of 20% of the production fees.[169] Lastly, Malka invoiced Showtime Networks in December 2022 for podcast performance/recording services which included a "Production Management" fee of approximately 23% of the total fees (excluding travel expenses).[170]

94. In contrast, Malka did not include a production fee on several projects invoiced to MoneyLion. On/around February 28, 2022, MoneyLion received three invoices for "Brand Team Retained Creative Services for Jan and Feb 2022," "Content Team retained Creative Service for Jan and Feb 2022," and "Creative services outside of retained internal teams" and was not charged

---

insufficient to support a reliable calculation of margin, let alone fair market value, thereby Buyer's calculation is flawed and inconsistent with the definition of fair market value.
[168] PX239, at MoneyLion_00049908.
[169] PX261, at MoneyLion_00630853.
[170] PX269 (2022.12.12 Showtime MoneyLion_00641896.pdf).

any production fee.[171] I analyzed various other invoices the Company sent to MoneyLion that likewise contained no production fee.[172]

95.   As demonstrated by the examples above, on multiple occasions it appears to me that Buyer was charged for services at rates *lower* than the Company's rates charged to other third parties. This further demonstrates that Buyer's adjustment to reduce revenue and EBITDA is unsupported and inaccurate.

96.   In summary, determining fair market value is a complex process involving various analyses to determine the gross revenue amount that a third party would pay for services. Not only has Buyer not performed such analyses, the limited calculation that it did perform is flawed due to its incorrect application of margin. Buyer's adjustment of $1,242,248 is wholly unsubstantiated and should be excluded as Buyer has failed to provide any documentation that the intercompany services provided by the Company to Buyer were not provided at fair market value.

**D.    Opinion 4: Buyer's 2022 Earnout Statement improperly includes a downward adjustment resulting from the Buyer's corporate-level decision to pay bonuses to Company employee in a manner inconsistent with the 2022 Budget, thereby understating 2022 EBITDA by $529,500.**

97.   In the 2022 Earnout Statement, Buyer included a downward adjustment to EBITDA totaling $544,500 related to cash bonuses paid in 2023.[173] Buyer explained that such adjustment was for "bonuses for Malka employees held at ML Corporate level."[174] Such adjustment is improper as it is a corporate expense in the year 2023 resulting from Buyer's decisions at the corporate level, which are inconsistent with the Company's 2022 Budget, in violation of the MIPA. As such, 2022 EBITDA is understated by $529,500.

---

[171] PX210, at MoneyLion_00017467, and MoneyLion_00017470, respectively.
[172] PX210, at MoneyLion_00017459 and MoneyLion_00017463~~573~~.
[173] JX119, at MoneyLion_000066.
[174] JX119, at MoneyLion_000066.

98. Historically, the bonuses paid at the Malka level were limited in both frequency and amount and related to employee referral bonuses, new-hire signing bonuses, miscellaneous "spot" bonuses, and sales incentive bonuses.[175] On/around January 26, 2023, Mr. Basdekis circulated to Kate Fallon, Buyer's Chief People Officer ("Ms. Fallon"), information regarding Malka's historical compensation structure, including historical bonus amounts paid to employees in 2021.[176] Mr. Basdekis wrote to Ms. Fallon that he ran the "prior two year bonus amounts, and vast majority is related to spot / stay or referral bonus."[177] Also on January 26, 2023, Mr. Krubich wrote to Ms. Fallon that "we traditionally weren't in positions to give bonuses[.]"[178] A file that Mr. Basdekis prepared reflected that bonuses paid in 2021 totaled $64,195 and only included $13,000 for "Year End Bonus."[179] Another file that Mr. Basdekis sent to Ms. Fallon on February 2, 2023 similarly reflected that Malka had paid $13,000 of 2020 "Year End Bonus[es]" in 2021 and had paid $17,125 of 2021 "Year End Bonus[es]" in 2022.[180]

99. Buyer's adjustment included in its 2022 Earnout Statement consisted of bonus payments totaling $544,500. Based on my analysis of the available information, Buyer is attempting to push the cost of decisions made at the MoneyLion corporate level down to Sellers. As explained by Mr. Torossian, such bonus pool was determined by the Buyer's Board at the corporate level and paid at the corporate level.[181] Mr. Torossian further testified that the "board makes determinations at the comp[ensation] committee for bonuses related to the entire company"[182] and that the "compensation committee approves the budget pool … that's being able

---

[175] PX296.
[176] PX295, at MoneyLion_00141957.
[177] PX295, at MoneyLion_00141957.
[178] PX294.
[179] PX296, at MoneyLion_00023201.
[180] PX297, at MoneyLion_00143236 (Bonus History tab) (produced in native excel).
[181] Torossian Tr. 181:17-25; 184:13-25.
[182] Torossian Tr. 181:17-19.

to be allocated to employees across MoneyLion."[183] At his deposition, Mr. Krubich testified that "MoneyLion dictated to us the bonus pool and asked us who to give bonuses to."[184] Buyer elected to include this corporate bonus as an expense of the Company for purposes of calculating the 2022 Earnout, resulting in a corresponding downward adjustment to the 2022 EBITDA.

100. Buyer's decision to allocate corporate bonuses is also contrary to Section 2.06(d) of the MIPA, which requires consistency with the 2022 Budget. Section 2.06(d) of the MIPA requires that for the period from January 1, 2022 and through December 31, 2022, the Buyer "shall, and shall cause the Company to **operate the business of the Company substantially in accordance with the operating and revenue budget.**"[185] The 2022 Budget was attached to the MIPA as Exhibit B and included only $15,000 of bonuses.[186]

101. In my experience, it is common for parties to agree to a budget, forecast, and/or business plan when the transaction involves an earnout, typically because prospective sellers anticipate having limited control of the business after the transaction closes. In this matter the 2022 Budget only included $15,000 of bonuses. Buyer's adjustment of $544,500 is more than 10 times the budgeted amount and the amount paid by Malka in 2021 and 2022, as illustrated in the table below:

---

[183] Torossian Tr. 184:14-16.
[184] Transcript of Deposition of Louis Krubich ("Krubich Tr.") dated July 10, 2024, 319:5-7.
[185] JX065, MIPA § 2.06(d)(ii).
[186] JX065, MIPA, Exhibit B.

| Monthly Bonus Payments | | | |
|---|---|---|---|
| Month | Actual Bonuses Paid by Malka in 2021[187] | Estimated Malka Bonuses in 2022 Budget[188] | Actual Bonuses Paid by Malka in 2022[189] | Bonuses Included in 2022 Earnout Calculation by MoneyLion[190] |
| | *Decided upon and paid by Malka* | | | *Decided upon and paid by MoneyLion* |
| January | $31,500 | $1,250 | $10,750 | |
| February | $4,000 | $1,250 | $0 | |
| March | $0 | $1,250 | $12,875 | |
| April | $1,000 | $1,250 | $0 | |
| May | $500 | $1,250 | $1,000 | |
| June | $0 | $1,250 | $1,000 | *(Monthly Amounts Unspecified)* |
| July | $3,500 | $1,250 | $1,000 | |
| August | $12,000 | $1,250 | $500 | |
| September | $1,000 | $1,250 | $0 | |
| October | $0 | $1,250 | $500 | |
| November | $2,500 | $1,250 | $500 | |
| December | $8,195 | $1,250 | $0 | |
| **Total** | **$64,195** | **$15,000** | **$28,125** | **$544,500** |

102. As shown in the table above, the bonuses decided on and paid at the Malka-level in 2022 is much closer to the 2022 Budget than Buyer's proposed adjustment. This further underscores how egregious Buyer's attempt is to reduce the Company's 2022 EBITDA.

103. The documentation cited above collectively demonstrates that Buyer clearly disregarded the Company's historical practices and budgets by pushing down corporate bonuses. Based on the terms of Section 2.06(d) of the MIPA, any amounts over the $15,000 budgeted amount should be rejected. The amounts actually paid in 2022 by the Company (excluding corporate allocations) is $28,125, less than 10% of what Buyer claimed in its adjustment. At a

---

[187] PX297, at MoneyLion_00143236 (Bonus History tab) (produced in native excel).
[188] JX065, MIPA, Exhibit B.
[189] PX297, at MoneyLion_00143236 (Bonus History tab) (produced in native excel).
[190] JX119, at MoneyLion_000066.

minimum, any amounts in excess of such paid amounts should be rejected and excluded from the calculation of 2022 EBITDA.

E.    **Opinion 5: Buyer's 2022 Earnout Statement improperly includes a downward adjustment for "retained teams," thereby understating 2022 revenue and EBITDA by $218,170.**

104. In the 2022 Earnout Statement, Buyer included a downward adjustment to 2022 revenue and EBITDA of $218,170 asserting that it represents a "double count of retained teams."[191] Buyer claims that certain Company employees who served the MoneyLion account post-Closing Date were not 100% dedicated to the MoneyLion account but were instead charging time to other clients.[192] Such adjustment is improper as it is not specifically contemplated by the MIPA, and Buyer offers no justification for the inclusion of such adjustment.

105. As an initial point, it is important to understand the construct of the team and services provided by the Company to MoneyLion post-Closing Date. Malka and the Buyer agreed that Malka would establish a team of professionals who would primarily work on MoneyLion projects. Importantly, although the parties commonly refer to this team of professionals as a "retained team", these employees of Malka remained employees of Malka during the 2022 Earnout period, and were not contractually precluded from serving projects or clients outside of MoneyLion.

106. Based on my analysis of the available information, an adjustment for time spent by the "retained team" is not specifically contemplated by the MIPA. Neither the Revenue Principles nor the EBITDA Principles on Schedule B include any adjustment for "retained teams" when those personnel work on other clients. Buyer attempts to retroactively create adjustments that neither party agreed upon. Mr. Torossian admitted that "the premise of retained teams is not listed

---

[191] JX119, at MoneyLion_000066.
[192] JX119, at MoneyLion_000061, MoneyLion_000066.

anywhere … of [sic] a defined term within the MIPA."[193] However, the MIPA *does* require that EBITDA be calculated consistent with historical practice. It is my understanding that Malka did not have any historical practices of excluding revenue and associated costs related to certain personnel working across multiple clients. As such, I see no term under the MIPA that would justify such an adjustment.

107. Even putting aside the lack of contractual terms supporting Buyer's adjustment, Buyer also failed to support this adjustment and offered no justification for the adjustment under the MIPA. Mr. Torossian claimed that certain Malka employees "were hired in Malka to be 100 percent dedicated to MoneyLion and MoneyLion only."[194] However, he was unable to provide any basis or explanation for such assertion.[195]

108. Buyer has not alleged that the revenue was not earned or the work was not performed. Likewise, Buyer offers no evidence to suggest the Company's work for Buyer was not completed in a timely manner, that its contract was somehow not satisfied, nor that the results were of inadequate quality.[196]

109. Furthermore, based on the contract for these services, Buyer purchased *services* and there is no indication that individual service providers could not be substituted as necessary. As an illustrative example, one invoice from Malka includes specific terms stating, "Client [MoneyLion] agrees to compensate MMG [Malka] $165,220.00 [] *for the services* described in Exhibit A …"[197]

---

[193] Torossian Tr. 341:11-14.
[194] Torossian Tr. 217:12-14.
[195] Torossian Tr. 217:16-24.
[196] As set forth below, Mr. Dudney curiously testified that the retained teams worked *zero hours* for MoneyLion in 2022 resulting in an approximately *$2 million* downward adjustment to Malka's revenue for 2022, notwithstanding the fact that MoneyLion itself has never raised this argument nor has anyone from MoneyLion ever asserted that the retained Malka teams that it was paying for in 2022 did not perform any work (*See* Dudney Tr. 378:21-382:13). Instead, MoneyLion's position has always been that while the retained teams performed the work requested of them by MoneyLion, they *also* performed some work for other customers, resulting in MoneyLion's proposed $218,170 downward adjustment to revenue and EBITDA.
[197] PX210, at MoneyLion_00017463 (emphasis added).

Exhibit A of the invoices described the project scope and description of service related to "Brand Team Retained Creative Services for Jan and Feb 2022."[198] Neither the terms nor Exhibit A ever mention the sole right or secondment of Malka personnel to MoneyLion. Nevertheless, Buyer included 21 employees in its calculation of this adjustment.[199] It is unclear how Buyer could justify an adjustment based on number of hours or revenue collected on other services/projections unrelated to their contract with the Company.

110. In summary, the MIPA does not specifically contemplate an adjustment related to retained teams working on other clients besides MoneyLion. Instead, the MIPA does require that EBITDA be calculated consistent with historical practice. The Company has a practice of hiring personnel to work on potentially multiple client accounts and were not hired as seconded employees. MoneyLion purchased services from Malka, not individual employees. Buyer failed to support this adjustment by offering no justification for the adjustment under the MIPA. As such, Buyer's downward adjustment of $218,170 to 2022 revenue and EBITDA is improper and should be excluded from the 2022 Earnout Statement.

### F.    Opinion 6: Buyer's 2022 Earnout Statement improperly includes a downward adjustment for an allocation of costs associated with Buyer's in-house legal counsel, thereby understating 2022 EBITDA by $58,438.

111. In the 2022 Earnout Statement, Buyer included an adjustment related to an allocation of Buyer's legal resources in the amount of $58,438. Buyer alleges the adjustment amount is required "for MoneyLion legal team working directly on Malka-related contract negotiations."[200] However, Buyer has been unable to provide documentation evidencing the time actually spent by these legal resources. As such, it is my opinion that this adjustment is improper under the MIPA

---

[198] PX210, at MoneyLion_00017463.
[199] PX003, at MoneyLion_02038248.
[200] JX112, at MoneyLion_01826076.

as Buyer has not provided evidence that these are direct expenses incurred by the Buyer on behalf of the Company.

112. Schedule B of the MIPA includes specific provisions related to the calculation of EBITDA. The fifth of these provisions specifically requires that EBITDA "include an allocation of direct expenses incurred by Buyer on behalf of the Company" ("MIPA EBITDA Principle #5"). Buyer asserts that personnel in its legal department dedicated a total of 20% of their time (15% of one attorney's time and 5% of another attorney's time) to Malka activities, contracts, and oversight in 2022.[201] During good faith negotiations regarding the 2022 Earnout, Sellers requested, but Buyer failed to provide, documentation that such time was spent directly and solely on such work for Malka. Further, based on my own discussions with Buyer's in-house counsel during the Parties' good faith negotiations, Buyer's in-house lawyers do not track time to specific projects. Mr. Torossian also confirmed such fact in his deposition.[202] As a result, it is my understanding that Buyer has no evidence to demonstrate that $58,438 of direct legal expenses were incurred by Buyer on the Company's behalf.

113. Notably, under the MIPA's definition of EBITDA in Article I, EBITDA shall be "adjusted to *exclude* … any management fees, ***general overhead expenses*** or other intercompany charges charged by Buyer or any of its affiliates to the Company."[203] While the MIPA does not define "general overhead expenses," legal department expenses including the annual salaries and cost of benefits for lawyers and other legal personnel at the corporate/parent level would typically be categorized, in my experience, as general overhead expenses. As a result, costs related to

---

[201] JX119, at MoneyLion_000066.
[202] Torossian Tr. 353:21-355:11.
[203] JX065, MIPA at DLA_006190 (emphasis added).

