**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED AND PAT CAPRA**,**

                            Plaintiffs,

*- against –*

MONEYLION TECHNOLOGIES INC. AND
CONTINENTAL STOCK TRANSFER & TRUST
COMPANY,

                            Defendants,

MONEYLION TECHNOLOGIES INC.**,**

                     Counterclaim Plaintiff,

*- against –*

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

                    Counterclaim Defendants,

MONEYLION INC.,

                     Third-Party Plaintiff,

*- against –*

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

                    Third Party Defendants.

**Case No. 1:23-cv-06339-JMF**

---

## **TRIAL AFFIDAVIT OF PROFESSOR PAUL A. GOMPERS, PH.D.**[1]

Professor Paul A. Gompers, Ph.D. being duly sworn, deposes and states:

---

[1] Cited herein are true and correct copies of written communications and their attachments, sent or received by me on or about the dates indicated in the documents.

MoneyLion's Exhibit
No. 1:23-cv-06339-JMF
DX-596

1.      My name is Paul A. Gompers. I am the damages expert for MoneyLion Inc. and its wholly owned subsidiary, MoneyLion Technologies Inc. (together, "MoneyLion").

2.      This affidavit serves as my direct testimony at trial in the case referenced above.

## I.      SUMMARY OF OPINIONS

3.      I have been retained by counsel for MoneyLion ("Counsel").  Based on my professional experience and on the analyses described below, I have arrived at the following two opinions:

4.      **Opinion 1**: As a result of the misrepresentations made by Jeffrey Frommer, Lyusen (Louis) Krubich, Daniel Fried, and Pat Capra (the "Sellers") alleged by MoneyLion, I estimate that MoneyLion suffered $27.2 million in damages.

5.      **Opinion 2**: The opinions of Sellers' rebuttal expert, Bruce B. Bingham, are based on groundless assumptions and unsupported analyses and, as a result, have no impact on my damages analysis.

## II.      QUALIFICATIONS

6.      I am the Eugene Holman Professor of Business Administration and Chair of the Elective Curriculum at Harvard Business School, where I teach courses and conduct research in corporate finance, company structure and governance, company valuation, private equity and venture capital, and institutional investor behavior.  Prior to joining the faculty of Harvard Business School, I was a faculty member at The University of Chicago Booth School of Business, where I taught entrepreneurial finance.  I received a Bachelor of Arts in Biology from Harvard College in 1987, a Master of Science in Economics from Oxford University in 1989, and a Doctor of Philosophy in Business Economics from Harvard University in 1993.

**DX-596.002**

7.      In my career as an academic, I have written many case studies and technical notes and published numerous articles in peer-reviewed finance and economics journals on the venture capital and private equity industries and entrepreneurial finance, among other topics.  I am the author or co-author of several books:  *The Venture Capital Cycle* (editions 1 and 2), published by MIT Press; *The Money of Invention: How Venture Capital Creates New Wealth*, published by Harvard Business School Press; *Entrepreneurial Finance: A Casebook*, published by John Wiley Press; *Private Equity: A Casebook*, published by Anthem Press; *Private Equity*, published by Edward Elgar Publishing; and *Financing the Entrepreneurial Venture*, published by Anthem Press.

8.      I have been an Associate Editor of the *Journal of Finance*, *Journal of Economic Literature*, *Small Business Economics*, and *Journal of Private Equity*, as well as a referee for several academic journals, including the *Journal of Financial Economics*, *Journal of Political Economy*, *Quarterly Journal of Economics*, and *Review of Financial Studies*.

9.      I have served as an expert in several legal matters.  In these matters, I have opined on the customs and practices of private equity and venture capital organizations, economic damages, the valuation of public and private companies, and the terms and conditions of employment agreements at privately held firms, among other things.

10.      I have served on the boards of directors of several privately held companies, including ZEFER, Mercanteo, and OnTheFrontier.com.  I have also been on the boards of directors or advisory boards of several venture capital and private equity companies, including New Capital Partners, Onpoint Technology Ventures, Khosla Ventures, Highland Capital Consumer Fund, Knightsbridge Investment Advisers, Spur Capital Partners, Evergreen Partners, Team8 Ventures, and Gemini Venture Capital.  In addition, I have advised numerous companies

**DX-596.003**

(including private equity and venture-capital-financed companies) on fundraising, future projections, and valuation. In addition, I serve on the board of Spur Capital Partners, which invests in venture capital funds, and on the board of Beth Israel Deaconess Hospital.

## III.    BACKGROUND

11.    In order to estimate damages, I relied on and incorporated the opinions of MoneyLion's accounting expert, Mr. Louis Dudney. Mr. Dudney opines that Sellers overstated the pre-Transaction revenues and earnings before interest, taxes, depreciation, and amortization ("EBITDA") (a measure of a company's operating profitability) of Malka Media Group LLC (together with its subsidiary Malka Sports LLC, "Malka") because of Sellers' failure to comply with U.S. Generally Accepted Accounting Principles ("GAAP"). Mr. Dudney finds that if Malka's revenue recognition had followed GAAP, (i) Malka's EBITDA would have been lower, (ii) Malka's EBITDA would have declined year-over-year from 2019 to 2021, turning negative in 2021, and (iii) Malka's revenue growth from 2019 to 2021 would have been lower.

12.    In order to estimate damages, I was instructed to assume that Sellers' alleged accounting misrepresentations and omissions regarding the financial performance and accounting practices of Malka ("Alleged Misrepresentations"), which Sellers allegedly made to induce MoneyLion to purchase Malka pursuant to a Membership Interest Purchase Agreement (the "MIPA") on November 15, 2021 (the "Transaction"), will be proven.

13.    I have also been instructed to assume that Malka's projected profit margins and revenue figures would have been significantly lower if Sellers had not made the Alleged Misrepresentations. I verified this assumption by speaking with MoneyLion's Chief Financial Officer ("CFO"), Richard Correia. Mr. Correia confirmed that had Sellers' Alleged Misrepresentations not occurred, Malka's projected revenues and EBITDA would have been

lower. Specifically, he stated that based on his knowledge of Malka's business at the time of the Transaction, had the true extent of the Alleged Misrepresentations been known before the Transaction (i.e., that it had downward trending and negative profitability), the expected long-term EBITDA margin of Malka would have been substantially reduced. Mr. Correia also informed me that, as a result of that significant decrease, had he known about Sellers' Alleged Misrepresentations, MoneyLion most likely would not have proceeded with the Transaction.

