# *JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH, DANIEL FRIED and PAT CAPRA,*
## *vs.*
# *MONEYLION TECHNOLOGIES INC.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No. 1:23-cv-06339 JMF

## **MoneyLion's Closing Presentation**
May 5, 2025

# Roadmap

1. How Schedule A, Schedule B, and Section 3.06 of the MIPA Should Be Interpreted

2. What the Parties Believed or Represented About Malka's Compliance With ASC 606 Before the MIPA Was Executed

3. Construction of Ambiguous Contract Terms

4. The Intentions of the Contracting Parties

5. Post-Agreement Conduct

6. The Finality of the 2021 Earnout

7. Consistency of 2021 and 2022 Earnout Calculations

8. MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA

9. Resolution of Disputes Under the MIPA

10. MoneyLion's Remedies

11. The 2022 Earnout Payment Issuance Date

12. Sellers' Request for Specific Performance

13. The Settlement With DUAL

14. MoneyLion's Recoupment Defense

2

# 1. How Schedule A, Schedule B and Section 3.06 of the MIPA Should Be Interpreted

# Interpretation of Schedule A, Schedule B, and Section 3.06 of MIPA



**DX 1016**

438.    Notably, "[c]ontract language is not ambiguous simply because the parties disagree on its meaning." *SeaWorld Ent., Inc. v. Andrews*, No. 2020-0955-NAC, 2023 Del. Ch. LEXIS 125, at *6 (Del. Ch. May 19, 2023).  Rather, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.  A court must accept and apply the plain meaning of an unambiguous term insofar as the parties themselves would have agreed ex ante." *Id.* (internal citations and quotations omitted).  Courts applying Delaware law "cannot interpret a contract as hoped for by litigation-driven arguments" and should "not relieve sophisticated parties of contracts they willingly accepted." *Id.*; *see also Julian v. Julian*, No. 1892-VCP, 2010 Del. Ch. LEXIS 56, at *27 (Del. Ch. Mar. 22, 2010) (noting that the Delaware chancery court "will not manufacture an ambiguity where one does not exist").

Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 438

# Interpretation of Schedule A, Schedule B, and Section 3.06 of MIPA



**DX 1046**

---

**Schedule B**

Revenue and EBITDA Calculation Principles

**"Revenue"** refers to revenue recognized according to the Company's historical revenue recognition principles for the combined and consolidated Company. By way of illustration, the Company's historical revenue recognition principles require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained. For purposes of this Agreement, Revenue will be calculated in accordance with the following:

1) Revenue shall include intercompany eliminations between Malka Media Group, LLC and Malka Sports LLC to present revenue on a consolidated basis;

2) No adjustment shall be made for intercompany adjustments made between the Company and Buyer;

3) Revenue shall include the difference between the fair market value of the intercompany services provided by the Company to Buyer and the actual charge for the intercompany services provided by the Company to Buyer; and

4) Revenue shall be adjusted for losses or gains related to write offs or provisions.

JX065 at DLA_006266

# Interpretation of Schedule A, Schedule B, and Section 3.06 of MIPA



**DX 1047**

**Section 3.06 Financial Statements.** Complete copies of the Company's unaudited financial statements consisting of the balance sheet of the Company as of December 31 in each of the years 2019 and 2020 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended (the "**Unaudited Financial Statements**"), and unaudited financial statements consisting of the balance sheet of the Company as of September 30, 2021 and the related statements of income and retained earnings, stockholders' equity and cash flow for the nine month period then ended (the "**Interim Financial Statements**" and together with the Unaudited Financial Statements, the "**Financial Statements**") are included in the Disclosure Schedules as previously delivered to Buyer. Except as set forth in Section 3.06 of the Disclosure Schedule, the Financial Statements have been prepared in accordance with the Accounting Principles throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Unaudited Financial Statements). The Financial Statements are based on the books and records of the Company, and fairly present the financial condition of the Company as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated. The balance sheet of the Company as of December 31, 2020 is referred to herein as the "**Balance Sheet**" and the date thereof as the "**Balance Sheet Date**" and the balance sheet of the Company as of September 30, 2021 is referred to herein as the "**Interim Balance Sheet**" and the date thereof as the "**Interim Balance Sheet Date**". The Company maintains a standard system of accounting established and administered in accordance with the Accounting Principles in all material respects.

JX065 at DLA_006214

6

# Interpretation of Schedule A, Schedule B, and Section 3.06 of MIPA



"**Accounting Principles**" means (a) the principles, policies and procedures expressly set forth on **Schedule A**; and (b) to the extent not inconsistent with the foregoing, the historical accounting principles, policies and procedures of the Company.

JX065 at DLA_006186

# Interpretation of Schedule A, Schedule B, and Section 3.06 of MIPA



**JX 065**

**DX 1019**

## Schedule A
### Accounting Principles

The Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with:

(a)  U.S. GAAP, except as follows:

    a.  the Company's historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained;

JX065 at DLA_006263

8

# Interpretation of Schedule A, Schedule B, and Section 3.06 of MIPA



DX-594.001

70.    I told Mr. Frommer that I would have no problem with Malka recognizing these rare instances of cash deposits as revenue for purposes of the earnouts, provided that there was no material impact on Malka's reported financial information.  Mr. Frommer assured me that these noncancelable cash deposits had no material impact on Malka's financials, which he reiterated were prepared according to GAAP.  Mr. Frommer also stated that these rare noncancelable cash deposits were Malka's only deviation from GAAP-compliant revenue recognition.  I also stated, and Mr. Frommer agreed, that this lone revenue-recognition exception relating to noncancelable deposits would only be applicable for historical purposes and for the Sellers' potential achievement of the earnouts.  I emphasized that, post-closing, all of Malka's revenues would need to be recognized in accordance with ASC 606 when consolidated into MoneyLion's financials.  Mr. Frommer indicated that understood this.

DX594 (Correia Aff.) ¶ 70

# Interpretation of Schedule A, Schedule B, and Section 3.06 of MIPA



*Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015) ("It is black-letter law that courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical.").



*In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (App. Div. 2003) ("A contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.") (internal citations omitted).

*Manti Holdings, LLC* v. *Authentix Acquisition Company, Inc.*, 261 A.3d 1199, 1211 (Del. 2021) ("Delaware courts read contracts as a whole, and interpretations that are commercially unreasonable or that produce absurd results must be rejected.").



*Osborn ex rel. Osborn* v. *Kemp*, 991 A.2d 1153, 1160–61 (Del. 2010) (rejecting "an absurd interpretation of [a] contract" and stating that "[a]n unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract").

10

# Interpretation of Schedule A, Schedule B, and Section 3.06 of MIPA

## Accounts Receivable

**Consolidated AR Aging as of 6/30/2021**

| $ in 000s | Dec-19 | Dec-20 | Jun-21 | % of total Dec-19 | Dec-20 | Jun-21 |
|---|---|---|---|---|---|---|
| Current | 412 | 1,659 | 1,317 | 21.0% | 61.2% | 36.3% |
| 1 - 30 days | 1,032 | 487 | 1,680 | 52.5% | 18.0% | 46.8% |
| 31 - 60 days | 194 | 116 | 515 | 9.9% | 4.3% | 14.2% |
| 61 - 90 days | 96 | 152 | 171 | 4.9% | 5.6% | 4.7% |
| >91 days | 191 | 258 | 146 | 9.7% | 9.5% | 4.0% |
| Reconciling item | 41 | 41 | - | 2.1% | 1.5% | 0.0% |
| Total | 1,966 | 2,712 | 3,629 | 100.0% | 100.0% | 100.0% |

**Consolidated AR Aging as of 6/30/2021**

| $ in 000s | Current | 1-30 days | 31-60 days | 61-90 days | >91 days | Total |
|---|---|---|---|---|---|---|
| ADP | 576 | 22 | - | - | 5 | 604 |
| Showtime Networks | 115 | 412 | - | - | 40 | 568 |
| VICE Media Group | - | 29 | 383 | - | - | 412 |
| KPMG LLP | 39 | 168 | - | - | - | 207 |
| MongoDB inc. | - | 139 | - | - | 5 | 144 |
| IBM Corporation | 138 | - | - | - | - | 138 |
| Moneylion | - | 105 | - | - | - | 105 |
| Morgan Stanley | 97 | 7 | - | - | 1 | 104 |
| Cognizant | 51 | 36 | - | - | - | 88 |
| Twitch Interactive, inc. | 32 | 49 | - | - | - | 81 |
| iHeart | - | - | 38 | 38 | - | 76 |
| eBay - Sneakers | - | 73 | - | - | - | 73 |
| WeWork | - | 68 | - | - | - | 68 |
| L'Oreal | - | 67 | 1 | - | - | 68 |
| Luxottica Group NA | 13 | 31 | - | 1 | 20 | 64 |
| Rutgers University | - | - | - | 54 | - | 54 |
| Amazon Web Services | - | - | - | 52 | - | 52 |
| Sotheby's International | 52 | - | 1 | - | - | 52 |
| Hillview Medial, inc | 20 | - | 5 | 23 | - | 48 |
| Proxima Spirits, Inc. | - | 3 | 42 | - | - | 45 |
| Others (33) | 183 | 272 | 47 | 2 | 74 | 578 |
| Total | 1,317 | 1,480 | 515 | 171 | 146 | 3,629 |

The tables to the left present a summary of the Company's accounts receivable as of the Historical Balance Sheet Dates, including a detailed breakout by customer at Jun-21.

**Accounts Receivable**

- Customers are invoiced upon completion of milestones set forth in respective contracts. While customer payment terms range between 15 to 90 days, most pay within 60 days. Management noted that the Company does not typically experience issues regarding collectability, and as such, it does not maintain an allowance for doubtful accounts.

