# Plaintiffs' Closing Presentation

JEFFREY FROMMER, *ET AL.*, V. MONEYLION TECHNOLOGIES INC., *ET ANO.*

# Introduction

**Sellers have proven their case.**

- **2022 Earnout**

  — Malka's revenue exceeded $30 million and its EBITDA exceeded $100,000.

  — It is undisputed that Malka's 2022 income statement, as delivered by Basdekis to MoneyLion on Jan. 25, 2023, followed Malka's historical accounting principles and was consistent with the methods and practices of the 2021 Earnout.

  — Sellers are entitled to specific performance under Section 9.12 of the MIPA, requiring delivery of the number of shares that would have been issued, but for the breach. In the alternative, Sellers are entitled to money damages based on the highest intermediate prices following each vesting date.

- **Vested Shares**

  — Nothing in the MIPA, RSAs, or RRA permits MoneyLion to freeze the shares.

  — **Closing Shares:** MoneyLion's only defense is its fraud claim, for which MoneyLion failed to prove a single element.

  — **2021 Earnout Shares:** Again, MoneyLion's only defense is its fraud claim, which MoneyLion failed to prove. As a result of the stub-period work, MoneyLion cannot deny actual knowledge of Malka's revenue recognition practices, including the exact adjustments that would be needed under GAAP, months before MoneyLion approved the 2021 Earnout on Mar. 15, 2022 (while knowing that the 2021 Earnout did not include those GAAP-based adjustments).

# How Schedule A, Schedule B, and Section 3.06 of the MIPA should be interpreted.

# Interpretation of Section 3.06, Schedule A, and Schedule B

*(1) How Schedule A, Schedule B, and Section 3.06 of the MIPA should be interpreted.*

- **<u>Short Answer</u>**

  — **Section 3.06** represents that Malka's financial statements were prepared in accordance with the Accounting Principles.

  — **Definitions**

    - **"Accounting Principles"** means (a) the principles, policies, and procedures expressly set forth on **Schedule A;** (b) to the extent not inconsistent with the foregoing, the historical accounting principles, policies and procedures of the Company.

  — **Schedule A** contains explicit "except[ions]" to GAAP for Malka's historical revenue recognition principles, and for its historical expense recognition principles, including costs.

  — There is no dispute that expenses and costs were disclosed exceptions to Malka's GAAP compliance.  (Tr. 806:14-807:4 (Correia), 1131:3-1132:13 (Dudney).)

---

# Interpretation of Section 3.06, Schedule A, and Schedule B (Cont'd)

*(1) How Schedule A, Schedule B, and Section 3.06 of the MIPA should be interpreted.*

- **Short Answer**

  — **Section 2.06(b)(i)** requires MoneyLion to calculate Malka's revenue and EBITDA for purposes of the 2021 and 2022 Earnouts in good faith and in accordance with the Revenue and EBITDA Calculation Principles.

  — **Definitions**

    • **"Revenue and EBITDA Calculation Principles"** means (a) the principles, policies, and procedures used by Buyer in its calculation of the Company's Revenue and EBITDA for the periods beginning on January 1, 2021 and ended December 31, 2021 and beginning January 1, 2022 and ended December 31, 2022, as set forth on **Schedule B;** and (b) to the extent not inconsistent with the foregoing, the historical accounting principles, policies and procedures of the Company.

  — Schedule B provides that revenue is recognized in accordance with Malka's "historical revenue recognition principles," and EBITDA is to be calculated using those same "historical revenue and cost recognition principles." Additional items are to be included in revenue and EBITDA.

  — The parties agree that the historical revenue and cost recognition principles in Schedules A and B are the same. (*See* ML Opp., ECF No. 160 at 43-44; Curran Decl. ¶¶ 67, 70; JX038.)

- MoneyLion claims (MPF at 74-80) there were two misrepresentations in Section 3.06 of the MIPA:

**Section 3.06 Financial Statements.** Complete copies of the Company's unaudited financial statements consisting of the balance sheet of the Company as of December 31 in each of the years 2019 and 2020 and the related statements of income and retained earnings, stockholders' equity and cash flow for the years then ended (the "**Unaudited Financial Statements**"), and unaudited financial statements consisting of the balance sheet of the Company as of September 30, 2021 and the related statements of income and retained earnings, stockholders' equity and cash flow for the nine month period then ended (the "**Interim Financial Statements**" and together with the Unaudited Financial Statements, the "**Financial Statements**") are included in the Disclosure Schedules as previously delivered to Buyer. ==**Except as set forth in Section 3.06 of the Disclosure Schedule, the Financial Statements have been prepared in accordance with the Accounting Principles**== throughout the period involved, subject, in the case of the Interim Financial Statements, to normal and recurring year-end adjustments (the effect of which will not be materially adverse) and the absence of notes (that, if presented, would not differ materially from those presented in the Unaudited Financial Statements). ==**The Financial Statements**== are based on the books and records of the Company, and ==**fairly present the financial condition of the Company**== as of the respective dates they were prepared and the results of the operations of the Company for the periods indicated. . . . The Company maintains a standard system of accounting established and administered in accordance with the Accounting Principles in all material respects. (JX065 at DLA_006214.)

# Interpretation of Section 3.06, Schedule A, and Schedule B (Cont'd)

- Section 3.06 of the Disclosure Schedules provided that there were no exceptions to the representations in Section 3.06 of the MIPA.  Thus, the representation in 3.06 that the financial statements were prepared in accordance with the **Accounting Principles** has no exceptions.

  — *See* JX065 – Schedule A

- **Schedule A (Accounting Principles)** provides that Malka's financial statements "shall be prepared in accordance with (a) U.S. GAAP, except as follows:

  — a. the ***Company's historical revenue recognition principles***, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained;

    - Schedule A does not say the "sole" or "only" GAAP deviation for revenue recognition is for non-cancelable deposits.

    - **Accounting Principles** includes all other aspects of the company's historical accounting principles, policies, and practices, so long as they are not inconsistent with Schedule A. Thus, all other revenue exceptions to GAAP for revenue recognition are implicitly recognized by the MIPA.

    - Schedule A does not say that Malka's historical deviations from GAAP with respect to revenue recognition were "minimal" or "immaterial"

  — b. the Company's historical cost recognition principles associated with such revenue, which require the Company to recognize costs on contracts as incurred;

  …

(JX065 at DLA_006263.)

- . . .

— c. invoiced expenses are recognized in related period based on receipt of the invoice (i.e., if the Company receives an invoice in October, it is entered in October and shows as an October expense, even if cash is not paid out until 30 or 60 days from the date of receipt; this applied to contracted costs, variable costs, and overhead);

- MoneyLion agrees this language unambiguously identifies expenses and costs as an exception to GAAP. (Tr. 806:14-807:4 (Correia), 1131:3-1132:13 (Dudney).)

— d. payroll is recognized in period as earned, paid out on the 15th and last day of every month, with the exception of commission; commission is recognized as expense net 60 from the second payroll of each month that commission was earned (i.e., commission earned in August is paid and recognized with the second EOM payroll cycle of October);

— e. credit card expense is recognized in period incurred

- i. historically, a year end true up was made to reflect it on the Company's annual financials, not on a monthly basis. This year, the Company has adjusted so that each month reflects associated credit card expenses in the month incurred; and

— f. capitalized expenses and depreciation recognized according to GAAP and adjusted annually with a minimal threshold of $2,500."

(JX065 at DLA_006263.)

# Interpretation of Section 3.06, Schedule A, and Schedule B (Cont'd)

- MoneyLion impermissibly, and without any textual justification, reads Schedule A as though it said:

  — The Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with: (a) U.S. GAAP, except as follows:
    a.  ~~the Company's historical revenue recognition principles, which require the Company to recognize into revenue~~ noncancelable deposits on contracts~~, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained;~~

- Dudney testified that his interpretation of Schedule A would be unchanged if it simply said: "U.S. GAAP." (Tr. 1149:23-1151:25.)

- This violates the "cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions." *E.I. duPont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del. 1985).

  — MoneyLion ignores the contract's very emphasis on "the Company's historical revenue recognition principles," and further ignores each of the descriptive elements of those principles in Schedule A.

# Interpretation of Section 3.06, Schedule A, and Schedule B (Cont'd)

— Turning back to the text of Section 3.06, it represents that the Financial Statements fairly presented the financial condition of Malka.

- *See* JX065 – Section 3.06

— This must be read with the remainder of Section 3.06 that the Financial Statements were prepared in accordance with the **Accounting Principles.**

— Read together, the Financial Statements fairly present the financial condition of the company as prepared in accordance with the **Accounting Principles** in Schedule A.

— If this had been another way of saying that the Financial Statements were prepared in accordance with GAAP and ASC 606, then there would be no reason for the representation in Section 3.06 that they were "prepared in accordance with the Accounting Principles," and no reason for Schedule A to exist.

— We will address this more fully in answering the Court's question as to construing ambiguous terms, but the exception to GAAP for Malka's historical recognition of expenses and costs proves this point, *i.e.*, that the Accounting Principles represented in Schedule A can be different from the accounting principles described in the Financial Statements, and that is the purpose of the representation in Section 3.06 that the Financial Statements were prepared in accordance with Schedule A.

# Interpretation of Section 3.06, Schedule A, and Schedule B (Cont'd)

— Let's turn to Schedule B and the Revenue and EBITDA Calculation Principles.

— The Revenue and EBITDA Calculation Principles for earnout purposes are (a) as set forth in **Schedule B** "and (b) to the extent not inconsistent with the foregoing, the historical accounting principles, policies and procedures of the Company."

— Now let's look at Schedule B.

  - *See* JX065 – Schedule B

# Interpretation of Section 3.06, Schedule A, and Schedule B (Cont'd)

- **Schedule B (Revenue and EBITDA Calculation Principles)** provides, in relevant part:

  — "'**Revenue'** refers to revenue recognized according to the ***Company's historical revenue recognition principles*** for the combined and consolidated Company. By way of illustration, the Company's historical revenue recognition principles require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained. . . ."

    - Schedule B also requires certain items to be included in Malka's calculated revenue. For example, "[r]evenue shall include the difference between the fair market value of the intercompany services provided by the Company to Buyer and the actual charge for the intercompany services provided by the Company to Buyer."

  (JX065 at DLA_006199, DLA_006266-67.)

— "'**EBITDA**' means the combined and consolidated net income before interest expense, federal, state and local taxes, depreciation and amortization of the Buyer, determined in accordance with U.S. GAAP (*including the Company's historical revenue and cost recognition principles*) as reviewed or audited by Buyer's independent accountants."

- Schedule B also requires certain items to be included in Malka's calculated EBITDA. For example, "EBITDA shall include the expected recognition of the New Jersey Digital Media Tax Credit ('Tax Credit') in the period in which the Tax Credit was applied for. By way of illustration, the Tax Credit applied for in 2021 was for services provided by the Company in 2019. The Tax Credit would be added to 2021 EBITDA."

(JX065 at DLA_006266-67.)

- <u>The parties agree</u> that the "historical revenue and cost recognition principles" referenced in Schedules A and B "are intended to be consistent"—except that Schedule B provides for specific, additional items to be included in the calculation of Malka's revenue and/or EBITDA for earnout purposes. (*See* ML Opp., ECF No. 160 at 43-44; Curran Decl. ¶¶ 67, 70; JX038.)

- Schedule A made explicit that Malka's expense and cost recognition practices did not follow GAAP. (Tr. 806:14-807:4 (Correia), 1131:3-1132:13 (Dudney).) There is no basis for using GAAP expenses or costs in the earnouts.

# What the parties believed or represented about Malka's compliance with ASC 606 before the MIPA was executed.

# The Parties' Pre-Closing Knowledge and Representations About ASC 606

*(2) What the parties believed or represented about Malka's compliance with ASC 606 before the MIPA was executed.*

## Short Answer – MoneyLion

— MoneyLion knew or should have known through due diligence that Malka recognized revenue upon invoicing, including for **"deposits"** and **"advance payments"** that were invoiced <u>before any work had been performed</u>.  (PX024; PX027; Tr. 1133:8-11 (Dudney).)

— MoneyLion knew through due diligence that Malka had not confirmed or validated compliance with ASC 606 and that Malka <u>deviated from ASC 606 in at least certain instances</u>.  (JX014.)

