UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                                                    :

JEFFREY FROMMER et al.,                      :
                                                    :

                    Plaintiffs,          :
                                                       :                   23-CV-6339 (JMF)

        -v-                                 :
                                                    :      <u>FINDINGS OF FACT AND</u>

MONEYLION TECHNOLOGIES INC. et al.,    :      <u>CONCLUSIONS OF LAW</u>
                                                    :

                  Defendants.        :
                                                    :
-----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       On November 15, 2021, MoneyLion Inc. ("MoneyLion"), a publicly traded financial

technology company, purchased Malka Media Group LLC ("Malka"), a media production and

marketing company, for a combination of cash and MoneyLion shares — some of which was to

be paid to the previous owners of Malka (the "Sellers") at the time of closing and some of which

was to be paid over the next two years if Malka hit certain performance metrics. Approximately

two years after the closing, the relationship between MoneyLion and the Sellers went south and

this litigation followed. In brief, the Sellers sued MoneyLion for failing to issue some shares to

which they claim they are entitled and for freezing their access to other shares that MoneyLion

had already issued to them. On the flipside, MoneyLion has accused Sellers of, among other

things, fraud and breach of contract, which, MoneyLion argues, not only vitiate any obligations it

otherwise would have had to continue payments to the Sellers but also entitle it to recission of

the agreement and damages in its own right. Additionally — but relatedly — MoneyLion argues

that the Sellers are not entitled to at least some of the payments because Malka failed to achieve

the performance metrics required under the parties' contract.

At the heart of the parties' disputes is a disagreement regarding the accounting practices that Malka was required to employ in measuring its financial performance both before and after the closing. The actual practices Malka used are not in dispute. But MoneyLion claims that Malka misrepresented its practices when negotiating the transaction. The parties also disagree about which accounting practices were to be employed in calculating whether Malka achieved the relevant performance metrics. Earlier this year, the Court held a bench trial to resolve these and other disputes. For the reasons set forth below, the Court finds that the Sellers neither fraudulently induced MoneyLion into agreeing to the purchase nor materially breached the agreement themselves and that Malka met the performance metrics set forth in the parties' contract. It follows that MoneyLion is indeed bound by the parties' contract and liable to the Sellers for breach of that contract. At the same time, the Court concludes that — notwithstanding language in the parties' agreement — the Sellers' own unclean hands make the proper remedy for MoneyLion's breach damages, not specific performance.

## FINDINGS OF FACT

Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact based on the testimony and exhibits at trial.[1]

---

[1] The Court ruled on most of the parties' objections to testimony and exhibits at trial. To the extent that the Court cites in this Opinion to any evidence to which a party objected, the objection is overruled. The Court need not and does not resolve the remaining objections.

In addition, MoneyLion filed motions to exclude the Sellers' experts' testimony pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). ECF Nos. 134, 139. MoneyLion's arguments in these motions, however, "to the extent they are accurate, do not raise real *Daubert* . . . reliability issues. They go to weight, not admissibility." *Universe Antiques, Inc. v. Vareika*, No. 10-CV-3629 (VM), 2011 WL 5117057, at *6 (S.D.N.Y. Oct. 21, 2011) (internal quotation marks omitted). Especially given that "*Daubert* motions function somewhat differently in the context of bench trials," where the "judge acts as both gatekeeper and factfinder," *Howard Univ. v. Borders*, No. 20-CV-04716 (LJL), 2022 WL 3355264, at *5 (S.D.N.Y. Aug. 14, 2022), the Court therefore denies those

## A. GAAP, Revenue and EBITDA

The Court begins with some background accounting terms and principles that are central to the parties' disputes. The first is "Generally Accepted Accounting Principles," commonly referred to as "GAAP," which are accounting principles generally used in the United States. PX407.[2] GAAP is codified by the Financial Account Standards Board ("FASB") as the FASB Accounting Standards Codification, which sets out precise rules for dealing with a variety of accounting issues. *Id*. These rules govern, for example, how and when to recognize revenue, costs, and expenses — the central issues in this case — but they address many other issues as well. Thus, a company can comply with GAAP in one area of accounting but materially diverge from it in another. All publicly traded companies in the United States are required to follow GAAP; other companies are not, and they often do not. Larson Aff. ¶ 38.

Two financial metrics are of particular importance here. The first is revenue. Revenue refers to whatever assets (in this case, cash) a company gains in exchange for delivering goods or rendering services. PX386, at 19. In other words, whatever a company is paid for providing a good or service is its revenue. The second is EBITDA, which is short for "earnings before interest, taxes, depreciation and amortization." Larson Aff. ¶ 41. EBITDA is not a GAAP-defined measure of financial performance, but it is nonetheless often used by investors to measure a company's financial health. *Id.* ¶¶ 41-42. In brief, EBITDA generally reflects a

---

motions and instead considers the parties' arguments only in "decid[ing] how much weight, if any, to give [the expert] opinions." *Universe Antiques*, 2011 WL 5117057, at *6.

[2]      "Trial Tr.__" refers to the transcript of the trial, which began on March 31 and concluded on May 5, 2025; "__ Aff." refers to a witness's trial testimony submitted by affidavit (as witnesses' direct testimony was largely taken by affidavit); "PX__" refers to a Plaintiff's Exhibit; "DX__" refers to a Defense Exhibit; and "JX__" refers to a Joint Exhibit.

company's profit — and thus depends primarily on a company's revenues and costs — although it disregards the effects of certain non-operating expenses, such as depreciation and amortization.

A third concept central to this case, also related to GAAP, is accrual. Under GAAP, both revenue and expenses are required to be "recognized" on an accrual basis. *See* PX386, at 24. That requires a company to account for the financial impact of a transaction in the period in which the real-world effects of the transaction occur. Larson Aff. ¶ 37. For example, if a company uses electricity in October but waits until November to pay its bill for that electricity, the company would recognize the costs of that electricity — i.e., would record the expense and integrate that expense into its profit calculations — in October, as that is when it actually used the electricity. *Id.* By the same token, the electricity company would recognize the revenue attributable to the electricity it provided in October — even though it did not receive payment until November — because that is when it earned the revenue by supplying the electricity. *Id.* ¶ 40. This revenue-recognition principle is codified within GAAP by Accounting Standards Codification 606 — or "ASC 606" for short. *Id.* ¶¶ 39-40. Under ASC 606, a single payment need not be recognized all at once. For example, if a company is paid a lump sum for a project that takes a year, it is supposed to recognize revenue incrementally as it completes the work. At bottom, the intention is to recognize the revenue only when it has actually been earned. PX386, at 24-27.

**B. The Parties**

MoneyLion Inc. is a financial technology company headquartered in New York that provides consumer financial products and services. Choubey Aff. ¶ 4; Stipulated Facts ¶ 6. MoneyLion Technologies Inc. is a wholly owned subsidiary of MoneyLion Inc., which, together, the Court will refer to throughout this Opinion as "MoneyLion." Lee Aff. ¶ 1. In 2021,

MoneyLion became a publicly traded company on the New York Stock Exchange.  Choubey Aff. ¶ 13, n. 4.[3]  At all times relevant to this case, the Chief Executive Officer of MoneyLion was Diwaker ("Dee") Choubey, and its Chief Financial Officer was Richard Correia.  Stipulated Facts ¶ 19; Correia Aff. ¶ 6.  Other MoneyLion employees relevant to this case include Michael Scalia, the Head of Securities and Exchange Commission ("SEC") Reporting; Mark Torossian, the Chief Accounting Officer; and Michelle Lee and Erika Nuno, both of whom were members of the company's Strategic Finance group.  Correia Aff. ¶¶ 83, 89; Lee Aff. ¶¶ 1,6.

Malka Media Group LLC ("Malka") was, before the acquisition at issue here, a standalone media and marketing company owned by Jeffrey Frommer, Lyusen (Louis) Krubich, Daniel Fried, and Pat Capra (collectively, the "Sellers").  *See* Stipulated Facts ¶¶ 1-5, 8.  Krubich was Malka's founder and Chief Executive Officer; Frommer was its President; Fried was a Managing Partner and Executive Producer; and Capra was President and Chief Executive Officer of Malka Sports LLC ("Malka Sports"), a wholly owned subsidiary of Malka that connected professional athletes with endorsement, advertisement, and other opportunities.  Krubich Aff. ¶ 8; Frommer Aff. ¶¶ 8, 9; Fried Aff. ¶ 10; Capra Aff. ¶ 9-11; DX166, at 6.  In early 2020, Malka hired Matthew Basdekis to be its Head of Finance.  Krubich Aff. ¶ 23; Frommer Aff. ¶ 18.  Basdekis's role managing Malka's finances was supplemented by work from an outside accountant, Ryan Curran of Curran & Company LLP.  Basdekis Aff. ¶ 5.  Malka engaged Curran to prepare its corporate tax returns; for a time, Curran also assisted with managing Malka's payroll and in preparing the Sellers' individual tax returns.  Curran Aff. ¶¶ 5-10.

---

[3]    In April 2025, MoneyLion was acquired by Gen Digital Inc.  *See* ECF No. 240.  Both sides agree that acquisition has no relevance to the issues in this case.  Trial Tr. 1046; Pl.'s Closing Pres. 84.

**C. Pre-Acquisition Negotiations**

In mid-2021, Malka began approaching investment banks to explore the possibility of finding a purchaser for the company.  DX027; DX028.  At the time, Malka had a relationship with MoneyLion because MoneyLion, three years earlier, had retained Malka to provide marketing services and create content to share on its web and mobile applications.  Correia Aff. ¶ 8.  During a group dinner in Manhattan in June 2021, Frommer, Choubey, and Correia first broached the possibility of MoneyLion acquiring Malka.  Choubey Aff. ¶ 7; Frommer Aff. ¶ 34.

In the discussions that followed, Frommer took the lead on Malka's side.  Near the outset, Frommer sent MoneyLion Malka's financial statements for 2019 and 2020 (the "Financial Statements"), which, critically, were reviewed but unaudited [4]; a pitch deck; and an income statement for the first quarter of 2021.  JX005; Curran Aff. ¶¶ 15-16, 22.  The Financial Statements — which are central to this case — had been prepared by Curran, with Basdekis's assistance, to provide to ConnectOne Bank in connection with a line of credit for Malka.  Curran Aff. ¶¶ 15, 22; *see* PX017.  The Financial Statements made several statements about Malka's business, operations, and accounting policies.  Most prominently, they made two assertions regarding Malka's GAAP compliance.  First, they provided that "[t]he Company has adopted ASC 606 as of December 31, 2019 regarding accounting for income from contracts and all revenues recognized by the Company for the year then ended are covered through ASC 606."  JX005, at 9.  Relatedly, the Financial Statements provided: "Revenue is recognized under the

---

[4]      According to Curran, a review — unlike an audit — "involves a less extensive analysis of a company's financial statements," and provides only "limited assurance" that no "material modifications . . . should be made to the company's financial statements for them to be in accordance" with GAAP.  Curran Aff. ¶ 16.

accrual basis of accounting and recorded as revenue when work is completed and invoice[d] to the Company's customers." *Id.*

It is now undisputed that neither of these statements was accurate. As described above, ASC 606 requires a company to recognize revenue when the work associated with that revenue is completed. But Malka recognized revenue at the moment that it sent an invoice to a customer, without regard for whether or when it did any work associated with that invoice. Trial Tr. 6. For example, Malka sometimes invoiced its customers (and then recorded that revenue) for substantial deposits — in some instances, up to 50% of an entire contract value — at the very outset, before it had completed any work. *Id.* at 26-30. At trial, Curran, who drafted the representations concerning ASC 606 in the Financial Statements, stated that he was comfortable saying Malka was ASC 606 compliant because he believed the nature of Malka's business meant that any difference to its revenue recognition from its noncompliance would be minimal. *Id.* at 587-88. But Curran admits that he did nothing to verify that the difference from ASC 606-compliant reporting was not significant. *Id.* at 592-93. The Financial Statements were also prepared with Management Representation Letters providing, among other things, that the statements were "fairly presented in conformity with U.S. GAAP." DX024, at 1. These letters were signed by Basdekis. DX024, at 2; Trial Tr. 636-38.

The pitch deck that Frommer sent to MoneyLion included representations about Malka's revenue and EBITDA in 2019 and 2020 and projections for the following years:



JX005, at 51. The pitch deck projected, for example, that Malka would have revenue of $32.4 million and EBITDA of $5.4 million for 2021 and revenue of $46.8 million and EBITDA of $9.1 million for 2022. *Id.* The pitch deck also included a proposed purchase price of $75 million, framing that number as a multiple of the company's 2021 revenue and EBITDA:



*Id.* at 53.

The day after Frommer sent MoneyLion the pitch deck and the Financial Statements, Correia responded with a counterproposal. JX006. Although MoneyLion accepted the $75 million valuation, it proposed paying for the acquisition mostly with MoneyLion shares: $10 million of the purchase price would be paid in cash and the rest in MoneyLion shares that would vest over several years, including two "Earnout" payments of MoneyLion shares that would have to be earned based on Malka's financial performance in 2021 and 2022. JX006-A. Significantly, MoneyLion's proposal noted that the stock payments could have "uncapped upside"; illustrating the point, the proposal explained that if the stock increased in value by 100%, the Sellers would be paid $140 million in total. *Id.*; *see also* PX063, at 2 (June 30, 2021 email citing as "Key Features" of MoneyLion's proposal "$40M fixed" and "$65M uncapped upside with floor (assuming targets achieved)" and modeling that if MoneyLion's stock price increased by 100% that the "Total Purchase Price" would be $140 million). It also said that the Sellers would have "protection" if MoneyLion's stock price decreased. *See* JX006-A. A few days later, MoneyLion followed with a Letter of Intent memorializing the same offer. PX058.

Thereafter, the parties continued their negotiations. Frommer and Correia discussed the payment structure for the Sellers in a telephone call, which Frommer recorded (without Correia's knowledge or consent). PX065. Frommer expressed concern about the effect of a change in the value of the shares that the Sellers would be issued before they were able to sell them; Correia responded by framing the combination of cash and restricted stock that the Sellers would receive as particularly favorable to the Sellers. *Id.* at 1-2. As he put it, the Sellers were "guaranteed 75 million" because the arrangement gave them "downside protection." *Id.* at 2. He further noted

that the Sellers could receive more shares if MoneyLion's share price dropped.  He pointed out, for example, that, if MoneyLion's share price dropped to $1, the Sellers might receive a quarter of the company's total market capitalization in compensation.  *Id.* at 2-3 (explaining the "risk that we have" as follows: "[L]et's say the company for some crazy reason came down to be trading at a dollar, right? . . .  You guys would have to receive $25 million dollars' worth of a company that is trading at a dollar that might have a market cap of 100 million.").

On July 12, 2021, after several back and forths, Frommer and Choubey executed a final Letter of Intent.  PX070.  It too valued Malka at $75 million and included an upfront payment of cash and stock followed by multiple payments of MoneyLion shares contingent on Malka's achievement of revenue and EBITDA goals.  *Id.* at 5-6.  After executing the Letter of Intent, MoneyLion prepared a presentation for its Board of Directors summarizing Malka's financial data.  DX518.  The presentation included graphs depicting Malka's revenue and EBITDA growing year over year, using data from Malka's earlier presentation:



*Id.* at 17.  It also presented Malka's value as $75 million, calculated as a multiple of both the revenue and EBITDA numbers provided by Frommer:

# TRANSACTION OVERVIEW

| | |
|---|---|
| **Consideration** | • Equity purchase: Enterprise value of $75M, cash-free / debt-free except for $2.5M credit facility<br>— Cash at closing: $10M<br>— Restricted Stock at closing: $30M, to be issued at closing with 25% to vest quarterly over 2022<br>— Earnout 2021: $10M restricted stock, based on achievement of $25M in revenue and $100k in EBITDA for 2021; issued upon achieving 67% of the milestones and on a linear basis up to 100% of targets<br>— Earnout 2022: $25M restricted stock, based on achievement of $30M in revenue and $100k in EBITDA for 2022; issued upon achieving 67% of the milestones and on a linear basis up to 100% of targets; if earned, to vest quarterly over 2023 |
| **Valuation** | • 2021 multiples: 2.3x Revenue; 13.9x EBITDA<br>• 2022 multiples: 1.6x Revenue; 8.2x EBITDA<br>• MoneyLion multiples: 16.5x 2021E Revenue; 9.2x 2022E Revenue |

*Id.* at 19.

Soon after, MoneyLion took the next step to move the transaction forward, retaining CFGI, LLC ("CFGI"), an accounting and advisory firm, to conduct due diligence on Malka. DX065.  MoneyLion had an existing relationship with CFGI, which had assisted MoneyLion in its process of becoming a public company.  Correia Aff. ¶ 43.  To facilitate the due diligence process, Malka's counsel for the acquisition, Fox Rothschild LLP ("Fox"), set up a data room to allow transmission of documents and information to MoneyLion and its advisors, including MoneyLion's counsel for the transaction, DLA Piper ("DLA").  Stipulated Facts ¶¶ 11, 15; PX084.  Over the course of the due diligence process, data room access was given to various people at MoneyLion, DLA Piper, CFGI, and, later in the diligence process, MoneyLion's representations and warranties insurer, DUAL North America ("Dual").  PX084; PX110.

The data room gave MoneyLion both high level and granular information about Malka's financial performance.  For example, Malka provided all of its large contracts with customers from the prior three years and, for the period from 2019 through June 2021, monthly sales detail of invoiced amounts as well as profit and loss and income statements.  PX083, at 15, 32; PX079.

Most important for present purposes, the data room revealed two facts about Malka's business. First, the data room made clear that Malka's revenue recognition correlated exactly with its invoicing.  For all of 2019 and (with a trivial exception) 2020, Malka's total recognized revenue per month exactly matched the total amount Malka had invoiced in that month.  PX024-A; PX027-A.  Separately — and equally significantly — the data room revealed that Malka often collected significant deposits from its customers.  For example, the data room included contracts requiring large deposits due "upon execution," *see, e.g.*, PX192, at 14, and a ledger of transactions, including dozens of entries with descriptions like "50% Deposit" and "50% Advance Payment," sometimes for hundreds of thousands of dollars, PX027-A.  In all, the due diligence process lasted over two months; during that time, MoneyLion was never refused a request for documents or information.  Frommer Aff. ¶ 72; DX399; Trial Tr. 65-66.

On October 5, 2021, CFGI sent MoneyLion a report titled "Project Queen Financial and Tax Due Diligence Report" (the "CFGI Report").  JX014.  (MoneyLion dubbed the transaction "Project Queen," a reference to the fact that "Malka" means "Queen" in Hebrew.  Krubich Aff. ¶ 8).  The CFGI Report included several observations relating to Malka's accounting practices and adherence to GAAP.  First, under the heading "Diligence adjustments" and the subheading "Accrual accounting," the Report stated:

> [Malka] generally does not prepare its financial statements on a full accrual basis of accounting, which could impact the Company's revenue, EBITDA and net working capital.  Examples of accounts for which the Company does not record accruals include but are not limited to: commissions, payroll, professional fees, prepaid licenses, and prepaid insurance.  We did not perform an analysis to quantify the potential impact of excluding these accruals and prepaid expenses.

