UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
JEFFREY FROMMER et al.,                                                 :
                                                                        :
                                    Plaintiffs,                         :
                                                                        :          23-CV-6339 (JMF)
                 -V-                                                     :
                                                                        :          OPINION AND ORDER
MONEYLION TECHNOLOGIES INC. et al.,                                      :
                                                                        :
                                    Defendants.                         :
                                                                        :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

On November 15, 2021, MoneyLion Inc. ("MoneyLion"), a publicly traded financial

technology company, purchased Malka Media Group LLC ("Malka"), a media production and

marketing company, for a combination of cash and MoneyLion shares — some of which was to

be paid to the previous owners of Malka (the "Sellers") at the time of closing and some of which

was to be paid over the next two years if Malka met certain performance metrics.

Approximately two years after the closing, the relationship between MoneyLion and the Sellers

soured, and this litigation followed. In brief, the Sellers sued MoneyLion for breach of the

parties' contract — the Membership Interest Purchase Agreement ("MIPA") — by failing to

issue some shares to which they claim they were entitled and by freezing their access to other

shares that MoneyLion had already issued to them. On the flipside, MoneyLion accused the

Sellers of, among other things, fraud and breach of contract. Following a bench trial, the Court

found that MoneyLion had breached the MIPA. *See Frommer v. MoneyLion Technologies Inc.*,

No. 23-CV-6339 (JMF), 2025 WL 2751254, at *31 (S.D.N.Y, Sept. 29, 2025) (ECF No. 241).

The Court awarded the Sellers money damages totaling $39,515,330.80 — $14,515,330.80 for

the Closing Payment and the earnout payment due for the period ending in 2021 (the "2021

Earnout"), and $25,000,000 for the earnout payment due for the period ending in 2022 (the "2022 Earnout") — as well as their reasonable attorneys' fees and costs in amounts to be determined. *Id.* at \*35. The Court declined to order specific performance as a remedy based on its conclusion that the Sellers had "unclean hands." *Id.* at \*34.

The Sellers now move for attorneys' fees and costs, including prejudgment interest. *See* ECF No. 244; *see also* ECF No. 245 ("Pl.'s Mem."). Specifically, the Sellers seek an award of $13,144,342.45 in attorneys' fees and $1,261,862.38 in costs (through October 28, 2025), for a total of $14,406,204.83, plus applicable prejudgment interest. Pl.'s Mem. at 1. For the reasons that follow, the Court agrees that the Sellers are entitled to an award of prejudgment interest, attorneys' fees, and costs, but the Court calculates the award differently in several respects.

## DISCUSSION

The Court has already held that, pursuant to the terms of the MIPA, the Sellers are entitled to reasonable "attorney's fees and court costs." *Frommer*, 2025 WL 2751254, at \*35. MoneyLion, however, opposes the amount that the Sellers seek on two grounds. First, it contends that the Sellers are not entitled to prejudgment interest given their unclean hands and unnecessary delays in the litigation. Second, it avers that, given the Sellers' fee arrangement with counsel, they are entitled to no more than $8,061,172.20 in attorneys' fees. ECF No. 255 ("Defs.' Mem."), at 1. The Court will address each argument in turn.

### A. Prejudgment Interest

First, MoneyLion argues that the Sellers are not entitled to any prejudgment interest because of their unclean hands and the delays they caused in the litigation. *Id.* at 5. Whether the Sellers are entitled to prejudgment interest is governed by Delaware law, pursuant to which interest is generally "a matter of right." *Bell Atlantic-Delaware, Inc./Verizon Delaware, Inc. v.*