Buyer's legal department that are not demonstrably "direct expenses incurred by Buyer on behalf of the Company" would be improper under the terms of the MIPA.

114. In summary, the MIPA only allows for an allocation of "direct expenses incurred by Buyer on behalf of the Company" and specifically excludes any "general overhead expenses or other intercompany charges charged by Buyer." Despite this, Buyer attempts to claim a favorable position with MIPA EBITDA Principle #5 even though it can only offer estimations for a percentage of time to substantiate such adjustment. As such, without documentation to support its claim for the amount, Buyer deviated from the terms of the MIPA by including such expenses of $58,438.

*** 

115. Based upon these opinions, if calculated utilizing the income statement prepared based on the Company's historical practices, and correcting for Buyer's flawed adjustments and omissions, Malka would exceed the Maximum 2022 Revenue Amount and the Minimum 2022 EBITDA Amount.

## II.    OPINIONS RELATING TO REBUTTAL OF MR. DUDNEY

116. The following section of my testimony addresses the Dudney Report and Dudney Rebuttal Report.

117. As an overarching point, neither MoneyLion nor Mr. Dudney alleges that Malka's revenue was fictitious or unsubstantiated. What they do allege is that is that there are timing differences between when Malka recorded revenue and when MoneyLion thinks Malka should have recorded revenue. There are no allegations that Malka recorded revenue that was never earned.

A.    **Rebuttal Opinion 1: Mr. Dudney incorrectly assumes that Malka had zero contracts that contained non-cancelable deposits, resulting in flawed conclusions and adjustments to <u>Revenue and EBITDA.</u>**

118. Mr. Dudney concludes that, based on his analysis, he did not identify *any* Malka projects with "noncancelable deposits" as contemplated in Schedule A to the MIPA. This conclusion is undermined by the documentation produced in this matter, and Mr. Dudney's own report.

119. Tellingly, in Footnote 86 of his report, Mr. Dudney admits he identified the following language in certain of the project documentation that he reviewed:  "[i]f Client cancels the services herein contracted, MMG shall retain the full sum of the Fee paid by Client[.]"[204] Mr. Dudney claims he "only identified this clause in a handful of projects" with initial invoices in 2021 and admits he was told by MoneyLion to assume that such language "does not reflect a 'noncancelable deposit' as described in Schedule A to the MIPA."[205]  At his deposition, Mr. Dudney confirmed that if he did not see the precise words "noncancelable deposit" in a statement or work or other project documentation, he assumed that the project did not include a noncancelable deposit as the term is used in Schedules A and B.[206]  In doing so, Mr. Dudney selectively ignores the clear, plain language included in many of Malka's agreements with clients.

120. As discussed in greater detail below, I reviewed hundreds of documents related to the projects included in Mr. Dudney's calculated adjustments and found indication of noncancelable deposits in many of the projects I analyzed for which Mr. Dudney claims adjustments in the nine months ended September 2021.

121. During his deposition, Mr. Dudney provided revised exhibits in which he considered projects I identified as Category 1 and 2A in my rebuttal report as non-cancellable. Specifically,

---

[204] Dudney Report, p. 22, footnote 86.
[205] Dudney Report, p. 22, footnote 86.
[206] Dudney Dep. Tr., at 50:15-54:11.

the adjustment amounts in Mr. Dudney's revised Exhibit 3A and 3B were determined by "treat[ing] the first invoice as the non-cancelable deposit amount and then straightlin[ing] the rest of the activity in the same way that [Mr. Dudney] did before with time cards" for projects identified in my Category 1 and Categories 1 and 2A, respectively.[207]   However, even with this revised analysis, Mr. Dudney still fails to calculate all of Malka's revenue consistent with historical practice, which Mr. Basdekis testified means when invoices are issued. Instead, he spreads (e.g., straight-lines) the remaining revenue evenly over an arbitrary time period for each project. Such methodology does not consider other factors such as the billing cadences for each customer and project (e.g., monthly or quarterly billing) as well as Malka's historical practice of recognizing revenue when invoices are issued. Mr. Dudney's blatant disregard for the Company's historical practices with respect to revenue are discussed further below.

**B.    Rebuttal Opinion 2: Mr. Dudney's calculated adjustments to revenue rely upon a series of unsupported assumptions, each of which is contradicted by evidence in this matter. As a result, Mr. Dudney's conclusions and adjustments are <u>fundamentally flawed.</u>**

122. Mr. Dudney's analysis contains a string of unsupported assumptions, either provided directly by MoneyLion's attorneys or that lack basis in the MIPA. As I describe below, each of these assumptions are contradicted by documents, deposition testimony and other information produced in this matter.

123. Mr. Dudney's assumptions result in circuitous logic and flawed conclusions. I have summarized below my understanding of Mr. Dudney's basis for his claimed adjustments, as well as the facts undermining each node in the wheel:

---

[207] Dudney Tr. 449:13-20.

Type text here

## Summary of Mr. Dudney's Bases

Mr. Dudney's Bases

Contradicting Evidence

Historical practice used milestones

Mr. Dudney ignores how the parties involved removed ASC 606 language from the MIPA and CFGI's analysis indicates Malka did not follow GAAP.

Mr. Dudney ignores the historical definition of milestones established in documentation and depositions.

Malka did not follow ASC 606

Milestones are synonymous with ASC 606

Mr. Dudney conflates milestones with "performance obligations."

ASC 606 requires performance obligations

Mr. Dudney ignores how ASC 606 never mentions the term "milestones" in the definition of performance obligations.

124. Mr. Dudney's conclusions only hold if each link in his circuitous wheel holds true, however, as I will describe in greater detail herein, Mr. Dudney ignores evidence that undermines each link, thus rendering his position unreliable.

       **1.**     **Mr. Dudney incorrectly conflates the term "milestones" with the term "performance obligations" resulting in flawed conclusions and adjustments to Revenue and EBITDA.**

125. Mr. Dudney asserts that the "Accounting Principles incorporate U.S. GAAP, which codifies its revenue recognition guidance in Accounting Standards Codification 606 – "Revenue Recognition."[208] While I agree that the Accounting Principles *mention* U.S. GAAP, Schedule A makes no mention of ASC 606. Rather, Schedule A states that the Financial Statements, Estimated Statements and Final Statements shall be prepared in accordance with "U.S. GAAP, except as follows: … the Company's historical revenue recognition principles".[209] Further, Schedule B (the Revenue and EBITDA Calculation Principles governing the Earnout Calculation) goes on to define "Revenue" as "revenue recognized according to the Company's historical revenue recognition principles",[210] with no reference to U.S. GAAP or ASC 606.

126. Notably, prior to closing, the parties exchanged several drafts of Schedules A and B to the MIPA, and the initial drafts prepared by MoneyLion did reference ASC 606, but those references were removed and do not appear in the executed final version of the MIPA.[211] While Mr. Dudney acknowledges, "language specifically referencing ASC 606 was removed from a draft of the MIPA," he claims that any assertion made about this fact is "inconsistent with the representation that the financial statements shall be prepared in accordance with GAAP … and

---

[208] Dudney Report, pp. 5, 18.
[209] JX065, MIPA, Schedule A.
[210] JX065, MIPA, Schedule B.
[211] Dudney Report, footnote 73; JX065, MIPA, Schedules A&B.

with the notes to the financial statements included in the MIPA."[212] In making this assertion, Mr. Dudney relies on Section 3.06 of the MIPA which includes a representation by Sellers that "the Financial Statements have been prepared **in accordance with the Accounting Principles** throughout the period involved …"[213] However, Mr. Dudney fails to acknowledge that this representation does not refer to U.S. GAAP or ASC 606, but instead refers to the **Accounting Principles** (*i.e.*, Schedule A), which include explicit exceptions to U.S. GAAP, including specifically for revenue recognition.[214]

127. Mr. Dudney claims that "Sellers represented that, except only for noncancelable deposits, it recognized revenue 'as milestones are attained,' which would be consistent with GAAP and ASC 606's requirement that revenue be recognized when performance obligations are satisfied."[215] Mr. Dudney mischaracterizes Schedule A by conflating the word "milestones" - which appears zero times in the ASC 606 definition of performance obligations - with the words "performance obligations" which are specifically defined in ASC 606.[216] Testimony confirms that "milestones", as the term was historically used by Malka, is not synonymous with the specific term "performance obligations" found in U.S. GAAP in ASC 606.[217] Rather, "milestones", as used by the Company, represented any pre-determined billing or payment date agreed with a customer, regardless of when revenue would be considered earned under GAAP.[218]

128. For example, Mr. Krubich confirmed in his testimony that the word "milestones" may, but does not necessarily, refer to when work is performed or completed, but rather that "anything" could be a milestone under Malka's historical practices, even just signing the contract with the

---

[212] Dudney Report, footnote 73.
[213] Dudney Report, p. 18 (emphasis added).
[214] JX065, MIPA, Section 3.06 & Schedule A.
[215] Dudney Report, pp. 19-20.
[216] PX393.
[217] Krubich Tr., 61:25-67:17, 203:20-15; Basdekis Tr., 28:19-29:21, 245:9-25.
[218] Krubich Tr., 203:25-204:22.

customer.[219] Mr. Krubich explained that Malka would determine milestones "on a per project basis to manage our clients."[220] Similarly, when asked "when did you generally send out an invoice for your clients[,]" Mr. Fried responded, "generally speaking, client-driven directives, milestones, times of the year; you know, these things were all - - were all done in collaboration with our clients wanting to do business with us."[221] Mr. Krubich's explanation and Mr. Fried's use of the word milestone is consistent with a functionality available within Malka's accounting software. Namely, NetSuite contains a drop-down field called "Milestones" which Malka could utilize to track billing dates or other customer milestones.[222] Mr. Dudney seems to ignore Mr. Krubich's and Mr. Fried's testimony, as well as the NetSuite milestone functionality.

129. Information contained in CFGI's quality of earnings report dated October 5, 2021 (the "CFGI Report") also aligns with Mr. Krubich's description of milestones, stating in part that "**[c]ustomers are invoiced upon completion of milestones set forth in respective contracts**. While customer payment terms range between 15 to 90 days, most pay within 60 days. Management noted that the Company does not typically experience issues regarding collectability, and as such, it does not maintain an allowance for doubtful accounts."[223] At my deposition, I was shown another portion of the CFGI Report that also aligns with Mr. Krubich's and Mr. Fried's testimony. CFGI noted that "[t]he Company recognizes revenue and invoices customers on the achievement of agreed project-based milestones (e.g., stages of completion) as specified in

---

[219] Krubich Tr., 204:8-15.
[220] Krubich Tr., 204:8-15.
[221] Transcript of Deposition of Daniel Fried dated July 17, 2024 ("Fried Tr"). 180:21-181:4; *see also* Fried Tr. 137:22-138:5 ("Q. … Did you decide when the invoice was going out or did the finance team? A. It would - - it would generally be a client-driven milestone, so, you know, we would try to - - if a project was approved and a client needed an invoice to be sent, we would work with them to send an invoice."), 146:24-147:8 ("Generally speaking, invoices would be sent when clients were expecting them to be received. … Those times were client-driven, so it would have likely been odd to send it when a client wasn't expecting, and we wouldn't have sent them.").
[222] PX047.
[223] JX020, at MoneyLion_01813401 (emphasis added).

customer contracts."[224]    This is consistent with Mr. Krubich's and Mr. Fried's testimony that milestones are project specific and customer driven and could be, *for example*, stages of completion, but could also be another date or event agreed upon by Malka's customers.

130. The CFGI Report further illustrates that MoneyLion had information prior to the Closing Date that indicated Malka was not following GAAP. Specifically, the CFGI Report states, "The Company generally does not prepare its financial statements on a full accrual basis of accounting, and **we anticipate net working capital would be significantly different if the Company reported under GAAP."[225]** As noted above, because working capital includes current assets, and accounts receivable is a current asset, an entity's revenue recognition can impact the calculation of working capital, particularly through the accounts receivable balance. Nonetheless, even with this express statement from CFGI that net working capital would be significantly different under GAAP, Mr. Dudney assumes that the use of the word milestones in the MIPA is synonymous with GAAP and ASC 606.[226]

131. It is a well-established fact that Malka historically recorded revenue based on when invoices were sent to customers.[227] Furthermore, as set forth below, I have seen many instances where the Company's project documentation included billing terms which clearly indicate that Malka would issue invoices at specific times, and those specific times are disconnected from when the work was performed/completed. However, Mr. Dudney ignores this information and incorrectly assumes that Malka should have recognized revenue only as work was performed (which is required by GAAP), because he incorrectly conflates the use of the word milestones with

---

[224] JX014, CFGI Report at MoneyLion_01813080.
[225] JX020, at MoneyLion_01813374 (emphasis added).
[226] Notably, and as I will discuss later herein, MoneyLion still did not make GAAP adjustments to net working capital when it prepared the Final Statements in early 2022.
[227] See, e.g., Basdekis Tr., 25:2-18, 74:21-24, 76:14-17, 79:1-3, 152:11-15, 153:1-4; Transcript of Deposition of Ryan Curran dated August 15, 2024 ("Curran Tr."), 200:16-201:3; and Scalia Tr., 55:15-23.

performance obligations. In addition, he followed the instruction to disregard non-cancelable deposits. Mr. Dudney also ignores the fundamental fact that Malka's historical revenue recognition practices are listed as an *exception* to GAAP in Schedule A. As a result, Mr. Dudney's calculation of claimed adjustments is flawed.

### 2.    Mr. Dudney's calculated adjustments are flawed.

132. Mr. Dudney states that he analyzed over 1,500 documents to support his proposed revenue adjustments.[228] In his report, he identifies five examples in which he claims Malka "improperly recognized revenue for items that were not non-refundable deposits, where work had not been performed, and where the invoices were not sent according to the SOW's planned project timeline."[229] Of the 2,644 projects in Mr. Dudney's Exhibit 4, I was able to locate documents produced in this matter for approximately 1,000 projects. I reviewed contracts, SOWs, and similar documentation related to those projects.

133. The nine-month period from January to September 2021 ("September 2021 YTD") is the last period included in the financial statements of the Company as defined in Section 3.06 of the MIPA.[230] I focused my analysis on the projects Mr. Dudney included in his proposed revenue adjustment for this September 2021 YTD period, totaling $(958,778), as a downward adjustment to revenue recognized by Malka.[231] Such adjustments span across 254 projects, of which I was able to match 168 projects to produced documents identified in Exhibit 7 of Mr. Dudney's report. I was not able to identify in Mr. Dudney's Exhibit 7 information for the remaining 86 projects included in Mr. Dudney's adjustments.

---

[228] Dudney Report, p. 22.
[229] Dudney Report, p. 22.
[230] JX065, MIPA, § 3.06.
[231] Dudney Report, p. 38, Exhibit 4.