14.    Based on my professional experience and my analyses, it is my opinion that the reduction in Malka's projected profit margins and revenue growth, attributed to removing the effect of Sellers' Alleged Misrepresentations, would reduce (1) Malka's value at the time of the Transaction, and (2) the likelihood that Malka could meet the post-Transaction financial targets necessary to earn the contingent consideration that MoneyLion agreed to make available to Malka at the time of the Transaction (the "Earnout Payments"). As a result, estimated damages to MoneyLion would be partly offset by a reduction in the value of the expected Earnout Payments.

15.    The difference between the reduction in the estimated value of Malka and the reduction in the value of the expected Earnout Payments represents the economic damages suffered by MoneyLion.

## IV.    OPINION 1: MONEYLION SUFFERED $27.2 MILLION IN DAMAGES

16.    It is my opinion that, as a result of Sellers' Alleged Misrepresentations, MoneyLion suffered damages amounting to $27.2 million.

### A.    *Background*

17.    To form my opinion on damages owed to MoneyLion, I first calculated the difference between the estimated value of Malka in two scenarios: (1) the "actual world"

**DX-596.005**

scenario, in which I estimated the value of Malka based on its expected performance at the time of the Transaction without correcting for the effect of Sellers' Alleged Misrepresentations on Malka's value, and (2) the "but for" scenario, in which I estimated the value of Malka if Sellers had never made the Alleged Misrepresentations and MoneyLion had been aware of Malka's true financial performance at the time of the Transaction. This difference captures the reduction in Malka's value caused by Sellers' Alleged Misrepresentations.

18.    I also calculated the difference between the estimated value of the Earnout Payments in both the "actual world" and "but for" scenarios. In order for Sellers to achieve each of the Earnout Payments, they had to satisfy specific revenue and EBITDA targets for 2021 and 2022. Because Sellers would be less likely to meet those financial thresholds in the "but for" scenario, where I assume that MoneyLion is aware of the Alleged Misrepresentations, the value of the Earnout Payments in the "but for" scenario is lower than in the "actual world" scenario.

19.    Thus, economic damages to MoneyLion are equal to the value of Malka in the "actual world" scenario minus the value of Malka in the "but for" scenario, offset by the reduced value of the Earnout Payments in the "but for" scenario.

**B.    *Performing a Valuation Using a Discounted Cash Flow ("DCF") Analysis***

20.    One of the central tenets of modern finance as reflected in the academic literature is that the value of a company is equal to the discounted value of its expected cash flows. Determining the value of a company at a given point in time thus requires estimating the present value of the expected future cash flows earned by a company.[2]

---

[2] Damodaran, Aswath, Damodaran on Valuation: Security Analysis for Investment and Corporate Finance, 2nd ed., Wiley, 2006, pp. 117. ("To value an asset, we have to forecast the expected cash flows over its life."), 457–458 ("[T]he value of any asset is a function of the cash flows generated by that asset, the life of the asset, the expected growth in the cash flows, and the risk associated with the cash flows. If we view a firm as a collection of assets, this approach can be extended to value a firm, using cash flows to the firm over its life and a discount rate that reflects the collective risk of the firm's assets.").

21.    The most widely accepted valuation approach is called a discounted cash flow valuation model, or "DCF".[3]  When appropriate inputs are used and the analysis is executed properly, the DCF model is often considered "the gold standard of valuation."[4]  In my analysis below, I value Malka using the DCF approach.

22.    In order to estimate a company's value, a DCF approach involves projecting expected free cash flows ("FCFs") earned by the company—cash flows that the company has available to pay interest and dividends to its debt and equity investors—and adjusting (or "discounting") them for their risk and the time-value of money.[5]  The appropriate risk-adjusted discount rate to discount a company's expected FCFs is known as the company's cost of capital or Weighted Average Cost of Capital ("WACC").[6]

23.    The opinions of Sellers' rebuttal damages expert, Bruce B. Bingham, do not change my decision to value Malka using a DCF approach.  In particular, I find unavailing Mr. Bingham's suggestion that I use a Market Approach—also known as a multiples-based analysis—alongside a DCF approach.

24.    A multiples-based analysis, which would rely on applying multiples, or ratios, to Malka's historical or expected financial metrics (such as revenue or EBITDA) to calculate its value, would not be informative for the purpose of estimating damages in this matter.  First,

---

[3] McKinsey & Company, Valuation, Measuring and Managing the Value of Companies, 6th ed., Wiley, 2015, p. 17 ("In its purest form, value is the sum of the present values of futures expected cash flows."); Damodaran, Aswath, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset, 3rd ed., Wiley, 2012, p. 11.

[4] Metrick, Andrew, and Ayako Yasuda, Venture Capital & the Finance of Innovation, 3rd ed., Wiley, 2021, p. 169.

[5] The cash flow estimates used should represent the expected cash flows, not the highest or lowest estimates of potential future outcomes.

[6] See, e.g., McKinsey & Company, Valuation, Measuring and Managing the Value of Companies, 6th ed., Wiley, 2015, p. 30 ("Weighted average cost of capital (WACC) is the rate of return that investors expect to earn from investing in the company and therefore the appropriate discount rate for the free cash flow").

revenue multiples are ill-suited for capturing the impact of the allegations at issue here, because the Alleged Misrepresentations have the same dollar impact on both revenue and EBITDA. This means that even if Malka's revenue needed to be corrected by just a moderate percentage due to the Alleged Misrepresentations, its EBITDA would be subject to a much larger percentage impact because of Malka's thin profit margin. Thus, in this case, a revenue-based multiples approach cannot reliably account for the Alleged Misrepresentations' potentially larger, more negative impact on Malka's profitability.[7] Second, EBITDA multiples cannot be applied to EBITDA projections that are negative, as was the case for Malka, because that would suggest a negative value for the company.

C. *Under a DCF Approach, and Assuming the Alleged Misrepresentations were Unknown, Malka's Estimated Value as of the Transaction Date was $60.5 Million*

25. To estimate damages, I first estimate the value of Malka using the DCF approach as of the Transaction Date in the "actual world" by calculating Malka's (i) expected future FCFs and (ii) WACC.