  - Regarding the balances aged greater than 91 days at June 30, 2021 (Showtime, Luxottica, etc.), Management noted these projects fell behind schedule. In those instances, customers sometimes withhold payment until a milestone is reached or the project is complete (based on the agreed timelines). This dynamic results in apparent aged receivables, which Management fully expects to collect.

  - During the Historical Period, the Company had $0 in bad debt expense, which supports Management's comment that the Company typically does not have issues regarding collectability.

## Consolidated Income Statement Summary

**Consolidated Income Statements**

| $ in 000s | FY19 | FY20 | LTM Jun-21 | % of Revenue FY19 | FY20 | LTM Jun-21 |
|---|---|---|---|---|---|---|
| Revenue | 14,421 | 18,885 | 23,715 | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 6,188 | 6,368 | 8,094 | 42.9% | 33.7% | 34.1% |
| Gross profit | 8,233 | 12,516 | 15,622 | 57.1% | 66.3% | 65.9% |
| Payroll expenses | 6,000 | 8,287 | 11,032 | 41.6% | 43.9% | 46.5% |
| Legal & professional fees | 165 | 427 | 497 | 1.1% | 2.3% | 2.1% |
| Rent and lease expense | 543 | 525 | 490 | 3.8% | 2.8% | 2.1% |
| Insurance | 299 | 452 | 447 | 2.1% | 2.4% | 1.9% |
| Dues & subscriptions | 162 | 216 | 418 | 1.1% | 1.1% | 1.8% |
| Computer & internet exp. | 53 | 329 | 304 | 0.4% | 1.7% | 1.3% |
| Marketing expense | 26 | 73 | 80 | 0.2% | 0.4% | 0.3% |
| HR expenses | 71 | 119 | 79 | 0.5% | 0.6% | 0.3% |
| Other expenses | 289 | 397 | 649 | 2.0% | 2.1% | 2.7% |
| Operating expense | 7,609 | 10,825 | 13,997 | 52.8% | 57.3% | 59.0% |
| Operating income | 624 | 1,691 | 1,625 | 4.3% | 9.0% | 6.9% |
| Other (income) / expense | 631 | (610) | (575) | 4.4% | 3.2% | 2.4% |
| Net income | (7) | 2,301 | 2,200 | 0.0% | 12.2% | 9.3% |

The schedule to the left presents the Company's summary consolidated income statements for the Historical Period. We describe the accounts herein on a consolidated basis. The Media and Sports income statements are presented within the *Appendix* of this report.

**Revenue**

- Revenue is generated primarily from (i) production, which includes design, filming, and various other content creation offerings and (ii) services, including talent representation, public relations campaigns, advertising, and other services.

**Revenue Summary**

| $ in 000s | FY19 | FY20 | LTM Jun-21 |
|---|---|---|---|
| Production revenue | 10,452 | 13,860 | 15,536 |
| Services revenue | 3,613 | 4,913 | 7,034 |
| Other revenue | 356 | 112 | 1,146 |
| Revenue | 14,421 | 18,885 | 23,715 |

- *Other revenue* – Comprised of T&E and merchandise sales.

- Management attributed the increases in FY20 and LTM Jun-21 revenue to growth driven by several new customers (e.g., Amazon and KPMG) as well as an expansion of services to existing customers. Refer to the Revenue by Customer Analysis on the following pages for further detail.

- The Company recognizes revenue and invoices customers on the achievement of agreed project-based milestones (e.g., stages of completion) as specified in customer contracts. Production and services projects with milestones are billed based on time and materials.

  Additionally, the Company earns "programmatic" revenue for certain production projects each time an ad is run on a platform (e.g., a podcast). For this revenue stream, the Company charges a fixed fee per ad, and income is recognized as earned.

- Management represented that contracts terms are generally less than a year. We understand the Company does not provide any discounts (early pay, etc.) to customers.

JX020 at MoneyLion_01813401, MoneyLion_01813388

## 2. What the Parties Believed or Represented About Malka's Compliance with ASC 606 Before the MIPA Was Executed

# The Financial Statements Represented That Malka Materially Complied With GAAP and ASC 606



MANAGEMENT'S RESPONSIBILITY FOR THE FINANCIAL STATEMENTS

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement whether due to fraud or error.

ACCOUNTANTS' CONCLUSION

Based on our review, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in accordance with accounting principles generally accepted in the United States of America.

JX005 at MoneyLion_01149851



2.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Revenue Recognition

Revenue is recognized under the accrual basis of accounting and recorded as revenue when work is completed and invoice to the Company's customers.  The Company's revenue is generated from a combination of project-based purchase orders that have various stages of completion whereby additional revenue is earned, and standalone billing. The Company's contracts are generally short-term in nature and are completed in less than one-year.

The Company has adopted ASC 606 as of December 31, 2019 regarding accounting for income from contracts and all revenues recognized by the Company for the year then ended are covered through ASC 606.

General and administrative expenses are charged to expense as incurred.

JX005 at MoneyLion_01149856

13

# Sellers Represented to CFGI That Malka Materially Complied With ASC 606



12. **<u>Revenue recognition</u>** – While Management represented that the Company is compliant with ASC 606 revenue recognition requirements, it has not performed a detailed assessment to confirm or validate compliance. Further, Management acknowledged that in certain instances where projects fell behind schedule, the Company invoiced customers based on the planned rather than actual timeline(s). Management noted that this dynamic can impact revenue recognition but noted any noncompliance to be minimal. Following this transaction, we understand that the Buyer plans to align the Company's accounting policies including in relation to revenue recognition, with that of MoneyLion.

JX020 at MoneyLion_01813370

14

# Sellers Represented to CFGI That Malka Materially Complied With ASC 606



**Brendan Gilmartin**

Q. And so given that you did not include any major revenue recognition deviations, does that mean that you don't recall management ever telling you that there were major revenue recognition deviations from GAAP.

**A. The only recollection I have is management indicating that the impact to revenue recognition was minimal.**

Gilmartin (CFGI) Dep. Tr. 74:10–17

DX 3002

15

# Mr. Frommer Made These Representations to CFGI



> 18.    In August 2021, I attended at least one financial due diligence call with Mr. Frommer, CFGI, and possibly Mr. Curran. Mr. Frommer took the lead on these calls, and I recall specifically during one call that Mr. Frommer told CFGI that Malka complied with GAAP and that any deviation from GAAP was minimal. My recollection of this call is strong because I was surprised that Mr. Frommer would tell CFGI that Malka complied with GAAP (and downplay the supposed deviations) when in fact Malka did not comply with GAAP at all—and because I knew Mr. Frommer knew that.

DX592 (Basdekis Aff.) ¶ 18

THE COURT: Now, can I ask you — and forgive me, Mr. Lauer, if I'm either jumping ahead or getting to something that you might be getting at — but in your direct testimony, at paragraph 18, you describe at least one call in the negotiation period in which you testified that Mr. Frommer told CFGI that Malka complied with GAAP and that any deviations from GAAP were minimal.

Do you recall that testimony?

**THE WITNESS: I do.**

THE COURT: And tell me if this is accurate. I take it -- I interpret your direct testimony to be that you understood and believed that Mr. Frommer wanted to convey to MoneyLion in the negotiations that, for the most part, the revenue recognition practices at Malka were GAAP-compliant, but with just some deviations. Is that an accurate description?

**THE WITNESS: Correct.**

Mar. 31, 2025 Rough Tr. 95:7-22 (Basdekis Cross)

16

# Mr. Frommer Told Mr. Correia That Malka Materially Followed GAAP



**Richard Correia**



**Jeff Frommer**

### October 19: After Receiving the CFGI Report

Q. How, if at all, does Mr. Frommer's purported account of that conversation comport or not comport with your recollection of it?

**A. Completely inconsistent.**

Q. Can you explain?

**A. We had talked about the CFGI report fully validating what we had seen in their financials, what we had seen in diligence, and it was confirming that in fact they were compliant with GAAP and that their books and records conformed to GAAP.**

Q. Is that what Mr. Frommer told you on the call?

**A. Yes.**

Q. And at any point on that call, or ever, did Mr. Frommer suggest to you, in words or substance, that Malka's current way of revenue recognition was not GAAP?

**A. No.**

Apr. 3, 2025 Rough Tr. 891:8-22 (Correia Redirect)

*See also* DX594 (Correia Aff.) ¶¶ 55-57, 67-73

### November 1: After Sellers Added "Noncancelable Deposits" to Schedule A

Q. And because, according to your testimony, you were sufficiently confused, it caused you to reach out to Mr. Frommer, right?

**A. We were confused because the statement which required the company to recognize into revenue noncancelable deposits on contracts, this was the first time I'd been seeing this despite the quality of earnings report being done, conversations with management. This was the first time it had come up. So, the fact they had, within their historical revenue recognition principles, this one exception was a surprise.**

Q. Okay. Because it is saying, to some extent, with respect to what's described, there is an acknowledgement that they deviate from GAAP for revenue recognition, right?

**A. That was this example, and when we had a follow-up, or I had a follow-up with Mr. Frommer, he confirmed that this deviation was, in fact, rare and an historical type of practice; and therefore, we got comfortable with the statement that we would be able to follow what had been represented, which is they're going to GAAP financials with this exception.**

Apr. 3, 2025 Rough Tr. 786:11-787:4 (Correia Cross)

17

# 3. Construction of Ambiguous Contract Terms

# A Company Can Be GAAP-Compliant With Minor Deviations

**November 1: After Sellers Added "Noncancelable Deposits" to Schedule A**

Q. Now, at this point, then, you have at least two specific practices by Malka that are exceptions to GAAP on revenue recognition, noncancelable deposits and booking revenue as planned, but not when all the work is done, right?