— Sellers <u>deleted any reference to ASC 606</u> from Schedules A and B, replacing it with references to Malka's "historical revenue recognition principles," which were listed in Schedule A as an "except[ion]" to GAAP.

— MoneyLion's contemporaneous communications during the drafting process show that it understood Schedules A and B as revised by Sellers <u>did not represent compliance with ASC 606.</u>

# The Parties' Pre-Closing Knowledge and Representations About ASC 606 (Cont'd)

*(2) What the parties believed or represented about Malka's compliance with ASC 606 before the MIPA was executed.*

## Short Answer – Sellers

— **June 2021:** Malka sends MoneyLion (1) a pitch deck which represents historical revenue and EBITDA numbers and (2) the 2019 and 2020 Financial Statements, which represent that Malka was in compliance with ASC 606 and no material modifications would be required for compliance with GAAP.  (JX005.)

— During due diligence, according to CFGI, one of Basdekis, Curran, or Frommer represented that Malka followed ASC 606, but that Malka had "not performed a detailed assessment to confirm or validate compliance."  By October 19, however, Frommer understood that Malka's historical revenue recognition practice did not follow ASC 606.

— Accordingly, Sellers deleted ASC 606 from the drafts of both Schedules A and B.

# The Parties' Pre-Closing Knowledge and Representations About ASC 606 (Cont'd)

**Timeline:**

- **June 2021:** Malka sends MoneyLion (1) a pitch deck which represents historical revenue and EBITDA numbers and (2) the 2019 and 2020 Financial Statements, which represent that Malka was in compliance with ASC 606 and no material modifications would be required for compliance with GAAP. (JX005.)

- **July – Oct. 2021:** Due Diligence

  — The data room available to MoneyLion and its advisors for several months before the closing included monthly sales detail (invoiced amounts) and income (revenue) for 2019 and 2020, and financials for 2019 through the first half of 2021. (PX024; PX027.)

  — These documents reflected that, for every month in 2019, Malka's total invoices and total revenue matched exactly: $13,587,569.13. Thus, they showed that in 2019, ***Malka recognized revenue upon invoicing.***

  — The documents reflected that in 2020, Malka's total invoices and total revenue matched exactly for the first 11 months, with revenue being $23,620.22 higher than invoices in Dec. 2020. Thus, they showed that in 2020, ***Malka recognized revenue upon invoicing***, plus modest additional revenue in Dec.

  — The invoices document (PX027) also referred to dozens of examples of "**50% Deposit**" and "**Advance Payment**" which were recognized as revenue at the beginning of a project. Thus, they showed that in both 2019 and 2020, Malka ***recognized upfront deposits (before any work was done) as revenue.***

    - Dudney testified that "deposit" refers to an amount of money paid without work being done. (Tr. 1133:8-11.)

# The Parties' Pre-Closing Knowledge and Representations About ASC 606 (Cont'd)

- **Oct. 5, 2021:** CFGI issued its report, advising MoneyLion:

  — Malka does not follow GAAP

  - "The Company [Malka] generally does not prepare its financial statements on a full accrual basis of accounting, ***which could impact the Company's revenue, EBITDA and net working capital*.**"

  - "[W]e anticipate ***net working capital would be significantly different if the Company reported under GAAP*.**"

  - "While Management represented that the Company is compliant with ASC 606 revenue recognition requirements, it has not performed a detailed assessment to confirm or validate compliance. Further, Management acknowledged that in certain instances where projects fell behind schedule, ***the Company invoiced customers based on the planned rather than actual timeline(s)*,**" which was a deviation from ASC 606. (Tr. 770:10-17, 794:19-25 (Correia).) CFGI made no investigation or finding as to the degree of noncompliance. "Following this transaction, we understand that the Buyer plans to align the Company's accounting policies including in relation to revenue recognition, with that of MoneyLion."

  - Therefore, CFGI proposed non-quantified adjustments to Malka's **<u>revenue</u>** and EBITDA.

(JX014 at MoneyLion_01813058, MoneyLon_01813066, MoneyLion_01813061-62.)

# The Parties' Pre-Closing Knowledge and Representations About ASC 606 (Cont'd)

- **Oct. 19, 2021:** Frommer writes an email to Basdekis, Curran, and Fox Rothschild that Correia "was open to having our business run on <u>its current way of revenue recognition</u> and ebitda calculations for purposes of earnouts while having a <u>separate book to align with their GAAP</u> for public filing purposes." (JX022.) At some point between July 9 and Oct. 19, Basdekis must have advised Frommer that Malka did not follow GAAP in recognizing revenue. (Frommer Decl. ¶ 89.)

  — <u>**Corroborated by**</u> Nuno's Dec. 2022 Slack with Torossian, referring to her and Correia's knowledge before the closing: "**i really regret not pushing back even harder on allowing them to use cash basis accounting for the earnout. . . . Rick was more flexible on that** which I get, we were trying to get them to agree to a floor that at the time was not beneficial to them." (PX275 at MoneyLion_01842895-98.)

- **Oct. 27, 2021:** MoneyLion's counsel (DLA Piper) sent initial drafts of Schedules A and B which explicitly required GAAP and ASC 606. (JX028 at DLA_001639-40; JX029 at DLA_001599.)

# The Parties' Pre-Closing Knowledge and Representations About ASC 606 (Cont'd)

- On **Oct. 29** and **Nov. 1, 2021**, Curran, Basdekis, and Fox Rothschild deleted references to ASC 606 from both schedules and replaced them with the "historical revenue recognition principles" language. (JX030; JX042.)

- **Nov. 1, 2021:**

  — Lee, Nuno, and Orokos understood the redline of Schedule B meant that Sellers "**want to use their historical revenue recognition principles and not GAAP / ASC 606**" for the earnouts, and that Sellers' revisions to Schedule B would require them to "**maintain separate rev recs**" for the earnout calculations and MoneyLion's GAAP-compliant consolidated financials. (PX128 at MoneyLion_01813812.)

  — Lee and Nuno understood that Sellers' revisions to Schedule B would mean "**we'd agree to diff rev than what we are having to report publicly**" and "maybe rick discussed w them." (JX044 at MoneyLion_01813635.)

  — Let's look at MoneyLion's reaction to Schedule A.

  — Lee also stated in the same Slack, "they [Sellers] sent us back a schedule a and it['] s basically like **no we will not follow gaap**." Nuno responded: "this is insane." (JX044.)

  — Lee testified she was "confused" about the revisions to Schedule B and Schedule A (Trial Tr. 385:22-24; Lee Aff. ¶ 16, 19). Correia also testifies to being "confused" and discussing Sellers' edits to Schedules A and B with Lee and Nuno. (Trial Tr. 785:24-786:10; Correia Aff. ¶ 66.)

- **Nov. 1 or 2, 2021:** Correia has a phone call with Frommer allegedly regarding the markup of the schedules.

# The Parties' Pre-Closing Knowledge and Representations About ASC 606 (Cont'd)

- Correia's supposed oral understanding about the meaning of Schedule A is outside of the MIPA. He **never put his supposed understanding** that non-cancelable deposits were "immaterial" **in writing** anywhere; and **never asked for it to be reflected in the MIPA**. (Tr. 793:1-4, 799:19-22.)

  — The only contractual representations regarding Malka's historical accounting principles are in Schedule A. Schedule A must be read with the definition of **Accounting Principles** to include all other nonconflicting historical accounting principles, policies, and procedures.

  — The only contractual principles for calculating Malka's revenue and EBITDA for 2021 and 2022 Earnout purposes are in Schedule B.

- Correia admits that **CFGI disclosed at least one additional deviation from ASC 606**, **which he did not inquire about**. (Tr. 770:10-17, 794:19-25.)

- Correia said that a deviation from GAAP of 5% or less would not be material, and in some cases the deviation could be greater. Recall his response to the Court's question that a 20% adjustment to revenue to comply with GAAP "would qualify as immaterial," in his view. (Tr. 763:10-12, 866:5-17.)

  — Dudney testified that Malka's revenue would have been just 0.2% lower for 2019, 3.9% lower for 2020, and 4.9% for Sept. 2021 year-to-date, for a <u>total adjustment of 3.28%</u> across the 33-month period considered by Dudney; if two categories of contracts with non-cancelable deposits provisions are excluded from Dudney's adjustments, the Sept. 2021 year-to-date adjustment is 3.1% and the 33-month <u>total adjustment is 2.6%</u>. (PX424 at 3; Tr. 1167:7-1169:7 (Dudney).)

# The Parties' Pre-Closing Knowledge and Representations About ASC 606 (Cont'd)

- Correia has no recollection of the substance of the Nov. 1, 2021 underwriting call with DUAL, CFGI, and DLA, during which GAAP and ASC 606 compliance was discussed.  (Trial Tr. 789:5-792:5; PX123; PX124.)

- **Nov. 2, 2021:** Lee emails DLA, copying Correia: "We are ok with Schedule A given that we now understand it pertains to historical periods only."  (PX131.)  No reference to non-cancelable deposits.

- **Nov. 4, 2021:** MoneyLion's counsel (DLA Piper)—forwarding a comment from MoneyLion's RWI insurer (Dual)—advised Sellers prior to the closing that DLA and Dual understood Schedule A represents that <u>Malka did not historically follow GAAP for revenue recognition</u>.

  - Dual: "[T]he Company is essentially making the representation that its financial statements have been historically prepared under GAAP **except revenue recognition** and contract costs."

  - DLA: "To that end, can your client please revise Schedule A to include those additional areas, **aside from revenue recognition** and contract costs?"

(JX054 at MoneyLion_01032413.)

- Dual's and DLA's comments clearly communicated that there was no need to further revise the already-disclosed exception to GAAP for revenue recognition.  (*See* Curran Decl. ¶¶ 87-88; Halbert Dep. Tr. at 112:12-113:9 ("I understood [DLA] to be communicating that the financial diligence had discovered some areas *beyond revenue recognition* and contract cost that they believed the company deviated from GAAP. And because Schedule A currently only mentioned revenue recognition and cost recognition, they wanted us to expand that schedule to mention these *other areas* in which the company may have deviated from GAAP.").)

# Construction of Ambiguous Contract Terms

# Construction of Ambiguous Contract Terms

*"How, if Schedules A and B do suggest that Malka's revenue recognition was not compliant with ASC 606, that should be reconciled with the inclusion in the MIPA of Malka's financial statements stating Malka complied with ASC 606. In addition, if those provisions conflict, whether the Court should look to extrinsic evidence to resolve any resulting ambiguity in the text of the MIPA."*

- **Short Answer:** There is nothing to reconcile.

  - Section 3.06 explicitly provides that the Financial Statements were prepared in accordance with the Accounting Principles <u>described in Schedule A</u>. If Schedule A is correctly read to represent that revenue is not compliant with ASC 606, then that is the governing representation. The fact that it is inconsistent with the Financial Statements does not make the contract ambiguous.

  - Section 9.06 of the MIPA provides that "<u>the statements in the body of this Agreement</u>" <u>will control</u> over statements in any other document. (JX065 at DLA_006255.)

- The Disclosure Schedules, to which the Financial Statements were attached, also provide: "Nothing in these Disclosure Schedules is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant unless clearly specified to the contrary herein or therein." (JX066 at MoneyLion_001037.)

# Construction of Ambiguous Contract Terms (Cont'd)

- A key to understanding why a conflict does not require reconciliation is the treatment of expenses. MoneyLion concedes that expenses and costs are listed as exceptions to GAAP in Schedule A. In contrast, the Financial Statements say that the expenses are GAAP. MoneyLion accepts that there can be and in fact is a conflict between the Financial Statements and Schedule A, and that Schedule A is controlling.

- Of course, the Court may look to extrinsic evidence if it locates an ambiguity within Schedule A or the MIPA generally, but the inconsistency does not create an ambiguity. The fact there is an inconsistency between Schedule A and the Financial Statements does not create an ambiguity.

- 3.06 is the representation, not the multiple documents included in the Disclosure Schedules. The representation is the Financial Statements were prepared in accordance with **Accounting Principles** (*i.e.*, Schedule A and to the extent not inconsistent, the Company's historical accounting principles, policies, and procedures) and as such fairly presented the financial condition of the company.