JX014, at 16.  Under the subheading "Revenue recognition," the Report also stated:

> While Management represented that the Company is compliant with ASC 606 revenue recognition requirements, it has not performed a detailed assessment to confirm or validate compliance.  Further, Management acknowledged that in certain instances where projects fell behind schedule, the Company invoiced

customers based on the planned rather than actual timeline(s).  Management noted that this dynamic can impact revenue recognition but noted any noncompliance to be minimal.  Following this transaction, we understand that the Buyer plans to align the Company's accounting policies including in relation to revenue recognition, with that of Moneylion.

*Id.* at 17.  Later, under in an analysis of "Net Working Capital," the Report noted another

"Adjustment" based on "Accrual accounting," to wit:

> As noted in the *Quality of Earnings Analysis*, The Company generally does not prepare its financial statements on a full accrual basis of accounting, and we anticipate net working capital would be significantly different if the Company reported under GAAP.  Examples of accounts for which the Company does not record nor track accruals include but are not limited to: commissions, payroll, professional fees, prepaid licenses and prepaid insurance.

*Id.* at 21.  The Report also stated that Malka "recognizes revenue and invoices customers

on the achievement of agreed project-based milestones (e.g., stages of completion) as

specified in customer contracts.  Production and services projects with milestones are

billed based on time and materials."  *Id.* at 35; *see also id.* at 47 ("Customers are invoiced

upon completion of milestones set forth in respective contracts.").

**D.  Drafting of the MIPA**

Following MoneyLion's receipt of the CFGI Report, the parties began drafting the

"MIPA," short for "Membership Interest Purchase Agreement."  Two sections of the MIPA —

"Schedule A" and "Schedule B" — are central to the parties' disputes.  Schedule A defines the

accounting principles that Malka represented that it had followed historically and that applied to

its past financial reporting.  Schedule B defined the accounting principles that would apply to

calculating revenue and EBITDA to determine whether the Sellers had hit their earnouts in the

future.  The first circulated draft of the MIPA, which was sent by DLA (MoneyLion's counsel)

to Fox (Malka's counsel) on October 7, 2021, contained only empty placeholders for Schedule A

and Schedule B.  JX017.  Over the next few weeks, however, Malka and MoneyLion discussed

— internally and with each other — the contents of the two Schedules.  On October 19, 2021, Frommer emailed Basdekis about a scheduled telephone call between the latter and a MoneyLion employee later that day.  JX022.  In relation to the pending drafting of the Schedules, Frommer told Basdekis that MoneyLion was "gonna wanna talk about GAAP" but that Correia had said that MoneyLion would be "open to having [Malka] run on its current way of revenue recognition and ebitda calculations for purposes of earnouts while having a separate book to align with their GAAP for public filing purposes."  *Id.*  (Notably, and as discussed below, this is exactly what ended up happening.)  Frommer told Basdekis this was "[m]aybe not something to bring up but something to keep in mind as you guys are connecting."  *Id.*

On October 27, 2021, DLA sent first drafts of Schedule A and Schedule B to Fox.  The first drafts of both schedules required strict adherence to GAAP and ASC 606 as follows:

**Schedule A**
**Accounting Principles**

The Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with:

    (a) U.S. GAAP including, but not limited to, FASB issued Accounting Standards Update (ASU) No. 2014-09, Revenue from Contracts with Customers (Topic 606);
    (b) the Buyer's Significant Accounting Policies disclosed within the Buyer's annual Audited Consolidated Financial Statements;
    (c) the specific accounting principles, policies, procedures, categorizations, definitions, methods, practices, and techniques set forth below ("Specific Policies").
In the event of any conflict among the above, clause (a) shall take precedence over (b) and (c), and clause (b) shall take precedence over clause (c).

JX025, at 6.

**Schedule B**

Revenue and EBITDA Calculation Principles

"**Revenue**" refers to revenue recognized according to ASC 606 revenue recognition requirements for the combined and consolidated Company and determined in accordance with U.S. GAAP as reviewed or audited by Buyer's independent accountants. For purposes of this Agreement, Revenue will be adjusted for:

JX028, at 5.  The same day, Curran asked Basdekis to confirm that Malka was adhering to GAAP and ASC 606 for the relevant periods.  JX026, at 1-2.  Basdekis responded that he saw examples in Malka's system of revenue that had been recognized where work did not appear to have been performed, which was inconsistent with GAAP and ASC 606.  *Id.* at 1.  In response, Curran wrote the next day to Basdekis, Frommer, and Fox that Malka's preference would be to redraft Schedule B:

> For purposes of the Earnout, [Malka] would like to continue to maintain our existing accounting principles with respect to revenue recognition and cost recognition associated with revenue through 12/31/2022 that have been utilized historically.  I think their financial due diligence folks got a handle on what that looked like.  Down payments on signed deals are booked into revenue as they are technically noncancelable, costs are recognized as incurred.

JX036, at 1.  The day after, on October 29, 2021, Malka internally circulated a redraft of Schedule B, upon which Frommer, Curran, and Basdekis all signed off.  JX034, at 1-2; JX035, at 1.  Among other things, the redlined draft removed references to GAAP and ASC 606 in the "Revenue" section of Section B — though not the "EBITDA" section:

## Schedule B

### Revenue and EBITDA Calculation Principles

"**Revenue**" refers to revenue recognized according to ~~ASC  606~~ the Company's historical revenue recognition ~~requirements~~ principles for the combined and consolidated Company ~~and determined in accordance with U.S. GAAP as reviewed or audited by Buyer's independent accountants~~. By way of illustration, the Company's historical revenue recognition principles require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained. For purposes of this Agreement, Revenue will be ~~adjusted for~~calculated in accordance with the following:

1) ~~Intercompany~~ Revenue shall not include intercompany eliminations between Malka Media Group, LLC and Malka Sports LLC to present revenue on a consolidated basis~~, but not any intercompany adjustments between the Company and Buyer;~~;

2) No adjustment shall be made for intercompany adjustments made between the Company and Buyer;

3) Revenue shall include the difference between the fair market value of the intercompany services provided by the Company to Buyer and the actual charge for the intercompany services provided by the Company to Buyer;

~~2) Any impact for accrual-based accounting in historical periods if not accurately reflected previously;~~

4) ~~3)Losses~~ Revenue shall be reduced by losses or gains related to write offs or provisions~~.~~; and

5) Revenue shall include the expected recognition of the New Jersey Digital Media Tax Credit ("Tax Credit") in the period in which the Tax Credit was applied for. By way of illustration, the Tax Credit applied for in 2021 was for services provided by the Company for 2019. The Tax Credit would be added to 2021 EBITDA.

"**EBITDA**" means the combined and consolidated net income before interest expense, federal, state and local taxes, depreciation and amortization of the Buyer, determined in accordance with U.S. GAAP as reviewed or audited by Buyer's independent accountants.

For purposes of this Agreement, EBITDA will be ~~adjusted for~~calculated in accordance with the following:

1) EBITDA shall not include "Extraordinary gain or loss" as defined in GAAP and other agreed upon one-time items, including related to loan forgiveness and litigation settlement;

2) ~~Losses~~ EBITDA shall not include losses or gains related to write offs or provisions;

3) [Impact from accrual-based accounting and other accounting policy related changes, such as related to rent expenses;] **Note: this item needs clarification**

4) ~~Intercompany~~ EBITDA shall not include intercompany eliminations between Malka Media Group, LLC and Malka Sports LLC~~, but not any intercompany adjustments between the Company and MoneyLion;~~

5) ~~4)~~EBITDA shall not be adjusted for intercompany adjustments between the Company and Buyer;

~~127562515.1~~

127562515.2

16

6)  ~~5)~~[An allocation of direct expenses incurred by Buyer on behalf of the Company;**] Note: this item needs clarification**

7)  ~~6)Exclusion of any~~ EBITDA shall exclude any EDITDA that results from subsequent acquisitions of businesses or product lines that are contributed to the Company subsequent to the Company's acquisition;

8)  ~~7)Exclusion of~~ EBITDA shall exclude any expenses related to equity, equity-based or equity linked compensation granted or issued to any employee of the Company;

9)  ~~8)Exclusion of~~ EBITDA shall exclude any transaction related expenses, including but not limited to professional fees and the amount of any transaction bonus ~~payment,~~ payments or management performance bonus ~~payment~~ payments in excess of applicable base pay contemplated by this Agreement, and all payroll taxes associated with such bonus payments;

10) ~~9)Exclusion of~~ EBITDA shall exclude legal, accounting or investment banking fees and expenses arising out of this Agreement and related transactions~~.~~;

11) EBITDA shall not include any indirect or overhead costs allocable to Company by Buyer (i.e. overhead allocation of rent from new office space occupied by Buyer employees);

12) EBITDA shall include the expected recognition of the New Jersey Digital Media Tax Credit ("Tax Credit") in the period in which the Tax Credit was applied for. By way of illustration, the Tax Credit applied for in 2021 was for services provided by the Company for 2019. The Tax Credit would be added to 2021 EBITDA; and

13) EBITDA shall include the base salary paid to Jeff Frommer and Louis Krubich, but shall not include the bonus or incentive compensation paid to Jeff Frommer and Louis Krubich.

JX030, at 5-6. Fox sent the proposed revisions to DLA on November 1, 2021. PX131, at 1.

The following days are critical to this case. Indeed, several events of significance occurred on November 1, 2021. First, starting at around 1:00 p.m. on that date, a member of MoneyLion's finance team, Michelle Lee, discussed the edits to Schedule B with colleagues on an internal Slack conversation. Lee stated that, as to Schedule B's terms for the calculation of revenue and EBITDA for the Sellers' earnouts, Malka "want[ed] to use [its] historical revenue recognition and not GAAP/ASC 606." PX128, at 2. Lee noted that she would have to discuss the proposed edits with Correia. *Id.* In a separate Slack conversation that same day that also began around 1:00 p.m., Lee stated to Nuno that the edited Schedule B seemed to say, "basically

like no we will not follow gaap." JX044, at 6. This conversation continued intermittently until almost 6:00 p.m., when it ended because Correia pinged Nuno for an in-person conversation, asking if Lee could join as well. *Id.* at 7. At 6:30 p.m., Lee sent an email to several members of the MoneyLion finance team, copying Correia, and stating that, for Schedule A, MoneyLion would "plan to push back on [Malka's] edit and insist on GAAP accounting." JX039.

Also beginning around 1:00 p.m., representatives from MoneyLion attended an underwriting call with Dual, MoneyLion's representations and warranties insurer. PX129. Several MoneyLion employees were present; Correia attended at least part of the call and provided background for the call. *Id.*; Trial Tr. 790-92. Among the topics discussed were MoneyLion's due diligence on Malka and Malka's revenue recognition and financial reporting practices. PX129, at 7. Meanwhile, at 3:32 p.m. that same day, Fox also sent a redline of Schedule A to DLA, which then shared the document with Lee, copying Nuno, Correia, and others at MoneyLion. JX040; JX041; JX042. Similar to the edits to Schedule B, the redline removed any reference to ASC 606 and qualified the reference to GAAP:

**Schedule A**
**Accounting Principles**

The Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with:

(a) ~~U.S. GAAP including, but not limited to, FASB issued Accounting Standards Update (ASU) No. 2014-09, Revenue from Contracts with Customers (Topic 606);~~
(b) ~~the Buyer's Significant Accounting Policies disclosed within the Buyer's annual Audited Consolidated Financial Statements;~~
(a) U.S. GAAP, except as follows:
    a. the Company's historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained, and
    b. the Company's historical cost recognition principles associated with revenue, which require the Company to recognize costs on contracts as incurred.

(b) ~~(c)~~ the specific accounting principles, policies, procedures, categorizations, definitions, methods, practices, and techniques set forth below ("Specific Policies").

JX042, at 5.

Finally, Correia claims that, at some point during that same day, he spoke with Frommer by telephone. Trial Tr. 793, 795-96. Correia says Frommer assured him on the call that the changes Malka proposed to Schedules A and B were mere technicalities made only to account for rare and one-off instances that only technically did not comport with ASC 606. Correia Aff. ¶ 68. According to Correia, Frommer explained that in rare historical instances, but not on an ongoing basis, Malka had recognized some cash deposits received from clients immediately as revenue rather than recognizing them at the time the associated work was performed. *Id.* ¶ 69. Correia also says Frommer represented the deposits had no material impact on Malka's financials and that they were the only deviation from GAAP-compliant revenue recognition. *Id.* ¶ 70. Finally, Correia says Frommer agreed on the call that, after the closing, Malka would have to recognize all revenue in accordance with ASC 606. *Id.* ¶¶ 68-70. For his part, Frommer does not recall having a telephone call with Correia on November 1, 2021, or any conversation with Correia about historical accounting principles or Schedules A and B. *See* Trial Tr. 270-72.

The next day, on November 2, 2021, Lee wrote to DLA, again copying Correia, taking back her earlier statement that MoneyLion would push back on Malka's edits to Schedule A. PX131, at 1. Lee stated that MoneyLion was willing to accept the edits to Schedule A "given that [they] now under[stood] that [Schedule A] pertain[ed] to historical periods only." *Id.* On November 3, 2021, DLA wrote to Fox, confirming that MoneyLion accepted the proposed revisions to Schedule A and including a redline of Schedule B. JX049. The next day, after sharing a draft with Frommer, Basdekis, and Curran, Fox sent a redline back to DLA, editing the definition of EBITDA to also qualify its reference to GAAP by adding a parenthetical tying the EBITDA calculation to Malka's historical revenue and cost recognition principles:

"**EBITDA**" means the combined and consolidated net income before interest expense, federal, state and local taxes, depreciation and amortization of the Buyer, determined in accordance with U.S. GAAP (including the Company's historical revenue and cost recognition principles) as reviewed or audited by Buyer's independent accountants.

JX047; *see* JX054, at 5.

When MoneyLion received these proposed changes from Malka, it shared them with Dual. Dual sent comments back, which DLA then shared with Fox on November 4, 2021. JX054, at 4. The comment from Dual stated that Dual read the MIPA to say that Malka was representing that its Financial Statements had historically been prepared under GAAP "except revenue recognition and contract costs." *Id.* Notably, however, Dual pointed out that CFGI had identified "numerous other GAAP deviations" — presumably outside of revenue recognition and contract costs — during its due diligence review. *Id.* DLA therefore requested that Malka make explicit any additional deviations from GAAP in Schedule A as well, "aside from revenue recognition and contract costs." *Id.* In an email to Frommer, Curran, and Fox, Basdekis responded with additional GAAP deviations he had identified in Malka's accounting, none of which related to revenue recognition. *Id.* at 1-2. After everyone on Malka's end signed off, Fox sent to DLA a redline of Schedule A that integrated these additional GAAP deviations:

**Schedule A**

**Accounting Principles**

The Financial Statements, Estimated Statements and the Final Statements shall be prepared in accordance with:

(a) U.S. GAAP, except as follows:

    a. the Company's historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained~~, and~~;

    b. the Company's historical cost recognition principles associated with such revenue, which require the Company to recognize costs on contracts as incurred~~.~~;

    c. invoiced expenses are recognized in related period based on receipt of the invoice (i.e., if the Company receives an invoice in October, it is entered in October and shows as an October expense, even if cash is not paid out until 30 or 60 days from the date of receipt; this applies to contracted costs, variable costs, and overhead);

    d. payroll is recognized in period as earned, paid out on the 15th and last day of every month, with the exception of commission; commission is recognized as expense net 60 from the second payroll of each month that commission was earned (i.e., commission earned in August is paid and recognized with the second EOM payroll cycle of October);

    e. credit card expense is recognized in period incurred

        i. historically, a year end true up was made to reflect it on the Company's annual financials, not on a monthly basis. This year, the Company has adjusted so that each month reflects associated credit card expenses in the month incurred; and

    f. capitalized expenses and depreciation recognized according to GAAP and adjusted annually with a minimal threshold of $2,500.

(b) the specific accounting principles, policies, procedures, categorizations, definitions, methods, practices, and techniques set forth below ("Specific Policies").

In the event of any conflict among the above, clause (a) shall take precedence over (b).

**Specific Policies**

- The Financial Statements, Estimated Statements and the Final Statements shall be prepared on a consolidated basis as of the Closing Date. Adjustments should be made to eliminate the cost of investment in any subsidiaries and to reconcile and eliminate any balances owed between subsidiaries.
- In preparing the Estimated Statements and the Final Statements, no item shall be included more than once.
- No amount shall be included for changes in assets or liabilities as a result of purchase accounting adjustments.
- COVID Tax Deferral from 2020 of $82,000, expense reflected in Q2 2020, 50% of this is due by 12/31/2021, the other 50% is due 12/31/2022. Adjustment made after 2020 financials submitted to CFGI.

- Jersey City Tax Withholding - $98,000, quarterly expense reflected in related periods from Q120 - Q321. The Company has already paid the Q3 liability - $17K, so total current as of Oct is $81K, payable by end of year. The Company will pay this out in two-week intervals. Adjustment made after 2020 financials submitted to CFGI.
- An Accrual in Q3 21 for talent and revenue share expenses tied to the Malka Network business (new to Malka) that were technically incurred in the period, but were based on an estimate and historically have never been invoiced to Malka. This was reversed in October.
- Approximately $9,000 of pre-paid Getty Images reflected in pre-paid.

JX058, at 1, 3-4. With these edits, the drafts of Schedules A and B were considered final. JX063.

On November 9, 2021, MoneyLion made a presentation to its Board regarding the Malka acquisition. PX146, at 1-2, 39-56. The presentation projected that Malka's revenue for 2021 and 2022 would be significantly lower than had been projected just months earlier. Most notably, Malka's projected revenue for 2022 was cut by over one third, from $46.8 million to $30.4 million. JX005, at 51; PX071, at 17; PX146, at 54. The presentation also omitted any mention of EBITDA and presented Malka's value as based solely on a multiple of its revenue. PX146, at 53-54. Despite these changes, the presentation still valued Malka at $75 million:

## Transaction Overview

|  | |
|---|---|
| Consideration | · Equity purchase: Enterprise value of $75MM, cash-free / debt-free except for $3.5MM credit facility<br>  — Cash at closing: $10MM<br>  — Restricted Stock at closing: $30MM, to be issued at closing with 25% to become unrestricted quarterly over 2022<br>  — Earnout 2021: $10M restricted stock, based on achievement of $25M in revenue and $100k in EBITDA for 2021; issued upon achieving the EBITDA target and 67% of the revenue target on a linear basis up to 100% of the revenue target; if earned, 25% to become unrestricted quarterly over 2022<br>  — Earnout 2022: $25M restricted stock, based on achievement of $30M in revenue and $100k in EBITDA for 2022; issued upon achieving the EBITDA target and 67% of the revenue target on a linear basis up to 100% of the revenue target; if earned, 25% to become unrestricted quarterly over 2023 |
| Valuation | · 2021 multiples: 2.7x Revenue<br>· 2022 multiples: 2.5x Revenue<br>· MoneyLion multiples: 7.8x 2021E Revenue; 4.3x 2022E Revenue |

*Id.* at 53.

The MoneyLion Board approved the purchase. After the closing, Frommer, Krubich, and Fried became members of MoneyLion's Executive Committee; Frommer became MoneyLion's

Chief Content Officer; and Frommer and Krubich became members of MoneyLion's Disclosure Committee.  Choubey Aff. ¶ 27.

### E.  The Finalized MIPA

The final version of the MIPA was executed on November 15, 2021.  JX065 ("MIPA"), at 1.  In addition to Schedules A and B, discussed above, it contained several other provisions relevant here.