2

*Saporito*, 2007 WL 773393, at \*3 (Del. Mar. 15, 2007); *see Miller v. Trimont Glob. Real Estate Advisors LLC*, 587 F. Supp. 3d 170, 200 (D. Del. 2022) ("Prejudgment interest in breach-of-contract cases is awarded as a 'matter of right.'"). In general, "[u]nless the parties have specified another rate by contract . . . , the statutory rate of interest" — which is 5% over the Federal Reserve discount rate including any surcharge thereon — "governs." *CertiSign Holding, Inc. v. Kulikovsky*, No. CV 12055-VCS, 2018 WL 2938311, at \*29 (Del. Ch. June 7, 2018); *see* Del. Code Ann. tit. 6, § 2301 (West); *see also, e.g.*, *In re Bremerton Cellular Tel. Co. Litig.*, 328 A.3d 330, 353–54 (Del. Ch. 2024). That said, "the right to pre-judgment interest is not unqualified," and "the trial court has discretion to reduce the amount of interest due." *Bell Atlantic-Delaware, Inc./Verizon Delaware, Inc.*, 2007 WL 773393, at \*3. When assessing whether and how much prejudgment interest to award, "[t]he Court may take into consideration all of the actions of the parties and apportion fault for any delay." *Id.* at \*3; *see id.* (holding that denial of all prejudgment interest was not abuse of discretion because the prevailing party "had caused the delay in payment" due to "poor record-keeping and changes in its position"). The doctrine of unclean hands allows a Court to deny relief to plaintiffs "on the basis of their inequitable conduct." *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998).

In its Findings of Fact and Conclusions of Law ("Decision"), the Court concluded that the Sellers had engaged in serious misconduct related to their claims, including a lack of candor in the Financial Statements they had provided to MoneyLion, negotiation of the MIPA, and even in testimony, both during discovery and at trial. *See Frommer*, 2025 WL 2751254, at \*32. As a result of these conclusions, it declined to award the specific performance to which the Sellers otherwise would have been entitled under the MIPA — a ruling that substantially reduced the amount that the Sellers were awarded. *See id.* Indeed, according to their calculations, the ruling

"effectively reduced" their "recovery from about $208 million to about $39.5 million."  Pls.'

Reply 3.  MoneyLion provides no basis to penalize the Sellers further by deviating from the

statutory interest rate on the damages that the Sellers were awarded.  *Cf. Branin v. Stein Roe Inv.*

*Couns., LLC*, No. CV 8481-VCN, 2015 WL 4710321, at *8 (Del. Ch. July 31, 2015) ("[W]here a

damages claim is legal, rather than equitable, in nature, the statutory rate should be applied.").

The Court, however, declines to award compound interest.  *Partner Reinsurance Co. Ltd. v.*

*RPM Mortg., Inc.*, 604 F. Supp. 3d 121, 203 (S.D.N.Y. 2022) (observing that "it is within a

court's discretion to award compounded interest if principles of equity support doing so" and that

"[c]ompounding prejudgment interest is particularly disfavored in 'a pure contract claim'"); *see*

*also Branin*, 2015 WL 4710321, at *8 (observing that the Delaware statute upon which the

Sellers rely here "has been interpreted as providing for simple interest only").

The parties also disagree about the dates from which the interest should accrue.  Pre-

judgment interest "accumulates from the date payment was due [to] the plaintiff."  *Brandywine*

*Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011).  With regard to the

2021 Earnout, the Sellers argue that prejudgment interest on the Court's $14,515,330.80 award

should begin on June 14, 2023 — when MoneyLion refused the Sellers' request to remove the

restricted legends from the Closing and 2021 Earnout Shares.  Pls.' Mem. 17.  An award of

prejudgment interest, however, is intended "to compensate a plaintiff for the loss of use

of money."  *Chandler v. Bombardier, Inc.,* 44 F.3d 80, 83 (2d Cir. 1994); *Williams Cos. v.*

*Energy Transfer LP*, No. CV 12168-VCG, 2022 WL 3650176, at *7 (Del. Ch. Aug. 25,

2022), *judgment entered sub nom. Williams Companies, Inc. v. Energy Transfer LP* (Del. Ch.

2022), *aff'd sub nom. Energy Transfer, LP v. Williams Companies, Inc.*, 346 A.3d 1089 (Del.

2023) ("A prejudgment interest award is designed to address the lost time value of money."