### a. *Non-Cancellable Deposits*

134. I have analyzed the 168 projects matched to produced documents to assess whether the documentation included indications of non-cancellable deposits.[232] Based on my analysis of the project documentation, I have categorized these projects as follows:

| Non-Cancellable Deposits Summary (September 2021 YTD) | | |
|---|---|---|
| *Category Description* | *Count of Projects* | *Adjustment Amount (Decrease to Revenue)[233]* |
| Category 1: The documentation included language indicating that the payment is made prior to work commencing, and Malka could keep those fees paid if the project was cancelled. | 21 | $(299,447) |
| Category 2A: The documentation included language indicating that Malka could keep fees if the project was cancelled.[234] | 21 | $(286,834) |
| Category 2B: The documentation was silent or unclear as to whether Malka could keep fees if the project was cancelled.[33] | 111 | $(699,271) |
| Category 3: The documentation included language indicating that Malka could not keep the fees paid if the project was cancelled. | 15 | $(225,737) |
| **Subtotal** | **168** | **$(1,511,289)** |
| **Add: Projects without documents in Dudney's Exhibit 7** | **86** | **$552,511** |
| **Total Dudney September 2021 YTD Adjustments** | **254** | **$(958,778)** |

135. Therefore, adding Category 1 and Category 2A arrives at ($586,282), which is approximately 39% of Mr. Dudney's claimed adjustments of ($1,511,289) for these 168 projects.

---

[232] I am not expressing a legal opinion as to whether or not the project documentation legally qualifies as a non-cancelable deposit.

[233] The adjustment amounts listed in the table reflect the net adjustment amount proposed for each project by Mr. Dudney in his Exhibits 3 and 4 to the Dudney Report. Based on his testimony at his deposition, the adjustment amounts in Mr. Dudney's revised Exhibit 3A and 3B were determined by "treat[ing] the first invoice as the non-cancelable deposit amount and then straightlin[ing] the rest of the activity in the same way that [Mr. Dudney] did before with time cards" (Dudney Tr. 449:13-20) for projects identified in my Category 1 and Categories 1 and 2A, respectively.

[234] I understand from Counsel that these projects in Category 2 may qualify as non-cancellable deposits from a legal perspective. When performing my analysis, I reviewed documentation relied upon by Mr. Dudney. Therefore, when I indicate that documentation was silent as to whether fees were refundable or silent as to a specific billing schedule, that does not mean that no such document exists that sets forth those terms for a given project. Rather, it means that these terms were simply not present in the documents Mr. Dudney relied upon.

Adding Category 1, Category 2A, and Category 2B arrives at ($1,285,552), which is approximately 85% of Mr. Dudney's claimed adjustments of ($1,511,289) for these 168 projects.

136. Below are examples of language included in project documentation that indicated that Malka could keep fees if the project was cancelled:

ADP Compliance Solutions Incentives Manager: *"If Client cancels the services herein contracted, MMG shall retain the full sum of the Fee paid by Client."*[235]

H&M Robbinsville NJ Plant Shoot: *"If Client cancels the services herein contracted without cause, MMG shall retain the full sum of the Fee paid by Client. Fees associated with cancellations cannot be applied to any other services."*[236]

Bytedance TikTok Global All Hands Conference November 2022: *"If Client cancels the services herein contracted, MMG shall retain the full sum of the Fee paid by Client, except that MMG shall cooperate, whenever practicable to assist Client with repurposing Deliverables towards Client's designated replacement project wherever Fees have been allocated but are yet unexpended."*[237]

137. Together, Categories 1 and 2A comprise $(586,282) or 61% of the total adjustment of ($958,778) proposed by Mr. Dudney for September 2021 YTD.[238] Categories 1, 2A, and 2B collectively total ($1,285,552) or 134% of the total adjustment of ($958,778) proposed by Mr. Dudney for September 2021 YTD.[239] Mr. Dudney himself acknowledges that noncancellable deposits is a defined exception in the MIPA, yet despite these projects in Categories 1 and 2A containing language indicating non- cancellable deposits, he ignores clear evidence of such

---

[235] For example, see PX232. I understand that this document is an example of Malka's "standard form" SOW template, frequently used for client projects.
[236] For example, see PX222.
[237] For example, see PX095.
[238] Calculated as sum of Categories 1 and 2A: $299,447 + $286,834.
[239] Calculated as sum of Categories 1, 2A, and 2B: $299,447 + $286,834 + $699,271.

deposits in Malka's historical project documentation.[240] Thus, Mr. Dudney's proposed adjustments for September 2021 YTD are flawed and should be rejected.

b.      *Billing Types*

138. While there are 111 projects in Category 2B and 15 projects in Category 3 - in which I identified either terms that were unclear or silent on refundability or terms suggesting fees could be refundable - Mr. Dudney's proposed adjustments for those projects, totaling $(925,007), are still flawed. I have analyzed these 126 total projects to assess whether the documentation contained indications that the Company would bill for its services based on "milestones" as the term was historically used. Based on my analysis of the project documentation, I have categorized these projects as follows:

| Billing Structures for Categories 2B and 3 Projects Summary (Sept. 21 YTD) | | | |
|---|---|---|---|
| *Category* | *Description* | *Count* | *Adjustment Amount (Decrease to Revenue)* |
| **Category A** | Documents indicate a payment on the date of execution or references a retainer or bucket of hours to be used throughout the term. Alternatively, documents indicated a one-time payment but is ambiguous about the timing of such payment. | 5 | $(82,560) |
| **Category B** | Documents did not include specified billing terms. | 59 | $(368,377) |
| **Category C** | Documents indicate payment based on an achieved event, milestone, or percentage of completed work denoted in the terms. Alternatively, documents indicate multiple payments that are not due to percentage of completion but another form of tracked progress or dates (e.g., end of month, quarterly). | 57 | $(404,573) |
| **Category D** | Documents indicate payment to be made after work is competed (e.g., upon delivery). | 5 | $(69,497) |

---

[240] Dudney Report, p. 22.

| | | |
|---|---|---|
| **Total Category 2B and 3 Contracts with September 2021 YTD Adjustments** | **126** | **($925,007)** |

139. As shown above, of the 126 projects in Categories 2B and 3, 53% of Mr. Dudney's adjustments fall in Category A, C or D, wherein the documentation had billing terms indicating payments were due on milestones as the term was historically used. The following represent examples of such language from project documentation.

- Purchase Order dated January 2021; "Description: JAN-21 – FEB-21"; "Payment Terms: Immediate."[241]

- Purchase Order dated May 2021; "Pmnt Terms: Immediate Bank Transfer"; "Delivery Date: 12/31/21"[242]

140. Notably, in addition to the 126 projects in Categories 2B and 3, I also analyzed the remaining 42 projects comprising Mr. Dudney's claimed adjustments for September 2021 YTD for which I had documentation. I have not included these 42 projects in the table above, so as to avoid double- counting Mr. Dudney's claimed adjustments, however, refer to the table below for a summary of my analysis for all 168 projects included in Mr. Dudney's September 2021 YTD adjustment for which I identified documentation. My analysis demonstrates to me that many projects had language indicating both non-cancellable deposits and milestones.

---

[241] PX035.
[242] PX049.

| Billing Structures Summary (September 2021 YTD) | | |
|---|---|---|
| *Category Description* | *Count of Projects* | *Adjustment Amount (Decrease to Revenue)* |
| Category A: Documents indicate a payment on the date of execution or references a retainer or bucket of hours to be used throughout the term. Alternatively, documents indicated a one-time payment but is ambiguous about the timing of such payment. | 16 | $(258,775) |
| Category B: Documents did not include specified billing terms. | 71 | $(590,703) |
| Category C: Documents indicate payment based on an achieved event, milestone, or percentage of completed work denoted in the terms. Alternatively, documents indicate multiple payments that are not due to percentage of completion but another form of tracked progress or dates (e.g., end of month, quarterly). | 75 | $(511,279) |
| Category D: Documents indicate payment to be made after work is competed (e.g., upon delivery). | 6 | $(150,532) |
| **Subtotal** | **168** | **$(1,511,289)** |
| **Add: Projects without documents in Dudney's Exhibit 7** | **86** | **$552,511** |
| **Total Dudney September 2021 YTD Adjustments** | **254** | **$(958,778)** |

141. My analysis and the examples above demonstrate to me that, consistent with the testimony in this matter, the Company historically recognized revenue as invoices were issued and milestones were attained – even though such milestones were not in all cases tied to completion of work. As a result, Mr. Dudney's proposed adjustments to September 2021 YTD are flawed and should be rejected.

142. In summary, the documents, information and testimony in this matter make it clear that the Company's past practice was to issue an invoice and record revenue when project milestones were achieved. Mr. Dudney ignores testimony indicating the Company's historical use of the word milestone "could mean anything" and incorrectly asserts that the word milestones is synonymous

with the term performance obligations in ASC 606. Mr. Dudney ignores the fact that ASC 606 never mentions the word milestones in the definition of performance obligations.

143. Mr. Dudney relies on Schedule A to assert that the "Accounting Principles incorporate U.S. GAAP, which codifies its revenue recognition guidance in Accounting Standards Codification 606 – "Revenue Recognition.""[243] However, Schedule A makes no mention of ASC 606.[244] Further, Mr. Dudney ignores that the parties specifically negotiated the *removal* of all language referring to ASC 606 in the MIPA and that MoneyLion's own advisor CFGI acknowledged that the Company did not follow a full accrual basis of accounting in its pre-closing analysis.

144. Moreover, Mr. Dudney inexplicably ignores clear language that comports with his own identified "narrow exception" to GAAP in the form of non-noncancelable deposits.

145. For these reasons Mr. Dudney's proposed adjustments for September 2021 YTD are flawed and should be rejected.

**C.    Rebuttal Opinion 3: Mr. Dudney fails to acknowledge the contemporaneous evidence in MoneyLion's own records which clearly demonstrates the accounting practices and records used for the 2021 Earnout Calculation and Final Closing Working Capital, and how such practices differ from GAAP.**

146. Mr. Dudney states, "It is my understanding that, at the time, MoneyLion believed that Malka prepared the 2021 financial statements used to prepare the 2021 Earnout Statement in accordance with Schedules A and B of the MIPA (i.e., in accordance with GAAP except for the items enumerated in Schedules A and B of the MIPA). I understand that MoneyLion now asserts that the 2021 financial statements used to prepare the 2021 Earnout Statement were not prepared in accordance with Schedules A and B of the MIPA."[245] As I described in my first opinion above,

---

[243] Dudney Report, pp. 5, 18.
[244] JX065, MIPA, Schedule A.
[245] Dudney Report, pp. 16-17.

MoneyLion and Mr. Dudney incorrectly assume that the MIPA contemplates only "narrow exceptions" to GAAP for purposes of calculating revenue. Moreover, as I have described herein, Malka's historical accounting practices – including those used in the 2021 financial statements used to prepare the 2021 Earnout Statement – were clearly described and documented both prior to and following the Closing Date. Mr. Dudney's failure to acknowledge this contemporaneous evidence further undermines the reliability of his conclusions.

147. First, Schedule B of the MIPA relates to the calculation of Revenue and EBITDA for the purposes of the Earnout Calculations.[246] The definition of "Financial Statements" in Section 3.06 of the MIPA only references the Accounting Principles, which are included in Schedule A.[247] Such section does not reference Schedule B. Second, contrary to Mr. Dudney's claims, Schedule A does not provide for solely a "narrow exception to the application of GAAP regarding Malka's recording of revenues."[248] However, even if Schedules A and B contemplated only a "narrow exception" to GAAP as Mr. Dudney asserts, then I would have expected Buyer to have adjusted the Company's Final Closing Working Capital calculation (including, for example, accounts receivable) and 2021 Earnout Statement to comply with GAAP. But Buyer made no such changes.

148. As detailed above, MoneyLion's Director of Mr. Scalia, was working with MoneyLion's auditors in early 2022 to adjust Malka's 2021 financial statements and opening balance sheet to make them GAAP-compliant for MoneyLion's SEC reporting purposes.[249] These GAAP adjustments (being made for SEC reporting purposes), were contemplated at or around the same time that MoneyLion was preparing the 2021 Earnout Statement, and therefore could have easily

---

[246] JX065, MIPA, Schedule B.
[247] JX065, MIPA, § 3.06, Schedule A.
[248] Dudney Report, p, 22; *see also* Dudney Dep. Tr., 50:4-7 ("Q: Okay. You're aware that the word 'narrow' doesn't appear in Schedule A? A: Correct. That's a characterization that I apply").
[249] *See* ¶¶ 56-58.

been included in the 2021 Earnout Statement if that is what MoneyLion understood the MIPA to require. But MoneyLion chose not to include these adjustments.

149. A detailed timeline of the accounts receivable balance is outlined above and includes details regarding the adjustments performed for MoneyLion's SEC reporting purposes.[250] Mr. Scalia's February 2 and February 4, 2022 spreadsheets demonstrate to me that Buyer's Final Closing Working Capital calculation could have, but did <u>not</u>, include adjustments to Malka's historical revenue recognition practices (and corresponding impact on accounts receivable) to comply with GAAP. As stated in my initial expert report, if Schedule A required strict adherence to GAAP, then I would have expected Buyer to have made GAAP adjustments to the Company's Final Closing Working Capital calculation (and, in particular, to accounts receivable) given that the MIPA is clear that that calculation needed to be prepared in accordance with Schedule A and given CFGI's statement that "net working capital would be significantly different if the Company reported under GAAP."[251]

150. Moreover, as explained above, MoneyLion accepted Malka's historical non-GAAP practices, including with respect to revenue recognition, when it approved of the 2021 Earnout Payment on March 15, 2022.[252] By March 15, 2022, MoneyLion had completed its GAAP adjustments to Malka's revenue for the 2021 "stub period," which resulted in a difference of $1,094,132.[253] Nonetheless, MoneyLion did not apply this adjustment to Malka's revenue for purposes of the 2021 Earnout and instead approved of the 2021 Earnout Payment on the basis of Malka's 2021 unadjusted financial statements prepared using its historical accounting practices.[254]

---

[250] See ¶ 56, *supra*.
[251] JX020, at MoneyLion_01813374.
[252] See ¶ 58, *supra*.
[253] See ¶ 58, *supra*.; PX 196 at MoneyLion_0187935 (produced in native excel).
[254] See ¶ 57, *supra*.; JX 74 at MoneyLion_01817462; JX 83 at MoneyLion_01826070.

As with Final Closing Working Capital, if Schedules A and B required strict compliance with GAAP for purposes of revenue recognition, I would have expected Buyer to have made the GAAP adjustments to Malka's revenue for the 2021 stub period that had already been made for SEC reporting purposes as of March 15, 2022.[255]

### 1. Mr. Dudney's highlighted examples of projects for which Malka allegedly did not record revenue in accordance with the Accounting Principles are flawed and misleading

151. In his report, Mr. Dudney calls out five examples of projects that he claims "evidence Malka's departure from the Accounting Principles," which Mr. Dudney incorrectly concludes means ASC 606.[256] Mr. Dudney's reliance on these examples is misplaced. For all five projects, Mr. Dudney claims that work was performed, at least in part, in 2022 and, therefore, Malka improperly recognized revenue on the projects, at least in part, in 2021.[257] However, Mr. Dudney ignores that MoneyLion had the opportunity to review Malka's 2021 revenue prior to approving of the 2021 Earnout Statement, yet chose not to make any adjustments to Malka's 2021 financial statements even though it had already completed its stub period GAAP adjustments prior to approving the 2021 Earnout, which reflected a difference between Malka's historical revenue recognition practices and GAAP.[258] Further, revenue for four out of five of the projects that Mr. Dudney emphasizes was recognized by Malka after the Closing Date of November 15, 2021, and revenue for the fifth project, was recognized in part after the Closing Date.[259] Thus, not only was revenue in connection with these projects recognized at a time when MoneyLion owned Malka, but to the extent that revenue was recognized after September 30, 2021, it was not included in the

---

[255] As set forth above, Buyer and its advisors also tracked Malka's performance towards the 2022 Earnout using the Company's unadjusted financial statements prepared using its historical accounting principles, and not strict GAAP, even though MoneyLion had access to Malka's GAAP-adjusted financials throughout 2022. *See* ¶ 59, *supra*

[256] Dudney Report, pp. 23-32.