26. To calculate Malka's expected future FCFs, I used projections for Malka's future financial performance provided by Malka's management (the "Malka Projections") that were used in the March 15, 2022 valuation report (the "CFGI Report")[8] prepared by CFGI, LLC ("CFGI"), an accounting and business advisory firm retained by MoneyLion to conduct a fair

_____

[7] I understand that the multiples-based approach was used by MoneyLion in the context of assessing Malka's value prior to the Transaction. See, e.g., DX035 at MoneyLion_01152723; DX528 at MoneyLion_01847153. In this section, I am addressing the reliability of using the multiples-based approach to value Malka for the purposes of estimating damages, which requires accounting for the effect of the Alleged Misrepresentations. While I find that a multiples-based analysis is uninformative for the purposes of my damages analysis, I am not suggesting that it would be inappropriate to value Malka using the multiples-based approach absent the Alleged Misrepresentations.

value analysis of certain assets acquired and liabilities assumed in connection with the Transaction.

27.     I find the projections contained in the CFGI Report to be the most relevant for the purposes of this valuation exercise for several reasons. First, the analyses in the CFGI Report were performed as of the Transaction Date and therefore reflect information that would have been known at that time. Second, the Malka Projections were ultimately used in the preparation of MoneyLion's audited financial statements as an input to value certain intangible assets and to estimate the value of the Earnout Payments at the time of the Transaction.[8] Third, the Malka Projections in the CFGI Report include all items that are needed to estimate FCFs.[10] I note that the Malka Projections match the EBITDA and Revenue projections in the MIPA for the years in which the two sources overlap, with the Malka Projections extending past the projections in the MIPA through the year 2027.[11]

28.     Instead of using the Malka Projections in the CFGI Report, Mr. Bingham starts from the revenue and EBITDA projections for 2021 and 2022 in the MIPA and makes a number

---

[8] JX081 at MoneyLion_01824593 (Supplemental 1 of the CFGI Report). I understand that CFGI was also retained to conduct a financial due diligence of Malka prior to the completion of the Transaction. See JX016 at MoneyLion_01812976 (CFGI's October 5, 2021 "Project Queen: Financial and Tax Due Diligence Report").

[9] The estimated value of the 2021 and 2022 Earnout Payments of $11.8 million calculated in the CFGI Report (JX081 at MoneyLion_01824565–66) appears in MoneyLion Inc. Form 10-K for the Fiscal Year Ended December 31, 2021, Filed on March 17, 2022 ("MoneyLion's 2021 10-K"). See DX204 at F-32. The estimated value of Malka's identified intangible assets of $17.8 million in the CFGI Report is consistent with the fair value listed in MoneyLion's 2021 10-K. See DX204 at F-33; see also JX081 at MoneyLion_01824592 (Exhibit 7 of the CFGI Report).

[10] The projections include estimates of revenues (net sales), EBITDA, depreciation, capital expenditures, and net working capital.

[11] See JX065 at DLA_006295–98 (Exhibit B of the MIPA); JX081 at MoneyLion_01824593 (Supplemental 1 of the CFGI Report). The Malka Projections include forecasts of Malka's financial performance only until 2027. After 2027, I use standard valuation approaches and assume that Malka's growth would decrease yearly until it reached its long-run growth rate of 2% (equal to the long-run expected inflation rate as of the Transaction Date) starting in 2031.

-9-

of assumptions about how Malka would be expected to perform in later years. There is no reason why Mr. Bingham—who has admitted that he is not an expert in Malka's industry—would be in a better position to project Malka's financials as of the date of the Transaction than Malka itself or CFGI, who was an independent party involved in Malka's due diligence that prepared the CFGI Report for the purposes of MoneyLion's financial reporting.

29.    Indeed, when available, contemporaneous, independent sources such as the CFGI Report offer a more reliable source for financial projections than Mr. Bingham's reliance on unsupported professional judgement. I thus use the Malka Projections from the CFGI Report, i.e., a contemporaneous, independent source, through 2027, as opposed to the subjective and unsupported assumptions for Malka's performance over this period that Mr. Bingham used.

30.    I estimate Malka's cost of capital by relying on the well-established Capital Asset Pricing Model ("CAPM") to estimate Malka's cost of equity.[12] This model is premised on the notion that investors require compensation for systematic risk only, which is risk that cannot be diversified away by investing in many different assets. The greater the systematic risk of the company, the higher the discount factor applied to future cash flows.[13] Systematic risk can be expressed quantitatively as "beta," which captures the sensitivity of an asset's returns to changes in systematic market factors.[14]

31.    Because Malka is not a publicly traded company, I cannot directly measure its historical beta. Instead, I estimate Malka's beta by analyzing publicly traded companies that are

---

[12] For a discussion of CAPM, see, e.g., Damodaran, Aswath, Damodaran on Valuation: Security Analysis for Investment and Corporate Finance, 2nd ed., Wiley, 2006, pp. 31–62.

[13] Risk that is specific to a firm, often called idiosyncratic or firm-specific risk, can be diversified away by investors making different investments, and thus investors do not require compensation for it.

[14] Brealey, Richard A., Stewart C. Myers, and Franklin Allen, Principles of Corporate Finance, 12th ed., McGraw-Hill Education, 2017, pp. 181–184.

comparable to Malka in terms of systematic risk.  To identify comparable firms, I rely on the "guideline public companies" selected by CFGI in the CFGI Report for use in "assess[ing] [Malka's] performance in comparison to the industry and to develop discount rates."[15]  The CFGI Report includes business descriptions for the guideline public companies identified as comparable to Malka.[16]  Based on my review of the guideline public companies' business descriptions and characteristics, the companies selected by CFGI appear to operate in a similar business sector as Malka.[17]  To account for the tendency of betas to revert in the long-run to the market beta of one, as documented in academic studies,[18] I applied a two-thirds weight to each estimated historical beta and a one-third weight to the market beta of 1.00 in order to estimate a forward looking beta.[19]  I use the median beta of these companies in my estimation of the discount rate to use in the valuation of Malka.

---

[15] The CFGI Report identifies the following guideline public companies:  Digital Media Solutions, Inc.; Dolphin Entertainment, Inc.; Entravision Communications Corporation; Townsquare Media, Inc.; and Troika Media Group, Inc.  I removed LiveWorld, Inc. and China Yanyuan Yuhui Natl Ed Group Inc. from my analysis, as they are not listed on national stock exchanges.  The CFGI Report describes the process for selecting the following guideline public companies as follows:  "The starting point for this research is the identification of the standard industry classification code ('SIC') or other classification to search for publicly-traded entities that operate in the same or similar industry.  Further refinement to the data set may be based upon geography, market capitalization, business description, sales volumes, assets size or other relevant characteristics.  Where possible, the entities selected represent companies shares in an actively traded market, similar to an ASC 820 criteria.  Comparability does contain a measure of subjectivity, which cannot be avoided, but provides a basis of comparison from an industry or market participant perspective."  See JX081 at MoneyLion_01824568 (CFGI Report), MoneyLion_01824594 (Supplemental 2A of the CFGI Report).