A. **You can still be compliant with GAAP even though you may have these immaterial differences.**



**Richard Correia**

Apr. 3, 2025 Rough Tr. 795:1-9 (Correia Cross)

19

# Mr. Frommer Assured Mr. Correia That Malka's GAAP-Deviated Revenue Recognition Practice Was Immaterial



represented to us that Malka followed ASC 606 in their 2019 and 2020 Financial Statements. Mr. Frommer told me that the Sellers' changes were mere technicalities, designed to ensure the representations in the Schedules were comprehensive. Mr. Frommer said, in sum and substance, that the edits were made to account for rare and one-off occurrences.

DX594 (Correia Aff.) ¶ 68

material impact on Malka's reported financial information. Mr. Frommer assured me that these noncancelable cash deposits had no material impact on Malka's financials, which he reiterated were prepared according to GAAP. Mr. Frommer also stated that these rare noncancelable cash deposits were Malka's only deviation from GAAP-compliant revenue recognition. I also stated,

DX594 (Correia Aff.) ¶ 70

# 4. The Intentions of the Contracting Parties

# Schedule A: Accounting Principles



**From:** Sharkey, Tim <tim.sharkey@dlapiper.com>
**Sent:** November 4, 2021 3:55 PM
**To:** Harrington, Michael S. <MHarrington@foxrothschild.com>
**Cc:** Michael Weiner <Michael.Weiner@FisherBroyles.com>; Simon, Marc H. <msimon@foxrothschild.com>; Cowan, Scott <scott.cowan@dlapiper.com>; Halbert, Andrew M. <ahalbert@foxrothschild.com>
**Subject:** [EXT] RE: Project Queen - Schedules A & B to MIPA

Thank you, Michael. We will review and let you know.

Separately, we have received the following feedback from the RWI insurer regarding Schedule A (Accounting Principles):

With respect to the Accounting Principles, the Company is essentially making the representation that its financial statements have been historically prepared under GAAP except revenue recognition and contract costs. However, based on the diligence, the Company operates an cash basis with numerous other GAAP deviations identified, including lack of accruals for commissions, payroll, professional fees, pre-paid licenses and pre-paid insurance. So we expect all Accounting Principles to ==reflect all non-GAAP items== (not just those listed in the previous sentence) or the Accounting Principles to acknowledge that the business operates on a cash basis.

PX138 at MoneyLion_01039352

**DX 3007**

# Interpretation of Schedule A, Schedule B, and Section 3.06 of MIPA



PX417

67.    ==In light of Mr. Basdekis' confirmation that Malka's historical revenue recognition principles were consistent with those described in the updated draft of Schedule B, I edited Schedule A to be consistent with my edits to Schedule B.==  As with my edits to Schedule B, I edited Schedule A to remove any reference to ASC 606 because I wanted to be clear that Malka was not representing in Schedule A that it had historically recognized revenue in accordance ASC 606.

PX417 (Curran Decl.) ¶ 67

55.    ==At the time I edited Schedule B, my understanding was that but for noncancelable deposits, Malka recognized revenue as milestones were attained.==  I do not recall from whom I got that understanding.  ==In my mind, I equated milestones with the completion of performance obligations.==  However, I did not confirm this view with Mr. Basdekis or Sellers, and I recognize that they might have had a different view and may use the term "milestones" more broadly and not limited to actual levels of performance.

PX417 (Curran Decl.) ¶ 55

23

# 5. Post-Agreement Conduct

# The Parties' Intent



*Eagle Indus., Inc.* v. *DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 n.11 (Del. 1997) ("[O]ne of the primary tenets of the parol evidence rule [is that] relevant extrinsic evidence is that which reveals the parties' intent **at the time they entered into the contract**.")



*Ellington v. EMI Music Inc.*, 106 A.D.3d 401, 403 (App. Div. 1st Dep't 2013) ("A court's role in interpreting a contract is to ascertain the intention of the parties **at the time they entered into the contract**."), *aff'd*, 24 N.Y.3d 239 (2014)

# Course of Conduct



*CP III Rincon Towers, LLC* v. *Cohen*, 2022 WL 61318, at *8 (S.D.N.Y. Jan. 6, 2022) (Furman, J.) ("Courts may also consider [t]he parties' course of conduct under a contract, . . . which is generally speaking, . . . deemed of great, if not controlling, influence.")



*Waterloo Cap. Partners, LLC* v. *BWX Ltd.*, 2022 WL 2063762, at *17 (S.D.N.Y. June 8, 2022) (Abrams, J.) (citing *Rincon Towers* and distinguishing "course of conduct under [the] contract" from "subsequent course of conduct . . . more attenuated from the contract")

26

# Course of Conduct



*Sun-Times Media Grp.* v. *Black*, 954 A.2d 380, 398 (Del. Ch. 2008) ("When the terms of an agreement are ambiguous, 'any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" (quoting Restatement (Second) of Contracts § 202(4))

# Michael Scalia Joined MoneyLion After the Acquisition Closed



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED AND PAT CAPRA,
                                    Plaintiffs,

        - against -

MONEYLION TECHNOLOGIES INC. AND
CONTINENTAL STOCK TRANSFER & TRUST
COMPANY,
                                    Defendants.

MONEYLION TECHNOLOGIES INC.,
                                    Counterclaim Plaintiff,          Case No. 1:23-cv-06339-JMF

        - against -

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,
                                    Counterclaim Defendants,
MONEYLION INC.,
                                    Third-Party Plaintiff,

        - against -

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,
                                    Third Party Defendants.

TRIAL AFFIDAVIT OF MICHAEL SCALIA[1]

[1] Cited herein are true and correct copies of written communications and their attachments, sent or received by me on or about the dates indicated in the documents.

1

14. I did not review any provisions of the November 15, 2021 Membership Interest Purchase Agreement (the "MIPA") concerning Malka's revenue recognition practices, including Schedules A or B, until 2023, well after Mr. Basdekis and I created the straight-line methodology for Malka's financials in January and February 2022. Because I joined MoneyLion in December 2021, after the November 15, 2021 Acquisition, I had no personal knowledge of any discussions with or representations by Jeffrey Frommer, Louis Krubich, Dan Fried, and Pat Capra (the "Sellers") during the course of the diligence and negotiations preceding the Acquisition. As a result, I did not, and could not, verify whether Sellers complied with the terms of the MIPA after the Acquisition. Instead, I simply conformed the Malka figures provided to me by Mr. Basdekis in the narrow context of my work concerning MoneyLion's SEC reporting obligations.

DX598 (Scalia Aff.) ¶ 14

**DX 3103**

# Stub Period Exercise



83.    I now understand that, following the Acquisition, MoneyLion's accounting team performed a limited revenue recognition adjustment of Malka's financial statements for the last 6 weeks of 2021: the post-closing "stub period" in which Malka's financials were included on MoneyLion's books for 2021.  The purpose of this reconciliation was to ensure MoneyLion's compliance with GAAP for the purposes of its public SEC filings, not to audit Malka's compliance with the MIPA.  This is a business-as-usual exercise that every public company undertakes with respect to all of its operations.  The accounting team who performed the adjustments (chiefly Michael Scalia, Director of SEC Reporting) were not involved in the MIPA negotiations, nor were they ever instructed to compare Malka's actual historical practices to what was required by the MIPA.  I was not aware of the results of the post-Acquisition GAAP reconciliations until after this litigation was filed.  Moreover, to the extent that any adjustments were made to Malka's 2021 revenue after the Acquisition, I would have viewed those adjustments as indicative of good-faith mistakes or clerical errors, ordinary-course year-end reconciliations, or the few instances of immaterial "noncancelable deposits" referenced in Schedules A and B and my November 2021 discussion with Mr. Frommer.  I certainly would not have viewed them as indicative of an intentional scheme to misrepresent or obfuscate Malka's true financial condition.

**DX 3104**

DX594 (Correia Aff.) ¶ 83

# Malka's Invoicing



> 57.    At no point in due diligence did Mr. Frommer or any of the Sellers disclose to me that, contrary to the 2019 and 2020 Financial Statements presented by Sellers, and Sellers' representations to CFGI, that Malka's prevailing practice was to issue invoices *weeks or months before work was performed* and recognize the full amount of those invoices into revenue immediately upon issuance of an invoice. Had I known that Malka was systematically recognizing revenue in this manner, and not materially in accordance with GAAP and ASC 606, I would have immediately terminated negotiations to acquire Malka.

DX594 (Correia Aff.) ¶ 57



> 29.    At the time, I was not concerned by Mr. Basdekis's comment that Malka recognized revenue at invoicing. This was because I understood that the MIPA provided detailed terms governing Malka's historical and current accounting practices based on my work with the legal team during the Acquisition. I am not an accountant and am not an expert in GAAP accounting, so I did not (and could not) consider whether Malka's policy complied with GAAP. When I received this email, I had no reason to believe that the practice described by Mr. Basdekis was inconsistent with what was authorized by the MIPA, and certainly had no evidence to suspect that Malka had misrepresented its financial condition to MoneyLion. As a result, I thanked Mr. Basdekis for his clarification and did not press further.

DX597 (Lee Aff.) ¶ 29

**DX 3105**

# 6. The 2021 Earnout

# The 2021 Earnout

(b)    **Delivery of Earnout Statement**.

(i)    **Statement Preparation.** Within thirty (30) days of receipt by Buyer of the Company's audited financial statements for the year ended December 31, 2021, but in no event later than May 31, 2022, Buyer shall deliver to the Sellers' Representative a statement (the "**2021 Revenue and EBITDA Statement**"), prepared in good faith and in accordance with the Revenue and EBITDA Calculation Principles, setting forth Buyer's calculation of the Company's Revenue and EBITDA for the year ended December 31, 2021 (the "**2021 Revenue Amount**" and the "**2021 EBITDA Amount**" respectively). Within thirty (30) days of receipt by Buyer of the Company's audited financial statements for the year ended December 31, 2022 but in no event later than May 31, 2023, Buyer shall deliver to the Sellers' Representative a statement (the "**2022 Revenue and EBITDA Statement**"; and together with the 2021 Revenue and EBITDA Statement, each a "**Revenue and EBITDA Statement**" and collectively the "**Revenue and EBITDA Statements**"), prepared in good faith and in accordance with the Revenue and EBITDA Calculation Principles, setting forth Buyer's calculation of the Company's Revenue and EBITDA for the calendar year ended December 31, 2022 (the "**2022 Revenue Amount**" and the "**2022 EBITDA Amount**" respectively). For the avoidance of doubt, it is the intention of the Parties that the 2021 Revenue Amount and the 2021 EBITDA Amount and the 2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using substantially consistent methods and practices.