# The Intentions of the Contracting Parties

# The Intentions of the Contracting Parties

*"If the Court looks to extrinsic evidence in interpreting the MIPA, whether the Court is limited to considering the intent of particular employees or representatives of the parties and, if so, which employees and representatives."*

- **Short Answer:** **No, the Court is not limited**. No person about whom the Court has heard evidence should be excluded. If the Court finds the relevant MIPA provisions (Section 3.06, Schedule A, and Schedule B) ambiguous and looks to extrinsic evidence, then it can consider extrinsic evidence as to any person who was authorized to work on the MIPA and its implementation. This list of people would include, but is not limited to:

  — On the MoneyLion side, all of MoneyLion's Strategic Finance and accounting teams (including Rick Correia, Michelle Lee, Erika Nuno, Gary Fishler, and Tony Orokos), MoneyLion's in-house counsel, and its outside counsel (DLA Piper), and its diligence advisor CFGI.

  — On Sellers' side, Ryan Curran, Matt Basdekis, Jeff Frommer, Louis Krubich, and Sellers' outside counsel (Fox Rothschild).

# The Intentions of the Contracting Parties (Cont'd)

- New York law is clear that knowledge of employees is imputed to the company.

  — *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 466 (2010) (holding "where conduct falls within the scope of the agents' authority, **everything they know or do is imputed to their principals**," and "the presumption that agents communicate information to their principals does not depend on a case-by-case assessment of whether this is likely to happen. Instead, **it is a legal presumption that governs in every case**, except where the corporation is actually the agent's intended victim.").

  — *Savik, Murray & Aurora Const. Mgt. Co., LLC v. ITT Hartford Ins. Group*, 86 A.D.3d 490, 493-94 (1st Dep't 2011) (where construction company agent had knowledge of accident, that knowledge was imputed to principal)

  — *Terra Securities ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 541 (S.D.N.Y. 2011) (where advisor acting as agent failed to investigate misrepresentations, that knowledge was imputed to principals)

- MoneyLion remarkably resorts (ML Opp. at 78-83) to citing three cases from Illinois in inapposite situations in which knowledge was imputed, but did not defeat reliance because the employee or agent with knowledge had no connection to or knowledge of the relevant transaction.  Not so with Lee and Nuno.

- Here, MoneyLion essentially says everyone associated with the diligence, creation of the MIPA, and performance under the MIPA, except for Correia, is irrelevant.  Which, of course, is truly absurd.

# Post-Agreement Conduct

# Post-Agreement Conduct

*"Whether the Court should consider the conduct of the parties* after *the execution of the MIPA—such as their actions surrounding the calculation of the adjustment for the 2021 Stub Period—in connection with interpreting the MIPA's terms, and, if so, what specific conduct is most illuminating."*

- <u>Short Answer:</u> **Yes. If the Court finds ambiguity in the MIPA, the Court should consider the conduct of the parties after the execution of the MIPA, before the dispute arose.**

  — *See Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 6 A.2d 329, 340 (Del. 1939) ("when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the courts.")

  — *Ocean Transport Line Inc. v. Am. Philippine Fiber Indus., Inc.*, 743 F.2d 85, 91 (2d Cir. 1984) ("The parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent")

  — *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.").

  — **With respect to the provisions of the MIPA relating to the 2021 and 2022 Earnout (*i.e.*, Section 2.06 and Schedule B), the Court of course should consider the conduct of the parties after the execution of the MIPA.** Basdekis provided MoneyLion with Malka's financial statements for purposes of the 2021 Earnout on February 15, 2022. MoneyLion then had 30 days to prepare the 2021 Earnout Statement in accordance with Schedule B.

# Post-Agreement Conduct (Cont'd)

- The most illuminating evidence is MoneyLion's stub-period work, which was shared with MoneyLion's Strategic Finance team and adjusted Malka's revenue to comply with GAAP. MoneyLion's Strategic Finance team, which was intimately involved with the MIPA pre-closing, expressed no surprise at the adjustments or their magnitude, and chose not to apply the adjustments when calculating Malka's revenue and EBITDA for the 2021 Earnout. Their lack of surprise and their disregard of the adjustments for earnout purposes is highly probative evidence of the way they understood the MIPA and its Schedules, and is consistent with Sellers' reading.

— **Feb. 2, 2022:** Scalia sends stub-period adjustments to MoneyLion, CFGI, and RSM. Adjustments show 1.1 million "variance of billed to straight-line" and 1.8 million debit to Malka's stub period revenue to comply with ASC 606. (PX196.)

— **Feb. 14, 2022:** Basdekis to Lee and Nuno: "**we recognized revenue as invoiced and had no accrual process** other than minor exceptions." Nuno replied: "**Got it, no worries at all**." (JX073 at MoneyLion_01817592.)

  - Scalia testified that **Basdekis explained to him that revenue was recognized regardless of when work was performed**. (Scalia Aff. ¶ 8; Tr. 463:7-19.)

# Post-Agreement Conduct (Cont'd)

- **Feb. 15, 2022:** Basdekis sent to MoneyLion and CFGI Malka's "unadjusted P&L for 2021 – only thing not reflected here is the tax credit which is allowable under MIPA." (JX074.) Basdekis followed Malka's historical accounting principles in preparing the income statement. (Tr. 103:13-16 (Basdekis).)

  — Basdekis calculated that Malka's total revenue was <u>$30,806,976.43</u> and its EBITDA was <u>$921,497.13</u> (not including the Tax Credit).

- That same day, Lee asks Fishler about "the revenue impact from the" stub-period work, and he responds, "almost 2m down." (PX201 at MoneyLion_01825489.)

- **Mar. 2, 2022:** Fishler sends Nuno and Lee the stub-period spreadsheet, and confirms a $1.8 million "overall revrec adjustment." (PX211 at MoneyLion_01845685; *see* PX196 at MoneyLion_01817935 (cell <u>S51</u>).)

- **Mar. 3, 2022:** Lee, sharing Malka's unadjusted P&L for 2021 with Monroe Capital: "we made some changes that are not reflected here that are mainly related to revenue recognition **since they were not previously following GAAP accounting (they were more on a cash basis)**." (JX076 at MoneyLion_01821878.) Lee testifies that the adjustments that were not made were the stub period adjustments. (Lee Aff. ¶ 26; Tr. 426:14-19, 427:15-19 (Lee).)

# Post-Agreement Conduct (Cont'd)

- **Mar. 11, 2022:** Lee, Nuno and Scalia discuss the stub period adjustment spreadsheet (JX080). Lee writes to Basdekis with questions about the stub period adjustment spreadsheet. (JX078.)

- **Mar. 14, 2022:** Basdekis to Lee and Nuno, in response to question about stub period adjustment spreadsheet: "the purpose of this file was to re-align when revenue was recognized during the 'stub period'…(as for historical principal [*sic*], **revenue was always recognized when we invoiced**) to coincide with delivery to client and project timeline. Some revenue was removed from the stub period and recognized before Nov. 16 so was removed and deferred into 2022" Lee: "**Yes, thanks, this makes sense**." (PX221 at MoneyLion_01840582.)

- **Mar. 15, 2022:** Lee to Correia: "their historical accounting practices are not cash based and are actually partly accrual based, so they recognized revenue when things are billed, not when cash is collected." <u>This is an explicit statement that MoneyLion had believed Malka's revenue recognition principles were not compliant with ASC 606.</u>

  — In response, **Correia said, "Ok," and approved payment of the 2021 Earnout**. (JX082 at MoneyLion_01826066.)

- **Mar. 15, 2022:** Lee sends the Sellers the 2021 Earnout Statement, making no adjustments to Malka's revenue, costs, or expenses to comply with GAAP, and adding the $890,905 Tax Credit. Adding the Tax Credit to Malka's baseline EBITDA of $921,497, MoneyLion determined that Malka's total 2021 EBITDA for earnout purposes was <u>$1,812,402</u>. (JX083.)

# Post-Agreement Conduct (Cont'd)

- Additional post-closing evidence that demonstrates the correct interpretation of the MIPA includes MoneyLion's calculation of Malka's net working capital and MoneyLion's tracking of Malka's progress to the 2022 Earnout.

**Net working capital**

- Section 2.05(b)(i) of the MIPA (JX065 at DLA_006204-05) required MoneyLion to calculate Malka's net working capital as of November 15, 2021 in accordance with the Accounting Principles.

- **Jan. 10, 2022:** MoneyLion sent Sellers final working capital calculations, without making any adjustments to comply with GAAP. (PX185.)

  - CFGI had informed MoneyLion on Oct. 5, 2021 that Malka's "net working capital would be significantly different if the Company reported under GAAP," yet MoneyLion made no GAAP-based adjustments. (JX014 at MoneyLion_01813066.)

  - Working capital was calculated as accounts receivable minus total liabilities, and MoneyLion used Basdekis's accounts receivable numbers based on Malka's historical revenue recognition principles. (Tr. 84:9-85:23 (Basdekis), 398:15-399:9 (Lee).)

# Post-Agreement Conduct (Cont'd)

**2022 Earnout Tracking**

- During 2022, MoneyLion regularly tracked Malka's progress toward the 2022 Earnout using Malka's historical accounting principles (not GAAP), and publicly reported the earnout liability as contingent consideration.

  — **May 2, 2022:** Basdekis sends Lee Malka's unadjusted Q1 2022 financials in response to Lee's request for "Q1 2022 financials in the historical accounting principles view," to "see how Malka is currently tracking towards the earnout." (JX086.)

  — That same day, Lee sends CFGI the same financials "using their historical accounting principles for the purposes of the earnout." (PX236.)

  — **July 6, 2022:** Lee and Nuno discuss that Malka "can use their cash basis accounting" and "also [] get the tax credit" for purposes of the 2022 Earnout. (PX246.)

  — **Aug. 31, 2022:** Basdekis sends Malka's NonGAAP Income Statement to Lee, Nuno, and Torossian. (JX091.)

    - Indeed, Basdekis maintained two sets of books (Tr. 10:16-11:12 (Basdekis)) and prepared and shared with others at MoneyLion "Non GAAP Income Statements" (of which JX091 is an Aug. 2022 example) (Torossian Aff. ¶ 18.)

  — **Oct. 13, 2022:** Lee sends CFGI Malka's Q3 2022 financials and writes: "The Malka financials are based on their historical accounting principles (not GAAP) which is what the earn-out is based on, so will not match GAAP financials." (PX254.)

# The Finality of the 2021 Earnout

# The Finality of the 2021 Earnout

*"Whether the MIPA's statement in Section 2.06(b)(iii) that the Revenue and EBITDA Statement as calculated by the Buyer shall be 'deemed final' if Sellers fail to object within 45 days precludes Defendants from challenging Plaintiffs' entitlement to the 2021 Earnout under the MIPA in this action."*

- **Short Answer:**  **Yes, Defendants are precluded from challenging their own approval of the 2021 Earnout.**  Section 2.06(b)(iii) is unambiguous that the 2021 Earnout became final. A fair reading is that this requirement applies equally to both parties.

  — Sellers acknowledge that if MoneyLion had proved fraud with respect to the 2021 Earnout, this 45-day finality provision would not apply.  But the overwhelming and uncontradicted record of MoneyLion's actual knowledge in Jan. and Feb. 2022 that Malka's revenue recognition did not comply with ASC 606, and would have to be adjusted by $1.8 million for GAAP compliance purposes, firmly establishes that there was no fraud with respect to the 2021 Earnout.

# Consistency of 2021 and 2022 Earnout Calculations

# Consistency of 2021 and 2022 Earnout Calculations

*"Whether the MIPA's statement in Section 2.06(b)(i) that Malka's revenue and EBITDA for the 2021 Earnout and the 2022 Earnout 'shall be calculated using substantially consistent methods and practices' precludes some or all of MoneyLion's adjustments to Malka's revenue and EBITDA for the 2022 Earnout."*

- **Short Answer:  Yes.**  Section 2.06(b)(i) is unambiguous.  At a minimum it precludes adjustments to Malka's 2022 revenue and EBITDA to comply with GAAP, because those adjustments were not made for 2021, even though MoneyLion made the adjustments for SEC reporting purposes.  It also precludes changing the approach to the Tax Credit by ignoring the year in which the application was filed.