#### 1.  Payouts to the Sellers

The MIPA provided for a "Closing Payment" of approximately $40 million, consisting of $12,162,678 in cash, with some pre-defined anticipated adjustments, MIPA § 2.05(a), and $30 million in restricted MoneyLion shares, the latter to vest in four installments over the year following the closing.  MIPA 4, § 2.03(a)(i)-(ii).  The MIPA also integrated a version of the earnout structure that had been proposed in the final Letter of Intent.  It included (1) a potential earnout of up to $10 million in restricted MoneyLion shares if Malka achieved specified revenue and EBITDA targets in 2021 (the "2021 Earnout"); and (2) a potential earnout of up to $25 million in restricted MoneyLion shares if Malka achieved specified revenue and EBITDA targets in 2022 (the "2022 Earnout").  *Id.* §§ 2.06(b)(v)(A)-(B).  The stock for both earnouts would *issue* on an initial date (along with the date of the closing, the "Issuance Dates") after MoneyLion determined that the earnout had been earned and then *vest* in four installments over the several months following.  *Id.*; *see also id.* § 2.06(e).  For the Sellers to receive the minimum payout of $6.7 million in shares for the 2021 Earnout, Malka had to hit targets of $16.75 million in revenue and $100,000 in EBITDA.  *Id.* § 2.06(b)(v)(A).  For the Sellers to receive the maximum payout of $10 million, Malka had to hit $25 million in revenue and $100,000 in EBITDA.  *Id.* Similarly, for the Sellers to receive the minimum payment of $16.75 million in shares for the

2022 Earnout, Malka had to hit targets of $20.1 million in revenue and $100,000 in EBITDA. *Id.* § 2.06(b)(v)(B). For the Sellers to receive the maximum payment of $25 million, Malka had to hit revenue of $30 million and EBITDA of $100,000. *Id.*

For each of the Closing Payment, the 2021 Earnout, and the 2022 Earnout, the number of shares that MoneyLion was required to issue on the relevant Issuance Date was based on the thirty-day average price of the stock on that date. *Id.* 2, §§ 2.03(a)(ii), 2.06(b)(v)(A)-(B). But, in each case, there was a ceiling to the number of shares MoneyLion could initially be obligated to pay based on a "Price Floor." For example, the Price Floor for the Closing Payment was $9.00, and, on the Issuance Date for the Closing Payment, MoneyLion was required to issue the Sellers a number of shares equal to $30 million divided by *the greater of* the thirty-day average price on the closing date or $9.00. *Id.* § 2.03(a)(ii). If the stock price were $4.50 on the Issuance Date, the Sellers would be issued shares as if the price were $9.00, meaning they would receive only $15 million in shares. The Price Floor for the 2021 Earnout was $8.00, and the Price Floor for the 2022 Earnout was $7.00. *Id.* at 13; *see also* § 2.06(b)(v)(A)-(B).

To make up for any potential shortfall resulting from the price floor, the MIPA also included a "Make-Whole Right" for the Sellers. *Id.* § 2.06(e). The Make-Whole Right provided that MoneyLion had to either issue additional stock or pay additional cash to each Seller if its stock price remained below the Price Floor on each of the four vesting dates that followed every Issuance Date. *Id.* On each vesting date for a tranche of stock, the MIPA required MoneyLion to again calculate the thirty-day average price of its stock and, if that average price was less than the Price Floor, pay the Sellers either cash or stock with a value equal to the difference between the two prices multiplied by the number of shares that were vesting on that date. *Id.* To go back to the earlier example, if MoneyLion issued only $15 million in shares to the Sellers based on a

$4.50 share price as of the Issuance Date of the Closing Payment, and the share price stayed at $4.50 for the next several months, MoneyLion would have to issue extra shares or pay extra cash at each vesting date such that, eventually, the Sellers would end up with the full $30 million in shares or a combination of cash and shares.  If the share price went up to $9.00 after the Issuance Date and before any shares vested, however, and stayed at that level throughout, the Sellers would not receive any extra shares, although they would still end up with $30 million based on the increase in the price of the shares they were already issued.

Significantly, because the parties aimed to "maximize [the Sellers'] opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment," MoneyLion also committed to "operat[ing] the business of [Malka] in good faith and substantially similar in all material respects with the past practice of [Malka] prior to Closing" and made explicit that it would not "take any action intended to interfere with or frustrate [the Sellers'] opportunity to receive the 2021 Earnout Payment and the 2022 Earnout Payment." *Id.* § 2.06(d).

### 2. Dispute Resolution

The MIPA also established a process through which the Sellers could dispute MoneyLion's determination of their entitlement to an Earnout.  The MIPA required MoneyLion, within thirty days of receipt of Malka's financial statements for 2021 and 2022, to deliver to Frommer (as the Sellers' representative) a statement "prepared in good faith and in accordance with the Revenue and EBITDA Calculation Principles, setting forth [MoneyLion's] calculation of [Malka's] Revenue and EBITDA for the year." *Id.* § 2.06(b)(i); *see id.* at 1.  The MIPA stipulated that "it is the intention of the Parties that the 2021 Revenue Amount and the 2021 EBITDA Amount and the 2022 Revenue Amount and the 2022 EBITDA Amount shall be calculated using substantially consistent methods and practices." *Id*. § 2.06(b)(i).  After receipt

of each statement, the Sellers would have forty-five days to review it and object to the

calculation of Malka's revenue and EBITDA by filing a "Statement of Objections."  *Id.*

§ 2.06(b)(ii)-(iii).  If the Sellers did not deliver such a statement during the review period, the

MIPA said the statement "shall be deemed final and to have been accepted by the Sellers'

Representative and the Seller Members."  *Id*. § 2.06(b)(iii).  If the Sellers did deliver a Statement

of Objections, both parties were required to "negotiate in good faith to resolve such dispute"

within thirty days.  *Id.*  If they were unable to resolve the dispute, it would be submitted to a

designated "Independent Accountant," who would make a written determination within thirty

days of receiving written submissions from each party.  *Id.* § 2.06(b)(iv).

### 3. Representations, Warranties, and Nonreliance

In Article III of the MIPA, the Sellers made certain representations and warranties in

connection with the transaction.  Article III notes that Malka's 2019 and 2020 "unaudited

financial statements" were attached to the MIPA in Disclosure Schedules.  *Id.* § 3.06.  The MIPA

states that the Financial Statements "have been prepared in accordance with the Accounting

Principles," referring to Schedule A, and that they "fairly present the financial condition of

[Malka] as of the respective dates they were prepared."  *Id.*  It goes on to say that Malka

"maintains a standard system of accounting established and administered in accordance with the

Accounting Principles in all material respects," again referring to the definition of "Accounting

Principles" in Schedule A.  *Id.*  For their part, the Disclosure Schedules, which were also

attached to the MIPA, stipulate that "Nothing in these Disclosure Schedules is intended to

broaden the scope of any representation or warranty contained in [the MIPA] or to create any

covenant unless clearly specified to the contrary."  JX066, at 1.

Articles III and IV of the MIPA disclaim reliance by both parties on any statements made outside the four corners of the agreement in entering into the transaction.  First, Section 3.33 says: "Except for the representations and warranties expressly set forth in this Agreement, no Seller Party or any other Person makes any other express or implied representation or warranty on behalf of the Seller Party or any of their respective Affiliates with respect to the transactions contemplated by this Agreement or otherwise."  MIPA § 3.33.  Section 4.08 makes the same statement on MoneyLion's side but also goes on to say: "[MoneyLion] further acknowledges and agrees that, except as expressly provided in this Agreement, [MoneyLion] is relying solely on its own investigation in entering into this Agreement and the Transactions and not on any information provided or to be provided by the Seller Parties or the Company."  *Id.* § 4.08.

In addition to the language disclaiming reliance on outside statements, the MIPA also includes a merger clause.  It provides:

> This Agreement and the Ancillary Documents constitute the sole and entire agreement of the Parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.  In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

*Id.* § 9.06.

### 4. Indemnification

The MIPA requires either party to indemnify the other if it incurs any losses resulting from "any inaccuracy in or breach of a representation or warranty" made in the MIPA.  *Id.* §§ 8.03(a), 8.04(a), 8.05(a).  It further requires the Sellers to indemnify MoneyLion as to any "Fraud-Type Claim with respect to" Malka or the Sellers.  *Id.* §§ 8.03(f), 8.04(d).  As to MoneyLion, the MIPA states that for it to seek indemnification for losses arising from an

inaccuracy in or breach of a representation or warranty by Malka or the Sellers, it has to draw first from a Retention Escrow Amount set up by the parties for that purpose (which totaled $375,000) and then submit claims to Dual, its representations and warranties insurer. *Id.* § 8.08(a)-(b); *see also id.* § 2.04, 92-93. Any losses MoneyLion sustained as to a breach of a representation or warranty would be deemed recompensed by whatever it was able to draw from the escrow account and by its submission of a claim to Dual. *Id.* § 8.08(a)-(b). For "Fraud-Type Claims," however, the MIPA provides that the Sellers are personally liable for losses that are not covered by the escrow account or insurance policy. *Id.* §§ 8.08(a), 8.08(e)-(f); *see also id.* §§ 2.04, 5.08. A claim based on a breach of a representation or warranty in the MIPA must be brought within eighteen months of the closing date, although Fraud-Type claims are not subject to this limitation. *Id.* § 8.01.

## 5. Specific Performance

The MIPA has a brief provision stating that specific performance is the appropriate remedy for a breach by either party. Specifically, it states "that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity." *Id.* § 9.12.

## 6. The Restricted Stock Agreement and the Registration Rights Agreement

Attached to the MIPA was a Restricted Stock Agreement ("RSA") that sets out terms for the transfer of the shares that were due to the Sellers as of the closing, called the "Closing Stock Payment." MIPA 116. Later, the parties entered into similar RSAs for each tranche of shares to which they determined the Sellers were entitled under the 2021 Earnout. *See* JX085; JX087-089; JX093-JX094; JX096; JX103-104; JX108-JX111. The first RSA provides that the Closing Stock

Payment will vest in four installments and that each Seller will be allowed to vote or transfer his shares once they vested.  MIPA 116, 118.  The RSA, however, includes several limitations on the Sellers' ability to sell their shares.  First, the RSA provides for a "Lock-Up Period" until March 21, 2022, during which no shares could be transferred.  *Id.* at 119.  Second, the RSA notes that there might be limitations on the Sellers' ability to transfer based on "applicable securities laws."  *Id.*  Finally, the RSA states that the Sellers' shares "shall not be transferred without the prior written consent of [MoneyLion], which shall not be unreasonably withheld, conditioned or delayed."  *Id.*  The Registration Rights Agreement ("RRA"), also attached to the MIPA, requires MoneyLion to "take such further action as any" holder of securities "may reasonably request . . . to enable such Holder to sell shares of Common Stock held by such Holder without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 promulgated under the Securities Act."  *Id.* at 131.

### F.  The Stub Period and the 2021 Earnout

After MoneyLion acquired Malka, there was a six-week "stub period" — from November 15, 2021, through December 31, 2021 — for which MoneyLion was required to include Malka's revenue in its own financial reporting for 2021 under SEC regulations.  Scalia Aff. ¶¶ 7, 8, 13.  Critically, that meant that Malka's revenue recognition for that period had to conform with MoneyLion's — that is, it had to comply with GAAP and ASC 606.  *See, e.g.*, JX071 (email from Basdekis to Frommer in which he notes that the "year end close" was "being done in accordance with GAAP and ASC 606, NOT our accounting principals [sic] the earnout is based off of").  This was anticipated even before the closing, as there had been discussion of a "post-close project to assist with bringing [Malka's] financials into ML format."  JX018, at 2.  To that end, Basdekis worked with the MoneyLion team during January and February 2022 to adjust

Malka's revenue recognition for the stub period and to integrate Malka's revenue into MoneyLion's. During that project, Basdekis provided detailed explanations of Malka's invoicing and revenue recognition policies to MoneyLion's teams. PX194. Working together with Basdekis, MoneyLion's Director of SEC Reporting, Michael Scalia, proposed a roughly $1 million downward adjustment of Malka's $5 million revenue — an adjustment of around 20% — for the month and a half at issue to comply with GAAP. PX196; PX196-A.

Around the same time, Basdekis corresponded with several members of the MoneyLion team in anticipation of the calculation of the 2021 Earnout. In that correspondence, Basdekis stated — and his counterparts at MoneyLion agreed — that "[t]he earnout calculation [would be] based off of [Malka's] historical accounting principals [sic]," meaning that the calculation would *not* incorporate "all of the things [Malka] never did historically that [it] now need[ed] to in order to be GAAP compliant." JX073. Basdekis explained that, historically, Malka "recognized revenue as invoiced and had no accrual process other than minor exceptions." *Id.* Lee confirmed her understanding of Malka's financials in an email to MoneyLion's lender a few weeks later, in which she explained that Malka was "not previously following GAAP accounting" and was "more on a cash basis." JX076, at 1. Around the same time, Nuno did the same, mentioning in an email exchange with Basdekis that Malka's "historical accounting practices" were "done on a cash basis." PX215, at 1.

On February 15, 2022, Basdekis sent a profit and loss spreadsheet to CFGI to allow it to calculate the 2021 Earnout. JX074. Basdekis noted that the spreadsheet was complete except that it did not include a New Jersey Digital Media Tax Credit that, according to the MIPA, should also have been added to Malka's EBITDA for the purposes of calculating its 2021

Earnout.  *Id*.  During the drafting of Schedule B of the MIPA, the Sellers had proposed — and

MoneyLion had agreed — that Malka's EBITDA calculation for the earnouts would:

> include the expected recognition of the New Jersey Digital Media Tax Credit
> ("Tax Credit") in the period in which the Tax Credit was applied for.  By way of
> illustration, the Tax Credit applied for in 2021 was for services provided by the
> Company for 2019.  The Tax Credit would be added to 2021 EBITDA.

MIPA 83.  As referenced in the MIPA's example, at the time the MIPA was drafted,

Malka had applied for a tax credit for its 2019 services totaling $890,904.80, although it

had not yet been paid.  JX069, at 3; Trial Tr. 934.[5]

     A few weeks after Basdekis sent the profit and loss spreadsheet to CFGI, Lee

followed up with him over email, copying Nuno, stating MoneyLion was "trying to

understand the . . . schedule for revenue recognition" that Basdekis had prepared.  JX078.

Basdekis responded a few days later, explaining that "[t]he purpose" of the spreadsheet

"was to re-align when revenue was recognized during the 'stub period' of Nov 16-Dec

31" because, under Malka's "historical principal [sic], *revenue was always recognized*

*when we invoiced*."  PX221 (emphasis added).  Lee responded, "Yes, thanks, this makes

sense."  *Id.*  Lee then shared with Correia the earnout calculation to be sent to Malka,

noting that it was Malka's "historical accounting practice[]" to "*recognize revenue when*

*things are billed*, not when cash is collected."  JX082 (emphasis added).  The attached

Excel file had one tab labeled "GAAPvsNonGAAPIncomeStatement," which detailed

Malka's revenue and EBITDA according to its historical accounting principles, and

another labeled "Earnout Calc" that summarized that data to show that Malka had

exceeded the earnout thresholds.  JX082-A.  Correia responded "Ok."  JX082.

---

[5]     According to Correia, the amount that New Jersey eventually paid was closer to
$700,000.  Trial Tr. 934.

On March 15, 2022, the Sellers received a 2021 Revenue and EBITDA statement from MoneyLion, confirming that Malka had "achieved the full earnout amount for 2021." JX083. Notably, the spreadsheet attached to the statement included an addition of $890,904.80 to Malka's EBITDA based on the New Jersey tax credit. JX083-A.

## G. The 2022 Earnout

Throughout 2022, MoneyLion tracked Malka's progress towards the 2022 Earnout. On October 13, 2022, Lee sent CFGI a spreadsheet with actual revenue and EBITDA to date and projected revenue and EBITDA through the end of the year. PX254, at 1. The purpose of the spreadsheet was for CFGI to calculate Malka's potential earnout, and Lee noted that it was therefore "based on their historical accounting principles (not GAAP)." *Id.* A week later, CFGI sent back a calculation of the Sellers' 2022 Earnout, which stated that Malka would likely achieve the maximum earnout payment for 2022. PX256, at 8. In addition, because MoneyLion's share price had declined by over 80% since the closing, and because CFGI projected that it would drop even more over 2023, CFGI calculated that MoneyLion would have to issue well over 100,000,000 shares to the Sellers to cover the 2022 Earnout (including make-whole payments) and the last tranche of payments from the 2021 Earnout. *Id.*; PX395, at 18. By December 12, 2022, MoneyLion's share price had declined even more to almost one tenth of what it had been as of the closing: $0.55 a share. PX395, at 12. That meant that a payment of $25 million to the Sellers in MoneyLion shares would have been almost 20% of MoneyLion's total market capitalization. PX358-A.

On December 14, 2022, Choubey and Correia spoke on the telephone with Frommer, Krubich, and Fried. Once again, the call was surreptitiously recorded by Frommer. PX271. The call centered on two topics. First, the Sellers were asking to be allowed to sell some of their

already-vested shares to help cover tax obligations they had incurred because of Malka's acquisition.  Although the Sellers had already been allowed to sell some of their shares, Choubey and Correia were reluctant to allow the Sellers to continue selling shares because they worried that it could lead to a further decline in MoneyLion's stock price.  *Id.* at 1-3.  For the two weeks prior, Krubich had been selling between 50,000 and 100,000 shares per day at around $0.50 per share.  *Id.* at 2.  Correia and Choubey said that his actions sent a message to the market that "the insider guys are running for the hills," *id.*, which could send the already-falling share price "into a death spiral," *id.* at 12.  The second issue was related.  Choubey and Correia wanted the Sellers to agree to a different payment structure than what was in the MIPA to avoid having to issue them "an endless number of shares" because of MoneyLion's lowered share price, *id.* at 5, which would itself "creat[e] more and more dilution," *id.* at 6.  Choubey said, realistically, that process would "take a year longer" than the MIPA had contemplated.  *Id.* at 5.  As Correia explained, if MoneyLion issued the shares at the current price on the schedule set forth in the MIPA, and the price then recovered, MoneyLion would "end up paying [the Sellers] . . . $300,000,000" for Malka, *id.* at 7, and the Sellers would "end up owning half the company," *id.* at 6.  Although Frommer pushed back that because the MIPA had been "so weighted on equity," the parties had contemplated this possibility, *id.* at 6, Choubey said outright that "[t]here is no scenario where the current make-whole construct can be the way it is," *id.* at 8.  Significantly, Correia agreed: "[W]e just can't issue that many shares. . . . [L]ike, are we breaking the agreement?  Sure[.]"  *Id.*

The next day, Choubey and Correia spoke on the telephone again, this time with all four of the Sellers.  PX273; ECF No. 138 ("Sellers PFF"), ¶ 354.  Again, the conversation focused on the same "two threads."  *Id.* at 1.  First, the group discussed how MoneyLion could help the Sellers meet their tax obligations.  Next, they talked about MoneyLion's reluctance to issue more

shares to the Sellers at the then-current share price, which was $0.50. Choubey and Correia framed the two issues as related, and asked the Sellers to defer vesting of their shares until the share price had recovered. *Id.* at 17-18. As Choubey put it, it was his "fiduciary responsibility . . . to use every corporate lever to . . . make sure that [the Sellers'] shares [were not] coming to market" at $0.50 per share. *Id.* at 18. Correia, too, said he was "strongly against trying to issue shares at 50 cents for the make-whole," *id.* at 28, and he framed adhering to the MIPA's make-whole structure as the Sellers' "just taking advantage of" an "egregious moment of weakness of the firm," *id.* at 21. He noted that "as the CEO of a public company," there was "no way . . . that [Choubey] [didn't] have [a] responsibility to protect the firm" from that result. *Id.* at 24. When Frommer said he could try to find money elsewhere "so [he could] go pay [his] taxes," Correia responded that he was trying to "get more shares at an insane price, right?" *Id.* at 27. The call ended with no agreements.