(cleaned up)).  And in awarding damages for the 2021 Earnout, the Court already accounted for the appreciation in value of those shares.  *Frommer*, 2025 WL 2751254, at *34.  Specifically, the Court assumed that the Sellers would have held the shares from June 14, 2023, through September 5, 2023 — the date on which the shares reached their peak value within the ninety-day period following the breach.  *Id.*; *see Diamond Fortress Techs., Inc. v. EverID, Inc.*, 274 A.3d 287, 306 (Del. Super. Ct. 2022) (noting that under Delaware law, damages in cases where stocks were "not delivered according to contractual or other legal obligation, or otherwise improperly manipulated," are calculated as "the highest intermediate value reached by the stock between the time of the wrongful act complained of and a reasonable time thereafter").  During that period, the shares nearly doubled in value.  *See Frommer*, 2025 WL 2751254, at *34; Defs.' Mem. 9 n.7.  Calculating prejudgment interest from June 14, 2023, would therefore result in a windfall for the Sellers.  Thus, the Court will use September 5, 2023 — when the Federal Reserve Discount Rate was 5.5% APR, *see* Bd. of Governors of the Fed. Reserve Sys., *Discount Window Primary Credit Rate* [DPCREDIT], Fed. Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/DPCREDIT [https://perma.cc/9UAJ-UG44], making the Delaware statutory rate 10.5% — as the start date for calculating prejudgment interest on the 2021 Earnout.

For the 2022 Earnout, the Sellers seek interest from April 14, 2023, when, they claim, MoneyLion "made improper adjustments to the 2022 Earnout Statement to deny Sellers the earnout to which they were entitled."  Pls.' Mem. 18.  But that is not when MoneyLion would have been required to pay the 2022 Earnout pursuant to the MIPA.  In fact, in its Decision, the Court explicitly declined to determine when the 2022 Earnout would have been payable, finding that "[n]either side [had] offer[ed] a non-arbitrary way to determine the 2022 Earnout Payment

Issuance Date, which is (circularly) defined in the MIPA as 'the date on which the 2022 Earnout Payment is issued.'" *Frommer*, 2025 WL 2751254, at *31. In the absence of an identifiable breach date, Delaware courts use the date on which the lawsuit was filed to calculate prejudgment interest. *See Moon Express, Inc. v. Intuitive Machines, LLC*, 2018 WL 4972220, at *8 (D. Del. Oct. 15, 2018), *aff'd*, 788 F. App'x 117 (3d Cir. 2019); *see, e.g.*, *Ripsom v. Beaver Blacktop Inc.*, 1988 WL 32071, at *21-22 (Del. Super. Ct. Apr. 6, 1988) (using the date of the amended complaint in light of uncertainty with respect to when the plaintiff would have been entitled to payment), *aff'd*, 567 A.2d 418 (Del. 1989); Defs.' Mem. 9. The Court will therefore use the date on which the initial complaint was filed, July 21, 2023 — when the Federal Reserve Discount Rate was 5.25% APR, *see* Bd. of Governors of the Fed. Reserve Sys., *Discount Window Primary Credit Rate* (DPCREDIT), FRED, Fed. Reserve Bank of St. Louis, https://fred.stlouisfed.org/series/DPCREDIT [https://perma.cc/9UAJ-UG44], making the Delaware statutory rate 10.25% — as the start date for calculating prejudgment interest on the 2022 Earnout. ECF No. 9.

Accordingly, the Sellers are awarded prejudgment interest at the statutory interest rate, starting on September 5, 2023 for the 2021 Earnout and on July 21, 2023 for the 2022 Earnout.

**B. Attorneys' Fees and Costs**

Next, the Sellers seek $13,144,342.45 in attorneys' fees and $1,261,862.38 in costs (through October 28, 2025), for a total of $14,406,204.83. The fee request is based on three categories of fees that the Sellers claim they owe their counsel, Katten Muchin Rosenman LLP ("Katten"): (1) $228,667.95 that they owe pursuant to a May 2023 engagement letter; (2) $4,067,035.80 that they owe pursuant to an April 2024 engagement letter; and (3) $8,848,638.70 that they owe pursuant to a September 2024 agreement (the "Engagement Supplement"). Pls.'

Mem. 11-13.  MoneyLion does not oppose the request for $1,261,862.38 in costs or the first two categories of fees; thus, the only dispute concerns the fees owed pursuant to the Engagement Supplement.  Defs.' Mem. 12-13.  In MoneyLion's view, the Sellers are entitled to "no more than" $3,765,468.45 pursuant to the Engagement Supplement.  *See id.* at 13.