[257] Dudney Report, pp. 23-32.

[258] PX196, at MoneyLion_0187935 (produced in native excel).

[259] Dudney Report, pp. 23-32.

financial statements for the nine-month period from January to September 2021, which is the last period included in the financial statements of the Company as defined in Section 3.06 of the MIPA.[260]

152. Perhaps most notably, the following two projects emphasized by Mr. Dudney were actually reviewed and adjusted by MoneyLion as part of its stub-period work in early 2022:

### Mr. Dudney Example One: Proximo "2022 Three Olives Retainer"

153. Mr. Dudney's first example is a project for Malka's customer Proximo titled "2022 Three Olives Retainer."[261] In connection with this project, Malka invoiced Proximo $400,000 (in four, $100,000 invoices) on November 19, 2021, and recognized revenue at that time, while work on the project began in 2022.[262] November 19, 2021 was after the Closing Date and was part of the "stub period" for which MoneyLion made GAAP adjustments to Malka's 2021 revenue for SEC reporting purposes. Thus, not only did MoneyLion own Malka at the time that it both invoiced Proximo and recognized revenue in connection with this project, but MoneyLion also actually made adjustments to the way that Malka recognized revenue for this Proximo project as part of its stub period adjustments in early 2022, as reflected on the spreadsheet that Mr. Scalia shared with MoneyLion's auditors and CFGI in early February 2022.[263] MoneyLion's GAAP adjustments to revenue recognized in connection with the Proximo "2022 Three Olives Retainer" could have been, but were not, included for purposes of the 2021 Earnout.

154. I also note that Mr. Fried was asked about this project at his deposition and about Malka's invoicing practices with respect to Proximo as a client.[264] Mr. Fried testified that he believed that

---

[260] JX065, MIPA, § 3.06.
[261] Dudney Report, pp. 23-26.
[262] Dudney Report, pp. 23-26.
[263] PX196, at MoneyLion_0187935 (produced in native excel), Row 8.
[264] Fried Tr., 304:3-319:20.

there was a master services agreement between Malka and Proximo and that "the invoicing practice with Proximo was a client-driven invoicing process" where "they had a variety of different brands, that each had different initiatives around different timelines and milestones. So we would work with them based on the needs of their specific brands and their specific initiatives."[265] With respect to the Proximo "2022 Three Olives Retainer" project in particular, Mr. Fried explained that Proximo—which he described as a "good marquee client for Malka, for MoneyLion"[266]—"had an additional ….$400,000" at the end of 2021 "that they wanted to spend with us."[267] Mr. Fried explained that "Q4 is typically … Malka's busiest quarter, because, in marketing, clients typically find remainders of money and they need to allocate it to certain initiatives or to certain projects."[268] Mr. Fried received a "direction" from Proximo to invoice them $400,000 "for a specific sub-brand," Three Olives vodka, and Mr. Fried "believe[s] the client had specific timing milestones that they were attributing some of the different work to," so he instructed that Proximo be invoiced $400,000 in four different $100,000 invoices tied to different projects.[269]

155. Mr. Dudney ignores both that MoneyLion itself made GAAP adjustments to the Proximo "2022 Three Olives Retainer" in early 2022 and Mr. Fried's testimony.

156. In his report, Mr. Dudney refers to six additional Proximo projects for which revenue was recognized in 2021, and he claims that adjustments should be made to each project to move revenue out of 2021.[270] I note that, like the 2022 Three Olives Retainer project, each of these six other Proximo projects were invoiced *after* the Closing Date and were specifically addressed in Mr. Scalia's February 2, 2022 stub-period schedule of GAAP-based revenue recognition

---

[265] Fried Tr., 305:16-306:13.
[266] Fried Tr., 319:13-17.
[267] Fried Tr., 310:9-14.
[268] Fried Tr., 312:2-12.
[269] Fried Tr., 311:3-314:22.
[270] Dudney Report, p. 26, Figure 8.

adjustments, and Mr. Scalia adjusted revenue recognized for each of these projects for SEC reporting purposes.[271] However, as with the 2022 Three Olives Retainer, even though MoneyLion had made GAAP adjustments to these projects prior to March 15, 2022, it nonetheless approved of the 2021 Earnout based on Malka's historical non-GAAP revenue recognition practices, without including these adjustments.

### Mr. Dudney Example Two: BetMGM - 2022

157. Mr. Dudney's second example is a project for BetMGM that was memorialized in a written contract dated October 15, 2021.[272] Mr. Dudney claims that Malka incorrectly recognized $500,000 of revenue in connection with this project on December 9, 2021, the date the invoice was sent to the client, while work was performed in 2022.[273] Like the Proximo projects, the revenue in connection with the BetMGM project was invoiced and recognized *after* the Closing Date, and was reviewed and adjusted by Mr. Scalia in early 2022 as part of his stub period work, prior to approval of the 2021 Earnout.[274] In fact, as early as January 2022, Mr. Scalia was working with MoneyLion's outside auditors, RSM, to review the BetMGM project as part of the "rev rec analysis" that they were performing at that time.[275]

158. Furthermore, the contract between Malka Sports and BetMGM provides for milestone billing, as described by Mr. Krubich and Mr. Fried. In particular, it provides that Malka Sports "shall receive a payment equal to a flat, all-in fee of One Million U.S. Dollars … payable as follows: (i) Fifty percent (50%) upon execution hereof, and (ii) Fifty percent (50%) payable in four

---

[271] PX0196, at MoneyLion_0187935 (produced in native excel), Row 16 (Kraken Rum 2022 Social Content), Row 17 (Proper Twelve 2022 Proper No. 12 – Lifestyle Shoot), Row 24 (Proper Twelve 2022 Super Bowl Planning), Row 11 (P12 2021 EOY Social Assets), Row 44 (Proper Twelve ITK Bowl 2022 Sponsorship), Row 45 (Three Olives Vodka ITK Bowl 2022 Sponsorship).
[272] Dudney Report, pp. 26-29; PX192 at MoneyLion_01818144.
[273] Dudney Report, ¶ 54.
[274] PX196, at MoneyLion_0187935 (produced in native excel), Row 6.
[275] JX070 (Jan. 12, 2022 Email from Scalia re: Agenda for RSM Malka Rev Rec Meeting); PX192 (Jan. 14, 2022 Email from Scalia to RSM, copying Basdekis and CFGI, attaching BetMGM SOW)

equal installments (e.g., $125,000 per installment) on each of the following dates: March 31, 2022, June 30, 2022, September 30, 2022, and December 31, 2022."[276] "The aforesaid compensation will be payable within thirty (30) days of the receipt of an invoice or statement of work" from Malka Sports.[277] MoneyLion's schedule reflecting its adjustments to Malka's 2021 stub period revenue recognition likewise reflects that the "Billing Schedule" for the BetMGM project is "50 - 12.5 - 12.5 - 12.5 - 12.5."[278]

159. Mr. Dudney ignores MoneyLion's stub period adjustments for this project and the fact that the BetMGM contract provides for milestone-based billing.

160. In summary, while Mr. Dudney acknowledges that "MoneyLion believed that Malka prepared the 2021 financial statements used to prepare the 2021 Earnout Statement in accordance with Schedules A and B of the MIPA …", he fails to acknowledge that the methodology negotiated by the Parties and memorialized in the MIPA for determining the 2021 Earnout Calculation and 2021 Final Closing Working Capital was distinctly different from MoneyLion's GAAP practices.[279] The revenue amount utilized to determine the 2021 Earnout Payment was the same revenue amount included in the financials that MoneyLion's Director of SEC Reporting and MoneyLion's external auditors were discussing in early 2022. When MoneyLion prepared the 2021 Earnout Statement, they easily could have, but did not, make GAAP adjustments to the 2021 Revenue or EBITDA amounts included in the 2021 Earnout Statement.

---

[276] PX192, at MoneyLion_01818156.
[277] PX192, at MoneyLion_01818156.
[278] PX196, at MoneyLion_0187935 (produced in native excel), Row 2, Column I.
[279] Dudney Report, p. 16.

**D.    Rebuttal Opinion 4: The Dudney Rebuttal Report Fails to Meaningfully Rebut My Opinions Related to the 2022 Earnout Calculation**

161. In the Dudney Report, Mr. Dudney states, "I am not offering an opinion on the accuracy of the 2022 Earnout Statement at this time, however, I reserve the right to respond to any criticisms of the 2022 Earnout Statement Malka and its experts may offer."[280]  In the Dudney Rebuttal Report, Mr. Dudney responds to certain opinions that I expressed in my first report regarding the 2022 Earnout Calculation.  None of Mr. Dudney's responses to my opinions change my views.

162. First, Mr. Dudney states that my opinion regarding revenue recognition in the 2022 Earnout Statement is flawed, because I relied on Malka's actual pre-closing accounting practices, which, according to Mr. Dudney, are inconsistent with Schedule A.[281] As set forth in detail above, my opinion is that the MIPA required Buyer to calculate Malka's revenue for purposes of the 2022 Earnout Payment using Malka's historical non-GAAP revenue recognition practices, as it did for the 2021 Earnout Payment, and that by failing to do so, Buyer understated Malka's revenue by at least $895,517.[282]  Mr. Dudney's disagreement with my opinion, and insistence that revenue for purposes of the 2022 Earnout Payment must be calculated in accordance with ASC 606, is based upon his same flawed reading of the MIPA and disregard for the contemporaneous records, which I describe in detail above.

163. In footnote 26 of the Dudney Rebuttal Report, Mr. Dudney states that "based on my project-by-project analysis, adjustment Malka's 2022 NetSuite revenue amounts based on project start and end dates would reduce Malka's revenue recognized by approximately $3.5 million (Initial Report, Ex. 4)."[283]  Approximately $2.5 million of this proposed adjustment relates to

---

[280] Dudney Report, footnote 68.
[281] Dudney Rebuttal Report, pp.4-8.
[282] *See* ¶¶ 43 and 61, *supra*.
[283] Dudney Rebuttal Report, p. 8 n. 26.

MoneyLion projects for "Retained Creative Services."[284] Mr. Dudney testified that such adjustment is due to the fact that there was no time card data for these projects in 2022.[285] Mr. Dudney ignores the fact that MoneyLion's wholly owned subsidiary invoiced its parent company for work in 2022 and instead relies solely on time card data to conclude that absolutely no work was performed and therefore no revenue can be recognized in 2022.[286] Additionally, Mr. Dudney is the first person to raise the allegation that no work was performed by the retained teams. This is in direct contradiction to Mr. Torossian's assertion that the retained teams were working on both MoneyLion and other clients and a significant departure from MoneyLion's own 2022 Earnout Statement. To my knowledge, MoneyLion did not raise this allegation during good faith negotiations. Instead, the negotiations were based on MoneyLion's proposed adjustments to revenue of only $895,517.

164. Second, in the Dudney Rebuttal Report, Mr. Dudney states that my opinions related to certain categories of expenses included in the 2022 Earnout Statement are unreliable.[287]  In particular, Mr. Dudney notes that MoneyLion's position is that "the 2022 Earnout Statement should record expenses in accordance with GAAP."[288]  I disagree with this position for the reasons set forth above.  I understand that the Court will determine the legal meaning of the MIPA, but my accountant's reading, based on the documents and information I considered, is that both revenue and expenses for purposes of the 2022 Earnout Statement should be determined using Malka's historical accounting principles, not GAAP, consistent with Schedules A and B and MoneyLion's practice for the 2021 Earnout Statement.

---

[284] Dudney Initial Report, Ex. 4.
[285] Dudney Tr. 378:21-24, 379:14-15.
[286] Dudney Tr. 381:3-13.
[287] Dudney Rebuttal Report, pp. 9-16.
[288] Dudney Rebuttal Report, p. 11.

165. Mr. Dudney also refers to MoneyLion's claim that "Malka failed to disclose that the costs of personnel directly involved in servicing its clients were excluded from its cost of goods sold, leading to overstated gross profits in its financial statements." However, Mr. Dudney ignores the fact that Malka's financial statements for the years ended 2019 and 2020 and the nine months ended September 30, 2021, which were available to Buyer prior to the Closing Date and included in the Disclosures Schedules to the MIPA, specifically disclosed the salaries and wages line item under General and Administrative Expenses. Thus, Mr. Dudney's "Gross Profit Adjustment" is improper and unsupported.

166. <u>Third</u>, in the Dudney Rebuttal Report, Mr. Dudney states that my analysis supporting the inclusion of the New Jersey Tax Credit is unreliable.[289] Mr. Dudney notes that MoneyLion asserts that the 2019 Tax Credit should not have been included in the 2021 Earnout Statement, but he fails to mention the fact that when Mr. Basdekis sent MoneyLion Malka's unadjusted (*i.e.* non-GAAP) financial statements for purposes of the 2021 Earnout on February 15, 2022, he noted that "the only thing not reflected is the tax credit which is allowable under MIPA."[290] When preparing the final 2021 Earnout Statement, which MoneyLion sent to Sellers on March 15, 2022, *MoneyLion itself* added the full amount of the New Jersey Tax Credit in the amount of $890,905.[291]

167. In addition, Mr. Dudney claims that "from an accounting standpoint, the 'expected recognition' of the Tax Credit would be similar to the recognition of a contingent gain. Under GAAP, contingent gains are not recognized until the gain is realized or realizable."[292] The MIPA does not require GAAP to be applied in the determination of the expected recognition of the New Jersey Tax Credit. As such, it is not appropriate to interpret the undefined term "expected

---

[289] Dudney Rebuttal Report, pp. 16-20.
[290] JX074.
[291] JX083.
[292] Dudney Rebuttal Report, p. 17.

recognition" through a GAAP lens. Doing so would be reading language into the MIPA that was not agreed upon by the Parties. The MIPA could have, but did not, define "expected recognition." Further, the MIPA also could have, but did not, include specifications or guidance for calculating the expected recognition. As a result, one should only read the words as they are written – e.g., "expected recognition" plainly means that one **expects** the Company to **recognize** (i.e., record) the New Jersey Tax Credit in the year it is applied for.

168. Fourth, Mr. Dudney states that my opinion regarding the fair market value of intercompany services provided by Malka to MoneyLion in 2022 is unreliable. He cites to a section of ASC 606 related to "Allocation of Transaction Price to Performance Obligations" as well as the IRS's guidance on arm's length transfer price.[293] Neither source is applicable for the determination of fair market value in this dispute. First, the portion of ASC 606 cited relates to how a company should allocate an already established purchase price to multiple performance obligations.[294] This literature in ASC 606 is only applicable in scenarios where a transaction price (e.g., the amount a marketplace buyer is willing to pay) is established and does not apply to establishing what the transaction price should be at the onset.