[16] I note that each of the guideline public companies' business descriptions indicate that their businesses are generally related to digital advertising or digital marketing, same as Malka.  See JX081 at MoneyLion_01824594 (Supplemental 2A of the CFGI Report).

[17] As noted above, I remove LiveWorld, Inc. and China Yanyuan Yuhui Natl Ed Group Inc. from my analysis, as these companies are not listed on national stock exchanges.

[18] The mean reversion tendency of betas over time is documented in the academic literature.  See Blume, M. E., "On the Assessment of Risk," The Journal of Finance 26, no. 1 (1971):  1–10, p. 10; Blume, M. E. (1975), "Betas and Their Regression Tendencies," The Journal of Finance 30, no. 3 (1975):  785–795, p. 794.

32.    To apply the CAPM model, I also need to estimate the risk-free rate and the equity risk premium, which is a measure of what investors require in terms of higher future expected returns on equities relative to a risk-free investment.[20]  For the risk-free rate, I use the yield of a 20-year U.S. Treasury bond, which was 2.05% on the Transaction Date, November 15, 2021.[21]  For the equity risk premium, based upon a review of academic literature and data provided by Kroll, which is a commonly used data source for this purpose, I conclude that an equity risk premium of 6.00% is appropriate.[22]  Combining these different components, I arrive at a discount rate of 6.99%.

33.    While Mr. Bingham claims that the discount rate I estimate is unreasonably low and opines that a much higher rate of 16.25% would have been more appropriate, this opinion is unfounded and flawed for several reasons.

---

[19] This adjustment method is consistent with Bloomberg's beta calculation methodology and is also supported by academic research.  See Klemkosky, R. C., and J. D. Martin, "The Adjustment of Beta Forecasts," The Journal of Finance 30, no. 4 (1975): 1123–1128, p. 1126.  Bloomberg's adjusted beta is "[a]n estimate of a security's future beta. [The] [a]djusted beta is derived from historical data, but [is] modified by the assumption that a security's beta moves toward the market average of one over time." See Bloomberg.  I also adjust the observed betas to account for the different levels of financial leverage of each firm.

[20] Damodaran, Aswath, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset, 3rd ed., Wiley, 2012, pp. 159–161.

[21] "Market Yield on U.S. Treasury Securities at 20-Year Constant Maturity, Quoted on an Investment Basis," FRED, available at https://fred.stlouisfed.org/series/DGS20.  See also Rosenbaum, Joshua, and Joshua Pearl, Investment Banking:  Valuation, Leveraged Buyouts, and Mergers & Acquisitions, Wiley, 2009, pp. 128–129 ("Investment banks may differ on accepted proxies for the appropriate risk-free rate, with some using the yield on the 10-year U.S. Treasury note and others preferring the yield on longer-term Treasuries.  The general goal is to use as long dated an instrument as possible to match the expected life of the company (assuming a going concern), but practical considerations also need to be taken into account ... Ibbotson Associates ('Ibbotson') uses an interpolated yield for a 20-year bond as the basis for the risk-free rate.").

[22] See e.g., Duff and Phelps, 2017 Valuation Handbook: Guide to Cost of Capital, Wiley, 2017, pp. 3-35–3-37; Kroll.  CFGI similarly used the supply-side long-horizon expected equity risk premium from Duff & Phelps' Cost of Capital Navigator, which was 6.0%.  See JX081 at MoneyLion_01824567 (CFGI Report).

34.     First, Mr. Bingham ignores the well-established distinction between systematic risk (i.e., the risk associated with market movements) and firm-specific risk (i.e., the risk that is specific to a firm) in his analysis.  He does so when he compares the discount rate that I estimate to the discount rate of large, listed companies in completely different industries.  Such a comparison is uninformative and reflects a lack of understanding of how a firm can both be risky due to high *firm-specific* risk (i.e., cash flows being volatile due to idiosyncratic reasons), but also have a low systematic risk and thus a low discount rate.[23]

35.     Second, Mr. Bingham selects key inputs based on his subjective professional judgment and relies on a model that is not supported by peer-reviewed literature in financial economics.[24]  In contrast, I apply a scientific methodology to estimate a discount rate based on well-accepted financial economic principles and clear, replicable steps.

36.     Finally, Mr. Bingham fails to acknowledge the 25% liquidity discount that I apply in my analysis[25] and also does not address that the discount rate calculated by CFGI for Malka is much closer to my estimate than his.

37.     Using the projected expected FCFs and the discount rate discussed above, I estimate Malka's value to be $60.5 million as of the Transaction Date, absent knowledge of Sellers' Alleged Misrepresentations.[26]

---

[23] There are many firms and investments that can have very large idiosyncratic risk, as their cash flows are highly uncertain, but relatively low systematic risk.  For instance, a bio-tech firm for which its success is entirely dependent on the results of a clinical trial may have a relatively low level of systematic risk (and thus a low discount rate), even if its firm-specific risk is very high.

[24] See discussion below in **Section V.A.2**.

[25] As a privately held firm, Malka is subject to greater liquidity risk, which is the risk associated with the ease with which its shares can be sold compared to the shares of a large publicly traded company.

[26] The value of Malka also accounts for its excess cash (i.e., cash not required for operations), which I obtain from the CFGI Report.

**D.    *The Expected Impact of the Alleged Misrepresentations Reduces Malka's Estimated Value from $60.5 Million to $20.1 Million***

38.    For my analysis, I rely on Mr. Dudney's opinions for adjusting Malka's revenue and EBITDA to account for the effect of the Alleged Misrepresentations.  These adjustments are shown in **Figure 1** below.

---

# Figure 1

*Calculation of reduced revenues and EBITDA from Dudney Report, 2019–2021, $ in thousands*

| Date | Revenues | | | EBITDA | | | EBITDA Margins | |
|---|---|---|---|---|---|---|---|---|
| | Original | Adjustment | Adjusted | Original | Adjustment | Adjusted | Original | Adjusted |
| 2019 | $13,621 | ($31) | $13,591 | $655 | ($31) | $624 | 4.8% | 4.6% |
| 2020 | $16,983 | ($655) | $16,328 | $1,005 | ($655) | $350 | 5.9% | 2.1% |
| 2021 Q1–Q3 | $19,484 | ($959) | $18,526 | ($1,065) | ($959) | ($2,024) | -5.5% | -10.9% |

39.    Incorporating Mr. Dudney's adjustments results in both a declining EBITDA and EBITDA margin from 2019 to Q1–Q3 2021.  In fact, after adjustments, the EBITDA margin declined from 4.6% in 2019 to *negative 10.9%* over the first three quarters of 2021.  From an economic perspective, this deteriorating profitability leading up to the Transaction calls into question Malka's projected steadily growing EBITDA margins from 2022 onwards, which turn positive in 2022 and reach 10% in 2027.