(ii)    **Examination.**   After receipt of a Revenue and EBITDA Statement, Sellers' Representative shall have forty five (45) days (the "**Revenue and EBITDA Earnout Review Period**") to review Buyer's calculation of such Revenue and EBITDA Statement. During the Revenue and EBITDA Earnout Review Period, Buyer shall provide the Sellers' Representative and its Representatives with reasonable access to the books and records of the Company and any other materials used by Buyer in the preparation of the calculation of the applicable Revenue and EBITDA Statement, in all cases as requested by Sellers' Representative, and shall make the Company's staff and advisors available to the Sellers' Representative and its Representatives, as may be reasonably requested by the Sellers' Representative, for the purpose of reviewing the Revenue and EBITDA Statement and to prepare a Revenue and EBITDA Statement of Objections (defined below).

(iii)    **Objection**. On or prior to the last day of the Revenue and EBITDA Earnout Review Period, Sellers' Representative may object to Buyer's calculation of the Revenue and EBITDA Statement by delivering to Buyer a written statement setting forth Sellers' Representative objections in reasonable detail, indicating each disputed item or amount and the basis for the Sellers' Representative disagreement therewith (the "**Revenue and EBITDA Earnout Statement of Objections**"). If Sellers' Representative fails to deliver the Revenue and EBITDA Earnout Statement of Objections before the expiration of the Revenue and EBITDA Earnout Review Period, such Revenue and EBITDA Statement as calculated by Buyer shall be deemed final and to have been accepted by the Sellers' Representative and the Seller Members. If Sellers' Representative delivers the Revenue and EBITDA Earnout Statement of Objections before the expiration of the Revenue and EBITDA Earnout Review Period, Buyer and Sellers' Representative shall negotiate in good faith to resolve such dispute within thirty (30) days after the delivery of the Revenue and EBITDA Earnout Statement of Objections (the "**Revenue and EBITDA Earnout Resolution Period**").

JX065 at DLA_006207-10

32

# The 2021 Earnout



*Internet Law Library, Inc.* v. *Southbridge Capital Mgmt., LLC,* 2005 WL 337054, at *4 (S.D.N.Y. Dec. 8, 2005) (holding that if a party was "induced into entering a contract by means of fraud . . . [it] may escape liability by establishing proof of such fraud")

*State St. Glob. Advisors Tr. Co.,* v. *Visbal*, 677 F. Supp. 3d 209, 245 (S.D.N.Y. 2023) (explaining that when a party to a contract materially breaches that contract, the other party is excused from performing)



*Abry Partners V, L.P.* v. *F & W Acquisition LLC,* 891 A.2d 1032, 1064 (Del. Ch. 2006) (finding that "[t]o the extent that the Stock Purchase Agreement purports to limit the Seller's exposure for its own conscious participation in the communication of lies to the Buyer, it is invalid under the public policy of this State")

33

# The 2021 Earnout

38.    At some point shortly after November 15, 2021, Mr. Frommer instructed me to generate as many invoices as possible through the end of the year, regardless of whether any work would even begin that year. I knew from my discussions with Mr. Frommer that he understood how Malka recognized revenue, and I understood that he was giving me this instruction in order to "generate revenue" for purposes of the 2021 earnout calculations (the "2021 Earnout Financials Calculations").

39.    As we got closer to the end of 2021, Mr. Frommer became more and more concerned about achieving the 2021 earnout. In a December 8, 2021 exchange of Slack messages, I sent Mr. Frommer, in response to his request, a spreadsheet showing him "where Dec[ember] needs to come in to hit [the $100,000 EBITDA earnout] target without [the New Jersey] tax credit." DX499 at MoneyLion_01643377. Mr. Frommer presumably reviewed the spreadsheet and wrote, "$110,584 . . . that's pretty tight . . . +/- 10% to get to 100K ebitda." I responded by explaining that I thought hitting the target could still be "realistic," noted that in November we had "processed 3x more . . . invoices . . . than any other month," and explained that "[a]t the end of the day, we need to have a month that looks like October and we[']re golden." DX499 at MoneyLion_01643377. Mr. Frommer responded that I should "make sure tom and partners have this info to drive." DX499 at MoneyLion_01643377. In other words, I was giving Mr. Frommer the state of play, which included a report on invoicing (i.e., recognition of revenue), and he wanted to make sure I gave the same report to Thomas McGrath, Malka's Director of Account Management, as well as Messrs. Krubich, Fried, and Capra so that they could "drive" revenue (i.e., process more invoices).

40.    The other Sellers were also focused on the earnout post-Acquisition. For example, a few days after the Acquisition, on November 18, 2021, Mr. Fried sent me a Slack instructing me that "we will need to bill for in the coming week" his client, Proximo Spirits, for $400,000 of work that had not yet taken place. DX172 at MoneyLion_01529631. Mr. Fried also asked for a call to chat and, either during that call or another call around the same time, he asked me how generating these invoices would affect the likelihood that Sellers would achieve the 2021 earnout. I told him that it would increase the likelihood and, consistent with its past practices, Malka booked all $400,000 in revenue for 2021 upon generation of the invoices, even though no work was done on the relevant Proximo Spirits project until 2022.

41.    Mr. Capra had the same focus. Also at the end of 2021, at Mr. Capra's direction, Malka sent a $50,000 invoice to Dan O'Brien Auto Group because a Malka Sports client, Devin McCourty, had done an endorsement for that customer. Malka recognized all $50,000 as revenue in 2021 even though it actually owed $40,000 to Mr. McCourty (i.e., Malka got a 20% commission). Malka, however, did not recognize the $40,000 expense until 2022.

42.    On February 15, 2022, at Sellers' direction and for purposes of the 2021 Earnout Financials Calculations, I sent to MoneyLion and others Malka's "unadjusted P&L for 2021," with information pulled directly from NetSuite. JX074 at MoneyLion_01817462. Mr. Frommer and the other Sellers understood that the financials I submitted to MoneyLion for the 2021 Earnout Financials Calculations were based on Malka's method for recognizing revenue—always upon invoice regardless of whether work was completed. JX074 at MoneyLion_01817462.

# The 2021 Earnout



**Michelle Lee**

Q. This final version, the 2021 revenue and EBITDA statement that you sent to Mr. Frommer, made no adjustments to Malka's revenue to comply with GAAP or ASC 606, right?

**A. No.**

Q. And this final version, the 2021 revenue and EBITDA statement that you sent to Mr. Frommer on March 15, 2022, made no adjustments to Malka's costs or expenses to comply with GAAP, right?

**A. Right, since it was based off their historical principles as defined in the MIPA.**

Apr. 1, 2025 Rough Tr. 443:8-17 (Lee's Cross)

35

# The 2021 Earnout

On Mon, Feb 14, 2022 at 1:40 PM Michelle Lee <mlee@moneylion.com> wrote:
> We haven't yet calculated anything for the earn-out, so there isn't anything that needs to be in-line with the purchase agreement. Also we're not planning on making any changes to the 2022 projections at this point.
>
> @Matthew Basdekis, please send over the finalized 2021 financials for Malka.
>
> Thanks,
> Michelle

On Mon, Feb 14, 2022 at 1:30 PM Michael Scalia <mscalia@moneylion.com> wrote:
> Did Michelle provide this last time? I want to make sure the format and calc (particularly EBITDA) is calculated correctly in line with the purchase agreement.
>
> Regards,
> **Michael Scalia | Director of SEC Reporting**
> Connect with me on LinkedIn

 **MoneyLion**
Check out our blog - Download our mobile app

On Mon, Feb 14, 2022 at 9:25 AM Chris Murphy <cmurphy@cfgi.com> wrote:
> Hey Team - Can you please provide the final Revenue / EBITDA numbers for Malka in 2021 and let us know if there were any changes to the 2022 Malka projections based on actual 2021 performance?
>
> Thanks,
>
> Chris

**Chris Murphy | Managing Director**

# The 2021 Earnout



17.    I have reviewed a log identifying individuals and the dates on which they obtained access to Malka's NetSuite, and I have confirmed that neither I nor any of my subordinates in the MoneyLion accounting department had credentials to access Malka's NetSuite system until December 19, 2022. *See* JX99 at MoneyLion_01842888 (December 19, 2022 Slack between Erika Nuno and myself, in which I report that Gary Fishler is "getting access to netsuite today."); DX505 at Row 408 (NetSuite Access Logs showing that Mr. Fishler was the first MoneyLion finance or accounting department employee to receive access to NetSuite, on December 19, 2022).[2]

18.    As a result, throughout 2022, my team and I trusted Malka to accurately record and calculate its own financial data for the purposes of the 2022 Earnout.  For example, in an August 2022 email chain, Mr. Basdekis circulated an Excel spreadsheet, generated from NetSuite, to provide MoneyLion with an update on Malka's purported progress towards the 2022 Earnout.[3] DX239 at MoneyLion_0176084 (August 31, 2022 email from Matt Basdekis to myself, Erika Nuno, Michelle Lee, and Sellers, attaching "NonGAAP Income Statement – MMG YTD July 2022."). These types of emails were representative of some of the financial "updates" we received from Malka in 2022. Once a month, I also met with Mr. Basdekis, Mr. Correia, Ms. Nuno, Mr. Frommer, and, sometimes, Mr. Krubich for monthly financial updates where we discussed Malka's status, including Malka's GAAP financial results. Neither I nor anyone else in the accounting department would have been able to verify the figures (or the methodology on which they were based) because we did not have access to Malka's NetSuite.