    — **Improper revenue adjustment: $895,517 (JX102)**

    — **Improper expense adjustment: $949,454 (JX102)**

    — **Improper Tax Credit adjustment: $1,590,603 (JX102)**

# Consistency of 2021 and 2022 Earnout Calculations

- **There is no dispute** that Basdekis used substantially consistent methods and practices when preparing the 2021 income statement that he sent to MoneyLion on Feb. 15, 2022 (JX074), and the 2022 income statement that he sent to MoneyLion on Jan. 25, 2023 (JX102). (Tr. 123:19-25 (Basdekis).)

- Torossian testified that Basdekis's "22 Earnout" column in Malka's income statement that Basdekis sent to him on Jan. 25, 2023 reflected "**the allowed and approved deviations** [from GAAP] **according to Schedule B and A** . . ." (Tr. 697:25-698:4.)

- **There is no dispute** that Torossian used substantially different methods and practices when preparing the 2022 Earnout Statement.

  — Torossian testified that his approach when calculating Malka's revenue and EBITDA for purposes of the 2022 Earnout was <u>not consistent</u> with that of the 2021 Earnout Statement, and that he took no steps to find out what methods and practices MoneyLion had used for 2021. (Tr. 727:4-730:1.) Thus, **MoneyLion admits it breached Section 2.06(b)(i).** (JX065 at DLA_006207.)

# Consistency of 2021 and 2022 Earnout Calculations

- **Basdekis's 2022 income statement** (JX102 at MoneyLion_01820691) showed the differences between "22 Earnout" (Schedule B) and "22 As Reported" (GAAP) numbers, and the major drivers of those differences:

— Revenue under "22 Earnout" was $895,517 higher than revenue under "22 As Reported" (cells N41, P41, R41), driven by the difference between revenue recognized pursuant to Schedule B and pursuant to GAAP;

— EBITDA under "22 Earnout" was $2,095,080 higher than EBITDA under "22 As Reported" (cells N106, P106, R106), driven by the $895,517 difference in revenue, as well as more than $1.2 million in expense and cost items:

| | |
|---|---|
| • Freelancers: $58,558 | Severance: $150,000 |
| • Revenue Share: $341,430 | Payroll Taxes, FICA and Medicare: $31,709 |
| • Production Insurance: $70,714 | Payroll Taxes, ML: $8,955 |
| • Other Variable Expenses: $97,240 | Payroll Taxes, Other: $112,097 |
| • 401(k): $163,302 | Rent: $70,519 |
| • Other Insurance and Benefits: $18,116 | Dues & Subscriptions: $65,562 |
| • Sales Commission: $13,656 | Miscellaneous & Other Overhead: $60,898 |

# MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA

*"What provision or provisions of the MIPA precluded MoneyLion from making business decisions that affected Malka's 2022 revenue and EBITDA such as: (1) applying a 401(k) match of 4%; (2) paying bonuses to Malka employees; and (3) paying severance to former Malka employees. Separately, what provision or provisions of the MIPA allowed MoneyLion to reduce Malka's 2022 revenue and EBITDA to account for (1) the double count of retained teams and (2) the fair market value of Malka's services to MoneyLion."*

- **<u>Short Answer:</u>**

  — All these adjustments were precluded by Section 2.06(b)(i), requiring MoneyLion to prepare the 2022 Earnout Statement "in good faith and in accordance with the Revenue and EBITDA Calculation Principles." *See* JX065 Section 2.06(b)(i)

  — The adjustments for bonuses and severance were also precluded by Section 2.06(d), requiring MoneyLion to follow the 2022 Budget and not to interfere with Sellers' opportunity to receive the 2022 Earnout. *See* JX065 Section 2.06(d)

  — The adjustments for 401(k), bonuses, and severance were also inconsistent with the "Revenue and EBITDA Calculation Principles," which were defined as those set forth in Schedule B and "to the extent not inconsistent with the foregoing, the historical accounting principles, **policies** and procedures of the Company." (JX065 at DLA_006199.) Malka's historical policies and procedures did not provide for a 401(k) match of 4%, or bonuses or severance in these amounts.

# MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA

- **<u>Short Answer:</u>**

  - Torossian admits that no MIPA provision authorized the "double count of retained teams." (Tr. 711:25-712:21.)

  - While Schedule B does permit an adjustment for fair market value, MoneyLion's so-called "fair market value" adjustment did not actually calculate fair market value, and improperly assumed that Malka's margins on its MoneyLion business were higher than its margins on non-MoneyLion business.

# MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA

**401(k) ($163,302)**

- MoneyLion's imposition of its own **401(k) match of 4%** was inconsistent with Malka's historical practice of a 1% match, in breach of Sections 2.06(b)(i) and (d).

- According to Basdekis, this was a policy in which Malka "had no say." (Tr. 126:4-13.)

**Severance ($150,000)**

- MoneyLion's imposition of **an additional $150,000 in severance** breached Section 2.06(d) because **the 2022 Budget did not include any amounts for severance**. (JX065 at DLA_006297.) It was also inconsistent with Malka's historical practice, as Basdekis testified (Tr. 126:15-127:14), and therefore further breached Sections 2.06(b)(i) and (d).

  — MoneyLion's bad faith is documented, in Torossian's words: "**another thing that is gonna hit the bros** is the severance cost of 150k in December." (PX275 at MoneyLion_01842898.)

**Double count of retained teams ($218,170)**

- **Torossian testified** that MoneyLion's adjustment for "double count of retained teams" <u>was not provided for in the MIPA or any other written agreement</u>. (Tr. 711:25-712:21.)

# MoneyLion's Adjustments to Malka's 2022 Revenue and EBITDA

**Bonuses ($529,500)**

- MoneyLion's imposition of **$544,500 in bonuses** breached Section 2.06(d) because **the 2022 Budget called for only $15,000 in bonuses**.  (JX065 at DLA_006298.)  In any event, this had no place in the 2022 Earnout because it was a 2023 expense; Sellers did not accrue for bonuses in 2022.  (JX098 at MoneyLion_01842732-33; Tr. 124:17-125:12 (Basdekis); 715:13-22 (Torossian).)

  — Basdekis's Jan. 25, 2023 income statement showed $28,125 in bonuses under both "22 Earnout" and "22 As Reported."  (JX102.)  This proves that Malka was not accruing $544,500, or any other amount above $28,125, in 2022.

  — Historically, Malka paid bonuses rarely and in small amounts, as MoneyLion knew. (JX014 at MoneyLion_01813068, MoneyLion_01813089 (CFGI Report); JX098 at MoneyLion_01842732 (Nuno and Torossian saying Malka did not accrue or pay out bonuses).)

  — Again, MoneyLion's bad faith is documented: Nuno and Torossian agreed it was important for MoneyLion to accrue the bonuses "before year end"; otherwise, "**it wouldn't hit their earnout**."  (JX098 at MoneyLion_01842733.)

- The fact that Frommer had requested in July 2022 that certain Malka employees working on MoneyLion projects receive a bonus—which request was rejected by MoneyLion (DX235)—is not relevant.

**Fair Market Value ($1,242,248)**

- Schedule B: "Revenue shall include the difference between the fair market value of the intercompany services provided by [Malka] to [MoneyLion] and the actual charge for the intercompany services . . ."

  — According to Fox Rothschild, "the intent [of this provision] was to normalize those rates so that . . . any intercompany services provided to MoneyLion, when plugged into the revenue and EBITDA formulas, would be plugged in at the standard third-party rate rather than the discounted rate." (Halbert Dep. Tr. 86:14-88:8; *see also* Curran Decl. ¶ 59.)

- MoneyLion's so-called "fair market value" adjustment of $1,242,248 does not actually calculate fair market value, and is based on the improper assumption that Malka's margins on its MoneyLion projects are significantly higher than its margins on its non-MoneyLion projects.

  — "Fair market value" definition: "amount that an arm's length, third-party buyer would pay for services" (Larson Aff. ¶ 89, Dudney Aff. ¶ 77)

  — Torossian **did not conduct a fair market value assessment**. Torossian did not compare the rates charged by Malka to MoneyLion and the rates charged by Malka to other customers.

    - Torossian admitted that MoneyLion was charged the standard hourly rates for shared creative services. (Trial Tr. 678:23-679:1) MoneyLion was also not charged 20% production management fee charged to non-MoneyLion customers (Trial Tr. 679:3-20).

**<u>Fair Market Value ($1,242,248) (cont'd)</u>**

- Torossian purports to use a "cost-plus-margin approach" to estimate fair market value, but that approach can only be used as a substitute for fair market value where the standalone selling price of a service is <u>not directly observable</u>.  **Dudney agrees** the standalone selling price for Malka's services to both MoneyLion and non-MoneyLion customers in 2022 was directly observable.  (Trial Tr. 1209:13-1212:3.)

- Even if his methodology was appropriate (it is not), Torossian's calculations were confused and conflated, had no basis in any published guidance, and are contradicted by documents showing that <u>Malka charged more to its third-party customers than to MoneyLion</u>. (Larson Decl. ¶¶ 91-94.)

  - **PX398**: Malka's NetSuite business records reflecting its margins and profitability in 2022.

- Torossian could have compared the 42.2% as-reported variable margin percentage calculated for the non-MoneyLion studio business with the 43.7% as-reported variable margin percentage for the MoneyLion studio business, a difference of 1.5%.  (JX106.) That 1.5% of the $8.3 million in revenue for the MoneyLion studio business would result in an adjustment of about $124,500.

# Resolution of Disputes Under the MIPA

# Resolution of Disputes Under the MIPA

*"Whether the parties' failure to follow through with the process set forth in Section 2.06(b)(iv) of the MIPA for resolution of disputes should affect either party's ability to raise any specific claims or seek any specific relief in this Court as to the 2021 Earnout or the 2022 Earnout. Specifically, whether that Section's statement that 'the decision of the Independent Accountant for each [] item and amount in dispute must be within the range of values assigned to each such item as provided in the written submissions" limits either party's ability to propose values outside of the range defined by Plaintiffs' Revenue and EBITDA Earnout Statement of Objections and Defendants' Revenue and EBITDA Statement.*

- **Short Answer:** **Yes**, Section 2.06(b)(iv) is unambiguous that the parties are limited to the range of values set forth in their respective 2022 Earnout submissions on Apr. 14 and May 25, 2023.

  — In the 2022 Earnout Statement sent on April 14, 2023 (JX112), MoneyLion calculated Malka's final revenue as $40,151,259 and EBITDA as ($2,778,845). MoneyLion may not further reduce revenue and EBITDA as it attempts to do through Dudney, who admits that he "start[ed] over" and "d[id] a fresh analysis" for 2022— proposing his own, newly created figures to increase Torossian's GAAP adjustments to revenue (in derogation of Section 2.06(b)(iv)). (Tr. 1236:3-1237:2 (Dudney).) While MoneyLion could *increase* revenue and EBITDA, it could not *decrease* revenue and EBITDA.

  — In the 2022 Earnout Statement Objections that Sellers sent on May 25, 2023 (JX119), Sellers provided itemized objections to each of the GAAP- and non-GAAP-based adjustments MoneyLion made to Malka's revenue and EBITDA, totaling $2,355,935 in revenue and $6,470,299 in EBITDA. While Sellers could *decrease* the amounts of their objections to revenue and EBITDA, they could not *increase* those amounts.

  — Sellers' objections to revenue have not changed. Through Larson's trial testimony, Sellers have decreased their EBITDA objections by $673,067, to account for new information on expenses made available through discovery that was not available at the time of the objections. (*See generally* Larson Decl.) As a result, consistent with Basdekis's Jan. 25, 2023 calculations (JX102), Sellers' position is that MoneyLion understated Malka's 2022 EBITDA by $5,797,232.