Between December 16, 2022 — the day after this last telephone call — and December 20, 2022, Nuno and Torossian had several discussions on Slack about "forensic work" they were doing regarding Malka's earnout as a follow-up to the telephone conversation. JX098, at 2; *see also* PX99, PX275. In those conversations, they emphasized how "heated" Choubey was about the situation, the likelihood that it was "going to get nasty," JX098, at 2-3, and that it would "not be fun to watch this whole thing unravel," JX099, at 3. In one of the chats, Torossian said he was now "public enemy #1 for Malka" and that the "only thing that [could] crush" the Sellers' ability to achieve the earnout was "the tax credit." PX275, at 2-3. At the same time, both Nuno and Torossian reconfirmed their understanding that Malka's historical accounting was "cash basis" and not GAAP-based. *Id.* at 4. On December 20, 2022, Choubey spoke again on the telephone with Frommer, Krubich, and Fried, saying the resolution of their call the previous

week was "a little disappointing" and that he "would have thought that [the Sellers] would have come to the table to get [the situation] sorted in a way that may have been better for the company."  PX277, at 15.

On January 25, 2023, Basdekis sent a spreadsheet to Torossian showing that, for earnout purposes, Malka's revenue for 2022 was roughly $42.5 million and its EBITDA was roughly $1.5 million not including the New Jersey tax credit, entitling the Sellers to the full 2022 Earnout of $25 million.  PX291; PX291-A.  The spreadsheet showed those numbers side-by-side with GAAP numbers and explained the deviations.  Notably, Malka's revenue was $41.6 million under GAAP reporting — almost $1 million lower — and its EBITDA was negative $600,000.  PX291-A.  A few months later, on April 14, 2023, Torossian sent the Sellers MoneyLion's 2022 Revenue and EBITDA Statement for Malka, which stated that the Sellers had failed to achieve any earnout at all for 2022.  DX312.  The Statement listed Malka's 2022 revenue as $40.2 million — well over the amount required — but listed its EBITDA as negative $2.8 million.  DX312, at 5.  After receiving the 2022 Revenue and EBITDA Statement, the Sellers retained outside counsel and hired Deloitte FAS ("Deloitte") to advise them as they prepared written objections to the Statement.  Frommer Aff. ¶ 230; Sellers PFF ¶ 400.

## H.  The Present Dispute

On May 15, 2023, MoneyLion sent a Notice of Claim to the Sellers seeking indemnification under the MIPA for various alleged breaches of the parties' contract.  JX113.  The Notice of Claim listed five breaches: (1) failure to disclose a subsidiary to Malka called Run That Back LLC; (2) misstatement of Malka's gross profit by failing to include, as a cost, employees who were billed to clients to generate revenue; (3) failure to disclose the Sellers' ownership of an investment company called Malka Holdings LLC; (4) failure to disclose that a

$113,332 account receivable was being disputed by the client; and (5) failure to disclose the dispute underlying that account receivable. *Id*. at 1-2. Four days later, MoneyLion sent notices of termination to all four Sellers who had become MoneyLion employees, citing alleged misappropriation of funds to pay for personal expenses. JX114-117.

On May 25, 2023, the Sellers sent MoneyLion a Statement of Objections to the 2022 Earnout Statement. JX119. The Sellers objected to the use of GAAP accounting principles to calculate Malka's revenue and EBITDA as well as several other downward adjustments MoneyLion had included in its calculations. *See id.* at 5-9. On June 6, 2023, the Sellers also sent a reply to MoneyLion's Notice of Claim. JX120. The Sellers objected to all five of MoneyLion's claims. *Id.* In June, the parties began discussions about engaging an independent accountant to resolve their dispute, following the dispute resolution process laid out in the MIPA. Frommer Aff. ¶¶ 233-38. Ultimately, the parties decided not to move forward on that front. *Id.* ¶¶ 238-39. On June 12, 2023, MoneyLion's transfer agent, Continental Stock Transfer & Trust Company ("Continental"),[6] informed the Sellers that MoneyLion had placed a "stop order" on all previously vested shares from the closing and from the 2021 Earnout. PX318. On July 20, 2023, MoneyLion sent the Sellers a Supplemental Notice of Claim raising one additional claim of breach: misrepresentation of Malka's "compliance with U.S. GAAP and ASC 606 in connection with the Company's financial statements for 2019 and 2020." PX323, at 1. The next day, the Sellers filed this lawsuit.

---

[6]    Continental was originally a Defendant in this suit, but the Sellers voluntarily dismissed their claims against it upon Continental's stipulation that it would be bound by any judgment entered against MoneyLion regarding the transfer of MoneyLion shares. *See* ECF No. 30.

## I.  Payments Made to the Sellers

Before this dispute materialized, MoneyLion made several payments of cash and MoneyLion shares to the Sellers.  The shares were all issued by sending an instruction to Continental, which then issued the shares on MoneyLion's behalf.  First, on November 15, 2021, MoneyLion paid the Sellers $10 million in cash and Continental issued 3,199,567 shares as part of the closing.  Sellers PFF 72, 87-88.  On December 31, 2021, Continental issued 975,274 more shares under the Sellers' make-whole rights under the MIPA because MoneyLion's stock price had dropped.  *Id.* at 88.  Continental issued 2,259,280 more make-whole shares on March 31, 2022, *id.*, another 3,678,137 on June 30, 2022, *id.*, and the final 4,664,667 shares related to the closing on September 30, 2022, *id.* at 89.  MoneyLion also instructed Continental to issue shares to the Sellers related to the 2021 Earnout.  First, on March 28, 2022, Continental issued 1,209,592 shares related to the earnout.  *Id.* at 118.  The first tranche of make-whole shares, which were first issued on March 31, 2022, and then adjusted on April 7, 2022, totaled 698,836. *Id.* at 118-19.  Continental issued another 1,200,200 make-whole shares on June 30, 2022, *id.* at 119, followed by 1,531,364 on September 30, 2022, *id.* at 119-20.  On March 14, 2023, MoneyLion made the final make-whole payment to the Sellers for the 2021 Earnout, which included $350,000 in cash and 3,327,754 shares.  *Id.* at 149.

On April 24, 2023, MoneyLion underwent a reverse stock split at a ratio of one to thirty, meaning that a shareholder who owned thirty shares before would own only one share after.  Around the time of the split, MoneyLion's share price was about $0.55, but the split increased the share price to around $16.50.  ECF No. 198, ¶ 32.  The change to the stock price had particular significance to the Sellers.  Under the MIPA's "make-whole" right, MoneyLion was required to issue the Sellers extra shares if MoneyLion's share price dropped below certain

thresholds on dates when shares vested in the Sellers.  MIPA § 2.06(e).  For the 2021 Earnout shares, the floor price for shares was $8.00 and, for the 2022 Earnout shares, the floor price was $7.00.  *Id.* at 13; *see also* § 2.06(b)(v)(A)-(B).  But as a MoneyLion employee pointed out in a Slack conversation at the time this dispute was materializing, the Sellers "d[id] not have anything protecting from a reverse stock split."  DX273, at 3.  The reverse split increased the stock price without increasing the value of the Sellers' holdings and could have had the effect of reducing their make-whole rights to nothing.

## J.  The Parties' Core Factual Dispute

Many of the arguments and issues in this case turn on a core factual dispute.  MoneyLion claims that, beginning at the earliest stages of negotiations and continuing until months after the MIPA was executed, the Sellers engaged in a concerted effort to mislead the company about Malka's accounting practices and the implications of those accounting practices for Malka's underlying financials.  In support of that contention, MoneyLion claims, for example, that Frommer repeatedly told MoneyLion's CFO, Correia, or employees of CFGI who were working on MoneyLion's behalf, that Malka was largely GAAP compliant in terms of its revenue recognition and that any deviations from GAAP were minimal and would have only trivial effect.  *See, e.g.*, ECF No. 144 ("MoneyLion PFF"), at 38.  The Sellers, meanwhile, claim that Frommer never made any such representations and that MoneyLion was — or, at least, should have been — aware that Malka's practices deviated significantly from GAAP in many ways.  *See* Sellers PFF 3-4.  The Sellers argue that this litigation arises from MoneyLion's efforts to avoid its obligations under the MIPA because its unexpectedly low stock price would have, in MoneyLion's view, resulted in a windfall to the Sellers.  This factual dispute underlies MoneyLion's claim that the Sellers fraudulently induced it into agreeing to the MIPA,

MoneyLion PFF 74, 108, MoneyLion's argument that the MIPA requires GAAP principles to be applied to calculations of Malka's revenue and EBITDA for purposes of calculating future earnouts, *id.* at 111, MoneyLion's arguments regarding the proper interpretation of the MIPA, *id.* at 75, and MoneyLion's argument that the Sellers breached the representations and warranties section of the MIPA, *id.* at 109.

Broadly stated, there are three problems with MoneyLion's version of events. The first is that it defies common sense. Following the acquisition, MoneyLion would own Malka, giving it unfettered access to all of Malka's books and records. Moreover, because MoneyLion was a public company, it was required to publicly report Malka's financials as its own, which meant reconciling Malka's financials with GAAP principles and then consolidating those financials with its own, almost immediately. *See, e.g.*, JX018, at 2 (Slack conversation between MoneyLion employees discussing "post-close project to assist with bringing [Malka's] financials into ML format"); JX071 (email from Basdekis to Frommer explaining 2021 "year end close" of Malka's financials, which was being done "in accordance with GAAP and ASC 606"). It follows that it would have been illogical, to say the least, for the Sellers to lure MoneyLion into the deal — a deal structured to defer the majority of the Seller's consideration for a year or two, and well beyond the reconciliation process, no less — by leading it to believe that Malka followed GAAP and ASC 606. They would have had to know (or at least believe) that their deception would unravel immediately — certainly well before they received full compensation.[7]

---

[7]    The key points for these purposes are that the Sellers would have known that MoneyLion had an unfettered right to access to Malka's books and records and almost certainly would have believed that MoneyLion would, in fact, access those books and records in connection with the reconciliation process. The fact that MoneyLion may not have availed itself of its right to access all of Malka's books and records until later is thus immaterial. *See* Torossian Aff. ¶ 17 & n. 2 (noting that no member of the MoneyLion accounting department had credentials to access Malka's accounting platform until December 2022).

Second, although there is a voluminous record in this case containing both internal and external communications involving the parties, including telephone call recordings and transcripts, Slack messages, text messages, and emails, MoneyLion cannot point to a single instance in which one of its officers or employees evinced a belief that Malka's revenue recognition was GAAP or ASC 606 compliant.  Nor is there any mention in any of those communications of anyone from Malka claiming that Malka was GAAP or ASC 606 compliant. In fact, there are countless examples of the opposite, beginning at the very early stages of the MIPA negotiations; time and again, MoneyLion employees discussed Malka's lack of GAAP compliance.  *See, e.g.*, JX044, at 6; PX128, at 2; JX076, at 1; PX215, at 1.  In the extensive record before this Court, the only expressions of actual surprise on MoneyLion's part regarding Malka's revenue recognition practices appear in its filings during this litigation, its statements to this Court, and the trial affidavits of its witnesses.  *See, e.g.*, Correia Aff. ¶ 28; Choubey Aff. ¶ 39.  The Court declines to credit these self-serving, after-the-fact statements.

The final problem with MoneyLion's position is that there is abundant evidence that Malka made repeated and consistent disclosures that its revenue recognition was materially non-GAAP compliant, beginning with what Malka provided in the data room to MoneyLion early in the negotiating process; continuing with Malka's many edits to Schedule A and Schedule B of the MIPA, which heavily qualified any reference to GAAP or ASC 606 by insisting they would apply only with exceptions for Malka's historical revenue and cost recognition principles, *see* JX030, at 5-6; JX042, at 5; JX047; JX054, at 5; and continuing again long after the acquisition in Malka's dealings with MoneyLion employees.

To begin, the granular information provided in the data room at least strongly suggested that Malka recognized revenue when invoices were issued.  For example, for all twelve months

in 2019, Malka Media's total recognized revenue included on its monthly profit and loss statement matched exactly the total amount that Malka invoiced for those months. *Compare* PX024-A, *with* PX027-A.  With one minor exception, the same was true for 2020.  *Compare* PX024-A, *with* PX027-A.  At the same time, the data room also included both invoices and contracts with Malka's largest clients, which showed large up-front payments soon after relationships were formed.  *See, e.g.*, PX192, at 14 (contract for $1 million dollars with 50% due "upon execution hereof"); PX085, at 3 (contract for $7,500 with "50% upon signature of this statement-of-work").  In fact, MoneyLion itself had previously entered into a contract with Malka for $150,000 with $25,000 due upon execution of the contract.  PX062, at 4.  Putting the two together, MoneyLion could have easily surmised that Malka was invoicing companies prior to performing any work on many of its large contracts and recognizing revenue as soon as the invoices were sent.

On top of the data room, there were also direct disclosures only a few months after the MIPA was executed, with no accompanying signs of surprise or alarm from MoneyLion.  For example, in February 2022, while working on the stub-period reconciliation with MoneyLion's team — and before the 2021 Earnout was calculated or paid — Basdekis explained to employees at MoneyLion that Malka had "no accrual process other than minor exceptions" because it "recognized revenue as invoiced" and did not comply with GAAP.  JX073, at 1.  No MoneyLion employee reacted with surprise to this disclosure.  To the contrary: Lee acknowledged in an email just a few weeks later that Malka was "not previously following GAAP accounting" and was "more on a cash basis."  JX076, at 1.  And around the same time, Nuno did the same, mentioning in an email exchange with Basdekis that Malka's "historical accounting practices" were "done on a cash basis."  PX215, at 1.  What is more, throughout 2022, Basdekis sent

spreadsheets to MoneyLion including tabs with names like "GAAPvsNonGAAPIncomeStatem" and explanations that the earnouts would be calculated based on the non-GAAP numbers. JX091; JX091-A.

MoneyLion's rejoinder — that it knew Malka was minimally non-GAAP-compliant but that it believed the deviations would result in only trivial changes to Malka's revenue recognition, MoneyLion PFF 114 — is simply not credible. At the same time that Basdekis informed MoneyLion in detail about Malka's revenue recognition practices, MoneyLion's director of SEC Reporting, Scalia, calculated that adjusting only two months of Malka's revenue to align with ASC 606 requirements would result in a 20% downward adjustment. PX196; PX196-A. And in a conversation one month later, MoneyLion employees speculated that $8 million in Malka revenue that was part of a certain calculation was "100% not" GAAP and might, for GAAP purposes, end up being only "half" as much. JX079, at 2. The same day, these employees had a meeting with Correia with the heading "Malka Earnout Discussion," all before the 2021 Earnout was calculated or paid. PX219.

All of this begs the question of whether the misstatements MoneyLion relies on were made at all. For example, as noted above, MoneyLion claims that, on November 1, 2021, a telephone call occurred between Frommer and Correia in which Frommer explained that any deviations from GAAP and ASC 606 principles in Malka's accounting were rare and one-off instances that would have minimal effect. Correia Aff. ¶¶ 67-70. Correia claims that these issues were central to MoneyLion, and yet he failed to memorialize the conversation in any way, shape, or form. Instead, to substantiate Correia's claims about the purported conversation, MoneyLion points to two emails sent by Lee on that day and the next. MoneyLion PFF 51-52. In the first, she says that MoneyLion planned to "push back" on Malka's edits to Schedule A of

the MIPA and "insist on GAAP Accounting." DX130, at 1. In the second, she changes course, saying MoneyLion was now "ok with Schedule A given that we now understand that it pertains to historical periods only." DX519, at 2. MoneyLion argues that this shows that Frommer explained away the edits on the call, convincing MoneyLion to view them as trivial. But the Court disagrees that the emails show any such thing. First, Lee herself says she does not remember any details of her conversation with Correia after his call with Frommer or anything about what he said Frommer had conveyed to him. Lee Aff. ¶¶ 21-22. Second, there is no indication in the record — from that time or otherwise — that Lee *ever* believed Malka to be materially GAAP-compliant.

In fact, the evidence in the record demonstrates the opposite. In two separate Slack conversations on November 1, 2021, Lee stated that Malka's edits reflected an unwillingness to commit to GAAP. JX044, at 6; PX128, at 2. A few months later, in February 2022, Lee was on an email chain with Basdekis and Nuno in which Basdekis said explicitly that "[t]he earnout calculation is based off of [Malka's] historical accounting principals [sic]," which were *not* "GAAP compliant," and that Malka "recognized revenue as invoiced and had no accrual process other than minor exceptions." JX073, at 1. In those emails, Nuno agreed with Basdekis's interpretation of the earnout calculation. Lee did not object. In another February 2022 message, Lee stated that the significant revenue recognition adjustments between Malka's reporting and MoneyLion's GAAP-compliant reporting should cease in the future because MoneyLion would "hopefully fix their rev rec." PX201, at 2. In March 2022, Lee wrote to MoneyLion's lender, attaching Malka financial documents and noting that "they were not previously following GAAP accounting (they were more on a cash basis)." JX076, at 1. The list goes on. *See, e.g.*, JX079, at 2. Thus, the more likely implication of Lee's second email is exactly what it said: that she

realized that Schedule A concerned only Malka's representations about its past practices, rather than what it would commit to for future accounting — which is simply a straightforward description of Schedule A's function in the MIPA. In short, the Court does not find Correia's account of his purported November 1, 2021 call with Frommer to be substantiated by the evidence or credible.

Correia's claim that he believed Malka was in all material respects GAAP compliant is further undermined by statements made by Nuno, who was also involved in the drafting of Schedules A and B. A year later, she stated that she "really regret[ted] not pushing back even harder on allowing [Malka] to use cash basis accounting for earnout" but that she understood why Correia had been "more flexible on that" given that MoneyLion was "trying to get [the Sellers] to agree to a floor that at the time was not beneficial to them." PX275, at 4-5. More confirmation still comes from communications between MoneyLion and Dual. Dual wrote to MoneyLion that it read Malka's edits to Schedule A as "making the representation that its financial statements ha[d] been historically prepared under GAAP *except revenue recognition* and contract costs." JX054, at 4 (emphasis added). Dual further pointed out that, "based on the diligence," Malka "operate[d] [on a] cash basis with numerous [] GAAP deviations." *Id.* Given Correia's testimony that Malka's GAAP compliance was of central importance to him and the many conversations he had with other MoneyLion finance team members about Malka's revenue recognition during the acquisition process, the claim that all of these contrary indications simply flew by without his notice are frankly impossible to believe.