To understand that dispute, some background is needed.  The Sellers engaged Katten on May 11, 2023, pursuant to a standard hourly rate agreement with no discount.  ECF No. 247 ("Borenstein Decl."), at ¶¶ 6-7; ECF No. 247-1.  Later that year, Katten began to work with the Sellers to explore litigation funding options given the substantial costs associated with the litigation.  Borenstein Decl. ¶ 9.  On April 8, 2024, the Sellers entered into an agreement (the "Investment Agreement") with a litigation funder (the "Funder").  ECF No. 247-2 ("Investment Agmt.").  The Sellers and Katten simultaneously entered into a new Engagement Agreement (the "April 2024 Agreement"), which superseded the May 2023 agreement.  ECF No. 247-3.

Section 6.2.1 of the Investment Agmt. establishes a three-tiered waterfall distribution scheme governing how "Plaintiff Recoveries" are to be allocated among the Funder, the "Firm" (i.e., Katten), and the Sellers:

> (a) *First*, 100% of the Plaintiff Recoveries to Funder until Funder has received the sum of (i) the Funding Cap plus (ii) items (b) through (f) of the definition of Investment; then
>
> (b) *Second*, 100% of the remaining Plaintiff Recoveries to Funder and Firm [Katten], pari passu and pro rata, until (i) Funder has received, in addition to the amount it received pursuant to Section 6.2.1(a), 1.0 times its Investment if received by June 30, 2025, which amount shall increase by an additional 0.25 times on the first day of each calendar quarter thereafter starting with July 1, 2025 (i.e., 1.25 times its Investment if received by September 30, 2025), up to a cap of 3.0 times the Funder's Investment, and (ii) Firm has received the 35% deferred portion of its fees corresponding to the fees Funder paid to Firm (at 65% of

Firm's standard rates) in accordance with the terms of this Agreement and the Engagement Letter; then

(c) *Third*, (i) 95% of the remaining Plaintiff Recoveries to Plaintiffs, to be shared with [Katten] in accordance with the Engagement Letter, and (ii) 5% of the remaining Plaintiff Recoveries to Funder.

Investment Agmt. § 6.2.1 (emphasis in original).  The Investment Agreement defines "Plaintiff Recoveries" as "any and all consideration and value received by or on behalf of any [Seller], or which any [Seller] is entitled to receive, in connection with the Litigation [in this matter]," including, among other things, damages, as well as interest, "attorneys' fees [and] costs." Investment Agmt. § 1.1 at 8.  The Investment Agreement specified that the Funder would fund up to an aggregate of $3 million for attorneys' fees (billed at 65%) and costs (billed at 100%), which was defined as the "Funding Cap."  *Id.* §§ 5.1, 5.2.2, 5.3.

On September 9, 2024, with the $3 million Funding Cap nearly met, Katten and the Sellers entered into the Engagement Supplement to the Investment Agreement.  ECF No. 247-4 ("Engagement Supp."); Borenstein Decl. ¶ 19.  The Engagement Supplement provided that Katten would represent the Sellers on a full-contingency basis for all fees (but not costs) invoiced above the $3 million Funding Cap.  *Id.* ¶¶ 19-20.  Once Katten's invoiced fees (applying the 35% discount) and costs hit the $3 million Funding Cap, any additional fees (but not costs) that Katten billed in excess of the Funding Cap would be paid under the terms of the Engagement Supplement (the "Contingency Fees").  Borenstein Decl. ¶ 20.  As relevant here, the Engagement Supplement provides that:

In the event that the Litigation concludes by means of a judgment or a verdict and not a consensual settlement, the Contingency Fees will be repaid in an amount equal to (a) twenty-five percent (25%) of the 95% Residual of each $1.00 in excess of $25,000,000 of Plaintiff Recoveries until Katten has been repaid an amount equal to 150% of the Contingency Fees, and (b) twenty-five percent (25%) of the 95% Residual of each $1.00 in excess of $55,000,000 of Plaintiff

Recoveries until Katten has been repaid an amount equal to an additional 50% of the Contingency Fees (for a total of $200%).