169. Further, the IRS publication cited is titled "LB&I International Practice Service Transaction Unit" and states that "IRC section 482 provides the authority for the IRS to make allocations between controlled parties to clearly reflect the income of each of the parties. The arm's length standard is the standard the IRS has adopted for implementing the clear reflection of income principle for controlled transactions under IRC section 482."[295] This earnout calculation does not

---

[293] Dudney Rebuttal Report, p. 22.
[294] PX392, at 606-10-05-4, 606-10-32-28, 606-10-32-31.
[295] 26 CFR § 1.482-9; "LB&I International Practice Service Transaction Unit," *Internal Revenue Service*, https://www.irs.gov/pub/int_practice_units/ISI9422_09_06.PDF.

involve the IRS making allocations between controlled parties and nowhere in the MIPA does it required the earnout be calculated in accordance with IRS standards.

170. Fifth, Mr. Dudney states that my opinion regarding the improper inclusion of corporate-level bonuses in the 2022 Earnout Statement fails to consider that Sellers requested the bonuses and that bonuses were not inconsistent with the overall 2022 Budget. The emails cited by Mr. Dudney show that when Mr. Frommer initially requested whether MoneyLion could put in place a bonus program for a set group of employees working on the MoneyLion account, MoneyLion said that was not possible and no bonuses were paid in 2022. Then, as I describe above, in 2023, MoneyLion informed Sellers that MoneyLion had budgeted for a pool of employee bonuses and bonuses were ultimately paid in 2023.[296] Further, Mr. Dudney's claim that the total "Compensation & Benefits" is consistent with the 2022 Budget, is irrelevant. The 2022 Budget (Exhibit B of MIPA) clearly has a line item titled "Bonus" within the "Compensation & Benefits" grouping which only included $15,000 of bonuses for 2022. Whether the total Compensation & Benefits category overall was in line with the overall budget is irrelevant and ignores the core issue. In my experience, the inclusion of a budget in an agreement providing for an earnout, such as this one, is to protect sellers (and their potential earnout payments) from decisions made by buyers post-closing. In this instance, bonuses were considerably more than the $15,000 budgeted for in 2022 and therefore, not consistent with the 2022 Budget.

171. Sixth, Mr. Dudney states that my analysis of the adjustment related to the MoneyLion retained teams is flawed. As mentioned above, Mr. Dudney testified that there was no time card data for retained teams projects in 2022.[297] However, MoneyLion's position has always been that

---

[296] See ¶¶ 99-101, supra.

[297] Dudney Tr. 378:21-24, 379:14-15.

while the retained teams performed work for MoneyLion, they also performed some work for other customers. Such assertion is the basis for their proposed downward adjustment of $218,170 to revenue and EBITDA in the 2022 Earnout Statement. If Mr. Dudney's assertion that retained teams did not perform *any* work on MoneyLion projects during 2022 is correct, then one would have expected MoneyLion's proposed adjustment to reduce such services to $0, rather than reducing them by $218,170. As such, Mr. Dudney's assertion is illogical and contradictory to MoneyLion's proposed adjustments.

172. <u>Seventh</u>, Mr. Dudney states that my opinion regarding the improper inclusion of a downward adjustment for Buyer's in-house legal team is inconsistent with the evidence and MIPA.[298]    Mr. Dudney claims that the "MIPA does not provide any specific calculation requirements, like those Ms. Larson attempts to impose"[299] and instead relies on the "estimates" of where legal personnel spent their time.[300] Here, Mr. Dudney contradicts his own line of argumentation in his other opinions. Notably, Mr. Dudney himself imposes specific calculation requirements using timecard data of Malka employees, yet he criticizes the need for detailed time records for Buyer's in-house legal team, professionals who, in my experience, would be very familiar with and used to providing such records. It is illogical that Mr. Dudney is comfortable asserting that Malka *did not* perform work when unable to produce timecard data yet he is also comfortable asserting that Buyer's in-house legal team *did* perform work despite not being able to produce time records.

173. <u>Eighth,</u> Mr. Dudney erroneously calculates Malka's margin on retained teams. In Mr. Dudney's Rebuttal Report, he states that "Malka's margin on the retained team charged to

---

[298] Dudney Rebuttal Report, pp. 26-29.
[299] Dudney Rebuttal Report, p. 28.
[300] Dudney Rebuttal Report, pp. 26-27.

MoneyLion was 88% compared to Malka's margin to other customers of 42.2%."[301] Mr. Dudney's

88% is calculated as "Margin" of $1,342,514 divided by "Cost" of $1,527,581.[302] Because margin

is calculated as revenue minus costs, Mr. Dudney's calculation is effectively: revenue minus costs

divided by ***costs***. In contrast, Mr. Torossian's calculation of 42.2% was calculated as: revenue

minus costs divided by ***revenue***. Therefore, it is not appropriate for Mr. Dudney to (i) claim that

Malka's margin on retained teams is 88% and (ii) compare that percentage to Mr. Torossian's

calculated 42.2%. Nevertheless, Mr. Dudney makes such comparison in an attempt to support his

conclusion that "Malka was generating higher profit margins on services provided to MoneyLion

compared to services provided to other clients."[303] If one were to calculate the margin on the

retained team consistent with MoneyLion's calculation of revenue minus costs divided by revenue,

the margin would be 46.8% (i.e., within 5% of the margin for other customers).[304] As such, Mr.

Dudney's assertion that Malka generates 88% profit margin on retained teams is inaccurate.

174. <u>Ninth,</u> Mr. Dudney insists on characterizing the Financial Statements as "not fairly and

accurately reflect[ing] Malka's financial condition"[305] which he testified is an "opinion broadly

related to the financial statements as a whole as opposed to going statement by statement."[306]

Typically, for an accountant to express an opinion on financial statements taken as a whole, they

perform an audit which generally includes performing various types of procedures across <u>many</u>

account balances (e.g., assets, liabilities, equity, revenue, expenses, etc.).  Mr. Dudney did not

perform an audit nor did he analyze more than one account. Mr. Dudney himself admitted that the

---

[301] Dudney Rebuttal Report, p. 20.
[302] JX119.
[303] Dudney Rebuttal Report, p. 20.
[304] JX119. Calculated as: ($2,870,095 - $1,527,581) / $2,870,095 = 46.8%
[305] Dudney Initial Report, p. 46.
[306] Dudney Tr. 239:11-14.

analysis he performed to straight-line revenue using "[ASC] 606 changes only … one statistic, revenue…"[307] yet he draws conclusions on the entirety of the Financial Statements.

175. Mr. Dudney's own analysis fails to support his conclusion that the Financial Statements are not fair or accurate.  Even though Mr. Dudney testified that his proposed revenue adjustments were "not insignificant,"[308] they represent just 0.2% of 2019 revenue, and 3.9% of 2020 revenue – a single line item in the Financial Statements. Mr. Dudney's broad \ assertion that the Financial Statements taken as a whole do "not fairly and accurately reflect Malka's financial condition"[309] is not reliable.

## **CONCLUSION**

176. Buyer's utilization of a GAAP-based income statement, rather than one based on the Company's historical accounting practices, to calculate revenue and expenses for purposes of the 2022 Earnout is unsupported and inconsistent with the Revenue and EBITDA Calculation Principles set forth in Schedule B of the MIPA, resulting in an understatement of Revenue and EBITDA.

177. Buyer's 2022 Earnout Statement improperly fails to include the New Jersey Digital Media Tax Credit applied for in 2022, thereby understating 2022 EBITDA by $1,590,603.

178. Buyer's 2022 Earnout Statement improperly includes a downward adjustment to revenue and EBITDA for the "fair market value" of intercompany services provided by the Company to Buyer, thereby understating 2022 Revenue and EBITDA by $1,242,248.

---

[307] Dudney Tr. 252:17-18.
[308] Dudney Tr. 252:14-15.
[309] Dudney Initial Report, p. 46.

179. Buyer's 2022 Earnout Statement improperly includes a downward adjustment resulting from the Buyer's corporate-level decision to pay bonuses to Company employee in a manner inconsistent with the 2022 Budget, thereby understating 2022 EBITDA by $529,500.

180. Buyer's 2022 Earnout Statement improperly includes a downward adjustment for "retained teams," thereby understating 2022 revenue and EBITDA by $218,170.

181. Buyer's 2022 Earnout Statement improperly includes a downward adjustment for an allocation of costs associated with Buyer's in-house legal counsel, thereby understating 2022 EBITDA by $58,438.

182. Nothing in the Dudney Report or the Dudney Rebuttal Report caused me to change my opinions.

183.  Mr. Dudney incorrectly assumes that Malka had zero contracts that contained non-cancelable deposits, resulting in flawed conclusions and adjustments to Revenue and EBITDA.

184. Mr. Dudney's calculated adjustments to Malka's revenue rely upon a series of unsupported assumptions, each of which is contradicted by evidence in this matter. As a result, Mr. Dudney's conclusions and adjustments are fundamentally flawed.

185. Mr. Dudney fails to acknowledge the contemporaneous evidence in MoneyLion's own records which clearly demonstrates the accounting practices used for the 2021 Earnout Calculation and Final Closing Working Capital, and how such practices differ from GAAP.

186. The Dudney Rebuttal Report fails to meaningfully rebut my opinions related to the 2022 Earnout Payment.

Executed on this 20th day of December, 2024 at Chicago, Illinois.


_____

Jennifer L. Larson

# Exhibit A

# Deloitte.

Risk and Financial Advisory

**Jennifer L. Larson, CPA, CFE**
Regulatory & Legal Services
US Leader, Investigations & Dispute
111 South Wacker Drive
Chicago, IL 60606
Phone:  312-486-2539
jenlarson@deloitte.com



**Profile**

Jen is a Certified Public Accountant, Certified Fraud Examiner and partner in Deloitte's Regulatory and Legal practice.  Jen is the US Leader for Deloitte's Investigations & Dispute practice.  Jen specializes in providing litigation and dispute support to clients and their legal counsel.  Jen has been engaged as an economic damages expert and a U.S. GAAP accounting expert, and has testified as an expert witness in U.S. Federal court (as well as domestic and international arbitrations).  During her career Jen has served as an expert and/or neutral arbitrator in hundreds of contract disputes, including purchase price and earn-out disputes, licensing, royalty, co-promotion, cost-sharing, supply, employment and other disputes.

**Select Arbitration and Contract Dispute Engagements**

- Engaged as an expert to assist a biotech client in evaluating and quantifying its potential claims under a distribution and supply agreement with respect to an anticipated shortfall of supply of the product.

- Conducted a contract audit on behalf of a medtech client pursuant to a cost-sharing agreement with a third party to recover monies owed under the agreement.

- Retained as an independent accountant in a contract dispute between a National Health Plan and a Pharmacy Benefit Manager concerning the number of eligible claims and corresponding payment required to the pharmacy benefit manager.

- Retained as the Neutral Arbitrator in a post-closing dispute involving accounting issues relating to the calculation of Net Working Capital, including: bill-and-hold arrangements, customer deposits, net earnings, accounts receivable, accounts payable, and accrued liabilities.

- Retained as an Accounting Expert in an arbitration engagement involving a post-closing M&A dispute between a private equity firm and a packaging company.  The parties disagreed on the appropriate application of Generally Accepted Accounting Principles ("GAAP") related to the following issues: cash and cash equivalents, accounts payable, funded indebtedness, inventory obsolescence, capitalized variance, accounts payable, accrued expenses, and employee benefits.

- Retained as a neutral accountant in a baseball-style arbitration between two parties in a licensing and royalty dispute regarding the correct application of percentage of completion revenue recognition.

- Led a team conducting a contract audit on behalf of a pharmaceutical company related to certain royalty fees to be paid pursuant to a profit-sharing contract. The analyses included inspection and testing of certain gross-to-net revenue adjustments, as well as cost of goods sold.

- Retained as the Neutral Arbitrator in an earn-out dispute between two life sciences companies involving the calculation of earnings before interest, tax, depreciation, and amortization ("EBITDA"), specifically the calculation of gross-to-net reserves.

- Retained as a mediator in a post-closing M&A dispute between a manufacturer and distributor of medical devices to resolve various accounting issues relating to accounts receivable and inventory.

- Retained by the seller as an Accounting Expert to assist them in a multi-billion-dollar purchase price dispute between two pharmaceutical manufacturers.  This dispute involved 32 disputed items related to the calculation of net working capital, including: undisclosed liabilities, gross-to-net adjustments, legal contingencies, inventory reserves, accounts receivable, royalties, severance, and assets not transferred, to name a few.

- Led an internal matter for Deloitte (as the buyer) against a seller in a purchase price adjustment dispute.  More than 80 financial statement account line items were in dispute, including: FIN 48 and FAS 5 reserves relating to deferred taxes and accrued foreign taxes, accrued severance, income taxes payable, accrued space restoration, accrued payroll, and bad debt.

- Retained as a neutral arbitrator in an earnout dispute between a property owner and a condominium developer.

- Retained as an independent accountant to resolve an earnout dispute between a Real Estate Investment Trust and a property developer.

- Retained by the buyer as an Accounting Expert in a purchase price dispute in the oil and gas industry.  The dispute involved evaluating the correct application of U.S. GAAP for accounts receivable and prepaid miscellaneous to determine whether these accounts should be included in the calculation of net working capital.

- Led an arbitration engagement involving a dispute between two former Limited Partners of a private equity fund.  Analyzed fund documents, partnership agreements, loan documentation, and bank records, among others to determine the appropriate accounting classification and disclosure of certain related party loans.

- Retained by the buyer (a private equity firm) as an Accounting Expert in a post-closing M&A dispute against the seller, a retailer.  The dispute involved issues relating to both the calculation of net working capital and the calculation of net debt, including: accrued expenses, obsolescence, bad debt, other accruals and provisions (including tax), employee retirement benefits, and international pension accounting.  Testified on behalf of the buyer in Amsterdam, Netherlands District Court.

- Retained as the Independent Accountant and mediator in a post-closing dispute between a private equity firm and a metal fabricator to resolve various accounting issues relating to the calculation of Net Working Capital including: merchandise returns, taxes, inventory surcharges, capitalized tooling, customer advances, prepaid expenses, warranty accruals, bonus accruals and payroll.

- Retained by the buyer as an Accounting Expert in a multi-billion-dollar purchase price dispute in the construction industry.  The dispute involved allegations of fraud with respect to the seller's historical financial statements, as well as indemnification claims, warranty claims, and

several issues involving the correct application of U.S. GAAP, specifically, use of percentage of completion method for recognizing revenue.

**Select Litigation Support Engagements**

- Retained by the buyer (a gas station and convenience store operator) as an Accounting Expert in a post-closing dispute against the seller. The dispute involved issues relating to the calculation of store-level EBITDA for sixty four (64) gas stations for the purposes of a reverse earnout payment owed from the seller. The analysis included assessment of purchaser's calculation of EBITDA and fuel revenue, cost of sales, and gross margin, historical performance of fuel gross margin and potential impact of Covid-19 on fuel revenue and volume, rebuttal of opposing expert's opinions regarding the inclusion of certain fuel rebates and markups, and rebuttal of allegations of intentionally manipulating the EBITDA calculation. Testified on behalf of the buyer in the Eastern District of Wisconsin.