40.    I understand from Mr. Correia, MoneyLion's CFO, that had MoneyLion known about the Alleged Misrepresentations, his expectations of Malka's future revenue growth and profitability would both have been reduced.  Specifically, according to my September 19, 2024

interview with Mr. Correia, he stated that based on his knowledge of Malka's business prospects at the time of the Transaction, had the true extent of the Alleged Misrepresentations been known before the Transaction, the expected long-term EBITDA margin of Malka would be highly unlikely to be greater than 4.6%, the highest historical EBITDA margin Malka achieved over the 2019–2021 Q3 period after incorporating Mr. Dudney's adjustments.

41.    My estimation of damages is based on the assumption provided to me by Counsel that, in the "but for" scenario, Malka's revenue trajectory would have been projected to be the same, but its long-run EBITDA margin would be 4.6%.[27] I note that the academic literature has documented the potentially large impact of accounting misrepresentations on a company's value, in particular with regard to intentional accounting misstatements and misstatements that affect core earnings, such as those related to revenue recognition, similar to the Alleged Misrepresentations.[28] It is not surprising that earnings are often the most value-relevant accounting item, given the importance of earnings to forecast future cash flows, which is a critical input in a DCF analysis.

42.    Relying on these representations and assumptions, I adjusted the Malka Projections to incorporate the impact of the Alleged Misrepresentations. I then estimated Malka's value as of the Transaction Date using the same methodology I used for its valuation in the "actual world". When doing so, I find that the estimated value of Malka in the "but for"

---

[27] This approach is conservative in that it considers only the effect of the Alleged Misrepresentations on expected EBITDA margins and not on expected revenue growth, which could be another important input in estimating the value of a company like Malka. I understand that, according to Mr. Correia, Malka's expected revenue growth would also be negatively impacted by the knowledge of the Alleged Misrepresentations.

[28] See, e.g., Palmrose, Zoe-Vonna, Vernon J. Richardson, and Susan Scholz, "Determinants Of Market Reactions To Restatement Announcement," Journal of Accounting and Economics 37 (2004): 59–89, p. 59; Palmrose, Zoe-Vonna, and Susan Scholz, "The Circumstances and Legal Consequences of Non-GAAP Reporting: Evidence from Restatements," Contemporary Accounting Review 21, no. 1 (2004): 139–180.

scenario is $20.1 million, which represents a reduction of $40.4 million relative to the estimated value of Malka in the actual world.

**E.**     ***The Alleged Misrepresentations Reduce the Value of the Potential Earnout Payments, Resulting in Estimated Damages to MoneyLion of $27.2 Million***

43.     As discussed above, estimated damages to MoneyLion need to incorporate the change in value of the consideration MoneyLion provided to Sellers through the Earnout Payments.  This is because the Alleged Misrepresentations likely would have reduced the chances that Sellers could satisfy the thresholds required for the Earnout Payments post-Transaction, and consequently, MoneyLion's obligation to pay the Earnout Payments to Sellers.  This fact, in turn, could partially offset harm to MoneyLion resulting from the decrease in Malka's value as described in **Section IV.D** above.

44.     Using a methodology like the one in the CFGI Report, I find that the value of the expected Earnout Payments was $13.2 million in the "actual world."  I then make the conservative assumption that, had the Alleged Misrepresentations been known at the time of the Transaction, Malka would not have been expected to meet the financial thresholds for the Earnout Payments under *any* potential scenario.[29]  Thus, the impact of the Alleged Misrepresentations on the value of the consideration offered to Sellers is the full $13.2 million associated with the expected cost of the Earnout Payments to MoneyLion in the "actual world".

---

[29] By assuming that Malka would not be expected to receive the Earnout Payments in the "but for" scenario, I reduce the damages to MoneyLion by the full value of the expected Earnout Payments in the "actual world", i.e., the largest amount possible for the consideration.  This approach is conservative in that, if Malka had a non-zero probability of achieving the financial targets, the reduction in value of the Earnout Payments would be smaller (and thus estimated damages higher).

DX-596.016

45.     Subtracting this amount ($13.2 million) from the estimated inflation in Malka's value caused by the Alleged Misrepresentations ($40.4 million), results in estimated damages to MoneyLion of $27.2 million in a baseline scenario.

## V.    OPINION 2: THE OPINIONS OF SELLERS' REBUTTAL EXPERT DO NOT CHANGE MY DAMAGES ANALYSIS

46.     To rebut my damages analysis, Mr. Bingham performs his own valuation of Malka and alternative calculation of damages to MoneyLion, as well as an analysis of purported synergies associated with the Transaction.  For the reasons I elaborate on in this section, it is my opinion that Mr. Bingham's own valuation analysis, alternative damages calculation, and conclusions about synergies are fatally flawed and unreliable.  This is because Mr. Bingham fails to apply a reliable, scientific methodology in both his valuation and synergies analyses and instead justifies the unsupported assumptions embedded in his analyses and conclusions by asserting that they are based on his professional judgment.   Furthermore, Mr. Bingham's arbitrary and flawed approach results in large discrepancies in his opinion that he does not explain.

### A.    *Mr. Bingham's Valuation Methodology is Flawed and Unreliable*

47.     Mr. Bingham opines that Malka's value is between $18.9 million and $21.7 million as of the Transaction Date, which is a substantially lower finding than the $60.5 million valuation I present.  To support his valuation, Mr. Bingham relies on two calculation methods which are based in subjective, unsupported, and flawed analyses: the Market Approach and the Income Approach.

## 1.  Mr. Bingham's Market Approach is Flawed and Unreliable

48.    Mr. Bingham considers two different Market Approach (or multiples-based) calculations:  the Guideline Public Company (which bases a company's value on the value of comparable companies) and Guideline Merged and Acquired Company methods (which determines an acquired company's value by comparing it to similarly situated companies involved in acquisitions).  Both of these analyses are flawed and unreliable.