# The 2021 Earnout

Q.  There were two points. Your ultimate point is, even if CFGI could determine from the data that revenue is recognized when an invoice is generated, it would not necessarily be able to determine whether the recognition of that revenue was consistent with GAAP, right?

**A.  I mean, starting with just the availability of contracts that you would need to determine when a work obligation was performed and the supporting data of hours being logged or anything like that, I don't think they would be able to determine any type of connection to delivery or final obligations.**

Q.  Even if they would have been able to determine that revenue equals invoicing?

**A.  If they were able to determine that, you would still need -- you would still need additional information to tie it back to a work performance delivery.**



**Matt Basdekis**

Mar. 31, 2025 Rough Tr. 15:6-21 (Cross of M. Basdekis)

38

# The 2021 Earnout



In *Garcia* v. *Scoppetta*, 289 F. Supp. 2d 343 (E.D.N.Y. 2003)—where Plaintiff brought a malicious prosecution claim against Defendants who argued that Plaintiffs' claim was barred under the res judicata doctrine because the Rule 68-based judgment issued in a preceding matter precluded Plaintiff from relitigating the same issues (*see id.* at 348–51)—the Court applied and interpreted contractual principles to the Rule 68-based judgment at issue to find that it was unambiguous and "d[id] not preclude the claims sought to be asserted" because "[n]o mention [wa]s made [in the judgment] of the intention to preclude litigation of any additional claims") (*see id.* at 352).

# 7. Consistency of the 2021 and 2022 Earnout Calculations

# Consistency of the 2021 and 2022 Earnout Calculations



(b)    **Delivery of Earnout Statement**.

(i)    **Statement Preparation.** Within thirty (30) days of receipt by Buyer of the Company's audited financial statements for the year ended December 31, 2021, but in no event later than May 31, 2022, Buyer shall deliver to the Sellers' Representative a statement (the "**2021 Revenue and EBITDA Statement**"), prepared in good faith and in accordance with the Revenue and EBITDA Calculation Principles, setting forth Buyer's calculation of the Company's Revenue and EBITDA for the year ended December 31, 2021 (the "**2021 Revenue Amount**" and the "**2021 EBITDA Amount**" respectively). Within thirty (30) days of receipt by Buyer of the Company's audited financial statements for the year ended December 31, 2022 but in no event later than May 31, 2023, Buyer shall deliver to the Sellers' Representative a statement (the "**2022 Revenue and EBITDA Statement**"; and together with the 2021 Revenue and EBITDA Statement, each a "**Revenue and EBITDA Statement**" and collectively the "**Revenue and EBITDA Statements**"), prepared in good faith and in accordance with the Revenue and EBITDA Calculation Principles, setting forth Buyer's calculation of the Company's Revenue and EBITDA for the calendar year ended December 31, 2022 (the "**2022 Revenue Amount**" and the "**2022 EBITDA Amount**" respectively). For the avoidance of doubt, it is the intention of the Parties that the 2021 Revenue Amount and the 2021 EBITDA Amount and the 2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using substantially consistent methods and practices.

JX065 at DLA_006207

41

# Consistency of the 2021 and 2022 Earnout Calculations



"**Revenue and EBITDA Calculation Principles**" means (a) the principles, policies and procedures used by Buyer in its calculation of the Company's Revenue and EBITDA for the periods beginning on January 1, 2021 and ended December 31, 2021 and beginning January 1, 2022 and ended December 31, 2022, as set forth on Schedule B attached hereto; and (b) to the extent not inconsistent with the foregoing, the historical accounting principles, policies and procedures of the Company.

JX065 at DLA_006199

42

# Consistency of the 2021 and 2022 Earnout Calculations



**Michelle Lee**

MS. MOSSE: Back to Exhibit JX 82, and if we go back to the Excel attachment.

Q.   So this is the earnout calculation that you sent to Mr. Correia for his approval on March 15th, 2022.

And, so, you calculate total revenue as 30,806,976, correct?

A.   **Yes. It's from the financials they sent us.**

Q.   Right.

The unadjusted financials without any adjustments to comply with GAAP, right?

A.   **Yes, the financials that are based on their historical accounting principles.**

Q.   Right.

And EBITDA is 921,497, right? That's in your earnout calculation tab?

A.   **Yes.**

Q.   And then you add $890,000 -- $890,905 for the 2019 tax credit, right?

A.   **Yes.**

Q.   And then you calculate EBITDA plus tax credit as 1,812,402, right?

A.   **Yes.**

Q.   And so, based on these numbers, you calculated that sellers achieved the maximum 2021 earnout amount, right?

A.   **Based on these numbers, yes.**

Apr. 1, 2025 Rough Tr. 441:16-442:15 (Lee's Cross)

43

# 8. MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA

# MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA



## Schedule B

### Revenue and EBITDA Calculation Principles

"**Revenue**" refers to revenue recognized according to the Company's historical revenue recognition principles for the combined and consolidated Company. By way of illustration, the Company's historical revenue recognition principles require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained. For purposes of this Agreement, Revenue will be calculated in accordance with the following:

1) Revenue shall include intercompany eliminations between Malka Media Group, LLC and Malka Sports LLC to present revenue on a consolidated basis;

2) No adjustment shall be made for intercompany adjustments made between the Company and Buyer;

3) Revenue shall include the difference between the fair market value of the intercompany services provided by the Company to Buyer and the actual charge for the intercompany services provided by the Company to Buyer; and

MIPA sch. B, JX065 at DLA_006266

45

# MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA



(d)    **Operation of the Business**. Except as otherwise set forth herein, in order to maximize the Seller Members' opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment, (i) from the Closing Date and through the end of December 31, 2021, Buyer shall, and shall cause the Company to operate the business of the Company in good faith and substantially similar in all material respects with the past practice of the Company prior to Closing, and will not take any action intended to interfere with or frustrate the Seller Members' opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment, and (ii) with respect to the period from January 1, 2022 and through the end of December 31, 2022, the Buyer shall, and shall cause the Company to operate the business of the Company substantially in accordance with the operating and revenue budget (the "**2022 Budget**") attached hereto as Exhibit B. Notwithstanding the foregoing, Buyer shall be able to make such changes, as it deems reasonably necessary, to the operation of the business of the Company or otherwise to ensure full compliance with all applicable Laws.

JX065 at DLA_006210

46

# MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA



**Richard Correia**

Q.  You are aware that there were actually line items in that budget, particular line items with particular numbers; right?

**A.  Yes.**

Q.  Did operating substantially in accordance with the budget mean adhering substantially to each line item?

**A.  *No. It was a framework. Some lines might be over, some might be under*, but ultimately they kind of total costs and total revenue for the target.**

Apr. 3, 2025 Rough Tr. 905:10-17 (Redirect of R. Correia)

47

# MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA



**Louis Dudney**

Q.  What, if anything, does the fact that the number ended up being exactly the same under either approach tell you?

A.  **To me, it served as a proof, if you will, that it doesn't matter whether you look at this analysis on a markup basis or a margin basis. If you're applying markup to markup or margin to margin and doing that comparison, based on the other adjustments that Mr. Torossian was making with respect to the costs that he was evaluating, you result in the same fair market value adjustment, recognizing that what Mr. Torossian, I understood, to be doing was trying to quantify the impact of charges to MoneyLion for internal services for Malka which were priced higher than ultimately what Malka charged to third parties.**

Apr. 28, 2025 Rough Tr. 1123:9–21 (Direct of L. Dudney)

# MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA



UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

                                                    Plaintiffs,

- against -

MONEYLION TECHNOLOGIES INC. AND
CONTINENTAL STOCK TRANSFER & TRUST
COMPANY,

                                                    Defendants.

MONEYLION TECHNOLOGIES INC.,
                                    Counterclaim Plaintiff,          Case No. 1:23-cv-06339-JMF

- against -

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

                                        Counterclaim Defendants,

MONEYLION INC.,

                                    Third-Party Plaintiff,

- against -

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,
Third Party Defendants.

**TRIAL AFFIDAVIT OF LOUIS G. DUDNEY, CPA, CFF**

83.    It is my understanding that MoneyLion made the $218,170 downward adjustment to the 2022 Earnout Statement because various employees on the retained team were not in fact completely dedicated to MoneyLion, meaning that MoneyLion expected to pay for 100% of their time, but did not receive it.   From an accounting perspective, ==this adjustment is reasonable as MoneyLion should not pay for services that were not rendered.   Moreover, under GAAP, Malka should not recognize revenue for work that was not performed.==

DX595 (Dudney Aff.) ¶ 83

49

# MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA



41.    I then made two adjustments to Malka's as-reported financials.  First, I subtracted $218,170 in revenue billed by employees who worked for Malka's external clients, but whose full-time salary and benefits were paid by MoneyLion.  This corrected for Sellers' practice of "double-billing" employees to both MoneyLion and external clients.  Second, I added the cost of $544,500 in bonuses that were paid to Malka employees, at Sellers' discretion, out of the MoneyLion company-wide bonus pool.  This, too, corrected for employee costs that were not included in Malka's income statement.

DX599 (Torossian Aff.) ¶ 41

50

# 9. Resolution of Disputes Under the MIPA

# Resolution of Disputes Under the MIPA



*HBMA Holdings LLC* v. *LSF9 Stardust Holdings LLC*, 2017 WL 6209594, at *3 (Del. Ch. Dec. 8, 2017)

Delaware courts lack subject matter jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate. There is a strong public policy in favor of arbitration in Delaware; thus, a motion to dismiss for lack of subject matter jurisdiction will be granted if the "dispute is one that, on its face, falls within the arbitration clause of the contract."