# Resolution of Disputes Under the MIPA (Cont'd)

| 2022 Earnout Scenario Analysis | | Revenue | EBITDA |
|---|---|---|---|
| 2022 Earnout Statement (JX112) | $ | 40,151,259 | $ (2,778,845) |
| | | | |
| Larson Revenue Adjustment | $ | 895,517 | $ 895,517 |
| Larson Expense Adjustment - Accruals | | - | 878,935 |
| Larson Expense Adjustment - Rent | | - | 70,519 |
| Larson Expense Adjustment - 401k Match | | - | 163,302 |
| Larson Expense Adjustment - Severance | | - | 150,000 |
| Larson Tax Credit Adjustment | | - | 1,590,603 |
| Larson Intercompany Services Adjustment | | 1,242,248 | 1,242,248 |
| Larson Corporate Bonus Adjustment | | - | 529,500 |
| Larson Retained Team Adjustment | | 218,170 | 218,170 |
| Larson Legal Expenses Adjustment | | - | 58,438 |
| | | | |
| **Adjustments** | $ | 2,355,935 | $ 5,797,232 |
| **TOTAL INCLUDING ADJUSTMENTS** | $ | **42,507,194** | $ **3,018,387** |
| | | | |
| Threshold | | $20.1M - $30.0M | $ 100,000 |
| | | | |
| Result | | **Full Payout: $25M in Shares** | |

# Sellers Proved Breach of Contract: Vested Shares

# MoneyLion Breached by Imposing a Stop Order

- MoneyLion breached the MIPA, the Restricted Stock Agreements, and the Registration Rights Agreement by unlawfully imposing restrictions on the Closing Stock Payment shares and the 2021 Earnout shares.

- **Section 2.03** of the MIPA provides that the Closing Stock Payment shall vest in four equal quarterly installments on Dec. 31, 2021, and Mar. 31, June 30, and Sept. 30, 2022. (JX065 at DLA_006202.)

- **Section 2.06(b)(v)(A)** provides that the 2021 Earnout shall vest in four equal quarterly installments on Mar. 31, June 30, Sept. 30, and Dec. 31, 2022. (JX065 at DLA_006209.)

- **Section 2** of each RSA provides that vested shares become "Earned Shares," while **Section 5** provides that the Seller holder "shall be considered the record owner" of any Earned Shares and shall become eligible to vote or transfer his shares once they become Earned Shares on each vesting date. (JX065 at DLA_006302.)

- **Section 3.5** of the RRA provides that Malka "covenants that it shall take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell shares of Common Stock held by such Holder . . ." (JX065 at DLA_006315.)

# MoneyLion Breached by Imposing a Stop Order (Cont'd)

- MoneyLion repeatedly sent proxy solicitations that recognized Sellers as record holders and beneficial owners of their vested shares, and asked them to vote for the Reverse Stock Split in April 2023. (Frommer Decl. ¶¶ 224, 269; Krubich Decl. ¶ 195; Fried Decl. ¶ 125; Capra Decl. ¶ 103.)

- The exact numbers of Closing and 2021 Earnout shares held by each Seller are set forth in their respective testimony. (Frommer Decl. ¶ 266; Krubich Decl. ¶ 192; Tr. 288:10-289:1 (Krubich clarification); Fried Decl. ¶ 122; Capra Decl. ¶ 100; Tr. 513:6-18 (Capra clarification).)

- Nothing in the MIPA, RSAs, or RRA gives MoneyLion the right to freeze Sellers' vested, earned shares.

- MoneyLion's only stated basis for the stop order is its fraud counterclaims.

  — MoneyLion <u>did not prove fraud at the closing.</u>

  — MoneyLion <u>did not prove fraud with respect to the 2021 Earnout.</u>

- *Since it could not prove fraud, MoneyLion has no defense. MoneyLion must remove the stop order on Sellers' vested shares.*

# Remedies:
# Vested Shares

# Vested Shares

**MoneyLion should be directed to tell its transfer agent to release the freeze on Sellers' shares.**

- In June 2023, <u>on the sole basis of its fraud claim</u>, MoneyLion imposed the "Stop Order" to prevent Continental from releasing the shares. PX318.

- Important to distinguish the vested shares, which Sellers ***already own,*** versus the 2022 earnout shares, which MoneyLion never issued and which Sellers never received.

  — Sellers own 597,095 vested shares in total, consisting of 356,355 Closing Shares and 240,740 2021 Earnout Shares. *See* Seller Declarations.

  — The vested shares are no different than other earnout or closing shares received by the Sellers and which the Sellers were permitted to sell before the dispute arose.

  — They are held by the transfer agent in accounts titled in the name of each Seller. Sellers receive regular account statements and can login and view their accounts at any time. *See* PX310.

  — MoneyLion publicly recognized Sellers' ownership of most of the vested shares in a registration statement (S-1) filed with the SEC in June 2022. PX240 at PDF p. 232.

  — Sellers have voted the vested shares on multiple occasions.

# Vested Shares (Cont'd)

**MoneyLion frames the issue as if this were a dispute over non-issuance of stock.  That is wrong.  Unlike the 2022 Earnout Shares, the vested shares were already issued, and Sellers own them.**

- Under its incorrect framing, MoneyLion contends that it should be permitted to pay Sellers $6-14 million in cash as money damages based on June 2023 share prices.  ML Opp. at 128-31.

- This implies—although MoneyLion never says it—that MoneyLion would repossess or cancel the shares (currently valued at approximately $50 million) that Sellers already own.  In other words, in a world where Sellers are the prevailing party on the fraud claim, MoneyLion imagines that the Court would enter an Order stripping Sellers of their own property and replacing it with a fraction of its value in cash.  That is totally unsupported by law and equity.

- To illustrate the fallacy of its position, consider a scenario where MoneyLion came to Court and lawfully obtained a pre-judgment attachment of the Sellers' shares on the basis of its fraud claim.  Imagine two years later the Court ultimately concluded that MoneyLion failed to prove its claim.  The Court would vacate the attachment and Sellers would have their shares.  Not $6-$14 million in cash.

- MoneyLion is arguing in effect that it should *benefit*—and the Sellers should suffer—because MoneyLion *unlawfully* implemented self-help rather than *lawfully* seeking and obtaining an attachment.

# Remedies: 2022 Earnout

# 2022 Earnout Shares – Enforcement of Specific Performance Clause

**MIPA § 9.12:**

> **The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties *shall be entitled to specific performance of the terms hereof*, in addition to any other remedy to which they are entitled at law or in equity.**

Delaware courts enforce specific performance clauses in a variety of contexts:

> **Delaware is strongly contractarian**, and the presence of a provision in favor of specific performance in case of breach . . . **must be respected**….[and once] a party has agreed to a provision like the Specific Performance Clause, the **party must establish a persuasive case-specific [reason] why the clause should not be respected.**

*Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 495 (Del. Ch. 2022) (emph. added) (enforcing specific performance clause and ordering release of escrowed funds). *See also*:

— *Gildor v. Optical Sols., Inc.*, No. 1416-N, 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006) (enforcing specific performance clause and directing issuance of company stock)

— *Reddy v. 2nd Chance Treatment Centers, LLC,* No. 2024-0193-SKR, 2024 WL 5088687, at *12 (Del. Ch. Dec. 12, 2024) (enforcing specific performance clause in M&A dispute)

— *L-5 Healthcare Partners, LLC v. Alphatec Holdings, Inc.*, No. 2019-0412-NAC, 2024 WL 3888696, at *10, n.72 (Del. Ch. Aug. 21, 2024) (holding "the presence of a specific performance provision, showing the parties' clear intentions, pushes the equities heavily toward enforcing the parties' intentions and expectations as set forth in the SPA")

# Specific Performance – MoneyLion's Attempts to Avoid Delaware Law

**MoneyLion now claims for the first time that the parties' choice of Delaware law cannot be enforced because the dispute's sole connection to Delaware is MoneyLion's place of incorporation.**

- MoneyLion is invoking legal issues on which courts in this district have split: whether (i) a New York court should engage in an interest analysis where sophisticated parties have selected their governing law, and (ii) one party's place of incorporation alone is sufficient to satisfy an interest analysis if one is done.

- The Court need not wade in to those splits because MoneyLion's place of incorporation is *not* the only connection to Delaware. The parties chose Delaware law for the multiple RSAs. PX154, PX155, PX156, PX157. MoneyLion conveniently ignores the RSAs when it argues this point. ML Opp. at 112 n.33.

- The performance at issue is another Delaware connection: the failure to deliver stock of a Delaware corporation. Under the internal affairs doctrine, Delaware law is determinative of the rights of Sellers vis-à-vis the corporation, and of the corporation's fiduciary duties to the Sellers. *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *24 (S.D.N.Y. Oct. 25, 2018), aff'd and remanded in part, 796 F. App'x 55 (2d Cir. 2020) ("[i]nvalidating the [Delaware law] provision would mean that stockholders in different states would be subject to varying laws, meaning the contracts 'could be interpreted differently for each' stockholder, 'based on the whim and movements' of the stockholders.").

- MoneyLion has already *consented* to Delaware law as controlling on the contract points, citing extensively to Delaware cases without offering any choice of law analysis. *Chartwell RX, LLC v. Inmar, Inc.*, 620 F. Supp. 3d 59, 71 (S.D.N.Y. 2022) ("Under New York's choice-of-law rules, where the parties' briefs assume that a given state's law controls, such implied consent ... is sufficient to establish choice of law."). *See e.g.* MPF at 77-78 (ECF No. 144) (quoting Delaware law contract interpretation principles); *id.* at 109 n.17 (same).

# Specific Performance – Federal Courts Enforce SP Clauses

**MoneyLion argues Delaware law cannot dictate the remedy in federal court.**

- Delaware law is not dictating; both parties acknowledge the Court has discretion to give specific performance. **Federal courts sitting in diversity have enforced specific performance clauses under state law.**

  — *Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 11 CIV. 4062 JPO, 2013 WL 372149, at *8-9 (S.D.N.Y. Jan. 31, 2013) (enforcing specific performance clause among sophisticated parties)

  — *Cuomo v. Cahill, Larkin & Co.*, P.C., No. 87 CIV. 7873 PNL, 1989 WL 1632800, at *1 (S.D.N.Y. Jan. 10, 1989) (enforcing specific performance clause and requiring employer to repurchase equity from employee)

  — *LocusPoint Networks, LLC v. D.T.V. LLC*, No. 14-CV-01278-JSC, 2015 WL 5043261, at *19 (N.D. Cal. Aug. 26, 2015) (enforcing specific performance clause under *Gildor* and Delaware law)

- MoneyLion cites *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 106 (1945) and *Perfect Fit Indus., Inc.* v. *Acme Quilting Co.*, 646 F.2d 800, 805 (2d Cir. 1981) for the proposition that, in a diversity action, state law cannot dictate to a federal court which equitable remedy to give. But Delaware law on enforcement of specific performance clauses is not incompatible with federal law, and *Guaranty* explicitly recognizes that federal courts can, under *Erie*, grant equitable rights created under state law.

# Specific Performance – Enforcement of SP Clause

**MoneyLion's arguments against specific performance miss the mark.**

- MoneyLion relies on cases that say non-issuance of stock can be remedied through money damages. This misses the point. None of those cases involves a specific performance clause. MoneyLion cites **no case** in **any jurisdiction** where the court set aside a specific performance clause because performance would require delivery of publicly traded stock.

  — If MoneyLion were correct that the possibility of money damages were alone enough to defeat enforcement of a specific performance clause, then such clauses would never serve a purpose. They could only be enforced where no monetary remedy is available—which is precisely when parties are entitled to specific performance even without the clause.

- Specific performance clauses represent an enforceable agreement between the parties that no adequate remedy at law exists for performance obligations under the contract. Courts in this district respect those agreements among sophisticated litigants. *Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 11 CIV. 4062 JPO, 2013 WL 372149, at *8-9 (S.D.N.Y. Jan. 31, 2013); *Cuomo v. Cahill, Larkin & Co.*, P.C., No. 87 CIV. 7873 PNL, 1989 WL 1632800, at *1 (S.D.N.Y. Jan. 10, 1989).

- MoneyLion invokes law of the case, referring to the Court's PI decision, but it is inapposite here. The Court followed cases holding that specific performance clauses cannot *compel* the Court to locate irreparable harm for PI purposes. That is still true here. But as MoneyLion acknowledges, the Court has *discretion* to give specific performance as final relief on the ground that the clause satisfies the no-adequate-remedy test, so long as the equities support Sellers.

**Court asked about determining the EPID for damages and/or specific performance. The MIPA (Art. I) defines the EPID as the date upon which the 2022 earnout payment is issued. Since MoneyLion should have but never issued the payment, Court should determine an appropriate EPID.**

- **A May 31, 2023 EPID is supported by the MIPA and the facts and circumstances. SPF ¶¶ 487-88, 492.**

  — MoneyLion gave its 2022 Earnout Statement on April 14, 2023. JX112. Sellers had 45 days to object, and did so on May 25, 2023. JX119. If MoneyLion had acted in good faith and accepted Sellers' objections on a reasonably prompt basis, it would have issued the payment and established the EPID.