The only piece of concrete evidence supporting MoneyLion's claim that Malka attempted to conceal its real accounting practices is in the CFGI Report. That report states that Malka's management "represented that the Company is compliant with ASC 606 revenue recognition

requirements," although even there it notes that "it has not performed a detailed assessment to confirm or validate compliance." JX014, at 17. The Report itself also notes at least one ASC 606 exception "acknowledged" by Malka, that "in certain instances where projects fell behind schedule, the Company invoiced customers based on the planned rather than actual timeline(s)." *Id.* The Report goes on to provide that Malka "noted that this dynamic can impact revenue recognition but noted any noncompliance to be minimal." *Id.*

But separate and apart from the sheer weight of other evidence in the record discussed above, the CFGI Report is insufficient to support MoneyLion's claims for at least three reasons. First, Brendan Gilmartin, who testified as CFGI's representative, seemed to suggest in his deposition that the Report's reference to management's "representations" might have just been drawn from Malka's 2019 and 2020 Financial Statements (which erroneously stated that Malka was ASC 606 compliant), rather than from separate statements to CFGI investigators. Gilmartin Tr. 69-71. Additionally, the CFGI Report itself contains statements indicating that Malka was not GAAP-compliant. For example, the Report says that Malka "generally does not prepare its financial statements on a full accrual basis of accounting" and that CFGI anticipates that "net working capital would be significantly different if the Company reported under GAAP." DX522, at 21. Elsewhere, it reiterates this point, stating that Malka "does not prepare its financial statements on a full accrual basis of accounting, which could impact the Company's revenue, EBITDA and net working capital." *Id.* at 16.

Finally, even if the Sellers did represent to CFGI that any "impact" on "revenue recognition" of their GAAP noncompliance was "minimal," that statement might have been accurate — and, thus, is not necessarily evidence of deception. According to MoneyLion's expert, adjusting Malka's 2019 and 2020 Financial Statements for GAAP compliance resulted in

a 0.2% and 3.9% change to revenue, respectively.  Dudney Aff. ¶¶ 25-29.  True, the impact of

that minimal change in revenue was significant for Malka's EBITDA for the same period, *see*

*id.*, but it supports a conclusion that the impact of GAAP noncompliance on Malka's "revenue

recognition" was arguably minimal, *see* Trial Tr. 763 (Correia agreeing that the standard for

materiality is "[s]ub 5 percent"); *see also, e.g.*, *Goldstein v. Denner*, No. 2020-CV-1061 (JTL),

2022 WL 1797224, at *11 (Del. Ch. June 2, 2022) ("As a rule of thumb, 5% is often used as a

starting point or rough gage of materiality").  In short, the CFGI Report does not support the

conclusion that Malka was affirmatively seeking to mislead CFGI or MoneyLion about its

accounting practices or, separately, that MoneyLion would have been justified in believing that

Malka was materially GAAP compliant in terms of its revenue recognition.

All of this is not to say that the Sellers are beyond reproach themselves.  Far from it.

Most prominently, Malka prepared its Financial Statements containing at least one outright lie —

that it "ha[d] adopted ASC 606 as of December 31, 2019 regarding accounting for income from

contracts and all revenues recognized by the Company for the year then ended [we]re covered

through ASC 606," JX005, at 9 — and then used those statements, first, to secure a loan from a

financial institution and, second, to negotiate the transaction with MoneyLion.  Additionally,

there is ample reason to doubt Frommer's testimony, at trial and in his deposition, professing

near total ignorance about GAAP principles, revenue recognition generally, accrual, and the

guidelines by which Malka recognized revenue.  Trial Tr. 147-56; *compare, e.g.*, *id.* at 156

("Q:  . . . And since you don't know what cash-basis accounting is, and you don't know what

accrual-basis accounting is, you don't know what the difference is between cash versus accrual,

right?  A. I do not."), *with* DX363, at 25 (text message in which Frommer says, in connection

with the 2021 Earnout, "Cash basis vs accrue also matters most. So it[']s not just when we get

the cash, but when we book the rev").  And while the Court does not accept that the Sellers promised MoneyLion that Malka was GAAP compliant, it is fair to say that the Sellers were not entirely forthright about what Malka's precise revenue recognition principles were and the extent to which those principles might allow the Sellers to manipulate reporting of Malka's revenue and profitability as it pertained to the earnouts.  For example, the record shows that at least some MoneyLion employees believed at various points that Malka's revenue recognition operated on a cash basis.  *See, e.g.*, PX275, at 4.  But that is also incorrect — Malka recognized revenue when it invoiced its customers, not when it was paid.  *Compare* Larson Aff. ¶ 38, *with*, Trial Tr. 6.

In short, no party involved in this case appears to have been acting with full candor in their dealings with each other — or, for that matter, in their testimony before the Court.  That, and the Court's assessment of the witnesses' demeanors at trial, leads the Court to make the following factual findings.  First, Correia's testimony that Frommer affirmatively lied to him about Malka's GAAP compliance is not credible.  Second, the Sellers did not inform MoneyLion about the details of Malka's revenue recognition practices prior to the execution of the MIPA (a fact that the Sellers do not appear to dispute).  Third, Correia and other MoneyLion employees did not believe, before executing the MIPA or in the period between the acquisition and payment of the 2021 Earnout, that Malka's historical revenue recognition practices diverged only trivially from ASC 606.  To the contrary, until Choubey and Correia realized that the Sellers potentially stood to gain a massive windfall through the 2022 Earnout due to the company's declining share price and looked for a way to back out of the deal they had negotiated, MoneyLion understood and believed that Malka's revenue recognition was *not* GAAP compliant.

## CONCLUSIONS OF LAW

The Sellers raise two categories of breach of contract claims against MoneyLion: one based on MoneyLion's restriction of the Sellers' access to their vested shares (Counts I and II) and another based on MoneyLion's failure to pay the Sellers in connection with the 2022 Earnout (Counts III and IV). The Sellers additionally claim that the indemnification provisions of the MIPA, MIPA §§ 8.05(b), 8.06(c), entitle them to attorney's fees and costs in connection with this litigation (Count V). After the Court's decision on the Sellers' earlier motion to dismiss, *see Frommer v. MoneyLion Techs. Inc.*, No. 23-CV-6339 (JMF), 2024 WL 2158589, at *1 (S.D.N.Y. May 14, 2024), and MoneyLion's withdrawal of certain counterclaims, ECF No. 218, MoneyLion's remaining counterclaims against the Sellers sound in securities fraud (Count III), common-law fraud (Count IV), negligent misrepresentation (Count V), and breach of fiduciary duty (Count VI). MoneyLion's breach of fiduciary duty claim is based on the Sellers' alleged misrepresentations surrounding the 2021 and 2022 Earnouts and their alleged direction of subordinates regarding the misstatement of Malka's finance. ECF No. 218.[8]

In general, most of the parties' claims and counterclaims as well as MoneyLion's primary affirmative defenses boil down to a few broad questions:

(1) whether MoneyLion should be relieved of its obligations under the MIPA because it was fraudulently induced into entering the agreement or because the Sellers breached the agreement;

(2) if not, whether the Sellers achieved either the 2021 Earnout, the 2022 Earnout, or both; and

(3) to the extent that the Sellers are entitled to a lifting of the restrictions on their already-vested shares or to additional shares under either Earnout or, alternatively, to the extent that MoneyLion is entitled to relief, what relief should be granted.

---

[8]    MoneyLion also raised several additional, unrelated, counterclaims, which it withdrew at trial. *See* ECF No. 218.

The Court will address each question in turn.

## A.  Whether the MIPA Applies

The first question is whether MoneyLion owes any obligations to the Sellers under the MIPA.  MoneyLion challenges the Sellers' ability to enforce the MIPA on two grounds.  First, MoneyLion makes arguments — sounding in fraud and negligent misrepresentation — that the MIPA should be invalidated because the Sellers made material misrepresentations.  MoneyLion PFF 110, 116.  Second, MoneyLion argues that it owes no obligations to the Sellers under the MIPA because the Sellers breached the agreement first.  *Id.* at 109.  As the Court will explain, the factual findings set forth above go a long way toward disposing of these arguments.

### 1.  Fraudulent Inducement (and Related Counterclaims)

MoneyLion's primary argument challenging the MIPA is that, by claiming to adhere to GAAP accounting principles, the Sellers fraudulently induced MoneyLion into agreeing to the MIPA.  Because the parties executed the MIPA in New York and MoneyLion's principal place of business is in New York, this claim is governed by New York law.  *See, e.g.*, *Hughes v. The Ester C Co.*, 317 F.R.D. 333, 352 (E.D.N.Y. 2016); *PPI Enters. (U.S.), Inc. v. Del Monte Foods Co.*, No. 99-CV-3794 (BSJ), 2003 WL 22118977, at *17 (S.D.N.Y. Sept. 11, 2003).[9]  Under New York law, the elements of fraudulent inducement are: "(i) a representation of material fact, (ii) which was untrue, (iii) which was known to be untrue or made with reckless disregard for the truth, (iv) which was offered to deceive another or induce him to act, and (v) which that other

---

[9]    That is true even though the MIPA has a choice-of-law provision that points to Delaware law.  *See* MIPA § 9.10(a); *see also, e.g.*, *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335 (2d Cir. 2005) ("Under New York law . . . tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract."); *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (holding that, under New York law, a contractual choice-of-law provision "does not apply to fraud claims, which sound in tort" (quoting *Rosenberg v. Pillsbury Co.*, 718 F. Supp. 1146, 1150 (S.D.N.Y. 1989)).

party relied on to its injury." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 580 (2d Cir. 2005) (citations omitted).

Here, MoneyLion alleges several misrepresentations in support of its arguments. First, MoneyLion points to two provisions in the MIPA itself: one stating that the Financial Statements attached to it were prepared in accordance with Schedule A and another stating that the Financial Statements "fairly present the financial condition of [Malka] as of the respective dates they were prepared." MoneyLion PFF 74-75. Second, MoneyLion points to several extracontractual statements it alleges were made to it during the negotiation process, including: (1) the Sellers' statement in their pitch deck that Malka's EBITDA was growing year-over-year, JX005, at 51; (2) the pitch deck's valuation of Malka as worth $75 million, *id.* at 53; (3) the statements in Malka's Financial Statements that they were prepared in accordance with GAAP and ASC 606, *id.* at 9; (4) Malka's alleged statements to CFGI that Malka followed GAAP and ASC 606 and that any deviations were minimal, *see* JX014, at 17; and (5) Frommer's alleged statement during a telephone call with Correia that Malka had only one revenue-recognition exception to GAAP and that it would not have a material impact on Malka's finances, Correia Aff. ¶¶ 67-73.

Although MoneyLion presses a panoply of fraud claims, the Court can largely dispose of them *en masse*. In general, MoneyLion's fraud claims turn on the same factual questions: whether the Sellers attempted to deceive MoneyLion as to Malka's divergence from GAAP accounting practices and whether MoneyLion genuinely believed Malka was GAAP-compliant. As the Court explained above, the answer to both questions is "no." MoneyLion's fraudulent inducement claims thus all fail for the same reasons: first, MoneyLion had actual knowledge of Malka's accounting practices at all relevant times, negating its claim that it reasonably relied on the Sellers' alleged misrepresentations; second, Malka made repeated disclosures that it did not

comply with GAAP, contradicting MoneyLion's claim that it had an intent to defraud; third, even if Malka had not made such disclosures, MoneyLion had information available to it that allowed it to fully understand Malka's revenue recognition and accounting practices; and finally, MoneyLion has failed to show that the Sellers made the alleged misrepresentations with knowledge of their falsity.

First, "under New York law[,] a plaintiff's actual knowledge of the allegedly misrepresented or omitted facts is fatal to his or her fraud claim." *de Atucha v. Hunt*, 756 F. Supp. 829, 831 (S.D.N.Y. 1991) (citing *Rubenstein v. East River Tenants Corp.*, 139 A.D.2d 451 (1st Dep't 1988)); *see also Bailey v. New York L. Sch.*, No. 16-CV-4283 (ER), 2017 WL 6611582, at *12 (S.D.N.Y. Dec. 27, 2017). Actual knowledge defeats a fraud claim because "a plaintiff [who] actually knew at the time a representation was made that it was false, . . . cannot claim to have relied on the truth of that representation." *In re Eugenia VI Venture Holdings, Ltd. Litig.*, 649 F. Supp. 2d 105, 118 (S.D.N.Y. 2008). Here, an abundance of evidence demonstrates that MoneyLion was aware of Malka's deviations from GAAP accounting, including:

- statements contemporaneous with and following the execution of the MIPA from MoneyLion employees, *see, e.g.*, JX044, at 6 (Lee's interpreting Malka's edits to the MIPA as saying "no we will not follow gaap"); PX128 (similar statement from Lee); JX076, at 1 (statement a few months later that Malka was "not previously following GAAP"); PX215 (similar statement from Nuno, acknowledging that the operating plan was based on historical accounting practices and not GAAP principles);

- later descriptions of the MIPA negotiation process by MoneyLion employees, *see, e.g.*, PX275, at 4-5 (Nuno stating that she "really regret[ted] not pushing back even harder on allowing [Malka] to use cash basis accounting for earnout" but that Correia had been "more flexible on that");

- communications between MoneyLion and its insurer, Dual, *see, e.g.*, JX054, at 4 (Dual telling MoneyLion Malka's redraft of Schedule A stated its Financial Statements had "been historically prepared under GAAP except revenue recognition and contract costs"); *see also, e.g.*, Okoniewski Dep. Tr. 247-48 (Dual representative describing Schedule A as creating "a massive carveout to GAAP" with "ASC noncompliance . . probably included . . . too"); and

- statements in the CFGI Report, *see, e.g.*, DX522, at 16 ("[Malka] does not prepare its financial statements on a full accrual basis of accounting, which could impact the Company's revenue, EBITDA and net working capital").

By contrast, and strikingly, there are no communications in the record whatsoever showing that any MoneyLion employee ever believed Malka was GAAP-compliant.

Relying on a series of cases from Illinois, MoneyLion argues that even if some of its employees knew or believed that Malka was not GAAP compliant before the MIPA was executed, that knowledge should not be imputed to it because the inquiry should focus on "the knowledge of the agent who was [allegedly] deceived." *Chicago Title & Trust Co. v. First Arlington Nat'l Bank*, 454 N.E.2d 723, 728 (Ill. Ct. App. 1983). But even accepting the dubious proposition that these non-binding decisions should govern the inquiry here, the Court would reach the same conclusion. For one thing, both Nuno and Lee *were* directly involved in the drafting of the MIPA. For example, it was Lee, not Correia, who communicated to DLA that MoneyLion would accept Malka's edits to Schedule A because that Schedule pertained to historical periods only. PX131. Notably, DLA appears to have accepted Lee's sign-off on behalf of MoneyLion. Correia said he "authorized [Lee] indirectly" to send the email by telling her he was "good with the changes," Trial Tr. 869, but there is nothing in the record suggesting that DLA asked for, let alone received, confirmation from Correia before it accepted Lee's direction as authoritative; nor has MoneyLion argued that DLA's failure to do so was improper. Moreover, even if Choubey and Correia were the only relevant players, MoneyLion's arguments would still fall short. The only evidence in the record that either of them believed Malka's revenue recognition was GAAP-compliant is their own self-serving statements, *see, e.g.*, Correia Aff. ¶ 73; Choubey Aff. ¶ 15, which the Court declines to credit — especially in the face of, among other things, Nuno's recollection that she had "push[ed] back" on allowing Malka to "use cash basis accounting for earnout" but that Correia had been "more flexible," PX275, at 4, and

the fact that Correia appears to have had conversations with Lee and other employees about Malka's edits to the MIPA Schedules at precisely the same time that Lee was professing her understanding that Malka was not GAAP compliant, *see, e.g.*, JX044.

Also fatal to MoneyLion's fraud arguments is the fact that Malka repeatedly disclosed its lack of GAAP-compliance to MoneyLion — both before and shortly after the execution of the MIPA.  "[A] claim for fraudulent inducement will not lie where the allegedly defrauded party is on notice from prior disclosures of the likely existence of the allegedly concealed information on which the claim of fraudulent inducement is based." *TIG Ins. Co. v. Glob. Int'l Reinsurance Co.*, 640 F. Supp. 2d 519, 524 (S.D.N.Y. 2009).  In this case, such disclosures included:

- Malka's edits to Schedules A and B of the MIPA, which unambiguously removed any references to ASC 606 and qualified references to GAAP by exempting Malka's practices for revenue and cost recognition, *see, e.g.*, JX030; JX042; JX047;

- Malka's invoices and contracts provided in the data room, which showed that it invoiced amounts that (nearly) exactly matched the revenue it recognized and that its contracts provided for initial payments, *see, e.g.*, PX024; PX027;

- Basdekis's explicit statements in the months after the MIPA was executed that Malka was not GAAP-compliant as to revenue recognition, *see, e.g.*, JX073; and

- Malka's statement to CFGI investigators that it "had not performed a detailed assessment to confirm or validate compliance" with ASC 606, DX522, at 17.

Granted, some of these disclosures occurred after the MIPA was executed.  Nevertheless, for two reasons, they still support the conclusion that the Sellers disclosed their GAAP noncompliance during the negotiation process.  First, it strains credulity to believe that the Sellers affirmatively hid their GAAP noncompliance until the moment the MIPA was executed and then immediately gave up the game by disclosing their own deception — especially given that the MIPA allowed MoneyLion to seek relief for a breach of a representation or warranty in the MIPA (not to mention the sort of fraudulent inducement claim that MoneyLion now brings).  Second, if GAAP compliance was as important to MoneyLion as it now contends and the Sellers had given up the

game after execution of the MIPA, one would have expected MoneyLion to react with surprise or anger. Yet the record contains no such reaction to the Sellers' disclosures.

In any event, even if Malka did not explicitly admit to MoneyLion the extent of its GAAP noncompliance, MoneyLion's reliance argument would be defeated because it could have and should have inspected Malka's financials more closely. "Where a party has means available to him for discovering, by the exercise of ordinary intelligence, the true nature of a transaction he is about to enter into, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." *Abrahami v. UPC Const. Co.*, 638 N.Y.S.2d 11, 14 (1996) (cleaned up); *see also Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 182 (2d Cir. 2007) (A "plaintiff cannot show it justifiably relied on statements it had reason to know were false."). Here, even if the Court were to accept that the disclosures discussed above were not enough to make MoneyLion aware that Malka was not GAAP compliant, they were at least enough to put MoneyLion on notice that it should have taken a closer look at Malka's accounting practices. Correia, the CFO of a publicly traded company, claims to have entered into a transaction worth tens of millions of dollars (if not more, given how it has played out) based solely on an unmemorialized verbal representation from Frommer that Malka's extensive edits to the MIPA had no practical effect and that the GAAP exceptions mentioned in the MIPA were *de minimis*. At the same time, Correia had nearly limitless access to Malka's contracts, invoices, and financial reporting information. Yet he told no one to investigate or confirm Frommer's representations and did nothing to even minimally check on them himself. *See* Trial Tr. 798-801. Correia's testimony is hard to believe on its own terms. But even if the Court were to accept it, MoneyLion's arguments would fail.