Engagement Supplement ¶ 3. The Engagement Supplement specifies that "the Contingency Fees will be paid (a) from Plaintiff Recoveries (as defined in the Investment Agreement) at the same time that the Funder is paid under the Investment Agreement and (b) out of the 95% Plaintiff Recoveries allocable to the Client under Section 6.2.1(c)(i) of the Investment Agreement (the '95% Residual')." *Id.* ¶ 1 (emphasis in original). The Engagement Supplement also provides that "Plaintiff Recoveries will be calculated on a gross basis and not net of any prior payments to the Funder or to Katten under the Investment Agreement" and that "the repayment of the Contingency Fees as provided in this Supplement is in addition to the obligation of the Clients to repay to Katten of the 35% discount as provided in the Engagement Letter." *Id.* ¶ 7.

The Sellers argue that, under the terms of the Engagement Supplement, Katten is entitled to $8,020.487.75 in Contingency Fees on top of the non-contingent attorneys' fees to which they are entitled pursuant to the May 2023 and April 2024 engagement letters (which MoneyLion does not contest). Pls.' Mem. 10. The Sellers argue that the Engagement Supplement provides for a two-step process for calculating contingency fees. Pls.' Mem. 12–13. Specifically, because "Plaintiff Recovery" is defined to include attorneys' fees, the Sellers contend that any contingency fee calculated under the Engagement Supplement must be reincorporated into the "Plaintiff Recovery" amount. Significantly, MoneyLion does not dispute that the Sellers are entitled to whatever fees are owed pursuant to the Engagement Supplement. But it does dispute the Sellers' interpretation of the agreement, contending that "95% Residual" means "the amount allocable to Sellers *after* the waterfall set forth in Section 6.2.1 of the Funding Agreement." Defs.' Mem. 18 (emphasis in original). MoneyLion also asserts that the Sellers' reading of the Engagement Supplement is impossible and circular because "'Plaintiff Recoveries' — as Katten

9

drafted the term — also includes attorneys' fees, which are, of course, yet to be determined.  In other words, the Engagement Supplement drafted by Katten makes the result of the attorney's fee formula a component of the formula for determining attorney's fees."  Defs.' Mem. 14 (emphases omitted).

The Sellers have the better of the parties' dispute with respect to the meaning of "95% Residual."  Indeed, MoneyLion's argument is foreclosed by the plain language of the Engagement Supplement, which, among other things, provides that, "[b]y way of example, if Katten's Contingency Fees are $2,000,000 and the Plaintiff Recoveries in the [judgment] are $57,000,000, then Katten will be repaid $3,975,000 in Contingency Fees (i.e., $237,500 (25% of the 95% Residual) for each $1,000,000 above $25,000,000 (up to $3,500,000) plus $237,500 for each $1,000,000 above $55,000,000)."  Engagement Supp. ¶ 3.  In this example, there is no mention of the "Plaintiff Recovery" amount for the purpose of the calculation being reduced by the other funding allocations.  Additionally, the Engagement Supplement expressly provides that "Plaintiff Recoveries will be calculated on a gross basis and not net of any prior payments to the Funder or to Katten under the Investment Agreement."  *Id.* ¶ 7.  As the Sellers observe: "[B]y the time Plaintiff Recoveries reach $25 million — the threshold under the Supplemental Engagement Agreement — the Funder and Katten have necessarily already been paid the amounts due to them under steps 1 and 2 of the waterfall, so to further reduce Plaintiff Recoveries by those amounts would be double counting."  ECF No. 262 ("Pls.' Reply"), at 10.

MoneyLion's second objection has at least some traction.  On the one hand, MoneyLion is correct insofar as it objects to the Sellers' proposed calculation, which involves "a two-stage process in which their fees are first calculated by defining 'Plaintiff Recoveries' as excluding attorneys' fees . . . , coming up with a fee number, and then . . . running the calculation again."