- Retained as a damages expert for a global textile company to opine on the economic damages incurred as a result of the diversion of corporate opportunities and resources to a competing entity. The claim included lost revenue from existing clients, lost revenue and margin on fabric sold at a discount, extra expenses on purchases made to satisfy customer contracts and extra expenses incurred on purchases of finished products purchased from the competing entity.

- Retained as an economic damages expert for a global food company to evaluate the losses it sustained from a power outage at one of its processing facilities. The claim included property damage, mitigation expenses and business interruption losses.

- Retained as a damages expert in defense of a building materials supplier in a matter against a general contractor. Retained to refute the opinions and damage calculation contained in the plaintiff's expert's report which alleged that the general contractor suffered lost profits as a result of alleged defective products received from the building materials supplier.

- Retained as an economic damages expert for a company that designs, manufactures and markets rapid cook solutions. Testified for the defendant against one of its licensees who claimed it suffered lost profits in the amount of $56 million due to defendant's alleged failure to appropriately transfer the license. The plaintiff was awarded no damages.

- Retained as a damages rebuttal expert for a real estate company involved in a shareholder suit. Created various mathematical models to project share prices based on the company's historical net asset value and to calculate potential losses to company shareholders.

- Retained as an expert for a freight broker, the plaintiff, in an ongoing matter against a nationwide transportation company. Retained to assist the plaintiff in its Motion for an Accounting from the defendant in order to calculate the commission owed to the plaintiff (per the terms of the contract) for services provided since 1984. Prepared an affidavit in support of the plaintiff's Motion for an Accounting.

- Retained as a damages expert in the *Michael Murphy v. CBS Radio East Inc. f/k/a Infinity Broadcasting Operations, Inc.* matter. Retained to calculate the amount of lost net profits, if any, incurred by Mr. Murphy as a result of his contract containing certain "restrictive covenants", which Mr. Murphy claimed prevented him from seeking alternative employment.

Issued an expert report and testified at deposition.  The damages awarded to Mr. Murphy were *de minimus*.

- Retained as an accounting expert on behalf of the Attorney Registration and Disciplinary Commission in three separate matters against previously disbarred attorneys seeking reinstatement.  Retained to analyze the financial, accounting and tax records of the petitioner in each matter.

- Assisted a leading, national newspaper in determining its potential liability in a breach of contract matter with a competing newspaper.  The analysis involved calculating the potential loss incurred by the competing newspaper as a result of alleged over-reporting of returned newspapers and under-supplying the market with competitor newspapers.

- Assisted a top glass manufacturer in Mexico in evaluating its losses sustained from Hurricane Alex. The multi-million-dollar claim involved multiple business units, and the loss calculation consisted of inventory damage, business interruption, and contingent extra expenses.

- Analyzed a breach of contract claim against our client, a leading international financial institution against a shopping center located in the U.S. Virgin Islands.  Led a team in the analysis and preparation of a real estate valuation Expert Rebuttal Report, including a calculation of damages, and prepared Expert for deposition and trial.

- Retained as a damages expert on behalf of a leading 5-star hotel in a multi-million-dollar wrongful termination matter. The plaintiff was awarded zero damages.

- Retained by a fiber and fabric manufacturer to evaluate its losses sustained from a fire. This one hundred-million-dollar claim involved multiple business units, and the loss calculation consisted of fixed asset and inventory damage, business interruption, and contingent extra expenses.

- Retained by counsel on behalf of a leading national insurance carrier in a multi-billion dollar asbestos claim.  Led the analysis and determination of damages in the matter.  Analyzed millions of pages of health care claim forms, emails and other documentation.  Prepared two Expert Reports and prepared Experts for both deposition and trial. Defendant's liability was inconsequential.

- Managed a litigation support engagement involving a dispute over the proper accounting treatment of the following issues: the accrual for environmental liabilities (specifically cost to closure), whether a contingent liability related to a possible future loss on a contract to purchase ethanol was required, and the proper calculation of straight line rent for an operating lease.  Drafted an Expert Report and prepared the Expert Witness for deposition and trial.


**Professional Publications**
- Lost Profits Damages: Principles, Methods, and Applications. Second Edition. Chapter 10: Analysis of Projected Lost Revenue.

**Professional Affiliations**
- AICPA Forensic & Litigation Services Committee; Economic Damages Advisory Panel
- Member, Association of Certified Fraud Examiners
- Member, Illinois Society of Certified Public Accountants
- Member, American Institute of Certified Public Accountants

**Education**
- University of Illinois:  Bachelor of Science in Finance

# Exhibit B

**JEFFREY FROMMER, et al. v. MONEYLION TECHNOLOGIES INC., et ano.**
Jennifer L. Larson - Information Considered

| Beginning Bates Number of Document | Description (if applicable) |
|---|---|
| MoneyLion_01813351 | MoneyLion Ex. 7 |
| MoneyLion_01846450 | MoneyLion Ex. 21 |
| MoneyLion_001037 | MoneyLion Ex. 22 |
| MoneyLion_01817462 | MoneyLion Ex. 28 |
| MoneyLion_01817466 | MoneyLion Ex. 28 (produced in native Excel file) |
| MoneyLion_01826070 | MoneyLion Ex. 33 |
| MoneyLion_01826071 | MoneyLion Ex. 33 (produced in native Excel file) |
| MoneyLion_01826072 | MoneyLion Ex. 40 |
| MoneyLion_000057 | MoneyLion Ex. 42 |
| MoneyLion_000023 | MoneyLion Ex. 44 |
| MoneyLion_00329727 | MoneyLion Ex. 44B |
| MoneyLion_01903956 | MoneyLion Ex. 75 |
| MoneyLion_00049908 | MoneyLion Ex. 77 |
| MoneyLion_00630853 | MoneyLion Ex. 80 |
| MoneyLion_00017463 | MoneyLion Ex. 81 |
| MoneyLion_00023194 | MoneyLion Ex. 85 |
| MoneyLion_01878901 | MoneyLion Ex. 121 |
| MoneyLion_01878902 | MoneyLion Ex. 121 (produced in native Excel file) |
| MoneyLion_01878903 | MoneyLion Ex. 121 (produced in native Excel file) |
| MoneyLion_01835166 | MoneyLion Ex. 134 |
| MoneyLion_01834199 | MoneyLion Ex. 138 |
| MoneyLion_01817787 | MoneyLion Ex. 144 |
| MoneyLion_01817788 | MoneyLion Ex. 144 (produced in native Excel file) |
| MoneyLion_01836909 | MoneyLion Ex. 150 |
| MoneyLion_01836920 | MoneyLion Ex. 151 |
| MoneyLion_01820688 | MoneyLion Ex. 161 |
| MoneyLion_01820691 | MoneyLion Ex. 161 (produced in native Excel file) |
| MoneyLion_02038248 | MoneyLion Ex. 169 (produced in native Excel file) |
| MoneyLion_01818125 | MoneyLion Ex. 173 |
| MoneyLion_01818143 | MoneyLion Ex. 174 |
| MoneyLion_01817934 | MoneyLion Ex. 175 |
| MoneyLion_01817935 | MoneyLion Ex. 175 (produced in native Excel file) |
| MoneyLion_01811951 | MoneyLion Ex. 187 |
| MoneyLion_01811953 | MoneyLion Ex. 187 (produced in native Excel file) |
| MoneyLion_01826004 | MoneyLion Ex. 188 |
| MoneyLion_01826006 | MoneyLion Ex. 188 (produced in native Excel file) |
| MoneyLion_01828187 | MoneyLion Ex. 191 |
| MoneyLion_01254513 | MoneyLion Ex. 211 |
| MoneyLion_01832077 | MoneyLion Ex. 212 |
| MoneyLion_00017459 | |
| MoneyLion_00017467 | |
| MoneyLion_00017470 | |
| MoneyLion_00017573 | |
| MoneyLion_00023200 | |
| MoneyLion_00029995 | |
| MoneyLion_00054001 | |
| MoneyLion_00141955 | |
| MoneyLion_00143234 | |
| MoneyLion_00143236 | |
| MoneyLion_00155283 | |
| MoneyLion_00641896 | |
| MoneyLion_012043511 | |
| MoneyLion_01776433 | |
| MoneyLion_01872758 | |
| MoneyLion_02038845 | |
| MoneyLion_02038846 | |
| MoneyLion_02038850 | |
| MoneyLion_02038854 | |
| MoneyLion_02038858 | |
| MoneyLion_02038891 | |

**JEFFREY FROMMER, et al. v. MONEYLION TECHNOLOGIES INC., et ano.**
Jennifer L. Larson - Information Considered

| Beginning Bates Number of Document | Description (if applicable) |
| --- | --- |
| MoneyLion_02038905 | |
| MoneyLion_02038925 | |
| MoneyLion_02038933 | |
| MoneyLion_02038949 | |
| MoneyLion_02038957 | |
| MoneyLion_02038973 | |
| MoneyLion_02038982 | |
| MoneyLion_02038991 | |
| MoneyLion_02038999 | |
| MoneyLion_02039044 | |
| MoneyLion_02039106 | |
| MoneyLion_02039118 | |
| MoneyLion_02039128 | |
| MoneyLion_02039155 | |
| MoneyLion_02039289 | |
| MoneyLion_02039313 | |
| MoneyLion_02039366 | |
| MoneyLion_02039453 | |
| MoneyLion_02039477 | |
| MoneyLion_02039480 | |
| MoneyLion_02039489 | |
| MoneyLion_02039490 | |
| MoneyLion_02039502 | |
| MoneyLion_02039516 | |
| MoneyLion_02039528 | |
| MoneyLion_02039553 | |
| MoneyLion_02039785 | |
| MoneyLion_02039837 | |
| MoneyLion_02042043 | |
| MoneyLion_02042060 | |
| MoneyLion_02042113 | |
| MoneyLion_02042128 | |
| MoneyLion_02042178 | |
| MoneyLion_02042235 | |
| MoneyLion_02042242 | |
| MoneyLion_02042246 | |
| MoneyLion_02042252 | |
| MoneyLion_02042273 | |
| MoneyLion_02042343 | |
| MoneyLion_02042344 | |
| MoneyLion_02042356 | |
| MoneyLion_02042401 | |
| MoneyLion_02042425 | |
| MoneyLion_02042431 | |
| MoneyLion_02042443 | |
| MoneyLion_02042466 | |
| MoneyLion_02042481 | |
| MoneyLion_02042493 | |
| MoneyLion_02042497 | |
| MoneyLion_02042507 | |
| MoneyLion_02042513 | |
| MoneyLion_02042529 | |
| MoneyLion_02042535 | |
| MoneyLion_02042541 | |
| MoneyLion_02042551 | |
| MoneyLion_02042553 | |
| MoneyLion_02042562 | |
| MoneyLion_02042569 | |
| MoneyLion_02042574 | |
| MoneyLion_02042592 | |

**JEFFREY FROMMER, et al. v. MONEYLION TECHNOLOGIES INC., et ano.**
Jennifer L. Larson - Information Considered

| Beginning Bates Number of Document | Description (if applicable) |
|---|---|
| MoneyLion_02042606 | |
| MoneyLion_02042613 | |
| MoneyLion_02042616 | |
| MoneyLion_02042662 | |
| MoneyLion_02042679 | |
| MoneyLion_02042683 | |
| MoneyLion_02042698 | |
| MoneyLion_02042721 | |
| MoneyLion_02042891 | |
| MoneyLion_02042908 | |
| MoneyLion_02042923 | |
| MoneyLion_02042988 | |
| MoneyLion_02043026 | |
| MoneyLion_02043032 | |
| MoneyLion_02043061 | |
| MoneyLion_02043062 | |
| MoneyLion_02043073 | |
| MoneyLion_02043083 | |
| MoneyLion_02043104 | |
| MoneyLion_02043105 | |
| MoneyLion_02043127 | |
| MoneyLion_02043165 | |
| MoneyLion_02043192 | |
| MoneyLion_02043226 | |
| MoneyLion_02043248 | |
| MoneyLion_02043271 | |
| MoneyLion_02043320 | |
| MoneyLion_02043359 | |
| MoneyLion_02043366 | |
| MoneyLion_02043374 | |
| MoneyLion_02043404 | |
| MoneyLion_02043415 | |
| MoneyLion_02043426 | |
| MoneyLion_02043469 | |
| MoneyLion_02043491 | |
| MoneyLion_02043512 | |
| MoneyLion_02043529 | |
| MoneyLion_02043571 | |
| MoneyLion_02043611 | |
| MoneyLion_02043621 | |
| MoneyLion_02043647 | |
| MoneyLion_02043648 | |
| MoneyLion_02043703 | |
| MoneyLion_02043718 | |
| MoneyLion_02043726 | |
| MoneyLion_02043731 | |
| MoneyLion_02043740 | |
| MoneyLion_02043744 | |
| MoneyLion_02043776 | |
| MoneyLion_02043788 | |
| MoneyLion_02043807 | |
| MoneyLion_02043813 | |
| MoneyLion_02043817 | |
| MoneyLion_02043826 | |
| MoneyLion_02043849 | |
| MoneyLion_02043855 | |
| MoneyLion_02043878 | |
| MoneyLion_02043882 | |
| MoneyLion_02043891 | |
| MoneyLion_02043897 | |

**JEFFREY FROMMER, et al. v. MONEYLION TECHNOLOGIES INC., et ano.**
Jennifer L. Larson - Information Considered

| Beginning Bates Number of Document | Description (if applicable) |
|---|---|
| MoneyLion_02043901 | |
| MoneyLion_02043930 | |
| MoneyLion_02043961 | |
| MoneyLion_02043973 | |
| MoneyLion_02044022 | |
| MoneyLion_02044089 | |
| MoneyLion_02044129 | |
| MoneyLion_02044134 | |
| MoneyLion_02044173 | |
| MoneyLion_02044181 | |
| MoneyLion_02044189 | |
| MoneyLion_02044202 | |
| MoneyLion_02044244 | |
| MoneyLion_02044256 | |
| MoneyLion_02044276 | |
| MoneyLion_02044292 | |
| MoneyLion_02044337 | |
| MoneyLion_02044339 | |
| MoneyLion_02044450 | |
| MoneyLion_02044458 | |
| MoneyLion_02044466 | |
| MoneyLion_02044647 | |
| MoneyLion_02044690 | |
| MoneyLion_02044722 | |
| MoneyLion_02044751 | |
| MoneyLion_02044790 | |
| MoneyLion_02044851 | |
| MoneyLion_02045024 | |
| MoneyLion_02045111 | |
| MoneyLion_02045146 | |
| MoneyLion_02045179 | |
| MoneyLion_02045206 | |
| MoneyLion_02045273 | |
| MoneyLion_02045622 | |
| MoneyLion_02046360 | |
| MoneyLion_02054791 | |
| MoneyLion_02078654 | |
| MoneyLion_02078666 | |
| MoneyLion_02078676 | |
| MoneyLion_02078744 | |
| MoneyLion_02078819 | |
| N/A | Amended Answer, Affirmative Defenses, Counterclaims, and Third Party Complaint, Case No. 1:23-cv-06339-JMF, October 13, 2023 |
| N/A | Jeffrey Frommer, Lyusen (Louis), Krubich, Daniel Fried and Pat Capra v. MoneyLion Technologies Inc. and Continental Stock Transfer & Trust Company, Complaint, July 21, 2023 |
| N/A | Jeffrey Frommer, Lyusen (Louis), Krubich, Daniel Fried and Pat Capra v. MoneyLion Technologies Inc. and Continental Stock Transfer & Trust Company, Dkt. No. 9, Amended Complaint, July 26, 2023 |
| N/A | MoneyLion's Supplemental Responses and Objections to Plaintiffs' Interrogatories dated June 14, 2024 |
| N/A | Expert Report of Louis G. Dudney, CPA, CFF, dated September 20, 2024 |
| N/A | Expert Rebuttal Report of Louis G. Dudney, CPA, CFF, dated October 28, 2024 |
| N/A | Supplemental Exhibits 3A and 3B by Louis G. Dudney, provided on November 20, 2024 |
| N/A | Transcript of Deposition of Louis Krubich dated July 10, 2024. |
| N/A | Transcript of Deposition of Dan Fried dated July 17, 2024. |
| N/A | Transcript of Deposition of Matthew Basdekis dated July 18, 2024. |
| N/A | Transcript of Deposition of Mark Torossian dated July 29, 2024. |
| N/A | Transcript of Deposition of Michael Scalia dated August 1, 2024. |
| N/A | Transcript of Deposition of Richard Correia dated August 13, 2024. |