### a.  Guideline Public Company Approach

49.    Under the Guideline Public Company approach, Mr. Bingham calculates the purported value of Malka based on a comparison to four guideline public companies he asserts are comparable to Malka:  Fluent, Inc.; Dolphin Entertainment, Inc.; IZEA Worldwide, Inc.; and Wilhelmina International, Inc.

50.    As an initial matter, Mr. Bingham does not provide an objective, replicable methodology for how he selects these purportedly comparable companies.  Nor does he even attempt to justify why the companies he selects are appropriate for determining Malka's value.

51.    Next, to calculate a value for Malka based on these purportedly comparable companies, Mr. Bingham selects two different multiples-to-enterprise values.  The first is based on trailing twelve-month revenue before September 30, 2021 ("TTM"), and the second is based on expected 2022 revenue ("FY 2022E").  Then, Mr. Bingham simply selects specific, but arbitrary, ranges for the values of these multiples:  between 0.70x – 0.80x for the TTM multiple and 0.50x – 0.60x for the FY 2022E multiple.  These ranges are not directly linked to the valuation multiples of the purportedly comparable companies Mr. Bingham selects.  In fact, the FY 2022E multiples he considers are below the multiple for all of the purportedly comparable

companies he identifies. Mr. Bingham justifies his decision to use this arbitrary range by referring again to his professional judgment.

52.    Mr. Bingham then applies these multiples to Malka's $25.9 million of TTM Revenue and $38 million of FY 2022E Revenue to estimate Malka's value. Next, he weights the two multiples approaches (that is, based on TTM Revenue and FY 2022E Revenue) by 60% and 40% respectively—weights he arbitrarily picks without offering any support—and finally applies a 5.0% rounded control premium. This results in an estimated value for Malka of $19.2 million to $22.5 million.

53.    The results from Mr. Bingham's flawed and arbitrary approach are highly sensitive to the unsupported inputs he uses. For example, had Mr. Bingham used the median valuation multiple of his purportedly comparable companies, rather than the arbitrary and baseless range he adopted, he would have arrived at a valuation of approximately $48.8 million, which is approximately double the estimate he presents.[30]

54.    Alternatively, had Mr. Bingham used the multiples he identified for Dolphin Entertainment, Inc. (which he identifies as the only relevant comparable company for estimating beta for the purpose of calculating WACC), the valuation would be approximately $60.9 million, close to the $60.5 million value I estimate above in **Section IV.C.**[31]

---

[30] This valuation range is estimated following Mr. Bingham's methodology. First, I multiply the medians of the TTM Revenue and FY 2022E revenue multiples (1.49x and 1.54x) by Malka's financial metrics of $25.9 and $38.0 million, respectively, and assign a weight of 60% to the first and 40% to the latter. Next, I subtract Net Debt, add Mr. Bingham's control premium, then add back the Net Debt.

[31] This valuation range is estimated following Mr. Bingham's methodology. First, I multiply Dolphin Entertainment's TTM Revenue and FY 2022E revenue multiples (2.24x and 1.54x) by Malka's financial metrics of $25.9 and $38.0 million, respectively, and assign a weight of 60% to the first and 40% to the latter. Next, I subtract Net Debt, add Mr. Bingham's control premium, then add back the Net Debt.

### b.  Guideline Merged and Acquired Company Approach

55.     Under his Guideline Merged and Acquired Company approach, Mr. Bingham identifies four purportedly comparable transactions and presents EV / Revenue and EV / EBITDA multiples for these transactions.  Mr. Bingham does not explain why these four transactions are relevant or how they offer an appropriate basis of comparison to Malka at the time of the Transaction.

56.     Although his selected transactions have EV / Revenue multiples between 1.0x and 1.7x, Mr. Bingham again arbitrarily selects an EV / TTM Revenue multiple range of 1.0x to 1.1x.  He then determines that Malka's value under this approach is $25.9 to $28.5 million.  Just like with the Guideline Public Company approach, Mr. Bingham's analysis for valuing Malka under the Guideline Merged and Acquired Company approach is entirely subjective and unsupported, rendering its results unreliable.

57.     Furthermore, Mr. Bingham's results are again sensitive to his arbitrary inputs and assumptions.  For example, had Mr. Bingham instead used the median valuation multiples of the guideline transactions he presents, he would have arrived at a valuation of approximately $39 million,[32] much higher than his estimate of $25.9–$28.5 million.

### 2.  <u>Mr. Bingham's Income Approach Analysis is Flawed and Unreliable</u>

58.     Mr. Bingham also prepares an Income Approach based on a DCF analysis.  As with the Market Approach, his analysis is flawed and unreliable, and is inconsistent with key principles of financial economics.

---

[32] This valuation is estimated following Mr. Bingham's methodology.  First, I obtain the median EV / Revenue multiple from the group of purportedly comparable transactions identified by Mr. Bingham (1.52x).  Then, I multiply this multiple by Malka's TTM Revenue of $25.9 million.

59.     Mr. Bingham uses projections from Malka's budget report for the 2021 and 2022 fiscal years, as depicted in Exhibit B of the MIPA.[33]  For the years after the projections Mr. Bingham uses, he assumes revenue growth will continue at 25%, 20%, and 15% for 2023, 2024, and 2025, respectively, with no basis beyond his professional judgment.  These revenue growth rates appear to be arbitrarily chosen, and do not appear to be tethered to any analysis or documentary evidence.  As a next step, to calculate cash flows for use in his DCF analysis, Mr. Bingham projects EBITDA based on historically achieved EBITDA margins in 2019 and 2020, and makes additional assumptions.  Mr. Bingham does not offer any explanations for why the assumptions he makes related to EBITDA margins are reasonable or consistent with the information known at the time of the Transaction.

60.     To discount the cash flows, Mr. Bingham calculates a purported WACC based on the beta of one single company, Dolphin Entertainment.  He does not articulate any clear reasoning or criteria for excluding from his calculation the other companies he considered in his Guideline Public Company approach.  Nor does he make any adjustment to the beta to account for the academic evidence regarding a company beta's tendency to revert to one over time.

61.     In his calculation of the WACC, Mr. Bingham uses a size premium of 3.21%.  Mr. Bingham has not explained why a size premium is appropriate in this matter.  In fact, Mr. Bingham's application of a size premium is inconsistent with more recent academic research.[34]  Mr. Bingham also includes a 1% company-specific risk premium to capture Malka's risks as compared to the industry, which is inconsistent with well-established financial economics

---

[33] JX065 at DLA_006295–98.