# Resolution of Disputes Under the MIPA



(iv)      **Resolution of Disputes**. If Sellers' Representative and Buyer fail to reach an agreement with respect to all of the matters set forth in an Revenue and EBITDA Earnout Statement of Objections before expiration of the Revenue and EBITDA Earnout Resolution Period, then any item or amount remaining in dispute ("**Revenue and EBITDA Earnout Disputed Amounts**" and any items or amounts not so disputed, the "**Revenue and EBITDA Earnout Undisputed Amounts**") shall be submitted for resolution to the office of the Independent Accountant. Within thirty (30) calendar days after submission to the Independent Accountant for resolution, Buyer and the Sellers' Representative shall each indicate in writing their position on each disputed matter and each such Party's determination of the amount thereof. The Independent Accountant shall make a written determination, acting as experts and not arbitrators, resolving the Revenue and EBITDA Earnout Disputed Amounts only and make any adjustments to a Revenue and EBITDA Statement no later than thirty (30) calendar days after receipt of each Party's written submission pursuant to the preceding sentence and such determination will be conclusive and binding upon the Parties to this Agreement with respect to that disputed matter, subject to the indemnification rights otherwise contained herein. In conducting its review, the Independent Accountant shall consider only items in dispute, and shall base its determination solely on the written submissions of Buyer and the Sellers' Representative (i.e., no independent investigation) to the Independent Accountant and the definitions and methodologies prescribed herein. The decision of the Independent Accountant for each item and amount in dispute must be within the range of values assigned to each such item as provided in the written submissions to the Independent Accountant by each Party. The fees and expenses of the Independent Accountant shall be paid, by both the Seller Members, on the one hand, and by Buyer, on the other hand, based upon the percentage that the amount actually contested but not awarded to the Seller Members or Buyer, respectively, bears to the aggregate amount actually contested by Seller Members and Buyer. The proposed Revenue and EBITDA Statement (including the 2021 Revenue and EBITDA Amount or the 2022 Revenue and EBITDA Amount, as applicable) shall be revised as appropriate to reflect the resolution of any Revenue and EBITDA Earnout Disputed Amounts pursuant to this Section 2.06(b)(iv).

# Resolution of Disputes Under the MIPA



*Luxottica Grp., S.p.A.* v. *Bausch & Lomb Inc.*, 160 F. Supp. 2d 552 (S.D.N.Y. 2001) (compelling party to submit disputes to independent account, serving as expert and not arbitrator, for determination pursuant to agreement)

*Campbell* v. *Plant Health Intermediate, Inc.*, 2024 WL 1054371 (S.D.N.Y. Mar. 11, 2024) (declining to resolve several claims, in an earnout payment dispute, that it deemed should have been submitted and resolved by an independent accountant per the agreement)

# Resolution of Disputes Under the MIPA



*In re Currency Conversion Fee Antitrust Litigation*, 2005 WL 1705285 (S.D.N.Y. July 22, 2005) (holding party waived right to compel arbitration by engaging in conduct inconsistent with arbitration)

*Hickey* v. *Smith*, 2024 WL 912041, at *3 (S.D.N.Y. Mar. 4, 2024) (acknowledging that there may be situations in which it is appropriate for a court to *sua sponte* enforce an arbitration clause, but declining to do so when the issue has not been properly briefed or when neither party has explicitly requested arbitration)

# Resolution of Disputes Under the MIPA



*Campbell* v. *Plant Health Intermediate, Inc.*, 2024 WL 1054371, at *9 (S.D.N.Y. Mar. 11, 2024)

There is no evidence in the record that the disputed items regarding the Second Earn-out Payment were negotiated in good faith, submitted to an Independent Accountant, or ever resolved.  Any counterclaim raised by [parties] for breach of contract for failure to pay the Second Earn-out Payment must be denied.

# 10. MoneyLion's Remedies

# MoneyLion's Preferred Remedy Is Complete Rescission

> 28.   For all of these reasons, if I had known in June of 2021, or at any time before the Acquisition, that Sellers' GAAP and ASC 606 representations were false, I would not have allowed MoneyLion to proceed any further in negotiating the Acquisition.

DX594 (Correia Aff.) ¶ 28



**Richard Correia**

Q.   Sitting here today, Mr. Correia, if you could give it back, would you?

A.   **Yes.**

Apr. 3 Rough Tr. at 910:13-15 (Correia Redirect)

DX 3131

58

# Rescission Is a Proper Remedy for Fraud Under New York and Federal Law



"A claim for damages sustained as a result of fraud or misrepresentation in the inducement of a contract or other transaction, shall not be deemed inconsistent with a claim for rescission or based upon rescission."

N.Y. C.P.L.R. 3002



"We note that rescission is also available as a remedy for violations of § 10(b) and the regulations promulgated thereunder."

*Boguslavsky v. Kaplan*, 159 F.3d 715, 721 n. 10 (2d Cir. 1998) (Straub, J.)

# Full Rescission Means a Return to the Status Quo



"Under New York law, a party fraudulently induced to enter into a contract has two general avenues; rescind the contract, return any consideration and seek restitution, or affirm the contract and seek damages."

*In re Stylesite Marketing, Inc.*, 253 B.R. 503, 511 (Bankr. S.D.N.Y 2000) (Bernstein, C.J.) (citing *Bazzano* v. *L'Oreal, S.A.*, 1996 WL 254873, at *3 (S.D.N.Y. 1996))

**DX 3133**

60

# Sellers Have Received $35,864,864.06 in Consideration

## Value Paid - Value Received (Gompers Valuation)

| | |
|---|---|
| Shares Registered and Sold By Sellers - Value At Issuance (FIFO) | $23,664,864.06 |
| Closing Cash Payment | $10,000,000.00 |
| Debt Paydown | $2,200,000.00 |
| **MoneyLion's Out-of-Pocket Transaction Consideration** | **$35,864,864.06** |

DX1013; DX1014 (Gompers Demonstratives)

**DX 3134**

61

# MoneyLion Has Worked Hard to Make Malka Profitable



88.    After issuing the restricted shares related to the 2021 Earnout,[11] I began to see indications suggesting that Malka was not as profitable as expected, and could even be on pace to operate at a loss.  By 2022, Malka was subject to MoneyLion's GAAP reporting processes, which gave us more insight into Malka's monthly performance.  In addition, throughout the fiscal 2022 year, the Sellers repeatedly requested that MoneyLion inject capital into Malka to help cover operating expenses.  I approved of these requests (which totaled over $8 million over the next 12 − 14 months), because I wanted the Sellers to have the resources they needed to succeed.  However, I found it surprising that Sellers needed these injections, given that, in seeking the 2021 Earnout, had reported that Malka had positive EBITDA of over $1.8 million.  Still, I had no reason to suspect prior to late 2022 that Sellers were engaged in any improper accounting practices.

DX594 (Correia Aff.) ¶ 88

62

# There Is No Basis to Deny Rescission Because Sellers Are Wrongdoers



"If the wrongdoer has, by his own act, complicated the case so that full restoration cannot be made, he has but himself to blame."

*Ajettix Inc.* v. *Raub*, 804 N.Y.S.2d 580, 593 (Sup. Ct. 2005) (Fisher, J.)
(quoting *Hammond* v. *Pennock*, 61 N.Y. 145, 152 (1874))

## Any Decrease in Malka's Value Is Sellers' to Bear



"If that which he returns is diminished in value by natural causes, or in the ordinary and proper use of it, he may still return it, as in such case, the contract being rescinded, and loss is the loss of the original owner."

*Ajettix Inc.* v. *Raub*, 804 N.Y.S.2d 580, 594 (Sup. Ct. 2005) (Fisher, J.)
(quoting *Snow* v. *Alley*, 144 Mass. 546, 551 (1887))

## The Court Has Discretion in Shaping an Order of Rescission



"[I]f it is possible to shape an equitable decree, restitution may be appropriate notwithstanding damage or depreciation at plaintiff's hands while she was in possession and after her discovery of the fraud."

*Ajettix Inc.* v. *Raub*, 804 N.Y.S.2d 580, 595 (Sup. Ct. 2005) (Fisher, J.)

# Overpayment – Gompers Valuation

## Value Paid - Value Received (Gompers Valuation)

| | |
|---|---|
| Shares Registered and Sold By Sellers - Value At Issuance (FIFO) | $23,664,864.06 |
| Closing Cash Payment | $10,000,000.00 |
| Debt Paydown | $2,200,000.00 |
| **MoneyLion's Out-of-Pocket Transaction Consideration** | **$35,864,864.06** |
| "But For" Value of Malka | $20,100,000.00 |
| **Value Paid - Value Received** | **$15,764,864.06** |

MoneyLion's Exhibit
No. 1:23-cv-06339-JMF
DX-1014

66

# Overpayment - Bingham Valuation

## Value Paid - Value Received (Bingham Valuation)

| | |
|---|---|
| Shares Registered and Sold By Sellers - Value At Issuance (FIFO) | $23,664,864.06 |
| Closing Cash Payment | $10,000,000.00 |
| Debt Paydown | $2,200,000.00 |
| **MoneyLion's Out-of-Pocket Transaction Consideration** | **$35,864,864.06** |
| "But For" Value of Malka | $13,600,000.00 |
| **Value Paid - Value Received** | **$22,264,864.06** |

MoneyLion's Exhibit
No. 1:23-cv-06339-JMF
DX-1015

## If the Court Chooses Not to Award Rescission, It Should Award MoneyLion Out-of-Pocket Damages, as of the Date of the Transaction



"Under the out-of-pocket rule, 'the loss is computed by ascertaining the difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain' *at the time of the transaction*.'"