  — May 31 is also relevant because it is expressly called out in the MIPA as the **last possible day** under Section 2.06(b)(i) for MoneyLion to have delivered an earnout statement that was "prepared in good faith and in accordance with the Revenue and EBITDA Calculation Principles."

- Sellers identified other possible equitable options: June 24, 30 days from receipt of Sellers' objections and the expiration of the 2022 Resolution Period (which would require the issuance of 2,250,992 shares); or August 23, based on when the Independent Accountant would have ruled (1,819,328 shares). May 31 is a sensible middle ground tied directly to the contract. It denies MoneyLion any benefit associated with its inequitable conduct.

- MoneyLion suggests April 14, 2023 as an EPID because it is the date it delivered the wrongful earnout statement. But the MIPA provides a process for the parties to object, confer, and resolve disputes. Using April 14 as the presumed EPID ignores that entire process and assumes the parties could have never resolved their dispute consensually.

- Nonetheless, we will provide calculations using both dates.

# 2022 Earnout Shares: May 31, 2023 EPID & Specific Performance

| Specific Performance-May 31 EPID | | |
|---|---|---|
| Earnout Achieved | $ | 25,000,000.00 |
| Price Floor | $ | 7.00 |
| 5/31/23 30-Day VWAP | $ | 13.6966 |
| Earnout shares | | 1,825,264.53 |
| | | |
| **1Q Vesting** | | |
| Number of vested shares | | 456,316.13 |
| Vesting Date | | 3/31/2023 |
| Vesting Date VWAP | $ | 18.0167 |
| Price Floor | $ | 7.00 |
| MakeWhole Shares | | 0.00 |
| | | |
| **2Q Vesting** | | |
| Number of vested shares | | 456,316.13 |
| Vesting Date | | 6/30/2023 |
| Vesting Date VWAP | $ | 11.0503 |
| Price Floor | $ | 7.00 |
| MakeWhole Shares | | 0.00 |
| | | |
| **3Q Vesting** | | |
| Number of vested shares | | 456,316.13 |
| Vesting Date | | 9/30/2023 |
| Vesting Date VWAP | $ | 20.8438 |
| Price Floor | $ | 7.00 |
| MakeWhole Shares | | 0.00 |
| | | |
| **4Q Vesting** | | |
| Number of vested shares | | 456,316.13 |
| Vesting Date | | 12/31/2023 |
| Vesting Date VWAP | $ | 47.63149 |
| Price Floor | $ | 7.00 |
| MakeWhole Shares | | 0.00 |
| | | |
| **Total Shares (Specific Performance)** | | **1,825,265** |

- 30-day VWAP on May 31 was $13.70 (PX415 ¶ 272).

- Number of earnout shares determined by $25M/$13.70. Price Floor is ignored because the EPID VWAP is greater.

- Shares would have vested quarterly on March 31, June 30, September 30, and December 31.

- No make-wholes because split-adjusted prices are always above the Price Floor.

- **MoneyLion obligated to issue 1,825,624 shares (MIPA requires rounding down).**

# 2022 Earnout Shares: Effect of Stock Split

**Court asks what effect, if any, the reverse stock split has on Plaintiffs' potential recovery and whether, as a result of the split, the $7 price floor should be reformed to $210.**

- A contract between sophisticated parties cannot be reformed or modified absent fraud, mutual mistake, or some other extraordinary circumstance that was not reasonably foreseeable at the time of contracting.

- None of that is alleged here. MoneyLion—which never negotiated for protection in the event of a stock split—voluntarily implemented a 1:30 split. NYSE threatened de-listing if the stock remained under $1, but shareholders approved a split of 1:2 – 1:30. PX308. MoneyLion elected to do 1:30.

- MoneyLion says it would "defy common sense and the law" for the Price Floor to remain at $7 (ML Opp. at 124) relying on *Reiss v. Fin. Performance Corp.*, 279 A.D.2d 13 (1st Dept. 2000), where the appellate division reformed a warrant to account for the issuer's 1:5 reverse stock split. The appellate division decision was ***reversed*** by the Court of Appeals, which refused to reform the warrant:

    That the warrants do not address the contingency of a reverse stock split does not, of itself, create an ambiguity. An omission or mistake in a contract does not constitute an ambiguity and the question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence.

97 N.Y.2d 195, 199 (2001) (cleaned up). There is no ambiguity in the $7 price floor and thus no basis in law to reform the price floor *to benefit MoneyLion*.

- At the same time, MoneyLion cannot use the stock split to prejudice Sellers, as much as Torossian and Nuno would have liked to, JX099. *Accord Reiss,* 97 N.Y.2d at 201. If the Court chooses an EPID that straddles the stock split (like April 14), and Sellers' implied shares are reduced 1:30, then the Price Floor for those shares must be adjusted to $210, which ML acknowledges. ML Opp. at 124.

# 2022 Earnout Shares: April 14, 2023 EPID & Specific Performance

| Specific Performance-April 14 EPID | | |
|---|---|---|
| 2022 Earnout Payment Shares | | |
| Earnout Achieved | $ | 25,000,000.00 |
| Price Floor | $ | 7.00 |
| 4/14/23 30-Day VWAP | $ | 0.55084 |
| Earnout shares | | 3,571,428.57 |
| | | |
| **1Q Vesting** | | |
| Number of vested shares | | 892,857.14 |
| Vesting Date | | 3/31/2023 |
| Vesting Date VWAP | $ | 0.6006 |
| Price Floor | $ | 7.00 |
| MakeWhole Shares (Pre-Split) | | 9,514,154.13 |
| Total Shares (Pre-Split) | | 10,407,011.27 |
| Total Shares (Post-Split) | | 346,900.38 |
| | | |
| **2Q Vesting** | | |
| Number of vested shares* | | 29,761.90 |
| Vesting Date | | 6/30/2023 |
| Vesting Date VWAP | $ | 11.0503 |
| Price Floor | $ | 210.00 |
| MakeWhole Shares | | 535,833.09 |
| | | |
| **3Q Vesting** | | |
| Number of vested shares | | 29,761.90 |
| Vesting Date | | 9/30/2023 |
| Vesting Date VWAP | $ | 20.8438 |
| Price Floor | $ | 210.00 |
| MakeWhole Shares | | 270,088.03 |
| | | |
| **4Q Vesting** | | |
| Number of vested shares | | 29,761.90 |
| Vesting Date | | 12/31/2023 |
| Vesting Date VWAP | $ | 47.63149 |
| Price Floor | $ | 210.00 |
| MakeWhole Shares | | 101,453.81 |
| | | |
| **Total Shares Due** | | **1,343,561** |

- 30-day VWAP on April 14 was $0.5508 (ECF No. 199). Price Floor used to require issuance of 3.57 million shares.

- First vesting tranche requires make-whole because VWAP is $0.60 and Price Floor is $7, requiring issuance of 9.5 million make-whole shares.

- On April 24, 1:30 split occurs, cutting total shares from 10.4M to 346,900.

- Price Floor then must be adjusted to $210, requiring make-whole shares in each subsequent quarter.

- **MoneyLion obligated to issue 1,343,561 shares under April 14, 2023 EPID.**

# The Equities Favor Specific Performance

# Sellers Accept Contingent Consideration For Malka And Outperform MoneyLion's Revenue Projections

**Delaware courts enforce specific performance clauses when balancing of the equities favors the plaintiff. *See L-5 Healthcare Partners, supra.* Here, no question the equities favor Sellers. Sellers proved that MoneyLion unlawfully conspired to deny Sellers their earnout shares.**

- **2011-2021**: Sellers found and grow Malka into a bicoastal studio employing 200 people and providing services to clients such as Amazon, Morgan Stanley, Showtime, ADP, Sotheby's, MoneyLion and others. (Krubich Decl. ¶ 9; Frommer Decl. ¶ 10; Fried Decl. ¶ 19).

- **June-July 2021**: After asking for $75 million in cash, Sellers agree to sell Malka to MoneyLion for $10 million cash, $30 million closing shares, $10 million 2021 earnout shares, and $25 million 2022 earnout shares. (PX070). MoneyLion pitches Sellers on deal by referring to "***uncapped upside***" of stock compensation. (JX006 at MoneyLion_01147422; PX063 at MoneyLion_01136901) (emph. added).

- **July 2, 2021**: Correia predicts the future: "let's say the company for some crazy reason came down to be trading at a dollar, right? . . . You guys would have to receive $25 million worth of a company that is trading at a dollar that might have a market cap of 100 million." (PX065 at 2-3).

- **November 9, 2021**: MoneyLion seeks Board approval for the "strategic" acquisition of Malka (PX145 at MoneyLion_002038255) and projects to the Board that Malka's 2022 revenue will be $30.4 million. (PX146 at MoneyLion_02038457).

- **2022**: Malka ***significantly outperforms*** MoneyLion's 2022 revenue projection under both Malka's historical accounting principles ($42,506,536) and GAAP ($41,611,677). (JX102; JX112).

# CFGI Advises MoneyLion It Will Need To Issue Over 120 Million Shares To Sellers

- **Throughout 2022**, MoneyLion tracks Malka's progress towards the 2022 Earnout using Malka's historical accounting principles, not GAAP, and publicly reports the earnout liability as contingent consideration. (PX236; JX086; PX246; JX091; PX254; ECF No. 202).

- Despite making adjustments to Malka's revenue for the 2021 Stub Period and throughout 2022 to comply with GAAP for SEC reporting purposes, MoneyLion *never once* asserts that the earnouts are based on GAAP or expresses surprise at the GAAP adjustments. (PX196; PX201; PX211).

- **Oct. 13, 2022**: Lee sends CFGI "Malka financials [] based on their historical accounting principles (not GAAP) which is what the earn-out is based on, so will not match GAAP financials" for CFGI's Q3 2022 quarterly valuation. (PX254).

- **Oct. 20, 2022**: Based on revenue and EBITDA numbers provided by Lee, CFGI values the 2022 Earnout as of Q3 2022 as if the maximum earnout payment will be achieved, and MoneyLion reports that valuation in its Q3 2022 10Q. (PX256 at MoneyLion_01836916; ECF No. 202-3 at 36).

- **Oct. 21, 2022**: CFGI writes to Scalia and Torossian that "[m]aximum revenue threshold achievement" for the 2022 Earnout "is now a *lock*" and "odds of achieving the minimum $100k EBITDA threshold have improved." (PX257 at MoneyLion_01836920) (emph. added).

- CFGI's valuation report shows that MoneyLion will have to issue over *120 million shares—over 30% of its outstanding shares as of Dec. 31, 2022—*to Sellers in respect of the 2022 Earnout and associated make-whole given MoneyLion's low stock price. (PX256 at MoneyLion_01836916; PX283, p. 93 of the pdf, p. F3; Trial Tr. 509-10 (Scalia)).

# The December 14-15, 2022 Calls

- **Nov. 2022:** Sellers ask MoneyLion to defer earnout vesting by *one day* for tax purposes. (DX546).

- **Dec. 12, 2022**: MoneyLion's share price has fallen from $5.80 as of Nov. 15, 2021 to approximately *$0.55* as of Dec. 12, 2022. (PX395).

- **Dec. 14, 2022:** Choubey and Correia ask Sellers to defer vesting of Q4 2021 make-whole shares and 2022 Earnout Payment shares until Jan. 1, 2024. (Frommer Decl. ¶ 202; Krubich Decl. ¶ 147; Fried ¶¶ 90-91; PX271).

  — Correia: "we're trying to figure out [] how we can get you guys your $70,000,000, how we can not have to issue an endless number of shares. … [*W*]*e just can't issue that many shares*." (PX271 at 5, 8) (emph. added). If MoneyLion's share price eventually recovered to $2 or $3, "*we're going to end up paying you, like, $300,000,000*, for the company." (PX271 at 7) (emph. added).

  — Choubey: "it's essentially gonna take a year longer for us to get you that $70,000,000 in shares …. if you believe that this is back at five, six, seven, eight, nine, ten dollars, from a relative value perspective in terms of what the people that own this percent of the company before this transaction and after, *you guys end up owning half the company*, right?" (PX271 at 5-6) (emph. added). "*There is no scenario where the current make-whole construct can be the way it is.*" (PX271 at 8) (emph. added).