Finally, MoneyLion fails to demonstrate that the misrepresentations it alleges the Sellers made were "made with actual knowledge that they were false or misleading." *Schaeffer v. Nabriva Therapeutics plc*, No. 19-CV-4183 (VM), 2020 WL 7701463, at *10 (S.D.N.Y. Apr. 28, 2020) (cleaned up).  It is not enough for MoneyLion to show that Frommer knew Malka was not GAAP compliant since, on Correia's own account, Frommer conceded as much during their alleged telephone call.  MoneyLion would have to show that the Sellers also knew or believed that the noncompliance would have been material.  Yet MoneyLion has put forward no evidence that Frommer knew what the ultimate effect of Malka's noncompliance would be or that its impact would be more than trivial.  MoneyLion's own expert report shows that Malka's revenue for 2019 and 2020 should have been reported as 0.2% and 3.9% lower, respectively, based on GAAP principals.  Dudney Aff. ¶¶ 25-26, 28-29.  True, the proportional impact on Malka's EBITDA would have been more significant given that Malka ran on such a thin margin.  *Id.*  But there is no evidence that any of this would have been obvious to Frommer or the Sellers.  In fact, Basdekis testified that it would not have been possible, before the MIPA, for Malka to determine what its GAAP-based financials would have been.  Trial Tr. 59, 138-39.  And MoneyLion's own expert stated that it took "hundreds of hours" of work to determine the effect of Malka's noncompliance with GAAP.  *See* Dudney Aff. ¶ 42.  Put simply, MoneyLion fails to prove that the Sellers knowingly made false statements when they (allegedly) represented that Malka's noncompliance with GAAP would not be material.

In short, MoneyLion's fraudulent inducement arguments fail for any one of several reasons.  These same reasons are fatal to its affirmative counterclaim for fraud under New York common law.  *See, e.g.*, *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) (enumerating the elements of a fraud claim under New York law, including "reasonable

reliance").  They also doom MoneyLion's securities fraud counterclaim (which is governed by

federal law, *see, e.g.*, *Greenwood Partners v. New Frontier Media Inc.*, No. 99-CV-9099 (WK),

2000 WL 278086, at *2 (S.D.N.Y. Mar. 14, 2000)).  *See, e.g.*, *First Lincoln Holdings, Inc. v.

Equitable Life Assurance Soc'y of U.S.*, 43 F. App'x 462, 464 (2d Cir.2002) (summary order)

(noting that "*reasonable* reliance must be proved as an element of a securities fraud claim"

(quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996)); *Ashland Inc. v. Morgan

Stanley & Co., Inc.*, 700 F. Supp. 2d 453, 469 (S.D.N.Y. 2010) (providing that a party "may not

justifiably rely on a misrepresentation if, through minimal diligence, [they] should have

discovered the truth" (quoting *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032 (2d Cir.

1993)).  And they also undermine MoneyLion's counterclaims for negligent misrepresentation,

which require proof of "reasonable reliance" as well.  *See, e.g.*, *Mandarin Trading Ltd. v.

Wildenstein*, 944 N.E.2d 1104, 1109 (N.Y. 2011).  Finally, MoneyLion supports its claim that the

Sellers breached their fiduciary duties to MoneyLion by arguing that they wrongfully

manipulated the calculation of revenue and EBITDA in seeking to obtain the 2021 and 2022

Earnouts and directed subordinates to misstate Malka's finances.  Once again, these arguments

presuppose that the Earnouts should have been calculated using GAAP principles.  Accordingly,

the Court rejects these arguments as well.

### 2.  Breach

In the alternative, MoneyLion contends that it is the Sellers who breached the MIPA.

MoneyLion PFF 109-110.  At the outset, the parties dispute what state's law governs the breach-

of-contract claims and counterclaims.  *Compare* ECF No. 161 ("MoneyLion PFF Resp."), at

108-13, *with* Sellers PFF 162, and ECF No. 224, at 1.  The MIPA includes a Delaware choice-of-

law clause stating as follows: "This Agreement shall be governed by and construed in

accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction)." MIPA § 9.10(a). That would seem to call for application of Delaware law, as the New York Court of Appeals has held that a court should "not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract." *Ministers & Missionaries Benefit Bd. v. Snow*, 45 N.E.3d 917, 922 (N.Y. 2015). Complicating matters, however, in *United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020), the Second Circuit construed New York law to still require "sufficient contacts with the transaction" even in the face of a choice-of-law clause. *Id.* at 20. At the same time, it is unclear whether *Moseley* remains good law since the New York Court of Appeals reaffirmed the holding of *Ministers* in *Petróleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 235 N.E.3d 949, 955 (N.Y. 2024). *See id.* at 957 ("We reaffirm the principle of . . . *Ministers* that when the parties have chosen New York Law, a court may not contravene that choice through a common-law conflicts analysis."); *see also Pilon v. Discovery Commc'ns, LLC*, No. 24-CV-4760 (JPO), 2025 WL 752244, at *10 (S.D.N.Y. Mar. 10, 2025) (stating that *Petróleos* "reaffirm[ed] the *Ministers* rule" that "New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract"); *Cajun Conti, LLC v. Starr Surplus Lines Ins. Co.*, No. 23-CV-8844 (KPF), 2025 WL 764131, at *5 (S.D.N.Y. Mar. 11, 2025) ("Under [*Petróleos*], the Court is obligated to enforce the Policy's choice-of-law clause and apply New York law, without consideration of a conflict-of-laws analysis."). *But see BDO USA, P.C. v. Rojas*, No. 24-CV-101 (CM), 2024 WL 3729581, at *10 (S.D.N.Y. Aug. 8, 2024) ("*Petroleos* did not effectively overrule *Moseley*.").

In any event, the Court concludes that Delaware law applies even if *Moseley* is the law of the Circuit because Delaware law bears "a reasonable relationship" to both the parties and the

transaction. *Willis Re Inc. v. Herriott*, 550 F. Supp. 3d 68, 95 (S.D.N.Y. 2021) (internal

quotation marks omitted). For one thing, MoneyLion is incorporated there. Stipulated Facts

¶¶ 6-7. There is a split of authority in this Circuit about whether incorporation of one party alone

is sufficient to establish a reasonable relationship with that state for choice-of-law purposes,

*compare, e.g.*, *Cambridge Cap. LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 420 (S.D.N.Y.

2023) ("The Court concludes that the better reasoned approach is that incorporation alone is

insufficient to establish a reasonable relationship")*, with Willis Re Inc.*, 550 F. Supp. 3d at 95

("[M]ost courts deemed one party's incorporation in the state of the parties chosen law sufficient

for purposes of the 'reasonable relationship' test." (internal quotation marks omitted)), but the

MoneyLion-Malka transaction's relationship to Delaware goes beyond MoneyLion's

incorporation there. First, the parties entered multiple agreements invoking Delaware law or

choosing Delaware as the forum for disputes. *See, e.g.*, PX157, at 6. And second, the MIPA

repeatedly refers to Delaware even for its definitions of terms. *See, e.g.*, MIPA 9 ("'Fraud'

constitutes common law fraud under the laws of the State of Delaware."), *id.* at 99 ("'Business

Day' shall mean any day other than a Saturday, Sunday or any other day on which banking

institutions located in the State of Delaware are authorized or obligated by law or executive order

to remain closed."). Taken together, these considerations are sufficient to support application of

Delaware law. *See, e.g.*, *Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*, 2019 WL

1322621, at *4 (E.D.N.Y. Feb. 28, 2019) ("[B]ecause Plaintiff is incorporated in Virginia, and

the parties entered into two separate transactions, totaling four separate signed agreements, all

stating that Virginia law governs, this Court concludes that Virginia bears a reasonable

relationship to the transactions."), *report and recommendation adopted*, 2019 WL 1317456

(E.D.N.Y. Mar. 22, 2019). MoneyLion's arguments to the contrary are premised on its

contention that New York has a closer relationship to the parties' transaction.  But that argument is hard to swallow given MoneyLion's own state of incorporation.  *See, e.g.*, *EMA Fin., LLC v. NFusz, Inc.*, 444 F. Supp. 3d 530, 541-42 (S.D.N.Y. 2020) ("While not dispositive to its analysis, the Court regards with some skepticism the arguments made by a [Delaware] corporation that the laws of its state of incorporation should not apply.").  And regardless, "[t]he relevant inquiry is not . . . whether the selected state is the state with the greatest number of connections to the parties or the transaction; rather, it is whether the relationship to the selected state is 'reasonable.'"  *Id.* at 541.  Accordingly, the Court will apply Delaware law to the parties' contract claims.

Applying Delaware law to MoneyLion's breach claims, they fail for several reasons.  MoneyLion's claim centers on two provisions of Section 3.06 of the MIPA.  The first is its representation that the Financial Statements, which were included in the Disclosure Schedule, "have been prepared in accordance with the Accounting Principles" defined in Schedule A.  MIPA § 3.06.  MoneyLion argues that Schedule A indicates that Malka followed GAAP principles for revenue recognition in all relevant respects.  *See* MoneyLion PFF 87, 109.  But that is incorrect.  For one thing, if the parties had agreed that the Sellers would represent their historical financials to have been prepared in accordance with GAAP and ASC 606, they could have — and presumably would have — simply said so.  *See, e.g.*, *GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. CIV.A 5571-CS, 2012 WL 2356489, at *6 (Del. Ch. June 21, 2012) (observing, in rejecting the plaintiff's proffered interpretation of the parties' contract, that "[i]t would have been easy to write the Development Agreement in the way that [the plaintiff] now urges that it should be read. . . .  But, this is not the contract that the parties wrote.").

Additionally, by its terms, Schedule A provides that the Financial Statements were "prepared in accordance with . . . U.S. GAAP, *except as follows*: (a) *the Company's historical revenue recognition principles*, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less) and recognize the remaining revenue on such contracts as milestones are attained." *Id.* at 76 (emphasis added). As MoneyLion's own contemporaneous communications make plain, *see, e.g.*, JX044, at 6; JX054, at 4; PX128, at 2; Okoniewski Dep. Tr. 247-48, that language cannot be read to represent that Malka's Financial Statements were GAAP-compliant as to revenue recognition, *see, e.g.*, *SARN SD3, LLC v. Czechoslovak Grp. A.S.*, 326 A.3d 1170, 1191 (Del. 2024) ("[A] contract must be interpreted in accordance with its plain terms as they would normally be understood."). Nor, as MoneyLion contends, *see* MoneyLion PFF 87, does Schedule A imply that "noncancelable deposits" are the sole (and inconsequential) exception to Malka's otherwise GAAP-compliant revenue recognition. That contention reads more into Section 3.06 than is there. In addition, it cannot be squared with other, related language in the MIPA, which provides that "'[r]evenue' refers to revenue recognized according to the Company's historical revenue recognition principles for the combined and consolidated Company. *By way of illustration*, the Company's historical revenue recognition principles require the Company to recognize into revenue noncancelable deposits on contracts . . . ." MIPA 82 (emphasis added). In sum, MoneyLion's first breach argument falls short.

MoneyLion's second argument is factually stronger. It rests on the representation in Section 3.06 that Malka's Financial Statements — which were attached to the MIPA in disclosure schedules — "fairly present the financial condition of the Company." MIPA § 3.06. As noted, the Financial Statements provide that Malka "has adopted ASC 606" and generally

recognizes revenue "under the accrual basis of accounting . . . when work is completed and invoice[d]." JX066, at 14. It is undisputed that these statements were false. And yet, it is not clear that these misrepresentations constitute a breach of the MIPA because, in effect, Section 3.06 contains two conflicting representations: first, that the Financial Statements were "prepared in accordance with the Accounting Principles" — which expressly provide that revenue recognition is *not* GAAP compliant — and, second, that Malka had adopted ASC 606 and recognized revenue only when work was "completed and invoiced." When a contract has "conflicting provisions," it is "render[ed] [] decidedly ambiguous," *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 836 (Del. Ch. 2007), and "courts may consider extrinsic evidence to resolve the ambiguity," *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014). As discussed above, all extrinsic evidence here points in the same direction: the parties understood that Malka was not GAAP compliant.

In any event, even if Malka did breach Section 3.06, MoneyLion's breach claim would still fail for multiple reasons. First, MoneyLion's claim of breach is likely time barred. The MIPA provides that "[a]ll representations and warranties of the Buyer contained in, or arising out of, this Agreement shall survive the Closing hereunder for a period of eighteen (18) months after the Closing Date." MIPA § 8.02. In light of this provision, the Court previously dismissed an affirmative claim by MoneyLion premised on this same breach as untimely. *See Frommer v. MoneyLion Techs. Inc.*, No. 23-CV-6339 (JMF), 2024 WL 2158589, at *8 (S.D.N.Y. May 14, 2024). Granted, under Delaware law, a party can sometimes "raise conduct as an affirmative defense even when a claim for relief based on the same facts would be time-barred," *Sunder Energy, LLC v. Jackson*, 305 A.3d 723, 752 & n.63 (Del. Ch. 2023), by relying on the "narrow exception . . . that permits a defendant to use the defense of recoupment to resuscitate a time-

barred claim and reduce the amount of damages that a plaintiff recovers." *Terramar Retail Centers, LLC v. Marion #2-Seaport Tr.*, No. CV-12875 (VCL), 2019 WL 2208465, at *20 (Del. Ch. May 22, 2019); *see also Claros Diagnostics, Inc. S'holders Representative Comm. through Goldberg v. OPKO Health, Inc.*, No. 2019-CV-0262 (SG), 2020 WL 829361, at *8 (Del. Ch. Feb. 19, 2020). But MoneyLion concedes that the MIPA would limit its ability to invoke a recoupment defense because it provides that an escrow account and "claims against the R&W Policy" are the "sole and exclusive sources of indemnification from which [MoneyLion] may recover Losses pursuant to" the relevant sections of the MIPA and that any such claims are deemed to be "satisfied" by the amount remaining in the escrow fund and by submission of a claim to the representations and warranties insurer. Trial Tr. 1370; MIPA § 8.08(b).[10]

Despite the foregoing, MoneyLion invites the Court to look to "the policy underlying recoupment" to excuse its performance under the MIPA — namely, payment of the earnouts — based on the Sellers' material breach. Trial Tr. 1370. The Court declines the invitation. For one thing, this argument is simply recoupment by another name and, even if the defense were not otherwise limited by the MIPA, the Court is skeptical that MoneyLion could meet the requirements for the "narrow exception" allowing invocation of otherwise time-barred claims. *Terramar Retail Centers*, 2019 WL 2208465, at *20; *see Finger Lakes Cap. Partners, LLC v. Honeoye Lake Acquisition, LLC*, 151 A.3d 450, 454 (Del. 2016) ("[G]reat care should be used before allowing a party to assert a stale claim as a basis to reduce its liability for a judgment in a suit brought by a party asserting timely claims."). In addition — and as MoneyLion acknowledges, Trial Tr. 1370 — the MIPA is explicit about the remedies available to

---

[10]    MoneyLion recovered $6.5 million from its representations and warranties insurer, DUAL, based on the alleged breach of Section 3.06. Trial Tr. 1369.

MoneyLion for the Sellers' breach of a representation and warranty, and those remedies do not include vitiating or reducing MoneyLion's obligation to pay the earnouts.  By contrast, those remedies are expressly allowed for a breach of a "Fundamental Representation," such as one concerning the Sellers' authority to enter into the MIPA.  MIPA §§ 3.01(a), 8.01.  The Court cannot rewrite the parties' agreement to provide MoneyLion a remedy for which it did not bargain.

## B.  The Sellers' Breach Claims

In short, MoneyLion's arguments concerning fraudulent inducement and breach on the Sellers' part fail.  It follows that MoneyLion can be held to its obligations under the MIPA and related agreements.  The Sellers allege MoneyLion breached those obligations in a few different ways.  The gravamen of their claims is that MoneyLion should have paid them the maximum number of shares for both the 2021 Earnout and the 2022 Earnout and that MoneyLion is also breaching the MIPA, the RRA, and various RSAs by restricting the Sellers' access to their shares from the Closing Stock Payment and the 2021 Earnout that have already vested.

The parties' core dispute underlying these claims turns on the meaning of Schedule B of the MIPA.  MoneyLion claims that it requires the earnouts to be calculated using GAAP principles, while the Sellers argue that Schedule B requires the use of Malka's historical revenue-recognition principles, which allowed revenue to be recognized at invoicing.  The Court agrees with the Sellers.  Notably, until the eve of this lawsuit, MoneyLion appeared to agree with Sellers as well.  The best evidence of that, discussed further below, is the 2021 Earnout Statement, in which MoneyLion itself calculated Malka's revenue and EBITDA using Malka's historical revenue and expense recognition principles, and not GAAP, even though MoneyLion had already determined that over $1 million of Malka's revenue for 2021 needed to be adjusted

in order to comply with GAAP and ASC 606 for MoneyLion's own GAAP-compliant

consolidated 2021 financial statement.  Moreover, contemporary and subsequent

communications between MoneyLion employees confirmed their understandings that the

earnouts were to be calculated based on Malka's "historical accounting principles," not GAAP.

### 1.  The Restrictions on Vested Shares

The Sellers' first claim of breach concerns the shares that MoneyLion had already issued

to them in connection with the Closing and the 2021 Earnout.  In each instance, MoneyLion had

previously accepted its obligation to make the payments contemplated in the MIPA to the Sellers

and actually made the requisite payments.  *See* Sellers PFF 87-89, 118-20, 149-50.  When the

Sellers later attempted to access their shares, however, Continental informed them that

MoneyLion had placed a "stop order" on the shares.  PX318.

The Court need not spill much ink to explain why the Sellers prevail on both points.

First, MoneyLion's arguments for why the Sellers should not be entitled to their shares from the

Closing rely entirely on its fraud, misrepresentation, and breach claims rejected above.  *See*

MoneyLion PFF 107-110.  Second, it is undisputed that, applying Malka's historical accounting

principles, Malka hit the revenue and EBITDA targets for the 2021 Earnout.  In light of the

Court's rulings above, that alone settles the matter.  But in any event, MoneyLion's arguments

regarding the 2021 Earnout fail for an independent reason.  MoneyLion delivered the 2021

Revenue and EBITDA Statement on which the 2021 Earnout calculation was based to the Sellers

on March 15, 2022.  JX083.  Under Section 2.06(b)(iii) of the MIPA, the Sellers then had thirty

days to object.  When that period expired without objection, MoneyLion's determination that the

Sellers had met the revenue and EBITDA targets was "deemed final" pursuant to the MIPA's

terms.  MIPA 2.06(b)(iii).  MoneyLion's argument (which it all but abandoned during closing

argument, *see* Trial Tr. 1346) that this provision only limited *the Sellers'* ability to contest the earnout calculation and did not affect MoneyLion's ability to do the same is baseless. Although the MIPA only addresses the Sellers' right to object during the thirty-day period, that is because the Statement itself is prepared and proposed by MoneyLion. Moreover, nothing in the provision stating that the Statement will be "deemed final" limits its effect to the Sellers. In short, despite MoneyLion's post hoc arguments, the Sellers were entitled to the 2021 Earnout.

Both the RRA that the parties executed when they were entering into the MIPA and the RSAs that they entered into with each group of shares prohibit MoneyLion from unreasonably restricting the Sellers from transferring their shares. MIPA 119 ("[T]he Restricted Shares . . . shall not be transferred without the prior written consent of [MoneyLion], which shall not be unreasonably withheld, conditioned or delayed."); *id.* at 131 ("[MoneyLion] further covenants that it shall take such further action as any Holder may reasonably request . . . to enable such Holder to sell shares of Common Stock held by such Holder."). It therefore follows that the Sellers are entitled to judgment on their claim that MoneyLion breached the MIPA, the RRA, and the applicable RSAs by refusing to lift the restrictions on all already-vested shares.