10

Defs.' Mem. 15 (emphasis omitted); *see* Pls.' Mem. 13.  On the other hand, the fact that Contingency Fees are to be calculated based in part on the attorney's fees to which the Sellers are entitled does not make the calculation impossibly circular.  Instead, because attorneys' fees are included in the definition of "Plaintiff Recoveries," the contingency fee and the total recovery figure are interdependent variables that must be solved simultaneously through an algebraic equation — not calculated in two separate steps where the output of the first step is simply fed back into the formula.  In the Court's view, the proper formula for the Contingency Fees is the following, where R = Total Plaintiff Recoveries, C = Contingency Fees owed under the Engagement Supplement, and D = Fixed Recoveries, including Damages, Prejudgment Interest, Costs, and Attorneys' Fees owed pursuant to the May 2023 and April 2024 engagement letters, and all figures are in millions:[1]

$$R = C + D$$
$$C = (.25) * (.95)(R - 25)$$
$$\mathbf{C = .3115D - 7.787}$$

If either side objects to the Court's proposed formula, the parties shall promptly confer and submit a joint letter addressing the formula by **July 14, 2026**.

**CONCLUSION**

In sum, the Sellers' motion for prejudgment interest, attorneys' fees and costs is GRANTED as set forth above.  The parties are ordered to promptly meet and confer in an effort

---

[1]    The formula would be inaccurate if $C$ (the amount to be repaid pursuant to the Engagement Supplement) exceeded 150% of the outstanding invoiced fees or the "Contingency Fees."  Engagement Supplement ¶ 3.  But $C$ does not come close to exceeding $12,030,731.6 (which is 150% of $8,020,487.75, the amount of outstanding fees to be paid pursuant to the Engagement Supplement).  Borenstein Decl. ¶ 36.

to reach agreement on any fees and costs incurred since the Sellers' motion.  If the parties reach

an agreement, the Sellers should prepare and, after conferring with MoneyLion, file a proposed

Judgment consistent with this Opinion and Order **no later than July 21, 2026**.  If the parties

disagree with respect to the fees and costs incurred since the Sellers' motion or the Sellers'

proposed judgment, the parties shall file a joint letter describing their disagreements and

proposing next steps by **July 23, 2026**.

One final housekeeping matter remains.  The Sellers filed a motion to file redacted

versions of their memorandum of law and declaration, *see* ECF No. 243 ("Pls.' Mot. to Seal"),

which the Court temporarily granted, *see* ECF No. 250.  *See also* ECF Nos. 252, 257

(MoneyLion motion seeking leave to file excerpts of the same redacted materials in its

opposition); ECF Nos. 258, 263 (same with respect to the Sellers' reply).  It is well established

that filings that are "relevant to the performance of the judicial function and useful in the judicial

process" are considered "judicial documents" to which a presumption in favor of public access

attaches.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  The

documents at issue here, most notably the Investment Agreement and Engagement Supplement,

plainly qualify as "judicial documents."  Moreover, the strength of the presumption in favor of

public access is strong, as the documents go to the "heart" of the parties' present dispute.  *See,*

*e.g.*, *Coscarelli v. Esquared Hospitality LLC*, 18-CV-5943 (JMF), 2020 WL 6802516, at *2

(S.D.N.Y. Nov. 19, 2020).  In the face of that, the Sellers provide only conclusory assertions that

the documents contain confidential business information.  *See* Pls.' Mot. to Seal 2.  But

"conclusory statements that documents contain confidential business information are a far cry

from the particular and specific demonstration of fact showing that disclosure would result in an

injury sufficiently serious to warrant protection that is required to justify keeping the information

12

under seal." *United States v. Wells Fargo Bank N.A.*, No. 12-CV-7527 JMF, 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015) (internal quotation marks omitted); *accord NRW, Inc. v. Bindra*, 12-CV-8555 (RJS), 2013 WL 12353961, at *1 (S.D.N.Y. Oct. 24, 2013).  Accordingly, the Sellers' motion to seal the documents permanently is DENIED, although they are granted leave to redact the names of third parties, including the Funder.  The parties shall refile the documents consistent with the foregoing no later than **July 14, 2026**.

The Clerk of Court is directed to terminate ECF Nos. 244 and 252.

SO ORDERED.

Dated: July 7, 2026
      New York, New York

_____
JESSE M. FURMAN
United States District Judge

13