**JEFFREY FROMMER, et al. v. MONEYLION TECHNOLOGIES INC., et ano.**
Jennifer L. Larson - Information Considered

| Beginning Bates Number of Document | Description (if applicable) |
|---|---|
| N/A | Transcript of Deposition of Ryan Curran dated August 15, 2024. |
| N/A | Transcript of Deposition of Louis G. Dudney dated November 20, 2024. |
| N/A | ASC 210-10-45-1 through -4, available at https://asc.fasb.org/1943274/2147483467/210-10-45-1. (last visited Sept. 18, 2024). |
| N/A | ASC 310-10-05-4, available at https://asc.fasb.org/1943274/2147481738/310-10-05-4 (last visited Sept. 18, 2024). |
| N/A | ASC 606, available at https://asc.fasb.org/606/showallinonepage (last visited Sept. 18, 2024). |
| N/A | ASC 842, available at https://asc.fasb.org/842/showallinonepage (last visited Sept. 18, 2024). |
| N/A | ASC Master Glossary at "Current Assets" available at https://asc.fasb.org/MasterGlossary (last visited Sept. 18, 2024). |
| N/A | ASC Master Glossary at "Fair Value" available at https://asc.fasb.org/MasterGlossary (last visited Sept. 18, 2024). |
| N/A | ASC Master Glossary at "Working Capital" available at https://asc.fasb.org/MasterGlossary (last visited Sept. 18, 2024). |
| N/A | FASB, About the Codification dated February 2023, available at https://asc.fasb.org/layoutComponents/getPdf?isSitesBucket=true&fileName=FASB_About_the_Codification.pdf, (last visited Sept. 17, 2024). |
| N/A | FASB, Effective Dates of Accounting Standards Updates, available at https://www.fasb.org/standards/accounting-standard-updated-effective-date (last visited Sept. 17, 2024). |
| N/A | FASB, Financial Accounting Standards Board, available at https://asc.fasb.org/Home (last visited Sept 17, 2024). |
| N/A | FASB, Meeting Recap of Financial Accounting Standards Advisory Council dated March 7, 2023, available at https://www.fasb.org/page/PageContent?pageId=/about-us/Advisory-Groups/fasac/meeting-recap/fasac-meeting-recap-march-7-2023.html (last visited Sept. 17, 2024) |
| N/A | FASB, Statement of Financial Accounting Concepts No. 8, Chapter 4, issued December 2021, available at https://fasb.org/page/ShowPdf?path=Concepts_Statement_8-Chapter_4-Elements.pdf&title=CONCEPTS%20STATEMENT%20NO.%208%E2%80%94CONCEPTUAL%20FRAMEWORK%20FOR%20FINANCIAL%20REPORTING%E2%80%94CHAPTER%204,%20ELEMENTS%20OF%20FINANCI (last visited Sept. 18, 2024). |
| N/A | FASB, The Conceptual Framework, available at https://fasb.org/the-conceptual-framework  (last visited Sept. 17, 2024). |
| N/A | MALKA, available at https://www.malkamedia.com/about (last visited Sept. 17, 2024). |
| N/A | MoneyLion Inc. Annual Report, Form 10-K for the Fiscal Year Ended December 31, 2022 available at https://www.sec.gov/Archives/edgar/data/1807846/000121390023033956/fars2022_moneylioninc.pdf (last visited Sept. 17, 2024). |
| N/A | SEC, Conditions for Use of Non-GAAP Financial Measures, updated on Aug. 31, 2023, available at https://www.sec.gov/rules-regulations/2003/03/conditions-use-non-gaap-financial-measures (last visited Sept. 17, 2024) |

# Exhibit C

Exhibit C - Dudney's September 2021 YTD Adjustments

| Database | Name | Project Name | Job ID | Document Number | Non-Cancellable Deposits | Billing Types | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Category A | Category B | Category C | Category D |
| NetSuite | 8fig | 8fig Branding Sept | 004772 | MoneyLion_02043813 | Category 1 | Yes | No | No | No |
| NetSuite | ADP | ADP Compliance Solutions Incentives Manager | 004311 | MoneyLion_02044790 | Category 1 | Yes | No | No | No |
| NetSuite | ADP | ADP Compliance Solutions Sales Rally Video | 004444 | MoneyLion_02043104 | Category 2B | No | Yes | No | No |
| NetSuite | ADP | ADP MOTM 2021 Award Videos | 003252 | MoneyLion_02042043 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | ADP MyWisely Videos 2021 | 003348 | MoneyLion_02042662 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | ADP Retirement Services Messaging Videos | 004628 | MoneyLion_02043973 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | ADP Service Messaging Sizzle | 003236 | MoneyLion_02042493 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | ADP Strategic Migration Sizzle | 003403 | MoneyLion_02042574 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | ADP WFN Sizzle Video | 003421 | MoneyLion_02042553 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | BPO Interactive Experience | 004526 | MoneyLion_02043826 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | Central Bank Testimonial | 004995 | MoneyLion_02045111 | Category 2B | No | Yes | No | No |
| NetSuite | ADP | Compliance Solutions - Compliance Minute | 003642 | MoneyLion_02043271 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | Cyber Security Video | 003661 | MoneyLion_02043165 | Category 2B | No | Yes | No | No |
| NetSuite | ADP | DataCloud Product Video | 004025 | MoneyLion_02043073 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | Earned Wage Assistance | 004796 | MoneyLion_02042616 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | Managed Services Sizzle | 003605 | MoneyLion_02042616 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | Mobile Adoption QR Code Video | 004302 | MoneyLion_02042923 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | MOTM 2022 | 005060 | MoneyLion_02045273 | Category 2B | No | Yes | No | No |
| NetSuite | ADP | MyADP Adoption Video How to Enroll in Your Benefits | 004301 | MoneyLion_02043404 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | Next Gen Monthly Website Maintenance 2021-2022 | 004184 | MoneyLion_02043083 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | Retirement Services Print Ad | 004878 | MoneyLion_02044466 | Category 2B | No | Yes | No | No |
| NetSuite | ADP | Roll Explainer Video | 003523 | MoneyLion_02042252 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | Roll Sizzle Video | 003396 | MoneyLion_02042443 | Category 2A | No | Yes | No | No |
| NetSuite | ADP | Roseland CMO Shoot | 004827 | MoneyLion_02044089 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | RUN Product Video | 004024 | MoneyLion_02042356 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | TotalSource Product Videos | 003988 | MoneyLion_02043248 | Category 2B | No | Yes | No | No |
| NetSuite | ADP | WorkForce Manager Video | 004303 | MoneyLion_02043127 | Category 2B | No | No | Yes | No |
| NetSuite | ADP | Workforce Now Payroll Video FY22 | 004212 | MoneyLion_02043529 | Category 2B | No | No | Yes | No |
| NetSuite | Amazon.com Inc. | Amazon Stories Retainer 2020-2021 | 003237 | MoneyLion_02042513 | Category 1 | No | No | Yes | No |
| NetSuite | Amazon.com Inc. | Amazon_DEI_Affinity Group Video | 004855 | MoneyLion_02043571 | Category 2B | No | No | Yes | No |
| NetSuite | Amazon.com Inc. | Amazon_Global_DEI_HRBP_Internal_Broadcast | 004918 | MoneyLion_02044647 | Category 2B | No | No | Yes | No |
| NetSuite | Amazon.com Inc. | Retailer HQ2 Spotlight | 004964 | MoneyLion_02044181 | Category 2B | No | No | Yes | No |
| NetSuite | Amazon.com Inc. : Amazon Stories | Amazon Stories Amazon Stories Retainer 2021 Q2 | 003905 | MoneyLion_02044256 | Category 2B | No | No | Yes | No |
| NetSuite | Amazon.com Inc. : Amazon Stories | Amazon Stories DAM Workflow & Archiving | 004707 | MoneyLion_02043718 | Category 2B | No | No | Yes | No |
| NetSuite | Amazon.com Inc. : Amazon Web Services | Amazon Web Services Embargo Videos Embargo Lamarr Video E5G | 004946 | MoneyLion_02043882 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Amazon Web Services | Amazon Web Services Embargo Videos Embargo Video_Roci Launch | 004945 | MoneyLion_02043817 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Amazon Web Services | Amazon Web Services re Invent Animated Explainers | 005009 | MoneyLion_02044173 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Amazon Prime Wheel of Time | 004818 | MoneyLion_02038991 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. H&R Block Branded Stream | 003339 | MoneyLion_02038858 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Heinz MiO Hydration Challenge | 004816 | MoneyLion_02038982 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Lexus IS Reveal | 003401 | MoneyLion_02038846 | Category 2B | No | No | No | Yes |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. McDonald's Crispy Chicken_Part 2 | 004655 | MoneyLion_02038933 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Miller Lite ASV Round 2 | 004128 | MoneyLion_02038845 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Monster x Apex Challenge | 004916 | MoneyLion_02038957 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Oculus Resident Evil 4 | 005022 | MoneyLion_02038973 | Category 2B | No | Yes | No | No |

Exhibit C - Dudney's September 2021 YTD Adjustments

| Database | Name | Project Name | Job ID | Document Number | Non-Cancellable Deposits | Billing Types | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Category A | Category B | Category C | Category D |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Old Spice Dynasty NFT | 004479 | MoneyLion_02038999 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Omen Branded Stream | 003338 | MoneyLion_02038891 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Omen Stream - Part 2 | 004401 | MoneyLion_02038905 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Patron Mixology Stream | 003277 | MoneyLion_02038854 | Category 2B | No | No | No | Yes |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Pizza Hut Gamer | 003299 | MoneyLion_02038850 | Category 2B | No | No | No | Yes |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Straight Talk | 003728 | MoneyLion_02038925 | Category 2B | No | Yes | No | No |
| NetSuite | Amazon.com Inc. : Twitch Interactive, Inc. | Twitch Interactive, Inc. Uber Eats Custom Commercial | 004817 | MoneyLion_02038949 | Category 2B | No | Yes | No | No |
| NetSuite | BetterCloud | Altitude 2021 | 004340 | MoneyLion_02043320 | Category 2B | No | No | Yes | No |
| NetSuite | BetterCloud | Altitude 2021 Altitude Sizzle Cutdowns | 004929 | MoneyLion_02043878 | Category 2B | Yes | No | No | No |
| NetSuite | BiOptimizers | BiOptimizers - Heal Thy Self | 004134 | MoneyLion_02042908 | Category 2B | No | Yes | No | No |
| NetSuite | BiOptimizers | Heal Thy Self Bioptimizers Renewal Q3 Sponsorship | 006655 | MoneyLion_02045206 | Category 2A | No | Yes | No | No |
| NetSuite | Birch Living | Heal Thy Self - 6 Month Flight (Oct 21-Dec 22) | 004874 | MoneyLion_02044339 | Category 2B | No | No | Yes | No |
| NetSuite | Butterfly Network Inc | Vet + Logic & Black Friday Production | 004849 | MoneyLion_02039489 | Category 2B | No | Yes | No | No |
| NetSuite | Butterfly Network Inc | Vet + Logic & Black Friday Production Vet + Logic & Black Friday Production | 004971 | MoneyLion_02039502 | Category 3 | No | Yes | No | No |
| NetSuite | Bytedance (TikTok) | TikTok Global All Hands Conference November 2022 | 006000 | MoneyLion_02039837 | Category 1 | No | No | Yes | No |
| NetSuite | Cadence13 | Feature-Length Podcast 'Treat' Marketing Materials | 004828 | MoneyLion_02039366 | Category 1 | No | No | Yes | No |
| NetSuite | CBS Interactive | CBS Morning Kombat Season 3 | 004808 | MoneyLion_02045622 | Category 2B | No | Yes | No | No |
| NetSuite | Cognizant | Intuition Engineered Campaign | 003779 | MoneyLion_02042988 | Category 2B | No | No | Yes | No |
| NetSuite | Cognizant | Intuition Engineered Teach for America Video | 004027 | MoneyLion_02043192 | Category 2A | No | Yes | No | No |
| NetSuite | Cytokinetics, Inc. | Display Wall Experience | 004694 | MoneyLion_02044244 | Category 2B | No | No | Yes | No |
| NetSuite | Cytokinetics, Inc. | HCM Documentary | 002655 | MoneyLion_02042344 | Category 2B | No | No | Yes | No |
| NetSuite | Dan O'Brien Automotive Group | 2021 Dan O'Brien Production | 003521 | MoneyLion_02042551 | Category 2B | No | No | Yes | No |
| NetSuite | Dan O'Brien Automotive Group | 2021-2022 Dan O'Brien Production Retainer | 005501 | MoneyLion_02044458 | Category 2B | No | Yes | No | No |
| NetSuite | Diageo | KG Certified Diageo/Crown Royal Moments of Generosity Sponsorship | 006096 | MoneyLion_02039785 | Category 2B | No | No | Yes | No |
| NetSuite | DraftKings | Q4 2021DraftKings - Called Game IO | 005298 | MoneyLion_02039477 | Category 2B | No | No | Yes | No |
| NetSuite | Ernst & Young | EY Microsoft Alliance Video | 005030 | MoneyLion_02044751 | Category 2A | No | No | No | Yes |
| NetSuite | Ernst & Young | Luminaries Video Series | 004920 | MoneyLion_02043703 | Category 1 | No | No | Yes | No |
| NetSuite | Glamorise Foundations Inc | Glamorise - Amazon OTT Videos | 003416 | MoneyLion_02042425 | Category 1 | No | No | Yes | No |
| NetSuite | Glosslab | Marketing Materials 2021Retainer | 003644 | MoneyLion_02042606 | Category 2B | No | No | Yes | No |
| NetSuite | H&M | CEO Introductory Video | 003408 | MoneyLion_02042466 | Category 2A | No | Yes | No | No |
| NetSuite | H&M | Evolving in the Workplace Shoot | 005015 | MoneyLion_02039313 | Category 2A | Yes | No | No | No |
| NetSuite | H&M | Robbinsville NJ Plant Shoot | 003976 | MoneyLion_02039289 | Category 1 | Yes | No | No | No |
| NetSuite | Hillview Medical, Inc | Kalo Monthly Retainers | 002935 | MoneyLion_02042246 | Category 2B | No | No | Yes | No |
| NetSuite | IBM Corporation | Mayflower Docuseries 2021 Episodes | 003522 | MoneyLion_02042613 | Category 2B | No | Yes | No | No |
| NetSuite | IBM Corporation | Quantum Animation Bundle | 004239 | MoneyLion_02043032 | Category 1 | No | No | Yes | No |
| NetSuite | IBM Corporation | Quantum Computing Case Study Video Series | 003383 | MoneyLion_02043366 | Category 2B | No | No | Yes | No |
| NetSuite | IBM Corporation | Quantum Virtual Event | 004777 | MoneyLion_02044337 | Category 2B | No | Yes | No | No |
| NetSuite | IBM Corporation | Quantum Virtual Event Additional Asset Production | 004865 | MoneyLion_02042401 | Category 2A | No | Yes | No | No |
| NetSuite | IBM Corporation | Quantum Virtual Event Post Production | 004866 | MoneyLion_02043930 | Category 2A | No | Yes | No | No |
| NetSuite | KPMG LLP | CFO Program | 003429 | MoneyLion_02043849 | Category 2A | No | Yes | No | No |
| NetSuite | KPMG LLP | Content Marketing Playbook | 003272 | MoneyLion_02042178 | Category 2B | No | No | Yes | No |
| NetSuite | KPMG LLP | Customer Advisory Awareness Campaign | 003224 | MoneyLion_02042507 | Category 3 | No | No | Yes | No |
| NetSuite | KPMG LLP | Customer Experience Site Framework | 004437 | MoneyLion_02043901 | Category 3 | No | No | Yes | No |
| NetSuite | KPMG LLP | Customer Solutions Visual Identity | 003367 | MoneyLion_02042529 | Category 3 | No | No | Yes | No |
| NetSuite | KPMG LLP | DAS CEO Circuit Pilot Creative | 004667 | MoneyLion_02044022 | Category 3 | No | No | Yes | No |
| NetSuite | KPMG LLP | DAS M&A TMT Trends Template | 004821 | MoneyLion_02043891 | Category 3 | No | No | Yes | No |
| NetSuite | KPMG LLP | Data and Analytics FY21 Theme Infusion | 003589 | MoneyLion_02042481 | Category 3 | No | Yes | No | No |