[34] See, e.g., Schwert, G. W., "Anomalies and Market Efficiency," Handbook of the Economics of Finance 1 (2003), p. 945 ("[I]t seems that the small-firm anomaly has disappeared since the initial publication of the papers that discovered it.").

principles that firm-specific risk should not affect the cost of capital.[35]  His only justification for the 1% company-specific risk premium is, again, his professional judgment.  In fact, Mr. Bingham admits that the CAPM model he purports to rely on is meant to compensate for systematic risk, but his valuation analysis does not rely on the same assumptions.

62.    Based on these inputs, Mr. Bingham arrives at a discount rate of 16.25%.  Mr. Bingham does not even attempt to reconcile why his discount rate of 16.25% is substantially higher than CFGI's estimate of 8.7%.[36]  Mr. Bingham then concludes that Malka's value ranges from $17.2 to $19.6 million.  This result is driven by his unsupported WACC.  Had Mr. Bingham applied the discount rate I estimated using a principled and objective approach, and applied a liquidity discount of 25%, consistent with my analysis, he would have arrived at an estimated value for Malka between $51.2 and $65.2 million, substantially closer to my estimate of $60.5 million.  Alternatively, had he used CFGI's discount rate his valuation would be $47.3 million to $55.8 million.

### 3.  Mr. Bingham's Overall Valuation Conclusion is Flawed and Unreliable

63.    As a final step in his valuation, Mr. Bingham applies arbitrary weights of 50%, 40%, and 10% to the results of the Income Approach analysis, Guideline Public Company analysis, and Guideline Merged and Acquired Company analysis described above, respectively, arriving at a final valuation of $18.9 to $21.7 million.  This approach is critically flawed, as his only justification for such a weighting is his own subjective assessment of the strengths and weaknesses of each valuation approach.

---

[35] Damodaran, Aswath, Investment Valuation: Tools and Techniques for Determining the Value of Any Asset, 3rd ed., Wiley, 2012, p. 59.

[36] JX081 at MoneyLion_01824568 (CFGI Report).

**DX-596.022**

64. Furthermore, Mr. Bingham has not explained why his Income Approach and Market Approach analyses generate vastly different results. To illustrate this point, I note that the midpoint for the Guideline Merged and Acquired Company analysis he performs is $27.2 million, 49% higher than the midpoint for his Income Approach analysis, which is $18.3 million. He arbitrarily assigns very little weight to his Guideline Merged and Acquired Company analysis (only 10%), an approach which yields the higher value for Malka.

### 4. Mr. Bingham's Damages Calculation is Flawed and Unreliable

65. Mr. Bingham also prepared an alternate valuation scenario (the "Alternate Scenario") in order to assess damages to MoneyLion. To do this, Mr. Bingham has purportedly adopted the revenue and EBITDA assumptions in my "but for" analysis. He calculates damages based on the difference in the "actual" and "but for" values and again applies weights of 50%, 40%, and 10% to the results of the Income Approach, Guideline Public Company, and Guideline Merged and Acquired Company analyses. Doing this, Mr. Bingham finds that Malka's value under the Alternate Scenario is $12.5 to $14.6 million, and therefore damages are $6.4 to $7.1 million based on the difference between the "actual" and "but for" value.

66. This calculation is critically flawed for several reasons.

67. First, it relies on Mr. Bingham's valuation of Malka, which, as described above, is arbitrary, unsupported, and impacted by Mr. Bingham's subjective choices.

68. Second, Mr. Bingham's multiples valuation in the Alternate Scenario is based on the unsupported premise that the multiples to be applied to Malka in the "but for" world would be the same arbitrary figures he selected in his baseline scenario. Mr. Bingham fails to explain why the revenue multiple would be expected to be the same in the "actual world" and in the "but

-23-

**DX-596.023**

for" scenarios, even though revenue growth and profitability expectations—important factors that affect revenue multiples—would likely be impacted by the Alleged Misrepresentations. This unsupported assumption makes Mr. Bingham's multiples valuation, and any damages calculated based on it, unreliable.

69.    Third, Mr. Bingham's damages estimate is driven by his use of the Market Approach, based on revenue multiples, which cannot appropriately account for the Alleged Misrepresentations.  As noted previously, the Alleged Misrepresentations have the same dollar effect on revenue and EBITDA.  This means the effect of the Alleged Misrepresentations on revenue is smaller than the effect on EBITDA on a percentage basis given that expected revenue far exceeds expected EBITDA.[37]  If Mr. Bingham were to base his damages estimate only on his calculations under the Income Approach, damages would be between $12.1 and $13.2 million.[38] This is substantially greater than the $6.4 million to $7.1 million range Mr. Bingham presents as his conclusion.

### 5.  Mr. Bingham's Synergies Analysis is Flawed and Unreliable

70.    Alongside performing a valuation calculation for Malka and a damages calculation for MoneyLion, Mr. Bingham also opines on the reason there is a difference between his low valuation for Malka (between $18.9 to $21.7 million) and the $75 million purchase price MoneyLion agreed to pay for Malka at the time of the Transaction, surmising that the difference

---

[37] For example, the 2022 projections for Malka's revenue and EBITDA were $38.0 million and $170,000, respectively. In the projections presented in the CFGI Report for 2022–2027, Malka's EBITDA ranged from 0.4% to 10.0% of its revenue. See JX081 at MoneyLion_01824593 (Supplemental 1 of the CFGI Report).

[38] This range is obtained by comparing Mr. Bingham's value for Malka in the "actual world" and Mr. Bingham's value for Malka under his "alternate scenario" using his low, mid, and high figures.

can be attributed primarily to both anticipated revenue and cost synergies amounting to $48.8 million.  This conclusion, however, has no reliable basis.

71.     As a preliminary matter, to support his opinion, Mr. Bingham relies on statements in various internal MoneyLion documents, including board meeting materials and MoneyLion's public disclosures.  Mr. Bingham fails to demonstrate, however, why the statements in these documents—many of which make only vague references to Malka's capabilities—would support his conclusion regarding synergies.  Indeed, Mr. Bingham fails to cite any specific estimate of synergies prepared by MoneyLion.

72.     Furthermore, Mr. Bingham implicitly assumes that the value of the synergies created by the Transaction, if any, would accrue to Malka as the seller (in the form of Malka receiving a higher payment).  This assumption is internally inconsistent with Mr. Bingham's apparent view that the specific features of MoneyLion's business were an important driver of such synergies.  Furthermore, Mr. Bingham offers no justification as to why synergies, if any, would not at least in part, and potentially mostly, benefit MoneyLion, reflecting its bargaining power in the acquisition process.