*Fezzani v. Bear, Stearns & Co. Inc.*, 2018 WL 11249124, at *1 (S.D.N.Y. Apr. 16, 2018) (Crotty, J.)
(citation omitted) (emphasis added)

## Calculation of Out-of-Pocket Damages Considers the Value of What MoneyLion Gave Up



"On a valid fraudulent inducement claim, a plaintiff may recover its 'out-of-pocket' damages: the difference between the value of the bargain it was fraudulently induced to make and the value of the consideration exacted as the price of the bargain."

*Myers Industries., Inc.* v. *Schoeller Arca Systems, Inc.,* 171 F. Supp. 3d 107, 123 (S.D.N.Y. 2016) (Keenan, J.)



"The usual measure of damages for securities fraud claims under Rule 10b–5 is out-of-pocket loss; ***that is, the difference between the value of what the plaintiff gave up and the value of what the plaintiff received***."

*Ambassador Hotel Co.* v. *Wei-Chuan Investment,* 189 F.3d 1017, 1030 (9th Cir. 1999) (Reed, J.) (emphasis added)

69

# Sellers' Shares Could Have Been Sold by MoneyLion At Face Value



**Paul Gompers**

Q.   But the 30 million in the restricted stock, that's not the equivalent, as you've been saying, of 30 million in cash?

A.   **So, it is because you can sort of think about that 30 million of shares which were issued cost MoneyLion $30 million. They could have issued it to the market. And so, 30 million of shares is worth $30 million.**

Q.   Well, it's restricted, right? And a share that's restricted is not the same -- is not valued the same as a share that's unrestricted?

A.   **So the academic literature shows that if you do private placements of restricted shares for public companies, generally, there's little or no discount. So there's a literature on private placement of restricted shares, which shows that, at most, the discount would be 10 percent, but some of the studies find zero.**

Apr. 28 Rough Tr. 1071:07-21 (Gompers Cross)

# Sellers' Shares Are Not Subject to a Liquidity Discount



**Paul Gompers**

Q.  And you touched on this earlier with Mr. Hertzberg, but would you apply a liquidity discount here?

A.  **No, both from the perspective of the opportunity cost to MoneyLion that they could just issue the shares as a public company; and then secondly, back to the point that Mr. Hertzberg asked me about, would you apply a liquidity discount to restricted shares and, again, I looked at the academic literature which shows that, generally, there is no discount on it or, at most, 10 percent.**

Apr. 28 Rough Tr. 1109:01-09 (Gompers Redirect)

# Any Liquidity Discount Would Not Exceed 10%

- Rahsan Bozkurt Inget, *Private Equity Placements and the Illiquidity Discount* (2009) ("In the initial sample, 2,198 of the placements involve a negative issue discount, that is, offering share price is less than the exchange share price while **595 placements involve a non-negative issue discount**, that is, offering share price is greater than or equal to the market price. The final sample (1,125 private placements) includes 240 deals with non-negative issue discounts and 885 deals with negative discounts.")

- Kai-Shi Chung, *Private Placements, Market Discounts and Firm Performance: The Perspective of Corporate Life Cycle Analysis*, 54 Review of Quantitative Finance and Accounting 541, 551 (2020) (deriving discounts for private placements between **.80% and 1.39%**)

- Linda H. Chen et al., *Risk, Illiquidity or Marketability: What Matters for the Discounts on Private Equity Placements?*, 57 Journal of Banking & Finance 41, 44 (2015) (deriving mean and median discounts of **10.33% and 10.45%** respectively by calculating discount as "relative difference between the issue price and the stock price one day before the issue.")

- Karen H. Wruck and YiLin Wu, *Relationships, Corporate Governance, and Performance: Evidence from Private Placements of Common Stock*, 15 Journal of Corporate Finance 30, 35, (2008) (discussing discount methodologies for issue discounts and deriving issue discounts between **6.79% and 11.33%**)

# Bingham Offers No Viable Method For Calculating Synergies



**Paul Gompers**

Q.   You know now, having sat through a deposition and been in this case for a while, that MoneyLion did place significant value on Malka for its expected synergies; right?

A.   I certainly know that there was a discussion of potential synergy value, but **there are no projections and no estimates that allow one to estimate synergy value. Certainly what Mr. Bingham does is sort of made up.  It has no basis.**

Apr. 28 Rough Tr. 1095:07-13 (Gompers Cross)

73

# 11. The 2022 Earnout Payment Issuance Date

# The 2022 Earnout Is Capped at $25 Million



and (ii) Seven Dollars ($7.00). In the event the Company exceeds the Minimum 2022 Revenue Amount, such 2022 Earnout Payment shall increase on a linear basis up to such number of shares of Parent Stock equal to an aggregate value of Twenty Five Million Dollars ($25,000,000) in proportion to the Company's achievement of up to Thirty Million Dollars ($30,00,000) of Revenue ("**Maximum 2022 Revenue Amount**"), calculated in the same manner as described in Section 2.06(b)(v)(A). If such stock is issued to a Selling Member in connection with the

JX065 at DLA_006209

# The Earnouts as a Whole Are Capped at $35 Million

> **"Earnout Payment Amount"** means the aggregate amount of payments in the form of Parent Stock that may be made pursuant to <u>Section 2.06</u>, not to exceed Thirty Five Million Dollars ($35,000,000).

JX065 at DLA_006190

# The 2022 Issuance Date Has Not Occurred

> "**2022 Earnout Payment Issuance Date**" means the date on which the 2022 Earnout Payment is issued.

JX065 at DLA_006186

# MIPA Price Floor

"**Parent Stock Floor Price**" means Nine Dollars ($9.00) with respect to Closing Stock Payment, Eight Dollars ($8.00) with respect to the 2021 Earnout Payment, and Seven Dollars ($7.00) with respect to the 2022 Earnout Payment.

JX065 at DLA_006197

# MoneyLion Historical Stock Price (Split Adjusted)



# Earnout Payment

(e)    **Make-Whole Right**. In the event that upon each date listed in Section 2.03(a)(ii), Section 2.06(b)(v)(A), and Section 2.06(b)(v)(B) (the "**Vesting Dates**"), the 30-Day VWAP determined as of such Vesting Date (the "**Vesting Date VWAP**") is less than the Parent Stock Price Floor as of (a) the Closing Date (for the Closing Stock Payment), (b) the 2021 Earnout Payment Issuance Date (for the 2021 Earnout Payment), and (c) the 2022 Earnout Payment Issuance Date (for the 2022 Earnout Payment), as applicable, Buyer shall with respect to the Closing Stock Payment, the 2021 Earnout Payment and the 2022 Earnout Payment, on such Vesting Date, in accordance with each Seller Member's respective Selling Equity Percentage, (i) issue additional Parent Stock to each Seller Member or (ii) pay additional cash to each Seller Member, as determined at Buyer's sole discretion, equivalent to (x) the difference between the Vesting Date VWAP and the Parent Stock Floor Price for such Vesting Date, (y) multiplied by the number of shares of Parent Stock vesting for each Seller Member on such Vesting Date.

JX065 at DLA_006210-11

JX 065

80

# The Price Floor Must Adjust for the Stock Split to Avoid an Absurd Result



*Cofman* v. *Acton Corp*, 768 F. Supp. 392, 395-96 (D. Mass 1991)

"Not a single word or phrase explicitly about stock splits or reverse stock splits appears anywhere in the Agreements . . ."

"[But] it ***would be as surely a departure from manifested meaning to add to the Agreements in this case a windfall compensation provision*** contingent on a stock split or reverse split."

# Plaintiffs Misread The *Reiss* Exception

*Fluor Corp.* v. *Citadel Equity Fund Ltd.*, 760 F. Supp. 2d 685, 693 (N.D. Tex. 2010), *aff'd*, 413 F. App'x 756 (5th Cir. 2011).

"[T]he ***Reiss*** **court found that the parties intentionally omitted a provision which allowed for a price adjustment.** There, the evidence clearly showed that the parties had contemplated including such a provision but had opted not to do so . . .

In contrast, here, **nothing in the record suggests that the parties contemplated including a term which would adjust the Closing Price in the event of a stock-split** . . . The omission of this term was not something which the parties bargained-for in entering into this contract . . .

Because the Court should not interpret a contract to produce absurd results, or results which are contrary to the parties' intent, the Court rejects Citadel's reading of Section 1.02(e) of the Supplemental Indenture."



**DX 3024**

# Sellers Contracted for $75,000,000



**Louis Krubich**

"Whoa, what it should feel like is we're **being—all we want to do is be protective of the value of the $75,000,000**. We can ignore going up to 300 [million] and we can—"

PX271 at 00:16:36

## MoneyLion Was Exploring Capital Markets Solutions



**Richard Correia**

"No, I'm saying that there are other capital market solutions out there, and that was just the senior debt facility with the covenant on our cash. Our ability to go do sub debt, tap into warehouse facility lines, potentially do even an equity or a convert, there are other capital market solutions out there. We were actually pursuing them."

Apr. 3, 2025 Rough Tr. 849:19-24 (Correia Cross)

84

# MoneyLion Was Exploring Capital Markets Solutions



**Richard Correia**

Q.  We saw documents, Mr. Lauer showed them to you, where Monroe was refusing requests to raise $1 million or to pay $350,000.  Why are you saying that they would have allowed you to raise money to pay a lot more than that?

A.  Because we had conversations with [Monroe]. They had given us the autonomy to go out and do things that wouldn't impact the cash of the company, meaning being sent out and reducing -- reducing their kind of cash coverage. But the spectrum of things that I just talked about would not have done that.