- **Dec. 15, 2022**: Choubey, Correia and Sellers again discuss proposed deferral of earnout. Sellers do not agree to defer vesting. (Frommer Decl. ¶¶ 211-15).

  — Choubey: we will "*use every corporate lever to then make sure that those shares aren't coming to market*." (PX273 at 17-18) (emph. added).

- As of Dec. 15, 2022, MoneyLion's market capitalization was about $126.7 million, of which $25 million in 2022 Earnout Payment shares would have been about *19.7%*. (PX358).

# One Day After Sellers Decline to Defer Vesting, Torossian Begins His "Forensic Work"

- **Dec. 16, 2022**:  At Correia's instruction—**one day after Dec. 15, 2022 call**—Torossian begins to perform "forensic work" of Malka's 2022 revenue and expenses and discusses ways to prevent Sellers from achieving the 2022 Earnout.

  — Torossian: "this is going to get nasty"

  — Nuno: "D [Choubey] is on one with this too, hes heated"

  — Nuno: "one thing I kinda forgot for a second is that **their earnout is based on cash basis accounting basically**"

  — Torossian: "i thought of that earlier too"

  — Torossian: "big thing is [Schedule B Revenue item] #3 … the contentious area is going to be the FMV calcs"

  — Nuno: "ya **i don't think they accrue bonuses**"

  — Torossian: "**i don't think they pay any out either**"

  — Nuno: "ya that's true, we should confirm that before year end bc **they might want to pay it out in march and it wouldn't hit their earnout**"

  — Torossian: "should be accrued if it is related to 2022"

(JX098 (emph. added); Trial Tr. 677-686 (Torossian)).

# Torossian And Nuno Discuss Ways To Interfere With The 2022 Earnout

- **Dec. 19, 2022**: Torossian and Nuno discuss use of reverse stock split to prevent issuance of 2022 make-whole shares to Sellers. (Trial Tr. 687:13-690:10 (Torossian)).

  — Torossian: "but you do know the wording I found right"

  — Torossian: "***they do not have anything protecting from a reverse stock split*** ☺"

  — Torossian: "given where the price is, we might have no choice but to do one"

  — Nuno: "would we be able to do it fast enough do you think?"

  — Nuno: "or does it take months and months?"

  — Torossian: "only have to do it by 3/31 [the first vesting date of the 2022 Earnout]"

  — Torossian: "or even 6.30 [the second vesting date of the 2022 Earnout] if we let one [vesting date] pass"

  — Torossian: "***I do think we have options lol***" --- ***It's all a joke to them.***

(PX274 at MoneyLion_01842890 (emph. added); Trial Tr. 689:25-690:5 ("Q. So you are saying that MoneyLion only has to do the reverse stock split by March 31 or June 30, if you let one pass, right, if you let one of the vesting dates pass? A. Yes. At this point in time I think we were -- THE COURT: Is that a yes? Is that what you said? THE WITNESS: Yes, this is what I wrote here. Yes.")).

- **Dec. 20, 2022**: Torossian and Nuno continue to discuss ways to interfere with Sellers' right to the 2022 Earnout. (Trial Tr. 690:11-696:10 (Torossian)).

  — Torossian: "I am on a tear haha"

  — Torossian: "I'm public enemy #1 for Malka haha"

  — Torossian: "***only thing that can crush this all is the tax credit***"

  — Nuno: "***i really regret not pushing back even harder on allowing them to use cash basis accounting for earnout***"

  — Torossian: "You are talking back when you guys did the deal?"

  — Torossian: "who would've thought we would be at 50 cents"

  — Nuno: "i hated it at the time though bc it seemed dumb to do that but they pushed really hard and ***Rick [Correia] was more flexible on that***"

  — Nuno: "which i get, we were trying to get them to agree to a floor that at the time was not beneficial to them"

  — Torossian: "So ***another thing that is gonna hit the bros is the severance cost of 150k in December***"

(PX275 at MoneyLion_01842895-98) (emph. added).

- **Jan. 25, 2023**: Basdekis sends Torossian Malka's income statement for 2022, showing both "22 Earnout" and "22 As Reported" numbers. "22 Earnout" numbers show total revenue of $42,506,536 and EBITDA (net ordinary income) of $1,492,713, even before adding the $1,590,603 tax credit. (JX102). Using Basdekis' "22 Earnout" numbers, ***Sellers achieved the maximum 2022 Earnout Payment Amount***.

- **Apr. 14, 2023**: MoneyLion sends Sellers the 2022 Earnout Statement. (JX112). ***Torossian admits that he took no steps to ensure that Malka's 2022 revenue and EBITDA were calculated using substantially consistent methods and practices as MoneyLion used for the 2021 Earnout***. (Trial Tr. 725:24-730:4 (Torossian)).

  — Unlike the 2021 Earnout Statement (JX083), the 2022 Earnout Statement adjusts Malka's revenue, costs and expenses to comply with GAAP and does not add the tax credit. The 2022 Earnout Statement includes additional downward adjustments to revenue and EBITDA—including for items like FMV, bonus, and severance—that Torossian and Nuno discussed on December 16-20, 2022. (JX112; JX106; JX098; PX275).

- **May 15, 2023**: MoneyLion sends Sellers a Notice of Claim, seeking indemnification under the MIPA with respect to certain issues, but not asserting any claim of fraud. (JX113).

- **May 19, 2023**: MoneyLion fires Sellers, allegedly for cause, denying them severance. (JX114-117). Basis for cause was the now-abandoned claim regarding personal expenses that MoneyLion never even gave Sellers a chance to pay for.

- **May 25, 2023**: Sellers object to 2022 Earnout Statement. (JX119).

- **June 6, 2023**:  Sellers reply to MoneyLion's May 15 Notice of Claim.  (JX120).

- **June 12, 2023**: MoneyLion places stop order on previously earned, vested, and voted Closing Stock Payment and 2021 Earnout Payment shares.  (PX318; Frommer Decl. ¶ 271; Krubich Decl. ¶ 197).  ***Sellers' fully vested shares remain frozen to date.***

- **July 20, 2023**: MoneyLion sends Sellers a "Supplemental Notice" raising for the first time an alleged breach of Section 3.06 by "misrepresenting the Company's compliance with U.S. GAAP and ASC 606[.]" (PX323).

  — Fraud claim was an afterthought.  And all the prior breach claims – which were the putative reasons for termination for cause, and MoneyLion's withholding the $375,000 retention amount under the MIPA – have now been abandoned.

# While Sellers' Vested Shares Remain Frozen, MoneyLion Executives Profit From Sales And Gen Digital Acquisition

**After denying Sellers the 2022 Earnout and terminating them without severance, MoneyLion froze their vested and earned shares.**

- Meanwhile, as stock price recovered in 2023—moving from $10-12 in May 2023 to $40-50 in November and more than $60 by year end—MoneyLion executives took opportunities to sell stock in every open insider trading window that followed, starting in August 2023.

- Focusing solely on Correia and Choubey—the architects of this litigation who owned 10% of the company collectively—they sold $27 million in stock in 2023 and 2024. (SEC Form 4s; Tr. 834:11-13)

- According to MoneyLion's March 2025 proxy statement, when the Gen Digital transaction closed, Choubey received or will receive more than $75 million and Correia more than $29 million.

# Monetary Damages For Failure to Issue 2022 Earnout Shares

- If the Court were to override the specific performance clause and award money damages instead, Sellers' damages would be computed using the highest intermediate price during a "reasonable period" following each vesting date. *Duncan v. TheraTx, Inc.,* 775 A.2d 1019 (Del. 2001); *Diamond Fortress Techs., Inc. v. EverID, Inc.*, 274 A.3d 287, 307 (Del. Super. Ct. 2022).

- The "reasonable period" is routinely determined by Delaware courts to be 90 days. *Vivint Solar, Inc. v. Lundberg,* No. 2020-0988-PAF, 2024 Del. Ch. LEXIS 205, at *70 (Del. Ch. May 30, 2024); *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 20 (Del. Ch. 2003).

  — Reasonable period serves to (a) allow a period of time in which a hypothetical shareholder could assess the market and consult advisors before making an investment decision; and (b) approximate the time in which the seller could theoretically liquidate his position without depressing the market. *Duncan*; *Vivint*.

- MoneyLion advocates (ML Opp. at 125 n.43) that the Court should consider a shorter period, relying on *Stuckey v. Online Res. Corp.*, 909 F. Supp. 2d 912, 943 (S.D. Ohio 2012), where, MoneyLion argues, the court used a 44-day period to locate the highest intermediate price. MoneyLion omits that this was a 44 *trading-day* period—which was 66 *calendar days*—and further omits that a second period in the same case was computed to be 86 trading days, or 125 calendar days. *See* Expert Report in *Stuckey*, 2010 Misc. Filings LEXIS 12089, at *9, *17. In other words, the average reasonable period in *Stuckey* was **95 calendar days**.

- There is no basis to shorten the presumptive 90-day period in this case. Sellers were subject to the MoneyLion insider trading policy that strictly limited the days in which they could trade. DX554 at MoneyLion_01864321. And because their stock was restricted and could not be sold until MoneyLion either registered the shares or gave its transfer agent a legal opinion under Rule 144, it would be reasonable to conclude that MoneyLion—which vowed to "use every corporate lever" to delay or prohibit sales into a depressed market—would have slow-walked that process.

# 2022 Earnout Shares – May 31, 2023 EPID & Money Damages

**Money Damages Using Highest Intermediate Prices, As Stipulated, with 90-Day Periods**

- Same 5/31 VWAP as used in the specific performance chart yields 1.825 million shares.

- 456,316 shares sold following each vesting date at highest intermediate price, with exception that first tranche would have become available to be sold on **May 31**, not **March 31**, due to May 31 EPID**.**

- Highest intermediate prices are stipulated.

- **Total Damages: $87,027,563.**

| Money Damages-May 31 EPID | | |
|---|---|---|
| Earnout Achieved | $ | 25,000,000.00 |
| Price Floor | $ | 7.00 |
| 5/31/23 30-Day VWAP | $ | 13.70 |
| Earnout shares | | 1,825,264.53 |
| | | |
| **1Q Vesting** | | |
| Number of vested shares | | 456,316.13 |
| Vesting Date | | 3/31/2023 |
| Vesting Date VWAP | $ | 18.0167 |
| Price Floor | $ | 7.00 |
| MakeWhole Cash Payment | $ | - |
| First able to sell | | 5/31/2023 |
| Highest Interm. Price (8/23/2023) | $ | 19.8050 |
| Damages | $ | 9,037,341.03 |
| | | |
| **2Q Vesting** | | |
| Number of vested shares | | 456,316.13 |
| Vesting Date | | 6/30/2023 |
| Vesting Date VWAP | $ | 11.0503 |
| Price Floor | $ | 7.00 |
| MakeWhole Shares | | 0.00 |
| Highest Interm. Price (9/20/2023) | $ | 25.1827 |
| Damages | $ | 11,491,272.30 |
| | | |
| **3Q Vesting** | | |
| Number of vested shares | | 456,316.13 |
| Vesting Date | | 9/30/2023 |
| Vesting Date VWAP | $ | 20.8438 |
| Price Floor | $ | 7.00 |
| MakeWhole Shares | | 0.00 |
| Highest Interm. Price (12/28/2023) | $ | 66.47 |
| Damages | $ | 30,331,333.41 |
| | | |
| **4Q Vesting** | | |
| Number of vested shares | | 456,316.13 |
| Vesting Date | | 12/31/2023 |
| Vesting Date VWAP | $ | 47.63149 |
| Price Floor | $ | 7.00 |
| MakeWhole Shares | | 0.00 |
| Highest Interm. Price (3/26/2024) | $ | 79.26 |
| Damages | $ | 36,167,616.76 |
| | | |
| **Total Damages (No Specific Performance)** | $ | 87,027,563 |

# 2022 Earnout Shares – April 14, 2023 EPID & Monetary Damages

**Money Damages Using Highest Intermediate Prices, As Stipulated, with 90-Day Periods**

- Pre-split VWAP used to determine that Sellers would be entitled to 3.57 million shares.

- Make-whole due with respect to first tranche.

- Split occurs on April 24 and requires adjustments to **both** share count and Price Floor.

- Assumes shares sold following each vesting date at highest intermediate price, with exception that first tranche becomes available to be sold on **April 14**, not **March 31**, due to April 14 EPID.