## 2. The 2022 Earnout Shares

That leaves the shares to which the Sellers argue they are entitled in connection with the 2022 Earnout. MoneyLion concedes that Malka met the revenue threshold for the 2022 Earnout, JX106-A, but contends for various reasons that Malka's EBITDA fell short. Notably, that position contradicts Basdekis's initial calculations with respect to the 2022 Earnout on MoneyLion's behalf, which concluded that the Sellers had earned the full 2022 Earnout. PX291. Using Malka's historical revenue recognition principles, he calculated Malka's revenue for 2022 as $42,506,536 (well more than the $30 million threshold for the Earnout) and its EBITDA as

$1,492,713 (well more than the $100,000 threshold). *See id.* That did not even include the New Jersey tax credit of $1,590,603 — which, if included, would make Malka's EBITDA almost $3 million more than the amount required for the 2022 Earnout.

The Statement MoneyLion delivered to the Sellers deviated from Basdekis's calculations in several ways. *See* DX312. First, it omitted the tax credit, effectively cutting EBITDA for earnout purposes in half. Second, it adjusted both revenue and EBITDA to account for GAAP; this, combined with the excluded tax credit, yielded a baseline EBITDA of -$849,599. Third, it reduced EBITDA by $762,670 based on Malka's "double count of retained teams" and bonuses for Malka employees. Fourth, it reduced revenue (and EBITDA) by $1,242,248 based on the MIPA's provision stating that revenue would "include the difference between the fair market value" of services Malka provided to MoneyLion and what Malka actually charged MoneyLion for those services — based on MoneyLion's conclusion that Malka had overcharged it for services in comparison to what it charged other customers. Fifth, it increased EBITDA by $134,109 to adjust for "losses for write offs." Finally, it reduced EBITDA by $58,438 to account for MoneyLion's legal team's work on "Malka-related contract negotiations." MoneyLion's final calculation was that Malka's EBITDA for the 2022 Earnout was -$2,778,845. At trial, MoneyLion's expert, Louis Dudney, testified that Malka's EBITDA was even lower than that — namely, -$3,789,617 — based on his team's analysis of timecards, statements of work, and invoices. Dudney Aff. ¶ 57.

By and large, the Court agrees with the Sellers that Basdekis's initial calculations were the correct ones — and that MoneyLion's later adjustments were inappropriate. First and foremost, for the reasons discussed above, the 2022 Earnout should have been calculated based on Malka's historical revenue and cost recognition principles, not GAAP. That difference alone

increases Malka's 2022 EBITDA to -$52,495, if starting from the baseline of MoneyLion's original Statement, or to -$958,277, if starting from Dudney's calculation.

Next, the Court agrees with the Sellers that, per the MIPA's plain terms, the New Jersey tax credit for which Malka applied in 2022 should have been included in its 2022 EBITDA. The MIPA provides that "EBITDA shall include the expected recognition of the New Jersey Digital Media Tax Credit . . . in the period in which the Tax Credit was applied for." MIPA 83. "By way of illustration," it continues, "the Tax Credit applied for in 2021 was for services provided by the Company for 2019. The Tax Credit would be added to 2021 EBITDA." *Id.* Consistent with this provision, the $890,904 tax credit for which Malka had applied in 2021 was included in the calculation of Malka's EBITDA for the 2021 Earnout, even though it was not paid out that year. PX177; JX069; JX082; JX083. In 2022, Malka applied for the same tax credit, this time in the amount of $1,590,603; it was preliminarily approved on February 8, 2023. PX263, at 3; PX298, at 1. MoneyLion now argues that the MIPA's use of the phrase "expected recognition" means that the tax credit could only be counted towards EBITDA once it was "realizable," Dudney Aff. ¶¶ 72-73, meaning, in essence, certain to be paid. But as noted, that post hoc argument is flatly inconsistent with how MoneyLion itself calculated EBITDA for the 2021 Earnout, and the parties expressly agreed in the MIPA that the 2021 and 2022 Earnouts were to be "calculated using substantially consistent methods and practices." MIPA § 2.06(b)(i). MoneyLion included the tax credit in the 2021 Earnout EBITDA calculation despite the fact that it was only approved "on an initial basis" in 2021, Dudney Aff. ¶ 73, and was not actually paid until two years later, Trial Tr. 934. MoneyLion's newfound argument also makes little sense in the context of the provision as a whole. Instead, the only reasonable interpretation of the MIPA

is that the amount of tax credit that is "expected" should be counted towards EBITDA "in the period in which the Tax Credit was applied for."

Given that the credit applied for in this case was $1,590,603 (the same amount that was preliminarily approved a few months later) that means that $1,590,603 should have been credited to Malka for its EBITDA for 2022.  Together with the adjustment based on accounting principles discussed above, that would increase Malka's 2022 EBITDA to either $1,538,108 (starting with MoneyLion's Statement as the baseline) or $632,326 (starting with Dudney's calculation as the baseline).  In either case, these two changes alone are enough to conclude that the Sellers are entitled to the full 2022 Earnout.

The Court could stop there, but for the record it concludes that some of MoneyLion's other adjustments were also inappropriate.  For one, its adjustment for the "fair market value" of services Malka provided to MoneyLion was unwarranted.  According to MoneyLion, when it calculated Malka's markup for services provided to its other customers, the markup was 42.2%.  But when MoneyLion looked at Malka's markup for services provided to MoneyLion, the markup was 88%.  Torossian Aff. ¶ 66.  MoneyLion therefore reduced Malka's revenue and EBITDA by $1,242,248 to account for what Malka's revenue would have been if it had charged MoneyLion a fair price.  *Id.*  As the Sellers' expert Jennifer Larson pointed out, however, MoneyLion's math is wrong.  The calculations on which this reduction is based are in a spreadsheet, which was prepared by Mark Torossian, MoneyLion's Chief Accounting Officer.  JX119-A.  The spreadsheet calculates Malka's markup on services it provided other companies as 42.2%, and Malka's markup on services it provided MoneyLion as 88%.  *Id.*  But the spreadsheet does the first calculation as revenue minus cost divided by *revenue* and the second as revenue minus cost divided by *cost*.  Larson Aff. ¶ 173.  Aligning the two calculations by doing

both as revenue minus cost divided by revenue yields a much less striking result: Malka's markup to its other customers was 42.2%, and its markup to MoneyLion was 46.8%, only marginally higher.  *Id.*[11]  MoneyLion's adjustment to Malka's EBITDA based on the two divergent calculations is therefore unwarranted.

Nor is the Court convinced by MoneyLion's justification for its related $218,170 adjustment for "double count of retained teams."  DX312.  As Dudney explained, MoneyLion made this adjustment "because various employees on the retained team" that was assigned to work on MoneyLion's projects at Malka "were not in fact completely dedicated to MoneyLion." Dudney Aff. ¶ 83.  In other words, because those employees also did work for other Malka clients, but their salaries were charged to MoneyLion, MoneyLion discounted Malka's revenue so it could not benefit twice from those employees' time.  At trial, Torossian testified that the retained teams were "always defined" to be "solely dedicated to MoneyLion" and that MoneyLion was "told . . . by the Malka team that" certain employees "were hired into Malka 100 percent to work on MoneyLion projects only."  Trial Tr. 711-12.  But MoneyLion fails to cite any agreement in the record that employees would be "retained" by MoneyLion; instead, the parties agreed that Malka would provide certain *services* to MoneyLion.  *See, e.g.*, PX210, at 11 ("Client agrees to compensate MMG $16522000 Fee for the services described above in Exhibit A.").  In other words, MoneyLion agreed to pay for services, not people — and MoneyLion does not claim that it did not receive the services it was promised.  *See* Larson Aff. ¶ 108-09.  In any event, even if MoneyLion had contracted for certain employees' undivided attention, there is no provision in the MIPA — which details the adjustments that should be made to revenue and

---

[11]    At trial, MoneyLion tried to salvage its argument by offering another way of calculating the fair market value adjustment, but the Court rejected it as untimely.  *See* Trial Tr. 1250.

EBITDA to calculate the earnouts — calling for an adjustment based on retained teams.  There is thus no basis, contractual or factual, for MoneyLion to claim Malka's revenue and EBITDA were overstated because of how it charged for those employees' time or services.

Although the issue is closer, the Court also agrees with the Sellers that the $529,500 adjustment for bonuses was inappropriate.  The MIPA required MoneyLion to "operate . . . [Malka] substantially in accordance with the operating and revenue budget" for the period "from January 1, 2022 and through December 31, 2022."  MIPA § 2.06(d).  The attached budget only included $15,000 for bonuses.  *Id.* at 113-14; Larson Aff. ¶ 100.  Dudney's rejoinder that the total compensation Malka budgeted for 2022 was still $2 million more than what was spent, *see* Dudney Aff. ¶ 80, is unconvincing.  Given that the budget broke down compensation into its component parts, MoneyLion was required to operate Malka substantially in accordance with the budget as to each of those parts.  Paying over thirty times the budgeted amount for bonuses does not meet that standard by any measure. [12]  Nor, for that matter, does it comply with MoneyLion's obligation not to "take any action intended to interfere with or frustrate the Seller Members' opportunity to receive the . . . 2022 Earnout Payment," *id.* at 22; MIPA § 2.06(d), especially given evidence in the record suggesting that MoneyLion had that very goal in mind when it made the bonus payments, *see, e.g.*, JX098, at 4 (Slack thread between Nuno and Torossian discussing

---

[12]      Granted, the MIPA is not entirely clear on how and which bonuses should be accounted for in Malka's EBITDA calculations.  For example, Schedule B stipulates that EBITDA "shall include the base salary paid to Jeff Frommer and Louis Krubich, but shall not include the bonus or incentive compensation paid to Jeff Frommer and Louis Krubich for 2021 only."  MIPA 83.  That seems to suggest both that there could be bonuses paid to Frommer and Krubich after 2021 — e.g., in 2022 — that would be included in EBITDA (which, the Court can assume, might have been contemplated to exceed $15,000) and that those bonuses could be decided at the MoneyLion corporate level.  Still, the Court bases its conclusion on the MIPA's affirmative statement that bonuses cannot exceed the specific amount listed in the budget, MIPA § 2.06(d), rather than drawing inferences from ambiguous omissions.

possible EBITDA adjustments for the 2022 Earnout including accrual of bonuses).[13] Eliminating MoneyLion's adjustment for bonuses puts Malka's EBITDA even further above the 2022 Earnout threshold, whether MoneyLion's Statement or Dudney's calculation is used as the baseline.

The Court does agree that MoneyLion was justified in making a $163,302 adjustment based on MoneyLion's 401(k) match of 4% that was applied to Malka employees, which was an increase from Malka's previous match of 1%. Larson Aff. ¶ 78-79. The Sellers offer no evidence that MoneyLion's preexisting 401(k) match policy was intended to frustrate the Sellers' ability to receive the 2022 Earnout payment, and the 4% match also does not conflict with the 2022 budget that was attached to the MIPA. The Court therefore sees no reason to conclude that the adjustment was inappropriate. The same reasoning supports MoneyLion's $150,000 adjustment for severance payments, which were related to Malka employees that were let go during 2022. Although Larson argues that this adjustment conflicts with Malka's historical principles, the record shows multiple severance agreements with post-separation pay from before the acquisition. *See, e.g.*, DX525. Finally, the MIPA also allows for the deduction of $58,438 for the legal services Malka accepted from MoneyLion's lawyers. *See* Dudney Aff. ¶¶ 84-87. Although Larson argues that these should be excluded based on the MIPA's provision stating that "EBITDA shall not include overhead or costs allocable to [Malka] by [MoneyLion]," MIPA 83, she provides no basis to classify legal costs as "overhead." Nor is the Court persuaded by her

---

[13]    As Dudney points out, the MIPA's noninterference clause arguably did not apply after December 31, 2021. *See* ECF No. 140-3, at 13-14. Regardless, "an implied covenant of good faith and fair dealing is engrafted upon every contract," and it "requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985). MoneyLion's actions with respect to including the bonuses in its calculation of EBITDA cannot be reconciled with that obligation.

argument that MoneyLion's in-house counsel's failure to track time to specific projects means that no costs can be attributed to them at all. The record establishes — and Malka does not refute —that MoneyLion's lawyers did advise Malka on various projects, *see*, *e.g.*, JX119-A, and the Sellers do not offer an alternative way to value those lawyers' time.

In sum, the Court agrees that $371,740 of MoneyLion's adjustments to Malka's revenue statement were appropriate in calculating the 2022 Earnout. But that still leaves over $2.7 million of EBITDA, which is more than $2.6 million over what was required for the Sellers to achieve the 2022 Earnout. The Sellers are therefore entitled to the full value of the 2022 Earnout, and the Court concludes that MoneyLion breached the MIPA when it failed to issue shares in connection with that Earnout as the MIPA requires.

## C. Remedy

That leaves the question of remedies for MoneyLion's breaches. Significantly, Section 9.12 of the MIPA provides that "[t]he Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity." MIPA § 9.12. Ordinarily, that might be the end of the matter; here, however, it is only the beginning. Section 9.12 notwithstanding, the Court concludes, for the reasons that follow, that the Sellers should not be granted the equitable relief of specific performance in light of the unclean hands doctrine. Instead, the Court awards the Sellers damages to compensate for MoneyLion's restriction on the Sellers' access to the shares that were issued to them in connection with the Closing and the 2021 Earnout and for MoneyLion's failure to issue shares or pay cash in connection with the 2022 Earnout.

The Court first addresses why damages are the appropriate remedy despite the plain language of Section 9.12 and then turns to how the Sellers' damages should be calculated.

### 1. Specific Performance Versus Damages

The remedy inquiry begins, once again, with the question of what law applies. Once again, the law in this Circuit on the issue is not entirely pellucid. On one hand, the generally accepted rule is that, "when forum state law defines the underlying substantive right," it also "governs the availability of [] equitable remedies . . . [like] specific performance." *Bangkok Crafts Corp. v. Capitolo di San Pietro in Vaticano*, No. 3-CV-15 (RWS), 2005 WL 1595283, at *5 (S.D.N.Y. July 6, 2005) (quoting 14 Wright & Miller, Fed. Prac. & Proc. § 4513 (2d ed.1996)). On the other hand, in *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800 (2d Cir. 1981), the Second Circuit endorsed a contrary rule, to wit that "[s]tate law does not govern the scope of the equity powers of the federal court; and this is so even when state law supplies the rule of decision." *Id.* at 806.

For several reasons, however, the Court will follow the generally accepted rule and look to Delaware law. First, *Perfect Fit* itself was contrary to an even earlier Second Circuit decision, *Franke v. Wiltschek*, 209 F.2d 493 (2d Cir. 1953), which held that "New York law govern[ed]" the question of whether a federal court could grant an injunction, *id.* at 497. Second, the Second Circuit has cited *Perfect Fit* in only one published decision since it was decided and only then to call its holding into question. *See Genovese Drug Stores, Inc. v. Conn. Packing Co.*, 732 F.2d 286, 288 n.1 (2d Cir. 1984) (stating that "[w]hatever rule is to be derived from *Perfect Fit* and *Franke*, it does not permit a district court exercising diversity jurisdiction to ignore the federal law requirement that threatened irreparable injury be shown before a *preliminary* injunction may issue," but that the Court "express[ed] no view on . . . [whether] state law supplies the standard

in a diversity case for determining whether a threatened injury is irreparable"). Finally, the Second Circuit and courts in this District have repeatedly looked to state law to determine whether equitable remedies, including specific performance, should be available in the years since *Perfect Fit*. *See Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) (citing *Simon v. Electrospace Corp.*, 269 N.E.2d 21 (N.Y. 1971), for the proposition that "specific performance is not appropriate where the claim involves publicly traded stock"); *see also NML Cap., Ltd. v. Republic of Argentina*, 699 F.3d 246, 262 (2d Cir. 2012) (stating that, "[u]nder New York law . . . the full panoply of appropriate remedies" including specific performance "remain[ed] available"); *Nimbus Therapeutics, LLC v. Celgene Corp.*, 570 F. Supp. 3d 100, 122 (S.D.N.Y. 2021) ("Under New York law, specific performance may be ordered where no adequate monetary remedy is available and that relief is favored by the balance of the equities" (cleaned up)); *Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1 v. Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d 484, 495 (S.D.N.Y. 2018) ("Under New York law, specific performance is an equitable remedy for breach of contract."); *New Pac. Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*, No. 99-CV-2436 (DLC), 1999 WL 285493, at *4 (S.D.N.Y. May 6, 1999) ("Accordingly, the Court shall apply California law to determine whether specific performance may be granted in this case."). "Although the general rule is that a federal district court is bound by the rule of the circuit, a district court should not rely on older precedents that have been rejected in later decisions." *Bais Yaakov of Spring Valley v. Alloy, Inc.*, 936 F. Supp. 2d 272, 280 (S.D.N.Y. 2013) (cleaned up). The Court concludes that is the case with the Circuit's decision in *Perfect Fit*. Accordingly, it will look to Delaware law to determine the appropriate remedy in this case.

Under Delaware law, there is a strong presumption that specific performance clauses like Section 9.12 of the MIPA should be enforced.  *See, e.g.*, *Am. Healthcare Admin. Servs., Inc. v. Aizen*, 285 A.3d 461, 495 (Del. Ch. 2022) ("Delaware is strongly contractarian, and the presence of a provision in favor of specific performance in case of breach . . . must be respected." (internal quotation marks omitted)); *Martin Marietta Mat'ls, Inc. v. Vulcan Mat'ls Co.*, 56 A.3d 1072, 1145 (Del. Ch. 2012) (stating that Delaware courts accept parties' contractual agreements "on the existence of requisite elements of a compulsory remedy, such as the existence of irreparable harm in the event of a party's breach," and a "stipulation is typically sufficient to demonstrate irreparable harm.").  But "a court is not *required* to enforce a specific performance provision"; instead, such a clause is treated as "an important influence on the exercise of discretion."  *Aizen*, 285 A.3d at 495 (emphasis added) (quoting Dan B. Dobbs, *Handbook on the Law of Remedies: Damages — Equity — Restitution*, § 12.9(6), at 819 (1973)).  Where a party asks a court to disregard a specific performance clause, as MoneyLion does here, "the party must establish a persuasive case-specific [reason] why the clause should not be respected."  *Id.* at 496.  The equitable remedy of specific performance is also subject to equitable defenses.  *See* 14 Wright & Miller, Fed. Prac. & Proc. § 4513 (3d ed. 2025) (stating state law also governs the availability of "equitable defenses and related equitable principles and defenses").  Particularly relevant here, "invoking [a] court's equitable powers . . . open[s] the door" to assertion of some equitable defenses even to legal claims.  *Aizen*, 285 A.3d at 493.

One such equitable defense is the doctrine of unclean hands, which provides a basis to deny relief to plaintiffs "on the basis of their inequitable conduct."  *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998).  For the defense to apply, a "plaintiff's hands must be rendered unclean by reason of some conduct relating directly to the matter in controversy."