Exhibit C - Dudney's September 2021 YTD Adjustments

| Database | Name | Project Name | Job ID | Document Number | Non-Cancellable Deposits | Billing Types | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Category A | Category B | Category C | Category D |
| NetSuite | KPMG LLP | Data and Analytics FY21 Theme Infusion Monthly Promotional Asset Optimization | 003830 | MoneyLion_02042535 | Category 3 | No | Yes | No | No |
| NetSuite | KPMG LLP | Data and Analytics FY21 Theme Infusion Remaining CFO Exploration | 003829 | MoneyLion_02042128 | Category 3 | No | No | Yes | No |
| NetSuite | KPMG LLP | Spectrum Marketing | 003834 | MoneyLion_02043512 | Category 3 | No | Yes | No | No |
| NetSuite | KPMG LLP | Tax ReImagined Campaign Refresh | 003310 | MoneyLion_02042060 | Category 3 | No | Yes | No | No |
| NetSuite | KPMG LLP | Tax ReImagined Final Renderings | 004347 | MoneyLion_02043740 | Category 2B | No | Yes | No | No |
| NetSuite | KPMG LLP | US Cross-Border Tax Conference | 003492 | MoneyLion_02043426 | Category 3 | No | Yes | No | No |
| NetSuite | KPMG LLP | US Cross-Border Tax Conference Production | 004153 | MoneyLion_02042235 | Category 3 | No | Yes | No | No |
| NetSuite | Labcorp | Fireside Chat Videos Series - Post | 004502 | MoneyLion_02044189 | Category 2B | No | Yes | No | No |
| NetSuite | Life House | Hotel Management Animated Product Demo Video | 004774 | MoneyLion_02039528 | Category 1 | No | No | Yes | No |
| NetSuite | LifeAid | Find Your Fit | 003709 | MoneyLion_02042698 | Category 1 | No | No | Yes | No |
| NetSuite | LifeAid | LifeAid 2021 Retainer | 004165 | MoneyLion_02043062 | Category 2B | No | Yes | No | No |
| NetSuite | Luxottica Group NA | MVC Sales Training Edit | 003972 | MoneyLion_02039044 | Category 2A | Yes | No | No | No |
| NetSuite | Luxottica Group NA | Q3 2021 Ops Force Town Hall | 004435 | MoneyLion_02039106 | Category 2A | Yes | No | No | No |
| NetSuite | Luxottica Group NA | Quarterly Recap Vids | 004269 | MoneyLion_02039128 | Category 2B | Yes | No | No | No |
| NetSuite | Luxottica Group NA | Retail/ Mason Town Hall (Sep) | 004830 | MoneyLion_02039155 | Category 2B | Yes | No | No | No |
| NetSuite | Luxottica Group NA | Wholesale Retainer Q1 2021 | 003407 | MoneyLion_02039118 | Category 2A | Yes | No | No | No |
| NetSuite | Manscaped, LLC | Manscaped - Calabassas 8/28 Fight Companion | 004799 | MoneyLion_02044129 | Category 2B | No | No | Yes | No |
| NetSuite | Manscaped, LLC | Manscaped - Calabassas Fight Companion (Oct to Dec Flight) | 005358 | MoneyLion_02043726 | Category 2B | No | No | Yes | No |
| NetSuite | Manscaped, LLC | Manscaped - Hotboxin' | 004549 | MoneyLion_02044134 | Category 2B | No | No | Yes | No |
| NetSuite | Manscaped, LLC | Manscaped - Weighing IN | 005081 | MoneyLion_02044202 | Category 2B | No | No | Yes | No |
| NetSuite | Manscaped, LLC | Manscaped All The Smoke Jan 2022 to July 2022 Flight | 005602 | MoneyLion_02042592 | Category 2A | No | No | Yes | No |
| NetSuite | Moneylion | IPO July 2021 Brand Video | 004503 | MoneyLion_02043415 | Category 1 | Yes | No | No | No |
| NetSuite | Moneylion | January Season | 003519 | MoneyLion_02042721 | Category 1 | No | No | Yes | No |
| NetSuite | Moneylion | MoneyLion 1H 2021 Retainer | 003656 | MoneyLion_02042113 | Category 1 | No | No | Yes | No |
| NetSuite | Moneylion | Moneylion Crypto Launch | 004706 | MoneyLion_02043731 | Category 2B | No | Yes | No | No |
| NetSuite | Moneylion | MoneyLion Unwaxed Custom Segment | 005718 | MoneyLion_02044851 | Category 2B | No | Yes | No | No |
| NetSuite | MongoDB Inc. | Mongo DB DWP Digital | 003336 | MoneyLion_02042497 | Category 2B | No | Yes | No | No |
| NetSuite | MongoDB Inc. | Mongo DB LDP Courses | 003422 | MoneyLion_02042679 | Category 2B | No | Yes | No | No |
| NetSuite | Morgan Stanley | Animated Infographic - Digital Footprint | 004451 | MoneyLion_02044276 | Category 2B | Yes | No | No | No |
| NetSuite | Morgan Stanley | BAU-Cybersecurity-Production-2021 | 003782 | MoneyLion_02042343 | Category 2B | No | Yes | No | No |
| NetSuite | Morgan Stanley | Firmwide Hero Video | 004688 | MoneyLion_02045146 | Category 2B | No | Yes | No | No |
| NetSuite | Morgan Stanley | Morgan Stanley Wealth Management Production | 003807 | MoneyLion_02043469 | Category 2B | No | No | Yes | No |
| NetSuite | Morgan Stanley | Morgan Stanley Women Without Limits | 003798 | MoneyLion_02043621 | Category 2B | No | Yes | No | No |
| NetSuite | MyBookie (Parle Media) | 2020 MyBookie Sponsorship | 003903 | MoneyLion_02042562 | Category 1 | No | No | Yes | No |
| NetSuite | National Society of Leadership & Success | New Foundations of Leadership Content | 003836 | MoneyLion_02043105 | Category 1 | No | No | Yes | No |
| NetSuite | Ned | Ned - Heal Thy Self | 004130 | MoneyLion_02042242 | Category 2A | No | No | Yes | No |
| NetSuite | NESN | Double Coverage - Licensing Fees | 003581 | MoneyLion_02042273 | Category 2B | No | No | Yes | No |
| NetSuite | Ogilvy & Mather | Corteva Argiscience Farm Doc Episode 5 | 004872 | MoneyLion_02039516 | Category 3 | No | Yes | No | No |
| NetSuite | Only One | Cop 26 Video | 004768 | MoneyLion_02039553 | Category 3 | No | Yes | No | No |
| NetSuite | Organifi | Organifi x Auaction AF | 004662 | MoneyLion_02043961 | Category 2B | No | No | Yes | No |
| NetSuite | PandoLogic | Additional Slide Design Work | 004033 | MoneyLion_02043611 | Category 2B | No | Yes | No | No |
| NetSuite | PandoLogic | Product Explainer Video | 003640 | MoneyLion_02045179 | Category 2A | Yes | No | No | No |
| NetSuite | Penn National Gaming | Barstool Q2 & Q3 2021 Retainer | 004144 | MoneyLion_02043359 | Category 1 | Yes | No | No | No |
| NetSuite | Purity Coffee | Purity Coffee - Heal Thy Self | 004088 | MoneyLion_02043226 | Category 1 | No | No | Yes | No |
| NetSuite | Roman Health Medical | Roman - All The Smoke | 004700 | MoneyLion_02039453 | Category 2B | No | Yes | No | No |
| NetSuite | Rutgers, The State University of New Jersey | RBS Hero Videos | 004028 | MoneyLion_02043061 | Category 2B | No | Yes | No | No |
| NetSuite | Showtime Networks | All the Smoke ATS Podcast All the Smoke Podcast Season 3 | 004791 | MoneyLion_02043744 | Category 2B | No | Yes | No | No |
| NetSuite | Showtime Networks | All the Smoke ATS Podcast All the Smoke Podcast Season 3 BEST OF ALL THE SMOKE - ICONS | 004912 | MoneyLion_02043855 | Category 2B | No | Yes | No | No |
| NetSuite | Showtime Networks | KG Certified | Podcast | Kevin Garnett | 002791 | MoneyLion_02044690 | Category 2B | No | Yes | No | No |

**Exhibit C - Dudney's September 2021 YTD Adjustments**

| Database | Name | Project Name | Job ID | Document Number | Non-Cancellable Deposits | Billing Types | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Category A | Category B | Category C | Category D |
| NetSuite | Showtime Networks | Morning Kombat Morning Kombat Season 3 | 004811 | MoneyLion 02046360 | Category 2B | No | Yes | No | No |
| NetSuite | Showtime Networks | Morning Kombat Seasons 1-2 2021 New MK Set | 003828 | MoneyLion 02044450 | Category 2B | No | Yes | No | No |
| NetSuite | Showtime Networks : Bellator | Bellator Bellator 263 | Pitbull vs. McKee | July 31, 2021 | 004438 | MoneyLion 012043511 | Category 2B | No | Yes | No | No |
| NetSuite | SLUGGER Creative | Thermo Fisher 3D Animation Posts | 004132 | MoneyLion 02039490 | Category 2A | No | Yes | No | No |
| NetSuite | Small Girls PR | Olay Sizzle Reel | 004300 | MoneyLion 01776433 | Category 2A | No | Yes | No | No |
| NetSuite | SoHo Experiential | Citi Porterhouse Virtual Event | 004061 | MoneyLion 02043374 | Category 2A | No | Yes | No | No |
| NetSuite | Sotheby's International Realty Inc | Auction House Wine Videos | 004711 | MoneyLion 02043491 | Category 2B | No | Yes | No | No |
| NetSuite | Sotheby's International Realty Inc | Holiday Cooking Event | 004831 | MoneyLion 02043648 | Category 2B | No | Yes | No | No |
| NetSuite | Sotheby's International Realty Inc : RealVitalize | RealVitalize RealVitalize Renovation Testimonials - Bridgewater | 004564 | MoneyLion 02043026 | Category 2B | No | No | Yes | No |
| NetSuite | Sports Business Radio | Boingo Sponsorship | 004102 | MoneyLion 02045024 | Category 2B | No | No | Yes | No |
| NetSuite | TBWA\WorldHealth | Lynparza VO & Animation Re-Record | 004054 | MoneyLion 02042891 | Category 2B | No | No | No | Yes |
| NetSuite | The Fighter and The Kid | TFATK Monthly Rent | 003531 | MoneyLion 02042431 | Category 2B | No | No | Yes | No |
| NetSuite | The Sway Effect | Sizzle Reel 2021 | 003824 | MoneyLion 02043807 | Category 1 | No | No | Yes | No |
| NetSuite | Thiccc Boy Network | Calabasas Fight Companion | 004736 | MoneyLion 02043647 | Category 2B | No | Yes | No | No |
| NetSuite | Unionwear | Unionwear Made in America Sales Enablement Video | 004263 | MoneyLion 02039480 | Category 2A | No | Yes | No | No |
| NetSuite | Washington Post Co | Rolex Sizzle Reel | 002535 | MoneyLion 02042683 | Category 2A | No | Yes | No | No |
| NetSuite | WeWork | Territory Marketing Center of Excellence | 003191 | MoneyLion 02042569 | Category 2B | No | No | Yes | No |
| NetSuite | WeWork | Territory Marketing Q2 COE 2021 | 004149 | MoneyLion 02043788 | Category 2B | No | Yes | No | No |
| NetSuite | WeWork | WeWork Office Product Video Set | 003809 | MoneyLion 02044722 | Category 1 | Yes | No | No | No |
| NetSuite | WildType | Merck Keytruda CRC Narratives Videos | 004922 | MoneyLion 02044292 | Category 2B | No | No | No | Yes |
| NetSuite | Women's Alzheimers Movement | WAM November Summit 2021 | 005034 | MoneyLion 02043897 | Category 2A | No | Yes | No | No |
| NetSuite | Yahoo | ITK Bowl 2021 | 003319 | MoneyLion 02042541 | Category 2B | Yes | No | No | No |
| QuickBooks | ADP -:[3217] ADP Workforce Now | - | | MoneyLion 02078666 | Category 2B | No | No | Yes | No |
| QuickBooks | ADP -:[3236] ADP Service Messaging - Sizzle | - | | MoneyLion 02078654 | Category 2B | No | No | Yes | No |
| QuickBooks | ADP -:[3403] ADP Sizzle Reel Strategic Migration | - | | MoneyLion 02078676 | Category 2B | No | No | Yes | No |
| QuickBooks | Amazon.com Services, Inc.:[3237] 2020/2021 Creative Content Production | - | | MoneyLion 02078744 | Category 1 | No | No | Yes | No |
| QuickBooks | WeWork Management LLC:[3191] Territory Marketing Center of Excellence | - | | MoneyLion 02078819 | Category 2B | No | No | Yes | No |