### a.  Mr. Bingham's Calculation of Revenue Synergies Is Unsupported and Unreliable

73.     Mr. Bingham's estimate of revenue synergies is unreliable because it depends on arbitrary and unsupported assumptions about customer growth and the number of customer acquisitions attributable to Malka.

74.     Specifically, to identify revenue synergies, Mr. Bingham projects customer growth starting from a 2021 growth rate of 135.7% and then tapers down the growth rate and

adds a terminal year with the 3% terminal growth rate he used in his DCF analysis. As with his other analyses, however, these assumptions are arbitrary and unsupported.

75.    Mr. Bingham then assumes, without any basis, that 5% of new MoneyLion customer acquisitions can be attributed to Malka. The arbitrary nature of this assumption is highlighted by (1) Mr. Bingham's arbitrary opinion that 1% or even 10% of MoneyLion's customer acquisition could alternatively be attributed to Malka, and (2) Mr. Bingham's opinion that the 5% he relies on is actually conservative and the actual percentage could be significantly higher.

### b. Mr. Bingham's Calculation of Cost Synergies Is Unsupported and Unreliable

76.    Mr. Bingham's cost synergies analysis starts from the same arbitrary and unsupported assumptions about customer growth as his revenue synergies analysis.

77.    Mr. Bingham multiplies the number of projected new customers by the change in customer acquisition cost, or "CAC," that he attributes—with no reliable basis—to the Malka acquisition. For this last metric, he points to a news article stating that MoneyLion's acquisition of Malka was "helping the company decrease their CAC," and that the CAC "decreased from $25 to $16" in Q1 2022.[39]  Mr. Bingham then assumes, without basis, that (i) the entirety of MoneyLion's CAC drop was caused by its acquisition of Malka, and that (ii) this $9 drop applies to all future customer acquisitions. Based on these unsupported assumptions and on the analysis of revenue synergies, and applying a 16.25% WACC, Mr. Bingham estimates total synergies of $48.8 million.

---

[39] DX227 (June 23, 2022 WorkWeek article entitled MoneyLion: Sitting Down with the CEO).

78.     Mr. Bingham's estimate of cost synergies is fatally flawed and unreliable, as there is no support for the two critical inputs: (1) the number of new customers, and (2) the perpetual CAC reduction.   In his analysis, Mr. Bingham relies upon a misleading and unsupported interpretation of the news article he references and assumes, without basis, that assertions in the article drafted by the article's author could be attributed to MoneyLion's CEO, Diwakar ("Dee") Choubey.   Additionally, Mr. Bingham's analysis also does not consider the impact of other factors that were discussed by MoneyLion's management as contributing to the reduction in CAC experienced in Q1 2022 and in the following periods.   These factors include the effect of the $440 million acquisition of Even Financial in Q1 2022.[40]   In fact, the article that Mr. Bingham relies upon mentions MoneyLion's acquisition of Even Financial, but Mr. Bingham fails to consider the possibility that the drop in MoneyLion's CAC could be at least partially attributed to this other acquisition.

---

[40] See, e.g., MoneyLion's March 10, 2022 4Q and Full Year 2021 Earnings Call Transcript at 4, 8 ("CAC continues to be will within plan and will increase further in efficiency with the close of the Even Financial acquisition and drives a market-leading sub-six month payback period"); DX527 at MoneyLion_01833943 (MoneyLion's May 12, 2022 1Q 2022 Earnings Call Transcript) ("Our Enterprise business revenue includes Affiliate fees.  If you recall, this was our fastest growing revenue stream in Q4 and is now included in the Enterprise business following the acquisition of Even Financial and its consolidation into our expanded Marketplace offering. […] As we look ahead, the Enterprise business is expected to rapidly scale to become half of our overall revenue mix in the near term.  This creates both revenue diversification and as Dee mentioned, significant customer acquisition and engagement synergies for the Consumer business"), p. 9 ("A lot of it is organic, but a lot of it [the changes in CAC] is the synergies from our enterprise business.  We're seeing that the top of the funnel becomes incredibly expanded. […] What we're seeing now with our enterprise business is that our banking, investing, and credit products are appealing to more segments of the American middle class.  And that's really what's driving CAC down in Q1 and we do expect it to stay stable in Q2 as well at those levels."). MoneyLion's purchase of Even Financial included a $360 million up-front payment and up to $80 million in earnout payments.  See "MoneyLion to Acquire Even Financial, Expanding Distribution Network and Enhancing Consumers' Financial Access and Decision Making," MoneyLion, December 16, 2021, available at https://investors.moneylion.com/news/detail/65/moneylion-to-acquire-even-financial-expanding-distribution.

**6.  Mr. Bingham's Claims Regarding Transactions in the Digital Marketing Space are Flawed and Unreliable**

79.    Mr. Bingham claims, without a reliable basis, that transactions in the digital marketing space have been based primarily on capturing market share and achieving revenue growth.

80.    Mr. Bingham fails to explain how this can be squared with his own valuation analysis, where he assigns 50% weight to his DCF analysis, which is based on cash flows that directly depend on the earnings of the company.  Mr. Bingham also fails to explain why MoneyLion would want to set the Earnout Payments contingent on post-merger EBITDA if he were correct in assuming that profitability is not important.

81.    To support this assertion, Mr. Bingham speculates that because some of the companies comparable to Malka that he identifies have negative EBITDA, revenue multiples must have been relied upon for their valuations.  He also points to comparable transactions that were purportedly priced based on revenue multiples.  Ultimately, however, Mr. Bingham fails to provide any evidence that these transactions were in fact priced based on revenue multiples.

82.    Mr. Bingham also notes that revenue is used as a metric to evaluate software-as-a-service ("SaaS") companies.  It is not clear why SaaS companies are relevant to Malka, as Malka is not a SaaS company.

83.    Finally, Mr. Bingham claims that MoneyLion itself had a significant valuation despite negative profitability.  He fails to recognize that MoneyLion operates in a different industry than Malka.  Mr. Bingham thus cannot reliably draw a conclusion about acquisitions in the digital marketing space based on MoneyLion's profitability and market value.

The foregoing is true and correct to the best of my knowledge and belief.

Dated at Newton, Massachusetts this 20th day of December, 2024

_____
Paul A. Gompers

Subscribed and sworn before me
this 20 day of December, 2024

_____
Notary Public
Commission Expires: 02/13/2027

Notarized online using audio-video communication

Molly Ng Colman
Online Notary Public
State of New York
New York County
Commission #: 01CO0001382
Commission Expires: 02/13/2027

-29-

**DX-596.029**