Apr. 3, 2025 Rough Tr. 917:20–918:4 (Correia Redirect)

85

## Sellers' Counterfactuals Are Irrelevant Under the Majority Rule



*Digital Ally, Inc*. v. *Z3 Tech*., LLC, 754 F.3d 802, 817–18  (10th Cir. 2014)

"**[M]ost cases have instead followed the rule set forth in the First Restatement of Contracts**:"

— "The damages for breach of an alternative contract are determined in accordance with that one of the alternatives that is chosen by the party having an election, or, **in case of breach without an election, in accordance with the alternative that will result in the smallest recovery.**"

— Exception: "**[I]n an alternative contract where one of the alternatives is a sum of money**, **the promisee is entitled to the sum of money** even though the other alternative may be less onerous to the promisor."

# 12. Sellers' Request for Specific Performance

# Frozen Shares



injunction or other final and non-appealable judgment or order issued by any court of competent jurisdiction. If, after the Effective Time, the no transfer order with respect to any Frozen Share is so released to a holder other than the Surviving Corporation, each such Frozen Share will thereupon be treated as if it had been converted into, at the Effective Time, the right to receive the Merger Consideration and the Surviving Corporation shall remain liable for payment of the Merger Consideration (without any interest thereon) for such Frozen Share in accordance with this Agreement. At the Effective Time, any holder or beneficial owner of any Frozen Share will cease to have any rights with respect thereto, except as provided in the immediately preceding sentence. Any Frozen Share that is not so released shall be treated as an Owned Company Share hereunder.

PX382 at 27

# The Merger Extinguished Sellers' Shareholder Rights



> (e)    _Frozen Shares_. Notwithstanding anything to the contrary set forth in this Agreement, each share of Company Common Stock with respect to which a no transfer order has been placed with the Company's transfer agent as of the date hereof that remains in place immediately prior to the Effective Time (each, a **"Frozen Share") will not be converted into the right to receive the Merger Consideration** pursuant to this _Section 2.7_, and holders (or, to the extent applicable, beneficial owners) of such Frozen Shares will not be entitled to receive payment in respect of any such Frozen Shares unless and until the no transfer order with respect to such Frozen Shares has been released by the Company, Surviving Corporation or Parent, as applicable, either voluntarily or pursuant to a
>
> *  *  *
>
> thereon) for such Frozen Share in accordance with this Agreement. **At the Effective Time, any holder or beneficial owner of any Frozen Share will cease to have any rights with respect thereto,** except as provided in the immediately preceding sentence. Any Frozen Share

PX382 at 26-27

# The Merger Entitles Sellers to Merger Consideration—and Nothing More



injunction or other final and non-appealable judgment or order issued by any court of competent jurisdiction. If, after the Effective Time, the no transfer order with respect to any Frozen Share is so released to a holder other than the Surviving Corporation, each such Frozen Share will thereupon be treated as if it had been converted into, at the Effective Time, the right to receive the Merger Consideration and the Surviving Corporation shall remain liable for payment of the Merger Consideration (without any interest

PX382 at 27

90

# The Merger Consideration Is Equivalent to Money Damages



(ii)    each share of Company Common Stock that is issued and outstanding as of immediately prior to the Effective Time (other than Owned Company Shares, Frozen Shares and Dissenting Company Shares) will be automatically cancelled, extinguished and converted into the right to receive (A) cash in an amount equal to $82, without interest thereon (the "**Per Share Price**", and such consideration, the "**Cash Consideration**") and (B) one contingent value right issued by Parent subject to and in accordance with the CVR Agreement (a "**CVR**") (the

PX382 at 25

# MoneyLion Cannot Issue Any Additional MLI Stock

> **"Parent Stock"** means the common stock, par value $0.0001 per share, of MoneyLion Inc.

JX065 at DLA_006197

# 13. The Settlement With DUAL

# MoneyLion Settled for $6.5 Million With DUAL



**Richard Correia**

Q.  But did you receive any money from DUAL in a settlement under that policy?

**A.  Yes, we did.**

Q.  And do you recall, of the $7.5 million policy, how much you received?

**A.  I think around 6 million.**

Q.  So it's about 80 percent?

**A.  About that, yes.**

Apr. 3, 2025 Rough Tr. 874:22-875:04

# MoneyLion Settled for $6.5 Million With DUAL



**Paul Gompers**

Q.  Actually, before we do that, are you aware that MoneyLion received 6-1/2 million from its reps and warranties insurer?

**A.  No.**

Apr. 28 Rough Tr. at 1078:01-03 (Gompers Cross)

# 14. MoneyLion's Recoupment Defense

## MoneyLion's Recoupment Defense



"Recoupment is in the nature of a defense, the purpose of which is to ***do justice viewing one transaction as a whole***."

— *Westinghouse Credit Corp.* v. *D'Urso*, 278 F.3d 138, 146 (2d Cir. 2002)

(emphasis added)

# MoneyLion's Recoupment Defense



Although a defendant "did not raise recoupment as an affirmative defense, time-barred claims can be considered for recoupment when they arise out of the same factually-related transaction as the plaintiff's claim."

— *Finger Lakes Cap. Partners, LLC* v. *Honeoye Lake Acquisition, LLC*, 151 A.3d 450, 453–54 (Del. 2016)

98

## MoneyLion's Recoupment Defense



"It is well established that statutes of limitations run against affirmative claims for relief, but not against defenses." . . .

"[E]ven if [a defendant] had filed a time-barred counterclaim, the statute of limitations would not have prevented [the defendant] from asserting its affirmative defense to the [plaintiffs'] claim."
— *Est. of Burne Hogarth* v. *Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 164 (2d Cir. 2003)



"The purpose of statutes of limitation is to bar actions and not to suppress or deny matters of defense, whether legal or equitable; and it is a general rule that such statutes are not applicable to defenses, but apply only where affirmative relief is sought."
— *Sunder Energy, LLC* v. *Jackson*, 305 A.3d 723, 748 (Del. Ch. 2023), *aff'd in part, rev'd in part on other grounds*, 332 A.3d 472 (Del. 2024)

## Material Breach – Standard



 A party's performance under a contract is excused "where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."

*Merrill Lynch & Co. Inc.* v. *Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007)

"We agree with appellants that there is no reason under New York law to treat a breach of warranty any differently than any other contractual breach."

*Merrill Lynch & Co. Inc.* v. *Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007)

# Material Breach – Malka's True Value



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED AND PAT CAPRA,

　　　　　　　　　　　　Plaintiffs,

- against –

MONEYLION TECHNOLOGIES INC. AND
CONTINENTAL STOCK TRANSFER & TRUST
COMPANY,

　　　　　　　　　　　　Defendants,

MONEYLION TECHNOLOGIES INC.,

　　　　　　　　Counterclaim Plaintiff,

- against –

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

　　　　　　　Counterclaim Defendants,

MONEYLION INC.,

　　　　　　　　Third-Party Plaintiff,

- against –

JEFFREY FROMMER, LYUSEN (LOUIS) KRUBICH,
DANIEL FRIED and PAT CAPRA,

　　　　　　　Third Party Defendants.

Case No. 1:23-cv-06339-JMF

**TRIAL AFFIDAVIT OF PROFESSOR PAUL A. GOMPERS, PH.D.[1]**

Professor Paul A. Gompers, Ph.D. being duly sworn, deposes and states:

[1] Cited herein are true and correct copies of written communications and their attachments, sent or
received by me on or about the dates indicated in the documents.

> 42.　Relying on these representations and assumptions, I adjusted the Malka Projections to incorporate the impact of the Alleged Misrepresentations.  I then estimated Malka's value as of the Transaction Date using the same methodology I used for its valuation in the "actual world".  When doing so, I find that the estimated value of Malka in the "but for" scenario is $20.1 million, which represents a reduction of $40.4 million relative to the estimated value of Malka in the actual world.

DX 596 (Gompers Aff.) at ¶ 42

101

# Material Breach – Malka's True Value



98. I performed a DCF analysis under the Income Approach, as well as two Market Approach analyses.

The details regarding the assumptions I used and how they differ in this alternative scenario from my Fair

Market Value analysis are discussed in Appendix C. My conclusions are presented in the table below:

**Alternate Scenario**
$ in thousands

| Valuation Methodology | Weighting | Malka Media Group LLC | | |
|---|---|---|---|---|
| | | Low | Mid | High |
| Income Approach: Discounted Cash Flow Analysis | 50.0% | $5,100 | $5,700 | $6,400 |
| Market Approach: Public Company Analysis | 40.0% | 18,700 | 20,300 | 21,800 |
| Market Approach: Transaction Analysis | 10.0% | 24,700 | 25,900 | 27,100 |
| | 100.0% | | | |
| **Indicated Enterprise Value Range (rounded)** | | $12,500 | $13,600 | $14,600 |

PX423 (Bingham Aff.) at ¶ 98

# Material Breach – Section 8.09 Exclusion of Money Losses



**Section 8.09 Exclusion of Other Remedies.** The Parties agree that, from and after the Closing Date, the indemnification or reimbursement obligations of the Parties set forth in this Article VIII shall constitute the sole and exclusive remedies of the Parties (other than the Sellers' Representative) for any monetary Losses based upon, arising out of or otherwise in respect of the matters set forth in this Agreement and the transactions contemplated hereby and thereby. The provisions of this Section 8.09 will not, however, prevent or limit a cause of action to enforce any decision or determination of the Independent Accountant. Without limiting the generality of this Section 8.09, the Parties hereby waive any statutory, equitable, or common law rights or remedies that otherwise may be asserted against such Party by any Seller Indemnitees or Buyer Indemnitees, as applicable. In addition, and without limiting the generality of the foregoing, any rights of any issuer of the R&W Policy, including any rights of subrogation, do not affect, expand, or increase any liability or obligation of the Seller Members in connection with the transactions contemplated by this Agreement. The provisions of this Article VIII shall apply even if (a) the R&W Policy is never issued by an insurer, (b) the R&W Policy is revoked, cancelled or modified in any manner after issuance, or (c) Buyer Indemnitees make a claim under the R&W Policy and such claim is denied by the insurer.

JX065 at DLA_006253