- **Total Damages: $52,525,313.**

| Money Damages-April 14 EPID | | |
|---|---|---|
| 2022 Earnout Payment Shares | | |
| Earnout Achieved | $ | 25,000,000.00 |
| Price Floor | $ | 7.00 |
| 4/14/23 30-Day VWAP | $ | 0.55084 |
| Earnout shares | | 3,571,428.57 |
| | | |
| **1Q Vesting** | | |
| Number of vested shares | | 892,857.14 |
| Vesting Date | | 3/31/2023 |
| Vesting Date VWAP | $ | 0.6006 |
| Price Floor | $ | 7.00 |
| MakeWhole Shares (Pre-Split) | | 9,514,154.13 |
| Total Shares (Pre-Split) | | 10,407,011.27 |
| Total Shares (Post-Split) | | 346,900.38 |
| First date able to sell | | 4/14/2023 |
| Highest Interm. Price (5/8/2023) | $ | 22.92 |
| Damages | $ | 7,950,921.92 |
| **2Q Vesting** | | |
| Number of vested shares* | | 29,761.90 |
| Vesting Date | | 6/30/2023 |
| Vesting Date VWAP | $ | 11.0503 |
| Price Floor | $ | 210.00 |
| MakeWhole Shares | | 535,833.09 |
| Highest Interm. Price (9/20/2023) | $ | 25.1827 |
| Damages | $ | 14,243,209.01 |
| **3Q Vesting** | | |
| Number of vested shares | | 29,761.90 |
| Vesting Date | | 9/30/2023 |
| Vesting Date VWAP | $ | 20.8438 |
| Price Floor | $ | 210.00 |
| MakeWhole Shares | | 270,088.03 |
| Highest Interm. Price (12/28/2023) | $ | 66.47 |
| Damages | $ | 19,931,024.92 |
| **4Q Vesting** | | |
| Number of vested shares | | 29,761.90 |
| Vesting Date | | 12/31/2023 |
| Vesting Date VWAP | $ | 47.63149 |
| Price Floor | $ | 210.00 |
| MakeWhole Shares | | 101,453.81 |
| Highest Interm. Price (3/26/2024) | $ | 79.26 |
| Damages | $ | 10,400,157.54 |
| | | |
| **Total Damages** | $ | **52,525,313** |

# 2022 Earnout Shares – MoneyLion's Ability to Pay in Cash

**MoneyLion argues that damages should be capped at $25 million because the MIPA provided an option for MoneyLion to pay the make-whole in cash. ECF No. 160 at 123.**

- Correia's testimony **disproved MoneyLion's argument** that it would have paid the 2022 make-whole provision in cash.

  — MoneyLion would have needed $22 million in cash to pay the make-whole. ECF No. 160 at 126.

  — Section 11.3(m) of the Monroe Capital Credit Agreement **prohibited** MoneyLion from using cash to pay the Malka Make-Whole, without Monroe's consent. PX421 at 78, 80 (§ 11.3(m).)

  — In Feb. and Mar. 2023, MoneyLion asked Monroe to consent to the use of cash to pay $1 million of the make-whole for the final tranche of the 2021 Earnout. PX300. **<u>Monroe said no</u>**. PX304.

  — Monroe Credit Agreement established a Restricted Payment basket of up to $10 million, but Correia acknowledged that MoneyLion did not meet the minimum requirements to use that basket because MoneyLion was under the debt-to-EBITDA ratio. (PX421 at 21, 80 (§ 11.3(j)); Tr. 855:20-857:4.) His contention that Monroe or some other unidentified white knight might have come in to provide the capital was **pure conjecture**, contradicted by the evidence.

  — Regardless, the Earnout Shares themselves could not be paid in cash under the MIPA—only the make-whole shares could be—and would be subject to either specific performance or the highest intermediate price rule regardless of whether MoneyLion could pay cash for the make-whole shares.

# Other Questions Raised By The Court

# Gen Digital Merger

# Gen Digital Merger

**Court asked what is the impact, if any, of the recent acquisition of MoneyLion by Gen, and how the acquisition bears on the calculation of any award of damages or specific performance.**

- <u>**Short Answer**</u>: With respect to the **vested shares**, they are specifically provided for in the merger agreement and defined as the "Frozen Shares."  Upon a voluntary or Court-ordered lifting of the Stop Order (text on next slide), Gen Digital is obligated to redeem them for the same Merger Consideration as all other shareholders.

  - Merger Consideration:  $82 per share in cash plus a contingent value right (a "CVR") that entitles the holder to a contingent payment of $23 if Gen reaches certain milestones.

  - The CVRs trade under the ticker GENVR and traded on the issuance date at $4.45, currently above $5.20

- With respect to specific performance of the 2022 Earnout Shares, they are not specifically accounted for in the merger agreement but we assume they will receive the same treatment, as no one has told us otherwise, and we were pleased to hear from Mr. Washer in response to the Court's question last week that the transaction will have no impact on this case ("***From our perspective, I don't think it affects the case or our position on any of this***.")

  — With respect to a money judgment in lieu of the 2022 shares, we again have no reason to suspect that MoneyLion could not pay it.

# Gen Digital Merger (Cont'd)

Merger Agreement § 2.7(e):

      (e)    <u>Frozen Shares</u>.  Notwithstanding anything to the contrary set forth in this Agreement, each share of Company Common Stock with respect to which a no transfer order has been placed with the Company's transfer agent as of the date hereof that remains in place immediately prior to the Effective Time (each, a "**Frozen Share**") will not be converted into the right to receive the Merger Consideration pursuant to this <u>Section 2.7</u>, and holders (or, to the extent applicable, beneficial owners) of such Frozen Shares will not be entitled to receive payment in respect of any such Frozen Shares unless and until the no transfer order with respect to such Frozen Shares has been released by the Company, Surviving Corporation or Parent, as applicable, either voluntarily or pursuant to a permanent injunction or other final and non-appealable judgment or order issued by any court of competent jurisdiction.  If, after the Effective Time, the no transfer order with respect to any Frozen Share is so released to a holder other than the Surviving Corporation, each such Frozen Share will thereupon be treated as if it had been converted into, at the Effective Time, the right to receive the Merger Consideration and the Surviving Corporation shall remain liable for payment of the Merger Consideration (without any interest thereon) for such Frozen Share in accordance with this Agreement.  At the Effective Time, any holder or beneficial owner of any Frozen Share will cease to have any rights with respect thereto, except as provided in the immediately preceding sentence.  Any Frozen Share that is not so released shall be treated as an Owned Company Share hereunder.

# Court's Other Questions: Rescission

**Court asked whether MoneyLion is entitled to complete or partial rescission of the MIPA, money damages against Sellers, or both, and how rescission would be structured.**

- MoneyLion waived the claim. After a pro forma request in the counterclaims for "rescission, restitution or compensatory damages" (¶ 211, 218) it has never pursued it.

  — No mention in the JPTO, proposed findings and conclusions, or in its response, even after Sellers argued (SPF ¶ 538) that MoneyLion (a) ratified the MIPA by accepting its benefits; and (b) rescission is impracticable now that four years had passed and Malka's business is irreparably damaged by MoneyLion's management of it after unlawfully firing the Sellers.

- "[A]cceptance of benefits under a contract subsequent to the discovery of fraud constitutes affirmance of the contract and, therefore, acts as a bar to attempts by the defrauded party to rescind the contract." *Hangzhou Silk Imp. & Exp. Corp. v. P.C.B. Int'l Indus., Inc.*, No. 00 CIV. 6344 (RLC), 2002 WL 2031591, at *4 (S.D.N.Y. Sept. 5, 2002)

- "[A] defrauded party to a contract may elect to either disaffirm the contract by a prompt rescission or stand on the contract and thereafter maintain an action at law for damages attributable to the fraud." *Big Apple Car, Inc. v. City of New York*, 204 A.D.2d 109, 110-111 (1st Dep't 1994).

- MoneyLion must perform its executory obligations—the earnouts—regardless of the merits of its claim that it was defrauded with respect to the purchase price. *Id.*

# Court's Other Questions:  DUAL

**Court asked whether damages against Sellers should be reduced by the settlement with DUAL and whether reduction depends on the specific claim(s) for which MoneyLion is determined to have prevailed and/or settled.**

- Sellers submit that any damages against Sellers should be reduced by $6.5 million, the amount MoneyLion received from DUAL.

- The agreement itself says nothing about what claims were settled, and the correspondence between MoneyLion, its insurance agent (Marsh), and DUAL, was heavily redacted on work product privilege grounds.

- MoneyLion has offered no evidence that its settlement with DUAL was anything but recompense for the losses claimed in this case.  In fact, it elicited testimony from Rick Correia at trial that was intended to suggest that the settlement amount of $6.5 million was a reflection of how DUAL viewed the claims in this action (Tr. 874:18-875:15).

- MoneyLion has recovered under the RWI policy exactly as the MIPA contemplates.  Its out-of-pocket losses resulting from any alleged inaccuracy in Section 3.06 has been reduced by $6.5 million.

# Court's Other Questions:  Recoupment

**Court asked whether any damages awarded to Sellers should be reduced by the amount MoneyLion would have been awarded if allowed to pursue its time-barred MIPA breach claims.**

- No, for three reasons.  First, MoneyLion never asserted an affirmative defense for recoupment.  *See generally* ECF No. 54.  No such defense is articulated in the JPTO or in either of the pretrial submissions.

- Second, Sellers can have **no personal liability** for non-fraud-based breaches of the MIPA.  MoneyLion's sole source of recovery is against the RWI.

  — MIPA § 8.08(b) provides that "the sole and exclusive sources of indemnification from which a Buyer Indemnitee may recover Losses pursuant to Section 8.03(a) and Section 8.04(a)"—*i.e.*, damages caused by an inaccurate representation or warranty in Article III—is "the Retention Escrow Amount and claims against the R&W Policy."  The Retention Escrow Amount is an escrowed fund of $375,000 set aside at closing.  *Id.* Art. I.

  — The Sellers *only* have personal liability under Section 8.08(e), which provides that Losses pursuant to Section 8.03(f)—a "Fraud-Type Claim"—are recoverable from the Sellers personally.  A Fraud-Type Claim is defined as "Legal Proceedings based upon" a claim of "common law fraud."  *Id.* Art. I.

  — Since MoneyLion could never have been entitled to an award of money damages against Sellers for a non-fraud-based breach of the MIPA, there can be no recoupment.

- Third, as the "initial aggressor" in this litigation (ECF No. 159 at 56-58) MoneyLion cannot use its time-barred breach claim as an affirmative defense to Sellers' claims.  *Davis v. 24 Hour Fitness Worldwide, Inc.*, 75 F. Supp. 3d 635, 638 (D. Del. 2014) ("mirror images . . . of time-barred claims" are also time-barred when asserted by the "initial aggressor") (citation omitted).

# Attorneys' Fees and Costs

# Attorneys' Fees and Costs

- **Sellers**

  — The MIPA makes MoneyLion liable to Sellers for legal fees and costs incurred due to its failure to perform.  (JX065 at DLA_006250 (Section 8.05)).  <u>Sellers proved that MoneyLion breached the parties' agreements</u>.

  — Sellers are entitled to reasonable attorneys' fees as a reasonable hourly rate multiplied by a reasonable number of hours expended on the work.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182 (2d Cir. 2008); *Kreisler v. 2d Ave. Diner Corp.*, No. 10 Civ. 7592 (RJS), 2013 WL 3965247, at *1 (S.D.N.Y. July 31, 2013).

  — Sellers respectfully propose to make post-trial submissions to the Court or to a magistrate judge, documenting our fees and costs incurred in the litigation, for a determination as to reasonableness.  *See Glob. Brand Holdings, LLC v. Accessories Direct Int'l USA, Inc.*, No. 17-CIV-7137 (LAK) (SLC), 2020 WL 9762874, at *6 (S.D.N.Y. May 29, 2020), *report and recommendation adopted*, 2020 WL 13823745 (S.D.N.Y. Aug. 4, 2020).

- **MoneyLion**

  — MoneyLion did not prove any of its claims.

  — MoneyLion incurred patently unreasonable attorneys' fees of $15 million (nearly 3x Sellers' attorneys' fees) through Dec. 2024, including in respect of now-withdrawn claims.