*Walter v. Walter*, 136 A.2d 202, 207 (Del. 1957); *see also In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 237–38 (Del. Ch. 2014) ("[F]or the unclean hands doctrine to apply, the inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought." (cleaned up)).  Put another way, "in applying the unclean hands doctrine, the relevant inquiry is . . . whether the nonmovant dirtied [its hands] in acquiring the right that party now asserts." *Aizen*, 285 A.3d at 494 (quoting 27A Am. Jur. 2d Equity § 25 (2022)).  If a court determines a plaintiff has unclean hands, it has "a wide range of discretion" to fashion a remedy "in refusing to aid the unclean litigant." *Id.* at 485.  In general, however, the upshot of the unclean hands defense is that "[s]pecific performance is refused" to the plaintiff who "does not come into court with clean hands" — although that plaintiff still "may be able to recover damages." *26 Cap. Acquisition Corp. v. Tiger Resort Asia Ltd.*, 309 A.3d 434, 471, 474 (Del. Ch. 2023); *see also Cook v. Fusselman*, 300 A.2d 246, 251-52 (Del. Ch. 1972) ("denying . . . leave to file a cross-claim for specific performance, but granting [] leave to file such a pleading for damages" because the defendant did not "come into court with clean hands").

Notwithstanding the Court's general agreement with the Sellers' theory of the case as summarized above, there are several points on which the Court agrees with MoneyLion that, taken together, support application of the unclean hands doctrine.  First, it is undisputed that the Sellers prepared statements of Malka's 2019 and 2020 financial performance that — whether intentionally or simply out of a stunningly cavalier attitude towards accuracy and truthfulness — were false in material respects.  They used these Financial Statements not only to obtain credit from a financial institution but also to negotiate the Project Queen transaction, which was heavily dependent on Malka's past financial performance.  True, the number from the Financial Statements on which MoneyLion was most focused — i.e., the only number that MoneyLion

used in both presentations to its board regarding the Malka acquisition, *see* DX518; PX071 —
was Malka's revenue and, even by the standard that MoneyLion stated at trial, the inaccuracy in
Malka's stated revenue was immaterial. *See* Trial Tr. 763 (Correia agreeing the standard for
materiality was generally a 5% deviation). But the Sellers and their accountant, Curran, did
nothing to verify the extent to which their statement of their own revenue was inaccurate. In
other words, they had no idea whether any difference was material or not.

Second, the Sellers did not inform MoneyLion before the execution of the MIPA of very
simple details about what Malka's actual historical revenue recognition practices were.[14] No
one disputes that, prior to the acquisition, Malka's practice was to recognize revenue in every
case at the moment that it invoiced a customer. Granted, those invoices might have sometimes
aligned with performance obligations based on a particular contract. But that was a business
practice not enshrined in — or enforceable under — the MIPA, and it was also not always the
case. By contrast, Malka's *revenue recognition* practices were central to the MIPA generally and
to the Earnouts specifically, and it is undisputed that the Sellers never explained exactly what
those practices were — even as they acknowledged amongst themselves that MoneyLion was
very invested in the language of Schedules A and B. *See* DX529 ("These principles are really

---

[14]    On this score, MoneyLion places great emphasis on text messages exchanged by the
Sellers during the negotiation period in which they stated that Malka was "not worth 50m,"
DX467, at 2, and that they should "kill the Moneylion deal" and "not embarrass ourselves,"
DX364, at 2. The Sellers credibly explained these texts as private expressions of anxiety. *See*
Trial Tr. 315-17; *see also id.* at 189-90, 262-63. In any event, "[t]he true value of any object . . .
is what one can get for it on the open market." *Barrows v. Forest Lab'ys*, Inc., No. 78-CV-1320
(PWK), 1981 WL 1642, at *3 (S.D.N.Y. May 19, 1981). Although the Sellers may have been
less than 100% forthcoming about the details of their accounting practices, it was MoneyLion
that accepted their proposed purchase price of $75 million and stuck with the deal even after its
due diligence resulted in reduction of Malka's revenue predictions by one third. JX005, at 51;
PX071, at 17-19, PX146, at 53. In other words, whether the Sellers privately believed that
MoneyLion was overpaying for Malka is neither here nor there.

important . . . [MoneyLion] said it's the MOST important thing.").  In the face of that realization, the Sellers edited Schedule A's reference to ASC 606 to say Malka's Financial Statements were prepared in accordance with its "historical revenue recognition principles, which require the Company to recognize into revenue noncancelable deposits on contracts, most of which are short-term in nature (3 months or less), and recognize the remaining revenue on such contracts as milestones are attained."  MIPA 79.  From the evidence adduced at trial, all of that is true: Malka did recognize as revenue any deposits (whether noncancelable or not) and subsequently recognize revenue based on "milestones" that sometimes corresponded to performance obligations.  But it is true only because those deposits and milestones coincided with when Malka happened to invoice its customers.  Had Malka revised Schedule A to say, for example, that Malka's historical principles "require the Company to recognize revenue when invoices are issued," all would have been clear.

Notably, Schedule A, as drafted, enabled the Sellers to give themselves a substantial advantage in achieving the Earnouts.  For example, Malka's EBITDA for the 2021 Earnout was $1,812,402 with the New Jersey tax credit, and $921,497 without it.  But that total included over $1 million — including $400,000 labeled as a "Retainer" — attributable to seven invoices sent in November and December to a single customer, Proximo Spirits, for work that Malka was to complete over the next several years.  DX464.  According to Malka's historical revenue recognition principles, this revenue was properly recognized in 2021, even though it did not constitute anything like a "noncancelable deposit."  Yet nothing in the MIPA directly alerted MoneyLion that the Sellers might sweep in large amounts of revenue that might otherwise have appeared years later to increase Malka's apparent profitability only for the years when the Sellers needed it to qualify for their Earnouts.  That is not to say, as MoneyLion contends, that Malka's

practices were "the Wild West" of accounting.  MoneyLion PFF 21; Correia Aff. ¶ 27.  There is no suggestion that Malka issued false invoices or that any of the invoices in question went unpaid.  But Malka's historical practices nevertheless enabled the Sellers to exaggerate Malka's profitability for those critical first two years after the acquisition — the only relevant years for the Earnouts — and, by all appearances, that is exactly what the Sellers did.

Third, the Sellers almost certainly misused MoneyLion's corporate funds to pay their own personal expenses, perhaps including personal legal and accounting expenses, airfare to the World Cup, trips to the Super Bowl, and family travel.  Correia Aff. ¶ 89; Torossian Aff. ¶ 46; Choubey Aff. ¶ 42; Trial Tr. 1339-40.  Granted, the record of this misappropriation was not fully developed at trial — which is perhaps why MoneyLion ultimately abandoned its related breach of contract counterclaim.  *See* ECF No. 218.  At the same time, the Sellers barely disputed that they had engaged in some misappropriation.  Frommer, for example, admitted to "los[ing] direct oversight" over certain expenses, Frommer Aff. ¶ 258, and all four maintained meekly that they would have made MoneyLion whole if or when they were confronted with the payments and that an "offset" (albeit only a "modest" one) might be appropriate on that basis, *see id.* ¶ 257; Fried Aff. ¶ 120; Capra Aff. ¶ 90; Krubich Aff. ¶ 180.  During closing arguments, the Sellers' counsel explicitly conceded that the issue might be a "ding against them in the equities column."  Trial. Tr. 1307.

Finally, the Court finds incredible Frommer's testimony — in his deposition and at trial — that he was ignorant of basic accounting concepts generally and Malka's accounting practices in particular.  For example, Frommer repeatedly insisted at trial that he did "not know exactly what [Malka's] revenue recognition practices were."  Trial Tr. 148-49.  But communications from the period around the execution of the MIPA make it impossible to credit this professed

ignorance.  *Compare* Trial Tr. 156 ("Q: And since you don't know what cash-basis accounting is, and you don't know what accrual-basis accounting is, you don't know what the difference is between cash versus accrual, right?  A. I do not."), *with* DX363 (text message in which Frommer says, in connection with the 2021 Earnout, "Cash basis vs. accrue also matters most.  So it's not just when we get the cash, but when we book the rev").  Relatedly, in his testimony at trial, Frommer plainly minimized his role in creating the projections of Malka's future financial performance that the Sellers sent to MoneyLion before the acquisition.  *Compare* DX604 (Slack message with Frommer telling Basdekis to add in EBITDA projection for 2024 "at 24.7%"), *with* Frommer Aff. ¶ 39 ("Mr. Basdekis took the lead in preparing these figures for inclusion in the June 2021 Pitch Deck.").  In short, the Court declines to credit some aspects of the Sellers' account of what they knew and said in the negotiation process for the MIPA.

Even taken together, the foregoing does not rise to the level of fraud or breach of contract for the reasons stated above.  But to justify application of the unclean hands defense, conduct "does not need to be of such a nature as to be punishable as a crime or as to justify . . . legal proceedings."  *New Start Holdings, LLC v. Zhou*, No. 2019-0831-MTZ, 2024 WL 4039440, at *15 (Del. Ch. Sept. 4, 2024), *judgment entered*, (Del. Ch. 2025) (cleaned up).  And the record makes plain that the Sellers, even if they did not directly lie to MoneyLion during the negotiation process for the MIPA, were less than entirely forthcoming.  Nor were they entirely forthcoming in their testimony before this Court.  *See, e.g.*, *Balch Hill Partners, L.P. v. Shocking Techs., Inc.*, No. CIV.A. 8249-VCN, 2013 WL 588964, at *3 (Del. Ch. Feb. 7, 2013) ("[T]he purpose of the doctrine of unclean hands is to maintain the integrity of the courts." (quotation marks omitted)); *Parfi Holding AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 933, 934 n.83 (Del. Ch. 2008) (denying unclean hands claim would "encourage other parties to play fast and loose with the

truth when speaking to [the] court"); *New Start Holdings*, 2024 WL 4039440, at *17 (unclean hands applies when party "persistently perjured herself on the stand on key precepts of her case"). The Court therefore declines to order specific performance against MoneyLion, despite the language in the MIPA selecting that remedy.

### 2. Calculation of Damages

Having concluded that damages are the appropriate remedy for MoneyLion's breach of its obligations regarding both the Sellers' already-vested shares related to the Closing and the 2021 Earnout and the unissued shares related to the 2022 Earnout, the Court must determine the proper measure of damages. Under Delaware law, damages in cases where stocks were "not delivered according to contractual or other legal obligation, or otherwise improperly manipulated," are calculated as "the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter." *Diamond Fortress Techs., Inc. v. EverID, Inc.*, 274 A.3d 287, 306 (Del. Super. Ct. 2022). In general, courts appear to have coalesced on ninety days as the "reasonable time" in which to look for the highest intermediate value. *See, e.g.*, *id.* at 308, 308 n.56; *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 20 (Del. Ch. 2003); *Segovia v. Equities First Holdings, LLC*, No. CIV.A.06C09-149 (JRS), 2008 WL 2251218, at *22 (Del. Super. Ct. May 30, 2008).

The Sellers were properly restricted from selling the shares associated with the Closing and the 2021 Earnout while they were employees of MoneyLion. *See* DX538 (stating that MoneyLion's Insider Trading Policy applied to "all members of the Malka team"). After the Sellers' employment with MoneyLion ended on May 19, 2023, *see, e.g.*, JX115, the Sellers waited until June 5, 2023, to write to Continental to begin the process of transferring shares to their brokers. PX318. Thereafter, Continental informed them that there was a stop order on their

shares and that it could not move forward without "direct instructions" from MoneyLion.  *Id.*  On June 14, 2023, the Sellers petitioned MoneyLion to remove any restrictive legends on their shares, which MoneyLion refused to do.  *See* ECF No. 9 ("Complaint"), ¶¶ 43-47.  As of that date, the Sellers were "no longer subject to MoneyLion's employee trading restrictions." MoneyLion PFF 129.  It follows that the appropriate measure of damages for MoneyLion's breach of the parties' agreements by restricting the Sellers' access to their already-vested shares is the highest closing price of MoneyLion stock during the ninety-day period beginning June 14, 2023, multiplied by the 597,093 shares that Continental was holding for the Sellers.  The parties stipulated that highest intermediate price in this period was $24.31 per share.  *See* ECF No. 198, ¶ 42.  The Sellers' damages for the Closing and 2021 Earnout are therefore $14,515,330.80.

By contrast, the Court concludes that the appropriate measure of damages for MoneyLion's breach of its obligation to issue shares or cash to the Sellers in connection with the 2022 Earnout is $25 million, which is the amount of "aggregate value" the MIPA guaranteed to the Sellers if they achieved the maximum revenue and EBITDA targets for that Earnout.  *See* MIPA § 2.06(b)(v)(B) (stating that Sellers would be entitled to "such number of shares of Parent Stock equal to an aggregate value of Twenty Five Million Dollars").  The Court reaches this conclusion based in part on the uncertainty inherent in any contrary measure of damages.  For example, the Sellers argue that their damages for the 2022 Earnout should be calculated by determining the number of shares they would have been issued based on the thirty-day volume-weighted average price ("VWAP") on an estimated 2022 Earnout Payment Issuance Date. Sellers PFF 187-89.  But neither side offers a non-arbitrary way to determine the 2022 Earnout Payment Issuance Date, which is (circularly) defined in the MIPA as "the date on which the 2022 Earnout Payment is issued."  MIPA 2.  Moreover, depending on which date the Court

selected as a 2022 Earnout Payment Issuance Date, MoneyLion might have been required to make some part of the Earnout payment in make-whole payments accompanying each tranche of vesting shares. *Id.* at 26-27. The MIPA allowed MoneyLion — in its "sole discretion" — to make any make-whole payments as "additional cash to each Seller Member" instead of "additional Parent Stock." *Id.* at 27. At trial, the Sellers presented evidence that MoneyLion would not have been able to make such a cash payment because it lacked the funds to do so. Trial Tr. 846-57. MoneyLion, on the other hand, argues that it would have been able to raise the funds through capital markets. Trial Tr. 848-49. Mindful that "[t]he amount of damages can be an estimate," *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015) (emphasis omitted), and that the "the party seeking damages bears the burden" of proving them, *Backyard Works Inc. v. Parisi*, 308 A.3d 1190, 2023 WL 7899381, at *3 (Del. 2023) (Table), the Court concludes that the Sellers' failure to justify any particular Earnout Payment Issuance Date and to provide persuasive proof that MoneyLion would have been unable to raise funds in capital markets calls for fixing damages for the 2022 Earnout at $25 million.

Additionally, however, the Court reaches this conclusion because, under Delaware law, when plaintiffs "invok[e] the court's equitable powers" by seeking an equitable remedy such as specific performance, as the Sellers do here, they "open[] the door to [the] assertion of an unclean hands defense" even against their legal claims. *Aizen*, 285 A.3d at 493; *see id* ("[A] defense of unclean hands is generally unavailable to defeat a legal claim, but becomes available if the plaintiff seeks equitable relief."); *see also, e.g.*, *Rsrvs. Dev. LLC v. Severn Sav. Bank, FSB*, No. CIV.A. 2502-VCP, 2007 WL 4054231, at *19 (Del. Ch. Nov. 9, 2007), *aff'd*, 961 A.2d 521 (Del. 2008) (providing that a party's "recovery . . . [can] be limited by the Court's finding that it acted . . . with unclean hands"). And, as noted, once a court determines that a plaintiff has

unclean hands, it has "a wide range of discretion" to fashion a remedy. *Aizen*, 285 A.3d at 485. Here, the MIPA guaranteed the Sellers $25 million if they achieved the 2022 Earnout — as the Court has concluded they did — but the damages calculations they press would allow them to recover between two and three times that amount. Given the Court's conclusions above regarding the Seller's own misconduct, it declines to approve that kind of windfall.

### 3. Attorney's Fees and Costs

Finally, each side seeks attorney's fees and costs under the MIPA. For its part, MoneyLion invokes the MIPA's provision that the Sellers are required to "promptly pay or reimburse [MoneyLion] for, any and all Losses sustained and incurred" from "any inaccuracy in or breach of a representation or warranty made by [Malka]" in the MIPA or "any Fraud-Type Claim with respect to the [Malka]." MIPA § 8.03(a), (f). The Sellers invoke a competing provision stating that MoneyLion must "indemnify, defend and hold harmless" the Sellers "from and against, any and all Losses sustained or incurred" by the Sellers "resulting from . . . any breach of a post-Closing covenant, agreement or obligation made by the Buyer" in the MIPA. *Id.* § 8.05(b). In either case, "Losses" are defined to include "reasonable attorneys' fees[,] expert consultant and witness fees, and costs of investigation and expenses." *Id.* at 12. Under Delaware law, "where [a] contract contains a fee-shifting provision, [a court] will enforce that provision." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 352 (Del. 2013). It follows from that, and the Court's conclusions as to the parties' underlying claims set forth above, that the Sellers are entitled to attorney's fees and costs while MoneyLion is not. The parties shall promptly confer in an effort to reach agreement on the Sellers' attorney's fees and costs (and alert the Court if they would like a referral to the assigned Magistrate Judge or Court-annexed mediation program to facilitate agreement). Absent agreement, the Sellers shall file a motion to fix those fees and

costs, supported by contemporaneous billing records, **within thirty days of the date of this ruling**; any opposition to such a motion shall be filed **within two weeks of the motion**; any reply shall be filed **within one week of the opposition**.

## CONCLUSION

In sum, the Court concludes that MoneyLion breached the parties' agreements both when it restricted the Sellers' access to their already-vested shares and when it declined to issue shares or payments to the Sellers in connection with the 2022 Earnout. Notably, Choubey and Correia all but confessed to MoneyLion's breach when, in their December 14, 2022 call with three of the Sellers, they bemoaned that, if MoneyLion's share price recovered, they would "end up paying [the Sellers] . . . $300,000,000" for Malka and that the Sellers would "end up owning half the company." PX271, at 6-7; *see also id.* at 8 (Correia: "[W]e just can't issue that many shares. . . . [L]ike, are we breaking the agreement? Sure[.]"). Having bound itself to compensate the Sellers based on Malka's performance in 2021 and 2022 as measured by the company's own historical accounting practices, not GAAP, however, MoneyLion could not later decide to effectively rewrite the parties' agreements to align the Earnouts with its own practices in an effort to avoid paying out what it — belatedly — perceived to be a windfall.

On the other hand, the Court is not obligated to — and will not — award the Sellers multiples of the value that they themselves placed on their company, especially in light of their own questionable conduct before and during the parties' negotiations and in this litigation. Instead, the Court finds that the Sellers are entitled to (1) the $14,515,330.80 that they would have earned had they sold their already-vested shares from the Closing and the 2021 Earnout at the highest intermediate price within the ninety days after they were wrongfully prohibited from

accessing them; (2) another $25 million to fulfill MoneyLion's obligations relating to the 2022 Earnout; and (3) attorney's fees and costs in amounts to be determined.

As set forth above, the parties shall promptly confer in an effort to reach agreement on the Sellers' attorney's fees and costs (and alert the Court if they would like a referral to the assigned Magistrate Judge or Court-annexed mediation program to facilitate agreement). If the parties reach such agreement, they should confer on, and the Sellers should file, a proposed Judgment consistent with this ruling. If the parties cannot reach agreement on the Seller's fees and costs, the Sellers shall file a motion to fix their fees and costs, supported by contemporaneous billing records, **within thirty days of the date of this ruling**; any opposition to such a motion shall be filed **within two weeks of the motion**; any reply shall be filed **within one week of the opposition**. After conferring with MoneyLion, the Sellers shall then file a proposed Judgment consistent with this ruling **within one week of the Court's ruling on the Sellers' attorney's fees and costs.**

The Clerk of Court is directed to terminate ECF Nos. 134 and 139.

SO ORDERED.

Dated: September 29, 2025
      New York, New York

                                         JESSE M. FURMAN
                                 United States District Judge